# IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, | **CIVIL ACTION NO. 3:19-cv-0053** |
| Plaintiffs, | |
| v. | |
| DAYBREAK, INC. dba HUBER & ASSOCIATES, | |
| Defendant. | |

## DEFENDANT'S MOTION TO EXTEND THE FACT DISCOVERY DEADLINE

COMES NOW the Defendant, DAYBREAK, INC., dba HUBER & ASSOCIATES, by and through its undersigned counsel, and hereby moves to extend the Fact Discovery Deadline and in support states as follows:

1.    Plaintiffs brought this action for alleged damages they sustained when they claim a roof failed during Hurricane Irma due to a construction defect.

2.    Defendants specifically requested information on possible insurance payments and other collateral source payments for the damages they are claiming they sustained.

3.    Plaintiffs stated in their response to interrogatories that they had none as to the claims related to Hurricane Irma. *See* Exhibit "A," *Answers to Interrogatories*.

Plaintiffs did disclose their insurer at the time Defendant performed the work which would have been more than 7 years prior to the storm.

4.    During his deposition, Thomas Friedberg admitted that he had insurance and that he entered into a settlement with the insurance company. *See* Exhibit "B," *Deposition of Thomas Friedberg,* Page 84, Line 6 to Page 86, Line 4.

5.    During his deposition, Thomas Friedberg named the wrong insurance company that he had filed suit against claiming he had a claim with Lloyds of London and underwriter, when his insurance company was Island Heritage Insurance Company. *See* Exhibit "C," *Complaint, Thomas Friedberg and Sarah Bunge v. Island Heritage Insurance Company, LTD. U.S. V.I Superior Court Case No. 0000489.* Island Heritage Insurance Company does not state on its website any affiliation with Lloyds of London. *See* https://islandheritageinsurance.com (Last accessed 5/12/2025).

6.    Plaintiffs have failed during the pendency of this case to provide any documents regarding insurance claims, engineering reports, and other related issues in this case pursuant to Fed. R. Civ. P. 16.

7.    Defendant is seeking to extend the Fact Discovery Deadline from May 7, 2025 to July 7, 2025 to allow Defendant to subpoena the records regarding Plaintiffs' insurance policies and reimbursements for damages that they should have disclosed as part of their ongoing obligation.

8.    Defendant believes it has good cause as required by Fed. R. Civ. P. 16(b)(4) to extend the deadlines due to Plaintiffs failure to disclose his insurance policies for the

property and by failing to update their Disclosures after the deposition of Thomas Friedberg.

9.     This extension will not affect any other deadlines outlined in this Court's Scheduling Order and it is not meant to delay this case going to trial.

WHEREFORE, the Defendant, DAYBREAK, INC., dba HUBER & ASSOCIATES, respectfully requests this Court enter an order granting its motion to extend the fact discovery deadline to July 7, 2025 and for any other relief this Court deems just and proper.

## CERTIFICATION OF CONFERRAL

I attest that I emailed Thomas Friedberg May 12, 2025 regarding this motion and he responded that he is not in agreement with this motion.


Date: May 20, 2025

<div style="margin-left:40%">

s/ Jeffrey C. Cosby, Esq.
Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL  34994
Telephone: 772-463-8402
Facsimile: 772-463-4820


s/ Andrew C. Simpson, Esq.
Andrew C. Simpson, Esq.
VI Bar 451
Attorney for Defendant Daybreak Inc
2191 Church Street, Ste. 5

</div>

Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone No. (340)719-3900

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that on May 14, 2025, we electronically served the

foregoing document via CM/ECF system to the parties listed below:

s/ Jeffrey C. Cosby, Esq.
Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL  34994
Telephone: 772-463-8402
Facsimile: 772-463-4820

s/ Andrew C. Simpson, Esq.
Andrew C. Simpson, Esq.
VI Bar 451
Attorney for Defendant Daybreak Inc
2191 Church Street, Ste. 5
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone No. (340)719-3900

**SERVICE LIST:**

Thomas Friedberg, Esq.
610 West Ash Street, Suite 1400
San Diego, CA 92166
tom@lawofficefb.com
Phone: 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
Attorney for the Plaintiffs

# IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, | **CIVIL ACTION NO. 3:19-cv-0053** |
| Plaintiffs, | |
| v. | |
| DAYBREAK, INC. dba HUBER & ASSOCIATES, | |
| Defendant. | |

### PLAINTIFFS' RESPONSES TO DEFENDANT'S INTERROGATORIES

PROPOUNDING PARTY    :    Defendant, DAYBREAK, INC dba HUBER & ASSOCIATES

RESPONDING PARTY    :    Plaintiffs, THOMAS F. FRIEDBERG & SARAH L. BUNGE

SET NO.    :    ONE

### PRELIMINARY STATEMENT

These responses are made solely for the purposes of, and in relation to, this action. Each answer is given subject to all appropriate objections (including, but not limited to, objections concerning competency, relevancy, materiality, propriety and admissibility) which would require the exclusion of any statement contained herein if the interrogatory were asked of, or any response were made by, a witness present and testifying in court. All such objections and grounds therefor are reserved and may be interposed at the time of trial. Plaintiff has not yet fully completed investigation of the facts relating to this case, has not fully completed discovery in this action, and has not completed preparations for trial. These answers are based only upon such information and

**EXHIBIT A**

documents which are presently available to and specifically known to responding party and they disclose only those contentions which presently occur to responding party.  It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts, add meaning to the known facts as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in and/or variations in these responses.

The following interrogatory responses are given without prejudice to plaintiff's right to produce evidence of any subsequently discovered facts which plaintiff may later recall.  Plaintiff accordingly reserves  the right to produce evidence of any subsequently discovered facts and the right to change any and all responses as additional facts are ascertained, analyses and contentions are made and legal research is completed.  The answers contained herein are made in a good faith effort to supply as much factual information and as much specification of legal conclusions as is presently known, but should in no way be to the prejudice of responding party in relation to further discovery, research or analysis.

## **GENERAL OBJECTIONS**

The  propounding  party  prefaces  the  interrogatories  with  certain  instructions  and definitions.  Objection is made to these instructions and definitions insofar as they purport to relate to persons and entities not under the control of the responding party.  Objection is further made to the entire set of interrogatories on the grounds that boiler plate definitions and instructions make the interrogatories overboard, burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  In addition, the scope of definitions and instructions causes the interrogatories to impermissibly seek information that is subject to the attorney-client and attorney

work product privileges. Objection is also made to the definitions and instructions insofar as they purport to expand the requirements of the Federal Code of Civil Procedure.

Objection is further made to the interrogatories for requiring information protected by the attorney-client privilege and the work product doctrine.

## RESPONSES AND SPECIFIC OBJECTIONS

Subject to the above preliminary statement and notwithstanding the above general objections, and without waiving those objections, plaintiff responds as follows:

## INTERROGATORY NO. 1:

What is the name and address of the person answering these interrogatories, and, if applicable, the person' official position or relationship with the party to whom the interrogatories are directed?

## RESPONSE TO INTERROGATORY NO. 1:

Thomas F. Friedberg, 1005 Rosecrans Street, Suite 202, PO Box 6814, San Diego, California 92166.

## INTERROGATORY NO. 2:

List all former names and when you were known by those names, all addresses where you have lived for the past 10 years, the dates you lived at each address, your Social Security number, your date or birth, and, if you are or have ever been married, the name of your spouse or spouses.

a.    Former names:
b.    Past addresses with dates:
c.    Social Security Number:
d.    Driver License Number:
e.    Date of Birth:
f.    Name(s) of spouse(s):

## RESPONSE TO INTERROGATORY NO. 2:

a. Not applicable.

b. Objection: The requested information is neither relevant to the subject matter nor is it reasonably calculated to lead to the discovery of admissible evidence. Further, the requested information is an invasion of Plaintiff's right to privacy. The requested information is also not proportional to the needs of the case.

c. Objection: The requested information is neither relevant to the subject matter nor is it reasonably calculated to lead to the discovery of admissible evidence. Further, the requested information is an invasion of Plaintiff's right to privacy. The requested information is also not proportional to the needs of the case.

d. Objection: The requested information is neither relevant to the subject matter nor is it reasonably calculated to lead to the discovery of admissible evidence. Further, the requested information is an invasion of Plaintiff's right to privacy. The requested information is also not proportional to the needs of the case.

e. June 3, 1958.

f. Sarah L. Bunge.

## INTERROGATORY NO. 3:

Describe in detail each act or omission on the part of any party to this lawsuit that you contend constituted negligence, breach of contract, or breach of any duty, or that was a contributing legal cause of your alleged damages.

## RESPONSE TO INTERROGATORY NO. 3:

The basis of this claim is that the contract required that cleats be installed 9 inches on center for all copper runs and this was not done on the main house, resulting in a portion of the main

house roof coming off during Hurricane Irma.  In contrast, the claims that are being litigated in the Superior Court lawsuit deal with leaks in the roofs of the gate house and garage/studio caused by other breaches of the roofing contract and different deficiencies in Daybreak's work. (Complaint at ¶¶ 10, 12)

The cleats under the main roof were not visible when Plaintiffs filed their counterclaim in the Superior Court Action in 2010.  For that reason, the latent defects in the main roof were not known to Plaintiffs at the time and were therefore not included in the Superior Court Action. Plaintiffs did not learn that Daybreak had not installed the cleats to secure the roof until Hurricane Irma peeled the copper panels from the main house roof in September 2017. As permitted by 5 V.I.C. § 32b, Plaintiffs timely filed in this Court a separate action for damages caused by the latent defects in the main house roof.

Furthermore, Plaintiffs have alleged in their Complaint facts showing that Daybreak's failure to install cleats on the main house roof was a latent defect that was not apparent by reasonable inspection prior to September 6, 2017, when Hurricane Irma exposed the defects in the main house roof.  (Complaint at ¶¶ 8, 10, 11.)  Pursuant to 5 V.I.C. § 32b Plaintiffs' action for breach of contract was timely filed after the latent defect was discovered.

**INTERROGATORY NO. 4:**

Describe each item for which you are claiming damages in this case, specifying the nature of the item, and the amount of damages you are seeking and which of the claims relate to the work of this Defendant.

**RESPONSE TO INTERROGATORY NO. 4:**

Repair/replacement of the roof of the main house due to separation of the pans which were not properly secured by the cleats as required by the contract. The cost of repair/replacement as of 2018 is contained in the documents provided in Plaintiff's Initial Rule 26 disclosures.

**INTERROGATORY NO. 5:**

List each item of expense or damage that you claim to have incurred as a result of the incidents described in the Complaint, giving for each item the date incurred, the name and business address of the person or entity to whom each was paid or is owed, and the goods or services for which each was incurred.

**RESPONSE TO INTERROGATORY NO. 5:**

The itemized cost of repair/replacement as of 2018 is contained in the documents provided in Plaintiff's Initial Rule 26 disclosures along with the persons/entities that provided the costs of repair/replacement.

**INTERROGATORY NO. 6:**

Has anything been paid or is anything payable from any third party for the damages listed in your answers to these interrogatories and if so, state the amounts paid or payable, the name and business address of the person or entity who paid or owes said amounts, and which of those third parties have or claim a right of subrogation.

**RESPONSE TO INTERROGATORY NO. 6:**

No.

**INTERROGATORY NO. 7:**

List the names and addresses of all persons who are believed or known by you, your agents, or your attorneys to have any knowledge concerning any of the allegations in the Complaint and specify the subject matter about which the witness has knowledge.

**RESPONSE TO INTERROGATORY NO. 7:**

1. Thomas F. Friedberg, c/o The Law Offices of Friedberg & Bunge, 1005 Rosecrans Street, Suite 202, PO Box 6814, San Diego, California 92166. Mr. Friedberg is a Plaintiff and owner of the property at 168 Chocolate Hole, St. John, Virgin Islands. Mr. Friedberg will testify as to the matters alleged in the Complaint and the contract with Defendant and the damage from Hurricane Irma.

2. Sarah L. Bunge, c/o The Law Offices of Friedberg & Bunge, 1005 Rosecrans Street, Suite 202, PO Box 6814, San Diego, California 92166. Ms. Bunge is a Plaintiff and owner of the property at 168 Chocolate Hole, St. John, Virgin Islands. Ms. Bunge will testify as to the matters alleged in the Complaint and the contract with Defendant and the damage from Hurricane Irma.

3. Arthur Sanders, AIA, Hoffman Architects, Inc., 2321 Whitney Avenue, Hamden, Connecticut 06518. Mr. Hoffman inspected the roof prior to Hurricane Irma and after Hurricane Irma and is expected to testify as to the pre-storm and post-storm condition of the roof, the failure to follow the contractual requirements regarding spacing of hurricane clips/cleats, the failure of the roof panels due to the improper installation of the roof clips/cleats and the costs of repair.

4. Richard Maiocio, F.J. Dahill Co., Inc., 176 Forbes Avenue, PO Box 9578, New Haven, Connecticut 06575. Mr. Maiocio inspected the roof following hurricane Irma as is expected to testify as to the post-storm condition of the roof, the failure to follow the contractual requirements regarding spacing of hurricane clips/cleats, the failure of the roof panels due to the improper installation of the roof clips/cleats and the costs of repair.

5.      Barry Huber.

6.      Employees of Daybreak, Inc., who installed the roof and include: Ron Baker;
        Micah Cady; Ralph Laverdure; Peter Laughlin; Timothy Petersen; Austin
        Schlimmer and Brandon Novak

**INTERROGATORY NO. 8:**

Have you heard or do you know about any statement or remark made by or on behalf of any party to this lawsuit, other than yourself, concerning any issue in this lawsuit and if so, state the name and address of each person who made the statement or statements, the name and address of each person who heard it, and the date, time, place, and substance of each statement.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiffs and Defendant have not communicated regarding this loss nor have they communicated after Hurricane Irma.

**INTERROGATORY NO. 9:**

State the name and address of every person known to you, your agents, or your attorneys, who has knowledge about, or possession, custody, or control of, any model, plans, plat, map, drawing, motion picture, videotape, or photograph pertaining to any fact or issue involved in this controversy; and describe as to each, what item such person has, the name and address of the person who took or prepared it, and the date it was taken or prepared.

**RESPONSE TO INTERROGATORY NO. 9:**

The individuals listed in response to interrogatory number 7 (1 through 5).

**INTERROGATORY NO. 10:**

Do you intend to call any expert witnesses at the trial of this case and if so, state as each such witness the name and business address of the witness, the witness's qualifications as an expert, the subject matter upon which the witness is expected to testify, the substance of the

facts and opinions to which the witness is expected to testify and a summary of the grounds for each opinion.

**RESPONSE TO INTERROGATORY NO. 10:**

Objection: Attorney work product privilege. The date for disclosure of experts and Rule 26 expert reports is governed by the Court's Trial Management Order.

**INTERROGATORY NO. 11:**

Have you made an agreement with anyone that would limit that party's liability to anyone for any of the damages sued for in this case and if so, state the terms of the agreement and the parties to it.

**RESPONSE TO INTERROGATORY NO. 11:**

No.

**INTERROGATORY NO. 12:**

Describe in detail all actions taken by you to prevent or correct the items complained of in this action, including all actions taken by you to mitigate your losses.

**RESPONSE TO INTERROGATORY NO. 12:**

Plaintiffs had Dahill visit the site after Hurricane Irma and temporary repairs were made to secure the roof.

**INTERROGATORY NO. 13:**

Please state if you have ever been a party, either Plaintiff or Defendant, in a lawsuit other than the present matter, and, if so, state whether you were Plaintiff or Defendant, the nature of the action, and the date and court in which such suit was filed.

**RESPONSE TO INTERROGATORY NO. 13:**

The requested information is neither relevant to the subject matter nor is it reasonably calculated to lead to the discovery of admissible evidence. Further, the requested information is also not proportional to the needs of the case.

**INTERROGATORY NO. 14:**

Describe in detail how any work performed by or on behalf of the parties was not performed according to any applicable code, law, architectural drawings, or specification(s).

**RESPONSE TO INTERROGATORY NO. 14:**

See response to interrogatory number 3.

**INTERROGATORY NO. 15:**

List the names, addresses and telephone numbers of each person who has inspected or examined the property described in your Complaint since the beginning of your relationship with the Defendant, Daybreak, Inc, and state the date of the inspection or examination, identify what was inspected or examined, whether a report was generated, whether the inspector or examiner performed any work at the property, and the result(s) of any inspection(s).

**RESPONSE TO INTERROGATORY NO. 15:**

Objection: Attorney work product privilege. Any inspections were conducted by Plaintiffs' consulting experts. The date for disclosure of experts and Rule 26 expert reports is governed by the Court's Trial Management Order.

**INTERROGATORY NO. 16:**

State whether the work performed by Daybreak, Inc was inspected by any city, county, state or other governmental official(s), and, if so, state the date of inspection, the name and address of the inspector, and state whether the work passed inspection.  If said work failed any inspection, state the specific nature of the failure.

**RESPONSE TO INTERROGATORY NO. 16:**

No.

**INTERROGATORY NO. 17:**

Please give the name and address of your principal site representative(s) primarily assigned during the course of work on the project which is the subject matter of this litigation.

**RESPONSE TO INTERROGATORY NO. 17:**

Plaintiffs were jointly the site representatives during the course of the work performed by Defendant.

**INTERROGATORY NO. 18:**

Describe in detail all communications with the parties relating to the design, construction, or demolition of the project at issue, the date of the conversation, and state the name of the representative of the party that you communicated with.

**RESPONSE TO INTERROGATORY NO. 18:**

Plaintiffs and Defendant's principal had numerous conversations prior to and during the project which have been detailed in prior discovery in the Superior Court action and are equally available to both parties. Since the date of the damage from Hurricane Irma, there have been no communications between Plaintiffs and Defendant's principal.

**INTERROGATORY NO. 19:**

Describe in detail all communications with the parties relating to alleged construction defects concerning the project at issue, the date of the communication, and state the name of the representative of the party that you communicated with.

**RESPONSE TO INTERROGATORY NO. 19:**

Plaintiffs and Defendant's principal had numerous conversations prior to and during the project which have been detailed in prior discovery in the Superior Court action and are equally available to both parties. Since the date of the damage from Hurricane Irma, there have been no

communications between Plaintiffs and Defendant's principal. Prior to the work being commenced, Defendant modified the contract and charged additional amounts to provide and install the cleats alleged above to be installed at specified intervals. The cleats were not installed pursuant to the contract.

**INTERROGATORY NO. 20:**

Have you made any claim with your insurance company for the damage to the roof that occurred during Hurricane Irma? If so, what is the claim number for the claim?

**RESPONSE TO INTERROGATORY NO. 20:**

There was not a claim for the main roof.

**INTERROGATORY NO. 21:**

What is the name, phone number, address, and any other contact information for any insurance company that insures the subject property?

**RESPONSE TO INTERROGATORY NO. 21:**

The property was insured at the time the work was performed with Island Heritage, policy number IHG54145.

**INTERROGATORY NO. 22:**

Please describe any remedial work preformed to repair the roof that was damaged during Hurricane Irma including the name and contact information for anyone who made the repairs.

**RESPONSE TO INTERROGATORY NO. 22:**

Plaintiffs had Dahill visit the site after Hurricane Irma and temporary repairs were made to secure the roof.

**INTERROGATORY NO. 23:**

What is the name and contact information for the individual or company that performed the investigation as alleged in the complaint?

**RESPONSE TO INTERROGATORY NO. 23:**

Objection: Attorney work product privilege. Any inspection was conducted by Plaintiff's consulting experts. The date for disclosure of experts and Rule 26 expert reports is governed by the Court's Trial Management Order.

**INTERROGATORY NO. 24:**

Please describe what claims you allege were covered in the Superior Court of the Virgin Islands Court Case No. ST-10-cv-716 settlement that was reached by the parties.

**RESPONSE TO INTERROGATORY NO. 24:**

Objection: Attorney work product privilege. However, without waiver, the Superior Court action consists of a claim by Daybreak that the entire bill for the roof was not paid and a counterclaim brought by Plaintiffs alleging construction defects that resulted in the roof leaking and resulting damage to Plaintiffs' home. The counterclaim is based on leaks to the roof. The claims in the Superior Court Action are limited to the two upper buildings—the gate house and the garage/studio. (Counterclaim in Superior Court Action ("Counterclaim") at ¶¶ 9, 12, 17, 20 [Document #: 12-2]. During the course of discovery, discovery responses stated that the cost of repair for three buildings was $210,000, which was based on an initial cost of repair estimate of $219,689.50. The scope of repair for this cost of repair was limited to repairing the copper roofs on the upper buildings. There was one line item for replacing caulk on the main house of $930.00.

In the Superior Court Action, after the initial cost of repair estimate was provided to Defendants, Plaintiffs' expert noted that there were cracks in some of the runs of the copper panels on the main house and a report was submitted to include a cost of repair of additional areas of the roof. These cracks are not the same as the separation of copper panels that were supposed to be held in place with cleats as alleged in the present lawsuit.

**INTERROGATORY NO. 25:**

Please provide an explanation of how the claims filed in this action differ from the claims filed in Virgin Islands Court Case No. ST-10-cv-716.

**RESPONSE TO INTERROGATORY NO. 25:**

Objection: Attorney work product privilege. However, without waiver, the Superior Court action consists of a claim by Daybreak that the entire bill for the roof was not paid and a counterclaim brought by Plaintiffs alleging construction defects that resulted in the roof leaking and resulting damage to Plaintiffs' home. The counterclaim is based on leaks to the roof. The claims in the Superior Court Action are limited to the two upper buildings—the gate house and the garage/studio. (Counterclaim in Superior Court Action ("Counterclaim") at ¶¶ 9, 12, 17, 20 [Document #: 12-2]. During the course of discovery, discovery responses stated that the cost of repair for three buildings was $210,000, which was based on an initial cost of repair estimate of $219,689.50. The scope of repair for this cost of repair was limited to repairing the copper roofs on the upper buildings. There was one line item for replacing caulk on the main house of $930.00.

In the Superior Court Action, after the initial cost of repair estimate was provided to Defendants, Plaintiffs' expert noted that there were cracks in some of the runs of the copper panels on the main house and a report was submitted to include a cost of repair of additional areas of the roof. These cracks are not the same as the separation of copper panels that were supposed to be held in place with cleats as alleged in the present lawsuit.

By: */s/ THOMAS F. FRIEDBERG, ESQ.*
THOMAS F. FRIEDBERG, ESQ.(VI#1006)
Attorneys for Plaintiffs THOMAS F.
FRIEDBERG & SARAH L. BUNGE
**THE LAW OFFICES OF FRIEDBERG &
BUNGE**
1005 ROSECRANS STREET, SUITE 202

PO BOX 6814
SAN DIEGO, CALIFORNIA 92166
TEL : (619)557-0101
FAX : (619)557-0560
E-mail : "tom@lawofficefb.com"

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of December 2024, a true and correct copy of **PLAINTIFFS' RESPONSES TO INTERROGATORIES** was e-mailed to the following:

Jeffrey C. Cosby, Esq.

Florida Bar No. 967981

Service to: eservice@wlclaw.com

Attorney for Defendant Daybreak Inc

Williams, Leininger & Cosby, P.A.

301 SE Ocean Blvd., Suite 205

Stuart, FL  34994

Telephone: 772-463-8402

Facsimile: 772-463-4820


Andrew C. Simpson

**ANDREW C. SIMPSON, PC**

2191 Church St., Ste. 5

Christiansted, VI 00820

TEL : 340.719.3900

E-MAIL :asimpson@coralbrief.com


*/s/ THOMAS F. FRIEDBERG*

**THOMAS F. FRIEDBERG**

Page 1

1           IN THE UNITED STATES DISTRICT COURT OF THE
                        VIRGIN ISLANDS
2              DIVISION OF ST. THOMAS AND ST. JOHN

3

4    THOMAS F. FRIEDBERG and SARAH L. BUNGE, )
                                             )CIVIL ACTION NO.
5        Plaintiffs,                         )3:19-cv-0053
                                             )
6    vs.                                     )
                                             )
7    DAYBREAK, INC. d/b/a HUBER & ASSOCIATES,)
                                             )
8        Defendant.                          )
     _____)

9

10                      DEPOSITION OF
11                   THOMAS F. FRIEDBERG
12                    March 17, 2025
13                      10:15 a.m.

14

15   REPORTED BY:  Gina Castro, CSR, RPR
                   Arizona CR No. 50989
16

17

18

19

20

21

22

23

     VERITEXT
24   290 West Mount Pleasant Avenue, Suite 3200
     Livingston, New Jersey 07039
25   800-567-8658

```
                                             Page 2

 1            The deposition of THOMAS F. FRIEDBERG, was taken
 2     on March 17, 2025 from 10:15 a.m. to 4:07 p.m. at
 3     Regus - Downtown Tucson, One South Church Avenue,
 4     Suite 1200, Tucson, Arizona 85701 before Gina Castro,
 5     Certified Shorthand Reporter for the State of Arizona
 6     and Registered Professional Reporter.
 7
 8                    APPEARANCES OF COUNSEL
 9     For The Plaintiffs:
10     THE LAW OFFICES OF FRIEDBERG & BUNGE
       BY: THOMAS F. FRIEDBERG
11         SARAH L. BUNGE
       1005 Rosecrans, Suite 202
12     Post Office Box 6814
       San Diego, California 92166
13     619-557-0101
       tom@lawofficefb.com
14
15     For The Defendant:
16     WILLIAMS, LEININGER & COSBY, P.A.
       BY: JEFFREY C. COSBY
17     301 Southeast Ocean Boulevard, Suite 205
       Stuart, Florida 34994
18     772-463-8402
       eservice@wlclaw.com
19
20
21
22
23
24
25
```

Page 3

```
 1                    INDEX OF EXAMINATION
 2
 3    WITNESS: THOMAS F. FRIEDBERG                   PAGE
 4    By Mr. Cosby                                   4
 5
 6                     INDEX TO EXHIBITS
 7    EXHIBIT                                        PAGE
 8    Exhibit 1  Answer, Counterclaim, Third Party Claim
                 Daybreak/Huber v. Friedberg/Bunge   149
 9    Exhibit 2  Original Complaint Daybreak/Huber v.
                 Friedberg/Bunge                     154
10    Exhibit 3  Proposal For Roofing 2-19-2010      157
      Exhibit 4  Itemization Of Goods, Art Sanders'
11               Letter, Report                      164
      Exhibit 5  Dahill Roofing Budget 5-17-2018     191
12    Exhibit 6  Hoffmann Architects Copper Roof
                 Investigation                       193
13    Exhibit 7  F&B v. Daybreak Rule 26 Disclosures
                 Series Of Photographs               201
14    Exhibit 8  Series Of Photographs               202
      Exhibit 9  Specifications                      203
15    Exhibit 10 Series Of Three(3) Photographs      203
      Exhibit 11 Main House Roof Plan Diagram        204
16    Exhibit 12 Paradigm Construction Services Document 205
      Exhibit 13 Photographs Produced By Plaintiffs'
17               Response To Production 3-8-2014     207
      Exhibit 14 E-mail From Barry Huber To Chris Bunge
18               2-8-2010                            207
      Exhibit 15 E-mail From Barry Huber To
19               Thomas Friedberg 5-19-2010          209
      Exhibit 16 E-mail From Barry Huber To Ron Barker
20               5-22-2010                           208
      Exhibit 17 E-mail From Barry Huber To
21               Thomas Friedberg 5-22-2010          208
      Exhibit 18 E-mail From Jack Burbach To Barry Huber
22               6-25-2010                           209
      Exhibit 19 Letter To Barry Huber From
23               Thomas Friedberg 7-13-2010          209
      Exhibit 20 E-mail From Barry Huber To
24               Thomas Friedberg 8-23-2010          209
      Exhibit 21 Cabinets With Mold Photographs      210
25    Exhibit 22 Gatehouse Cabinet Invoices          211
```

Page 4

1                    INDEX TO EXHIBITS CONTINUED

2    EXHIBIT                                          PAGE

3    Exhibit 23 Huber & Associates All Transactions For

                 Friedberg & Bunge                   211

4    Exhibit 24 Friedberg/Bunge Residence Documents  212

     Exhibit 25 Settlement Agreement*                212

5    Exhibit 26 Action For Damages, Breach Of Contract

                 And Demand For Jury Trial           213

6    Exhibit 27 Photographs From Hoffmann Deposition 213

7    *Retained by Mr. Cosby

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                       Page 5
 1                    THOMAS F. FRIEDBERG,
 2                having been first duly sworn,
 3             was examined and testified as follows:
 4                         EXAMINATION
 5     BY MR. COSBY:
 6         Q    Good morning.  Please state your name.
 7         A    Good morning.  Tom or Thomas Friedberg.
 8         Q    All right.  I'm going to dispense with the rules
 9     for a deposition today.  I'm sure you're comfortable
10     there.
11              All right.  As you know we're here to take your
12     deposition regarding a property in the Virgin Islands and
13     the lawsuit relating to that mainly due to roof issues;
14     is that correct?
15         A    Yes.
16         Q    Okay.  Is there any reason you can't give
17     truthful testimony today such as you're on medications or
18     sick or anything like that?
19         A    No.
20         Q    Okay.  All right.  What is your profession?
21         A    I'm an attorney.
22         Q    All right.  And of course you're representing
23     yourself and your wife in this case?
24         A    Yes.
25         Q    All right.  And where's your practice?
```

Page 6

```
 1        A     Primarily -- primarily in San Diego, California.
 2        Q     And tell me about your practice.  What kind of
 3   practice is it?
 4        A     Civil -- civil litigation, personal injury,
 5   medical negligence, maritime, products liability.
 6        Q     How long have you been practicing in the
 7   San Diego area?
 8        A     Since 1983.
 9        Q     Is that when you were admitted?
10        A     Yes.
11        Q     All right.  And you do have an office in the
12   Virgin Islands and also practice some there; is that
13   correct?
14        A     Yes.
15        Q     Okay.  Are there any other states that you
16   maintain an office?
17        A     No.
18        Q     And your Virgin Islands practice, is that also
19   the same practice areas?
20        A     Yes.
21        Q     Did you open a practice or start handling cases
22   in the Virgin Islands before purchasing this property?
23        A     No.
24        Q     Okay.  And when I say this property, tell us the
25   address -- the property at issue.
```

```
                                                    Page 7

  1        A    The physical address is 168 Chocolate Hole,

  2    St. John, Virgin Islands.   I think it's 00830 or 00831, I

  3    just don't recall.

  4        Q    Okay.   Is there a -- you said the physical

  5     address.

  6              Is there some other address associated with it?

  7        A    Well, we have a mailing address for the

  8    office --

  9        Q    Okay.

 10        A    -- there because we don't receive mail.

 11        Q    At --

 12        A    At the house --

 13        Q    Okay.

 14        A    -- in Chocolate Hole.

 15        Q    Okay.   So which came first, you started handling

 16     some cases down there or you purchased Chocolate Hole?

 17        A    We purchased the home --

 18        Q    Okay.

 19        A    -- or excuse me -- the property.

 20        Q    Okay.   And when you purchased it, was there any

 21     structures on it?

 22        A    Yes.   There was a hurricane blowdown from

 23    Marilyn.

 24        Q    Hurricane Marilyn?

 25        A    Yes.
```

Page 8

1        Q    Do you recall what year Hurricane Marilyn hit?

2        A    I think it was 1995.

3        Q    Was anything left as far as structures on the

4    property after that hurricane?

5        A    Yes.

6        Q    Okay.  Give me a description.

7        A    There was -- the footprint for the gatehouse was

8    there.  There were cisterns, and there was a storage room

9    between the cisterns.

10       Q    And when you say the gatehouse, what does that

11    mean?

12       A    Well, there's --

13       Q    Can you describe it for me?

14       A    Sure.  We built a two-bedroom, two-story,

15    two-and-a-half bath home on the footprint.  It was

16    partially expanded, but that -- we called that building

17    the gatehouse.

18       Q    Fast forwarding, how many buildings are

19    currently on the property?

20       A    I think five.

21       Q    Okay.  And can you describe them or tell me

22    how -- what you call -- refer to them as?

23       A    Sure.  There's the gatehouse, there's the

24    garage, there's the main house, there's a guesthouse, and

25    there's a beach pavilion.  And also a dining pavilion.  So

                                                              Page 9

 1   I take -- there's six, actually.

 2        Q    All right.  And is the gatehouse currently a

 3   two-bedroom, two-and-a-half bath?

 4        A    Yes.

 5        Q    How many -- two-car garage?

 6        A    Yes.

 7        Q    Describe the main house in terms of bed, bath,

 8   and square footage.

 9        A    The main house, as you enter there's a great

10   room, and there is the master bedroom on the main level.

11        Q    How many stories?

12        A    It goes down to ground.  It's really two

13   stories, but with a cistern, you could --

14        Q    Right.

15        A    -- argue it's three.

16        Q    Okay.  And how many -- how many bedrooms total?

17        A    Well, on the main level there's one master

18   bedroom.  On the lower level there's another similar --

19   it's not really a master bedroom, but it's essentially

20   the -- the same.  So really there are two bedrooms in

21   the -- the main house.

22        Q    Do you know the square footage of the main

23   house?

24        A    Not off the top of my head.

25        Q    How many baths?

```
                                                Page 10

1         A    I think there are four.

2         Q    What else is there?  I'm sure there's a kitchen?

3         A    There's a kitchen.

4         Q    Any other rooms that are used for other purposes

5    like an office or something like that?

6         A    There's a library.  This is on the -- the main

7    level.  I think that's about it.

8         Q    Okay.  How about the guesthouse?  How many beds

9    and baths?

10        A    The guesthouse is two stories, and there's a

11   bedroom/studio on each floor.

12        Q    How many bathrooms?

13        A    Two.

14        Q    And the beach pavilion, describe that.

15        A    There is an open pavilion on the upper level.

16   And on the lower level there's a bedroom with a small

17   kitchenette.

18        Q    Is that where guests would stay if you had

19   guests there?

20        A    Yes, guests have stayed there.

21        Q    Okay.  And then the dining pavilion, what is

22   that?

23        A    That's just open.

24        Q    Okay.

25        A    It's a -- on an octagon that's built -- butts up
```

Page 11

1    to the pool.

2         Q    And is it as its name suggests, where you dine?

3         A    The -- the intent is, yes, it will be a formal

4    dining room.

5         Q    Okay.  Now, are all of these different rooms or

6    structures we just went over currently functional?

7         A    Yes, they're functional.

8         Q    Okay.  Are any of them -- are any of them not in

9    complete -- strike that.

10        Have any of them -- are any of them still in the

11   process of any construction?

12        A    Yeah.  The -- the main house still has some work

13   to be done.

14        Q    Tell me about that.  What kind of work to be

15   done?

16        A    Stonework, tile work, finishes, cabinets, things

17   like that.

18        Q    Is that from the initial construction that you

19   all began on the project?  In other words, was that ever

20   finished?

21        A    I'm not sure I understand your question.

22        Q    Yeah.  You said there still has to be some stone

23   and tile work along with cabinetwork.

24        Is that to replace cabinets that existed before

25   or install cabinets that have never existed?

Page 12

1        A    The latter.

2        Q    Okay.  And is -- is there a timeline to that

3    project?

4        A    Soon.

5        Q    Okay.  I mean, is it ongoing work right now?

6        A    Yes.

7        Q    Okay.  And who's there currently working at the

8    property?

9        A    Currently I have maintenance individuals.  We

10   don't have a builder.

11       Q    Is the plan to get a builder involved?

12       A    Yes.

13       Q    To do the stone, tile, and cabinetwork?

14       A    Yes.

15       Q    Anything else?

16       A    Whatever else needs to be done.

17       Q    Has it been determined by any builder as to what

18    needs to be done?

19       A    Somewhat, yes and no.  I mean, I've met with a

20   builder.  We've have preliminary discussions.  Nothing to

21   pen and paper.

22       Q    So no estimates or quotes or anything like that?

23       A    Probably it'll be time and materials.

24       Q    Who have you had those discussions with?

25       A    Blue Bay Construction.  I think that's their

Page 13

1    name -- or Build- -- Blue Bay Builders.

2         Q    Where are they located?

3         A    St. John.

4         Q    And who is it that you've spoken to from

5    Blue Bay?

6         A    Lanny.

7         Q    And is Lanny a local?

8         A    Well, he lives on the island, yeah.

9         Q    Okay.

10        A    He's originally from Texas.

11        Q    Okay.  Anyone else you've spoken with from that

12   company?

13        A    No.

14        Q    And when's the last time Lanny has been out to

15   the Chocolate Hole address?

16        A    Probably a few months ago.

17        Q    How many times has he been there?

18        A    Oh, half a dozen, maybe.  Could be more.

19        Q    Any other builders that you've spoken to about

20   this current work that needs to be done?

21        A    No.

22        Q    Who are the maintenance individuals that you

23   referred to earlier?

24        A    Patti and Joseph.

25        Q    What's Patty's last name?

```
                                                    Page 14
 1        A     Matejka.

 2        Q     Can you spell that?

 3        A     I'll probably be off.  M-j-a-e-c-k-a [sic], I

 4    believe.

 5        Q     Is this a he or a she?

 6        A     She.

 7        Q     And Joseph, what's his last name?

 8        A     Oh, gosh, I wish I knew.

 9        Q     Okay.  Do they work together?

10        A     Yes.

11        Q     Is there a company?

12        A     No.

13        Q     And what do they do?

14        A     Patti takes care of maintenance and cleaning and

15    hauling in repair people as -- as needed and ensuring that

16    the service people such as pool people -- you know, show

17    up regularly and things like that.  Joseph does the

18    outdoor work, whatever needs to be done.

19        Q     Landscape-type work?

20        A     Landscape, irrigation, checking on the property,

21    walking the property.

22        Q     Is there a sprinkler system?

23        A     Yes.

24        Q     How long have -- let me break it down.

25              Patti, how long has she been working at the
```

```
                                                      Page 15
 1    property?
 2         A    Patti has been providing services to us for a
 3    very long time.
 4         Q    Okay.
 5         A    Over 10 years.
 6         Q    Okay.  That same type work you just mentioned?
 7         A    Yes.  She has done more the last year.  And she
 8    also does more over the summers.
 9         Q    Why is that?
10         A    Because Chris no longer lives in St. John.
11         Q    Okay.  And Chris, tell me who he is.
12         A    Chris Bunge is Sarah's older brother who stayed
13    on after construction and took care of maintaining the
14    property for us and anything else that needed to be done.
15         Q    Okay.  And when did Chris leave?
16         A    May of 2024.
17         Q    Where did he move?
18         A    I'm sorry?
19         Q    Where did he move?
20         A    To Minnesota.
21         Q    Okay.  Prior to him moving to Minnesota in
22    May -- approximately May of 2024 was he -- strike that.
23              How often was he in the Virgin Islands prior to
24    that?
25         A    He lived there.
```

```
                                                   Page 16
 1          Q    Okay.  Full-time?

 2          A    Full-time.

 3          Q    And where did he live in the Virgin Islands?

 4          A    In Gifft Hill, which is an area of the island.

 5          Q    How far was that from Chocolate Hole?

 6          A    Oh, I don't know.  Maybe a mile,

 7     mile-and-a-half.

 8          Q    Okay.  Was anyone living there with Chris?

 9          A    No.

10          Q    And what is Chris' background?  Is he a

11      contractor?

12          A    Chris, I believe, was a general contractor in

13     Minnesota.  And also did roofing as well in Minnesota.

14          Q    Do you think he was licensed in Minnesota?

15          A    He may have been, I'm not sure.

16          Q    Okay.  Did he hold any professional licenses in

17      the Virgin Islands?

18          A    No.

19          Q    Did he work when he lived there?

20          A    Lived where?

21          Q    In Virgin -- in the Virgin Islands.

22          A    Yes.

23          Q    And what did he do for work?

24          A    Chris joined the construction crew and worked in

25     building the home for a number of years.  And then took
```

Page 17

1    over and basically did project maintenance and that -- you

2    know, man- -- management and taking care of the property.

3        Q    When you say he joined the construction crew,

4    you mean regarding Chocolate Hole --

5        A    Yes.

6        Q    -- or Chocolate Hole address?

7        A    Yes.

8        Q    Were there any other properties he was working

9    on in the Virgin Islands, to your knowledge?

10       A    At times he did.

11       Q    Okay.  At the time he was -- he joined the

12   construction crew -- crew for your property at

13   Chocolate Hole was he working on any -- any other

14   properties or was it solely that one?

15       A    I believe it was just our property.

16       Q    Okay.  And can you give me the timeframe that he

17   worked at Chocolate Hole?  Not -- not as maintenance, but

18   when you said he joined the construction crew.

19       A    Sure.  I believe Chris came down in 2000 or 2001

20   and stayed there regularly.  He left for a year or two and

21   then came back.  And he would normally go back to

22   Minnesota over the summers.

23       Q    When he left for a year or two was that to go to

24   Minnesota?

25       A    Yes.

Page 18

1       Q     How old's Chris, approximately?

2       A     Seventy.

3       Q     When you said Chris joined the construction crew

4     and you were -- you meant pertaining to Chocolate Hole,

5     what construction crew was that that he joined?

6       A     The crew was being run by a gentleman known as

7     Kiwi.  Kiwi's full name is Phil Holford.  H-o-l-f-o-r-d.

8       Q     Was there a name to Phil's company?

9       A     Yeah, there was.  I think it was Evergreen or

10    Ever something.  It's a New Zealand -- it was Kiwi,

11    New Zealand -- Sarah will probably know the specific name.

12      Q     Okay.  And is that the only construction crew

13    related to Chocolate Hole that Chris worked with at

14    Chocolate Hole?

15      A     No.

16      Q     What others did he work with?

17      A     We were the owner/builders after Kiwi left, and

18    we brought in a gentleman by the name of Andy Hardesty.

19    And Andy ran the crew.

20      Q     When was it that Kiwi left the job?

21      A     These are my best estimates...

22      Q     Yeah.  All of this is best estimates.

23      A     Yeah, I understand.

24            Kiwi was there about 18 months-ish or so.

25      Q     Okay.  I'm just trying to understand.

```
                                                Page 19

 1                What years are we talking?

 2        A     2001 to 2002 to 2003-ish.

 3        Q     Okay.

 4        A     Or 2004.  Somewhere along those lines.

 5        Q     And Andy came in when?  Do you remember that

 6   date?

 7        A     About six months after Kiwi left.

 8        Q     Okay.  What's the name of Andy's company?

 9        A     I don't think Andy has a company.

10        Q     And was Andy -- where did he live at the time?

11   Was he living on the island?

12        A     Yes.

13        Q     Where's he from originally?

14        A     I'm not sure.

15        Q     Okay.  Do you know what his nationality is?

16        A     He's -- he's a U.S. --

17        Q     Okay.

18        A     -- American -- U.S. citizen.

19        Q     Is he a licensed general contractor?

20        A     At the time I don't believe he is.  I don't know

21   what his status is now.

22        Q     Do you know where he was licensed at the time he

23   was working at your property?

24        A     I -- I don't know if he was licensed.

25        Q     Okay.  So Chris worked with Phil Holford and
```

Page 20

1    Kiwi and Andy.
2           Is there anyone else that Chris worked with on
3    the property as far as construction crews?
4    A    Well, Andy pretty much ran the crew.  There were
5    other individuals -- Chris worked for us.  I'll just leave
6    it at that.  And he did certain work for those other
7    individuals as well.
8    Q    Okay.  So if I understand you correctly, when
9    Chris worked on the property he would get paid directly
10   by you all; is that correct?
11   A    He was paid initially by Kiwi while Kiwi was
12   still there.
13   Q    Right.
14   A    And thereafter we paid him directly.
15   Q    Okay.  You said Chris had some experience in
16   roofing.
17          Do you know what kind of roofing he had
18   experience in while in Minnesota?
19   A    Not really.
20   Q    Do you have any understanding as far as Chris'
21   work in Minnesota as to how much of it was residential
22   versus commercial?
23   A    I understand Chris worked on some grain
24   elevators.  I would say that's commercial.
25   Q    Okay.

1       A     I don't know if he did any other commercial

2    work.  I believe he also did residential work as well.

3    But I really don't know the full nature, scope, and extent

4    of it.

5       Q     Okay.  With regard to his residential work --

6     and you may not know the answer to this, but I want to

7     ask it anyway -- do you know if he had any particular

8     specializations?  In other words, he did mostly X, Y,

9     or Z or he did everything from the ground up in the home

10    building area?

11      A     I really don't know.

12      Q     Okay.  When Chris was working, I guess,

13    alongside Andy, that's when he was paid directly by you

14    all?

15      A     Yes.

16      Q     Okay.  So he -- Andy did not pay him; is that

17    correct?

18      A     Correct.

19      Q     Okay.  And is there anyone else that Chris

20     worked with as far as construction crews on the property?

21      A     Well, we had other individuals that were there.

22    I wouldn't go so far as to say they were -- they were

23    management versus workers, but --

24      Q     Okay.

25      A     -- a lot of the laborers were local

Page 22

1     West Indians, and then there were other individuals from

2     the states that had construction experience that were on

3     the crew.  And they all worked directly for us.

4          Q    As far as Andy's work, I know you said it was

5      approximately six months after Kiwi left.

6               How long was Andy on the project?

7          A    2009, 2010-ish.

8          Q    And then did somebody take over the project in

9      '09 or '10?

10         A    We -- Andy left the island, and the project -- I

11    don't know if anyone took over, per se, but we had an

12    individual by the name of Jonathan Doran that was there

13    while Andy was there.  And --

14         Q    Spell the last name.

15         A    D-o-r-a-n.

16              And there was a crew, about four or five

17     West Indians, that had been there since the inception and

18      stayed on with Chris managing them, for lack of a better

19      word.

20         Q    Jonathan Doran, was he -- who did he work for?

21         A    He worked for us.

22         Q    Was he just an independent --

23         A    Yes.

24         Q    -- or did he work for a company?

25         A    He worked -- no, he didn't have a company at

Page 23

1    that time.  At least to my knowledge.

2        Q    So did he stay on after Andy left?

3        A    Yes.

4        Q    But he worked at the same time as Andy as well?

5        A    Yes.

6        Q    Okay.  How long total, if you can approximate,

7    was Jonathan Doran on the project?

8        A    Till roughly 2009, 2010.  It could have been a

9    year or two later after that.

10       Q    Did someone take over at that point?

11       A    Well, we were somewhat in charge.  Chris was --

12   stayed on with a crew of four or five --

13       Q    Okay.

14       A    -- West Indians.

15       Q    Other than the four or five West Indians -- and

16   those are laborers?

17       A    Some of them had greater skills than laborers --

18       Q    Okay.

19       A    -- but -- so I'm not sure.  You say laborers.

20   I -- I don't really know what you mean.

21       Q    Okay.  I guess I mean -- you know, a lower level

22   of construction personnel versus someone calling the

23   shots.

24       A    Well, the individual West Indians were -- a lot

25   of them were stone masons, plaster people --

Page 24

```
 1        Q    Okay.
 2        A    -- things like that.  They called their own
 3   shots.
 4        Q    Okay.  Was there someone that oversaw their
 5    work?
 6        A    Well -- I mean, Chris was there, and then we
 7   would be there.
 8        Q    Okay.  When Jonathan left, other than Chris, did
 9    anyone else oversee the work or did -- did anyone else
10    get involved other than the four to five West Indians you
11    referred to?
12        A    Yeah.  We had, I think, three individual
13   carpenters, framers, and finishers that continued and --
14   and stayed on and did quite a bit of work.
15        Q    And who -- what were their names?
16        A    There was Darren.  And I really don't remember
17   the other two.  I can picture their faces, I just don't
18   remember their names.
19        Q    Okay.  Do you know Darren's last name?
20        A    It starts with a B.  I don't really -- Sarah may
21   recall, I really don't.
22        Q    Did the three carpenters work for the same
23    company?
24        A    They were all independent.
25        Q    Okay.  And were they living on the island?
```

Page 25

1        A     Yes.
2        Q     Do you know the names of any of the four to five
3     West Indians working there?
4        A     There was Thomas.  And I'm picturing them, I'm
5     just somewhat --
6        Q     Yeah.
7        A     -- stumbling at -- at their names.  It's not --
8     I can't think right now of their names.
9        Q     Out of the four to five West Indians, was any
10     one of them either in charge or appear to be calling the
11     shots or -- as to the others?
12        A     Garnett was his name, and, yes, he was the one
13     that was somewhat leading the -- the plasterers and the
14     stone folks.  And they also did concrete work.
15        Q     Garnett was the leader?
16        A     Gar- -- Garnett seemed to be the one with more
17     experience.
18        Q     Okay.
19        A     And he was the one I would communicate with.
20        Q     Okay.  He spoke English?
21        A     They call it English.
22        Q     Okay.
23        A     I don't -- you've been down in the islands.
24        Q     Yeah.
25        A     It's hard to understand sometimes, at least for

Page 26

```
 1  me --
 2        Q    Right.
 3        A    -- but they all are conversing in English.
 4        Q    Okay.  Do you speak any other languages?
 5        A    Not fluently.
 6        Q    Okay.  Any others that you recall other than
 7   Thomas or Gar- -- Garnett?  Garnet?
 8        A    No.
 9        Q    Do you know the last names of either of those?
10        A    Thomas was Guiste, G-u-i-s-t-e.  And I -- I'm
11   not sure if that's the correct spelling.
12        Q    Okay.  And that -- and you referenced four to
13    five West Indians.
14             Was that crew basically the same over the period
15    of time they worked there or are you -- are people coming
16    in and out?
17        A    Pretty much the same.
18        Q    Okay.  Why did Kiwi leave the project?
19        A    He had an 18-month contract, and he left when
20   the contract was up.
21        Q    Was that contract with you?
22        A    Yes.
23        Q    Was there any discussion about extending the
24    contract?
25        A    Yes.
```

Page 27

1    Q    And who -- who requested that?  Was it you

2    wanted him to continue on or he wanted to continue on?

3    A    He wanted to continue on.

4    Q    Okay.  And did you -- why didn't he continue on?

5    A    We wouldn't agree to his terms.

6    Q    Okay.  And what were his terms?

7    A    He wanted significantly more money.

8    Q    Where was the construction project in terms of

9    its completion when he left?

10   A    The upper buildings were done, the gatehouse,

11   the garage studio, and the beach bar was done.  And the

12   foundation was poured for the main house.  And the cistern

13   walls had been formed but not poured.

14   Q    The cistern, what is that used for?

15   A    Storing water.

16   Q    I figured, but I didn't know if it was just

17   called that or you used it from something else.

18   A    There's no municipal water there.

19   Q    Okay.

20   A    The water that is used is collected on the roof

21   and then stored in an underground cistern.

22   Q    One cistern?

23   A    We have multiple cisterns on the property.

24   Q    Okay.  How many?

25   A    There's two in the gatehouse.  There is either

Page 28

1    one or two in the guesthouse.  And the main cisterns are

2    in the main building.  And there's also a cistern off

3    the -- there's another bedroom, we call it the waterfall

4    room, and there's a -- a cistern off of that as well.

5         Q    Aside from that being the water source, is there

6     plenty of water or does it vary year to year?

7         A    We've been fortunate that we don't have to buy

8    water.

9         Q    Uh-huh.  Okay.  And it looks like a tropical

10    area, but I don't follow how much rainfall they get.  I

11    assume like south Florida they get a lot of summer

12    showers.

13           Is that generally what happens?

14       A    There is a rainy -- there is a raining -- rainy

15    season.

16       Q    Okay.  What's the rainy season?

17       A    I wish I could tell you off the top of my head.

18       Q    Okay.  But there is some period that's rainier

19    than others?

20       A    Yeah.  Usually some passing shower on a regular

21    basis, whether it drops measurable rain or not.  But there

22    are also dry periods of time when there's no rain.

23       Q    Right.  Okay.  Have you ever had periods where

24     the water level dropped to a -- to a concerning level?

25       A    Well, we've purchased water.

Page 29

```
 1        Q    Okay.
 2        A    I -- I don't know if it's concerning or not --
 3        Q    Yeah.
 4        A    -- but when it reaches a certain level --
 5        Q    Yeah.
 6        A    -- there are water trucks that are readily
 7   available.  And you just call them up, and they're there
 8   usually within a day or so.
 9        Q    And where do they obtain the water?
10        A    There is -- there are water -- there's a place
11   where they fill up in Cruz Bay.
12        Q    Okay.
13        A    And I don't know if it's from desal or -- or it
14   comes over from St. Thomas.  I -- I just don't know,
15   but --
16        Q    Okay.
17        A    -- there's big tanks in Cruz Bay.  They drive
18   under there, there's a pipe that comes out, and they fill
19   up these trucks that I think hold 3,000 or 5,000 gallons.
20        Q    Okay.  Why did Andy leave the project?
21        A    His wife wanted to leave the island.
22        Q    Do you know why?
23        A    She wanted to practice oriental medicine in
24   northern California.
25        Q    Was there a contract with Andy?
```

Page 30

```
 1        A     No.
 2        Q     Okay.  Was there any agreed upon period of time
 3    that he was going to work there?
 4        A     I don't think anything was ever written down.
 5        Q     Yeah.
 6        A     We had hoped he'd stay as long as he can.
 7        Q     Right.  Was he given money to stay on through
 8    X phases of the project?
 9        A     He billed us on a weekly basis.
10        Q     Okay.  So did he leave on good terms?
11        A     Yes.
12        Q     Where does Andy live now?
13        A     I don't know.
14        Q     Is it your understanding that when they left the
15    island they did move to California?
16        A     Yes.
17        Q     Okay.  How do you spell his last name?
18        A     I think it's H-a-r-d-e-s-t-y-, but I could be --
19    you know, I'm not sure if that's the spelling.
20        Q     So it's Hardesty?
21        A     I believe so.
22        Q     And then Jonathan, why did he leave the project?
23        A     We were, at that time, taking a little break.
24    And we didn't necessarily want to have the weekly payroll
25    that we were incurring.
```

Page 31

```
 1        Q    Do you recall the amount of the weekly payroll
    you were incurring when you took a break?
 2
 3        A    No.
 4        Q    Prior to this Chocolate Hole property had you
 5   ever built in the Virgin Islands before?
 6        A    No.
 7        Q    Did you have any understanding, either before
 8   beginning the building or along the way, what the general
 9   timeframe was to build something in the Virgin Islands?
10        A    Well, there's what people will tell you and what
11   it really takes.
12        Q    Right.  What were you told, and what did it
13   really take?
14        A    Couple years, maybe.
15        Q    Couple years is what you were told?
16        A    Couple years, yes.  But we spent a
17   year-and-a-half in excavation before those couple years
18   really started.
19        Q    Okay.  And I don't know that I asked this, but
20   when did you begin construction at the property?
21        A    2000 or 2001.
22        Q    And was there a time where the construction was
23   completed?
24        A    Certain portions are completed.
25        Q    Right.
```

```
                                                        Page 32
 1        A     Everything is not 100 percent.
 2        Q     Right.   Okay.   So to-date there was never a time
 3     where everything was completed; is that correct?
 4        A     To-date there are still matters that we would
 5     like to have done.   So the answer is it's not to our --
 6     for our purposes, it's not 100 percent complete.
 7        Q     Yeah.   And I'm trying to differentiate
 8     between -- anyone who owns a house, there's a list that
 9     never seems to end -- at least at my house.   So -- you
10     know, maintenance issues or new plans, new things you
11     wanted to do that you didn't plan on doing originally.
12              So was there a plan at the outset as to how many
13     buildings you wanted to have and that kind of thing?
14        A     Yes.
15        Q     And is that the six buildings we talked about?
16        A     Yes.
17        Q     Okay.   And those six buildings -- help me out.
18     Which ones remain unfinished from the original plans?
19     And by plans I mean you and your wife's plans, not
20     architectural plans.
21        A     I've already described the main house, what
22     needs to be done.
23        Q     Okay.   Other than the main house, the other
24     buildings are completed?
25        A     Yeah.   I mean, the guesthouse doesn't have stone
```

Page 33

```
1    floors in yet.  It's a concrete floor --
2         Q    Okay.
3         A    -- you know, things like that.
4         Q    Okay.  And was the idea that aside from the
5     availability of workers and things like that you would
6     kind of build or complete areas of the project as we go
7     or was the hope that we'd finish the whole thing in two
8     years?
9         A    Well, I don't think two years was ever -- you
10    know, realistic.
11        Q    Right.
12        A    But --
13        Q    Or four or five years?
14        A    -- the plan was -- plan was to build until it
15    was done.
16        Q    Okay.  How long of a break did you take when you
17    said, we didn't want the weekly payroll?
18             So I assume that's when Jonathan stopped working
19    on the project?
20        A    Yes.
21        Q    Did he ever resume?
22        A    No.
23        Q    Okay.  How long did that break become?
24        A    Well, we still had Chris and the four or five
25    other individuals and Darren.  And the other two finish
```

Page 34

1    carpenters or framers that continued on.

2         Q    Okay.  So Jonathan took a break, others did not?

3         A    Correct.

4         Q    Okay.  And did Jonathan ever come back?

5         A    No.  Not to work for us.

6         Q    Okay.  All right.  Were there periods of time

7    when there was no work being done at all?

8         A    There's always somebody there.  So the answer to

9    your question is no.  There was not a time when nothing

10   was happening.

11        Q    Okay.  And I don't mean maintenance like by the

12   current maintenance people, but actual construction work

13   being performed.

14        A    There was construction work being performed.

15        Q    At all times?

16        A    Yes.

17        Q    Okay.  And that continues currently?  I know you

18   said Lanny was there a few months ago.  So is there

19   currently construction work going on?

20        A    We have a few items that are being done, but we

21   don't have big crews there doing matters currently.

22        Q    Okay.  And what are the current items being

23   done?

24        A    You know, certain aspects of taking care of the

25   property, which -- you know, maybe I should rephrase that.

Page 35

1    I'd say there's not necessarily, quote, construction, as
2    we speak right now.
3        Q    Uh-huh.
4        A    Whether it's maintenance or repair, those are
5    ongoing continuously.  But it's been probably a couple
6    months before -- well, since there was someone actually
7    last there doing construction work.
8        Q    The lawsuit that we're here about that's pending
9    in Federal Court in the Virgin Islands revolves around
10   the roof of the main house; is that correct?
11       A    Yes.
12       Q    Okay.  And is that the only structure that's
13   involved in this litigation -- the roof of the
14   main house?
15       A    Yes.
16       Q    What was the subject of the Superior Court
17   litigation?
18       A    It started out where Barry Huber or Daybreak
19   filed a lawsuit or mechanic's lien against us.
20       Q    And let me separate that because you raised a
21   good point.
22            A counterclaim was filed?
23       A    We filed the counterclaim.
24       Q    Correct.  So what was the subject of the
25   counterclaim?

Page 36

```
 1        A     There were leaks in a lot of the upper buildings
 2    and -- yeah.  There were leaks.  That's --
 3        Q     Roof leaks?
 4        A     Roof leaks.
 5        Q     And which upper buildings were experiencing roof
 6    leaks --
 7        A     Predominately --
 8        Q     -- re- -- related to the Superior Court
 9    litigation?
10        A     Predominately the gatehouse.
11        Q     But include all it, not just what's
12    predominately.
13        A     The upper buildings were the -- really the
14    focus.  There were leaks in the studio garage building as
15    well.
16        Q     Were there leaks in the main house at any time
17    during the Superior Court litigation or leading up to it?
18        A     I think there were some leaks.
19        Q     Was any portion of the main house part of that
20    Superior Court litigation?
21        A     The court issued a ruling saying that the
22    Superior Court litigation was limited to the -- the
23    gatehouse and to the garage studio, excluding any other
24    portion of the property.
25        Q     Was that pursuant to a motion?
```

Page 37

```
 1       A     I'm not sure if it was or wasn't.
 2       Q     I'm just trying to understand.
 3             Why would the court make that type of a ruling?
 4       A     That's a good question.
 5       Q     Okay.
 6       A     I -- I'm not sure why the judge did what they
 7   did.
 8       Q     Okay.
 9       A     We had one judge, Judge Christensen, and then he
10   retired and another judge came on.  And original cost to
11   repair just dealt with the upper buildings, and somehow
12   the -- the new judge limited it to the upper buildings.
13       Q     Did the mechanic's lien -- basically Barry's
14    suit against you was for money; is that correct?
15       A     Yes.
16       Q     Saying that he performed work and wasn't paid
17    for certain work he performed?
18       A     That was his allegation.
19       Q     Right.  And did any of that work that he claimed
20    involve the main house roof?
21       A     I don't think so.  But I'm -- again, this was
22   many years ago.
23       Q     Regardless of what the judge ruled regarding
24    what the parameters were for that Superior Court case,
25    were there allegations at any time within your
```

Page 38

1    counterclaims that dealt with the main -- main house?
2         A    There were some issues on the main house.
3         Q    What were those?
4         A    Probably don't have the correct terms of art --
5         Q    That's all right.
6         A    -- but it dealt with how the flashings were
7    where the metal met the stonework.  There were issues
8    referable to -- the seams didn't seem to be straight.
9    They were crooked.  It just see- -- appeared to be sloppy.
10   I think those were the main issues.
11        Q    You represented yourself in the Superior Court
12    case as well?
13        A    Yes.
14        Q    And the counterclaimants were who?  Just you?
15    You and your wife?
16        A    Just Sarah and I, yes.
17        Q    Okay.  Barry's suit against you also included
18    your law firm; is that correct?
19        A    Yes.
20        Q    Okay.  Was that -- was the law firm a continual
21    defendant in that or did that get resolved at some point?
22    I know the whole case resolved, but --
23        A    Yeah.  No --
24        Q    -- was there a motion to dismiss the law firm
25    or...?

Page 39

```
 1        A     No.

 2        Q     Okay.  Do you need to take a break?

 3        A     No.

 4        Q     Okay.  Let me know if you do at any point.  I

 5     tend to offer it, but I also tend to lose track of time.

 6     So...

 7        A     I'll let you know if I need to take a break.

 8        Q     When -- when did you first notice any issues

 9     with work performed by Barry's company?

10        A     Right after they left the island.

11        Q     Which was when?

12        A     I don't recall the date.

13        Q     Year?

14        A     I don't recall the year.

15        Q     Can you give me a range?

16        A     They were there in 2010, I think for a few

17     months right around the 4th of July.  It would have been

18     shortly afterwards.

19        Q     How long were they on the project --

20        A     Six or eight wee- --

21        Q     -- total?

22        A     -- six or eight weeks.  Maybe a little more.

23        Q     It was a copper roof?

24        A     Yes.

25        Q     When you said you noticed issues after they left
```

Page 40

1   the island, are you referring to when they left the
2   project?
3        A    Yes.
4        Q    And tell me about how they left the project.  In
5   other words, did they have some kind of a contract with a
6   time limit?
7        A    I don't think so.
8        Q    Do you know why they left?  In other words, did
9   they feel like their work was finished?  Did you tell
10  them, I don't want you to work on the project anymore?
11  Or how did it end?
12       A    They were supposed to be there and present until
13  we had a final walk-through.
14       Q    Okay.
15       A    Sarah went down for the final walk-through, and
16  they had left a day or two earlier.  They being --
17       Q    Barry's crew?
18       A    -- the crew.
19       Q    Was the final walk-through conducted a couple
20  days later regardless of whether they were there or not?
21       A    They never came back.
22       Q    Okay.  So the walk-through you're referring to
23  is your wife, Sarah, walking through with them?
24       A    Yes.
25       Q    Okay.  Were there any other trades on the

Page 41

1    project at the time that Barry's crew was there?

2         A    Yes.

3         Q    Okay.  What trades, just generally?

4         A    Well, Chris was -- Chris was there, and the --

5    I -- I -- it's probably not appropriate calling them

6    West Indians, but the -- the other --

7         Q    Okay.

8         A    -- individuals were there.  I'm not sure if

9    Darren was there or not.  And we had our electrician,

10   Chris Clark, there as well sometimes.

11        Q    Chris Clark?

12        A    Yes.

13        Q    The stone guys, the -- the people we've been

14   calling the West Indians, who brought those people to the

15   project?

16        A    I don't know.

17        Q    Okay.  In other words, they were not Chris'

18   people or any particular -- Jonathan's or Kiwi's or...?

19        A    Some stayed on from Kiwi, some came on

20   afterwards.

21        Q    Okay.  So you said your wife was there to be

22   there for the final walk-through.

23             Between you and your wife, who was most involved

24   in this project?

25        A    It depends.  I mean, we both were involved.

```
                                              Page 42

 1        Q    Okay.  So you can't say it was mostly her or
 2    mostly you, kind of 50/50?
 3        A    You have to ask the question.  I'm not -- I
 4    can't put percentages on it.
 5        Q    I -- I'm a- -- asking the question.  I think you
 6    answered it by saying, I don't know.
 7        A    Yeah.  I -- certain things I did, certain things
 8    Sarah did.
 9        Q    Okay.  Were there certain aspects of the
10    property that you were responsible for versus her?
11        A    I wrote a lot of the checks.
12        Q    Yeah.  That's important.
13             But I mean as far as overseeing the work?
14        A    Well, when I was there I would -- you know,
15    oversee what I could.
16        Q    Okay.
17        A    I'm not a contractor.
18        Q    Okay.
19        A    When Sarah was there, she did the same.
20        Q    Okay.  Over the course of the construction on
21    the property, who was there more, you or your wife?
22        A    Hard to say.
23        Q    Okay.  Are -- were you there at times where she
24    wasn't there?
25        A    Yes.
```

Page 43

1        Q    And vice versa?

2        A    Yes.

3        Q    Okay.  As far as Barry and his crew, who

4     communicated with them more, you or your wife?

5        A    I -- I don't know.  We had -- I had certain

6     communications with Barry and Ron -- I believe was his

7     name.  He was the person that ran the office.

8        Q    Ron?

9        A    Ron.  I think Baker may be his last name.  He

10    may have been the point person we dealt with the most.

11       Q    Were you able to reach Barry when you needed to

12     up to the point where he left the project?

13       A    I don't know if there was ever a time when I

14    couldn't reach him.  There's nothing that stands out in my

15    mind.

16       Q    When you noticed, for example, the flashings

17     where the metal met the stonework or the areas seemed

18     crooked or there appeared to be some sloppy work, did you

19     bring that to Barry's attention?  Or did somebody bring

20     it to his attention?

21       A    Yeah, I brought it to his attention.  He -- he

22    showed up during the project, and we walked it.

23       Q    Okay.

24       A    And I pointed what I thought were concerns

25     and...

Page 44

1      Q    What was his response?

2      A    My recollection is he said he'd take care of it.

3      Q    Okay.  The response wasn't, that's how it's

4    supposed to be; or, you're...

5      A    Not to my recollection.

6      Q    Okay.  And did he, in fact, correct it?

7      A    Some was done, some was not done.

8      Q    Okay.  And where was Chris as far as the --

9    either inspection or observations during the roofing

10   portion?

11     A    I -- I don't know.  Again, he -- Chr- -- Chris

12   would work on the project --

13     Q    Okay.

14     A    -- from regular hours -- 7 to 3:30.

15     Q    At the time Barry's crew was working there for

16   whatever weeks those were you said -- six weeks or

17   whatever it was -- Chris was present on the island at the

18   time?

19     A    Yes.

20     Q    And Chris was present on the job at the time?

21     A    Yes.

22     Q    Okay.  And was the -- the issues that you

23   noticed with the roof that we just talked about --

24   flashings, sloppiness or crooked- -- crookedness -- was

25   that something that you noticed on your own or did Chris

Page 45

1    bring that to your attention?

2        A    I noticed certain of the items.  Chris may have

3    mentioned other items to me.  I just don't remember.

4        Q    Okay.  Did you ever meet with -- you said you

5    did meet with Barry at the project to point out these

6    things?

7        A    Yes.

8        Q    Was Chris present?

9        A    I don't know if he was with us when we were

10   walking around.

11       Q    Was anyone else other than Chris that you

12   recall?

13       A    I don't really remember.

14       Q    Was Ron ever at the project?

15       A    No.  Never.  At least to -- to our knowledge,

16   Ron did not go down to St. John.

17       Q    Who was the lead on the project as far as

18   Barry's group?

19       A    That's a good question.  His son-in-law, the --

20   who didn't have copper experience, was a framer.  And he

21   appeared to be the one telling everybody what to do.

22       Q    What was his name?

23       A    Micah.

24       Q    Micah?

25       A    Yes.

Page 46

1       Q    During the project, with Barry's company, was
2    Barry mostly on the island during those weeks?
3       A    No.
4       Q    Do you know how many days he was on the island
5    during the project?
6       A    I met him at the beginning -- no, strike that.
7            I met him before the actual work had commenced,
8    and I met him once during the project.  I don't know if
9    he spent the night or whether he came over from BVI.  He
10   was doing some other projects there.
11      Q    Okay.
12      A    So I don't know the length of time he was there.
13      Q    Okay.  How did you find Barry?
14      A    He found us.
15      Q    How did he find you?
16      A    I don't know.  But somebody who worked with him
17   came by and introduced themselves and solicited work.
18      Q    Do you remember the timeframe of that?
19      A    Maybe a year or two before we started with the
20   copper roof.
21      Q    Prior to -- do you -- strike that.
22           Do you remember who that was that came by?
23      A    Initially -- no.  It wasn't Barry.  I don't know
24   who it was, though.  It may have been a relative of his or
25   someone -- you know, it was someone that worked with him.

Page 47

1    And there was some relation.  I don't really recall what
2    the relation was.
3         Q    Do you know if that person or Barry's company
4     was doing any other work on the island at the time?
5         A    I don't believe they had any other work on
6    St. John.
7         Q    Okay.  I'm just trying to understand.
8              This person's there.  Was it -- were they on
9     vacation?  Or do you have any idea?
10        A    I think that they were doing work for -- on
11   Necker Island for Branson.  And they came over initially
12   with a -- a thatch product that was -- it wasn't real
13   thatch, it was some type of synthetic thatch.  And that's
14   initially, I believe, how they contacted us to see if we'd
15   be interested in that product.
16        Q    What was the plan prior to being contacted by
17    whoever that was as far as who would conduct the roofing
18    on the project?
19        A    Well, the -- the roof was in place.  We were
20   going to put a copper cap on it, a copper top.
21        Q    Okay.
22        A    And that was the plan.
23        Q    Okay.  Was there any plan as to who was going to
24    do that before this person came by?
25        A    At or near that time, or after that time, we

Page 48

1    dealt with a different copper roofing contractor out of
2    Florida.
3        Q    Prior to Barry?
4        A    Yes.
5        Q    Okay.  And who was that?
6        A    I don't remember his name or the company's name.
7        Q    What involvement did they have on the project?
8        A    Well, I believe they came down -- I don't know
9    if it was more than once or not -- and they prepared -- I
10   believe they prepared a bid and talked about design of the
11   roof and things like that.  Or design of the copper
12   portion of the roof, I should say.
13       Q    What -- describe the roof prior to having this
14    discussion on the copper portion.  What was the material
15    on the roof?
16       A    Well, it was -- again, I'm not a roofer.  I
17   think the term is sheathing --
18       Q    Okay.
19       A    -- waterproofing, underlayments.  And then there
20   was a Rolath product that was put on, which is a synthetic
21   type of material that's used.  It's used in Minnesota,
22   actually, for roofing material as the finished roof.
23       Q    Okay.  So did it look like a finished roof at
24    that point?
25       A    It was black.  I mean, it was -- I don't know.

Page 49

1   What do you mean finished?  It was a black, Rolath,
2   rubberized --
3        Q    Right.
4        A    -- roof.
5        Q    But I guess pri- -- was the plan all along to
6    have some kind of copper on the roof?
7        A    We had wanted to.
8        Q    Okay.
9        A    -- that -- that was our intention.
10       Q    All right.  And I'm just trying to understand.
11            Prior to anyone coming and discussing the copper
12    portion did it look like a finished roof to the lay eye?
13       A    I think so.
14       Q    Okay.
15       A    I mean, it -- you can tell -- I mean, it was a
16   rubber -- it was a rubberized -- and I'm probably using
17   the word rubber -- it was a synthetic material.  I do know
18   it was called Rolath.
19       Q    Rolath.  Okay.
20            And aside from aesthetics, did it function
21    properly as a roof?
22       A    We didn't have problems with it.
23       Q    No leaks?
24       A    Not that I was aware of.
25       Q    Okay.  And what is the period of time that that

Page 50

1    Rolath was completed?

2         A    I -- I don't know if it was a year or two.  I

3    mean, there may have been times that we redid the Rolath.

4    So I -- I'm not sure if it was once, twice, or thri- --

5    three times.

6         Q    Okay.  What was your understanding of the life

7    of the Rolath?

8         A    It -- it -- I don't know if I had an

9    understanding.

10        Q    Okay.  But did you say you had to redo it?

11        A    We had it -- because of the harsh conditions

12   down there -- the wind, the sea, whatever -- you know --

13        Q    The sun?

14        A    -- we thought it prudent to -- I'm not sure if

15   it was redone or portions were added to it or not.

16        Q    Who did that work?

17        A    Chris, I believe, did the Rolath work.  Or at

18   least he was one of the individuals.  But he -- and he had

19   some other individuals assisting him.

20        Q    Okay.  And that was both the original Rolath

21   work and any follow-up?

22        A    Yes.

23        Q    The plan as far as the copper additions to the

24   roof, would that make the Rolath not visible?

25        A    Well, once the copper's on.

Page 51

1    Q    Right.  It completely covers the Rolath; right?
2    A    It should.
3    Q    Okay.  Do you remember as to any particular
4  structure or the entire -- entirety of the structures how
5   many square feet of copper was required?
6    A    Well, according to the CAD drawings -- and I --
7  I probably don't have these numbers correct -- but the
8  roof had 8200 square feet or -- and -- and, again, this is
9  a number of years ago.  I could be off.
10    Q    Understood.
11    A    Yeah.
12    Q    8200 square feet total.
13    A    Of copper.
14    Q    Of copper total.
15    A    Yeah, I think so.
16    Q    Yeah.  We're not talking about just the main
17   house or...?
18    A    Total of --
19    Q    Okay.
20    A    -- of all the buildings.
21    Q    Okay.  And was it the intent to have copper put
22   on all the buildings?
23    A    Yes.  I mean, there's certain flat roofs that
24  have Vulkem.
25    Q    Right.

Page 52

1    A    But on all the roofs that -- on each buildings

2    there was a -- yeah, an intention to have copper.

3    Q    Okay.  Back to this bid from the company in

4    Florida.

5         That was a written bid, I assume?

6    A    I believe so.

7    Q    Okay.  And do you have that written bid?

8    A    I don't know.

9    Q    Okay.  Is there any reason that wouldn't be kept

10   with other paperwork regarding this project?

11   A    We've moved our offices several times, and I'm

12   not sure if those documents still exist.

13   Q    Have you looked?

14   A    I -- I've looked.  I have not been able to

15   locate any.  I'm not saying whether they're there or not,

16   but, again, a lot of the documents, when we moved, when we

17   downsized various offices, they went in storage, and --

18   you know, certain things got shredded.  So I -- I just

19   don't know.

20   Q    Okay.

21   A    That was well before things were scanned in.

22   Q    Right.  How did you find this company in

23   Florida?

24   A    I don't recall.  Sarah may have.  I don't -- you

25   know, I don't think I personally sourced them out.

Page 53

1      Q    Do you have any other communications with that
2    company -- e-mails, letters, faxes, whatever the
3    communications were?
4      A    I'm not sure.
5      Q    Did you ever pay them any money?
6      A    We -- the answer is yes.
7      Q    Okay.  And what did you pay them for?
8      A    We purchased all the copper.
9      Q    Through them?
10     A    Yes.
11     Q    And what method of payment was used to purchase
12    that copper?
13     A    Either a check or a wire.  Probably a check.
14     Q    Okay.  And I'm just trying to figure out how we
15    can determine who this company is.
16          So the check would come from the law firm or
17    your personal account?
18     A    I don't recall.
19     Q    Okay.  Do you recall the name of anyone that you
20    dealt with at that company --
21     A    No.
22     Q    -- first names?
23     A    No.
24     Q    And what part of Florida?
25     A    I don't know.  I don't recall.  I do know Barry

```
                                                  Page 54
1     went down there to pick up the copper.  So he probably
2     would know.
3          Q    Okay.  Was the bid simply to supply the copper
4      or to install it?
5          A    It -- it was we would pay for the materials, and
6     we would -- ourselves -- and they would perform the labor.
7          Q    Okay.  Were they paid for any of the labor
8      portion?
9          A    No.
10         Q    Why did you choose not to go with them?
11         A    While the copper was in their warehouse, one of
12    their employees pilfered quite a bit.  I understand
13    they're thousand-pound rolls --
14         Q    Okay.
15         A    -- and he had been trimming away at the rolls --
16    whether 5-, 6-, or 7,000-pound rolls -- there was a lot.
17         Q    Yeah.
18         A    The owner contacted us and advised what was
19    happening.
20         Q    Okay.  I mean, was that copper that was
21     earmarked for your project?
22         A    Yes.
23         Q    Okay.  What warehouse?  Was it their warehouse
24     or yours?
25         A    Their -- they -- they had custody, possession,
```

Page 55

1    and control of the copper.
2         Q    Okay.  So he gives you a heads-up, one of my
3    employees has been stealing the -- pieces of this copper;
4    is that correct?
5         A    Yes.
6         Q    Okay.  But that wouldn't affect their obligation
7    to provide you with the copper that you intended to pay
8    for; right?
9         A    Well, it -- it -- it did affect it.  I mean, we
10   were short.  Copper was stolen.
11        Q    Okay.
12        A    And I don't know whether -- we -- we never were
13   reimbursed for the amount of copper that was taken by this
14   company.
15        Q    At the time that that was going on, this
16   employee was taking copper, was it copper you had already
17   paid for?
18        A    Yes.
19        Q    Did they -- did you say, are you going to
20   replace whatever your employee stole?
21        A    Yes.
22        Q    It seems like a reasonable request; right?
23        A    Yes.
24        Q    And what was their response?
25        A    We never got it replaced or reimbursed.

Page 56

1      Q    Did they say they were going to do it?
2      A    I don't recall all the -- the specifics.  I do
3   believe the company we were dealing with, the individual,
4   he contacted the police and -- you know, his insurance.
5   But there really wasn't any insurance that was available.
6   And I didn't really run it down to -- you know...
7      Q    Yeah.  Did they ever reimburse you for any of
8   it?
9      A    The --
10     Q    Or provide you substitute copper?
11     A    No.
12     Q    Did you ever make -- did you file a claim or
13  bring a lawsuit against them?
14     A    No.
15     Q    How much are we talking that was taken,
16  approximately?  I mean, significant amounts or...?
17     A    Entire rolls weren't missing --
18     Q    Okay.
19     A    -- but portions of rolls were missing.
20     Q    Right.  And I'm just trying to understand if it
21  was, I'm not comfortable dealing with this company who
22  can't control its employees; or, I'm not dealing with
23  this company because a good portion of our copper's gone;
24  or both or...?
25     A    We didn't have a good feeling dealing with this

Page 57

```
 1    company following learning what had occurred and the fact
 2    that the individuals or the owner wasn't stepping up.  So
 3    we didn't really want to have further dealings with them.
 4         Q    Okay.  Is -- do you have any understanding
 5     whether it was just your copper this guy was stealing or
 6     others as well?
 7         A    I'd be speculating.
 8         Q    Okay.  A police report was filed?
 9         A    I believe that -- I -- I don't have -- I never
10    received it --
11         Q    Yeah.
12         A    -- but I believe that I was told that the police
13    were involved.
14         Q    And was an arrest ever made or charges?
15         A    I have no idea.
16         Q    Were you ever contacted as a victim to --
17         A    No.
18         Q    -- you know, be a witness in a criminal case?
19         A    No.
20         Q    And you were never paid restitution?
21         A    Correct.
22         Q    Do you know the name of this employee that stole
23     stuff?
24         A    No.
25         Q    Do you recall what year that was?
```

Page 58

1       A    Huber did our project in 2010.

2       Q    So that -- that timeframe?

3       A    So it would have been a year or two before.

4       Q    Okay.  Was anyone else considered other than the

5    Florida company to do the copper work?  Not supply it,

6    but actually perform the work?

7       A    I believe the only two were the Florida company

8    and Daybreak.

9       Q    Once this person came by -- did they come by

10   your property?  I'm talking about the one who came by and

11   recommended Barry's company, Daybreak.

12      A    He may have been with Daybreak.  I don't know.

13      Q    Okay.

14      A    I never met the individual.

15      Q    But he stopped by the property in the

16   Virgin Islands?

17      A    Yes.

18      Q    Did he meet with Chris?  Or who did he meet

19   with?

20      A    I -- I don't know if he met with Chris,

21   Jonathan, or Sarah.  I -- I don't know.

22      Q    Okay.  So what did you all do with that

23   information?  Did you say, I'll hire him immediately?

24   Did you research his background?  What did you do?

25      A    We were interested in the product.  And we had

Page 59

1    discussions whether we were going to put thatch on the

2    beach bar or copper.  And after the issue with the copper

3    theft, I think we then reached out to Barry.

4        Q    Did you do any research regarding Daybreak or

5    Barry's work product?

6        A    Independently, I did not.

7        Q    Okay.  Did anyone?  Did Chris, for example?

8        A    I don't know.

9        Q    Was any of Chris' work in Minnesota or anywhere

10   else -- was it involving copper roofing?

11       A    I don't think so.

12       Q    During the work performed by Daybreak did Chris

13   ever bring issues to your attention?  And let's say

14   timeframe-wise prior to you noticing sloppiness or

15   crookedness or the things we talked about earlier.

16       A    Well, there -- there were one or two issues that

17   Chris brought to my attention I recall.

18       Q    What were those?

19       A    There had to be a roof run -- electrical roof

20   run on the garage studio building, which -- something that

21   an electrician would need to do before the copper was

22   placed.  And the Daybreak crew seemed to set their own

23   schedule.  And even though they were advised, you can't

24   start work until we have the electrician come for this

25   building, that didn't fit their plan.

Page 60

```
 1        Q    Okay.  But that was the garage.  And I'm --
 2             I didn't limit my question to the issues in this
 3    lawsuit, but that was garage-related issues; correct?
 4        A    Correct.
 5        Q    The one -- that -- that issue.
 6             What other issues were there?
 7        A    It -- it was --
 8        Q    Or you said there were two, I think.
 9        A    Well, there was sched- -- setting schedules.
10    You know, they wanted the -- Chris and the laborers to
11    work according to how they wanted to work without
12    deference to the number of hours or weekends and things
13    like that.
14        Q    Okay.
15        A    And also carnival was going on during a period
16    for a few days.  And it's customary that -- you know,
17    workers -- you know, don't work during carnival.
18        Q    Right.
19        A    So more what I heard about was the scheduling.
20        Q    Yeah.
21        A    And the fact that -- you know, also they would
22    leave Chris' tools -- they would borrow some, and leave
23    them up on the roof, and it would rain.  These are the
24    things Chris would -- brought to me about.
25        Q    Gotcha.  It's like working on St. Patrick's Day.
```

Page 61

1      A    Yeah.  There you go.  But you're not Irish.

2      Q    No.  Actually, I have a done 23andMe so I'll

3    know what kind of mutt -- blood I have.

4         All right.  So other than those issues you just

5    mentioned, was there any time that Chris came to you and

6    said -- during the work Daybreak was performing that

7    Chris said, hold on, I don't think this is the company

8    for the project; or, this doesn't look like it's being

9    performed properly?

10     A    We did not have those conversations.

11     Q    Okay.  Was Chris' -- Chris' job duties on the

12    project, did it include inspecting work performed by

13    other trades, any trades, including roofing?

14     A    At times.

15     Q    Okay.  What do you mean at times?

16     A    Well -- you know, if -- if somebody was there to

17    do work and I was off island, I would ask Chris, was it

18    done?

19     Q    That sounds reasonable.

20         Did you have to ask him that or would he kind of

21    act as a superintendent-type or a project manager or a

22    foreman?

23     A    Chr- -- Chris -- you know, he would talk to me,

24    but he's not the most communicative individual.

25     Q    Okay.

Page 62

```
 1        A    I sometimes would have to ask him questions to
 2   get information.
 3        Q    Okay.
 4        A    But he was -- he was responsive when you asked
 5   him --
 6        Q    Right.
 7        A    -- the question.
 8        Q    Okay.  Was there any time during the project on
 9    any portion of the project, any trade where Chris
10    contacted you without you asking him, how's it going, and
11    said, I think this is a problem?
12        A    I -- I believe there were.
13        Q    Okay.
14        A    I mean, again, this project went on for many,
15   many years.
16        Q    Yeah.  Anything related to the roof?
17        A    Not to my knowledge.
18        Q    Okay.  Do you know as far as the main roof --
19    the main house roof how much that square footage was?  I
20    know you gave me an estimate total.
21        A    5,000.  4,000, 5,000.  It's -- it's a good chunk
22   of the square footage.  But, again, the plans will speak
23   as to what the square footage is.
24        Q    When did Hurricane Irma hit?
25        A    September 2017.
```

Page 63

1      Q    And if Barry was on the project in 2010, that
2    would mean the copper portions of that roof existed for
3    eight years; is that correct?
4      A    Seven years.
5      Q    Seven years.  Agreed.
6           Does that -- is that correct?
7      A    I believe so.
8      Q    Prior to Hurricane Irma were there issues with
9    water leaks in the main house?
10     A    I think that they were resolved.  I don't recall
11   any.
12     Q    You're shaking your head.
13          Is that a no to that question?
14     A    Probably my head moved, and I'm sitting here
15   thinking.
16     Q    Yeah.  Okay.
17     A    I -- I don't recall.  I believe we had leaks --
18   you know, or issues, but I believe that they were
19   addressed.
20     Q    Who were they addressed by?
21     A    Chris did some work.  I'm not sure if we had
22   people down there.  There were caulking issues and plaster
23   issues where the copper would meet other materials.  Those
24   appeared to be the source of the leaks.
25     Q    Once the copper portion of the roof was

Page 64

1    completed was there other work that needed to be

2    performed on the roof?  And I'm talking about independent

3    of any leaks.  Or was that supposed to be the completion

4    of the roof?

5          A    That was supposed to be the completion of the

6    roof.

7          Q    Okay.  Was there any portion -- and I'm not

8    limiting it to the main house -- was there any portion of

9    the roof that you felt at the time Chris left -- in other

10   words, a day or two before that walk-through was

11   scheduled with your wife -- that his job was not

12   completed?

13         A    You mean Barry?  Not Chris.

14         Q    Oh, I'm sorry.  Barry.

15         A    I don't know.  I wasn't present at that

16   particular time.  But there were -- if -- if I recall,

17   there was -- some correspondence went back and forth about

18   we consider- -- what we considered to be outstanding

19   issues.

20         Q    Okay.

21         A    And there were issues that -- materials we were

22   billed for never arrived.

23         Q    Okay.

24         A    And -- and there was some acc- -- accounting

25   issues.  That portion I do recall.  And I believe I wrote

Page 65

1    a letter to Barry --

2         Q    Okay.

3         A    -- detailing it all.

4         Q    And I think I have that.

5              But kind of aside from the accounting issues,

6     were they kind of punch list items?

7         A    That's a nice way of putting it.

8         Q    Okay.  And where was the copper stored on the

9     island during the work of Daybreak?

10        A    The machine -- forming machine was by the garage

11    doors on the upper portion of the property.  I think we

12    got a 20-foot container to put the copper in.  Because of

13    the value of the copper --

14        Q    Right.

15        A    -- we didn't want to just leave it out.

16        Q    Right.

17        A    It's either there or in the garage -- they put

18    it in.

19        Q    Okay.

20        A    But it took a machine to move the rolls.

21    They're thousand-pound rolls --

22        Q    Right.

23        A    -- from what I understand.

24        Q    Right.  Copper is obviously valuable.  We know

25     an employee -- not at Daybreak, but the other --

Page 66

```
 1     Fort Lauderdale employee was stealing it; correct?
 2          A     That's what I understand.
 3          Q     And there would be a worry if it was left
 4     unattended on the island it could disappear; right?
 5          A     We wanted to make sure that the copper was
 6     secure.
 7          Q     Right.  Was any copper unaccounted for or
 8     missing or stolen while on the island?
 9          A     No.  To our knowledge, no.  But there were two
10     or three times that they had to send down supplemental
11     copper.
12          Q     Okay.  And I'm not suggesting it's not prudent
13     to get a 20-foot trailer or put it in a garage.  I'm just
14     trying to understand if there was any theft that you're
15     aware of.
16          A     Not my knowledge.
17          Q     Okay.  How many people comprised the Daybreak
18     crew?
19          A     I think six.
20          Q     You mentioned Chris' crew wanting to work
21     certain hours that might not have been consistent with
22     the -- either the Western Indian crew or Chris' crew or
23     whoever.
24          A     You -- you mean Barry's crew.  You keep saying
25     Chris' crew.
```

Page 67

1      Q     Let me back up.  Maybe I misstated something.
2            Barry's crew, the Daybreak crew --
3      A     Uh-huh.
4      Q     -- you said they wanted to work hours that may
5      not have been consistent with Chris' crew.
6      A     Yes.
7      Q     Okay.  Was there any discussion between you and
8      Barry or Ron or anyone at Daybreak that, hey, we have a
9      limited time we're down here.  We've got other roofs to
10     go build or work on, so we need -- you know, we need all
11     hands on deck for at least a few week period here?
12     A     I -- I'm not sure if that -- if we had those
13     specific discussions.
14     Q     Was -- was there ever any complaints by Barry or
15     anyone at Daybreak about that type of issue?
16     A     What type of issue?
17     Q     Meaning coordination; and, we -- we need people
18     there, and they're not there when we need them there?
19     A     No.  I think the issue was more that they wanted
20     to work more and extend beyond regular working hours.  And
21     weekends and holidays, they wanted to be there --
22     Q     I understand.
23     A     -- because they wanted to go home.  But we
24     needed to have somebody on-site while they were there.
25     Q     Right.  I mean, I -- I'm under- -- I get both

1    sides of this.  I'm just trying to understand what

2    complaints may have been made to you by anyone at

3    Daybreak about that.  Like, listen, we're not even

4    getting the full-time before we talk about weekends or

5    carnival time --

6         A    Sure.

7         Q    -- or extra time.

8         A    They were there full-time plus.

9         Q    Okay.  Was it your sense that Daybreak wanted to

10   work seven days a week -- not 24/7, but...

11        A    My sense was that the crew wanted to go back to

12   Florida once or twice during the project, and Barry didn't

13   approve of that transportation --

14        Q    Okay.

15        A    -- the cost -- and told them to work through.

16   And...

17        Q    Barry's crew was the U.S. crew?

18        A    Yeah.  Well, they're from Florida.

19        Q    Okay.  I mean, it wasn't a local Virgin Islands

20   crew?

21        A    No.  They were -- they flew in from Florida.

22        Q    Okay.  And did you ever have any discussions

23   about that with Barry such as, listen, if -- if the

24   property's not going to be available as many hours as we

25   need it, then I'm going to need some help with the

Page 69

1    transportation issues or that kind of thing?

2         A    No.  I mean, basically Barry said, I'm going to

3    do the project.  The dates and the hours -- you know, we

4    didn't control, but the access to the site was something

5    that we had hoped that they would coordinate with Chris

6    and the other folks.  They seemed not to want to

7    coordinate.  They wanted to pretty much come and go or

8    stay as they please.  And I think at the end of the day

9    Chris and the crew just accommodated them.

10        Q    Okay.  Do you know if there were any times where

11    the Daybreak crew was there without anyone else?

12        A    I -- I don't know.  I -- I do recall hearing --

13    you know, some -- not being happy at -- at having to be

14    there on weekends and -- you know, but I believe that

15    there was someone there at all times.

16        Q    You recall someone not being happy about being

17    there on the weekends.

18             Are you talking about Chris and his crew?

19        A    Yes.

20        Q    Okay.  But my question is was there ever a time

21    where Barry's Daybreak crew was there without anyone

22    else?

23        A    Not to my knowledge.

24        Q    The property itself, it's -- it's a place for

25    you and your wife to get away; is that fair?

Page 70

1           A       Yes.

2           Q       Is it an intent for you to live there

3      permanently at any point?

4           A       I don't believe so.

5           Q       Any plan to rent it?

6           A       You know, at the time we talked about -- when we

7      were building it we were thinking about it.  But that's

8      never come to fruition.

9           Q       Okay.  It's never been rented?

10          A       Correct.

11          Q       Tell me, to your knowledge, what are the issues

12     with the roof on the main house?

13          A       As I understand, on the west side the pans,

14     which are like pie-shaped portions, they're supposed to be

15     cleated or clipped approximately 9.5 inches on center.

16     There are sections where there are clips missing the

17     entire run, which allowed uplift during Hurricane Irma.

18          Q       The sections where clips are missing, is that

19     only on west side -- the west side?

20          A       There may be more.  But in order to see the

21     clips, you have to remove or take up part of the -- the

22     roof.  I believe there were one or two, maybe three, areas

23     on the west side that were removed and inspected, and the

24     clips were not as set forth in the contract.  There were

25     not clips there at 9.5 inches on center or even at

Page 71

1   12 inches on center.

2          Q     Were there any clips discovered?

3          A     On -- on one of the sections, no.  They were

4   like -- I mean, I don't want to pull numbers out of my

5   head, but there -- there may have been clips on a portion

6   of it because I think you're talking from the top of the

7   roof to the gutter -- 34, 38 feet.

8          Q     Uh-huh.

9          A     I -- I'm not here because -- to say that there

10  were no clips.  But the area where the roof came apart,

11  there were no clips.

12         Q     Who discovered that there were no clips?

13         A     The individuals from Dahill came down to do the

14  repair.  And I believe Art Sanders also came down.  He may

15  have come down separately from the Dahill crew.  This

16  would have been 2018.

17         Q     You may have answered this, but do you know if

18   any clips were discovered at any time?

19         A     I'm sorry.  Any clips...?

20         Q     You mentioned that there were no clips that were

21   9.5 or even 12 inches apart.  And I'm trying to

22   understand whether there were any clips.

23         A     My recollection is the -- one of the pans was

24   separated.  The -- they pulled out -- because I was asking

25   the questions, what are you talking about?  Why did this

Page 72

```
1    separate?  And he said, there's no clips.  And they used
2    tools to disassemble and bring it up.  And I don't know if
3    it was 6 feet, 8 feet, 10 feet -- there was portions there
4    were no clips.
5         Q    Okay.
6         A    That I do recall.
7         Q    And that I understand.
8         A    Yeah.
9         Q    But were there portions where there were clips?
10        A    Oh, I suspect there were.  But we didn't dis- --
11   the roof wasn't taken apart.
12        Q    Okay.
13        A    I'd be speculating either way.
14        Q    Yeah.  So you -- you're not aware whether there
15    were any clips determined to be present?  I'm just trying
16    to understand is this a situation that you were told,
17    these clips were too far apart; or, there are no clips at
18    all?  That's what I'm trying to understand.
19        A    Sure.  The area that was disassembled for me to
20   take a look at had no clips at all.
21        Q    Okay.
22        A    You know, I can't tell you if that was -- you
23   know -- you know, you have the pie section, and they would
24   take a -- and I'm probably using the terms incorrectly --
25   a ridge cap -- and then they'd lift it up --
```

Page 73

1        Q    Okay.

2        A    -- and you're supposed to see the clips holding

3    down the sections.

4        Q    Right.

5        A    I do know specifically there was one section

6    there were no clips, and there may have been two or three

7    other sections.

8        Q    Were there any areas disassembled where clips

9     were found?

10       A    I -- I think there -- there were on the east

11   side.

12       Q    Okay.  So is the claim related entirely to the

13    west side of the roof?

14       A    Well, about a third or a half of the roof seemed

15   to have lifted up.  You can step on it, and it --

16       Q    Did you say a third or a half?

17       A    Yeah, about a third or a half.

18       Q    Continue.  You were saying you can step on it...

19       A    Step on it, and there would be -- it's not

20   supposed to go up and down.  There's not supposed to be

21   some bounce to it.

22       Q    Right.

23       A    There was bounce to it.  And I asked the

24   question, why is there boun- -- you know, these are my

25   terms --

```
                                              Page 74
 1        Q    I understand.
 2        A    -- and I was advised it's because wind had
 3   gotten underneath the pans.
 4        Q    Right.  When you're using any of these terms, I
 5   assume you're not going to be acting as an expert in this
 6   case; correct?
 7        A    I am not a roofing or copper --
 8        Q    Right.
 9        A    -- individual/expert, that is correct.
10        Q    You're -- you're doing the best you can to
11   describe various building components, and -- you know,
12   things like bounce -- I -- I'm following --
13        A    Yeah.
14        Q    -- what you're saying, but I understand --
15        A    The- -- these are lay terms.
16        Q    Right.  Okay.  You don't have a general
17   contractor's license?
18        A    No.
19        Q    Or any contracting license; correct?
20        A    Correct.
21        Q    Have you ever built a home -- and by built I
22   don't mean you with your own hands -- but have you been
23   an owner of a home that had copper roofing?
24        A    No.
25        Q    Let's talk about Irma.
```

Page 75

1           What were the maximum winds in Irma?

2       A   Well, the claimed report of maximum winds were

3   225.  I don't know that's verified or not.

4       Q   Is that the highest winds that you're aware of

5    that have ever been recorded on the Virgin Islands if

6    those winds are true -- the 225?

7       A   I don't know.

8       Q   Okay.  Do you know if there's any particular

9    rating regarding those clips?  In other words, in what

10   winds will these clips not hold up?

11      A   Well, again, I don't have really personal

12   knowledge regarding that.

13      Q   Okay.

14      A   All I can tell you is that the sections that

15   failed had no clips.  The sections that didn't fail

16   presumably had clips.

17      Q   Or maybe they didn't.  I don't know either.

18          But my -- my point is have you ever researched

19    or has anyone told you what the maximum winds these clips

20    would be expected to hold?

21      A   I haven't seen the Material Safety Data Sheets

22   on these clips.

23      Q   Whether you've seen those sheets or not has

24    anyone told you about the maximum sustained wi- -- winds

25    that these clips would hold up under?

Page 76

```
 1       A     Well, again, when I spoke to Art Sanders and the
 2    Dahill people, they advised me that there were no clips in
 3    the areas that failed.  And I believe they had looked at a
 4    certain other portion on the west end that -- that had
 5    clips.  They may not have been spaced exactly 9.5, but
 6    there were some -- there were clips present.
 7       Q     That's not my question.
 8             My question is has anyone told you what -- the
 9     maximum winds that these clips would be expected to hold?
10       A     I don't know the maximum these clips would --
11    are designed for.
12       Q     I know.  But has anyone to- -- ever told you
13     what -- what they are?
14       A     No one has said, this clip is designed for
15    X number miles per hour.
16       Q     Okay.
17       A     Other than to tell me that it's all Dade County
18    approved, whatever that means.
19       Q     Yeah.  Do you know what that means?
20       A     Not really.
21       Q     Where were you when Irma hit?
22       A     I was in St. John at the home.
23       Q     Did it hit during daylight hours or nighttime?
24       A     Daylight.
25       Q     Who was present?
```

Page 77

```
 1       A    Well, Sarah and I were both present.

 2       Q    Okay.

 3       A    I'm not sure if we put Chris or Thomas in the

 4  studio or not.  Because we thought that our house would be

 5  safer for them.

 6       Q    Than theirs?

 7       A    Yes.

 8       Q    Okay.  And what was it like during Irma?  Was it

 9   scary?

10       A    Well, we've been through a few big storms.  Not

11  there, but -- yeah, it was -- it was -- yeah, I would say

12  it was scary.

13       Q    What category was Irma?

14       A    Five.

15       Q    And I don't mean this facetiously -- was there a

16   reason you were there at the time?  In other words, a lot

17   of people flee --

18       A    Yeah.

19       Q    -- flee such things.

20       A    Sure.  I had a court hearing that I needed to be

21  in St. Thomas for two or three days before.  And there was

22  rumor that the storm was coming, but it was going to go

23  north of us -- as they usually do.

24       Q    Right.

25       A    And it wasn't until 12 hours or so before it hit
```

Page 78

1    that we realized that now we're going to get hit, and then

2    there really wasn't ability to leave.

3         Q    Right.  Right.  Was there an evacuation order at

4    any point?

5         A    I don't know if there was or wasn't.

6         Q    Okay.

7         A    I mean -- you know, the challenge with St. John

8    is you have to get from -- on ferry or barge to

9    St. Thomas, and they shut the ports down.

10        Q    Right.

11        A    So --

12        Q    Yeah.

13        A    -- there's not much you can do at that point.

14        Q    I take it you didn't have a boat there?

15        A    We had a boat.

16        Q    Okay.  Could you have gotten from St. John to

17    St. Thomas by your boat?

18        A    It was secured to the driveway, latched down on

19    the trailer --

20        Q    Right.

21        A    -- and I would not have put it in the water with

22    a storm coming like that.

23        Q    Right.  What was your sense as far as the people

24    on St. John?  Did most people leave?  Did most people

25    stay?  Some combination?

Page 79

```
 1        A    Most of the island's made up of tourists.  I
 2   think a lot of tourists left.  You know, other -- they may
 3   have gone to -- there are evacuation places -- you know,
 4   where people can go --
 5        Q    Right.
 6        A    -- they went there.  Again, there wasn't great
 7   communication.  We --
 8        Q    Yeah.
 9        A    -- knew a storm was coming.  We didn't know if
10   we'd be in the crosshairs of the storm or not.
11        Q    Right.  Did you have -- prior to this storm
12    coming did you have TVs at the house and things like
13    that?
14        A    Yes.
15        Q    Okay.  So you could watch The Weather Channel?
16        A    Well, we watched it until it stopped working.
17        Q    Right.  Right.  When was the last roof leak in
18    the main house prior to Irma hitting?
19        A    Some time before.
20        Q    Months before or -- I'm just trying to get an
21    understanding.
22        A    May have been years before.
23        Q    What's that?  Maybe years?
24        A    It may have been, yeah.
25        Q    Okay.
```

Page 80

1       A    The roof leaks were not a real big concern at
2   the time of Irma.
3       Q    And did the roof begin leaking during Irma?
4       A    In -- in the gatehouse, where we were, I don't
5   believe it did.
6       Q    How about in the main house?
7       A    I don't know.  There may have been some leaks.
8   I didn't go down there during the actual storm.
9       Q    Right.  But afterwards you would see evidence of
10   a leak if there were some.
11       A    You know, there --
12       Q    Did you notice anything?
13       A    -- there was wind-driven rain, horizontal rain.
14   You know, there was some moisture that came in.  I don't
15   know whether it was from -- you know, other openings or
16   the roof.  I -- I really couldn't say.
17       Q    Okay.  What type of door systems were there on
18    the main house?  In other words, were there sliding glass
19    doors or things like that?
20       A    It was all plywood.  It had been secured up.
21   There were no doors at the time.
22       Q    Okay.  And who put up the plywood to secure it?
23       A    Well, Chris and some of the other individuals.
24       Q    Okay.  And was that specifically for Irma?
25       A    No.  That was just -- well, I take that back.

Page 81

1          It was to secure the buildings.  And then they
2     were re-enforced prior to the storms coming.  Because we
3     had some knowledge that there were storms coming.
4          Q    Okay.  I'm just trying to understand.
5               Was the plywood there to secure the building
6     unrelated to storms?
7          A    That was the intent.
8          Q    Okay.  Meaning keep people out and that kind of
9     thing or...?
10         A    Well, just to keep the buildings closed and
11    secured.
12         Q    Okay.
13         A    So they wouldn't be exposed to the elements.
14         Q    Right.  So I assume there are doors on the main
15    house now?
16         A    There's some doors.  There's still some openings
17    that haven't been installed.
18         Q    Okay.  And what kind of doors have been
19    installed?
20         A    Just regular doors.
21         Q    Okay.  Is there a plan for sliding glass doors
22    or -- you know, doors that are larger than a regular
23    door?
24         A    Yeah.  We -- we've been to the builders show and
25    talked and had discussions with various manufacturers.

Page 82

1  The plan was to put them in last year, but -- you know.

2        Q    Okay.  But there is a plan for such --

3        A    Oh, yes.

4        Q    -- other doors?

5        A    Oh, yes.

6        Q    Okay.  And the plywood -- was anything other

7  than plywood used to secure the main house?

8        A    Yes.

9        Q    What?

10       A    A product called Storm Catcher.

11       Q    What is that?

12       A    It's a Kevlar-based product similar to

13  Armor Screen that is made -- that is to Dade County

14  Specifications.  My understanding is it's supposed to stop

15  95 percent of wind and rain up to 150 miles per hour.

16       Q    Okay.  Which would leave 75 miles an hour if

17  it's 225; right?

18       A    The Storm Catcher survived just fine.

19       Q    Okay.  Did any of the plywood have a breach or

20  disappear?

21       A    No.  And, again, the 225 was just kind of rumor

22  on the island as to --

23       Q    Understood.

24       A    -- what the maximum winds -- sustained winds.  I

25  don't think they were actually measured or there was --

Page 83

1    was ability to actually measure them on St. John.

2         Q    Do you know if it was a direct hit to St. John?

3         A    I don't think it was a direct hit.  But the

4    eye- -- portion of the eyewall did go over the island.

5         Q    How long -- are you aware of how long the

6      hurricane-force winds were battering the island?

7         A    Couple hours.  I mean, that's just a guess.

8         Q    Yeah.  Do you remember the speed of the storm?

9      Its forward speed, for example?

10        A    Not really.

11        Q    Okay.  And you're not a meteorologist, I take

12     it?

13        A    No.

14        Q    Was there any damage to any of the property

15     other than the roof lift- -- lifting up?

16        A    Yes.

17        Q    What -- what -- describe the damage.

18        A    We lost a bit of plaster on a number of

19     structures.  Our generator took a strike.  Someone's roof

20     took off the console -- or the center console for our

21     boat.

22        Q    Someone else's roof?

23        A    Yeah.

24        Q    Okay.

25        A    Yeah.  About 50 percent of the homes were

Page 84

1    destroyed on the island.  And -- you know, we had a --
2    quite a bit of cosmetic damage, foliage damage, generator
3    damage.  You know, had a new truck, a deck went through
4    the windshield -- you know, and the like.  You know, the
5    actual physical integrity of the structures held.
6        Q    Did you have property insurance?
7        A    We did have property insurance.
8        Q    And did -- how did that work?  Did you make a
9    claim?
10       A    It didn't work out very well.
11       Q    Okay.
12       A    We were underinsured.  And so there's a
13   tremendous penalty for being underinsured and -- you know,
14   it was my -- so at the end of the day, no, we really did
15   not make out very well at all.
16       Q    Who was the insurance with?
17       A    It was through Lloyd's.  Don't recall which
18   Lloyd's underwriter it was.
19       Q    Did you have an agent?
20       A    No.  Did we have an agent?  Yeah.  I think the
21   pro- -- the product was purchased through Tunick Insurance
22   in -- in -- they have an office in St. John.
23       Q    Does it still exist?
24       A    Tunick is still in existence.
25       Q    Were -- was there an amount paid out?

Page 85

1        A     There was an amount paid out.

2        Q     And what was that amount?

3        A     100,000, I'm thinking.  I -- I could be off.  It

4    could be a little more.  I don't think it was less.

5        Q     Do you remember the total amount of the

6    coverage?

7        A     I believe we had a million-dollar coverage.  Or

8    at least the property was insured for up to a million

9    dollars.

10       Q     Was there any claim made -- I know a claim was

11    made.

12             Was there any litigation that arose out of the

13    property insurance claim?

14       A     Yeah.  We had to sue.

15       Q     And was that a settlement for 100,000 plus?

16       A     It was -- I mean, again, I don't recall the

17    exact number, but, yeah, it was a settlement.

18       Q     Where was the suit?

19       A     It was in the Virgin Islands.

20       Q     Which court?

21       A     District Court.

22       Q     When did that resolve?

23       A     Hurricane -- it was 2017, was the hurricane.

24             Before 2020.

25       Q     And how did it resolve?  Was it a mediation?

Page 86

1      Did it go to trial?

2          A    No.  It resolved by way of settlement.  And I

3      should add that amount is -- whatever amount was paid was

4      a confidential amount.

5          Q    Okay.

6          A    So I'm going to ask Ms. Reporter to note the --

7      any dollar amount I probably shouldn't be saying it

8      without permission to do so.

9          Q    Okay.  Did you sign a release --

10         A    I prob- --

11         Q    -- pursuant to that settlement?

12         A    I'm sure I did.

13         Q    And are you 100 percent sure there's a

14     confidentiality provision?

15         A    I would say yes because since I've been

16     practicing in the Virgin Islands, every single lawsuit

17     I've ever been involved in has a confidentiality

18     provision.  They're very big on them down there.

19         Q    Okay.  And who was the suit against?  You

20     versus -- or tell me who the plaintiffs were and who --

21         A    We were the -- Sarah and I were the plaintiffs

22     versus the underwriter -- underwriting entity.  I don't

23     recall --

24         Q    Do you remember the name?

25         A    No.  I -- it was a Lloyd's underwriter.  I don't

Page 87

1    recall specifically the -- the name of it.
2         Q    Okay.  All right.  Let's go ahead and take a
3    break.  We've been going for two hours.  I'd like to take
4    a break for the court reporter and anybody who wants a
5    break.
6         A    Sure.
7                   (Off the record at 12:06 p.m.)
8                   (On the record at 12:12 p.m.)
9    BY MR. COSBY:
10        Q    Do you know anything about the structures that
11   existed on the property prior to your purchase of the
12   property?
13        A    Yes.
14        Q    And I mean before whatever Hur- -- you said
15   Hurricane Marilyn took those down.
16             So do you have an idea, either through pictures
17   or otherwise, what it looked like previously?
18        A    Yes.
19             You know, real quick, I just want to make
20   sure -- I may -- I want to make clear that the clips that
21   were missing were on the east side, not the west side.
22        Q    Okay.
23        A    And Sarah mentioned to me during the break I may
24   have confused those two.
25        Q    Okay.  So is it your understanding that the

Page 88

1    issues with the roof of the main house are limited to the
2    east side?
3        A    I wouldn't say limited.  But my understanding is
4    that the clips that were discovered to be missing were on
5    the east side.
6        Q    Okay.
7        A    The entire roof has not been ripped up, so I
8    don't know.  And I'm not going to speculate.  But the
9    failure -- failed areas that we're aware of are on the
10   east side.
11       Q    Okay.  So this -- I don't know -- this bouncing
12   that was -- that you've described, is that predominately
13   on the east side?
14       A    Yes.
15       Q    Okay.  Does the west side have any of that
16   bounce?
17       A    I don't know.
18       Q    Okay.  And how about north and south?  Or is it
19   strictly an east or a west thing?
20       A    It may not necessarily be -- you know --
21       Q    I'm not going to --
22       A    -- it's the area facing the ocean.
23       Q    Okay.
24       A    Which is a good -- you've seen pictures, I
25   think.

Page 89

1       Q     Right.  Yeah.

2       A     So the area facing the ocean is the area of

3   concern.

4       Q     Okay.  Have you walked the entire roof or the

5    majority of the roof since Irma?

6       A     I -- I'm sure I did.

7       Q     Okay.

8       A     I don't specifically recall everything about the

9   roof, but I'm sure I walked around on the roof.

10      Q     Right.  What areas were there actual breaches of

11   the roof?  In other words -- let me -- let me retract

12   that question.  Let me ask a different question.

13            Were there actual breaches in the roof?

14      A     There was one area that there was a minor

15   breach -- the master bedroom on the north side.

16      Q     Okay.

17      A     Or the approximate north side of the property.

18      Q     Do you know if there were any components of the

19   roof that blew away or were missing completely --

20      A     No.

21      Q     -- after Irma?

22      A     No.  The -- the challenge or the breaches

23   occurred because of, I believe, debris.  There were homes

24   above us and around us that were flattened.  And our

25   speculation is --

Page 90

```
 1        Q     Uh-huh.
 2        A     -- that it was debris from those homes that
 3     struck the roof.
 4        Q     Uh-huh.  But you described a lifting up.
 5              Nothing lifted up and blew away?
 6        A     No.  There was a -- a small area that needed to
 7     be repaired with more copper.  And it really wasn't lifted
 8     up, it was -- I don't know if it was deformed from debris
 9     hitting it --
10        Q     Okay.
11        A     -- but it -- it was something that was
12     addressed.
13        Q     Were any claims made against any neighbors?
14     Sometimes debris can't be helped, but sometimes it --
15     stuff isn't secured.  Was there any claim brought against
16     any neighbor --
17        A     We -- we --
18        Q     -- related to debris?
19        A     -- we did not.
20        Q     Okay.  It's hard to identify where anything came
21     from, I assume, directly or specifically?
22        A     It was a war zone afterwards.  So...
23              You're from south Florida --
24        Q     Right.
25        A     -- you -- you understand what hurricanes can do.
```

```
                                                    Page 91
 1        Q    Yeah.  Absolutely.
 2             What kind of water intrusion was flooding -- was
 3     there any flooding?
 4        A    Not really.  It was more wind in Irma.
 5        Q    Right.  Okay.
 6        A    I don't believe we really had a water intrusion
 7     issue.
 8        Q    Do you know what the altitude is at your
 9     property?
10        A    Well, we go from sea level to about 110 feet.
11        Q    Okay.  That's all your property -- from sea
12     level to 110 feet?
13        A    Well -- you know, there's a -- an abandoned
14     right-of-away, a state right-of-way in front of our
15     property --
16        Q    Okay.
17        A    -- that may be 20 feet from the mean high tide
18     that doesn't technically belong to us.
19        Q    I gotcha.
20             There's nothing you have like a dock or anything
21     like that --
22        A    No.
23        Q    -- correct?
24        A    Correct.
25        Q    It's a beautiful area.  No doubt about that.
```

```
                                              Page 92

 1          There are properties above yours as far as
 2     altitude?
 3     A     Yes.
 4     Q     So back to what structures may have been on the
 5     property prior to them being destroyed or altered by
 6     Hurricane Marilyn.
 7          How many structures were there on the property?
 8     A     There was a home.  We used some of that
 9     foundation for the gatehouse.
10     Q     Okay.  Were there multiple structures like you
11     have or just a single home?
12     A     I don't believe there were multiple structures.
13     Q     Who did you purchase the property from?
14     A     We purchased it from a husband/wife individual.
15     Q     Who -- do you know their names?
16     A     Not off the top of my head.
17     Q     And had they lived there?
18     A     No.  Excuse me.  Not to my knowledge.
19     Q     Okay.  So I'm trying to understand kind of the
20     chronology -- not from the beginnings of time -- but do
21     you know how many owners there had been on the
22     property --
23     A     Several.
24     Q     -- of the property?
25     A     Several.
```

Page 93

1        Q    Several.  Okay.

2             And the ones you purchased from never lived

3     there?

4        A    Oh, I don't know.  They -- they may have lived

5     there.

6        Q    Did they own it a short period of time?

7        A    I don't recall.

8        Q    Okay.  And do you know who they purchased from?

9        A    No.  I -- I do know that the property was

10    subdivided out of the Massac Estate, Chocolate Hole

11    Estate --

12       Q    Okay.

13       A    -- and sold to an individual before ECHLA came

14    into -- which is the homeowners association --

15       Q    Okay.

16       A    -- before it came to existence.

17       Q    Okay.  And the home was -- was it just listed as

18    a property for sale when you bought it?

19       A    It was land, yeah.

20       Q    I mean -- yeah.  The land was?

21       A    Yes.

22       Q    Okay.  Do you know -- I'm just trying to

23    understand what happened.

24            Marilyn happens, levels their property.

25            And were these owners you bought it from in

Page 94

1    possession of it when Marilyn hit?

2        A    I don't recall --

3        Q    Okay.

4        A    -- if they were or weren't.

5        Q    Okay.  And what was the purchase price of the

6    land?

7        A    I'm not sure that's relevant.  It's privacy.

8        Q    Okay.  Well, I don't think you can raise a

9    relevance objection at a deposition, but...

10       A    Privacy.  What we paid is not -- is -- is -- is

11   a -- is a private matter.

12       Q    Is there any public record of that?

13       A    I don't know.  Not to my -- I -- I mean, I don't

14   know if there is or isn't.

15       Q    What was the total -- do you have an idea,

16   estimate, ballpark, or do you know specifically what

17   you've paid for your entire building project since you

18   purchased the property?

19       A    Not off the top of my head.

20       Q    What was your contract with Daybreak -- the

21   dollar figure, if there was one?

22       A    I -- I'm thinking just shy of 200.

23       Q    Were there any add-ons?

24       A    There was an initial contract, and then before

25   work began there was an add-on.

Page 95

```
1          Q     Change order?
2          A     Well, I don't know if it was a change order, but
3    before the contract was signed, there was an add-on.
4          Q     What was the original price?
5          A     It was an add-on of 10- or 11,000 dollars.
6          Q     What was that regarding?
7          A     Specifically the cleats and the spacing of the
8    cleats.
9          Q     And where did that come from that -- who -- who
10   determined that there needed to be an add-on?  Was that
11   you or Daybreak or someone else?
12         A     Daybreak decided they wanted to charge us more.
13         Q     Okay.
14         A     Huber decided he wanted to charge us more.
15         Q     Okay.  But did -- who decided that there needed
16   to be these specific cleats and spacing of the cleats?
17         A     That was a discussion with -- with Huber.  And
18   the representation was that the 9.5 on center was what was
19   necessary for the hurricane protection that we were
20   seeking.
21         Q     Right.  And I'm trying to understand who raised
22   that issue.
23         A     I wasn't part of the actual discussion with
24   Huber at the initial, and I don't know if Sarah did it or
25   not.  The initial proposal was 12 inches on center, and
```

Page 96

1    then it got to 9.5 on center.  And there was an additional

2    charge for that.

3         Q    Who -- who was involved in that discussion?

4         A    Well, at some point I suspect I was.  But in

5    terms of why it went from 12 to 9.5, my only understanding

6    is is that it was done specifically for hurricane

7    protection.

8         Q    Right.  But I'm trying to understand where that

9     came from.  It doesn't sound like it came from

10    Daybreak -- hey, we need you to go from 12 to 9.5.

11        A    Don't know if -- I mean, there were discussions

12    with Barry regarding the cleat spacing.

13        Q    Right.

14        A    Ultimately that was what was agreed upon, and

15    that's what he represented he would do.

16        Q    And I'm trying to understand what led to that

17     discussion.  I mean, you all have a contract to

18     perform -- for him to perform roofing work.

19             What stopped that or caused this add-on to be --

20        A    Well --

21        Q    -- discussed?

22        A    -- no -- no work had yet been done.  He had sent

23    a proposal.

24        Q    I understand.

25        A    And the discussion, I believe, was that the

Page 97

1    prior contractor had cleating spacing less than 12 inches
2    on center.  And, again, Sarah had spoken with him.  My
3    understanding is that there had been some type of
4    engineering, and there was discussions with Barry
5    regarding engineering the roof and what was necessary to
6    give it whatever Dade County rating it needed.
7        Q    The prior company, you're referring to the
8     Fort -- the Florida company?
9        A    Yes.
10       Q    That you don't recall the name of?
11       A    I don't recall their name.
12       Q    All right.  Is there an engineer?
13       A    We didn't hire an engineer.  I do believe the
14    prior company -- I think had an engineer.  How they went
15    about it, I'm not sure.
16       Q    Do you know if Chris was involved in this
17     cleating issue?
18       A    No.
19       Q    Do you know of anyone that was involved with it
20     aside from Daybreak and you or Sarah in terms of this
21     add-on being discussed?
22       A    No.
23       Q    Who was the architect?
24       A    Springline Architects.
25       Q    Where are they located?

Page 98

1      A     They were in St. Thomas.

2      Q     They're gone?

3      A     The company is no longer in existence, is my

4   understanding.

5      Q     Are they the only architects for this --

6      A     For the main house that was built, yes.

7      Q     Okay.  For any other structures?

8      A     Well, we had a prior architect for the

9   gatehouse.

10      Q     Who was that?

11      A     Michael Milne, Barefoot Architects.

12      Q     What did Springline do as architects on the

13   project?  What was their role?

14      A     They were the architect of record.

15      Q     Okay.

16      A     They did it all.

17      Q     All right.  On the main house?

18      A     Well, the main house, the -- you know,

19   guesthouse, dining gazebo, and -- you know, whatever else

20   they do in terms of the topography and things like that.

21      Q     So did they prepare the plans and the

22   specifications?

23      A     Yes.  But they didn't do anything referable.

24   There was no copper roof analysis done by them.

25      Q     But I'm not there yet.  I'm just trying to

Page 99

1      understand if there were any plans.

2          A    Yes, there are plans.

3          Q    Okay.  The plans didn't have detail for the

4      copper roof; is that fair?

5          A    Correct.

6          Q    Plus it didn't have any detail as to clips or

7      clip spacing?

8          A    Correct.

9          Q    Is there any alternative to having clips?  In

10     other words, is there some other product to secure?

11         A    I don't know.

12         Q    Did you ever determine through billing or

13     otherwise whether you were charged for clips at the

14     spacing of 9.5 or 12 or whatever?

15         A    What I do know is that material was sent down.

16     Ron Baker was in charge of it.  And there were two or

17     three times during dependency of the project Daybreak's

18     crew, particularly Micah, had indicated that materials --

19     they were shorted materials, Ron didn't send them down.

20     On several occasions additional materials came down, and

21     one time someone hopped on a plane and brought some more

22     materials down.  Whether they were clips or not, I don't

23     know.

24         Q    Okay.  Tell me the ways that materials were

25     delivered to the project.

                                                    Page 100

1      A    Initially in a container or two.  The -- I would
2  say it was our expectation that everything was going to be
3  containered in and within those containers.
4      Q    What size container?
5      A    They were 20-foot containers.  You're -- you're
6  limited in that area -- you know --
7      Q    Okay.
8      A    -- bringing 20-foot containers.
9      Q    And where do those get transported to?
10  St. Thomas?
11     A    Yes.  They initially were brought to St. Thomas
12  and then trucked over to our property.
13     Q    Okay.  Are they locked containers or secured
14  containers?
15     A    I think once they're empty they're taken away.
16  We had rented our own 20-foot storage container for the
17  site that was locked.
18     Q    Okay.  I'm trying to understand the process,
19  though.
20          If things are missing, I start thinking about,
21  okay, from Point A to Point B, how do they get there?  So
22  if they're sitting in St. Thomas somewhere, it wouldn't
23  be unheard of for something to go missing.
24     A    I don't think there's any issue with theft along
25  the way.

Page 101

1      Q    Okay.

2      A    The issue was is that Ron, who was in charge,

3    didn't procure what was necessary.

4      Q    So how do we know that versus theft?

5      A    Because I was told that by Micah and other

6    individuals there.  And they were calling Ron complaining,

7    why isn't this here, you were supposed to ship this down.

8    That's how I know that.

9      Q    Right.  But what was Ron's response to that?

10    I -- I did; or, sorry, I forgot?

11      A    I didn't speak to Ron, but I know other

12    materials came like within -- right away, day or two or

13    three after they spoke to him.

14      Q    Okay.  But what is your understanding of how the

15    products are shipped?  Is it in a container already?

16      A    Well, they're initially shipped on a container.

17    The supplemental materials, I don't think they came in

18    containers.  I believe -- I -- I'm not sure how they got

19    there --

20      Q    Okay.

21      A    -- but it was -- I believe it was through the

22    same shipping agent.

23      Q    Okay.

24      A    And -- you know, once they arrive in St. Thomas

25    they have to clear.  And then there are customs agents

Page 102

1    that are hired that then get the products from St. Thomas

2    to St. John.

3         Q     And were they delivered in a container?

4         A     The supplemental products, I don't believe so.

5         Q     Okay.

6         A     They would have --

7         Q     Just boxes?

8         A     -- they would have been less than load.  Some

9    were.  I don't know how the copper was shipped.  I didn't

10   personally observe it.  But it's -- you know, throughout

11   dependency of the project we ordered lots of materials,

12   and oftentimes it was less than load.

13        Q     Is it fair you had no discussions with Ron about

14    missing products?

15        A     I had discussions with Ron as to why certain

16   products weren't included when they were supposed to be

17   included.

18        Q     And what was his response?

19        A     Essentially is, I'm going to get them to you as

20   soon as I can.  I didn't really drill down farther than

21   that.  I heard that certain things were needed, and -- you

22   know, I did speak to Ron because he had wanted progress

23   payments throughout this, and I said, well -- you know, I

24   gotta make sure all the materials that you need are down

25   there.  And that's kind of how the discussions went.

```
                                               Page 103
 1        Q    Uh-huh.  Do you recall specifically what
 2   products were missing?
 3        A    Yes.
 4        Q    What were they?
 5        A    There wasn't enough copper.  There weren't
 6   enough clips.
 7        Q    What --
 8        A    And there wasn't caulk.
 9        Q    Okay.  How many different types of clips are
10   involved in this roof?  Do you know?
11        A    Not really.
12        Q    Do you know what the clips are made out of?
13        A    No.
14        Q    Are they a non-copper product?
15        A    I think so.
16        Q    And what is your understanding of -- are you
17   saying there were no clips sent down or not enough?
18        A    Not enough.
19        Q    Okay.  And how do you know that?  In other
20   words, is there a number somewhere as to how many clips
21   were supposed to arrive?
22        A    I -- this is what I had been advised by Micah on
23   the site.
24        Q    That there weren't enough clips?
25        A    There weren't enough clips, and there weren't --
```

```
                                               Page 104
 1    that there wasn't enough copper.
 2         Q    Okay.
 3         A    And I know at least on two different occasions
 4    they had to ship more copper down.
 5         Q    Okay.
 6         A    And one of those they put some on a plane, and
 7    they flew it down.
 8         Q    Okay.  And these are the thousand-pound rolls
 9     you're talking about?
10         A    No.  No.  These are a lot less.  The one that
11    was shipped down, I don't know what size it is.
12         Q    Just kind of supplemental pieces we're talking
13     about?
14         A    Yeah.  I mean, they were rolls.  They weren't
15    thousand-pound rolls.
16         Q    Okay.
17         A    And the one probably had a certain weight limit
18    to get on a plane.  I -- I don't know.
19         Q    Yeah.  The copper we're talking about that
20     wasn't in the thousand-pound rolls, do you know how much
21     it cost per whatever it was delivered as?
22         A    I -- I'm sure there's documents --
23         Q    Okay.
24         A    -- addressing that.  Off the top of my head, the
25    answer is no.  I don't really know right now.
```

Page 105

1      Q    Are there any liens on the property?

2      A    No.

3      Q    And is the Lloyd's policy or whatever it was the

4    only policy that's ever existed on the pro- -- on the

5    property since -- since you've owned it?

6      A    We no longer have Lloyd's.  We have a different

7    homeowners insurance carrier.  But that was after all of

8    this.

9      Q    Okay.  Have there been any claims with the

10   latest homeowners policy?

11     A    No.

12     Q    Is it difficult to get homeowners coverage

13   there?

14     A    I don't know how typical it is.  Generally, if

15   you have a loan on the property, you have to insure the

16   lender's interests --

17     Q    Right.

18     A    -- and if you can't, they put you in a

19   force-placed.

20     Q    Okay.  What does that mean -- force-placed?

21     A    In other words, they buy the insurance for you

22   for the amount of the loan --

23     Q    Okay.

24     A    -- and charge you whatever.

25     Q    Right.

```
                                               Page 106

 1       A    I'm sure you have a similar product in Florida.

 2       Q    Yeah.  Other than this Irma claim were there any

 3   other claims made against your property insurer?

 4       A    I don't believe so.

 5       Q    You said -- tell me about the excavating.  You

 6   said there was some excavating that was performed.

 7       A    Yes.

 8       Q    Was that an extensive exca- -- excavating job?

 9       A    I thought it was extensive.

10       Q    Okay.  Can you tell me in lay terms what -- why

11   it needed to be done or what was done?

12       A    The property goes from 110 feet to sea level at

13   an angle.  We want to carve out the property to anchor the

14   home.  The substrate or the ground was made of -- they

15   call it down there Blue Bitch.

16       Q    Okay.

17       A    It's a type of granite that requires the large

18   trackhoes with hammers.  And no one can really give you an

19   accurate estimation of how long it's going to take.

20       Q    Right.

21       A    Ours seemed to take a particularly long time.

22       Q    Okay.  Do you have any flooding issues -- not

23   related to Irma, per se -- but do you find that there's

24   water coming from properties above you?

25       A    No.
```

Page 107

1      Q    Hard rains you don't get extensive flooding or
2   anything like that?
3      A    No.
4      Q    Has there been any inspection performed that
5   concluded that the Rolath or that sheathing was not
6   installed properly?
7      A    I don't think there's ever been a contention
8   regarding that.
9      Q    Was there any damage to that product or those
10  products during Irma?
11     A    They were covered by copper.  So I don't
12  think -- they were not exposed.
13     Q    Okay.
14     A    So I -- I mean, I would be speculating, but I
15  think the answer is no.
16     Q    The main house is composed of what?
17     A    I'm not sure what -- I don't understand your
18  question.
19     Q    Yeah.  The walls, like are they -- is it --
20     A    Sure.  The home is free-form concrete.
21     Q    Okay.
22     A    And then certain portions are faced with stone,
23  certain other portions are plaster.
24     Q    Any wood products on any of the levels --
25  meaning structurally, not -- and I'm not talking about

```
                                              Page 108
 1    trusses or things like that, but --
 2        A    No.  It's all concrete.
 3        Q    No wood frame?
 4        A    Correct.  It's all concrete construction.
 5        Q    Do you know what the square footage of your lot
 6    is?
 7        A    It's a little over an acre.  Like 1.04, I think.
 8        Q    Other than the add-on was there ever any change
 9    order or additional add-ons with Daybreak?
10        A    There was a dispute regarding the additional
11    copper costs.  And this came down from Barry's analysis.
12    He measured the roof.  He told us what was needed.  He
13    also told us what the waste factor was.  He then contended
14    that the roof was larger than what was measured by him,
15    and that's why he needed more copper, and he wanted us to
16    pay for it.
17        Q    Now, when you say he measured it, do you mean
18    Barry was the actual person that measured the roof or one
19    of his people?
20        A    We -- we had asked that he come down and verify
21    on-site all measurements.  And he represented he did.
22        Q    Okay.  And the -- tell me about the waste
23    factor.  What was your understanding of what it would be?
24        A    He -- there's a certain amount of the copper
25    which would be waste because they have to be cut.
```

Page 109

1          Q    I understand.

2          A    And the -- the number that strikes me -- it

3    was -- it was 20 percent, was his number.  I mean, I could

4    be off.  But I relied on his representation what would be

5    the waste percentage.

6          Q    And was there any discussion from him about,

7     listen, the waste factor was higher than predicted?

8          A    I don't recall that.  I do recall his contention

9    that the amount of square foot the roof was -- which he

10   initially represented and our architect confirmed was

11   either 82- or 8400 -- he then said it was more than that,

12   and that's why we needed more copper, and he wanted us to

13   pay more money.

14         Q    Okay.  Are you aware of anyone that measured the

15    roof other than perhaps Barry and the architect?

16         A    I don't think so.  I mean, I'm not sure if Chris

17   did or didn't.  It's not a very simple roof.

18         Q    Right.

19         A    And that's why I went to the architect with CAD

20   and said, hey, what is the square footage?

21         Q    When did you do that?  Before?  Or when Barry

22    brought up that this is more?

23         A    Before and after.  I mean, we went into this

24   knowing what the number was -- the square footage was.

25   The conversation with Barry before the contract was, you

Page 110

1  need to verify yourself what the square footage -- do your

2  own field measurements.

3      Q    Do you know if there were any measurements of

4  the roof taken by the entity that supplied the roofing

5  itself prior to the copper installation?

6      A    I'm not sure I understand your question.

7      Q    There was a roof there before the copper was

8  installed; correct?

9      A    You mean the wooden roof?

10     Q    Yes.

11     A    Yeah.  That was based upon the CAD drawings.

12     Q    Okay.  Do you know who the specific workers were

13  who installed that roof?

14     A    Yes.

15     Q    Who?

16     A    Andy.

17     Q    Okay.  And was Andy -- did Andy ever measure the

18  roof?

19     A    I -- I didn't see him.  I suspect that he did

20  measurements on the roof.

21     Q    Right.

22     A    I don't know if he actually measured the entire

23  square footage or not.

24     Q    Was his billing ever based on the square footage

25  of the roof?

Page 111

1      A     Time and materials.

2      Q     Okay.

3      A     He was -- strike that.

4            He was time.  We supplied the materials.

5      Q     Right.  Okay.  So if I understand what you've

6    said correctly is Barry measured the roof.

7            Do you know how Barry measured the roof?

8      A     I wasn't present.

9      Q     Okay.

10     A     I don't know.

11     Q     And the architect's measurements of the roof

12   were simply from a computer?

13     A     Yes.  The -- the plans.  The --

14     Q     I understand.  I just want to make sure.

15           The -- the architect or anyone working for the

16   architect was never out there measuring the roof by

17   getting on the roof?

18     A     I don't know.  I do know that they came out a

19   number of times in the construction to do field

20   measurements.  The communication regarding measurements

21   was directly between Andy and the Springline staff.  If

22   measurements needed to be obtained, they always said,

23   don't take them off the plans, call us.  You know?

24   They're in St. Thomas.  As opposed to just figuring it out

25   from the plans what the measurements were supposed to be.

Page 112

1          Q     Who said that?

2          A     The architects.

3          Q     Do you know if any of the building components

4     other than the roof were performed contrary to the plans?

5          A     Yeah.  I mean, there were change orders in the

6     field.  And then the plans were then modified to

7     reflect --

8          Q     Did any --

9          A     -- those changes.

10          Q     Yeah.  Did any of that relate to the roof?

11          A     No.

12          Q     In other words, if walls were bigger than

13     expected or wider or -- you know, encompass more square

14      footage, the roof would be different than originally

15      planned.

16          A     Well, again, there were changes made along the

17     construction process.

18          Q     Right.

19          A     The roof was really not one of them because that

20     was like the last thing that went on.  This was a lot of

21     building it up.  And location of windows, doors, walls,

22     things like that may have changed.  The outside structure

23     upon which the roof sits I don't think changed.

24          Q     What was Barry's contention as to the size of

25      the roof?  Was there a specific number?

  — not applicable

Page 113

1        A     He came up with something.  And he -- I don't
2   believe he was able to justify it.  I mean, these
3   questions were asked of him at his deposition, but I
4   haven't looked at his deposition since I took it a long
5   time ago.
6        Q     Yeah.
7        A     In my opinion, we never received a satisfactory
8   answer as to why he thought that he should get more money
9   for the copper.
10       Q     So what was the ultimate conclusion or how did
11    that pan out?
12       A     There is a letter laying it out.  You know, I
13  wrote him a two- or three- or four-page letter, and I
14  said, here's what I paid you, here's what your bid is --
15  you know, here is what you're claiming you still want.
16  Some of those items were never shipped.  I mean, one was
17  like rosin paper or something like that.  You know, we
18  didn't use rosin paper because we already had
19  underlayments.  And at the end of the day -- and then
20  there was some additional work that needed to be done
21  because they kind of walked off the job, and he wanted
22  like 30- or 40,000.  And I said, I think you're only
23  entitled to 22, and I sent them a check -- or 20, whatever
24  it was.  And the next thing I knew, he sued us.
25       Q     Did he continue doing the work?

Page 114

1    A    He never showed back up.  I --

2    Q    Yeah.

3    A    -- made a request that they return, and then --

4    no.

5    Q    Did he provide the copper that was in dispute?

6    In other words, we need more, it's bigger than I thought

7    and all of that.

8    A    Yes.  He provided that copper.

9    Q    Okay.  At his own expense?  I mean, you didn't

10    pay for additional copper, that's what I'm gleaning.

11         Is that --

12    A    I paid for some.  I don't recall specifically.

13    Q    Okay.  Why would you pay for any if it was your

14    contention that the roof is what it is, and there

15    shouldn't be any extra?

16    A    Barry had represented during dependency of

17    project he needed additional copper.  I didn't really

18    drill down.  He told me what it was -- you know, and I

19    said fine.

20    Q    Well, was that part of the disputed amounts he

21    said you didn't pay when he filed the Superior Court

22    case?

23    A    I -- I don't know.  He believed that there --

24    you know, earlier on I said this happened twice, may have

25    been more.  You know, after I had paid him for the

Page 115

1    additional copper, then he said he needed more copper than
2    that.  And I believe I -- at that point I said, no, I
3    don't think I'm going to pay for this.  But, again, I
4    wrote him a letter laying this all out.
5         Q    Irma hits.
6              Do you all -- when do you leave the island after
7    Irma?
8         A    Two-and-a-half months later.
9         Q    Okay.  Was that the first time you could leave?
10        A    Yes.
11        Q    And by what process did you leave?  Like you
12   normally would?  Or was there some bizarre way you had to
13   leave?
14        A    It's when Americans started bringing planes in,
15   is when we left.  The airport was destroyed --
16        Q    Okay.
17        A    -- in St. Thomas.
18        Q    Okay.
19        A    So there was a several month period of time that
20   commercial flights were not available.  Private planes or
21   cargo planes would come in.
22        Q    Okay.  But you waited until a commercial plane
23   was available?
24        A    Yeah.  We didn't organize a -- or charter a
25   flight.

Page 116

```
 1        Q    Right.
 2        A    We -- we waited.
 3        Q    Okay.  And is there any ferry system that you
 4   could have utilized?
 5        A    Ferry to where?
 6        Q    I don't know.
 7        A    No.
 8        Q    Okay.
 9        A    Because two weeks after Irma hit, Maria hit.  It
10   hit Puerto Rico more.  And there was -- there are -- were
11   ferry services between Irma and Maria.  They were
12   evacuating people to Puerto Rico until Maria hit.
13        Q    Right.
14        A    And then Puerto Rico was pretty much
15   destroyed --
16        Q    Yeah.
17        A    -- with Maria.
18        Q    Yeah.  Did Maria hit St. John?
19        A    Yeah, we had Maria.  I think it scurried south
20   of us.
21        Q    From when you owned the property up to Irma were
22    there any named storms that hit St. John?
23        A    Yeah.  I recall Otto.  A light 2, maybe.
24        Q    Okay.
25        A    Category 2.
```

Page 117

1    Q    Where was your home in construction?

2    A    We pretty much were where we were at.  I mean,

3  the copper roof wasn't there, but --

4    Q    Did Otto cause any damage?

5    A    No.

6    Q    Did any storm cause any damage other than Irma,

7  including Maria?

8    A    Yeah.  I don't think we really got dam- -- I'm

9  sitting here thinking.  I don't think we really got damage

10  from Maria.  It was more of a rain event for us.  At least

11  where we were.  The damage we had was from the -- the

12  winds from Irma.

13    Q    What was the year of Maria?

14    A    It was 2017.  It was a couple weeks after Irma.

15    Q    If -- if Maria involved rain was there any water

16  intrusion from Irma via the roof -- I'm sorry -- from

17  Maria via the roof?

18    A    No.  My recollection was we had water intrusion

19  from the rain through the doors --

20    Q    Okay.

21    A    -- onto the stone floors, which --

22    Q    Into the main house?

23    A    The gatehouse.  Because we were --

24    Q    You were in the gatehouse?

25    A    -- we were in the gatehouse, yeah.

Page 118

1      Q    How about the main house?  How did it do during

2    Maria?

3      A    I think it did fine.  I mean, there wasn't

4    anything of real concern.  I mean, I'm not going to sit

5    here and say there was no water intrusion, but it was

6    nothing that caused us any concern.

7      Q    Was there any water intrusion that you're aware

8     of through the roof in the main house due to Maria?

9      A    Not that I'm aware of.  But, again -- you know,

10    the amount of water or whatever or evidence of water was

11    minimal.

12      Q    Yeah.  What is your understanding as to -- you

13     had this roof that existed, you were adding copper to it.

14        Were there things that needed to be cut into the

15     roof to install the copper?

16      A    I'm not sure I understand.  What do you mean by

17    cut into the roof?

18      Q    I'm trying to understand if the existing

19     under-roof, if we can call it that, was altered by

20     placing the copper on it.  In other words, did they have

21      to cut through it at any points to secure the copper

22      roof?

23      A    Not to my knowledge.  I know that Chris had

24    installed battens, and in between the battens he had put

25    insulation.  And the copper was to be secured to the

Page 119

1    battens.

2         Q    When did Chris perform the battens in relation

3    to the Daybreak work?

4         A    Right before they came.  And he may have been

5    still installing them when they started.

6         Q    Were the battens part of the architectural

7    plans?

8         A    I don't think so.

9         Q    Were the battens solely to assist in installing

10   the copper roof or did they serve any other purpose?

11        A    I -- I believe it was for the installation.

12        Q    Right.  And as I understand it -- or let me --

13   let me state it differently.

14             Were there any plans ever created or developed

15   related to the installation of the copper roof?

16        A    No.  Other than field sketches by Barry, things

17   like that.

18        Q    Okay.  Is there any reason the architect wasn't

19   utilized for that purpose?  Like, hey, we're adding this

20   copper roof, can you draft plans for that?

21        A    My understanding is Barry didn't believe it was

22   necessary.

23        Q    Did you ever discuss that with your architect,

24   whether or not Barry thought it was necessary?

25        A    We probably had discussions.  But -- you know,

Page 120

1    Barry represented, hey, I'm a copper roof guy, I can
2    design, install, and build this.  And we said okay.
3         Q    So did the architect agree that no plans were
4    necessary or advisable?
5         A    I don't know if I actually posed that question.
6         Q    Were they ever consulted regarding installation
7    of a copper roof -- the architect?
8         A    Specifically, I don't believe they were.  They
9    were aware of it.
10        Q    And why did you switch from Barefoot Architect
11   to Springline?
12        A    Well, after we paid a stipulated sum amount,
13   which was supposed to cover all the plans -- which I
14   thought was a lot of money -- two days later he sent me a
15   bill for twice that amount.  Which was a significantly
16   more amount of money.
17        Q    Who did?  Springline or --
18        A    No --
19        Q    -- Barefoot?
20        A    -- Barefoot.  And the plans were not complete.
21   And I felt that that was not an individual we wanted to
22   continue doing business with.  So we realized at that
23   point we needed to find a new architect.
24        Q    What plans specifically were Barefoot preparing?
25        A    The gatehouse and the studio and the beach bar.

Page 121

1    He had plans for the main house, but we ended up not using

2    those.  In fact, we scrapped them.  We brought Springline

3    in, drew all new plans, and then we excavated because the

4    footprint needed to be changed.  And then we proceeded to

5    build.

6        Q    Why were the plans scrapped from Barefoot

7     regarding the main house?

8        A    Number one is is that they were incomplete, and

9    there was a question whether or not they could actually be

10   prepared or the structure would be appropriate.  There was

11   no structural issues.  The house has a cantilevered pool

12   off the main level, and he had nothing there how to pour

13   or secure a cantilevered pool.  And, in fact, we had a lot

14    of challenges with him.

15            He didn't put electrical in because he said it's

16    easier just to chip it in afterwards, which we found out

17    really is not the case.  But suffice it to say that we

18    had disagreements regarding the scope of the plans he'd

19    prepared, and the fact that he wanted two to three times

20    more than what we had already paid him, which was

21    represented to be, at the time we paid him, all that we

22    needed to pay.

23       Q    Was it his contention that he'd completed a full

24   set of plans?

25       A    No.  He never said he did.

Page 122

1      Q    Did he -- did his plans include the roof on the

2    main house?

3      A    We didn't build the main house with his plans.

4      Q    I know.  But did it -- there were main house

5    plans, you said, that were scrapped; correct?

6      A    That is correct.  It had a roof, but we didn't

7    use those.

8      Q    I know.  But did his plans include a roof?

9      A    Yes.

10     Q    Okay.  What type of roof?

11     A    I don't recall.

12     Q    Was there anything about copper roofing in his

13   plans?

14     A    I'm not sure.

15     Q    Was there a litigation between you and Barefoot?

16     A    Yes.

17     Q    In what court?

18     A    District Court, Virgin Islands.

19     Q    What was the outcome of that?

20     A    His lawsuit was thrown out.  And our

21   counterclaim, which had previously been dismissed, was

22   reinstated by the Third Circuit.  And he paid us a

23   monetary settlement, which consisted of the amount of

24   money we paid to Springline for bringing in a new

25   architect.

Page 123

1      Q    What was your claim against him?

2      A    His plans were unusable, and we had to bring in

3   a new architect, in essence.

4      Q    And that resolved via settlement or a trial?  Or

5    what happened?

6      A    His claims were thrown out on summary judgment.

7      Q    Okay.

8      A    He -- he went up to the Third Circuit, published

9   opinion.  They affirmed the District Court and reinstated

10   our counterclaim.

11      Q    And so what happened with the counterclaim?

12      A    It resolved in a settlement.

13      Q    Okay.

14      A    And then we got a judgment for attorney's fees.

15   And then he promptly took the assets of Barefoot overnight

16   and changed them to a different entity.

17      Q    Okay.  Is that still ongoing, the --

18      A    No.  We've let it go.

19      Q    Okay.  Was there -- do you know what the

20    measurements were of the main house roof under the

21    Barefoot plans that were scrapped?

22      A    No.

23      Q    Were the Barefoot plans ever provided to

24    Daybreak?

25      A    No.

Page 124

1    Q    Were the Springline plans provided to Daybreak?

2    A    I -- I believe they were.  Because part of his

3    contract has some of the roofing portions.

4    Q    From Hurricane Irma to the present, how often

5    are you -- how often have you been in the Virgin Islands

6    at your residence?

7    A    I -- I'm there frequently.  No particular

8    schedule.

9    Q    How about your wife?

10    A    Frequently.  No particular schedule.

11    Q    And are you there both together and separately?

12    A    Yes.

13    Q    Has anyone else -- has anyone else stayed

14    overnight at the property other than you two and Chris?

15    A    Yeah.  We -- we have friends that have come down

16    and stayed with us.

17    Q    Okay.  When's the last time you've had friends

18    come down and stay with you?

19    A    Oh, I don't recall specifically.  I can't recall

20    specifically.

21    Q    Any time in 2024?

22    A    I don't think so.

23    Q    Certainly not any time in 2025.  If you can't

24    remember that -- it's only in March.

25    A    Yeah.  Well, I'm not sure I remember everything

Page 125

1    from even yesterday.

2         Q    Yeah.

3         A    I'm being facetious.

4         Q    Yeah.

5         A    No, I -- we haven't had friends stay with us in

6    2025.

7         Q    Okay.  Have you celebrated any events or

8     significant events -- birthdays, anniversaries, things

9     like that -- with friends down there?

10        A    Oh, yes.

11        Q    When's the last time?

12        A    Year or two.

13        Q    Okay.  And what was it?

14        A    I don't think it was a birthday or anniversary,

15   but it was just -- you know, I don't know if I'd call it a

16   special occasion or not, but -- you know, we -- we tend

17   to -- we have friends down there, and we tend to get

18   together.

19        Q    That live down there?

20        A    Oh, yes.

21        Q    Okay.  What is the -- what is the most number of

22    people you've hosted there?  I don't mean for a few

23    hours, I mean overnight.

24        A    I don't know.  Couple.  Three or four.

25        Q    Okay.  Is there any way to track when you've

Page 126

1   been there?  Like if you were asked to do that, how would

2   you do it?

3        A    I don't know.

4        Q    Are there times where you travel to the

5   Virgin Islands and you don't stay there?

6        A    I mean, there have been times I had to fly in

7   for a hearing, and I go to St. Thomas, and I fly right

8   out.

9        Q    Yeah.

10       A    That's happened maybe a half a dozen times since

11  I've been admitted.  But, generally, I go to the house.

12       Q    Right.  How many cases do you have in the

13  Virgin Islands?

14       A    My caseload and type of cases, things like that,

15  no, I'm not going to answer.  That's privacy.

16       Q    Why is that private?

17       A    Our practice and the number of cases and the --

18  you know, those type of things, has nothing to do -- it's

19  privacy.  You can mark the record.  I will not answer.

20       Q    All right.  I'm trying to understand why.

21            These cases are a public record.  In other

22  words, you're an attorney of record, they're public

23  records.  Wouldn't --

24       A    Some cases I file, some cases I don't file.  The

25  type of cases, number of cases, my clients are --

Page 127

1          Q     How many filed cases do you have in the
2     Virgin Islands?
3          A     I don't know.
4          Q     How often do you travel to the Virgin Islands
5      for work versus nonwork?
6          A     I'm generally working when I'm down there.
7     Unfortunately the nature of our business is we usually
8     work most days.
9          Q     I know.  But I could be visiting Tucson, Arizona
10      and work but not be here for work.  So...
11         A     Yeah.  Again --
12         Q     I'm trying to sep- -- I'm trying to separate
13      when you go down there for pleasure versus going down
14      there for work.
15         A     Yeah.
16         Q     So I don't mean going down there and -- you
17      could be working on a California case, but that doesn't
18      necessarily require you to be in the Virgin Islands.
19         A     My trips are usually combined business and
20      pleasure.
21         Q     Okay.  And do you fly commercially every time
22      when you go down there?
23         A     Most times, yeah.
24         Q     So there would be a record of you purchasing a
25      commercial flight down there; correct?

Page 128

1      A    I suspect there would be.

2      Q    Okay.  Same for your wife?

3      A    I suspect there would be.

4      Q    And your wife's a lawyer also?

5      A    Yes.

6      Q    And what type of practice?  Is it the same?

7      A    Yeah.  She's more retired than actually actively

8    practicing these days.

9      Q    So she's smarter?

10     A    I would agree on that on the record.

11     Q    What type of practice did she perform?

12     A    She did predominately what I did.  And prior to

13   that she did insurance defense, maritime.

14     Q    Okay.  When you fly to the Virgin Islands -- or

15    when you travel to the Virgin Islands is it always by

16    air?

17     A    Yes.

18     Q    Through St. Thomas?

19     A    Yes.

20     Q    St. Thomas requires a passport; is that correct?

21     A    No.

22     Q    What do they require?

23     A    It's part of the United States.  A driver's

24   license.

25     Q    Okay.  Has that always been the case?

Page 129

1        A    A driver's license?  There was a court challenge

2    a number of years ago.  They used to require a passport,

3    and then there was a case you don't need a passport.

4        Q    All right.  When was that?

5        A    Oh, years ago.  Now, whether it's changed or

6    not, I don't know.  I just use my Global Entry card for my

7    identification.  So...

8        Q    Okay.  Well, give me an estimate of how often

9     you travel there in any given year.

10        A    Well, this year I've been down once already.

11    I'm going down in about a week, week-and-a-half.

12    You know, I'm sure I'll be there down there three or four

13    or five more times this year.

14        Q    How about 2024?

15        A    Probably half a dozen.

16        Q    In 2023?

17        A    I'd have to -- I don't know off the top of my

18    head.  I travel a lot.

19        Q    So do I, but I know where I travel.

20             How about around COVID, 2020?  Were you down

21     there at all?

22        A    I stayed away for a year or two.

23        Q    Right.  It was pretty buttoned up during COVID,

24    wasn't it?

25        A    I don't know who -- the term buttoned up.  I --

```
                                              Page 130
 1    I don't nec- -- you know, again, I wasn't down there.
 2         Q    Right.  Well, when I appeared in this case, I
 3    don't think they were -- they certainly weren't
 4    encouraging people to come down there.
 5         A    When did you appear?  2023?
 6         Q    No.  Before that.  Well before that.  Before
 7    COVID.
 8         A    Okay.  I -- I don't know.  I can't speak to
 9    that.
10         Q    The courts -- were the courts operating normally
11    through COVID?
12         A    You know, there --
13         Q    In the Virgin Islands, I mean.
14         A    Yeah.  There were emergency orders.  You know?
15    I wasn't required to show up for any appearances.
16         Q    Right.
17         A    Whether they were allowing people into the
18    courthouses or not, I -- I think there was some
19    prohibition, but I don't specifically recall.
20         Q    Okay.  So what timeframe do you recall avoiding
21    the Virgin Islands due to COVID?
22         A    It was about a year or two.
23         Q    2020 into 2021?
24         A    Whenever COVID was, yeah.
25         Q    My recollection is it was March of 2020.
```

```
                                            Page 131
 1        A    Okay.
 2        Q    How often does Sarah go to the Virgin Islands --
 3    let's say this year?
 4        A    I don't think she's been down this year.
 5        Q    How about to 2024?
 6        A    I'm not sure.
 7        Q    You don't have any estimate whether it's over
 8    10 times or under 10 times?
 9        A    Oh, I think it's under 10 times.  The -- I --
10    I'm not sure.
11        Q    Okay.
12        A    There are times that I travel, and she travels,
13    and...
14        Q    All right.  Do you know how many times she's
15    traveled there without you in 2024?
16        A    No.  I don't think there are many, if any.  I'm
17    not sure.
18        Q    When you go down there currently, where do
19    you -- what structure do you stay in?
20        A    We stay in the gatehouse.
21        Q    And is there a reason you stay in the gatehouse
22    versus the main house?
23        A    The gatehouse is completely done, and -- you
24    know, it's comfortable.
25        Q    Is the plan to -- for that to continue?  Once
```

                                            Page 132

1     construction's completed do you plan on continuing to

2     stay in the gatehouse versus the main house?  I'm just

3     trying to understand.

4          A    Probably not.

5          Q    Okay.  And is there a -- in your mind, a

6     contemplated completion date for the main house?

7          A    I would like it --

8          Q    A wish list, any of that?

9          A    Yeah.  I would like it to be soon.  What that

10    means, I'm not sure.

11         Q    Is construction -- what's the construction like

12    generally down there right now?  Are there plenty of

13    workers or is it like other --

14         A    You know --

15         Q    -- parts of the U.S. that have a reduction in

16    the labor force and the construction industry?

17         A    I -- I think there's a challenge with the

18    immigration issues going on in our country right now that

19    will affect or affect St. John.  Because -- you know, most

20    of the workers have to come over from St. Thomas.  And as

21    in the past, there have been immigration round-ups.  I

22    don't know what's happened in the last two to three weeks,

23    but judging what's happening in the country, I suspect

24    there are issues.

25         Q    Let's go before that.  Before the current

Page 133

1    president.

2             What was the status of the labor issues there

3    before that?  In other words, are there -- you know, in

4    the states at least, clients I deal with complain about

5    being un- -- unable to find enough workers.

6        A    Yeah.

7        Q    They have plenty of work, they don't have enough

8    labor force.  So...

9        A    There are -- you know, again, I don't have a lot

10   of personal knowledge other than the fact I can say that

11   there seems to be -- you know, good finish work is hard to

12   come by down there.  You generally have to bring the

13   workers in.  For technical work like AC and things like

14   that, if you want it to work, you need to find somebody

15   else.  So de- -- depending on the level of workers, there

16   seems to be a number of -- you know, if you need concrete

17   poured, yeah, that's usually not a problem.

18       Q    The -- the gentleman you're currently working

19   with, tell me his name again.

20       A    I'm not sure if I have -- what do you mean

21   gentleman who I'm working with?

22       Q    Isn't there someone you're currently having -- I

23   thought you said there was someone that was going to be

24   working on the property.

25       A    Oh, yeah.  There is -- in terms of a contractor

Page 134

1    I've been talking to --

2        Q    Yeah.

3        A    -- it's Lanny.

4        Q    Okay.  So what's Lanny's crew like?  Do you

5    know?

6        A    Lanny has -- he seems to have multiple crews --

7    you know, that do certain aspects.  But he does seem to be

8    able to complete large projects.

9        Q    That's Blue Bay Builders we're talking about?

10       A    Blue Bay something, yeah --

11       Q    Right.

12       A    -- Builders, Construction, yeah.  It's Blue Bay.

13       Q    So as far as you know, Lanny doesn't have those

14   issues with labor?

15       A    I suspect he has issues because there's always

16   issues -- I shouldn't say always.  There are usually

17   issues on St. John with labor.

18       Q    Yeah.

19       A    So I suspect he has issues.  How it's affected

20   him, I haven't had that discussion with him.

21       Q    Do you stay -- since Irma, when you go to the

22   Virgin Islands, do you always sleep in the gue- --

23   guesthouse?

24       A    Yeah.

25       Q    I'm sorry.  The gatehouse?

Page 135

1       A    The gatehouse, yes.
2       Q    Yeah.  Never the main house?
3            You're shaking --
4       A    Yeah.
5       Q    -- your head, but...
6       A    No.  I'm sitting here thinking.  You know?
7       Q    Yeah.
8       A    But, no, I would say the gatehouse.
9       Q    Okay.  Are there furnishings in the main house?
10      A    Not really.
11      Q    No beds, couches --
12      A    Correct.
13      Q    -- anything like that?
14           And was there ever furniture in the main house?
15      A    No, I don't believe so.
16      Q    The name gets me, but although it's called the
17   gatehouse, that's been your living arrangement there;
18   correct?
19      A    Well, it's where we generally stay, yes.
20      Q    It's where you sleep, cook, clean -- not
21   clean -- where you sleep, eat?
22      A    Generally, yes.
23      Q    Did Daybreak do all of the work on the roof or
24   did they have any subcontractors?
25      A    I don't believe they had subcontractors.

```
                                              Page 136
 1          Q     Since Irma, who has been on that roof?
 2          A     Well, the folks from Dahill, Art Sanders, Chris,
 3     and myself.  I'm not sure if anyone else has been up
 4     there.
 5          Q     What's Art's company?
 6          A     It was -- well, he's retired now.  It's
 7     Hoffmann Architects.
 8          Q     I thought you mentioned someone else.  You
 9      mentioned Art, yourself, Chris.  And there was a
10      company --
11          A     Dahill.
12          Q     Dahill.
13                And Art was -- what was his role or purpose of
14      being on the roof?
15          A     He was a consultant expert.
16          Q     You say was.  Is he still?
17          A     Yes, he is.
18          Q     Okay.
19          A     He's our consultant expert.
20          Q     Anyone else that's been on the roof?
21          A     I mentioned the Dahill folks.  I don't remember
22      their names.
23          Q     Okay.
24          A     Chris and myself.
25          Q     That's it?
```

Page 137

1       A    To my knowledge.  Yeah, I don't know.  We may

2    have -- me -- we periodically have people do wood

3    staining, and there's some rafters that probably were

4    stained.  I don't know whether they accessed them by

5    scaffolding -- they usually do.

6       Q    Okay.  What kind of wood is that?

7       A    Either pressure-treated or mahogany.

8       Q    Okay.

9       A    And then there's Sheetal applied on it, which is

10   refurbished every two years or so.

11      Q    Do you know who else from Hoffmann Architects

12    other than Art might have been on the roof?

13      A    No.  Art was the only one I dealt with from

14   Hoffmann Architects.

15      Q    Do you know if he was the only one on the roof?

16      A    While I was present, the answer is, yeah, he was

17   the only one.

18      Q    And has he only been on the roof while you were

19    present?

20      A    He may have been there -- you know, a time -- I

21   may have left town or left St. John, he may have been

22   there.  But, generally, yeah, I was usually there when he

23   was there.

24      Q    And when was he there?

25      A    He was there in 2018.

```
                                                    Page 138
 1          Q    Is that it?
 2          A    I think that was the last time he was there,
 3     yes.
 4          Q    When's the last time Chris was at the property?
 5          A    May of 2024.
 6          Q    Any plans for Chris to go to the property?
 7          A    Chris is officially retired.
 8          Q    Does that mean, no, there's no plan for him
 9      to --
10          A    Well, I'm sure he'll visit us when he's on
11     island.  But, no, there's no plan to have him come back to
12     work.
13          Q    And Dahill, when's the last time they were on
14      the roof?
15          A    20- -- 2018.
16          Q    Do you know if any drones were ever used to
17      photograph the roof after Irma?
18          A    Yes.
19          Q    Yes is the answer that -- yes, they were?
20          A    Yes.
21          Q    Who conducted the drone usage?
22          A    Steve Simonsen.
23          Q    Who's that?
24          A    He's a photographer on island.
25          Q    Is he the only one that's used drones, to your
```

Page 139

1    knowledge, to take photographs?

2         A    It's the only one we've requested.

3         Q    Yeah.  That's why I said to your knowledge.

4         A    Yeah.

5         Q    When was that?

6         A    Following Irma.  Still probably -- probably late

7    2017.

8         Q    Is that the only time he's done it?

9         A    At my request, yes.

10        Q    To your knowledge?

11        A    Yeah.  I mean, I -- I do know that he

12   publishes -- you know, photographs and things like that.

13   So I don't know if he's flown drones in the area.

14        Q    Yeah.

15        A    But...

16        Q    I -- I don't mean that.  I mean that you or your

17   wife or -- someone that you've requested to do it over

18   your property.

19        A    Yeah, that was -- it was just once.

20        Q    Other than Chris are there any other family

21   members who have visited the -- the home since Irma?

22        A    No.

23        Q    Are there any other contractors that have worked

24   on the property that we haven't discussed?

25        A    You mean like general contractors?

```
                                                        Page 140
 1         Q    Right.
 2         A    No.
 3         Q    Are there any other roofing contractors that
 4    have been involved in either bids or discussions about
 5    the property other than the ones we've talked about?
 6         A    No.
 7         Q    Has the roof been repaired to any extent since
 8    Irma?
 9         A    Yes.
10         Q    How so?
11         A    Dahill had -- there were two -- I guess Art
12    refers to them as tin knockers.  I guess that's -- they
13    were down for about a week performing --
14         Q    Tin -- what is that?  Tin mocker?
15         A    Tin knockers.
16         Q    Tin knockers.
17              Was their repair company hired by Dahill?
18         A    No.  They were Da- -- they work for Dahill.
19         Q    Okay.  I'm trying to understand.
20              Is that a separate company, Tin Knockers?
21         A    No.  That's the job description.
22         Q    Okay.
23         A    They're people that -- you know, bend and form
24    and repair metal roofs.
25         Q    So what did they do as far as repairs?
```

Page 141

1      A    There were areas that they patched.  There were
2  areas they replaced.  There was areas they knocked or --
3  you know, tin knocked, whatever you call it, to straighten
4  out --
5      Q    Yeah.
6      A    -- you know, things like that.
7      Q    Were -- did they add any clips to the areas
8   that --
9      A    I -- I --
10     Q    -- were removed?
11     A    -- I don't think -- you know, I don't think they
12  actually disassembled.  I -- I do believe they somehow
13  secured certain portions.  I don't know how they did it.
14     Q    Do you know what the options are to secure other
15   than clips?
16     A    I'm sorry.  I don't understand your question.
17     Q    You said you think they secured portions, but
18   you're not sure how.
19          My question is are you aware of ways to secure
20   the copper roof other than using clips?
21     A    Not personally, no.
22     Q    Okay.  Whoever dissembled -- disassembled the
23   roof and determined or concluded that there were no
24   clips, were clips ever added in those areas?
25     A    I don't know.

Page 142

1      Q     So what's the current state of the roof?

2      A     It's there.  Present.  I mean, I'm not sure I

3   understand your question.

4      Q     Well, you had someone do repairs to it.

5            Are there -- is there a need for additional

6    repairs?

7      A     I've been advised that, yes, the pans need to

8   be -- the recommendation is it's easier to replace it than

9   repair it.  And that's something that is a matter of

10  expert testimony that I really don't have personal

11  knowledge of.  And when we designate our Rule 26 experts,

12  they will have a report addressing that issue.  And --

13     Q     Did you say the recommendation is replacement is

14   better than repair?

15     A     It's -- it's -- it's been explained to me --

16  and, again, I'm no roofing expert -- that the cost

17  involved in disassembling is going to be more -- and then

18  reusing -- is going to be more than replacing.

19     Q     What is your understanding as to whether any of

20   the copper that exists can be reused in any form?

21     A     Not really.  I asked that question.  And it --

22  is has to be annealed, which I understand is a heating,

23  before it can be moved when it's been up there.  And

24  there's a problem with doing that.  And the short answer

25   is they told me it's cheaper to replace than repair.

Page 143

1      Q    And what have you been told in terms of the cost
2    to replace?
3      A    There was an estimate for just the -- in 2018 of
4    400 grand or so.  But that did not include the
5    mobilization, scaffolding, and all -- whatever else is
6    necessary.  I don't know what the cost is in today's
7    dollars although I'm fearful that prices have gone up
8    significantly.  And I don't know to what extent copper's
9    going to be affected by tariffs.  Because I don't think
10   there's a lot of copper being produced in the
11   United States.
12     Q    Is there any reason you didn't go forward with
13   replacement?
14     A    We got involved in other projects, and -- you
15   know, I'm looking for the money to do it.
16     Q    Okay.  What other pro- -- projects did you get
17   involved with?
18     A    Well, we -- we bought some other properties.
19   And I don't necessarily think that our property situation
20   is really appropriate or relevant.  Privacy issues.  But
21   suffice it to say that we've had other projects that have
22   kept us involved.
23     Q    You mean real estate projects?
24     A    Yes.
25     Q    Construction projects?

Page 144

1        A    Yes.

2        Q    You have a home in the Virgin Islands and in

3    San Diego.

4             Are there other projects ongoing?

5        A    Not ongoing right now.

6        Q    Do you have other properties?

7        A    Yes.

8        Q    Where?

9        A    A full listing of my properties really is a

10   pr- -- matter of privacy.

11       Q    Okay.  Well, what can you tell me?  I'm not

12    looking for addresses or...?

13       A    We have other homes.  I'll just say that.

14       Q    Okay.

15       A    I mean, if you want to go off the record, I can

16   talk to you about it off the record.  I'm not going to

17   talk about it on the record.

18             MR. COSBY:  Okay.  Let's go off the record.

19                  (Off the record at 1:26 p.m.)

20                  (On the record at 1:27 p.m.)

21    BY MR. COSBY:

22       Q    I asked you earlier about how much time you

23    spent in the Virgin Islands.

24             What do you consider your primary residence?

25    What location?

Page 145

1       A    That's a hard question to ask.  I'm domiciled in
2    California.
3       Q    Okay.
4       A    Our office is in San Diego.  Our main home is in
5    San Diego.  I spend quite a bit of time in Tucson, though.
6       Q    Okay.  So you can't say that San Diego is where
7     you spend most of your time?
8       A    I don't think -- the -- the answer is yes.  I --
9    looking at this past year, I wouldn't say it's -- yeah.
10      Q    Yes, what?
11      A    Yes, I'm --
12      Q    Yes --
13      A    -- not -- it's not primarily where I'm at.  I'm
14   there a significant portion of time --
15      Q    Uh-huh.
16      A    -- on a monthly basis.  I'm back and forth a
17   lot.
18      Q    Can you give me a percentage of the time you
19    spend in the Virgin Islands --
20      A    I'm down --
21      Q    -- on average?
22      A    Yeah.  I'm down there maybe six times, eight
23   times a year.  Three days to a week each time.
24      Q    Okay.  That helps.
25           And Sarah, what would you estimate for her?

```
                                                          Page 146
 1      Similar or...?

 2           A      Less.

 3           Q      Less?

 4           A      She's less.

 5           Q      Okay.  And barring things like Hurricane Irma,

 6      what was the plan as far as the time you intended to

 7      spend down in the Virgin Islands?  Is it about -- is that

 8      about what you were hoping or...?

 9           A      I think we were probably going to spend more

10      time.  I mean, absent Hurricane Irma, everything would

11      have been completed.

12           Q      Right.  But -- and that's separate.  But assume

13      Irma didn't happen and everything was complete.  And I'm

14      trying to get an understanding of what --

15           A      We -- we would --

16           Q      -- the mindset was.

17           A      Yeah.  I mean -- you know, a couple weeks down

18      there, and then I want to go somewhere else.  Couple weeks

19      down there, I want to go somewhere else.

20           Q      Right.

21           A      So it's not someplace where we go and we spend

22      months --

23           Q      Right.

24           A      -- at a time.

25                  MR. COSBY:  Let's go off the record.
```

1                    (Off the record at 1:29 p.m.)

2                    (On the record at 1:29 p.m.)

3    BY MR. COSBY:

4        Q    You said your wife's retired.

5             How long -- do you have a retirement date that

6    you have in mind or...?

7        A    I don't know.

8        Q    Okay.  Is -- is there a plan once you retire as

9    far as where you'd like to spend most of your time or

10   live?

11       A    Not specifically, no.

12       Q    Okay.  When you are in San Diego and you travel

13   to the Virgin Islands, tell us how you do that --

14       A    Well, since Irma --

15       Q    -- generally.

16       A    -- I have to spend the night in Miami because

17   American doesn't have flights.  By the time I get to

18   Miami, the last flight to St. Thomas has left.

19       Q    Right.

20       A    So I spend the night there, and then I fly in

21   the morning.

22       Q    How about the reverse?

23       A    I can catch -- I can make it back the same day

24   because of the time zones.

25       Q    Right.

1           MR. FRIEDBERG:  You know, let's go off for a

2      second.

3                   (Off the record at 1:30 p.m.)

4                   (On the record at 2:06 p.m.)

5      BY MR. COSBY:

6      Q     All right.  We're back after a quick lunch

7      break.  We were just talking off the record about ACs.

8            Do you -- do you have an HVAC system?

9      A     Oh, yes.

10     Q     Okay.  In all structures on the property?

11     A     We do now.

12     Q     Okay.  How long have you had that?

13     A     Well, the gatehouse, studio, the garage, the

14     beach house have had AC a long, long time.  Many, many

15     years.  Last year -- and then the guesthouse AC was

16     installed about two years ago, three years ago.  And then

17     last year we had the ACs installed for the rest of the

18     property.

19     Q     Okay.  Any issues with the ACs?

20     A     No.  Well, I take that back.  Compressors last

21     about four or five years there, then you have to replace

22     them --

23     Q     Yeah.

24     A     -- because of the harsh environment.

25     Q     Yeah.

Page 149

1     A    So, yeah -- I mean, there are issues with ACs
2     that they don't last as long as they last stateside.
3     Q    Yeah.  Close to Florida levels, but maybe not
4     that quick.
5     A    I don't know what Florida levels are.  So...
6     Q    Probably don't get the -- the life you do in
7     other areas, but who knows.  Everybody's got some weather
8     issue to deal with.
9          All right.  Let's start going over some
10    documents.  I've marked as Exhibit 1 the -- what I
11    believe to be your counterclaim in the Superior Court
12    case against Daybreak and Barry Huber.
13         Can you take a look at that and just confirm
14    that that's what that is?  I think it's also your answer
15    to his complaint.
16    A    Right.  I just haven't seen these documents for
17    a number of years --
18    Q    Yeah --
19    A    -- just give me a moment.
20    Q    -- take your time.
21    A    Yeah.
22    Q    That's correct?
23    A    Yeah.  That's the answer and counterclaim,
24    third party claim.
25    Q    One of the -- I had highlighted some portions.

Page 150

1              One of the parts of the counterclaim indicates
2      that Daybreak walked off the job prior to the final
3      walk-through and left certain portions of the roofs
4      uncompleted.
5              What portions were left uncompleted?
6      A    I think they dealt with the gatehouse.  Yeah.
7      Q    Then you say, as a result of counterdefendants'
8      conduct in failing to complete their job, the roofs leak
9      and have resulted in damage to counterclaimants' home.
10             Which roofs were leaking as referenced there?
11     A    Primarily the gatehouse roof.
12     Q    But what else?
13     A    That is the one that comes to mind.
14     Q    It says, counterclaimants have been damaged in a
15     sum in excess of 75,000 for necessary expenses incurred
16     to complete the roof installation.
17             Was the roof installation completed at any time
18     after this?
19     A    Yes.
20     Q    And who completed it?
21     A    Chris did a certain portion of it.
22     Q    Anyone else?
23     A    I don't think so.
24     Q    And what -- what was the charge by Chris to
25     complete it?

```
                                                    Page 151
 1        A    I -- I don't recall.  Chr- -- Chris is paid --
 2    you know, hourly without necessarily specifying what
 3    his --
 4        Q    Do you know what his hourly rate is -- or was?
 5        A    I think it was 40 an hour.  I think.
 6        Q    And do you know how long it took him to complete
 7    it?
 8        A    No.
 9        Q    And he was the only one involved in any
10    completion of the roof installation?
11        A    Well -- you know, I -- he probably had a few
12    guys working with him.  But -- you know, again, I --
13        Q    Meaning Chris or his workers?
14        A    Yeah.  Yeah.
15        Q    Did Chris ever have to purchase any more copper?
16        A    Not to my knowledge.
17        Q    Did he have to purchase any materials?  Or were
18    those still present?
19        A    I don't know.  He might have.
20        Q    Another paragraph, 16, in the counterclaim
21    indicates, pursuant to the contract entered into between
22    counterclaimants and counterdefendants, counterdefendants
23    agreed to manufacture and install the standing seam
24    copper roof of counterclaimants' home in accordance -- I
25    think it should say with -- the Revere Copper & Common
```

Page 152

1    Sense & SMACNA and to comply with the applicable standard

2    of the industry in the manufacture and installation of

3    the standing seam copper roof and impliedly warranted

4    that the manufactured roof panels were of merchantable

5    quality and were fit for their intended purpose, namely

6    as watertight roof for counterclaimants' St. John home.

7         What do you know about the Revere Copper &

8    Common Sense?  Anything?

9         A    No.  No.

10        Q    Okay.  Do you know what the SMACNA is?

11        A    Not off the top of my head.  I suspect at one

12   point in time I probably reviewed it.

13        Q    Is it your contention that in our case with

14   regard to the main house that Daybreak did not comply

15   with the standards of Revere Copper & Common Sense?

16        A    The allegations are a breach of contract that

17   are set forth.  Specific cleats were called for with a

18   certain spacing, and I've already testified where there

19   were no cleats on the east side.  And it's a breach of

20   contract claim.  It's not a warranty.

21        Q    That's not my question.

22             Is it your contention that he did not comply

23   with the Revere Copper & Common Sense?

24        A    I don't -- I don't know.

25        Q    Okay.  How about the SMACNA?

```
                                                Page 153
 1        A    I don't know.
 2        Q    Do you know if either of those standards or
 3    entities discuss the clip spacing or clips at all?
 4        A    I don't know.
 5        Q    Do you know what the standard of the industry is
 6    in clip spacing for a copper roof like this?
 7        A    I know what was agreed on.  That's the extent of
 8    my knowledge.
 9        Q    Okay.  Separate and apart from what was agreed
10    on, do you know what the standard is in the industry?
11        A    No.
12        Q    Is that your contention in our Federal District
13    case?  Not that he didn't conform with the standards of
14    the industry, simply that he didn't do what was in the
15    contract?
16        A    Just one cause of action for breach of contract.
17    The contention is is that the contract specifically called
18    for cleats at a certain spacing.  He failed to provide
19    them.
20        Q    And that the failure to provide them caused the
21    roof to become damaged --
22        A    Correct.
23        Q    -- in Hurricane Irma?
24        A    Correct.
25        Q    Does that boil down -- does that accurately
```

Page 154

1    summarize the claim?

2        A    Well, in essence, yes.  I mean, it's a

3    straightforward, simple, one cause of action complaint for

4    breach of contract.

5        Q    Does the claim of negligence by installing

6    flashing over the plaster and the installation of copper

7    panels have anything to do with the claim in

8    Federal District Court?

9        A    It has nothing to do with the main roof.

10       Q    I'll put these over here.

11            Just so we have it for completeness, this looks

12   like the original complaint that was brought against you

13   in the Superior Court that I've listed as Exhibit 2.

14            Take a look at that, and let me know if you

15   agree.

16       A    Yeah.  Appears to be it.

17       Q    Okay.  You agree that the Superior Court action

18   that resolved also included a cause of action for breach

19   of contract; correct -- among others?

20       A    It -- it -- it may have.  I would have to go

21   back and look at it.  If there's a claim in there for

22   breach of contract, okay.

23       Q    Is that a yes?

24       A    There is a claim in there for breach of

25   contract.

Page 155

1      Q    Okay.  And I'm showing you Exhibit 1 again.

2      A    Understood.

3      Q    Exhibit -- well, before we get there.

4           What is your understanding of where in the roof

5      that the clips needed to be?

6      A    Where the pans were secured to the roof.

7      Q    Okay.  And does that include all areas of the

8      roof or are there areas of the roof that do not have pans

9      or that pans are not located?

10     A    There are areas, my understanding, that don't

11     have pans, but I believe -- again, I'm not a copper

12     roofing expert -- that each section was to be clipped,

13     each 15-inch section, or somehow afastened.  Whether they

14     were supposed to be clipped underneath or not, I don't

15     know.  I do know the pans -- those that were pointed out

16     to me -- were to be clipped and secured.

17     Q    Were there any other components to the roof

18     other than the pans that have -- that required clips?

19     A    I don't know.

20     Q    Do you know if there were any other portions of

21     the roof that had clips?

22     A    I'm not sure I understand your question.

23     Q    Well, my first question was whether it was

24     required by the contract.

25          The second question is are you aware of whether

Page 156

1    any clips existed, whether it was contracted for or not?

2         A    I do believe on the west si- -- was it the west

3    side -- there were clips identified.  They might not have

4    been spaced pursuant -- but they were substantially there.

5         Q    Okay.  Do you know what the spacing was on the

6     west side clips?

7         A    It's documented.

8         Q    Okay.

9         A    I don't recall off the top of my head.

10        Q    Do you know -- did you ever discuss with Barry

11     the issues of the clips?  Meaning, hey, we had

12     Hurricane Irma, I know you've been gone, but what -- did

13     you ever use clips, and if not, why not?

14        A    I haven't spoken to your client since he walked

15    off the job.

16        Q    Okay.

17        A    Or his company.

18        Q    Other than in deposition?

19        A    Yeah, other than taking his deposition.

20        Q    In that deposition that -- that you took of him,

21     did you ask him that?

22        A    I don't recall.

23        Q    Is there any reason you didn't call him after he

24     walked off the job and Irma hit and you discovered there

25     may have been clips missing?  Or that's the allegation.

Page 157

1        Any reason you didn't call him and ask?

2            A     There were a number of years that transpired

3        between the time he walked off the job, he filed his

4        lawsuit, and Irma.  And I think he was still represented

5        by counsel, so I wouldn't have contacted him directly.

6            Q     Was there any period before he sued you that you

7        were aware of the clips --

8            A     No.

9            Q     -- being absent or --

10           A     No.

11           Q     -- not spaced properly?

12           A     No.

13           Q     Were you ever provided with any of the spacing

14       of the clips that existed?

15           A     I'm not sure I understand your question.

16           Q     Yeah.  You said there may have been clips,

17       whether or not they were spaced, on the west side.

18                 So were you ever provided measurements of what

19       the clips were actually spaced that existed?

20           A     There is some documentation indicating what they

21       were.  You know, again, it -- it's a picture that is

22       annotated with the spacing.  That's what I recall.

23           Q     Who provided that?

24           A     Art Sanders.

25           Q     Okay.  Take a look at Exhibit 3.  It's titled as

Page 158

1    Proposal for the Roofing at the Friedberg -- and is it

2    Bunge or --

3         A    Bunge.

4         Q    -- Bunge Residence, Dated February 19, 2010.

5    I've marked it as Exhibit 3.  It was also marked as

6    Sanders 8 in a separate deposition.  So I assume that was

7    the Sanders depo.

8         A    Yeah.

9         Q    Is that -- what is that?

10        A    This appears to be several proposals and the

11   final agreed upon contract.  And at the end apparently

12   there's a separate document for copper for $12,526.

13        Q    Was that additional copper that he had

14   requested?

15        A    I think so.  Yeah.  Looking at the date,

16   June 22, 2010, I would say that's copper he needed during

17   dependency of the project, he realized was needed.

18        Q    Okay.  Was that part of the disputed copper or

19   was that the part you paid?

20        A    I think I paid this.  I mean, I'd have to -- the

21   letter, I believe, explains it all --

22        Q    Okay.

23        A    -- and I don't specifically recall off the top

24   of my head.

25        Q    Does anything in Exhibit 3 mention or clarify

Page 159

1    the cleat spacing or clips?

2        A    Yes.  The contract that was signed, Bates stamp

3    P00008, it has $10,735 for smaller panels and cleat

4    spacing.  That same document also refers to -- page

5    seven -- cleats installed at an average of 9.05 on center

6    with two ring shank nails per cleat.

7        Q    Do you know what -- when it says, add for

8     smaller pan- -- panels and cleat spacing, what it -- what

9     it refers to as to smaller panels?

10       A    There was some discussion regarding the width of

11   the panels.  I don't recall all the discussions.  I do

12   believe that one of the rolls or some of the copper may

13   have been wider than 15 inches because that's what was

14   available.  And I think that's what that portion is

15   referring to.  But the agreement -- the final agreement

16   was 15-inch width panels with cleats at 9.5 inches.  And

17   there was a specific change order for that -- or at

18   least -- I shouldn't say change order -- a specific line

19   item.  And that was the contract that was accepted.

20       Q    Was there more than one contract entered?

21       A    No.  There were some proposals.  And I believe

22   you have the series of proposals.  But my belief is -- I

23   just looked through these -- there was only one that's

24   signed.

25       Q    And the one -- are you talking about the

```
                                              Page 160

 1     signature on page eight?

 2          A    Yes.

 3          Q    Is -- do you have one where Barry has signed or

 4     someone from Daybreak?

 5          A    You know, that's a good question.  And Barry

 6     apparently doesn't have any documentation when I took his

 7     deposition.

 8          Q    All right.  Do you?

 9          A    We've produced what we have.

10          Q    Okay.

11          A    So the answer is, no, I do not.

12          Q    The -- referring you to page seven, do you see

13     where the 9.5 inches with two ring shank nails is

14     written --

15          A    Yes.

16          Q    -- per cleat?

17               Underneath that there's a note that says, See

18     Alternate A for screws in lieu of nails.

19               Do you know anything about what that means?

20          A    I think there was some discussion, and I think

21     we ended up with the ring shank.

22          Q    Do you know -- I don't see what Alternate A is.

23               Do you know what that is?  Like was it part of

24     this document, Exhibit 3?

25          A    I didn't see it.
```

Page 161

1     Q     Okay.  Do you recall anything being in writing

2   as to what Alternate A refers to there?

3     A     No.

4     Q     And this is the only contract you had with

5   Daybreak, Huber & Associates, or Barry; correct?

6     A     The one that's signed.  I think there's three

7   separate documents there in one exhibit.  But there's only

8   one signed --

9     Q     Right.

10    A     -- which, I think, was the May 7th.  And that's

11  the only contract we have.

12    Q     So you're saying the other ones were some

13   proposals that were discussed, and you landed on the

14  May 7, 2010 --

15    A     Yeah.  There were propo- --

16    Q     -- as the agreement?

17    A     Yes.  There were other proposals discussed, but

18  then there were conversations regarding the spacing of the

19  cleats and -- for maximum windstorm issues.  And this was

20  what was represented would be sufficient.  And that's what

21  we agreed on and we agreed to pay the extra money for.

22    Q     Was it your understanding that this roofing

23   system would hold up under all winds?

24    A     Well, it was designed to hold up, yes.  It

25  was -- strike that.

Page 162

1          As agreed upon, if installed correctly, it was
2     designed to hold up, was my understanding.
3          Q    Under any winds?  Whether it's 225 miles an hour
4     or even greater than that?
5          A    Well, I'm not going to speculate.  I'm just
6     going to tell you what the facts are and the fact that the
7     roofs held in place with the exception of this particular
8     area without clips.
9          Q    That wasn't my question.
10         A    I understand --
11         Q    My question was --
12         A    -- but that's -- I'm not going to speculate as
13    to -- you know, hypothetically what wind speed may be.
14    I'm just going to tell you what I know.  And I just
15    testified to that.
16         Q    Right.  My question was was it your
17     understanding that this roof system would hold up under
18     any winds regardless of how high they are?
19         A    I've already testified what my understanding
20    was, and I'm not going to speculate based upon your
21    question.  It's inappropriate as to form.  Calls for
22    speculation.  Lack of foundation.
23         Q    Can you answer that question, yes or no?
24              Was it your understanding that the roof was
25     supposed to hold up under any winds?  You said it was

Page 163

1    supposed to hold up.  I'm clarifying whether you mean

2    under any conditions of wind.  Like no matter how high

3    the winds were, it was supposed to hold up?

4         A    I can't answer that question.  If you don't

5    like --

6         Q    Why not?

7         A    I'm not going to speculate as -- as to what

8    various wind speeds may be.  If you don't like my answer,

9    mark it, and let's move on.

10        Q    I don't need to mark it.  I'm asking you what

11   your understanding of the roofing system was.

12             Was it your understanding that it would -- you

13   said it was intended to hold up under weather conditions

14   or something to that effect.  So is it supposed to hold

15   up under any weather condition whatsoever?

16        A    Well, the roof was intended to hold up in the

17   hurricane-force winds -- at least a Category 5 hurricane.

18        Q    And where is that written?  Is that part of the

19   contract?

20        A    Well, again, the discussions were -- and that's

21   why there was a change in spacing as reflected in the

22   various drafts.  And we -- 9.5 -- it was either

23   represented by Huber or somehow -- I didn't have the

24   research for it, but I was advised that that would be

25   sufficient.  And that's what Huber represented.  And he

Page 164

1    said it would cost us extra money, and we agreed.

2        Q    Okay.  That wasn't my question.

3             My question is where in the contract does it

4    state anything about it will hold up under any wea- --

5    weather conditions?

6        A    It doesn't state that in the contract.

7        Q    Okay.  Other than the spacing of the cleats, is

8    there any other portion of this contract in this

9    Federal District Court claim that you're claiming he

10   breached?

11       A    Well, the fact that there were no cleats in

12   certain areas, which is in addition to the spacing issue.

13       Q    Okay.

14       A    But it deals with the cleats.

15       Q    Other than the cleat issues, meaning either they

16   weren't there or they weren't spaced properly, is there

17   anything else in this contract you're claiming he

18   breached in this current action?

19       A    No.

20       Q    Let's look at Exhibit 4.

21             And these Bates numbers, those are yours;

22   correct?

23       A    Yeah.

24       Q    And was that part of your disclosure -- your

25   initial disclosure in this case or something else?

Page 165

1        A     I don't know.

2        Q     Okay.  Tell me what -- what those documents are.

3        A     Well, one appears to be an invoice or

4   itemization of goods shipped.

5        Q     Let's start --

6        A     What?

7        Q     -- start -- let's start there or stop there for

8    a minute.

9              You see up there where it indicates cleats?

10   Right there.

11       A     Yes.

12       Q     And what's the quantity on the left column?

13       A     9,350.

14       Q     Okay.  Is it your contention that those cleats

15    were not provided?

16       A     I don't know if they were provided or not.  I

17   don't talk about -- they were not installed in the areas I

18   already testified to.

19       Q     Do you know if anyone ever saw those cleats?

20       A     The 9,350 cleats?

21       Q     Right.  Like did Chris --

22       A     I --

23       Q     -- for example, see a box of cleats?

24       A     -- I -- I don't know.

25       Q     Okay.  Keep going.

                                        Page 166

1            So what's -- page one indicate- -- is an invoice
2      or indicates some products and pricing; is that correct?
3       A    Yes.
4       Q    And then what -- what do we have beyond that?
5       A    Appears to be a report from August 2018.
6       Q    From?
7       A    Or I -- I take that -- a letter from August
8      of 2018.
9       Q    From who to who?
10      A    Art Sanders to -- to myself.
11      Q    Okay.  And what's the summary of that letter or
12     the gist of it?
13      A    It's a supplemental.  And the letter speaks for
14     itself.
15      Q    Art was an expert you hired to analyze the
16     roof --
17      A    Yep.
18      Q    -- post-Irma?
19      A    Yes.
20      Q    Is he the one that disassembled and noted no
21     cleats?
22      A    I don't know if he was the one or the Dahill
23     workers were the one.
24      Q    Okay.
25      A    I don't recall.

Page 167

```
1        Q     All right.  What else do we have after that
2    letter?
3        A     A report starting on page 13 of July 2018.
4        Q     From Art?
5        A     From Art, yeah.
6        Q     How many pages is the report?
7        A     Page 13 through page 58.
8        Q     Okay.  Then is that it?
9        A     Yeah.  That was all part of Art's report.
10       Q     His report includes photos of the project; is
11   that correct?
12       A     Yes.
13       Q     For example, Photo 1, what -- what's the
14   timeframe on that?  Is that pre-Irma or post-Irma?
15       A     I think this is post-Irma.
16       Q     Did you provide any photos to Art or did he take
17   them all himself?
18       A     That looks like a drone photo, which I probably
19   would have provided to him.
20       Q     From the drone guy that we spoke about earlier?
21       A     Yes.
22       Q     Okay.  Did you pro- -- did you take any photos?
23       A     Well, I might have.  I don't recall.
24       Q     Art indicates in his Storm Damage Summary
25   Background that, in fall of 2017 two hurricanes occurred
```

```
                                                    Page 168
 1      in the Caribbean, Irma and Maria.  And we've talked about
 2      those.
 3              On September 6th, Irma hit St. John with
 4      reported sustained winds more than 200 miles per hour for
 5      several hours.
 6              Do you know where he got that information?
 7      A    No.
 8      Q    He says, on its trek through the Caribbean,
 9      Irma's contiguous period of maintaining Category 5
10      intensity became the second-longest Atlantic storm to
11      maintain winds above 165 -- excuse me -- 156 miles per
12      hour behind only the 1932 Cuba hurricane.
13              Do you know where he got that?
14      A    No.
15      Q    The damage documented in this summary to the
16      copper roofs occurred from winds associated with Irma.
17              You understand that's his conclusion?
18      A    Yes.
19      Q    And then he says, two weeks later, Maria was
20      more southerly, and there was no additional damage.
21              You agree with that?
22      A    Yes.
23      Q    His damage assessment says, the damage varied
24      from punctures in the copper pans.  Let's stop there for
25      a minute.
```

Page 169

1          Punctures in the copper pans does not sound like
2     something that's related to clips being there or not.
3          Would you agree?
4     A    Yes.
5     Q    Sounds like what you were talking about earlier,
6     debris from other properties and things like that?
7     A    Sounds reasonable.
8     Q    Okay.  And distortion of standing seams created
9     by flying debris -- so he -- he seems to suggest the same
10    thing -- to up- -- comma, to uplift/displacement at
11    ridges, period.  In addition, the coating on the flat
12    concrete roof surfaces was torn away by the force of the
13    winds.
14         What does that refer to -- the coating on the
15    flat concrete roof surfaces?
16    A    It's like a Vulkem or Pyroseal.
17    Q    Okay.  Does that have anything to do with
18    Daybreak's work?
19    A    No.
20    Q    Was Art an expert in the Superior Court case?
21    A    Yes.
22    Q    He says, no trained metal workers are available
23    on the islands that can accomplish these repairs, which
24    is his Approach to Repairs.
25         Do you agree that that's the case, from your

Page 170

1    understanding?

2        A    I would agree that there aren't trained metal

3    workers that deal with copper roofs.  At least that we are

4    aware of.

5        Q    It says, there's a metal break at the site, and

6    if needed, fabrication less than 10 feet in length could

7    be formed as-needed on-site.

8            What does that refer to -- a metal break?

9        A    It's a piece of equipment that we purchased.

10       Q    That you purchased?

11       A    Yes.

12       Q    Okay.  Was that utilized by Daybreak?

13       A    I think so.

14       Q    And that's something you've kept?

15       A    I think it's still there.

16       Q    Okay.  That was for the roof solely or is it

17   used for something else?

18       A    No.  Gutters and --

19       Q    Okay.

20       A    -- there was oth- -- there's other metal work on

21   the property that Daybreak wasn't involved in.

22       Q    How did the gutters fair in the storm?  Did they

23   exist at the time?

24       A    No problems.

25       Q    Okay.  Is it your understanding that Art's

Page 171

1    opinion was that it should be repaired as opposed to

2    replace?

3        A    As I understand, insofar as the main roof, his

4    recommendation was to replace, not repair.

5        Q    Do you know why he's saying things like Approach

6    to Repairs and talking about -- you know, what would need

7    to be done?

8        A    A number of other roofs were able to be

9    repaired.  I -- and I have to speculate -- I mean, what he

10   saw on those other roofs.

11       Q    When's the last time you've spoken with Art?

12       A    Well, I don't want to get into any attorney

13   work product privilege, but it was in 2025.

14       Q    Okay.  And where is he located?

15       A    I believe he's in northeast United States.

16       Q    Okay.  What state?  I'm just curious.  I'd like

17   to dispose him once he's disclosed, if he is disclosed.

18       A    Right.  Well -- you know, I don't know if he's

19   still in Connecticut.

20       Q    Okay.

21       A    I didn't ask him that question.  But that's

22   previously where he was.

23       Q    Okay.  And how old is he?  Is he retired or he's

24   still working?

25       A    He's a young guy like you.

```
                                              Page 172
 1        Q    Thank you.
 2        A    Art -- Art retired.  I don't know when.  Maybe
 3    two years ago.
 4        Q    Okay.
 5        A    A year ago.
 6        Q    Congratulations to him.
 7             Did you ever -- is it your understanding on the
 8    repair work that something different would be used other
 9    than clips?  In other words, rivets?  Did that ever come
10    up?
11        A    Well, rivets are not the same as clips, but,
12    again, I'm not --
13        Q    I'm not -- I'm not a roofer.
14        A    Yeah.
15        Q    That's why I'm asking.
16        A    There were missing rivets, which were
17    re-riveted.
18        Q    Okay.  Missing rivets.  Was it determined or
19    known whether they ever existed or were they blown out
20    because of the storm?
21        A    I don't know.  I -- I just don't know.  I --
22        Q    Did you ever hear a complaint by Chris or a
23    comment that there are rivets missing on the roof before
24    Irma?
25        A    I don't recall.
```

Page 173

1      Q    Did -- I know -- I'm going to back up for a
2   minute.
3           You said that your wife was present, expecting a
4   final walk-through that never occurred with -- with Barry
5   or somebody from Barry's company.
6           Was an inspection of the roof ever done?  Not by
7   Barry, but by anyone pre-Irma?
8      A    Pre-Irma?  Yes.
9      Q    Who?
10     A    Art.
11     Q    Okay.  And tell me again -- Irma was 2017?
12     A    Yes.
13     Q    Did -- did Art author some kind of inspection
14  report?
15     A    Yes.
16     Q    Okay.  Is that something you've provided?
17     A    Yes.
18     Q    Okay.  Maybe we'll get to it.  I don't -- I
19  don't remember the date on that one.
20          But pre-fall of '17?
21     A    Yes.
22     Q    And what was -- was anything -- what was the
23  result of the inspection of the roof?
24     A    He recommended certain work be done.
25     Q    What was it?

Page 174

```
 1        A    I don't necessarily recall --
 2        Q    Okay.
 3        A    -- top of my head.
 4        Q    I don't imagine it had anything to do with
 5   clips; correct?
 6        A    Not -- I believe it did not, correct.
 7        Q    Pans were never lifted up to see what was
 8   underneath at that time?
 9        A    Correct.
10        Q    Or nothing was disassembled?
11        A    Correct.
12        Q    Does it ring any bells that it was the areas you
13   talked about before where the copper was touching other
14   materials?
15        A    I'm not under- -- sure I understand what you're
16   saying.
17        Q    Yeah.  I think you -- I thought you said earlier
18   there was some issues with the roof, maybe in the
19   Superior Court case, that involved the roofing next to
20   plaster or something else.
21        A    Yeah.  There were issues in that regard.
22        Q    Was that what he was reporting on?  Does that
23   ring any bells?
24        A    Well, that was one of the thing- -- I believe
25   that was addressed.
```

Page 175

1      Q    Okay.  Do you recall anything else he addressed?

2      A    No.  I mean, I haven't looked at those --

3      Q    Right.

4      A    Not -- not -- not presently.

5      Q    Yeah.  So he has the areas that he thinks things

6   should be done under Copper Work.  It says General, then

7   he has Gatehouse, which we know is not the main house.

8   The Garage, which we know what that is.  The Guest and

9   Dining Pavilion.

10          You -- you referenced the dining pavilion

11   earlier.  The guest pavilion is what?

12      A    The guesthouse.

13      Q    The guesthouse.  Okay.

14          The Main Pavilion.  Is that the main house --

15      A    Well, I assume so.  I'm not looking at the

16   report, but I -- when I refer to it I call it the main

17   report -- the main house.

18      Q    Okay.  He says main pavilion.

19          Is there some other structure you would call the

20   main pavilion?

21      A    I'm assuming that's what he's meaning.

22      Q    Okay.  And he says -- and this is -- this report

23   we're looking at right now is post-Irma; correct?  It's

24   2018.

25      A    Okay.

1      Q    I believe March.  I'm sorry.  July 30, 2018 --

2      A    Okay.

3      Q    -- agreed?

4           He says under the Main Pavilion, the drawings

5      indicate damage to more than 80 panels.

6           Do you know how many total panels there were?

7      A    No.

8      Q    Hoffmann Architects recommends that the entire

9      main pavilion roof be replaced -- so there's some

10     clarification as to that -- a total of 160 panels

11     totaling 3,520 square feet.  So --

12     A    There -- there's your answer to your prior

13     question.

14     Q    Yeah.  Does that sound right as far as the

15     square footage of the main --

16     A    I'd be speculating.  I -- I -- I don't know.

17     Q    Okay.  The substrate membrane should be

18     recovered with new membrane.

19          Do you know what that refers to?

20     A    Not really.

21     Q    Okay.  Was Daybreak responsible for installing

22     any kind of a membrane?

23     A    No.  Although I think they billed me for one

24     that was never delivered to the island.

25     Q    Okay.  New blocking is needed at the

```
                                        Page 177
```

1    intersecting ridges to cleat the pans at their midpoints

2    where the winds displaced the ridges.  Provide two new

3    vent stack flashings.

4         Do you know anything about that --

5    A    No.

6    Q    -- new vent -- vent stack flashings?

7    A    No.  I mean, I understand what a vent stack

8    flashing is.

9    Q    Okay.  But you don't -- all right.

10        Okay.  The Main Pavilion Library, that's part of

11   the main house?

12   A    Yes.

13   Q    It says replace two panels.  Talks about their

14   length.  At each panel check the substrate membrane for

15   damage and patch as required.

16        Are you aware of any damage to the membrane done

17   in Irma?

18   A    No.

19   Q    Okay.  Replace ridge caps, full length, for each

20   run with 1- -- 1/12-inch battens, 96 feet total.

21        Do you know what that means?

22   A    No.  I mean, I understand what a batten is.

23   Q    Right.  Okay.  Master Suite, that's part of the

24   main house?

25   A    Yes.

Page 178

```
 1        Q    Replace three panels.  Kind of similar stuff in
 2   that.
 3             Beach Pavilion is a separate structure; correct?
 4        A    Yes.
 5        Q    And then it looks like we go into some diagrams
 6   where he starts with the guest pavilion and dining
 7   pavilion roof plans.
 8             Is that what that looks like --
 9        A    Yes.
10        Q    -- on page -- I'm just going to use the Bates
11   number that's here in red -- page 18?
12        A    Yeah.
13        Q    Main Pavilion and Master Suite Roof Plans is
14   page 19.  It looks like there's a notation of cracks.
15             Do you know what the cracks were?
16        A    Yeah.  The pan- -- the -- let me make sure I use
17   these terms correctly.
18             The copper 15-inch sections, they go -- it's
19   kind of a witch's hat --
20        Q    Uh-huh.
21        A    -- the top of it.  Where it changes, that's
22   where the cracks are.  At the ridges.
23        Q    Okay.  At -- at the joint, are you saying?
24        A    There wasn't a joint.  It was just --
25        Q    Okay.
```

Page 179

1      A    -- the -- the metal.

2      Q    Okay.

3      A    And they're, I believe -- well, again, that's

4    where the cracks, I believe --

5      Q    Is the crack at the bend?

6      A    On the ridge, yes.  That's -- I think that's

7    what he's referring to.

8      Q    Okay.  So take a look at this page 19, and

9    orient me to -- where's the east side of the roof you

10    referenced as having the problems?

11      A    Right --

12      Q    Is it the lower section of the diagram?

13      A    Yeah.  Yeah.

14      Q    So lower -- lower part of the diagram is east,

15    upper is west?

16      A    Roughly.  You know, that's the --

17      Q    Yeah.

18      A    -- best or -- you know, it's maybe not due west,

19    but...

20      Q    And then to your right is the north, and to your

21    left is to the south?

22      A    Yes.

23      Q    And I'm talking about the larger structure

24    there.

25      A    I understand.

Page 180

```
 1        Q    Okay.  So tell me about these different
 2   structures.
 3             What -- this main -- I don't know if it -- is it
 4   hexagonal or octagonal?  One, two, three, four --
 5        A    You must have aced geometry.
 6             This is the main -- I refer -- this is all we
 7   refer to as the main house.
 8        Q    Right.
 9        A    The entire --
10        Q    The entire diagram?
11        A    Entire.
12        Q    What is the larger --
13        A    This is the great room.
14        Q    Okay.
15        A    This is the library.
16        Q    Okay.  So moving from left to right we start
17   with great room, library.
18        A    This is -- underneath, this is the master bath.
19        Q    Okay.
20        A    This is the mas- -- this is a steam shower --
21   shower.
22        Q    Okay.
23        A    And then this is the master bedroom.
24        Q    Okay.  Is there any area where he's pointed
25   out -- I see broken rivets -- is there any area where
```

Page 181

1    he's pointed out missing rivets?

2        A    I don't know.  I mean, I haven't really looked

3    at this.  I -- I -- it looks to me like he just -- on this

4    page it says broken pop rivets.

5        Q    When -- do you recall when it was discovered

6    that there may have been an issue with either clips being

7    present or spaced properly?

8        A    Clips not being present -- you mean cleats not

9    being present?

10       Q    By being present I meant either one.

11       A    Yeah.  It was during Art's inspection post-Irma.

12       Q    Okay.  Does he mention anything about cleats

13   being present or not present or not spaced properly in

14   this page 19 that you see?

15       A    No, not that I see.

16       Q    Okay.  Was there any debris still within the

17   roof anywhere?  Like a puncture where something stuck

18   there and --

19       A    No.

20       Q    Was Art deposed in the Superior Court case?

21       A    Yes.

22       Q    Look at page 24, same exhibit.  We're still on

23   Exhibit 4.  Photo 5.

24            Is that a photograph that was taken post-Irma?

25       A    Yeah.  The drone photos, I think, were all

Page 182

1    post-Irma.

2         Q    Okay.  Is there anything you can point out in

3     terms of damage in the -- Photo 5, for instance?

4         A    I don't know if you can see in these photos, but

5    right here --

6         Q    I see that.

7         A    Yeah.

8         Q    What's that?

9         A    There was -- I -- I testified earlier on the

10   north side of the master bedroom there was some

11   deformation to some of the copper, and you see a lighter

12   color.  We put some of that spray that comes out as foam,

13   then hardens.

14        Q    Right.

15        A    You know?  That's what was done where there was

16   any issue that there may have been.

17        Q    Was that a puncture --

18        A    I don't know if --

19        Q    -- from a puncture?

20        A    -- I don't know if it a puncture or a

21   deformation, but --

22        Q    Right.

23        A    -- we just sprayed it, and --

24        Q    Right.  Other than that, where you've sprayed

25    that, do you see any other --

Page 183

1      A    It's hard to --

2      Q    -- damage --

3           I know.  It's a drone photo.  It's as good as

4      the photo.  But I just wondered if there's anything I'm

5      not seeing that's there --

6      A    No.

7      Q    -- that you see?

8      A    Not really.

9      Q    Okay.  Same question as to photos -- well,

10     that's the beach pavilion.  Nevermind.

11          On page 26 do you know what roofing systems

12     those are?  In other words, the main house, the

13     gatehouse, or what that is?

14     A    No.  No.

15     Q    Was -- was that spray foam applied anywhere

16     other than the main house?

17     A    There were different areas, yeah.  Wherever

18     there -- it was necessary to be applied, it was applied.

19     Q    Look at Photo 12 on page 27 of this composite

20     exhibit.

21          Where's that flat roof?

22     A    Hard to say.  This may be the gatehouse above

23     the jacuzzi -- inside jacuzzi.  I think.

24     Q    Okay.  How about Photo 14?  Do you know where

25     that is?  On page whatever -- what page --

```
                                              Page 184
 1      A    I -- page 28.  I think this is the garage studio
 2    roof.  I mean, it's somewhat hard.  There's no context
 3    there.
 4      Q    Maybe this will help us.
 5           On page 34 -- like in the margins of some of
 6    these pages it will say, I guess, where we're now
 7    starting to look at.  So it looks as if Photo 26 starts
 8    with what says the Main Pavilion on page 34.
 9           Do you agree?
10      A    Yeah.
11      Q    At the time -- or just prior to Ir- -- Irma
12    hitting were there any structures attached to the roof
13    like a -- this may sound silly -- but a satellite or an
14    antenna or a lightning system?
15      A    The items that were attached to the roof were
16    attached to the -- above the garage studio to the flat
17    roof.  That's where the -- it's not really an antenna.  It
18    aims across the bay to -- for the Internet.
19      Q    Okay.  Nothing on the main house like that?
20      A    Correct.  They were attached to po- -- like vent
21    stacks that were coming out of the flat roofs.
22      Q    Gotcha.  Earlier we saw something from the
23    drone.  This is not from the drone, but look at page 43,
24    Photo 44.
25           Is that what we were looking at?
```

Page 185

1        A    I don't know.  This looks to me -- yeah.  This
2    is -- in the lower photograph, that's the area I was
3    referring to --
4        Q    Yeah.
5        A    -- that had -- had deformation.
6        Q    Because that's northeast corner.  It seemed to
7    match where you were pointing earlier.
8        A    Yeah.
9        Q    How many reports did Art prepare?
10        A    I think just --
11        Q    You said there was one pre-Irma.  And there's
12    this one.
13        A    Yeah.  I think just two.
14        Q    So starting on page 49 it looks like he has a
15    Scope of Project of the work.
16        A    Okay.
17        Q    And this is where I was reading from earlier, I
18    think, unless this is a different one.
19             But as to the main house, it indicates a roof
20    replacement is recommended; correct?
21        A    Yeah.  Yes.
22        Q    And then he talks about kind of some of the
23    options.  And he says, one thing we could do is
24    prefabricate the panels and ship in a 40-foot container,
25    but that's not an option because the container could not

Page 186

1    be transported to the site.

2          A    Well, it can be transported to St. John.  And

3    then there's an area where people offload to 20-foot

4    containers.

5          Q    Okay.

6          A    I don't know if we've ever brought a 40-foot

7    container to the property.  I mean, there are 40-foot

8    containers in Chocolate Hole that have made it.

9          Q    Uh-huh.

10         A    You're somewhat familiar with the terrain of the

11   island --

12         Q    Yeah.

13         A    -- say at the west end.

14         Q    Yeah.

15         A    It's a challenge getting them up over

16   Jacob's Ladder.

17         Q    Yeah.

18         A    More often than not, they slide back -- the

19   trucks.

20         Q    Yeah.  Well, the -- it says they're over 33 feet

21    in length.  So it sounds like a 20-foot thing would not

22    work.

23         A    The further discussion, whether it's in the

24   report or not, was to --

25         Q    It's coming, I think.

Page 187

1      A    Okay.

2      Q    So hold -- hold that thought.

3           But do you know -- do you know it to be -- he's

4    saying a 40-foot container could not be transported to

5    the site.

6           Do you agree with that or no?

7      A    I -- I think that's probably correct.  It can't

8    get all the way to the site.

9      Q    Right.  Or it would be logistically difficult?

10     A    I would agree with that.

11     Q    Okay.  Two is roll the pieces on-site.  But he

12   says there's no rolling machine on the island.  For the

13   original construction a machine was shipped and then was

14   returned.  He said the option was considered but found to

15   be quite costly.

16          Does that ring a bell?

17     A    Yes.

18     Q    Okay.  And then three was if the roof's

19   reinstalled with pan lengths of less than 20 feet, the

20   copper can be fabricated off-site and shipped in a

21   20-foot container.  This solution is the least expensive.

22          So was that the plan?

23     A    I believe so.

24     Q    Okay.  And then he talks about what he would do

25   with the main pavilion library, the master suite, and the

Page 188

1      beach pavilion.  And he says, Schedule:  It is
2      anticipated that the work will be performed in late
3      January 2019, and the duration may be 60 to 90 days.
4              So was it ever more formally discussed or
5      planned that it would, in fact, occur in January 2019?
6         A    There were discussions with Dahill.  There were
7      scheduling issues.  And I don't know -- and then COVID
8      hit.
9         Q    Right.  Well, COVID was a year later.  So I'm
10     trying to --
11        A    There was --
12        Q    I know that in construction a year is like a
13     second, but...
14        A    There -- there were scheduling issues.
15     Predominately, any work to -- that would be done would
16     have to be done during the hard winter months when Dahill,
17     who was out of the northeast, doesn't -- they don't work
18     on roofs.
19        Q    Right.
20        A    So we were -- that was what the discussions
21     were.  And then -- you know, again, there were scheduling
22     issues.
23        Q    What is the permitting process in the
24     Virgin Islands?  If you were to redo this roof as we've
25     just talked about -- and I don't care if we're -- just

Page 189

```
1     in -- in generally speaking --
2          A     Yeah.
3          Q     -- how hard is it to get permitting?
4          A     I don't think a permit -- I mean, Huber didn't
5     pull a permit, I'll tell you that.  So I don't know.  I
6     mean --
7          Q     Okay.  Sometimes when there's hurricane-related
8      stuff they issue them easier or quicker, but...
9          A     This is not a structural -- so --
10         Q     Yeah.
11         A     -- I don't --
12         Q     Yeah.
13         A     -- I don't know --
14         Q     I don't know that it's required either.
15         A     Yeah.  That's kind of the point I was getting
16    at.
17         Q     Okay.
18         A     Your client was down there doing the work
19    without a permit.  And permits were on him.  So...
20         Q     Uh-huh.  I don't see anything in Art's Scope of
21     Construction Management Services that discusses the need
22      for a permit or obtaining a permit.
23               Do you agree?
24         A     I don't know.  I -- again, I haven't reviewed
25    that document for quite some time.
```

Page 190

1      Q    Then he says with his cost estimates it's based

2   on estimates from four sources, including

3   Hoffmann Architects, F.J. Dahill, Springline Design, and

4   local sources.  And then he's got an estimate at the end

5   on page 58 with a subtotal of $592,920 with a total of

6   $687,088.  Let me have you look at that and ask you some

7   questions.

8           What changes the subtotal to equal that total?

9   Do you know?  Usually there's something that says like --

10  you know, tax or -- you know, profit for the contractor

11  or something --

12     A    Well, I'm -- again, just looking at the 121, 471

13  is the 592.  And then you have 67,5 and 26, which I'm

14  reading upside down...

15     Q    Yeah.  Let me see that.  I don't know what those

16  refer to, though.

17     A    I think they refer to -- this portion here seems

18  to be the -- again, I'm reading upside down -- the

19  architectural portion of 67 and change, and then the

20  Construction Administration is 26.  So --

21     Q    All right.

22     A    -- that -- that's how I'm reading it.

23     Q    Okay.  Let me see that again.

24          Is this solely related to the main building?

25     A    I don't know.  You know, again -- I'm not sure.

```
                                              Page 191
```

1    And I may have mentioned this to you previously that I've
2    asked Dahill to clarify that.
3        Q     Uh-huh.
4        A     Because it may refer to other portions.
5        Q     Have they refer- -- have they clarified it?
6        A     I haven't received that yet.  I've spoken to
7    them recently, and we're in the process of getting that
8    figured out.
9        Q     Right.  Because at the time that Art prepared
10   this report, the Superior Court case regarding many other
11   structures was still pending, wasn't it?
12       A     I think so.
13       Q     Okay.  So he wasn't limiting it to the issues,
14   necessarily, in this Federal District Court case?
15       A     Yeah.  I -- I have agreed, and I think I've
16   represented to you that that may include buildings that
17   are not part of this lawsuit, in which case we need to get
18   further clarification from Dahill.
19       Q     Was that provided as the damages that were
20   sought to be recovered in the Superior Court case?
21       A     No.  Because the main house was not included.
22       Q     And maybe this answers it.
23             Take a look at -- it's a weird thing.  I guess
24   this is dated May 17, 2018.  I -- I've never seen a date
25   written like that.  But look at Exhibit 5.

```
                                              Page 192

 1        A      People in the northeast does things differently.

 2        Q      Yeah.

 3        A      Okay.

 4        Q      What is that document?

 5        A      This -- this appears to be the main pavilion

 6    budget based upon costs in 2018.

 7        Q      Okay.  So that would be, at that time, Dahill's

 8     estimate to repair anything regarding the main building;

 9     correct --

10        A      Right.

11        Q      -- roo- -- roofing?

12        A      Their work would be the materials and labor, but

13    not the Architectural Contract Administration portion.  Or

14    the mobilization.

15        Q      What do you mean by the mobilization?

16        A      Well, getting scaffolding up, getting the site

17    prepped.

18        Q      Okay.  Because this says excluded are lodging,

19     travel, permits, scaffolding, and taxes.

20        A      Yeah.  Okay.

21        Q      And, again, I don't know what they mean by

22     permit here.

23        A      I -- I -- I -- I don't know if a permit is

24    required or not.  But I would think that the

25    transportation and the lodging would be a -- a big ticket
```

Page 193

1    item.

2          Q    During the original roof work that was done by

3    Daybreak -- look at that ratio of labor to materials.

4                Is that similar to your recollection of what it

5    was like before?

6          A    I don't know.  I mean...

7          Q    Does 89,000 in material sound proper to replace

8    all the copper?

9          A    For some reason --

10         Q    Considering it was '18 -- 2018?

11         A    For some reason I'm thinking we paid 80 to 100

12    for the copper initially.

13         Q    Okay.

14         A    And then plus what we paid to Huber.

15         Q    And we can check that and see.

16         A    Yeah.  So -- you know.

17         Q    All right.  Exhibit 6 looks like something that

18    may have been attached to the Hoffmann Architects -- I

19    don't know what it is.  It looks like their pricing for

20    their different personnel working on the project.  I'll

21    show this to you in a second, and you can tell me what

22    your understanding of it is.

23                Sorry.  Remind me of -- when was Irma?

24         A    2017.

25         Q    What's not making sense to me is -- well, this

1    is Exhibit 6, and I'll let you fully look at it in a

2    second.  But that date on the top in the engagement is

3    not making sense to me.

4         A    I don't understand why.  This was -- this was

5    the initial report in the Superior Court case.

6         Q    Okay.  So this is pre-Irma?

7         A    Yep.

8         Q    This is the report we were talking about

9    earlier?

10        A    Yes.

11        Q    Okay.  That's what was throwing me off.

12             MR. FRIEDBERG:  While you're looking -- can we

13        take a break so I can use the restroom?

14             MR. COSBY:  Yeah.  Go ahead.

15                  (Off the record at 3:18 p.m.)

16                  (On the record at 3:21 p.m.)

17    BY MR. COSBY:

18        Q    We talked earlier of the contention that the

19    clips were the cause of the roof lifting up -- the lack

20    of clips; is that correct?

21        A    Yes.

22        Q    And is it your understanding the clips were the

23    only thing securing the roof?

24        A    Yes.

25        Q    Or those portions of the roof to the structure?

Page 195

1      A    Yes.

2      Q    So looking at this pre-Irma report.

3           Why was Hoffmann Architects brought in?

4      A    To review the copper roof.

5      Q    Okay.  Is that the only reason?

6      A    Yes.

7      Q    Okay.  So I'm going to show you Exhibit 6 in a

8   moment, but -- but it's -- look at the highlighted

9   portion of that, and -- and take a look at anything you

10  need to verify that that is the initial report.

11          And that is the initial report from Hoffmann

12  that we were discussing earlier; correct?

13     A    Yeah.

14     Q    Yes?

15     A    Yes.

16     Q    Okay.  So it looks like there was some

17  investigation into whether there were clips or not, and

18  it was confirmed there were; is that correct?

19     A    This is on the west side, which I testified

20  earlier there was a portion taken apart, and they verified

21  there was some -- clips were there.  And there's a picture

22  showing the spacing.

23     Q    Okay.

24     A    They may not have been 9.5 on center, but they

25  were present.  And there's some notation in the photograph

Page 196

1    of what the spacing was.

2         Q    Is there any reason he -- are you suggesting he

3    limited that to the west side?

4         A    Yeah.  That was the only where -- the only area,

5    to my recollection, which was disassembled.  And it was

6    predominately because one of the ridge caps needed to be

7    redone.  And so that was the reason why it was removed and

8    redone and re-riveted back in.

9         Q    So when he's doing this work either he or his

10   crew is removing rivets; correct?

11        A    Rivets were removed.

12        Q    And under this site investigation -- and it

13   talks about things at the gatehouse, which I'm not going

14   to focus on that because we're -- we're -- we're

15   concerned with the main pavilion -- the remainder of the

16   first day was spent investigating the pan and ridge

17   construction of the main pavilion.  Traversing the entire

18   roof, defects in the pans were noted and phot- --

19   photographically documented.  A section of the

20   intersecting pans between the pie shapes of the octagon

21   was opened up by first drilling out the pop-up rivets,

22   removing the -- removing one section of cap, revealing

23   the joined pans, and unfolding the overlapped pan edges

24   to check for clips.  This condition was then reinstalled

25   with new rivets, replacing those removed.  This occupied

Page 197

1    the remainder of the day.

2            I don't see anything in there that suggests this

3    was to the west side versus the east, do you?

4        A    I can tell you I was present.  That's where it

5    was.

6        Q    Okay.  So you were present and remember all of

7    that?

8        A    I remember specifically it was the west side.

9        Q    Okay.  Was -- 10 years ago?

10       A    I don't like roofs.  I would not want to walk

11   out on the east side.  I had a lot of trepidation

12   post-Irma.

13       Q    Okay.

14       A    This was an easy area to get to.

15       Q    But this was pre-Irma.

16       A    I understand that.

17       Q    So let's not think about post-Irma trepidation.

18       A    I did not personally walk out on the east side

19   because I was literally afraid of the height.  I --

20       Q    Is the -- is the east side the ocean side?

21       A    Yes.

22       Q    Okay.  So it looks like you'd fall right down

23   the --

24       A    Thirty- to forty-five-foot drop --

25       Q    Okay.

Page 198

1      A    -- to the ground from the east side.  The west

2   side is easily accessible.  You know, you're talking

3   about -- to get onto the roof about 8-foot.

4      Q    Okay.  The second paragraph says, at the main

5    pavilion, in the morning of the second day, a section of

6    double lock seam was carefully opened up to verify the

7    double lock seaming and expose and verify the clip

8    spacing.  This joint was repaired to its original

9    condition.  As more verification was not deemed

10   necessary, no other invasive pan investigations were

11   performed.

12          So at that time it certainly --

13   Hoffmann Architects could have looked farther, but chose

14    not to; correct?

15      A    Well, anything is possible.  I'm not going to

16   speculate.

17      Q    Well, was there any reason they couldn't

18    continue to inspect different areas of the roof?

19      A    It was a question of disassembling the roof, and

20   they felt -- well, I'm not going to speak to --

21      Q    You don't have to speak --

22      A    -- Hoffmann --

23      Q    -- for them, but --

24      A    But, no, the -- upon disassembly it was noted

25   what was noted in the report.  And they then reinstalled.

1    They didn't go ahead and do destructive testing on any

2    other portion of the roof.

3        Q    All right.  It was confirmed there were clips

4     there -- at least in some portions of the roof; correct?

5        A    We're -- we're not disputing.  I've already

6    testified on the west side there were clips where it was

7    disassembled.  And the west side did not fail in Irma.  It

8    was the east side.

9        Q    There's mention of water testing.

10            Do -- were you present during that water

11     testing?

12        A    I believe I was.

13        Q    Do you know if that water testing complied with

14     any of the industry standards for professional water

15     testing as opposed to --

16        A    I -- I don't -- I don't know.

17        Q    -- using a garden hose?

18        A    I -- I don't know.  But I believe that was in

19    the gatehouse.

20        Q    Is that what it refers to as the kitchen?

21        A    Yes.

22        Q    Okay.  There's mention of applying water along

23     the exterior wall above the living room.

24            What structure is that?

25        A    The gatehouse.

```
                                        Page 200

 1      Q    Other than the west side of the roof was there

 2   any other portion of any of the roof systems on any

 3   buildings where there was an investigation as to the --

 4   whether clips were present or whether they were spaced

 5   appropriately?

 6      A    I -- I don't believe so.  But, again, I'm not

 7   100 percent sure.

 8      Q    There's mention to a Mr. Hendren's visit to the

 9   site.

10           Who is that -- Stephen Hendren?

11      A    He was a defense expert for Day- -- he was

12   Daybreak's expert.

13      Q    Was there any issue with the plaster

14   construction?

15      A    I -- I'm not sure what -- what do you mean

16   plaster construction?

17      Q    There was plaster as part of the construction of

18   the --

19      A    Well, there was -- was plaster.  The issue was

20   where the flashing met the plaster.

21      Q    I mean in general.  Did you have issues with the

22   work performed by whoever performed the plasterwork?

23      A    Not really.

24      Q    Does that mean no?

25      A    Well --
```

Page 201

1       Q    Not really sounds like maybe, maybe not.

2       A    Well, I -- I know quite a bit of plaster was --

3  came off in Irma and Maria.  I don't know what the cause

4  of it was.  But, no -- I mean, the plasterwork we were

5  satisfied with.

6       Q    Did you ever reach out to the person performing

7   the plasterwork or that company to say, hey, come repair

8   this, it didn't hold up during Irma?

9       A    They were part of the crew that worked for us.

10      Q    Okay.  Take a look at this series of photos.

11  It's titled -- this is Exhibit 7, I've marked it as, but

12  it's titled F&B v. Daybreak Rule 26 Disclosures.  And

13  it's Bates stamped 298 to 331.

14            These are photos of your home, I assume, but

15   tell me the timeframe.

16      A    These were likely pictures I took.  I think they

17  were -- they are pictures I took during the construction.

18      Q    During what portion of the construction?

19      A    Well, whi- -- while Daybreak was down there.

20  Whatever period of time that was in 2010.

21      Q    Okay.  So Daybreak's construction, you're

22   referring to?

23      A    Yeah.  I mean, you can see their workers up

24   there.  They all wear their blue shirts.

25      Q    Are there any photos contained in that grouping

Page 202

1    that in- -- that support the contention that the clips

2    weren't spaced properly or may not have been present?

3         A    No.  I -- it's part of our disclosure.  I think

4    a request had been made for photographs, and these were

5    pictures that I had taken.  And they were just to kind of

6    show what was going on.

7         Q    Yeah.  And that's how I looked at them.  I just

8    want to make sure --

9         A    No.  There's no specific --

10        Q    -- there's nothing else in there.

11        A    -- contention that those photographs document

12   anything.  It's just generally what was happening.

13        Q    All right.  So that's Composite Exhibit 7.

14             Don't need that.

15             Exhibit 9 is a separate collection of photos.

16             Tell me what those are.

17        A    These, again, would have been taken -- these

18   look like while Daybreak's people were there.

19        Q    Photos taken by you?

20        A    I -- I believe so, yeah.

21        Q    Okay.

22        A    I -- I don't see the guys there, but it looks

23   like the work was still going on.

24        Q    All right.  We'll -- I'm going to remark this

25    one as 8 because I didn't use my other 8.  So this isn't

```
                                                    Page 203
 1     going to be 9.  The one we just referenced will be 8
 2     because I took 8 out.  I don't need it, it's a duplicate.
 3     And I'll make a 9 so that I don't forget.
 4              This, I believe, was also a portion of your --
 5     it may have been a portion of your disclosure.  Maybe
 6     not.  It's listed as Exhibit 23, I think, in another
 7     deposition.
 8              But tell me what this is, to your knowledge.
 9     A     I don't know.  Looks like some specifications.
10     But that would not have been a Bates stamp I would have
11     put on.  I don't --
12     Q     Okay.
13     A     -- I don't put on Bates stamps like that.
14     Q     It just says Exhibit 3 --
15     A     Yeah.
16     Q     -- but you -- you're not aware of what this --
17     well, it's -- I think we referred to earlier, SMACNA.  So
18     maybe it's something that one of your experts provided in
19     the Superior Court case?
20     A     Maybe.
21     Q     Okay.  We'll go ahead and keep it marked as
22     Exhibit 9 even though you're not sure exactly what this
23     is.  Might have been in my client's depo even.
24              Let's mark the next set of photos -- three
25     photos -- as Exhibit 10.  This looks like maybe some kind
```

```
                                          Page 204
 1     of Google Earth or other type image.
 2              Have you ever seen those?  Does that depict
 3     anything that really helps us?
 4         A    No.
 5         Q    All right.
 6         A    Not that I know of.
 7         Q    No meaning it doesn't depict anything --
 8         A    Any particular -- it's the -- the home at
 9     some --
10         Q    Ultra faraway --
11         A    -- faraway --
12         Q    Yeah.
13         A    -- you can see our boat there and...
14         Q    Yeah.  So this is the home, it just doesn't zoom
15     in and really provide much.  I'm going to leave it in
16     there anyway as Exhibit 10.
17              Exhibit 11.  I'll show you.
18              Is this also a diagram of the roof plan of the
19     main house?
20         A    Yeah.  This looks like a -- the Springline plan.
21     And...
22         Q    That's just the structure of the roof, not the
23     copper component; correct?
24         A    I don't know the structure's layout of the -- it
25     just shows the roof from a plan view.
```

Page 205

1      Q     And that was from --

2      A     It was part of the Springline plans.

3      Q     Yeah.  Who's Paradigm Construction Services?

4      A     That was a company that we consulted with

5   regarding the gatehouse and the garage studio in terms of

6   repairs and things like that.

7      Q     All right.

8      A     It has nothing to do with this case.

9      Q     Well, the only -- I see, main house caulking,

10   remove and replace bad caulking.

11         Do you know what that refers to?

12      A     That --

13      Q     Is that roof-related?

14      A     That would be the gatehouse.

15      Q     Okay.

16      A     Because it solely was looking at the upper

17   structures.

18      Q     Well, it says main house.  I see gatehouse

19   there, but it says main house right there.

20      A     You know, again, I can't comment on that other

21   than -- I don't know.  It says it needs some caulking.

22      Q     All right.  I'm going to mark it.  I understand

23   your testimony regarding it, but I don't want to not know

24   what we were talking about --

25      A     Sure.

Page 206

1          Q     -- so I'm going to mark it.

2          A     It's your deposition.

3          Q     Where do workers lodge when they're doing

4    this -- any kind of work, I guess?  Like roofers, for

5    ex- -- instance.  If you were to have the roof replaced,

6    what are the lodging options?

7          A     Well, our house.  There are places.  We maintain

8    an apartment -- a one-bedroom apartment where we put

9    witnesses and workers.  Those really are the options.

10         Q     What do you mean witnesses?

11         A     We litigate cases down there --

12         Q     Oh, yeah.

13         A     -- I have to bring witnesses down.

14         Q     Yeah.

15         A     We need to find them lodging.  We found it

16   easier to maintain an apartment --

17         Q     Yeah.

18         A     -- for that purpose.

19         Q     Yeah.  Having seen the invoice for places like

20    The Westin, I -- I get it.

21         A     It -- it -- it it's a real challenge.

22   Especially post-COVID.

23         Q     Have you had any of the workers on the

24    construction of the home up to this point stay there?

25         A     Yes.

1      Q    Take a look at what I haven't marked yet, but

2   will mark as Exhibit 13.  It has a marking on it that

3   says Photographs Produced by Plaintiffs' Response to

4   Production, Dated -- Virgin Islands Superior Court

5   Case -- lists the number -- March 8, 2014.

6           Who took those photos?

7      A    Well, it appears -- these seem to be the same

8   photos that we previously went over that I took.

9      Q    Okay.

10     A    In addition, there seems to be pictures starting

11  on --

12     Q    It looks like there was some additional ones in

13   there, but --

14     A    Yeah.  These are dealing with the gatehouse

15  issues.

16     Q    Okay.

17     A    And the garage issue.

18     Q    All right.  Exhibit 14.  Take a look at that,

19   and tell me what that is.

20     A    It looks like an e-mail to Chris from

21  Barry Huber.

22     Q    Regarding the roof?

23     A    Yeah.

24     Q    Okay.  Dated February 8, 2010?

25     A    Yeah.  It looks like when he came down and did

Page 208

1    the measurements.
2         Q     Okay.  And CE Bunge is who?
3         A     Is Chris.
4         Q     Okay.  Who's Jack Burbach?
5         A     I'm not sure.
6         Q     He's --
7         A     It's not my e-mail.
8         Q     -- he's CC'd -- you don't know who that is?
9               No?
10        A     No, I don't know who Jack Burbach is.
11        Q     Here's -- I'll mark as Exhibit 15.  Looks like
12    an e-mail from Barry to you regarding waste or projected
13    waste; is that correct?
14        A     Uh-huh, yeah.
15        Q     All right.
16        A     Yeah, that seems to be what he's addressing.
17        Q     Exhibit 16 looks like another e-mail from Barry
18    to Ron Barker; CC Jamin Huber, one of his crew;
19    Jack Burbach, I assume is one of his crew.  Talking about
20    the 20-foot storage container and where to put the
21    copper.
22              Is that the gist of that?
23        A     Yeah.
24        Q     Exhibit 17 looks like an e-mail from Barry to
25    you dated May 22, 2010.  Let me know if you agree, and

Page 209

1    what -- what is the gist of that?  More again like

2    storing the copper or some logistics regarding that?

3         A    Yeah.  I mean, it's hard to read, but -- yeah.

4         Q    Whoever this Jack Burbach is, this is an e-mail

5    from him dated June 25, 2010 to Barry and Ron Barker

6    talking about something to do with extra square footage.

7              Do you know what they're referring to there?

8         A    I have no idea.  I'm not on the e-mail.  So...

9         Q    Okay.  You don't know if that's about the

10    additional square footage for more copper needed?

11        A    I'd be speculating.  I don't know.

12        Q    Okay.  Here's one you should know about.  A

13    letter from your office to Barry.  I think we were -- you

14    were referring to this earlier.  Kind of your breakdown

15    of where you were in terms of charges and payments and so

16    forth.

17        A    Yes.

18        Q    That'll be 19.

19             Exhibit 20 is an -- looks like an e-mail from

20    Barry to you dated August 23, 2010.  Read that one and

21    tell me what your understanding of that e-mail is about.

22             My first question being is that after Barry left

23    the job?

24        A    Yes.  I think that summarizes Barry's sentiment

25    quite well.

Page 210

1        Q    He says, I guess you guys went ahead with the
2    final items you wanted punched out.
3             Did someone -- did Chris performed those punch
4    list items you talked about?
5        A    He may have.
6        Q    Do you have the punch list?
7        A    No, I wouldn't have it.
8        Q    Have you -- would Chris have it?
9        A    I don't know if it was an actual punch list
10   or -- I -- I don't recall.
11       Q    Yeah.
12       A    But here's in August.  They walked off July 3rd.
13   So we're talking over a month later.  And there was no
14   indication that Barry or any of his crew were going to
15   come back to do anything.  Other than just threats of
16   litigation.
17       Q    That's 20.
18            Before I mark it -- well, I guess I'll mark it.
19    Exhibit 21 looks like cabinets with mold.
20            Is that in another structure?
21       A    This is in the gatehouse.
22       Q    Okay.  I'll keep it marked, but realizing this
23    is not the main house.
24            Did the main house have cabinets like that, that
25    African wood?

```
                                               Page 211
 1        A     No.

 2        Q     No?

 3              Mark this as Composite 22.  I'll have you look

 4    at this quickly as well.  The bottom Bates thing says

 5    Gatehouse Cabinet Invoices.

 6              So that's not related to the main house;

 7    correct?

 8        A    Correct.  And this is example of how we dealt

 9    with these people.  They would give us bills -- Andy and

10    David.  So you asked how we dealt with them earlier.

11        Q    I don't remember asking -- you're talking

12    Andy Simpson?

13        A     Andy Hardesty.

14        Q     Oh, okay.  Okay.

15        A     They would give us a -- a document, and we'd pay

16    it.

17        Q     Let me show you Exhibit 23.  It's titled

18    Huber & Associates, all transactions for you and your

19    wife.

20              See if you recognize it.

21        A     Well, this is not my document.  This is Huber's

22    document.

23        Q     I know.  Do you -- have you ever seen that

24    before?  In the other litigation, perhaps?

25        A     You -- you know, I might have when I took his
```

```
                                              Page 212
 1    deposition.  I haven't looked at it for a number of years.
 2         Q    Okay.  That's Exhibit 23.
 3              All right.  Twenty-four -- Exhibit 24.  Take a
 4    look at this.
 5              Do you recognize this set of documents?
 6         A    Yeah.  These are Huber's documents.
 7         Q    Related to expenses or what?
 8         A    I don't know.  I mean, something I think I saw
 9    when I took his deposition.
10         Q    Exhibit 25, I believe, is the settlement
11    agreement in the Superior Court case.
12              But take a look at that, see if you agree.
13         A    Do you have a copy with your client's signature?
14         Q    I don't know.  That's the copy I have.
15         A    Okay.  I believe your client had insisted on
16    confidentiality.  So --
17              MS. BUNGE:  That shouldn't be in the record.
18         A    -- it shouldn't be in the record.
19         Q    Well, I will keep this document separate.  I'm
20    not going to have it attached to the deposition.
21              But this is the settlement agreement; correct?
22         A    Yes.
23         Q    And it could be an issue in this case, which may
24    take it outside of the confidentiality order.  Not for
25    all the public, but for at least our case.  We'll see.
```

Page 213

1    But certainly what you agreed to release could be an
2    issue.  So I'll -- I'll maintain that exhibit.  If you --
3    I'm sure you have a copy, but if you need a copy of the
4    one I have, I'm happy to provide it.  He probably already
5    provided it.
6        A    I would like one with your client's signature.
7        Q    What's that?
8        A    I would like one with your client's signature.
9        Q    I -- I don't -- I don't know that -- this is the
10   only one that I'm aware of that I have.  So...
11       A    I never received a signed copy back from Joe.
12       Q    Okay.  Well, as you know, I wasn't part of that.
13   But...
14       A    I understand.
15       Q    What was that 25?
16            So 26.  I think this is the current action for
17   damages/complaint that we're traveling under in the
18   Federal District Court case; correct?
19       A    Yes, it appears to be.
20       Q    All right.  We've got that as 26.
21            This last set of documents is listed as a
22   composite, and I think it's continuous 1 through 86.
23   It -- it's titled Photographs from Hoffmann Deposition.
24            Take a look at that, and see if you recognize
25   those documents -- or those photos?

Page 214

1        A    Yeah.  I mean, they appear to be photos of

2    different portions of our house and the residents --

3    iguanas.

4        Q    Do you charge them rent?

5        A    When we built we were hoping to see iguanas on

6    our property.  Be careful what you wish for.

7        Q    Yeah.  Florida Keys has a run of those as well.

8             All right.  Let me just look over my notes.

9     It's four o'clock magically, and we may be finished here.

10            What is -- is there anyone currently that's

11     planned to visit the roof, inspect the roof?

12        A    I don't know.  I don't -- as we sit here

13    today --

14        Q    Nothing is scheduled right now?

15        A    -- nothing scheduled.

16        Q    Are there any photographs that exist regarding

17     the main building roof -- main residence roof in addition

18     to those that we've gone over?

19        A    I -- I mean, I suspect --

20        Q    That you have custody or control of?

21        A    I -- I mean, I suspect there's a number of

22    photographs during the construction.  You know?  But I

23    think that we've produced the ones that at least we have

24    that were taken during the work done by your client.

25        Q    Are there any lawsuits or claims related to the

Page 215

1     property that we haven't discussed?

2          A     You mean this particular property?

3          Q     Yeah.  The Chocolate Hole property.

4          A     I don't know if it's still pending or not, but

5     my neighbor up the hill claims that our gatepost

6     encroaches on his property.  And our position is that the

7     driveway has been in existence since the '50s, and so it

8     is what it is.  But that case -- I don't know if -- what's

9     happened with it.  It's in the Superior Court.  Cases just

10    kind of don't move.

11         Q     The release from the homeowners insurer, did

12    that include any damage to the main roof?

13         A     I don't know.

14         Q     What inspections occur for a Virgin Islands

15    property or St. John's property?  Are there any --

16         A     Can you be more specific?

17         Q     Yeah.  You built this home.  What -- what was

18    required -- did they come in and inspect anything or is

19    it just --

20         A     The --

21         Q     -- you build your property --

22         A     No.

23         Q     -- build your house and so be it?

24         A     No.

25         Q     Talking about agencies.  Like if you built a

Page 216

1      house here --

2          A    Yeah.  You -- you need to get a permit, and then

3      there needs to be inspections.  And that all has to take

4      place.  I mean, things have changed a bit in terms of the

5      stringency.  But, again, we haven't been in the process of

6      needing inspections.

7          Q    Right.

8          A    I understand now a lot of them could be called

9      in.

10         Q    Right.

11         A    When we were building, they had to go out there

12     and actually physically inspect.

13         Q    Did any of the components of the building fail

14     inspection?

15         A    No.  Not that I'm aware of.

16         Q    And I don't mean roof.  I mean anything

17     whatsoever.

18         A    No.  No, not that I'm aware of.

19         Q    Are there any persons other than names we've

20     already discussed that have any knowledge of your damages

21     claims?

22         A    Not that I'm aware of.

23         Q    Okay.  Let me just look over my notes some more.

24              Was a replacement of the main house roof any

25     part of the claim in the Superior Court?

Page 217

1       A     No.

2       Q     Was there any discussion of failure to have

3    cleats in the Superior Court case?

4       A     No.

5       Q     Was it ever suspected during that first case

6    that cleats may not have existed?

7       A     No.

8       Q     Or may not have been spaced correctly?

9       A     No.

10       Q     So none of that was discussed in the depo taken

11    of your expert?

12       A     Yeah, there -- there was some issue that we

13    talked about on the west side.  We looked at it, and I

14    think those were some of the photos in the exhibits.  They

15    weren't 9.5 inches on center, but they were there.

16       Q     Yeah.

17       A     And he marked whatever dimensions there were.

18    And I think that was the extent of it.

19       Q     Some of them were 9, some less than 9, and one

20    over 9?

21       A     He wrote down on the photo.  He annotated.

22       Q     Yeah.

23       A     So it is what it is.

24       Q     Other than Chris has any -- Chris and his crew

25    has anyone else performed any work on the roof since

```
                                              Page 218
 1    Irma?
 2         A    Well, the Dahill folks.
 3         Q    Other than that?
 4         A    No.
 5         Q    Was there any cable TV or cables that involve
 6    the roof of the main house?
 7         A    No.
 8         Q    Cabling?
 9         A    No.
10         MR. COSBY:  That's all the questions I have.
11         MR. FRIEDBERG:  Thank you.
12         MR. COSBY:  If there's anything you want to
13    question yourself about...
14         MR. FRIEDBERG:  No.
15         MR. COSBY:  But if not --
16         MR. FRIEDBERG:  No.
17         MR. COSBY:  -- read or waive?
18         MR. FRIEDBERG:  Yeah.  I'll read and review.
19    And I'll take a -- a copy sent to me with a full
20    suite, exhibits and everything.
21         THE COURT REPORTER:  All right.  And for you
22    also, sir?
23         MR. COSBY:  I'm ordering the deposition, yes.
24              (Deposition concluded at 4:07 p.m.)
25
```

Page 219

1                      CERTIFICATE OF REPORTER
2
3      STATE OF ARIZONA )
                        )              ss:
4      COUNTY OF PIMA   )
5
              I, Gina Castro, a Certified Shorthand Reporter
6      for the State of Arizona and Registered Professional
       Reporter, do hereby certify that the foregoing deposition
7      was taken before me in the County of Pima, State of
       Arizona; that an oath or affirmation was duly
8      administered by me to the witness, THOMAS F. FRIEDBERG,
       pursuant to A.R.S. 41-324(B); that the questions
9      propounded to the witness and the answers of the witness
       thereto were taken down by me in shorthand and thereafter
10     reduced to typewriting; that the transcript is a full,
       true, and accurate record of the proceeding, all done to
11     the best of my skill and ability; that the preparation,
       production, and distribution of the transcript and copies
12     of the transcript comply with the Arizona Revised
       Statutes and ACJA 7-206(J)(1)(g)(1) and (2).
13            The witness herein, THOMAS F. FRIEDBERG,
       reserved right to review and signature.
14            I FURTHER CERTIFY that I am in no way related to
       any of the parties nor am I in any way interested in the
15     outcome hereof.
              IN WITNESS THEREOF, I have set my hand in my
16     office in the County of Pima, State of Arizona, this
       9th day of April 2025.
17
18                              *Gina Castro*
19                              _____
20                              Gina Castro, CSR, RPR
                                Arizona Certificate No. 50989
21
          I certify that Veritext Corporation has
22     complied with the ethical obligations set forth in ACJA
       7-206(J)(1)(g)(1) through (6).
23
24
                      _____
25                    Veritext Corporation, RRF No. R1061

```
                                                    Page 220
```

1    Thomas F Friedberg

2    tom@lawofficefb.com

3                          April 9th, 2025

4    RE:  Friedberg, Thomas F. v. Daybreak, Inc.

         3/17/2025, Thomas Friedberg (#7235554)

5

6        The above-referenced transcript is available for

7    review.

8        Thomas Friedberg should read the testimony to

9    verify its accuracy. If there are any changes,

10   Thomas Friedberg should note those with the reason

11   on the attached Errata Sheet.

12       Thomas Friedberg should, please, date and sign the

13   Errata Sheet and email to the deposing attorney as well as

14   to Veritext at Transcripts-fl@veritext.com and copies will

15   be emailed to all ordering parties.

16       It is suggested that the completed errata be returned 30

17   days from receipt of testimony, as considered reasonable

18   under Federal rules*, however, there is no Florida statute

19   to this regard.

20       If the witness fails to do so, the transcript may be used

21   as if signed.

22                    Yours,

23                    Veritext Legal Solutions

24

      *Federal Civil Procedure Rule 30(e)/Florida Civil Procedure

25     Rule 1.310(e).

Page 221

1    Friedberg, Thomas F. v. Daybreak, Inc.

2    3/17/2025, Thomas Friedberg (#7235554)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19

20   Under penalties of perjury, I declare that I have
     read the foregoing document and that the facts

21   stated in it are true.

22

23   _____  _____

             (Thomas Friedberg)                DATE

24

25

[& - 2025]                                                                    Page 222

**&**

**&**   1:7 2:10,16
4:3,3 151:25
152:1,7,15,23
161:5 211:18

**0**

**0053**   1:5
**00830**   7:2
**00831**   7:2
**07039**   1:24
**09**   22:9

**1**

**1**   3:8 149:10
155:1 167:13
177:20 213:22
219:12,12,22,22
**1.04**   108:7
**1.310**   220:25
**1/12**   177:20
**10**   3:15 15:5
22:9 72:3 95:5
131:8,8,9 170:6
197:9 203:25
204:16
**10,735**   159:3
**100**   32:1,6 86:13
193:11 200:7
**100,000**   85:3,15
**1005**   2:11
**10:15**   1:13 2:2
**11**   3:15 204:17

**11,000**   95:5
**110**   91:10,12
106:12
**12**   3:16 71:1,21
77:25 95:25
96:5,10 97:1
99:14 183:19
**12,526**   158:12
**1200**   2:4
**121**   190:12
**12:06**   87:7
**12:12**   87:8
**13**   3:16 167:3,7
207:2
**14**   3:17 183:24
207:18
**149**   3:8
**15**   3:18 155:13
159:13,16
178:18 208:11
**150**   82:15
**154**   3:9
**156**   168:11
**157**   3:10
**16**   3:19 151:20
208:17
**160**   176:10
**164**   3:11
**165**   168:11
**168**   7:1
**17**   1:12 2:2 3:20
173:20 191:24
208:24

**18**   3:21 18:24
26:19 178:11
193:10
**19**   3:22 158:4
178:14 179:8
181:14 209:18
**191**   3:11
**193**   3:12
**1932**   168:12
**1983**   6:8
**1995**   8:2
**1:26**   144:19
**1:27**   144:20
**1:29**   147:1,2
**1:30**   148:3

**2**

**2**   3:9 116:23,25
154:13 219:12
**2-19-2010**   3:10
**2-8-2010**   3:18
**20**   3:23 65:12
66:13 91:17
100:5,8,16
109:3 113:23
138:15 186:3,21
187:19,21
208:20 209:19
210:17
**200**   94:22 168:4
**2000**   17:19
31:21
**2001**   17:19 19:2
31:21

**2002**   19:2
**2003**   19:2
**2004**   19:4
**2009**   22:7 23:8
**201**   3:13
**2010**   22:7 23:8
39:16 58:1 63:1
158:4,16 161:14
201:20 207:24
208:25 209:5,20
**2014**   207:5
**2017**   62:25
85:23 117:14
139:7 167:25
173:11 193:24
**2018**   71:16
137:25 138:15
143:3 166:5,8
167:3 175:24
176:1 191:24
192:6 193:10
**2019**   188:3,5
**202**   2:11 3:14
**2020**   85:24
129:20 130:23
130:25
**2021**   130:23
**2023**   129:16
130:5
**2024**   15:16,22
124:21 129:14
131:5,15 138:5
**2025**   1:12 2:2
124:23 125:6

**[2025 - 8]**

171:13 219:16
220:3
**203**   3:14,15
**204**   3:15
**205**   2:17 3:16
**207**   3:17,18
**208**   3:20,21
**209**   3:19,22,23
3:24
**21**   3:24 210:19
**210**   3:24
**211**   3:25 4:3
**212**   4:4,4
**213**   4:5,6
**22**   3:25 113:23
158:16 208:25
211:3
**225**   75:3,6 82:17
82:21 162:3
**23**   4:3 203:6
209:20 211:17
212:2
**23364**   219:19
**23andme**   61:2
**24**   4:4 181:22
212:3
**24/7**   68:10
**25**   4:4 209:5
212:10 213:15
**26**   3:13 4:5
142:11 183:11
184:7 190:13,20
201:12 213:16
213:20

**27**   4:6 183:19
**28**   184:1
**290**   1:24
**298**   201:13
**2:06**   148:4

**3**

**3**   3:10,15 157:25
158:5,25 160:24
203:14
**3,000**   29:19
**3,520**   176:11
**3-8-2014**   3:17
**3/17/2025**   220:4
221:2
**30**   113:22 176:1
220:16,24
**301**   2:17
**3200**   1:24
**33**   186:20
**331**   201:13
**34**   71:7 184:5,8
**34994**   2:17
**38**   71:7
**3:18**   194:15
**3:19**   1:5
**3:21**   194:16
**3:30**   44:14
**3rd**   210:12

**4**

**4**   3:4,10 164:20
181:23
**4,000**   62:21

**40**   151:5 185:24
186:6,7 187:4
**40,000**   113:22
**400**   143:4
**41-324**   219:8
**43**   184:23
**44**   184:24
**471**   190:12
**49**   185:14
**4:07**   2:2 218:24
**4th**   39:17

**5**

**5**   3:11 54:16
163:17 168:9
181:23 182:3
191:25
**5,000**   29:19
62:21,21
**5-17-2018**   3:11
**5-19-2010**   3:19
**5-22-2010**   3:20
3:21
**50**   83:25
**50/50**   42:2
**50989**   1:15
219:20
**50s**   215:7
**58**   167:7 190:5
**592**   190:13
**592,920**   190:5

**6**

**6**   3:12 54:16
72:3 193:17
194:1 195:7
219:22
**6-25-2010**   3:22
**60**   188:3
**619-557-0101**
2:13
**67**   190:19
**67,5**   190:13
**6814**   2:12
**687,088**   190:6
**6th**   168:3

**7**

**7**   3:13 44:14
161:14 201:11
202:13
**7,000**   54:16
**7-13-2010**   3:23
**7-206**   219:12,22
**7235554**   220:4
221:2
**75**   82:16
**75,000**   150:15
**772-463-8402**
2:18
**7th**   161:10

**8**

**8**   3:14 72:3
158:6 198:3
202:25,25 203:1

[8 - admitted]

203:2 207:5,24
**8-23-2010** 3:24
**80** 176:5 193:11
**800-567-8658**
1:25
**82** 109:11
**8200** 51:8,12
**8400** 109:11
**85701** 2:4
**86** 213:22
**89,000** 193:7

**9**

**9** 3:14 202:15
203:1,3,22
217:19,19,20
**9,350** 165:13,20
**9.05** 159:5
**9.5** 70:15,25
71:21 76:5
95:18 96:1,5
99:14 159:16
160:13 163:22
195:24 217:15
**9.5.** 96:10
**90** 188:3
**92166** 2:12
**95** 82:15
**96** 177:20
**9th** 219:16
220:3

**a**

**a.m.** 1:13 2:2
**a.r.s.** 219:8
**abandoned**
91:13
**ability** 78:2 83:1
219:11
**able** 43:11 52:14
113:2 134:8
171:8
**above** 89:24
92:1 106:24
168:11 183:22
184:16 199:23
220:6
**absent** 146:10
157:9
**absolutely** 91:1
**ac** 133:13
148:14,15
**acc** 64:24
**accepted** 159:19
**access** 69:4
**accessed** 137:4
**accessible** 198:2
**accommodated**
69:9
**accomplish**
169:23
**accordance**
151:24
**account** 53:17

**accounting**
64:24 65:5
**accuracy** 220:9
**accurate** 106:19
219:10
**accurately**
153:25
**aced** 180:5
**acja** 219:12,22
**acre** 108:7
**acs** 148:7,17,19
149:1
**act** 61:21
**acting** 74:5
**action** 1:4 4:5
153:16 154:3,17
154:18 164:18
213:16
**actively** 128:7
**actual** 34:12
46:7 80:8 84:5
89:10,13 95:23
108:18 210:9
**actually** 9:1
35:6 48:22 58:6
61:2 82:25 83:1
110:22 120:5
121:9 128:7
141:12 157:19
216:12
**add** 86:3 94:23
94:25 95:3,5,10
96:19 97:21
108:8,9 141:7

159:7
**added** 50:15
141:24
**adding** 118:13
119:19
**addition** 164:12
169:11 207:10
214:17
**additional** 96:1
99:20 108:9,10
113:20 114:10
114:17 115:1
142:5 158:13
168:20 207:12
209:10
**additions** 50:23
**address** 6:25 7:1
7:5,6,7 13:15
17:6
**addressed** 63:19
63:20 90:12
174:25 175:1
**addresses**
144:12
**addressing**
104:24 142:12
208:16
**administered**
219:8
**administration**
190:20 192:13
**admitted** 6:9
126:11

**[advisable - appeared]**

**advisable** 120:4
**advised** 54:18
  59:23 74:2 76:2
  103:22 142:7
  163:24
**aesthetics** 49:20
**afastened**
  155:13
**affect** 55:6,9
  132:19,19
**affected** 134:19
  143:9
**affirmation**
  219:7
**affirmed** 123:9
**afraid** 197:19
**african** 210:25
**agencies** 215:25
**agent** 84:19,20
  101:22
**agents** 101:25
**ago** 13:16 34:18
  37:22 51:9
  113:5 129:2,5
  148:16,16 172:3
  172:5 197:9
**agree** 27:5
  120:3 128:10
  154:15,17
  168:21 169:3,25
  170:2 184:9
  187:6,10 189:23
  208:25 212:12

**agreed** 30:2
  63:5 96:14
  151:23 153:7,9
  158:11 161:21
  161:21 162:1
  164:1 176:3
  191:15 213:1
**agreement** 4:4
  159:15,15
  161:16 212:11
  212:21
**ahead** 87:2
  194:14 199:1
  203:21 210:1
**aims** 184:18
**air** 128:16
**airport** 115:15
**allegation** 37:18
  156:25
**allegations**
  37:25 152:16
**allowed** 70:17
**allowing** 130:17
**alongside** 21:13
**altered** 92:5
  118:19
**alternate**
  160:18,22 161:2
**alternative** 99:9
**altitude** 91:8
  92:2
**american** 19:18
  147:17

**americans**
  115:14
**amount** 31:1
  55:13 84:25
  85:1,2,5 86:3,3
  86:4,7 105:22
  108:24 109:9
  118:10 120:12
  120:15,16
  122:23
**amounts** 56:16
  114:20
**analysis** 98:24
  108:11
**analyze** 166:15
**anchor** 106:13
**andy** 18:18,19
  19:5,9,10 20:1,4
  21:13,16 22:6
  22:10,13 23:2,4
  29:20,25 30:12
  110:16,17,17
  111:21 211:9,12
  211:13
**andy's** 19:8 22:4
**angle** 106:13
**annealed**
  142:22
**anniversaries**
  125:8
**anniversary**
  125:14
**annotated**
  157:22 217:21

**answer** 3:8 21:6
  32:5 34:8 53:6
  104:25 107:15
  113:8 126:15,19
  137:16 138:19
  142:24 145:8
  149:14,23
  160:11 162:23
  163:4,8 176:12
**answered** 42:6
  71:17
**answers** 191:22
  219:9
**antenna** 184:14
  184:17
**anticipated**
  188:2
**anybody** 87:4
**anymore** 40:10
**anyway** 21:7
  204:16
**apart** 71:10,21
  72:11,17 153:9
  195:20
**apartment**
  206:8,8,16
**apparently**
  158:11 160:6
**appear** 25:10
  130:5 214:1
**appearances** 2:8
  130:15
**appeared** 38:9
  43:18 45:21

**[appeared - attorney]**                                                Page 226

63:24 130:2
**appears** 154:16
 158:10 165:3
 166:5 192:5
 207:7 213:19
**applicable**
 152:1
**applied** 137:9
 183:15,18,18
**applying** 199:22
**approach**
 169:24 171:5
**appropriate**
 41:5 121:10
 143:20
**appropriately**
 200:5
**approve** 68:13
**approved** 76:18
**approximate**
 23:6 89:17
**approximately**
 15:22 18:1 22:5
 56:16 70:15
**april** 219:16
 220:3
**architect** 97:23
 98:8,14 109:10
 109:15,19
 111:15,16
 119:18,23 120:3
 120:7,10,23
 122:25 123:3

**architect's**
 111:11
**architects** 3:12
 97:24 98:5,11
 98:12 112:2
 136:7 137:11,14
 176:8 190:3
 193:18 195:3
 198:13
**architectural**
 32:20 119:6
 190:19 192:13
**area** 6:7 16:4
 21:10 28:10
 71:10 72:19
 88:22 89:2,2,14
 90:6 91:25
 100:6 139:13
 162:8 180:24,25
 185:2 186:3
 196:4 197:14
**areas** 6:19 33:6
 43:17 70:22
 73:8 76:3 88:9
 89:10 141:1,2,2
 141:7,24 149:7
 155:7,8,10
 164:12 165:17
 174:12 175:5
 183:17 198:18
**argue** 9:15
**arizona** 1:15 2:4
 2:5 127:9 219:3
 219:6,7,12,16

219:20
**armor** 82:13
**arose** 85:12
**arrangement**
 135:17
**arrest** 57:14
**arrive** 101:24
 103:21
**arrived** 64:22
**art** 3:10 38:4
 71:14 76:1
 136:2,9,13
 137:12,13
 140:11 157:24
 166:10,15 167:4
 167:5,16,24
 169:20 171:11
 172:2,2 173:10
 173:13 181:20
 185:9 191:9
**art's** 136:5
 167:9 170:25
 181:11 189:20
**aside** 28:5 33:4
 49:20 65:5
 97:20
**asked** 31:19
 62:4 73:23
 108:20 113:3
 126:1 142:21
 144:22 191:2
 211:10
**asking** 42:5
 62:10 71:24

163:10 172:15
 211:11
**aspects** 34:24
 42:9 134:7
**assessment**
 168:23
**assets** 123:15
**assist** 119:9
**assisting** 50:19
**associated** 7:6
 168:16
**associates** 1:7
 4:3 161:5
 211:18
**association**
 93:14
**assume** 28:11
 33:18 52:5 74:5
 81:14 90:21
 146:12 158:6
 175:15 201:14
 208:19
**assuming**
 175:21
**atlantic** 168:10
**attached** 184:12
 184:15,16,20
 193:18 212:20
 220:11
**attention** 43:19
 43:20,21 45:1
 59:13,17
**attorney** 5:21
 126:22 171:12

**[attorney - beginnings]**

220:13
**attorney's**
  123:14
**august**  166:5,7
  209:20 210:12
**author**  173:13
**availability**  33:5
**available**  29:7
  56:5 68:24
  115:20,23
  159:14 169:22
  220:6
**avenue**  1:24 2:3
**average**  145:21
  159:5
**avoiding**  130:20
**aware**  49:24
  66:15 72:14
  75:4 83:5 88:9
  109:14 118:7,9
  120:9 141:19
  155:25 157:7
  170:4 177:16
  203:16 213:10
  216:15,18,22

**b**

**b**  1:7 24:20
  100:21 219:8
**back**  17:21,21
  34:4 40:21 52:3
  64:17 67:1
  68:11 80:25
  92:4 114:1

138:11 145:16
147:23 148:6,20
154:21 173:1
186:18 196:8
210:15 213:11
**background**
  16:10 58:24
  167:25
**bad**  205:10
**baker**  43:9
  99:16
**ballpark**  94:16
**bar**  27:11 59:2
  120:25
**barefoot**  98:11
  120:10,19,20,24
  121:6 122:15
  123:15,21,23
**barge**  78:8
**barker**  3:19
  208:18 209:5
**barring**  146:5
**barry**  3:17,18
  3:19,20,21,22
  3:23 35:18 43:3
  43:6,11 45:5
  46:2,13,23 48:3
  53:25 59:3 63:1
  64:13,14 65:1
  67:8,14 68:12
  68:23 69:2
  96:12 97:4
  108:18 109:15
  109:21,25 111:6

111:7 114:16
119:16,21,24
120:1 149:12
156:10 160:3,5
161:5 173:4,7
207:21 208:12
208:17,24 209:5
209:13,20,22
210:14
**barry's**  37:13
  38:17 39:9
  40:17 41:1
  43:19 44:15
  45:18 46:1 47:3
  58:11 59:5
  66:24 67:2
  68:17 69:21
  108:11 112:24
  173:5 209:24
**based**  82:12
  110:11,24
  162:20 190:1
  192:6
**basically**  17:1
  26:14 37:13
  69:2
**basis**  28:21 30:9
  145:16
**bates**  159:2
  164:21 178:10
  201:13 203:10
  203:13 211:4
**bath**  8:15 9:3,7
  180:18

**bathrooms**
  10:12
**baths**  9:25 10:9
**batten**  177:22
**battens**  118:24
  118:24 119:1,2
  119:6,9 177:20
**battering**  83:6
**bay**  12:25 13:1
  13:5 29:11,17
  134:9,10,12
  184:18
**beach**  8:25
  10:14 27:11
  59:2 120:25
  148:14 178:3
  183:10 188:1
**beautiful**  91:25
**bed**  9:7
**bedroom**  8:14
  9:3,10,18,19
  10:11,16 28:3
  89:15 180:23
  182:10 206:8
**bedrooms**  9:16
  9:20
**beds**  10:8
  135:11
**began**  11:19
  94:25
**beginning**  31:8
  46:6
**beginnings**
  92:20

**[belief - builder]**

**belief** 159:22
**believe** 14:4
  16:12 17:15,19
  19:20 21:2
  30:21 43:6 47:5
  47:14 48:8,10
  50:17 52:6 56:3
  57:9,12 58:7
  62:12 63:7,17
  63:18 64:25
  69:14 70:4,22
  71:14 76:3 80:5
  85:7 89:23 91:6
  92:12 96:25
  97:13 101:18,21
  102:4 106:4
  113:2 115:2
  119:11,21 120:8
  124:2 135:15,25
  141:12 149:11
  155:11 156:2
  158:21 159:12
  159:21 171:15
  174:6,24 176:1
  179:3,4 187:23
  199:12,18 200:6
  202:20 203:4
  212:10,15
**believed** 114:23
**bell** 187:16
**bells** 174:12,23
**belong** 91:18
**bend** 140:23
  179:5

**best** 18:21,22
  74:10 179:18
  219:11
**better** 22:18
  142:14
**beyond** 67:20
  166:4
**bid** 48:10 52:3,5
  52:7 54:3
  113:14
**bids** 140:4
**big** 29:17 34:21
  77:10 80:1
  86:18 192:25
**bigger** 112:12
  114:6
**bill** 120:15
**billed** 30:9
  64:22 176:23
**billing** 99:12
  110:24
**bills** 211:9
**birthday** 125:14
**birthdays** 125:8
**bit** 24:14 54:12
  83:18 84:2
  145:5 201:2
  216:4
**bitch** 106:15
**bizarre** 115:12
**black** 48:25
  49:1
**blew** 89:19 90:5

**blocking** 176:25
**blood** 61:3
**blowdown** 7:22
**blown** 172:19
**blue** 12:25 13:1
  13:5 106:15
  134:9,10,12
  201:24
**boat** 78:14,15
  78:17 83:21
  204:13
**boil** 153:25
**borrow** 60:22
**bottom** 211:4
**bought** 93:18,25
  143:18
**boulevard** 2:17
**boun** 73:24
**bounce** 73:21,23
  74:12 88:16
**bouncing** 88:11
**box** 2:12 165:23
**boxes** 102:7
**branson** 47:11
**breach** 4:5
  82:19 89:15
  152:16,19
  153:16 154:4,18
  154:22,24
**breached**
  164:10,18
**breaches** 89:10
  89:13,22

**break** 14:24
  30:23 31:2
  33:16,23 34:2
  39:2,7 87:3,4,5
  87:23 148:7
  170:5,8 194:13
**breakdown**
  209:14
**bring** 43:19,19
  45:1 56:13
  59:13 72:2
  123:2 133:12
  206:13
**bringing** 100:8
  115:14 122:24
**broken** 180:25
  181:4
**brother** 15:12
**brought** 18:18
  41:14 43:21
  59:17 60:24
  90:15 99:21
  100:11 109:22
  121:2 154:12
  186:6 195:3
**budget** 3:11
  192:6
**build** 13:1 31:9
  33:6,14 67:10
  120:2 121:5
  122:3 215:21,23
**builder** 12:10
  12:11,17,20

**builders** 13:1,19
18:17 81:24
134:9,12
**building** 8:16
16:25 21:10
28:2 31:8 36:14
59:20,25 70:7
74:11 81:5
94:17 112:3,21
190:24 192:8
214:17 216:11
216:13
**buildings** 8:18
27:10 32:13,15
32:17,24 36:1,5
36:13 37:11,12
51:20,22 52:1
81:1,10 191:16
200:3
**built** 8:14 10:25
31:5 74:21,21
98:6 214:5
215:17,25
**bunge** 1:4 2:10
2:11 3:8,9,17
4:3,4 15:12
158:2,3,4 208:2
212:17
**burbach** 3:21
208:4,10,19
209:4
**business** 120:22
127:7,19

**buttoned**
129:23,25
**butts** 10:25
**buy** 28:7 105:21
**bvi** 46:9

**c**

**c** 2:16 14:3
**cabinet** 3:25
211:5
**cabinets** 3:24
11:16,24,25
210:19,24
**cabinetwork**
11:23 12:13
**cable** 218:5
**cables** 218:5
**cabling** 218:8
**cad** 51:6 109:19
110:11
**california** 2:12
6:1 29:24 30:15
127:17 145:2
**call** 8:22 25:21
28:3 29:7
106:15 111:23
118:19 125:15
141:3 156:23
157:1 175:16,19
**called** 8:16 24:2
27:17 49:18
82:10 135:16
152:17 153:17
216:8

**calling** 23:22
25:10 41:5,14
101:6
**calls** 162:21
**cantilevered**
121:11,13
**cap** 47:20 72:25
196:22
**caps** 177:19
196:6
**car** 9:5
**card** 129:6
**care** 14:14
15:13 17:2
34:24 44:2
188:25
**careful** 214:6
**carefully** 198:6
**cargo** 115:21
**caribbean** 168:1
168:8
**carnival** 60:15
60:17 68:5
**carpenters**
24:13,22 34:1
**carrier** 105:7
**carve** 106:13
**case** 5:23 37:24
38:12,22 57:18
74:6 114:22
121:17 127:17
128:25 129:3
130:2 149:12
152:13 153:13

164:25 169:20
169:25 174:19
181:20 191:10
191:14,17,20
194:5 203:19
205:8 207:5
212:11,23,25
213:18 215:8
217:3,5
**caseload** 126:14
**cases** 6:21 7:16
126:12,14,17,21
126:24,24,25,25
127:1 206:11
215:9
**castro** 1:15 2:4
219:5,20
**catch** 147:23
**catcher** 82:10
82:18
**category** 77:13
116:25 163:17
168:9
**caulk** 103:8
**caulking** 63:22
205:9,10,21
**cause** 117:4,6
153:16 154:3,18
194:19 201:3
**caused** 96:19
118:6 153:20
**cc** 208:18
**cc'd** 208:8

**[ce - claiming]**

ce  208:2
celebrated
  125:7
center  70:15,25
  71:1 83:20
  95:18,25 96:1
  97:2 159:5
  195:24 217:15
certain  20:6
  29:4 31:24
  34:24 37:17
  42:7,7,9 43:5
  45:2 51:23
  52:18 66:21
  76:4 102:15,21
  104:17 107:22
  107:23 108:24
  134:7 141:13
  150:3,21 152:18
  153:18 164:12
  173:24
certainly  124:23
  130:3 198:12
  213:1
certificate  219:1
  219:20
certified  2:5
  219:5
certify  219:6,14
  219:21
challenge  78:7
  89:22 129:1
  132:17 186:15
  206:21

challenges
  121:14
change  95:1,2
  108:8 112:5
  159:17,18
  163:21 190:19
  221:4,7,10,13
  221:16
changed  112:22
  112:23 121:4
  123:16 129:5
  216:4
changes  112:9
  112:16 178:21
  190:8 220:9
channel  79:15
charge  23:11
  25:10 95:12,14
  96:2 99:16
  101:2 105:24
  150:24 214:4
charged  99:13
charges  57:14
  209:15
charter  115:24
cheaper  142:25
check  53:13,13
  53:16 113:23
  177:14 193:15
  196:24
checking  14:20
checks  42:11
chip  121:16

chocolate  7:1,14
  7:16 13:15 16:5
  17:4,6,13,17
  18:4,13,14 31:4
  93:10 186:8
  215:3
choose  54:10
chose  198:13
chr  44:11 61:23
  151:1
chris  3:17 15:10
  15:11,12,15
  16:8,10,12,24
  17:19 18:1,3,13
  19:25 20:2,5,9
  20:15,20,23
  21:12,19 22:18
  23:11 24:6,8
  33:24 41:4,4,10
  41:11,17 44:8
  44:11,17,20,25
  45:2,8,11 50:17
  58:18,20 59:7,9
  59:12,17 60:10
  60:22,24 61:5,7
  61:11,11,17,23
  62:9 63:21 64:9
  64:13 66:20,22
  66:25 67:5 69:5
  69:9,18 77:3
  80:23 97:16
  109:16 118:23
  119:2 124:14
  136:2,9,24

138:4,6,7
  139:20 150:21
  150:24 151:1,13
  151:15 165:21
  172:22 207:20
  208:3 210:3,8
  217:24,24
christensen  37:9
chronology
  92:20
chunk  62:21
church  2:3
circuit  122:22
  123:8
cistern  9:13
  27:12,14,21,22
  28:2,4
cisterns  8:8,9
  27:23 28:1
citizen  19:18
civil  1:4 6:4,4
  220:24,24
claim  3:8 56:12
  73:12 84:9
  85:10,10,13
  90:15 106:2
  123:1 149:24
  152:20 154:1,5
  154:7,21,24
  164:9 216:25
claimed  37:19
  75:2
claiming  113:15
  164:9,17

claims 90:13
105:9 106:3
123:6 214:25
215:5 216:21
clarification
176:10 191:18
clarified 191:5
clarify 158:25
191:2
clarifying 163:1
clark 41:10,11
clean 135:20,21
cleaning 14:14
clear 87:20
101:25
cleat 96:12
159:1,3,6,8
160:16 164:15
177:1
cleated 70:15
cleating 97:1,17
cleats 95:7,8,16
95:16 152:17,19
153:18 159:5,16
161:19 164:7,11
164:14 165:9,14
165:19,20,23
166:21 181:8,12
217:3,6
client 156:14
189:18 212:15
214:24
client's 203:23
212:13 213:6,8

clients 126:25
133:4
clip 76:14 99:7
153:3,6 198:7
clipped 70:15
155:12,14,16
clips 70:16,18
70:21,24,25
71:2,5,10,11,12
71:18,19,20,22
72:1,4,9,15,17
72:17,20 73:2,6
73:8 75:9,10,15
75:16,19,22,25
76:2,5,6,9,10
87:20 88:4 99:6
99:9,13,22
103:6,9,12,17
103:20,24,25
141:7,15,20,24
141:24 153:3
155:5,18,21
156:1,3,6,11,13
156:25 157:7,14
157:16,19 159:1
162:8 169:2
172:9,11 174:5
181:6,8 194:19
194:20,22
195:17,21
196:24 199:3,6
200:4 202:1
close 149:3

closed 81:10
coating 169:11
169:14
collected 27:20
collection
202:15
color 182:12
column 165:12
combination
78:25
combined
127:19
come 34:4 53:16
58:9 59:24 69:7
70:8 71:15 95:9
108:20 115:21
124:15,18 130:4
132:20 133:12
138:11 172:9
201:7 210:15
215:18
comes 29:14,18
150:13 182:12
comfortable 5:9
56:21 131:24
coming 26:15
49:11 77:22
78:22 79:9,12
81:2,3 106:24
184:21 186:25
comma 169:10
commenced
46:7

comment
172:23 205:20
commercial
20:22,24 21:1
115:20,22
127:25
commercially
127:21
common 151:25
152:8,15,23
communicate
25:19
communicated
43:4
communication
79:7 111:20
communicatio...
43:6 53:1,3
communicative
61:24
company 13:12
14:11 18:8 19:8
19:9 22:24,25
24:23 39:9 46:1
47:3 52:3,22
53:2,15,20
55:14 56:3,21
56:23 57:1 58:5
58:7,11 61:7
97:7,8,14 98:3
136:5,10 140:17
140:20 156:17
173:5 201:7
205:4

**company's** 48:6
**complain** 133:4
**complaining**
  101:6
**complaint** 3:9
  149:15 154:3,12
  172:22 213:17
**complaints**
  67:14 68:2
**complete** 11:9
  32:6 33:6
  120:20 134:8
  146:13 150:8,16
  150:25 151:6
**completed**
  31:23,24 32:3
  32:24 50:1 64:1
  64:12 121:23
  132:1 146:11
  150:17,20
  220:16
**completely** 51:1
  89:19 131:23
**completeness**
  154:11
**completion** 27:9
  64:3,5 132:6
  151:10
**complied**
  199:13 219:22
**comply** 152:1
  152:14,22
  219:12

**component**
  204:23
**components**
  74:11 89:18
  112:3 155:17
  216:13
**composed**
  107:16
**composite**
  183:19 202:13
  211:3 213:22
**compressors**
  148:20
**comprised**
  66:17
**computer**
  111:12
**concern** 80:1
  89:3 118:4,6
**concerned**
  196:15
**concerning**
  28:24 29:2
**concerns** 43:24
**concluded**
  107:5 141:23
  218:24
**conclusion**
  113:10 168:17
**concrete** 25:14
  33:1 107:20
  108:2,4 133:16
  169:12,15

**condition**
  163:15 196:24
  198:9
**conditions**
  50:11 163:2,13
  164:5
**conduct** 47:17
  150:8
**conducted**
  40:19 138:21
**confidential**
  86:4
**confidentiality**
  86:14,17 212:16
  212:24
**confirm** 149:13
**confirmed**
  109:10 195:18
  199:3
**conform** 153:13
**confused** 87:24
**congratulations**
  172:6
**connecticut**
  171:19
**consider** 64:18
  144:24
**considered** 58:4
  64:18 187:14
  220:17
**considering**
  193:10
**consisted**
  122:23

**consistent** 66:21
  67:5
**console** 83:20
  83:20
**construction**
  3:16 11:11,18
  12:25 15:13
  16:24 17:3,12
  17:18 18:3,5,12
  20:3 21:20 22:2
  23:22 27:8
  31:20,22 34:12
  34:14,19 35:1,7
  42:20 108:4
  111:19 112:17
  117:1 132:11,11
  132:16 134:12
  143:25 187:13
  188:12 189:21
  190:20 196:17
  200:14,16,17
  201:17,18,21
  205:3 206:24
  214:22
**construction's**
  132:1
**consultant**
  136:15,19
**consulted** 120:6
  205:4
**contacted** 47:14
  47:16 54:18
  56:4 57:16
  62:10 157:5

**[contained - corporation]**                                     Page 233

**contained**
201:25
**container** 65:12
100:1,4,16
101:15,16 102:3
185:24,25 186:7
187:4,21 208:20
**containered**
100:3
**containers**
100:3,5,8,13,14
101:18 186:4,8
**contemplated**
132:6
**contended**
108:13
**contention**
107:7 109:8
112:24 114:14
121:23 152:13
152:22 153:12
153:17 165:14
194:18 202:1,11
**context** 184:2
**contiguous**
168:9
**continual** 38:20
**continue** 27:2,2
27:3,4 73:18
113:25 120:22
131:25 198:18
**continued** 4:1
24:13 34:1

**continues** 34:17
**continuing**
132:1
**continuous**
213:22
**continuously**
35:5
**contract** 4:5
26:19,20,21,24
29:25 40:5
70:24 94:20,24
95:3 96:17
109:25 124:3
151:21 152:16
152:20 153:15
153:16,17 154:4
154:19,22,25
155:24 158:11
159:2,19,20
161:4,11 163:19
164:3,6,8,17
192:13
**contracted**
156:1
**contracting**
74:19
**contractor**
16:11,12 19:19
42:17 48:1 97:1
133:25 190:10
**contractor's**
74:17
**contractors**
139:23,25 140:3

**contrary** 112:4
**control** 55:1
56:22 69:4
214:20
**conversation**
109:25
**conversations**
61:10 161:18
**conversing** 26:3
**cook** 135:20
**coordinate** 69:5
69:7
**coordination**
67:17
**copies** 219:11
220:14
**copper** 3:12
39:23 45:20
46:20 47:20,20
48:1,11,14 49:6
49:11 50:23
51:5,13,14,21
52:2 53:8,12
54:1,3,11,20
55:1,3,7,10,13
55:16,16 56:10
57:5 58:5 59:2,2
59:10,21 63:2
63:23,25 65:8
65:12,13,24
66:5,7,11 74:7
74:23 90:7
98:24 99:4
102:9 103:5,14

104:1,4,19
107:11 108:11
108:15,24
109:12 110:5,7
113:9 114:5,8
114:10,17 115:1
115:1 117:3
118:13,15,20,21
118:25 119:10
119:15,20 120:1
120:7 122:12
141:20 142:20
143:10 151:15
151:24,25 152:3
152:7,15,23
153:6 154:6
155:11 158:12
158:13,16,18
159:12 168:16
168:24 169:1
170:3 174:13
175:6 178:18
182:11 187:20
193:8,12 195:4
204:23 208:21
209:2,10
**copper's** 50:25
56:23 143:8
**copy** 212:13,14
213:3,3,11
218:19
**corner** 185:6
**corporation**
219:21,25

[correct - crooked]                                              Page 234

**correct** 5:14
  6:13 20:10
  21:17,18 26:11
  32:3 34:3 35:10
  35:24 37:14
  38:4,18 44:6
  51:7 55:4 57:21
  60:3,4 63:3,6
  66:1 70:10 74:6
  74:9,19,20
  91:23,24 99:5,8
  108:4 110:8
  122:5,6 127:25
  128:20 135:12
  135:18 149:22
  153:22,24
  154:19 161:5
  164:22 166:2
  167:11 174:5,6
  174:9,11 175:23
  178:3 184:20
  185:20 187:7
  192:9 194:20
  195:12,18
  196:10 198:14
  199:4 204:23
  208:13 211:7,8
  212:21 213:18
**correctly** 20:8
  111:6 162:1
  178:17 217:8
**correspondence**
  64:17

**cosby** 2:16,16
  3:4 4:7 5:5 87:9
  144:18,21
  146:25 147:3
  148:5 194:14,17
  218:10,12,15,17
  218:23
**cosmetic** 84:2
**cost** 37:10 68:15
  104:21 142:16
  143:1,6 164:1
  190:1
**costly** 187:15
**costs** 108:11
  192:6
**couches** 135:11
**counsel** 2:8
  157:5
**counterclaim**
  3:8 35:22,23,25
  122:21 123:10
  123:11 149:11
  149:23 150:1
  151:20
**counterclaima...**
  38:14 150:9,14
  151:22,24 152:6
**counterclaims**
  38:1
**counterdefend...**
  150:7 151:22,22
**country** 132:18
  132:23

**county** 76:17
  82:13 97:6
  219:4,7,16
**couple** 31:14,15
  31:16,17 35:5
  40:19 83:7
  117:14 125:24
  146:17,18
**course** 5:22
  42:20
**court** 1:1 35:9
  35:16 36:8,17
  36:20,21,22
  37:3,24 38:11
  77:20 85:20,21
  87:4 114:21
  122:17,18 123:9
  129:1 149:11
  154:8,13,17
  164:9 169:20
  174:19 181:20
  191:10,14,20
  194:5 203:19
  207:4 212:11
  213:18 215:9
  216:25 217:3
  218:21
**courthouses**
  130:18
**courts** 130:10
  130:10
**cover** 120:13
**coverage** 85:6,7
  105:12

**covered** 107:11
**covers** 51:1
**covid** 129:20,23
  130:7,11,21,24
  188:7,9 206:22
**cr** 1:15
**crack** 179:5
**cracks** 178:14
  178:15,22 179:4
**created** 119:14
  169:8
**crew** 16:24 17:3
  17:12,12,18
  18:3,5,6,12,19
  20:4 22:3,16
  23:12 26:14
  40:17,18 41:1
  43:3 44:15
  59:22 66:18,20
  66:22,22,24,25
  67:2,2,5 68:11
  68:17,17,20
  69:9,11,18,21
  71:15 99:18
  134:4 196:10
  201:9 208:18,19
  210:14 217:24
**crews** 20:3
  21:20 34:21
  134:6
**criminal** 57:18
**crooked** 38:9
  43:18 44:24

**crookedness**
  44:24 59:15
**crosshairs**
  79:10
**cruz** 29:11,17
**csr** 1:15 219:20
**cuba** 168:12
**curious** 171:16
**current** 13:20
  34:12,22 132:25
  142:1 164:18
  213:16
**currently** 8:19
  9:2 11:6 12:7,9
  34:17,19,21
  131:18 133:18
  133:22 214:10
**custody** 54:25
  214:20
**customary**
  60:16
**customs** 101:25
**cut** 108:25
  118:14,17,21
**cv** 1:5

**d**

**d** 1:7 18:7 22:15
  30:18
**da** 140:18
**dade** 76:17
  82:13 97:6
**dahill** 3:11
  71:13,15 76:2

136:2,11,12,21
138:13 140:11
140:17,18
166:22 188:6,16
190:3 191:2,18
218:2
**dahill's** 192:7
**dam** 117:8
**damage** 83:14
  83:17 84:2,2,3
  107:9 117:4,6,9
  117:11 150:9
  167:24 168:15
  168:20,23,23
  176:5 177:15,16
  182:3 183:2
  215:12
**damaged**
  150:14 153:21
**damages** 4:5
  191:19 213:17
  216:20
**darren** 24:16
  33:25 41:9
**darren's** 24:19
**data** 75:21
**date** 19:6 32:2,4
  39:12 132:6
  147:5 158:15
  173:19 191:24
  194:2 220:12
  221:23
**dated** 158:4
  191:24 207:4,24

208:25 209:5,20
**dates** 69:3
**david** 211:10
**day** 29:8 40:16
  60:25 64:10
  69:8 84:14
  101:12 113:19
  147:23 196:16
  197:1 198:5
  200:11 219:16
**daybreak** 1:7
  3:8,9,13 35:18
  58:8,11,12 59:4
  59:12,22 61:6
  65:9,25 66:17
  67:2,8,15 68:3,9
  69:11,21 94:20
  95:11,12 96:10
  97:20 108:9
  119:3 123:24
  124:1 135:23
  149:12 150:2
  152:14 160:4
  161:5 170:12,21
  176:21 193:3
  201:12,19 220:4
  221:1
**daybreak's**
  99:17 169:18
  200:12 201:21
  202:18
**daylight** 76:23
  76:24

**days** 40:20 46:4
  60:16 68:10
  77:21 120:14
  127:8 128:8
  145:23 188:3
  220:17
**de** 133:15
**deal** 133:4 149:8
  170:3
**dealing** 56:3,21
  56:22,25 207:14
**dealings** 57:3
**deals** 164:14
**dealt** 37:11 38:1
  38:6 43:10 48:1
  53:20 137:13
  150:6 211:8,10
**debris** 89:23
  90:2,8,14,18
  169:6,9 181:16
**decided** 95:12
  95:14,15
**deck** 67:11 84:3
**declare** 221:20
**deemed** 198:9
**defects** 196:18
**defendant** 1:8
  2:15 38:21
**defense** 128:13
  200:11
**deference** 60:12
**deformation**
  182:11,21 185:5

deformed 90:8
delivered 99:25
  102:3 104:21
  176:24
demand 4:5
dependency
  99:17 102:11
  114:16 158:17
depending
  133:15
depends 41:25
depict 204:2,7
depo 158:7
  203:23 217:10
deposed 181:20
deposing 220:13
deposition 1:10
  2:1 4:6 5:9,12
  94:9 113:3,4
  156:18,19,20
  158:6 160:7
  203:7 206:2
  212:1,9,20
  213:23 218:23
  218:24 219:6
desal 29:13
describe 8:13,21
  9:7 10:14 48:13
  74:11 83:17
described 32:21
  88:12 90:4
description 8:6
  140:21

design 48:10,11
  120:2 190:3
designate
  142:11
designed 76:11
  76:14 161:24
  162:2
destroyed 84:1
  92:5 115:15
  116:15
destructive
  199:1
detail 99:3,6
detailing 65:3
determine 53:15
  99:12
determined
  12:17 72:15
  95:10 141:23
  172:18
developed
  119:14
diagram 3:15
  179:12,14
  180:10 204:18
diagrams 178:5
diego 2:12 6:1,7
  144:3 145:4,5,6
  147:12
different 11:5
  48:1 89:12
  103:9 104:3
  105:6 112:14
  123:16 172:8

180:1 183:17
  185:18 193:20
  198:18 214:2
differentiate
  32:7
differently
  119:13 192:1
difficult 105:12
  187:9
dimensions
  217:17
dine 11:2
dining 8:25
  10:21 11:4
  98:19 175:9,10
  178:6
direct 83:2,3
directly 20:9,14
  21:13 22:3
  90:21 111:21
  157:5
dis 72:10
disagreements
  121:18
disappear 66:4
  82:20
disassemble
  72:2
disassembled
  72:19 73:8
  141:12,22
  166:20 174:10
  196:5 199:7

disassembling
  142:17 198:19
disassembly
  198:24
disclosed
  171:17,17
disclosure
  164:24,25 202:3
  203:5
disclosures 3:13
  201:12
discovered 71:2
  71:12,18 88:4
  156:24 181:5
discuss 119:23
  153:3 156:10
discussed 96:21
  97:21 139:24
  161:13,17 188:4
  215:1 216:20
  217:10
discusses
  189:21
discussing
  49:11 195:12
discussion
  26:23 48:14
  67:7 95:17,23
  96:3,17,25
  109:6 134:20
  159:10 160:20
  186:23 217:2
discussions
  12:20,24 59:1

**[discussions - east]**

67:13 68:22
81:25 96:11
97:4 102:13,15
102:25 119:25
140:4 159:11
163:20 188:6,20
**dismiss** 38:24
**dismissed**
122:21
**dispense** 5:8
**displaced** 177:2
**displacement**
169:10
**dispose** 171:17
**dispute** 108:10
114:5
**disputed** 114:20
158:18
**disputing** 199:5
**dissembled**
141:22
**distortion** 169:8
**distribution**
219:11
**district** 1:1
85:21 122:18
123:9 153:12
154:8 164:9
191:14 213:18
**division** 1:2
**dock** 91:20
**document** 3:16
158:12 159:4
160:24 189:25

192:4 202:11
211:15,21,22
212:19 221:20
**documentation**
157:20 160:6
**documented**
156:7 168:15
196:19
**documents** 4:4
52:12,16 104:22
149:10,16 161:7
165:2 212:5,6
213:21,25
**doing** 32:11
34:21 35:7
46:10 47:4,10
74:10 113:25
120:22 142:24
189:18 196:9
206:3
**dollar** 85:7 86:7
94:21
**dollars** 85:9
95:5 143:7
**domiciled** 145:1
**door** 80:17
81:23
**doors** 65:11
80:19,21 81:14
81:16,18,20,21
81:22 82:4
112:21 117:19
**doran** 22:12,20
23:7

**double** 198:6,7
**doubt** 91:25
**downsized**
52:17
**downtown** 2:3
**dozen** 13:18
126:10 129:15
**draft** 119:20
**drafts** 163:22
**drawings** 51:6
110:11 176:4
**drew** 121:3
**drill** 102:20
114:18
**drilling** 196:21
**drive** 29:17
**driven** 80:13
**driver's** 128:23
129:1
**driveway** 78:18
215:7
**drone** 138:21
167:18,20
181:25 183:3
184:23,23
**drones** 138:16
138:25 139:13
**drop** 197:24
**dropped** 28:24
**drops** 28:21
**dry** 28:22
**due** 5:13 118:8
130:21 179:18

**duly** 5:2 219:7
**duplicate** 203:2
**duration** 188:3
**duties** 61:11

**e**

**e** 3:17,18,19,20
3:21,23 14:3
26:10 30:18
53:2 207:20
208:7,12,17,24
209:4,8,19,21
220:24,25 221:3
221:3,3
**earlier** 13:23
40:16 59:15
114:24 144:22
167:20 169:5
174:17 175:11
182:9 184:22
185:7,17 194:9
194:18 195:12
195:20 203:17
209:14 211:10
**earmarked**
54:21
**earth** 204:1
**easier** 121:16
142:8 189:8
206:16
**easily** 198:2
**east** 73:10 87:21
88:2,5,10,13,19
152:19 179:9,14

**[east - excuse]**

197:3,11,18,20
198:1 199:8
**easy** 197:14
**eat** 135:21
**echla** 93:13
**edges** 196:23
**effect** 163:14
**eight** 39:20,22
63:3 145:22
160:1
**either** 25:10
26:9 27:25 31:7
44:9 53:13
65:17 66:22
72:13 75:17
87:16 109:11
137:7 140:4
153:2 163:22
164:15 181:6,10
189:14 196:9
**electrical** 59:19
121:15
**electrician** 41:9
59:21,24
**elements** 81:13
**elevators** 20:24
**else's** 83:22
**email** 220:13
**emailed** 220:15
**emergency**
130:14
**employee** 55:16
55:20 57:22
65:25 66:1

**employees**
54:12 55:3
56:22
**empty** 100:15
**encompass**
112:13
**encouraging**
130:4
**encroaches**
215:6
**ended** 121:1
160:21
**enforced** 81:2
**engagement**
194:2
**engineer** 97:12
97:13,14
**engineering**
97:4,5
**english** 25:20,21
26:3
**ensuring** 14:15
**enter** 9:9
**entered** 151:21
159:20
**entire** 51:4
56:17 70:17
88:7 89:4 94:17
110:22 176:8
180:9,10,11
196:17
**entirely** 73:12
**entirety** 51:4

**entities** 153:3
**entitled** 113:23
**entity** 86:22
110:4 123:16
**entry** 129:6
**environment**
148:24
**equal** 190:8
**equipment**
170:9
**errata** 220:11
220:13,16
**eservice** 2:18
**especially**
206:22
**essence** 123:3
154:2
**essentially** 9:19
102:19
**estate** 93:10,11
143:23
**estimate** 62:20
94:16 129:8
131:7 143:3
145:25 190:4
192:8
**estimates** 12:22
18:21,22 190:1
190:2
**estimation**
106:19
**ethical** 219:22
**evacuating**
116:12

**evacuation** 78:3
79:3
**event** 117:10
**events** 125:7,8
**evergreen** 18:9
**everybody**
45:21
**everybody's**
149:7
**evidence** 80:9
118:10
**ex** 206:5
**exact** 85:17
**exactly** 76:5
203:22
**examination** 3:1
5:4
**examined** 5:3
**example** 43:16
59:7 83:9
165:23 167:13
211:8
**exca** 106:8
**excavated** 121:3
**excavating**
106:5,6,8
**excavation**
31:17
**exception** 162:7
**excess** 150:15
**excluded** 192:18
**excluding** 36:23
**excuse** 7:19
92:18 168:11

**[exhibit - far]**                                              Page 239

| | | | |
|---|---|---|---|
| **exhibit** 3:7,8,9 | **existence** 84:24 | **exposed** 81:13 | **fact** 44:6 57:1 |
| 3:10,10,11,12 | 93:16 98:3 | 107:12 | 60:21 121:2,13 |
| 3:13,14,14,15 | 215:7 | **extend** 67:20 | 121:19 133:10 |
| 3:15,16,16,17 | **existing** 118:18 | **extending** 26:23 | 162:6 164:11 |
| 3:18,19,20,21 | **exists** 142:20 | **extensive** 106:8 | 188:5 |
| 3:22,23,24,25 | **expanded** 8:16 | 106:9 107:1 | **factor** 108:13,23 |
| 4:2,3,4,4,5,6 | **expectation** | **extent** 21:3 | 109:7 |
| 149:10 154:13 | 100:2 | 140:7 143:8 | **facts** 162:6 |
| 155:1,3 157:25 | **expected** 75:20 | 153:7 217:18 | 221:20 |
| 158:5,25 160:24 | 76:9 112:13 | **exterior** 199:23 | **fail** 75:15 199:7 |
| 161:7 164:20 | **expecting** 173:3 | **extra** 68:7 | 216:13 |
| 181:22,23 | **expense** 114:9 | 114:15 161:21 | **failed** 75:15 |
| 183:20 191:25 | **expenses** 150:15 | 164:1 209:6 | 76:3 88:9 |
| 193:17 194:1 | 212:7 | **eye** 49:12 83:4 | 153:18 |
| 195:7 201:11 | **expensive** | **eyewall** 83:4 | **failing** 150:8 |
| 202:13,15 203:6 | 187:21 | | **fails** 220:20 |
| 203:14,22,25 | **experience** | **f** | **failure** 88:9 |
| 204:16,17 207:2 | 20:15,18 22:2 | **f** 1:4,11 2:1,10 | 153:20 217:2 |
| 207:18 208:11 | 25:17 45:20 | 3:3 5:1 18:7 | **fair** 69:25 99:4 |
| 208:17,24 | **experiencing** | 219:8,13 220:1 | 102:13 170:22 |
| 209:19 210:19 | 36:5 | 220:4 221:1 | **fall** 167:25 |
| 211:17 212:2,3 | **expert** 74:5,9 | **f&b** 3:13 201:12 | 173:20 197:22 |
| 212:10 213:2 | 136:15,19 | **f.j.** 190:3 | **familiar** 186:10 |
| **exhibits** 3:6 4:1 | 142:10,16 | **fabricated** | **family** 139:20 |
| 217:14 218:20 | 155:12 166:15 | 187:20 | **far** 8:3 16:5 |
| **exist** 52:12 | 169:20 200:11 | **fabrication** | 20:3,20 21:20 |
| 84:23 170:23 | 200:12 217:11 | 170:6 | 21:22 22:4 |
| 214:16 | **experts** 142:11 | **faced** 107:22 | 42:13 43:3 44:8 |
| **existed** 11:24,25 | 203:18 | **faces** 24:17 | 45:17 47:17 |
| 63:2 87:11 | **explained** | **facetious** 125:3 | 50:23 62:18 |
| 105:4 118:13 | 142:15 | **facetiously** | 72:17 78:23 |
| 156:1 157:14,19 | **explains** 158:21 | 77:15 | 92:1 134:13 |
| 172:19 217:6 | **expose** 198:7 | **facing** 88:22 | 140:25 146:6 |
| | | 89:2 | 147:9 176:14 |

**[faraway - footage]**                                          Page 240

**faraway** 204:10
204:11
**farther** 102:20
198:13
**fast** 8:18
**faxes** 53:2
**fearful** 143:7
**february** 158:4
207:24
**federal** 35:9
153:12 154:8
164:9 191:14
213:18 220:18
220:24
**feel** 40:9
**feeling** 56:25
**fees** 123:14
**feet** 51:5,8,12
71:7 72:3,3,3
91:10,12,17
106:12 170:6
176:11 177:20
186:20 187:19
**felt** 64:9 120:21
198:20
**ferry** 78:8 116:3
116:5,11
**field** 110:2
111:19 112:6
119:16
**figure** 53:14
94:21
**figured** 27:16
191:8

**figuring** 111:24
**file** 56:12
126:24,24
**filed** 35:19,22
35:23 57:8
114:21 127:1
157:3
**fill** 29:11,18
**final** 40:13,15
40:19 41:22
150:2 158:11
159:15 173:4
210:2
**find** 46:13,15
52:22 106:23
120:23 133:5,14
206:15
**fine** 82:18
114:19 118:3
**finish** 33:7,25
133:11
**finished** 11:20
40:9 48:22,23
49:1,12 214:9
**finishers** 24:13
**finishes** 11:16
**firm** 38:18,20
38:24 53:16
**first** 5:2 7:15
39:8 53:22
115:9 155:23
196:16,21
209:22 217:5

**fit** 59:25 152:5
**five** 8:20 22:16
23:12,15 24:10
25:2,9 26:13
33:13,24 77:14
129:13 148:21
197:24
**fl** 220:14
**flashing** 154:6
177:8 200:20
**flashings** 38:6
43:16 44:24
177:3,6
**flat** 51:23
169:11,15
183:21 184:16
184:21
**flattened** 89:24
**flee** 77:17,19
**flew** 68:21 104:7
**flight** 115:25
127:25 147:18
**flights** 115:20
147:17
**flooding** 91:2,3
106:22 107:1
**floor** 10:11 33:1
**floors** 33:1
117:21
**florida** 2:17
28:11 48:2 52:4
52:23 53:24
58:5,7 68:12,18
68:21 90:23

97:8 106:1
149:3,5 214:7
220:18,24
**flown** 139:13
**fluently** 26:5
**fly** 126:6,7
127:21 128:14
147:20
**flying** 169:9
**foam** 182:12
183:15
**focus** 36:14
196:14
**foliage** 84:2
**folks** 25:14 69:6
136:2,21 218:2
**follow** 28:10
50:21
**following** 57:1
74:12 139:6
**follows** 5:3
**foot** 65:12 66:13
100:5,8,16
109:9 185:24
186:3,6,7,21
187:4,21 197:24
198:3 208:20
**footage** 9:8,22
62:19,22,23
108:5 109:20,24
110:1,23,24
112:14 176:15
209:6,10

**[footprint - geometry]**

**footprint** 8:7,15
  121:4
**force** 83:6
  105:19,20
  132:16 133:8
  163:17 169:12
**foregoing** 219:6
  221:20
**foreman** 61:22
**forget** 203:3
**forgot** 101:10
**form** 107:20
  140:23 142:20
  162:21
**formal** 11:3
**formally** 188:4
**formed** 27:13
  170:7
**forming** 65:10
**fort** 66:1 97:8
**forth** 64:17
  70:24 145:16
  152:17 209:16
  219:22
**fortunate** 28:7
**forty** 197:24
**forward** 83:9
  143:12
**forwarding**
  8:18
**found** 46:14
  73:9 121:16
  187:14 206:15

**foundation**
  27:12 92:9
  162:22
**four** 10:1 22:16
  23:12,15 24:10
  25:2,9 26:12
  33:13,24 113:13
  125:24 129:12
  148:21 180:4
  190:2 212:3
  214:9
**frame** 108:3
**framer** 45:20
**framers** 24:13
  34:1
**free** 107:20
**frequently**
  124:7,10
**friedberg** 1:4,11
  2:1,10,10 3:3,8
  3:9,19,21,23,24
  4:3,4 5:1,7
  148:1 158:1
  194:12 218:11
  218:14,16,18
  219:8,13 220:1
  220:4,4,8,10,12
  221:1,2,23
**friends** 124:15
  124:17 125:5,9
  125:17
**front** 91:14
**fruition** 70:8

**full** 16:1,2 18:7
  21:3 68:4,8
  121:23 144:9
  177:19 218:19
  219:10
**fully** 194:1
**function** 49:20
**functional** 11:6
  11:7
**furnishings**
  135:9
**furniture**
  135:14
**further** 57:3
  186:23 191:18
  219:14

**g**

**g** 26:10 219:12
  219:22
**gallons** 29:19
**gar** 25:16 26:7
**garage** 8:24 9:5
  27:11 36:14,23
  59:20 60:1,3
  65:10,17 66:13
  148:13 175:8
  184:1,16 205:5
  207:17
**garden** 199:17
**garnet** 26:7
**garnett** 25:12
  25:15,16 26:7

**gatehouse** 3:25
  8:7,10,17,23 9:2
  27:10,25 36:10
  36:23 80:4 92:9
  98:9 117:23,24
  117:25 120:25
  131:20,21,23
  132:2 134:25
  135:1,8,17
  148:13 150:6,11
  175:7 183:13,22
  196:13 199:19
  199:25 205:5,14
  205:18 207:14
  210:21 211:5
**gatepost** 215:5
**gazebo** 98:19
**general** 16:12
  19:19 31:8
  74:16 139:25
  175:6 200:21
**generally** 28:13
  41:3 105:14
  126:11 127:6
  132:12 133:12
  135:19,22
  137:22 147:15
  189:1 202:12
**generator** 83:19
  84:2
**gentleman** 18:6
  18:18 133:18,21
**geometry** 180:5

[getting - handling]                                                    Page 242

**getting** 68:4
   111:17 186:15
   189:15 191:7
   192:16,16
**gifft** 16:4
**gina** 1:15 2:4
   219:5,20
**gist** 166:12
   208:22 209:1
**give** 5:16 8:6
   17:16 39:15
   97:6 106:18
   129:8 145:18
   149:19 211:9,15
**given** 30:7 129:9
**gives** 55:2
**glass** 80:18
   81:21
**gleaning** 114:10
**global** 129:6
**go** 17:21,23
   21:22 33:6
   45:16 54:10
   61:1 67:10,23
   68:11 69:7
   73:20 77:22
   79:4 80:8 83:4
   86:1 87:2 91:10
   96:10 100:23
   123:18 126:7,11
   127:13,22 131:2
   131:18 132:25
   134:21 138:6
   143:12 144:15

144:18 146:18
146:19,21,25
148:1 154:20
178:5,18 194:14
199:1 203:21
216:11
**goes** 9:12
106:12
**going** 5:8 30:3
34:19 47:20,23
55:15,19 56:1
59:1 60:15
62:10 68:24,25
69:2 74:5 77:22
78:1 86:6 87:3
88:8,21 100:2
102:19 106:19
115:3 118:4
126:15 127:13
127:16 129:11
132:18 133:23
142:17,18 143:9
144:16 146:9
149:9 162:5,6
162:12,14,20
163:7 165:25
173:1 178:10
195:7 196:13
198:15,20 202:6
202:23,24 203:1
204:15 205:22
206:1 210:14
212:20

**good** 5:6,7
30:10 35:21
37:4 45:19
56:23,25 62:21
88:24 133:11
160:5 183:3
**goods** 3:10
165:4
**google** 204:1
**gosh** 14:8
**gotcha** 60:25
91:19 184:22
**gotta** 102:24
**gotten** 74:3
78:16
**grain** 20:23
**grand** 143:4
**granite** 106:17
**great** 9:9 79:6
180:13,17
**greater** 23:17
162:4
**ground** 9:12
21:9 106:14
198:1
**group** 45:18
**grouping**
201:25
**gue** 134:22
**guess** 21:12
23:21 49:5 83:7
140:11,12 184:6
191:23 206:4
210:1,18

**guest** 175:8,11
178:6
**guesthouse** 8:24
10:8,10 28:1
32:25 98:19
134:23 148:15
175:12,13
**guests** 10:18,19
10:20
**guiste** 26:10
**gutter** 71:7
**gutters** 170:18
170:22
**guy** 57:5 120:1
167:20 171:25
**guys** 41:13
151:12 202:22
210:1

## h

**h** 18:7 30:18
221:3
**half** 8:15 9:3
13:18 16:7
31:17 73:14,16
73:17 115:8
126:10 129:11
129:15
**hammers**
106:18
**hand** 219:15
**handling** 6:21
7:15

[hands - hours]                                              Page 243

**hands** 67:11
  74:22
**happen** 146:13
**happened** 93:23
  114:24 123:5,11
  126:10 132:22
  215:9
**happening**
  34:10 54:19
  132:23 202:12
**happens** 28:13
  93:24
**happy** 69:13,16
  213:4
**hard** 25:25
  42:22 90:20
  107:1 133:11
  145:1 183:1,22
  184:2 188:16
  189:3 209:3
**hardens** 182:13
**hardesty** 18:18
  30:20 211:13
**harsh** 50:11
  148:24
**hat** 178:19
**hauling** 14:15
**he'll** 138:10
**head** 9:24 28:17
  63:12,14 71:5
  92:16 94:19
  104:24 129:18
  135:5 152:11
  156:9 158:24

  174:3
**heads** 55:2
**hear** 172:22
**heard** 60:19
  102:21
**hearing** 69:12
  77:20 126:7
**heating** 142:22
**height** 197:19
**held** 84:5 162:7
**help** 32:17
  68:25 184:4
**helped** 90:14
**helps** 145:24
  204:3
**hendren** 200:10
**hendren's** 200:8
**hereof** 219:15
**hexagonal**
  180:4
**hey** 67:8 96:10
  109:20 119:19
  120:1 156:11
  201:7
**high** 91:17
  162:18 163:2
**higher** 109:7
**highest** 75:4
**highlighted**
  149:25 195:8
**hill** 16:4 215:5
**hire** 58:23 97:13
**hired** 102:1
  140:17 166:15

**hit** 8:1 62:24
  76:21,23 77:25
  78:1 83:2,3 94:1
  116:9,9,10,12
  116:18,22
  156:24 168:3
  188:8
**hits** 115:5
**hitting** 79:18
  90:9 184:12
**hoffmann** 3:12
  4:6 136:7
  137:11,14 176:8
  190:3 193:18
  195:3,11 198:13
  198:22 213:23
**hold** 16:16
  29:19 61:7
  75:10,20,25
  76:9 161:23,24
  162:2,17,25
  163:1,3,13,14
  163:16 164:4
  187:2,2 201:8
**holding** 73:2
**hole** 7:1,14,16
  13:15 16:5 17:4
  17:6,13,17 18:4
  18:13,14 31:4
  93:10 186:8
  215:3
**holford** 18:7
  19:25

**holidays** 67:21
**home** 7:17 8:15
  16:25 21:9
  67:23 74:21,23
  76:22 92:8,11
  93:17 106:14
  107:20 117:1
  139:21 144:2
  145:4 150:9
  151:24 152:6
  201:14 204:8,14
  206:24 215:17
**homeowners**
  93:14 105:7,10
  105:12 215:11
**homes** 83:25
  89:23 90:2
  144:13
**hope** 33:7
**hoped** 30:6 69:5
**hoping** 146:8
  214:5
**hopped** 99:21
**horizontal**
  80:13
**hose** 199:17
**hosted** 125:22
**hour** 76:15
  82:15,16 151:5
  162:3 168:4,12
**hourly** 151:2,4
**hours** 44:14
  60:12 66:21
  67:4,20 68:24

69:3 76:23
77:25 83:7 87:3
125:23 168:5
**house** 3:15 7:12
8:24 9:7,9,21,23
11:12 27:12
32:8,9,21,23
35:10,14 36:16
36:19 37:20
38:1,2 51:17
62:19 63:9 64:8
70:12 77:4
79:12,18 80:6
80:18 81:15
82:7 88:1 98:6
98:17,18 107:16
117:22 118:1,8
121:1,7,11
122:2,3,4
123:20 126:11
131:22 132:2,6
135:2,9,14
148:14 152:14
175:7,14,17
177:11,24 180:7
183:12,16
184:19 185:19
191:21 204:19
205:9,18,19
206:7 210:23,24
211:6 214:2
215:23 216:1,24
218:6

**how's** 62:10
**huber** 1:7 3:8,9
3:17,18,19,20
3:21,22,23 4:3
35:18 58:1
95:14,17,24
149:12 161:5
163:23,25 189:4
193:14 207:21
208:18 211:18
**huber's** 211:21
212:6
**huh** 28:9 35:3
67:3 71:8 90:1,4
103:1 145:15
178:20 186:9
189:20 191:3
208:14
**hur** 87:14
**hurricane** 7:22
7:24 8:1,4 62:24
63:8 70:17 83:6
85:23,23 87:15
92:6 95:19 96:6
124:4 146:5,10
153:23 156:12
163:17,17
168:12 189:7
**hurricanes**
90:25 167:25
**husband** 92:14
**hvac** 148:8
**hypothetically**
162:13

**i**

**idea** 33:4 47:9
57:15 87:16
94:15 209:8
**identification**
129:7
**identified** 156:3
**identify** 90:20
**iguanas** 214:3,5
**image** 204:1
**imagine** 174:4
**immediately**
58:23
**immigration**
132:18,21
**impliedly** 152:3
**important** 42:12
**inappropriate**
162:21
**inception** 22:17
**inch** 155:13
159:16 177:20
178:18
**inches** 70:15,25
71:1,21 95:25
97:1 159:13,16
160:13 217:15
**include** 36:11
61:12 122:1,8
143:4 155:7
191:16 215:12
**included** 38:17
102:16,17

154:18 191:21
**includes** 167:10
**including** 61:13
117:7 190:2
**incomplete**
121:8
**incorrectly**
72:24
**incurred** 150:15
**incurring** 30:25
31:2
**independent**
22:22 24:24
64:2
**independently**
59:6
**index** 3:1,6 4:1
**indian** 66:22
**indians** 22:1,17
23:14,15,24
24:10 25:3,9
26:13 41:6,14
**indicate** 166:1
176:5
**indicated** 99:18
**indicates** 150:1
151:21 165:9
166:2 167:24
185:19
**indicating**
157:20
**indication**
210:14

**individual**
22:12 23:24
24:12 56:3
58:14 61:24
74:9 92:14
93:13 120:21
**individuals** 12:9
13:22 20:5,7
21:21 22:1
33:25 41:8
50:18,19 57:2
71:13 80:23
101:6
**industry** 132:16
152:2 153:5,10
153:14 199:14
**information**
58:23 62:2
168:6
**initial** 11:18
94:24 95:24,25
164:25 194:5
195:10,11
**initially** 20:11
46:23 47:11,14
100:1,11 101:16
109:10 193:12
**injury** 6:4
**inside** 183:23
**insisted** 212:15
**insofar** 171:3
**inspect** 198:18
214:11 215:18
216:12

**inspected** 70:23
**inspecting**
61:12
**inspection** 44:9
107:4 173:6,13
173:23 181:11
216:14
**inspections**
215:14 216:3,6
**install** 11:25
54:4 118:15
120:2 151:23
**installation**
110:5 119:11,15
120:6 150:16,17
151:10 152:2
154:6
**installed** 81:17
81:19 107:6
110:8,13 118:24
148:16,17 159:5
162:1 165:17
**installing** 119:5
119:9 154:5
176:21
**instance** 182:3
206:5
**insulation**
118:25
**insurance** 56:4
56:5 84:6,7,16
84:21 85:13
105:7,21 128:13

**insure** 105:15
**insured** 85:8
**insurer** 106:3
215:11
**integrity** 84:5
**intended** 55:7
146:6 152:5
163:13,16
**intensity** 168:10
**intent** 11:3
51:21 70:2 81:7
**intention** 49:9
52:2
**interested** 47:15
58:25 219:14
**interests** 105:16
**internet** 184:18
**intersecting**
177:1 196:20
**introduced**
46:17
**intrusion** 91:2,6
117:16,18 118:5
118:7
**invasive** 198:10
**investigating**
196:16
**investigation**
3:12 195:17
196:12 200:3
**investigations**
198:10
**invoice** 165:3
166:1 206:19

**invoices** 3:25
211:5
**involve** 37:20
218:5
**involved** 12:11
24:10 35:13
41:23,25 57:13
86:17 96:3
97:16,19 103:10
117:15 140:4
142:17 143:14
143:17,22 151:9
170:21 174:19
**involvement**
48:7
**involving** 59:10
**ir** 184:11
**irish** 61:1
**irma** 62:24 63:8
70:17 74:25
75:1 76:21 77:8
77:13 79:18
80:2,3,24 89:5
89:21 91:4
106:2,23 107:10
115:5,7 116:9
116:11,21 117:6
117:12,14,16
124:4 134:21
136:1 138:17
139:6,21 140:8
146:5,10,13
147:14 153:23
156:12,24 157:4

166:18 167:14
167:14,15 168:1
168:3,16 172:24
173:7,8,11
175:23 177:17
181:11,24 182:1
184:11 185:11
193:23 194:6
195:2 197:12,15
197:17 199:7
201:3,8 218:1
**irma's** 168:9
**irrigation** 14:20
**ish** 18:24 19:2
22:7
**island** 13:8 16:4
19:11 22:10
24:25 29:21
30:15 39:10
40:1 44:17 46:2
46:4 47:4,11
61:17 65:9 66:4
66:8 82:22 83:4
83:6 84:1 115:6
138:11,24
176:24 186:11
187:12
**island's** 79:1
**islands** 1:1 5:12
6:12,18,22 7:2
15:23 16:3,17
16:21 17:9
25:23 31:5,9
35:9 58:16

68:19 75:5
85:19 86:16
122:18 124:5
126:5,13 127:2
127:4,18 128:14
128:15 130:13
130:21 131:2
134:22 144:2,23
145:19 146:7
147:13 169:23
188:24 207:4
215:14
**issue** 6:25 59:2
60:5 67:15,16
67:19 91:7
95:22 97:17
100:24 101:2
142:12 149:8
164:12 181:6
182:16 189:8
200:13,19
207:17 212:23
213:2 217:12
**issued** 36:21
**issues** 5:13
32:10 38:2,7,10
39:8,25 44:22
59:13,16 60:2,3
60:6 61:4 63:8
63:18,22,23
64:19,21,25
65:5 69:1 70:11
88:1 106:22
121:11 132:18

132:24 133:2
134:14,15,16,17
134:19 143:20
148:19 149:1
156:11 161:19
164:15 174:18
174:21 188:7,14
188:22 191:13
200:21 207:15
**it'll** 12:23
**item** 159:19
193:1
**itemization** 3:10
165:4
**items** 34:20,22
45:2,3 65:6
113:16 184:15
210:2,4

**j**

**j** 14:3 219:12,22
**jack** 3:21 208:4
208:10,19 209:4
**jacob's** 186:16
**jacuzzi** 183:23
183:23
**jamin** 208:18
**january** 188:3,5
**jeffrey** 2:16
**jersey** 1:24
**job** 18:20 44:20
61:11 64:11
106:8 113:21
140:21 150:2,8

156:15,24 157:3
209:23
**joe** 213:11
**john** 1:2 7:2
13:3 15:10
45:16 47:6
76:22 78:7,16
78:24 83:1,2
84:22 102:2
116:18,22
132:19 134:17
137:21 152:6
168:3 186:2
**john's** 215:15
**joined** 16:24
17:3,11,18 18:3
18:5 196:23
**joint** 178:23,24
198:8
**jonathan** 22:12
22:20 23:7 24:8
30:22 33:18
34:2,4 58:21
**jonathan's**
41:18
**joseph** 13:24
14:7,17
**judge** 37:6,9,9
37:10,12,23
**judging** 132:23
**judgment** 123:6
123:14
**july** 39:17 167:3
176:1 210:12

**june**  158:16
  209:5
**jury**  4:5
**justify**  113:2

**k**

**k**  14:3
**keep**  66:24 81:8
  81:10 165:25
  203:21 210:22
  212:19
**kept**  52:9
  143:22 170:14
**kevlar**  82:12
**keys**  214:7
**kind**  6:2 11:14
  20:17 32:13
  33:6 40:5 42:2
  49:6 61:3,20
  65:5,6 69:1 81:8
  81:18 82:21
  91:2 92:19
  102:25 104:12
  113:21 137:6
  173:13 176:22
  178:1,19 185:22
  189:15 202:5
  203:25 206:4
  209:14 215:10
**kitchen**  10:2,3
  199:20
**kitchenette**
  10:17

**kiwi**  18:7,10,17
  18:20,24 19:7
  20:1,11,11 22:5
  26:18 41:19
**kiwi's**  18:7
  41:18
**knew**  14:8 79:9
  113:24
**knocked**  141:2
  141:3
**knockers**
  140:12,15,16,20
**know**  5:11 9:22
  14:16 16:6 17:2
  18:11 19:15,20
  19:22,24 20:17
  21:1,3,6,7,11
  22:4,11 23:20
  23:21 24:19
  25:2 26:9 27:16
  29:2,13,14,22
  30:13,19 31:19
  32:10 33:3,10
  34:17,24,25
  38:22 39:4,7
  40:8 41:16 42:6
  42:14 43:5,13
  44:11 45:9 46:4
  46:8,12,16,23
  46:25 47:3 48:8
  48:25 49:17
  50:2,8,12 52:8
  52:18,19,25
  53:25,25 54:2

55:12 56:4,6
57:18,22 58:12
58:20,21 59:8
60:10,16,17,21
61:3,16,23
62:18,20 63:18
64:15 65:24
67:10 69:3,10
69:12,13,14
70:6 71:17 72:2
72:22,23,23
73:5,24 74:11
75:3,7,8,17
76:10,12,19
78:5,7 79:2,3,9
80:7,11,14,15
80:15 81:22
82:1 83:2 84:1,3
84:4,4,13 85:10
87:10,19 88:8
88:11,17,20
89:18 90:8 91:8
91:13 92:15,21
93:4,8,9,22
94:13,14,16
95:2,24 96:11
97:16,19 98:18
98:19 99:11,15
99:23 100:6
101:4,8,11,24
102:9,10,22,23
103:10,12,19
104:3,11,18,20
104:25 105:14

108:5 110:3,12
110:22 111:7,10
111:18,18,23
112:3,13 113:12
113:15,17
114:18,23,24,25
116:6 118:9,23
119:25 120:5
122:4,8 123:19
125:15,15,16,24
126:3,18 127:3
127:9 129:6,12
129:17,19,25
130:1,8,12,14
131:14,24
132:14,19,22
133:3,9,11,16
134:5,7,13
135:6 137:1,4
137:11,15,20
138:16 139:11
139:12,13
140:23 141:3,6
141:11,13,14,25
143:6,8,15
146:17 147:7
148:1 149:5
151:2,4,6,11,12
151:19 152:7,10
152:24 153:1,2
153:4,5,7,10
154:14 155:15
155:15,19,20
156:5,10,12

157:21 159:7
160:5,19,22,23
162:13,14 165:1
165:16,19,24
166:22 168:6,13
171:5,6,18,18
172:2,21,21
173:1 175:7,8
176:6,16,19
177:4,21 178:15
179:16,18 180:3
181:2 182:4,15
182:18,20 183:3
183:11,24 185:1
186:6 187:3,3
188:7,12,21
189:5,13,14,24
190:9,10,10,15
190:25,25
192:21,23 193:6
193:16,19 198:2
199:13,16,18
201:2,3 203:9
204:6,24 205:11
205:20,21,23
208:8,10,25
209:7,9,11,12
210:9 211:23,25
212:8,14 213:9
213:12 214:12
214:22 215:4,8
215:13
**knowing** 109:24

**knowledge** 17:9
23:1 45:15
62:17 66:9,16
69:23 70:11
75:12 81:3
92:18 118:23
133:10 137:1
139:1,3,10
142:11 151:16
153:8 203:8
216:20
**known** 18:6
172:19
**knows** 149:7

**l**

**l** 1:4 2:11 18:7
**labor** 54:6,7
132:16 133:2,8
134:14,17
192:12 193:3
**laborers** 21:25
23:16,17,19
60:10
**lack** 22:18
162:22 194:19
**ladder** 186:16
**land** 93:19,20
94:6
**landed** 161:13
**landscape** 14:19
14:20
**languages** 26:4

**lanny** 13:6,7,14
34:18 134:3,6
134:13
**lanny's** 134:4
**large** 106:17
134:8
**larger** 81:22
108:14 179:23
180:12
**latched** 78:18
**late** 139:6 188:2
**latest** 105:10
**lauderdale** 66:1
**law** 2:10 38:18
38:20,24 45:19
53:16
**lawofficefb.c...**
2:13 220:2
**lawsuit** 5:13
35:8,19 56:13
60:3 86:16
122:20 157:4
191:17
**lawsuits** 214:25
**lawyer** 128:4
**lay** 49:12 74:15
106:10
**laying** 113:12
115:4
**layout** 204:24
**lead** 45:17
**leader** 25:15
**leading** 25:13
36:17

**leak** 79:17 80:10
150:8
**leaking** 80:3
150:10
**leaks** 36:1,2,3,4
36:6,14,16,18
49:23 63:9,17
63:24 64:3 80:1
80:7
**learning** 57:1
**leave** 15:15 20:5
26:18 29:20,21
30:10,22 60:22
60:22 65:15
78:2,24 82:16
115:6,9,11,13
204:15
**led** 96:16
**left** 8:3 17:20,23
18:17,20 19:7
22:5,10 23:2
24:8 26:19 27:9
30:14 39:10,25
40:1,4,8,16
43:12 64:9 66:3
79:2 115:15
137:21,21
147:18 150:3,5
165:12 179:21
180:16 209:22
**legal** 220:23
**leininger** 2:16
**lender's** 105:16

**[length - looked]**

**length** 46:12 170:6 177:14,19 186:21
**lengths** 187:19
**letter** 3:11,22 65:1 113:12,13 115:4 158:21 166:7,11,13 167:2 209:13
**letters** 53:2
**level** 9:10,17,18 10:7,15,16 23:21 28:24,24 29:4 91:10,12 106:12 121:12 133:15
**levels** 93:24 107:24 149:3,5
**liability** 6:5
**library** 10:6 177:10 180:15 180:17 187:25
**license** 74:17,19 128:24 129:1
**licensed** 16:14 19:19,22,24
**licenses** 16:16
**lien** 35:19 37:13
**liens** 105:1
**lieu** 160:18
**life** 50:6 149:6
**lift** 72:25 83:15
**lifted** 73:15 90:5 90:7 174:7

**lifting** 83:15 90:4 194:19
**light** 116:23
**lighter** 182:11
**lightning** 184:14
**likely** 201:16
**limit** 40:6 60:2 104:17
**limited** 36:22 37:12 67:9 88:1 88:3 100:6 196:3
**limiting** 64:8 191:13
**line** 159:18 221:4,7,10,13 221:16
**lines** 19:4
**list** 32:8 65:6 132:8 210:4,6,9
**listed** 93:17 154:13 203:6 213:21
**listen** 68:3,23 109:7
**listing** 144:9
**lists** 207:5
**literally** 197:19
**litigate** 206:11
**litigation** 6:4 35:13,17 36:9 36:17,20,22 85:12 122:15

210:16 211:24
**little** 30:23 39:22 85:4 108:7
**live** 16:3 19:10 30:12 70:2 125:19 147:10
**lived** 15:25 16:19,20 92:17 93:2,4
**lives** 13:8 15:10
**living** 16:8 19:11 24:25 135:17 199:23
**livingston** 1:24
**lloyd's** 84:17,18 86:25 105:3,6
**load** 102:8,12
**loan** 105:15,22
**local** 13:7 21:25 68:19 190:4
**locate** 52:15
**located** 13:2 97:25 155:9 171:14
**location** 112:21 144:25
**lock** 198:6,7
**locked** 100:13 100:17
**lodge** 206:3
**lodging** 192:18 192:25 206:6,15

**logistically** 187:9
**logistics** 209:2
**long** 6:6 14:24 14:25 15:3 22:6 23:6 30:6 33:16 33:23 39:19 83:5,5 106:19 106:21 113:4 147:5 148:12,14 148:14 149:2 151:6
**longer** 15:10 98:3 105:6
**longest** 168:10
**look** 48:23 49:12 61:8 72:20 149:13 154:14,21 157:25 164:20 179:8 181:22 183:19 184:7,23 190:6 191:23,25 193:3 194:1 195:8,9 201:10 202:18 207:1,18 211:3 212:4,12 213:24 214:8 216:23
**looked** 52:13,14 76:3 87:17 113:4 159:23 175:2 181:2 198:13 202:7

**[looked - maria]**                                                      Page 250

212:1 217:13
**looking**   143:15
  144:12 145:9
  158:15 175:15
  175:23 184:25
  190:12 194:12
  195:2 205:16
**looks**   28:9
  154:11 167:18
  178:5,8,14
  181:3 184:7
  185:1,14 193:17
  193:19 195:16
  197:22 202:22
  203:9,25 204:20
  207:12,20,25
  208:11,17,24
  209:19 210:19
**lose**   39:5
**lost**   83:18
**lot**   21:25 23:24
  28:11 36:1
  42:11 52:16
  54:16 77:16
  79:2 104:10
  108:5 112:20
  120:14 121:13
  129:18 133:9
  143:10 145:17
  197:11 216:8
**lots**   102:11
**lower**   9:18
  10:16 23:21
  179:12,14,14

185:2
**lunch**   148:6

**m**

**m**   14:3
**machine**   65:10
  65:10,20 187:12
  187:13
**made**   57:14
  68:2 79:1 82:13
  85:10,11 90:13
  103:12 106:3,14
  112:16 114:3
  186:8 202:4
**magically**   214:9
**mahogany**
  137:7
**mail**   3:17,18,19
  3:20,21,23 7:10
  207:20 208:7,12
  208:17,24 209:4
  209:8,19,21
**mailing**   7:7
**mails**   53:2
**main**   3:15 8:24
  9:7,9,10,17,21
  9:22 10:6 11:12
  27:12 28:1,2
  32:21,23 35:10
  35:14 36:16,19
  37:20 38:1,1,2
  38:10 51:16
  62:18,19 63:9
  64:8 70:12

79:18 80:6,18
81:14 82:7 88:1
98:6,17,18
107:16 117:22
118:1,8 121:1,7
121:12 122:2,3
122:4 123:20
131:22 132:2,6
135:2,9,14
145:4 152:14
154:9 171:3
175:7,14,14,16
175:17,18,20
176:4,9,15
177:10,11,24
178:13 180:3,6
180:7 183:12,16
184:8,19 185:19
187:25 190:24
191:21 192:5,8
196:15,17 198:4
204:19 205:9,18
205:19 210:23
210:24 211:6
214:17,17
215:12 216:24
218:6
**maintain**   6:16
  168:11 206:7,16
  213:2
**maintaining**
  15:13 168:9
**maintenance**
  12:9 13:22

14:14 17:1,17
32:10 34:11,12
35:4
**majority**   89:5
**make**   37:3
  50:24 56:12
  66:5 84:8,15
  87:19,20 102:24
  111:14 147:23
  178:16 202:8
  203:3
**making**   193:25
  194:3
**man**   17:2
**management**
  17:2 21:23
  189:21
**manager**   61:21
**managing**   22:18
**manufacture**
  151:23 152:2
**manufactured**
  152:4
**manufacturers**
  81:25
**march**   1:12 2:2
  124:24 130:25
  176:1 207:5
**margins**   184:5
**maria**   116:9,11
  116:12,17,18,19
  117:7,10,13,15
  117:17 118:2,8
  168:1,19 201:3

**[marilyn - mentioned]**

**marilyn** 7:23,24
8:1 87:15 92:6
93:24 94:1
**maritime** 6:5
128:13
**mark** 126:19
163:9,10 203:24
205:22 206:1
207:2 208:11
210:18,18 211:3
**marked** 149:10
158:5,5 201:11
203:21 207:1
210:22 217:17
**marking** 207:2
**mas** 180:20
**masons** 23:25
**massac** 93:10
**master** 9:10,17
9:19 89:15
177:23 178:13
180:18,23
182:10 187:25
**match** 185:7
**matejka** 14:1
**material** 48:14
48:21,22 49:17
75:21 99:15
193:7
**materials** 12:23
54:5 63:23
64:21 99:18,19
99:20,22,24
101:12,17

102:11,24 111:1
111:4 151:17
174:14 192:12
193:3
**matter** 94:11
142:9 144:10
163:2
**matters** 32:4
34:21
**maximum** 75:1
75:2,19,24 76:9
76:10 82:24
161:19
**mean** 8:11 12:5
12:19 17:4
23:20,21 24:6
32:19,25 34:11
41:25 42:13
48:25 49:1,15
49:15 50:3
51:23 54:20
55:9 56:16
61:15 62:14
63:2 64:13
66:24 67:25
68:19 69:2 71:4
74:22 77:15
78:7 83:7 85:16
87:14 91:17
93:20 94:13
96:11,17 104:14
105:20 107:14
108:17 109:3,16
109:23 110:9

112:5 113:2,16
114:9 117:2
118:3,4,16
125:22,23 126:6
127:16 130:13
133:20 138:8
139:11,16,16,25
142:2 143:23
144:15 146:10
146:17 149:1
154:2 158:20
163:1 171:9
175:2 177:7,22
181:2,8 184:2
186:7 189:4,6
192:15,21 193:6
200:15,21,24
201:4,23 206:10
209:3 212:8
214:1,19,21
215:2 216:4,16
216:16
**meaning** 67:17
81:8 107:25
151:13 156:11
164:15 175:21
204:7
**means** 76:18,19
132:10 160:19
177:21
**meant** 18:4
181:10
**measurable**
28:21

**measure** 83:1
110:17
**measured** 82:25
108:12,14,17,18
109:14 110:22
111:6,7
**measurements**
108:21 110:2,3
110:20 111:11
111:20,20,22,25
123:20 157:18
208:1
**measuring**
111:16
**mechanic's**
35:19 37:13
**mediation** 85:25
**medical** 6:5
**medications**
5:17
**medicine** 29:23
**meet** 45:4,5
58:18,18 63:23
**members**
139:21
**membrane**
176:17,18,22
177:14,16
**mention** 158:25
181:12 199:9,22
200:8
**mentioned** 15:6
45:3 61:5 66:20
71:20 87:23

Veritext Legal Solutions

[mentioned - need]                                                    Page 252

136:8,9,21
191:1
**merchantable**
152:4
**met** 12:19 38:7
43:17 46:6,7,8
58:14,20 200:20
**metal** 38:7
43:17 140:24
169:22 170:2,5
170:8,20 179:1
**meteorologist**
83:11
**method** 53:11
**miami** 147:16
147:18
**micah** 45:23,24
99:18 101:5
103:22
**michael** 98:11
**midpoints** 177:1
**mile** 16:6,7
**miles** 76:15
82:15,16 162:3
168:4,11
**million** 85:7,8
**milne** 98:11
**mind** 43:15
132:5 147:6
150:13
**mindset** 146:16
**minimal** 118:11
**minnesota**
15:20,21 16:13

16:13,14 17:22
17:24 20:18,21
48:21 59:9
**minor** 89:14
**minute** 165:8
168:25 173:2
**missing** 56:17
56:19 66:8
70:16,18 87:21
88:4 89:19
100:20,23
102:14 103:2
156:25 172:16
172:18,23 181:1
**misstated** 67:1
**mobilization**
143:5 192:14,15
**mocker** 140:14
**modified** 112:6
**moisture** 80:14
**mold** 3:24
210:19
**moment** 149:19
195:8
**monetary**
122:23
**money** 27:7
30:7 37:14 53:5
109:13 113:8
120:14,16
122:24 143:15
161:21 164:1
**month** 26:19
115:19 210:13

**monthly** 145:16
**months** 13:16
18:24 19:7 22:5
34:18 35:6
39:17 79:20
115:8 146:22
188:16
**morning** 5:6,7
147:21 198:5
**motion** 36:25
38:24
**mount** 1:24
**move** 15:17,19
30:15 65:20
163:9 215:10
**moved** 52:11,16
63:14 142:23
**moving** 15:21
180:16
**multiple** 27:23
92:10,12 134:6
**municipal** 27:18
**mutt** 61:3

**n**

**n** 22:15
**nails** 159:6
160:13,18
**name** 5:6 11:2
13:1,25 14:7
18:7,8,11,18
19:8 22:12,14
24:19 25:12
30:17 43:7,9

45:22 48:6,6
53:19 57:22
86:24 87:1
97:10,11 133:19
135:16
**named** 116:22
**names** 24:15,18
25:2,7,8 26:9
53:22 92:15
136:22 216:19
**nationality**
19:15
**nature** 21:3
127:7
**near** 47:25
**nec** 130:1
**necessarily**
30:24 35:1
88:20 127:18
143:19 151:2
174:1 191:14
**necessary** 95:19
97:5 101:3
119:22,24 120:4
143:6 150:15
183:18 198:10
**necker** 47:11
**need** 39:2,7
59:21 67:10,10
67:17,18 68:25
68:25 96:10
102:24 110:1
114:6 129:3
133:14,16 142:5

142:7 163:10
171:6 189:21
191:17 195:10
202:14 203:2
206:15 213:3
216:2
**needed**  14:15
15:14 43:11
64:1 67:24
77:20 90:6
95:10,15 97:6
102:21 106:11
108:12,15
109:12 111:22
113:20 114:17
115:1 118:14
120:23 121:4,22
155:5 158:16,17
170:6,7 176:25
196:6 209:10
**needing**  216:6
**needs**  12:16,18
13:20 14:18
32:22 205:21
216:3
**negligence**  6:5
154:5
**neighbor**  90:16
215:5
**neighbors**  90:13
**never**  11:25
32:2,9 40:21
45:15 55:12,25
57:9,20 58:14

64:22 70:8,9
93:2 111:16
113:7,16 114:1
121:25 135:2
173:4 174:7
176:24 191:24
213:11
**nevermind**
183:10
**new**  1:24 18:10
18:11 32:10,10
37:12 84:3
120:23 121:3
122:24 123:3
176:18,25 177:2
177:6 196:25
**nice**  65:7
**night**  46:9
147:16,20
**nighttime**  76:23
**non**  103:14
**nonwork**  127:5
**normally**  17:21
115:12 130:10
**north**  77:23
88:18 89:15,17
179:20 182:10
**northeast**
171:15 185:6
188:17 192:1
**northern**  29:24
**notation**  178:14
195:25

**note**  86:6
160:17 220:10
**noted**  166:20
196:18 198:24
198:25
**notes**  214:8
216:23
**notice**  39:8
80:12
**noticed**  39:25
43:16 44:23,25
45:2
**noticing**  59:14
**number**  16:25
51:9 60:12
76:15 83:18
85:17 103:20
109:2,3,24
111:19 112:25
121:8 125:21
126:17,25 129:2
133:16 149:17
157:2 171:8
178:11 207:5
212:1 214:21
**numbers**  51:7
71:4 164:21

**o**

**o**  18:7,7 22:15
**o'clock**  214:9
**oath**  219:7
**objection**  94:9

**obligation**  55:6
**obligations**
219:22
**observations**
44:9
**observe**  102:10
**obtain**  29:9
**obtained**  111:22
**obtaining**
189:22
**obviously**  65:24
**occasion**  125:16
**occasions**  99:20
104:3
**occupied**  196:25
**occur**  188:5
215:14
**occurred**  57:1
89:23 167:25
168:16 173:4
**ocean**  2:17
88:22 89:2
197:20
**octagon**  10:25
196:20
**octagonal**  180:4
**offer**  39:5
**office**  2:12 6:11
6:16 7:8 10:5
43:7 84:22
145:4 209:13
219:16
**offices**  2:10
52:11,17

| | | | |
|---|---|---|---|
| **officially** 138:7 | 32:23 33:2,4,16 | 79:15,25 80:17 | 128:25 129:8 |
| **offload** 186:3 | 33:23 34:2,4,6 | 80:22,24 81:4,8 | 130:8,20 131:1 |
| **oftentimes** | 34:11,17,22 | 81:12,18,21 | 131:11 132:5 |
| 102:12 | 35:12 37:5,8 | 82:2,6,16,19 | 134:4 135:9 |
| **oh** 13:18 14:8 | 38:17,20 39:2,4 | 83:11,24 84:11 | 136:18,23 137:6 |
| 16:6 64:14 | 40:14,22,25 | 86:5,9,19 87:2 | 137:8 140:19,22 |
| 72:10 82:3,5 | 41:3,7,17,21 | 87:22,25 88:6 | 141:22 143:16 |
| 93:4 124:19 | 42:1,9,16,18,20 | 88:11,15,18,23 | 144:11,14,18 |
| 125:10,20 129:5 | 42:23 43:3,23 | 89:4,7,16 90:10 | 145:3,6,24 |
| 131:9 133:25 | 44:3,6,8,13,22 | 90:20 91:5,11 | 146:5 147:8,12 |
| 148:9 206:12 | 45:4 46:11,13 | 91:16 92:10,19 | 148:10,12,19 |
| 211:14 | 47:7,21,23 48:5 | 93:1,8,12,15,17 | 152:10,25 153:9 |
| **okay** 5:16,20 | 48:18,23 49:8 | 93:22 94:3,5,8 | 154:17,22 155:1 |
| 6:15,24 7:4,9,13 | 49:14,19,25 | 95:13,15 98:7 | 155:7 156:5,8 |
| 7:15,18,20 8:6 | 50:6,10,20 51:3 | 98:15 99:3,24 | 156:16 157:25 |
| 8:21 9:16 10:8 | 51:19,21 52:3,7 | 100:7,13,18,21 | 158:18,22 |
| 10:21,24 11:5,8 | 52:9,20 53:7,14 | 101:1,14,20,23 | 160:10 161:1 |
| 12:2,5,7 13:9,11 | 53:19 54:3,7,14 | 102:5 103:9,19 | 164:2,7,13 |
| 14:9 15:4,6,11 | 54:20,23 55:2,6 | 104:2,5,8,16,23 | 165:2,14,25 |
| 15:15,21 16:1,8 | 55:11 56:18 | 105:9,20,23 | 166:11,24 167:8 |
| 16:16 17:11,16 | 57:4,8 58:4,13 | 106:10,16,22 | 167:22 169:8,17 |
| 18:12,25 19:3,8 | 58:22 59:7 60:1 | 107:13,21 | 170:12,16,19,25 |
| 19:15,17,25 | 60:14 61:11,15 | 108:22 109:14 | 171:14,16,20,23 |
| 20:8,15,25 21:5 | 61:25 62:3,8,13 | 110:12,17 111:2 | 172:4,18 173:11 |
| 21:12,16,19,24 | 62:18 63:16 | 111:5,9 114:9 | 173:16,18 174:2 |
| 23:6,13,18,21 | 64:7,20,23 65:2 | 114:13 115:9,16 | 175:1,13,18,22 |
| 24:1,4,8,19,25 | 65:8,19 66:12 | 115:18,22 116:3 | 175:25 176:2,17 |
| 25:18,20,22 | 66:17 67:7 68:9 | 116:8,24 117:20 | 176:21,25 177:9 |
| 26:4,6,12,18 | 68:14,19,22 | 119:18 120:2 | 177:10,19,23 |
| 27:4,6,19,24 | 69:10,20 70:9 | 122:10 123:7,13 | 178:23,25 179:2 |
| 28:9,16,18,23 | 72:5,12,21 73:1 | 123:17,19 | 179:8 180:1,14 |
| 29:1,12,16,20 | 73:12 74:16 | 124:17 125:7,13 | 180:16,19,22,24 |
| 30:2,10,17 | 75:8,13 76:16 | 125:21,25 | 181:12,16 182:2 |
| 31:19 32:2,17 | 77:2,8 78:6,16 | 127:21 128:2,14 | 183:9,24 184:19 |

**[okay - paid]**

185:16 186:5
187:1,11,18,24
189:7,17 190:23
191:13 192:3,7
192:18,20
193:13 194:6,11
195:5,7,16,23
197:6,9,13,22
197:25 198:4
199:22 201:10
201:21 202:21
203:12,21
205:15 207:9,16
207:24 208:2,4
209:9,12 210:22
211:14,14 212:2
212:15 213:12
216:23
**old**  171:23
**old's**  18:1
**older**  15:12
**once**  46:8 48:9
50:4,25 58:9
63:25 68:12
100:15 101:24
129:10 131:25
139:19 147:8
171:17
**ones**  32:18 93:2
140:5 161:12
207:12 214:23
**ongoing**  12:5
35:5 123:17
144:4,5

**ons**  94:23 108:9
**open**  6:21 10:15
10:23
**opened**  196:21
198:6
**openings**  80:15
81:16
**operating**
130:10
**opinion**  113:7
123:9 171:1
**opposed**  111:24
171:1 199:15
**option**  185:25
187:14
**options**  141:14
185:23 206:6,9
**order**  70:20
78:3 95:1,2
108:9 159:17,18
212:24
**ordered**  102:11
**ordering**  218:23
220:15
**orders**  112:5
130:14
**organize**  115:24
**orient**  179:9
**oriental**  29:23
**original**  3:9
32:18 37:10
50:20 95:4
154:12 187:13
193:2 198:8

**originally**  13:10
19:13 32:11
112:14
**oth**  170:20
**otto**  116:23
117:4
**outcome**  122:19
219:15
**outdoor**  14:18
**outset**  32:12
**outside**  112:22
212:24
**outstanding**
64:18
**overlapped**
196:23
**overnight**
123:15 124:14
125:23
**oversaw**  24:4
**oversee**  24:9
42:15
**overseeing**
42:13
**own**  24:2 44:25
59:22 74:22
93:6 100:16
110:2 114:9
**owned**  105:5
116:21
**owner**  18:17
54:18 57:2
74:23

**owners**  92:21
93:25
**owns**  32:8

**p**

**p.a.**  2:16
**p.m.**  2:2 87:7,8
144:19,20 147:1
147:2 148:3,4
194:15,16
218:24
**p00008**  159:3
**page**  3:3,7 4:2
113:13 159:4
160:1,12 166:1
167:3,7,7
178:10,11,14
179:8 181:4,14
181:22 183:11
183:19,25,25
184:1,5,8,23
185:14 190:5
221:4,7,10,13
221:16
**pages**  167:6
184:6
**paid**  20:9,11,14
21:13 37:16
54:7 55:17
57:20 84:25
85:1 86:3 94:10
94:17 113:14
114:12,25
120:12 121:20

121:21 122:22
122:24 151:1
158:19,20
193:11,14
**pan** 113:11
159:8 178:16
187:19 196:16
196:23 198:10
**panel** 177:14
**panels** 152:4
154:7 159:3,8,9
159:11,16 176:5
176:6,10 177:13
178:1 185:24
**pans** 70:13
71:23 74:3
142:7 155:6,8,9
155:11,15,18
168:24 169:1
174:7 177:1
196:18,20,23
**paper** 12:21
113:17,18
**paperwork**
52:10
**paradigm** 3:16
205:3
**paragraph**
151:20 198:4
**parameters**
37:24
**part** 36:19
53:24 70:21
95:23 114:20

119:6 124:2
128:23 158:18
158:19 160:23
163:18 164:24
167:9 177:10,23
179:14 191:17
200:17 201:9
202:3 205:2
213:12 216:25
**partially** 8:16
**particular** 21:7
41:18 51:3
64:16 75:8
124:7,10 162:7
204:8 215:2
**particularly**
99:18 106:21
**parties** 219:14
220:15
**parts** 132:15
150:1
**party** 3:8
149:24
**passing** 28:20
**passport** 128:20
129:2,3
**past** 132:21
145:9
**patch** 177:15
**patched** 141:1
**patrick's** 60:25
**patti** 13:24
14:14,25 15:2

**patty's** 13:25
**pavilion** 8:25,25
10:14,15,21
175:9,10,11,14
175:18,20 176:4
176:9 177:10
178:3,6,7,13
183:10 184:8
187:25 188:1
192:5 196:15,17
198:5
**pay** 21:16 53:5
53:7 54:5 55:7
108:16 109:13
114:10,13,21
115:3 121:22
161:21 211:15
**payment** 53:11
**payments**
102:23 209:15
**payroll** 30:24
31:1 33:17
**pen** 12:21
**penalties** 221:20
**penalty** 84:13
**pending** 35:8
191:11 215:4
**people** 14:15,16
14:16 23:25
26:15 31:10
34:12 41:13,14
41:18 63:22
66:17 67:17
76:2 77:17

78:23,24,24
79:4 81:8
108:19 116:12
125:22 130:4,17
137:2 140:23
186:3 192:1
202:18 211:9
**percent** 32:1,6
82:15 83:25
86:13 109:3
200:7
**percentage**
109:5 145:18
**percentages**
42:4
**perform** 54:6
58:6 96:18,18
119:2 128:11
**performed**
34:13,14 37:16
37:17 39:9
59:12 61:9,12
64:2 106:6
107:4 112:4
188:2 198:11
200:22,22 210:3
217:25
**performing**
61:6 140:13
201:6
**period** 26:14
28:18 30:2
49:25 60:15
67:11 93:6

**[period - please]** Page 257

115:19 157:6
168:9 169:11
201:20
**periodically**
137:2
**periods** 28:22
28:23 34:6
**perjury** 221:20
**permanently**
70:3
**permission** 86:8
**permit** 189:4,5
189:19,22,22
192:22,23 216:2
**permits** 189:19
192:19
**permitting**
188:23 189:3
**person** 43:7,10
47:3,24 58:9
108:18 201:6
**person's** 47:8
**personal** 6:4
53:17 75:11
133:10 142:10
**personally**
52:25 102:10
141:21 197:18
**personnel** 23:22
193:20
**persons** 216:19
**pertaining** 18:4
**phases** 30:8

**phil** 18:7 19:25
**phil's** 18:8
**phot** 196:18
**photo** 167:13,18
181:23 182:3
183:3,4,19,24
184:7,24 217:21
**photograph**
138:17 181:24
185:2 195:25
**photographer**
138:24
**photographica...**
196:19
**photographs**
3:13,14,15,16
3:24 4:6 139:1
139:12 202:4,11
207:3 213:23
214:16,22
**photos** 167:10
167:16,22
181:25 182:4
183:9 201:10,14
201:25 202:15
202:19 203:24
203:25 207:6,8
213:25 214:1
217:14
**physical** 7:1,4
84:5
**physically**
216:12

**pick** 54:1
**picture** 24:17
157:21 195:21
**pictures** 87:16
88:24 201:16,17
202:5 207:10
**picturing** 25:4
**pie** 70:14 72:23
196:20
**piece** 170:9
**pieces** 55:3
104:12 187:11
**pilfered** 54:12
**pima** 219:4,7,16
**pipe** 29:18
**place** 29:10
47:19 69:24
162:7 216:4
**placed** 59:22
105:19,20
**places** 79:3
206:7,19
**placing** 118:20
**plaintiffs** 1:5
2:9 3:16 86:20
86:21 207:3
**plan** 3:15 12:11
32:11,12 33:14
33:14 47:16,22
47:23 49:5
50:23 59:25
70:5 81:21 82:1
82:2 131:25
132:1 138:8,11

146:6 147:8
187:22 204:18
204:20,25
**plane** 99:21
104:6,18 115:22
**planes** 115:14
115:20,21
**planned** 112:15
188:5 214:11
**plans** 32:10,18
32:19,19,20
62:22 98:21
99:1,2,3 111:13
111:23,25 112:4
112:6 119:7,14
119:20 120:3,13
120:20,24 121:1
121:3,6,18,24
122:1,3,5,8,13
123:2,21,23
124:1 138:6
178:7,13 205:2
**plaster** 23:25
63:22 83:18
107:23 154:6
174:20 200:13
200:16,17,19,20
201:2
**plasterers** 25:13
**plasterwork**
200:22 201:4,7
**pleasant** 1:24
**please** 5:6 69:8
220:12

[pleasure - prior] Page 258

**pleasure** 127:13
127:20
**plenty** 28:6
132:12 133:7
**plus** 68:8 85:15
99:6 193:14
**plywood** 80:20
80:22 81:5 82:6
82:7,19
**po** 184:20
**point** 23:10
35:21 38:21
39:4 43:10,12
45:5 48:24 70:3
75:18 78:4,13
96:4 100:21,21
115:2 120:23
152:12 182:2
189:15 206:24
**pointed** 43:24
155:15 180:24
181:1
**pointing** 185:7
**points** 118:21
**police** 56:4 57:8
57:12
**policy** 105:3,4
105:10
**pool** 11:1 14:16
121:11,13
**pop** 181:4
196:21
**portion** 36:19
36:24 44:10

48:12,14 49:12
54:8 56:23 62:9
63:25 64:7,8,25
65:11 71:5 76:4
83:4 145:14
150:21 159:14
164:8 190:17,19
192:13 195:9,20
199:2 200:2
201:18 203:4,5
**portions** 31:24
50:15 56:19
63:2 70:14 72:3
72:9 107:22,23
124:3 141:13,17
149:25 150:3,5
155:20 191:4
194:25 199:4
214:2
**ports** 78:9
**posed** 120:5
**position** 215:6
**possession**
54:25 94:1
**possible** 198:15
**post** 2:12 166:18
167:14,15
175:23 181:11
181:24 182:1
197:12,17
206:22
**pound** 54:13,16
65:21 104:8,15
104:20

**pour** 121:12
**poured** 27:12,13
133:17
**pr** 144:10
**practice** 5:25
6:2,3,12,18,19
6:21 29:23
126:17 128:6,11
**practicing** 6:6
86:16 128:8
**pre** 167:14
173:7,8,20
185:11 194:6
195:2 197:15
**predicted** 109:7
**predominately**
36:7,10,12
88:12 128:12
188:15 196:6
**prefabricate**
185:24
**preliminary**
12:20
**preparation**
219:11
**prepare** 98:21
185:9
**prepared** 48:9
48:10 121:10,19
191:9
**preparing**
120:24
**prepped** 192:17

**present** 40:12
44:17,20 45:8
64:15 72:15
76:6,25 77:1
111:8 124:4
137:16,19 142:2
151:18 173:3
181:7,8,9,10,13
181:13 195:25
197:4,6 199:10
200:4 202:2
**presently** 175:4
**president** 133:1
**pressure** 137:7
**presumably**
75:16
**pretty** 20:4
26:17 69:7
116:14 117:2
129:23
**previously**
87:17 122:21
171:22 191:1
207:8
**pri** 49:5
**price** 94:5 95:4
**prices** 143:7
**pricing** 166:2
193:19
**primarily** 6:1,1
145:13 150:11
**primary** 144:24
**prior** 15:21,23
31:4 46:21

47:16 48:3,13
49:11 59:14
63:8 79:11,18
81:2 87:11 92:5
97:1,7,14 98:8
110:5 128:12
150:2 176:12
184:11
**privacy** 94:7,10
126:15,19
143:20 144:10
**private** 94:11
115:20 126:16
**privilege** 171:13
**pro** 84:21 105:4
143:16 167:22
**prob** 86:10
**probably** 12:23
13:16 14:3
18:11 35:5 38:4
41:5 49:16 51:7
53:13 54:1
63:14 72:24
86:7 104:17
119:25 129:15
132:4 137:3
139:6,6 146:9
149:6 151:11
152:12 167:18
187:7 213:4
**problem** 62:11
133:17 142:24
**problems** 49:22
170:24 179:10

**procedure**
220:24,24
**proceeded**
121:4
**proceeding**
219:10
**process** 11:11
100:18 112:17
115:11 188:23
191:7 216:5
**procure** 101:3
**produced** 3:16
143:10 160:9
207:3 214:23
**product** 47:12
47:15 48:20
58:25 59:5
82:10,12 84:21
99:10 103:14
106:1 107:9
171:13
**production** 3:17
207:4 219:11
**products** 6:5
101:15 102:1,4
102:14,16 103:2
107:10,24 166:2
**profession** 5:20
**professional** 2:6
16:16 199:14
219:6
**profit** 190:10
**progress** 102:22

**prohibition**
130:19
**project** 11:19
12:3 17:1 22:6,8
22:10 23:7
26:18 27:8
29:20 30:8,22
33:6,19 39:19
40:2,4,10 41:1
41:15,24 43:12
43:22 44:12
45:5,14,17 46:1
46:5,8 47:18
48:7 52:10
54:21 58:1 61:8
61:12,21 62:8,9
62:14 63:1
68:12 69:3
94:17 98:13
99:17,25 102:11
114:17 158:17
167:10 185:15
193:20
**projected**
208:12
**projects** 46:10
134:8 143:14,16
143:21,23,25
144:4
**promptly**
123:15
**proper** 193:7
**properly** 49:21
61:9 107:6

157:11 164:16
181:7,13 202:2
**properties** 17:8
17:14 92:1
106:24 143:18
144:6,9 169:6
**property** 5:12
6:22,24,25 7:19
8:4,19 12:8
14:20,21 15:1
15:14 17:2,12
17:15 19:23
20:3,9 21:20
27:23 31:4,20
34:25 36:24
42:10,21 58:10
58:15 65:11
69:24 83:14
84:6,7 85:8,13
87:11,12 89:17
91:9,11,15 92:5
92:7,13,22,24
93:9,18,24
94:18 100:12
105:1,5,15
106:3,12,13
116:21 124:14
133:24 138:4,6
139:18,24 140:5
143:19 148:10
148:18 170:21
186:7 214:6
215:1,2,3,6,15
215:15,21

**property's**
68:24
**propo** 161:15
**proposal** 3:10
95:25 96:23
158:1
**proposals**
158:10 159:21
159:22 161:13
161:17
**propounded**
219:9
**protection**
95:19 96:7
**provide** 55:7
56:10 114:5
153:18,20
167:16 177:2
204:15 213:4
**provided** 114:8
123:23 124:1
157:13,18,23
165:15,16
167:19 173:16
191:19 203:18
213:5
**providing** 15:2
**provision** 86:14
86:18
**prudent** 50:14
66:12
**public** 94:12
126:21,22
212:25

**published** 123:8
**publishes**
139:12
**puerto** 116:10
116:12,14
**pull** 71:4 189:5
**pulled** 71:24
**punch** 65:6
210:3,6,9
**punched** 210:2
**puncture**
181:17 182:17
182:19,20
**punctures**
168:24 169:1
**purchase** 53:11
87:11 92:13
94:5 151:15,17
**purchased** 7:16
7:17,20 28:25
53:8 84:21
92:14 93:2,8
94:18 170:9,10
**purchasing** 6:22
127:24
**purpose** 119:10
119:19 136:13
152:5 206:18
**purposes** 10:4
32:6
**pursuant** 36:25
86:11 151:21
156:4 219:8

**put** 42:4 47:20
48:20 51:21
59:1 65:12,17
66:13 77:3
78:21 80:22
82:1 104:6
105:18 118:24
121:15 154:10
182:12 203:11
203:13 206:8
208:20
**putting** 65:7
**pyroseal** 169:16

**q**

**quality** 152:5
**quantity** 165:12
**question** 11:21
34:9 37:4 42:3,5
45:19 60:2 62:7
63:13 69:20
73:24 76:7,8
89:12,12 107:18
110:6 120:5
121:9 141:16,19
142:3,21 145:1
152:21 155:22
155:23,25
157:15 160:5
162:9,11,16,21
162:23 163:4
164:2,3 171:21
176:13 183:9
198:19 209:22

218:13
**questions** 62:1
71:25 113:3
190:7 218:10
219:8
**quick** 87:19
148:6 149:4
**quicker** 189:8
**quickly** 211:4
**quite** 24:14
54:12 84:2
145:5 187:15
189:25 201:2
209:25
**quote** 35:1
**quotes** 12:22

**r**

**r** 18:7 22:15
30:18 221:3,3
**r1061** 219:25
**rafters** 137:3
**rain** 28:21,22
60:23 80:13,13
82:15 117:10,15
117:19
**rainfall** 28:10
**rainier** 28:18
**raining** 28:14
**rains** 107:1
**rainy** 28:14,14
28:16
**raise** 94:8

**raised**  35:20
  95:21
**ran**  18:19 20:4
  43:7
**range**  39:15
**rate**  151:4
**rating**  75:9 97:6
**ratio**  193:3
**reach**  43:11,14
  201:6
**reached**  59:3
**reaches**  29:4
**read**  209:3,20
  218:17,18 220:8
  221:20
**readily**  29:6
**reading**  185:17
  190:14,18,22
**real**  47:12 80:1
  87:19 118:4
  143:23 206:21
**realistic**  33:10
**realized**  78:1
  120:22 158:17
**realizing**  210:22
**really**  9:12,19
  9:20 20:19 21:3
  21:11 23:20
  24:16,20,21
  31:11,13,18
  36:13 45:13
  47:1 56:5,6 57:3
  75:11 76:20
  78:2 80:16

83:10 84:14
  90:7 91:4,6
  102:20 103:11
  104:25 106:18
  112:19 114:17
  117:8,9 121:17
  135:10 142:10
  142:21 143:20
  144:9 176:20
  181:2 183:8
  184:17 200:23
  201:1 204:3,15
  206:9
**reason**  5:16
  52:9 77:16
  119:18 131:21
  143:12 156:23
  157:1 193:9,11
  195:5 196:2,7
  198:17 220:10
  221:6,9,12,15
  221:18
**reasonable**
  55:22 61:19
  169:7 220:17
**recall**  7:3 8:1
  24:21 26:6 31:1
  39:12,14 45:12
  47:1 52:24
  53:18,19,25
  56:2 57:25
  59:17 63:10,17
  64:16,25 69:12
  69:16 72:6

84:17 85:16
  86:23 87:1 89:8
  93:7 94:2 97:10
  97:11 103:1
  109:8,8 114:12
  116:23 122:11
  124:19,19
  130:19,20 151:1
  156:9,22 157:22
  158:23 159:11
  161:1 166:25
  167:23 172:25
  174:1 175:1
  181:5 210:10
**receipt**  220:17
**receive**  7:10
**received**  57:10
  113:7 191:6
  213:11
**recently**  191:7
**recognize**
  211:20 212:5
  213:24
**recollection**
  44:2,5 71:23
  117:18 130:25
  193:4 196:5
**recommendati...**
  142:8,13 171:4
**recommended**
  58:11 173:24
  185:20
**recommends**
  176:8

**record**  87:7,8
  94:12 98:14
  126:19,21,22
  127:24 128:10
  144:15,16,17,18
  144:19,20
  146:25 147:1,2
  148:3,4,7
  194:15,16
  212:17,18
  219:10
**recorded**  75:5
**records**  126:23
**recovered**
  176:18 191:20
**red**  178:11
**redid**  50:3
**redo**  50:10
  188:24
**redone**  50:15
  196:7,8
**reduced**  219:10
**reduction**
  132:15
**refer**  8:22
  169:14 170:8
  175:16 180:6,7
  190:16,17 191:4
  191:5
**referable**  38:8
  98:23
**referenced**
  26:12 150:10
  175:10 179:10

203:1 220:6
**referred** 13:23
24:11 203:17
**referring** 40:1
40:22 97:7
159:15 160:12
179:7 185:3
201:22 209:7,14
**refers** 140:12
159:4,9 161:2
176:19 199:20
205:11
**reflect** 112:7
**reflected** 163:21
**refurbished**
137:10
**regard** 21:5
152:14 174:21
220:19
**regarding** 5:12
17:4 37:23
52:10 59:4 75:9
75:12 95:6
96:12 97:5
107:8 108:10
111:20 120:6
121:7,18 159:10
161:18 191:10
192:8 205:5,23
207:22 208:12
209:2 214:16
**regardless**
37:23 40:20
162:18

**registered** 2:6
219:6
**regular** 28:20
44:14 67:20
81:20,22
**regularly** 14:17
17:20
**regus** 2:3
**reimburse** 56:7
**reimbursed**
55:13,25
**reinstalled**
187:19 196:24
198:25
**reinstated**
122:22 123:9
**relate** 112:10
**related** 18:13
36:8 60:3 62:16
73:12 90:18
106:23 119:15
169:2 189:7
190:24 205:13
211:6 212:7
214:25 219:14
**relating** 5:13
**relation** 47:1,2
119:2
**relative** 46:24
**release** 86:9
213:1 215:11
**relevance** 94:9
**relevant** 94:7
143:20

**relied** 109:4
**remain** 32:18
**remainder**
196:15 197:1
**remark** 202:24
**remember** 19:5
24:16,18 45:3
45:13 46:18,22
48:6 51:3 83:8
85:5 86:24
124:24,25
136:21 173:19
197:6,8 211:11
**remind** 193:23
**remove** 70:21
205:10
**removed** 70:23
141:10 196:7,11
196:25
**removing**
196:10,22,22
**rent** 70:5 214:4
**rented** 70:9
100:16
**repair** 14:15
35:4 37:11
71:14 140:17,24
142:9,14,25
171:4 172:8
192:8 201:7
**repaired** 90:7
140:7 171:1,9
198:8

**repairs** 140:25
142:4,6 169:23
169:24 171:6
205:6
**rephrase** 34:25
**replace** 11:24
55:20 142:8,25
143:2 148:21
171:2,4 177:13
177:19 178:1
193:7 205:10
**replaced** 55:25
141:2 176:9
206:5
**replacement**
142:13 143:13
185:20 216:24
**replacing**
142:18 196:25
**report** 3:11 57:8
75:2 142:12
166:5 167:3,6,9
167:10 173:14
175:16,17,22
186:24 191:10
194:5,8 195:2
195:10,11
198:25
**reported** 1:15
168:4
**reporter** 2:5,6
86:6 87:4
218:21 219:1,5
219:6

[reporting - right]                                                    Page 263

**reporting**
174:22
**reports** 185:9
**representation**
95:18 109:4
**represented**
38:11 96:15
108:21 109:10
114:16 120:1
121:21 157:4
161:20 163:23
163:25 191:16
**representing**
5:22
**request** 55:22
114:3 139:9
202:4
**requested** 27:1
139:2,17 158:14
**require** 127:18
128:22 129:2
**required** 51:5
130:15 155:18
155:24 177:15
189:14 192:24
215:18
**requires** 106:17
128:20
**research** 58:24
59:4 163:24
**researched**
75:18
**reserved** 219:13

**residence** 4:4
124:6 144:24
158:4 214:17
**residential**
20:21 21:2,5
**residents** 214:2
**resolve** 85:22,25
**resolved** 38:21
38:22 63:10
86:2 123:4,12
154:18
**response** 3:17
44:1,3 55:24
101:9 102:18
207:3
**responsible**
42:10 176:21
**responsive** 62:4
**rest** 148:17
**restitution**
57:20
**restroom**
194:13
**result** 150:7
173:23
**resulted** 150:9
**resume** 33:21
**retained** 4:7
**retire** 147:8
**retired** 37:10
128:7 136:6
138:7 147:4
171:23 172:2

**retirement**
147:5
**retract** 89:11
**return** 114:3
**returned** 187:14
220:16
**reused** 142:20
**reusing** 142:18
**revealing**
196:22
**revere** 151:25
152:7,15,23
**reverse** 147:22
**review** 195:4
218:18 219:13
220:7
**reviewed**
152:12 189:24
**revised** 219:12
**revolves** 35:9
**rico** 116:10,12
116:14
**ridge** 72:25
177:19 179:6
196:6,16
**ridges** 169:11
177:1,2 178:22
**right** 5:8,11,20
5:22,25 6:11 9:2
9:14 12:5 20:13
25:8 26:2 28:23
30:7 31:12,25
32:2 33:11 34:6
35:2 37:19 38:5

39:10,17 49:3
49:10 51:1,1,25
52:22 55:8,22
56:20 60:18
61:4 62:6 65:14
65:16,22,24
66:4,7 67:25
73:4,22 74:4,8
74:16 77:24
78:3,3,10,20,23
79:5,11,17,17
80:9 81:14
82:17 87:2 89:1
89:10 90:24
91:5,14,14
95:21 96:8,13
97:12 98:17
101:9,12 104:25
105:17,25
106:20 109:18
110:21 111:5
112:18 116:1,13
119:4,12 126:7
126:12,20 129:4
129:23 130:2,16
131:14 132:12
132:18 134:11
140:1 144:5
146:12,20,23
147:19,25 148:6
149:9,16 160:8
161:9 162:16
165:10,21 167:1
171:18 175:3,23

**[right - roofs]**

| | | | |
|---|---|---|---|
| 176:14 177:9,23 | **rolls** 54:13,15 | 108:12,14,18 | 193:2 194:19,23 |
| 179:11,20 180:8 | 54:16 56:17,19 | 109:9,15,17 | 194:25 195:4 |
| 180:16 182:5,14 | 65:20,21 104:8 | 110:4,7,9,13,18 | 196:18 198:3,18 |
| 182:22,24 187:9 | 104:14,15,20 | 110:20,25 111:6 | 198:19 199:2,4 |
| 188:9,19 190:21 | 159:12 | 111:7,11,16,17 | 200:1,2 204:18 |
| 191:9 192:10 | **ron** 3:19 43:6,8 | 112:4,10,14,19 | 204:22,25 |
| 193:17 197:22 | 43:9 45:14,16 | 112:23,25 | 205:13 206:5 |
| 199:3 202:13,24 | 67:8 99:16,19 | 114:14 117:3,16 | 207:22 214:11 |
| 204:5 205:7,19 | 101:2,6,11 | 117:17 118:8,13 | 214:11,17,17 |
| 205:22 207:18 | 102:13,15,22 | 118:15,17,19,22 | 215:12 216:16 |
| 208:15 212:3 | 208:18 209:5 | 119:10,15,20 | 216:24 217:25 |
| 213:20 214:8,14 | **ron's** 101:9 | 120:1,7 122:1,6 | 218:6 |
| 216:7,10 218:21 | **roo** 192:11 | 122:8,10 123:20 | **roof's** 187:18 |
| 219:13 | **roof** 3:12,15 | 135:23 136:1,14 | **roofer** 48:16 |
| **ring** 159:6 | 5:13 27:20 | 136:20 137:12 | 172:13 |
| 160:13,21 | 35:10,13 36:3,4 | 137:15,18 | **roofers** 206:4 |
| 174:12,23 | 36:5 37:20 | 138:14,17 140:7 | **roofing** 3:10,11 |
| 187:16 | 39:23 44:23 | 141:20,23 142:1 | 16:13 20:16,17 |
| **ripped** 88:7 | 46:20 47:19 | 150:11,16,17 | 44:9 47:17 48:1 |
| **riveted** 172:17 | 48:11,12,13,15 | 151:10,24 152:3 | 48:22 59:10 |
| 196:8 | 48:22,23 49:4,6 | 152:4,6 153:6 | 61:13 74:7,23 |
| **rivets** 172:9,11 | 49:12,21 50:24 | 153:21 154:9 | 96:18 110:4 |
| 172:16,18,23 | 51:8 59:19,19 | 155:4,6,8,8,17 | 122:12 124:3 |
| 180:25 181:1,4 | 60:23 62:16,18 | 155:21 162:17 | 140:3 142:16 |
| 196:10,11,21,25 | 62:19 63:2,25 | 162:24 163:16 | 155:12 158:1 |
| **rolath** 48:20 | 64:2,4,6,9 70:12 | 166:16 169:12 | 161:22 163:11 |
| 49:1,18,19 50:1 | 70:22 71:7,10 | 169:15 170:16 | 174:19 183:11 |
| 50:3,7,17,20,24 | 72:11 73:13,14 | 171:3 172:23 | 192:11 |
| 51:1 107:5 | 79:17 80:1,3,16 | 173:6,23 174:18 | **roofs** 51:23 52:1 |
| **role** 98:13 | 83:15,19,22 | 176:9 178:7,13 | 67:9 140:24 |
| 136:13 | 88:1,7 89:4,5,9 | 179:9 181:17 | 150:3,8,10 |
| **roll** 187:11 | 89:9,11,13,19 | 183:21 184:2,12 | 162:7 168:16 |
| **rolling** 187:12 | 90:3 97:5 98:24 | 184:15,17 | 170:3 171:8,10 |
| | 99:4 103:10 | 185:19 188:24 | 184:21 188:18 |

**[roofs - secured]** Page 265

197:10
**room** 8:8 9:10
11:4 28:4
180:13,17
199:23
**rooms** 10:4 11:5
**rosecrans** 2:11
**rosin** 113:17,18
**roughly** 23:8
179:16
**round** 132:21
**rpr** 1:15 219:20
**rrf** 219:25
**rubber** 49:16,17
**rubberized** 49:2
49:16
**rule** 3:13 142:11
201:12 220:24
220:25
**ruled** 37:23
**rules** 5:8 220:18
**ruling** 36:21
37:3
**rumor** 77:22
82:21
**run** 18:6 56:6
59:19,20 70:17
177:20 214:7

**s**

**s** 26:10 30:18
221:3
**safer** 77:5

**safety** 75:21
**sale** 93:18
**san** 2:12 6:1,7
144:3 145:4,5,6
147:12
**sanders** 3:10
71:14 76:1
136:2 157:24
158:6,7 166:10
**sarah** 1:4 2:11
18:11 24:20
38:16 40:15,23
42:8,19 52:24
58:21 77:1
86:21 87:23
95:24 97:2,20
131:2 145:25
**sarah's** 15:12
**satellite** 184:13
**satisfactory**
113:7
**satisfied** 201:5
**saw** 165:19
171:10 184:22
212:8
**saying** 36:21
37:16 42:6
52:15 66:24
73:18 74:14
86:7 103:17
161:12 171:5
174:16 178:23
187:4

**says** 150:14
159:7 160:17
168:8,19,23
169:22 170:5
175:6,18,22
176:4 177:13
181:4 184:8
185:23 186:20
187:12 188:1
190:1,9 192:18
198:4 203:14
205:18,19,21
207:3 210:1
211:4
**scaffolding**
137:5 143:5
192:16,19
**scanned** 52:21
**scary** 77:9,12
**sched** 60:9
**schedule** 59:23
124:8,10 188:1
**scheduled** 64:11
214:14,15
**schedules** 60:9
**scheduling**
60:19 188:7,14
188:21
**scope** 21:3
121:18 185:15
189:20
**scrapped** 121:2
121:6 122:5
123:21

**screen** 82:13
**screws** 160:18
**scurried** 116:19
**se** 22:11 106:23
**sea** 50:12 91:10
91:11 106:12
**seam** 151:23
152:3 198:6
**seaming** 198:7
**seams** 38:8
169:8
**season** 28:15,16
**second** 148:2
155:25 168:10
188:13 193:21
194:2 198:4,5
**section** 72:23
73:5 155:12,13
179:12 196:19
196:22 198:5
**sections** 70:16
70:18 71:3 73:3
73:7 75:14,15
178:18
**secure** 66:6
80:22 81:1,5
82:7 99:10
118:21 121:13
141:14,19
**secured** 78:18
80:20 81:11
90:15 100:13
118:25 141:13
141:17 155:6,16

**[securing - side]**                                                    Page 266

**securing** 194:23
**see** 38:9 47:14
  70:20 73:2 80:9
  110:19 160:12
  160:17,22,25
  165:9,23 174:7
  180:25 181:14
  181:15 182:4,6
  182:11,25 183:7
  189:20 190:15
  190:23 193:15
  197:2 201:23
  202:22 204:13
  205:9,18 211:20
  212:12,25
  213:24 214:5
**seeing** 183:5
**seeking** 95:20
**seem** 38:8 134:7
  207:7
**seemed** 25:16
  43:17 59:22
  69:6 73:14
  106:21 185:6
**seems** 32:9
  55:22 133:11,16
  134:6 169:9
  190:17 207:10
  208:16
**seen** 75:21,23
  88:24 149:16
  191:24 204:2
  206:19 211:23

**send** 66:10
  99:19
**sense** 68:9,11
  78:23 152:1,8
  152:15,23
  193:25 194:3
**sent** 96:22 99:15
  103:17 113:23
  120:14 218:19
**sentiment**
  209:24
**sep** 127:12
**separate** 35:20
  72:1 127:12
  140:20 146:12
  153:9 158:6,12
  161:7 178:3
  202:15 212:19
**separated** 71:24
**separately**
  71:15 124:11
**september**
  62:25 168:3
**series** 3:13,14
  3:15 159:22
  201:10
**serve** 119:10
**service** 14:16
**services** 3:16
  15:2 116:11
  189:21 205:3
**set** 59:22 70:24
  121:24 152:17
  203:24 212:5

  213:21 219:15
  219:22
**setting** 60:9
**settlement** 4:4
  85:15,17 86:2
  86:11 122:23
  123:4,12 212:10
  212:21
**seven** 63:4,5
  68:10 159:5
  160:12
**seventy** 18:2
**several** 52:11
  92:23,25 93:1
  99:20 115:19
  158:10 168:5
**shaking** 63:12
  135:3
**shank** 159:6
  160:13,21
**shaped** 70:14
**shapes** 196:20
**sheathing** 48:17
  107:5
**sheet** 220:11,13
**sheetal** 137:9
**sheets** 75:21,23
**ship** 101:7 104:4
  185:24
**shipped** 101:15
  101:16 102:9
  104:11 113:16
  165:4 187:13,20

**shipping** 101:22
**shirts** 201:24
**short** 55:10 93:6
  142:24
**shorted** 99:19
**shorthand** 2:5
  219:5,9
**shortly** 39:18
**shots** 23:23 24:3
  25:11
**show** 14:16
  81:24 130:15
  193:21 195:7
  202:6 204:17
  211:17
**showed** 43:22
  114:1
**shower** 28:20
  180:20,21
**showers** 28:12
**showing** 155:1
  195:22
**shows** 204:25
**shredded** 52:18
**shut** 78:9
**shy** 94:22
**si** 156:2
**sic** 14:3
**sick** 5:18
**side** 70:13,19,19
  70:23 73:11,13
  87:21,21 88:2,5
  88:10,13,15
  89:15,17 152:19

**[side - speak]**

156:3,6 157:17
179:9 182:10
195:19 196:3
197:3,8,11,18
197:20,20 198:1
198:2 199:6,7,8
200:1 217:13
**sides** 68:1
**sign** 86:9 220:12
**signature** 160:1
212:13 213:6,8
219:13,19
**signed** 95:3
159:2,24 160:3
161:6,8 213:11
220:21
**significant**
56:16 125:8
145:14
**significantly**
27:7 120:15
143:8
**silly** 184:13
**similar** 9:18
82:12 106:1
146:1 178:1
193:4
**simonsen**
138:22
**simple** 109:17
154:3
**simply** 54:3
111:12 153:14

**simpson** 211:12
**single** 86:16
92:11
**sir** 218:22
**sit** 118:4 214:12
**site** 67:24 69:4
100:17 103:23
108:21 170:5,7
186:1 187:5,8
187:11,20
192:16 196:12
200:9
**sits** 112:23
**sitting** 63:14
100:22 117:9
135:6
**situation** 72:16
143:19
**six** 9:1 19:7 22:5
32:15,17 39:20
39:22 44:16
66:19 145:22
**size** 100:4
104:11 112:24
**sketches** 119:16
**skill** 219:11
**skills** 23:17
**sleep** 134:22
135:20,21
**slide** 186:18
**sliding** 80:18
81:21
**sloppiness**
44:24 59:14

**sloppy** 38:9
43:18
**smacna** 152:1
152:10,25
203:17
**small** 10:16 90:6
**smaller** 159:3,8
159:9
**smarter** 128:9
**sold** 93:13
**solely** 17:14
119:9 170:16
190:24 205:16
**solicited** 46:17
**solution** 187:21
**solutions** 220:23
**somebody** 22:8
34:8 43:19
46:16 61:16
67:24 133:14
173:5
**someone's** 83:19
**someplace**
146:21
**somewhat** 12:19
23:11 25:5,13
184:2 186:10
**son** 45:19
**soon** 12:4
102:20 132:9
**sorry** 15:18
64:14 71:19
101:10 117:16
134:25 141:16

176:1 193:23
**sought** 191:20
**sound** 96:9
169:1 176:14
184:13 193:7
**sounds** 61:19
169:5,7 186:21
201:1
**source** 28:5
63:24
**sourced** 52:25
**sources** 190:2,4
**south** 2:3 28:11
88:18 90:23
116:19 179:21
**southeast** 2:17
**southerly**
168:20
**spaced** 76:5
156:4 157:11,17
157:19 164:16
181:7,13 200:4
202:2 217:8
**spacing** 95:7,16
96:12 97:1 99:7
99:14 152:18
153:3,6,18
156:5 157:13,22
159:1,4,8
161:18 163:21
164:7,12 195:22
196:1 198:8
**speak** 26:4 35:2
62:22 101:11

**[speak - states]**                                                    Page 268

102:22 130:8
198:20,21
**speaking** 189:1
**speaks** 166:13
**special** 125:16
**specializations**
21:8
**specific** 18:11
67:13 95:16
110:12 112:25
152:17 159:17
159:18 202:9
215:16
**specifically** 73:5
80:24 87:1 89:8
90:21 94:16
95:7 96:6 103:1
114:12 120:8,24
124:19,20
130:19 147:11
153:17 158:23
197:8
**specifications**
3:14 82:14
98:22 203:9
**specifics** 56:2
**specifying** 151:2
**speculate** 88:8
162:5,12,20
163:7 171:9
198:16
**speculating**
57:7 72:13
107:14 176:16

209:11
**speculation**
89:25 162:22
**speed** 83:8,9
162:13
**speeds** 163:8
**spell** 14:2 22:14
30:17
**spelling** 26:11
30:19
**spend** 145:5,7
145:19 146:7,9
146:21 147:9,16
147:20
**spent** 31:16 46:9
144:23 196:16
**spoke** 25:20
76:1 101:13
167:20
**spoken** 13:4,11
13:19 97:2
156:14 171:11
191:6
**spray** 182:12
183:15
**sprayed** 182:23
182:24
**springline** 97:24
98:12 111:21
120:11,17 121:2
122:24 124:1
190:3 204:20
205:2

**sprinkler** 14:22
**square** 9:8,22
51:5,8,12 62:19
62:22,23 108:5
109:9,20,24
110:1,23,24
112:13 176:11
176:15 209:6,10
**ss** 219:3
**st** 1:2,2 7:2 13:3
15:10 29:14
45:16 47:6
60:25 76:22
77:21 78:7,9,16
78:17,24 83:1,2
84:22 98:1
100:10,11,22
101:24 102:1,2
111:24 115:17
116:18,22 126:7
128:18,20
132:19,20
134:17 137:21
147:18 152:6
168:3 186:2
215:15
**stack** 177:3,6,7
**stacks** 184:21
**staff** 111:21
**stained** 137:4
**staining** 137:3
**stamp** 159:2
203:10

**stamped** 201:13
**stamps** 203:13
**standard** 152:1
153:5,10
**standards**
152:15 153:2,13
199:14
**standing** 151:23
152:3 169:8
**stands** 43:14
**start** 6:21 59:24
100:20 149:9
165:5,7,7
180:16
**started** 7:15
31:18 35:18
46:19 115:14
119:5
**starting** 167:3
184:7 185:14
207:10
**starts** 24:20
178:6 184:7
**state** 2:5 5:6
91:14 119:13
142:1 164:4,6
171:16 219:3,6
219:7,16
**stated** 221:21
**states** 1:1 6:15
22:2 128:23
133:4 143:11
171:15

**[stateside - suggests]**

**stateside** 149:2
**status** 19:21
  133:2
**statute** 220:18
**statutes** 219:12
**stay** 10:18 23:2
  30:6,7 69:8
  78:25 124:18
  125:5 126:5
  131:19,20,21
  132:2 134:21
  135:19 206:24
**stayed** 10:20
  15:12 17:20
  22:18 23:12
  24:14 41:19
  124:13,16
  129:22
**stealing** 55:3
  57:5 66:1
**steam** 180:20
**step** 73:15,18,19
**stephen** 200:10
**stepping** 57:2
**steve** 138:22
**stipulated**
  120:12
**stole** 55:20
  57:22
**stolen** 55:10
  66:8
**stone** 11:22
  12:13 23:25
  25:14 32:25

41:13 107:22
  117:21
**stonework**
  11:16 38:7
  43:17
**stop** 82:14 165:7
  168:24
**stopped** 33:18
  58:15 79:16
  96:19
**storage** 8:8
  52:17 100:16
  208:20
**stored** 27:21
  65:8
**stories** 9:11,13
  10:10
**storing** 27:15
  209:2
**storm** 77:22
  78:22 79:9,10
  79:11 80:8
  82:10,18 83:8
  117:6 167:24
  168:10 170:22
  172:20
**storms** 77:10
  81:2,3,6 116:22
**story** 8:14
**straight** 38:8
**straighten**
  141:3
**straightforward**
  154:3

**strictly** 88:19
**strike** 11:9
  15:22 46:6,21
  83:19 111:3
  161:25
**strikes** 109:2
**stringency**
  216:5
**struck** 90:3
**structural**
  121:11 189:9
**structurally**
  107:25
**structure** 35:12
  51:4 112:22
  121:10 131:19
  175:19 178:3
  179:23 194:25
  199:24 204:22
  210:20
**structure's**
  204:24
**structures** 7:21
  8:3 11:6 51:4
  83:19 84:5
  87:10 92:4,7,10
  92:12 98:7
  148:10 180:2
  184:12 191:11
  205:17
**stuart** 2:17
**stuck** 181:17
**studio** 10:11
  27:11 36:14,23

59:20 77:4
  120:25 148:13
  184:1,16 205:5
**stuff** 57:23
  90:15 178:1
  189:8
**stumbling** 25:7
**subcontractors**
  135:24,25
**subdivided**
  93:10
**subject** 35:16,24
**substantially**
  156:4
**substitute** 56:10
**substrate**
  106:14 176:17
  177:14
**subtotal** 190:5,8
**sue** 85:14
**sued** 113:24
  157:6
**suffice** 121:17
  143:21
**sufficient**
  161:20 163:25
**suggest** 169:9
**suggested**
  220:16
**suggesting**
  66:12 196:2
**suggests** 11:2
  197:2

**suit** 37:14 38:17
85:18 86:19
**suite** 1:24 2:4,11
2:17 177:23
178:13 187:25
218:20
**sum** 120:12
150:15
**summarize**
154:1
**summarizes**
209:24
**summary** 123:6
166:11 167:24
168:15
**summer** 28:11
**summers** 15:8
17:22
**sun** 50:13
**superintendent**
61:21
**superior** 35:16
36:8,17,20,22
37:24 38:11
114:21 149:11
154:13,17
169:20 174:19
181:20 191:10
191:20 194:5
203:19 207:4
212:11 215:9
216:25 217:3
**supplemental**
66:10 101:17

102:4 104:12
166:13
**supplied** 110:4
111:4
**supply** 54:3
58:5
**support** 202:1
**supposed** 40:12
44:4 64:3,5
70:14 73:2,20
73:20 82:14
101:7 102:16
103:21 111:25
120:13 155:14
162:25 163:1,3
163:14
**sure** 5:9 8:14,23
10:2 11:21
16:15 17:19
19:14 23:19
26:11 30:19
37:1,6 41:8 50:4
50:14 52:12
53:4 63:21 66:5
67:12 68:6
72:19 77:3,20
86:12,13 87:6
87:20 89:6,9
94:7 97:15
101:18 102:24
104:22 106:1
107:17,20
109:16 110:6
111:14 118:16

122:14 124:25
129:12 131:6,10
131:17 132:10
133:20 136:3
138:10 141:18
142:2 155:22
157:15 174:15
178:16 190:25
200:7,15 202:8
203:22 205:25
208:5 213:3
**surfaces** 169:12
169:15
**survived** 82:18
**suspect** 72:10
96:4 110:19
128:1,3 132:23
134:15,19
152:11 214:19
214:21
**suspected** 217:5
**sustained** 75:24
82:24 168:4
**switch** 120:10
**sworn** 5:2
**synthetic** 47:13
48:20 49:17
**system** 14:22
116:3 148:8
161:23 162:17
163:11 184:14
**systems** 80:17
183:11 200:2

**t**

**t** 26:10 30:18
221:3,3
**take** 5:11 9:1
22:8 23:10
31:13 33:16
39:2,7 44:2
70:21 72:20,24
78:14 80:25
83:11 87:2,3
106:19,21
111:23 139:1
148:20 149:13
149:20 154:14
157:25 166:7
167:16,22 179:8
191:23 194:13
195:9 201:10
207:1,18 212:3
212:12,24
213:24 216:3
218:19
**taken** 2:1 55:13
56:15 72:11
100:15 110:4
181:24 195:20
202:5,17,19
214:24 217:10
219:7,9
**takes** 14:14
31:11
**talk** 61:23 68:4
74:25 144:16,17

165:17
**talked** 32:15 44:23 48:10 59:15 70:6 81:25 140:5 168:1 174:13 188:25 194:18 210:4 217:13
**talking** 19:1 51:16 56:15 58:10 64:2 69:18 71:6,25 104:9,12,19 107:25 134:1,9 148:7 159:25 169:5 171:6 179:23 194:8 198:2 205:24 208:19 209:6 210:13 211:11 215:25
**talks** 177:13 185:22 187:24 196:13
**tanks** 29:17
**tariffs** 143:9
**tax** 190:10
**taxes** 192:19
**technical** 133:13
**technically** 91:18
**tell** 6:2,24 8:21 11:14 15:11 28:17 31:10 40:4,9 49:15 70:11 72:22 75:14 76:17 86:20 99:24 106:5,10 108:22 133:19 144:11 147:13 162:6,14 165:2 173:11 180:1 189:5 193:21 197:4 201:15 202:16 203:8 207:19 209:21
**telling** 45:21
**tend** 39:5,5 125:16,17
**term** 48:17 129:25
**terms** 9:7 27:5,6 27:8 30:10 38:4 72:24 73:25 74:4,15 96:5 97:20 98:20 106:10 133:25 143:1 178:17 182:3 205:5 209:15 216:4
**terrain** 186:10
**testified** 5:3 152:18 162:15 162:19 165:18 182:9 195:19 199:6
**testimony** 5:17 142:10 205:23 220:8,17
**testing** 199:1,9 199:11,13,15
**texas** 13:10
**thank** 172:1 218:11
**thatch** 47:12,13 47:13 59:1
**theft** 59:3 66:14 100:24 101:4
**theirs** 77:6
**thereof** 219:15
**thereto** 219:9
**thing** 32:13 33:7 69:1 81:9 88:19 112:20 113:24 169:10 174:24 185:23 186:21 191:23 194:23 211:4
**things** 11:16 14:17 24:2 32:10 33:3,5 42:7,7 45:6 48:11 52:18,21 59:15 60:12,24 74:12 77:19 79:12 80:19 98:20 100:20 102:21 108:1 112:22 118:14 119:16 125:8 126:14,18 133:13 139:12 141:6 146:5 169:6 171:5 175:5 192:1 196:13 205:6 216:4
**think** 7:2 8:2,20 10:1,7 12:25 16:14 18:9 19:9 24:12 25:8 29:19 30:4,18 33:9 36:18 37:21 38:10 39:16 40:7 42:5 43:9 47:10 48:17 49:13 51:15 52:25 59:3,11 60:8 61:7 62:11 63:10 65:4,11 66:19 67:19 69:8 71:6 73:10 79:2 82:25 83:3 84:20 85:4 88:25 94:8 97:14 100:15,24 101:17 103:15 107:7,12,15 108:7 109:16 112:23 113:22 115:3 116:19 117:8,9 118:3 119:8 124:22

**[think - times]**                                              Page 272

125:14 130:3,18
131:4,9,16
132:17 138:2
141:11,11,17
143:9,19 145:8
146:9 149:14
150:6,23 151:5
151:5,25 157:4
158:15,20
159:14 160:20
160:20 161:6,10
167:15 170:13
170:15 174:17
176:23 179:6
181:25 183:23
184:1 185:10,13
185:18 186:25
187:7 189:4
190:17 191:12
191:15 192:24
197:17 201:16
202:3 203:6,17
209:13,24 212:8
213:16,22
214:23 217:14
217:18
**thinking**  63:15
70:7 85:3 94:22
100:20 117:9
135:6 193:11
**thinks**  175:5
**third**  3:8 73:14
73:16,17 122:22
123:8 149:24

**thirty**  197:24
**thomas**  1:2,4,11
2:1,10 3:3,19,21
3:23,24 5:1,7
25:4 26:7,10
29:14 77:3,21
78:9,17 98:1
100:10,11,22
101:24 102:1
111:24 115:17
126:7 128:18,20
132:20 147:18
219:8,13 220:1
220:4,4,8,10,12
221:1,2,23
**thought**  43:24
50:14 77:4
106:9 113:8
114:6 119:24
120:14 133:23
136:8 174:17
187:2
**thousand**  54:13
65:21 104:8,15
104:20
**threats**  210:15
**three**  3:15 9:15
24:12,22 50:5
66:10 70:22
73:6 77:21
99:17 101:13
113:13 121:19
125:24 129:12
132:22 145:23

148:16 161:6
178:1 180:4
187:18 203:24
**thri**  50:4
**throwing**
194:11
**thrown**  122:20
123:6
**ticket**  192:25
**tide**  91:17
**tile**  11:16,23
12:13
**till**  23:8
**time**  12:23
13:14 15:3 16:1
16:2 17:11
19:10,20,22
23:1,4 26:15
28:22 30:2,23
31:22 32:2 34:6
34:9 36:16
37:25 39:5 40:6
41:1 43:13
44:15,18,20
46:12 47:4,25
47:25 49:25
55:15 61:5 62:8
64:9,16 67:9
68:4,5,7,8 69:20
70:6 71:18
77:16 79:19
80:2,21 92:20
93:6 99:21
106:21 111:1,4

113:5 115:9,19
121:21 124:17
124:21,23
125:11 127:21
137:20 138:2,4
138:13 139:8
144:22 145:5,7
145:14,18,23
146:6,10,24
147:9,17,24
148:14 149:20
150:17 152:12
157:3 170:23
171:11 174:8
184:11 189:25
191:9 192:7
198:12 201:20
**timeframe**
17:16 31:9
46:18 58:2
59:14 130:20
167:14 201:15
**timeline**  12:2
**times**  13:17
17:10 34:15
42:23 50:3,5
52:11 61:14,15
66:10 69:10,15
99:17 111:19
121:19 126:4,6
126:10 127:23
129:13 131:8,8
131:9,12,14
145:22,23

**[tin - two]**

**tin** 140:12,14,14
  140:15,16,20
  141:3
**titled** 157:25
  201:11,12
  211:17 213:23
**today** 5:9,17
  214:13
**today's** 143:6
**together** 14:9
  124:11 125:18
**told** 31:12,15
  57:12 68:15
  72:16 75:19,24
  76:8,12 101:5
  108:12,13
  114:18 142:25
  143:1
**tom** 2:13 5:7
  220:2
**took** 15:13
  16:25 22:11
  31:2 34:2 65:20
  83:19,20 87:15
  113:4 123:15
  151:6 156:20
  160:6 201:16,17
  203:2 207:6,8
  211:25 212:9
**tools** 60:22 72:2
**top** 9:24 28:17
  47:20 71:6
  92:16 94:19
  104:24 129:17

152:11 156:9
  158:23 174:3
  178:21 194:2
**topography**
  98:20
**torn** 169:12
**total** 9:16 23:6
  39:21 51:12,14
  51:18 62:20
  85:5 94:15
  176:6,10 177:20
  190:5,8
**totaling** 176:11
**touching** 174:13
**tourists** 79:1,2
**town** 137:21
**track** 39:5
  125:25
**trackhoes**
  106:18
**trade** 62:9
**trades** 40:25
  41:3 61:13,13
**trailer** 66:13
  78:19
**trained** 169:22
  170:2
**transactions** 4:3
  211:18
**transcript**
  219:10,11,12
  220:6,20
**transcripts**
  220:14

**transpired**
  157:2
**transportation**
  68:13 69:1
  192:25
**transported**
  100:9 186:1,2
  187:4
**travel** 126:4
  127:4 128:15
  129:9,18,19
  131:12 147:12
  192:19
**traveled** 131:15
**traveling**
  213:17
**travels** 131:12
**traversing**
  196:17
**treated** 137:7
**trek** 168:8
**tremendous**
  84:13
**trepidation**
  197:11,17
**trial** 4:5 86:1
  123:4
**trimming** 54:15
**trips** 127:19
**tropical** 28:9
**truck** 84:3
**trucked** 100:12
**trucks** 29:6,19
  186:19

**true** 75:6 219:10
  221:21
**trusses** 108:1
**truthful** 5:17
**trying** 18:25
  32:7 37:2 47:7
  49:10 53:14
  56:20 66:14
  68:1 71:21
  72:15,18 79:20
  81:4 92:19
  93:22 95:21
  96:8,16 98:25
  100:18 118:18
  126:20 127:12
  127:12 132:3
  140:19 146:14
  188:10
**tucson** 2:3,4
  127:9 145:5
**tunick** 84:21,24
**tv** 218:5
**tvs** 79:12
**twenty** 212:3
**twice** 50:4 68:12
  114:24 120:15
**two** 8:14,14,15
  9:3,3,5,12,20
  10:10,13 17:20
  17:23 23:9
  24:17 27:25
  28:1 33:7,9,25
  40:16 46:19
  50:2 58:3,7

59:16 60:8
64:10 66:9
70:22 73:6
77:21 87:3,24
99:16 100:1
101:12 104:3
113:13 115:8
116:9 120:14
121:19 124:14
125:12 129:22
130:22 132:22
137:10 140:11
148:16 159:6
160:13 167:25
168:19 172:3
177:2,13 180:4
185:13 187:11
**type** 14:19 15:6
37:3 47:13
48:21 61:21
67:15,16 80:17
97:3 106:17
122:10 126:14
126:18,25 128:6
128:11 204:1
**types** 103:9
**typewriting**
219:10
**typical** 105:14

**u**

**u** 26:10
**u.s.** 19:16,18
68:17 132:15

**uh** 28:9 35:3
67:3 71:8 90:1,4
103:1 145:15
178:20 186:9
189:20 191:3
208:14
**ultimate** 113:10
**ultimately** 96:14
**ultra** 204:10
**un** 133:5
**unable** 133:5
**unaccounted**
66:7
**unattended**
66:4
**uncompleted**
150:4,5
**under** 29:18
67:25 75:25
118:19 123:20
131:8,9 161:23
162:3,17,25
163:2,13,15
164:4 174:15
175:6 176:4
196:12 213:17
220:18 221:20
**underground**
27:21
**underinsured**
84:12,13
**underlayments**
48:19 113:19

**underneath**
74:3 155:14
160:17 174:8
180:18
**understand**
11:21 18:23,25
20:8,23 25:25
37:2 47:7 49:10
54:12 56:20
65:23 66:2,14
67:22 68:1
70:13 71:22
72:7,16,18 74:1
74:14 81:4
90:25 92:19
93:23 95:21
96:8,16,24 99:1
100:18 107:17
109:1 110:6
111:5,14 118:16
118:18 119:12
126:20 132:3
140:19 141:16
142:3,22 155:22
157:15 162:10
168:17 171:3
174:15 177:7,22
179:25 194:4
197:16 205:22
213:14 216:8
**understanding**
20:20 30:14
31:7 50:6,9 57:4
79:21 82:14

87:25 88:3 96:5
97:3 98:4
101:14 103:16
108:23 118:12
119:21 142:19
146:14 155:4,10
161:22 162:2,17
162:19,24
163:11,12 170:1
170:25 172:7
193:22 194:22
209:21
**understood**
51:10 82:23
155:2
**underwriter**
84:18 86:22,25
**underwriting**
86:22
**unfinished**
32:18
**unfolding**
196:23
**unfortunately**
127:7
**unheard** 100:23
**united** 1:1
128:23 143:11
171:15
**unrelated** 81:6
**unusable** 123:2
**uplift** 70:17
169:10

**[upper - wanting]**

**upper** 10:15 27:10 36:1,5,13 37:11,12 65:11 179:15 205:16

**ups** 132:21

**upside** 190:14 190:18

**usage** 138:21

**use** 113:18 122:7 129:6 156:13 178:10 178:16 194:13 202:25

**used** 10:4 27:14 27:17,20 48:21 48:21 53:11 72:1 82:7 92:8 129:2 138:16,25 170:17 172:8 220:20

**using** 49:16 72:24 74:4 121:1 141:20 199:17

**usually** 28:20 29:8 77:23 127:7,19 133:17 134:16 137:5,22 190:9

**utilized** 116:4 119:19 170:12

**v**

**v** 3:8,9,13 201:12 220:4 221:1

**vacation** 47:9

**valuable** 65:24

**value** 65:13

**varied** 168:23

**various** 52:17 74:11 81:25 163:8,22

**vary** 28:6

**vent** 177:3,6,6,7 184:20

**verification** 198:9

**verified** 75:3 195:20

**verify** 108:20 110:1 195:10 198:6,7 220:9

**veritext** 1:23 219:21,25 220:14,23

**veritext.com** 220:14

**versa** 43:1

**versus** 20:22 21:23 23:22 42:10 86:20,22 101:4 127:5,13 131:22 132:2 197:3

**vice** 43:1

**victim** 57:16

**view** 204:25

**virgin** 1:1 5:12 6:12,18,22 7:2 15:23 16:3,17 16:21,21 17:9 31:5,9 35:9 58:16 68:19 75:5 85:19 86:16 122:18 124:5 126:5,13 127:2,4,18 128:14,15 130:13,21 131:2 134:22 144:2,23 145:19 146:7 147:13 188:24 207:4 215:14

**visible** 50:24

**visit** 138:10 200:8 214:11

**visited** 139:21

**visiting** 127:9

**vs** 1:6

**vulkem** 51:24 169:16

**w**

**waited** 115:22 116:2

**waive** 218:17

**walk** 40:13,15 40:19,22 41:22

64:10 150:3 173:4 197:10,18

**walked** 43:22 89:4,9 113:21 150:2 156:14,24 157:3 210:12

**walking** 14:21 40:23 45:10

**wall** 199:23

**walls** 27:13 107:19 112:12 112:21

**want** 21:6 30:24 33:17 40:10 57:3 65:15 69:6 71:4 87:19,20 106:13 111:14 113:15 133:14 144:15 146:18 146:19 171:12 197:10 202:8 205:23 218:12

**wanted** 27:2,2,3 27:7 29:21,23 32:11,13 49:7 60:10,11 66:5 67:4,19,21,23 68:9,11 69:7 95:12,14 102:22 108:15 109:12 113:21 120:21 121:19 210:2

**wanting** 66:20

**[wants - witch's]**                                    Page 276

**wants** 87:4
**war** 90:22
**warehouse**
  54:11,23,23
**warranted**
  152:3
**warranty**
  152:20
**waste** 108:13,22
  108:25 109:5,7
  208:12,13
**watch** 79:15
**watched** 79:16
**water** 27:15,18
  27:20 28:5,6,8
  28:24,25 29:6,9
  29:10 63:9
  78:21 91:2,6
  106:24 117:15
  117:18 118:5,7
  118:10,10 199:9
  199:10,13,14,22
**waterfall** 28:3
**waterproofing**
  48:19
**watertight**
  152:6
**way** 31:8 65:7
  72:13 86:2
  91:14 100:25
  115:12 125:25
  187:8 219:14,14
**ways** 99:24
  141:19

**we've** 12:20
  28:7,25 41:13
  52:11 67:9
  77:10 81:24
  87:3 123:18
  139:2 140:5
  143:21 160:9
  168:1 186:6
  188:24 213:20
  214:18,23
  216:19
**wea** 164:4
**wear** 201:24
**weather** 79:15
  149:7 163:13,15
  164:5
**wee** 39:20
**week** 67:11
  68:10 129:11,11
  140:13 145:23
**weekends** 60:12
  67:21 68:4
  69:14,17
**weekly** 30:9,24
  31:1 33:17
**weeks** 39:22
  44:16,16 46:2
  116:9 117:14
  132:22 146:17
  146:18 168:19
**weight** 104:17
**weird** 191:23
**went** 11:6 40:15
  52:17 54:1

62:14 64:17
  79:6 84:3 96:5
  97:14 102:25
  109:19,23
  112:20 123:8
  207:8 210:1
**west** 1:24 22:1
  22:17 23:14,15
  23:24 24:10
  25:3,9 26:13
  41:6,14 70:13
  70:19,19,23
  73:13 76:4
  87:21 88:15,19
  156:2,2,6
  157:17 179:15
  179:18 186:13
  195:19 196:3
  197:3,8 198:1
  199:6,7 200:1
  217:13
**western** 66:22
**westin** 206:20
**whatsoever**
  163:15 216:17
**when's** 13:14
  124:17 125:11
  138:4,13 171:11
**whi** 201:19
**wi** 75:24
**wider** 112:13
  159:13
**width** 159:10,16

**wife** 5:23 29:21
  38:15 40:23
  41:21,23 42:21
  43:4 64:11
  69:25 92:14
  124:9 128:2
  139:17 173:3
  211:19
**wife's** 32:19
  128:4 147:4
**williams** 2:16
**wind** 50:12 74:2
  80:13 82:15
  91:4 162:13
  163:2,8
**windows** 112:21
**winds** 75:1,2,4,6
  75:10,19,24
  76:9 82:24,24
  83:6 117:12
  161:23 162:3,18
  162:25 163:3,17
  168:4,11,16
  169:13 177:2
**windshield** 84:4
**windstorm**
  161:19
**winter** 188:16
**wire** 53:13
**wise** 59:14
**wish** 14:8 28:17
  132:8 214:6
**witch's** 178:19

| | | | y |
|---|---|---|---|
| **witness** 3:3 | 34:7,12,14,19 | 20:23 21:20 | |
| 57:18 219:8,9,9 | 35:7 37:16,17 | 22:3,21,25 23:4 | **y** 21:8 30:18 |
| 219:13,15 | 37:19 39:9 40:9 | 26:15 46:16,25 | **yeah** 11:12,22 |
| 220:20 | 40:10 42:13 | 139:23 201:9 | 13:8 18:9,22,23 |
| **witnesses** 206:9 | 43:18 44:12 | **workers** 21:23 | 24:12 25:6,24 |
| 206:10,13 | 46:7,17 47:4,5 | 33:5 60:17 | 28:20 29:3,5 |
| **wlclaw.com** | 47:10 50:16,17 | 110:12 132:13 | 30:5 32:7,25 |
| 2:18 | 50:21 58:5,6 | 132:20 133:5,13 | 36:2 38:23 42:7 |
| **wondered** 183:4 | 59:5,9,12,24 | 133:15 151:13 | 42:12 43:21 |
| **wood** 107:24 | 60:11,11,17 | 166:23 169:22 | 51:11,15,16 |
| 108:3 137:2,6 | 61:6,12,17 | 170:3 201:23 | 52:2 54:17 56:7 |
| 210:25 | 63:21 64:1 65:9 | 206:3,9,23 | 57:11 60:20 |
| **wooden** 110:9 | 66:20 67:4,10 | **working** 12:7 | 61:1 62:16 |
| **word** 22:19 | 67:20 68:10,15 | 14:25 17:8,13 | 63:16 68:18 |
| 49:17 | 84:8,10 94:25 | 19:23 21:12 | 72:8,14 73:17 |
| **words** 11:19 | 96:18,22 113:20 | 25:3 33:18 | 74:13 76:19 |
| 21:8 40:5,8 | 113:25 119:3 | 44:15 60:25 | 77:11,11,18 |
| 41:17 64:10 | 127:5,8,10,10 | 67:20 79:16 | 78:12 79:8,24 |
| 75:9 77:16 | 127:14 133:7,11 | 111:15 127:6,17 | 81:24 83:8,23 |
| 80:18 89:11 | 133:13,14 | 133:18,21,24 | 83:25 84:20 |
| 99:10 103:20 | 135:23 138:12 | 151:12 171:24 | 85:14,17 89:1 |
| 105:21 112:12 | 140:18 169:18 | 193:20 | 91:1 93:19,20 |
| 114:6 118:20 | 170:20 171:13 | **worry** 66:3 | 104:14,19 106:2 |
| 126:22 133:3 | 172:8 173:24 | **writing** 161:1 | 107:19 110:11 |
| 172:9 183:12 | 175:6 185:15 | **written** 30:4 | 112:5,10 113:6 |
| **work** 11:12,14 | 186:22 188:2,15 | 52:5,7 160:14 | 114:2 115:24 |
| 11:16,23 12:5 | 188:17 189:18 | 163:18 191:25 | 116:16,18,19,23 |
| 13:20 14:9,18 | 192:12 193:2 | **wrote** 42:11 | 117:8,25 118:12 |
| 14:19 15:6 | 196:9 200:22 | 64:25 113:13 | 124:15,25 125:2 |
| 16:19,23 18:16 | 202:23 206:4 | 115:4 217:21 | 125:4 126:9 |
| 20:6,21 21:2,2,5 | 214:24 217:25 | | 127:11,15,23 |
| 22:4,20,24 24:5 | **worked** 16:24 | x | 128:7 130:14,24 |
| 24:9,14,22 | 17:17 18:13 | **x** 21:8 30:8 | 132:9 133:6,17 |
| 25:14 30:3 34:5 | 19:25 20:2,5,9 | 76:15 | |

**[yeah - zoom]**                                                           Page 278

| | | **z** |
|---|---|---|
| 133:25 134:2,10 | 212:6 214:1,7 | **z** 21:9 |
| 134:12,18,24 | 215:3,17 216:2 | **zealand** 18:10 |
| 135:2,4,7 137:1 | 217:12,16,22 | 18:11 |
| 137:16,22 139:3 | 218:18 | **zone** 90:22 |
| 139:4,11,14,19 | **year** 8:1 15:7 | **zones** 147:24 |
| 141:5 145:9,22 | 17:20,23 23:9 | **zoom** 204:14 |
| 146:17 148:23 | 28:6,6 31:17 | |
| 148:25 149:1,3 | 39:13,14 46:19 | |
| 149:18,21,23 | 50:2 57:25 58:3 | |
| 150:6 151:14,14 | 82:1 117:13 | |
| 154:16 156:19 | 125:12 129:9,10 | |
| 157:16 158:8,15 | 129:13,22 | |
| 161:15 164:23 | 130:22 131:3,4 | |
| 167:5,9 172:14 | 145:9,23 148:15 | |
| 174:17,21 175:5 | 148:17 172:5 | |
| 176:14 178:12 | 188:9,12 | |
| 178:16 179:13 | **years** 15:5 16:25 | |
| 179:13,17 | 19:1 31:14,15 | |
| 181:11,25 182:7 | 31:16,17 33:8,9 | |
| 183:17 184:10 | 33:13 37:22 | |
| 185:1,4,8,13,21 | 51:9 62:15 63:3 | |
| 186:12,14,17,20 | 63:4,5 79:22,23 | |
| 189:2,10,12,15 | 129:2,5 137:10 | |
| 190:15 191:15 | 148:15,16,16,21 | |
| 192:2,20 193:16 | 149:17 157:2 | |
| 194:14 195:13 | 172:3 197:9 | |
| 196:4 201:23 | 212:1 | |
| 202:7,20 203:15 | **yep** 166:17 | |
| 204:12,14,20 | 194:7 | |
| 205:3 206:12,14 | **yesterday** 125:1 | |
| 206:17,19 | **young** 171:25 | |
| 207:14,23,25 | | |
| 208:14,16,23 | | |
| 209:3,3 210:11 | | |

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under
rule 1.330(d)(4).




DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.


Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.