# The Collateral Source Rule in Contract Cases

JOSEPH M. PERILLO*

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 705 |
| II. | THE DEFENDANT PROVIDED NO PART OF THE CONSIDERATION | 708 |
| III. | THE DEFENDANT PARTICIPATED IN PROVIDING CONSIDERATION | 712 |
| IV. | THE CONTRACT REQUIRES THE PLAINTIFF TO PROVIDE INSURANCE | 715 |
| V. | THE COLLATERAL SOURCE RULE IS NOT PUNITIVE | 716 |
| VI. | SUBROGATION AND THE COLLATERAL SOURCE RULE | 719 |
| VII. | CONCLUSION | 721 |

## I. INTRODUCTION

Dick Speidel, to my knowledge, never wrote about the topic of the "collateral source rule." A Westlaw search of the fourth edition of Williston's treatise on contracts shows only one use of the term *collateral source*, and that use is in a case that is briefed in a footnote.[1] Farnsworth's index to *Contracts* shows a reference to *collateral source*.[2]

---

\* Distinguished Professor Emeritus, Fordham University School of Law. An earlier version of this paper was presented at a meeting of the International Contracts Conference held in Sacramento in February 2007.
 1. 24 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 64:1 n.8 (4th ed. 2002) (briefing *Corl v. Huron Castings, Inc.*, 544 N.W.2d 278 (Mich. 1996), a minority case refusing to apply the collateral source rule). *Corl* allowed a deduction from damages of the amount an aggrieved employee had received in unemployment compensation. *Corl*, 544 N.W.2d at 286.
 2. E. ALLAN FARNSWORTH, CONTRACTS 919 (4th ed. 2004) (referencing section 12.9, footnote 14).

The footnote that is referenced is unhelpfully enigmatic, tracking the *Restatement of Contracts*. The *Restatement* mentions the doctrine but takes no position on its applicability.[3] The revised Corbin treatise—revised by myself—unfortunately treats the rule only under damages for employers' breach of employment contracts.[4]

The issue in a collateral source case is: should contract damages be reduced by the amount of payments that the wronged party has received from a third party such as an insurer? This kind of question arises most frequently in tort cases involving property damage, personal injuries, or death, where a doctrine known as the collateral source rule has evolved. Under this rule, except where changed by statute, damages assessed against a tortfeasor generally are not diminished by any payments received by the injured party from medical insurance, pension and disability plans, or any sources other than the tortfeasor or the tortfeasor's insurer.[5]

Similar questions arise in contract law. Suppose an employer fires an employee without justification, breaching a contract of employment, and the employee turns to his or her savings account for living expenses. No one would argue that the employee's recovery against the employer should be diminished by the employee's withdrawals from savings. The savings account is a collateral source. To the extent that another collateral source resembles a savings account, the plaintiff should be able to recover damages without a deduction for the amount received from the collateral source. Despite the clarity of this hypothetical, many cases state that the collateral source rule does not apply to cases of breach of contract.

The few relevant references in the literature to the collateral source rule generally dismiss the idea that the doctrine has any application to contract law.[6] Only one scholarly article has been devoted to the

---

[3]. 3 RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. e (1981) states in part:
   The principle that a party's liability is not reduced by payments or other benefits received by the injured party from collateral sources is less compelling in the case of a breach of contract than in the case of a tort. See Restatement, Second, Torts § 920A. The effect of the receipt of unemployment benefits by a discharged employee will turn on the court's perception of legislative policy rather than on the rule stated in this Section.

Fleming criticized this provision "as more a will 'o the wisp than a guide." John G. Fleming, *The Collateral Source Rule and Contract Damages*, 71 CAL. L. REV. 56, 79–80 (1983) (pointing out that the decided unemployment cases have not turned on legislative purpose).

[4]. 11 JOSEPH M. PERILLO, CORBIN ON CONTRACTS: DAMAGES § 60.7 (rev. ed. 2005).

[5]. Dag E. Ytreberg, Annotation, *Collateral Source Rule: Receipt of Public Relief or Gratuity as Affecting Recovery in Personal Injury Action*, 77 A.L.R.3d 366, 371 (1977).

[6]. *See, e.g.*, Richard C. Maxwell, *The Collateral Source Rule in the American Law of Damages*, 46 MINN. L. REV. 669 (1962). Designed to be part of a revision of CHARLES T. MCCORMICK, HANDBOOK OF THE LAW OF DAMAGES (1935), the article pays

subject. Professor John Fleming wrote an article exploring the subject in 1983.[7] After extensive investigation of the case law, he concluded that "the collateral source rule has usually prevailed regardless of the type of breach, type of loss, or type of collateral benefit."[8] He also concluded that there is no principled distinction in the application of the collateral source rule between contract and tort.[9] Dan Dobbs is an exception to writers of treatises on contracts and remedies. He points out that in an earlier edition of the *Handbook on the Law of Remedies*, he erroneously stated that "the collateral source rule is not used at all in contract claims"[10] and credits Professor Fleming's article with awakening him to the error of his earlier dismissal of the idea. The cases, he states, "are quite divided."[11] It is interesting to note that the only two scholarly discussions of the collateral source rule in contract cases have been made by scholars who are primarily identified with scholarship in the law of torts.

Fleming's analysis rebuts the fairly widespread—perhaps superficial—belief that the collateral source rule is confined to tort or tort-like claims. "In sum," according to Professor Fleming, "the judicial record actually discourages any facile distinction merely between tort and contract."[12] According to Fleming, "the policies underlying the law of contract do not dictate an application of the collateral source rule different from that in tort."[13] Despite this cogent analysis, the case law is replete with dicta to the effect that the collateral source rule has no application in contract cases, although actual holdings to that effect are few.[14] The cases can profitably be subjected to a contractual analysis that pigeonholes them into several distinct categories. The answers to two questions dominate

---

scant attention to contract law beyond an approving reference to "[t]he idea that the collateral source rule is a doctrine for tort cases." Maxwell, *supra*, at 675. His selection of contract cases is unsystematic and unrepresentative.

