**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, | **ACTION NO. 3:19-cv-0053-RAM-EAH** |
| Plaintiffs, | **ACTION FOR DAMAGES** |
| v. | |
| DAYBREAK, INC. dba HUBER & ASSOCIATES, | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION…………………………………………………………………4

II.     STATEMENT OF FACTS……………………………………………….......6
        A.      The Parties' Contract……………………………………………….6

        B.      The Contract Required Defendant to Comply with Industry Standards that Include Securing the Copper Roof with Cleats…………………………………………………..6

        C.      Defendant's Methodology for Constructing the Main House Roof………........9
        D.      Defendant Admits that it Failed to Install Cleats to Secure the Copper Roof at the Hip Ridges as Required by the Contact……………………………………………………...11

        E.      During Hurricane Irma the Unsecured Hip Ridge Seams were Damaged and One of the Hip Ridge Seams Opened……………………………………………………15

        F.      To Repair the Damage Cause by Defendant's Breach of the Contract the Entire Main House Roof Must be Replaced……………………………………………………...17

III.    ARGUMENT………………………………………………………………...17
        A.      Summary Judgment Standard……………………………………………17

        B.      Defendant Breached the Contract by Failing to Install the Cleats Required to Secure the Copper Membrane at the Hip Ridges……………………………………19

        C.      Plaintiffs' Damages Caused by Defendant's Breach of the Contract is the Cost of Replacing the Main House Roof……………………………………………………22

IV.     CONCLUSION………………………………………………………………...24

## **TABLE OF AUTHORITIES**

### **Cases**

*Beal Bank SSB v. Pittorino*, 177 F. 3d 65, 68 (1st Cir. 1999)……………………………………17

*Blunt v. Lower Merion Sch. Dist.*, 767 F. 3d 247, 265 (3d Cir. 2014)……………………………19

*Christmas v. Virgin Islands Water & Power Auth.*, 527 F. Supp. 843, 18 V.I. 624 (D.V.I 1981)….23

*Cooper Concrete Co. v. Hendricks*, 386 S.W.2d 221 (Tex. Civ. App. 1965)……………………23

*Dierickx v. Vulcan Industries*, 10 Mich. App. 67, 158 N.W.2d 778 (Mich. Ct. App. 1968)……….23

*Equimark Commercial Fin. Co. v. C.I.T Fin. Servs. Corp.* 812 F. 2d 141, 144 (3d Cir. 1987)..18-19

*Hewitt v. Morton*, 1999 VI Lexis (April 14, 1999)……………………………………………22

*In re Tutu Water Wells Contamination Litigation,* 42 V.I. 299, 306 (D.V.I 1999)……. . .17, 18, 19

*Lauren W. v. DeFlaminis*, 480 F. 3d 259, 266 (3d. Cir. 2007)…………………………………19

*Lawrence v. Nat'l Westminster Bank of New Jersey*, 98 F. 3d 61, 65 (3d Cir. 1996)………………17

*Manbodh Asbestos Litigation Series, et al. v. Hess Oil, Virgin Islands Corp.*, 47 V.I. 267, 290 (V.I. Super. Ct. 2005)………………………………………………………………………………..18

*Mitsubishi Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)……………………19

*Sheldon v. Northeast Developers. Inc.*, 127 Vt. 15, 238 A.2d 775 (Vt. 1968)……………………23

*Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.* 860 F. Supp. 1448, 1450 (C.D. CA 1993)………………………………………………………………………………………17

*Whitfield Constr. Co., Inc. v. Community Dev. Corp.*, 392 F. Supp. 982, 11 V.I. 655 (D.V.I. 1975)………………………………………………………………………………………20

### **Statutes**

Fed.R.Civ.P Rule 56.… ……………………………………………………………………17

5 V.I.C. §32(b)………………………………………………………………………………..5

### **Treatises**

13 Am. Jur. 2d *Building and Construction Contracts* 27…………………………………………19

13 Am. Jur. 2d *Building and Construction Contracts* 72……………………………………..…20

13 Am Jur 2d *Building & Construction Contracts*  80……………………………………………23

5 *Corbin on Contracts* 1089 (1964)………………………………………………………………23

17A C.J.S. *Contracts* 494(2)……………………………………………………………………19

Restatement (Second) of Contracts § 235 (1981)…………………………………………………20

Restatement Second Contracts § 347……………………………………………………………...23

Restatement Second Contracts § 206……………………………………………………………...21

Plaintiffs Thomas F. Friedberg and Sarah L. Bunge ("Plaintiffs") submit this Memorandum of Points and Authorities in Support of their Motion for Summary Judgment against Defendant Daybreak, Inc. dba Huber & Associates ("Defendant"):

## I.    <u>INTRODUCTION</u>

This case is a single cause of action for breach of contract between Plaintiffs and Defendant to manufacture and install a standing seam copper roof on Plaintiffs' home located at 168 Chocolate Hole, St. John, United States Virgin Islands. The home consists of 6 separate buildings. The only building at issue in this breach of contract claim is the Main House Pavilion ("Main House"). The gravamen of the complaint is that Defendant failed to comply with the contractual requirement that it install cleats to secure the copper membrane to the roof substrate. Because Defendant did not install cleats to secure the seams of the copper pans where they intersect along the hip ridge lines of the octagonal Main House roof, the hip ridges are susceptible to wind damage.   Plaintiffs discovered the omission when the roof's hip ridge seams were damaged by storm winds during Hurricane Irma, with one seam opening to reveal the absence of cleats.

