IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE,<br><br>                   Plaintiffs,<br><br>v.<br><br>DAYBREAK, INC. dba HUBER & ASSOCIATES,<br><br>                   Defendant. | ACTION NO. 3:19-cv-0053-RAM-EAH<br><br>ACTION FOR DAMAGES |

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS'

## MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Thomas F. Friedberg and Sarah L. Bunge ("Plaintiffs"), respectfully submit the following Statement of Undisputed Facts in Support of their Motion for Summary Judgment against Defendant Daybreak, Inc. dba Huber & Associates ("Defendant" or "Daybreak"):

1.        This case is a single cause of action for breach of contract between Plaintiffs and Defendant to manufacture and install a standing seam copper roof on Plaintiffs' home located at 168 Chocolate Hole, St. John, United States Virgin Islands.   *See*, Action for Damages at ¶¶ 6-13, Exhibit G to the Declaration of Thomas F. Friedberg in Support of Plaintiffs' Motion for Summary Judgment ("Friedberg Decl.")(Doc. No. 1); Declaration of Arthur L. Sanders, AIA *Emeritus*, in Support of Plaintiffs' Motion for Summary Judgment ("Sanders Decl.") at ¶ 2.

**Defendant's Response:**


2.        The home consists of 6 separate buildings. The only building at issue in this breach of contract claim is the Main House Pavilion ("Main House"). The gravamen of the complaint is

that Defendant breached its contract with Plaintiffs by failing to comply with the contract requirements and industry standards and specifications incorporated into the contract regarding the attachment of the copper membrane that makes up the copper roof on the Main House. Specifically, Defendant breached the contractual requirement that it install cleats to secure the copper membrane to the roof substrate. Because Defendant did not install cleats to secure the triangular copper pans where they intersect along the hip ridge lines of the octagonal Main House roof, the copper pans are not secured to the substrate and are susceptible to wind damage. Plaintiffs discovered the omission when the roof's hip seams were damaged by storm winds during Hurricane Irma, with one seam opening up to reveal the absence of cleats.   *See*, Action for Damages at ¶¶ 7-10, Exhibit G to Friedberg Decl.; Sanders Decl. at ¶ 2.

**Defendant's Response:**


3.      On or about September 7, 2017, Hurricane Irma struck the Territory.   In or about February 2018, Plaintiffs retained Hoffmann Architects, Inc., ("Hoffmann Architects") to document the damage to the roofs of the buildings at 168 Chocolate Hole.   The task involved visual and photographic review and graphic documentation of defects with recommendations for repair or replacement.   Hoffmann Architects prepared an outline scope used to assist in preparing an estimate for the work.   *See*, Sanders Decl. at ¶ 2.


**Defendant's Response:**


4.      Subsequent investigation revealed for the first time that Defendant did not install cleats to secure the copper membrane where the copper pans intersect at the hip ridges as required

by the parties' contract.    Because the cleats that Defendant should have installed are not visible once the hip seam is capped, the absence of the cleats at the hip ridge seams could not be detected before one of them opened during Hurricane Irma.    Defendant's employees and principal have since admitted in deposition testimony that Defendant did not install cleats to secure the copper roof to the substrate at *any of the hip seams* on the Main house roof as required by the parties' contract.    *See*, Sanders Decl. at ¶¶ 4, 31, 32, 33, 34, 36, 39, 44, Exhibit E-1; April 28, 2025 Deposition of Micah Cady ("4/28/25 Cady Depo.") at 36:10-37:4; 39:24-40:3; 44:6-8, attached as Exhibit C to Friedberg Depo.; Deposition of Micah Cady dated October 7, 2025 ("10/7/25 Cady Depo.") at 25:20-26:12; 26:22-27:1; 31:4-13, attached as Exhibit D to Friedberg Decl.; October 7, 2025 Deposition of Barry Huber ("10/7/25 Huber Depo"). at 38:22-40:9; 51:7-52:2, attached as Exhibit B to Friedberg Decl.

**Defendant's Response:**


5.    Following Hurricane Irma, Plaintiffs retained Hoffmann Architects to inspect and document damage to the copper roofs on their property and prepare proposals and estimates for repairing the roofs.    In February 2018 Arthur Sanders ("Sanders"), Hoffmann Architect's architectural director and manager of its Connecticut office at the time, visited the property after services had been restored to St. John.    The purpose of Sanders' visit was to identify and document the damage to the roof throughout the property, propose specific repairs, and work with a roofing contractor, Dahill Co., Inc. ("Dahill"), to prepare a construction cost estimate.    Sanders has been designated as Plaintiffs' architectural expert in this action.    *See*, Sanders Decl. at ¶¶ 1, 6, Exhibit A.

**Defendant's Response:**

6.      Hoffmann Architects and Sanders prepared a Summary of Storm Damage ("Hoffmann Report").   In his cover letter Sanders made "special note of the damage to the Main Pavilion where the copper pans were pulled upward along the hip ridge lines and now are not safely secured."   Hoffmann Architects estimated that over 50% of the Main House roof panels would have to be replaced and that likely many of the remaining pans would be damaged during the work.   Hoffmann Architects recommended removal and replacement of the entire Main House roof.   *See*, Sanders Decl. at ¶ 7, Exhibit B.

**Defendant's Response:**


7.      During Sanders' inspection of the Main House roof, he observed that all the caps covering the hip ridge lines on the octagonal roof were loose and disturbed by the high winds during Hurricane Irma.   Included in the Hoffmann Report is Roof Damage Plan A102 which documents Sanders' findings that all the hip ridge caps were loosened and damaged and needed to be replaced.   In the Storm Damage Summary section Hoffmann Architects reported that the storm damage included "uplift/displacement at ridges."   *See*, Sanders Decl. at ¶ 7; July 27, 2018 cover letter, Storm Damage Summary at Page – 1 and Page – 2, and Roof Damage Plan at Exhibit B to Sanders Decl.

