# EXHIBIT "A"

```
              IN THE UNITED STATES DISTRICT COURT

                    OF THE VIRGIN ISLANDS

              DIVISION OF ST. THOMAS AND ST. JOHN


THOMAS F. FRIEDBERG & SARAH L.   ) ACTION NO.
BUNGE,                           ) 3:19-cv-0053-RAM-EAH
                                 )
           Plaintiffs,           )
                                 )
     vs.                         )
                                 )
DAYBREAK, INC., dba HUBER &      )
ASSOCIATES,                      )
                                 )
           Defendant.            )
_____)




                       VIDEO-RECORDED

                VIDEOCONFERENCE DEPOSITION OF

                         BARRY HUBER

                       April 28, 2025




              Reported by Beth A. Ballerini, CSR

                    Certificate No. 7358



Job No. 124759
```

```
 1    Q.   And so down in Section II it talks about
 2  17 on-center panel widths and cleats installed 12 inches
 3  on center.
 4         Do you see that?
 5    A.   Yes.
 6    Q.   Let's go to P11, if we can.
 7         And do you see this document?
 8    A.   Yes.
 9    Q.   And this is a May 7, 2010, proposal?
10    A.   Correct.
11    Q.   Do you know if this was the final agreement
12  that was reached between -- for this particular project?
13    A.   I believe it was.
14    Q.   Do you have a signed version?
15    A.   I do not know.
16    Q.   Do you know whether you signed this contract?
17    A.   I do not recall.
18    Q.   Whether you signed it or didn't sign it, would
19  you agree that the May 7 proposal is in fact the
20  contract?
21    A.   It appears to be.
22    Q.   So Section II, I want to talk to you about
23  some differences.  It says panels 15 inches on center
24  and cleats 9 1/2 inches on center.
25         Do you see that?
                                                     Page 18
```

```
 1    A.   Yes.
 2    Q.   Can you explain to me why there's a difference
 3  between the February and May proposals?
 4    A.   It would be apparent that the information was
 5  given to us that the panels were wished to be smaller
 6  and the cleat spacing tighter.
 7    Q.   And are you aware of the reason for this?
 8    A.   Pardon?
 9    Q.   Are you aware of the reason for this, the
10  cleat spacing being tighter?
11    A.   I guess the question is confusing.
12    Q.   All right.  Let me withdraw and reask.
13         Why is there a difference between 12 inches on
14  center and 9 1/2 inches on center for the cleat spacing?
15    A.   So I -- if I may clarify.
16    Q.   Sure.
17    A.   So you're wondering what the foundation of the
18  change is, why -- what -- what precipitated the change?
19    Q.   Let's start with that.
20    A.   Okay.  I imagine somebody gave us some
21  information that the deck -- or roof deck or battens --
22  were going to be spaced differently than what we had
23  proposed.
24    Q.   And did that result in a change order or
25  increase in changes?
                                                     Page 19
```

```
 1    A.   It would have caused an increase because of
 2  the amount of additional fasteners and additional panels
 3  to install on the roof.
 4    Q.   Let's go to page 12.
 5         That 10,735, is that the additional charge for
 6  the smaller panels and cleat spacing?
 7    A.   Correct.
 8    Q.   So under the terms of the agreement of May
 9  2010, would you agree that the cleats were to be spaced
10  approximately 9 1/2 inches on center?
11         MR. COSBY:  Object to the form.
12         You can answer.
13         THE WITNESS:  I believe the page with the
14  scope referred to 9 1/2 inches on average.
15  BY MR. FRIEDBERG:
16    Q.   All right.  Okay.  Would you agree that the
17  agreement of May 2010 required cleats to be installed an
18  average of 9 1/2 inches on center with 2 ring shank
19  nails per cleat?
20    A.   Yes.
21    Q.   And if, hypothetically, cleats were not
22  installed an average of 9 1/2 inches on center and in
23  fact there were areas where there was several feet of
24  cleats not installed, would you agree that would be in
25  contravention of the May 2010 agreement?
                                                     Page 20
```

```
 1         MR. COSBY:  Object to the form.
 2         You can answer.
 3         THE WITNESS:  Hypothetically, well, yes.
 4  BY MR. FRIEDBERG:
 5    Q.   If in fact cleats were not installed on an
 6  average of 9 1/2 inches on center, what is the effect of
 7  that?
 8         MR. COSBY:  Form.
 9         You can answer.
10         THE WITNESS:  That is -- it's -- the question
11  is not a simple answer.
12  BY MR. FRIEDBERG:
13    Q.   Okay.  I'm listening.
14    A.   Okay.  So if it was in some part of the roof
15  to, say, 10 inches, or another part of the roof
16  12 inches, and it is localized, little to no effect.
17  But the only way to really determine, someone would have
18  to actually do an uplift test to a panel to see what
19  effect if any failure would come with uplift pressures.
20    Q.   And what is an uplift test?
21    A.   If you were able to construct a pull test --
22  if I could explain a pull test maybe with tile, clay
23  tile, because maybe it's easier.
24         You could put a device above the tile, hook
25  the edge of the tile and pull upwards and see how much
                                                     Page 21
```

