# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT

OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

THOMAS F. FRIEDBERG & SARAH L. BUNGE, ) ACTION NO.
) 3:19-cv-0053-RAM-EAH
)
Plaintiffs, )
)
vs. )
)
DAYBREAK, INC., dba HUBER & ASSOCIATES, )
)
Defendant. )

VIDEO-RECORDED

VIDEOCONFERENCE DEPOSITION OF

NON-RETAINED EXPERT BARRY HUBER

October 7, 2025

Reported by Beth A. Ballerini, CSR

Certificate No. 7358

Job No. 131974

**Page 6**

 1  Daybreak.
 2        THE COURT REPORTER: Mr. Huber, please raise
 3  your right hand.
 4        Do you solemnly swear the testimony you are
 5  about to give in the matter now pending will be the
 6  truth, the whole truth, and nothing but the truth?
 7        THE WITNESS: I do.
 8        THE COURT REPORTER: Thank you.
 9
10              E X A M I N A T I O N
11  BY ATTORNEY FRIEDBERG:
12    Q.  Hi. Good morning, Barry. I'm here to meet
13  with you again based on the fact that you've been listed
14  as a, quote, non-retained expert, close quote, to ask
15  you about some of your opinions and testimony.
16        Do I need to repeat the general admonitions or
17  instructions for a deposition?
18    A.  I hope not. We should be good.
19    Q.  All right. If for any reason I'm not clear
20  with my question and you'd like me to restate it, just
21  speak up and I'll be more than glad to do so. Okay?
22    A.  Absolutely.
23    Q.  Have you had an opportunity of reviewing your
24  deposition transcript from April 28, 2025?
25    A.  Yeah, briefly. My own briefly, yeah.

**Page 7**

 1    Q.  Did you sign your deposition?
 2    A.  No.
 3    Q.  Were there any errors in your deposition that
 4  you were aware of?
 5    A.  Not that I'm aware of.
 6    Q.  What documents have you reviewed since
 7  April 28, 2025, pertaining to this case?
 8    A.  Well -- let's see. Looking through various
 9  project photos; the contract; SMACNA; Revere. I read
10  through the depositions by Brabas and Sanders, Part I
11  and Part II. I can't say it was exciting reading and I
12  retained it all, but I did read through them. Thinking
13  through just, you know, looking through some of the
14  documents about the case since the previous --
15    Q.  What documents -- I interrupted you.
16    A.  Like I say, you know, SMACNA; the contracts;
17  photographs of the job.
18    Q.  And those photographs, from what source?
19    A.  Our own file.
20    Q.  Those were photographs that were produced
21  previously by your office?
22    A.  Correct.
23    Q.  You've reviewed Mr. Brabas's deposition?
24    A.  I did.
25    Q.  Did you review the photographs Mr. Brabas

**Page 8**

 1  took?
 2    A.  I was not aware of photographs.
 3    Q.  Were you aware of photographs showing where
 4  the hip/ridge intersection of the main roof failed?
 5    A.  As I say, I was not aware of photographs.
 6    Q.  When you reviewed the deposition transcript,
 7  did you see that they referred to photographs?
 8    A.  I honestly don't recall that.
 9    Q.  What about when you reviewed Mr. Sanders'
10  deposition, Volume I and II, were you aware of
11  photographs taken post-Irma?
12    A.  It would only be, not in reference to reading
13  through the deposition, but just knowing the history
14  with Sanders, that there were photographs from an
15  earlier report.
16    Q.  You haven't visited the site since April 2025?
17    A.  No.
18    Q.  In fact, you've never been on the site since
19  the work was completed in July of 2010.
20    A.  I'm trying to remember if I went back after
21  completion. I think I did because you had some concern
22  with -- that you wanted some of those hip seams
23  straightened out, and I took pictures of them. But
24  that's the best of my recollection. Obviously, it's --
25  best of my recollection being so far back.

