# IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. THOMAS AND ST. JOHN

THOMAS F. FRIEDBERG & SARAH L. BUNGE,

    Plaintiffs,

v.

DAYBREAK, INC. dba HUBER & ASSOCIATES,

**CIVIL ACTION NO. 3:19-cv-0053**

    Defendant.

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR FINAL SUMMARY JUDGMENT

Defendant Daybreak, Inc. is entitled to final summary judgment for the following reasons:

1. The exact issue raised in this case was known to Plaintiffs (collectively "Friedberg") and settled in 2023 (I think we said 2024 in the res judicata MSJ I just reviewed) in the related Superior Court action Friedberg brought (Case No. ST-2010-CV-00716) ("the Superior Court Case") and is therefore barred by both the express terms of the release and *res judicata*.

2. Friedberg's failure to replace or repair the roof after his expert opined in 2014 that the roof was not constructed to the engineering standards adopted by Friedberg for the express purpose of protecting the roof from loss during a hurricane is an intervening cause that breaks the chain of causation related to Daybreak's alleged failure to construct the roof in accordance with the terms of the contract.

3. Friedberg cannot prove that Daybreak's alleged breach of contract was a cause of the Hurricane Irma damage.

1

    4.      Friedberg failed to mitigate the alleged damages by repairing or replacing the roof in 2015. The 10-year (and counting) delay in repairs has resulted in vastly increased prices due to changing economic factors.

## I. Facts

### A. The Contract and Roof Terminology

In 2010, Daybreak Roofing Company ("Daybreak") was contracted to install copper standing seam roofs on eight separate structures, including the "Main Pavilion," at the Friedberg-Bunge residence in St. John, Virgin Islands. Statement of Uncontested Material Facts ("SUMF") ¶1. The contract included specific provisions regarding the installation of cleats (metal fasteners) that secure the copper panels to the roof substrate. SUMF ¶1. The contract specified that cleats should be installed at an average of 9.5 inches on center. SUMF ¶2.

The claim in this case (and one of the claims in the prior Superior Court case) was whether Daybreak, through its principal Huber," was required to install cleats under the "ridge" seams on the Main Pavilion roof or only under the standing seams. The ridges in this case are not the typical "ridge" one sees on a gable or hip roof. The Main Pavilion roof was an octagonal "witch's hat" roof formed with eight triangular sections with the apex of each triangle at the point of the hat:



2

Each ridge seam is located at the point where the sides of one triangle intersect with the sides of another triangle. SUMF ¶4. The other seams on the roof are "standing seams" joining 15" wide copper "pans" together to form each of the eight triangles. SUMF ¶5.

### B. 2010-Hurricane Irma (Sept. 2017)

#### 1. Initiation of litigation

Friedberg failed to pay Daybreak's final invoice for the roofing work, causing Daybreak to sue Friedberg in the Superior Court of the Virgin Islands seeking payment. SUMF ¶6. Friedberg counterclaimed, alleging widespread defects in the roofing work across all eight structures including the Main Pavillion. SUMF ¶7. To support his counterclaim, Friedberg retained Arthur L. Sanders, AIA, as an expert witness to evaluate the alleged defects. SUMF ¶8.

#### 2. Sanders' 2014 inspection and discovery of the alleged ridge defect

In support of his expert report for the Superior Court litigation, Sanders conducted a comprehensive inspection of all eight roofs, including an invasive examination of the Main Pavilion roof. SUMF ¶9. When asked why he brought a roofing mechanic with him to the inspection of the roof, he explained that it was for the specific purpose of determining if the roof was cleated in accordance with the contractual requirements:

> I know how copper is installed and the question is, you know, do a due diligence to whether this was installed properly or does it – *is it cleated in accordance with all the spec requirements that the contractor said he was going to do.* You -- you can't just look at it – you can't put a ladder up the side of a roof and look at the copper and say it looks fine.

SUMF ¶11.

