IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, <br><br> Plaintiffs, <br><br> v. <br><br> DAYBREAK, INC. dba HUBER & ASSOCIATES, <br><br><br> Defendant. | CIVIL ACTION NO. 3:19-cv-0053 |

**DEFENDANT'S STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF MOTION FOR FINAL SUMMARY JUDGMENT**

Defendant Daybreak, Inc. submits the following statement of uncontested material facts that demonstrate that it is entitled to final judgment as a matter of law on all of the claims asserted by Plaintiffs in this case.

1. In 2010, Daybreak Roofing Company ("Daybreak") was contracted to install copper standing seam roofs on eight separate structures, including the "Main Pavilion," at the Friedberg-Bunge residence in St. John, Virgin Islands. Exhibit 1, Contract.

2. The contract specified that cleats should be installed at an average of 9.5 inches on center. *Id.*

3. The contract also specified that the roofing would be "installed in accordance with *Revere Copper & Common Sense & SMACNA*[1]." (Italics in the original.) *Id.*

---

[1] "SMACNA" stands for "Sheet Metal and Air Conditioning Contractors' National Association."

4. Each ridge seam is located at the point where the sides of one triangle intersect with the sides of another triangle. *See* Exhibit 2 at 8:3-6, Arther Sanders' Deposition taken September 11, 2025.

5. The other seams on the roof are "standing seams" joining 15" wide copper "pans" together to form one of the eight triangles. *See* Exhibit 1.

6. Daybreak sued Friedberg in the Superior Court of the Virgin Islands alleging that Friedberg had failed to make the final payment due under the contract. *See* Exhibit 3, Complaint filed in Case No. ST-2010-CV-00716 in the St. Thomas/St. John Division of the Superior Court of the Virgin Islands on December 21, 2010 ("Case No. ST-2010-CV-00716").

7. Friedberg counterclaimed, alleging widespread defects in the roofing work across all eight structures, including the Main Pavillion. *See* Exhibit 4, Answer, Counterclaim and Third-Party Claim filed in in Case No. ST-2010-CV-00716 on October 5, 2012.

8. To support his counterclaim, Friedberg retained Arthur L. Sanders, AIA, as an expert witness to evaluate the alleged defects. Exhibit 5, Expert Report of Sanders in Case No. ST-2010-CV-00716.

9. In support of his expert report for the Superior Court litigation, Sanders conducted a comprehensive inspection of all eight roofs, including an invasive examination of the Main Pavilion roof. *Id.* at Page 2.

10. As part of this inspection, as Sanders physically opened a section of the copper roof on the Main Pavilion to examine the construction beneath the visible surface and observed the absence of cleats in the ridges. Exhibit 6, 14:9-15:25, Arthur Sanders' Deposition taken in Case No. ST-2010-CV-00716.

11. When asked why he brought a roofing mechanic with him to the inspection of the roof, he explained that it was for the specific purpose of determining if the roof was cleated in accordance with the contractual requirements:

> I know how copper is installed and the question is, you know, do a due diligence to whether this was installed properly or does it – *is it cleated in accordance with all the spec requirements that the contractor said he was going to do.* You -- you can't just look at it – you can't put a ladder up the side of a roof and look at the copper and say it looks fine.

*Id.* at 12:17-24 (emphasis added).

12. As part of this inspection, Sanders had a roofer physically open a section of the copper roof on the main pavilion to examine the construction beneath the visible surface and described what he observed:

> Q: Okay. So this -- the place where you did this was on the main pavilion?
>
> A: Yes.
>
> Q: Okay. And you said you unlocked -- you actually unlocked the ridge --
>
> A: We drilled out the pop rivets on the cap, we -- we unlocked the portion that was overlapped and we found in that case *there were no cleats so in the -- in the intersection of the pans at the ridges, we found no cleats securing those to the -- to the substrate below.*
>
> Q: *And this would have been cleats in the ridges or cleats in the --*
>
> A: *Cleats in the ridges.*
>
> Q: Not in the standing seam, you are talking?
>
> A: Not in the standing seam.

*Id.* at 15:1-17 (emphasis added).

13. Sanders also testified regarding how much of the roof he took off:

> Q: And how far -- how much of the ridge did you -- I don't know what the term is -- unwind?

