# EXHIBIT "P"

```
              IN THE UNITED STATES DISTRICT COURT

                    OF THE VIRGIN ISLANDS

              DIVISION OF ST. THOMAS AND ST. JOHN


THOMAS F. FRIEDBERG & SARAH L.   ) ACTION NO.
BUNGE,                           ) 3:19-cv-0053-RAM-EAH
                                 )
            Plaintiffs,          )
                                 )
     vs.                         )
                                 )
DAYBREAK, INC., dba HUBER &      )
ASSOCIATES,                      )
                                 )
            Defendant.           )
_____)
```

VIDEO-RECORDED

VIDEOCONFERENCE DEPOSITION OF

NON-RETAINED EXPERT MICAH CADY

October 7, 2025

Reported by Beth A. Ballerini, CSR

Certificate No. 7358

Job No. 131974

**Page 22**

1    A.   He estimated the projects.  He put the
2  quantities together and got the pricing.
3    Q.   Do you know if Mr. Burbach actually went down
4  and measured the roofs?
5    A.   I don't know that for a fact.
6    Q.   Ron Barker you said was, I believe, a project
7  manager?
8    A.   At one point he was, yes.
9    Q.   Was he a project manager for this project?
10   A.   I cannot recollect.
11   Q.   At the time that you went down to work on the
12 project, were you advised by Barry or anyone else in the
13 organization that the contract prepared by Huber &
14 Associates, among other things, had three requirements:
15 One is that the cleats be spaced on an average of
16 9 1/2 inches on center; the second requirement is
17 compliance with Copper & Common Sense; and the third
18 requirement was compliance with SMACNA?
19        Were you aware of that?
20        ATTORNEY COSBY:  Object to the form.
21        You can answer.
22        THE WITNESS:  At the time I know we went over
23 the details for the project of what was involved in it.
24 I'm sure we had a meeting before we left.  But to those
25 three specific items, 15 years ago, I couldn't tell you.

**Page 23**

1  BY ATTORNEY FRIEDBERG:
2    Q.   Is it standard in the industry to comply with
3  the contract terms for the roof in performing the work
4  pursuant to a roofing contract?
5        ATTORNEY COSBY:  Object to the form.
6        THE WITNESS:  Yes.
7  BY ATTORNEY FRIEDBERG:
8    Q.   And if there are requirements in the contract
9  that cannot be met for any reason, is that something
10 that generally is documented?
11   A.   It's usually brought to the attention if it's
12 something that can't be done, and then there's another
13 way that they go about doing it.
14   Q.   Is there any -- strike that.
15        Were you done?
16   A.   No.  I mean, as far as documentation, I don't
17 know if there would be documentation of it.  Just a
18 conversation.
19   Q.   Are you aware of any evidence that exists in
20 any format in this case for the fact that the three
21 requirements which I previously mentioned could not be
22 complied with?  Those requirements are:  installation of
23 the cleats on an average of 9 1/2 inches on center; two,
24 compliance with SMACNA; and, three, compliance with
25 Copper & Common Sense?

**Page 24**

1        ATTORNEY COSBY:  Object to the form.
2        You can answer.
3        THE WITNESS:  No reason it couldn't be.
4  BY ATTORNEY FRIEDBERG:
5    Q.   What did you do to evaluate the claims --
6  well, let me ask you, were you asked to evaluate the
7  claims in this case?
8    A.   Can you be more specific as to claims?
9    Q.   Well, I'm looking at paragraph 3 on P6.  It
10 says:
11           Mr. Cady has evaluated claims that
12           the copper standing seam roof at
13           168 Chocolate Hole Road in St. John
14           sustained wind uplift damage during
15           Hurricane Irma due to installation
16           deficiencies.
17       Do you see that sentence?
18   A.   Hang on one second.  My thing was blocking it.
19 Move my stuff over.
20       So I have evaluated the claims that the copper
21 standing seam roof at Chocolate Hole sustained wind
22 damage.
23       I have evaluated the claims, correct.
24   Q.   All right.  What claims did you evaluate?
25       Well, first of all, did you evaluate claims?

