# Exhibit 2



IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

ACTION NO. 3:19-cv-0053-RAM-EAH


| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH BUNGE, | ) |
| | ) |
| Plaintiffs, | ) |
| vs. | ) |
| | ) |
| DAYBREAK, INC., dba HUBER & ASSOCIATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |



VIDEO-RECORDED DEPOSITION OF

JOE BRAGG

SEPTEMBER 23, 2025




REPORTED BY:  SUSAN L. FOSTER, CSR

Certificate No. 2942




Job No. 130860

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

ACTION NO. 3:19-cv-0053-RAM-EAH


THOMAS F. FRIEDBERG & SARAH BUNGE,      )
                                        )
                Plaintiffs,             )
vs.                                     )
                                        )
DAYBREAK, INC., dba HUBER  &            )
ASSOCIATES,                             )
                                        )
                Defendant.              )
                                        )
_____)



        The video recorded deposition of JOE BRAGG was
taken pursuant to Notice of Service of Plaintiffs' Notice
of Deposition and Request for Production at Sarasota,
Florida, on Tuesday, September 23, 2025, commencing at
8:00 A.M. before Susan L. Foster, CSR No. 2942, a
Certified Shorthand Reporter in and for the State of
California.

A P P E A R A N C E S

                (All appearances via Zoom)


For the Plaintiffs:

      LAW OFFICES OF FRIEDBERG & BUNGE
      BY:  THOMAS F. FRIEDBERG, ESQ.
      1005 Rosecrans Street, Suite 202
      P.O. Box 6814
      San Diego, California 92166
      (619) 557-0101
      tom@lawofficefb.com


For the Defendant Daybreak, Inc.:

      WILLIAMS, LEININGER & COSBY, P.A.
      BY:  JEFFREY C. COSBY, ESQ.
      301 SE Ocean Boulevard, Suite 205
      Stuart, Florida 34994
      (772) 463-8402
      eservice@wlclaw.com


Videographer:

      JOHN DUSENBERRY
      Lexitas Legal Solutions


Also Present:


      Sarah Bunge, Esq., Plaintiff

I N D E X

WITNESS:

JOE BRAGG


Examination by:                                      PAGE

     MR. FRIEDBERG                                    6

     MR. COSBY                                       115



I N D E X   O F   E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | WSJ report<br>(Bates P000001 - P000060) | 118 |
| Exhibit 2 | Billing Statement dated 9/18/2025<br>(Not provided to reporter) | --- |
| Exhibit 3 | Dahill Report with photos by<br>Mr. Barabas, 3/8/2019<br>(Bates P000332 - P000366) | 118 |
| Exhibit 4 | Photos taken by Mr. Bragg showing<br>holes in roof<br>(Not provided to reporter) | --- |

SARASOTA, FLORIDA, TUESDAY, SEPTEMBER 23, 2025

8:02 A.M.

THE VIDEOGRAPHER:  Good morning.   We are now on the record. Today's date is September 23rd, 2025.   The time is approximately 8:01 A.M. Pacific time.  This is the recorded deposition of Joe Bragg, testifying in the matter of Friedberg versus Daybreak, Inc.  It is in Federal District Court of the Virgin Islands, Division of St. Thomas and St. John's, Case No. 3:19-cv-0053-RAM-EAH. This deposition is taking place via Zoom Videoconferencing.  My name is John Dusenbery.  I'm the videographer with Lexitas.  The California Certified Shorthand Reporter today is Susan Foster.  The deposition is being recorded at all times unless all Counsel agree to go on or off the record.

Will all Counsel present please state your appearance, starting with the noticing attorney?

MR. FRIEDBERG:  Good morning.  This is Tom Friedberg on behalf of myself and Sarah Bunge.

MR. COSBY:  Jeff Cosby on behalf of Daybreak.

THE VIDEOGRAPHER:  Susan?

THE REPORTER:  Counsel, can we go off the record?

THE VIDEOGRAPHER:  You're having an issue. We're going off the record.  Going off the record at

approximately 8:03 A.M.

       (Discussion off the record.)

       THE VIDEOGRAPHER:  Okay.  One moment.  We're back on the record at 8:07 A.M.

       Will the court reporter please swear the witness?

JOE BRAGG,

having been first duly placed under oath,

testified remotely as follows:

E X A M I N A T I O N

BY MR. FRIEDBERG:

   Q.   Good morning, Mr. Bragg.  My name is Tom Friedberg and I understand you've been designated as an expert on behalf of Daybreak; is that correct?

   A.   Yes, sir.

   Q.   All right.  I've looked through your materials. I take it you've been deposed in the past?

   A.   Yes, sir.

   Q.   Approximately how many times?

   A.   Over 60, I believe.

   Q.   All right.  When was the last time you had your deposition taken?

   A.   Yesterday.

   Q.   Are you sufficiently familiar with the general instructions I may dispense with them?

A.   Yes, sir.

Q.   All right.  If for any reason any of my questions you're not sure what they are or doesn't make sense to you, or don't understand them, just speak up and I'll be more than glad to rephrase, okay?

A.   Thank you.

Q.   All right.  I have some materials that were sent to me by e-mail, but I do want to go over the notice of deposition request for production.  Do you have that in front of you, sir?

A.   I can grab it, yes, sir.

Q.   All right.  We're going to mark as Exhibit 1 the documents which I previously sent which are Bates stamped one through -- P1 through P60.  Do you have those in front of you?

A.   Yes.

Q.   All right.

A.   Do you have this --

Q.   I also note that there were some additional materials that were sent.  One was a billing statement through August 19, 2025 -- actually the billing statement dated September 18th, 2025.  Do you have that in front of you, sir?

A.   I do.

Q.   All right.  We're going to mark that as -- I

guess we'll mark this Exhibit 2.  Are there any other
billing statements?

     A.   Not that I'm aware of, no, sir.

     Q.   Okay.  What I'd like to do is make sure I
understand what all you have reviewed.  What depositions
have you reviewed?

     A.   I have only reviewed Mr. Sanders' first
deposition, Mr. Huber's first deposition, and his
son-in-law, Micah, I believe is his name.

     Q.   Okay.  All right.  And Huber's first deposition,
you mean the deposition in this particular case as
opposed to the prior case?

     A.   Prior case.

     Q.   Okay.  Have you -- the prior case meaning the
Superior Court and not the Federal Court case?

     A.   The initial -- the initial case I've read from
head to toe.  The most recent, I've perused.

     Q.   All right.  I'm not sure I understand that.

     A.   Well, yeah.

     Q.   So -- okay.  All right.  So if I understand,
you've seen Sanders Volume I.  That's from this case, the
Federal Court case?

     A.   Yeah.  The Federal Court case for this case, I
perused versus reading every single word of his initial
deposition from the initial court case.

Q.   Okay.  And Mr. Huber, what depositions have you reviewed?

A.   That's Mr. Huber.  I'm sorry.  Was I confused?  Is that what you asked the first time?

Q.   Well, I'll restart.

A.   Thank you.

Q.   Let's start with Mr. Sanders.

A.   Mr. Sanders.  All right.

Q.   What deposition did you review?

A.   His first one only.

Q.   The one for this case?

A.   No.  His last case, from 2015.

Q.   Okay.

A.   And I perused his most recent.

Q.   I'm not sure I understand what perused means.

A.   It's just a loose reading of it.  I'm not reading every word.  Just kind of going through it quickly.

Q.   Did you make any notes?

A.   No.

Q.   Is there anything in particular that you are relying on or stood out?

A.   Only the fact that he did --

MR. COSBY:  Form.

THE WITNESS:  Only the fact that he did mention

that there was no windows or doors at the time of his
inspection after the hurricane.

BY MR. FRIEDBERG:

    Q.   All right.  We're going to come back to that.

    A.   Yep.

    Q.   And Mr. Huber, which depositions have you
reviewed?

    A.   His initial one from the very first case, and
I -- and I quickly read over the most recent one.

    Q.   Anything in particular in the most recent one,
meaning this particular case, that stands out that you're
relying on?

    A.   No, sir.

    Q.   And you -- in terms of Mr. Cady, did you review
his deposition?

    A.   Yes, sir.

    Q.   Okay.  What about my deposition or Sarah Bunge's
deposition?  Did you review those?

    A.   No, sir.

    Q.   What about Chris Bunge's deposition, did you
review that?

    A.   No, sir.

    Q.   Were you provided those?

    A.   I believe so, yes, sir.

    Q.   All right.  Any particular reason you didn't

review them?

    A.   Well, I was assigned to try to understand the roof system itself, the components that went into it, the methodologies.  And I believe that it was just more critical for me to understand from the roofer's standpoint as well as the architect's standpoint more so.

    Q.   Okay.  What about any of the Dahill folks?  Did you review their deposition, Mr. Barabas or Mr. Miyoko?

    A.   No, sir.  I did review the reports.

    Q.   All right.  You mean the -- the photograph reports from Mr. Barabas?

    A.   Yeah.  The most recent one that came in just a couple days before discovery.

    Q.   All right.  Let's -- we're going to mark the Dahill report you just referred to as Exhibit 3.  This a series of photographs that were produced or taken by Mr. Barabas.  I think it was in 2018 or 2019.  Did you see those?

    A.   I saw a report.  I did not see any pictures, like any raw pictures.

    Q.   You have not seen any raw pictures?

    A.   No, sir.

    Q.   Okay.  So I'm not sure which raw -- which documents are you referring to in the Dahill report?  Can you describe it?

A.   Yeah.  It was the one released after their
return from the breakdown, the most recent one that was
given to us that we didn't have up until recently.  It
showed pictures of what they interpreted as damages and
the actions that they took.  They kind of had a punch
list -- bullet point, I should say, where they describe
each building and what they observed along with
corresponding pictures.

Q.   Would that be the third disclosure statement?

A.   Yeah, it was the one that just came in last --
it was probably one of the last things I received.

Q.   Right.  Well, I need to identify it, and
unfortunately, I'm real remote --

A.   Mm-hmm.

Q.   I'm pulling up your -- the electronic file notes
provided to me, and it says under Dahill, Repair Report
and Disclosure.  That's the third disclosure statement.
Is that the document you're referring to?

A.   Yes, sir.

Q.   And let's mark those exhibit -- I think we
marked that as Exhibit 3.

A.   Yeah, it had a date on it of March 8, 2019.

Q.   All right.  There is a series of other
photographs that were -- let me ask you:  Have you
reviewed any other photographs from Mr. Barabas?

A.   I believe I haven't.

Q.   You have or have not?

A.   I have not.

Q.   Okay.  Have you been advised what Mr. Barabas testified about?

A.   No.

Q.   All right.  What was your specific scope of assignment in this case?

A.   I was asked to go out there and observe the roof and try to understand through the documentation given to me whether or not, A, the system had been installed correctly per the contract, and B, was there any wind damage that could be identified.

Q.   Was it your expectation you'd be provided all the materials from defense counsel?

A.   I just receive what I receive.  I don't have any expectation.  I just ask, and yeah.  I mean I definitely asked after the onsite if there was any documentation regarding any previous repairs.

Q.   Were you provided any information regarding repairs made after Hurricane Irma?

A.   Not until a couple days before the last discovery.

Q.   And what specifically is your understanding of what was repaired?

A.    It didn't look like much was repaired to me.

Q.    Okay.  Was anything repaired?

A.    It didn't look so on the main house, no.

Q.    All right.  So it's your testimony there were no repairs performed after Hurricane Irma?

A.    It's my testimony that I cannot -- I can't recognize or identify any repairs, and the pictures are too ambiguous to understand whether repairs were required in the one area along the hip.

Q.    Okay.  Are you aware that Mr. Barabas was deposed about what repairs he performed?

A.    No, because I didn't read it.

Q.    Did Counsel advise you what Mr. Barabas testified about?

A.    I believe I already answered that question, sir. No one has spoken to me about what Mr. Barabas said.

Q.    I'm sorry, no one spoke to you about what Mr. Barabas said; is that your testimony?

A.    Yes.  That would be the second time I've answered that, yes, sir.

Q.    All right.  Let me ask you a little bit about your experience.

      How long have you been involved in forensic work such as what you're doing here today?

A.    Well, I've been paid as an expert for about the

last six years in this capacity.  However, prior -- prior
to that, I did serve wind hail claims for a company
called Grip for approximately at least five years in New
York.

Q.    I'm sorry, what was the name of that company?

A.    Grip.

Q.    Spell it.

A.    G-R-I-P.

Q.    Any particular reason that's not on your resume?

A.    Hmm, no.  I -- I would do it on the weekends and
I feel like my more recent is more important versus that.

Q.    Well, how long did you work for Grip Claims?

A.    Just on the weekend, I would do probably one or
two a weekend in the summertime.  So it's not like I did
a ton, but I did do it.

Q.    During what years?

A.    Probably around 2010 to 2015.

Q.    And how many claims did you work on?

A.    Probably several score.  Not a ton.

Q.    I don't understand what several score means.

A.    Well, score is twenty.  And several is -- I
don't know.  I'm not going to put a number on it 'cause
I'm not sure.  I did more than twenty.  Probably more
than forty.

Q.    And what type of claims were those?

A.   Wind hail.

Q.   All right.  And specifically what were you evaluating?

A.   I was evaluating whether or not the roof system had been impacted and its functionality challenged by wind or hail.

Q.   And what area or location were you working then?

A.   New York back then.

Q.   So you worked as a roofer for -- when did you start working as a roofer?

A.   I'm 46.  I started at 19.

Q.   Okay.  And going through your resume, you have listed the companies you've worked for.  Are there others that are not included in your resume?

A.   I worked for two companies before I started my own business.

Q.   Okay.  And what companies were those?

A.   That would be Stockton Roofing and Siding, which is what the majority of it was, and then I worked for Precision Roofing for one season, and then I started AJ Enterprise.

Q.   All right.  Well, let's go back.  What was the first company that you worked for?

A.   Stockton Roofing and Siding.

Q.   And when did you work for Stockton Roofing and

Siding?

    A.   Hmm, probably from '99 until 2002, 2003.

    Q.   And what did you do for Stockton Roofing?

    A.   I began as a laborer, and I worked my way up to, you know, probably out of 60 guys, I was one of the top installers.

    Q.   And what type of roofs were installed?

    A.   All -- basically the whole gambit, flat roofs, shingle roofs, slate roofs, cedar shake repairs, copper roofs.  In regards to, like, bay windows and decorative lower roofs for copper.

    Q.   The copper roofs or metal roofs you installed, were those panel system?

    A.   Yeah, generally speaking.

    Q.   Did you ever do rolled form?

    A.   We did.

    Q.   All right.  And how many copper rolled form roofs have you worked on?

    A.   Hmm, probably a couple dozen.

    Q.   That's a couple dozen in your career or a just couple dozen at Stockton Roofing?

    A.   Stockton Roofing.

    Q.   And you left in 2003.  Where did you next go?

    A.   Precision Roofing.

    Q.   And where is Precision Roofing?

A.    Same area.

Q.    The New York area?

A.    Yes, sir.

Q.    How long did you work for Precision Roofing?

A.    Just one season.

Q.    And what year was that?

A.    I don't know.  It says on my resume, I think, so let me pull that up so I don't misspeak.

Q.    Well, the reason I'm asking is I don't see Precision Roofing on your resume.

A.    Yeah.  It would have been the year before I started AJ Enterprise.  We can work backwards from there on the resume.

Q.    That's roughly 2004?

A.    Yeah.  Yeah.  So I believe I stated 2003, so yeah.

Q.    All right.  What type of work did AJ Enterprise and Greenbush Construction do?

A.    We focused primarily on roof systems.  We did do siding, windows and doors occasionally, and gutters and soffit, but we were mainly a roof installation company.

Q.    And you were there, looks like, 11 years; is that right?

A.    Yeah, around there, yeah.

Q.    And the type of roofs that you installed were

what?

A.    Same type as previously stated.  Yeah, so same experience, same types of the roof.  Shingles, flat roofs, slate roofs, cedar shake.  And then I would moonlight and help people when they had the smaller bay window, decorative copper lower roofs.

Q.    Did you ever roll form roofing with copper?

A.    Yes.

Q.    Okay.  How many roofs at AJ Enterprises?

A.    Probably a couple dozen.  Very expensive product, and where I'm from, unless you're getting these very, very large homes, it's not used as much as it used to be.

Q.    Okay.  Generally speaking, when you worked on rolled form products, what were the sizes of the homes or the square footage of the roof just so I have an idea?

A.    Yeah, yeah.  They were probably like three or four square each, sometimes a little less, because they're decorative lower roofs on humongous homes.

Q.    Three to four square each.  I'm not sure what that means.

A.    Well, a square is ten-by-ten which is a hundred square feet.

Q.    Okay.  Were these panels or rolled form?

A.    They're -- they're rolled form.  I mean they're

rolled form, but additional to the copper, I've probably done over a hundred standing seam roofs that are either aluminum or galvanized.

Q.   Okay.  Is there a different installation of the rolled form versus panels?

A.   Sure.

Q.   What are the differences?

A.   Well, rolled you can -- you can make any -- any length you want.  Pan comes typically in ten-foot or whatever premanufactured length.

Q.   Okay.  What about the fastening systems?

A.   Fastening systems can vary.  They can be clipped.  Sometimes rolled, you can actually get a built-in nailer on them -- on some of the systems. Generally speaking, clipped --

Q.   What do you mean by a built-in nailer?

A.   Well, some of them have a built-in nailer when they're rolled out within the one side.  So there's the female side and the male side.  The male side would have a nailable lock system sometimes cut into them.

Q.   Okay.  And then how would the female side attach?

A.   It's -- it would be seamed with a machine.

Q.   All right.  So in 2016, you left and worked for Colonial Roofing?

A.    Yes, sir.  I sold my business in 2015 and moved
to Florida.

Q.    All right.  And you were -- what type of work --
you were a General Manager.  What type of work did
Colonial Roofing do?

A.    All -- every type of roof system that previously
was stated outside of slate and cedar shake.  In Florida,
there's not a lot of that, but there's much more standing
seam and tile.

Q.    By standing seam, you mean panel systems or
rolled form?

A.    Rolled form.

Q.    All right.  All right.  And then what's
production -- what's Roofing by Furry?  What type of work
did they do?

A.    They -- they primarily did residential roofs
whereas Colonial did commercial.

Q.    All right.  What is WJA Consultants?

A.    WJA Consultants is a company that was started by
a gentleman by the name of Doug Wallace, who helps
support roof systems.

Would you like me to go through all the things
we kind of do provide?

Q.    Well, yeah.  What does WJA provide?

A.    Yeah.  Yeah.  So currently, we do a lot of

in-progress inspections for commercial installations in the state of Florida, we also do wind hail claims for several insurance carriers throughout the country, and we do litigation regarding construction defect.

Q.  Okay.

A.  We also do spec packaging.

Q.  Of the cases you've been involved, let's say, in the last two years, can you give me your estimate the number of the volume of cases?  Is it ten, is it a hundred?

A.  Well, the last two years, it's definitely over 50.

Q.  All right.  Generally speaking, since you've been involved in the last six years doing litigation or forensic work, what percentage of your work is plaintiff versus defense?

A.  Yeah, it can seem like a weighted question, only because of this.  I have to say that probably 65 to 70 percent is for the defendant.  However, there are a lot of times where I go to homeowners' homes, and I'm able to mediate prior to there being any litigation involved.

Q.  All right.  What do you mean you're able to mediate?

A.  Well, there's always -- I usually come in when there's a conflict that needs to be resolved, typically

between the contractor and the owner.  There's usually two sides to every story, and I try to come in and make everyone at least compromised to a point where they can walk away without there having to be any litigious actions taken.

Q.   All right.  Who hires you in those circumstances?

A.   The homeowner.

Q.   All right.  Have you been hired by any homeowners in a litigated case to provide expert testimony against a roofing contractor?

A.   Yes.

Q.   How many times?

A.   Over a dozen.

Q.   Okay.  How many times have you been hired on behalf of an insurance company or a defense firm to give testimony in favor of the roofing contractor?