    7. Fleming, *supra* note 3.
    8. *Id.* at 57.
    9. *Id.*
   10. DAN B. DOBBS, HANDBOOK ON THE LAW OF REMEDIES: DAMAGES-EQUITY-RESTITUTION § 8.10, at 587 (1973).
   11. 3 DAN B. DOBBS, DOBBS LAW OF REMEDIES: DAMAGES-EQUITY-RESTITUTION § 12.6(4) n.4, at 154 (2d ed. 1993) [hereinafter DOBBS, REMEDIES].
   12. Fleming, *supra* note 3, at 86.
   13. *Id.* at 62.
   14. *See* Nisenzon v. Morgan Stanley DW, Inc., 546 F. Supp. 2d 213, 234 n.75 (E.D. Pa. 2008) (listing cases that held or stated that the collateral source rule is inapplicable in contract cases).

the results: first, did the contract breaker provide the consideration?; and second, is the collateral source subrogated to the plaintiff's recovery?

## II. THE DEFENDANT PROVIDED NO PART OF THE CONSIDERATION

At times, defendants attempt to invoke the myth that the collateral source rule has no role in contract damages when the defendant has provided no part of the consideration. Such attempts ought to and often do fail.

An example of when the doctrine is clearly applicable in a contract case is *Hugo Boss Fashions, Inc. v. Federal Insurance Co.*[15] The defendant, an insurer, breached its contractual duty to defend a corporation against charges of trademark infringement.[16] Defense costs were picked up and paid by the insured's parent corporation.[17] In an action by the subsidiary against the insurer for damages for breach of the terms of the policy, the parent's payments were properly regarded as coming from a collateral source and the costs of defense were damages awarded to the subsidiary without diminution by the amount contributed by the parent corporation.[18] It is indeed doubtful that the parent corporation intended to benefit the insurer rather than its subsidiary. Moreover, there is no apparent reason for the legal system to reward the insurer for its own violation of the terms of its commitment as expressed in the insurance policy.

Similarly, a landlord's contract with a cooperative association provided that the losing party to litigation would pay for the other party's attorneys' fees.[19] The landlord was not the prevailing party in its litigation with the cooperative.[20] The landlord was made to pay the fees without diminution despite the fact that the association's insurer paid the cooperative's attorneys' fees.[21]

Another illustration is provided in *Wilkinson ex rel. Wilkinson v. Palmetto State Transportation Co.*, a recent South Carolina case.[22] Scott

---

15. 252 F.3d 608 (2d Cir. 2001).
16. *Id.* at 610.
17. *Id.* at 623 n.15.
18. *Id.*; *accord* Ford Motor Credit Co. v. Wintz Cos., 184 F.3d 778, 779 (8th Cir. 1999) (regarding a parent who had a loss-sharing agreement with plaintiff). *Contra* Farmers State Bank v. United Cent. Bank of Des Moines, 463 N.W.2d 69, 71–72 (Iowa 1990) (deciding that a parent's payment to a subsidiary to prevent a banking regulation violation was not a benefit that invokes the collateral source rule); *cf.* Drewry v. Cont'l Cas. Co., No. 03A01-9111-CH-417, 1992 WL 60876, at *5 (Tenn. Ct. App. Mar. 30, 1992) (holding that the collateral source rule was not applicable to doctors' legal defense costs).
19. Isaacs v. Jefferson Tenants Corp., 704 N.Y.S.2d 71, 72 (App. Div. 2000).
20. *Id.*
21. *Id.*; *accord In re* Briggs, 143 B.R. 438, 463–64 (Bankr. E.D. Mich. 1992).
22. 638 S.E.2d 109 (S.C. Ct. App. 2006).

Wilkinson, a truck driver, was employed by the defendant.[23] He was injured in the course of his employment, resulting in his death.[24] The decedent—or rather his surviving widow and child—received payments from Zurich, an insurance company that had issued him an insurance policy covering occupational disability.[25] He alone had paid the premiums for the policy.[26] The Workers' Compensation Commission, in granting death benefits to his surviving spouse and child, refused any credit to the defendant and its insurance carrier for the amounts Zurich paid under the occupational disability policy.[27] On appeal, this ruling was affirmed.[28] The court quite properly held that the employer should not receive a "windfall benefit" from the policy that the employee had bought and paid for.[29] As one scholar has observed, in this type of case, the workers' compensation insurer had no greater claim to the disability payments than it had to the decedent's bank account.[30] No rational argument can be made that the result was a windfall to the widow or that the result would have punished Wilkinson's employer or its insurer.[31]

In *Hurd v. Nelson*, a divorcing couple entered into a separation agreement in which Mr. Hurd promised to "pay for the remodeling of the house to the Plaintiff's satisfaction at a cost not to exceed the sum of $10,000.00" and "also to pay for the completion of the construction of a shop and storage building."[32] Mr. Hurd did not fully comply with these terms, and members of his former wife's church contributed their labor toward the fulfillment of his obligations.[33] It was held that the contributions of labor were a collateral source, and that Mr. Hurd could not claim the

---

23. *Id.* at 112.
24. *Id.*
25. *Id.*
26. *Id.*
27. *Id.*
28. *Id.* at 113.
29. *Id.* at 115–16.
30. Fleming, *supra* note 3, at 58.
31. The *Wilkinson* court cited as authority the North Carolina case of *Jenkins v. Piedmont Aviation Services*, 557 S.E.2d 104 (N.C. Ct. App. 2001), which made no mention of the collateral source rule. The *Jenkins* court based its holding on the interpretation of the state's Workers' Compensation Act. *Id.* at 108–09. The case, however, is consistent with the collateral source rule in holding that a disabled worker's compensation claim should not be reduced by royalties that she received from song lyrics she had lawfully written for others during the term of her employment. *Id.* at 108, 110.
32. 714 P.2d 767, 768 (Wyo. 1986).
33. *Id.*

benefit of the contributions.[34] It is doubtful that members of Mrs. Hurd's church intended to benefit Mr. Hurd at Mrs. Hurd's expense.