Plaintiffs' filed their complaint on July 14, 2017, less than 2 years after Hurricane Irma. Plaintiffs alleged in paragraph 11 of the complaint that the failure to install the cleats in accordance with the plans and specifications was a latent defect under 5 V.I.C.§32(b) since the failure to install the cleats was not apparent by reasonable inspection prior to September 7, 2017, that date Hurricane Irma struck the territory. (Doc. No. 1, ¶ 11)

This is a very simple case to resolve and there are no disputed factual issues for a jury to resolve.   Defendant admits it did not install cleats to secure the copper membrane at the hip ridge seams as required by the parties' contract and the industry standards incorporated into it. Defendant has no valid defense for its breach.   Repairing the damage caused by Defendant's

breach requires replacement of the entire Main House roof.    Because there are no issues of material fact that require a jury trial this is an appropriate case for summary judgment.

## II.    STATEMENT OF FACTS

### A.    The Parties' Contract

On May 7, 2010, Plaintiffs and Defendant entered into a contract for the manufacture and installation of the copper standing seam roofs on all the buildings in the project, including the Main House (the "Contract").    The Contract required Defendant to install a copper standing seam roof system as provided by two industry standards incorporated into the Contract.    The Contract required Defendant to install cleats to secure the copper roofing at an agreed spacing averaging 9.5 inches on center.    To secure maximum protection from wind damage in the hurricane-prone Territory, Plaintiffs negotiated for more cleats installed closer together than called for by the industry standards—and paid more for that extra security. There are no exclusions or limitations in the Contract (that Defendant drafted) that allow Defendant to omit cleats from the elevated hip ridges where the elevated copper membrane is more prone to wind damage. (Statement of Undisputed Facts ("SUF") 8, 9, 10.)

### B.    The Contract Required Defendant to Comply with Industry Standards that Include Securing the Copper Roof with Cleats

The Contract incorporates two specific industry standards with which Defendant was required to comply: (a) Revere Copper & Common Sense ("Revere C&CS"), and (b) the Sheet Metal and Air Conditioning Contractors' National Association, Inc. ("SMACNA").    (SUF 11.)

Standing seam roofing involves joining sheets or strips of copper with seams that are elevated above the roof surface.    This method provides a weathertight copper membrane. Standing seam roofing may be formed from sheets, strips and/or rolls of copper.    Individual panels

can be formed with hand tools, on sheet metal brakes (power or manually operated), or with portable pan-forming equipment.    Panels can be connected to form pans; and both panels and pans are secured to the substrate in the same manner. (SUF 12.)

The octagonal roof on the Main House was designed as a series of copper panels forming triangular-shaped pans connected where the ends of the panels making up the pans meet at the hip ridges of the roof.    The panels are joined together to form pans with one edge of each panel secured to the substrate with cleats; and the pans are joined by creating a seam where they meet at the roof's hip ridge lines.    Seams connecting the edges of the panels within the pans, and the seams formed where the pans meet and connect at the roof's hip ridges, can be finished (completed and closed) with a variety of hand and power tools.    In the case of the octagonal design of the Main House roof, the ends of the panels forming the triangular pans are cut at an angle and seamed to the cut ends of the corresponding panels making up the next pan where they meet at the hip ridge line. (SUF 13.)

As stated in Revere C&CS: "Regardless of the form of copper used, the method of forming panels and/or finishing seams, certain basic principles apply to all standing seam installations." Those standard principles include the method for securing the seams of the copper panels and pans making up the copper membrane to the roof surface with cleats worked into the seams.    Revere C&CS provides:

> Standing seam roofing and wall cladding *is secured to the structure by cleats worked into the seams*.    It is necessary that the cleats be attached to a material that has sufficient "holding power" to prevent fastener "pull-out" during high wind events.

(SUF 14; Revere C&CS, Section 3A at p. 3.A.2, Exhibit C to Declaration of Arther L. Sanders, AIA *Emeritus*, in Support of Plaintiffs' Motion for Summary Judgment ("Sanders Decl.").

The Revere C&CS standards provide that the cleats used to secure the panels and pans in a standing seam roof should be (a) the same copper weight as the roof panels and 2" wide; (b) preferably spaced 12" apart; and (c) secured to wood deck/sheathing with two copper, copper alloy or stainless steel screws. (SUF 15.)

The SMACNA standards also require securing a standing seam copper roof with cleats and provides specifications: "Cleats should be at 12 in. (300 mm) maximum intervals. Two fasteners per cleat are used with cleat tabs folded over the fastener heads." (SUF 16; SMACNA Manual Summary of Guidelines, h.4. at pp. 6.1-6.2, attached to Sanders Decl. as Exhibit D.)