**Defendant's Response:**


8.      On May 7, 2010, Plaintiffs and Defendant entered into a contract for the manufacture and installation of the copper standing seam roofs on all the buildings in the project, including the Main House (the "Contract").   The parties agree that the unsigned May

7, 2010 proposal attached as Exhibit A to the Declaration of Sarah L. Bunge in Support of Plaintiffs' Motion for Summary Judgment ("Bunge Decl.") is the Contract between Plaintiffs and Defendants. *See*, Contract, attached as Exhibit A to Bunge Decl.; Sanders Decl. at ¶ 9; Deposition of Barry Huber dated April 28, 2025 ("4/28/25 Huber Depo.") at 18:6-21, attached as Exhibit A to Friedberg Decl.; 10/7/25 Huber Depo. at 9:9-25, attached as Exhibit B to Friedberg Decl.;

**Defendant's Response:**

9.      The Contract required Defendant to install a "Red Copper standing seam roof system" from roll-formed panels of 15 inches on center panels with double locked standing seams.   Per the Contract, Defendant was to install cleats to secure the copper roofing at an agreed spacing averaging 9.5" on center.   The cleats were to be made of copper and be secured with 2" ring shank nails to the wooden battens that were pre-installed. *See,* Contract, attached as Exhibit A to Bunge Decl.; Sanders Decl. at ¶ 10.

**Defendant's Response:**

10.      The following Section II of the Contract states the Work requirements:

COPPER STANDING SEAM METAL ROOF (APPRX 8,400 SF)

1) Provide and install Rosin slip sheet over modified underlayment.
2) Install 16oz. Red Copper standing seam roof system:
   - Installed in accordance with Revere Copper & Common Sense & SMACNA
   - Panels to be roll-formed in 15" O.C. panel widths with 1" double locked standing seam.
   - Cleats installed at an average of 9.5" O.C.  with 2" shank nails per cleat.
     o   NOTE: See alternate A for screws in lieu of nails.
   - Includes traditional style single rib ridge finish.

5

*See*, Contract, attached as Exhibit A to Bunge Decl.; Sanders Decl. at ¶ 11.

**Defendant's Response:**


11.     The Contract incorporates two specific industry standards with which Defendant was required to comply: (a) Revere Copper & Common Sense ("Revere C&CS"), and (b) the Sheet Metal and Air Conditioning Contractors' National Association, Inc. ("SMACNA").    Sanders Decl. at ¶ 12, Exhibits C and D.

**Defendant's Response:**


12.     Standing seam roofing involves joining sheets or strips of copper with seams (joints) that are elevated above the roof surface.    This form or method provides a weathertight – not watertight – copper membrane. Standing seam roofing may be formed from sheets, strips and/or rolls of 12-, 16- or 20-ounce copper.    Individual panels can be formed with hand tools, on sheet metal brakes (power or manually operated), or with portable pan-forming equipment. Panels can be connected to form pans; and both panels and pans are secured to the substrate in the same manner.    *See,* Sanders Decl. at ¶ 13; Revere C&CS, Section 3A at p. 3.A.2, attached to Sanders Decl. as Exhibit C.

**Defendant's Response:**


13.     The octagonal roof on the Main House was designed as a series of copper panels forming triangular-shaped pans connected where the ends of the panels making up the pans meet at the hip ridges of the roof.    The panels are joined together to form pans with one edge of each panel secured to the substrate with cleats; and the pans are joined by creating a seam where they

meet at the roof's hip ridge lines.    Seams connecting the edges of the panels within the pans, and the seams formed where the pans meet and connect at the roof's hip ridges, can be finished (completed and closed) with a variety of hand and power tools.    In the case of the octagonal design of the Main House roof, the ends of the panels forming the triangular pans are cut at an angle and seamed to the cut ends of the corresponding panels making up the next pan where they meet at the hip ridge line.    *See*, Springline Architects' Main House roof plan ("Roof Plan") attached as Exhibit B to Bunge Decl.; Sanders Decl. at ¶ 14.

**Defendant's Response:**

14.    As stated in Revere C&CS: "Regardless of the form of copper used, the method of forming panels and/or finishing seams, certain basic principles apply to all standing seam installations."    Those standard principles include the method for securing the seams of the copper panels and pans making up the copper membrane to the roof surface with cleats worked into the seams.    Revere C&CS provides:

> *Standing seam roofing and wall cladding is secured to the structure by cleats worked into the seams.  It is necessary that the cleats be attached to a material that has sufficient "holding power" to prevent fastener "pull-out" during high wind events.*

> When the surface behind the copper is a material other than wood – e.g., gypsum or concrete – it is necessary to provide wood nailing strips for securing cleats. Preferably, these should be spaced twelve inches (12") apart and run perpendicular to the standing seams.

*See,* Sanders Decl., ¶ 15; Revere C&CS, Section 3A at p. 3.A.2, attached to Sanders Decl. as Exhibit C (emphasis added).

**Defendant's Response:**

15.    The Revere C&CS standards provide that the cleats used to secure the panels and pans in a standing seam roof should be (a) the same copper weight as the roof panels and 2" wide; (b) preferably spaced 12" apart; and (c) secured to wood deck/sheathing with two copper, copper alloy or stainless steel screws.    *See,* Sanders Decl., ¶ 16; Revere C&CS, Section 3A at pp. 3.A.3, 3.A.7, attached to the Sanders Decl. as Exhibit C.

**Defendant's Response:**


16.    The SMACNA Manual contains a section entitled "Summary of Design Guidelines for Metal Wall and Roof Systems."    The design guidelines identify "[f]actors to consider in designing eave to ridge runs of standing seam and batten seam roofing."    The requirement for cleats states in relevant part: "Cleats should be at 12 in. (300 mm) maximum intervals. Two fasteners per cleat are used with cleat tabs folded over the fastener heads."    *See,* Sanders Decl., ¶ 17; SMACNA Manual Summary of Guidelines, h.4. at pp. 6.1-6.2, attached to Sanders Decl. as Exhibit D.

**Defendant's Response:**


17.    Both the Revere C&CS and SMACNA standards require the installation of cleats in *all* seams to secure the copper panels/pans *including where they meet at hips or ridges*.    The Revere C&CS industry standards are the same for securing copper seams anywhere on the roof, including the roof's flat surfaces and its hips and ridges.    Revere C&CS states under the heading Hips and Ridges: "Ridges and hips shall be provided with standing seams constructed as specified for standing seams of main roof."    This includes the same requirement that cleats must be "*worked into the seams*" at specified intervals to secure the copper roof panels/pans to the substrate

8

on both the main roof and the hips and ridges.        *See,* Sanders Decl., ¶ 18; Revere C&CS at p.