**Page 22**

1  resistance it has to try to replicate what wind pressure
2  would do to a tile.
3  　　　　It's more difficult with a copper standing
4  seam because you have to have your apparatus out a good
5  ways from the standing seams to do the pull test.
6  　　　　So engineering would tell you that
7  12 inches on center -- or at least engineering that I
8  have seen before -- 12 inches on center would meet the
9  Dade County wind codes.
10 　　　　So when you ask the question, Tom, to be a
11 little more clearer, it's kind of a broad thing just to
12 say well, if it wasn't at 9 1/2 inches on average, what
13 is the effect.  It's -- it's not just, like, a clear-cut
14 answer there.
15 　　Q.　This pull test you're referring to, what's the
16 ASTM standard for that?
17 　　A.　I do not know.
18 　　Q.　And in fact it's essentially by pulling up
19 you're exerting pounds, or equivalent to pounds, I take
20 it?
21 　　　　Well, first of all, are you familiar with how
22 to perform this test?
23 　　A.　Not on copper standing seam, no.
24 　　Q.　If, hypothetically -- well, strike that.
25 　　　　The actual cleats themselves are to be secured

**Page 23**

1  to the battens with 2-inch ring shank nails, correct?
2  　　A.　I don't know.
3  　　Q.　Well, I'm reading the contract.  It says an
4  average --
5  　　　　Well, what are the cleats attached to; do you
6  know?
7  　　A.　The cleats should have been attached to the
8  battens.
9  　　Q.　With 2 ring shank nails per cleat.
10 　　A.　Correct.
11 　　Q.　And were you present when Mike had testified
12 that he would know that in fact the ring shank nails
13 were in fact nailed into a wooden batten?
14 　　A.　I heard something in the previous deposition
15 about would you know whether you hit insulation or not,
16 or somebody said something about insulation.
17 　　Q.　And do you recall what Mike had testified to?
18 　　A.　That he would be aware.
19 　　Q.　==If, hypothetically, there were several feet in==
20 ==which there was no cleats -- in other words, there were==
21 ==battens skipped -- do you know whether or not that would==
22 ==be in contravention to the May 2010 agreement?==
23 　　A.　==Yes, it would be.==
24 　　Q.　So you heard testimony -- or, strike that.
25 Let me ask you this.  Strike what I just said

**Page 24**

1  previously.
2  　　　　As I understand, each panel where it meets the
3  hip, it's supposed to be folded over?
4  　　A.　Correct, a single lock.
5  　　Q.　And where the two panels meet, how much copper
6  is available to make that lock?
7  　　A.　One panel is bent up shorter than the other
8  panel, and then the longer panel is folded over the
9  shorter.
10 　　Q.　Sure.  What are the dimensions?
11 　　A.　Approximately anywhere from 1 inch on one side
12 to 1 1/2 and maybe greater on the other.
13 　　Q.　Are there --
14 　　A.　Approximately.
15 　　Q.　Sure.
16 　　　　Are there minimum tolerances for the amount of
17 copper to be used in folding over to make the seam?
18 　　A.　On a single lock there could be.
19 　　Q.　What are the ranges of tolerances?
20 　　A.　I'm not sure.
21 　　Q.　Well, if, hypothetically, one of the panels
22 did not have enough material to be folded over to make a
23 single lock, would that affect the integrity of the
24 actual seam itself?
25 　　　　MR. COSBY:  Object to the form.

**Page 25**

1  　　　　You can answer.
2  　　　　THE WITNESS:  If that was the case, it doesn't
3  necessarily -- well, I guess -- I guess let's be clear,
4  if we could.  Do you mean the integrity of the seam as
5  far as waterproofness?
6  BY MR. FRIEDBERG:
7  　　Q.　Wind.
8  　　A.　Wind.  No.
9  　　Q.　All right.  So you're saying that if one panel
10 in fact did not have any excess material and the other
11 panel did have some excess material that was used to
12 form the seam, would that be an appropriate or
13 acceptable seam in accordance with Revere Copper &
14 Common Sense and SMACNA?
15 　　A.　To be clear, you're asking a different
16 question than the previous question.  Is that correct?
17 　　Q.　My question stands.  Do you have an answer for
18 it or do you need it read back?
19 　　　　THE COURT REPORTER:  In accordance with -- we
20 couldn't hear you when you turned your head.
21 　　　　MR. FRIEDBERG:  Sure.  In accordance with
22 Revere Copper & Common Sense and SMACNA.
23 　　　　THE WITNESS:  So could you repeat the
24 question, please?
25 　　　　MR. FRIEDBERG:  Can you read it back, Beth.