**Page 9**

 1    Q.  Okay. When you hired -- were you the one that
 2  hired Micah?
 3    A.  Yeah. I'm pretty sure, yeah.
 4    Q.  What was Micah's experience in the roofing
 5  industry at the time you hired him?
 6    A.  It was limited, as far as roofing goes. He
 7  was -- had a construction background because his dad was
 8  a contractor, so --
 9    Q.  The contract that we're referring to in this
10  case --
11        ATTORNEY FRIEDBERG: And, John, if you could
12  bring it up. It's on P8 of Exhibit 1.
13        (Exhibit 1 marked for identification.)
14  BY ATTORNEY FRIEDBERG:
15    Q.  Do you see that, Barry?
16    A.  Yeah. It's a little blurry. It's coming into
17  view here, I think.
18        Yup, there you go.
19    Q.  Did you draft this contract?
20    A.  I mean, if I didn't, Jack Burbach would have.
21  It was probably one of us, I would assume.
22    Q.  You agree, though, that this is a contract
23  from Huber & Associates, or Daybreak, for this
24  particular project.
25    A.  Correct.

```
 1   "or."
 2        Q.   Move to strike as nonresponsive.
 3             The contract that was presented to the
 4   homeowners for approval did not use the word Copper &
 5   Common Sense or SMACNA.  Agreed?
 6        A.   Agreed.
 7        Q.   And the purpose, as you just testified, of
 8   listing the standards is to provide information to the
 9   homeowner as to which standard would be complied with.
10   Agreed?
11        A.   Correct.
12        Q.   And in terms of the actual work to be
13   performed --
14             Well, let's bring up page 8 of Exhibit 1.
15             Okay.  Do you see the Section II, work?
16        A.   Correct.
17        Q.   All right.  And we've talked about installed
18   in accordance with Revere Copper & Common Sense and
19   SMACNA.  Agreed?
20        A.   Agreed.
21        Q.   Anything else?  Any other opinions or
22   testimony regarding this bullet point?
23        A.   The first bullet point?  No.
24        Q.   Yeah, the bullet point that says installed in
25   accordance with Revere Copper & Common Sense and SMACNA.
                                                      Page 22
```

```
 1        A.   No other comments right now.
 2        Q.   All right.  And then the third bullet says:
 3   Cleats installed at an average of 9 1/2 inches O.C. --
 4   which is on center -- with 2 ring shank nails per cleat.
 5             Do you see that?
 6        A.   Correct.
 7        Q.   Was there any language limiting where cleats
 8   were to be installed?
 9        A.   The language is indicative of the cleats in
10   the panels.  It is not indicative of the hip seams.
11        Q.   Is there any mention of the fact that cleats
12   were not to be installed at the hip/ridge seam in the
13   contract?
14        A.   The geometry would prevent an installer from
15   installing cleats at the 9 1/2 inches on center in the
16   hip seams.
17        Q.   Move to strike as nonresponsive.
18             ATTORNEY FRIEDBERG:  Can you please read my
19   question, Beth.
20             (Record read:
21                  Q.  Is there any mention of the fact
22                  that cleats were not to be installed at
23                  the hip/ridge seam in the contract?)
24             THE WITNESS:  No.
25   BY ATTORNEY FRIEDBERG:
                                                      Page 23
```

```
 1        Q.   Does SMACNA address cleats at the hip/ridge
 2   intersections?
 3        A.   They have an image in the book of them.
 4        Q.   And the image depicts that, cleats being used
 5   at the hip/ridge intersection?
 6        A.   Correct.
 7        Q.   Any written documentation indicating that for
 8   the work to be performed cleats were not going to be
 9   installed at the hip/ridge intersections?
10        A.   Any documentation to that effect?
11        Q.   Yeah.
12        A.   No.  The real world would prevent it, but no
13   documentation.
14        Q.   Move to strike as nonresponsive.
15             The contract that you provided, you intended
16   to list the material terms of the contract?
17             ATTORNEY COSBY:  Object to the form.
18             You can answer.
19             THE WITNESS:  I'm sorry, again, not to be
20   difficult, could you repeat that question?
21   BY ATTORNEY FRIEDBERG:
22        Q.   Yeah.  The document you drafted or had drafted
23   and you approved regarding the proposal for the roofing
24   project in St. John intended to contain all material
25   terms for the work, correct?
                                                      Page 24
```

```
 1             ATTORNEY COSBY:  Form.
 2             You can answer.
 3             THE WITNESS:  It should.  I mean it's
 4   obviously a very brief proposal, but it should identify
 5   most things.  But obviously it is -- I mean if you
 6   really wanted to identify every single detail, we
 7   probably could have had a couple more pages of the
 8   details.
 9   BY ATTORNEY FRIEDBERG:
10        Q.   Well, you were the one that drafted the
11   proposal, correct?
12        A.   Either drafted or reviewed.
13        Q.   Okay.  And I think you testified the purpose
14   was to provide information to the owner?
15        A.   Correct.
16        Q.   And also define the work to be performed by
17   Huber & Associates.
18        A.   Correct.  However, you've asked the question
19   about details.  This is very limited in details, this
20   particular proposal.
21        Q.   Right.  But what is specified, you would
22   agree, which is listed as a line item is that the
23   installation is to be in accordance with both Revere
24   Copper & Common Sense and SMACNA.  Agreed?
25        A.   Agreed.  The --
                                                      Page 25
```