As part of this inspection, Sanders had a roofer physically open a section of the copper roof on the main pavilion to examine the construction beneath the visible surface and described what he observed:

> Q: Okay. So this -- the place where you did this was on the main pavilion?
>
> A: Yes.
>
> Q: Okay. And you said you unlocked -- you actually unlocked the ridge --
>
> A: We drilled out the pop rivets on the cap, we -- we unlocked the portion that was overlapped and we found in that case *there were no cleats so in the -- in the intersection of the pans at the ridges, we found no cleats securing those to the -- to the substrate below.*
>
> Q: *And this would have been cleats in the ridges or cleats in the --*
>
> A: *Cleats in the ridges.*
>
> Q: Not in the standing seam, you are talking?
>
> A: Not in the standing seam.

SUMF ¶12 (emphasis added).

> Q: And how far -- how much of the ridge did you -- I don't know what the term is -- unwind?
>
> A: Yeah. We did that at the intersection of the pans and we took off about a ten foot section of cap. We opened up two pan-widths, approximately. So you know, there should have been a minimum of two cleats, one in each pan.

SUMF ¶13. The specific purpose of opening up the ridge was to check for cleats.

> The remainder of the first day was spent investigating the pan and *ridge* construction of the Main Pavilion. Traversing the entire roof, defects in the pans were noted and photographically documented. A section of the *intersecting pans between the pie shapes* of the octagon was opened up by first drilling out the pop-rivets, removing one section of cap, revealing the joined pans, *and unfolding the overlapped pan edges to check for clips.*[1] This condition was then reinstalled with new rivets replacing those removed.

SUMF ¶14.

---

[1] Sanders uses the terms "clips" and "cleats" interchangeably. *See* Sanders' 8/28/2025 Depo. 52:12-15 (stating that they are "pretty much synonymous").

4

The ridge seam that Sanders opened up is shown in Photo 40 in his 2014 Expert Report:



Photo 40. Ridge seam opened showing a simple lap not a lock.

SUMF ¶15.

In his September 11, 2025 deposition, Sanders was asked about Photo 40 from his 2014 report. SUMF ¶16. He confirmed that the only ridge seam that failed during Hurricane Irma was the ridge seam that he opened up in 2014 as shown in Photo 40. SUMF ¶17.

This alleged defect was also reported in Sanders' 2014 expert report where he summarized his findings:

> The investigation found that the pan system in the field of the roofs was installed on the roofs of the nine structures in accordance with industry standards and with the project required 9.5" o.c. cleat spacing. However, the end conditions at intersections of pans; *ridges* and hips, were not installed in accordance with Copper and Common Sense's recommended single lock seam *and were not secured in the joint with cleats as is standard practice.*

SUMF ¶18 (emphasis added).

5

Sanders emphasized the lack of cleats at the ridge: "[Y]ou can see along this entire section there are no cleats in the ridge seam." SUMF ¶19.

When questioned about his concerns regarding the absence of cleats at the ridge,[2] Sanders provided clear testimony about the structural implications:

> Q: What was your concern about the lack of a cleat at the—along the ridge?
>
> A: It should be tied down. It—you know, it should be secured to the substrate.

SUMF ¶20.

Sanders further testified that the reason for the 9.5" spacing requirement for cleats (less than the industry standard of 12") was because "this is a high wind area." SUMF ¶21.

It was Sanders' opinion in 2015 during his deposition that "cleats should have been in the ridges." SUMF ¶23.

When deposed in this case, Sanders opined that the alleged damage from Hurricane Irma would not have occurred if there were cleats on the ridges:

> 1Q: But your suggestion is on the ridge line there wouldn't have been damage had there been cleats, is that a fair statement?
>
> A: Yes, that's a correct statement.

SUMF ¶24.

### 3. Friedberg's claim that the contract was breached for lack of cleats on the ridge was specifically a part of his Superior Court case

In supplemental interrogatory responses in the Superior Court case, Friedberg specifically adopted Sanders' November 12, 2014 expert report as outlining all of his claims regarding

---

[2] Daybreak does not agree that cleats are required at the ridge and asserts that the standard in the industry does not require cleats on a ridge. Rather, as reflected in both Revere Copper & Common Sense and SMACNA, the standard is to secure the standing seams (which run perpendicular to the ridge of a standard roof) with cleats because they create a rigid structure that does not require cleats along the ridge. For purposes of summary judgment only, Daybreak will assume cleats were required along the ridge so as to avoid creating a question of material fact. Even with that assumption, Friedberg cannot prevail.