> A: Yeah. We did that at the intersection of the pans and we took off about a ten foot section of cap. We opened up two pan-widths, approximately. So you know, there should have been a minimum of two cleats, one in each pan.

*Id.* at 18:12-19.

14. The specific purpose of opening up the ridge was to check for cleats.

> The remainder of the first day was spent investigating the pan and *ridge* construction of the Main Pavilion. Traversing the entire roof, defects in the pans were noted and photographically documented. A section of the *intersecting pans between the pie shapes* of the octagon was opened up by first drilling out the pop-rivets, removing one section of cap, revealing the joined pans, *and unfolding the overlapped pan edges to check for clips.*[2] This condition was then reinstalled with new rivets replacing those removed.

Exhibit 5 at Page 2.

15. The ridge seam that Sanders had opened up is shown in Photo 40 in his 2014 Expert Report:



Photo 40. Ridge seam opened showing a simple lap not a lock.

---

[2] Sanders uses the terms "clips" and "cleats" interchangeably. *See* Sanders' 8/28/2025 Depo. 52:12-15 (stating that they are "pretty much synonymous").

*Id.* at Page 21.

16. In his September 11, 2025 deposition in the present case, Sanders was asked about Photo 40 from his 2014 report. Exhibit 2 at 16:3-11.

17. He confirmed that the only ridge seam that failed during Hurricane Irma was the ridge seam that he opened up in 2014 as shown in Photo 40. *Id.* at 25:18-24.

18. This alleged defect was also reported in Sanders' 2014 expert report where he summarized his findings:

> The investigation found that the pan system in the field of the roofs was installed on the roofs of the nine structures in accordance with industry standards and with the project required 9.5" o.c. cleat spacing. However, the end conditions at intersections of pans; *ridges* and hips, were not installed in accordance with Copper and Common Sense's recommended single lock seam *and were not secured in the joint with cleats as is standard practice.*

Exhibit 5 at 45 (emphasis added).

19. Sanders emphasized the lack of cleats at the ridge: "[Y]ou can see along this entire section there are no cleats in the ridge seam." Exhibit 6 at 55:1-2.

20. When questioned about his concerns regarding the absence of cleats at the ridge,[3] Sanders provided clear testimony about the structural implications:

> Q: What was your concern about the lack of a cleat at the—along the ridge?
>
> A: It should be tied down. It—you know, it should be secured to the substrate.

Exhibit 6, 19:24-20:2.

21. Sanders further testified that the reason for the 9.5" spacing requirement for cleats (less than the industry standard of 12") was because "this is a high wind area." *Id.* at 20:23.

---

[3] Daybreak does not agree that cleats are required at the ridge and asserts that the standard in the industry does not require cleats on a ridge. Rather, as reflected in both Revere Copper & Common Sense and SMACNA, the standard is to secure the standing seams (which run perpendicular to the ridge of a standard roof) with cleats because they create a rigid structure that does not require cleats along the ridge. For purposes of summary judgment only, Daybreak will assume cleats were required along the ridge so as to avoid creating a question of material fact. Even with that assumption, Friedberg cannot prevail.

22. At the time of his deposition, Sanders could not recall having seen the engineering report. Exhibit 6 at 21:2-7.

23. It was "absolutely" Sanders' opinion in 2015 during his deposition that "cleats should have been in the ridges." *Id.* at 16:9-11.

24. When deposed in this case, Sanders opined that the alleged damage from Hurricane Irma would not have occurred if there had been cleats on the ridges:

> 1Q: But your suggestion is on the ridge line there wouldn't have been damage had there been cleats, is that a fair statement?
>
> A: Yes, that's a correct statement.

Exhibit 7 at 100:6-9, Arthur Sanders's Deposition taken August 25, 2025.

25. In supplemental interrogatory responses in the Superior Court case, Friedberg specifically adopted Sanders' November 12, 2014 expert report as outlining all of his claims regarding defective workmanship. *See* Exhibit 8, Counterclaimant's Supplemental Responses to Interrogatories in Case No. ST-2010-CV-00716.

26. Sanders specifically called for replacement of the entire Main Pavilion roof in the Superior Court case. Exhibit 6 at 152:7-10.

27. By adopting Sanders' report, Friedberg therefore asserted claims based on all defects identified in that report, including:

   a. The alleged lack of cleats securing the ridge seam to the substrate below it;
   b. The need for complete replacement of the Main Pavilion roof.