**Page 25**

1    A.   The claims as in evaluate the issues you were
2  having on the roof based on this claim.
3    Q.   All right.  Well, what issues were you
4  specifically asked to evaluate?
5    A.   The fact, I guess, that due to the -- you said
6  the workmanship -- we didn't install clips at the hips,
7  is what we evaluated.
8    Q.   Okay.  And what was the upshot of your
9  evaluation?
10   A.   It's not --
11        ATTORNEY COSBY:  Form.
12        THE WITNESS:  Go ahead.
13        ATTORNEY COSBY:  Sorry.  I object to the form.
14        You can answer.
15        THE WITNESS:  It's not a common standard; it's
16 not a requirement.  So there were no hips -- no clips in
17 the hips.
18 BY ATTORNEY FRIEDBERG:
19   Q.   Are you required --
20        ==Are you aware of what SMACNA and Copper &==
21 ==Common Sense state regarding hips -- strike that --==
22 ==regarding clips at the hip/ridge --==
23   ==A.   I believe SMACNA is an option, and it is not==
24 ==mentioned in Copper & Common Sense.  It's not in there.==
25   ==Q.   So if I understand what you're telling me is==

```
 1    SMACNA does have a -- does SMACNA have a requirement of
 2    cleats to be placed in the hip/ridge intersection?
 3           ATTORNEY COSBY:  Object to the form.
 4           You can answer.
 5           THE WITNESS:  Requirement?  No.
 6    BY ATTORNEY FRIEDBERG:
 7       Q.  Well, is SMACNA -- what does SMACNA say
 8    regarding cleats or clips at the hip/ridge intersection?
 9           ATTORNEY COSBY:  Form.
10           You can answer.
11           THE WITNESS:  I believe it's an option.
12    Optional.
13    BY ATTORNEY FRIEDBERG:
14       Q.  What do you mean by option or optional?
15       A.  It's -- I believe from what I read, it's an
16    option.
17       Q.  And when did you read the SMACNA requirements?
18       A.  In the last month.
19       Q.  And what was the purpose of reviewing the
20    SMACNA requirements?
21       A.  The purpose of reviewing the clips.
22       Q.  And what would be the purpose, if you know, of
23    having clips or cleats on a hip/ridge intersection?
24       A.  If the panels are extra wide, you may need
25    some more cleating.  But on common practice, they're
                                                       Page 26
```

```
 1    installed on the edges of the panels only.
 2       Q.  Let's go to P8.
 3           Let me stop you right there.  Yeah, P8.
 4           Have you seen this document before, the May 7,
 5    2010, proposal?
 6       A.  I don't know -- yeah, May 7, correct.  Yes, I
 7    have.
 8       Q.  And you understand this is the contract under
 9    which Huber & Associates was operating on for this
10    project?
11       A.  Yes.
12       Q.  All right.  Do you see Section II, bullet
13    point 2 in the middle of the page?
14           Do you see that?
15       A.  Yeah, I see it.  Sorry.  I do.
16       Q.  All right.  Am I reading this document
17    correctly saying that under Section II, item No. 2 --
18    there are some bullet points, and the first bullet
19    point is:
20               Installed in accordance with Revere
21               Copper & Common Sense & SMACNA.
22       A.  Correct.
23       Q.  In other words, the installer doesn't have a
24    discretion and has to comply with both Revere and Copper
25    & Common Sense as well as SMACNA.
                                                       Page 27
```

```
 1           Would you agree?
 2       A.  I would agree.  But what you're referring to
 3    is an option.  It's not a standard; it's not a
 4    requirement.
 5       Q.  Well, let me ask you this:  Is it listed as
 6    optional in the contract?
 7       A.  It doesn't specifically list clips on
 8    [inaudible] --
 9           THE COURT REPORTER:  It doesn't specifically
10    list -- I'm sorry, I couldn't hear you.
11           THE WITNESS:  It doesn't specifically list or
12    itemize clips on the hip.
13    BY ATTORNEY FRIEDBERG:
14       Q.  The contract is specific and says that the