A.   The remainder of the time.  But again, that outweighs because there's several dozen times where I've been hired by the homeowner and never reached that point, although it's a similar type of construction defect issue.

Q.   What I'm trying to find out is if you can give me the numeric value of the plaintiff versus defense. Are you able to do that?

A.    No, I believe I already stated 70-30.

Q.    Right.   How many numbers?   You gave me a percentage.   I've asked for number of claims.

A.    No, I don't know off the top of my head, sir.

Q.    Okay.   At WJA, what percentage of your work is forensic work?   Is that a hundred percent or do you do anything else?

A.    50 percent.

Q.    What's the other 50 percent?

A.    The other things I previously stated, in-progress inspections, wind hail claims, spec packaging, those type of things.

Q.    Okay.   Maybe my question wasn't clear.   I'm talking about forensic work.   I'm talking about any type of investigative work as opposed to strapping on a belt and going up and building a roof.

A.    Ah.   Yeah.   I don't -- no, I don't build roofs anymore, but I would say probably 80 percent is dedicated to forensic work in some capacity.   I apologize.

Q.    What's the other 20 percent?

A.    The other 20 percent is the in-progress inspections and spec packaging.

Q.    The in-progress inspections, are those ones -- well, let me ask you:  Are those the ones that you referred you're hired by the homeowner?

A.    I can be hired by the homeowner, yes.  Most of the time, I represent general contractors.

Q.    Okay.  And -- all right.  So if I understand of the 20 percent, most of that 20 percent is for the builder or the roofing contractor?

A.    Typically, yeah.

Q.    And --

A.    That's the most consistent.

Q.    And what do you mean by in-progress inspections?

A.    Well, there's building's being erected.  They bring me in to understand the blueprints, bring up any issues that might happen with the blueprints versus Code versus practicality.  And then we do pre-bid meetings to make sure everyone's on the same page.  And then I do in-progress inspections once the installations began to ensure that the products are being installed to the manufacturer's specifications and job-specific details.

Q.    All right.  What is Haag, H-A-A-G?

A.    Haag is a -- a head sharing company that's been around about a hundred years who has done a lot of studies regarding wind hail and their impact on roof function.

        They've created a system, a scientific method to try to determine when wind or hail can impact the functionality of a system, properly identify and

communicate it.

     Q.   Well, what is the methodology that Haag

recommends using --

          THE REPORTER:  I'm sorry, Counsel, you cut out.

          MR. COSBY:  Object to the form.

          THE REPORTER:  Counsel, repeat your question,

please.

BY MR. FRIEDBERG:

     Q.   What is the methodology that Haag recommends

using in inspecting roofs?

          MR. COSBY:  Form.  You can answer.

          MR. FRIEDBERG:  Of course he can answer.  He's

the witness.  You can't instruct him, Counsel.  Go ahead.

          THE WITNESS:  When --

          MR. COSBY:  Tom, just ask your questions.  I

made objection to the form.  I've made it clear to Joe

that he can answer the question.

          MR. FRIEDBERG:  Don't instruct him what to do.

You've made your objection.  Let's move on.  Go ahead and

answer.

          MR. COSBY:  Object to the form.  You can answer

the question.

          THE WITNESS:  May I have the question repeated,

please?

          MR. FRIEDBERG:  Read it back.

Let me reask it.  Let me know when you're ready, Susan.

THE REPORTER:  Okay.  Go ahead.  Thank you.

BY MR. FRIEDBERG:

Q.  What is the methodology used as recommended by Haag in inspecting roofs?

MR. COSBY:  Form.  You can answer.

THE WITNESS:  That's definitely a broad question.  The way I do it is I go up on the property, I typically try to observe the vertical walls and surrounding property first to identify if there's any indicators of hail or wind damage.

Then proceed to the roof and do visual observations of the roof in order to identify whether or not there is any anomalies to the roof that could cause there to be a loss of function.

BY MR. FRIEDBERG:

Q.  All right.  Is the protocol recommended by Haag published anywhere to your knowledge?

A.  They're pretty well-known.  I do think that they make you kind of pay for it, from what I understand.

Q.  I'm not sure I understand.  You said they -- what was your statement?

A.  I believe they do -- they definitely publish a lot, but as far as the training goes, you have to pay for

that.  The published -- regarding the training.  But
they -- they definitely publish other articles
frequently.

    Q.  Have you paid for the training?

    A.  Yes, I have.

    Q.  All right.  And when was your training?

    A.  2020, 2021, around there.  But previously, I had
been schooled on it for Grip.

    Q.  Do you have licenses in Florida other than a
driver's license?

    A.  I do, yes, sir.

    Q.  And what licenses are those?

    A.  I have a Roofing License and a General
Contractor License.

    Q.  And they're both in good standing?

    A.  Yes, sir.

    Q.  All right.  There isn't any limitations on your
licenses?

    A.  No, sir.

    Q.  Okay.  Have you ever been a party to a lawsuit
involving any of your professional work, including
inspections?

    A.  No, sir.

        MR. COSBY:  Form.

        THE WITNESS:  Not that I'm aware of.

BY MR. FRIEDBERG:

Q.    Before being retained on this case, have you worked with Defense Counsel or his firm?

A.    No, sir.

Q.    Are you aware of who the insurance company is for Huber?

A.    I am not, no, sir.

Q.    All right.  Who have you spoken to regarding this case?

A.    I have spoken to Mr. Cosby and Mr. Huber.

Q.    Okay.  And when did you speak to Mr. Huber?

A.    Might be in the billing.  May I -- may I check real quick?

Q.    Sure.

A.    I didn't charge for it.  It was a very short conversation.  It was right before the -- my report was released.

Q.    And what did you folks talk about?

A.    Just talked about the facts of the case, tried to understand from his perspective what happened, and his interpretation.

Q.    What was his perspective?

A.    He's been roofing for 50 years and he's very confident in what he does.

Q.    Okay.  Did Mr. Huber advise you whether or not

he actually inspected the roof during the construction?

    A.   He didn't mention that to me.

    Q.   He did or did not?  I'm sorry.  I didn't hear you.

    A.   He didn't, did not.

    Q.   Okay.  Did you ask Mr. Huber how many times he actually looked at the roof?

    A.   I did not.

    Q.   Okay.  Did you speak to Mr. Cady?

    A.   I did not.

    Q.   All right.  What did Mr. Cosby tell you about the case?

    A.   Mr. Cosby just kind of gave me a highlight of the case before I took it on.  He had a problem with the standing seam copper roof in St. John; asked me if I was familiar with the standing seam copper.  I told him yes. When we met on site -- he gave me a ride there, so just small talk.  When we left, I believe we spoke about, A, if there's any existing pictures other than what's already been provided from anybody, can you please get them for me?  If there's any -- any record of repair from anybody, can you please get me that?

    Q.   Did Mr. Cosby provide you the records of repair from Dahill in 2019?

    A.   Yeah, he did.

Q.   Okay.  What's your understanding of what was
done in 2019?

A.   I -- from what it looked like on the main roof
is that the same hip that had been taken apart in the
initial inspection by Mr. Sanders had been taken apart
again, and that's -- that's all I saw in the pictures.

Q.   Okay.  What about the pictures from Mr. Barabas
in terms of the repair?  Were you aware of what was done?

A.   I wasn't aware of what was done, but I did make
some visual observations.

Q.   Visual observations from what, the photos or
from being down there?

A.   From the initial photos from everybody up until
the point when I went there.  And then when I went there,
I made my own visual observations, understanding that I
can recognize repair versus not being repaired.

Q.   Were you aware over 30 feet of the -- one of the
seams had opened up?

A.   I was never given an actual picture of it.  I --
I've seen claims of it.  I'm not disputing that.
However, that is the hip that was taken apart in the
initial 20 -- whatever Mr. Sanders' date of his initial
inspection and destructive testing was.

Q.   All right.  So are you familiar with the compass
directions of where the property is?

A.   Very familiar.

Q.   Okay.  And by "very familiar," I take it you checked the compass directions with your phone?

A.   I checked with Google Earth.

Q.   Okay.  All right.  Where did Mr. Sanders' compass direction -- where did he testify he took apart the standing seam as you testified?

A.   He took apart the field standing seam on the west side.  He took --

Q.   On the west side?

A.   Yeah.  Yeah.  If we're aligning the house dead to cardinal north, generally speaking, so that would be to the inside towards the hill.

Q.   Okay.  What about on the side towards the water?

A.   Yeah, yeah.  So that would be at about one -- 1:00 o'clock, 1:30, so essentially the northeast corner.

Q.   All right.  Was there any portion taken apart on the northeast side?

A.   Yeah, there was a hip taken apart.

Q.   Where was that hip?

A.   On the northeast side.

Q.   Maybe -- let's go back.  I had asked you initially the part that was taken apart, you said the west side.  Is that your testimony?

A.   Yes, yes, sir.  There was a portion of the field

panel on the west side that exposed multiple battens and clips.

Q.   Okay.

A.   On the northeast side, the hip was taken apart originally.

Q.   And --

A.   When I came back in 2019 and took apart the exact same hip, claiming the same things that were claimed in the 2015 observations from Mr. Sanders.

Q.   All right.  How much do you contend of the hip on the east side was taken apart by Mr. Sanders?

A.   Originally?  A ten-foot piece of the cap was taken apart to my understanding.

Q.   A ten-foot piece of the cap?

A.   Mm-hmm.

Q.   Do you mean --

A.   Well, there's a union of the two sides on the hip, and then there was a U-shaped, I suppose, cap piece that was put over top that were in ten-foot sections.

Q.   Are the panels ten-foot sections or are they longer?

A.   They're longer.

Q.   Okay.  But you say ten-foot sections, so I'm a little bit confused what you're referring to.

A.   The cap pieces.  Exactly what I said.  And

directly after I said cap piece, I said they were put in
in ten-foot sections.

Q.    The cap, you mean the portion right on the top?

A.    The U-shaped piece that I just previously
explained, yes, sir.

Q.    Can you describe to me what you mean by U-shape?

A.    Well, it's in the shape of a 'U', and it went
over top of the two joining panels, and that was riveted
in place.

Q.    So if that were removed, the cap would be in the
shape of a 'U'; is that your testimony?

A.    Generally speaking.

Q.    All right.  Are you aware of Mr. Barabas' report
or Dahill report indicating that the area of failure was
on the north side of the roof?

A.    Well, like I said, it's northeast.  And I can --
I can prove in the pictures it's the same exact hip.

Q.    All right.  Of the roughly 30 -- well, let me
ask you:  Do you agree that Dahill or Mr. Barabas
examined approximately 30 linear feet of the hip seam on
the main roof?

A.    I have no reason to believe he didn't.  He
showed one picture, probably showed about ten, 15 feet of
it, but I'm not challenging that he didn't expose 30
feet.

Q.    Do you agree that -- well, do you have any reason to disbelieve Mr. Barabas' statement that no clips were found throughout this open seam?

A.    I have no reason to disagree.  However, there's no physical -- there's no physical evidence showing that. But again, I'm not going to argue the point.

Q.    Okay.  Were there clips -- should there have been clips on all that seam?

A.    Well, if you -- if you listen to SMACNA, yes. But if you listen to Copper and Common Sense, no.

Q.    You've seen the contract in this case, right?

A.    I have.

Q.    And there's a statement that clips are to be provided an average of nine-and-a-half inches on center?

A.    Certainly.  And where they were exposed, that was confirmed.

When you say nine-and-a-half inches on center in the industry, that indicates the horizontal portion of the battens where it intersects with the vertical lock of the seam.  In no way, shape, or form does that ever have anything to do with the hip and ridge.

Q.    Well, is there any indication in the contract that the -- the clips or cleats would not be used at any -- would not be used in areas in which the panels needed to be joined?

MR. COSBY:  Object to the form.

THE WITNESS:  Again, we have to go by industry standard here.  When somebody says that a standing seam needs to be secured at nine-and-a-half inches, it is known within the industry that that is indicating the vertical section of each individual panel.  I've never heard of it in 26 years of ever being anything associated with how the hip and ridge is finished.

BY MR. FRIEDBERG:

Q.  All right.  My question to you is is that -- well, let me ask you this:  You've seen the complaint in this case?

A.  Certainly.

Q.  And you're aware it's a breach of contract claim?

A.  I'm aware that it's a breach of -- breach of contract claim, yes.

Q.  All right.  And you're aware that the contract terms that are alleged are the ones prepared in the Huber contract by Mr. Huber, agreed?

A.  Well, again, it's all in how you interpret how the nine-and-a-half spacing is.  It's convenient now to say that the nine-and-a-half spacing doesn't follow the hip and ridge, but industry standard doesn't indicate that.  In fact, there's an indication in the contract

that indicates how the hip and ridge will be finished.

    Q.   Does the contract indicate that cleats or --
cleats or clips would not be used on the hip ridge seams?

        MR. COSBY:  Object to the form.

        THE WITNESS:  It doesn't say either.  It doesn't
mention hip and ridge attachment in the contract to my
understanding unless there's a small line item that I
missed.

BY MR. FRIEDBERG:

    Q.   Are you aware if the contract -- language in the
contract excluding the installation of the cleats on the
hip ridge seams?

    A.   I'm sorry, could you repeat that question,
please, sir?

    Q.   Are you aware of whether or not the contract
excludes the requirement that cleats are to be installed
on the hip ridge seam?

    A.   Not to my --

        MR. COSBY:  Object to the form -- hold on.
Object to the form.

        THE WITNESS:  To my understanding, if I'm
recalling the contract correctly, which we could pull up
if we want, I do not remember the hips and ridge and
their attachment ever being mentioned within the
contract.

BY MR. FRIEDBERG:

Q.   It just says the cleats are to be installed at an average of nine-and-a-half on center to two raincheck nails -- ring shank nails per cleat, correct?

A.   Correct, to my understanding, yes, sir.

Q.   Have you ever published any articles or journals?

A.   No, sir.  We're in the process of trying to create a recognized system for water testing for leaks on roof systems.

Q.   What evidence do you have based upon the statement in your report that no remediation of the main roof had been completed post Hurricane Irma?

Well, my -- my observations are this:  If you have open holes in the panels that would allow water intrusion, and you pay to have somebody repair it, why did they not repair those?  So because I wasn't given any information prior to the writing of the report, and I was able to compare the conditions within the pictures and the conditions I found onsite, being a roofer, if you were to hire me to go out there and repair the roof, the first thing I would repair were those multiple open holes that are existing within the pans due to impact from flying debris.  And because those weren't fixed and because I didn't have any other data, I felt like no

repairs had been done.

Q.   Are you aware that there was temporary repairs to the roof done after Hurricane Irma?

A.   I saw some caulk and I can't determine when some patches were put over holes, but again, there's multiple holes over that roof that are still open to this day to my understanding, unless something changed after I went there.

Q.   Do you have any photographs documenting these multiple holes?

A.   Sure, sure.

Q.   Can you show me?

A.   They're within my photos, sir.

Q.   Well, you have Exhibit 1 with the various Bates stamps to your report.  Can you tell me what page, using the Bates stamp page, you're referring to?

A.   Actually, it's -- it's in where all my pictures are.  I believe you asked for just my photos.

Q.   Well, did you attach all your photos to the report?

A.   Not to the report, no.

Q.   All right.

MR. COSBY:  Is Exhibit 1 his report?

MR. FRIEDBERG:  Yeah.

MR. COSBY:  Okay.  It is then.

BY MR. FRIEDBERG:

Q.    Well, I'm trying to find out, but unfortunately this thing got moved to Zoom and was supposed to be in person, and that's the problem in dealing with, you know, all this electronic.

Can you assist me and give me some type of indication how I would find that photograph?  Do you have a .jpg number or some other --

A.    If -- if -- I don't have them written down, but if you were to give me a five-minute break, I can give you every picture number that is associated with a hole.

Q.    All right.  Well, let's do this, let's leave Exhibit 4 blank, and you'll put the photos with the holes, and we'll get that, and then you'll get them to the reporter.

And what am I going to see in these photographs?

A.    I can probably do it shortly after we're done here, sir, if you like.

Q.    Well, can you describe what you believe will be shown in these photographs?

A.    Yeah.  Open holes, actually punctures within the pans themselves.

Q.    Okay.  All right.  Do you know whether any of the roof was reseamed at all?

A.    Well, I would imagine that the hip that was

taken apart would have been.

Q.   Okay.  What about the rivets themselves?  Did you inspect any of the rivets?

A.   I certainly did, yes.

Q.   All right.  What is your observation regarding the rivets?

A.   There were some rivets that didn't go all the way through.  I'm not going to sit here and try to present like they didn't.  Are there some poorly-seated rivets?  Absolutely.  Are there rivets that were done incorrectly?  Absolutely.

I would say, though, that based upon Dunhill's observations in 2019, them not realizing this is the same hip, when they say there's missing rivets on that hip, it's directly due to the actions taken in 2015 by an employee of theirs.

Q.   How long are these -- on top of the actual hip ridge seam, there is a piece of copper shaped like a 'V' that's riveted on?

A.   Yeah, 'U' or a 'V', yeah.

Q.   Okay.  Is that the cap that you're referring to previously, the 'U' cap?

A.   Yes, sir.

Q.   And what is the length of those generally?

A.   Well, they're put in ten-foot length.

Q.   Okay.  Are you aware that or do you have any evidence that along the approximately 30-foot length on the north side of the main pavilion, there were no rivets that went all the way through the male/female sides?

MR. COSBY:  Form.

THE WITNESS:  Well, I mean I wasn't there when they observed it, but like I previously stated, if that's the same hip they took apart at least ten feet of, ten feet of that is theirs.  They didn't put the rivets in right.

BY MR. FRIEDBERG:

Q.   All right.  What about the -- if what you say -- and I'm just not agreeing, if it's taking what you stated that there's a 30-foot portion opened up, and your contention that the ten feet was previously opened, what about the other 20 feet?  What was the status of that?

MR. COSBY:  Form.

THE WITNESS:  I would say what if you get hit by 180-mile-per-hour storm and the rivets weren't there and the cap was just sitting on there with nothing holding it, I find it hard to believe, although I won't challenge it.  I don't have any pictures.  I didn't see any pictures of that within the report, so I have to take their word for it.

/////

BY MR. FRIEDBERG:

Q.   Okay.  Counsel didn't provide to you all the photos that were produced by Mr. Barabas in his deposition, I take it?

MR. COSBY:  Form.

THE WITNESS:  Not that I'm aware of.  They might have sent it and I didn't see it.

BY MR. FRIEDBERG:

Q.   Let me ask you a little about your meteorological expertise.

A.   Sure.

Q.   What is it?

A.   Hmm, I'm able to read NOAA, and I have to pull weather -- weather data whenever I do wind hail.  I've been trained in identifying wind hail and the association between wind speeds.

In Florida, we have multiple wind zones which dictate different types of installation based upon those.

I've lived through six hurricanes that went -- three of them went directly over my home.  I've inspected thousands of roofs associated with wind speeds and wind damage.  I suppose that's how I understand weather.

Q.   All right.  Do you have any scientific training to determine the effect of wind speeds on stationary objects?

A.   No scientific training, no, sir, other than FRSA/TRI explained to us the effects of negative and positive pressures on a roof system and how it can negatively affect that system itself.

Q.   All right.  You state that Irma is the second-strongest hurricane.  What was that based on?

A.   I think it was this:  I think I took that right from Mr. Sanders' report.

Q.   Well, let me ask you this:  Do you have any scientific basis as to the wind speeds experienced on St. John during Hurricane Irma, any published data?

MR. COSBY:  Form.

THE WITNESS:  I don't think anything published I'm aware of, although I was associated with the Westin on St. John and St. Thomas and the resulting effects of that storm.

I went for the final inspections of the roof systems being installed at both properties in 2022. Multiple people within my company went there prior and I saw the pictures.  And I can compare the pictures to the pictures I see in Florida, and the difference between a hundred and seventy-five and a hundred and eighty -- eighty-five mile-per-hour storm versus a hundred and forty mile-per-hour storm is significant.