In *Hall v. Miller*, the plaintiffs' cattle were infected with brucellosis due to defendant's breach of warranty.[35] Some of plaintiffs' herd was destroyed pursuant to a federal and state campaign to contain the disease.[36] They were compensated by federal and state grants in the amount of slightly less than $10,000.[37] The collateral source rule was applied and the amount of plaintiffs' damages was not offset by these grants.[38] Should the legal system have rewarded the defendant's breach of warranty by refusing to apply the collateral source rule? It is doubtful that the federal government's grant or the State of Vermont's grant was designed to benefit the defendant. This is especially true when one takes into account breach of contract victims' undercompensation and particularly their liability for attorneys' fees.

The rationale for applying the collateral source rule in these cases is clear. No consideration was paid by the breaching party. In the employment case, all of the consideration was paid or furnished by the victim of the breach. The same was true in the landlord-cooperative case. In the corporate defense case, the collateral source was a parent corporation that had an economic interest in the well-being of its subsidiary. In the divorce case, the source was the kindness of the aggrieved party's fellow churchgoers. In the case involving brucellosis, the governments intended to reward cooperating farmers and not warranty breachers. In all of these cases, the defendant would have been unjustly enriched if the collateral source rule had not been applied. Similarly, payments received by an employer from a fidelity bond should not diminish the employer's recovery against defalcating employees.[39] As the Minnesota Supreme Court has stated in a court-adopted syllabus, "The collateral source rule is properly invoked in a contract case if its application places the responsibility for losses on the party causing them without overcompensating the invoker."[40] Many other cases agree.[41]

---

34. *Id.* at 771; *accord* New Found. Baptist Church v. Davis, 186 S.E.2d 247, 248–49 (S.C. 1972) (denying defendant accused of negligent construction the benefit of church trustee's repairs charging the church only for expenses).
35. 465 A.2d 222, 224 (Vt. 1983).
36. *Id.*
37. *Id.* at 226.
38. *Id.*
39. Pac. Gas & Elec. Co. v. Superior Court, 33 Cal. Rptr. 2d 522, 525 (Ct. App. 1994).
40. Hubbard Broad., Inc. v. Loescher, 291 N.W.2d 216, 218 (Minn. 1980).
41. *E.g.*, McConal Aviation, Inc. v. Commercial Aviation Ins. Co., 799 P.2d 133, 137 (N.M. 1990). A similar rationale is applicable to a case in which the breach results in a tax benefit to the plaintiff. G & R Corp. v. Am. Sec. & Trust Co., 523 F.2d 1164, 1176 (D.C. Cir. 1975); DePalma v. Westland Software House, 276 Cal. Rptr. 214, 221

The collateral source rule has many positive effects in contract cases such as those discussed above. It helps to discourage opportunistic breaches when the breaching party relies on the victim's insurance or the possibility that a third party, such as a parent corporation, a major shareholder, or a beneficent donor will come to the rescue of the victim of the breach. Moreover, the application of the rule is a premier example of preventing a wrongdoer's unjust enrichment. Efficient breach theory is not at war with these results: "[T]he contract breaker would be taking advantage of an externality and thus distort the true cost of his reallocation of resources."[42] Despite these advantages, astonishingly, one court has stated, "We have found no authority to support the application of the collateral source rule in the contracts field. Authority is to the contrary."[43] Indeed, if the court and counsel for the City of Twin Falls had searched, they would have found authority.[44] The court further mused that "[p]erhaps there is an element of punishment of the wrongdoer involved."[45] Despite the court's positive statement that there was no authority for application of the collateral source rule to contract cases, there was abundant authority for its application.

The rationale for permitting a victim of a breach of contract to keep the collateral source and recover for the breach has been expressed by the Delaware Supreme Court in a considered dictum:

> There is no reason why a risk-averse insured should not be permitted to contract for a double recovery. If a person pays both auto and health insurance premiums, he has paid the expected value of loss due to injury in an automobile accident twice. Accordingly, if an injury occurs he should be permitted, as a matter of contract law, to receive a double recovery since that is what he has paid for. Thus, the conditions under which double recovery should be allowed may best be determined by examining the consideration that has been paid. If the insured has paid consideration for recovery from a collateral source, then recovery should be allowed.[46]

---

(Ct. App. 1990); Billings Clinic v. Peat Marwick Main & Co., 797 P.2d 899, 912–13 (Mont. 1990). In such a case, there is also the question of the unpredictable and speculative nature of tax benefits.

    42. Fleming, *supra* note 3, at 62 n.29 (citing Robert L. Birmingham, *Breach of Contract, Damage Measures, and Economic Efficiency*, 24 RUTGERS L. REV. 273, 285 (1970)).

    43. United States v. City of Twin Falls, 806 F.2d 862, 873 (9th Cir. 1986). *City of Twin Falls* was impliedly overruled on other grounds in *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444–45 (1987).

    44. For example, *Bang v. International Sisal Co.*, 4 N.W.2d 113, 116 (Minn. 1942), and its progeny, which are discussed in the next section. The court and counsel could have started with the article by Fleming, *supra* note 3.