Both the Revere C&CS and SMACNA standards require the installation of cleats in *all* seams to secure the copper panels/pans *including where they meet at hips or ridges*. The Revere C&CS industry standards are the same for securing copper seams anywhere on the roof, including the roof's flat surfaces and its hips and ridges. Revere C&CS states under the heading Hips and Ridges: "Ridges and hips shall be provided with standing seams constructed as specified for standing seams of main roof." This includes the same requirement that cleats must be "*worked into the seams*" at specified intervals to secure the copper roof panels/pans to the substrate on both the main roof and the hips and ridges. (SUF 14, 17.) Revere C&CS "Specifications for roofs with standing seams" addresses the pan method of construction *and includes the installation of cleats in the seams of the copper roof pans*, with no exception for copper pans that intersect at the roof's hip or ridge lines. (SUF 17, 18; Revere C&CS Section 3A at pp. 3.A.8, 3.A.9 and 3.A.2, attached to Sanders Decl. as Exhibit C (emphasis added).)

The SMACNA Manual also requires that with both the pan and roll method of construction, copper panels and pans must be installed with cleats inside the seams to attach the copper to the substrate, including at the roof's hips or ridges. The SMACNA Manual includes diagrams

8

depicting the placement of cleats inside the seams where the panels or pans form the "hip or ridge" of the roof.    (SUF 19, 20; "Standing Seam Roofs" section of SMACNA Manual and Figures 6-5 and 6-6 at pp. 6.14-6.16, attached to Sanders Decl. as Exhibit D.)

When the roof is installed, the cleats attaching each copper panel and pan to the substrate are not visible because the cleats are covered with the next copper panel or pan and the edges are then seamed closed.   In Defendant's installation of the Main House roof, the seams at the hip ridges where the copper panels making up the triangular pans meet were covered with a copper cap that was riveted over the pan seams.    The seams Defendant formed at the hip ridges, and the cleats that should be installed within the seams, are not visible when the roof assembly is complete. (SUF 21.)

The applicable standards provide that cleats securing the copper membrane to the substrate should be spaced at 12 inches on center.    Plaintiffs negotiated to increase the number of cleats and reduce the spacing to 9.5 inches on center to provide increased wind protection. The increase in the number of cleats and the tighter spacing resulted in a price increase to the Contract. (SUF 22.)

Daybreak Project manager Micah Cady ("Cady") confirmed that the purpose of the cleats is "to hold the panel down to the substrate."   Cady testified that the pre-installed wooden battens were spaced sufficiently to allow Defendant to secure the copper with cleats at an average of 9.5 inches on center.   Defendant's principal, Barry Huber ("Huber"), testified that the purpose for securing the copper seams with cleats is to provide wind resistance and protect from wind failure and confirmed the wooden battens were properly installed. (SUF 23, 34.)

C.    Defendant's Methodology for Constructing the Main House Roof

Defendant's methodology of installation of the roof included first running rolled copper coils through a machine to form the panels making up the triangular pans.   The

machine created a male connection on one side and a female connection on the other side of the copper strip, resulting in a 15" panel.   The copper panels were then cut to a designated length based on the octagonal roof section measurements.   The cut panels were taken to the roof where each copper octagonal roof pan was assembled in place.   The pan construction started with a 15" panel or strip in the center of the octagonal section. Installation proceeded counter-clockwise from the first center panel with cleats placed over the right-hand side of the panel on every wooden batten at an average of 9.5 inches on center from the base of the roof to the peak.   The next panel was installed by locking its female edge onto the male edge of the cleated panel.   The interlocked edges of the panels were then seamed closed with hand seamers.   The process was repeated with enough copper panels to form the pans that covered each octagonal section of the roof. (SUF 24.)

The pan installation process continued until the pan length overlapped the ridge line and the pan was marked, trimmed and turned up to form the hip ridge seam.   This seam is 1" high and runs along the angled ridge.   Because Defendant made the diagonal cuts to the ends by hand after the panels were attached to the roof, the edges of the triangular pans did not have the same male/female connectors that would have been formed by the rolling machine.   To create the seams joining the triangular pans at the hip ridges without male/female connectors, Defendant just folded the trimmed ends of the panels together and crimped the seams by hand. (SUF 25, 27, 28.)

Revere C&CS and the SMACNA Manual require the installation of cleats to secure the seams created from the edges of the copper panels that form the pans where they meet at the hip ridge line.   Neither of the standards exempt hip or ridge line seams from the requirement that cleats must be used to secure *all* copper seams to the substrate.   On the contrary, *both standards* require that cleats be worked into every copper seam to secure the copper panels and pans to the roof's

10

substrate. Properly spaced and secured cleats attaching the pans at the hip ridge lines are a key component of the concealed fastening system to ensure straight lines for aesthetics and securement for weathertightness. Conversely, if the cleats are missing or not properly spaced at the hip ridge lines, the copper membrane is not secured at the roof's hip ridges and can fail in high wind events. The pan seams at the hip ridge lines are located at the highest elevations of the roof which increases the likelihood of failure during wind events and makes securing the hip ridge seams with cleats even more critical. (SUF 26.)