3.A.9 and 3.A.2, attached to Sanders Decl. as Exhibit C.

**Defendant's Response:**

18.        Revere C&CS "Specifications for roofs with standing seams" addresses the pan

method of construction *and includes the installation of cleats in the seams of the copper roof pans*:

> Pan Method – General
> Roofing pans shall be formed of Revere (12-ounce)(16-ounce)(20-ounce) copper.
> Pans shall be made from (sheets eight (8') or ten (10') feet long) or (coils), and not
> more than twenty-four inches (24") wide.   (Pans made of Revere 12-ounce copper
> shall be made from sheets or coils not more than eighteen inches (18") wide.) No
> straight run of standing seam copper shall exceed forty-five feet (45').
>
> Alternate pans formed from sheets shall begin at eaves with half (1/2) length sheets,
> thereby staggering the transverse seams.   *Cleats shall be spaced twelve inches
> (12") apart in each standing seam.   Each cleat shall be secured with two (2)
> copper, copper alloy or stainless steel nails or screws*.   Pans shall be formed to
> allow one-sixteenth inch (1/16") minimum space at the base of each standing seam.
>
> *For standing seam roof seams up to thirty feet (30'), one-piece, fixed cleats shall
> be installed twelve inches (12") apart.*

*See*, Sanders Decl., ¶ 19; Revere C&CS, Section 3A at p. 3.A.8, attached to Sanders Decl. as

Exhibit C (emphasis added).

**Defendant's Response:**

19.        The SMACNA Manual also requires that copper panels and pans must be installed

with cleats attaching the copper to the substrate, whether on the main roof surface or at the roof's

hip ridges.   The Manual's section on "Standing Seam Roofs," provides:

> Figure 6-5 shows a typical standing seam roof.   The two methods of installing
> standing seam roofing are the pan and roll method.   In the pan method, the sides
> of the sheets are formed as shown in A of Detail 1.   Top and bottom edges of pans
> are formed as shown in detail 3, Figure 6-6.

Pans are installed with cleats (B of Detail 1) double nailed on 12 in. (305mm) centers.   Each pan is locked to the one below as shown in A, or B of Detail 3, Figure 6-6.   The adjacent row of pans is next installed and the standing seams completed as in C and D of Detail 1.
. . . .
In the roll method, ends of sheets are joined together using a double flat lock seam and sent to the job site in rolls.

The standing seam is field formed as shown in A of Detail 2 (less cleat).   *The roofing is installed in lengths reaching from the eave to the ridge and cleated on 12 in. (305 mm) centers.*   After second length is installed and cleats are in place, the standing seam is formed as shown in Detail 2.

*See*, Sanders Decl., ¶ 20; "Standing Seam Roofs" section of SMACNA Manual and Figures 6-5

and 6-6 at pp. 6.14-6.16, attached to Sanders Decl. as Exhibit D (Emphasis added).

**Defendant's Response:**

20.    The SMACNA Manual includes diagrams depicting the placement of cleats where

the panels or pans form the hip or ridge:




AT  HIP  OR  RIDGE
DETAIL 5

*See*, Sanders Decl., ¶ 21; Revere Copper & Common Sense, Section 3A at p. 3.A.9, C to Sanders Decl.; SMACNA Architectural Sheet Metal Manual at p. 6.16, Figure 6-6 A, Exhibit D to Sanders Decl.

**Defendant's Response:**

21.    When the roof is installed, the cleats attaching each copper panel to the substrate are not visible because the cleats are covered with the next copper panel forming the pan and the edges are then seamed closed.   In the installation by Defendant in this case, the seams at the hip ridges where the copper panels making up the triangular pans met were covered with a copper cap that was riveted at the intersection of the pans.   As with the panel seams within the pans, the pan seams at the roof hip ridges, and the cleats installed in the seams, are not visible when the roof assembly is complete.   As shown in the diagram from the SMACNA Manual above, the cleats securing the copper panels at the hip ridges are covered by the copper panels that are seamed together and cannot be seen.   *See,* Sanders Decl., ¶ 22; SMACNA Manual at p. 6.16, Figure 6-6 A, attached to Sanders Decl. as Exhibit D.

**Defendant's Response:**

22.    The applicable standards provide that cleats securing the copper membrane to the substrate should be spaced at 12 inches on center.   However, Plaintiffs negotiated to increase the number of cleats and reduce the spacing to provide increased wind protection.   Defendant's original proposal dated February 8, 2010 proposed fewer cleats spaced at 12 inches on center per the referenced standards.   Plaintiffs negotiated to increase the number of cleats and have them placed closer together at 9.5 inches on center.   The increase in the number of cleats and the tighter spacing resulted in a price increase to the Contract.   *See,* February 8, 2018 Daybreak Proposal,

attached as Exhibit C to Bunge Decl.; Contract, attached as Exhibit A to Bunge Decl.; 4/28/25 Huber Depo. at 19:2-6; 19:30-20:3, attached as Exhibit A to Friedberg Decl.; Sanders Decl., ¶ 23.

**Defendant's Response:**

23.    Per the terms of the contract, Daybreak was to install cleats to secure the copper membrane to the substrate at an agreed spacing averaging 9.5 inches on center.   The cleats were made of copper and have two holes to secure the cleats with 2" ring shank nails to the wooden battens that were pre-installed.   Daybreak Project manager Micah Cady ("Cady") confirmed in his deposition testimony that the purpose of the cleats is "to hold the panel down to the substrate."   Cady testified that the 2" x 4" wooden battens installed by another contractor were spaced sufficiently to allow the cleats to be secured into the wooden battens at an average of 9.5 inches on center.   Defendant's principal, Barry Huber ("Huber") also confirmed that there is no evidence that the battens were not properly installed.   *See,* Sanders Decl., ¶ 24; 4/28/25 Cady Depo. at 26:16-24; 27:10-23; 33:5-14; 38:8-15; 50:21-51:2, attached as Exhibit C to Friedberg Decl.; 4/28/25 Huber Depo. at 35:22-25, attached as Exhibit B to Friedberg Decl.