Page 34

```
 1    Q.   If in fact the seams don't have sufficient
 2  material to fully bend over, do you know whether or not
 3  those particular panels are susceptible to wind uplift?
 4         MR. COSBY:  Form.
 5         You can answer.
 6         THE WITNESS:  Again, it -- it is -- it is
 7  about waterproofing the roof at the hip.  The wind
 8  resistance is your panel fastening.
 9  BY MR. FRIEDBERG:
10    Q.   And panel fastening is what?
11    A.   Is the cleats -- in your case of your roof,
12  Tom, is 9 1/2 inches on center with 15-inch-wide panels.
13    Q.   All right.  So is it your testimony that it's
14  the cleats solely that's providing the wind resistance?
15         MR. COSBY:  Form.
16         You can answer.
17         THE WITNESS:  The cleats and the panels, yes.
18  BY MR. FRIEDBERG:
19    Q.   Okay.  And how are the panels providing wind
20  resistance?
21    A.   With the attachment of the cleats which are
22  folded into the seam.
23    Q.   Okay.
24    A.   And those cleats nailed to hopefully sound
25  wood deck or batten.
```

Page 35

```
 1    Q.   Is there any evidence that there was anything
 2  unsound about the wood battens that the cleats were
 3  nailed into?
 4    A.   We did no testing of the integrity of the
 5  battens.
 6    Q.   All right.  Well, the battens were -- well,
 7  let me ask you, what is your understanding of what the
 8  battens were?
 9    A.   Our understanding was that the battens were
10  going to be applied in the hurricane zone that you are
11  in.
12    Q.   All right.  That was a poor question.
13         What was the size of the battens?
14    A.   They were I believe -- well, from pictures
15  they appear to be 1-by-4s, which is -- 1-by-4 is not
16  really 1-by-4.  It's 3/4 by 3 1/2.
17    Q.   Is that --
18    A.   I'm sorry, go ahead.
19    Q.   Is that a standard size batten, if you know?
20    A.   I would say it's one of the more commonly used
21  products for battens.
22    Q.   At any point in time did you become aware or
23  is there any evidence that the battens were not properly
24  installed?
25    A.   No.  I mean no recollection of such.
```

Page 36

```
 1    Q.   You mentioned the word alligator.  You were
 2  down a number of months before the actual work began,
 3  correct?
 4    A.   Correct.
 5    Q.   What you saw as alligatoring, was that when
 6  you first -- your first visit to the site?
 7    A.   I believe so, my first look.
 8    Q.   Do you know if that condition was remedied
 9  prior to the copper panels being installed?
10    A.   I would assume so.
11    Q.   All right.  I mean were you aware from
12  anything your crew told you that there was alligatoring
13  existing at the time the copper roof was installed?
14    A.   I don't recall.
15    Q.   And you mentioned about rollers.  What type of
16  rollers were used on this project?
17    A.   If you're referring to the machine seaming of
18  the double-lock --
19    Q.   Yes.
20    A.   I believe it was an ESE machine.  It's called
21  ESE.  It's just a manufacturer of roll-forming and
22  pan-forming equipment.
23    Q.   And that's electrical; in other words, it has
24  to be plugged in?
25    A.   It's electrical.
```