| | |
|---|---|
| 1  Q. Are you done? | 1  Do you see that? |
| 2  A. Yes. | 2  A. Yeah, there it is. |
| 3  Q. So it's your testimony it's impossible to put | 3  Q. What's wind uplift? |
| 4  cleats or clips at 9 1/2 inches on the hip/ridge | 4  A. Wind uplift. So it's basically what happens |
| 5  configuration for this roof? | 5  on top of an airplane wing. There's a pressure created |
| 6  A. The way the roof was constructed, yes. | 6  by the wind that pulls on an airplane wing or a roof |
| 7  Q. Could not be done. | 7  system. |
| 8  A. Could not be done because of simple geometry. | 8  Q. Does the wind uplift -- |
| 9  Q. Now, in this proposal that you prepared, you | 9  Well, what did you intend wind uplift to be |
| 10 made sure to include things that would not be included, | 10 used as referred to in this paragraph 2 on page 5? |
| 11 correct? | 11 A. There's been discussion or -- that there's |
| 12     ATTORNEY COSBY: Object to the form. | 12 been some wind uplift damage on the main pavilion, and |
| 13     But you can answer. | 13 it was to address that. |
| 14     THE WITNESS: Yeah, I'm not sure what you're | 14 Q. And what are you referring to? |
| 15 referring to. | 15 A. Only what has been reported to me as a hip |
| 16 BY ATTORNEY FRIEDBERG: | 16 seam coming loose, or the hip cap. I'm not sure exactly |
| 17 Q. Well, in the general conditions you basically | 17 what this damage is to this day. But very minimal |
| 18 said that we're not to include travel, rental cars, | 18 damage, as I understand it. |
| 19 food, lodging, or freight, right? | 19 Q. And who told you it was minimal damage? |
| 20 A. That is correct. And, again, I will add, the | 20 A. I saw some picture or something of -- that |
| 21 proposal is quite brief. I could show you multipage | 21 there was a hip seam just that had come loose, or the |
| 22 proposals. And the proposal is quite brief, so it | 22 cap had come loose. |
| 23 doesn't necessarily address every single addition or | 23 Q. And the cap is secured by rivets? |
| 24 deletion that would be applicable to this project. | 24 A. Yes. |
| 25 Q. The proposal -- are you done? | 25 Q. And what rivets -- what size rivets were used? |
| Page 30 | Page 32 |
| 1  A. Yes, I'm done. | 1  A. I couldn't tell you. |
| 2  Q. The proposal of May 7, 2010, is what you | 2  Q. Are the rivets supposed to go through both |
| 3  deemed to be appropriate for a contract to go forward | 3  sides of the copper panel that form the hip seam? |
| 4  with this particular project. Agreed? | 4  A. That would be the intention. |
| 5  A. Agreed. | 5  Q. All right. And the reason why it would go |
| 6  Q. It was totally within your -- strike that. | 6  through both portions of the copper, why is that? |
| 7  You had the discretion and ability to insert | 7  A. To be more secure. |
| 8  or delete terms as you desired. Agreed? | 8  Q. And if the ridge caps only went through one |
| 9  A. Correct. | 9  side of the copper, would that be deficient? |
| 10 Q. You had the ability to use the terminology | 10     ATTORNEY COSBY: Object to the form. |
| 11 that you so desired. Agreed? | 11     You can answer. |
| 12 A. Correct. | 12     THE WITNESS: I don't -- I don't know if |
| 13 Q. And I think you previously testified that the | 13 that's possible -- what you mean by one side. I mean, |
| 14 purpose of the contract, among other things, was to | 14 if you're drilling through the -- what we call a batten |
| 15 advise the homeowner what the work was to be done and | 15 cap -- if you're drilling through the batten cap, you're |
| 16 what standards would be used. Agreed? | 16 coming out the other side. So you would be going |
| 17 A. Agreed. | 17 through both, like, automatically. |
| 18 Q. And within the proposal, as you prepared it, | 18 BY ATTORNEY FRIEDBERG: |
| 19 there was no indication that certain standards would not | 19 Q. All right. Well, the hole is drilled and the |
| 20 be followed even though they were mentioned in the | 20 rivets are manually installed, right? |
| 21 contract. Agreed? | 21 A. Correct. Again, it's drilled through the |
| 22 A. Agreed. | 22 entire seam from side to side. If the drill bit doesn't |
| 23 Q. Let's go back to page 5. | 23 come out the other side, you can't put the rivet in. |
| 24     Do you have that document -- okay, here it | 24 Q. Understood. So if it's drilled through the |
| 25 goes. | 25 sides -- if it's drilled through on both sides, the |
| Page 31 | Page 33 |