6

defective workmanship. SUMF ¶25. Sanders specifically called for replacement of the entire Main Pavilion roof in the Superior Court case. SUMF ¶26. By adopting Sanders' report, Friedberg therefore asserted claims based on all defects identified in that report, including:

1. The alleged lack of cleats securing the ridge seam to the substrate below it; and
2. The need for complete replacement of the Main Pavilion roof.

SUMF ¶27.

### 4. Friedberg failed to repair the roof

Despite Sanders' 2014 recommendation for complete replacement, his testimony about wind vulnerability, and his explicit concern about inadequate attachment "in a high wind area," Friedberg chose not to repair or replace the roof. Instead, the allegedly defective roof which Sanders testified was vulnerable to damage from severe winds in St. John's hurricane-prone environment remained in place through multiple hurricane seasons. SUMF ¶28.

### C. Hurricane Irma (September 6-7, 2017)

On September 6-7, 2017, approximately three years after Sanders' inspection and while the Superior Court litigation was still pending, Hurricane Irma struck St. John as a Category 5 hurricane. The storm brought sustained winds of approximately 185 mph, with higher gusts, making it one of the most powerful hurricanes to impact the Virgin Islands in recorded history. SUMF ¶29. According to Sanders, St. John sustained winds in excess of "200 MPH for several hours." SUMF ¶30.

Despite the strength of Irma, the Main Pavilion roof fared quite well. Specifically, there were impact damages from flying debris and the only structural damage occurred at the exact location where Sanders had unfolded the ridge seam and discovered that there were no cleats in that section of the ridge. SUMF ¶31. Sanders conducted an inspection of the Main Pavilion roof in 2018 after

Hurricane Irma (SUMF ¶32) and opined that his inspection revealed that Daybreak "did not install cleats at the intersection of the copper panels that form the ridge between the copper pans at 9.5 inches on center as required by the terms and conditions of the contract." SUMF ¶33.

When deposed about this statement, Sanders admitted that the area where he found the absence of cleats was the same ridge seam that he opened in 2014:

> 1Q: After the storm, investigation reveal that Defendant did not install cleats at the intersection of the copper panels *that form the ridge between copper pans* at 9.5 inches on center as required by the terms and conditions of the contract."
>
> A: I did say that.
>
> Q: *Now, the only ridge where that was confirmed was the one that was opened, correct?*
>
> A: Yes.
>
> Q: So where it says, "did not install cleats at the intersection of the copper panels," *that's only in the one area where the ridge was opened that's in photo 40* that we went over a moment ago, correct?
>
> A: *That is the only area that we had opened*.
>
> Q: And the areas that you didn't open you can't confirm whether there are cleats or not there, correct?
>
> A: That's correct.

SUMF ¶34 (emphasis added, objections omitted).

He reiterated that the damage found after Hurricane Irma was on the exact same ridge seam that he opened as shown in Photo 40 in his 2014 expert report:

> 1Q: You say during the April 2018 site visit the ridge lines between the pans on the east side of the main pavilion failed by opening up during Hurricane Irma. The only -- you used the plural, ridge lines. The only one we know of is the one that was opened in Exhibit 40 – not Exhibit 40, but photo 40, correct?
>
> A: Yes.

SUMF ¶35.

8

Sanders expressly linked the 2017 hurricane damage directly to the alleged defect he identified in 2014:

> 1Q: But your suggestion is on the ridge line there wouldn't have been damage had there been cleats, is that a fair statement?
>
> A: Yes, that's a correct statement.

SUMF ¶36.

**D. 2018-Present**

### 1. Filing of new lawsuit based on hurricane damage

In 2018, while the Superior Court case was still pending, Friedberg filed a separate lawsuit in this Court. Rather than asserting the hurricane damage as additional damage for the alleged defects Friedberg was already asserting in the Superior Court, Friedberg initiated the litigation in this Court. SUMF ¶37.