*See* Exhibit 5 at Page 47 and Exhibit 8.

28. Despite Sanders' 2014 recommendation for complete replacement, despite his testimony about wind vulnerability, and his explicit concern about inadequate attachment "in a high wind area," Friedberg chose not to repair or replace the roof. Instead, the allegedly defective roof—that Sanders testified was vulnerable to damage from severe winds in St.

John's hurricane-prone environment—remained in place through multiple hurricane seasons. Exhibit 9 at 142:1-12, Deposition of Thomas Friedberg taken on March 15, 2025.

29. On September 6-7, 2017, approximately three years after Sanders' inspection and while the Superior Court litigation was still pending, Hurricane Irma struck St. John as a category 5 hurricane. The storm brought sustained winds of approximately 185 mph, with higher gusts, making it one of the most powerful hurricanes to impact the Virgin Islands in recorded history. Exhibit 10 at Page 3, National Hurricane Center Tropical Cyclone Report for Hurricane Irma.

30. According to Sanders, St. John sustained winds in excess of "200 MPH for several hours." Exhibit 11 at Page 1, Sanders' Report for insurance claim purposes.

31. Despite the strength of Irma, the Main Pavilion roof fared quite well. Specifically, there were impact damages (from flying debris) and the only structural damage occurred at the exact location where Sanders, in 2014, unfolded the ridge seam and discovered that there were no cleats in that section of the ridge. Exhibit 7 at 111: 3-8.

32. Sanders conducted an inspection of the Main Pavilion roof in 2018 after Hurricane Irma. Exhibit 12, Sanders' June 29, 2025 Expert Report at 2.

33. Sanders opined that his inspection revealed that Daybreak "did not install cleats at the intersection of the copper panels that form the ridge between the copper pans at 9.5 inches on center as required by the terms and conditions of the contract." *Id.* at 5.

34. When deposed about this statement, Sanders admitted that the area where he found the absence of cleats was the same ridge seam that he had opened up in 2014:

> Q: After the storm, investigation revealed that Defendant did not install cleats at the intersection of the copper panels *that form the ridge between copper pans* at 9.5 inches on center as required by the terms and conditions of the contract."

>A:  I did say that.
>
>Q: *Now, the only ridge where that was confirmed was the one that was opened, correct?*
>
>A:  Yes.
>
>Q: So where it says, "did not install cleats at the intersection of the copper panels," *that's only in the one area where the ridge was opened that's in photo 40* that we went over a moment ago, correct?
>
>A: *That is the only area that we had opened.*
>
>Q: And the areas that you didn't open you can't confirm whether there are cleats or not there, correct?
>
>A:  That's correct.

Exhibit 2 at 22:17 to 23:11. (emphasis added, objections omitted).

35. He reiterated that the damage found after Hurricane Irma was on the exact same ridge seam that he opened up as shown in Photo 40 in his 2014 expert report:

>1Q:      You say during the April 2018 site visit the ridge lines between the pans on the east side of the main pavilion failed by opening up during Hurricane Irma. The only -- you used the plural, ridge lines. The only one we know of is the one that was opened in Exhibit 40 – not Exhibit 40, but photo 40, correct?
>
>A:  Yes.

*Id.* at 25:18-24.

36. Sanders expressly linked the 2017 hurricane damage directly to the alleged defect he identified in 2014:

>Q: But your suggestion is on the ridge line there wouldn't have been damage had there been cleats, is that a fair statement?
>
>A:  Yes, that's a correct statement.

Exhibit 7 at 100:6-9.

37. In 2018, while the Superior Court case was still pending, Friedberg filed a separate lawsuit in this Court. Rather than asserting the hurricane damage as additional damage for the alleged defects Friedberg was already asserting in the Superior Court, Friedberg initiated the present litigation. *See* Exhibit 13, Doc. No. 1, District Court Complaint.

38. In his District Court Complaint, Friedberg advanced a theory that directly contradicted the facts established by Sanders' 2014 inspection and testimony. Specifically, Friedberg alleged:

"The failure to install the cleats at 9.5 inches on center was a latent defect *that was not discoverable prior to September 7, 2017,* since the cleats were to have been placed underneath the copper panels and copper pans and their existence or non-existence would not have been visible to the naked eye or upon reasonable inspection since the cleats are concealed. The failure to install the cleats became discoverable after the intersection of the copper pans separated where there were no cleats. The failure to install the cleats in accordance with the plans and specifications of the contract is a breach of the construction contract and constitutes a latent defect under 5 V.I.C. § 32b since *the failure to install the cleats was not apparent by reasonable inspection prior to September 7, 2017*." Exhibit 13, ¶11 (emphasis added).