15    copper standing seam roof is to be installed in
16    accordance with Revere Copper & Common Sense and SMACNA.
17           Am I reading that correctly?
18       A.  You are correct.
19       Q.  All right.  There's no further explanation,
20    delineation, or further discussion regarding options to
21    comply with Revere Copper & Common Sense or SMACNA in
22    the four corners of the contract.  Agreed?
23       A.  Agreed, but just one note.  Just because the
24    book has multiple options doesn't mean you do every
25    option.
                                                       Page 28
```

```
 1       Q.  Is there any -- okay.  I'm going to move to
 2    strike as nonresponsive.
 3           Is there anything in the contract that allows
 4    the installer to pick and choose which requirement --
 5    under SMACNA or Revere Copper & Common Sense --
 6    according to what they want to do?
 7           ATTORNEY COSBY:  Object to the form.
 8           You can answer.
 9           THE WITNESS:  Not specifically in the
10    contract.  But, again, you don't do every option in the
11    book just because it lists the book.
12    BY ATTORNEY FRIEDBERG:
13       Q.  All right.  I'll move to strike as
14    nonresponsive.
15           Sir, in the body of the contract is there any
16    limiting language giving the installer or the roofing
17    contractor any discretion to deviate from installation
18    in accordance with Revere Copper & Common Sense and
19    SMACNA?
20           ATTORNEY COSBY:  Object to the form.
21           You can answer.
22           THE WITNESS:  In the contract, no, there's
23    not.
24    BY ATTORNEY FRIEDBERG:
25       Q.  And in addition to the contract, it says:
                                                       Page 29
```

```
 1              Cleats installed at an average of
 2              9 1/2 inches O.C. -- meaning on center --
 3              with 2 ring shank nails per cleat.
 4         Do you see that?
 5     A.  Correct.
 6     Q.  And that's one of the items in the contract
 7  specifically, correct?
 8     A.  Yes.
 9     Q.  And there's no mention in the contract of
10  excluding installation of cleats in the hip/ridge
11  intersections, is there?
12         ATTORNEY COSBY:  Object to the form.
13         You can answer.
14         THE WITNESS:  There's not.  There's also no
15  line item including the hips because it's not a
16  standard.
17  BY ATTORNEY FRIEDBERG:
18     Q.  Move to strike as nonresponsive.
19         Sir, in accordance with -- when I say four
20  corners of the contract, I mean the actual contract
21  document.
22         Within the four corners of the contract is
23  there any language that limits the location where cleats
24  are to be installed?
25         ATTORNEY COSBY:  Object to the form.
                                                    Page 30
```

```
 1         You can answer.
 2         THE WITNESS:  No.
 3  BY ATTORNEY FRIEDBERG:
 4     Q.  Within the four corners of the contract is
 5  there any statement or language indicating cleats are
 6  not to be installed at the hip/ridge intersections?
 7         ATTORNEY COSBY:  Form.
 8         You can answer.
 9         THE WITNESS:  No.
10  BY ATTORNEY FRIEDBERG:
11     Q.  Is it your testimony that you've never
12  installed clips or cleats at hip/ridge intersections?
13     A.  That is correct.
14     Q.  Have you ever spoken to Mr. Brag, the expert
15  hired by counsel in this case?
16     A.  I have not.
17     Q.  Are you aware of what Mr. Brag testified to in
18  his deposition regarding the requirement for clips or
19  cleats in the hip/ridge intersection?
20     A.  I have not read that.
21     Q.  Have you been informed what Mr. Brag testified
22  to by anybody?
23     A.  No.
24     Q.  Have you reviewed Art Sanders' depositions,
25  Volume I and II, taken in this case?
                                                    Page 31
```

```
 1     A.  I don't believe I have, no.
 2     Q.  Have you been advised what Mr. Sanders