However, at the same time, I have seen those

wind speeds at Boca Raton and Pine Island outside of Fort Myers during, I think it was, Ian.

    Q.   What portion of Irma struck St. John?

    A.   Off the top of my head, I'm not sure.

        MR. COSBY:  Form.

        THE WITNESS:  All I know is that it struck St. John and essentially destroyed the whole island.

BY MR. FRIEDBERG:

    Q.   What do you base that upon?

    A.   People that live there.

    Q.   Who did you speak to that lived there that you base that upon?

    A.   Multiple people who work at the Westin.

    Q.   All right.  Were those people at the Westin present during Hurricane Irma or they left to St. Thomas for refuge?

    A.   Actually, they hid in the Westin, yeah.

    Q.   Ah.  Are you aware from what direction the primary winds came from?

    A.   Not off the top of my head.  It's a corkscrew and it's typically counterclockwise, and I believe that it forms in the Atlantic, so at least in some capacity, it came east to west.

    Q.   All right.  Are you aware whether it was windward or the leeward side that got the major brunt?

A.    I don't think it really much matters.

Q.    So it's your testimony that it doesn't matter whether it's windward or leeward?

MR. COSBY:  Objection --

THE WITNESS:  No, because it's a corkscrew motion, sir, it's a corkscrew motion.  It's going to hit both sides.

BY MR. FRIEDBERG:

Q.    Where did the eye go?

MR. COSBY:  Form.

THE WITNESS:  Off the top of my head, I'm not sure.

BY MR. FRIEDBERG:

Q.    Wouldn't the location of the eye be of assistance in knowing whether it came from the windward versus the leeward or vice versa?

MR. COSBY:  Form.

THE WITNESS:  I think we're splitting hairs here.  We know that the hurricane went over the island and it caused damage.  The exact nuance of how the storm formed and how it went over the island, I didn't put much stock into it.  I saw the pictures.  I know what happened to the island and it was devastating.  Irregardless of what side it came from, a corkscrew motion from a hurricane, being the guy that's inspected over thousands

of these, it doesn't much matter.

BY MR. FRIEDBERG:

    Q.   What was the status of the property once it hit Chocolate Hole?

        MR. COSBY:  Form.

BY MR. FRIEDBERG:

    Q.   What damage did it sustain due to Hurricane Irma?

        MR. COSBY:  Form.

        THE WITNESS:  From the pictures provided, looked like impact damage.

BY MR. FRIEDBERG:

    Q.   And what do you mean by impact damage?

    A.   Flying debris making impact with the roof system.

    Q.   Okay.  Any other damage you're able to ascertain?

    A.   There was nothing listed within the -- any of the Cunningham Lindsey, I don't believe, or Mr. Sanders' report.  If there was, it -- both of those mainly focused on the roof system.

    Q.   Was there structural damage?

    A.   There very well could have been.  I'm not aware of it.

    Q.   Fine.  You mentioned that everything was the

eye -- and I don't mean to misstate your testimony, but I thought you said something along the line that everything was destroyed.  Would you say Chocolate Hole was destroyed?

        MR. COSBY:  Form.

        THE WITNESS:  I tell you what, compared to a lot of other things I see, it held up extremely well.

BY MR. FRIEDBERG:

    Q.   And are you aware of why it held up extremely well?

    A.   I think it has a lot to do with shielding of the hill, and the -- the fact that it's a standing seam system.

    Q.   All right.  Are you aware of the construction methodology that was used for the actual substrate for the main roof?

    A.   I believe it was multiple layers of plywood, yeah.

    Q.   And what was beneath those multiple layers of plywood, if you know?  Or let me ask you, do you know?

    A.   You wouldn't let me inside, so I can't answer that.

    Q.   Well, did you learn from any other source what was the --

    A.   It looked like open cathedral to me.

Q.   It looked like what?

A.   Open cathedral.

Q.   What do you mean by open cathedral?

A.   I mean that when you step inside, you can see the roof deck beneath you.

Q.   Okay.

A.   Or above you.  I'm sorry.

Q.   All right.  And what type of structure was used to support the roof?

MR. COSBY:  Form.

THE WITNESS:  I'd rather not answer because I didn't see it in person.  It looked like beams to me.

BY MR. FRIEDBERG:

Q.   Do you know how those beams were attached?

A.   I -- I don't, because you didn't let me inside to look.

MR. FRIEDBERG:  I move to strike.

Q.   The answer is do you, yes or no.  There's no need to have a commentary.

Do you know how those beams were attached?

A.   I apologize if you took that as disrespect.  I do not know.

MR. COSBY:  Form.

BY MR. FRIEDBERG:

Q.   All right.  Well, it's not disrespect.  I just

need you to answer the questions specifically without

commentary.

       All right.  Was there any damage to the wood

substrate to your knowledge?

    A.   I can't know.

    Q.   And again the reason you can't know is why?

    A.   Because you didn't let me inside to look.

    Q.   All right.  And what is your expectation that

what you have seen inside that above -- well, let me ask

you this -- move to -- I'm going to withdraw.

       You walked on the roof.  Was there any

indication that there was damage to the substrate?

    A.   No.

       MR. COSBY:  Form.

BY MR. FRIEDBERG:

    Q.   And if hypothetically there was damage to the

substrate, what would you expect to see?

       MR. COSBY:  Form.

       THE WITNESS:  Heaving.

BY MR. FRIEDBERG:

    Q.   Heaving?

    A.   Yes, sir.

    Q.   Describe what you mean by heaving?

    A.   Well, when we see the panels distorted and moved

up as well as if I was allowed inside, I could have

observed how they were attached to the beams or whatever structure they had.  I could have looked at how the beams were attached to the sill plate on the exterior walls, and that would have indicated whether or not there was structural damage associated with it.

Q.   How would you be able to see between the beams and the multiple layers of substrate?

A.   Well, I would just see if the wood had been displaced or pushed up.

Q.   Okay.  Are you aware from any other source of any evidence that there was any type of this -- any portion of the substrate that was affected?

A.   I'm not aware.

Q.   Did you review the deposition of Sarah -- I think I may have asked you this and you didn't, right?

A.   No, sir, I did not.

Q.   All right.  Are you aware of Armor Screen or Storm Capture?

A.   No, sir.

Q.   Have you ever -- you never heard of those products?

A.   No.

MR. COSBY:  Form.

BY MR. FRIEDBERG:

Q.   You're in Florida, right?

A.    I certainly am.

Q.    Never heard of Armor Screen or Storm Capture in Florida?

A.    I'm not sure --

MR. COSBY:  Form.

THE WITNESS:  I'm not sure.  It sounds like asking you if you know what Kleenex is or tissue. There's plenty of products on the market.  I'm not intimately familiar or ever heard of them.  I don't know what they refer to.

BY MR. FRIEDBERG:

Q.    Are you aware of Kevlar-based materials that are Dade County-approved that are put up for purposes of protection in hurricanes?

MR. COSBY:  Form.

THE WITNESS:  Cause -- so I have heard of wind screens over windows and doors, yeah.

BY MR. FRIEDBERG:

Q.    Do you have any experience with wind screens as you refer to it?

A.    Some have perforated holes in them, some are only attached, they're like netting, some are hard, and they're directly attached to the wall.  It depends on what they are.

Q.    Do you have any specific knowledge of the

products that are Storm Capture or Armor Screen?

        MR. COSBY:  Form.

        THE WITNESS:  I don't know of any particular products.  There are dozens of those types that are out there.  There's some that are electrically manipulated, there's some made of pure plastic, corrugated metal, rolled metal.

BY MR. FRIEDBERG:

    Q.  Did you have any --

        MR. COSBY:  Are we done?

        THE WITNESS:  Screening.  I suppose, yes, sir. There's a lot of products out there, so I don't know exactly which product that is.

BY MR. FRIEDBERG:

    Q.  Did you observe any wind screen on the property when you were there in May of 2025?

    A.  I didn't see any on the walls that you allowed me to walk.

    Q.  Well, did you see on the -- move to strike, nonresponsive.

        Did you see any wind screen on any portions of the property?

    A.  Well, like I said, I was only allowed to look at the roof on the main pavilion.  When I did attempt to look around the main pavilion, you prevented me from and

asked me politely not to, which I most gladly out --
facilitated and left.  I didn't have enough time to even
look.  You stopped me.

       MR. FRIEDBERG:  All right.  I move to strike,
nonresponsive.

    Q.  You walked from the road to the main pavilion --
to the main house, correct?

    A.  Correct.

    Q.  You walked down a driveway down the hill?

    A.  Yeah.

    Q.  In order to do so, you had passed several
buildings?

    A.  Yes.

    Q.  And did you look at those buildings as you
walked by them?

    A.  Not really.  I noticed there was a lot of stucco
missing off the one building.  That was about it.  My
focus was on the main house.  That's what I was asked to
do.

    Q.  Okay.  Did -- at any portion walking down, did
you see any of the wind screen deployed?

    A.  No, sir.

    Q.  All right.  Do you know if any wind screen was
deployed at the time of Hurricane Irma?

    A.  I do not.

MR. COSBY:  Form.

BY MR. FRIEDBERG:

Q.  All right.  Do you know the effects of any wind screen that would have been deployed during Hurricane Irma?

MR. COSBY:  Form.

THE WITNESS:  It depends on how the material was made.

BY MR. FRIEDBERG:

Q.  If it's Dade County-approved storm capture material -- well, first of all, do you understand what Dade County-approved wind screens are?

A.  Of course, I do, sir.  I'm a licensed roofer and a general contractor in the state of Florida.  I understand it intimately.  But if I don't understand what the product is made of, I can't speak to how it performs.

Q.  All right.

A.  Whether or not it's okay to Miami-Dade, there's some that have perforated holes in them that are flexible.  There's -- like I previously stated, there's a whole bunch of a missing line of it.

If you were to show me a picture, I would probably have a more capable answer for you, but because I don't know what you're talking about, trying to beat me up on it is pointless.

Q.    I'm not trying to beat you up.  I'm trying to find out.  You know, you've already told me you don't know what Storm Capture and Armor Screen are, so I'm trying to find out if you're aware if they have a Dade County approval rating.  Do you know what that means?

MR. COSBY:  Form.

THE WITNESS:  And as I previously stated, yes, I do, because I'm a licensed roofer and general contractor in the state of Florida, and it's -- a part of being a contractor is understanding what the NOA is.

BY MR. FRIEDBERG:

Q.    All right.  And in dealing with -- is there a certain wind rating that these products may be approved to?

A.    Sure.

Q.    What is that wind rating?

MR. COSBY:  Form.

THE WITNESS:  I believe Miami-Dade is now around 175 now.  In 2017, it might have been different.  The wind map has changed and updated.  It doesn't always necessarily change down there, but it does change.  So from 2025 to 2017, I cannot definitively state at 2017 off the top of my head what the exact wind speeds are for Miami-Dade-Broward.  I do know currently it's around 175, 170 to 180, and I do believe the Keys are 190.

BY MR. FRIEDBERG:

    Q.   Look at P43, which is Page 24 of your report.

          THE REPORTER:  I'm sorry, Counsel, what page?

          MR. FRIEDBERG:  P43, which is Page 24 of your report.

          THE WITNESS:  E-43?

BY MR. FRIEDBERG:

    Q.   Well, it's in Exhibit 1.

    A.   Yeah.

    Q.   Page 24 of your report.

    A.   Is there a letter designation to the page, sir?

    Q.   Well, there's a letter, 24.  Looks like 6 underneath the photograph.

    A.   Well, at the bottom right corner, it says page and it will be like, G, H, I.

    Q.   No.  Do you have Exhibit 1 in front of you?

    A.   I have what was sent to me earlier, and I printed it.

    Q.   All right.  On the bottom portion in red, there's a Bates stamp, starts with 'P'.  Do you see that?

    A.   Yeah.  Yeah.

    Q.   Go to P43.

    A.   P43 shows Side 6 and two pictures, yes, sir.

    Q.   Look at the bottom picture.  Do you see the building in the upper left-hand corner?

A.    I do.

Q.    Do you see the material that's over the openings?

A.    I can't tell what that is from that.

Q.    Well, that wasn't my question.  Do you see it?

A.    I do see it, but I can't tell --

Q.    And it's your testimony you don't know what that is, right?

A.    I apologize, sir.  I missed that last half.  My thing stopped working.

Q.    Is it your testimony you do not know what that material is?

A.    Yeah, I believe I stated that multiple times, yeah.

Q.    All right.  So you don't know whether or not any Storm Capture or other wind screen product was actually deployed for the main house during Hurricane Irma, do you?

        MR. COSBY:  Form.

        THE WITNESS:  I do not know, but at the same time, windscreen is exactly what it is.  It's only meant to shield the windows from damage.

BY MR. FRIEDBERG:

Q.    All right.  Are you aware of the plywood openings, how they work in the main house?  In other

words, are they operable, are they bolted on, or do you

have any understanding?

    A.   I can't because I wasn't let inside.

       MR. COSBY:  Form.

BY MR. FRIEDBERG:

    Q.   Well, you looked at the openings before you went

on the roof, right?

    A.   I only looked at the two openings you allowed me

to look at before you prevented me from looking any

further.

    Q.   And what two openings were those?

    A.   Two small windows.

    Q.   All right.  Do you know whether or not any of

those openings -- any of those plywood openings were

operable at the time in 2017?

    A.   I do not know.

       MR. COSBY:  Form.

BY MR. FRIEDBERG:

    Q.   Do you know -- do you have any basis to

understand how the plywood openings were constructed?

       MR. COSBY:  Form.

       THE WITNESS:  I do not know.

BY MR. FRIEDBERG:

    Q.   All right.  So it would be correct you don't

know whether or not they were plywood openings or plywood

at the openings in addition to Storm Capture or wind
screen?

      MR. COSBY:  Form.

      THE WITNESS:  I -- what I do know is that
plywood is not a substitute for an actual window.

BY MR. FRIEDBERG:

    Q.  Okay.  Well, what do you mean by that?

    A.  What I mean is when you're all of a sudden
within a windstorm, plywood covers the opening, I've had
multiple cases where if only plywood was covering the
opening of a structure, and it had impacted negatively
the roof.  Whereas when the home has windows and a sealed
exterior wall system, the effects of wind uplift are --
are minimalized in comparison to my experience seeing
windows covered with plywood only.

    Q.  Do you have any foundational basis to know
how -- the type of plywood or the thickness that was
used?

      MR. COSBY:  Form.

      THE WITNESS:  I, I -- there's no way I can
answer that because you didn't let me inside to look.

BY MR. FRIEDBERG:

    Q.  All right.  It just calls for a yes or no.  I
move to strike everything else.  The answer is no, you
don't know, correct?

MR. COSBY:  Form.

THE WITNESS:  Because you didn't let me inside, correct.

MR. FRIEDBERG:  Move to strike.  It just calls for a yes or no, please.  You don't have to put the colloquy behind it.

Q.  Is it correct you do not know the specifics of the plywood openings in terms of the type of wood, the thickness?

MR. COSBY:  Form.

THE WITNESS:  There's no way for me know, no, sir.

BY MR. FRIEDBERG:

Q.  And -- all right.  Is it true you don't know how those plywood openings were actually constructed, whether they were in a frame that was bolted to the concrete versus just nailed onto something?

MR. COSBY:  Form.

THE WITNESS:  Huh-uh.

BY MR. FRIEDBERG:

Q.  You don't know, do you?

A.  There's no way I can know, you know this, because you didn't let me inside.

Q.  Move to strike.  Again, just answer.  My job is to --

A.    Yeah, I understand.  I did answer.  Yeah, and I did answer.  Relax.  Please.

MR. FRIEDBERG:  We're going to take a break.  I do not appreciate that comment you just made, and it is really inappropriate.  So let's go off the record.  Let's take a five-minute break and please calm down.

THE WITNESS:  I am totally calm.  You're the one that is raising your voice.

MR. COSBY:  You need to calm down.

THE WITNESS:  You're the one that is being confrontational, raising your voice and being confrontational --

MR. COSBY:  Counsel, and Mr. Bragg, we're going to take a five-minute break.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  Going off the record at approximately 9:17 A.M.

(Discussion off the record.)

THE VIDEOGRAPHER:  We're back on the record at approximately 9:25 A.M.

BY MR. FRIEDBERG:

Q.    You ready, Joe?

A.    Yes, sir, I'm ready.

Q.    How many times have you testified in court?

A.    One time.

Q.   And where was that, State or --

A.   Fort Myers.

Q.   I understand.  Was that Federal Court or State Court, if you know?

A.   I believe it was State.

Q.   Okay.  And you were hired by plaintiff or defense in that case?

A.   Defense.

Q.   And essentially what was your opinion?

A.   That the -- it was a tile system with mortar patties that had slid down due to the adhesive properties of the mortar having aged.  There was no displacement of the tiles.  There was probably approximately five or six tiles that had slid from their original position.  There was corresponding engineering papers that collaborated my stance.

Q.   So basically it was a mortar failure; is that what you're --

A.   Yes, sir.  Yeah, over time, mortar dries out and loses adhesive properties.  The homeowner had claimed it was hurricane damage, and that's where the conflict was.

Q.   Do you know how that case resolved?

A.   I was never told.

Q.   All right.  Have you ever prepared a Federal Rule 26 report before?

A.    I don't know what a Federal Rule 26 report is, sir.

Q.    Do you know if you've been retained in cases in Federal Court?

A.    I do believe I have actually, yeah.

Q.    Have you prepared a report in those cases?

A.    I don't believe that I -- I believe they went off my original report, and then it ended up in a -- in a Federal Court.

Q.    Do you know if your depositions were ever taken in any of those cases?

A.    I can't recall.

Q.    Okay.  To your knowledge, are you aware of whether or not any challenge has ever been made to your opinion in attempt to exclude or limit them?

A.    Not that I'm aware of, no, sir.

Q.    Do you know just -- I just want to ask a couple of quick cleanup questions.

You said that you weren't aware of the woven material.  Are you aware of woven storm screen material based on the added Kevlar?

A.    Yes, yeah.

Q.    And what is your knowledge of that?

A.    It's put tightly over windows and doors to prevent impact from damaging the windows or doors that

are shielded behind it.

Q.    Okay.  Are you aware of the attachment methods
or the various attachment methods that are available to
be used?

A.    I've seen it with lag bolts imprinted within the
stucco and then washered on, meaning that there's a
thread that come out of the wall, and then they're put on
and then screwed into place.  I'm sure there's several
different types.

Q.    Okay.  Do you have any personal experience on
these systems?

A.    I do, yeah.

Q.    And what's your experience?

A.    I had helped my uncle put them up on his house
one time.

Q.    And do you know what type of product your uncle
put up?

A.    A very similar woven product.  Woven product.

Q.    Okay.  Was it put up at an angle to the opening
or was it put up flush with the opening, if you know?

A.    For my uncle, it was flush.

Q.    Do you know the reasons why a particular Kevlar
woven product is recommended not to be put flush to the
opening?

A.    I wouldn't know, yeah.

Q. All right. Did you see any evidence of the movement of the substrate while you were inspecting the roof?

A. Not from the outside, no, sir.

Q. If there were hypothetically movement in the substrate, would you be able to determine that by walking on the roof?

A. If the plywood had been impacted in any way or detached from its connecting truss or beams, likely. Would I be able to tell if it was detached along the sill plate, meaning the exterior perimeter attachment of the framing, likely not.

Q. In terms of the number of layers of plywood, do you have any understanding of what was used on this project?

A. I believe that it's a finished three-quarter on the inside, and then another piece of plywood attached on top.

Q. Do you know if more than one piece of plywood was attached on top?

A. I do not.

Q. Do you know the thickness of the plywood that was attached on top?

A. The typical thickness of a plywood is five-eighths. I mean it can come three-quarters.

Q.   Do you know if one-inch marine-grade plywood was used?

A.   It very well can be.  It does exist, yes, sir.

Q.   If two layers of one-inch marine-grade plywood were put on top of three-quarter-inch tongue-and-groove or one-inch tongue-and-grove, is that generally the type of roof system that you're familiar with?