    45. *City of Twin Falls*, 806 F.2d at 873.

    46. State Farm Mut. Auto. Ins. Co. v. Nalbone, 569 A.2d 71, 75 (Del. 1989).

The argument is sound, although, the term "double recovery" seems inappropriate as it smacks of a windfall.[47] Moreover, as discussed below, often through the device of subrogation, there will be no "double recovery" because the action against the breaching party will be brought for the benefit of the insurer.[48] If there is no subrogation under the facts of the case, the plaintiff is merely reaping the benefit of the bargain that the plaintiff struck with a third party, perhaps with an insurer, or is receiving the benefit of a gift by beneficent donors. If one invests in insurance premiums and collects from an insurer as well as the contract-breacher, the term "double recovery" seems invidious. As in the fable of the grasshoppers and the ants, those who prepare for misfortune should be rewarded—not frustrated or demeaned.[49]

### III. THE DEFENDANT PARTICIPATED IN PROVIDING CONSIDERATION

More complex are the cases where the employer breaches its contract with the employee and the employee receives unemployment compensation. Here, the question is whether the employee's damages for breach should be reduced by the amount of unemployment benefits the employee may have collected. The complicating factor is that the employer has contributed to the unemployment compensation fund. This complicating factor was discussed in a 1942 Minnesota case. The court in *Bang v. International Sisal Co.* came out squarely to regard unemployment benefits as a collateral source:

---

47. A malpractice case couched in terms of permitting "double recovery" is *Hardi v. Mezzanotte*, 818 A.2d 974, 984 (D.C. 2003). Double recovery seems to have been granted in a restitution case, in which a minor purchased an automobile, wrecked it, collected more than the purchase price from his collision insurer, and successfully sued the dealer to recover his purchase price. Star Chevrolet Co. v. Green *ex rel.* Green, 473 So. 2d 157, 159, 162–63 (Miss. 1985). The court allowed no credit to the dealer for the collision insurance. *Id.* at 162. Although it appears to be supported by the cases in which the defendant did not participate in the consideration for the insurance, the result seems inappropriate in an infancy disaffirmance case.
48. *See infra* text accompanying notes 85–87.
49. In *Rametta v. Stella*, 572 A.2d 978, 981 (Conn. 1990), plaintiff recovered damages from her insurance agency for failing to procure fire insurance on certain property that she had contracted to sell, despite selling the property at no loss. The court dodged the collateral source issue by stating that the sale price was irrelevant to the damages for failure to procure insurance. *Id.* at 982.

> Nor can funds received by plaintiff during the contract year from the state unemployment compensation fund on account of his unemployment be regarded as compensation received from other employment so as to be deductible in mitigation of damages. The benefits received were intended to alleviate the distress of unemployment, not to diminish the amount which an employer must pay as damages in making whole a wrongfully discharged employe[e].[50]

The case represents the great weight of authority as to unemployment compensation. Although the implicit rationale in *Bang* is that this kind of compensation is paid pursuant to a social welfare program,[51] there is a better rationale—an explanation that is more consistent with contemporary conceptualization. In the employment relation, the paycheck is only a portion of the employee's compensation. Fringe benefits, including the payment of unemployment compensation premiums, are part of the compensation package for which the employee provides consideration by rendering his services. In other words, unemployment compensation payments by the employer are part of the employee's earnings.[52] This line of reasoning is consistent with holdings that damages payable to a wrongfully discharged employee include the loss of fringe benefits

---

50. 4 N.W.2d 113, 116 (Minn. 1942) (citations omitted); *accord* Hughes v. Elec. Data Sys., 976 F. Supp. 1303, 1309 (D. Ariz. 1997); Billeter v. Posell, 211 P.2d 621, 623 (Cal. Dist. Ct. App. 1949); Technical Computer Servs., Inc. v. Buckley, 844 P.2d 1249, 1255 (Colo. Ct. App. 1992); Wash. Welfare Ass'n v. Poindexter, 479 A.2d 313, 317 (D.C. 1984); Gomez v. The Finishing Co., 861 N.E.2d 189, 202 (Ill. App. Ct. 2006); Young v. City of Duluth, 410 N.W.2d 27, 30 (Minn. Ct. App. 1987); Burens v. Wolfe Wear-U-Well Corp., 158 S.W.2d 175, 178–79 (Mo. Ct. App. 1942); Sporn v. Celebrity, Inc., 324 A.2d 71, 77 (N.J. Super. Ct. Law Div. 1974); Rutzen v. Monroe County Long Term Care Program, Inc., 429 N.Y.S.2d 863, 865–66 (N.Y. Sup. Ct. 1980); Hall v. Hotel L'Europe, Inc., 318 S.E.2d 99, 101–02 (N.C. Ct. App. 1984); Century Papers, Inc. v. Perrino, 551 S.W.2d 507, 510–11 (Tex. Civ. App. 1977). Also in accord is the holding that damages will not be reduced by the receipt of Social Security disability payments. Seibel v. Liberty Homes, Inc., 752 P.2d 291, 293 (Or. 1988) (en banc). Damages for violation of the Americans with Disabilities Act, 42 U.S.C. § 12117(a), were not reduced by Veterans Administration benefits or Social Security disability payments in *Bleek v. Supervalu, Inc.*, 95 F. Supp. 2d 1118, 1122–23 (D. Mont. 2000). *Accord* Van Waters & Rogers, Inc. v. Keelan, 840 P.2d 1070, 1075 (Colo. 1992) (en banc) (disability benefits); *but cf.* Berutti v. Dierks Foods, Inc., 496 N.E.2d 350, 351 (Ill. App. Ct. 1986) (deducting unemployment benefits without discussion). Deduction of unemployment benefits was allowed in a promissory estoppel case. Mers v. Dispatch Printing Co., 529 N.E.2d 958, 965 (Ohio Ct. App. 1988). The Supreme Court of Ohio has held that a back pay award should be offset by unemployment benefits. State *ex rel.* Guerrero v. Ferguson, 427 N.E.2d 515, 516 (Ohio 1981).
51. 4 N.W.2d at 116. This social welfare conceptualization has led to at least one hostile law review critique of the application of the collateral source rule to such payments. *See generally* Barbara B. Creed, Note, *Mitigation of Damages by Social Welfare Benefits*, 48 B.U. L. REV. 271 (1968).
52. *Technical Computer*, 844 P.2d at 1254; *Rutzen*, 429 N.Y.S.2d at 865.