### D. Defendant Admits that it Failed to Install Cleats to Secure the Copper Roof at the Hip Ridges as Required by the Contact

Defendant admits that it did not secure the seams of the copper pans to the substrate with cleats where the pans met at *any of the hip ridge lines* on the Main House roof. Defendant acknowledges that it formed the hip ridge line seams *without installing cleats inside the seams* and then covered the hip ridge seams by riveting copper hip caps over the seams. (SUF 29, 30, 31, 32, 33, 35, 37.)

Defendant's Project Manager, Cady, testified that Defendant connected the triangular, pie-shaped copper pans where they met at the roof ridges by simply folding the edges together to form a seam and then riveting a copper hip cap over the seam. Cady confirmed that Defendant did not install any cleats in the seams it formed to secure the copper pans/panels where they met at the hip ridges of the roof. Cady incorrectly testified that installing cleats to secure the copper seams at the hip ridges is not required by Revere C&CS and is only "optional" under the SMACNA standards. (SUF 30, 31, 32, 33.)

Defendant's principal, Barry Huber ("Huber"), acknowledged that the purpose of installing cleats within the copper seams is to provide the *only* source of wind protection

11

for the roof.  Huber confirmed that Defendant did not install cleats to secure the copper seams where the pans meet at the hip ridges.  He acknowledged that Defendant only secured the copper panel seams within the pans to the substrate and did not install cleats inside the seams where the pans intersect at the hip ridge lines.  Huber claimed that Defendant did not install cleats within the hip ridge seams because it "is not a requirement" under Revere C&CS and SMACNA. (SUF 34, 35.)

Defendant is wrong about the applicable standards.  Both Revere C&CS and SMACNA require that cleats be worked into all seams to secure the copper membrane to the substrate. Both standards required Defendant to install cleats inside the seams at the hip ridges to secure the copper membrane at those critical, elevated locations.  There is nothing "optional" about the important *mandatory* requirement that hip ridge seams must be secured with cleats in the same manner as every other copper seam on the roof. (SUF 36.)

Huber conceded in his deposition testimony that the Contract required Defendant to secure the entire copper roof membrane with cleats installed on average of 9.5 inches on center.  Huber acknowledged that the purpose of the cleats is to secure the copper to the roof, and Defendant's failure to install cleats at the specified intervals would be a breach of the Contract. (SUF 34, 39.)

Huber testified that Defendant drafted the Contract to provide information to Plaintiffs and define the scope of Defendant's work.  Huber agreed that Defendant included as a Contract line item that it must install the roof in accordance with *both* Revere C&CS and SMACNA.  Huber and Cady both acknowledged that the wooden battens were installed properly and allowed the copper membrane to be secure to the battens every 9.5 inches as required by the Contract. (SUF 23, 40.)

Huber claimed for the first time in discovery that it would have been "mathematically impossible" to install cleats at 9.5 inches at the hip ridges because of the "way it was constructed,"

and it "[c]ould not be done because of simple geometry."   Huber admitted that Defendant had the

ability to include any qualification or exclusion it wanted in the Contract; and Defendant did not

address its alleged inability to comply with the standards requiring cleats at hip ridges due to the

roof's geometry.   Huber agreed that there was no exclusion or indication that certain standards

would not be followed even though they were incorporated into the Contract. (SUF 40, 41, 42.)

Defendant's designated roofing expert, Joseph Bragg ("Bragg"), concedes that the

SMACNA standards required Defendant to secure the hip ridge seams to achieve attachment but

claims that the Revere C&CS standard that was also incorporated into the contract does not.   Bragg

claims that Revere C&CS "doesn't require attachment along the hip and ridge."   Bragg testified at

his deposition:

> Q.    Does SMACNA say you need cleats there or not?
> A.    SMACNA does indicate within their diagram that, yeah.
> Q.    That yes, what?
> A.    That cleats are required along the hip ridge whereas Copper and Common
> Sense doesn't.

Deposition of Joseph Bragg ("Bragg Depo.") at 77:25-78:2; 113:2-10, attached as Exhibit H to the

Declaration of Thomas F. Friedberg in Support of Plaintiff's Motion for Summary Judgment

("Friedberg Decl.").   Bragg testified that the SMACNA standards are a "collaboration of multiple

authors that are associated" with SMACNA.   When asked about the standard of care regarding

what he claimed are two competing sources, Bragg conceded that SMACNA is "well-known

exponentially versus Copper and Common Sense."   (Bragg Depo. at 113:20-25, attached as

Exhibit H to Friedberg Decl.)