**Defendant's Response:**

24.    Defendant's methodology of installation of the roof was done by first using the rolled 18" copper coils and running the rolled copper through a forming machine to form the panels making up the triangular pans for the octagonal roof.   The machine creates a male connection on one side and a female connection on the other side of the copper strip, resulting in a 15" panel.   The copper panels were then cut to a designated length based on the octagonal roof section measurements.   The cut sheets of copper were

taken to the roof where each copper octagonal roof section, or pan, was assembled in place.   The pan construction started with a 15" panel or strip in the center of the octagonal roof section and proceeded counterclockwise towards the next octagon.   Installation proceeded counter-clockwise from the first center panel with cleats placed over the right-hand side of the panel (the 1" male edge) on every wooden batten at an average of 9.5 inches on center from the base of the roof to the peak.   The purpose of the cleats is to secure the copper panels and pans to the substrate.   On this roof the substrate was a series of wooden battens that were secured to multiple layers of plywood on top of the tongue and groove decking that forms the inside ceiling. The next panel was installed by locking its female edge onto the male edge of the cleated panel. The interlocked edges of the panels were then seamed closed with hand seamers.   The process was repeated with enough copper panels to form the pans that covered each octagonal section of the roof. *See*, Sanders Decl., ¶ 25; 4/28/25 Cady Depo. at 24:20-24; 25:12-26:24; 33:5-34:22, attached as Exhibit C to Friedberg Decl.

**Defendant's Response:**

25.    The pan installation process continued until the pan length overlapped the ridge line and the pan was marked, trimmed and turned up to form the hip ridge seam.   It is very important for this type of installation that there must be a taller side of the hand-cut panel edges to create a proper seam at the hip ridges.   This seam is 1" high and runs along the angled ridge. Because Defendant made the diagonal cuts to the ends by hand after the panels were attached to the roof, the edges of the pans did not have the same male/female connectors that would have been formed by the rolling machine.   To create the seams joining the triangular pans at the hip ridges

where there were no male/female connectors, Defendant just folded the trimmed ends of the panels together to form the pan seams and crimped the seams by hand.   *See*, Sanders Decl., ¶ 26.

**Defendant's Response:**


26.   The standards in Revere C&CS and the SMACNA Manual that are incorporated into the Contract require the installation of cleats to secure the seams created from the edges of the copper panels that form the pans where they meet at the hip ridge line.   Neither of the standards exempt hip or ridge line seams from the requirement that cleats be used to secure all copper seams to the substrate.   On the contrary, *both standards* require that cleats be worked into every copper seam to secure the copper panels and pans to the roof's substrate.   Properly spaced and secured cleats attaching the pans at the hip ridge lines are a key component of the concealed fastening system to ensure straight lines for aesthetics and securement for weathertightness.   Conversely, if the cleats are missing or not properly spaced at the hip ridge lines, then the triangular copper pans making up the copper membrane are not secured at the roof's hip ridges and can fail in high wind events.   The pan seams at the hip ridge lines are located at the highest elevations of the roof which increases the likelihood of failure during wind events and makes the use of cleats to secure the copper pans at the elevated hip ridge lines even more critical.   *See*, Sanders Decl., ¶ 27.

**Defendant's Response:**


27.   The following photographs show Defendants construction of the roof on the Main House in 2010:

14







*See*, Sanders Decl., ¶ 28; Exhibit D to Bunge Decl.

**Defendant's Response:**

28.     As shown in the photographs, Defendant elected to cut the copper panels to lengths that extended beyond the hip ridge line leaving sufficient excess copper to trim and form the hip ridge seams after the panels were installed on the roof.   Defendant then transported the panels to the roof, secured the 15" panels to the substrate, and then trimmed the edges that extended past the ridge line.   Defendant was required to leave sufficient copper at the ends of the panels to form a seam with the panels making up the copper pan on the other side of the hip ridge line.   After the adjacent triangular copper pans were installed, Defendant formed the 1" high standing seam connecting the edges of the adjacent copper pans at the hip ridge line.   The Contract and the Revere C&CS and SMACNA standards incorporated into it required the installation of cleats to secure the

16

pan seams to the substrate at the hip ridge line.  *See*, Sanders Decl., ¶ 29; Exhibit D to Bunge Decl.

**Defendant's Response:**


29.    Defendant admits that it did not secure the seams of the copper pans to the substrate with cleats where the pans met at *any of the hip ridge lines* on the Main House roof.  Defendant acknowledges that it formed the hip ridge line seams *without installing cleats inside the seams* and then covered the hip/ridge seams by riveting copper hip ridge caps to the seams.   *See*, Sanders Decl., ¶ 30; 4/28/25 Cady Depo. at 36:10-37:4; 39:24-40:3; 44:6-8, Exhibit C to Friedberg Depo.; 10/7/25 Huber Depo. at 38:22-40:9; 51:7-52:2, attached as Exhibit B to Friedberg Decl.

**Defendant's Response:**


30.    Defendant's Project Manager Cady testified about how Defendant connected the triangular, pie-shaped pans where they met at the roof hip ridges:

> Q.    How do the two triangles - - how are they attached?
> A.    I believe you're describing the hips, like, the hip corners where the hips - - when it comes to the hips.   So each panel is cleated to the roof on the sides, and then when it gets to the hip, one side is turned up 1 inch, and then when the other side comes into it, that side is folded up 2 inches, and then they fold over the top of each other and lock. And then - -
> Q.    And they are put on top of the hips?
> A.    The hips, yes.   Then there's a batten cap on top of the hips.
> Q.    And what's the purpose of the batten cap?
> A.    The batten cap is to cover the seam.

*See*, Sanders Decl., ¶ 31; 4/28/25 Cady Depo. at 36:10-37:4, attached as Exhibit C to Friedberg Depo.