Page 37

```
 1    Q.   Right.  And then basically you run it up the
 2  seams and it crimps them?
 3    A.   Yeah, yes.
 4    Q.   And were hand seamers used as well?
 5    A.   Hand seamers are necessary to start the seam
 6  off correctly sometimes.  You know, these seamers, these
 7  mechanical seamers -- and probably especially at the
 8  time we did your roof -- you usually had to start --
 9  kind of start the machine out with a hand seam to make
10  sure it got off on a good start.
11    Q.   Let me have you go to page 70.
12         And do you see this document?
13    A.   Let me get my reading glasses, if I could.
14         THE COURT REPORTER:  John, can you make it
15  bigger, please.
16         THE WITNESS:  It's legible.
17  BY MR. FRIEDBERG:
18    Q.   What is this document?
19    A.   It appears to be an invoice, but it's not --
20  but yet it says "Job Information," so I'm unclear.
21    Q.   It says "Extra Materials, Work & Expenses" on
22  the top.
23         Do you see that?
24    A.   I do see that.
25    Q.   And then at the bottom there's a total of
```

```
 1        You can answer.
 2        THE WITNESS:  We did that at the direction of
 3   the owner.  The reason -- it wasn't necessarily a reason
 4   for doing that.  That's where it's inaccurate.
 5        It would be more accurate to say the spacing
 6   of 9 1/2 inches on center was because it was requested
 7   by the owner to do it that way, but --
 8   BY MR. FRIEDBERG:
 9        Q.  And that -- I interrupted you.  Were you done?
10        A.  No, I wasn't.
11        Q.  Please continue.
12        A.  But the rest of the statements I would agree
13   with.
14        Q.  Okay.  The cleats -- the purpose of the cleat
15   is to secure the copper to the roof.  Agreed?
16        A.  Correct.
17        Q.  Would you agree that if in fact that there
18   was -- cleats were not installed at every batten and in
19   excess of even 12 inches, that would be in violation of
20   the contract?
21        MR. COSBY:  Object to the form.
22        THE WITNESS:  As long as we had the batten to
23   fasten to.
24   BY MR. FRIEDBERG:
25        Q.  All right.  So if there's a batten, it's
                                                      Page 46
```

```
 1   supposed to have a cleat.
 2        Is that your testimony?
 3        A.  The battens were to be spaced so that our
 4   cleats could be spaced at average of 9 1/2 inches.
 5        Q.  So if there's a batten, there's supposed to be
 6   a cleat attached to it, correct?
 7        MR. COSBY:  Form.
 8        You can answer.
 9        THE WITNESS:  That statement goes too far.
10   BY MR. FRIEDBERG:
11        Q.  Okay.  Correct it for me.
12        A.  Because if battens were at 4 1/2 inches on
13   center, we would not be installing a cleat at every
14   batten.
15        Q.  Do you have any reason to believe the cleats
16   were anything other than spaced so they could accept a
17   cleat at 9 1/2 inches on center?
18        A.  No.
19        MR. COSBY:  Object to the form.
20        THE WITNESS:  No.
21   BY MR. FRIEDBERG:
22        Q.  So if in fact the battens were placed at
23   9 1/2 inches so they could accept a cleat -- let me
24   withdraw and reask.
25        If in fact the battens were placed so they
                                                      Page 47
```

```
 1   could accept a cleat at approximately an average of
 2   9 1/2 inches on center, if in fact cleats were not
 3   placed to -- secured to a batten, would that be in
 4   violation of the contract?
 5        MR. COSBY:  Form objection.
 6        You can answer.
 7        THE WITNESS:  It would be a violation to the
 8   specification we wrote and the proposal, yes, and not
 9   aligned with what was proposed.
10   BY MR. FRIEDBERG:
11        Q.  And the proposal in fact was a contract.
12   Agreed?
13        A.  We could agree on that, I believe.
14        Q.  And although there may be a dispute as to the
15   lack of amount of dollars paid, Huber received roughly
16   $230,000 on this contract?
17        A.  I don't recall.
18        Q.  As we sit here today, is there anything else
19   you can recall about the project that we haven't
20   discussed?
21        MR. COSBY:  Form objection.
22        You can answer.
23        THE WITNESS:  Yeah, there is.
24   BY MR. FRIEDBERG:
25        Q.  Okay.  What is it?
                                                      Page 48
```

```
 1        A.  The disappointment that we were never given
 2   opportunity by you to do anything additional to the roof
 3   if you weren't happy with something.
 4        Q.  Okay.  Do you have a recollection of being
 5   asked to send a crew down to complete the roof?
 6        MR. COSBY:  Object to the form.
 7        You can answer.
 8        THE WITNESS:  That question?  No.
 9   BY MR. FRIEDBERG:
10        Q.  Did you ever send a crew down after the last
11   day that the workers were on the island to complete the
12   roof?
13        A.  We sent --
14        MR. COSBY:  Object to the form.  Predicate.
15        THE WITNESS:  I'm sorry.
16        MR. COSBY:  Sorry.  Object to the form.
17   Predicate.
18        THE WITNESS:  I -- to the best of my
19   recollection, we sent two guys down to address some
20   issues that were not suitable.
21   BY MR. FRIEDBERG:
22        Q.  All right.  Did any of that involve the main
23   roof?
24        A.  I don't recall.
25        Q.  Anything else that you can recall about the
                                                      Page 49
```