**Page 38**

```
 1   Atlantic storm recorded for that many days and passed
 2   just north of St. John when it was a Cat 5.  So I could
 3   assume that the winds were pretty intense.  But to know
 4   them exactly, of course not.
 5       Q.   I'm going to move to strike everything other
 6   than no, of course not, as nonresponsive.
 7       A.   Oh, my.
 8       Q.   Well, I just want to be clear, because I don't
 9   want this case to go to trial and you come up with a
10   number.
11            You don't know what the wind velocity was at
12   the time the wind struck this roof on St. John, do you?
13            ATTORNEY COSBY:  Object to the form.
14            You can answer.
15            THE WITNESS:  And I'm going to answer with a
16   question:  Does anybody?
17   BY ATTORNEY FRIEDBERG:
18       Q.   I don't care about anybody.  My question is do
19   you know?  Yes or no.
20       A.   No, I don't know.
21       Q.   Thank you.
22            If, hypothetically, that there are no clips at
23   the hip/ridge seam and the batten caps don't have rivets
24   through both sides, or the rivets didn't have purchase
25   on both sides, what is holding the panels together?
```

**Page 39**

```
 1       A.   The cleats that were installed in the panels
 2   themselves.  Like, for example, if you took two pieces
 3   of paper, laid them on your desk, and you hemmed those
 4   two pieces together -- meaning you took one piece of
 5   paper and folded it over the top of the other with a
 6   little simple seam, which is done on the hips -- if
 7   those two pieces of paper didn't come up, the hip seam
 8   or the seam of the paper would not come up.
 9            So if your panels are secured, the hip seam
10   will not come up.
11       Q.   Okay.  So if I understand what you just told
12   me is that if the hips -- if the clips are not secure,
13   then the hip seam or hip/ridge seams can come apart.
14            Is that what you just told me?
15       A.   I told you that in the actual roof panels, if
16   the roof panels remain attached, the seam cannot come up
17   itself because the seam is made by the two panels.  It's
18   like I say with this -- you know, imagine two pieces of
19   paper laid.  You take one, fold it up, the other one
20   folded up, fold it over each other.  And then if the
21   paper doesn't come up, that fold will not come up.
22            The only way for the hip seam to come up is
23   for the panels to come up.  And that's why the
24   9 1/2 inches for the roof panels was what was specified
25   and followed.
```

**Page 40**

```
 1       Q.   So it's your testimony that if the roof panels
 2   are cleated, then the hip/ridge seam won't come apart?
 3       A.   The -- it won't, like, actually come up.  I
 4   mean, yeah, the battens -- the batten cap could be blown
 5   off.  And it's possible that one side of the seam could
 6   be lifted.  I don't know if that happened or not.  But
 7   as far as actual hip seam -- like damage or missing or
 8   whatever -- the panels -- if the panels are secured, the
 9   hip seam is there.
10       Q.   If the hip seam comes apart approximately half
11   an inch to an inch, would you agree that there is -- the
12   hip/ridge configuration didn't hold?
13            ATTORNEY COSBY:  Object to the form.
14            You can answer.
15            THE WITNESS:  I would -- I guess I'd have to
16   know exactly what -- what -- so you're asking, like,
17   say, if one side of the hip seam lifted up?  I mean I
18   know you mentioned potentially the batten cap.  But one
19   side of the actual hip seam lifted up?  Is that what
20   you're asking?
21   BY ATTORNEY FRIEDBERG:
22       Q.   Yes.
23       A.   Is that what you're asking?
24       Q.   Yes.
25       A.   Oh, okay.  Then -- then that -- then that
```