### 2. Friedberg's "latent defect" theory

In his District Court Complaint, Friedberg advanced a theory that directly contradicted the facts established by Sanders' 2014 inspection and testimony. Specifically, Friedberg alleged:

"The failure to install the cleats at 9.5 inches on center was a latent defect *that was not discoverable prior to September 7, 2017,* since the cleats were to have been placed underneath the copper panels and copper pans and their existence or non-existence would not have been visible to the naked eye or upon reasonable inspection since the cleats are concealed. The failure to install the cleats became discoverable after the intersection of the copper pans separated where there were no cleats. The failure to install the cleats in accordance with the plans and specifications of the contract is a breach of the construction contract and constitutes a latent defect under 5 V.I.C. § 32b since *the failure to install the cleats was not apparent by reasonable inspection prior to September 7, 2017.*" SUMF ¶38.

9

.

Sanders' 2014 opinion and his deposition testimony in both cases establishes beyond dispute that the alleged defective condition of missing cleats securing the ridge seams was known to Sanders (and therefore to Friedberg) by September 11, 2014, the first day of his roof inspection made as part of the Superior Court case. SUMF ¶39.

### 3. 2023 - Settlement of the Superior Court case

In 2023, the Superior Court case was finally resolved through a monetary settlement. The settlement was purely financial; no repairs were performed as part of the resolution. The settlement agreement was a general release with a specific and limited carveout of *only* claims that were asserted in the District Court case that were not encompassed in the Superior Court case:

> The settlement of the above-entitled Superior Court Lawsuit does not extinguish the claims in the District Court case number 3: 19-cv-0053 to the extent that District Court case does not encompass claims that were asserted in the above-entitled Superior Court case.

SUMF ¶40. (The quoted statement above is repeated four separate times in the Settlement Agreement.)

As noted in Section B.3 above, Friedberg expressly adopted as claims asserted in the Superior Court Case all defects identified by Sanders in his November 2014 expert report.

### III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. Pro. 56(a).* A material fact is one that must be decided to resolve the substantive claim or defense addressed in the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is considered genuine if a reasonable jury could return a verdict for the non-moving party *Id.*

When a moving party meets the obligations pursuant to Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ...." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587 (1986). "Where the record … taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. Summary judgment is appropriate when the non-moving party cannot establish an essential element it has the burden to prove. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). It is also appropriate when the facts do not support the non-moving party's version of events. *Scott v. Harris,* 550 US 372, 380 (2007).

## IV. ARGUMENT

### A. Friedberg's claim is barred by Release and/or *Res Judicata*

As explained above, Friedberg released all claims encompassed in the Superior Court case. Friedberg claims that the instant case is wholly separate from the case previously filed in the Superior Court regarding the same roof. Specifically, Friedberg claims that this lawsuit "deal[s] exclusively with the main house on the lower portion of Plaintiffs' property," *see* SUMF 41 whereas (again according to Friedberg) "[t]he claims in the Superior Court Action are limited to the two upper buildings—the gate house and the garage/studio. SUMF 42. But Friedberg has not been candid with the Court. Friedberg supplemented his interrogatory responses in the Superior Court case to clarify that his claims encompassed everything in the Sanders' expert report. SUMF ¶25.

**INTERROGATORY NO. 11:**

With respect to each alleged defect within the scope of Counter defendant's work, please state how such defect(s) contribute(s) to alleged deficient and faulty construction of the Project.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:**

See Rule 26 report of Arthur Sanders that was previously provided.

Sander's report explained the alleged defects related to the ridge cleats:

> The investigation found that the pan system in the field of the roofs was installed on the roofs of the nine structures in accordance with industry standards and with the project required 9.5" o.c. cleat spacing. However, the end conditions at intersections of pans; ridges and hips, were not installed in accordance with Copper and Common Sense's recommended single lock seam and were not secured in the joint with cleats as is standard practice.