39. Sanders' 2014 opinion and his deposition testimony in both cases establishes beyond dispute that the alleged defective condition of missing cleats securing the ridge seams was known to Sanders (and therefore to Friedberg) by September 11, 2014, the first day of his roof inspection made as part of the Superior Court case. *See* Exhibit 8.

40. In 2023, the Superior Court case was resolved through a monetary settlement. The settlement was purely financial; no repairs were performed as part of the resolution. It

resulted in a general release with a specific and limited carveout of only claims that were asserted in the District Court case that were not encompassed in the Superior Court case:

> The settlement of the above-entitled Superior Court Lawsuit does not extinguish the claims in the District Court case number 3: 19-cv-0053 to the extent that District Court case does not encompass claims that were asserted in the above-entitled Superior Court case.

Exhibit 14, Settlement Agreement. (The quoted statement above is repeated four separate times in the Settlement Agreement.)

41. Friedberg claims that this law "deal[s] exclusively with the main house on the lower portion of Plaintiffs' property." *See* Exhibit 15, Plaintiffs' Opposition to Defendant's Motion to Dismiss.

42. Friedberg also stated that "[t]he claims in the Superior Court Action are limited to the two upper buildings—the gate house and the garage/studio. *Id.* at 3.

43. A final judgment dismissing the Superior Court Case with prejudice was entered with no carve out of any claims asserted in that case. Exhibit 16, Final Judgment in Case No. ST-2010-CV-00716.

44. Sanders admitted that he did not have the expertise to opine as to the windspeeds that cleats could withstand if they encountered winds in excess of 200 miles per hour and explained "you need someone who diagnoses these things from the industry to respond to that. Perhaps somebody from Copper and Common Sense or perhaps someone from Miami Dade." Exhibit 7 at 104:13-20).

45. When asked to acknowledge that "wind damage, wind speeds, what damage would be caused by what speed" was not in his expertise, Sanders agreed, stating, "I'm not in that business, no." *Id.* at 105:6.

46. Sanders expressed his personal belief that a "[i]f there were cleats there, there would be no uplift damage to a reasonable wind speed, including *maybe* the second largest storm in St. John's history" and that a "reasonable wind speed was "*[m]aybe* a 175 miles per hour." *Id.* at 104:3-5.

47. Sanders thought the highest wind speed on St. John was 176 mph. *Id.* at 104:6-12.

48. In his report supporting the insurance claim, Sanders claimed that more than 80 panels (pans) were damaged, justifying replacing the entire roof and he makes no mention of missing cleats contributing in any way to the loss. Exhibit 11 at Page 1.

49. Sanders' opinions are based on assumptions. Exhibit 7 at 112:1 to 114:2).

50. Sanders is only able to testify with 51% certainty that the cleats, if installed as he claims was required by the contract, would have allowed the roof to remain unscathed. *Id.* at 100:20 to 101:4.

51. In Sanders' Report for his insurance case, he does not allege any fault to the cleats. Exhibit 11 at Page 1.

52. Friedberg knew about the lack of cleats on the ridges as least as of September 11, 2014 when Sanders unfolded the ridge seam. Exhibit 5.

53. Moreover, Friedberg was alleging general defects with the main pavilion roof as early as 2012. Exhibit 5 at Page 2.

54. In Sanders' report in 2014, he opined that the replacement cost of the Main Pavilion roof was $358,771. Exhibit 5 at Page 47.

55. Friedberg asserts that the same replacement cost is between $682,301 and $712,540. Exhibit 17 at Page 2, Expert Report of Laura Fuchs Dolan.

Date: December 14, 2025

s/ Jeffrey C. Cosby, Esq.

Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL  34994
Telephone: 772-463-8402
Facsimile: 772-463-4820

<u>s/ Andrew C. Simpson, Esq.</u>
Andrew C. Simpson, Esq.
VI Bar 451
Attorney for Defendant Daybreak Inc
2191 Church Street, Ste. 5
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone No. (340)719-3900