 3  testified to regarding the requirement for cleats or
 4  clips at the hip/ridge intersection?
 5     A.  No.
 6     Q.  In your role at Huber, do you actually draft
 7  contracts, roofing proposals?
 8     A.  Currently or at the time of 2010?
 9     Q.  Currently.  Let's start there.
10     A.  I help review them, not draft.
11     Q.  Who drafts them?
12     A.  It's a combination -- go ahead.
13         Yeah, a combination between Barry, Jamin.
14     Q.  Do you have any involvement in drafting
15  proposals?
16     A.  No.
17     Q.  Have you ever had any involvement with
18  drafting proposals?
19     A.  Not unless they're out of town and I've got to
20  do something with it.  But no.  I help review them, but
21  not draft them.
22     Q.  All right.  Well, in this case the work was
23  out of town.  So you didn't have anything to do with the
24  proposal in this case, did you?
25     A.  No.  I was referring to, like, if Barry or
                                                    Page 32
```

```
 1  Jamin was out of town.  Then maybe I have to help out.
 2  But I'm not -- as far as this contract or proposal,
 3  drafting it, no, nothing.
 4     Q.  How do you define -- or do you have a
 5  definition of wind uplift?
 6     A.  Repeat the question.
 7     Q.  Sure.
 8         ATTORNEY FRIEDBERG:  Can you read it back.
 9         (Record read:
10             Q.  How do you define -- or do you have
11             a definition of wind uplift?)
12         THE WITNESS:  I know there's written
13  standards.  I know Miami-Dade has a wind uplift standard
14  they go by.
15  BY ATTORNEY FRIEDBERG:
16     Q.  What is wind uplift?
17     A.  It's a calculation to calculate the velocity
18  of the wind uplift.
19     Q.  Okay.  Maybe I'm asking -- let me ask you a
20  little more basically.
21         What does wind uplift mean to you?
22     A.  It's a calculation done to know how many clips
23  or fasteners or how something needs to be fastened for
24  the wind zone that it's in.
25     Q.  Does the wind uplift have something to do with
                                                    Page 33
```

```
 1  Volume II of his depositions, taken within the last
 2  60 days?
 3      A.   No.
 4      Q.   And you haven't reviewed Mr. Brabas's
 5  deposition I believe taken within the last 30 days?
 6      A.   No.
 7      Q.   And you have not reviewed Mr. Brabas's
 8  photographs or documentation concerning what he
 9  encountered post-Irma while inspecting the roof,
10  correct?
11      A.   Correct.
12      Q.   It goes on on this disclosure to say you're
13  expected to offer opinions on roofing installation
14  practices.
15           What are your opinions?
16      A.   On the specific project?
17      Q.   I'm reading the statement.  You can look at it
18  here on P6, Exhibit 1.  It says that further he -- being
19  you -- is expected to offer opinions on roofing
20  installation practices.
21           So I'm asking, what are your opinions?
22      A.   We do -- we follow the standards.  We don't
23  take shortcuts.  We do things by the book.  We do things
24  according to how it should be done professional, and I
25  think we did a great job.
                                                   Page 38
```

```
 1      Q.   If, hypothetically, the standard of care of
 2  roofing installation practices require that clips be
 3  placed at the hip [inaudible] --
 4           THE COURT REPORTER:  I'm sorry, I can't hear
 5  you.  Require that --
 6  BY ATTORNEY FRIEDBERG:
 7      Q.   -- clips be placed at the hip/ridge
 8  intersection, you would agree that was not done in this
 9  case?
10      A.   Correct.
11           ATTORNEY COSBY:  Object to form.
12           You can answer.
13           THE WITNESS:  Correct.  It wasn't a
14  requirement.
15  BY ATTORNEY FRIEDBERG:
16      Q.   I'm going to move to strike everything after
17  requirement.
18           You agree that this was not done in this
19  particular case in terms of clips being installed at the