MR. COSBY:  Form.

THE WITNESS:  I have -- I have seen layered plywood, yes.

BY MR. FRIEDBERG:

Q.   Okay.  And what's the effect of the layers of plywood on top of the tongue-and-groove?

A.   It stiffens the roof.

MR. COSBY:  Form.

BY MR. FRIEDBERG:

Q.   I'm sorry?

A.   It stiffens the roof.

Q.   Okay.  And what do you mean by "stiffened the roof"?

A.   It makes it stronger.

Q.   Are you aware of how this -- the plywood and the tongue-and-groove were secured?  In other words, were they ring shank nails, were they screws, or do you have

any basis at all?

    A.   I wouldn't know.

    Q.   In terms of, you know, the damage to the other areas around this property, were you aware of whether any of the other homes sustained damage?

         MR. COSBY:  Form.

         THE WITNESS:  Well, I mean the Westin is approximately a mile as the crow flies away, and it was utterly destroyed.

BY MR. FRIEDBERG:

    Q.   What about -- you're aware the Westin is south-facing.  This property is east-facing.  You're aware of that, right?

    A.   Yes.  Well, I mean, yeah.  I mean it kind of faces the northeast and the south, generally speaking, because of the coast.

    Q.   This particular property is facing due east.  You're aware of that, right?

         MR. COSBY:  Form.

         THE WITNESS:  Well, it's -- it's directly on the coast, so it does have exposure to the northeast and the south.

BY MR. FRIEDBERG:

    Q.   You would agree, would you not, that the forces of wind at the Westin are not necessarily the same as the

forces experienced at Harp Bay and the ones at Chocolate Hole?

        MR. COSBY:  Form.  Form.

        THE WITNESS:  There's no way to determine that, sir.  I don't have the data and I don't believe anyone does.  I'd be more welcome to entertain and try to understand the data if it was available, though.

BY MR. FRIEDBERG:

    Q.  That's all right.  I'm just here to find out what you know and you don't know.  The answer --

    A.  Yes, sir.

    Q.  I'm not trying to put words in your mouth, but let me just confirm you really don't know, correct?

    A.  No, no, I don't know.  Do I believe it to be considerably different over a mile, not really.

    Q.  Well, I only consider it if you have a reasonable degree of probability for your testimony, not whether you're guessing or speculating.

    A.  Well, most certainly.

    Q.  Do you have a reasonable degree of probability to understand the consistencies or inconsistencies of the wind at the Westin versus Harp Bay once it takes Chocolate Hole?

        MR. COSBY:  Form.

        THE WITNESS:  I'll go on record and say this:

If it was a little different, it wasn't too much
different.  The conditions were extreme, whether --
whether at Chocolate Hole or the Westin, considering how
close together they were.

           MR. FRIEDBERG:  I move to strike,
nonresponsive.

     Q.   Let me ask you this -- because the way you
answered it, I got to follow up.  Can you tell me to a
reasonable degree of probability how -- or strike that.

           Can you tell me to a reasonable degree of
probability the difference in the wind strength at the
Westin versus ones such at, say, Chocolate Hole?

     A.   I'm not aware of that.

     Q.   And are you able to tell me to a reasonable
degree of probability the direction of wind force at the
Westin versus 168 Chocolate Hole?

           MR. COSBY:  Form.

           THE WITNESS:  Well, I know that the wind speeds
are counter clockwise to the hurricane, so it would
really depend on exactly where the hurricane landed.  So
that's my stance.  I -- I don't know definitively.  I
don't -- I didn't break it down.

BY MR. FRIEDBERG:

     Q.   That's fine.  If you don't know, you don't know.

     A.   Yeah.

Q.   All right.  You mentioned the Westin.  You're aware -- are you aware that a number of -- strike that.

What buildings were affected at the Westin?

A.   Nearly every single one of them.

Q.   Well, let me ask you this, what buildings were destroyed?

A.   I think most of the roofs on most of the buildings as well as a lot of vertical wall stucco had been ripped off, believe it or not.

Q.   Yeah.  There are a number of buildings both on either side of the road.  Are you familiar with that?

A.   I certainly am, yes, sir.

Q.   And what type of roofing systems were at the Westin?

A.   Partial standing seam, TPO, mod bit on some outbuildings, and a product called DaVinci, which is, for lack of a better term, a plastic material that's applied like a tile or a shingle to give it a cedar shake look.

Q.   The standing seam, those were panels?

A.   Correct.  Well, they're -- they're rolled panels, yeah.

Q.   Well, they were preformed panels, right?

A.   No.

Q.   They didn't actually roll them on the site or did they roll them on the site?

A.    They did, yes, sir.  They brought in a -- I think it's a Berridge machine, and they rolled them because WJA was associated with some of the reroofs that occurred afterwards.

Q.    Well, I'm talking about -- this is before Hurricane Irma.  There were -- you said there were standing seams.  Do you know were they panels or rolled form?

A.    Off the top of my head, sir --

MR. COSBY:  Form.

THE WITNESS:  Off the top of my head, sir, I don't know.

BY MR. FRIEDBERG:

Q.    Do you know how they were attached?

A.    I don't know off the top of my head, no.

Q.    And do you know what type of substrate were on those metal roofs?

A.    Yeah, plywood, I believe, over top of a corrugated metal on many of the buildings.  I can't definitively state that on every single building, although I did see that on some.

Q.    Now, how do you define uplift?

A.    In what regard, sir?

Q.    I see the word uplift used in the report.  What is uplift?

A.    Wind uplift is damage associated where wind gets under a product and displaces it from its original position and damages it.

Q.    And you have damage to a product from winds that go -- maybe I'm not using the correct term, side-to-side as opposed to underneath?

A.    It definitely can go all different ways depending on how the structure is built, depending on the phase of the structure.  It can come from underneath due to positive pressure.  It can come from above and side-to-side, which is typical of a hurricane because the winds kind of become sideways.

Q.    Can you have side-to-side wind damage without uplift?

A.    You can have flying debris impact.

Q.    Can you have wind side-to-side damage not from flying debris without any uplift?

MR. COSBY:  Form.

THE WITNESS:  I know that side-to-side uplift can impact the panel locks.  I'm not sure how else you're asking me.  That's the way we're trained.  That's the verbiage we use.  It's wind damage.  It's typically associated wind uplift, yeah.

BY MR. FRIEDBERG:

Q.    All right.  Well, let me make sure we're on the

same page.  You're using uplift when you have a situation of negative pressure when wind is entering an envelope and pushing up?

A.    Negative pressure is a suction on the roof from the outside.  Positive pressure is on the inside pushing up.

Q.    Okay.  Assuming that there wasn't the differentiation of pressure inside the main house, the ones at Chocolate Hole, can you have damage from the wind going across or side-by-side the copper roof?

A.    Absolutely, yeah, it could detach the panels.

Q.    All right.  And if the half, which is that U-shaped or V-shaped portion put over the hip ridge is not properly riveted through both sides of the panels, can that increase the likelihood that the cap will become displaced in a high-wind event from side-to-side winds?

A.    It certainly could.

Q.    And if hypothetically the cap does become displaced because there are no rivets that go all the way through, can that also result in wind getting underneath the panels?

A.    Well, in this particular case, there is -- there is a minor fold as a backup.  I wouldn't call it a single fold.  There were attempts at a minor fold.  I believe 15 to 16, to my understanding, held up, and the only one

that didn't, like I said, had been previously disturbed
by Mr. Sanders and his partner prior to that.

Q.   All right.  If the cap becomes displaced --
well, let me make sure we're using the same terminology.

The cap, are you referring to that 'U' shape or
'V' shape portion put over the ridge that --

A.   Yes, sir.  Yes, sir.  Yeah.

THE REPORTER:  I'm sorry, Counsel, I didn't hear
the end of the question.  "Portion put over the ridge
that"?

MR. FRIEDBERG:  Yeah, that was the question.
I'm not sure, Miss Reporter.  Can you read back what you
have?

(Record read.)

MR. FRIEDBERG:  That is put over the seams.
BY MR. FRIEDBERG:

Q.   Are we on the same page, what -- that the cap
is?

A.   Yes, sir.

Q.   All right.  And just so I understand what your
contentions are, what your testimony is, is that you're
claiming that prior to Irma in 2014 or 2015, Mr. Sanders
and his crew opened up a portion of the ridge.  And how
much did they open in linear feet?

A.    I believe they took off a ten-foot piece of cap,

and I believe that he exposed one seam.

    Q.   By one seam, how -- what do you mean?

    A.   One panel, one panel.  I apologize.  One panel.

    Q.   And how many linear feet are we talking about?

    A.   Probably three feet --

    Q.   Okay.

    A.   -- two-and-a-half feet, around there
approximately.

    Q.   If hypothetically two-and-a-half to three feet
were exposed, yet the actual portion of the seam that
came apart is 30-plus feet, do you have an explanation of
why the other 27 feet of seam opened up?

        MR. COSBY:  Form.

        THE WITNESS:  Well, I would -- I would -- I
would ask -- I would say this.  First, I didn't see any
indication in the pictures that that occurred.  However,
it could have occurred kind of like a domino effect.  If
the one they took off wasn't attached properly, then as
that one was loosened, it would pull up on the others and
disengage them possibly, in a hypothetical situation.

BY MR. FRIEDBERG:

    Q.   All right.  So you don't know that to any
reasonable degree of probability, do you?  You're just --

    A.   No, I am basing that off of actual experience
with over 2500 wind hail inspections.

Q.    Okay.  Well, let me ask you this:  I mean you --
based on what you just said, I mean I've asked you if
what you're saying is true, if two-and-a-half to three
feet was removed, are you aware of how that
two-and-a-half to three feet was reattached?

MR. COSBY:  Object to the form.

THE WITNESS:  Actually, I said ten feet of the
'U' cap had been removed, and one panel had been exposed
to observe whether or not there were clips present.

BY MR. FRIEDBERG:

Q.    Do you know how that one panel was reattached?

A.    According to Mr. Sanders, in an approved way.

Q.    Do you know what that means?

A.    I -- I don't, no, sir.

Q.    All right.  Well, as a roofer, do you have any
understanding what the approved way is for reattaching a
panel?

A.    With rivets likely, the way that -- in order to
mimic the way the existing system stands, yeah.

Q.    All right.  In terms of the seaming itself, how
is that done in an approved manner?

A.    Well, it depends -- it depends on who you read.
The seaming on a hip and ridge for -- per Copper and
Common Sense, it requires a continuous anchor clip.

If you're -- I'm sorry, reverse that.  SMACNA

says that.  Copper and Common Sense doesn't require
attachment along the hip and ridge.

Q.   Okay.  If hypothetically the two-and-a-half foot
of the seam was opened up and reseamed and then a
ten-foot section of the cap was placed back on and
re-riveted, would that be an approved method?

A.   Yeah.  Apparently, yeah.  Yep.

Q.   And if hypothetically it was reinstalled in an
approved method, do you have any explanation why some 27
feet of seam opened up after Hurricane Irma?

A.   I have never --

MR. COSBY:  Form.

THE WITNESS:  -- to this day, sir, seen any
pictorial evidence that indicates 30 foot of the 'U'
shape is missing or displaced.  Furthermore --
furthermore, if ten feet was removed and riveted, based
upon Dunhill (sic), is that their name?  I apologize.
Their -- their bullet points they say there was missing
rivets.

BY MR. FRIEDBERG:

Q.   Okay.  Just so I'm clear, Counsel didn't provide
you the -- all the photographs from Mr. Barabas
documenting the roughly thirty feet of open seam?

MR. COSBY:  Object to the form.

THE WITNESS:  Not -- not that I'm aware of, no.

But again, if I made a report, I'm going to put the smoking guns front and center.

BY MR. FRIEDBERG:

Q.   The smoking guns.  What do you mean by that?

A.   I mean that if there's obvious damage, I'm going to include them in my report.

Q.   Okay.  And your expectation is the attorneys who hired you would have provided you with all the evidence, especially before your deposition, right?

MR. COSBY:  Object to the form.

THE WITNESS:  Like I said, Mr. Friedberg, I've never seen a picture within a report.  I never saw Mr. Sanders say that that cap had been displaced for thirty feet.  He never put that in his report either to my understanding, so yeah.

BY MR. FRIEDBERG:

Q.   All right.  I'm speaking about Mr. Barabas, the person who was down there in 2019 documenting the post-Irma damages.  And you can't -- and I don't want to beat a dead horse, but your expectation would be that that evidence would have been provided to you?

A.   Didn't Mr. Sanders go down in 2018?

MR. COSBY:  Form.

BY MR. FRIEDBERG:

Q.   Well, the testimony is the testimony.  And the

photographs of the Dahill people, you haven't seen them, right?

A.  I haven't, but Mr. Sanders was down there before him, if I'm not mistaken, and he would have probably provided the same thing when he -- when he released his first storm report.

Q.  Well, again --

A.  Yeah.

Q.  -- just so we're clear --

A.  Yes, sir.  Yes, sir.

Q.  -- you haven't seen the Barabas documentation, deposition --

MR. COSBY:  Object to the form.

THE WITNESS:  I have neither read his deposition nor seen if there's any pictures other than what was included within his report.

BY MR. FRIEDBERG:

Q.  If hypothetically the requirement of the contract was that cleats were to be installed on all seams including hip ridge seams, and if, in fact, cleats were not installed on hip ridge seams, is there a methodology for remediation or repair to install cleats on those hip ridge seams?

A.  You could probably open it up.  It would be fairly invasive.  I would more so go back with a soldered

Z-clip on each side and a preformed pan that went over

top.

Q.   All right.  Can the actual seams be opened up as

they exist now and put -- placed on each hip ridge seam

to the entire main panel -- main roof, excuse me?

A.   Dahill seemed to be able to get it open

fairly -- I don't know about easy.  I don't know how hard

it was, but they did get open that one panel, yeah --

that one hip.  I apologize.

Q.   Right.  Would clips be able to be installed

then?

A.   Copper's malleable, and the -- six inches away

there's that fold-over on the rip -- on the ridge.  So

you know, I'm not going to say it's going to be easy.

Can I say it can be done?  If they can get it open, it

can likely be done.  Is it ideal?  It's not as easy as

just putting a -- a hip cap over top of it.

Q.   How would the clips be installed?

A.   You would get the two panels slightly apart, put

your anchor clip in there, if you're following SMACNA,

and then secure it to the deck.  You just have to lift up

the overlap piece a little higher and get access to the

deck underneath.  Not easy.  Not impossible.

Q.   How likely is it that the -- any of the panels

would be deformed in the process of doing so?

A.   Oh --

MR. COSBY:  Object -- object -- object -- hold on, Joe.  Object to the form.

THE WITNESS:  Yeah.  I would say copper is malleable and it can always be somewhat bent back into place.

BY MR. FRIEDBERG:

Q.   Have you ever had a situation where you've installed clips in a remediation type of situation similar to what I'm asking you?

A.   I've never, ever installed clips over the hundreds of standing seam roofs I've done ever on the hips of the ridge so I can't answer that.

Q.   Okay.  Have you ever reinstalled clips in any portion of a standing seam roof?

A.   Yeah, you can -- yes, I have actually, yes, sir.

Q.   And what were the circumstances of why you were reinstalling clips?

A.   It was -- there was a challenge in one section that the clips were improperly done.  We went in the attic, and we measured the distance of the clips, and it ended up not being correct.  So this was a snap box system, a little differently, so it was easily able to be opened up and clips added.

Q.   In other words, the clips are visible from the

inside view?

A.    Underneath, you could see the spacing where the screw heads 'cause it's a double screw, and that's how we did it, yeah.

Q.    Okay.  In this particular case, you wouldn't be able to service or install clips from the inside, would you?

A.    Well, I didn't mean we -- we put them on the inside, sir.  What we did was we were able to determine the spacing from the inside.  I apologize if I misspoke to your question.

        The clips had to be installed on the topside, and it was a snap-lock system where the seam was detached, and clips were added and the seam reattached.

Q.    This is not a snap-lock system, is it?

A.    No, sir.

Q.    All right.  In terms of labor, is it more labor-intensive to attempt to open up each seam and install a clip versus reinstalling the roof?

        MR. COSBY:  Object to the form.

BY MR. FRIEDBERG:

Q.    Do you have an opinion regarding that one way or the other?

A.    I do.  I believe it comes down to acumen.  If you got -- you got -- 'cause there's two -- there's two

different types of installers.  There's those that are young that want to move fast, and there's those that are old and want to move slow.  And the more skilled, slower, older type of roofer can definitely pull it off if he's not put under a time restraint.  I -- I don't believe that a younger roofer would be interested in such a task.

Q.   All right.  How long -- how many man-hours are you looking at versus remediation with clips versus installing the new copper roof?

A.   In --

MR. COSBY:  Form.

THE WITNESS:  In a hypothetical situation, because I don't believe the clips are required here because of the way that Copper and Common Sense has the detail, but in a hypothetical situation, I would probably say two days a hip.

BY MR. FRIEDBERG:

Q.   Two days a hip?

A.   Yeah.

Q.   And there are -- how many hips are -- eight hips you said, sir?

A.   I believe they're 16.

Q.   16.

A.   Yeah.

Q.   Okay.  And how many -- two days of how many

people?

A.   Probably two people.  Yeah, I don't think you want too many people on top of that.

Q.   Do you know how long it took to install the main roof?

A.   I do not, no, sir.

Q.   Would that be important for you to know?

A.   Not really, because everyone has their own acumen.  And to be honest with you, if someone is going to send me to St. John to do a roof, I'm going to take my good old time because it's so beautiful down there.

Q.   Okay.  Well, you raise a good point.  Have you done any research if there's anyone who has the ability to do this type of work down in the Virgin Islands?

A.   I don't believe so.  My understanding is that typically there's -- there's a couple of skilled laborers down there, but people are usually shipped in for that type of thing.

Q.   And by shipping in, what is that -- have you ever been involved where you've had to give an estimate in terms of what's required to do work outside of the contiguous 48 states?

A.   Actually, I -- I -- I'm aware of the logistics. I know it's very difficult.  They have to be put in cargoes -- cargo boxes and sent over, and there's

restrictions on how big the boxes are.  I have never personally done an estimate, but we have -- WJA has asked multiple companies to do it for us.

Q.   So for purposes of this case, you haven't worked up any estimate?

A.   No, no, sir.  I was never asked to try to determine any monetary value to this system.

Q.   In order to properly install this roof, how much of an overlap of the male and female sections were required?

A.   I think it's inch-and-three-quarter on one side and approximately an inch-and-a-half on the other is a healthy way of doing it.  I do know that -- that's for a double lock.  In this particular case, you can't do a double lock.  You can't even do a single lock, really, because the machine can't get up the hips, so it's all hand bending.

So I believe that the one side they tried to get three-quarters of an inch and the other side a little -- around one-and-a-half.

Q.   Do you know if that was done?

A.   I know they attempted to do it.

Q.   Okay.  Did the standard require that that be done, three-quarter on one side and inch-and-a-half and on the other?

A.   Well, at the same time, this is -- this is kind a little outside the range.  It's a cross between a single lock and a custom, so I don't know if there's really a -- a perfect system to it.  I believe that's why they added the -- the cap.

Q.   Do you know what overlap was used in this case?

A.   I know there -- I believe their intentions were probably three-quarters to a half-inch on one side and inch-and-a-half on the other -- inch-and-three-quarter on the other.  I know that only a few panels with pictures I saw, some came up short, and I'm not going to stand here and try to say they weren't.  But when you consider how many panels are on there, I cannot definitively say what the state of the remainder of the roof is.

Q.   Okay.  The panels that came up short, in your words, is that below what's required for this installation of this roof?

MR. COSBY:  Object to the form.

THE WITNESS:  Again, we are -- we're in a custom -- kind of a custom fit here.  It's somewhat follows Copper and Common Sense.  But again, they had to -- had to do it their own way because they couldn't get the machines on the hip.