received as part of the employee's compensation package.[53] Thus, an unemployment compensation award should be regarded as an insurance recovery that properly belongs to the employee as a result of his contract of employment. The same should hold true for pension benefits, stock options, health insurance, and other fringe benefits.[54]

The employer's premium in many jurisdictions will vary depending on its history of causing or not causing unemployment claims. In *NLRB v. Gullett Gin Co.*, the NLRB ordered the reinstatement of certain employees with back pay and disallowed the employer's claim to offset the unemployment compensation benefits the employees had received.[55] The U.S. Supreme Court held that the NLRB's refusal to diminish the back pay award by the amount of those benefits was not an abuse of discretion.[56] In its opinion, unemployment benefits were based on "a policy of social betterment for the benefit of the entire state."[57] Any increase in unemployment taxes caused by the NLRB's order was only "incidental."[58]

Of course, legislatures can determine whether or not the collateral source rule shall attach to particular kinds of liability. For example, in

---

53. Smith v. Brown-Forman Distillers Corp., 241 Cal. Rptr. 916, 924 (Ct. App. 1987) (bonuses); Wyatt v. Sch. Dist. No. 104, 417 P.2d 221, 225 (Mont. 1966) (value of teacher's rent-free quarters); Knox v. Microsoft Corp., 962 P.2d 839, 843 (Wash. Ct. App. 1998) (stock options); *see* P.G. Guthrie, Annotation, *Elements and Measure of Damages in Action by Schoolteacher for Wrongful Discharge*, 22 A.L.R.3d 1047, 1072 (1968) (discussing the loss of fringe benefits as damages); *but see* McAleer v. McNally Pittsburg Mfg. Co., 329 F.2d 273, 278 (3d Cir. 1964) (denying recovery for loss of group life insurance protection); Comenos v. Viacom Int'l, Inc., 882 F. Supp. 677, 681 (E.D. Mich. 1995) (same); Rodgers v. Ga. Tech Athletic Ass'n, 303 S.E.2d 467, 473–74 (Ga. Ct. App. 1983) (disallowing damages based on certain fringe benefits).
54. *See* Varghese v. Honeywell Int'l, Inc., 424 F.3d 411, 417 (4th Cir. 2005) ("'Once a bonus, commission or fringe benefit has been promised as a part of the compensation for service, the employee would be entitled to its enforcement as wages.'" (quoting Whiting-Turner Contracting Co. v. Fitzpatrick, 783 A.2d 667, 672 (Md. 2001))); RESTATEMENT (THIRD) OF EMPLOYMENT LAW § 1.02 cmt. b (Tentative Draft No. 1, 2008) (noting that employees are also induced to work by compensation that does not come from the employer, such as insurance); *see also* Nolde Bros. v. Local No. 358, Bakery & Confectionery Workers Union, 430 U.S. 243, 248–49 & n.4 (1977) (suggesting that severance pay could be considered deferred compensation); Office & Professional Employees International Union, Local 2 v. FDIC, 27 F.3d 598, 601 (D.C. Cir. 1994) (holding that severance is part of an employee's compensation). A pension plan is similarly intended to tide employees over the period of their retirement; yet, pension plans are clearly part of the compensation package and not liquidated damages for the termination of employment. *See* McMillian v. FDIC, 81 F.3d 1041, 1054 (11th Cir. 1996) (expressing in strong dictum that pension plans are part of compensation).
55. 340 U.S. 361, 362 (1951).
56. *Id.* at 364.
57. *Id.*
58. *Id.* at 365. *But cf.* Masterson v. Boliden-Allis, Inc., 865 P.2d 1031, 1035 (Kan. Ct. App. 1993) (holding that recovery was properly diminished by unemployment benefits, but Social Security and pension payments are a collateral source).

order to keep the cost of automobile insurance affordable, some legislatures have enacted legislation providing that collateral sources, such as workers' compensation and Social Security disability benefits, should reduce any recovery that the plaintiff may obtain under no-fault insurance benefits.[59]

## IV. THE CONTRACT REQUIRES THE PLAINTIFF TO PROVIDE INSURANCE

A contract between a bailor and a bailee will often require the bailee to insure against possible losses in such a way as to make the bailor a coinsured and thereby a third-party beneficiary. If a loss ensues because of the liability of one or both of the parties, recovery against the insurer is credited to the person who is liable.[60] The bailor should not be able to claim the insurance proceeds and claim full damages without an offset for the insurance proceeds. Although the source is collateral in such a case, the parties have foreseen possible injury and provided for how the injury should be compensated. Part of the consideration paid to the bailor is in exchange for the bailee's promise to provide insurance, and part of the bailee's consideration is the provision of insurance.