A review of Revere C&CS shows that Defendant and its expert are *wrong* when they claim

that industry standard does not require that hip ridge seams be secured with cleats, and that it does

not even address the issue.   Revere C&CS includes a section entitled "Hips and Ridges" which

states that "[r]idges and hips shall be constructed as specified for standing seam main roof." (Revere C&CS at p. 3.A.2, attached as Exhibit C to Sanders Decl.; SUF 17.)    Revere C&CS identifies "basic principles" that apply to "all standing seam installations," including the requirement that "standing seam roofing . . . is secured to the structure by cleats worked into the seams."    (Revere C&CS at p. 3.A.9, attached as Exhibit C to Sanders Decl.; SUF 17.)    Contrary to Defendant's claim, Revere C&CS specifies that to comply with its "basic principles" that apply to "all standing seam installations," cleats must be worked into the seams Defendant constructed at the hip ridges just as it did on every other copper seam it created on the Main House roof.    Both standards incorporated into the Contract required cleats to secure the hip ridge seams; and Defendant admits it breached that contractual requirement by failing to install cleats in any of the hip ridge seams.

Plaintiffs' architectural expert, Arthur Sanders, AIA *Emeritus*, confirms and documents that the wooden battens at the hip ridge intersections allowed the installation of cleats at 9.5 inches on center at the hip ridge seam.    Sanders documents Defendant's failure to secure the triangular pans with cleats embedded in the hip ridge seams as required by the Contract, Revere C&CS and SMACNA.    Without cleats at the hip ridge seams securing the copper to the substrate, the only things holding the triangular pans together are the seams Defendant hand-formed without male/female connectors, and the copper hip caps Defendant installed on top of the hip ridges.    That is contrary to the Contract provision requiring cleats securing the copper at 9.5 inches on center, and both industry standards incorporated into the Contract.    Sanders shows the proper installation of cleats at the hip ridge intersections and provides alternative means for Defendant to comply with the Contract requirement. (SUF 43, 44, 45.)

**E.    During Hurricane Irma the Unsecured Hip Ridge Seams were Damaged and One of the Hip Ridge Seams Opened**

On or about September 7, 2017, Hurricane Irma struck the Territory.   Plaintiffs retained Sanders to inspect and document damage to the copper roofs on their property and prepare proposals and estimates for repairing the roofs.   In February 2018 Sanders visited the property to identify and document the damage to the roofs throughout the property, propose specific repairs, and prepare a construction cost estimate.   Sanders observed and documented that all the copper caps covering the hip ridge lines on the octagonal Main House roof were loose and disturbed by the high winds during Hurricane Irma.   In his Storm Damage Report Sanders reported that the storm damage included "uplift/displacement at ridges." (SUF 3, 5, 6, 7.)

In February 2019 Plaintiffs hired Dahill Co. ("Dahill"), a Structural Restoration Contractor, to make temporary repairs to the roof to stabilize it and prevent further damage.   Dahill and its Project Manager, Richard Barabas ("Barabas"), identified an approximately 30-foot section of a hip ridge cap on the northeast side of the Main House roof that had been deformed and displaced during the hurricane and the seam had opened.   Barabas testified that Dahill removed the hip cap to expose the open hip ridge seam to inspect it.   Barabas documented the open seam in photographs.   Barabas and Dahill confirmed that there were no cleats securing the open seam to the substrate.   This is consistent with Defendant's testimony that it did not install cleats inside any of the hip ridge seams.   Dahill closed the seam by putting a new cap on and riveting it closed. (SUF 46, 47, 48.)

Dahill and Barabas also identified problems with Defendant's riveting of the hip cap that covered the open hip seam.   Dahill documented that rivets Defendant used to secure the copper panels together in the hip ridge seam did not penetrate the lower portion of the hip seam.   Dahill

reported that this condition was typical throughout the entire length of the seam. Defendant's failure to properly secure the hip caps with rivets is significant because Defendant admits it did not install cleats inside the hip ridge seams. As a result, only the improperly riveted hip caps hold the hip ridge seams together. The unsecured condition in which Defendant left all the hip ridge seams explains why Sanders observed that all the Main House hip caps were loosened and displaced by wind uplift during Hurricane Irma, with one hip ridge seam opening completely. (SUF 46-50.)

Defendant's expert, Bragg, claims that the hip ridge seam that opened during Hurricane Irma was the same seam that Sanders and his firm, Hoffmann Architects, allegedly "opened" during an inspection in 2014 as part of unrelated litigation. Bragg testified that he believed that in 2014 Sanders and his crew took off a hip ridge cap to expose a two-and-a half to three-foot section of one hip ridge seam. (Bragg Depo. at 75:20-76:8, attached as Exhibit H to Friedberg Decl.) Bragg speculated that Sanders and his crew did not reattach the hip cap properly which caused a 30-foot section of the same ridge seam to open during Hurricane Irma. Bragg testified:

> Q. If hypothetically two-and-a-half to three feet were exposed, yet the actual portion of the same seam that came apart is 30-plus feet, do you have an explanation of why the other 27 feet of seam opened up?
> MR. COSBY: Form.
> THE WITNESS: Well, I would - - I would ask - - I would say this. First, I didn't see anything in the pictures that that occurred. However, it could have occurred kind of like a domino effect. If the one they took off wasn't attached properly, then as that one loosened, it would pull up the others and disengage them possible, in a hypothetical situation.
> BY MR. FRIEDBERG:
> Q. All right. So you don't know that to any reasonable degree of probability, do you? You're just - -
> A. No, I am basing that off of actual experience with over 2500 wind hail inspections.