**Defendant's Response:**

31.    Cady testified that Defendant did not install any cleats to secure the copper panels/pans where they met at the hip ridges of the roof:

> THE WITNESS:      No, because there are no cleats on the – the hip and ridge don't have any cleats.   You have cleats in the body of the panel that are averaged 9 ½.   There are no cleats and not needed on actual hip junctures.

*See*, Sanders Decl., ¶ 32; 4/28/25 Cady Depo. at 39:24-40:3; 44:6-8, attached as Exhibit C to Friedberg Depo.

**Defendant's Response:**


32.    Defendant designated Cady as a non-retained expert and he was deposed again on October 7, 2025.   He testified that he was asked to evaluate Defendant's failure to install cleats where the copper panels met at the roof hip ridges.   When asked what the SMACNA and Revere C&CS standards provide regarding installing cleats at hip joints Cady testified: "I believe SMACNA is an option, and it is not mentioned in Copper & Common Sense.   It's not in there." Cady testified that the "optional" installation of cleats at a hip ridge intersection might apply if "the panels are extra wide, you may need more cleating.   But on common practice, they're installed on the edges of the panels only."   *See*, Sanders Decl., ¶ 33; 10/7/25 Cady Depo. at 25:20-26:12; 26:22-27:1, attached as Exhibit D to Friedberg Decl.

**Defendant's Response:**


33.    Cady conceded that there is nothing in the Contract indicating that cleats are not to be installed inside the seams at the hip ridge intersections.   He testified he has never installed cleats at a hip ridge intersection:

> Q.    Within the four corners of the contract is there any statement or language indicating cleats are not to be installed at the hip/ridge intersections?
> ATTORNEY COSBY: Form.

18

> You can answer.
> THE WITNESS.        No.
> BY ATTORNEY FRIEDBERG.        Is it your testimony that you've never
> installed clips or cleats at hip/ridge intersections?
> A.        That is correct.

In his second deposition Cady again confirmed that in this roof installation Defendant did not

install cleats at any of the hip ridge intersections.    *See*, Sanders Decl., ¶ 34; 10/7/25 Cady Depo.

at 31:4-13; 39:1-10; 39:18-21, attached as Exhibit D to Friedberg Decl.

    **Defendant's Response:**


34.    Daybreak's principal, Barry Huber ("Huber"), acknowledged in his deposition

testimony that the purpose for installing cleats within the copper seams is to provide wind

resistance and protect from wind failure.    Huber testified:

> THE WITNESS:        The wind resistance is your panel fastening.
> BY MR. FRIEDBERG:
> Q.        And panel fastening is what?
> A.        Is the cleats – in your case of your roof, Tom, is 9 ½ inches on center with
> 15-inch-wide panels.
> Q.        All right.    So is it your testimony that it's the cleats solely that's providing
> the wind resistance?
> MR. COSBY:    Form.
> You can answer.
> THE WITNESS:        The cleats and the panels, yes.
> BY MR. FRIEDBERG:
> Q.        Okay.    And how are the panels providing wind resistance?
> A.        With the attachment of the cleats which are folded into the seam.

*See*, Sanders Decl., ¶ 35; 4/28/25 Huber Depo. at 34:6-22, attached as Exhibit A to Friedberg Decl.

    **Defendant's Response:**


35.    Huber testified at his deposition that Defendant did not install cleats at the

intersection of the hip ridge seams "[b]ecause there is no specification for it."    He testified: "If

19

you refer to SMACNA and Revere, you would know it is not a requirement."   *See*, 10/7/25 Huber

Depo. at 51:7-52:2, attached as Exhibit B to Friedberg Decl.; Sanders Decl., ¶ 36.

**Defendant's Response:**


36.      As Plaintiffs' architectural expert, Sanders, testifies in his declaration, Huber is

wrong about the applicable standards.   Both Revere C&CS and SMACNA require that cleats be

worked into *all* seams to secure the copper membrane to the substrate.   Both standards

incorporated into the Contract required the installation of cleats inside the seams Defendant formed

at the hip ridges to secure the copper roof membrane at those critical, elevated locations.   There

is nothing "optional" about the important *mandatory* requirement that hip ridge seams must be

secure with cleats in the same manner as every other copper seam on the roof.   *See*, Sanders Decl.,

¶ 36.

**Defendant's Response:**


37.      Huber testified that Defendant only used cleats to secure the edges of the

individual panels making up the triangular pans and did not install cleats to secure the pan seams

where they were joined at the hip ridge intersections.   Huber claimed that Defendant's use of

cleats at the edges of the panels within the pans was sufficient to prevent the elevated seams at the

hip ridge lines, which did not have cleats, from separating during a wind event.   The hip ridge

seams failed in Hurricane Irma.   Had the hip ridge seams been secured with cleats as required by

the contract terms, SMACNA and Revere C&CS, the hip ridge seams would not have been

damaged and opened.   The lack of cleats and the failure of the hip ridge seams proves Huber

wrong.  *See*, Sanders Decl., ¶ 36; 10/7/25 Huber Depo. at 38:22-40:9; 51:7-52:2, attached as

Exhibit B to Friedberg Decl.

**Defendant's Response:**


38.    In his deposition testimony Huber conceded that the Contract required Defendant

to secure the copper roof membrane with cleats installed on average of 9.5 inches and failure to do

so would be in contravention of the Contract.    Huber testified:

> Q.   So under the terms of the agreement of May 2010, would you agree that the
> cleats were to be spaced approximately 9 1/2 inches on center?
> MR. COSBY:  Object to the form.
> You can answer.
> THE WITNESS:  I believe the page with the scope referred to 9 1/2 inches on
> average.
> BY MR. FRIEDBERG:
> Q.   All right.  Okay.  Would you agree that the agreement of May 2010 required
> cleats to be installed an average of 9 1/2 inches on center with 2 ring shank nails
> per cleat?
> A.   Yes.
> Q.   And if, hypothetically, cleats were not installed an average of 9 1/2 inches
> on center and in fact there were areas where there was several feet of cleats not
> installed, would you agree that would be in contravention of the May 2010
> agreement?
> A.   Yes.

See, 4/28/25 Huber Depo. at 20:8- 21:1; 23:19-23, attached as Exhibit A to Friedberg Decl.