**Page 41**

```
 1   would have been wind uplift in that case.  Yeah, where
 2   one side lifted up.  Yeah, the batten cap comes off and
 3   one side, which is from one panel, comes and goes over
 4   the top of the other.  The one side lifts up, that would
 5   be wind damage then -- it could be wind damage, I should
 6   say, not could -- I mean is -- it could be wind damage,
 7   of course.
 8       Q.   And is it your testimony if the cleats are
 9   placed at 9 1/2 inches on center, that that cannot
10   occur?
11       A.   I didn't say that, no.  I said that -- you
12   asked about the hip seam itself.  So if one side of --
13   so it's two panels joining, and one goes and folds over
14   the top of the other.  If that one that is folded over
15   the top of the other was to be lifted -- just that fold
16   gets lifted up, that could potentially be wind uplift at
17   that point.
18            But to further clarify this, if there would
19   have been cleats in the hips, it would not have
20   prevented such because the cleat in the hip would only
21   be on the one panel.  So even in the case that you put
22   forth here, the hypothetical, it is -- it wouldn't have
23   made a difference.
24       Q.   A couple of things.  Number one is you
25   actually haven't done any evaluation, have you,
```

```
 1    Q.   The cleats were to be 9 1/2 inches on center,
 2  not the battens.
 3    A.   Well, for the cleats to be, the battens needed
 4  to be.
 5    Q.   The battens are -- well, how wide are the
 6  battens?
 7    A.   They're 1-by-4s, I believe.
 8    Q.   All right.  So nominal is 3 1/4 or
 9  3 1/2 inches nominally?
10    A.   3 1/2.  Yeah, 3 1/2.
11    Q.   And it's your testimony it would be impossible
12  for the battens to be placed in such a manner that they
13  could not receive a cleat on average of 9 1/2 inches on
14  center?
15    A.   That was not my testimony, no.
16    Q.   All right.  Well, can the battens be placed in
17  such a manner so that the cleats can be placed on an
18  average of 9 1/2 inches on center for the hip/ridge
19  seam?
20    A.   I don't know what the geometry would be
21  without doing some calculations, but they would have
22  been -- in some of those roofs on your property would
23  have needed to be, like, almost solid decking, I think.
24    Q.   I'm going to move to strike as nonresponsive.
25         As you sit here today, you can't tell me, can
                                                    Page 50
```

```
 1  you, if in fact battens in the dimensions we've talked
 2  about were installed whether it would accept the cleat
 3  on an average of 9 1/2 inches on center at the hip/ridge
 4  seam, can you?
 5    A.   Well, mathematically, in many cases it would
 6  not be sufficient.
 7    Q.   Whether it was or was not sufficient, you
 8  would agree that there was no mention of the fact that
 9  cleats were not to be installed [inaudible] within the
10  terms of the contract?