Friedberg also included all of the damages identified in Sanders' Expert Report as part of his claim in the Superior Court Case:

> **INTERROGATORY NO. 18:**
>
> List all damages you claim in your counterclaim, specifically enumerating each amount incurred and to whom paid. Specifically describe any damages you are claiming other than out of pocket expenses and the specific basis for each.
>
> **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18:**
>
> 1. Cost of repair as set forth in Rule 26 Expert Report of Arthur Sanders;

The Sanders' report asserted that the entire Main Pavillion roof needed to be replaced (along with all other roofs [and specifically not limited to only two buildings]):

> Hoffmann Architects recommends removal and replacement of all roofs. Because this involves removal of the existing, a new weather protection coarse, remobilizing, and all the costs associates with working in St. John this is a substantial cost. Our opinion of the probable cost of construction for this effort is $ 759,357.

As the Sanders' report, his deposition, and supplemental interrogatory responses in the Superior Court Case make clear, that case encompassed the claimed defects in the Main Pavillion roof and the specific claim that the lack of cleats along the ridge was a defect.

A settlement agreement is an enforceable contract governed by basic contract principles. *1Vlaun, v. Briscoe*, 77 VI 436, 443 (2022); *1Boynes v. Transp. Servs. of St. John, Inc.*, 60 V.I. 453, 459 (V.I. 2014). It is uncontested that Friedberg entered into a binding settlement agreement that

12

provided for the release of all claims that were asserted in the Superior Court Case. Indeed, a final judgment dismissing the Superior Court Case with prejudice was entered with no carve out of any claims asserted in that case. SUMF ¶40. Friedberg understandably did not appeal that order because it reflects exactly what was agreed to in the settlement. Consequently, Friedberg's claims in this case, which were expressly asserted in the Superior Court Case, were both released under the settlement and dismissed by court order.

Even if the settlement agreement did not bar the claim, *res judicata* would likewise apply in the instant case because the issues arise out of the same transaction and occurrence as the claims brought in the Superior Court Case. *See Steward v. Virgin Island Board of Land Use Appeals,* 66 V.I. 522, 531 (2017). Courts in the U.S. Virgin Islands have historically precluded a party from relitigating claims where "(1) the prior judgment was valid, final, and on the merits; (2) the parties in the subsequent action are identical to or in privity with parties in the prior action; and (3) the claims in the subsequent action arise out of the same transaction or occurrence as the prior claims." *Id.* at 532. Federal Courts have found that *res judicata* refers to both claim preclusion and issue preclusion. *See Venuto v. Witco Corp.,* 117 F.3d 754, 758 (US 3d 1997). The litigation of an issue related to a previous case may only be allowed if the previous court allowed for a reservation as to that specific issue. *Id.* at 760.

In the instant case, the U.S. Virgin Islands Superior Court case did not, as part of its dismissal, state that the issues with the Main Pavilion roof were separate and apart from the rest of the case. Plaintiffs were compensated as part of a settlement agreement in the U.S. Virgin Islands Superior Court case for breach of contract. The present case is an attempt to have another bite of the apple and does not comply with the laws of the USVI. Thus, Plaintiffs' claim is also barred under *res judicata.*

**B. Friedberg's failure to fix the claimed defects is an intervening cause.**

Friedberg knew by September 11, 2014 when Sanders opened the ridge seam that there were no cleats in that location. Moreover, at that time Sanders was opining that the entire Main Pavilion roof needed to be replaced because of alleged defects, including the alleged lack of cleats. An intervening cause destroys the causal connection between the defendant's acts and the victim's injury, thereby becoming the cause of the injury. *Cyprian v. Virgin Islands Water & Power Auth.*, 2022 VI SUPER 99, ¶29, 2022 WL 22949652 (Dec. 22, 2022). If the intervening act was reasonably foreseeable, it is not considered to have destroyed the causal connection. *Id.* ¶30. Gross negligence is unforeseeable whereas ordinary negligence is considered foreseeable. *Id.*

Here, Friedberg knew in 2014 that his expert, Sanders, considered the Main Pavilion roof to be defectively constructed and required replacement. Friedberg also is charged with the knowledge of Sanders that the ridges did not have cleats securing them to the substrate and it was Friedberg who retained an engineer to specify cleat placement for purposes of securing the roof for hurricanes. Under those facts, the failure to repair the roof, even if it was to only temporarily repair it so that the ridges were secured in the manner Sanders claims was required by the contract, can only be deemed to be wanton, reckless behavior demonstrating a conscious indifference to the safety of property. That's the definition of gross negligence. *Id.* ¶31. The decision not to secure the roof in a hurricane zone is more than mere thoughtlessness or inadvertence, or simple inattention (ordinary negligence). As such, Friedberg's failure to protect his own property from a known danger rises to the level of an intervening cause, breaking the chain of causation and preventing a finding of causation against Daybreak.