20  hip/ridge intersection.  Agreed?
21      A.   Agreed.
22      Q.   What are your opinions regarding industry
23  standard of care?
24      A.   Could you rephrase the question?  Industry
25  standard of care as in?
                                                   Page 39
```

```
 1      Q.   I'm reading the statement, sir.  Do you have
 2  that in front of you?  Do you see what I'm reading?
 3      A.   No.  It's not on the screen.
 4           ATTORNEY FRIEDBERG:  Can you put it up, John.
 5           Hey, John, are you still there?
 6           THE VIDEOGRAPHER:  Yes.  Someone just came and
 7  asked me something.  I didn't hear you, sir.
 8           ATTORNEY FRIEDBERG:  Can you put up P6 of
 9  Exhibit 1 up on the screen.
10  BY ATTORNEY FRIEDBERG:
11      Q.   Do you see that, Micah?
12      A.   I do now, yup.
13      Q.   So I'm reading in the kind of -- I don't know,
14  the third sentence down about what you're expected to
15  offer, and one of the areas is industry standards of
16  care.
17           Do you see that?
18      A.   I'm looking for it.  Hold on.
19      Q.   It says:  Further, he's expected to offer
20  opinions --
21      A.   -- on the roofing install practices, industry
22  standards of care.
23           So industry standards of care is basically
24  maintenance on the roof, in my opinion.  You know,
25  yearly inspections.
                                                   Page 40
```

```
 1      Q.   All right.  Well, what opinions do you have
 2  regarding industry standards of care?
 3      A.   Each -- each roof is different, whether it be
 4  copper, slate, cedar.  Each one kind of carries a
 5  different set of standards.
 6           Industry standards of care, even with copper,
 7  and even a roof, it's best to do a yearly or, you know,
 8  semi-annually inspection of a roof to make sure that all
 9  flashing, sidewall flashings, headwall flashings, seams,
10  and everything is still in good shape and everything is
11  good to go.
12      Q.   Have you seen any evidence regarding any
13  inspections or maintenance on this roof?
14      A.   I have not.
15      Q.   Are you aware of any inspections or
16  maintenance on this roof?
17      A.   No.  Maintenance would have to be scheduled.
18  And no, I'm not aware of any.
19      Q.   So insofar as the roof at 168 Chocolate Hole,
20  you have no actual knowledge of any maintenance or
21  repairs or inspections since the time that you left
22  St. John in July of 2010.
23           Would that be true?
24      A.   I am not aware of any, correct.
25      Q.   You also -- there's another area here:  Causes
                                                   Page 41
```

Micah Cady                                                          October 7, 2025

1                    REPORTER'S CERTIFICATE

2

3          I, Beth A. Ballerini, Certified Shorthand

4    Reporter in and for the State of California, do hereby

5    certify:

6          That the witness was by me duly sworn, and

7    the foregoing testimony was reported by me and was

8    thereafter transcribed with computer-aided

9    transcription; and the preceding pages contain a full,

10   complete, and true record of said proceeding.

11         I further certify that I am a disinterested

12   person and am in no way interested in the outcome of

13   said action or connected with or related to any of the

14   parties in said action or to their respective counsel.

15         The dismantling, unsealing, or unbinding of the

16   original transcript will render the Reporter's

17   Certificate null and void.

18         IN WITNESS WHEREOF, I have hereunto set my hand

19   this 21st day of October 2025.

20         __X__  Reading and Signing was requested.

21         _____  Reading and Signing was waived.

22         _____  Reading and Signing was not requested.

23

24                              _____
                                Beth A. Ballerini, CSR
25                              Certificate No. 7358