So, you know, I don't know if it's necessarily there's any design that perfectly shows how it was

supposed to be done.  I know their intentions were true, and the pictures don't lie.  There are a few panels that were a little short on the -- on the male side.  But again, I don't see enough of a sample -- I can't say that all of them are wrong.  I can't say a few were.

As far as shortness, ideally should they have been higher, yes.  But the fact that they put the cap on was, I believe, their way of trying to come up with another coverage, a secondary coverage, on top of that. If it had standed alone without the cap, it would be a problem.  However, with the cap, I believe they tried to make up for where there was probably some short panels.

Q.  Did the cap -- was it required to be riveted to both panels, the male and female?  In other words, the rivets the whole the way through was attached --

A.  Yeah.

MR. COSBY:  Form.

THE WITNESS:  Yeah, ideally it should be, yeah.

BY MR. FRIEDBERG:

Q.  Was that required?

MR. COSBY:  Form.

THE WITNESS:  I would believe so, yeah.  Yeah. But I -- like I said, I believe Mr. Sanders said there was maybe five -- five or six that he saw that were improperly seated on the main house.

BY MR. FRIEDBERG:

    Q.   If hypothetically the rivets were short, in other words, they didn't go through both sides, would that be below the standard of care?

    A.   I think it's a punch --

       MR. COSBY:  Form.

       THE WITNESS:  I think it's a -- I think it can be made better, or you come from the other side and then try to attach it that way, too.

BY MR. FRIEDBERG:

    Q.   If the rivets didn't go all the way through the caps to attach the caps to the male and female sides and there were no rivets coming from the other side to secure it, would that be below the standard of care?

       MR. COSBY:  Object to the form.

       THE WITNESS:  I believe that depends on your perspective because, again, we have this customization, and I -- I would more so rely upon how it performed versus the hypothetical.

       I -- I can't say it's good, I can't say it's bad unless I see it tested.  I believe it was tested, and it held up really well.

BY MR. FRIEDBERG:

    Q.   How was it tested?

    A.   It was tested through the hurricane.

Q.   Okay.  Are you aware that the caps that failed did not have rivets all the way through?

MR. COSBY:  Form.

THE WITNESS:  I have one picture of one ten-foot section on the same hip that had previously been destructively tested by Mr. Sanders.  He shows me an ambiguous picture within his storm report that says that's displaced.  I believe that occurred in 2018.  Dunhill (sic) comes in 2019 and has a different take on what Mr. Sanders said.  Mr. Sanders is the expert.  I'll refer to him.  He doesn't say thirty feet are detached, to my understanding, or at least he doesn't show it in his pictures.  And in fact, it looks like a cap is still there.  So --

BY MR. FRIEDBERG:

Q.   You never --

A.   -- and the fact that -- and the fact that they're the ones who took that piece apart, so if there's any problem with the rivets, they would be the ones that owned the rivets.

Q.   Okay.  You haven't reviewed Volume II of Mr. Sanders' deposition, correct?

A.   No, I have not.

MR. COSBY:  Form.

/////

BY MR. FRIEDBERG:

Q.   And you haven't seen the exhibits attached to Volume II of Mr. Sanders' deposition, correct?

A.   I have not.

Q.   Okay.  And so if I understand, if, in fact, the male and female portions may be short, I think that's your testimony, was this in more than one ridge they were short?

A.   Well, only --

MR. COSBY:  Form.

THE WITNESS:  -- only one hip has ever been taken apart, sir, twice.

BY MR. FRIEDBERG:

Q.   All right.

A.   There's fifteen others.

Q.   Okay.  And you have no knowledge of what the fastening systems are on those other fifteen ridges?

A.   I do not, and I don't believe anyone does.

MR. FRIEDBERG:  Move to strike after you do not as nonresponsive.

Q.   So in your report, you have this diagram of uplift.  Is it your suggestion in referring to Bates Stamp Page 12 in your report where you have a Certified Commercial Property Inspectors Association diagram -- do you see that?

A.    I'm sorry, what page, sir?  I apologize.

Q.    Bates Stamp P12.

A.    Yeah.

Q.    Is it your contention that this is what occurred
at 168 Chocolate Hole or --

A.    I think there's a strong possibility that
some -- some pressures did enter the home from beneath.
I don't believe that it negatively affected it.  I do
believe that the system itself wasn't impacted by it.  It
doesn't mean that it didn't happen.  It's just the way
the building is built, the way the roof was installed, it
was able to resist it.

Q.    Let me make sure -- you just said a lot of
things.  You don't have any evidence to a reasonable
degree of probability of what the inside pressure
differential was in the main house, do you?

A.    I don't believe anybody does.

        MR. FRIEDBERG:  Sir, I move to strike as
nonresponsive.

Q.    My question is do you have any evidence to a
reasonable degree of probability of the inside
pressure -- differential between the inside and the
outside of the main house?

        MR. COSBY:  Form.

        THE WITNESS:  I don't have any readings, but I

do have the observations that I made onsite as well as
the observations of others based upon their pictures that
show that there was no damage present or associated with
pressures from the inside affecting the system.

          MR. FRIEDBERG:  Move to strike as nonresponsive.

     Q.   Do you have any evidence to a reasonable degree
of probability what the inside pressure differential was
versus the outside pressure at 168 Chocolate Hole during
Hurricane Irma?

          MR. COSBY:  Same objection

BY MR. FRIEDBERG:

     Q.   Just calls for a yes or no.

     A.   No.

     Q.   Thank you.  And even hypothetically, if there
were some differentials, your testimony was there was no
uplift damage?

     A.   Did not look so, no, sir.

     Q.   I think you also said that's in part because of
how the substrate of the roof was constructed?

     A.   Not just the substrate, but the roof -- the roof
system itself.

     Q.   What do you mean by the roof system?

     A.   The standing seam system.

     Q.   The standing -- would you agree that the
standing seam system is only as strong or sound as the

substrate?

       MR. COSBY:  Form.

       THE WITNESS:  Well, the substrate can be sound, and if it's improperly installed, the roof can still fail.

BY MR. FRIEDBERG:

    Q.   Do you have any evidence to a reasonable degree of probability that the substrate system was not properly installed?

    A.   I do not.

       MR. COSBY:  Form.

BY MR. FRIEDBERG:

    Q.   I'm sorry, I didn't hear your answer.

    A.   I do not.

    Q.   Do you recall Mr. Huber's testimony that the substrate system was sound when he first went down to bid on the roof?

       MR. COSBY:  Form.

       THE WITNESS:  Well, the way it's constructed, I think it's indisputable.

BY MR. FRIEDBERG:

    Q.   Indisputable what?

    A.   That it's very strong, very sound.  It doesn't mean it's not susceptible to wind uplift.  It just happened to resist it.

Q.   Based upon your answer, do you have any evidence to a reasonable degree of probability that when Hurricane Irma hit, there was wind uplift from the inside to the substrate?

A.   Well, I --

MR. COSBY:  Same objection.

THE WITNESS:  I can't definitively state that because I was never given access to the inside.

MR. FRIEDBERG:  Move to strike, nonresponsive. The answer is yes or no.

MR. COSBY:  He's allowed to explain his answer. He doesn't have to answer the question with yes or no.

MR. FRIEDBERG:  And you don't need to give speaking objections.

MR. COSBY:  He doesn't have to answer a question yes or no.  You're improperly instructing him.

MR. FRIEDBERG:  I'm not improperly instructing him.

MR. COSBY:  He's not limited to yes or no in the answer.

MR. FRIEDBERG:  Counsel, limit your soliloquy and comments, please.

MR. COSBY:  He's not limited to yes or no answers.

MR. FRIEDBERG:  Counsel, let's take a few-minute

break and let you calm down.  Just off the record.

        MR. COSBY:  You must need to calm down.  I'm
fine.

        MR. FRIEDBERG:  Counsel, I don't need the
statement and I don't need your commentary.  We're going
to go off the record for a few minutes so you can calm
down.

        MR. COSBY:  You're the only one yelling.  You're
the only one yelling.

        THE VIDEOGRAPHER:  All right.  Going off the
record at approximately 10:05 A.M.

        (Discussion off the record.)

        THE VIDEOGRAPHER:  We are back on the record at
approximately 10:09 A.M.

BY MR. FRIEDBERG:

    Q.  Are you ready, Joe?

    A.  I certainly am, yes, sir.

    Q.  Okay.  Yes or no, do you have any evidence that
the -- to a reasonable degree of probability that the
wind pressure inside was negatively affected versus the
outside pressure in the --

    A.  I don't --

        MR. COSBY:  Object to form.

BY MR. FRIEDBERG:

    Q.  -- Hurricane Irma?

THE REPORTER:  Wait, wait, wait.  Wait.

(Discussion off the record between Counsel and the witness and the reporter.)

BY MR. FRIEDBERG:

Q.   That the wind pressure on the inside is different than the wind pressure on the outside during Hurricane Irma at 168 Chocolate Hole?

MR. COSBY:  Form objection.

THE WITNESS:  I don't have enough data to answer that question.

BY MR. FRIEDBERG:

Q.   Now, you mentioned that you inspected thousands of hurricane claims or damage -- damage claims.  Any of those claims similar to the claims in this particular case?

MR. COSBY:  Form.

THE WITNESS:  Similar in the idea that people are claiming there's damages, and it's not visually easy to identify, yes.

BY MR. FRIEDBERG:

Q.   All right.  Let me try to drill down then.

Any claims similar in which there's a contention in a standing seam copper roof put above -- on top of a substrate consisting of three-quarter inch -- or inch-and-three-quarter, I should say, tongue-and-groove

and two one-inch layers of marine-grade plywood in which there has been a contention that wind across the top of the copper roof has caused damage?

        MR. COSBY:  Form.

        THE WITNESS:  Well, I don't know about the substrate in terms, but yeah, plenty of times, standing seam is challenged with being damaged without there any physical evidence present.

BY MR. FRIEDBERG:

    Q.  All right.  Well, let me make sure so I'm just clear so we can check this off the list.  Do you have any contention there's any issues with the substrate in this case?

        MR. COSBY:  Form.  You can answer.

        THE WITNESS:  I can't definitively.  I do believe, but I'm not here to assume.  I can't definitively answer that, sir.

BY MR. FRIEDBERG:

    Q.  So you're not able to tell me to a reasonable degree of probability there was damage to the substrate, yes or no?

    A.  Lack of data.  Can't answer.

    Q.  And can there be damage to the standing seam if, in fact, the substrate is not affected if the standing seam ridges are not secured?

MR. COSBY:  Form.

THE WITNESS:  Of course.

BY MR. FRIEDBERG:

Q.  And the method of securing per the contract in this case were cleats?

MR. COSBY:  Form.

THE WITNESS:  For the field panels, yes, sir.

BY MR. FRIEDBERG:

Q.  And you use the word field -- field panels. What is a field panel?

A.  The 15-inch-wide approximately vertical panels that were installed on the roof.

Q.  Okay.  Is it your contention that there was no need to cleat the ridge seams?

A.  Per Copper and Common Sense, yes, it was not required.

Q.  All right.  Was there any exclusion in the written contract of Dahill that the hip ridge seams were not to be cleated?

MR. COSBY:  Object to the form.

THE WITNESS:  I'm sorry, per Dahill?

BY MR. FRIEDBERG:

Q.  Let me withdraw and reask.

In the Daybreak contract, was there any exclusion for not cleating the ridge seams?

MR. COSBY:  Objection to the form.

THE WITNESS:  Nothing directly speaks to that, but again, in the industry, when someone establishes the distance between cleats, it's naturally assumed it's for the field panels only.

MR. FRIEDBERG:  Move to strike as nonresponsive.

Q.  You have seen the terms of the contract, right?

A.  I have, yes.

Q.  In the terms of the contract, is there a written exclusion whereby the ridge caps do not have to be cleated?

MR. COSBY:  Objection to the form.

THE WITNESS:  There's nothing within the contract that says the ridge caps need to be cleated.

BY MR. FRIEDBERG:

Q.  So is it your testimony it's ambiguous as to whether or not the ridge caps have to be cleated?

MR. COSBY:  Form.

THE WITNESS:  I believe it's open to interpretation because it's not directly stated either/or.

BY MR. FRIEDBERG:

Q.  Okay.  You're aware that there was an upcharge or a specific charge for cleats to be spaced at nine-and-a-half inches on center?

MR. COSBY:  Form.

THE WITNESS:  If I'm understanding this correctly, and forgive me because I didn't focus on this as much, but I believe the original quote was for twelve inches on center.  And then we had to tighten it up because of an engineering report that you had retrieved that said nine-and-a-half, so I do believe there was an upcharge, yeah.

BY MR. FRIEDBERG:

Q.    Okay.  And that upcharge was to install cleats at nine-and-a-half inches on center -- on an average of nine-and-a-half inches on center?

A.    Yes, sir.  Yes, sir.

Q.    And do you have evidence that that upcharge, in fact, was paid?

MR. COSBY:  Form.

THE WITNESS:  I -- I don't know, and I'm not going to bother trying to answer.

BY MR. FRIEDBERG:

Q.    Do you have any opinions about this particular roof that are not in your report?

MR. COSBY:  Form.

THE WITNESS:  My opinion upon walking away from the roof was I was very confused as to what was being claimed as damage.

BY MR. FRIEDBERG:

Q.   All right.   And are you still confused?

A.   I know there was impact hits on it, yeah.   And I
didn't see any other collaborating evidence of damage to
the functionality of the system.

Q.   And your expectation is that any supporting data
in evidence, that would have been provided to you by
Defense Counsel, Mr. Cosby, right?

MR. COSBY:  Object to the form.

THE WITNESS:  No, I did rely upon the stated
expert on the other side's actual storm report.  He's the
expert.  And then I didn't receive the other report until
well after my report had been written.  And I -- I didn't
see any -- any pictures to substantiate the claims made.

BY MR. FRIEDBERG:

Q.   Right.   So anything that you relied on was given
to you by Mr. Cosby.   In other words, you didn't
independently obtain it?

A.   No, sir.   Yeah, he gave it to me.   Yeah.

Q.   All right.   And your expectation is that
Mr. Cosby would have provided you with everything that
was necessary for you to evaluate this case and render an
opinion?

MR. COSBY:  Object to the form, asked and
answered multiple times.

THE WITNESS:  Well, I --

MR. FRIEDBERG:  Counsel, can I finish my question?

MR. COSBY:  No, no, you can't, when you keep asking the same question.

MR. FRIEDBERG:  Well, first of all -- no, you did object to form, and that's fine.  You can't tell me what to do and not do.

MR. COSBY:  When it's the fifth time --

BY MR. FRIEDBERG:

    Q.  Mr. Bragg --

MR. COSBY:  When it's the fifth time you've asked the question --

BY MR. FRIEDBERG:

    Q.  Mr. Bragg --

MR. COSBY:  -- I'm going to object asked and answered when you keep asking the same questions over and over.

BY MR. FRIEDBERG:

    Q.  Mr. Bragg --

MR. COSBY:  Which you -- which you've done multiple times.

MR. FRIEDBERG:  Well --

MR. COSBY:  It's going to be in the transcript. It will speak for itself so --

BY MR. FRIEDBERG:

    Q.   Mr. Bragg, have you been involved in other cases as a forensic roofing expert when you're hired by one side when the attorney hiring you doesn't provide you all the documentary evidence --

        MR. COSBY:  Object to the form.

BY MR. FRIEDBERG:

    Q.   -- in order for you to evaluate the claim?

        MR. COSBY:  Object to the form.

        THE WITNESS:  Happens all the time.

BY MR. FRIEDBERG:

    Q.   That happens all the time?

    A.   It really does, yeah.

    Q.   All right.  Well, you're out there.  You're testifying in a Federal -- or you intend to testify in a Federal Court.  Are you aware that there are certain portions of this evidence that hasn't been provided to you?

        MR. COSBY:  Object to the form.

        THE WITNESS:  I don't know -- I don't know what is termed as evidence, sir, because like I previously stated, if there was a smoking gun, if there was obvious points of wind uplift damage, Mr. Sanders would have identified it post-storm.

        And Dunhill (sic) comes after Mr. Sanders.  Your

expert showed two ambiguous pictures of one hip with the
cap still in place, so what could have possibly changed?
If -- if Dunhill (sic) is saying the cap was displaced
for 30 feet, why didn't Mr. Sanders not show that in the
pictures?  In fact, the two pictures he did provide have
the caps still in place, so I don't understand where --
where this mysterious stuff in 2019 is going to impact
what Mr. Sanders said in 2018.  It doesn't affect my
testimony or my opinion whatsoever.

       MR. FRIEDBERG:  I am going to move to strike as
nonresponsive.

    Q.  So just to summarize, as I understand, that as
far as you're concerned, you don't accept the evidence
put forth by Dahill of this storm damage to the roof?  Is
that what I'm understanding?

    A.  The pictures showed --

       MR. COSBY:  Object to the form.

       THE WITNESS:  The pictures they showed did not
indicate storm damage.

BY MR. FRIEDBERG:

    Q.  All right.  Fair enough.

    So we have covered your opinions that exist as
of today, for the 23rd of September, on this case?

    A.  I believe so, yes, sir.

    Q.  All right.  Have you been asked to do anything

else by Defense Counsel?

A.    Actually, I misspoke.  There is one other opinion that I would like to put out there.

Q.    All right.

A.    The expansion cleats.  Within one book, it says expansion cleats over 30 feet are required.  Within the other book, it says they're not required or it doesn't state that they're required, and they contradict each other.  And any insinuation that expansion cleats had impacted the function of the roof during the storm or afterwards lack any credible physical evidence to prove that.

Q.    All right.  Well, there's a difference between the cleats that are called for -- let me ask you:  Is there a difference in the cleats that are called for in the contract versus expansion cleats?

A.    I didn't -- I wasn't aware that expansion cleats were present in the contract.

Q.    Well, what I'm trying to find out is when the term cleats are used, is there a difference between those cleats and expansion cleats?

A.    Generally speaking.  I mean you could differentiate between the two.

Q.    Okay.  And what does an expansion cleat do versus a -- a non-expansion cleat?

A.    It facilitates movement during temperature variations.

Q.    All right.  And you're aware of the report from Lindsey, the inspector for the homeowners insurance?

A.    I am.  Where it states that he's relying upon your expert to give him the data regarding the roof, yeah.

Q.    Are you aware of any criticisms of Lindsey regarding failure to have expansion cleats?

MR. COSBY:  Form.

THE WITNESS:  Well, I believe that Lindsey is wrong, number one, because one book says it needs it, one book says it doesn't.  And furthermore, Mr. Lindsey -- or Lindsey Cunningham never even opened a single -- single piece to even determine whether or not they were there or not.

We've opened three lineal feet of the field.  So you know, there's hundreds of lineal feet there.  So to assume that there's no expansion cleats, being the adjuster without -- without even looking, he's getting a little bit ahead of himself, especially when one says it needs it, one says it doesn't, so that's open to interpretation.  So to say that that directly led to damages, I don't see the damages that would have been associated with the lack of expansion cleats.

BY MR. FRIEDBERG:

Q.    Would those damages be cracking in the copper in the change of elevation?

A.    Well, I mean in 2015, eight cracks are identified by Mr. Sanders -- I'm sorry, in 2015.  In 2018, nine cracks were identified.  If, in fact, this was such a problem, I would think that they would have significantly expanded in the damages because if there's only one more, how did that one more come to be?  Did he miss it the first time?  Was it an expansion of something?  I can't definitively say.

All I can say is those cracks were there beforehand.  How they came to be there, I'm not too sure.

Q.    If I understand what you're telling me, it's no big deal that those cracks are there?

MR. COSBY:  Form.

THE WITNESS:  That's not what I said.

BY MR. FRIEDBERG:

Q.    All right.  Well, what did you say?  You said it is affecting the roof.

MR. COSBY:  Form.

THE WITNESS:  I'm not sure because I can't tell if there was any water intrusion on the inside or not.

BY MR. FRIEDBERG:

Q.    Okay.  As a roof inspector, assuming that there

was no litigation in this case and you became aware of
the cracks in the roof panels, do you know what your
recommendation would be?