Similarly, it is common for a lessee to promise to carry insurance that insures the landlord and for a subcontractor to promise to insure the general contractor as a coinsured. Yet, in one properly decided case, in which the owner was required by contract to provide "all risks" insurance coverage, the court indulged in two dicta that contribute to the confusion in this area and are often repeated in contract cases involving collateral source issues. The first dictum was that "'[t]he collateral source rule is punitive; contractual damages are compensatory.'"[61] The

---

 59. Vitauts M. Gulbis, Annotation, *Validity and Construction of No-Fault Insurance Plans Providing for Reduction of Benefits Otherwise Payable by Amounts Receivable from Independent Collateral Sources*, 10 A.L.R.4th 996, 999 (1981).
 60. *See, e.g.*, Beechwoods Flying Serv., Inc. v. Al Hamilton Contracting Corp., 476 A.2d 350, 352, 353–54 (Pa. 1984).
 61. Green Constr. Co. v. Kan. Power & Light Co., 759 F. Supp. 740, 744 (D. Kan. 1991) (quoting Patent Scaffolding Co. v. William Simpson Constr. Co., 64 Cal. Rptr. 187, 191 (Ct. App. 1967)), *aff'd*, 1 F.3d 1005 (10th Cir. 1993). In crafting its dictum, the district court apparently overlooked *Mahoney, Inc. v. Galokee Corp.*, 522 P.2d 428 (Kan. 1974), and *Broce-O'Dell Concrete Products, Inc. v. Mel Jarvis Construction Co.*, 634 P.2d 1142 (Kan. Ct. App. 1981). Citing these cases, the court in *Masterson* said, "Kansas courts, however, have applied a collateral source analysis in breach of contract cases." 865 P.2d at 1035. In *King Grain Co. v. Caldwell Manufacturing Co.*, 820 F. Supp. 569, 573 (D. Kan. 1993), the court ruled that a warranty breach resulting in property damage could be brought under a tort theory or contract theory. If the plaintiff opted for a

second dictum was: "[T]he collateral source rule, if applied to an action based on breach of contract, would violate the contractual damage rule that no one shall profit more from the breach of an obligation than from its full performance."[62] The court should have simply said that the source, required by the contract to compensate the owner for damages caused by "all risks," was part of the bargained-for exchange.

In still another case, the Iowa Supreme Court held that that under any theory, the collateral source rule was inapplicable. However, the court also dwelled on the alleged punitive nature of the doctrine and said that the collateral source rule is not applicable to actions for breach of contract.[63]

## V. THE COLLATERAL SOURCE RULE IS NOT PUNITIVE

The frequent refrain in judicial dicta and holdings that the collateral source rule is punitive, while contract damages are compensatory, is simply wrong. Exactly why the collateral source rule is deemed punitive by some courts has never been explained. Despite the patently nonpunitive nature of the doctrine, the myth that the rule is punitive rears its head from time to time.[64] For example, the collateral source rule was labeled as punitive by the Supreme Court of California in a tort case,[65] a characterization it correctly disavowed three years later in another tort case.[66] Fleming has this to say about the supposed punitive nature of the collateral source rule:

> There is indeed a fairly widespread, if superficial, belief that the collateral source rule is confined to tort or tort-like claims. Evidently based on a punitive rationale for the rule, this hypothesis has rarely been seriously probed either in judicial opinions or scholarly writing. There are few decisions to back it up, and the dicta in bootstrap fashion cite each other.[67]

The punitive label on the collateral source rule in contract cases is simply false. Punitive damages are based on culpability. Contract

---

contract theory, the collateral source rule would be inapplicable, again ignoring Kansas cases. *Id.* Such reasoning calls attention to the lack of any policy basis for the distinction between contract and tort rules with respect to collateral sources.

    62. *Green Constr.*, 759 F. Supp. at 744 (quoting *Patent Scaffolding*, 64 Cal. Rptr. at 191).

    63. Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc., 579 N.W.2d 823, 828–30 (Iowa 1998).

    64. *See id.* at 830.

    65. City of Salinas v. Souza & McCue Constr. Co., 424 P.2d 921, 926 (Cal. 1967) (holding that the collateral source rule is punitive and is not applicable against a public entity).

    66. Helfend v. S. Cal. Rapid Transit Dist., 465 P.2d 61, 69 (Cal. 1970) (holding that the collateral source rule is not punitive and is applicable against public entity).

    67. Fleming, *supra* note 3, at 85–86.

damages are not based on culpability; they are normally based on expectations regardless of fault. In an award of expectation damages, the plaintiff gets more than he or she is out-of-pocket. In an award of tort damages—some intentional torts aside—once liability has been established, culpability is not relevant to compensatory damages.[68] Tort recovery is generally limited to out-of-pocket costs.[69] Pain and suffering, lost limbs, and the like are equated with out-of-pocket losses.[70] The equivalent of such out-of-pocket damages in contract cases is reliance damages, generally available as a substitute when expectancy damages cannot be proved.[71] The normal contract measure of damages, based on expectations, is more robust and ample than tort damages. Consider, for example, damages for the tort of deceit. Two competing measures of damages vie for adoption in this contract-related tort.[72] Out-of-pocket costs are typical tort-based damages, while the competing and more ample benefit-of-the-bargain measure smacks of contract damages. Dobbs characterizes the out-of-pocket measure as "more conservative."[73]

Despite the twin fallacies of the punitive nature of the collateral source rule and the purely compensatory nature of contract as opposed to tort damages, courts are quite willing to apply the collateral source rule to tort-like breaches of contract—for example, negligent construction resulting in injury to property,[74] personal injury,[75] breach of warranty