(Bragg Depo. at 76:9-25, attached as Exhibit H to Friedberg Decl.)

Bragg's speculation is not based on facts. In 2014 Hoffman and Dahill inspected the roofs of the entire property as part of an unrelated action pending between Plaintiffs and Defendant at

that time.   The inspection included two areas on the Main House roof: (1)   A small area of copper panel seam in the middle of a pan on the west side of the Main House roof was opened and cleats were observed securing the panel seam to the substrate, which is consistent with Defendant's testimony that it only installed cleats to secure the panels that make up each pan; and (2) a short section of a hip ridge cap on the east side of the Main House that was loose and was removed, the seam was recrimped, and the cap was replaced and riveted securely in place.   The hip seam itself was not opened so the absence of cleats inside the hip seam was not observed.   (SUF 54, 56.)

The hip cap that was removed and replaced by Sanders and Dahill in 2014 was not covering the same hip ridge seam on the northeast side of the Main House that opened during Hurricane Irma in 2017.   (SUF 54, 55, 56.)   The removal of a small section of hip cap on a *different hip ridge seam* has no relevance to the failure of the hip ridge seam on the northeast side of the roof where Defendant *admits that it did not install cleats* to secure the copper to the substrate as required by the Contract.

## F.    To Repair the Damage Cause by Defendant's Breach of the Contract the Entire Main House Roof Must be Replaced

Defendant acknowledges that cleats provide the only source of wind protection for the copper roof.   Defendant's failure to install cleats as required to secure the hip ridge seams eliminated that wind damage protection, which caused one of the Main House hip ridge seams to open during Hurricane Irma and all the other hip ridge caps to become loose and disturbed. Defendant's admission that it omitted cleats at *every hip ridge seam* on the Main House means that none of the triangular pans are properly secured to the substrate.   The only way to secure the hip ridge seams connecting the triangular panels that make up the hexagonal roof on the Main House is to remove all the pans to allow one side to be accessible for cleating.   The repair process would

17

likely damage the copper pans and the panels that make up each pan.   Replacement of all the copper pans that make up the Main House roof is the only viable option. (SUF 53, 57, 58.)

Plaintiff's economic expert has calculated the current cost of the copper roof replacement on the Main House, including increases due to tariffs imposed in 2025, at $666,964 in 2025 and $719,792 at the time of trial in 2026. (SUF 59, 60.)   Defendant's expert testified that he does not have an estimate of the cost to repair or replace the Main House roof and was not asked to prepare one.   (SUF 61.)   There is no evidence contradicting the cost estimate prepared by Plaintiffs' experts.

## III.   **ARGUMENT**

### A.   **Summary Judgment Standard**

Upon a showing that there is no genuine dispute of material fact as to particular claims or defenses, the court may grant summary judgment in the party's favor on "each claim or defense— or the part of each claim or defense—on which summary judgment is sought.   FRCP Rule 56(a); *see Beal Bank SSB v. Pittorino*, 177 F. 3d 65, 68 (1st Cir. 1999);.   "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established for the case."   FRCP Rule 56(g).

Summary judgment must be granted unless the opposing party establishes that "a reasonable jury could return a verdict for the non-moving party."   *See In re Tutu Water Wells Contamination Litigation,* 42 V.I. 299, 306 (D.V.I 1999) *citing Lawrence v. Nat'l Westminster Bank of New Jersey*, 98 F. 3d 61, 65 (3d Cir. 1996).   If the moving party meets its burden, the non-movant must "do more than simply show that there is some metaphysical doubt as to material facts." *See In re Tutu*, *supra*, 42 V.I. at 306-307, *citing Mitsubishi Elec. Indust. Co. v. Zenith Radio Corp*., 475 U.S. 574,

586 (1986). Rather, the opposing party must by affidavits, depositions, admissions or other evidence on the record sufficiently establish that a genuine issue of material fact exists as to each element essential to that party's case. *See In re Tutu*, *supra*, 42 V.I. at 307, *citing Equimark Commercial Fin. Co. v. C.I.T Fin. Servs. Corp.* 812 F. 2d 141, 144 (3d Cir. 1987) (declaring that a non-movant may not "rest upon mere allegations, general denials, or … vague statements").

However, "[w]here the non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is no genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law. *See Blunt v. Lower Merion Sch. Dist.*, 767 F. 3d 247, 265 (3d Cir. 2014), *citing Lauren W. v. DeFlaminis*, 480 F. 3d 259, 266 (3d. Cir. 2007). The court in *In re Tutu* emphasized that summary judgment is appropriate where the opposing party's evidence is "merely colorable or is not significantly probative." *See In re Tutu*, *supra*, 42 V.I. at 306-307.

**B.** **Defendant Breached the Contract by Failing to Install the Cleats Required to Secure the Copper Membrane at the Hip Ridges**

Breach of contract claims require "an enforceable contractual duty to perform, a full performance by the nonbreaching party, a failure to perform without legal excuse by the beaching party, and damage that flows from that breach." *Manbodh Asbestos Litigation Series, et al. v. Hess Oil, Virgin Islands Corp.*, 47 V.I. 267, 290 (V.I. Super. Ct. 2005) (citing Restatement (Second) of Contracts 235 (1981)) (citations omitted).