**Defendant's Response:**


39.    Huber further testified that if the cleats were not installed at the specified intervals,

it would be a violation of the contract:

> Q.   Okay.  The cleats -- the purpose of the cleat is to secure the copper to the
> roof.  Agreed?
> A.   Correct.

Q.   Would you agree that if in fact that there was -- cleats were not installed at every batten and in excess of even 12 inches, that would be in violation of the contract?

MR. COSBY:  Object to the form.

THE WITNESS:  As long as we had the batten to fasten to.

BY MR. FRIEDBERG:

Q.   All right.  So if there's a batten, it's supposed to have a cleat.  Is that your testimony?

A.     The battens were to be spaced so that our cleats could be spaced at average of 9 1/2 inches.

Q.   So if there's a batten, there's supposed to be a cleat attached to it, correct?

MR. COSBY: Form.

You can answer.

THE WITNESS:        That statement goes too far.

MR. FRIEDBERG:    Okay.   Correct it for me.

A.     Because if battens were at 4 1/2 inches on center, we would not be installing a cleat at every batten.

Q.     Do you have any reason to believe the cleats were anything other than spaced so they could accept a cleat at 9 1/2 inches on center?

A.     No.

MR. COSBY: Object to the form.

THE WITNESS:       No.

BY MR. FRIEDBERG:

Q.     So if in fact the battens were placed at 9 1/2 inches so they could accept a cleat -- let me withdraw and reask.

If in fact the battens were placed so they could accept a cleat at approximately an average of 9 1/2 inches on center, if in fact cleats were not placed to -- secured to a batten, would that be in violation of the contract?

MR. COSBY: Form objection.

You can answer.

THE WITNESS:       It would be a violation to the specification we wrote and the proposal, yes, and not aligned with what was proposed.

BY MR. FRIEDBERG:

Q.     And the proposal in fact was a contract. Agreed?

A.     We could agree on that, I believe.

*See*, 4/28/25 Huber Depo. at 46:14-48:13, attached as Exhibit A to Friedberg Decl.

**Defendant's Response:**


40.     Huber testified that the Contract Defendant drafted was to provide information to

the owner and define the work to be performed by Defendant.   Huber testified:

Q.     Well, you were the one that drafted the proposal, correct?

22

A.      Either drafted or reviewed.

Q.      And I think you testified the purpose was to provide information to the owner?

A.      Correct.

Q.      And also define the work to be performed by Huber & Associates.

A.      Correct.   However you've asked the question about details.   This is very limited in details, this particular proposal.

Q.      Right.   But what is specified, you would agree, which is listed as a line item is that the installation be in accordance with both Revere Copper & Common Sense and SMACNA.   Agreed?

A.      Agreed.   The –

*See*, 10/7/25 Huber Depo. at 25:10-25, attached as Exhibit B to Friedberg Decl.

**Defendant's Response:**

41.      Huber claimed that "in the real world, you could not mathematically conform to 9 ½ inches in center for hip cleat spacing.   It's mathematically impossible."   Huber testified:

Q.      So it's your testimony it's impossible to put cleats or clips at 9 ½ inches on the hip/ridge configuration for this roof?

A.      The way it was constructed, yes.

Q.      Could not be done.

A.      Could not be done because of simple geometry.

*See*, 10/7/25 Huber Depo. at 30:3-8, attached as Exhibit B to Friedberg Decl.

**Defendant's Response:**

42.      Huber testified that Defendant had the "discretion and ability to insert or delete terms as desired" and "use the terminology" it desired.   He agreed that in the May 7, 2010 Proposal that became the Contract, "there was no indication that certain standards would not be followed even though they were mentioned in the contract."

*See*, 10/7/25 Huber Depo. at 31:2-22, attached as Exhibit B to Friedberg Decl.

**Defendant's Response:**

43.    Plaintiffs' architectural expert, Sanders, confirms and documents in diagrams that the 2" x 4" wooden battens to which the copper was to be attached meet at the hip ridge intersections and were properly spaced to allow the installation of cleats at 9.5 inches on center at the hip ridge seam.    Defendant's Project Manager, Cady, contradicted Huber's testimony that it was "impossible" to secure the hip ridge seams to the battens at an average of 9.5 inches on center. Cady confirmed that the battens were properly installed to allow for the installation of cleats at an average of 9.5 inches on center throughout the Main House roof.    In his first deposition, Huber also testified there is no evidence that the battens were not placed so that cleats could be installed as required by the Contract anywhere on the roof.  *See,* Sanders Decl., ¶ 38, Exhibit E-1-5; 4/28/25 Cady Depo. at 26:16-24; 27:10-23; 33:5-14; 38:8-15; 50:21-51:2, attached as Exhibit C to Friedberg Decl.; 4/28/25 Huber Depo. at 35:22-25, attached as Exhibit B to Friedberg Decl.

**Defendant's Response:**

44.    Sanders shows in his diagrams Defendant's non-compliant installation of the copper where the pan edges intersect at the hip ridges.     The diagrams show the location of the wooden battens where Defendant created the pan seams at the hip ridge intersections.    Sanders' diagram depicts Defendant's failure to secure the triangular pans with cleats embedded in the seams as required by the Contract, Revere C&CS and SMACNA.    Without cleats at the hip ridge seams, the only things holding the pans together are the seams Defendant hand-formed without male/female connectors, and the copper hip caps Defendant installed on top of the hip ridges. Without cleats worked into the hip ridge seams Defendant formed by hand on the roof, there is nothing securing the copper pans to the substrate at the hip ridge lines.    That is contrary to the Contract provision requiring cleats securing the copper at 9.5 inches on center, and both industry

standards incorporated into the Contract requiring cleats to be worked into all seams to secure the copper to the substrate.  *See,* Sanders Decl., ¶¶ 39, 40, Exhibit E-2.

**Defendant's Response:**


45.    Sanders shows the proper installation of cleats to secure the copper at the hip ridge intersections which would have conformed with Contract requirements.   Sanders shows how Defendant could have installed cleats to secure the copper membrane at the hip ridge seam to each of the battens that meet at the intersection of the triangular pans.    Sanders provides two alternative means by which Defendant could have complied with the Contract requirement to secure the hip ridge seams to the substrate with cleats.   *See,* Sanders Decl., ¶ 41, Exhibit E-3, Exhibit E-4 and Exhibit E-5.