11         ATTORNEY COSBY:  Object to the form.
12         You can answer.
13         THE WITNESS:  I'm sorry, you're going to have
14  to repeat that.
15         THE COURT REPORTER:  You froze in your
16  question, Tom.
17         Whether it was or was not sufficient, you
18  would agree that there was no mention of the fact that
19  cleats were not to be installed -- within the terms of
20  the contract?  We missed a section.
21  BY ATTORNEY FRIEDBERG:
22    Q.   Sure.  That the cleats were not to be
23  installed at the intersection of the hip/ridge seams.
24         ATTORNEY COSBY:  Object to the form.
25         THE WITNESS:  Because there is no
                                                    Page 51
```

```
 1  specification for it.  If you refer to SMACNA and
 2  Revere, you would know that is not a requirement.
 3  BY ATTORNEY FRIEDBERG:
 4    Q.   Move to strike as nonresponsive.
 5         I just want to -- looking at the four corners
 6  of the contract, you would agree there's no mention of
 7  the fact that cleats are not to be installed at the
 8  hip/ridge seams on the contract itself?
 9    A.   It is inferred by the standards.
10    Q.   Move to strike as nonresponsive.
11         Would you agree that it's specifically not
12  listed on the contract that cleats are not to be
13  installed at the hip/ridge seams?
14         ATTORNEY COSBY:  Object to the form.
15         You can answer.
16         THE WITNESS:  How about just do nonresponsive?
17  BY ATTORNEY FRIEDBERG:
18    Q.   No.  I'm asking for the question, and I'll
19  move to compel it.
20         Do you need the question read back?
21    A.   Sure.
22         (Record read:
23             Q.  Would you agree that it's
24         specifically not listed on the contract
25         that cleats are not to be installed at
                                                    Page 52
```

```
 1         the hip/ridge seams?)
 2         THE WITNESS:  One could easily gather that
 3  that was the case.
 4  BY ATTORNEY FRIEDBERG:
 5    Q.   Move to strike as nonresponsive.
 6         On the contract itself, you're able to read
 7  the words that you drafted?
 8    A.   Correct.
 9    Q.   And the words that you drafted, is it
10  mentioned anywhere in the contract that the cleats are
11  not to be installed at the hip/ridge seams?
12         ATTORNEY COSBY:  Object to the form.
13         You can answer.
14         THE WITNESS:  I guess it would be appropriate
15  to say that they are not listed as needing to be
16  installed.
17  BY ATTORNEY FRIEDBERG:
18    Q.   Move to strike as nonresponsive.
19         Really simple.  And, again, I know you can
20  read the contract; you drafted it.
21         Looking at your contract that you drafted,
22  does it specifically mention the cleats are not going to
23  be installed at the hip/ridge intersections?
24         ATTORNEY COSBY:  Form.
25         THE WITNESS:  It doesn't say that they would
                                                    Page 53
```