**C. Friedberg cannot meet his burden of proving causation**

14

Even without the intervening cause, there are at least three possible explanations for the alleged roof failure in this case: (1) alteration of the roof by Friedberg's own agent, Sanders; (2) the roof was not designed to escape completely unscathed when encountering the windspeeds and gusts of a storm such as Irma; and/or (3) defective workmanship. Because Friedberg is unable to rule out the first two potential causes, he cannot prove his claim based upon the third potential cause.

### 1. Sanders materially altered the roof

The putative roof failure in this case is limited to a single area of the roof that was materially altered by Sanders during his September 11-12, 2014 inspection. SUMF ¶10. During that inspection, Sanders had a metal worker unfold a section of the seam at a ridge (shown in Photo 40). SUMF ¶15. When the investigation was completed, the metal worker re-folded the ridge seam. There is no evidence that this alteration of the ridge seam restored the ridge seam to its original condition. The entire roof (and all eight roofs) did remarkably well after Hurricane Irma with the putative failure found *only* at the site where Sanders altered the roof.

### 2. Plaintiff cannot prove that the roof was designed to withstand the forces of Hurricane Irma

There is no evidence in this case that establishes that the roof, as specified in the contract, was designed to withstand the hurricane force winds generated by Category 5 Hurricane Irma. Sanders testified in his 2015 deposition that Friedberg informed him that the 9.5-inch average cleat spacing was done because St. John was a "high wind area." SUMF ¶21. At the time of that deposition, he could not recall seeing the engineering report. SUMF ¶22. Sanders admitted that he did not have the expertise to opine as to the windspeeds that cleats could withstand if they encountered winds in excess of 200 miles per hour and explained "you need someone who diagnoses these things from the industry to respond to that. Perhaps somebody from Copper and

15

Common Sense or perhaps someone from Miami Dade." SUMF ¶44. When asked to acknowledge that "wind damage, wind speeds, what damage would be caused by what speed" was not in his expertise, Sanders agreed, stating, "I'm not in that business, no." SUMF ¶45.

Sanders expressed his personal belief that "[i]f there were cleats there, there would be no uplift damage to a reasonable wind speed, including *maybe* the second largest storm in St. John's history" and that a "reasonable wind speed was "*[m]aybe* 175 miles per hour." SUMF ¶46. He thought the highest wind speed on St. John was 176 mph. SUMF ¶47. In his report prepared for Friedberg's insurance claim following Irma, however, Sanders stated that St. John received "sustained winds more than 200 mph for several hours." SUMF ¶30. Hurricane Irma was "the strongest hurricane ever observed in the open Atlantic Ocean, and one of only 5 hurricanes with measured winds of 185 MPH or higher in the entire Atlantic basin." SUMF ¶29.

Friedberg has never produced an engineering report either explaining the basis for specifying cleats spaced on average of 9.5 inches or identifying the expected winds the roof could withstand. In the absence of any evidence that the roof was designed to withstand the forces generated by Hurricane Irma, Friedberg is unable to prove that the alleged failure to install cleats on the ridges was a causative factor in the failure.

### 3. There is no evidence of causation or damages attributable to Daybreak

Sanders is not a credible expert, and his opinion is not admissible. Without such opinion testimony, there is no proof that Daybreak's alleged breach of contract was the cause of the damage to the Main Pavilion roof.

Sanders created two separate reports pointing to two different causes of the damage to the roof of the main pavilion. One report was to support Friedberg's insurance claim and the second report to support his claim in this case. In his report supporting the insurance claim, Sanders claimed that more than 80 panels (pans) were damaged, justifying replacing the entire roof. He makes no mention of missing cleats contributing in any way to the loss. SUMF ¶48. But, in his report to support Friedberg's claim in this case, Sanders claims the damage was caused by the cleats allegedly not being installed pursuant to the contract. SUMF ¶36.