    A.   First, try to solder them.

    Q.   Okay.  You mean solder; is that --

    A.   Yeah.  Solder, "sodder," same thing.

    Q.   Okay.  All right.  That would leave some
evidence of silver or solder versus against -- in other
words, it would be visible, the solder, right?

        MR. COSBY:  Form.

        THE WITNESS:  It would be visible if you're
standing directly over top of it.  You would not likely
be visible from the ground.

BY MR. FRIEDBERG:

    Q.   What other recommendations would you have, if
any?

    A.   I think another thing would be easy.  You could
insert a transition piece at that point.

    Q.   What about the potential of -- well, let me ask
you this:  If you soldered them in place, there's any
fire potential or fire risk?

    A.   Well, there always is with that.

        MR. COSBY:  Form.

BY MR. FRIEDBERG:

    Q.   Okay.  And what is the risk?

A.    The risk is that you could burn the building down.

Q.    Okay.  If -- what other alternatives are there to deal with the cracks that wouldn't involve the risk of burning the building down?

A.    Well, I would say that most copper seam roofs need to be soldered, and it's always going to be a risk. It's part of the system itself.

However, if you didn't want to solder because you were worried about that, I mean -- I'm not sure where that comes from, but however, you could put it -- you could insert a transition piece between the turn in the panels.

Q.    And how would that be done?

A.    Well, you would cut the two panels apart and be able to install a cleated expansion transition piece, and that would do it.

Q.    So you would cut, like, for example, the 30-foot run, you would cut that at the transition, and then install another piece of copper or a panel on top of it; is that what you're saying?

A.    Yeah -- not on top of it, underneath on the top piece and over top of the bottom transition piece, and it would go continuously along the transition itself.

Q.    I'm having a hard time how would that look.  In

other words, you're putting a piece of copper over, a piece of copper under?

A.   It's very hard to explain, but if this is the top piece, there would be a piece slipped underneath that would go over top of the bottom piece.  It would be very subtle, but it could be done.

Q.   Would that require annealing the copper and bending it to get those transition pieces underneath?

A.   It would take some -- it would take some -- it would take a high-acumen mechanic to do it, but it can be done.

Q.   And would that be annealing the copper to do that?

A.   Annealing, I would need the definition of that, sir.

Q.   Well, don't you have to heat the copper up to make it pliable?

A.   Not necessarily.

Q.   Okay.  Is that copper panel -- are those easily -- or bendable without heating them up?

A.   Copper is very malleable.

Q.   All right.  And in terms of the approximate number of man-hours necessary for this solution that you're putting forward, do you have an estimate?

        MR. COSBY:  Form objection.

THE WITNESS:  I mean you asked me a different way of doing it.  I'm not sure how long it would take.  I do want -- I do want to caveat by that saying that -- and this is a hypothetical.  This means nothing to the roof because I don't believe the expansion cleats are necessary because of the one book saying they don't need it.

And the fact is that probably three on five of the eight sides only reach or breach 30 foot approximately.  The other three sides have the lattice overhang which shortens the panels.  But if I were to have to put transition piece in, I would probably say that that would probably be two-and-a-half days per side with eight sides.

BY MR. FRIEDBERG:

Q.  You indicated that there are two sources for the cleating.  One says you shouldn't have it, one says you should.  Which one says -- Copper and Common Sense says you should or shouldn't?  I didn't break that down.

A.  Yeah, Copper and Common Sense says that you should.  And then SMACNA says it doesn't -- it doesn't state it.  Whereas -- and here's the difference. Copper -- I'm sorry, SMACNA has a standing seam roof and then the Bermuda roof, which is a horizontal panel, it specifically states that the 30-foot needs an expansion

cleat.

Q.    Maybe I'm mistaken.  Let's talk -- let's move off expansion cleats and come back to the actual cleats themselves that get ridge attachment.  Does SMACNA say you need cleats there or not?

A.    SMACNA does indicate within their diagram that, yeah.

Q.    That yes, what?

A.    That cleats are required along the hip ridge whereas Copper and Common Sense doesn't.

Q.    What are the -- who puts out these various publications, if you know?

A.    I mean the -- I think SMACNA is a collaboration of multiple authors that are associated with the -- whatever this affiliation is.

Q.    Well, what about Copper and Common Sense?

A.    I believe that's the same, believe it or not, yeah.  I believe that there's multiple editions of it, so obviously there's a collaboration.

Q.    All right.  Do you know what the standard of care is when there's two competing sources, if you know?

MR. COSBY:  Form.

THE WITNESS:  I generally don't know, but I would say that SMACNA is well -- well-known exponentially versus Copper and Common Sense.

BY MR. FRIEDBERG:

    Q.    All right.  Have you ever spoken to anyone in either of -- are these trade groups, if you know?

    A.    I -- I don't know how they would be designated, and I have not spoken to anyone associated with either.

        MR. FRIEDBERG:  All right.  Let's -- let's go off the record and go over my notes.  I think I'm pretty much done.  Let's go off the record for a few minutes.

        THE VIDEOGRAPHER:  Going off the record at approximately 10:30 A.M.

        (Discussion off the record.)

        THE VIDEOGRAPHER:  We're back on the record at approximately 10:33 A.M.

BY MR. FRIEDBERG:

    Q.    Joe, you had -- we had talked earlier about the individuals down in the Virgin Islands and I just wanted to follow up.  In terms of this remediation repair method that we were talking about, are you aware of anyone in the Virgin Islands that has the ability to do that --

    A.    I don't believe so.

    Q.    Let me finish.  On a copper standing seam roof?

    A.    I apologize for speaking over you, sir.

        No, I do not believe so.  No, probably not.

        MR. FRIEDBERG:  Thank you.  I have nothing further.  Thank you for your time.

THE WITNESS:  Thank you.

MR. COSBY:  I've got a few questions, Joe.

E X A M I N A T I O N

BY MR. COSBY:

Q.   You were asked a couple questions prefaced with a yes-or-no answer.  One of them was do you know whether other portions of the roof were properly secured.  You said no, I don't know.  Do you know if anyone else knows?

A.   Not that I'm aware of, no, sir.

Q.   All right.  Same question as to the -- sorry. Hang on one second.

MR. FRIEDBERG:  Let me put in a lawyer objection to that question and object to form.

MR. COSBY:  Got lawn equipment going by.  Sorry.

Q.   Same question as to the pressure differential question you were asked.  I think you answered based on your knowledge, are you aware of any other calculations made by anyone else in this case that you have seen regarding a pressure differential?

A.   No, sir, not that I'm aware of.

MR. FRIEDBERG:  Objection -- let me get my objection in.  Objection, form.

BY MR. COSBY:

Q.   I think you said "Dunhill" several times.  When you said that, did you mean Dahill?

A.    Yes, I apologize.

Q.    Okay.  That's all right.  Do you intend to read, when I obtain a copy of the Sanders Part II deposition, along with exhibits, as well as the Barabas deposition along with exhibits?

MR. FRIEDBERG:  Objection, form, Rule 26.

THE WITNESS:  At this point, no.  If we were to go to court, yes.

BY MR. COSBY:

Q.    Okay.  Well, --

MR. FRIEDBERG:  Objection, form, Rule 26.

MR. COSBY:  I haven't asked a question, Tom.  I don't know what you're objecting to.

Q.    My question to you, Mr. Bragg, is if I send you these materials and request that you review them, are you able to do so?

A.    Oh, absolutely.

MR. FRIEDBERG:  Objection, form, Rule 26.

BY MR. COSBY:

Q.    You can answer.

A.    Most certainly I would, yes, sir.

Q.    Thank you.  I think you were asked at the beginning what this case was about, and you said whether there was a breach of contract regarding the presence of cleats or not.

Would you agree based on that that the rivet issues have nothing to do with the presence of cleats or not?

MR. FRIEDBERG:  Objection, form.

THE WITNESS:  It's a separate issue.

BY MR. COSBY:

Q.  Okay.  Same thing with any panels or portions of the roof being too short has nothing to do with cleating, correct?

MR. FRIEDBERG:  Objection, form.

THE WITNESS:  Correct.

MR. COSBY:  All right.  That's all the questions I have.

Q.  Have all the opinions you've given been within a reasonable degree of roofing contractor's certainty and probability?

MR. FRIEDBERG:  Objection, form.

THE WITNESS:  I've answered to the best of my knowledge.

MR. COSBY:  Thank you.  Nothing further.  I'll take a copy if it's ordered.

THE VIDEOGRAPHER:  Would you care for the video, sir?

MR. COSBY:  Not at this --

THE VIDEOGRAPHER:  You can get it at any time.

No problem.

        MR. COSBY:  All right.

        THE VIDEOGRAPHER:  This concludes today's deposition.  We're going off the record at approximately 10:37 A.M.

        THE REPORTER:  I have one question, please. Is the witness requesting review and sign?

        MR. COSBY:  Yeah, we'll read.

        THE REPORTER:  All right.  Thank you.

        (Proceedings concluded at 10:37 A.M.)

        (Exhibits 1 and 3 marked for identification.)

                  --o0o--

```
Deponent:              JOE BRAGG
Deposition Date:       September 23, 2025
Case Name:             Friedberg vs Daybreak
Case No.               3:19-cv-0053-RAM-EAH


PLEASE CHECK ONE OF THE FOLLOWING:

_____   No corrections were made to the transcript

_____   Changes were made to the transcript as follows:

Use Change Reason Codes for Changes:
     1.  To clarify the record
     2.  To conform the facts
     3.  To correct transcription errors


Page_____ Line_____ Reason Code_____

From_____to_____

Page_____ Line_____ Reason Code_____

From_____to_____

Page_____ Line_____ Reason Code_____

From_____to_____

Page_____ Line_____ Reason Code_____

From_____to_____

Page_____ Line_____ Reason Code_____

From_____to_____

Page_____ Line_____ Reason Code_____

From_____to_____

Page_____ Line_____ Reason Code_____

From_____to_____


_____       _____
     DATE                          JOE BRAGG
```

DEPONENT'S DECLARATION UNDER PENALTY OF PERJURY

   I, JOE BRAGG, a witness in the above-entitled action, do hereby declare under penalty of perjury under the laws of the United States, that I have read the foregoing transcript of my deposition under oath taken September 23, 2025 and have made such corrections as appear in ink therein and the reason therefor; and that the testimony contained in said deposition, as corrected, is the truth, the whole truth, and nothing but the truth.

   Executed this _____ day of _____, 2025.


_____

       JOE BRAGG

DEPOSITION OFFICER'S/REPORTER'S CERTIFICATE

I, SUSAN L. FOSTER, CSR No. 2942, Certified Shorthand Reporter licensed in the State of California, do hereby certify:

That prior to being examined, the deponent was by me duly sworn to testify to the truth, the whole truth and nothing but the truth; that the foregoing testimony was reported by me stenographically and was thereafter transcribed through computer-aided transcription; and that the foregoing contains a full, complete and true record of said proceedings.

That the witness did _X_ did not____ request to read and sign the original deposition transcript.

That I am in no way interested in the outcome of this action, and am not connected with, related to, or an employee of any of the parties in this action or to their respective counsel.

That the dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certificate null and void.

In witness whereof, I have hereunto set my hand this 8th day of October, 2025.

_____

SUSAN L. FOSTER, CSR
Certificate No. 2942

## IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

THOMAS F. FRIEDBERG & SARAH L.
BUNGE,

      Plaintiffs,

v.

DAYBREAK, INC. dba HUBER &
ASSOCIATES,

      Defendant.

**ACTION NO. 3:19-cv-0053-RAM-EAH**

**JURY TRIAL DEMANDED**



BRAGG Depo
September 23, 2025
**Exhibit 1**
Susan L. Foster, CSR 2942

## PLAINTIFFS' NOTICE OF DEPOSITION AND REQUEST FOR PRORUCTION

PLEASE TAKE NOTICE that Plaintiffs will take the following deposition:

| Deponent | Date | Time | Location |
|----------|------|------|----------|
| Joe Bragg | September 23, 2025 | 9:00 am EST | Lexitas, 20 North Orange Avenue, Suite 700, Orlando, Florida 32801 |

This deposition will be taken before a Certified Shorthand Reporter and will continue from day to day, excluding Sundays and holidays, until completed. This deposition may be videotaped for use at trial.

PLEASE TAKE FURTHER NOTICE that at the date and time of the deposition, Defendant is requested to produce the following:

### DEFINITIONS

The terms "project" and "contract" shall refer to the copper roofing project referred to in Plaintiffs' complaint.

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*September 8, 2025*
*Page 2*

PLEASE TAKE FURTHER NOTICE that three days prior to the deposition, Defendant is requested to produce the following:

1.    Your entire file, including all correspondence, notes, reports,    documents reviewed or relied upon, or any other documents which forms the basis for each expert witnesses opinions to be given at time of trial;

2.    The complete billing file showing all bills or invoices submitted;

3.    A complete list of all cases in which the witnesses has testified in trial or deposition within the past 4 years, including the case name, case number, jurisdiction where filed and name, address and telephone number of the attorney or firm that retained your services.

4.    All diagrams, charts and reports whether for submission as an exhibit or for demonstrative purposes.

5.    Copies of any published articles or journals written by you or to which you contributed.

6.    All materials in your possession pertaining to this lawsuit.

7.    Each and every document you relied upon in forming your opinions in this case.

8.    All documents in your custody, possession or control pertaining to Hurricane Irma.

9.    All documents in your custody, possession or control pertaining to Hurricane Maria.

10.    All documents reviewed or relied upon addressing the effects of wind uplift.

11.    All documents in your custody, possession or control that document or address the roof, including the substrate, for the main house at 168 Chocolate Hole, St. John, Virgin Islands.

2

**F&B v. DAYBREAK – BRAGG DEPO EXHIBITS    P000002**

1.2

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*September 8, 2025*
*Page 3*

12.     All documents in your custody, possession or control that address any testing done by you or relied upon by you in forming any opinions in this case.

13.     All evidence relied upon by you in stating in your Rule 26 reports that "at the time of WJA's May 6, 2025, inspection, no remediation to the main house has been completed post-Hurricane Irma, leaving the roof system in situ in relation to the DOL."

14.     All documents relied upon by you, including photographs, diagrams, notes or other documents that address, discuss or were relied upon by you that address the building envelope that existed for the main house at 168 Chocolate Hole as of September 2017.

15.     Copies of any lawsuits in which either WJA or you have been sued for any roofing work performed by WJA or by you for either construction defect, negligence, breach of contract or any other lawsuit alleging that WJA or you failed to perform in the design, installation and construction of any roofing system.

Dated : September 8, 2025                        **LAW OFFICES OF FRIEDBERG & BUNGE**

By: /s/ *THOMAS F. FRIEDBERG, ESQ.*
        THOMAS F. FRIEDBERG, ESQ.(VI#1006)
        Attorneys for Plaintiffs THOMAS F.
        FRIEDBERG & SARAH L. BUNGE
        **THE LAW OFFICES OF FRIEDBERG &**
        **BUNGE**
        1005 ROSECRANS STREET, SUITE 202
        PO BOX 6814
        SAN DIEGO, CALIFORNIA 92166
        TEL : (619)557-0101
        FAX : (619)557-0560
        E-mail : "tom@lawofficefb.com"

3

**F&B v. DAYBREAK – BRAGG DEPO EXHIBITS      P000003**

1,3

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*September 8, 2025*
*Page 4*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of September 2025, a true and correct copy of **PLAINTIFFS' NOTICE OF DEPOSITION AND REQUEST FOR PRODUCTION** was e-mailed to the following:

Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL  34994
Telephone: 772-463-8402
Facsimile: 772-463-4820


Andrew C. Simpson
**ANDREW C. SIMPSON, PC**
2191 Church St., Ste. 5
Christiansted, VI 00820
TEL : 340.719.3900
E-MAIL :asimpson@coralbrief.com

_/s/ THOMAS F. FRIEDBERG_
**THOMAS F. FRIEDBERG**

4

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS      P000004**

1,4

## IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>DAYBREAK, INC. dba HUBER & ASSOCIATES,<br><br>　　　　Defendant. | **CIVIL ACTION NO. 3:19-cv-0053** |

TO: THOMAS F. FRIEDBERG & SARAH L. BUNGE

　　　Defendant, Daybreak, Inc d/b/a Huber & Associates hereby files the

following Amended Expert Disclosure Statement Pursuant to Fed. R. Civ. P. Rule

26(a):

Retained Expert:

1. Joseph V. Bragg, 400 N New York Avenue, Suite 110, Winter Park, FL

    32789. Mr. Bragg Mr. Bragg is a Roofing Contractor (CCC1333311) and

    General Contractor (CGC1534425), as well as a HAAG Certified Inspector

    (#992103012). He has over 20 years of experience in the roofing industry,

    encompassing a broad range of roofing systems and products, including tile.

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS**　　　**P000005**

shingle, modified bitumen, TPO, FiberTite, standing seam, 5-V, R-panel, coping, gutters, and coating products.

Mr. Bragg has evaluated claims that the copper standing seam roof at 168 Chocolate Hole Road in St. John sustained wind uplift damage during Hurricane Irma due to installation deficiencies. Further, he is expected to offer opinions on roofing installation practices, industry standards of care, causes of roofing failures or deficiencies, adequacy of materials and workmanship, and related matters based on his inspection, experience, and review of case materials. His opinions will be based on his personal expertise, inspection findings, industry standards and accepted roofing practices.

Additional subjects, analyses, and opinions are set forth in detail in his expert report, which is incorporated herein by reference.

Non-Retained Experts:

2. Barry Huber, c/o Jeffrey C. Cosby, Esq. Mr. Huber is a licensed roofer who has 49 years of experience in the roofing industry, encompassing a broad range of roofing systems and products, including wood, slate, clay tile, copper, ornamental, thatch, and historical roofing. Mr. Huber has evaluated claims that the copper standing seam roof at 168 Chocolate Hole Road in St. John sustained wind uplift damage during Hurricane Irma due to installation

deficiencies. Further, he is expected to offer opinions on roofing installation practices, industry standards of care, causes of roofing failures or deficiencies, adequacy of materials and workmanship, and related matters based on his experience and review of case materials. His opinions will be based on his personal expertise, industry standards and accepted roofing practices.

3. Micha Cady, c/o Jeffrey C. Cosby, Esq. Mr. Cady is roofer who has 17 years of experience in the roofing industry, encompassing a broad range of roofing systems and products, including wood, slate, clay tile, copper, ornamental, thatch, and historical roofing. Mr. Cady has evaluated claims that the copper standing seam roof at 168 Chocolate Hole Road in St. John sustained wind uplift damage during Hurricane Irma due to installation deficiencies. Further, he is expected to offer opinions on roofing installation practices, industry standards of care, causes of roofing failures or deficiencies, adequacy of materials and workmanship, and related matters based on his experience and review of case materials. His opinions will be based on his personal expertise, industry standards and accepted roofing practices.

## :CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on August 19, 2025, we electronically served the foregoing document via CM/ECF system to the parties listed below:

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000007**

s/ Jeffrey C. Cosby, Esq.
Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL 34994
Telephone: 772-463-8402
Facsimile: 772-463-4820

s/ Andrew C. Simpson, Esq.
Andrew C. Simpson, Esq.
VI Bar 451
Attorney for Defendant Daybreak Inc
2191 Church Street, Ste. 5
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone No. (340)719-3900

**SERVICE LIST:**

Thomas Friedberg, Esq.
LAW OFFICES OF FRIEDBERG & BUNGE
1005 Rosecrans Street, Suite 202
P.O. Box 6814
San Diego, California 92166-0814
Telephone : (619)557-0101
Attorney for the Plaintiffs

**F&B v. DAYBREAK – BRAGG DEPO EXHIBITS      P000008**

1,8



## EXPERT REPORT



**THOMAS F. FRIEDBERG & SARAH L. BUNGE**

**V**

**DAYBREAK, INC., dba HUBER & ASSOCIATES**

**Civil Case No. 3:19-cv-0053**

**Prepared for:**

**Williams, Leininger & Cosby, P.A.**

**301 SE Ocean Blvd., Suite 205**

**Stuart, Florida 34994**

**August 5, 2025**

Page A

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS**    **P000009**

1.9

Date: August 15, 2025

Inspection Requested by: Williams, Leininger & Cosby, P.A.