---

68. The black letter rule stated in MCCORMICK, *supra* note 6, § 76(a), states: "Where the injury inflicted by the wrongdoer is aggravated by the existence of a previous susceptibility, disease, or injury, the wrongdoer is fully responsible for the augmented pain or disability incident to the injury."
69. *See* 2 DOBBS, REMEDIES, *supra* note 11, § 8.1(1).
70. *Id.* § 8.1(4).
71. JOSEPH M. PERILLO, CALAMARI AND PERILLO ON CONTRACTS § 14.9, at 500 (6th ed. 2009) ("When the aggrieved party cannot establish its expectancy interest with sufficient certainty, the party may recover expenses of preparation and of part performance, as well as other foreseeable expenses incurred in reliance upon the contract.")
72. *Peek v. Derry*, (1887) 37 Ch.D. 541, and *Reno v. Bull*, 124 N.E. 144, 145–46 (N.Y. 1919), are leading cases establishing the out-of-pocket rule. *See also* MCCORMICK, *supra* note 6, at 448. The contrary "benefit of the bargain" rule adopted by U.C.C. § 2-721 (2004) has support in prior law in a good number of jurisdictions. *See* J.F. Rydstrom, Annotation, *"Out-of-Pocket" or "Benefit of Bargain" as Proper Rule of Damages for Fraudulent Representations Inducing Contract for the Transfer of Property*, 13 A.L.R.3d 875 (1967).
73. 2 DOBBS, REMEDIES, *supra* note 11, at 551–52.
74. El Escorial Owners' Ass'n v. DLC Plastering, Inc., 65 Cal. Rptr. 3d 524, 541–42 (Ct. App. 2007). In *Shaffer v. Debbas*, 21 Cal. Rptr. 2d 110, 113 (Ct. App. 1993), the defendant unsuccessfully argued that the rule was limited to personal injury cases. In *Pan Pacific Retail Properties, Inc. v. Gulf Insurance Co.*, 471 F.3d 961, 973 (9th Cir.

resulting in injury to property,[76] negligent handling by carriers,[77] Carriage of Goods by Sea Act lawsuits for injury to cargo,[78] and consequential injury to property caused by a failure to deliver fuel.[79] In these cases, the negligent or warranty-breaching party is typically insured and is subject to the insurance company's subrogation rights.[80]

There is a sounder justification than its supposed punitive nature for not applying the collateral source rule to contract litigation. Although it is a better reason, it also fails to convince. A Georgia case citing *American Jurisprudence* put it this way: "'[N]o one should profit more from the breach of an obligation than from its full performance.'"[81] Thus, "'[i]t has been held that the collateral source rule does not apply to pure breach of contract cases.'"[82] The court's quotation continues and expresses the fundamental fallacy of the nonrecognition of the collateral source rule in some jurisdictions in contract cases: "'[I]t is basic to the law of contracts that the measure of damages is the plaintiff's injury, rather than the defendant's culpability.'"[83]

The first quoted statement has some validity, but only in other contexts.[84] The second quoted statement is totally inapposite as demonstrated above. What is the appropriate context for the statement that "no one should profit more from the breach of an obligation than from its full

---

2006), the court ruled that California does not apply the collateral source rule to contract cases, ignoring *Billetter v. Posell*, 211 P.2d 621, 623 (Cal. Ct. App. 1949), *Pacific Gas & Electric Co. v. Superior Court*, 33 Cal. Rptr. 2d 522, 524 (Ct. App. 1994), and *Shaffer*, 21 Cal. Rptr. 2d at 113.

75. Fleming, *supra* note 3, at 74.
76. Hall v. Miller, 465 A.2d 222, 226 (Vt. 1983).
77. Gusikoff v. Republic Storage Co., 272 N.Y.S. 77, 78–79 (App. Div. 1934) (applying the rule to bonded warehouse's liability for releasing plaintiff's goods to a forger).
78. Texport Oil Co. v. M/V Amolyntos, 11 F.3d 361, 365 (2d Cir. 1993) (applying the collateral source rule so that indemnification of a trading company did not insulate vessel from full liability for contamination of plaintiff's cargo of gasoline).
79. In *Yeiser v. Ferrellgas, Inc.*, No. 06CA0494, 2008 WL 4330265 (Colo. Ct. App. Sept. 18, 2008), defendant entered into a contract with plaintiff to deliver propane gas to plaintiff's home. When the defendant failed to deliver the propane on time, the pipes in the plaintiff's home froze and caused significant damage. *Id.* at *1. Although Colorado accepts the collateral source rule, the fact that plaintiff's homeowner's insurer had been subrogated to part of plaintiff's claim defeated its application. *Id.* at *2.
80. *See infra* text accompanying notes 85–87 for a discussion of the relevance of subrogation.
81. Amalgamated Transit Union Local 1324 v. Roberts, 434 S.E.2d 450, 452 (Ga. 1993) (quoting 22 AM. JUR. 2D *Damages* § 568 (1988)).
82. *Id.* (quoting City of Miami Beach v. Carner, 579 So. 2d 248, 253–54 (Fla. Dist. Ct. App. 1991)).
83. *Id.* (quoting *Carner*, 579 So. 2d at 254).
84. For example, payment by one of several joint obligors is credited to the other joint obligors. This is because there is but one obligation. RESTATEMENT (SECOND) OF TORTS § 920A cmt. a (1979).

performance"? This maxim means that a plaintiff should not recover from the defendant any amount in excess of the amount that the defendant would have to pay to perform the contract, and that any earnings or proceeds from mitigation must be credited to the defendant. For example, a contractor agrees with a municipality to build a bridge. Before the contractor does anything toward performance of the contract, the municipality repudiates the contract. The contractor recovers not the contract price of the bridge, but only the profit he would have made in performing the contract.[85] If he were to recover more than his profit, the maxim would be violated because in the face of repudiation, the contractor has no right to continue performance.[86] Other applications of this maxim exist. To generalize, the aggrieved party may not recover for any costs that could have been avoided or that were avoided. The maxim has no rational application to amounts received from collateral sources. Yet, based upon this weak reed, cases have been decided that denied the application of the collateral source rule.[87]