A contractor's liability is fixed by the terms of his contract, and he is obligated to perform according to those terms. 13 Am. Jur. 2d *Building and Construction Contracts* 27 and 17A C.J.S. *Contracts* 494(2); *See also Whitfield Constr. Co., Inc. v. Community Dev. Corp.*, 392 F. Supp. 982, 11 V.I. 655 (D.V.I. 1975). Where a party to a building or construction contract fails to comply

with the duty imposed by the terms of the contract, a breach results for which an action may be maintained to recover the damages sustained thereby. 13 Am. Jur. 2d *Building and Construction Contracts* 72; *See also* Restatement (Second) of Contracts 235(2) (When performance of a duty under a contract is due any non-performance is a breach).

The Contract at issue in this case was prepared by Defendant and its terms are clear. Defendant was required to install a standing seam copper roof "in accordance with Revere Copper & Common Sense and SMACNA." Plaintiff negotiated a more stringent requirement for the spacing of the cleats that secure the copper membrane than the specified standards recommend. To increase wind protection for the copper roof Defendant agreed to increase the number of cleats securing the copper roof to the substrate and reduce the spacing to an average of 9.5 inches on center instead of 12 inches as recommended by Revere C&CS and SMACNA. Defendant charged Plaintiff more money to increase the number of cleats securing the copper roof. (SUF 8-11, 22, 23.)

There is no disagreement or ambiguity in the Revere C&CS and SMACNA standards regarding how and where Defendant was required to install the cleats securing the copper membrane. Both standards require that cleats be worked into *every copper seam* on the roof to provide the *only* source of wind resistance in a standing seam copper roof installation. There is no exception for the copper seams formed where panels or pans meet at the hip ridge lines, the highest points on the roof that are the most susceptible to wind damage. To the contrary, both standards required Defendant to construct the copper seams at the hip ridges in the same manner as the seams that connected the panels that made up the triangular pans. (SUF 14-20, 26, 29, 36.)

As with all seams, Defendant was required to install cleats inside the hip ridge seams to secure the copper membrane to the substrate. Defendant admits it ignored that contractual

20

requirement and omitted the cleats from the hip ridge seams. Plaintiff's architectural expert has demonstrated that the pre-installed wooden battens were positioned to accept the hip ridge cleats and identified different ways in which Defendant could have installed cleats in the hip ridge seams. The result of Defendant's breach is that *none* of the hip ridge seams are secured to the substrate. Defendant's breach caused all the hip seams to become loose and disturbed by Hurricane Irma, with one of the hip ridge seams opening to reveal the absence of cleats. Defendant acknowledges that its failure to install cleats in the hip ridge seams eliminated the only source of protection from wind uplift and damage and was a breach of the Contract's requirements. (SUF 20, 29-40, 43-53.)

Defendant has no valid excuse for its failure to secure the hip ridge seams with cleats. Defendant inaccurately claims that the Revere C&CS standard does not address installing cleats to secure hip ridge seams. In fact, Revere C&CS expressly provides that hip and ridge seams must be constructed with cleats in the same manner as all other copper seams on the roof. Defendant claims that the SMACNA direction to install cleats inside hip ridge seams—with its diagram showing how to do so—is only "optional." Defendant's argument is contradicted by the mandatory language in the SMACNA manual. Even if there were an inconsistency between the two standards incorporated into the Contract (which there is not), any ambiguity must be resolved against Defendant because it drafted the Contract. Restatement (Second) of Contracts 206.

There is no evidence to support Defendant's claim, made for the first time recently, that it was "mathematically" or "geometrically" impossible for Defendant to install cleats in the hip ridge seams. Plaintiff's expert has shown that the wooden battens met at the hip ridges and it was possible to install cleats along the ridge lines. Defendant's Project Manager testified the battens were placed appropriately and there were no problems attaching the copper membrane to the battens anywhere on the Main House roof. Furthermore, Defendant had the roof plan when it prepared

the Contract and would have known if it was mathematically or geometrically impossible to comply with the standards Defendant incorporated into the Contract. Defendant admits it did not exclude hip ridge cleats from the Contract and did not provide an exception—due to alleged impossibility or any other reason—to Defendant's agreement to comply with both Revere C&CS and SMACNA. (SUF 40-45.)

Defendant acknowledges that the Contract required it to install cleats to secure the copper membrane at 9.5 inches on center and that failure to do so would be a breach. (SUF 38-40.) Defendant knew that securing the copper membrane to the roof with cleats was important to Plaintiffs, who paid more to exceed the industry standards for the number and spacing of cleats securing the copper membrane. Defendant did not inform Plaintiffs that cleats could not be installed to secure the copper membrane at the hip ridges based on the octagonal design of the Main House roof. Defendant observed the pre-installed wooden battens before it began installing the copper roof. Defendant did not object to the batten layout or inform Plaintiffs that it would be "impossible" to secure the hip ridge seams with cleats as required by the Contract and the incorporated standards. Defendant may not claim after Plaintiffs learned of the breach years later that it was "impossible" to perform a critical contract requirement.