**Defendant's Response:**


46.    In February 2019 Plaintiffs hired Dahill Co. ("Dahill") a Structural Restoration Contractor, to make temporary repairs to the roof to stabilize it and prevent further damage. Dahill prepared a Project Review Report dated March 8, 2019 ("Dahill Report").   As stated in the Dahill Report and the deposition testimony of its Project Manager, Richard Barabas ("Barabas"), the purpose of Dahill's visit was to make temporary repairs to the damaged panels where airborne debris punctured the roofing system, investigate the source of an ongoing leak in the gatehouse, make repairs to an open hip seam and confirm the attachment method used at the open hip seam, and acquire field measurements of damaged seams for future repair.  *See*, Sanders Decl., ¶ 42; Dahill Report at P000333, Exhibit E to Bunge Decl.; Deposition of Richard Barabas ("Barabas Depo.") at 10:24-11:5, attached as Exhibit E to Friedberg Decl.

**Defendant's Response:**

47.     As documented in the Dahill Report and described in the Barabas deposition, an approximately 30-foot section of a hip ridge cap on the northeast side of the Main House roof had been deformed and displaced during the hurricane and the seam had opened.   Dahill removed the hip cap to expose the approximately 30-foot open hip ridge seam to inspect it.   Barabas testified: "There was one seam we found that was a hip seam that we opened up and took the hip cap off to expose what was underneath.   There was about thirty – a thirty foot of seam was open, and documented it and closed it back up."   Dahill documented the open hip seam in photographs taken by Barabas.   Dahill closed the seam by putting a new cap on and riveting it closed while making sure they riveted through all the layers of copper.   *See,* Sanders Decl., ¶ 43; Barabas Depo. at 12:25-13:12; 33:21-25, attached as Exhibit E to Friedberg Decl.; Dahill/Barabas photographs P000355-P000362 attached as Exhibit F to Friedberg Decl.

**Defendant's Response:**

48.     Barabas testified that his inspection of the open hip ridge seam confirmed that Defendant did not install cleats to secure the seam to the substrate.   That finding is consistent with Defendant's testimony that it did not install any cleats to secure the copper seams it formed at the hip ridges of the Main House.   Barabas testified that he typically sees cleats in every copper roof seam, whether it be a hip seam or not.   He testified that typically a cleat is folded between the layers of metal in the hip seams.   He testified that he would expect to see the cleats "between the two seams and rolled between the two sheets of metal."   *See*, Sanders Decl., ¶ 44; Barabas Depo. at 22:17-23:1; 25:17-26:9, attached as Exhibit E to Friedberg Decl.

26

**Defendant's Response:**

49.     Dahill also identified problems with Defendant's riveting of the hip cap that covered the hip seam that opened during the storm.   Dahill documented that rivets Defendant used to secure the copper panels together in the hip ridge seam did not penetrate the lower portion of the hip seam.   Dahill identified multiple examples of rivets in the upper panel, but no rivet holes in the lower panel.   Dahill reported that this condition was typical throughout the entire length of the seam.  *See,* Sanders Decl., ¶ 45; Dahill Report at P000333, P000338, P000339, attached as Exhibit E to Bunge Decl.; Barabas Depo. at 24:11-25:3; 25:20-24, attached as Exhibit E to Friedberg Decl.; Barabas photographs attached as Exhibit F to Friedberg Decl.

**Defendant's Response:**

50.     Defendant's failure to properly secure the hip caps with rivets is significant because Defendant admits it did not secure the copper membrane at the hip ridges with cleats.   As a result, only the hip caps Defendant put on top of the folded seams it created at the hip ridges held the seams together.    The hip ridge seams were not secured to the substrate because Defendant failed to install cleats at the hip ridges; and Defendant improperly riveted the hip caps that provided the only means of holding the hip ridge seams together.   The unsecured condition in which Defendant left all the hip ridge seams explains why Hoffmann Architects observed that all the Main House hip seam caps were loosened and displaced by Hurricane Irma.  *See,* Sanders Decl., ¶ 46.

**Defendant's Response:**

27

51.     The Hoffman Report includes photographs of the storm damage to the hip ridge seams on the Main House observed during Sanders' inspection in February 2018.   Specifically, Photo 26 and Photo 27 show the failed hip ridge seam on the northeast side of the Main House roof:



**Photo 26. Overall view of failed hip ridge cap.**



**Photo 27. Failure along hip ridge line due to wind uplift.**

*See*, Sanders Decl., ¶ 47, Exhibit B.

**Defendant's Response:**

52.     The Hoffmann Report includes photos showing examples of deformation of other areas of the pan caused by wind uplifting.   Defendant's failure to secure the hip ridge seam with cleats as required by the Contract allowed wind underneath the pan that resulted in uplift and deformation of the panels making up the pan.



**Photo 28. Pans have lifted at other ridges.**



**Photo 29. Pans have lifted at other ridges**.

*See*, Sanders Decl., ¶ 48, Exhibit B.

**Defendant's Response:**

53.     Defendant acknowledges that it did not install cleats to secure any of the seams connecting the triangular pans to the roof's substrate at the hip ridges.  Defendant's failure to secure the copper pans at the hip ridges allowed Irma's storm winds to penetrate the hip ridge seams, causing a hip seam on the northeast side to open, and causing additional wind uplift damage to the panels making up that pan.   As documented in the Hoffman Report, Irma's winds damaged and loosened every copper cap Defendant installed over all the hip ridge seams on the Main House. Defendant acknowledges that cleats provide the only source of wind protection for the copper roof. Defendant's failure to install cleats as required to secure the hip ridge seams eliminated that wind damage protection, which caused one of the Main House hip ridge seams to open during Hurricane Irma and all the other hip ridge caps to become loose and disturbed.  Defendant's failure to properly secure the hip ridge seams puts the entire Main House roof at risk of future wind damage. The only way to repair the damage caused by Defendant's failure to install cleats to secure the copper membrane at the hip ridges is to replace the entire Main House roof.  *See*, Sanders Decl., ¶ 49.