Further, Sanders lacks the appropriate expertise and factual predicate to support his opinions in addition to his lack of credibility. Without expert testimony, Friedberg cannot prove (1) that the cleat spacing was the cause in fact of the failure and (2) that the monetary damage is reasonably certain and attributable to Defendant. Additionally, his opinions are based on assumptions. SUMF ¶49. Sanders is only able to testify with 51% certainty that the cleats, if installed as he claims was required by the contract, would have allowed the roof to remain unscathed. SUMF ¶50. But of course, as documented in Sanders' report for the insurance claim, all of the roofs sustained significant damage in Hurricane Irma, and he documented damage to more than 50% of the Main Pavilion panels that was unrelated to the claim the cleats should have been installed along the ridges. SUFM ¶51. Speculative, conclusory allegations cannot survive summary judgment. *Anderson* at 248.

### E. Plaintiffs' Damages, if any, are Limited to the Cost of Materials and Labor that Existed When the Defect was Found in 2014.

If damages are awarded in the instant case, they should be limited to the costs of materials and labor when the defect was found in 2014 by Plaintiffs' expert Arthur Sanders.

17

Plaintiffs were aware of defects in the Main Pavilion roof as early as 2012 when they filed their counterclaim in the Superior Court Case. They were made aware of the possibility of missing cleats in 2014 when their expert, Mr. Sanders, discovered a lack of cleats in one area of the roof. However, to this day, the roof has not been replaced as their expert advised them to do in 2014.

By failing to mitigate their damages, Plaintiffs are limited in the damages that they are able to recover. *See Ramier v. Stout,* 1979 WL 444370 (Terr. V.I. 1978). In that case, Plaintiffs knew of the defect with the construction. *Id.* However, they failed to mitigate their losses and have the issues repaired in a timely manner. *Id.* In that case, the Court found that Plaintiff had a duty to mitigate his damages and that he was limited to the costs to repair when the defect was discovered. *Id.*

In the instant case, Friedberg knew about the lack of cleats on the ridges as of September 11, 2014 when Sanders unfolded the ridge seam. SUMF ¶12. Moreover, Friedberg was alleging general defects with the Main Pavilion roof as early as 2012. SUMF ¶7. Based on this knowledge, Friedberg had an obligation to replace or repair the roof in 2014 as soon as he learned of the alleged defect. Instead, Friedberg kept the same roof in place that was installed. Meanwhile, the price of labor and materials has skyrocketed. In Sanders' report in 2014, he opined that the replacement cost of the Main Pavilion roof was $358,771. SUMF ¶54. Currently, Friedberg asserts that the same replacement cost is between $682,301 and $712,540. SUMF ¶55.

Plaintiffs were obligated to repair or replace the Main Pavilion roof at the time it was discovered. Therefore, damages, if any, should be limited to the costs of labor and materials in 2014 when the defect was discovered.

## V. CONCLUSION

Plaintiffs' breach of contract claim is barred by both Release and *res judicata*; Plaintiff is unable to prove, lacks expert support, fails to establish causation or damages, and is barred by *res judicata*. Additionally, if this case moves forward to trial, damages should be limited to 2014 costs of labor and materials. Accordingly, Defendant is entitled to final summary judgment as a matter of law.

WHEREFORE, Defendant, DAYBREAK, INC., dba HUBER & ASSOCIATES, respectfully requests this Court enter Final Summary Judgment in favor of Defendant; dismiss Plaintiffs' Complaint with prejudice; award Defendant costs and reasonable attorneys' fees, or in the alternative restrict the damages Plaintiffs may seek to 2014 labor and materials costs, and grant such other relief which is just and proper.

Date: December 14, 2025

/s/ Jeffrey C. Cosby, Esq.
Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL  34994
Telephone: 772-463-8402
Facsimile: 772-463-4820

/s/ Andrew C. Simpson, Esq.
Andrew C. Simpson, Esq.
VI Bar 451
Attorney for Defendant Daybreak Inc
2191 Church Street, Ste. 5
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone No. (340)719-3900