Inspection Address: 168 Chocolate Hole Road, St. John, US Virgin Islands

## EXECUTIVE SUMMARY:

On Wednesday, September 6th, 2017, Hurricane Irma occurred over St. John. Claims of separated copper pans at the ridge have been made at the residence located at 168 Chocolate Hole Road.

Subsequent investigation by multiple parties concluded that a failure to install cleats had directly led to wind uplift damage to the property. Final conclusions brought forth the claim that the roof system over the main house requires full replacement.

WJA Consultants (WJA) will challenge the claims of wind uplift damage to the home. Furthermore, allegations of improper installation practices utilizing destructive testing data led to the recommendations and conclusions of others that led to full replacement being necessary.

The argument put forth regarding full replacement is unsubstantiated. The pictures provided did not show any uplift displacement, signs of panel failure directly due to wind uplift, or detachment of clips, which are typically defined as wind uplift damage to a standing seam roof system.

Additionally, the clip spacing that has been a point of contention was established in the contract as a requirement of the homeowner who required changes to the original proposal. No engineering data has been supplied that shows the maximum wind uplift of the designed system that the homeowner requested. Therefore, the wind uplift resistance (based upon the clip spacing dictated by the owner) has never been established. There is no ability to prove that the existing system was even designed to resist the significant wind speeds experienced, but the roof did perform as intended.

Upon the conclusion of the second strongest Atlantic storm on record, the home's roof system was intact, without any of the wind uplift damage typically identified or defined in the industry. The main home was not complete in its construction, and the absence of windows and doors significantly increased the internal pressure, yet it amounted to no damage. Any intended or designed wind uplift resistance would be predicated on a closed system, which was not the case here. The fact that the roof did not experience damage due to wind uplift, even with this variable and the extreme conditions, only exemplifies that the roof system was properly installed. With all the outside variables stacked against the roof system sustaining its functionality, to this day, the system is still intact with only minor issues and no direct evidence of continued roof leaks or failure due to wind uplift.

Page B

## INTRODUCTION:

WJA was retained by Williams, Leininger & Cosby, P.A. (WLC) to evaluate a claim by the homeowners of wind uplift damages directly due to installation deficiencies incurred at the property located at 168 Chocolate Hole Road, St. John, US Virgin Islands.

WJA conducted a full non-destructive inspection of the property in question on May 6, 2025, approximately 8 years after the claimed loss. In preparing this report, WJA reviewed and relied upon the following documents:

- WJA Photographs and Notes
- Satellite/Aerial imagery
- Copper Roof Investigation authored by Hoffmann Architects, Inc., dated November 12, 2014
- Copper and Common Sense, 9th Edition
- SMACNA Metal Panel and SPF Roof Systems
- National Hurricane Center data
- Pictures of the in-progress installation
- Sedwick International UK Final Report, dated 2/22/2019
- Hoffman Architects Summary of Storm Damages, dated August 20, 2018
- Cunningham Lindsey International Final Report, dated December 27, 2018
- Deposition of Arthur L. Sanders
- Deposition of Barry Huber
- Deposition of Micah Cady
- Federal Complaint
- Blueprint
- Job contract
- Progress reports

WJA reserves the right to amend this report and further develop its opinions and findings should additional data become available at a later date. Please note that any missing references contained in the contributed discovery that were omitted were not done intentionally.



Page C

## ANALYSIS:

On May 7, 2010, Huber & Associates (Huber) and Thomas Friedberg entered into a contract to install a 16oz. Red Copper standing seam roof system to the main house, guest house and gazebo, gate house, garage, and beach bar. A 2014 investigation resulted in destructive testing and a report provided by Hoffman Architects, Inc. (Hoffman) regarding claimed construction deficiencies.

On September 6th, 2017, Hurricane Irma visited the island, causing claimed wind uplift along hip lines and field panel attachment to the main house. An insurance claim was filed by the homeowners to recoup alleged losses directly due to the hurricane, which reached wind speeds of at least 185 mph per the National Hurricane Center and became the second longest recorded sustained wind speeds above 156 mph from the Atlantic Ocean, per multiple sources.

Hoffman released a second 2018 report claiming damage occurred due to the storm. WJA will first address the 2018 report's allegations of damage. Secondly, WJA will respond to allegations of installation deficiency that are claimed to be the reason for the claimed hurricane damage to the main house only.

Please note that at the time of WJA's May 6th, 2025, inspection, no remediation to the main house has been completed post-Hurricane Irma, leaving the roof system in situ in relation to the DOL.

Before proceeding with the evaluation of each report, it is important to highlight the negative effects of wind uplift on a metal standing seam roof system.



Certified
Commercial
Property
Inspectors
Association
diagram

Wind uplift can cause roof components to lift, buckle, cause structural failure, deflection, clip disengagement, and/or seam separation. It is also important to understand that wind uplift is a force created when wind hits a roof, creating negative lower pressure on the topside while positive internal pressure is created on the inside.

The lack of windows and doors and a proper sealing of the building envelope during the storm significantly affected the internal uplift pressures from inside. The building's condition at the time would have reduced the roof's ability to resist uplift. If plywood was covering the openings as suggested, it

Page D

1.12

would have created a temporary reprieve from wind-driven rain and flying debris. Still, it is not a substitute for a closed system and ultimately would not have reduced the pressure.

When considering this pertinent fact, it's also important to note that there was no lifting, buckling, structural failure, or deflection highlighted in any documentation or observed during WJA's onsite inspection. Some deficiencies noted were pre-existing conditions prior to the storm that were included in Hoffman's 2014 report. The following responses will highlight the absence of reliable proof of wind uplift damage and how a few pictures provided only substantiate WJA's position that no physical evidence of clip failure has directly led to the claimed damages associated with the roof system.

**Hoffman Architects Report dated 8/20/2018**



Hoffman's detailed and professional report highlights nine cracks, three dents, and one puncture on the main house roof system.

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS**    P000013

> The Main Pavilion Roof is an octagon in plan with a peak at the center of the roof. The roof line is formed with two different slopes. The initial slope at the edge is approximately 3 in 12 with the rise to the peak of 7 in 12.
>
> Because this roof was installed with continuous formed pans, the upturned legs that form the standing seams were cut at the transition point to achieve the change in slope. The upturned legs were overlapped and crimped with the cap bent similarly. We observed cracks in the copper pan and the standing seam in eight locations around the roof circumference.
>
> *Hoffman 2014 Copper Roof Investigation Report 11/12/14 Pg 15*

The original 2014 report found eight cracks around the roof circumference. The cracks that pre-existed Irma, based upon their initial report, were never differentiated from their 2018 evaluation, making it highly probable these were not the result of wind uplift but the same cracks identified in the 2014 report.

Pictures were also provided of dents and punctures that most certainly could have been caused by flying debris, although documentation of some previous dents and punctures was contained in the 2014 report. WJA acknowledges that other structures on the property, as well as throughout the island, did sustain obvious impact damage that has caused functional damage, making it probable that some of the dents were caused by Hurricane Irma.



The pictures above are another example given by Hoffman of claimed wind uplift damage. The failure in the pictures is never completely defined. The blackness at the "ridge" in the photos is a shadow effect and not open holes. Close-up pictures of the exact hip are shown below.

400 N New York Avenue . Suite 110 . Winter Park, Fl . 32789
**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000014**

f.14





The pictures above were taken by WJA and show the exact same location with zero sign of failure along the hip. These pictures depict the metal in the same position as the 2018 picture. Although the pieces are not evenly cut, and when zoomed in via a camera lens, it is not aesthetically pleasing, it is not an indication of poor workmanship, nor does it affect the functionality. There are zero open holes, no signs of failure at the hip, and no wind uplift damage per industry standard.



The photo taken from Hoffman's 2014 report is the same hip in question that was destructively tested and shown in the 2018 report as having "failure". Technically, due to this area being disturbed by the test, it is no longer the original installation, although WJA does not believe it to be damaged.

To be clear, the one hip Hoffman definitively states with pictorial evidence of failure due to wind uplift is the exact hip that was disassembled by their hired mechanics brought to the island in 2014. This means that if there was damage, it was due to the reassembly having failed and not the original construction. Again, WJA does not believe there is damage but believes it's important to note that the one hip Hoffman believed to be damaged was the exact one their mechanic previously disassembled.



The last two photos provided are listed as showing "pans have lifted at other ridges". The pictures are very ambiguous in what they are trying to depict. WJA attempted to find this condition listed during its inspection and failed to identify this claim. WJA did find movement at some of the ridges directly due to the panels being installed over battens, allowing the spacing between the boards to contain a very minimal bounce. No displacement of actual panels or ridge cover was observed.

Please refer to attachment #1, where WJA compares its own photos to the panels and ridge caps existing conditions as of 2025, to Hoffman's diagram, where particular panels are identified as having signs of wind uplift damage. WJA was not able to identify any damage pertaining to wind uplift, which the pictures show.

**Conclusion:**

In summary, Hurricane Irma hit the island of St. John on September 6th, 2017. A 2018 report by Hoffman, based upon observations made post-Irma, was released with claims of damage to approximately 80 panels on the main pavilion. Claims of damage to the main roof octagon were denied by the homeowners' insurer.

Thirteen pictures were included within the 2018 Hoffman report used to substantiate the claim that approximately half of the Main roof was damaged by wind. Of the thirteen pictures, there is one of the cap with no damage, four of the ridge claimed to be lifted, two of cracks at the transition, and six of scratches/dents from flying debris.

The four regarding "pans have lifted at other ridges" fail to definitively identify any lifting other than ambiguous photos. The six pictures of scratches/dents look to be due to flying debris, although Hoffman's original 2014 report did identify the presence of some minor scratches/dents already present. The two pictures of cracks at the transition do not differentiate what was identified as being cracked in the 2014 report versus the 2018 report, and whether or not these are the pre-existing cracks versus a new development.

In 2014, Hoffman exposed one field seam and three cleats spaced 8", 10", and 9", which comes to an average of a little over 9". Technically, they did verify in the one area of approximately 27 inches that the cleats did meet the contract spacing within the field.

The plaintiff has put forth the argument that the roof sustained damage due to the improper cleat spacing along the ridges. WJA was able to confirm onsite that the 1x4 battens were spaced in a manner that allows for 9.5" spacing to occur if cleats are present at each batten for vertical securement. The 9.5" spacing refers to the vertical panel spacing only, per industry standard.

Attempting to combine the hip/ridge attachment spacing with the vertical attachment spacing is not standard. The field panels are attached with defined spacing, and the hip/ridge attachment is another configuration altogether. In hundreds of experienced standing seam roof system installs, WJA has never seen or experienced the vertical panel spacing combined with the hip/ridge attachment.

Only 28 inches out of thousands of lineal inches of the total field panel length was exposed, which confirmed the correct cleat spacing and presence. Another thirty inches of ridge was exposed, which failed to find any additional attachment other than the hemmed seam. The absence of clips was identified by the homeowners' expert in 2014. Although it is a recommended practice, if the expert or homeowners found that to be of such grave concern, they have had ample time to correct it, yet have not.

Hoffman argues that the failure to secure the diagonal along the hip at the same spacing as field panels has directly led to damage. No wind uplift damage to the panels, per industry definitions, was observed by WJA. Not one disengaged cleat was presented in pictorial evidence nor found while onsite, not one example of buckling/lifting/deflection was given or observed, and not one instance of seam separation was shown or found.

The one ridge (aka hip) highlighted in their photos as having been damaged by wind uplift was the exact same hip they performed destructive testing on in 2014, making it not an original part of the installation, although no damage was present. When considering that there are hundreds of linear feet of hip present with zero signs of displacement or damage, it makes the lack of clips a moot point.

WJA could not identify any wind uplift damage to the system, but signs of flying debris impact from Hurricane Irma were present. The homeowner provided the system attachment with no documentation showing its wind rating regarding uplift resistance.

Zero proof was provided that the cleats in the field were improperly installed. No evidence of damage to the panels was definitively provided that technically meets the definition of wind uplift damage. The existing roof survived some of the most extreme conditions ever experienced in the area, with cosmetic issues but no definitive proof of other deficiencies directly due to wind uplift.

Eight years later, the roof is still functioning without any obvious signs of failure. If Hurricane Irma had compromised the functionality of the system, the damage should be obvious eight years later, but it seems not to exist.

Based on my experience of over 2,500 wind/hail inspection claims, utilizing basic observation techniques, 26 years of roofing experience, and the effects of wind/hail observed/inspected, or the HAAG inspection protocol and parameters, it is my professional opinion that the roof did not sustain wind uplift damage and that the construction of the roof was not a contributing factor to the claimed damage.

**F&B v. DAYBREAK – BRAGG DEPO EXHIBITS      P000018**



In closing, the second-largest recorded Hurricane in St. John's history occurred at the location. No obvious wind uplift damage was identified by WJA. Without proof of wind uplift damage, attempts to repeatedly cite installation deficiencies bear no consequence to the argument when no obvious wind uplift damage is present.

Joseph V Bragg
WJA Consultants
CCC1333311
CGC1534425
HAAG #992103012





**ATTACHMENT #1**
**PICTURES SHOWING EXISTING CONDITIONS**
**MAY 6, 2025**

ROOF
DAMAGE
PLAN

A102

Hurricane Damage Plans.dwg

PROJECT NUMBER
214406

TF-DI 0228

COPYRIGHT HOFFMANN ARCHITECTS INC. 2016

| | |
|---|---|
| ▨ | REPLACE COPPER PANS |
| ⩘ | REPLACE RIDGE CAPS |

DIAGRAM DEPICTS ROOF DAMAGES
PER HOFFMAN

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS**     **P000020**

1.20



EACH SIDE GIVEN A NUMBER TO ALLOW THE
'FOLLOWING PICTURES TO HIGHLIGHT
EXISTING CONDITIONS VERSUS
CLAIMS OF DAMAGE PER HOFFMAN

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000021



1



1

3

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000022**

1.22



1



1

4

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000023

1.23



1



2

5

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS        P000024

1.24



2



2

6

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS     P000025

1.25



2



2

7

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS      P000026**

1.26



2



2

8

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS      P000027

1.27



3



3

9

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000028**

1.28



3



3

10

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS      P000029

1.29



3



3

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS        P000030



3



3

12

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS     P000031

1.31



3



4

13

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000032

1.32



4



4

14

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS      P000033

1.33



4



4

15

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000034**

1.34



4



4

16

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000035**

1.35



4



4

17

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000036**

1.36



4



5

18

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS      P000037

1.37



5



5

19

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS      P000038**

1.38



5



5

20

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000039**

1.39



5



5

21

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS** **P000040**

1.40



5



5

22

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000041**

1.41



5



5

23

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS     P000042**

1.42



6



6

24

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000043**

1.43



6



6

25

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000044**

1.44



6



6

26

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS        P000045

1.45



6



6

27

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000046

1.46



6



6

28

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000047**

1.47



6



7

29

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000048**

1.48



7



7

30

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000049**

1.49



7



7

31

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000050**

1.50



7



7

32

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000051**

1.51



8



8

33

**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000052**

1.52



8



8

34

F&B v. DAYBREAK - BRAGG DEPO EXHIBITS    P000053

1.53



**Joseph V. Bragg**

Florida Roofing Contractor – CCC1333311
Florida General Contractor – CGC1534425
HAAG Certified Inspector #992103012

**Senior Roofing Consultant**
**WJA Consultants, 4/2019 - Present**

Roofing professional and former business owner with 20 years of experience and technical
expertise in roofing products and applications, including tile, shingle, modified, TPO,
FiberTite, standing seam, 5-V, R-panel, coping, gutters, and coating products.
• Inspected over 900 homes to date
• Lead and observe destructive testing
• Involved in multiple legal cases involving installation practices

**Production Supervisor, Retail Roofing Operations**
*Roofing By Curry, 03/2017 - 4/2019*

• Improved division operations resulting in revenue growth of 78% over two years
• Advise team of salesmen in pre-bid and pre-job meetings to ensure correct products and
  applications are used; review projected labor cost estimates for accuracy
• Point of contact to communicate explanations of materials and techniques to owners,
  inspectors, General Contractors, and consultants
• Supervise installation and quality control for 11 reroof crews and 2 punch-out crews
• Complete final inspections on all large projects
• The "go-to guy" for diagnosing roof issues that are otherwise unresolvable
• Coordinate punch list items, ensure customer satisfaction, and collect final payments

**General Manager**
*Colonial Roofing, Sarasota Office, 09/2016 - 02/2017*

• Coordinated, scheduled and supervised service and production crews for maximum
  efficiency and output
• Trained and increased productivity of service technicians
• Compiled and analyzed job cost reports to identify budget vs actual variances
• Inspected completed work to ensure quality workmanship
• Diagnosed warranty claims accurately to resolve issues
• Communicated and developed relationships with management companies and
  Homeowners

400 N New York Avenue , Suite 110 , Winter Park, FL 32789

**F&B v. DAYBREAK – BRAGG DEPO EXHIBITS**    P000054

1.54



**Owner and General Manager**
*AJ Enterprise and Greenbush Construction Inc., 2005-2016 Buffalo, NY*
*Residential roofing & home improvement, sold to Se-Me Contracting to relocate to FL*

• Performed detailed roofing inspections and reports for insurance companies
• Supervised all jobs to ensure quality control, hands on owner
• Maximized the output and efficiency of crews
• Ordered and utilized materials in the most effective way to minimize waste and reduce costs
• Consistently met and continuously exceeded expectations for completion dates
• Ensure compliance with OSHA regulations, internal safety controls and insurance requirements
• Communicated regularly with contractors to ensure work was scheduled and completed in a timely manner
• Retained numerous long-term employees despite high industry turnover rates


**Education:**

Niagara County Community College, 2001
A.A.S. Business Administration, Math, and Science
United Brotherhood of Carpenters Union, Local 280 4th Year Apprenticeship
SUNY Environmental Science & Forestry at Syracuse University, 1998-1999


**Licenses:**

HAAG Certified Inspector #992103012
Florida Roofing Contractor – CCC1333311
Florida General Contractor – CGC1534425

400 N New York Avenue , Suite 110 , Winter Park, Fl 32789

**F&B v. DAYBREAK – BRAGG DEPO EXHIBITS**    P000055

1.55



## JOSEPH V. BRAGG
## RECORD OF TESTIMONY/DEPOSITIONS

07/07/2025    Craig L. Ames, as trustee for The Spencer Road Land Trust v. Jeff Surbaugh and Belcher Contractors & Roofing, Inc.
Case No.: 24-CA-002032

06/30/2025    Gary McLoughlin and Mary McLoughlin v. Ashton Tampa Residential, LLC v. Gulf Western Roofing
Case No.: 01-21-0004-5561

06/02/2025    Ronald Baur and Janet Baur v. Privilege Underwriters Reciprocal Exchange
Case No.: 2024-CA-000511

05/19/2025    JoAnn Elardo and Robert Elardo v. Privilege Underwriters Reciprocal Exchange
Case No.: 2024-CA-004522

05/15/2025    Pointe Cypress Townhomes Homeowners Association, Inc. v. Park Square Enterprises v. Colliss Roofing Inc.
Case No.: 2022-CA-009558-O

04/22/2025    Aria Longboat Key Condominium Association v. Crowther Roofing and Sheet Metal of Florida, Inc.
Case No.: 2019-CA-001461 NC

03/25/2025    Summerset Apartments Limited Partnership v. Core Construction Services of Florida, LLC
Case No.: 2022-CA-002875

02/03/2025    Wesley Cadena v. Rock Ridge Insurance Company and Openly, LLC
Case No.: CIV-24-715-R

01/13/2025    Divima Enterprises, LLC v. Todd Rhyne Inc.
Case No.: 2023-CA-2100

12/16/2024    Charles Plaia v. Wellington Place Homeowners' Association Inc.
Case No.: 2024-CA-002771