## VI. SUBROGATION AND THE COLLATERAL SOURCE RULE

This Article has focused on one reason for the applicability of the collateral source rule to contracts. The discussion has centered on the fact that the victim of the breach has provided consideration in whole or in part to the third party who is the collateral source, that is, the victim of the breach is merely benefitting from his contract with a third party for which the victim has provided the consideration. Another foundation of the rule's application to contracts is the doctrine of subrogation. "Subrogation enables the insurer to 'stand in the shoes' of the insured and assert the insured's rights against a legally responsible third party."[88] Typically, an insurer pays its insured and then by operation of law becomes equitably subrogated to the insured's cause of action.[89] The topic of subrogation is quite complex. The presence of the possibility of

---

85. Rockingham County v. Luten Bridge Co., 35 F.2d 301, 308 (4th Cir. 1929).
86. Bu-Vi-Bar Petroleum Corp. v. Krow, 40 F.2d 488, 491, 492 (10th Cir. 1930).
87. *E.g.*, Norwest Bank v. Symington, 3 P.3d 1101, 1110 (Ariz. Ct. App. 2000); *Amalgamated Transit*, 434 S.E.2d at 455; Corl v. Huron Castings, Inc., 544 N.W.2d 278, 286 (Mich. 1996).
88. ROBERT H. JERRY, II & DOUGLAS R. RICHMOND, UNDERSTANDING INSURANCE LAW 676 (4th ed. 2007).
89. At times, the subrogation is contractual rather than equitable. Contractual subrogation occurs because the insurance policy or other contract contains a clause entitling the insurer or other similar party, such as the government, to subrogation.

subrogation is often critical to the application of the collateral source rule. If the collateral source will be subrogated for its payment to the plaintiff, this fact provides a secure basis for application of the collateral source rule. The fact that an insurance company or the government will be subrogated to the plaintiff's recovery of actual damages rebuts any argument that the plaintiff will reap the reward of a double recovery. In fact, in modern law, the subrogee will sue in its own name: "Real party in interest rules or statutes generally require that an insurer bring suit in its own name against the tortfeasor or other third person where the insurer has paid a loss in full and becomes subrogated."[90]

The importance of subrogation is illustrated in *Metoyer v. Auto Club Family Insurance Co.*[91] The plaintiff's property suffered major damage from Hurricane Katrina.[92] The defendant had insured the property against wind damage.[93] The Louisiana Recovery Authority made a grant of $150,000 to the plaintiff.[94] In exchange, it would be subrogated *pro tanto* to plaintiff's claim against the insurer.[95] This was held to be a major reason for application of the collateral source rule to the plaintiff's claim against the insurer.[96] By virtue of subrogation, the insured's recovery against the insurer effectively would be reduced by $150,000.[97] For example, if its insurance policy provided a maximum coverage of $150,000 or less, plaintiff would have had zero incentive to sue its insurer. Indeed, because of the transaction costs of litigation, plaintiff would have an incentive not to sue inasmuch the insured would be less well off by suing than by not suing. Of course, the state as subrogee could sue.

Another role that subrogation plays often leads to what appears to be a denial of the application of the collateral source rule. For example, a lease requires the tenant to procure premises liability insurance. The tenant fails to honor this commitment and a personal injury claimant alleges that both tenant and landlord have been negligent. The landlord's insurer pays the claim and is subrogated to the landlord's claim against

---

90. 17 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE 3d § 241:31 (2005).

91. 536 F. Supp. 2d 664 (E.D. La. 2008).

92. *Id.* at 665.

93. *Id.*

94. *Id.*

95. *Id.* at 670.

96. *Id.* at 670–71.

97. Plaintiff had earlier recovered $128,000 from Allstate on its flood insurance policy. *Id.* at 665. Whether this payment triggered the collateral source rule raised questions of fact that could only be answered after a trial. *Id.* at 671. In *Safeco Insurance Co. of America v. City of White House*, 191 F.3d 675, 693 n.12 (6th Cir. 1999), the City claimed that a collateral source, the EPA, was entitled to subrogation. The court ruled that this argument should be considered on remand. *Id.*

the tenant because the tenant has breached its commitment to purchase insurance. Many courts have restricted the subrogee's claim to the landlord's out-of-pocket costs, mainly its cost of insurance premiums.[98] The theory of these cases is that these are the only damages to the landlord that are proximately caused by the breach. Such cases may show the limits of subrogation rather than a rejection of the collateral source rule. Yet, other courts have simply applied the collateral source rule.[99]

## VII. Conclusion

The collateral source rule is logically applicable to the law of contract damages. Some courts, without giving the matter much thought, automatically dismiss the possibility of its application to contract cases on the authority of an encyclopedia and cases that have blindly followed its inept reasoning. Although the possibility of subrogation strengthens the case for its application, fundamentally its basis is in the law of contracts. The reasonable expectation of the plaintiff is that its bank accounts or their equivalent is its own property and is not intended to benefit the breaching party. The protection of the reasonable expectations of contracting parties is the foundation of the law of contracts.[100]

---

98. *E.g.*, Inchaustegui v. 666 5th Ave. Ltd. P'ship, 749 N.E.2d 196, 198–99 (N.Y. 2001).
99. Clark v. Greater Anchorage, Inc., 780 P.2d 1031, 1036 n.8 (Alaska 1989); PPG Indus., Inc. v. Cont'l Heller Corp., 603 P.2d 108 (Ariz. 1979).
100. 1 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1.1 (Joseph M. Perillo ed., rev. ed. 1993 & Supp. 2008). The principal thought in this section was that of Professor Corbin himself.