There are no disputed facts and Plaintiffs have established that Defendant breached the Contract requirement to install cleats securing the copper membrane at the hip ridge intersections. Defendant is liable for breach of contract as a matter of law and responsible for all damage caused by its breach.

**C.    Plaintiffs' Damages Caused by Defendant's Breach of the Contract is the Cost of Replacing the Main House Roof**

The measure of damages for breach of contract in the Virgin Islands was stated by the Court in *Hewitt v. Morton*, 1999 VI Lexis (April 14, 1999), as follows:

> Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed. Restatement (Second) of Contracts 347, cmt. a; *See also Christmas v. Virgin Islands Water & Power Auth.*, 527 F. Supp. 843, 18 V.I. 624 (D.V.I 1981). For breach due to defective performance or due to abandonment of the contract, an injured party can get a judgment for damages measured by the reasonable cost of reconstruction and completion in accordance with the contract, so long as this is possible and does not involve unreasonable economic waste. *See* 13 Am Jur 2d *Building & Construction Contracts* 80 and 5 *Corbin on Contracts* 1089 (1964)(emphasis supplied); *See also Sheldon v. Northeast Developers. Inc.*, 127 Vt. 15, 238 A.2d 775 (Vt. 1968) and *Cooper Concrete Co. v. Hendricks*, 386 S.W.2d 221 (Tex. Civ. App. 1965). The amount actually paid by the owner to another contractor for correction and completion in accordance with the contract is a measure of damages for the Defendant's breach. 5 *Corbin on Contracts* 1089; *See also Dierickx v. Vulcan Industries*, 10 Mich. App. 67, 158 N.W.2d 778 (Mich. Ct. App. 1968).

Restatement Second Contracts sets forth the measure of damages as follows:

> § 347 Measure of Damages in General
>
> Subject to the limitations stated in §§ 350-53, the injured party has a right to damages based on his expectation interest as measured by:
>
> (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
>
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
>
> (c) any cost or other loss that he has avoided by not having to perform.

In this case, Plaintiffs expectation was that Defendant would comply with the contract requirements and the Revere C&CS and SMACNA standards by providing a copper roof secured with cleats at an average of 9.5 inches on center. Instead, Defendant delivered a roof with *no cleats at all* securing the copper membrane at the hip ridge lines. Defendant's breach, which it admits occurred, left the entire Main House roof vulnerable to wind damage. Defendant's breach caused

Plaintiffs damage in September 2017 when Hurricane Irma damaged and loosened all the unsecured hip ridge seams and caused one of them to open up.

The measure of damages for Defendant's breach is the cost Plaintiffs must incur to replace the Main House roof.   Plaintiff's experts have identified the cost to replace the Main House roof as $666,964 in 2025 dollars, and $719,792 at the time of trial in 2026.   (SUF 57-60.)   Defendant has not produced any evidence to dispute that damage amount.   (SUF 61.)

## IV.    CONCLUSION

There are no disputed facts requiring a jury trial in this case.   The Contract required Defendant to install cleats as specified to secure all copper to the roof and there was no exception for the copper seams Defendant formed at the hip ridge lines.   The Contract and both standards incorporated into it required Defendant to secure the hip ridge seams with cleats.   Defendant admits it failed to do so and acknowledges that failure was a breach of the Contract.   Defendant's failure to secure the copper with cleats caused a hip ridge seam to open during Hurricane Irma that revealed Defendant's breach.   It is undisputed that the measure of damages for Defendant's breach is the cost of replacing the Main House roof.   Plaintiffs are entitled to summary judgment as requested in this Motion.

Dated :   December 13, 2025          **LAW OFFICES OF FRIEDBERG & BUNGE**

By: _/s/ THOMAS F. FRIEDBERG, ESQ._
             THOMAS F. FRIEDBERG, ESQ.(VI#1006)
                Attorneys for Plaintiffs THOMAS F.
             FRIEDBERG & SARAH L. BUNGE
             **THE LAW OFFICES OF FRIEDBERG &**
             **BUNGE**
             1005 ROSECRANS STREET, SUITE 202
             PO BOX 6814
             SAN DIEGO, CALIFORNIA 92166
             TEL : (619)557-0101
             FAX : (619)557-0560
             E-mail : "tom@lawofficefb.com"

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December 2025, a true and correct copy of

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**

**MOTION FOR SUMMARY JUDGMENT** was filed with the CM/ECF system which will

provide notice to the following:

Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994
Telephone: 772-463-8402
Facsimile: 772-463-4820

Andrew C. Simpson
**ANDREW C. SIMPSON, PC**
2191 Church St., Ste. 5
Christiansted, VI 00820
TEL : 340.719.3900
E-MAIL :asimpson@coralbrief.com

        */s/ THOMAS F. FRIEDBERG*
        **THOMAS F. FRIEDBERG**