**Defendant's Response:**

54.     In 2014 Hoffman and Dahill inspected the roofs of the entire property as part of an unrelated action pending between Plaintiffs and Defendant at that time.   The inspection included two areas on the Main House roof: (1)   A small area of copper panel seam in the middle of a pan on the west side of the Main House roof was opened and cleats were observed securing the panel

seam to the substrate, which is consistent with Defendant's testimony that it only installed cleats to secure the panels that make up each pan; and (2) a short section of a hip ridge cap on the east side of the Main House that was loose and was removed, the seam was recrimped, and the cap was replaced and riveted securely in place.   The hip seam itself was not opened so the absence of cleats inside the hip seam was not observed.   *See*, Sanders Decl., ¶ 50.

**Defendant's Response:**

55.    Defendant has made the claim that the hip ridge seam on the Main House that opened up during Hurricane Irma is the same hip ridge where Plaintiff's contractor repaired the hip ridge cap in 2014.   That claim is false.   The following photograph shows the seam and cap on the north and west sides involved in the 2014 Dahill and Hoffman inspection, and the 30-foot section of hip seam on the northeast side that opened during Irma in 2017:



The shorter lines depict the areas inspected in 2014.   The long line is the hip ridge seam that opened in Irma in 2017.   The hip ridge seam that opened during the storm revealing the absence

of cleats securing it to the substrate is *not* the same hip ridge on which Dahill repaired the cap in 2014. *See*, Sanders Decl., ¶ 51.

**Defendant's Response:**


56.    The following is a photograph of the 2014 hip cap and seam repair which did not involve opening the hip seam:



*See*, Sanders Decl., ¶ 52.

**Defendant's Response:**


57.    Defendant acknowledges it did not install cleats as required by the Contract to secure the hip ridge seams to the substrate anywhere on the Main House roof.   Defendant's failure to secure the hip ridge seams with cleats resulted in the damage observed when one of the seams opened during Hurricane Irma, and the other hip ridge seam caps were loosened and disturbed. Defendant's acknowledgment that it omitted cleats at *every hip ridge seam* on the Main House means that none of the triangular pans are properly secured to the substrate.   The only way to

secure the hip ridge seams connecting the triangular panels that make up the hexagonal roof on the Main House is to remove all the pans to allow one side to be accessible for cleating.   The repair process would likely damage the copper pans and the panels that make up each pan.   Replacement of all the copper pans that make up the Main House roof is the only viable option.   *See*, Sanders Decl., ¶ 53.

**Defendant's Response:**


58.    The Hoffman Report recommends replacing the entire Main House roof and includes a comprehensive estimate of the replacement work and its estimated cost.   The following is the proposal for replacement of the Main House roof:

Main Pavilion

- The drawings indicate damage to more than 80 panels. Hoffmann Architects recommends that the entire Main Pavilion roof be replaced; a total of 160 panels totaling 3,520 S.F. The substrate membrane should be recovered with a new membrane. New blocking is needed at the intersecting ridges to cleat the pans at their intermediate points. Provide 2 new vent stack flashings.

- The existing installed pans are over 33 feet in length. To reinstall in kind there are two options.

    1. Prefabricate and ship in a 40-foot container. This is not an option because the container could not be transported to the site.

    2. Roll the pieces on site. There is no rolling machine on the island. For the original construction a machine was shipped to the site and returned after the work was complete. This option was considered but was found to be quite costly because of the transportation cost and the higher cost of onsite fabrication.

    3. If the roof is reinstalled with pan lengths of less than 20 feet the copper can be fabricated off-site and shipped in a 20-foot container. This solution is the least expensive.

*See*, Sanders Decl., ¶ 54, Exhibit B.

**Defendant's Response:**

59.    The Hoffman and Dahill construction cost estimate in the Hoffman Report included the cost of repair and replacement of the other roofs that are not involved in this lawsuit.   Sanders estimates that 95% of the cost of copper and labor in the 2018 cost estimate is for the Main House roof.  *See*, Sanders Decl., ¶ 55, Exhibit B.

**Defendant's Response:**

60.    Plaintiff's economic expert Laura Dolan has calculated the current cost of the copper roof replacement on the Main House, including increases due to tariffs imposed in 2025, at $666,964 in 2025 and $719,792 at the time of trial in 2026.  *See*, Declaration of Laura Fuchs Dolan, M.B.A., in support of Plaintiffs' Motion for Summary Judgment, ¶¶ 5-7, Exhibits B and C; Sanders Decl., ¶ 56.

**Defendant's Response:**

61.    Defendant's roofing expert, Joseph Bragg, testified that he was not asked to prepare an estimate of the cost to replace or repair the Main House roof and he does not have one.   *See*, Deposition of Joseph Bragg ("Bragg Depo.") at 86:4-7, attached as Exhibit H to Friedberg Decl.

Dated :   December 13, 2025           **LAW OFFICES OF FRIEDBERG & BUNGE**

By: */s/ THOMAS F. FRIEDBERG, ESQ.*
      THOMAS F. FRIEDBERG, ESQ.(VI#1006)
      Attorneys for Plaintiffs THOMAS F.
      FRIEDBERG & SARAH L. BUNGE
      **THE LAW OFFICES OF FRIEDBERG &**
      **BUNGE**

1005 ROSECRANS STREET, SUITE 202
PO BOX 6814
SAN DIEGO, CALIFORNIA 92166
TEL : (619)557-0101
FAX : (619)557-0560
E-mail : "tom@lawofficefb.com"

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December 2025, a true and correct copy of

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR**

**SUMMARY JUDGMENT** as filed with the CM/ECF system which will provide notice to the

following:

Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994
Telephone: 772-463-8402
Facsimile: 772-463-4820


Andrew C. Simpson
**ANDREW C. SIMPSON, PC**
2191 Church St., Ste. 5
Christiansted, VI 00820
TEL : 340.719.3900
E-MAIL :asimpson@coralbrief.com


                        /s/ THOMAS F. FRIEDBERG
                        **THOMAS F. FRIEDBERG**

36