11/05/2024    Van Gorder, Jan and Linda v. Privilege Underwriters Reciprocal Exchange
Case No.: 2023-CA-011447

10/21/2024    Tuscany Towns of Volusia Homeowners Association, inc. v Collis Roofing, Inc.
Case No.: 2023 32619 CICI



460 N New York Avenue, Suite 110, Winter Park, FL 32789
**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS**    **P000056**

1.56



09/13/2024    Lakeside Village Townhomes Homeowners Association, Inc. v Professional
Sunshine Roofing, Inc.
Case No.: 2022-CA-7616-O

07/08/2024    Portofino Meadows HOA, Inc. v Collis Roofing, Inc.
Case No.: 2020-CA-009679-O

05/06/2024    Disantis v Pure Specialty
FL-026-136

03/28/2024    Worthmann LLC v The Gainesville Church, Inc. d/b/a Campusview Church
Case No.: 2023-CA-000843

02/05/2024    Champions Club Condominium Association, Inc., v Crown Roofing LLC
Case No.: 01-22-0003-4007

09/12/2023    Incantro I, LLC v Artisan of Seagrove Beach, Inc.
Case No.: 2019-CA-000502

04/21/2023    Villa Medici Townhomes HOA, Inc. v Portofino Springs Townhomes, LLC
Case No.: 20-CA-003641

04/14/2023    Rodriguez v. National Specialty Insurance Company
Case No.: CACE-21-009853

02/22/2023    Venetian Multi Family, LLC v Weiland Corporation; Liberty Mutual Insurance
Company; Latite Roofing and Sheet Metal, LLC; Crawford Landscaping Group,
LLC
Case No.:2019-CA-4395 (H)

02/06/2023    Roof Commander v SPC Homes, Inc.
Case No.: 2021-CA-018771

01/09/2023    Patrick and Debra Knight v National Specialty Insurance Company
Case No.:2022-CA-003402-O

11/21/2022    Yan Bin Lu v National Specialty Insurance Company
Case No.:50-2021-CA-012714

09/19/2022-    Venetian Multi Family, LLC v Weiland Corporation; Liberty Mutual Insurance
09/21/2022    Company; Latite Roofing and Sheet Metal, LLC; Crawford Landscaping Group,
LLC
Case No.:2019-CA-4395 (H)

09/12/2022    Mai Kai Condominium Association v Universal Roofing Group
Case No.: 2021-CA-2684-O

460 N New York Avenue , Suite 110 , Winter Park, FL 32789
**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS**    **P000057**

1.57



| | |
|---|---|
| 08/08/2022 | James Proce and Robert Oliver v National Specialty Insurance Co.<br>Case No.:21-CA-003984 |
| 08/01/2022 | Sylvia Iglesias v National Specialty Insurance Co.<br>Case No.:21-000807 CA 25 |
| 06/13/2022 | East Coast Roof Tarping, Inc. aao Derrick Davis v National Specialty Insurance<br>Co<br>Case No. COINX-21-051651 |
| 06/06/2022 | Frank and Carol Seager v Hartford Insurance Co. of the Midwest<br>Case No. 2:20-CV-00728-SPC-MRM |
| 04/18/2022 | Wendy and Ira Goldberg v National Specialty Insurance Company<br>Case No. CACE-21-010244 |
| 02/28/2022 | Anayama Cardoso Alvarenga v Security First Insurance Company<br>Case No.:2020-CC-11832-O |
| 02/21/2022 | Nicholas J. Reimesch and Jennifer E. Reimesch v Family Security Insurance<br>Company<br>Case No.: 2020-CA-001035-O |
| 01/24/2022 | Cesar Gavidia and Erika Gavidia v National Specialty Insurance Co<br>#4020102A76E-0001<br>Case No.: 0:21-cv-61086-WPD |
| 01/20/2022 | David Brackett v. National Specialty Insurance Co.<br>#30204512241-0001 |
| 12/20/2021 | Conti v National Specialty Insurance Co<br>Case No.: 9:21-cv-81038-DMM RH 21-23051 |
| 12/13/2021 | Mayerlin Almonte v National Specialty Insurance Co<br>Case No.: 0:21-CV-61004-RKA |
| 11/22/2021 | Calvart C. Raugh and Bernicetrust Raugh v The Hartford<br>#PPP0017750683 |
| 11/15/2021 | Anne McGrath v National Specialty Insurance Co<br>#20-22089 |
| 11/08/2021 | Soppa v National Specialty Insurance Co<br>#4020102dfc80001<br>Case No.: 2021-CA-000477 |

460 N New York Avenue , Suite 110, Winter Park, FL 32789
**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS**   **P000058**

1.58



10/14/2021    SFR Services, LLC a/a/o Charles and Pamela Stirzel v Heritage Property &
              Casualty Ins Co
              #HP200354
              Case No.: 20-CA-2442

09/24/2021    Stirzel v Heritage Insurance
              #200354

09/20/2021    Martha Blanco and Charles Blanco v National Specialty Insurance Co
              #30205250950-0001

08/02/2021    Amish Chirali and Karishma Thakker v Capital Preferred Insurance Co Inc
              #592020CA0026010000XX

07/26/2021    Sylvia Iglesias v National Specialty Insurance Co
              #40201135C0D-001

04/06/2021    Evert v National Specialty Insurance Co
              #20-22217

12/7/2020     Carol Fox v National Specialty Insurance Corp
              #5020-CC-006207

09/28/2020    John Huether v Privilege Underwriters Reciprocal Exchange (PURE)
              #FL-016-176

08/14/2020    Apex Roofing & Restoration, LLC (A/A/O William Baggott) v National Specialty
              #19-CA-5171

05/18/2020    Martin Sandler v National Specialty Insurance Co
              #30192611787-0001

460 N New York Avenue, Suite 110, Winter Park, FL 32789
**F&B v. DAYBREAK - BRAGG DEPO EXHIBITS        P000059**

1.59

**WJA Consultants**
400 N New York Avenue
Suite 110
Winter Park, FL 32789
407-773-3682
info@wjaconsultants.com

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/14/2025 | 5113 |

Bill To

Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL 34994-2209

| P.O. No. | Terms | Rep | Project |
|----------|-------|-----|---------|
| | Net 30 | JB | Friedberg Bunge v ... |

| Date | Description | Quantity | Time | Rate | Amount |
|------|-------------|----------|------|------|--------|
| 05/06/2025 | On-Site Roof Inspection - 168 Chocolate Hole Rd, St. John, USVI | 1 | | 3,000.00 | 3,000.00 |
| | Travel - Airfare | 1 | | 1,248.71 | 1,248.71 |
| | Accomodations and meals (3 days, 2 nights) | 1 | | 2,216.50 | 2,216.50 |
| 05/05/2025 | Travel day | 1 | | 1,500.00 | 1,500.00 |
| 05/07/2025 | Travel day | 1 | | 1,500.00 | 1,500.00 |
| | THOMAS P. FRIEDBERG & SARAH L. BUNGE v. DAYBREAK, INC. dba HUBER & ASSOCIATES | | | | |

| | |
|---|---|
| **Total** | $9,465.21 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $9,465.21 |

Established 1883

Telephone (203) 469-6454
Fax (203) 469-0868
Email: service@fjdahill.com



F. J. **Dahill** CO., INC.

**Structural Restoration Contractors**

176 Forbes Avenue • P.O. Box 9578 • New Haven, Connecticut 06535

# PROJECT REVIEW REPORT

BRAGG Depo
September 23, 2025

**Exhibit 3**

Susan L. Foster, CSR 2942

**PROJECT INFO:**

| JOB NAME: | Friedberg Property | DATE: | March 8, 2019 | | |
|---|---|---|---|---|---|
| ADDRESS: | Croton Rd | | | | |
| CITY: | Cruz Bay | STATE: | St. John, USVI | ZIP | 00830 |
| DATE OF VISIT: | February 24, 2019 – February 28 2019 | | | | |

**Property Overview:**



**F&B v. DAYBREAK**                    **P000332**

3.1

## PURPOSE OF VISIT

- On February 24th, 2019, Dahill visited the above-mentioned project at the request of the property owner. The purpose of this visit is to make temporary repair to the damaged panels where airborne debris punctured the roofing system, investigate the source of an ongoing leak in the gatehouse, make repairs to an open hip seam & confirm the attachment method used at the same hip seam, and to acquire field measurement of damaged seams for future repair.

## PROJECT REVIEW COMMENTS:

### Gatehouse:
1) Several areas of physical damage have occurred to the panel roofing system.
   a. Temporary repairs have been made in all damage areas.
   b. 5 additional panels were found to be damaged, and have been marked on the revised roof plan. (See attached revised roof plan).

### Garage:
1) Minor dents were found in several panels. No temporary repairs were required at this time.

### Beach Pavilion:
1) Minor dents were found in several panels. No temporary repairs were required at this time.

### Guest Pavilion & Dining Pavilion:
1) Several areas of physical damage have occurred to the panel roofing system.
   a. Temporary repairs have been made in all damage areas.
   b. 3 additional panels were found to be damaged, and have been marked on the revised roof plan. (See attached revised roof plan).

### Main Pavilion & Master Suite:
1) Several areas of physical damage have occurred to the panel roofing system.
   a. Temporary repairs have been made in all damage areas.
   b. 2 additional panels were found to be damaged, and have been marked on the revised roof plan. (See attached revised roof plan).
2) An open hip on the north side of the Main Pavilion was further investigated to verify the attachment method during the project review. The verification found the following results:
   a. No clips were added in the hip seam area. A section of seam approximately 30' long was opened, with no evidence of clips being installed. (See Photos).
   b. Rivet that were installed to secure the panels together in this seam were found to not penetrate the lower portion of the hip seam. (See Photos).

**F&B v. DAYBREAK**

**Gatehouse:**



- **Gatehouse: East Side of Building**



- **Gatehouse: Main Roof**
- Severe damage caused by airborne debris.
- Located on Southwest section of the property.
- Damage exposed the insulation and wood decking below.



- **Gatehouse: Main Roof**
- Additional damage has been found during this visit, and noted on a revised roof plan.
- During the repairs, glass was found in one of the panels. It is assumed this glass is left over from the time of impact.



- **Gatehouse: Main Roof**
- Multiple temporary repairs made on the west side of the main roof on the Gatehouse.



- **Gatehouse: Lower East Roof**
- Damaged panel on the North side of the Lower East Roof.
- Damage appears to be caused by impact.



- **Gatehouse: Lower East Roof**
- Damaged panel on the North side of the Lower East Roof.
- Temporary repairs made to damaged panel.
- 2 corner panels have been added to the repair scope, located on the revised roof plan.



- **Gatehouse: Lower East Roof**
- **Leak located on the lower level of the gatehouse.**
- During the visit, cracks were found on the stucco wall surrounding the window, and above the counter flashing. The cracking will allow wind driven rain to infiltrate the building envelope in the crack locations.
- Temporary repairs were made utilizing a clear caulk to the stucco wall during our visit.



- **Gatehouse: Lower East Roof**
- **Leak located on the lower level of the gatehouse.**
- During the visit, cracks were found on the stucco wall surrounding the window, and above the counter flashing. The cracking will allow wind driven rain to infiltrate the building envelope in the crack locations.
- Temporary repairs were made utilizing a clear caulk to the stucco wall during our visit.

Garage:



- **Garage Roof: South side of building:**
- No damaged panel require repair on the Garage roof.

Page 6 of 12



- **Garage Roof: East Side of building**

**Guest Pavilion and Dining Pavilion:**



- **Guest Pavilion and Dining Pavilion: West Side of Building**



- **Guest Pavilion and Dining Pavilion: North Side of Building.**
- Additional damage has been found during this visit, and noted on a revised roof plan.

**Main Pavilion and Master Suite:**



- **Main Pavilion and Master Suite: South side of the building.**



- **Main Pavilion and Master Suite: East side of the building.**



- **Main Pavilion and Master Suite:**
- Open hip seam found on the north side of the building.
- Removed hip cap to expose the seam.
- Found rivets did not secure through the lower panel in this area.
- No clips were found throughout the open seam.
- Total seam length is approximately 36-38 linear feet. 30 linear feet was open during the investigation.



**Main Pavilion and Master Suite:**
- Open hip seam found on the north side of the building.
- No clips were found throughout the open seam.
- Total seam length is approximately 36-38 linear feet. 30 linear feet was open during the investigation.
- Image shows rivet in the upper panel, and no hole in the lower panel. This condition is typical throughout the entire seam length.



**Main Pavilion and Master Suite:**
- Open Hip seam found on the North Side of the building.
- Found rivets did not secure through the lower panel in this area.
- No clips were found throughout the open seam.
- Total seam length is approximately 36-38 linear feet. 30 linear feet was open during the investigation.
- Image shows the open seam where the hip cap was removed.



**Main Pavilion and Master Suite:**
- Open Hip seam found on the North Side of the building.
- No clips were found throughout the open seam.
- Total seam length is approximately 36-38 linear feet. 30 linear feet was open during the investigation.
- Image shows rivet in the upper panel, and no hole in the lower panel. This condition is typical throughout the entire seam length.



- **Main Pavilion and Master Suite:**
- Cap detail. Typical in 7 locations throughout the project.
- Low nails found in each location.
- Cuts to panels below the cap are visible in each location.



- **Main Pavilion and Master Suite:**
- Cap detail. Typical in 7 locations throughout the project.
- Low nails found in each location.
- Cuts to panels below the cap are visible in each location.



- **Main Pavilion and Master Suite:**
- Temporary repairs to the damaged panels on the Master Suite.

Page 10 of 12

## REVISED ROOF PLANS:



F&B v. DAYBREAK                    P000341

3.10

Page 11 of 12



F&B v. DAYBREAK          P000342

3.11

Page 12 of 12





Established 1883

Telephone (203) 469-6454
Fax (203) 469-0868
Email: service@fjdahill.com

F. J.    CO., INC    **Structural Restoration Contractors**

176 Forbes Avenue  •  P.O. Box 9578  •  New Haven, Connecticut 06535

January 22nd in our
137th year 2020

LAW OFFICES OF FRIEDBERG & BUNGE
610 West Ash Street, Suite 1400
P.O. Box 6814
San Diego, California 92166-0814

*Attention: Thomas F. Friedberg Esq. <Tff@LawOfficeFB.com>*
*Arthur L. Sanders <asanders@hoffmanarch.com>*

**RE: FRIEDBERG-BUNGE RESIDENCE/ST. JOHN U.S. VIRGIN ISLANDS**

We are pleased to submit to you our proposal for the roof replacement and
remediation for the above referenced location. The work to be completed will include
the following:

| SCOPE OF WORK: Main Building – Roof Replacement & Outer Building(s) Remediation | |
|---|---|
| 1. | Mobilize Dahill equipment and material onto jobsite. |
| 2. | Provide personal protective equipment in accordance with OSHA guidelines and F.J. Dahill's Health and Safety Program. |
| NOTES: | **Scaffolding meeting OSHA certifications and requirements will be provided, set-up, and maintained by others.** |
| 3. | Remove and dispose of the existing roof system down to the substrate. |
| 4. | Overlay the existing underlayment with a new synthetic underlayment. |
| 5. | New copper panel on the Main Pavilion will be installed following Hoffman and panel manufacturer specifications and drawings. (See drawing A-102) |
| 6. | Replace up to an additional thirty-one (31) panels on the remaining buildings as identified and specified on drawings A-101, and A-103. |
| NOTES: | **Where possible, we will repurpose panels from the existing main pavilion roof to be used as replacement pieces on the out buildings.** |
| 7. | Remove and replace all hip and ridge covers with new coper hip and ridge covers and rivet. |

**F&B v. DAYBREAK**            **P000344**

3.13

| | |
|---|---|
| 8. | Complete breakdown of Dahill equipment leaving the project in broom swept condition. |

Cost.............................................................................................$449,000.00

Notes:
- Permits, approvals, taxes and other related fees are excluded from this proposal.
- Interior protection is excluded from this proposal.
- Lodging and travel expenses are not included from this proposal.
- Perimeter scaffolding following OSHA guidelines and codes is to be provided and set-up, and maintained by others.
- Any/all disconnects and reconnects that may be required to complete the roof replacement is excluded from this price.
- Roof substrate replacement is excluded from this proposal. If substrate replacement is required, it shall be completed on a time and material basis at a rate of $98.00 per man per hour, materials will be provided by the building owners representative.
- The price provided above is contingent on final detail drawings to be provided from Hoffman Architects, Inc.
- Charges for the temporary repair work that was completed in the spring of 2019 is included in the proposal above. If this proposal is not accepted, a bill for those charges will be forwarded to the building owner for payment.

**Nature of Work.** F. J. Dahill Co., Inc. ("Dahill") shall furnish the labor and material necessary to perform the construction work described herein or in the referenced contract documents. Dahill does not provide engineering, consulting or architectural services. It is the Owner's responsibility to retain a licensed architect or engineer to determine proper design and code compliance. Dahill assumes no responsibility for structural integrity, compliance with building codes, or design. If plans, specifications or other design documents have been furnished to Dahill, Customer warrants that they are sufficient and conform to all applicable laws and building codes. Dahill is not responsible for any loss, damage or expense due to defects in plans or specifications or building code violations unless such damage results from a deviation by Dahill from the contract documents. Customer warrants all structures to be in sound condition capable of withstanding normal activities of roofing construction equipment and operations.

F. J. Dahill's scope of work shall not include the identification, detection, abatement, encapsulation or removal of asbestos or similar hazardous substances, except as related to this proposal. If F. J. Dahill Co., Inc. encounters any such products or materials in the course of performing its work, or if such hazardous materials are encountered by any other firm performing work at the job site and F. J. Dahill Co., Inc. determines that such materials present a hazard to its employees, F. J. Dahill Co., Inc. shall have the right to discontinue its work and remove its employees from the job site until such products or materials, and any hazards connected therewith, are located and abated, encapsulated or removed, or it is determined that no hazard exists (as the case may require), and F. J. Dahill Co., Inc. shall receive an extension of time to

Page 3 of 3

complete its work hereunder and compensation for delays encountered as a result of such situation and correction.

Our employees are protected by Workers' Compensation, Commercial General Liability and Comprehensive Auto Liability Insurance   A Certificate of Insurance will be furnished upon request.

We appreciate the opportunity to present our proposal and if accepted we will strive to exceed your expectations.

Very truly yours,

F. J. DAHILL CO., INC.

Richard Barabas
Roofing Division

**General Conditions:**

1.    This price will remain valid for 30 days.
2.    **Pricing is based upon acceptance of this proposal or a Standard AIA Agreement.**
3.    Terms: Payment upon completion of work

ACCOUNTS OVERDUE ARE SUBJECT TO A FINANCE CHARGE OF 1½% PER MONTH (18% ANNUALLY). IF LEGAL ACTION IS NECESSARY, ALL COLLECTION COSTS AND ATTORNEY'S FEES WILL BE ADDED.

Accepted By: _____          Tel. No.: _____
Title: _____                Fax No.: _____
Date: _____                 E-mail: _____

RSB/bl





F&B v. DAYBREAK

P000348



F&B v. DAYBREAK                    P000349

3.18



F&B v. DAYBREAK

P000350



F&B v. DAYBREAK

P000351

3.20



F&B v. DAYBREAK                                                    P000352

3.21



F&B v. DAYBREAK                              P000353

3.22



F&B v. DAYBREAK

P000354

3.23



F&B v. DAYBREAK

P000355

3.24



F&B v. DAYBREAK

P000356

3.25



F&B v. DAYBREAK

P000357

3.26



F&B v. DAYBREAK

P000358



F&B v. DAYBREAK

P000359

3.28



F&B v. DAYBREAK

P000360



F&B v. DAYBREAK

P000361

3.30



F&B v. DAYBREAK

P000362



F&B v. DAYBREAK

P000363



F&B v. DAYBREAK

P000364

3.33



F&B v. DAYBREAK

P000368

3.34



F&B v. DAYBREAK

P000366

3.35