**EXHIBIT 3**

IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

CIVIL CASE NO.: ST-10-CV-716

- - - - - - - - - - - - - - - - - - -X
DAYBREAK, INC., d/b/a                 :
HUBER AND ASSOCIATES,                 :
                    Plaintiff         :
                                      :
VS                                    :
                                      :
THOMAS F. FRIEDBERG, SARAH BUNGE,     :
LAW OFFICES OF FRIEDBERG & BUNGE,     :
AND MERRILL LYNCH CREDIT              :
CORPORATION,                          :
                    Defendants        :
- - - - - - - - - - - - - - - - - - -X
THOMAS F. FRIEDBERG and               :
SARAH L. BUNGE,                       :
                    Counterclaimants  :
                                      :
VS                                    :
                                      :
DAYBREAK, INC., D/B/A                 :
HUBER AND ASSOCIATES,                 :
                    Counterdefendants :
- - - - - - - - - - - - - - - - - - -X
THOMAS F. FRIEDBERG and               :
SARAH L. BUNGE,                       :
                                      :
            Third Party Plaintiffs,   :
                                      :
VS                                    :
                                      :
BARRY R. HUBER,                       :
            Third Party Defendant     :
- - - - - - - - - - - - - - - - - - -X


DEPOSITION OF ARTHUR L. SANDERS, AIA

Draft Copy

DAYBREAK V. THOMAS F. FRIEDBERG, ET AL.


Deposition of ARTHUR L. SANDERS, AIA taken at the

offices of Hoffman Architects, Inc., 2321 Whitney

Avenue, Hamden, Connecticut, before Clifford

Edwards, LSR, Connecticut License No. SHR.407, a

Professional Shorthand Reporter and Notary Public,

in and for the State of Connecticut on March 6,

, at 10:21 a.m.

Draft Copy

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF AND COUNTERDEFENDANT

ANDREW C. SIMPSON, ESQ.
ANDREW C. SIMPSON, PC
2191 Church St., Suite 501
Christiansted, VI  00820
340.719.3900
asimpson@coralbrief.com


ON BEHALF OF THE THIRD PARTY DEFENDANT:

JOE GOLDBERG, ESQ.
COLE, SCOTT & KISSANE, P.A.
Dadeland Centre II
9150 South Dadeland Blvd., Suite 1400
Miami, Florida  33156
joe.goldberg@csklegal.com


ON BEHALF OF THE DEFENDANTS:

THOMAS F. FRIEDBERG, ESQ.
LAW OFFICES OF FRIEDBERG & BUNGE
610 West Ash Street, Suite 1400
PO Box 6814
San Diego, California  92166
tom@lawofficefb.com

Draft Copy

```
 1              ARTHUR L. SANDERS, AIA

 2    residing at 2001 Chapel Street, New Haven,

 3    Connecticut 06515, having first been duly sworn,

 4    deposed and testified as follows:

 5

 6

 7              DIRECT EXAMINATION

 8

 9

10    BY MR. SIMPSON:

11        Q    Good morning, Mr. Sanders.

12        A    Good morning.

13        Q    You were asked to render an opinion in

14    this case for the defendants.

15             Correct?

16        A    Yes.

17        Q    Okay.  Could you tell us what the general

18    nature of the request that was made to you regarding

19    that opinion was?

20                 MR. FRIEDBERG:  Can you hang on a

21             second.  I just need to get logged in

22             here.

23                 MR. SIMPSON:  Let's get started the

24             with the preliminaries because we are

25             starting late because of you and we need
```

```
 1              all the time we can get.

 2                  MR. FRIEDBERG:  All right.  Just

 3              give me 30 seconds or so if you --

 4    BY MR. SIMPSON:

 5        Q    Well, go ahead and answer my question,

 6    please.

 7        A    Well, I was contacted by Mr. Friedberg

 8    in relationship to the cooper roof on his residence

 9    and buildings in Saint John and he solicited my

10    opinion as to the installation of the copper on the

11    roof.

12        Q    When he contacted you, what did he tell

13    you about the roofs?

14        A    He gave me a series of photographs, he

15    told me the chronology of when it was installed and

16    kind of some of the methods of acquisition of

17    copper, the contracting and some of the issues that

18    he felt might be things that -- that -- conditions I

19    might want to look at when I came down.

20        Q    And with respect to the conditions that

21    he told you about, what did he tell you?

22        A    He said -- I think there were things like

23    missing pop rivets, there were leaks in his

24    gatehouse and he questioned whether or not the

25    system was installed as it should have been.
```

Page 6

1    Q    And when you say "the system," you mean

2    the roof?

3    A    The copper roof.  Yeah, the standing seam

4    copper roof.

5    Q    And was that specific to the gatehouse

6    when he was questioning whether it was --

7    A    No.

8         He was -- he -- he told me that there

9    were a series of buildings and that it was all done

10   at the same time and it was approximately 8700

11   square feet of copper roof.  So --

12   Q    What did he tell you he thought was --

13   might be wrong in terms of the installation of the

14   system?

15   A    He was looking for my opinion.

16   Q    Okay.

17   A    Didn't tell me a lot.

18   Q    Okay.  So he told you about some missing

19   pop rivets and leaks in the gatehouse, any other

20   leaks that he mentioned?

21   A    No.

22        He said is there was leaks in the main

23   pavilion also.

24   Q    Any other leaks that he mentioned?

25   A    There wasn't a long discussion about

1  leaks.

2      Q     Okay.

3      A     So --

4      Q     Had you ever dealt with Mr. Friedberg

5  before?

6      A     No.

7      Q     Okay.  Do you have any idea how he came

8  to retain you as opposed to some other architect?

9      A     I think because he -- he found a previous

10  journal that I had written years ago on copper

11  roofing and called and asked what my background was

12  in relationship to copper roof installation.  And I

13  told him about numerous installations that we've

14  been involved with in work over the years with

15  copper roofs.

16      Q     What is the journal article that you are

17  referencing?

18      A     It's this Hoffman journal article called

19  Copper, an Enduring Link Between Past and Future.

20              MR. GOLDBERG:  Thank you.

21  BY MR. SIMPSON:

22      Q     Is that a copy that we could mark as an

23  exhibit?

24      A     Yeah.

25      Q     Okay.  I'll go ahead and mark that as

1   Exhibit 1 to the deposition.

2        A        And as part of your request for the

3   deposition, I've actually given -- I would give

4   you these other journal articles that I've written

5   on various other topics that goes to my

6   expertise --

7        Q        Okay.

8        A        -- in building envelope issues.

9                    (THEREUPON, SANDERS EXHIBIT NO. 1,

10                   HOFFMAN JOURNAL ARTICLE CALLED

11                   COPPER, AN ENDURING LINK BETWEEN PAST

12                   AND FUTURE, WAS MARKED FOR

13                   IDENTIFICATION.)

14  BY MR. SIMPSON:

15       Q        And so I'll mark the second group of

16  journal articles you've mentioned -- four -- five --

17  six -- seven -- which looks like it's seven

18  different articles.  And I'll mark that as Exhibit 2

19  to your deposition.

20                   (THEREUPON, SANDERS EXHIBIT NO. 2,

21                   SEVEN JOURNAL ARTICLES, WAS MARKED

22                   FOR IDENTIFICATION.)

23  BY MR. SIMPSON:

24       Q        Is this -- are these documents, these

25  journal articles, are they published in a recognized

Page 9

1    architectural publication or are they marketing

2    information that your --

3         A     They are --

4         Q     -- architectural firm produces?

5         A     They are -- they are -- they are

6    produced -- our tact has always been with the

7    journal is producing documentation to the

8    architectural and building industry giving technical

9    knowledge to people out there.  We've done it as a

10   service.  Actually, John Hoffman was a awarded a

11   national AIA award for the journal back in the mid

12   90s and we see it as a public service to our

13   industry.

14           There -- occasionally, and I can't speak

15   to the specific journals that I've written or

16   coauthored in some cases -- occasionally, we get

17   requests to have reproduced in publications and I

18   know that at least one of mine was published in

19   Building Design and Construction.

20        Q     Okay.  After your first contact with

21   Mr. Friedberg, what was your next contact with him?

22        A     The first contact was an e-mail and then

23   a phone call.  And after that, there was some back

24   and forth, I think, with our business development

25   manager and sending an agreement and so on.  And

Page 10

1   Mr. Friedberg asking that -- if I could be

2   available to come down in early September to look at

3   the roof.

4            And I asked if we could have a roofing

5   mechanic to open up sections of the roof to examine

6   it.  We actually started -- I started searching for

7   someone by contacting someone who is a former

8   national roofing contractor's, the national

9   organization, I believe he was past president, and

10  asking if he knew of anyone in the Florida area that

11  could assist us.  That research led to not really

12  finding anyone.

13           And I -- I then fell back on using a roof

14  mechanic from a contractor in this local area who

15  I've done many many years of work with and -- and

16  the mechanic I've known through some investigation

17  so I knew that he could -- was capable of taking

18  some pieces apart and putting them back together and

19  not destroying the roof.

20      Q    Okay.  And who was that individual?

21      A    His name was Francis Nelson -- his name

22  is Francis Nelson who works for F J Dahill Company

23  here in New Haven.

24      Q    During the subsequent communications with

25  Mr. Friedberg, did he tell you anything more about

Page 11

1    problems with the roof?

2        A      I think over the series of e-mails in

3    August he provided me more photographs.  At one

4    point he transmitted to me the estimates that were

5    done and this specification, if you will, for what

6    the contractor was going to do and provided me with

7    background plans from the architect in the Virgin

8    Islands and that was basically it before the trip, I

9    think.

10       Q      Okay.  Did he give you any other

11   information about the condition of the roof during

12   this time?

13       A      No.

14       Q      Any other --

15       A      Not any more than I had had.

16       Q      And --

17       A      Background information about how the pans

18   were to be done and shipping a machine down there

19   and so on.

20       Q      And when did he first contact you?

21       A      August 11, I believe.

22       Q      And that was 20 --

23       A      That chronology is in my report.

24       Q      2014.

25              Correct?

Page 12

1      A      Yes.

2      Q      Okay.  So when you went down -- you went

3   down in September.

4           Correct?

5      A      Yes.

6      Q      Okay.  And so at the time you went down,

7   you knew that the complaints were missing pop

8   rivets, leaks in the gatehouse and leaks in the main

9   pavilion?

10     A      Yeah.

11     Q      And that was the extent of what you had

12  been told in terms of the conditions of the roofs?

13     A      Yes.

14     Q      Why were you thinking you needed a

15  roofing mechanic to come down at that point with

16  you?

17     A      Because I know how copper is installed

18  and the question is, you know, do a due diligence to

19  whether this was installed properly or does it -- is

20  it cleated in accordance with all the spec

21  requirements that the contractor said he was going

22  to do.  You -- you can't just look at it -- you

23  can't put a ladder up the side of a roof and look at

24  the copper and say it looks fine.

25     Q      Okay.

Page 13

1      A      Some investigation is required to

2  understand whether or not the system is properly

3  installed.

4      Q      Were you asked to opine upon the problems

5  with the roof or the compliance with the contract or

6  both?

7      A      I'm -- I'm sure that compliance with what

8  the contractor proposed and whether it was

9  appropriate was a focus of my work, yes.

10     Q      Okay.  When you got down to Saint John

11  and -- tell us what you did to inspect the roof?

12     A      Well, and that's all in my report.

13     Q      I know.

14     A      But the -- you know, my -- the majority

15  of the first morning was visual observations; going

16  up on each roof, walking around, looking at what was

17  there.  And I'll refresh my memory.

18            So I think we started on the main

19  pavilion, walked around, looked at the conditions at

20  the interface between the pans at the ridges, we

21  looked at, you know, dents and dings and defects in

22  the copper and how they had done the ridge detail

23  between -- between pans.

24            Also, there we -- we looked at -- I

25  looked at the base flashing briefly, at the shower

Page 14

1    of the master suite and those interfaces, the

2    valleys in the hip roofs at the master suite.  We

3    also got onto the dining gazebo and the guest house,

4    briefly, to look at conditions there and we

5    actually -- we put a ladder up on the beach bar and

6    got up to that roof.  I think it was later on in the

7    afternoon that we looked at the garage and the

8    gatehouse.  So we --

9         Q     After that first day of inspection what

10   were your concerns about the roof?

11        A     Well, and I'm just refreshing my memory.

12   But we -- we unlocked -- we took apart a cap and

13   unlocked the seam between pans at the -- at one of

14   the ridges.  And we chose a place where, actually,

15   there was an opening between the pan and the cap

16   where the copper was not long enough to lap in at

17   that seam.

18             And my concern was that any -- any driven

19   rain could go into this opening and go in under the

20   roof.  And that particular location was uphill from

21   staining at the perimeter of the building inside the

22   main pavilion.  So based on reasonable evidence,

23   it's -- you know, it's very reasonable that that --

24   that leaks there and is the cause of the staining at

25   the edge of the roof.

Page 15

```
 1        Q      Okay.  So this -- the place where you did

 2    this was on the main pavilion?

 3        A      Yes.

 4        Q      Okay.  And you said you unlocked -- you

 5    actually unlocked the ridge --

 6        A      We drilled out the pop rivets on the cap,

 7    we -- we unlocked the portion that was overlapped

 8    and we found in that case there were no cleats so in

 9    the -- in the intersection of the pans at the

10    ridges, we found no cleats securing those to the --

11    to the substrate below.

12        Q      And this would have been cleats in the

13    ridges or cleats in the --

14        A      Cleats in the ridges.

15        Q      Not in the standing seam, you are

16    talking?

17        A      Not in the standing seam.

18        Q      Okay.

19        A      The next day, you know, we did take --

20    unfold a portion of the standing seam on the west

21    side of the roof and verify along a length that

22    there were three cleats.  And they were supposed to

23    be at nine and a half inches, they varied from

24    between eight to almost ten but, basically, they

25    were within tolerance of that cleat spacing.
```

Draft Copy

Page 16

1    Q    Okay.

2    A    So we did not do further destruction to

3  understand whether or not the cleats were properly

4  secured to the wood below and there's nothing that

5  really led me to believe that they weren't secured

6  well.

7    Q    Is it your opinion that the cleats should

8  have been in the ridges?

9         Is it your opinion that cleats should

10  have been in the ridges?

11    A    Yeah, absolutely.

12    Q    Okay.  And do either --

13    A    SMACNA details show cleats in ridges.

14    Q    And does Copper and Common Sense also

15  show cleats in ridges?

16    A    Yes.

17    Q    Now SMACNA does a number of publications

18  on a number of things.  What particular publications

19  were you relying on from SMACNA?

20    A    The --

21    Q    All caps, SNAMCA --

22    A    NA, yeah.

23         SMACNA.

24    Q    Sorry.  Yeah.

25    A    Sheet Metal and Air Conditioning

Page 17

```
 1    Contractors' National Association.

 2        Q     Yeah.

 3        A     The architectural sheet metal manual.

 4              And SMACNA is more brief than Copper and

 5    Common Sense.  It has one page of text and three

 6    pages of details.

 7        Q     Okay.

 8        A     It doesn't cover everything, it's very

 9    general.

10              Here is the -- is a detail of a ridge and

11    it has a cleat in it.

12        Q     Okay.  You are referring to page 6.16,

13    it's figure 6-6, standing seam roofs?

14        A     Yeah.

15              MR. GOLDBERG:  What figure?  I'm

16         sorry.

17              MR. SIMPSON:  Six dash six.

18              MR. GOLDBERG:  Thank you.

19        A     Well --

20    BY MR. SIMPSON:

21        Q     And where is -- and you are looking at --

22    specifically referring to the drawing labeled A at

23    the lower left of that?

24        A     Yes.

25        Q     Okay.  And where the is the cleat shown
```

Page 18

1    there?

2        A       The cleat is here.

3        Q       Okay.

4        A       There is -- there's a double -- this

5    shows a double lock and there's pan coming up from

6    both directions and the cleat is here.

7        Q       Okay.

8        A       Now, they do show an alternate so I'm --

9    I'm calling this the traditional detail.  There is

10   an alternate that shows a cap and it also has a

11   cleat.

12       Q       Okay.  And how far -- how much of the

13   ridge did you -- I don't know what the term is --

14   unwind?

15       A       Yeah.  We did that at the intersection of

16   the pans and we took off about a ten foot section of

17   cap.  We opened up two pan-widths, approximately.

18   So you know, there should have been a minimum of two

19   cleats, one in each pan.

20       Q       And -- and you were referring to the

21   sixth edition of the architectural sheet metal

22   manual.

23               Correct?

24       A       Yeah.

25               And there is a -- there is a seventh

1  edition.  Usually, our New York office is the one

2  that's the stepchild and we have the most recent but

3  in this case they have the most recent.  But the

4  details in the SMACNA manual have not changed over

5  the years.

6       Q    Okay.

7       A    Copper and Common Sense similarly shows

8  it.  And I think they reference it by talking

9  about cleat placement and not having a specific

10 detail.  Copper and Common Sense also has all the

11 details in digital so they are not all in the

12 manual.  So --

13      Q    Is it your testimony that they don't have

14 a detail that shows a cleat?

15      A    I'd have to look at the -- at the details

16 online to verify that.

17      Q    Would you agree with me that the

18 printed out portion, which is attached to your

19 report, does not show a detail for a cleat on the

20 ridge line?

21      A    Yeah.  I don't think I addressed that --

22      Q    Okay.

23      A    -- in the report.  So --

24      Q    What was your concern about the lack of a

25 cleat at the -- along the ridge?

Page 20

1        A       It should be tied down.  It -- you know,

2    it should be secured to the substrate.

3        Q       Can't that be accomplished by a cleat in

4    the standing seam near the ridge?

5        A       Well, it wouldn't meet the spacing of the

6    nine and a half inches.  The pan is 15.  It's on a

7    skew at the ridge so the dimension across that is --

8    is -- is a diagonal of that 15 inches.  So it's

9    probably in the neighborhood of 20 inches across

10   there.

11              So you know, the requirement is -- to

12   have cleats at nine and a half inches wouldn't be

13   met.

14       Q       Okay.  Of course, the requirement was an

15   average of nine and a half inches.

16              Correct?

17       A       Yes.

18       Q       Okay.

19       A       Well, I think the contractor proposed --

20   I know that I was told by Mr. Friedberg that he had

21   engineering done on the roof.

22              The typical spacing in SMACNA and so on

23   is 12 inches but this is a high wind area and he had

24   analysis done that said it should be at nine and a

25   half inches on center and that's what he had the

1    contractor propose on.

2        Q      Did you ever see this engineering report

3    of Mr. Friedberg's?

4        A      I don't think -- I don't think I was

5    given a copy of that.  But --

6        Q      Okay.

7        A      I -- I don't recall.

8        Q      Now, it's your opinion that all of the

9    roofs have to have the panels removed and new panels

10   installed.

11              Correct?

12       A      That is my opinion.

13              And that opinion is driven by, one, that

14   first of all, the main pavilion I don't think will

15   ever be right because of the long expanses of

16   copper.  And it's not only -- not only the 34-foot

17   span in the middle but the 17-foot span where it --

18   it breaks and turns up, the expansion in that

19   17 feet, with a hundred degree temperature change,

20   is still almost a quarter of an inch.  And that

21   flexure, which -- which really with the -- with the

22   not having expansion cleats, that expansive force is

23   enough to create the tears at the change in plane

24   that are being experienced there.  So that's my

25   first thing is the main pavilion, I think,

Page 22

1    absolutely has to be replaced.

2              On the other roofs, the interface at the

3    ridges that was just simply capped, it's my opinion

4    that that can't be repaired in a way that brings the

5    roof into a lifespan that's appropriate to what was

6    supposed to be installed.  And that attempts --

7    I've, you know, seen the report to possibly fold

8    down the copper from each direction to create a cap

9    but I think that's flawed in that every time the

10   adjacent standing seam intersects with that,

11   there's -- it's going to be very difficult to make

12   that watertight.

13             And if it had been done in the beginning,

14   perhaps it could have been done.  They were -- from

15   my examination of where the folded standing seam

16   mates into the ridge intersection, there was no

17   attempt to take material out of that standing seam

18   to make it less bulky, which is a very common

19   practice amongst, if I can use the term, tin

20   knockers, people that work with copper and metal, to

21   lessen the thickness of that material as it goes

22   into another folded joint.

23             It goes to -- I -- I kind of feel like

24   they were there, they -- they got to those

25   intersections, they really didn't have the

Page 23

1    experience perhaps to understand what they should

2    have done, and it just got folded together.  From

3    the photographs I saw of -- during installation, the

4    copper was brought to one edge of the -- those ridge

5    lines and then the other sheets were brought in from

6    the other direction.  They appear to have been field

7    cut as opposed to fitting, bringing down to a break

8    and cleanly broken at those intersections, taken

9    back up and fitted in and, you know, precut as

10   opposed to being cut on the roof.

11            The -- having opened up one of those

12   ridges, I saw that it was very irregularly cut

13   across those lines and that leads me to believe that

14   it wasn't well fitted in the field.  And the -- the

15   solution of doing a cap along those lines, I think

16   is a very time-expedient option to those conditions.

17   And that, more traditionally, that would have been a

18   double lock seam just like the pan seams in the

19   roof.

20       Q    Well, are you saying that it would have

21   been improper to do it as a single lock ridge?

22       A    That, in SMACNA, is an alternate.

23       Q    Okay.  And do you agree they were single

24   locked ridges?

25       A    I do agree that they are single lock and

1    I recognize that.  What -- what I said in the report

2    I think was incorrect in that -- in that nature but

3    it's -- it's a single lock with a cap and pop

4    rivets.

5         Q     And the cap isn't necessary.

6               Correct?

7         A     It -- it wouldn't be necessary but I

8    think there was a fear there that -- that it needed

9    something more because they -- they -- it wasn't

10   well covered with the single lock.

11        Q     So your belief is that was done because

12   there was concern that the single lock ridge wasn't

13   going to be sufficiently watertight?

14        A     Yeah.  It's -- it's not a very good

15   joint.

16        Q     But -- but my point is that -- your

17   belief is that's the reason the contractor did it --

18        A     Yeah.

19        Q     -- for the --

20        A     Because it covers a lot of ills.

21               (THEREUPON, THE COURT REPORTER

22               REQUESTS CLARIFICATION.)

23   BY MR. SIMPSON:

24        Q     You believe that the contractor used the

25   ridge cap over the single lock to add additional

Page 25

1    water resistant qualities to the roof.

2            Correct?

3        A     My opinion is that the cap was used

4    because it covers a lot of ills.

5        Q     But --

6        A     So --

7        Q     -- are any of those ills lack of

8    watertight integrity?

9        A     Yes.

10       Q     Okay.  How did you or did you determine

11   whether expansion cleats were used on the main

12   pavilion?

13       A     The cleats I saw, where we opened up a

14   seam, were traditional cleats.

15       Q     Okay.  And what were --

16       A     And I was -- I asked Chris, who had been

17   on site through all this work, if he could show me

18   the cleats that were used and he showed me the

19   pieces that were used to form the cleats.  And they

20   were, just simply, copper sheet folded at the

21   cleat.

22       Q     And where did he get those?

23       A     From the -- the excess stock that were on

24   site.

25       Q     Okay.

Page 26

1      A      And those were the ones that he saw

2  installed.

3      Q      And where --

4      A      In order to -- and expansion cleat are

5  usually manufactured and there's no record in any of

6  the shipping that there were any expansion cleats in

7  the shipping.  They are kind of V-shape with hooks

8  in opposite directions.

9      Q      Where did you open up the standing seam

10  on the roof?

11      A      On the west side of the main pavilion.

12      Q      In the vicinity of the transition where

13  the -- of the roof?

14      A      Below the transition.

15      Q      Okay.  How far below the transition?

16      A      Three or four feet.

17            It wouldn't have been prudent to open it

18  at the transition.  It would have needed to

19  probably solder things back in order to make it

20  watertight.

21      Q      Okay.  Now, if this were a 30-foot

22  span -- pan, excuse me, rather than 34-foot, there

23  would be no need for expansion cleats.

24            Correct?

25      A      It --

Draft Copy

1          MR. FRIEDBERG:  Let me object to the

2          form of the question.  Lacks foundation.

3          Incomplete as phrased.

4                    Go ahead and answer.

5     A     30-foot straight, not bent at mid span,

6   in accordance -- in accordance with SMACNA and

7   Copper and Common Sense, that's true.

8   BY MR. SIMPSON:

9     Q     Okay.  And what about -- you qualified

10   that by saying if it's not bent, why does that make

11   a difference?

12     A     Because this is a hard point that doesn't

13   allow expansion at all.  So when it's bent here, any

14   expansion is up against a hard point and it's going

15   to -- it's going to work back and forth and create

16   stress and create the cracks that are along those

17   lines right now.

18                    In 17 feet, which is basically half of

19   that span in the middle, the expansion is just under

20   a quarter of an inch, it's like three-sixteenths of

21   an inch.  That's a lot for metal that's rigidly held

22   at that -- that intersection point where it changes

23   plane.

24     Q     You are saying the expansion for 17 feet

25   is a quarter inch?

Page 28

1       A       Yeah.   Let me just --

2               So using the other number, if we use 9.8

3   times ten to the minus six -- well, let me go

4   back -- equals -- to the minus six -- times -- he

5   used a hundred degrees -- times 100-degree

6   temperature difference, times 17 feet -- times

7   17 feet, times 12 inches is .19 inches.   So

8   somewhere between three sixteenths and a quarter.

9   So --

10      Q       What other solutions to the -- this

11  problem that you've described with the expansion of

12  the roof did you consider, rather than just simply

13  replacing the entire roof?

14      A       It's my feeling that that juncture where

15  it changes plane should probably have been a

16  disconnect between the upper panels and the lower

17  panels.  So would you leave the lower panels and let

18  it extend up and then lap on a new panel?  Well,

19  that requires having formed pans that -- that would

20  be preformed.

21              I mean, you really -- you really have to

22  take the roof off to do that again anyway.  So it's

23  not an option that I considered.

24      Q       Why couldn't you simply cut the existing

25  pans at the transition point and fold them back and

Page 29

1    do a --

2         A    You'd have to open up all the vertical

3    standing seams to do that and it's likely that would

4    be such a mess when you put it back together that it

5    wouldn't be as watertight as it is now.

6         Q    Well, I mean, it's possible to open up

7    standing seams on roofs, it's done all the time.

8              Right?

9         A    Yeah.

10        Q    And in fact, that's one of the --

11        A    And --

12        Q    -- beauties of copper?

13             Right.

14        A    Well, yeah.  But once you start working

15   it you weaken every -- you know, that -- that copper

16   and it's more subject to failing earlier.

17        Q    But that is what copper is designed to

18   do.

19             Correct?

20        A    That's what copper -- copper is malleable

21   and you can do that.

22        Q    Okay.

23        A    It takes a lot of expertise and a lot of

24   time and it's a very, very slow process.

25        Q    It's a lot cheaper than replacing the

Page 30

1    entire roof though, isn't it?

2                    MR. FRIEDBERG:   Incomplete as

3              phrased.  Lacks foundation.

4        A    I can't say on that, no.

5    BY MR. SIMPSON:

6        Q    Okay.  If a vandal got up on top of that

7    roof and cut a hole in the copper without damaging

8    the substrate, would you replace the entire roof?

9                    MR. FRIEDBERG:   Incomplete.  Lacks

10             foundation.  Speculation as phrased.

11       A    I -- you know, it depends on what the

12   owner wants it to look like.  Does he want it to

13   look like a pair of Levis that were patched?

14   BY MR. SIMPSON:

15       Q    You could replace one panel and replace

16   it, couldn't you?

17                    MR. FRIEDBERG:   Same objection as

18             before.

19                    MR. SIMPSON:   I'll give you a

20             standing objection.

21       A    You know, I suppose you could open it up

22   from top to bottom and replace one panel.

23   BY MR. SIMPSON:

24       Q    Now, you noted in your inspection -- your

25   report shows pictures of holes in the roof.

1              Right?

2      A      Uh-huh.

3      Q      You have to answer "yes" or "no" for the

4  court reporter.

5      A      Yes.

6      Q      Okay.

7      A      Sorry.

8      Q      What roofs had holes in them?

9      A      There were small holes in almost every

10  roof.  The main pavilion had three or four.  I

11  believe there was one in the master bedroom.  So

12  I -- I did not document every -- every hole.

13     Q      How did the holes get there?

14     A      I don't know.

15     Q      Okay.  Is it your opinion that the holes

16  were there at the time the job was finished?  At the

17  time Huber and Associates stopped working?

18     A      I can't speculate.

19     Q      Okay.  Did you want to say something?

20     A      Well, just that -- that I don't think

21  that there was traffic on these roofs from other

22  people.

23     Q      But you don't know?

24     A      But I don't know.

25     Q      Did you see evidence that lightning

1   protection was installed on the roofs?

2        A     I saw evidence at the peak of the -- of

3   the main pavilion that there was a cable coming out

4   for lightning protection.

5        Q     Do you know who installed that?

6        A     No.

7        Q     Do you know when it was installed?

8        A     No.  But it went through the existing

9   cooper roof so I'm presuming it predated the

10  installation of the roof.  But --

11       Q     Did a hole have to be cut for that or how

12  did it get through the roof is what I'm trying to

13  understand?

14       A     I don't know.

15       Q     Okay.  It sounds like a stupid question

16  then.  But then how do you know that it went through

17  the roof?

18       A     Well, it's coming out from the roof.

19       Q     Okay.  Could you see where it's coming

20  out from the roof?

21       A     No.  Because we didn't -- in that

22  particular instance, we didn't take off the cap that

23  was there.

24       Q     Okay.  So it was under -- so at the point

25  where it was coming out from the roof was under the

1  cap?

2      A    I think it was just to the side of the

3  cap.

4      Q    Okay.

5      A    So --

6      Q    And could you see how it got into the

7  roof?

8              MR. GOLDBERG:  Are all those

9          pictures in your report, sir?

10              THE WITNESS:  No.  And this is a

11          copy for you.

12              MR. GOLDBERG:  I appreciate that.

13          We'll mark everything but --

14              MR. SIMPSON:  Yeah.

15      A    It's not clear to me where it comes out

16  but it may be just below the cap.

17  BY MR. SIMPSON:

18      Q    Did it appear to you that it went under

19  the cap though?

20      A    I -- again, I can't tell.  And I -- my

21  recollection is not clear.  So --

22      Q    Okay.

23      A    And it's only the main pavilion from what

24  I see, the center of the main pavilion.

25      Q    Other than using expansion cleats, is

Page 34

1    there any other way to address the -- well,

2    actually, it's -- it would be your recommendation

3    that the main pavilion be reroofed and not have a

4    continuous panel from ridge to --

5         A    Right.

6         Q    -- eve.

7              Correct?

8         A    Either -- either have full panels from

9    the eve to the change and probably turning up the

10   change and then having another panel down from

11   below or to have it all done in the traditional ten

12   foot lengths and have, you know, seams every ten

13   feet within the body of both of those roofs.

14   But --

15        Q    So you'd have horizontal seams then?

16        A    Well, you'd have offset horizontal seams,

17   yeah.

18        Q    Okay.

19        A    And as -- and as is shown here where you

20   would have discontinuous pans and they would be

21   offset from each other, which is --

22        Q    Just for the record, you are referring to

23   page 3.a.5 of --

24        A    Copper --

25        Q    -- Copper and Common Sense?

1      A      Yeah.

2      Q      And the drawing on that page?

3      A      Yeah.

4             That was a decision that was made, as I

5      understand it, early on, you know, with the roofing

6      contractor to do everything as continuous pans, to

7      ship a machine to roll form those on site.  And I

8      think I was told or may have read that there was

9      some debate back and forth, you know, with the

10     contractor when he was originally pricing it as to

11     how to do it, whether to ship, you know, many many

12     ten foot pans down there and do all the -- do it

13     that way or do it as continuous.

14            It certainly -- there's a lot of detail

15     work when you do ten foot pans and it certainly

16     takes longer.

17     Q      And the roof would not look as nice

18     either.

19            Correct?

20            MR. FRIEDBERG:  Objection.

21            Incomplete as phrased.  Lacks foundation.

22     A      No.  I -- I think -- I think, you know,

23     the world -- the northeast is full of standing seam

24     roofs that are done in ten foot sections and I think

25     they are attractive.  But -- so it -- I don't -- I

Draft Copy

Page 36

1   think that's an esthetic thing, it's just a judgment

2   call.

3   BY MR. SIMPSON:

4        Q    Okay.  Other than -- did you have -- did

5   you have any criticism of the ridge on the main

6   pavilion?

7        A    You mean the cap?

8        Q    Yeah.  The --

9        A    Yeah.  I have a criticism of all of the

10  caps, that they were essentially -- I don't think it

11  was well thought out as to how to do the cap on the

12  job.

13       Q    You agree it's single locked?

14            You agree the main pavilion ridge is also

15  single locked?

16       A    No.  No.

17            Are you talking about the ridges between

18  the pans or are you talking about the very top?

19       Q    The very top.

20       A    The very top is a cap.  The -- where we

21  took apart a cap --

22       Q    Oh, that's right.  Yes.

23       A    Okay.

24            -- they actually just cut the pans

25  separate from one another.  There was a gap of,

1  perhaps, half an inch between those pans.  They

2  terminated the ridge cap and they created a copper

3  cap that they then set in sealant on top of that and

4  then they connected little pieces of ridge cap

5  together and pop rivetted them together and put them

6  down over the ridge cap below so it -- it relied on

7  sealant to hold it in place and to make it

8  watertight.

9      Q      And how would you have done it?

10     A      Probably would have -- would have taken

11 those pans and folded them each together underneath

12 all of that and probably created a cap that was

13 above -- above the level of the standing seams and

14 had a little return that went down and was cleated

15 into the panel below.

16     Q      Do SMACNA or Copper and Common Sense

17 address those?

18     A      They don't address -- they don't get into

19 details that address things that specific.

20     Q      Okay.  So you are not saying that this

21 detail did not meet the standards of those two

22 organizations?

23     A      I'm -- I'm not saying it didn't meet the

24 standard of SMACNA or Copper and Common Sense, but

25 there are no details in Copper and Common Sense or

 1    SMACNA that rely on sealant to hold copper down.

 2        Q     It's your testimony that the sealant was

 3    used to hold the copper down?

 4        A     There was no other -- there was no other

 5    way it was being held down.

 6        Q     It wasn't being held down by rivets?

 7        A     No.  There were no rivets between that

 8    cap and the other copper.

 9        Q     Okay.  And so how would you hold the --

10    recommend that the cap be held in place?

11        A     With some sort of a cleat.  The cleat

12    might be soldered to the pan material, it might be

13    somehow created in the pan material if you thought

14    ahead of time about it.  So --

15        Q     Okay.

16                THE WITNESS:  Are we showing

17                common -- Copper and Common Sense

18                details?

19                MR. GOLDBERG:  This is your journal.

20                THE WITNESS:  Yeah.  That's what I

21                mean.

22                But are they generic details?

23                MR. GOLDBERG:  I didn't say

24                anything.

25                THE WITNESS:  Okay.

Page 39

1  BY MR. SIMPSON:

2      Q     You said you observed leaks or evidence

3  of leaks in the main pavilion.

4          Correct?

5      A     Yes.

6      Q     And where did you observe evidence of the

7  leak?

8      A     There were two specific locations, one

9  was on the ocean side above the doors going out to

10  the -- to the outside and then along the interface

11  of the -- I believe it's the -- oh, I'm sorry --

12  the interface of the library and -- and the main

13  roof.

14      Q     And did you determine where water was

15  leaking into the roof that was causing the leak

16  above the door by the entranceway that you

17  described?

18      A     Well, from my experience and having

19  opened up the area where the copper was short on the

20  roof, it's my inclination and my best judgment that

21  that's the source of that leak.

22      Q     So you are talking about along a standing

23  seam?

24      A     Along the ridge that we opened up on that

25  side of the roof.

Draft Copy

Page 40

1        Q       And was it your belief it was coming in

2    where the cap was or someplace else?

3        A       No.  I believe it was coming in there

4    where -- where the pan was short of the cap and

5    there was a -- there was an opening.

6        Q       Okay.  But that -- to the extent the pan

7    was short of the cap, that could also be addressed

8    with a larger cap.

9                Correct?

10       A       Well, not -- not really.  I mean, the cap

11   can't -- the cap can't come down -- well, to have a

12   cap that comes down and -- and comes down and covers

13   over the pan, that's -- would be kind of strange,

14   but you -- you wouldn't prevent wind driven rain

15   from getting up in that case.

16       Q       And with respect to the leak at the

17   interface with the library, what did you determine

18   was the source of that?

19       A       Well, when I examined the counter

20   flashing that was installed in the wall, the -- an

21   I'll just -- I want to do a quick little sketch

22   here.

23              The depth of the reglet in the wall, the

24   cut slot in the wall was such that the counter

25   flashing barely went in.  When its edge returned, it

Page 41

1   was out to the same edge as the stone above and

2   there was sealant in the metal and there was

3   actually openings between the metal and the stone.

4   So this is a situation that would allow moisture --

5   water to come in and behind the flashing.

6           The counter flashings that we -- the base

7   flashings that we saw on the gatehouse, which were

8   to the, you know, my reasonable judgment are

9   installed all the same, are simply up against the

10  wall here.  So any water that's behind this the

11  counter flashing is down and in and the -- when the

12  wall continues down here there's the plywood

13  structure below and this was all stained from water

14  intrusion.

15  Q      Okay.  And how long had the stains been

16  there?

17  A      I -- I can't tell you that.

18  Q      Okay.  Can you tell whether they were

19  there before the --

20  A      The --

21  Q      Let me finish the question, please.

22          Can you tell whether they were there

23  before the copper roof was installed?

24              MR. FRIEDBERG:  Incomplete as

25          phrased.  Lacks foundation.

Page 42

1     A    They -- if -- if there were no copper

2  roof installed, it really is a function of knowing

3  whether -- how it was protected from above.  If --

4  if it weren't protected at all from above, you would

5  have stains throughout that roof and there were not

6  other stains in that roof, they were all localized

7  to this condition.

8  BY MR. SIMPSON:

9     Q    What would be the solution to that

10  flashing problem that you've described on the

11  library?

12     A    The depth of the reglet in the wall was

13  insufficient for installation of a proper counter

14  flashing.  It needs to be cut to a greater depth

15  and it was -- the sealant joint created was less

16  than a quarter of an inch.  And a quarter of an

17  inch sealant joint is a standard in the industry

18  for the proper performance of a -- of a -- of a

19  sealant.

20          So the reglet should be cut deeper and a

21  little bit wider and -- and backer rod and sealant

22  installed in that.  So --

23     Q    When you say the sealant should be a

24  quarter inch wide or greater, are you just talking

25  about the bead?

Page 43

1      A     Yes.

2      Q     Okay.  So that would just be a matter of

3  putting on more sealant, a bigger bead?

4      A     No.  The joint has to be wide enough to

5  accommodate that size.

6      Q     Okay.

7      A     Now, the flashing did not appear to be

8  installed the way you normally do a counter flashing

9  where this V-joint is held in -- into the joint with

10  a shield, a led shield, or a piece of -- a small

11  piece of led.  But instead, it was face-fastened

12  through the flashing with a nail-in type fastener.

13  Those are fairly watertight but not always

14  watertight.

15          But if you are uninstalling this to redo

16  it, you really have to do the entire new flashing

17  because one, you've already -- you have to destroy

18  the masonry to get the nail-in type fasteners out,

19  they don't come out without destroying their

20  substrate.  So you now have a hole in this flashing

21  that you either need to repair with a lot of labor

22  or replace the flashing.

23      Q     There's also another type of flashing

24  that you could simply put over that.

25              Correct?

Page 44

1      A      A face-fastened -- those are not as

2   reliable as -- as reglet-mounted flashings.  The --

3   a face-fastened flashing here relies heavily on this

4   sealant joint at the top which is not a shape that

5   performs well.  So it would require a lot more

6   maintenance over the years.

7      Q      Okay.  Does either Copper and Common

8   Sense or SMACNA address how the reglet should be --

9   you described with a led --

10      A      -- wedge?

11      Q      -- ledge --

12      A      Yeah.  It's not a -- it's not a detail

13   that they deal with in -- in their standards.

14      Q      Okay.  And they don't say that you can't

15   put a fastener through the side of the flashing

16   either.

17              Right?

18      A      No.

19      Q      Okay.  "No," that's not right or "no"

20   that is right?

21      A      "No," they do not say --

22      Q      Okay.

23      A      -- that it's wrong.  They don't address

24   it.

25              It's from my own experience and practice

Page 45

```
 1   in seeing these in roofing projects we see what
 2   fails and what doesn't perform as well.
 3        Q     Now, with respect to the other roofs, you
 4   said your -- the reason they need to be replaced is
 5   because the -- I think the way you put it is -- the
 6   ridge is going to have a -- going wear out sooner
 7   than the roof would -- than the normal expected
 8   lifespan of the roof.
 9             Is that correct?
10        A     I -- I think that the detail with the cap
11   is not going to perform as well as if it had been a
12   double locked seam.  And there are, throughout the
13   work, places where the workmanship, you know,
14   created openings in -- that was not -- there -- you
15   know, the copper was short of reaching that.  And in
16   all those cases, the cap is faulty on all of the
17   peaks.
18        Q     How is the cap faulty in all the peaks?
19        A     Well, I'm saying, again, because it was
20   installed as -- you know, installed into sealant
21   instead of using copper details that would have
22   secured it.  Even the few roofs where the two
23   ridges -- the two hip ridges come together with the
24   ridge at the top of the hip, where it was done
25   without having done a cap, but the -- the interface
```

Page 46

1    between those three caps were just spliced together

2    with very little overlap and pop rivetted together.

3              Really, they were quite a few cases in

4    the roof where a little bit of prefabrication of

5    caps and soldering would have provided a much better

6    detail, more enduring detail more in fitting with

7    the lifespan that was expected of this roof.

8        Q    Okay.  Now, you said that the detail was

9    not going to perform as well as a double lock.

10             Correct?

11       A    Yes.

12       Q    Now double lock was not required on this

13   roof.

14             Correct?

15       A    No.

16       Q    And it will perform as well as a single

17   lock.

18             Correct?

19       A    Yeah.

20             Except that if it were only single

21   locked, they would have had to correct the pan

22   deficiencies that exist on this roof where the pan

23   was short.  There were -- there were cases in the

24   photographs in my report where there's dried sealant

25   coming out onto the pan, which to me is an

1   indication that they didn't think it was watertight

2   so they just stuffed sealant in it.

3        Q     Okay.  Now, you -- who put that sealant

4   in?

5        A     Well, it's the same sealant that's

6   everywhere.

7        Q     Who put the sealant in?

8        A     I'm presuming, the roofing contractor.

9        Q     You don't know what was done after they

10  left the -- Huber and Associates left the job,

11  whether someone took sealant that was left on the

12  job --

13       A     It's --

14       Q     Let me finish, please.

15             -- someone took sealant that was left on

16  the job and tried to seal something on the roof, do

17  you?

18       A     I don't know.

19       Q     I'm sorry to interrupt you when you are

20  trying to talk but --

21       A     That's all right.

22       Q     -- the court reporter can only take down

23  one person talking at a time.

24       A     That's fine.

25       Q     Was it your understanding that the

Page 48

1    standing seams were cut at the transition point on

2    the main pavilion before they were folded over?

3         A     You mean to form the change in plane?

4         Q     Yes.

5         A     They would have had to have been cut.

6         Q     Did you look at them to see whether they

7    were cut?

8         A     Yeah.  I saw that they were cut.

9         Q     Is that something that you criticize on

10   the roof, the fact that they were cut there?

11        A     You -- you have to -- in order to take

12   the standing seam and transition it at an angle, you

13   would have to cut it.

14        Q     My question is:  Do you criticize that

15   practice on this roof or is that an acceptable

16   thing?

17                    MR. FRIEDBERG:  Incomplete as

18                    phrased.  Lacks foundation.

19        A     Yeah.  It's just -- I -- the fact that

20   the -- the seam, which is an integral waterproofing

21   part of this system, has to be cut at that location

22   in order to make this change in plane is not a great

23   thing because it leaves you something that's -- that

24   overlapped but susceptible to water infiltration.

25   And since this -- the pans below and the pans above,

Page 49

1    one continuous piece, both wanting to expand and

2    contract, it's -- it's a source for tearing the

3    copper.

4    BY MR. SIMPSON:

5        Q    Do you think that the reason you are

6    seeing cracks in the pans at the transition point

7    is due to the fact that the seams were cut there

8    rather than it occurring some other place on the

9    roof?

10       A    I think it's strictly a matter of

11   expansion and contraction why the cracks are

12   appearing.

13       Q    Other than the expansion issue, is there

14   any other reason the main pavilion roof needed to be

15   replaced?

16       A    That and the ridges that are, you know,

17   that there are -- there are places where there are

18   openings where the copper is short on those ridges.

19       Q    What do you mean when you say "the copper

20   is short"?

21       A    The pan should come in, turn up, the

22   other pan from the other direction should lap over

23   and down.  There are cases where one, this -- this

24   is, you know, about half an inch off the roof and

25   this piece is short.  So there's an opening there.

Page 50

1      Q      Okay.  And in the copper industry one of

2    those is a called the female and one of those is

3    called the male.

4              Right?

5      A      Right.

6      Q      The one where it is just folded up

7    without being folded over is the male.

8              Correct?

9      A      Yes.

10     Q      Okay.  And so what you are saying -- and

11   then the other piece where it's folded up and then

12   rolled over the other piece is the female.

13             Correct?

14     A      Right.

15     Q      Okay.  So what you are saying is the male

16   pan was cut short?

17     A      Well, yeah.  Cut short or this wavered so

18   much off of the line that it was physically short.

19     Q      What do you mean "wavered so much off of

20   the line"?

21     A      Well, these ridges varied all over the

22   place because of workmanship.  They weren't straight

23   from bottom to top.

24     Q      Okay.  And how did you determine the male

25   part of the pan was too short?

Page 51

1      A     You -- it was -- it was open, you could

2  see the hole.

3      Q     You are talking about the section that

4  you opened up?

5      A     Yes.

6      Q     Okay.

7      A     Yeah.

8      Q     And that was about how long of a section?

9      A     Three or four inches.  I mean, it --

10  you -- I mean, it was a hole.  It was a hole that

11  was probably about an inch.

12      Q     That you opened up?

13      A     No.  No.  No.

14      Q     Okay.

15      A     We opened -- we took off a ten-foot

16  section of cap.

17      Q     Okay.

18      A     And within that we opened up a pan-width.

19  So --

20      Q     Okay.  So you removed -- and this type of

21  cap, you are talking about the U-shaped cap.

22            Correct?

23      A     Yes.

24      Q     Okay.  So you took off the U-shaped cap,

25  about ten feet of that?

Page 52

1        A       Uh-huh.

2        Q       And then you opened --

3                MR. GOLDBERG:   You have to answer

4                out loud.

5        A       Yes.

6    BY MR. SIMPSON:

7        Q       Okay.  And then you opened up the seam

8    for about one pan-length -- width, I mean?

9        A       Yes.

10       Q       Okay.  And in that one pan-width, how --

11   how short or long was the male piece?

12       A       Probably one section an inch long.

13       Q       Okay.

14       A       So --

15       Q       Did you take any photos of that?

16       A       Yeah.  They are in the report.

17       Q       Okay.  Why don't you direct me to them in

18   your report, if you will, just so the record will be

19   clear.

20       A       Photo 38 and 39 are actually two

21   different locations, one that's approximately an

22   inch and a half to two inches and one that's about

23   three quarters to an inch.  It's -- actually, 39 is

24   the area we opened up.

25       Q       Okay.  And 39, does that show the male

Page 53

1    piece?

2        A    Yes.  It's here, where the arrow is

3    pointing.

4        Q    Okay.  The female piece is not rolled up

5    at this point, is it?  I mean, it's, like, pried up

6    a little bit but it's not rolled up completely, is

7    it?

8        A    No.  That's -- you are looking at the cap

9    in that case.

10       Q    Okay.  That's the cap on top of the --

11       A    Yeah.

12       Q    Okay.  But this is the area where you

13   took the cap off?

14       A    Yes.

15       Q    Do you have any pictures with the cap

16   off?

17       A    Forty.

18            And you can see the crease line in the

19   male part leaves less than half an inch and it was

20   probably about three quarters of an inch on

21   average here.  And then it steps up to about an

22   inch.

23       Q    Okay.  And this looks like it's done

24   right at the transition area.  Looking at the --

25       A    It is at the transition area, yeah.

Page 54

1        Q      Okay.

2        A      Where the copper pans are now not laying

3    down on the deck, there's -- there's a -- when you

4    step on these pans, there's a gap underneath the

5    pan.

6        Q      Okay.  And what's the cause of that?

7        A      I would think that part of it is lack of

8    securement, expansion and contraction of the copper

9    over time, and it's really not clear whether it

10   could have been not installed all the way down to

11   the deck in these transitions.

12       Q      Okay.

13       A      You know --

14       Q      Well, there are cleats and you noted the

15   cleats and the cleats were properly installed.

16              Correct?

17       A      In the section that I opened up, the

18   cleats were properly installed.

19       Q      Which was right here.

20              Correct?

21       A      No.  No.

22       Q      Okay.

23       A      It's on the other side of the roof and

24   down about three or four feet from this area.

25       Q      Okay.  And --

Page 55

1        A       And you can see along this entire section

2    there are no cleats in the ridge seam.

3        Q       Okay.  And what is the -- well, first of

4    all, could the condition of the substrate be the

5    reason why it isn't -- the roof is not making -- the

6    copper is not making contact with the substrate at

7    that point?

8        A       Could there be irregularities in the

9    substrate that were ignored?  I guess there could

10   be.

11       Q       All right.

12       A       Usually, specifications, you know,

13   prepared for any sort of roofing work ask the

14   contractor examine the substrate and verify that

15   it's suitable for installation of whatever material

16   is going on it and to report to the architect or the

17   owner anything that would inhibit the installation

18   of the work.

19       Q       There wasn't anything about that in the

20   proposal of this --

21       A       There's no -- this was a

22   contractor-driven proposal with him proposing what

23   would be done.

24       Q       Okay.  Didn't you already tell me that

25   Mr. Friedberg specified the distance between the

Page 56

1    cleats?

2         A      Yeah.  Because I understand he had an

3    engineering report done and that for his roof that's

4    what was determined to be the spacing.  But my

5    understanding is that this is essentially a

6    design-build with the roofing contractor proposing

7    the system to be used.

8         Q      But the underlayment was already there.

9                Correct?

10        A      Yeah.

11        Q      In fact, another roofer had already

12   walked off the job.

13               Right?

14        A      I don't know about --

15               MR. FRIEDBERG:  Assumes facts not in

16               evidence.

17        A      -- walking off the job.

18               THE WITNESS:  Yeah.

19               MR. GOLDBERG:  Move to strike.

20        A      I guess what I'm saying is if -- if -- if

21   the contractor looked at the substrate that was

22   there and felt that the roof couldn't be properly

23   installed above it, he should have yelled and

24   screamed.

25

Draft Copy

1   BY MR. SIMPSON:

2        Q      Okay.

3        A      I don't know how much examination of the

4   site was done in advance.

5        Q      How much of the copper was not making --

6   what area are we talking about that wasn't making

7   contact where the substrate?

8        A      Every panel around the transition.

9        Q      Okay.  Can you -- do you have a photo

10  from a distance that would help orient us as to

11  exactly where photo 40 was taken?

12       A      I can tell you in plan.

13       Q      Okay.

14       A      And this is, of course, the architect's

15  original plan.

16              It was in this area.

17       Q      Okay.  How about if you draw an arrow to

18  that and write "photo 40" so that we can -- we'll

19  make that into an exhibit.

20       A      Okay.

21       Q      Okay.

22       A      It -- I was going to say, if you want --

23  want to just skip ahead here for a second and do

24  that.  We had talked about where the -- the pan was

25  taken apart.

Draft Copy

Page 58

1           I'm sorry.  We'll get to that but we'll

2    mark on here that this is where the standing seam

3    was taken apart.

4           Okay.  I'm sorry.  It's photo nine.

5    Q    Okay.  And you've made a heavy pencil

6    mark on that to show where -- and you have written

7    "photo 9" on the plan drawing.

8           Correct?

9    A    Yes.

10   Q    Okay.  Why don't we mark that, before I

11   forget, as Exhibit 3.

12              (THEREUPON, SANDERS EXHIBIT NO. 3,

13              PLAN DRAWING WITH MARKINGS BY THE

14              WITNESS INDICATING LOCATIONS, WAS

15              MARKED FOR IDENTIFICATION.)

16   BY MR. SIMPSON:

17   Q    One of your criticisms is that rosin

18   paper was not used under this copper.

19           Correct?

20   A    I think it was just an observation that

21   it was in the contractor's proposal and it was not

22   installed.

23   Q    You understand that -- or is it your

24   understanding that because of the type of

25   underlayment on the roof, rosin paper wouldn't

Page 59

1    normally be required on this roof.

2              Correct?

3    A      Yeah.

4              And in many instances, you know, what we

5    use and what's required in the industry, rosin paper

6    is there as a slip sheet and -- and if there's no,

7    you know, if the underlayment is such that it

8    doesn't restrict the movement of the copper, then

9    it's not necessary.  We sometimes use 30-pound felt

10   because we want to isolate areas that are soldered

11   from the combustibility below and that little bit of

12   asphaltic membrane is enough to be able to solder

13   and not ignite anything.

14   Q      As part of your report or in your

15   examination, you reviewed the architectural drawings

16   for this project.

17             Correct?

18   A      I reviewed what was available to me, yes.

19   Q      Okay.

20   A      So --

21   Q      And would you agree that Huber and

22   Associates installed the roof to the design of the

23   architect?

24   A      What is available as the architectural

25   design does not detail the roof.  I mean, it --

Page 60

```
1    it -- it gives the dimensional shapes of all the

2    roofs, it was shown as a -- as a tile and it was

3    really a design -- as far as I'm concerned, it was

4    really a design-build to change it to a copper roof

5    system and, therefore, the details kind of fell into

6    the roofing contractor's scope.

7         Q    Okay.  Would you -- you talked about the

8    reglet on the library, that was into -- was that a

9    stone wall or a stucco wall at that point?

10        A    There's stone applied to the concrete --

11        Q    Okay.

12        A    -- walls.

13        Q    Are there any concerns with cutting into

14   that -- cutting deeper into that stone with damaging

15   the stone facing?

16        A    No.  I don't -- I don't have any

17   concerns.

18        Q    Okay.  How -- that's -- how thick is that

19   stone facing?

20        A    I don't know.

21        Q    Okay.

22        A    See, I'm presuming that it's a nominal,

23   you know, perhaps two and five-eighths, three

24   inches.  You know, that's something that if we were

25   to do a detail to repair that or something, we'd
```

Page 61

1    find out from Mr. Friedberg's record or from an

2    investigation.  You know, it -- it -- it's always

3    preferred to have through-wall flashing or a

4    flashing that goes as far back as any facing

5    material.  But, you know, here I -- I think that a

6    one inch depth into that stone would not damage the

7    stone and would be sufficient to create a reglet

8    here.

9         Q    Okay.  Now, one of the criticisms in your

10   report was the use of copper rivets with steel

11   mandrels.

12             Correct?

13        A    It wasn't really a criticism, it was an

14   observation.

15        Q    Okay.  So are you saying it was improper

16   to use those rivets?

17        A    I'm just saying that you are going to get

18   rust stains all over the place.

19        Q    You agree that there's nothing in Copper

20   and Common Sense or SMACNA that would say that you

21   shouldn't use those types of rivets.

22             Right?

23        A    No.

24        Q    Okay.  And there's nothing in the

25   contract that would prohibit the use of those

Page 62

1    rivets.

2              Correct?

3      A      No.

4      Q      Okay.

5      A      And steel mandrels are stronger if they

6    were sized properly, you know, they -- they would

7    have held the cap together.

8      Q      Okay.  And approximately -- you also --

9    you mention in your report some points where the

10   rivets were either missing or didn't go all the way

11   through?

12     A      Yes.

13     Q      Okay.  Let's start with the ones that

14   were missing, how many rivets were missing?

15     A      I -- I didn't do a tally of those.

16     Q      Are we talking less than five?

17     A      No.  We are probably talking about a

18   couple dozen.

19     Q      Okay.  And were they in any one

20   particular area or was it just throughout the roof?

21     A      Throughout the roofs.

22     Q      Okay.  And with respect to the ones that

23   were too short, how many were there that were too

24   short?

25     A      I -- I couldn't even count.  I would say

Page 63

1   that probably, you know, 50 to 60 percent were too

2   short.

3        Q     Okay.  How did you determine they were

4   too short?

5        A     Because there was an open hole in one

6   side that wasn't engaged with the rivet.

7        Q     Okay.  And the solution to that would be

8   to simply drill out the rivet and put in a proper

9   sized rivet.

10             Correct?

11       A     You could do that, yes.

12       Q     Anything wrong with that solution?

13       A     No.  But it doesn't address the open

14   holes that are -- you know, the short panels and so

15   on.

16       Q     I'm talking about addressing the rivet

17   that --

18       A     Yeah.

19       Q     Other than -- well, actually, on the main

20   roof, the two leaks you've described, did you do

21   anything to test to see whether they actually leaked

22   rather than just looking at stains?

23       A     Not in those locations.  The short pan

24   where at photo 40, since we saw the leak down here

25   15 feet away, maybe 30 feet away, we would be

Page 64

```
1    wetting substrate if you water tested that.  It

2    really wouldn't make sense.

3         Q    Okay.

4         A    We -- you know, the -- we did not water

5    test it at the library.  We did, you know, of

6    course the next day, water test it at the

7    gatehouse.

8         Q    Okay.  Any reason why you didn't water

9    test at the library?

10        A    Well, I think the conditions are so

11   similar that, you know, to -- with my experience, I

12   think you can equate the two.

13        Q    Okay.  So because of the water test you

14   did at the gatehouse, you --

15        A    -- didn't do a water test --

16        Q    -- extrapolate that to the library.

17             Correct?

18        A    Yes.

19        Q    Okay.  When you put the seam back

20   together or the ridge back together at photo 40,

21   did you do anything to address the leak at that

22   time?

23        A    The craftsman, the tin knocker, reworked

24   the joint to make it better.

25        Q    Okay.
```

Draft Copy

Page 65

1      A      So basically, he -- he refolded the male
2  side and moved the joint over slightly.

3      Q      Okay.  And you believe that addressed the
4  problem?

5      A      I believe it closed the opening at that
6  location.

7      Q      Well, there was no opening at that
8  location until you opened it.

9             Right?

10     A      No, it was open.

11            That's -- that's photo 39.  You can see
12  the hole.

13            I'm sorry, photo 38.  Well, no.  I'm
14  sorry.  Photo 39, just to the -- you know, where the
15  end of the arrow there, that is the exposed edge of
16  the male side.

17     Q      Okay.  That -- where it's dark black?

18     A      Yes.

19     Q      Okay.

20     A      And that condition also is in photo 38 at
21  a different location.

22     Q      Okay.  Now in this -- in photo 39, the
23  cap is in place there.

24            Correct?

25     A      Yes.

Page 66

1       Q      Okay.

2       A      And it does not cover that opening.

3       Q      Did you do anything to test for leak

4    after your guy reworked the metal?

5       A      No.

6       Q      Okay.

7       A      Again, for the same reason as before.

8       Q      Okay.  Did you take any information from

9    people who've been in the house as to information

10   about the leak there, referring to the one below

11   where photo 40 was taken?

12      A      I -- I was told that it -- that it leaked

13   when it rained.

14      Q      You were told that -- did it happen in

15   every rain?

16      A      I -- I didn't ask that.

17      Q      Okay.

18      A      But -- so --

19      Q      Did you make any inquiry as to whether

20   the wind had to be from a certain direction or

21   anything like that?

22      A      No.

23      Q      Okay.  What about with respect to the

24   leak at the library?

25      A      I -- I did not ask about that.

Page 67

1    Q    Okay.  You didn't ask anything about

2   that?

3    A    No.

4    Q    Okay.

5    A    Just -- I was just told that it -- that

6   it leaks.

7    Q    Okay.  Can you show on Exhibit 3 where

8   photo 38 was taken?

9    A    I believe it's just lower down in the

10  same ridge.

11   Q    Okay.  And for the record, you've marked

12  that on Exhibit 3.  Thank you.

13   A    Okay.

14   Q    What other roofs had leaks that you

15  determined?

16   A    There -- you know, all these spaces are

17  unfinished and not well lit so I -- I was not made

18  aware of other leaks.  And because they are

19  unfinished inside, there are not a lot of surfaces

20  that -- that would show stains and leaks.  So other

21  than these and the gatehouse --

22   Q    Okay.

23   A    -- I'm not aware of other leaks.

24   Q    Specifically in the garage, did you

25  determine whether there were any leaks in the

Page 68

1   garage?

2        A     Oh, there are -- I'm sorry -- leaks in

3   the garage.

4        Q     Okay.  Let's talk about the gatehouse

5   now --

6        A     Yeah.

7        Q     -- and what your observations were about

8   the sources of leaks for the gatehouse.

9        A     Okay.  I think from the water testing we

10  did and from my observations, the leaks are

11  directly -- directly related to infiltration at the

12  counter flashing.

13       Q     Okay.  So this is, again, the issue with

14  the reglets and the depth of the reglet?

15       A     The size of the sealant joint and the way

16  that the reglet is secured -- the way the counter

17  flashing is secured in the reglet.

18       Q     Okay.  And with respect to the way that

19  it's secured, is that the same criticism about not

20  using the led wedge rather than the method that was

21  used?

22       A     And the depth of the reglet.

23       Q     Okay.

24       A     So --

25       Q     And on the -- go ahead.

Page 69

1       A       In addition, because these are secured

2    into -- into stucco, I -- I saw a photograph shortly

3    after installation of one of the areas and the

4    stucco is not cracked.  And the fact that these are

5    very, very thin joints, I -- it is my opinion that

6    the movement of the metal with expansion has caused

7    the cracking in the stucco.

8       Q       Okay.  And how could that be avoided?

9       A       By having a joint that's large enough in

10   the stucco so that the metal is not in enough

11   contact with the stucco to influence it with its

12   change in temperature and its expansion.

13      Q       Okay.  You mentioned you saw a photo

14   prior to the roof being installed?

15      A       Yeah.

16      Q       Can you point that out to us?

17      A       I don't know if I can.  It's in -- it

18   would be in -- this is in a -- I guess was in an

19   e-mail and it says from Micah -- Micah? -- Micah to

20   Tom.

21              MR. FRIEDBERG:  You mean Huber's

22              son-in-law, Micah.

23              THE WITNESS:  Okay.

24      A    So --

25              MR. GOLDBERG:  Unnecessary.

Page 70

1                    MR. FRIEDBERG:  Well, no.  I mean,

2            it's Micah and --

3                    MR. GOLDBERG:  Unnecessary.

4                    MR. FRIEDBERG:  -- I'm just

5            clarifying who Micah is.

6                    THE WITNESS:  Okay.

7                    MR. GOLDBERG:  Unnecessary.

8                    MR. FRIEDBERG:  No, it is not

9            unnecessary.

10      A    The counter flashing is installed here

11   and I see no evidence of the cracking that now

12   exists along this whole line and we can -- we can

13   make a photocopy of that.

14                   And I don't know if in my report -- well,

15   actually, this is photograph 55 shows distinctive

16   cracking all the way along this line and I know I

17   had one photograph in my grouping that the end of

18   this wall is torn away with the expansion of -- of

19   that metal along that line.

20   BY MR. SIMPSON:

21      Q    Is that photo 66?

22      A    No.

23      Q    No.  No.

24           Go to photo 66?

25      A    Fifty-six?

Page 71

1      Q      Sixty-six?

2              MR. GOLDBERG:  Sixty-six.

3      A      Sixty-six?

4              MR. GOLDBERG:  Sixty-six.

5      A      Yes.

6  BY MR. SIMPSON:

7      Q      Okay.

8      A      So I interpret that end cracking as the

9  copper expanding and dragging that stucco away from

10  the wall.

11     Q      And do you believe that a larger reglet

12  would have addressed the way the end cap is pushed

13  away?

14     A      It would have -- it would have divorced

15  the stucco from the movement of the metal, that

16  expansion would have been relieved through sealant

17  joint.

18     Q      Why don't we -- where did this photo that

19  you had with the e-mail from Micah to Tom, there's a

20  group of photos, where did these come from?

21     A      They came from Tom.

22     Q      Okay.

23              (THEREUPON, THERE WAS A DISCUSSION

24              OFF THE RECORD.)

25     A      And I didn't know if those had been

Page 72

1   previously --

2               MR. GOLDBERG:  We can mark them so

3          that --

4               THE WITNESS:  I can have somebody --

5               MR. GOLDBERG:  Is this ours?  I

6          mean, is this part of the file that we

7          are going to mark today?

8               THE WITNESS:  I would like to make a

9          copy of it.

10              MR. GOLDBERG:  That's fine.

11              THE WITNESS:  I think that's my only

12         copy.

13              MR. GOLDBERG:  Let's just mark them

14         all.

15              THE WITNESS:  I'll tell you what,

16         why don't I --

17              MR. SIMPSON:  Probably a good time

18         for a quick break.

19              THE WITNESS:  Okay.

20              MR. GOLDBERG:  Not long though

21         because we have got to push on.

22              THE WITNESS:  Okay.  I didn't know

23         if there's anything you wanted to do

24         about lunch or anything?  I can bring in

25         a menu and we can order sandwiches or if

Page 73

1              you just wanted to just press on, we can

2              just press on.

3                   MR. SIMPSON:  I would prefer to

4              press on.  If anyone wants to eat, they

5              can order in.

6                   MR. FRIEDBERG:  Whatever you want.

7                   THE WITNESS:  I'm fine with just

8              going.

9                   MR. SIMPSON:  If you could make a

10             copy of those and then we can have those

11             marked.

12                  (THEREUPON, THERE WAS A RECESS TAKEN

13             FROM 12:03 p.m. TO 12:12 p.m.)

14   BY MR. SIMPSON:

15        Q    We'll mark as Exhibit 4 -- right? -- the

16   group of photos that were sent to you by

17   Mr. Friedberg and it looks like you've numbered them

18   or someone has numbered them and photo number 24 is

19   the one that you were showing us the stucco without

20   cracks.

21             Correct?

22        A    Yes.

23        Q    Okay.

24        A    It appears to be a photo taken at the end

25   of installation.

Page 74

1                    (THEREUPON, SANDERS EXHIBIT NO. 4,

2                    PHOTOGRAPHS, WAS MARKED FOR

3                    IDENTIFICATION.)

4    BY MR. SIMPSON:

5        Q    And then if I could have those other

6    groups of photos that you said you've already made

7    copies for us?

8        A    Yeah.

9        Q    And the top page of each of those has a

10   date on it.  I understand that the first one with

11   the date 9/11/14, that's the date you took those

12   photos?

13       A    Uh-huh.

14       Q    And the other group were taken on

15   September 12.

16            Correct?

17       A    Yes.

18       Q    Okay.  I'll mark the September 11 ones as

19   Exhibit 5 and then the September 12 ones as Exhibit

20   6.

21                   (THEREUPON, SANDERS EXHIBIT NO. 5,

22                   PHOTOGRAPHS TAKEN ON SEPTEMBER 11,

23                   WAS MARKED FOR IDENTIFICATION.)

24

25

Draft Copy

Page 75

1                    (THEREUPON, SANDERS EXHIBIT NO. 6,

2                    PHOTOGRAPHS TAKEN ON SEPTEMBER 12,

3                    WAS MARKED FOR IDENTIFICATION.)

4        A      So would you like to continue on my

5    methodology at these two areas of the gatehouse?

6    BY MR. SIMPSON:

7        Q      Sure.

8        A      I was shown evidence of staining inside

9    at the kitchen wall and at the kitchen -- the back

10   of the kitchen cabinet and staining along the arched

11   wall that goes to the living area from the kitchen.

12   And we -- we chose to do spray water testing with a

13   hose and a nozzle, just an ordinary garden hose.

14   And we started at the roofline and only soaked the

15   roof.

16              And we did that for about 45 minutes in

17   the area of both the low point of the roof going

18   down to the adjacent walls as well as along the

19   other roof edge going down.  And then we put water

20   on the flashing itself, the counter flashing, and

21   none of those produced leaks.  We then sprayed the

22   top of the counter flashing and within ten to 15

23   minutes, we got water in that showed up on the

24   arched wall above the interface between the kitchen

25   and the living space.  And it showed up as a series

Page 76

1    of streaks coming down in about six locations along

2    that wall.

3        Q    Okay.

4        A    Okay.  And then we also went over to the

5    area of the kitchen cabinet and the kitchen wall and

6    we did a similar thing.  We first put water on the

7    low roof and ran that for about 45 minutes to an

8    hour and it didn't produce any leaks.  We put it on

9    the masonry steps where the door comes out onto that

10   low roof and there were no leaks.

11            And then we worked up onto the copper --

12   the short copper roof that extends out on that side

13   and again, there was no leaking.  And then we put

14   water on the counter flashing and it soon thereafter

15   started leaking at the soffit down below.  And we,

16   at that point, determined that water was entering in

17   under the roofing and we start -- we took that whole

18   thing apart.

19       Q    What do you mean, you "took that whole

20   thing apart"?

21       A    Well, we uninstalled the counter

22   flashing.  If you look at 60, 61 and 62, we took out

23   the Zamac, the nail-in fastener, and we folded back

24   the counter flashing to expose the reglet and in the

25   corner of the -- in the corner of that reglet, there

1   was water behind that had come in and gone behind

2   the counter flashing and had seeped down the wall.

3   And the way that this base flashing is installed,

4   the pans were bent over to create a receiver.  And

5   the base flashing was then hooked on that and simply

6   went up the wall and -- and was just flush against

7   that wall.  So any water that bypasses the counter

8   flashing, goes down and seeps down behind the base

9   flashing.

10              When we disengaged the base flashing

11  slightly, there's just unprotected roofing under

12  that and that was all wet and had -- the water had

13  dripped, both at that edge, had dripped down and

14  had dripped down the roof to the very edge of the

15  roof.

16       Q    Okay.

17       A    So --

18       Q    Once the water gets -- sorry, are you

19  done?

20       A    Yes.

21       Q    Okay.  Once the water gets behind the

22  flashing, how -- what's the path it traveled to get

23  it into that -- how does it get through the wall?

24       A    I think that since we only did this for

25  ten or 15 minutes, it's hard to say because once --

Page 78

1    once this roof is saturated, it could go anywhere.

2    And it showed up in the soffit but I'm sure that

3    once it's saturated, it just, by gravity, it goes

4    down.

5        Q     Okay.  Well, you didn't spray it long

6    enough to saturate it.

7              Right?

8        A     No.

9        Q     Okay.

10       A     We sprayed it long enough that it started

11   leaking.

12       Q     So what I'm trying to understand is how

13   is it getting --

14       A     You would have to destroy this whole roof

15   to find out exactly how it's going in.  But --

16       Q     There's got to be a flaw in the wall

17   itself for it to get inside the building.

18             Correct?

19       A     The flaw is -- the flaw is here in the

20   flashing.  This is not supposed to be water proof

21   under this.

22       Q     I understand what you are saying there.

23       A     Yeah.

24       Q     But that doesn't explain how it gets from

25   there inside the house, does it?

Page 79

1     A     I don't think you need to explain how

2  it gets inside the house.  It gets in past the

3  roofing that's supposed to protect the house.  And

4  it's -- it's like a stain that shows up in here that

5  comes from a joist that's, you know, bearing on

6  steel that comes from the curtain wall.  It gets

7  there.  So --

8     Q     Looking at photo 64 in your report --

9  it's on the next page from where you are -- this is

10 showing the flashing after the water has been

11 applied as part of the water test.

12          Correct?

13    A     Yeah.  This is around the corner from

14 that, yes.

15    Q     Okay.  And so the corner of a window is

16 showing up there above the bricks.

17          Right?

18    A     Uh-huh.

19               MR. GOLDBERG:  Yes?

20 BY MR. SIMPSON:

21    Q     You have to say "yes" or "no"?

22    A     Yes.

23    Q     And what kind of -- you said you used a

24 garden hose and a nozzle, what kind of nozzle did

25 you use?

Draft Copy

Page 80

1       A     Just a regular spray nozzle.  We -- we

2   didn't put a strong pressure on this, we just did a

3   light pressure.

4       Q     Okay.  What kind of spray pattern, a wide

5   one?

6       A     You know, probably like this.

7       Q     Okay.

8       A     I mean --

9       Q     Indicating --

10      A     I mean, we are not -- it wasn't a strong

11  pressure, it was like you would have for a gentle

12  rain.

13      Q     And you were demonstrating an area about

14  a foot wide?

15      A     Yeah.

16      Q     Okay.  So you had a circular --

17      A     And he was -- he was perhaps two feet

18  away with that.  So --

19      Q     Who is he?

20      A     The -- Franny Nelson.

21      Q     Okay.  And so it was like a one foot-wide

22  spray pattern coming out of this nozzle.

23            Correct?

24      A     Yeah.

25      Q     And what did you do -- and it looks like

1  we can see water droplets on this window in picture

2  64?

3      A     Yeah.  We actually -- and when -- when he

4  did the top of this -- surprisingly, at the base of

5  it where there's very little height, if you will,

6  under that brick sill, he wetted that and it didn't

7  produce a leak inside.

8      Q     Okay.  How did he wet -- go about just

9  wetting that?

10     A     It was -- it was at the roofline and

11  bouncing up onto it.

12     Q     Okay.  And is there a leak associated

13  with photo No. 64?

14     A     There are more leaks further down through

15  the stucco that the entire arched wall -- let me go

16  back to those photos.

17            You see the photo 23 with the

18  air-conditioning unit there on the wall, those --

19  those nine leak indications are all along that edge.

20  The window is probably the third leak down.  That's

21  kind of the location.

22     Q     You said the third leak down from the

23  top?

24     A     Yeah.

25     Q     Okay.  So near the corner of the air

Page 82

1    conditioner?

2        A    Yes.

3        Q    The left corner?

4        A    Yeah.

5        Q    Okay.

6        A    So actually, the one that's indicated by

7    the arrow is probably the strongest leak in that

8    group, the one at the corner of the air conditioner

9    is pretty -- a pretty significant flow of water down

10   into the stucco.

11       Q    Other than the photos in your report, do

12   you have any photos of the cracks in the pans that

13   you noted on the main pavilion?

14       A    I'm sure that there are other photos in

15   here.

16            Cracks or -- are you saying the cracks at

17   the transitions?

18       Q    I think -- I think that's where you

19   described there being cracks in the pans, was at the

20   transitions, yes.

21       A    Yeah.  As opposed to punctures.

22       Q    Right.

23       A    I think they are in these photographs on

24   the -- on the third page here but that at this scale

25   you don't see them, you know.  So these are -- these

Page 83

1    are the documenting -- this was actually Tom

2    pressing in on the pan.

3        Q    And you are referring to the photo that

4    has a sneakered foot in it?

5        A    Yes.

6        Q    Okay.

7        A    I -- I think they are in these photos,

8    you just don't see them at this scale.  So --

9        Q    Okay.  Do you have any photos that --

10   first of all, let's just be clear we are looking at

11   Exhibit 6?

12       A    Yeah.

13       Q    The third page.  Okay.

14            And are they -- did you see cracks in

15   pans or only in the standing seam portion of the

16   pan?

17       A    It extends into the pan.

18       Q    Okay.

19       A    So --

20       Q    And do they originate from the standing

21   seam?

22       A    They are in the location of where the

23   bend is, yes.

24       Q    Okay.  Do you have any photos that do

25   show the cracks?

Draft Copy

Page 84

1      A      I'm sure that they are shown on here, you

2  just have to blow them up to see them.

3      Q      Okay.  Would it be possible for you to

4  provide us with digital copies of those photos from

5  Exhibits 5 and 6?

6      A      Sure.

7      Q      Okay.  I'd ask that you do that and we'll

8  make the digital photos Exhibit 7 to the deposition.

9  We'll leave that to be added.

10      A      I'll see if I can get somebody to do that

11  while I'm here.

12      Q      Okay.

13      A      Just take a break and I'll see if I can

14  do that.

15      Q      Okay.

16              (THEREUPON, THERE WAS A RECESS TAKEN

17              FROM 12:29 p.m. TO 12:31 p.m.)

18      A      I don't think those are very, you know,

19  cracked but those are the photographs I did take of

20  cracks.

21  BY MR. SIMPSON:

22      Q      Are they -- would they be the more

23  significant cracks you observed?

24      A      Probably not any different than other

25  cracks that were there, so --

Page 85

1      Q      Okay.

2                  MR. SIMPSON:  Okay.  You can go

3            ahead.

4

5

6                  CROSS-EXAMINATION

7

8

9   BY MR. GOLDBERG:

10      Q      Okay.  He's going to pass it over to me

11   for a little bit.

12      A      Okay.

13      Q      Sir, you are an architect.

14            Right?

15      A      Yes.

16      Q      Do you have a general contracting

17   license?

18      A      I'm not a general contractor.

19      Q      Do you have a roofing contractor's

20   license?

21      A      No.

22      Q      Have you ever installed a roof yourself?

23      A      I've installed a slate roof on my house,

24   yes.

25      Q      Okay.  Have you ever installed a copper

Page 86

1   metal standing seam roof?

2        A    No, I have not.

3        Q    Have you ever disassembled a copper metal

4   standing seam roof?

5        A    Yes.

6        Q    When?

7        A    In investigation.  I disassembled a flat

8   seam copper roof at Gillette Castle here in

9   Connecticut and to investigate leaks that were due

10  to faulty soldering in the seams.

11       Q    And did you do that yourself, sir?

12       A    No.

13       Q    You had somebody with you that was

14  assisting?

15       A    Yes.  A roofing contractor.

16       Q    So my question is:  Have you ever

17  personally disassembled a copper metal roof?

18       A    No.

19       Q    I understand you've overseen that process

20  but have you ever actually done it yourself?

21       A    No.

22       Q    Okay.

23       A    You'd be hard pressed to find an

24  architect who has ever done that.

25       Q    And I understand that.  You are an

1   architect?

2        A     Yeah.

3        Q     I get it.

4        A     Yeah.

5        Q     Did you have a chance to look at the

6   contract and proposals prepared by Daybreak?

7        A     Yes.

8        Q     And if you could, can you -- can you --

9   can you please pull those -- pull those out for me.

10  Just if we need to refer to them --

11       A     Let me just tell you what I have.

12       Q     Sure.

13       A     Which is February 19, 2010; February 8,

14  and May 7.

15       Q     And is that what you were provided with

16  by Mr. Friedberg?

17       A     Yes.

18       Q     And in looking at those proposals, I

19  believe you testified earlier that you believe this

20  was a design-build type of project.

21              Right?  With respect to Huber and

22  Associates?

23       A     That -- that's my understanding and

24  that's my interpretation of -- of, you know, having

25  seen these proposals and knowing that there was not

Page 88

1    anything provided in the architect's design for

2    that.

3        Q    Can you show me where in the proposals it

4    shows that any contemplation was made for the design

5    of the roof by Huber and Associates?

6        A    Well, this is a -- this is, essentially,

7    a proposal that specifies what's to be done by

8    virtue of specifying that it's a pan system, that

9    is, essentially, design.

10       Q    Okay.  But in terms of the actual

11   specifications for the roof, an architect did that.

12            Right?

13       A    I'm -- to my knowledge, there's no

14   specifications for the roof.

15       Q    Did you look at the proposals and see any

16   particular drawings associated with an

17   architect's -- strike that.

18            Did you have any CAD drawings associated

19   with this --

20       A    No.

21       Q    -- project?

22       A    No.

23       Q    You didn't?

24            You didn't review any CAD files?

25       A    CAD files for --

Page 89

```
 1        Q     Yes, sir.

 2        A     I reviewed these CAD files.

 3        Q     Okay.  Did you review any architectural

 4   drawings, CAD files?

 5        A     I reviewed Mr. Friedberg's architectural

 6   drawings that were provide for me.  They were

 7   provided in CAD.  They show architectural plans,

 8   elevations, and these roof plans.

 9        Q     Right.  And is it your understanding that

10   that's how the roof was supposed to be built,

11   towards those specifications?

12        A     It's my understanding that that's what

13   the architect showed in -- in the proposed design of

14   this building.

15        Q     Sure.

16        A     And these --

17        Q     Did the --

18        A     -- are dated.

19        Q     Sorry.

20        A     These are dated back to '01, '02 -- no,

21   I'm sorry.

22              No, that's the CAD file.  No, I'm not

23   sure.  These go back to '02.

24        Q     Do you know --

25        A     2002.
```

Draft Copy

Page 90

1       Q      Do you have any knowledge whether or not

2    Mr. Huber and his team were provided with those CAD

3    drawings in anticipation and in preparation for the

4    work that they were going to do at the Huber

5    residence?

6       A      I don't know that.

7       Q      Isn't that normally what happens in your

8    industry, that the architect drawings up the plans

9    and then a particular contractor will go and

10   actually, I guess, execute on those plans?

11                    MR. FRIEDBERG:  Objection.

12              Incomplete as phrased.  Lacks foundation.

13   BY MR. GOLDBERG:

14      Q      You can answer.

15      A      You know, generally speaking, yes.

16   Architectural plans are prepared that become a

17   permit set, if you will, for building a job and a

18   contractor proposes his -- his work on that basis.

19   My understanding was, you know, that at some point

20   here between the time that these drawings were done

21   and -- and the time that they decided to do a roof

22   here, they decided they wanted the longevity and the

23   look of a copper roof and they sought out a

24   contractor to do that work.

25      Q      Okay.  Can you show me where in the

Page 91

1    project it says that Huber and Associates was

2    responsible to design the roof?

3        A    I -- I don't know what you define as

4    "design."

5        Q    Well, show me -- I didn't ask you for my

6    definition, I asked for yours.

7                    MR. FRIEDBERG:  Argumentative.

8    BY MR. GOLDBERG:

9        Q    How do you define in the proposal that

10   Huber and Associates was supposed to design the

11   roof?

12                   MR. FRIEDBERG:  Asked and answered.

13                   Go ahead.

14       A    You know, they are specifying exactly

15   what they are going to do.  And if that's not a

16   design, I don't know what is.

17   BY MR. GOLDBERG:

18       Q    Is there anything in particular in the

19   proposal that stands out to you that would suggest

20   that this was a design project undertaken by Huber

21   and Associates?

22                   MR. FRIEDBERG:  Objection.  Asked

23           and answered.

24                   Go ahead.

25       A    I think the whole proposal, you know, it

Page 92

1    proposes to do a copper -- a copper roof and -- and

2    that is a design that -- that is not backed up by

3    somebody else's documents.  It falls all on Huber to

4    implement this copper roof.

5    BY MR. GOLDBERG:

6         Q    To build it.

7              Right?

8         A    Yes.

9         Q    Not to design it?

10        A    You --

11        Q    You wouldn't have a job.

12        A    Again, it depends on your definition of

13   design.  You know, when a flat roofing contractor

14   takes on a project to do a roof for an owner and

15   there's no design professional involved, they are

16   responsible for all the elements of the design that

17   make that roof warrantable and -- and -- and

18   watertight.

19        Q    Okay.

20        A    I think I -- I can't speak for

21   Mr. Friedberg but if -- if I were the owner here, my

22   expectation would have been that the roofing

23   contractors provided everything needed to complete

24   this roof and all the design elements that might

25   have to go into it to make it, you know, a proper

Page 93

1    metal roof.

2         Q      And where is that contemplated in any of

3    the proposals there?

4         A      I -- I don't think it's shown here at

5    all.  I think it's implicit in the owner contracting

6    with the roofer to provide a design for the copper

7    roof that is not shown on anybody else's work

8    product.

9         Q      But again, you don't see it in the

10   proposal.

11               Right?

12        A      No.

13        Q      Okay.  Now, in terms of the proposal

14   itself, can you identify areas for me that were not

15   properly or not undertaken as it pertains to the

16   proposal with the exception of the rosin paper,

17   which you've already testified to?

18        A      There are -- there are intricacies --

19   well, the -- the proposal is -- is sparse, if you

20   will.  It doesn't get into the details of --

21   the exact details of doing the work.

22               It says "traditional style single ridge."

23   It's not a very all-inclusive -- I mean, it's vague.

24   I -- contractually, I don't think there's, you know,

25   there's not a lot shown here to -- to show

Page 94

1    conformance.

2        Q      Right.

3        A      Yeah.  So --

4        Q      Do you know whether or not Mr. Friedberg

5    signed a proposal that was prepared by Mr. Huber and

6    his team?

7        A      I don't know.

8        Q      Okay.  Assuming that --

9        A      Did he authorize the work?

10       Q      I'm sorry?

11       A      Yeah, I don't know.

12       Q      Okay.

13       A      I don't -- I don't have a copy that shows

14   his signature.

15       Q      Okay.  Assuming that he did sign it, I

16   want you to assume that for me, would you agree with

17   me that the terms of the contract were upheld as

18   written in black and white in front of you?

19                  MR. FRIEDBERG:  Incomplete as

20                  phrased.  Lacks foundation.

21   BY MR. GOLDBERG:

22       Q      You can answer.

23                  MR. FRIEDBERG:  Vague and ambiguous.

24   BY MR. GOLDBERG:

25       Q      You can still answer.

Page 95

1      A      I can't answer that.

2      Q      Well, as part of your analysis in this

3    project, wasn't it -- didn't you take a look at the

4    proposals and determine whether or not Huber and

5    Associates and Daybreak complied with the terms of

6    the proposal that was prepared?

7      A      I reviewed the installation and I made

8    comments about, you know, conformance to SMACNA

9    and -- and comparing whether or not what is said as

10   traditional style single rib is actually what was

11   installed as a single lock with a cap on top of it

12   strikes me as different.  You know, one of the

13   proposals had cleats at 12 inches off center,

14   eventually that got revised to nine and a half

15   inches on center, that complied with his proposal.

16   They did use 15-inch pans.

17     Q      Sir, my question is simple.  I'm happy

18   for you to continue if you want but my question is

19   very simple.

20            My question is:  Is there anywhere in any

21   of the proposals that you have reviewed that was

22   prepared by Huber and Associates where you see that

23   that work was not completed or done?

24     A      I think that the work completed complied

25   with what Huber's proposal was.

Page 96

1      Q      Now, I wanted to get into SMACNA a little

2   bit.

3             Did you have an opportunity at all at any

4   point to read the forward and the notice to users in

5   the SMACNA manual?

6      A      I haven't for a long time.

7      Q      Are you familiar with the forward?

8      A      Yeah.  So what is specifically your

9   question?

10     Q      Sure.  I'm going to ask it.  I wanted to

11  make sure you were aware of the forward itself.

12            And what is your understanding what the

13  forward actually is supposed to --

14     A      You know --

15     Q      -- identify or otherwise is there for?

16     A      -- SMACNA is a general manual.  It has

17  general details and you have to use judgment in

18  details that aren't shown in the manual.

19     Q      I understand.

20            My question is just:  Do you understand

21  what the forward is there for?

22     A      Well, my --

23     Q      In a general sense?

24     A      My interpretation of why the forward is

25  there is because they don't want to take

1    responsibility for things that people rely on for,

2    you know, as a standard for this manual.

3        Q    Okay.  Fair enough.  So it kind of gives

4    a guideline?

5        A    Yeah.

6        Q    And allows certain type -- and provides

7    for certain allowances?

8        A    Sure.

9        Q    Okay.  So -- and you have to read the

10   forward in conjunction with certain of the -- with

11   certain of the guidelines associated with the

12   manual.

13            Is that correct?

14              MR. FRIEDBERG:  Incomplete as

15            phrased.

16   BY MR. GOLDBERG:

17       Q    You can answer.

18              MR. FRIEDBERG:  Lacks foundation.

19            As well as speculation.

20       A    Yeah.

21   BY MR. GOLDBERG:

22       Q    Sorry?

23            You do.

24            Right?

25       A    I -- yes.

Page 98

1      Q     Okay.  So assuming that the forward is a

2  part of your analysis in this particular situation,

3  and is it?

4      A     You know, I think what goes better to the

5  point is that industry practice and industry

6  standards and what people do is more to the point

7  than -- than saying that you can interpret these

8  things the way you want to interpret them.

9      Q     Sure.  And the only reason I'm bringing

10  up SMACNA is because it's referred to in your

11  report.

12            Is that right?

13      A     Yeah.

14      Q     Okay.

15      A     And so is Copper and Common Sense.

16      Q     And so Copper and Common Sense and SMACNA

17  are both authoritative with respect to the copper

18  industry.

19            Right?

20      A     They are generally authoritative.

21      Q     Okay.  Fine.  But they are used as

22  authoritative material?

23      A     Right.

24      Q     Okay.  Sure.  And are you aware that the

25  forward does speak to the use of sealants?

Page 99

1      A     Yes.

2      Q     And what is your position as it pertains

3   as to the use of sealants with respect to -- with

4   respect to waterproofing?

5                    MR. FRIEDBERG:  Incomplete as

6                phrased.  Assumes facts not in evidence.

7                Lacks foundation.

8      A     It's --

9   BY MR. GOLDBERG:

10     Q     You can answer.

11     A     -- like a whole --

12                   MR. GOLDBERG:  You have a standing

13               question, Tom.

14     A     -- open --

15                   MR. FRIEDBERG:  Well, if you keep

16               asking bad questions I'm going to keep

17               objecting to them.

18                   You can go ahead and answer.

19     A     Yeah.  It opens up a whole realm of,

20   well, where do you use sealant in standing seam

21   roofing?

22               Well, if you are in a high snow drift

23   area and you have got a one inch seam, maybe you are

24   going to put butyl tape in your seams.  But sealant

25   is not used as the main waterproofing element of

Page 100

1    metal roofing.  So --

2    BY MR. GOLDBERG:

3        Q    Sure.  Do you believe this project is

4    subject to any type of building code?

5        A    I -- I can't answer that.

6        Q    Did you -- did you do that as part of

7    your analysis?

8        A    No.

9        Q    Did you look into any building code?

10       A    I did not.

11       Q    Are you familiar with the International

12   Residential Code?

13       A    Yes.

14       Q    Okay.  Tell me -- tell me what your --

15   what your belief is as to that particular code?

16   What does it -- what does it cover?

17                  MR. FRIEDBERG:  Overbroad as

18           phrased.

19                  Go ahead.

20   BY MR. GOLDBERG:

21       Q    In a -- in a -- in a general sense.  I

22   mean, what is it --

23       A    No.

24       Q    -- utilized for?

25       A    It's too broad a question.

Page 101

1       Q      Are you able to answer my question?

2       A      No.

3       Q      Do you know what the International

4    Residential Code is?

5       A      Yes.

6       Q      What is it?

7       A      It's a code.  As a matter of fact,

8    Connecticut refers to the International Residential

9    Code.  It's a very broad document with -- you know,

10   the provisions that are in there for roofing,

11   building flashings, and so on, are very generalized

12   provisions.

13      Q      Did you do any analysis or otherwise

14   consult the International Residential Code in -- in

15   preparation for your analysis in this case?

16      A      No.  Because there's not really a lot of

17   things that apply.

18      Q      Okay.  Do you have any belief that the

19   work that was done on Mr. Friedberg's home didn't

20   comply with the international Residential Code?

21      A      No.

22      Q      Now, in terms of the plans, the plans

23   that you've provided here that are marked as Exhibit

24   3, not that you provided but that are here and have

25   been marked as Deposition Exhibit 3, were those

Page 102

1    prepared by an architect?

2        A     Yes.

3        Q     And do you know whether or not those were

4    provided to Huber and Associates in order for them

5    to prepare a bid on this project?

6        A     I have no idea.

7        Q     Okay.  In a general sense, in your

8    industry as an architect, do you normally prepare

9    these types of drawings or drawings similar to

10   Exhibit 3 prior to a -- any of the contractors

11   coming to prepare bids?

12       A     Yes.

13       Q     And they use the architectural drawings

14   in order to prepare their bids.

15             Right?

16       A     They use the architectural drawings for,

17   you know, dimensional take offs and so on.

18       Q     The contractor didn't design the roof

19   plans themselves, did he?

20       A     What do you mean by "design the roof

21   plans"?

22       Q     The roof plans that were -- that were

23   submitted --

24       A     There are structural drawings for the

25   roof.  There's -- you know, the composition of

Page 103

1    everything up to and under the copper roof, I

2    presume, was either in these plans or -- or was

3    something that was coordinated with the contractor

4    who did the roof -- who did the structure.

5         Q     All right.  And an architect, he prepares

6    the plans?

7         A     He or she.

8         Q     Yeah.  He or she prepares the plans and

9    sometimes, or most of the time, those are used to

10   obtain a permit.

11              Is that right?

12        A     Yes.

13        Q     Okay.  It shows, most of the times, the

14   roof plan associated with the building that needs to

15   have a roof installed.

16              Right?

17        A     Yes.

18        Q     It shows elevations?

19        A     Uh-huh.

20        Q     Yes?

21        A     Yes.

22        Q     It shows the design intent?

23        A     Yes.

24        Q     Okay.  Do you have any reason to believe

25   that the architect of record on this project, do you

Page 104

1   have any reason to believe that he didn't -- that he

2   didn't provide those particular drawings so that the

3   contractor could prepare his bid?

4        A    I don't --

5             MR. FRIEDBERG:  Asked and answered.

6        A    Yeah.  I -- I don't -- I know -- I know

7   that in having been sent CAD files from this

8   architect, I think that they were aware that the

9   owner had changed their mind as to how the roof --

10  what the roof look was going to be.

11  BY MR. GOLDBERG:

12       Q    Okay.  And you've reviewed those CAD

13  drawings.  Would you agree with me that the

14  contractor, Huber and Associates, built the roof to

15  the specifications as identified in the CAD

16  drawings?

17             MR. FRIEDBERG:  Vague and ambiguous.

18             Incomplete as phrased.

19       A    I've -- I've said in my report that there

20  are no details related to the roof in -- in these

21  drawings.

22  BY MR. GOLDBERG:

23       Q    No, I understand that.  My question is --

24  is -- my question is pertaining -- and I believe you

25  said you reviewed -- I'm looking at the item of the

Page 105

1    documents that you reviewed -- that you reviewed the

2    architectural drawings and the auto CAD files.

3                My question is very simple.

4    A      Yeah.

5    Q      Assuming that those drawings were

6    provided to Huber and Associates, did Huber and

7    Associates build the roof and install it in

8    compliance with the CAD files that you had -- that

9    you reviewed?

10                MR. FRIEDBERG:  Objection to form.

11                Incomplete as phrased.  Lacks foundation.

12   BY MR. GOLDBERG:

13   Q      You can answer.

14                MR. FRIEDBERG:  Assumes facts not in

15                evidence.

16   A      I -- is it dimensionally the same?  Are

17   the layouts the same?

18                I -- I -- I can't -- I can't say because

19   there's not enough detail -- there's not enough --

20   there's really no roofing details in this set of

21   plans.

22   BY MR. GOLDBERG:

23   Q      From the architect.

24                Right?

25   A      Yeah.

Page 106

1        Q     Okay.

2        A     Is it -- is it dimensionally the same

3    from the architect?

4              I would assume so.

5        Q     Do you take issue with the architect's

6    work on this project?

7                   MR. FRIEDBERG:  Vague and ambiguous.

8        A     What would I take issue with?

9    BY MR. GOLDBERG:

10       Q     Yeah.  Do you have any opinions?

11             You are an architect.  Do you have any

12   opinions regarding the work that the architect did

13   on this case?

14       A     No.

15                  MR. FRIEDBERG:  Incomplete as

16             phrased.

17   BY MR. GOLDBERG:

18       Q     No?

19       A     I don't have an opinion on their -- on

20   their work.

21       Q     So I -- let me ask you this:  Did you

22   review the auto CAD files, sir?

23       A     Yes.

24       Q     The architectural drawings?

25       A     Yes.

Page 107

1      Q      Okay.  And my question is:  Did you go on

2  the roof and look at the workmanship that was done

3  by Huber and Associates?

4      A      Yes.

5      Q      Did you go on the roof, sir?

6      A      Yes.

7      Q      Okay.  My question is very simple.  In

8  looking at the CAD drawings and looking at the work

9  that was done by Mr. Huber and his team, did you see

10  any areas where Mr. Huber and his team did not

11  comply or otherwise build the roof and install it in

12  compliance with the CAD drawings?

13                MR. FRIEDBERG:  Objection to the

14                question as phrased.  Lacks foundation.

15                Assumes facts not in evidence.

16      A      You are saying -- I mean, dimensionally,

17  and that's all that's shown on these drawings, are

18  that the graphic representation of the slopes of the

19  roof and -- and did they do that same representation

20  in their work but in copper?

21                Yes.

22  BY MR. GOLDBERG:

23      Q      Okay.  Thank you.  Now, are you familiar

24  with the type of product that the sealant was on

25  this project?

Page 108

1        A      The Sika?

2        Q      Yes.

3               Are you familiar with that --

4        A      Yes.

5        Q      -- particular brand?

6        A      Yes.

7        Q      Are you familiar with their

8    specifications and manufacturer's details?

9        A      That's a very vague question but I am

10   familiar with Sika and their products.

11       Q      Okay.  Are you familiar with the Sikflex

12   110?

13       A      I don't think that was the product that I

14   saw.

15       Q      That's not the product that was used on

16   this roof?

17       A      Where -- where's the shipping detail?  I

18   thought it was 1a.

19              Can you give me a cut of what was

20   actually installed or --

21       Q      I'm asking you, sir.  If you don't know

22   that's fine.

23       A      I don't know.

24       Q      Okay.  Are you aware that under

25   application for that particular Sika product, are

1    you aware of how that's supposed to be applied?

2         A       They -- again, that's a very vague

3    generalization.

4         Q       Okay.

5                     MR. FRIEDBERG:   Object to the form

6                 of the question.

7         A       Sika --

8    BY MR. GOLDBERG:

9         Q       Let me ask it this way --

10        A       Sika --

11        Q       Sure.

12        A       -- as any sealant performs best when it's

13   in a joint that has a ratio of two to one, the

14   thickness of the joint being half of the width of

15   the joint.

16                 Installed as a -- as a flat layer from

17   one piece of metal surface to another piece of metal

18   surface, there's nothing in their literature that

19   talks about how that's installed.

20        Q       Okay.

21        A       It's a -- it's a nonstandard way of

22   installing sealant, which is just basically as

23   goop.

24        Q       You state -- you stated in your report

25   that the sealant did not meet any manufacturer's

Page 110

1    minimum width.

2                Is that right?

3        A    That's for the counter flashing.

4        Q    Yes, sir.

5        A    Yes.

6        Q    Do you recall stating that in your

7    report?

8        A    Yeah.

9        Q    Did you ever get a chance to look at the

10   manufacturer's suggestion as to application of that

11   product?

12       A    I would have to --

13               MR. FRIEDBERG:  Wait.  Wait.

14           Objection.  Incomplete as phrased.

15       A    Yeah.

16               MR. FRIEDBERG:  Lacks foundation as

17           to which specific product.

18               Go ahead.

19   BY MR. GOLDBERG:

20       Q    You can answer.

21               MR. GOLDBERG:  And your objection

22           should be limited to form, Tom.  It's

23           inappropriate.

24   BY MR. GOLDBERG:

25       Q    But you can answer.

Page 111

1       A       I haven't looked at the specific data cut

2    for that material --

3       Q       Okay.

4       A       -- and what you seem to be referencing.

5       Q       Okay.  But is it your testimony or your

6    belief that the sealant is -- strike that.  That's

7    okay.

8               Your experience in roofing, is that

9    particular -- is that particular to design of

10   roofs?

11      A       What do you mean by that?

12      Q       Yeah.  So in terms of roofing itself,

13   your -- your expertise is in the design of roofs.

14              Is that right?

15      A       I've -- I've been involved in roofing in

16   over 35 years of practice in designing and

17   overseeing of roofing work and it includes writing

18   specifications for, doing details for, and

19   overseeing work in the field.

20      Q       I wanted to talk a little about the water

21   testing that you did.

22              Are you familiar with the ASTM standards

23   for water testing?

24      A       Yes.

25      Q       Did you comply with those on the project

Page 112

1    when you --

2        A      It's not a condition where you would use

3    an ASTM standard.

4        Q      My question is did you comply with the

5    ASTM standards when you did the water testing?  I'll

6    get to the condition --

7        A      What ASTM standards?

8        Q      Sure.  ASTM standard E2140?

9        A      There are tremendous numbers of

10   standards.  I --

11       Q      Okay.

12       A      -- would have to look at that one to see

13   what you are talking about.

14       Q      Did you comply with ASTM standard E2140?

15              MR. FRIEDBERG:  Objection.

16              Incomplete as phrased.

17       A      I can't answer that.

18   BY MR. GOLDBERG:

19       Q      Are familiar with a water nozzle called a

20   501?

21       A      Yes.

22       Q      Did you use the 501 nozzle?

23       A      No.

24       Q      Okay.  Are you aware that water testing

25   has to be regulated?

Draft Copy

Page 113

1       A     Yes.

2       Q     Are you aware --

3       A     And --

4       Q     -- that it has to be pressurized --

5       A     And --

6       Q     -- at a known PSI?

7                 MR. FRIEDBERG:  Wait a second.  Let

8             the witness finish the question, counsel.

9             You are getting at him in rapid-fire

10            sequence.  He's not getting an

11            opportunity to answer and then you are

12            hitting him with another question.

13    BY MR. GOLDBERG:

14      Q     If you need more time let me know, that's

15    fine.

16      A     I'm aware of the pressures and -- and we

17    do testing in this office as directly related to

18    nozzle codes.  And it's from my experience that we

19    did a test that closely emulated those pressures.

20      Q     Okay.  So my question is:  Did -- did

21    your water testing include pressurized -- was your

22    water testing pressurized?

23      A     No.

24      Q     Okay.

25      A     There was no need for it to be

Page 114

1    pressurized.

2        Q    And you didn't use a regulator.

3             Right?

4    A    No.

5        Q    Did you use a 501 pressure nozzle?

6    A    No.

7        Q    Did you use a three-quarter inch hose?

8    A    I believe it was five-eighths.

9        Q    Did you use a three-quarter inch hose?

10   A    No.

11       Q    Did you have any -- did you have any

12   conversation with Mr. Friedberg as to if the roof

13   gets replaced whether you'd be retained to do

14   architectural services for him?

15   A    We haven't had a discussion like that.

16       Q    Okay.  Did you do destructive testing

17   while you were out on the site?

18   A    We took apart the copper and put it back

19   together.  It was -- it was -- it could be defined

20   as destructive.  We didn't destroy anything.

21       Q    Do you know what destructive testing is?

22   A    Yes.

23       Q    Are you familiar with that term?

24   A    Yeah.

25       Q    Okay.

Page 115

1        A      So -- okay.  We did not, for example --

2        Q      I don't believe I have a question

3    pending.

4                    MR. FRIEDBERG:  Well, no --

5    BY MR. GOLDBERG:

6        Q      But you can answer.  You can -- you

7    can -- you can go ahead.

8               I don't have any question pending but you

9    can go ahead.  Go ahead.

10       A      We did not --

11       Q      If you need to clarify.

12       A      -- for example demolish any of the stucco

13   above the counter flashings.

14       Q      Do you have any opinion regarding the

15   stucco work that was done on the property?

16                   MR. FRIEDBERG:  Overbroad as

17               phrased.  Incomplete as phrased.

18   BY MR. GOLDBERG:

19       Q      You can answer.

20       A      Generally I think the stucco work was

21   very good.  I didn't see a lot of crazing.  I didn't

22   see a lot of cracking.  Other than related directly

23   to the metal counter flashings.

24       Q      Do you know when Huber and Associates

25   completed their project?

Page 116

```
 1        A      I understand it was late June 2010, in

 2    that -- that --

 3        Q      And when did you go on --

 4        A      I --

 5        Q      Oh, I'm sorry.

 6        A      I was going to say:  I know I had a

 7    chronology --

 8        Q      Oh, I'd love to see that if you have

 9    that.

10        A      That was just handwritten.

11        Q      Sure.

12        A      And it's here.

13        Q      May I?

14        A      I think I made a copy for you.

15               So the material was shipped on June 8th,

16    2010 and there was a punch list done on July 9th,

17    2010.

18        Q      May I?

19        A      Sure.

20        Q      Thank you.

21               What's your understanding of the first

22    time that there were any complaints -- well, you

23    know, strike that.

24               Do you have any knowledge regarding

25    complaints of the integrity or workmanship of the
```

Page 117

1   roof?

2       A    I have no knowledge.

3       Q    Okay.  Mr. Friedberg didn't provide you

4   with that information, did he?

5       A    I don't know.  I don't remember.

6       Q    Okay.  Do you have anything in your file

7   which suggests that a complaint was made regarding

8   the workmanship of the roof to Mr. Huber or his

9   team?

10      A    That wasn't my purview to --

11      Q    The question is:  Is it in your report?

12      A    No.

13      Q    I'm sorry.  Is it in your materials?

14      A    No.

15      Q    And what was the date that you went to

16  the property?

17      A    September 11th and September 12th of --

18      Q    Of what year?

19      A    -- 2014.

20      Q    So roughly, over four years had passed

21  since initial installation of the roof.

22           Right?

23      A    Uh-huh.

24      Q    Yes?

25      A    Yes.

Draft Copy

1      Q     Okay.  Do you have any knowledge as to

2  what other contractors were on the roof between June

3  2010 and September 2014?

4      A     No.

5      Q     Do you have any knowledge as to what

6  conditions existed on the property between June of

7  2010 and September 2014?

8      A     No.

9      Q     Did you take into account the weather

10 conditions in the Virgin Islands, for example?

11     A     No.

12     Q     Okay.  Did you look at the hurricanes

13 that had hit the island between June of 2010 and

14 September 2014 when evaluating or otherwise

15 providing your report?

16     A     No.

17     Q     Okay.  Are you aware that there were

18 several hurricanes and tropical storms that had been

19 present between --

20     A     I'm --

21     Q     I've got to finish my question, sir.

22           -- between June of 2010 and September of

23 2014?

24     A     I'm not aware.

25     Q     Would you -- wouldn't you agree with me

Page 119

1    that weather conditions certainly play a factor in

2    terms of integrity of roofs?

3        A    Weather conditions as, for example,

4    hurricanes that you are suggesting would produce

5    damage that I would -- I would think is -- I would

6    recognize.

7        Q    And did you account for that in your

8    report?

9        A    There were no conditions that I saw that

10   I thought would have been created by a hurricane.

11       Q    And I've reviewed a lot of your articles.

12   You've written quite a bit which definitely assisted

13   me and I just -- you talk a lot about maintenance in

14   your reports.

15            Did you take any -- into account

16   maintenance from June 2010 until the date you did

17   your inspection?

18       A    This is --

19       Q    Maintenance on the roof.

20       A    This is a cooper roof that the owners

21   wanted to install because of its ability to not

22   require maintenance.

23       Q    Oh, so are you telling me that there was

24   no maintenance that would have been required

25   between June of 2010 and September 2014 on the

Page 120

```
 1   roofs?

 2                   MR. FRIEDBERG:  Objection.

 3                   Argumentative with the witness.

 4   BY MR. GOLDBERG:

 5        Q     You can answer.

 6        A     I don't -- I don't think it would have

 7   been required.

 8        Q     What about roof inspections; do you -- do

 9   you believe that that should have been done at any

10   time in the four year period between June 2010 and

11   September 2014?

12        A     On a cooper roof --

13                   MR. FRIEDBERG:  Vague -- vague --

14             vague --

15        A     I don't --

16                   MR. FRIEDBERG:  Wait.  Wait.  Wait.

17                   Vague and ambiguous.

18   BY MR. GOLDBERG:

19        Q     You can answer.

20        A     Yeah.  On a copper roof, I don't think --

21   I don't think -- you are probably better off not

22   going up on the roof.

23        Q     All right.

24        A     It's certainly a very short time period.

25        Q     Yeah.  You talk about facility manager in
```

Page 121

1   a lot of your reports, what are you referring to

2   when you are talking about a facility manager?

3       A    You are talking about much bigger

4   facilities.  You are talking about, you know,

5   corporate buildings, and so on.

6       Q    Okay.  So that doesn't apply to

7   residential homes?

8       A    It certainly doesn't normally.  The

9   facility manager on my house is me.

10      Q    Yeah.  No, I understand that.  Yeah.

11  Yeah.  And that's exactly my point.

12           Right?

13           So -- so I understand a facility manager

14  you are telling me is for bigger projects, condos

15  and maybe large commercial type of facilities.

16           Right?

17      A    Yeah.

18      Q    Okay.  And you would agree with me that a

19  facility manager -- and you just testified -- at

20  your particular home -- and I don't know how big it

21  is and I don't really care and I don't need to ask

22  that -- you would agree that the facility manager at

23  your particular home is you.

24           Right?

25      A    Yeah.

Page 122

1      Q      You are the owner of the home?

2      A      Yeah.

3      Q      And you designated yourself as

4      facility --

5      A      Yeah.

6      Q      -- manager.

7             Right?

8      A      And if I have got a leak in my bedroom

9      and I ignore it for two years then it's my own

10     fault --

11     Q      Okay.

12     A      -- that I've got damage.

13     Q      Sure.

14     A      But, you know --

15     Q      Do you know who the facility manager was

16     on -- or who you would say the facility manager was

17     on the Friedberg residence?

18     A      I -- I -- I don't know in that time

19     period, you know, who was in charge of that.

20     Q      And you had a chance to meet Mr. Bunge?

21     A      Yeah.

22     Q      Chris Bunge?

23     A      Yeah.

24     Q      Do you know who that is?

25     A      Yeah.

Draft Copy

Page 123

1        Q      Who is it?

2        A      I guess it's Sarah's brother.

3        Q      Okay.  So it's Mr. Friedberg's son-in-law

4    or -- I beg your pardon -- brother-in-law?

5        A      Yeah.  And I understand he lives on the

6    island and he does odd things around the site.

7        Q      Is he the facility manager for that

8    property?

9        A      I don't know what his designation is by

10   Tom.

11       Q      Is there a difference in your mind

12   between a copper roof and what you just identified

13   in certain of your reports or certain of your

14   articles as a metal roof or would that fall --

15   would a copper roof fall under the metal roof

16   category?

17       A      In general, copper roofs fall under the

18   general metal roof category but in the industry,

19   metal roofs can be anything from an insulated panel

20   on a metal -- manufactured metal building, it can be

21   preformed metal -- metal, and actually, you know,

22   metals that have many more problems related to how

23   metals are joined.

24       Q      Okay.  Does copper fall under the metal

25   roofing category?

Page 124

1      A     Yes.

2      Q     Okay.  Did you receive any data from

3  Mr. Friedberg relative to any data concerning the

4  roof condition between 2010 and 2014?

5      A     I don't believe so.

6      Q     Okay.  Was any roof condition studies

7  done between 2010 and 2014?

8      A     Not --

9      Q     To your knowledge?

10      A     Not to my knowledge.

11      Q     Do you believe it's prudent to collect

12  condition information on a regular basis?

13              MR. FRIEDBERG:  Incomplete as

14              phrased.  Lacks foundation.

15  BY MR. GOLDBERG:

16      Q     You can answer.

17      A     It depends --

18              MR. FRIEDBERG:  Vague and ambiguous.

19      A     -- on the roof.

20  BY MR. GOLDBERG:

21      Q     You can answer?

22      A     Depend on the roof.

23      Q     Sure.  On this particular roof do you

24  believe it would have been prudent to collect roof

25  condition information on a regular basis?

Page 125

```
 1              MR. FRIEDBERG:  Incomplete as
 2         phrased.  Lacks foundation.  Vague and
 3         ambiguous.
 4    A    I --
 5 BY MR. GOLDBERG:
 6    Q    You can answer.
 7    A    Yeah, I don't think it was necessary.
 8    Q    Okay.  Are you aware of an article that
 9 you wrote in November 2012 entitled, Roof
10 Inspections Checklist:  Help Facility Managers Spot
11 Trouble Early?
12    A    Uh-huh.
13    Q    Do you recall that?
14    A    Yeah.
15    Q    Okay.
16    A    It was geared towards industrial
17 buildings, commercial buildings, and large roofs.
18    Q    Sure.  Are you familiar with an article
19 that you wrote called Long Term Roofing Plans Can
20 Save Money and Aggravation?
21    A    Uh-huh.
22    Q    Yes?
23    A    Yes.
24    Q    Written in November 2012?
25    A    Yes.
```

Draft Copy

Page 126

1      Q      Do you agree that water can migrate so

2   leaks may not originate where they are observed?

3      A      Yes.  And I think that's exactly the case

4   in the main pavilion where the roof is at the -- the

5   leak is at the perimeter of the roof and the opening

6   in the copper is halfway up.

7      Q      Yeah.  And sometimes what might appear to

8   be a roof leak might actually be something else?

9              MR. FRIEDBERG:  Speculation.

10             Incomplete as phrased.

11     A      Yeah.

12  BY MR. GOLDBERG:

13     Q      You can answer?

14     A      You are speculating, but yes.

15     Q      And for example, it could be

16  condensation?

17             MR. FRIEDBERG:  Well, speculation.

18             Lacks foundation.

19     A      Condensation occurs a lot in the

20  northeast where we have temperatures -- very cold

21  temperatures and we get a lot of warm moist air

22  migrating to cold surfaces within wall systems.

23  I -- I don't think condensation is that -- we had

24  unconditioned spaces at Saint John and presently

25  there's -- I doubt --

Page 127

1  BY MR. GOLDBERG:

2      Q    You have what, I'm sorry?

3      A    I doubt if there are any condensation

4  issues in -- presently.

5      Q    What about exterior wall failures, is

6  that possible?

7                MR. FRIEDBERG:  Incomplete as

8                phrased.  Lacks foundation.  Speculation

9                as phrased.

10     A    In many non-solid wall conditions, there

11  can be wall failures.  In the wall conditions that I

12  saw at Saint John, solid concrete construction and

13  stone exterior, not likely.

14  BY MR. GOLDBERG:

15     Q    Unlikely but possible.

16          Right?

17                MR. FRIEDBERG:  Speculation.

18                Incomplete as phrased.

19     A    I -- I wouldn't even speculate that it

20  was possible.

21  BY MR. GOLDBERG:

22     Q    Okay.  Did you see any roof plans

23  associated with this -- roof plan log that you

24  reference in some of your articles, did you see any

25  of that associated with this project?

Draft Copy

Page 128

1        A     No.

2        Q     Are you familiar with an article that you

3    wrote in November 2012 entitled, Properly Maintained

4    Roof Logs Helps Streamline Management of Roof

5    Systems?

6        A     Yes.  Again, that's geared towards large

7    commercial and industrial projects.

8        Q     Would you agree with me that regular

9    upkeep on an installation of copper roof is

10   important?

11       A     No.  I think that -- that -- that the

12   longevity that is expected when you install a copper

13   roof requires very low maintenance.

14       Q     Okay.  Are you familiar with an article

15   that you wrote also in of November 2012 entitled,

16   Plan for Roof Replacement to Avoid Catastrophic

17   Failure?

18       A     Yes.

19       Q     Okay.  Are you familiar with a -- strike

20   that.

21             Would you agree with me that if a roof is

22   left unattended, roof leaks can damage other

23   building systems including exterior walls,

24   structural systems and equipment, as well as

25   interior fixtures and finishes?  Would you agree

Page 129

1   with that statement?

2        A     Yes.

3        Q     Do you have any belief that the roof was

4   tended to in the four year period between the time

5   you looked at it and the time that Mr. Huber left?

6        A     And that's in reference to the previous

7   question?

8        Q     It's a general question.

9              MR. FRIEDBERG:  Well, he needs

10             clarification --

11  BY MR. GOLDBERG:

12       Q     Sure.  Yeah.  I mean, you can answer how

13  you believe -- how you'd like.  I'm happy to clarify

14  for you.

15             MR. FRIEDBERG:  Well, no.  Don't

16             speculate.

17             Vague and ambiguous.

18  BY MR. GOLDBERG:

19       Q     You can answer.

20       A     You know, the conditions on the buildings

21  that are unfinished inside, you know, the

22  unattended, you know, defects in the roof aren't

23  affecting finishes, they may be affecting materials

24  within the roof system that are unseen.

25       Q     All right.

Page 130

1       A       Wet and deteriorated.

2       Q       Did you bring a moisture meeter with you

3    to the island when you did your inspection?

4       A       There was no -- there's no reason, I

5    think, to have a moisture meeter.

6       Q       My question was:  Did you bring a

7    moisture meter with you?

8       A       No.

9       Q       Thank you.  Did you take any measurements

10   with a moisture meeter while you were on island?

11      A       No because I didn't bring one.

12      Q       Okay.  Just because you didn't bring one,

13   you might have gotten one on island.  Did you have a

14   moisture meeter --

15      A       No.

16      Q       -- at any time during your inspection?

17      A       No.

18      Q       Do you have any idea as to whether the

19   moisture spots that you saw were preexisting

20   Mr. Huber coming on island?

21                    MR. FRIEDBERG:  Objection.

22               Incomplete as phrased.  Vague and

23               ambiguous.

24   BY MR. GOLDBERG:

25      Q       You can answer.

Page 131

1      A      The moisture that I saw, for example, in

2   the gatehouse on the wall between the kitchen and

3   the living space, I did not know whether or not the

4   stains that were there preexisted but when we water

5   tested it we created them.

6      Q      Okay.  And would you agree with me that

7   it makes good financial sense to invest time in

8   routine inspections?

9                  MR. FRIEDBERG:  Vague and ambiguous.

10     A      It's always good to look at your facility

11   and assess where it's at.

12   BY MR. GOLDBERG:

13     Q      And did you get any information from

14   Mr. Friedberg regarding the assessments that were

15   done on the property between 2010 and 2014?

16     A      No.

17     Q      Because if they would have taken stock

18   maybe of the roof system at an earlier time, maybe

19   they could have mitigated some of the issues

20   associated with this roof?

21                  MR. FRIEDBERG:  Argumentative.

22                  Incomplete as phrased.  Lacks foundation.

23                  You can answer.

24                  MR. GOLDBERG:  Not sure it's

25                  argumentative.

Page 132

1    BY MR. GOLDBERG:

2        Q      You can answer.

3        A      The mitigation would have been the repair

4    of the roof that the contractor would have had to

5    come back to do.

6        Q      And do you have any knowledge or

7    information in your file relative to whether or not

8    any information was given to the contractor that he

9    needed to come back --

10       A      I do not --

11       Q      Let me finish my question, I'm sorry.

12              -- to come back on island and make

13   repairs?

14       A      I have no knowledge.

15       Q      But if that particular information would

16   have been given to him at an earlier time, would it

17   have salvaged the issue that you reference as to

18   replacement of the whole roof?

19              MR. FRIEDBERG:  Speculation.

20              Incomplete as phrased.  Lack of

21              foundation.

22   BY MR. GOLDBERG:

23       Q      You can answer.

24       A      It doesn't address the issue of whether

25   the whole roof should be replaced or not.  It might

Page 133

1    address whether or not there's damage in the -- the

2    materials below the roof that are -- that could be

3    worse now than before but that's not known at this

4    time.

5            Q    Right.  And we'll never know.

6                 Right?

7            A    You'll know if you take the roof off.

8            Q    What will you know?

9            A    Whether or not the materials in between

10   are damaged.

11           Q    The materials in between where?

12           A    Between the copper roof and -- and the

13   interior.

14           Q    Who did the -- that particular portion of

15   the job?

16           A    I don't have full knowledge of that.

17           Q    Okay.  And let me ask you this:  Did

18   you -- do you have any knowledge as to how long the

19   roof sat in a condition with just the underlayment

20   on before a roof was put on?

21           A    No.

22           Q    And would that be something that would be

23   somewhat important to your analysis as to where the

24   leaks are coming from?

25                MR. FRIEDBERG:  Incomplete as

1           phrased.

2    BY MR. GOLDBERG:

3        Q     You can answer.

4        A     I -- I don't feel -- I don't feel that's

5    related.

6        Q     Okay.  So let's take a hypothetical, for

7    example.  Let's say that the roof -- and let me

8    just -- before I pose the hypothetical --

9        A     In a -- in a very unreadable form, I've

10   seen some of those photographs.

11       Q     Yeah.  I wanted to see if you've seen

12   these and we can mark them but let's just flip

13   through these and tell me if you've seen any of

14   these photographs?

15       A     This is the garage roof and it shows

16   the -- the blocking that was installed in

17   preparation and insulation in between.

18       Q     Okay.  Who did that?  Do you know?

19       A     I don't know.

20       Q     Do you know whether or not Huber and

21   Associates did it?

22       A     I -- I think I was told that they did

23   not.

24       Q     Okay.  I wanted to go ahead and mark each

25   picture separately.  And I don't know what exhibit

Page 135

1    we are on.

2              But let me ask you this:  Do you have any

3    idea --

4                   MR. GOLDBERG:  What exhibit number

5              are we on?

6                   COURT REPORTER:  Well, I think that

7              the -- we were going to mark something

8              seven so this would be eight?

9                   MR. GOLDBERG:  Well, we can mark --

10             that's actually fair.  Let's mark the

11             contracts as eight.

12                  Seven is what you have on your thumb

13             drive, I believe.

14                  THE WITNESS:  Okay.

15                  (THEREUPON, SANDERS EXHIBIT NO. 8,

16             CONTRACTS, WAS MARKED FOR

17             IDENTIFICATION.)

18                  (THEREUPON, THERE WAS A DISCUSSION

19             OFF THE RECORD.)

20                  MR. GOLDBERG:  I'm going mark the

21             first one as exhibit nine.

22                  (THEREUPON, SANDERS EXHIBIT NO. 9,

23             PHOTOGRAPHS, WAS MARKED FOR

24             IDENTIFICATION.)

25

Page 136

1           (THEREUPON, SANDERS EXHIBIT NO. 10,

2           PHOTOGRAPH OF ROOF, WAS MARKED FOR

3           IDENTIFICATION.)

4    BY MR. GOLDBERG:

5        Q    With regard to nine, you are not sure who

6    prepared the roof in that manner?

7        A    Yeah.

8        Q    Are you?

9        A    No, I'm not.

10       Q    Do you know how long it stayed in that

11   fashion before Mr. Huber came to install the copper

12   roof?

13       A    No.

14       Q    Wouldn't that be important in your

15   analysis?

16       A    Only if that exposure caused a problem to

17   install the copper roof.

18       Q    Do you know whether it did or didn't?

19       A    I -- I -- I don't think I -- you know, I

20   don't think I did.

21       Q    You don't --

22       A    I don't think it did.

23       Q    Okay.  But would it make a difference to

24   you, say, that roof stayed like that for a year's

25   time?

Page 137

1       A       With --

2                       MR. FRIEDBERG:  Assumes facts not in

3               evidence.

4                       MR. GOLDBERG:  I'm posing a

5               hypothetical.  I understand that.

6       A       I don't know what the insulation is.  I

7       don't know what the blocking is.  I didn't know what

8       the underlayment under this is --

9       BY MR. GOLDBERG:

10      Q       Sure.

11      A       -- that I presume was this.

12      Q       We'll get to that.

13      A       So --

14      Q       Okay.  You said that Exhibit 9 is the

15      garage?

16      A       Yeah.

17      Q       Do you see any leaks in the garage?

18      A       No.

19      Q       Okay.  Exhibit --

20      A       Not in the garage under the -- under the

21      hip roof.

22      Q       Did you see any leaks in the garage?

23      A       Yes.

24      Q       Where?

25      A       On the wall -- this wall.

Page 138

1        Q     Okay.  Do you know whether or not those

2    leaks came from -- strike that.

3              Do you know whether those leaks were

4    associated with Mr. Huber's work on the project or

5    whether it came from other sources?

6        A     I think they came from the wall flashing,

7    counter flashing.

8        Q     Are you able to exclude any other causes

9    of that particular leak there?

10       A     The primary leak --

11             MR. FRIEDBERG:  Form.  Objection to

12             the form.

13             I mean, it's an improper question.

14   BY MR. GOLDBERG:

15       Q     You can answer.

16       A     The primary leak was on this side and I

17   associated it directly with the --

18       Q     So my --

19       A     -- counter flashing installation.

20       Q     My question is:  Are there any other

21   potential causes or explanations for that particular

22   leak or are you able to exclude all other

23   possibilities?

24             MR. FRIEDBERG:  Objection.

25             Incomplete.  It's an inappropriate

Page 139

1              question.

2    BY MR. GOLDBERG:

3         Q    You can answer.

4         A    Yeah.  I -- I -- I don't think that I saw

5    any other cause other than the flashing.

6         Q    My question is:  Is it within a

7    reasonable degree of probability and certainty as a,

8    I guess, architect, design professional, are you

9    able to eliminate all other possibilities for the

10   leak associated with the garage wall?

11                   MR. FRIEDBERG:  That's an

12                   inappropriate standard.  He's already

13                   answered the question properly.

14        A    No.

15   BY MR. GOLDBERG:

16        Q    Can you?

17        A    Asked and answered.

18        Q    No.  No.  You don't get to do that.  You

19   don't get to do that.

20        A    The primary leak was over in this area.

21   Now, this through wall over here is wetting the wall

22   but there was not a lot of damage here.  The damage

23   was over here --

24        Q    Okay.  And that's not associated with

25   Mr. Huber's job, is it?

Draft Copy

Page 140

1      A      No.

2      Q      And now, if you can make a circle where

3   that is, please, where you are referring to where

4   it's not Mr. Huber's issue.  And we'll mark that as

5   Exhibit 10 or I'm sorry, Exhibit 11.

6            You know what, let me get something a

7   little bit better because that is going to come off.

8   That one might be better.  Make a circle if you

9   would with that.

10           We need a Sharpie.

11     A      Yeah.

12     Q      I think I have one in my bag somewhere.

13     A      We got it.

14     Q      You have it?

15     A      Yeah.

16     Q      Great.

17           And just to be clear, the circle that's

18   not associated with Mr. Huber's work?

19     A      Right.

20     Q      Okay.  But you are able to say that

21   there's no other explanation for -- and I'm happy

22   for you to make an "X" where you believe it to be

23   the case.  Why don't -- why don't you make an "X"

24   where you believe there's another issue inside.

25           Okay.  And just to be clear, where you

Page 141

1    have marked your "X" on Exhibit 11 is your -- is

2    your testimony that the only possible explanation

3    for the leak inside that wall there is associated

4    with the work done by Huber and Associates?

5         A    My opinion is that that is associated

6    with the wall flashing that was done by Huber and

7    Associates.

8         Q    Could there be any other explanations for

9    that?

10        A    No.  Not that I saw.

11                  (THEREUPON, SANDERS EXHIBIT NO. 11,

12                  PHOTOGRAPH, WAS MARKED FOR

13                  IDENTIFICATION.)

14   BY MR. GOLDBERG:

15        Q    Okay.  Thank you.  Now we are going to

16   get to Exhibit 12 that I'm going mark.

17                  (THEREUPON, SANDERS EXHIBIT NO. 12,

18                  PHOTOGRAPH OF MAIN PAVILION, WAS

19                  MARKED FOR IDENTIFICATION.)

20   BY MR. GOLDBERG:

21        Q    What is that a picture of?

22        A    That's a photograph of the main

23   pavilion --

24        Q    Okay.

25        A    -- with some sort of a protective

1    covering on the -- the main part of the roof and the

2    sub girts being started to -- starting to be

3    installed on the roof.

4        Q      Who installed that?

5        A      I do not know.

6        Q      Is that important for you to know?

7        A      No.  As long as it's a substrate that was

8    accepted by the roofing contractor to put the copper

9    on and to know that it was installed --

10       Q      Okay.

11       A      -- properly.

12       Q      Do you know how long it stayed in the

13   condition as --

14       A      No, I do not.

15       Q      I have got to finish my question.  Sorry.

16       A      Okay.

17       Q      Just because we have to make a record

18   here.

19              Do you have any idea how long that

20   particular underlayment and condition existed as

21   depicted in Exhibit 12?

22       A      No.

23       Q      And you did note leaks associated with

24   the main pavilion.

25              Right?

Page 143

1      A      Yes.

2      Q      Two different leaks, I believe, you

3   testified to?

4      A      Yes.

5      Q      Okay.  And are you able to testify

6   whether or not the leaks could have been associated

7   with the work shown in Exhibit 12?

8                     MR. FRIEDBERG:  Incomplete as

9             phrased.  Lacks foundation.  Speculation

10            as phrased.

11   BY MR. GOLDBERG:

12      Q      You can answer.

13      A      In my opinion, it does not have any

14   relationship to this.

15      Q      Are you able to exclude that as a

16   potential option?

17      A      Yes, in my opinion.

18      Q      Okay.  And why is that?

19      A      Because I think it's the surface that any

20   water that gets through the copper roof flows upon

21   to the exterior wall where it can leak in.

22      Q      Okay.

23                     (THEREUPON, SANDERS EXHIBIT NO. 13,

24             DOCUMENT, WAS MARKED FOR

25             IDENTIFICATION.)

Page 144

1    BY MR. GOLDBERG:

2        Q    Okay.  Exhibit 13 again, who did that

3    work on the roof as you see it depicted in Exhibit

4    13?

5        A    Again, I don't know.

6        Q    Do you know how long it stayed in that

7    particular condition?

8        A    No.

9        Q    Okay.  Did Mr. Huber and his team do that

10   work?

11       A    Not to my knowledge.

12       Q    Okay.

13                (THEREUPON, SANDERS EXHIBIT NO. 14,

14                DOCUMENT, WAS MARKED FOR

15                IDENTIFICATION.)

16   BY MR. GOLDBERG:

17       Q    And exhibit 14, again, did Mr. Huber do

18   the work associated with Exhibit 14?

19       A    Not to my knowledge.

20       Q    Okay.  Do you know how long the roof

21   stayed in that condition?

22       A    No, I do not.

23       Q    Let me ask you this:  Let's assume the

24   roof stayed in that condition -- I'm going to pose a

25   hypothetical.  Let's say it stayed in that condition

Page 145

1    for five years before Mr. Huber came on the

2    property, would that be of concern to you?

3                  MR. FRIEDBERG:  Assumes facts not in

4            evidence.

5                  Go ahead.

6                  MR. GOLDBERG:  I understand.  I

7            posed a hypothetical.

8                  MR. FRIEDBERG:  That's a ridiculous

9            hypothetical.

10                 Go ahead.

11   A    I -- I'm not sure that it matters.

12   BY MR. GOLDBERG:

13   Q    Okay.  Let me ask you:  How long of a

14   time does matter, if any at all?

15   A    This is -- this is like a vapor barrier

16   put down on a metal deck on a job that the vapor

17   barrier may stay there for, you know, exposed to

18   the sun for six months and then insulation is

19   applied to metal deck and final roofing.  You know,

20   it -- it should -- in my opinion, it should not have

21   any affect on installing a standing seam copper

22   roof --

23   Q    Okay.  So --

24   A    -- above it.

25   Q    So there's no time that you believe would

Page 146

1    pass that it would make a difference to you?

2        A    Not in this case.

3        Q    Okay.  Thank you.  When you went down to

4    the project in 2014 for your site inspection, what

5    was the completion status of the project?

6        A    Define "project."

7             The overall --

8        Q    Let me ask you this --

9        A    -- construction of the entire facility?

10       Q    Was it done?

11       A    The roofing?

12       Q    Was the -- no.

13            The whole project?

14       A    No.

15       Q    Were there windows in the main pavilion?

16       A    No.

17       Q    Were they boarded up with plywood?

18       A    Yes.

19       Q    Is that -- does that come into your

20   decision at all, did you analyze that particular

21   issue as it pertains to the elements being able to

22   enter into the property?

23                 MR. FRIEDBERG:  That's vague and

24            ambiguous.

25            Go ahead and answer if you -- I

Page 147

1              mean, I don't know --

2    BY MR. GOLDBERG:

3         Q     You can answer.

4         A     It would -- it would appear to me that

5    the facility was watertight from the standpoint of

6    temporary -- openings -- openings being closed by

7    temporary plywood walls.

8         Q     Do you know how long the project has been

9    ongoing, the whole project?

10        A     I understand that Mr. and

11   Mrs. Friedberg -- Mrs. Friedberg? -- Mr. Friedberg

12   and Ms. Bunge started the project, perhaps, in

13   2001.

14        Q     And do you have any opinions regarding

15   the percentage of completion for the whole project?

16        A     No.

17        Q     Okay.  Isn't that what you do sometimes?

18   I mean, you are an architect.  You oversee

19   completion time for projects and completion

20   percentages for different projects that you design

21   the drawings for?

22        A     Yes.

23        Q     Okay.

24        A     I can think of a house near me that the

25   former architect, who is deceased now, whose wife is

Page 148

1   now mayor of New Haven, and it took 14 years to

2   build the house.

3        Q    Not my question but I appreciate the

4   anecdote.  My question is:  When you went down to

5   the island -- well, strike that.

6             Are you able to give me a completion

7   percentage for the project down on Saint John on

8   Mr. Friedberg's residence?

9        A    No, I'm not.  Because it's not in

10  my purview --

11       Q    Okay.

12       A    -- to talk about.

13       Q    You didn't assess that, did you?

14       A    No.

15       Q    But you would agree with me that it's not

16  anywhere near a hundred percent complete.

17            Right?

18       A    There's a lot to do.

19       Q    But you would agree with me that it's not

20  a hundred percent complete.

21            Right?

22       A    I agree.

23       Q    What's left to be done?

24       A    The build out of spaces.

25       Q    Explain -- tell me what's left to be

Page 149

1    done.  Give me a laundry list of what you believe is

2    left to be done?

3        A     The interior spaces of the guest house.

4        Q     Okay.

5        A     The exterior stone finishes.

6        Q     Okay.

7        A     This is -- this is based on having

8    reviewed the CAD drawings.

9        Q     I understand.

10       A     The windows and doors.

11       Q     There's no windows or doors -- right? --

12   except for the gatehouse and garage?

13       A     Correct.

14       Q     Okay.  And how many square feet of roof

15   would you say is associated with all of the

16   structures on the property less the gatehouse and

17   garage?

18       A     Well, if there's 8700 square feet in the

19   total, I don't know.  I'd have to take a guess

20   that --

21       Q     Yeah.  If you are estimating for me,

22   that's fine.

23       A     I mean, maybe the gatehouse and garage

24   are a couple thousand.  So there's still, you know,

25   65 to 7,000 square feet -- 6500 square feet that are

1    not built out.

2        Q    And not finished.

3             Right?

4        A    Yeah.

5        Q    I thought it was 8400 square feet but I

6    could be wrong.  Is it 8700 or 8400?

7        A    I think that's part of the problem with

8    the additional copper required to finish the job.

9    It -- it may also be a factor of how many square

10   feet of living space compared to how many square

11   feet of copper needed to do the sloped roofs.

12       Q    But I just want to make sure I understand

13   your testimony and your report.  It's my

14   understanding -- strike that.

15            There's nine buildings on the property

16   you've identified.

17            Right?

18       A    Uh-huh.

19       Q    Yes?

20       A    Yes.

21       Q    Do you believe that replacement is needed

22   of the roofs for all nine structures?

23       A    I don't think the shower building

24   requires replacement.

25       Q    Why does your report say it does?

Page 151

```
1        A     I -- I think that if you were doing them

2   all you'd want them all to look alike.

3        Q     Why does your report say it does?

4        A     Because I think you should do it to make

5   them all look alike.

6        Q     Oh, okay.  What else doesn't need

7   replacement?

8        A     I'm -- I'm recommending they all be

9   replaced.

10       Q     But you just told me here that the shower

11  building does not require replacement.  Are you

12  backing away from that?  If you are --

13       A     No.

14       Q     -- that's fine.

15       A     I just said, other than that, everything

16  should be replaced.

17       Q     And is that associated with the fact that

18  you believe it should all look the same or is it

19  associated with defects --

20       A     It has --

21       Q     I have got to finish my question.

22             -- and unworkmanlike qualities on the

23  roof?

24       A     The shower building has the same seaming

25  on the hip ridges as everything else.  It -- it's
```

Page 152

```
 1   still done in the same fashion as everything else.

 2        Q     I don't think --

 3        A     Even though it's a dinky little

 4   ten-by-five foot --

 5        Q     Well, let's just go through it.

 6        A     -- roof.

 7        Q     Let's go through the structures.  Do you

 8   believe full replacement is needed with respect to

 9   the main pavilion?

10        A     Yes.

11        Q     Do you believe replacement is needed with

12   respect to the library?

13        A     Yes.

14        Q     How about the master suite?

15        A     Yes.

16        Q     Full replacement, master suite?

17        A     Yes.

18        Q     Guest house?

19        A     Yes.

20        Q     Gatehouse?

21        A     Yes.

22        Q     Garage?

23        A     Yes.

24        Q     Beach bar?

25        A     Yes.
```

Draft Copy

Page 153

1      Q      Shower?

2      A      I think you could leave the shower.

3      Q      Okay.  Dining gazebo?

4      A      Yes.

5      Q      Why?

6             We haven't talked about the dining

7      gazebo, that's why I asked you.

8      A      It has the same cap condition and the

9      same intersecting ridge conditions as everything

10     else.

11     Q      Have you done any representative projects

12     in the Virgin Islands?

13     A      No.

14     Q      Have you done any representative projects

15     in the Caribbean?

16     A      Representative -- we are currently a

17     consultant to UBS in Nassau and we replaced a

18     Bermuda roof on that facility all the way down to

19     the structure because the existing plywood had

20     termites and as well as some flat roofs.

21     Q      Is that a copper roof?

22     A      No, that's not.

23     Q      Okay.  It appears to me that most of your

24     copper roof experience is in the northeast.

25             Right?

Page 154

```
 1        A      Aside from some work in Oklahoma City and

 2   in Washington, D.C.

 3        Q      Would you agree with me that the weather

 4   conditions down in Saint John, Virgin Islands are

 5   quite different than the copper roofing projects

 6   that you've done in and northeast and Washington,

 7   D.C. and Oklahoma?

 8        A      The temperature differences don't --

 9   there's not a significant difference in the design

10   because of those climate differences.

11        Q      Move to strike as nonresponsive.

12             My question is very simple.  My question

13   is whether you would agree with me that the weather

14   conditions down in the Saint John, U.S. Virgin

15   Islands are different than the representative

16   projects that you've done with copper in the

17   northeast, Oklahoma, and Washington, D.C.?

18        A      The weather conditions in those two

19   different climates are different.

20        Q      Okay.

21             MR. GOLDBERG:  I'm going to mark, as

22             I had before -- I'm out of whatever so

23             I'm going to have to deal with it later

24             whatever the next --

25             COURT REPORTER:  I think 15 is next.
```

Page 155

```
 1                 MR. GOLDBERG:  Can I write on it

 2            later and you'll deal with later in terms

 3            of making it all --

 4                 COURT REPORTER:  Sure.

 5            (THEREUPON, SANDERS EXHIBIT NO. 15,

 6            TIMELINE, WAS MARKED FOR

 7            IDENTIFICATION.)

 8  BY MR. GOLDBERG:

 9       Q    I'm going to mark your timeline as

10  Exhibit 15.

11       A    Okay.

12       Q    Because I didn't mark it before.

13       A    I just want to get a copy of that.

14       Q    I thought this was my copy.

15       A    No.

16       Q    Sorry.

17       A    Handwritten --

18                 MR. FRIEDBERG:  Well, let's go off

19            the record for a second.

20                 MR. GOLDBERG:  Yeah.

21            (THEREUPON, THERE WAS A DISCUSSION

22            OFF THE RECORD.)

23            (THEREUPON, SANDERS EXHIBIT NO. 7,

24            THUMB DRIVE, WAS MARKED FOR

25            IDENTIFICATION.)
```

Page 156

1   BY MR. GOLDBERG:

2       Q       In terms of the engineering report, did

3   you review it?  The engineering report that was done

4   by Mr. Huber before -- excuse me -- by Mr. Friedberg

5   before Huber came on island?

6               Did you review the engineering report

7   that Mr. Friedberg had prepared?

8       A       The engineering report that came up with

9   the spacing of the securement of the roof?

10      Q       Yes, sir.

11      A       I had answered that before that I did --

12  I don't believe I've seen that report.

13      Q       Okay.  Do you know who did it?

14      A       No.

15      Q       And you said you spoke to Chris Bunge

16  while you were in Saint John.  What did you guys

17  discuss?

18      A       I don't -- I don't know that we had a

19  specific discussion.  He was on the roof at times

20  and -- and probably made statements but we didn't

21  have a have a face-to-face certain, you know,

22  discussion.

23      Q       Do you have a recollection of any of your

24  conversations with Chris?

25      A       Not really.  I mean, tom and Sarah were

Page 157

1    there.  I --

2        Q    And that was my next question:  Who was

3    there?  It was Tom, it was Chris, it was Sarah, it

4    was you, it was the gentleman you brought --

5        A    Fran Nelson.

6        Q    Yeah.

7             And anybody else?

8        A    No.

9        Q    Okay.  And I just -- just to make the

10   record clear, if you don't recall it's fine.  But do

11   you recall what you spoke to Chris about?

12       A    I never really had any direct

13   conversations with Chris.  I mean, he may have been

14   on the roof and made comments related to things

15   but I don't have a strong recollection of his

16   comments.

17       Q    Would you agree with this statement:  A

18   substrate on a roof is important?

19       A    Yes.

20       Q    Why?

21       A    Because it's -- if the roof is secured to

22   it, you have to understand it's securement to

23   whatever is below.  You have to -- it -- is it --

24   there are a lot of reasons for what the substrate to

25   be important --

Draft Copy

Page 158

1      Q      You are the expert.   I want you to tell

2   me.

3      A      Well --

4      Q      That's why I'm asking.

5                MR. FRIEDBERG:   That's overbroad.

6   BY MR. GOLDBERG:

7      Q      For the benefit of the jury, please tell

8   us why a substrate is important on a roof in a

9   general sense, please.

10               MR. FRIEDBERG:   It's overbroad as

11               phrased.

12   BY MR. GOLDBERG:

13      Q      You can answer.   It's meant to be a broad

14   question.

15      A      Well, in a --

16      Q      And I want you to enlighten the jury for

17   us.

18      A      In a broad sense, it is important because

19   it's what the roof is secured to.

20      Q      And who did the substrate on this

21   particular roof?

22      A      I -- I don't know.

23      Q      Is that important to you or no?

24               MR. FRIEDBERG:   Incomplete as

25               phrased.  Vague and ambiguous.

Page 159

1                    Important how?

2    BY MR. GOLDBERG:

3         Q     You can answer.

4         A     It would be important to me if the

5    contractor didn't accept the substrate as acceptable

6    to do his work.

7         Q     Would you agree with me that there's many

8    ways to install a copper standing seam roof, many

9    different ways?

10                   MR. FRIEDBERG:  Incomplete as

11                phrased.  Vague and ambiguous.

12                Overbroad.

13        A     I've installed standing seam copper roofs

14   that have been inch and a half height --

15   BY MR. GOLDBERG:

16        Q     You've designed them.

17                Right?

18        A     -- and low slope --

19        Q     I don't mean to cut you off, but you've

20   designed them or you have installed them?

21        A     I've designed --

22        Q     Okay.  Please go on.

23        A     They are inch and a half, standing seam

24   heights because of low slope conditions in areas

25   where there may be weather conditions that dictate a

Page 160

```
1    higher rib height.  I've, you know, installed -- I'm
2    sorry.
3                I've designed standing seam roofs that
4    tie into flat seam roofs.  There are a lot of
5    configurations and combinations of details for
6    standing seam roofs.
7         Q    Okay.  So the answer to my question is:
8    Yes, there are many different ways to install a
9    copper standing seam roof?
10        A    In a general sense, yes.
11        Q    Okay.  And you'd agree with me in
12   similar -- because I had asked you about
13   installation of a copper standing seam roof, you'd
14   also agree with me that the design of a copper
15   standing seam roof can be done in many ways.
16               Right?
17                    MR. FRIEDBERG:  It's incomplete as
18               phrased.  Vague and ambiguous --
19   BY MR. GOLDBERG:
20        Q    You can answer.
21                    MR. FRIEDBERG:  Overbroad.
22   BY MR. GOLDBERG:
23        Q    You can answer.
24                    MR. FRIEDBERG:  Allow me to finish
25               my objection, Counsel, before you keep
```

Page 161

1              interrupting me.

2    BY MR. GOLDBERG:

3         Q     You can answer.

4              MR. SIMPSON:  Your objections are

5              only supposed to be to form.

6              MR. GOLDBERG:  Yeah.  It -- it's too

7              much.

8              MR. SIMPSON:  It's under local

9              rules.

10             MR. GOLDBERG:  It's too much.  It

11             really is, Tom.

12             MR. FRIEDBERG:  Ask better

13             questions.

14             MR. SIMPSON:  No.  You obey the

15             rule.  The rule is you object to form and

16             nothing else.

17             MR. FRIEDBERG:  Don't point your

18             figure at me, Andy.  I'm obeying the

19             rules.

20             Continue.

21             MR. GOLDBERG:  No you are not.

22   BY MR. GOLDBERG:

23        Q     Go ahead.

24        A     Please re-ask --

25        Q     Sure.

Page 162

1        A       -- the question so --

2        Q       You would agree with me that the design

3   of copper standing seam roofs can be done in many

4   different ways?

5        A       In that general sense, yes.

6        Q       Okay.  I want to point your attention to

7   photo 40.  I believe you testified, and correct me

8   where I'm wrong, that you believed the pans were

9   short in this particular photo -- right? -- and

10  that's what's causing the leaks?

11       A       Yes.

12       Q       Is there any other explanation for what

13  could be causing the leaks?

14       A       In -- in my analysis, I've found no other

15  reason for the leaks.

16       Q       Okay.  Thank you.  Now, in terms of the

17  stucco issue and drilling in for the reglets to the

18  stucco, would you agree with me -- strike that.

19               In terms of drilling into the stucco for

20  the reglets, you either testified or it's in your

21  report that that caused cracking of the stucco.

22               Is that correct?

23       A       No.

24       Q       Tell me.  Tell me where I'm wrong,

25  please?

Page 163

1      A      Well, first of all you said drilling into

2   the stucco for the reglet.

3      Q      Cutting into the stucco.

4      A      In --

5      Q      I'm sorry.

6      A      Generally, yeah, you saw cut into the

7   reglet.  And I didn't say that that caused the

8   damage in the stucco.

9      Q      Oh.

10     A      I said that the lack of width to the

11  joint that was created, that the metal flashing went

12  into, caused the flashing expansion and contraction

13  to be transferred into that stucco causing it to

14  crack.

15     Q      Okay.  But if you made a bigger width,

16  wouldn't that cause even further cracking?

17     A      No.

18     Q      Why?

19     A      Because it's divorcing the metal from the

20  upper stucco width of a sealant joint that's

21  appropriate.

22     Q      Now I'd like to turn your attention to

23  photo 41.

24            Would you agree with me that it would be

25  an easy fix just to go ahead and straighten that?

Page 164

1        A      No, I wouldn't agree.

2        Q      Okay.  When you went to Saint John, was

3    that your first time on island?

4        A      Yes.

5        Q      What did you charge Mr. Friedberg to go

6    down on island and do everything that you did up

7    until the point you left your office until the time

8    you came back here to Connecticut?

9               And we'll get into other areas of billing

10   but I'd like to just address that particular

11   portion.

12       A      I can give you invoices, all the invoices

13   that we --

14       Q      That would be great.  And I don't know

15   because I haven't seen your invoices.

16              Are you able to parse it out in the way

17   that I've phrased the question or no?

18       A      I don't think so.

19       Q      Okay.

20       A      I -- I -- you know, it's possible that

21   our accounting system could -- we record things by

22   codes.

23       Q      Okay.

24       A      So that bill -- the site visit probably,

25   my travel time was isolated and so on.

Page 165

1        Q      What did you charge -- what did you

2   charge per hour for that?

3        A      My billable rate for -- for this work is

4   $350 an hour.

5        Q      And --

6        A      We --

7        Q      Sorry?

8        A      Mr. Friedberg asked that we have a

9   reduced billing rate for the actual travel, which

10  was billed at $250 an hour, but everything that's

11  been billed has essentially been billed --

12       Q      How much total to date?

13       A      The total to date is around $38,000.

14       Q      That's how much you've billed in this

15  case?

16       A      Yes.

17       Q      Before the depo today?

18       A      Yes.

19       Q      Have you been paid for all that?

20       A      I would say we have been.  Mr. Friedberg

21  issued a check that he sent me a photocopy of that's

22  the last $2,800 that was due.

23       Q      So other than the $2,800, all the rest of

24  the 38,000 --

25       A      Yes.

Page 166

1      Q      -- has been -- has been deposited in your

2    account?

3      A      Yes.

4      Q      May I?

5      A      This has the statement with the last

6    and -- and, actually, I'll -- and -- and included in

7    that is the check.

8      Q      Okay.

9      A      I'll give you that, the original.  And

10   then that was the -- the last statement -- oh, I'm

11   sorry.  She made --

12     Q      Can you just pass it over?  I just wanted

13   to look through it.

14     A      She made lots of copies of that one so.

15   And then there's three invoices.

16     Q      Thank you.

17            Are these the entirety of invoices that

18   you prepared --

19     A      Yes.

20     Q      -- in this particular case?

21     A      Yes.

22            MR. GOLDBERG:  Let's mark it as 16.

23            I need more stickers.

24            Oh, no.  I don't.  I was just

25            kidding.

Page 167

1                    (THEREUPON, SANDERS EXHIBIT NO. 16,

2                    INVOICES, WAS MARKED FOR

3                    IDENTIFICATION.)

4    BY MR. GOLDBERG:

5        Q    16 would be composite exhibit relative to

6    all of the invoices that have been prepared in this

7    matter.

8             I assume and I'm not going to do all the

9    math right now because I don't have time.

10            These will total $38,000?

11       A    Yeah.  And whatever odd amount in the

12   total, yes.

13       Q    Sorry?

14       A    Yeah.  You'd have to look at the invoice

15   amount for the last --

16       Q    Oh, there, I see.  You had it altogether.

17       A    Yeah.

18       Q    Keep that together if you would.

19            Have you done expert work for

20   Mr. Friedberg in the past?

21       A    No.

22       Q    And have you ever done any expert work --

23   litigation expert work prior to this deposition?

24       A    Yes.

25       Q    Do you have a list of your deposition

Page 168

1    that you've given and testimony given at trial?

2        A    I -- I would say that this, on my résumé,

3    is a summary of that.

4        Q    Yeah.  I saw that, but it doesn't speak

5    to --

6        A    It doesn't speak to what actually went to

7    litigation.

8        Q    Are you able to -- well, strike that.

9            Are you able to look at your

10   representative expert experience and tell me if

11   you've given a deposition or testified at trial?

12       A    Yeah.

13       Q    You want to mark it on there for me?

14       A    Yeah.

15       Q    And then we'll mark that.  That would be

16   easier.

17       A    Okay.  The John Trumbull Primary School.

18       Q    I'm sorry, where is that one?

19       A    The very bottom.

20       Q    Oh, we are on the bottom.  Okay.

21       A    Okay.  Flesher Thompson resolved in --

22       Q    Well, let's go through each one.  If we

23   start at the bottom, let's just do it.

24       A    Okay.

25       Q    Jill M. McGoldrich, did you give a

Page 169

1    deposition in that case?

2        A    Yes.

3        Q    And who -- and what was the style of the

4    case?

5        A    The case was about --

6        Q    No.  I don't want to know about that

7    because --

8                 MR. FRIEDBERG:  He wants to know the

9                 case caption.

10   BY MR. GOLDBERG:

11       Q    I want to have the case caption, the name

12   of the case.

13                MR. FRIEDBERG:  If you know it.

14       A    I probably don't.

15   BY MR. GOLDBERG:

16       Q    Okay.  Where was it venued?

17       A    In Connecticut.

18       Q    What county?

19       A    Fairfield County.

20       Q    Do you have a list, if I'm not -- if you

21   could, and you might have it with you right here, do

22   you have a list of the names of the cases where you

23   provided expert testimony?  That might save us a

24   little time.

25       A    UConn -- University of Connecticut, the

Page 170

1    top one, I provided -- I'm sorry.

2             Expert testimony in court?

3        Q    Well, here's the reason I'm asking:  When

4    I look at your representative expert witness

5    experience, it doesn't tell me a name of the case or

6    where I can find information regarding the case.  It

7    just tells me --

8        A    Right.

9        Q    -- the name of the law firm and --

10       A    And --

11       Q    -- where maybe it was or what you did.

12       A    Right.

13       Q    I need to know --

14       A    And I would say -- and except for the

15   last case, all of these were resolved prior to

16   trial.

17       Q    Okay.

18            MR. SIMPSON:  What about

19            depositions?

20   BY MR. GOLDBERG:

21       Q    Still not my question.

22            I'm just trying to -- what about

23   depositions, did you give depositions in any of

24   those?

25       A    Yes.  The Foxwoods Resort Casino.

Page 171

1      Q      You gave a depo there?

2      A      Yeah.

3      Q      And who were you retained by?

4      A      Retained by Foxwoods.

5      Q      What lawyer?

6      A      I'd have to find that out.  It's --

7      Q      Do you have anywhere, sir, a list of the

8   names of the cases?

9      A      I'm not sure if I do.

10     Q      Okay.

11     A      But I can -- I can probably look these

12  up.

13     Q      Okay.

14            MR. GOLDBERG:  We'll mark as --

15            we'll do a separate Exhibit 16 for

16            your -- for the cases, full case style to

17            the extent you have it, that you've been

18            involved with and Mr. Friedberg will get

19            me that as an additional item once we are

20            done.

21            MR. SIMPSON:  That will be

22            Exhibit 17.

23            MR. GOLDBERG:  17, sorry.

24     A      And I'm sure that these are probably

25  sealed.

Page 172

1    BY MR. GOLDBERG:

2        Q    I doubt it, but that's fine.

3        A    Yeah.

4        Q    Most likely -- depositions, most of the

5    time, are public and they are available to the

6    public.

7        A    Okay.

8        Q    Okay.

9        A    Except for Mashantucket which has its own

10   court.

11       Q    Understood.

12       A    Okay.

13       Q    I mean, of course, there's certain --

14   there are certain extenuating circumstances.

15       A    Okay.

16       Q    But I will need that information.

17       A    Okay.

18       Q    And I assume when a case comes in to you,

19   you run some type of a conflict check -- right? --

20   to make sure that --

21       A    Yes.

22       Q    Okay.  And how do you do that?

23       A    We do it from a list of who's involved in

24   the case.

25       Q    That's what I need.  It's not my view why

Page 173

1    you can't -- you can't identify.

2              If you are able to tell me who's involved

3    in the case, that's the only information that I need

4    to have.

5        A      Okay.

6        Q      Okay.  And if you have the case style and

7    the venue, that would be terrific and the lawyer

8    that retained you.

9              I wanted to refer to photo 10.

10   Underneath it, I don't know if it's referenced to 10

11   or 11, photo 10 or 11, but you say in the second

12   sentence, "The spacing was verified in all roofs."

13             And then in the last sentence, "We did

14   not remove any pans and the fastening of the cleats

15   was not verified."

16             That's just with respect to that

17   particular portion.

18             Right?

19       A      We did not remove any pans completely and

20   we did not verify the fastening of cleats.

21       Q      Okay.  But you --

22       A      That is, the cleat fastened to the -- to

23   the sub wood structure.

24       Q      You added a word in there and you said,

25   "We did not remove any pans completely."

Page 174

1              Your sentence there just says, "We did

2       not remove any pans."

3       A       Yeah, that's true.

4       Q       Is that true?

5       A       Yes.

6       Q       And the next sentence says, "And the

7       fastening of the cleats were not verified."

8               Right?

9       A       Yeah.

10      Q       Okay.  Now, I'd like you to look at page

11      6 of your report, if you would, page 6.

12      A       Uh-huh.

13      Q       Under system observations, second

14      sentence, "We found four cleats in this area that

15      were spaced at 8, 10 and 9."

16      A       Correct.

17      Q       But you said in -- with respect to photo

18      10 --

19      A       The fastening of the cleats, not the

20      cleats themselves.

21      Q       Okay.  Thanks.

22              Was 16-ounce copper used on this job?

23      A       I put a gauge on the copper that I

24      brought back and yes.

25      Q       Okay.  And do you have any belief that

Page 175

1    the cleats that were installed, were those installed

2    as agreed upon in the proposal?

3        A    At the spacing agreed upon in the

4    proposal, yes.

5        Q    Would you agree with me that the pop

6    rivets on the ridge cap and hip caps can be replaced

7    with copper brass dome head rivets by simply

8    drilling out the existing rivets to one sized over

9    and then just installing new copper rivets?

10       A    That would -- would complete the

11   installation as it was installed.  I would agree.

12       Q    Thank you.

13            And that's just a repair -- right? --

14   that's not a replacement?

15       A    Correct.

16       Q    With respect to -- we talked a lot about

17   photo 38 and 39, let's go back, if we could.

18            In lieu of replacing the entire roof,

19   would you agree with me that these areas could be

20   simply repaired?

21       A    I think -- I don't agree.  I think

22   that -- I think that the repair might even make it

23   worse and --

24       Q    Might?

25       A    Yes.

Page 176

1      Q     You are not sure.

2            Right?

3      A     Not conclusive.

4      Q     Wouldn't you agree with me that a repair

5  should be attempted before full replacement to see

6  if it would work and then assess after that?

7      A     Yeah.  I'm not of that opinion, but --

8      Q     But that could be done.

9            Right?

10     A     Yes.

11           MR. FRIEDBERG:  Objection.

12           Speculation.

13  BY MR. GOLDBERG:

14     Q     Thank you.

15           Now, with respect to sealants, do you

16  have any opinions as to industry in the

17  construction -- sorry -- construction industry

18  standards as to how often sealants should be checked

19  or maintained?

20           MR. FRIEDBERG:  Form of the

21           question.

22     A     Sealants used in joints that are designed

23  specifically as sealant joints, we find that -- that

24  the warranty -- that the duration that's usually

25  noted as the life of a sealant joint is probably

1    less than what manufacturers claim.  If -- if

2    there's a 20-year warranty on silicone, we find

3    that -- that some of the silicone fails at 15

4    years.

5    BY MR. GOLDBERG:

6        Q     Was silicone used on this project?

7        A     No.

8        Q     Okay.  So I want to talk to you about the

9    sealant particularly.

10           Do you have any opinions relative to

11   industry standard, construction industry standard as

12   to how often sealant should be checked or

13   maintained?

14       A     I have an opinion related to sealants

15   used in copper roof construction and I don't think

16   they -- they necessarily should be part of this

17   construction.

18       Q     I'm sorry, what shouldn't be part of the

19   construction?

20       A     I -- for example, on photo 36, I don't

21   understand why sealant was used in this detail at

22   all.

23       Q     But that's a personal opinion of yours.

24           Right?

25       A     It's a personal opinion based on a lot of

Page 178

1   years of experience that sealant has no place in

2   this detail and wondering why it's there.

3       Q    Yeah.  But it's appropriate as an

4   industry standard to use it.

5           Right?

6               MR. FRIEDBERG:  Incomplete.  Lacks

7               foundation.

8       A    You know --

9   BY MR. GOLDBERG:

10      Q    Is it appropriate?

11      A    This is a rolled joint and cap joint.  In

12  SMACNA, it doesn't say apply sealant here.

13      Q    My question is very simple.  You can

14  either answer it --

15      A    I -- I -- I don't think it's --

16      Q    You got to let me finish.

17              MR. FRIEDBERG:  He's trying to

18              finish the question that you --

19              MR. GOLDBERG:  No.  He's not

20              answering the --

21              MR. FRIEDBERG:  No, you are cutting

22              him off.

23  BY MR. GOLDBERG:

24      Q    Go ahead and finish.

25      A    Yeah.  We --

Page 179

1           MR. FRIEDBERG:  Just let him finish

2           the answer.

3    BY MR. GOLDBERG:

4       Q    Go ahead and finish.  You are making it a

5    little longer though.

6       A    I don't think it's appropriate.

7       Q    Here's my question:  Is it appropriate

8    under industry standards to use sealant in cooper

9    roof structures?

10          MR. FRIEDBERG:  Incomplete.  Lacks

11          foundation.

12      A    A sealant above counter -- counter

13   flashing?  Yes.

14   BY MR. GOLDBERG:

15      Q    My question is very simple.  Very simple,

16   sir.  I think it calls for a yes or no answer, but

17   you can answer how you want.

18          My question is:  Is it appropriate as an

19   industry standard to use sealant in copper roofs?

20          MR. FRIEDBERG:  Vague and ambiguous.

21      A    In certain instances within copper roof

22   construction, yes.

23   BY MR. GOLDBERG:

24      Q    Okay.  And if it is used, do you know

25   what the industry states in terms of maintenance or

1    checking of that particular sealant?

2                    MR. FRIEDBERG:   Overbroad.   Vague

3              and ambiguous.

4       A      Depends entirely on the installation.

5    BY MR. GOLDBERG:

6       Q      Okay.  Do you know -- do you know whether

7    or not the industry standard associated with that?

8              You either do or you don't.

9       A      I do not offhand, no.

10      Q      Okay.  Why don't you know that, sir?

11      A      Because there are a variety of different

12   installations and there's a variety of different

13   answers that could be given to that question.

14      Q      Okay.  Would you --

15      A      There's not --

16      Q      Sorry.  Sorry.

17      A      -- one industry standard for the length

18   of time to maintain sealant.

19      Q      Would you agree with this, the statement,

20   "Sealant was obviously used on this particular

21   project."

22              Would you agree with me that further

23   maintenance is required in a condition with hostile

24   environment like Saint John as opposed to a

25   different type of weather environment?

Page 181

```
 1                  MR. FRIEDBERG:  Incomplete as

 2           phrased.  Lack of foundation.  Overbroad.

 3           Vague and ambiguous.

 4                  MR. GOLDBERG:  Keep it to form, Tom.

 5           It's enough.

 6                  MR. FRIEDBERG:  The questions are

 7           horrible.

 8                  MR. GOLDBERG:  I don't care.  It's

 9           not for you -- you know what, it's not

10           for you to decide if my questions are

11           right or not.

12                  MR. FRIEDBERG:  Well, you are

13           spending time --

14                  MR. GOLDBERG:  It's not -- it's

15           not -- excuse me.  Excuse me.  It's my

16           deposition.

17                  MR. FRIEDBERG:  No.

18                  MR. GOLDBERG:  I'll make --

19                  MR. FRIEDBERG:  Don't raise your

20           voice at me, Joe.

21                  MR. GOLDBERG:  And don't raise --

22           you don't raise your voice at me.

23                  MR. FRIEDBERG:  I'm not raising my

24           voice.

25                  MR. GOLDBERG:  Yes, you are.  You
```

Page 182

1           certainly are.  I'm paying for his time.

2           I'll ask him the questions I want and the

3           judge will determine whether it's

4           appropriate, not you.

5                MR. FRIEDBERG:  You don't have to

6           lecture me, Joe.

7    BY MR. GOLDBERG:

8        Q    You can answer.  You can answer.  You can

9    answer.

10       A    Sealant joints should always be reviewed

11   for their -- for possible failures due to age.  And

12   in this environment, it's probably accelerated.  I

13   don't see in any of the failures of these sealant

14   joints things related to weather.  I see failures

15   related to joint width and -- and not having a

16   properly designed joint.

17       Q    Okay.  Did you receive any documentation

18   from Mr. Friedberg relative to inspections or

19   checkups done on the sealant at the property between

20   2010 and 2014?

21       A    No.

22       Q    During your water testing, did you

23   observe any cracks or deficiencies in the exterior

24   stucco?

25       A    Yes.

Page 183

1    Q     Did you spray the water directly on the

2    stucco located above the counter flashings?

3    A     Yes.

4    Q     Was water infiltration observed when the

5    water testing -- when water testing the stucco or

6    the stucco corner beads?

7    A     We limited our water spray to try to hit

8    the top joint and stay away from the stucco above.

9    Q     It was hard to do though?

10   A     But there was -- there was water

11   infiltration related to those water tests.

12   Q     Let's look at photo 65.

13         Tell me when you are there, if you would,

14   sir.

15   A     Okay.

16   Q     Would you agree that if water is leaking

17   through the stucco or the stucco components there

18   located by the roof flashing or the counter

19   flashing, that the water would leak behind the roof

20   flashing or counter flashing and appear to be a roof

21   lake?

22              MR. FRIEDBERG:  Objection to the

23         form.  Vague.

24   BY MR. GOLDBERG:

25   Q     You can answer.

Page 184

```
 1       A      Depends on the depth of the counter

 2    flashing.

 3       Q      So it is possible?

 4       A      It's possible.

 5       Q      Thank you.

 6              Did you isolate the stucco areas when

 7    water testing the roof or the counter flashing?

 8       A      We did not.

 9       Q      And you would agree that would have

10    eliminated the potential of water infiltration

11    through the exterior cladding there.

12              Right?

13       A      Yes.

14              Can I explain further?

15       Q      You can explain anything you want, sir.

16    I would never limit your abilities to do so.

17       A      Okay.  The -- in my opinion, the cracking

18    in the stucco was created by the counter flashing,

19    so --

20       Q      I understand.  You've testified to that.

21       A      Yeah.  Okay.  So you know, the fact that

22    water may get into those cracks and -- and bypass

23    the counter flashing is a function of the way the

24    counter flashing was installed.

25       Q      With respect to photo 66, stucco is
```

Page 185

1   cracked there.

2               Right?

3       A     Uh-huh.

4       Q     Yes?

5       A     Yes.

6       Q     An open hole you see there in the stucco?

7       A     Yes.

8       Q     And the stucco corner beading there is

9   open on the side?

10      A     Uh-huh.

11      Q     Yes?

12      A     Yes.

13      Q     Would that allow water to infiltrate the

14  building?

15      A     Not necessarily.

16      Q     But it could.

17            Right?

18      A     Yes.

19      Q     Okay.

20      A     Can I clarify?  There weren't any --

21      Q     You can clarify.

22      A     -- leaks inside the building at -- at

23  that condition.

24      Q     Okay.  Would you agree with me in a

25  general sense that all types of buildings require

Page 186

1    some type of maintenance?

2        A    Yes.

3        Q    And even further maintenance for harsh

4    conditions hostile environments like Saint John?

5        A    Yes.

6            Not any more harsh than -- than when that

7    hurricane hits Connecticut.

8        Q    Move to strike the portion concerning the

9    hurricanes.

10           Would you agree with me that the roof

11   could be repaired, but it might not be to your

12   esthetic preference?

13       A    No.

14       Q    Why not?

15       A    I don't think it has to do with the

16   esthetic preference.  It has to do with the ability

17   to make these defects whole without completely

18   removing panels and spending more time than if you

19   completely replaced the roof.

20       Q    Are you sure that the peak caps weren't

21   removed after Mr. Huber left the island, his team?

22       A    I have no knowledge.

23       Q    Okay.  Would you agree with me that the

24   peak caps would need to be removed to install

25   lightning protection assuming that it was done after

Page 187

1    Mr. Huber and his team left the island?

2                    MR. FRIEDBERG:   Form.

3         A      The -- the only lightning protection

4    is -- you are referring to one lightning protection

5    cable that comes out of the peak of the dining

6    pavilion --

7    BY MR. GOLDBERG:

8         Q      I'm --

9         A      Sorry, the main --

10        Q      I'm referring to your report, sir.

11        A      Yeah.

12        Q      Pictures --

13        A      There's only one location.

14        Q      That's what I'm referring to.

15        A      And I don't -- I don't know when that was

16   done.

17        Q      You are not sure?

18        A      I'm not sure.

19        Q      But you would agree with me that a peak

20   cap at some point in time was either -- was

21   removed?

22        A      I don't know that peak cap was removed.

23        Q      Okay.   Could the --

24        A      I don't know how that was done.

25        Q      Could the lightning protection have been

Page 188

1    installed if the peak cap wasn't removed assuming

2    that the roof was in place before the lightning

3    protection was -- was installed?

4                    MR. FRIEDBERG:  Objection.

5        A    I don't know.  I don't have a clear

6    recollection of that condition and that photo

7    doesn't give me enough detail --

8    BY MR. GOLDBERG:

9        Q    Okay.

10       A    -- to answer that question.

11       Q    Okay.  Would you agree with me that if it

12   had been removed, the damage to that particular

13   portion of the roof could have been after Mr. Huber

14   left the island and not associated with his work?

15                   MR. FRIEDBERG:  Vague.  Form.

16       A    I can't answer that because I don't

17   associate any damage with that.

18             You asked me if -- can you repeat your

19   question?

20             Can you repeat his question?

21                   MR. GOLDBERG:  You can -- you can go

22             ahead or actually, I'm happy to rephrase

23             it.

24   BY MR. GOLDBERG:

25       Q    I'm talking about the cap of the roof

1    peak --

2        A    Yes.

3        Q    -- that you identified in your report.

4             Right?

5        A    Yes.

6        Q    You identified that as a problem area.

7             Right?

8        A    Right.  It's poorly installed.

9        Q    My question is:  Assuming that the peak

10   cap was removed, uninstalled from the roof after

11   Mr. Huber and his team left the island.  Okay.

12   Assume that for me.  We don't know; right?  You

13   don't know, you couldn't testify to that?

14       A    Right.

15       Q    Assume that for me.  Could that be the

16   cause of the damage and associated report that

17   you've identified here?

18                 MR. FRIEDBERG:  Vague and ambiguous.

19             Form.

20       A    I have not associated damage associated

21   with that.  I've associated that it was not

22   installed in a way that's appropriate.

23   BY MR. GOLDBERG:

24       Q    Okay.  So let's rephrase then.

25       A    If it were -- if it were removed after

Page 190

1   Mr. Huber left the island and -- and reinstalled,

2   perhaps set in new sealant, again, it doesn't change

3   my opinion of -- of it performing.

4       Q    Sure.  But it wouldn't -- but you'd

5   agree with me that if that was done and the

6   workmanship that was done on that after it was

7   uninstalled and reinstalled or removed and then --

8   and then placed back would not be Mr. Huber's

9   responsibility?

10                  MR. FRIEDBERG:  Objection to form.

11                  Vague and ambiguous.

12      A    If there were some damage created by it

13  being uninstalled and reinstalled, certainly, it's

14  not the roofing contractor's fault.

15  BY MR. GOLDBERG:

16      Q    Okay.

17      A    But I have no evidence to understand --

18      Q    Right.

19      A    -- to know whether or not there was any

20  damage.

21      Q    We don't know.

22           Right?

23           We don't know?

24      A    Well, I do not associate any damage

25  associated with that location.

Page 191

1       Q    Well, let's look at it then.  Let's look

2    at it.  Let's see what you say about it.

3            What picture do you have it up there?

4       A    42.

5       Q    42?

6       A    Uh-huh.

7       Q    And 43.  Sir, 43?

8       A    Yeah.  No.  43 is the beach bar.

9       Q    43 is the beach bar.

10           Do you have any other pictures of the

11   main pavilion peak cap?

12      A    Let me -- there's one here.  It

13   doesn't -- not particularly different.

14      Q    Okay.  Well, let's go with what you've

15   got then.

16      A    But --

17      Q    Sorry.

18      A    -- you know, let me describe what I'm

19   seeing here.

20      Q    I think you have in your report, but go

21   ahead.

22      A    Okay.  But -- but you've got a cap there.

23      Q    Yes, sir.

24      A    It almost looks to me like the -- the

25   cable for the lightning protection.  It comes out of

Page 192

1    the roof from below.

2         Q    Let me make sure I understand.

3              That -- the lightning protection is the

4    blue hose-type of looking thing?

5         A    Well, it's corroded in some areas.  It's

6    blue in some areas.

7         Q    I understand, sir.

8         A    It's more --

9         Q    But it looks like a rope, if you will?

10        A    Yes.

11        Q    Okay.  That's the lightning protection?

12        A    It's a twisted cable, yeah.

13        Q    Okay.  Go ahead.

14        A    I mean, it looks like to me it comes out

15   near the seam down below the cap.  I don't even know

16   if the cap was uninstalled.

17        Q    Okay.  You are not sure?

18        A    No.

19        Q    Okay.  But it certainly is possible?

20        A    Yeah.

21        Q    Yes?

22        A    Yes.

23              (THEREUPON, THERE WAS A DISCUSSION

24              OFF THE RECORD.)

25

Page 193

1    BY MR. GOLDBERG:

2        Q     Did you look at Mr. Hendrin's (phonetic)

3    deposition transcript?

4        A     Uh-huh.  Yes, I have.

5        Q     And what else have you looked at, sir,

6    that's not identified?

7              I understand your rule 26 disclosure

8    was obviously prepared before Mr. Hendrin's

9    deposition.  But if you'll look at page -- I believe

10   it's 3, yeah, page 3 of your report, besides what's

11   listed there, what else have you reviewed since

12   then, sir?

13       A     Let me see if any of these are in there.

14   This is November -- let me see.

15             Going back to the beginning,

16   December 21st, 2010 and --

17       Q     What's that sir, I'm sorry?

18       A     I believe this is your deposition or --

19       Q     2010?

20       A     This is the complaint.

21       Q     Oh.  Sure.  Sure.

22       A     This is the complaint from Daybreak.

23             Right?

24       Q     Yeah.

25       A     Okay.  And then --

Page 194

1      Q      That you have here listed?

2      A      Yeah.  And --

3      Q      And probably the associated --

4      A      And counterclaim.

5      Q      Okay.  Yeah.  I mean, the associated

6  pleadings.

7      A      Right.  And that and then this is -- this

8  is a deposition of Mr. Hendrin.

9      Q      Okay.  What else, sir?

10     A      And then the most recent one that --

11 the -- this one from January 7.

12     Q      Did you review a preliminary cost of

13 repair report prepared by Paradigm Construction

14 Services out of El Cajon.  C-a-j-o-n, California?

15     A      I believe I did.

16     Q      Okay.

17     A      Yeah.

18     Q      You did?

19     A      Yeah.

20     Q      And what were your -- what was your --

21 tell me what -- what you did in terms of that

22 particular cost of repair?

23     A      We looked at it in relationship to some

24 of the -- the series of secondary things that needed

25 to be done on site in relationship to accomplishing

Page 195

1    the work.

2         Q     Okay.  Would you agree with me that these

3    items listed as repairs should be done before

4    replacement?

5                   MR. FRIEDBERG:  Objection.  Form.

6              Vague.

7         A     I'm not sure what you are specifically

8    referring to.

9    BY MR. GOLDBERG:

10        Q     Yeah.  I mean, I'm talking about -- if

11   you need to parse it out, that's fine.  I'm happy

12   for you to do that.

13             I'm talking about the cost of repair

14   here.  I'm talking about whether or not you believe

15   that these things that are itemized should be

16   repaired before replaced.

17        A     We did not review it in that --

18        Q     I'm asking you now.  I'm asking you now.

19        A     I wouldn't -- I wouldn't give you an

20   answer based on a five-minute review.

21        Q     Oh, okay.  So you need more time on

22   that?

23        A     Yeah.

24        Q     Okay.  So -- so -- I thought it was

25   your -- I thought it was your testimony that the

Page 196

1    whole roof needed replacement though?

2                    MR. FRIEDBERG:  Objection.

3              Argumentative.

4    A      Yeah.  We didn't use this as the basis of

5    what we thought should be done.

6    BY MR. GOLDBERG:

7    Q      I understand.

8    A      So --

9    Q      You were provided with it, I assume you

10   analyzed it.

11             Right?

12   A      Not -- not specifically.  We used it as a

13   background to think about what our recommendation

14   is.

15   Q      And you understand that this particular

16   cost of repair estimates only contemplates repair.

17             Right?

18   A      Yes.

19   Q      Not replacement?

20   A      Right.

21   Q      And do you have any reason to dispute the

22   contents of this particular report?

23                    MR. FRIEDBERG:  Objection.  Form.

24   BY MR. GOLDBERG:

25   Q      You can answer.

Page 197

```
 1        A     It's our own report that we are relying

 2   on.

 3        Q     I'm sorry?

 4        A     It's our own report that we are relying

 5   on.

 6        Q     Yeah.  No, I understand.

 7        A     And our analysis.

 8        Q     Yeah.

 9        A     Not his analysis.

10        Q     I get it.

11              But do you have any reason to dispute

12   the contents of this preliminary cost of repair

13   report?

14        A     Why should I accept it at all?

15        Q     I don't know.  This is -- this is

16   Mr. Friedberg's document, not mine.

17        A     Yeah.  And I'm not sure what the basis he

18   asked for it on and what the expertise of the person

19   that did it was, so --

20        Q     Well, it's not that long of a report.

21   I'd like you to review it for me, if you could, and

22   understanding that you're going to take a few

23   minutes, please do so.

24        A     Well, I -- I wouldn't rely on this at

25   all.  I -- I -- you know, it was prepared probably
```

1    in relationship to some expectation by

2    Mr. Friedberg and -- and, you know, it has -- it

3    doesn't have much to do with what our recommendation

4    was.

5         Q     Okay.

6         A     So --

7         Q     You didn't consider this at all?

8         A     No.

9         Q     Well, let's go through it, if we could.

10            Page 1 of 3, roof repair gatehouse.  It

11   just -- if you'll look at those line items just

12   under 1.1, please.

13        A     Uh-huh.

14        Q     Take a look at them and then I'll ask you

15   some questions.  I wanted you to look at it first so

16   you have an understanding of what's in there.

17        A     Okay.

18        Q     Do you believe that those things could --

19   should be done before fully replacing the gatehouse

20   roof?

21        A     I -- I think you have to remove the

22   stucco and reinstall it.

23        Q     Okay.

24        A     I think you have to re- -- recut the --

25   or reform if you are reinstalling new stucco, reform

Page 199

1    a reglet for the -- for the flashing.

2        Q    Okay.

3        A    I think you have to reinstall the base

4    flashing.

5        Q    Right.  And these are all repairs.

6             Right?

7        A    Yes.

8        Q    And you agree that these things can be

9    done?

10       A    No.

11       Q    You just told me --

12       A    I'm -- I'm agreeing with the stucco, for

13   example, but I'm -- I'm not saying that you can

14   repair the copper.  It's saying -- it's saying

15   remove poorly installed standard seam roofing.

16       Q    Yeah.  For how many square feet?

17       A    Well, it says 573.

18       Q    Right.  And how big is the gatehouse?  Is

19   it more than 573 square feet?

20       A    Offhand, I can't -- I can't tell you

21   that.

22       Q    Okay.  Would you agree that it's more

23   than 573 square feet, the gatehouse?

24       A    I believe so, yeah.

25       Q    Okay.  Would you agree that only 573

Draft Copy

Page 200

```
 1   square feet of the gatehouse --

 2        A     No.

 3        Q     -- needed to be repaired?

 4        A     No.

 5        Q     So you disagree with this report?

 6        A     Yeah.  I -- you know, I think our report

 7   stands on its own and this -- this is background

 8   that was provided to us, but we -- you know, we

 9   didn't put a lot of faith in any of it.

10        Q     Okay.  You understand --

11        A     We relied on our own recommendations.

12        Q     You understand that this is

13   Mr. Friedberg's report?

14        A     Yes.

15        Q     Okay.  You understand it was furnished to

16   me in discovery?

17        A     Okay.

18        Q     Do you understand that?

19        A     Yes.

20        Q     Okay.  And you understand that the total

21   at the bottom when you scroll up to page 3 only

22   account for $219,000?

23        A     Yeah.

24        Q     Yours is about $560,000 more?

25        A     Yes.
```

Draft Copy

Page 201

1    Q    How did you come up with those numbers

2    considering you haven't done any work in Saint John

3    before?

4    A    Some of it -- some of it was based on

5    talking to a roofing contractor here and coming up

6    with costs of roofing installations, average costs

7    around here and coming up with mobilization and

8    other costs for doing work in -- in Saint John.

9    Q    And what's your understanding as to what

10    those costs are?

11    A    There are a lot of costs on the side that

12    are required to do work in Saint John.  To get

13    materials to the island, to transport it from

14    Virgin Island, from Saint Thomas over to Saint

15    John.

16    Q    Did you verify your numbers with any

17    architect on island?

18    A    No.

19    Q    Did you verify any of your numbers with

20    anybody in the industry that's located on the

21    island?

22    A    No.

23    Q    And then when I talk about "the island,"

24    I'm talking about Saint John, Saint Thomas or Saint

25    Croix.

1        Have you done that at all?

2    A    No.

3    Q    Would you agree with me that it's

4  possible to get contractors for cheaper?

5              MR. FRIEDBERG:  Form.

6    A    I would agree that you can always get

7  contractors for cheaper.

8  BY MR. GOLDBERG:

9    Q    Did you do any analysis as to who would

10 be available or who otherwise would submit a bid for

11 the project that's assuming that a replacement would

12 be done?

13   A    No.  I do understand it's very difficult

14 to get contractors in general to work on the

15 island.

16   Q    Have you ever tried it yourself?

17   A    No.

18   Q    Referring back to exhibit -- exhibit with

19 the timeline.

20              MR. SIMPSON:  They took it out for

21              copying, I think.

22              THE WITNESS:  Oh, okay.

23              MR. GOLDBERG:  Oh, that's okay.

24         That's okay.  Sit down.  Sit down,

25         because I got to run soon.

Page 203

1                    THE WITNESS:  Yeah.

2    BY MR. GOLDBERG:

3        Q     How much time elapsed between the date

4    that Mr. Huber and his team left the island and the

5    date of your inspection?

6        A     Well, I believe, approximately, four

7    years and two months.

8        Q     Okay.  How much time elapsed between the

9    date Mr. Huber and his team left the island and the

10   first date that a complaint was made relative to the

11   roof?

12       A     I've said previously, I don't know when

13   complaints --

14       Q     Okay.

15       A     -- were made.

16       Q     Would you agree with me that there could

17   be other explanations as to why you believe

18   replacement of the roof is necessary?

19                    MR. FRIEDBERG:  Objection to the

20            form of the question.  It's been asked

21            and answered.

22       A     I don't know what that means.

23   BY MR. GOLDBERG:

24       Q     Besides -- besides workmanship by my

25   client, would you agree there could be other

Page 204

1    explanations as to why the roof needs to be repaired

2    and/or replaced?

3                    MR. FRIEDBERG:  Objection to the

4            form.

5        A    My opinion is that the roof needs to be

6    replaced because there are deficiencies in the roof

7    and the best way to address those is to replace the

8    entire roof.

9    BY MR. GOLDBERG:

10       Q    Were the deficiencies in -- taking your

11   statement, were the deficiencies in the roof caused

12   by Huber & Associates?

13       A    Yes.

14       Q    Okay.  Are there other possible

15   explanations for why those deficiencies were

16   present?

17                   MR. FRIEDBERG:  Objection to form.

18       A    There are not other possibilities in my

19   opinion are.

20   BY MR. GOLDBERG:

21       Q    Relative to the whole roof or every

22   single thing you've testified to?

23                   MR. FRIEDBERG:  Objection to the

24           form.

25       A    Relative to the whole roof.

Page 205

1    BY MR. GOLDBERG:

2        Q       Okay.  Would you agree with me that

3    weather conditions can affect a roof?

4                    MR. FRIEDBERG:  Objection.  Form.

5        A       Weather conditions can affect roofs.

6    BY MR. GOLDBERG:

7        Q       Would you agree with me that human

8    physical force could affect a roof?

9                    MR. FRIEDBERG:  Objection.  Form.

10       A       I would agree, but I don't see anything

11   here that has caused that.

12   BY MR. GOLDBERG:

13       Q       So there are possible -- other possible

14   explanations.

15               Right?

16                    MR. FRIEDBERG:  Objection.  Form.

17       A       I've written a report with my

18   professional opinion.  I haven't seen other forces

19   in play here.

20   BY MR. GOLDBERG:

21       Q       Well, there's certain areas where you

22   have, I believe --

23                    MR. FRIEDBERG:  You don't have to

24               answer that.

25

Page 206

1  BY MR. GOLDBERG:

2      Q     -- with respect to the lightning

3  protection for example.

4            Right?

5                 MR. FRIEDBERG:  Objection.

6            Argumentative.

7  BY MR. GOLDBERG:

8      Q     Right?

9      A     If there's one small issue on --

10     Q     If there's one, there could be others.

11           Right?

12                MR. FRIEDBERG:  Form.

13           Argumentative.

14 BY MR. GOLDBERG:

15     Q     What code provisions do you believe allow

16 you to suggest -- or strike that.

17           What code provisions are present that

18 would -- that would state that full replacement of

19 the roof is necessary?

20                MR. FRIEDBERG:  Objection.  Form.

21     A     I don't think it's -- it's applicable to

22 ask what code provisions require full replacement of

23 a roof.

24 BY MR. GOLDBERG:

25     Q     Okay.  And you've already testified you

Page 207

1    don't believe spot repairs can be done.

2           Right?

3      A    I don't believe that it would produce a

4    roof that is the intent of the owner's original

5    request.

6      Q    I'm sorry?

7      A    I said --

8      Q    Sorry?

9      A    -- I don't think that the repairs would

10   produce the end product that the -- originally, the

11   owner contracted for.

12     Q    In the proposal by Mr. Huber; is that

13   what you are referring to?

14     A    Yeah.  I'm talking about, you know, a

15   copper roof design of lasting integrity.

16     Q    You are talking about the proposal by

17   Mr. Huber.

18          Right?

19     A    I'm talking about his proposal to do this

20   roof, yes.

21     Q    Okay.

22          THE WITNESS:  I need to take a short

23          break.

24          MR. GOLDBERG:  Go.  Go quick.  Yeah,

25          that's fine.

Page 208

1                    (THEREUPON, THERE WAS A RECESS TAKEN

2                    FROM 2:24 p.m. TO 2:28 p.m.)

3                       MR. GOLDBERG:  With respect to the

4                    journals, Exhibit 1 is one single

5                    journal, copper roofing journal article,

6                    but Exhibit 2 consists of seven different

7                    journals.

8                       So I just want to make sure we get

9                    them all either in some type of a scanned

10                    format or if Mr. Sanders is able to

11                    furnish them electronically, I'm happy to

12                    take them that way, too, but there are

13                    seven publication here, so I just want to

14                    make sure we get all of that.  And I've

15                    clipped it together.

16       A     Yeah.

17    BY MR. GOLDBERG:

18       Q     Did you need to say something about that?

19       A     Yeah.  No.

20       Q     Okay.

21       A     I'll try to see if -- I'm not sure

22    when -- what we have in PDF form and --

23       Q     Okay.  Let me see that Exhibit 15 really

24    quick.

25                    And before I do, do you recall authoring

1    an article, "The best way to stop a leak prevented

2    in November of 2008"?

3        A    Yes.

4        Q    Okay.  Previous -- what does that say --

5    deal?

6        A    I'm sorry.

7                MR. SIMPSON:  You are referring to

8            Exhibit 15?

9                MR. GOLDBERG:  I'm sorry.  Yeah,

10           Exhibit 15.

11               MR. SIMPSON:  I beg your pardon.

12       A    The beginning said "previous deal copper

13   employer."

14   BY MR. GOLDBERG:

15       Q    What does that mean?

16       A    Well, mr. Friedberg told me that he

17   started -- he initiated a contract to have someone

18   produce the roof and actually purchased copper

19   and -- and then it didn't go ahead --

20       Q    Oh, okay.

21       A    -- because somebody in the guy's firm

22   sold copper or something, so he had purchased

23   material, it was in a warehouse and that was what

24   became part of this work, I understand.

25       Q    Do you think that Mr. Huber's proposal

Page 210

1    was -- the cost was lower than you would have

2    anticipated for a job like that?

3        A    It seemed really low to me.

4        Q    How much of your $750,000 -- I'll just

5    call it 750.  I know it's between 750 and 8-.

6             How much of your $750,000 cost of

7    replacement proposal accounts for the removal of the

8    roof?

9        A    I -- I'd have to look back in my records.

10       Q    Please do.

11       A    I think probably in the neighborhood of

12   45- to $50,000.

13       Q    So the rest of the $725,000 is for the

14   installation of a new roof?

15       A    Access to the roof, dumpsters, yeah.

16       Q    So 50 grand for removal?

17       A    Yeah.

18       Q    And over 700 for installation?

19       A    Yeah.

20       Q    Okay.  And so -- so taking that

21   particular -- taking that as I guess taking it at

22   face value, how much was Mr. Huber's proposal?

23       A    How much was his original proposal?

24       Q    Yes, sir.

25       A    If you add back in the cost of copper, in

Page 211

1    the neighborhood of 220,000.

2         Q    Okay.

3         A    I'm just kind of remembering.

4         Q    So would it be your testimony that

5    Mr. Huber undervalued his proposal --

6         A    That --

7         Q    Hold on.  Hold on.

8              -- by $500,000?

9         A    No.

10        Q    Tell me.

11        A    Because our estimate includes the

12   scaffolding which the owner paid for --

13        Q    And that --

14        A    -- the first time.

15        Q    How much was the scaffolding -- let's go

16   through it.

17             How much is the scaffolding?

18        A    I --

19        Q    Please.  Please go ahead and refer to it.

20   That's why we are here.

21        A    Yeah.  These are -- I mean, these are

22   just rough because you have the roof broken down by

23   building.

24        Q    If you need a calculator, please go get

25   one.

Page 212

1      A      I can use my phone.

2      Q      Okay.

3      A      Probably in the neighborhood of 10- to

4   $12,000.

5      Q      Okay.  Let's call it 12.  Let's use your

6   high end.

7             What else?

8      A      Insulation and substrate repairs.  I

9   mean -- well, let's -- let's just jump to, you know,

10  installing standing seam copper, which we've figured

11  at $90 a square foot.

12     Q      No.  No.  Here's -- here's the question

13  that I have.

14     A      Well, I -- I'm going to get to the

15  reverse.

16     Q      Go ahead.

17     A      I --

18     Q      Okay.  That's fine.

19     A      I'm -- I'm going to give you the copper

20  reinstall number.

21     Q      Please.  Got it.  Got it.  Got it.

22     A      I'd say in the neighborhood of $600,000.

23     Q      So taking that number, is it your

24  testimony that Mr. Huber undervalued his report by

25  approximately -- what would that be, $360,000?

1                    MR. FRIEDBERG:  Form.

2       A     The difference between the original

3    proposal and what we have as a cost per square foot

4    four years later.  I -- you know, it could be that

5    our number is conservative.  It could be that, you

6    know, it's a number that's four years later.

7    BY MR. GOLDBERG:

8       Q     How much did you take into account for

9    the time difference of four years later?

10      A     No.  We -- we didn't look at it that way.

11      Q     Okay.

12      A     We looked at it as -- as what we think

13   the cost of installing the copper is.

14      Q     In today, in today's dollars, I guess?

15      A     Yeah.

16      Q     Right?

17      A     Yeah.

18      Q     And Mr. Huber was quoting under 2010

19   standards?

20      A     It certainly is four years later, five

21   years later, so --

22      Q     Do you believe that anything should be

23   accounted for the four-year time difference?

24      A     Well, obviously, the cost of copper

25   fluctuates and you can't tell, so --

Page 214

1    Q    How much was Mr. Huber charging for

2    copper?

3    A    I -- you know, price per pound, it was in

4    the documentation I reviewed.  I don't have it on

5    the top of my --

6    Q    Did he charge for copper?

7    A    He -- there was a certain amount of

8    copper that he -- that he provided to the job and a

9    certain amount of copper that was provided by the

10   owner.

11   Q    Right.  And the portion that he provided

12   was -- was -- is a part of this lawsuit, is it not?

13                MR. FRIEDBERG:  Objection.  Form.

14   BY MR. GOLDBERG:

15   Q    If you know.

16   A    Yeah, I don't know.

17   Q    You don't know?

18   A    I don't know.

19   Q    Did you do any analysis relative to the

20   initial complaint in this matter where Mr. Huber

21   sued Mr. Friedberg, his company sued Mr.

22   Friedberg --

23   A    I --

24   Q    -- for nonpayment of around $30,000 in

25   copper?

Draft Copy

Page 215

1     A     Yes, I did.

2     Q     Okay.  Was it your understanding that the

3  rest of the copper was already furnished for the

4  job?

5     A     Yes.

6     Q     Okay.  Did you do any -- did you

7  undertake any investigation as to the cost of the

8  copper that was provided by Mr. Friedberg to

9  Mr. Huber?

10    A     No.

11    Q     Okay.  So --

12    A     Can I --

13    Q     Yeah, you can, but let me just -- let me

14  just -- while I'm on this one issue, so I don't lose

15  my train of thought.

16          So would you agree with me that

17  Mr. Huber's proposal is approximately $380,000 less

18  than the proposal that you have indicated -- have

19  should be used on this particular replacement

20  project?

21                MR. FRIEDBERG:  Objection.  Form.

22                Incomplete.

23    A     One factor that I don't think has been

24  taken into account is that Mr. Friedberg paid for

25  all the transportation to get the material to the

Page 216

1   island --

2   BY MR. GOLDBERG:

3       Q       Okay.

4       A       -- which is a significant cost.

5       Q       Let's look at that.  How much did you

6   account for that?

7       A       Well, that's included in the --

8       Q       Well, tell me.  I'm here now.

9       A       That's included in the number.

10      Q       That's included in what number, sir?

11      A       In the numbers that I gave you.

12      Q       I understand.

13              And how much is associated with that?

14      A       I -- we didn't specifically detail that.

15      Q       You didn't?

16      A       I don't believe so.

17      Q       You didn't parse that out?

18      A       No, we didn't.

19      Q       Are you able to do so here?

20      A       No.

21      Q       Don't you think that's important?

22      A       Well, I could ask Mr. Friedberg to go

23  back and find his records of what it cost for the

24  shipping for the -- for the costs in getting things

25  from Saint Thomas to Saint John and hiring the

Page 217

1    trucking to get it up the hill and the forklift

2    and everything else to get it into containers on

3    site.

4         Q     Did you prepare a line item report with

5    that information or no?

6         A     With that?

7         Q     Yes.

8         A     Parsed out?  No.

9         Q     Do you have any notes relative to how you

10   came up with the numbers?

11        A     We -- we used, in consultation with a

12   roofing contractor here in Connecticut, we came up

13   with a cost per square foot that we felt took all of

14   that into account.

15        Q     Who is that roofing contractor?

16        A     FJ Dahill.

17        Q     FJ --

18        A     -- Dahill.

19        Q     D-a-l-e?

20        A     D-a-h-i-l-l.

21        Q     Yes?

22        A     Yes, Dahill.

23        Q     And is that Franny or Fran?

24        A     That's who Fran does work for, yes.

25        Q     Okay.  That's the gentleman who came on

Page 218

1    island with you?

2        A    Yes.

3        Q    Okay.  Do you know whether or not any

4    conversations were had with this particular

5    contractor as to whether the replacement roof could

6    be done by them?

7        A    No, there's not --

8        Q    No, you don't know or you --

9        A    No, there's not a thought of them doing a

10   replacement roof.

11       Q    How do you know?  Do you know if

12   Mr. Friedberg has spoken to Fran?

13       A    Well, Fran is -- Fran is a worker.  He

14   hasn't had any conversations --

15       Q    Okay.

16       A    -- relative to them doing replacement of

17   the roof.

18       Q    So my initial question was:  Do you have

19   any notes associated with how you came up with your

20   numbers?

21       A    Just the take off sheets.

22       Q    Well, let me see what you were looking

23   at.

24       A    Okay.  This is our probable construction

25   cost.

Page 219

1      Q     Oh, I don't know that I've seen this.

2            MR. GOLDBERG:  Let's mark this,

3            please.

4                  What are we on?

5                  Let's go off the record for a

6            second.

7                  (THEREUPON, THERE WAS A DISCUSSION

8                  OFF THE RECORD.)

9                  (THEREUPON, SANDERS EXHIBIT NO. 18,

10                 OPINION OF PROBABLE CONSTRUCTION

11                 COSTS, WAS MARKED FOR

12                 IDENTIFICATION.)

13   BY MR. GOLDBERG:

14      Q     I'm going to mark as 18 the opinion of

15   probable construction costs.  I just want to get a

16   range.

17            I mean, how much are you saying that

18   Mr. Huber valued his report by -- his proposal by?

19   Sorry.

20            MR. FRIEDBERG:  Objection.  Form.

21      A     I don't have an exact number, but I think

22   the cost of work today is -- is significantly

23   different including all of the -- the housing,

24   everything else that -- that Mr. Friedberg paid to

25   get the work done.

Page 220

1   BY MR. GOLDBERG:

2       Q    Okay.

3       A    I think that his proposal doesn't relate

4   to the actual cost of work and -- and whether it's

5   more is more of opinion of our -- opinion of how

6   much it cost to do the work.

7       Q    Sure.  And I guess since you are making

8   those opinions, I just want to ask you about them.

9            How much of a percentage would you

10  account for that?

11               MR. FRIEDBERG:  Objection.  Form.

12  BY MR. GOLDBERG:

13      Q    I mean, you are making the opinion, so I

14  got to ask you about it.  You are saying --

15      A    I didn't formulate it that way, so I

16  can't give you an answer in that form.

17      Q    Well, if you are accounting for cost of

18  living issues and -- and that things are different

19  under today's standards as opposed to 2010 and that

20  work is different and so on and so forth and workers

21  might cost more money and shipping might be more, I

22  just want to know round about percentage wise how

23  much more you believe that is today?

24               MR. FRIEDBERG:  Objection.  Form.

25

Page 221

1  BY MR. GOLDBERG:

2       Q     If you can answer.

3       A     I can't answer.  And some -- and some of

4  it is how much does it cost to house a crew to be

5  down there.

6       Q     Okay.  So -- okay.

7       A     And you know --

8       Q     Housing of a crew.

9             Are you able to tell me at all how much

10 Mr. Huber undervalued his report by?

11                 MR. FRIEDBERG:  Objection.  Form.

12 BY MR. GOLDBERG:

13      Q     His proposal.  Sorry, I said report.

14                 MR. FRIEDBERG:  Form.

15      A     I don't see it as undervaluing as much

16 as -- as what wasn't included that -- that is the

17 cost of the work.

18 BY MR. GOLDBERG:

19      Q     What wasn't included?

20      A     The transportation of the material to the

21 site, all the logistics, the scaffolding, the

22 housing, the crew, feeding, you know, meals.

23      Q     Anything else?

24      A     Well, you know, at this point, it would

25 have to be overseen so there's probably, you know,

Page 222

1    some construction management.

2         Q    Does that account for roughly $400,000?

3         A    I think it could.

4         Q    Okay.  Now, referring back to Exhibit 15,

5    where your little timeline, if you will, you have at

6    the bottom July 9, 2010, and I believe the words

7    "punch list."

8              Is that right?

9         A    Yeah.

10        Q    What is that associated with?

11        A    I think that's associated with when

12   Mr. Friedberg's wife showed up at site and everybody

13   was gone.  I'm not sure a punch list was done,

14   but --

15        Q    You did put punch list, though.

16             Right?

17        A    Yeah, I did.

18        Q    You came up with that name somehow,

19   didn't you?

20        A    Yeah.

21        Q    Okay.  It didn't come from thin air?

22        A    Yeah.  I think it came from our

23   conversation, true.

24        Q    Would you agree with me that determining

25   a leaks probable cause is the most challenging part

Page 223

1   of the remediation process?

2                   MR. FRIEDBERG:  Well --

3        A    A leaks probable cause?

4   BY MR. GOLDBERG:

5        Q    I'm happy to rephrase it.

6                   MR. FRIEDBERG:  Form.

7   BY MR. GOLDBERG:

8        Q    Do you agree with me that identifying

9   signs of water intrusion determining the leaks

10  probable cause are the most challenging parts of the

11  remediation process --

12                  MR. FRIEDBERG:  Form.

13  BY MR. GOLDBERG:

14       Q    -- of a repair?

15       A    I don't agree.  I think that that's

16  certainly part of it, but form of -- in general,

17  observations of construction defects are not

18  necessarily linked to obvious infiltration, you

19  know.

20       Q    So no?

21       A    No.

22       Q    Okay.  No, you don't agree with that?

23       A    I said no.

24       Q    Okay.  Would you agree with me that

25  making prompt repairs to areas of a roof would serve

Page 224

1    to benefit the roof itself from potential

2    replacement?

3                    MR. FRIEDBERG:  Objection.  Form.

4        A     In this case, it doesn't necessarily have

5    anything to do with the material itself and more

6    degradation because of, you know, addressing some

7    problems.

8    BY MR. GOLDBERG:

9        Q     So you don't believe if some of these

10   issues that you noted in your report were found

11   earlier, that steps could have been taken to

12   mitigate?

13                    MR. FRIEDBERG:  Form.

14       A     I don't agree.

15   BY MR. GOLDBERG:

16       Q     Why?

17       A     Because I'm -- I'm not so sure that the

18   things that are wrong -- it's hard to tell what

19   hidden damage there is there because of not

20   addressing the open areas that exist.

21       Q     You are not able to testify regarding

22   that.

23             Right?

24                    MR. FRIEDBERG:  Well, misstates the

25             testimony.

Page 225

1       A     I'm able to testify to the things that

2    are in the gatehouse certainly and the things in the

3    garage --

4    BY MR. GOLDBERG:

5       Q     That's it?

6       A     -- that actually caused damage.

7             In this case, you know, there are

8    unfinished interior surfaces that may not even have

9    telltales of where they are in the rest of the

10   buildings on site.

11      Q     Okay.  And just -- if you are only able

12   to assess, you said that the garage and gatehouse?

13                 MR. FRIEDBERG:  Misstates the

14             testimony.

15   BY MR. GOLDBERG:

16      Q     Is that right?

17                 MR. FRIEDBERG:  Misstates the

18             testimony.

19   BY MR. GOLDBERG:

20      Q     Is that right?

21      A     Yes.

22      Q     Thank you.

23            And so just to be clear -- strike that.

24                 (THEREUPON, THERE WAS A DISCUSSION

25             OFF THE RECORD.)

1    BY MR. GOLDBERG:

2         Q    May I see the rest of your file, sir, and

3    look through it.

4         A    You don't need the deposition.

5         Q    Yeah.  I don't need any of the court file

6    or depos or anything, just your notes.

7         A    I had prepared a copy of the report for

8    you, but --

9         Q    Thank you.  I appreciate that.  I do have

10   multiple versions --

11        A    Okay.

12        Q    -- but I appreciate it.

13             Are there any of your -- are there any

14   details in your report that you need to correct or

15   that you misstated --

16        A    Not to my knowledge.

17        Q    -- besides the issue of the single lot

18   which I believe you already testified to?

19        A    Not -- not to my knowledge.

20        Q    Okay.

21        A    This was just the handwritten report.

22        Q    That's fine.  I don't need that.

23        A    Okay.

24        Q    I've got that.

25             All right.  Or let me see what that is.

Page 227

1               Do you -- sorry.

2      A      I don't know if you want a copy of --

3      Q      No.

4      A      -- our signed proposal.

5      Q      Let me see that.

6               This is the proposal with Mr. Friedberg?

7      A      Yes.

8      Q      Yeah.  This, I will mark.

9      A      Oh, I did that in color.  That's why.

10     Q      What is that, sir, I'm sorry?

11     A      No.  I wondered why.  I made a copy of

12     all these field notes and other things that were in

13     my file.

14               (THEREUPON, THERE WAS A DISCUSSION

15               OFF THE RECORD.)

16     BY MR. GOLDBERG:

17     Q      As part of your -- let me go ahead and

18     mark this.

19               MR. GOLDBERG:  What am I up to?

20               MR. SIMPSON:  19.

21               COURT REPORTER:  19.

22     BY MR. GOLDBERG:

23     Q      I'm going to mark the proposal from you

24     to Mr. Friedberg as composite exhibit.  It's going

25     to be -- looks like eight pages and the last two

1    pages appear to be invoices.

2        A    No.  That's probably copies of the other

3    one.

4        Q    That's fine.

5            Is this part of the proposal?

6        A    That's the -- the schedule of fees.

7        Q    That's the last page.

8            Right?

9        A    Yeah.

10       Q    This actually we'll include --

11       A    It's just -- you've got those copies.

12       Q    That's right, I did.

13       A    Yeah.

14       Q    Okay.

15           (THEREUPON, SANDERS EXHIBIT NO. 19,

16            PROPOSAL TO MR. FRIEDBERG, WAS MARKED

17            FOR IDENTIFICATION.)

18   BY MR. GOLDBERG:

19       Q    I'm looking at page 3, scope of services.

20   The last bullet point states, "Document

21   investigation findings as directed by

22   Mr. Friedberg."

23           Can you tell me what that means and what

24   he did?

25       A    It's probably very common when we enter

Page 229

1    an investigation that may lead to litigation, that

2    whether or not we are to write a report or not write

3    a report, we leave to the owner and that's all that

4    meant.

5         Q      Where did you stay when you were on

6    island?

7         A      I stayed at the -- let me see --

8    Mr. Friedberg provided -- paid for the room at the

9    Westin Saint John.

10        Q      May I see that.

11        A      Oh, this is -- this is my travel

12   documents.

13        Q      That's okay.  I'd like to see that.

14        A      Yeah.

15        Q      That's part of your file.

16               Right?

17        A      No.  It's really part of my personal

18   file.

19        Q      It's part of your personal file, sir?

20        A      Well, it's part of -- this is the

21   receipts for my airline and stuff like that that

22   went to my expenses.

23        Q      That's not part of this file?

24        A      Well, it's not normally part of the file

25   that we tuck away.

Page 230

1       Q      I believe we asked for it.

2       A      Okay.  I mean, you can have it.  It's my

3   research on the ferry and notes on how to get there

4   and --

5       Q      Trust me, I've done the same research.

6       A      -- baggage claim.

7              (THEREUPON, THERE WAS A DISCUSSION

8              OFF THE RECORD.)

9              (THEREUPON, SANDERS EXHIBIT NO. 20,

10             RESEARCH DOCUMENTS, WAS MARKED FOR

11             IDENTIFICATION.)

12  BY MR. GOLDBERG:

13      Q      What else do we have there?

14      A      No.  That's it.

15      Q      Just give it all.

16      A      That's it.

17             MR. SIMPSON:  He had already given

18             us that.  He just didn't realize it.

19  BY MR. GOLDBERG:

20      Q      And these have your markings on it, sir?

21      A      Yeah.

22      Q      Why do you have the Copper Development

23  Association staff here?

24      A      Because I -- I called and talked about

25  the --

Page 231

1              MR. GOLDBERG:  20?

2              MR. SIMPSON:  Yeah.

3      A     -- the span issues on the continuous --

4  BY MR. GOLDBERG:

5      Q     Who did you speak to?

6      A     Actually, initially -- do you have that?

7      Q     Yeah.  I found the page.

8              MR. SIMPSON:  Last page.

9              MR. GOLDBERG:  I can give it to you.

10             MR. SIMPSON:  Oh, is it here?

11     A     Well, actually, we eventually wound up

12  talking to the regional manager, but my initial call

13  was to one of the other people on the list, but

14  the -- the guy's whose address is there.

15  BY MR. GOLDBERG:

16     Q     Would you agree with me that over 30-inch

17  panel length are acceptable under SMACNA?

18             MR. FRIEDBERG:  Form.

19     A     I wouldn't agree in this case -- SMACNA

20  says you can.

21  BY MR. GOLDBERG:

22     Q     That was my question, but you can

23  answer.

24     A     Copper Development says that you should

25  allow for expansion with expansion cleats -- I'm

1   sorry, not Copper Development.  I mean --

2                  MR. SIMPSON:  Copper and Common

3          Sense.

4      A     Yeah, Copper and Common Sense.

5   BY MR. GOLDBERG:

6      Q     Yeah.

7      A     So I initially talked to -- I eventually

8   talked to Greg Thompson, but I initially talked to

9   Gene Shapiro.

10     Q     My question is very simple.  My question

11  is whether SMACNA allows for panel lengths over

12  30 inches.

13     A     In --

14                 MR. FRIEDBERG:  Objection.  Form.

15     A     -- 30 feet.

16  BY MR. GOLDBERG:

17     Q     30 feet.  Sorry.  Thank you.

18     A     The -- the raw wording says yes.

19     Q     Okay.

20     A     They don't talk about having provisions

21  for expansion and Copper and Common Sense does.

22     Q     Okay.  But SMACNA is -- is acceptable.

23          Right?

24                 MR. FRIEDBERG:  Objection.  Form.

25     A     It really doesn't apply to this roof with

Page 233

1    this change in -- in slope.

2    BY MR. GOLDBERG:

3        Q    Okay.  But that's not what SMACNA says,

4    is it?

5                MR. FRIEDBERG:  Objection.  Form.

6        A    It -- it's a very general statement.

7    BY MR. GOLDBERG:

8        Q    I understand.  I never said it wasn't,

9    but that's not what SMACNA requires, is it?

10       A    Yeah.  And Mr. Hendrin's report

11   photocopies that section and says, you know, it can

12   be over 30 feet.

13       Q    Okay.  And let me ask you:  How many

14   panels exceeded the 30 feet?

15       A    Probably, the middle five on every -- on

16   the roof in every wedge of the main pavilion.

17       Q    Five panels?

18       A    Five times eight.

19       Q    So you have 40 panels?

20       A    Yes.

21       Q    And how many panels were used on the

22   job?

23       A    I'd have to calculate that.

24       Q    About 500 or more?

25       A    Yeah.

1       Q     Yes?

2       A     Yes.

3       Q     Would you agree with me that the weather

4   in the USVI does not have as severe contraction or

5   expansion as other parts of the -- as other parts of

6   the country where winter temperatures can reach

7   obviously lower degrees?

8                   MR. FRIEDBERG:  Form.

9       A     I -- I agree with Mr. Hendrin's analysis

10  to use 100-degree temperature swing for this

11  condition and not something that might be another

12  60-degrees down to minus temperatures.

13  BY MR. GOLDBERG:

14      Q     So do you agree that the weather down in

15  USVI does not have the severe contraction or

16  expansion as other parts of the country?

17                  MR. FRIEDBERG:  Form.

18      A     I agree with that.  I still think it's a

19  problem with the amount of expansion in that roof.

20  BY MR. GOLDBERG:

21      Q     Does SMACNA require a 20-ounce copper

22  edge and valley?

23                  MR. FRIEDBERG:  Objection.  Form.

24                  MR. GOLDBERG:  I don't know what the

25              objection is for.

Page 235

1              MR. FRIEDBERG:  Counsel, I'll be

2         more than glad to give you a speaking

3         objection.

4              MR. GOLDBERG:  Yeah, I'll take it on

5         this one.  I just want to know how that

6         is an improper question.

7              MR. FRIEDBERG:  Well, it's

8         incomplete as phrased.  Lacks foundation.

9         It's vague and ambiguous the way you've

10        asked it.

11   BY MR. GOLDBERG:

12      Q    Sir, you are familiar with SMACNA.

13           Right?

14      A    Yes.

15      Q    I think we have established that

16   foundation.  My question is very simple.

17           20-ounce copper edges and valleys, does

18   SMACNA require that?

19      A    No.

20              MR. FRIEDBERG:  It depends on the

21        circumstances.

22              MR. GOLDBERG:  Excuse me.

23              MR. FRIEDBERG:  Well, you've asked

24        me for a speaking objection.

25              MR. GOLDBERG:  And you've given it

Page 236

1              and it's done.

2                   Thank you.

3      A      But I haven't objected to -- to

4      everything being made out 16-ounce copper.

5      BY MR. GOLDBERG:

6      Q      I understand.  I'm just asking the

7      question.  It's the -- not everything is -- needs to

8      be an issue.

9      A      It doesn't require 20-ounce copper.

10     Q      Thank you.

11            Were you able to look at all at the

12     underlayment and the membrane?

13     A      No.

14     Q      Did you ever see any pictures of the

15     underlayment or the membrane?

16     A      Other than in reports that were sent to

17     me that were in very low quality black and white.

18     Q      Do you have any opinions relative to

19     that?

20     A      No.

21     Q      Would you agree with me with respect to

22     the sewer vent flashing that those could be redone

23     and a flashing panel simply added?

24     A      I would agree if, in fact, the existing

25     roof could be soldered without causing any damage to

Page 237

1    the building.

2         Q     Is that possibly -- is that possible to

3    be done?

4         A     I -- I can't conclude that because

5    there's no separation fabric in between that it

6    might depend on the skill of the worker to do that

7    soldering with an iron and not cause the substrate

8    to be overheated or burnt.

9         Q     In your 35 years, have you seen it?

10        A     I've only seen soldering that was done

11   with -- with a, you know, 30-pound felt underneath,

12   so it would isolate the wood below.

13        Q     So --

14        A     I've certainly --

15        Q     I'm sorry.

16        A     I've heard plenty of stories of buildings

17   been burned down with torches.

18        Q     So can it be done?

19        A     I think it can be done.

20        Q     With respect to the small cracks at the

21   pitch change --

22        A     Can I ask one question of you related to

23   the answer of --

24        Q     Yeah.  I don't know if I will know the

25   answer, but you can ask me a question.

Page 238

1        A        Was redoing the -- what I said in my

2    report was that there was no expansion relief at

3    most of the vent pipes and that in order to create

4    that, you basically have to create a secondary panel

5    within the panel to allow for that.  And that was

6    only done in one case and that was done at the

7    library early on in the job.

8        Q        Is that a question or a statement?

9        A        No.  I -- I'm wondering if your question

10   to me was to just simply solder the flashing boot

11   back on to relieve the vent stack problem.

12       Q        I think you've answered my question.

13       A        Okay.

14       Q        With respect to the small crack at the

15   pitch change, could that be repaired by adding a

16   transition flashing?

17                    MR. FRIEDBERG:  Form.

18       A        I don't know what you mean by "transition

19   flashing," but are you implying a soldered piece or

20   a new piece of copper to cover over the defects?

21   Sorry.

22   BY MR. GOLDBERG:

23       Q        You tell me what would need to be done.

24   You are the expert, not me.

25       A        Well --

Page 239

```
 1                    MR. FRIEDBERG:  Objection.  Form.

 2                    Are you asking him about the area

 3              he's already opined about?

 4   BY MR. GOLDBERG:

 5        Q     You can answer.

 6                    MR. FRIEDBERG:  If you understand.

 7        A     I think those cracks are going to

 8   continue due to stresses and due to expansion or

 9   contraction.  I think that -- that the roof because

10   of -- because of that configuration, the roof needs

11   to be redone.

12   BY MR. GOLDBERG:

13        Q     Have you authored an article entitled,

14   "How to Succeed with Exterior Insulation and Finish

15   Systems"?

16        A     Yes.

17        Q     Almost done.

18                    MR. GOLDBERG:  Did we mark this?

19                    MR. SIMPSON:  Pretty sure.  I don't

20              know how you got it.

21                    MR. GOLDBERG:  I don't know if we

22              did.  Well, this was from a production.

23                    Just mark it.  He can have mine.

24              I've got plenty of copies of this.  Let's

25              do a 21.
```

Draft Copy

Page 240

1                    MR. SIMPSON:  Is that the opinion

2          of --

3                    MR. GOLDBERG:  No.  No.

4                    MR. FRIEDBERG:  No.  That's the

5          previous --

6                    MR. GOLDBERG:  Yeah.  This is the

7          cost of repair from Mr. Friedberg's

8          initial expert.

9   BY MR. GOLDBERG:

10      Q     Do you know Paradigm, have you ever heard

11  of them?

12      A     No.

13                   MR. GOLDBERG:  What are we on?

14                   MR. SIMPSON:  21.

15                   MR. GOLDBERG:  21 cost of repair,

16          Tom.

17                   (THEREUPON, SANDERS EXHIBIT NO. 21,

18          COST OF REPAIR, WAS MARKED FOR

19          IDENTIFICATION.)

20                   MR. GOLDBERG:  I'm almost done.  I

21          think that Mr. Simpson has some

22          follow-ups for you.

23                   MR. FRIEDBERG:  I have follow-ups,

24          too.

25                   MR. GOLDBERG:  Let's go off the

Page 241

```
 1              record for a second.

 2                   (THEREUPON, THERE WAS A DISCUSSION

 3                   OFF THE RECORD.)

 4    BY MR. GOLDBERG:

 5        Q    Okay.  What do those documents look like

 6    to you?

 7              What do those documents look like to you?

 8        A    It looks to me like a second floor plan

 9    and a roof plan of the gatehouse.

10        Q    Who prepared it?

11        A    I have no idea.

12        Q    Does it look like an architect's

13    preparation?

14        A    More or less, yes.

15                   MR. GOLDBERG:  Okay.  Let's go and

16              mark it actually, 22.

17                   (THEREUPON, SANDERS EXHIBIT NO. 22,

18                   ARCHITECT'S PLAN, WAS MARKED FOR

19                   IDENTIFICATION.)

20    BY MR. GOLDBERG:

21        Q    That wouldn't have been done by a roofing

22    contractor, would it?

23        A    I have no clue.

24        Q    Okay.

25        A    I mean --
```

Page 242

1        Q     It's a two-page document.  I'll mark it

2   as 22.

3        A     I mean, it looks like it has a series of

4   notes here that wouldn't necessarily be related to a

5   roofing contractor.

6                   MR. GOLDBERG:  And that was two

7             pages.

8   BY MR. GOLDBERG:

9        Q     Did you author a report, sir, called

10  "Repair and Maintenance of a Historical Marble and

11  Limestone Structures, Regular Maintenance is the Key

12  to Longevity"?

13       A     Yes.

14       Q     And --

15       A     That's one of the documents you have.

16       Q     Is it?  Okay.  That's one of the

17  journals --

18       A     Yeah.

19       Q     -- that you furnished me with?

20       A     One of the journals.

21       Q     Do you know of any other subcontractors,

22  contractors or people that were involved in this

23  particular construction project?

24       A     No.

25       Q     Do you know what Mr. Friedberg does for a

Page 243

1   living?

2        A      Yes.

3        Q      What?

4        A      He's a lawyer.

5        Q      Okay.  How many projects, more or less,

6   whether it be commercial or residential, have you

7   done work for as an architect?

8        A      Hundreds.  I -- I --

9        Q      How many, sir, I'm sorry?

10       A      Hundreds.

11       Q      Okay.  And when you are an architect --

12   and maybe it varies for job, I'm happy for you to

13   tell me that.

14              When you do work as an architect, do you

15   stay on the project through completion?

16       A      That's generally our -- our -- if you

17   call it monitor in this office is that when we

18   assign a project manager, that person stays on from

19   design through bidding and construction

20   administration.

21       Q      Is that industry practice?

22       A      It's not the full industry practice.  I

23   mean, there are -- there are certainly architectural

24   firms who have specialists who -- who are in the

25   field doing construction administration for them and

Page 244

1    aren't necessarily the person who started the design

2    project.

3         Q    Okay.  What would you say that the

4    industry standard is though?

5         A    In my experience, it's probably not our

6    office.  It's probably people having specific

7    construction administration people who follow

8    through on projects.

9         Q    And what have you seen to be the issues

10   that -- what have you seen to be -- strike that.

11             What's been your experience when projects

12   are done and owners want certain things remedied or

13   otherwise fixed?

14                  MR. FRIEDBERG:  Objection.  Form.

15        A    Too vague to answer.

16   BY MR. GOLDBERG:

17        Q    Are you able to answer that at all or

18   not?

19        A    No.  Because it -- it varies all over the

20   place.

21        Q    Yeah.  But has it been your experience

22   that once a contractor leaves a site and if there's

23   issues relative to the work that was done, usually,

24   some type of remediation process is undertaken?

25                  MR. FRIEDBERG:  Objection.  Form.

Page 245

1    BY MR. GOLDBERG:

2        Q       For example, notifying the contractors

3    that work was done improperly or otherwise not to

4    their satisfaction?

5                       MR. FRIEDBERG:  Objection.  Form.

6        A     I -- I can't opine on that.

7    BY MR. GOLDBERG:

8        Q       Okay.  Why not?

9        A       Because it -- of the hundreds of jobs

10   I've done, I don't -- I don't think that that

11   category has really come up that often.

12       Q       Okay.  Would you agree with me that if a

13   homeowner has an issue with the way that something

14   was installed on their property, that the only way

15   the contractor or architect or particular

16   professional would know is if they were notified of

17   it?

18                      MR. FRIEDBERG:  Form.

19       A       In that general sense, yes.

20   BY MR. GOLDBERG:

21       Q       Okay.  Have you reviewed Mr. Friedberg's

22   responses to interrogatories?

23       A       I did a long time ago.

24       Q       Do you have it there?

25                       Are you able to pull it quickly or no?

Page 246

1      A     I don't think so.

2      Q     Okay.  You don't have it there, sir?

3      A     I mean, I'm sure I had it some place.  I

4  don't know, but --

5      Q     This is my last question.

6            I'd like you to -- I'm happy to show you

7  mine --

8      A     What was the date of that?

9      Q     Let's see.  It appears to be March 8,

10  2014.

11            MR. SIMPSON:  Here's a copy.

12  BY MR. GOLDBERG:

13      Q     There you go.

14            MR. SIMPSON:  Here's a copy.

15      A     Okay.  I mean, is that -- is that this

16  document in whole?

17  BY MR. GOLDBERG:

18      Q     Let me see it, sir.  I don't know.  I

19  don't know what you are looking at, sir.

20            MR. SIMPSON:  No.  That's the

21            request for production.

22            THE WITNESS:  Okay.

23            MR. GOLDBERG:  You can hand it to

24            him.

25            MR. SIMPSON:  Okay.

Page 247

1    BY MR. GOLDBERG:

2        Q       I'd like you to refer to that -- well,

3    first off, have you seen that before?

4                Were you furnished of that?

5        A       I -- I'm not sure.

6        Q       Well, take a look at it.

7        A       Yeah.  I think I may have seen this, but

8    I can't be sure.

9        Q       Okay.

10       A       So --

11       Q       I'd like to refer -- I'd like to point

12   you to response to interrogatory No. 3.

13       A       All right.

14       Q       Okay.  And the interrogatory asks or

15   requests, "Describe in detail all work and services

16   performed by the counter defendant" -- that's

17   Mr. Huber and his team -- "and all materials

18   provided pursuant to the construction work that is

19   subject to this lawsuit by identifying among other

20   things" -- and you can read -- "itemized list of

21   work" -- and I'm paraphrasing -- "or services

22   performed, the dates, and itemized work services or

23   materials that were performed or furnished and each

24   person by -- known to you have knowledge of the

25   fact."

Page 248

1          Did you -- did you look at the answer to

2    that?

3       A    I believe I did, yes.

4       Q    Okay.  And the second sentence says,

5    "Project was to provide a custom standing seam

6    copper roof for six buildings."

7          What three are missing?

8       A    I don't know.

9       Q    Okay.  Let's go to interrogatory -- wait

10    a second.

11          Going down the list here, it says,

12    "Counter-defendant Mr. Huber and his team was to

13    provide the following job set up."

14          Was that provided?  Do you know?

15       A    The counter-defendant is Mr. Huber?

16       Q    Yes.

17          This is the response now that

18    Mr. Friedberg is giving to interrogatory No. 3 and

19    it says, "Counter-defendant was to provide the

20    following:  One, job set up."

21          Did you see that?  Do you know if it was

22    provided?

23               MR. FRIEDBERG:  Objection to form.

24       A    I don't know what "job set" up means.

25

Page 249

1    BY MR. GOLDBERG:

2        Q     Okay.  I'm not sure I do either.

3        A     Is that just -- is that just coming to

4    the site and preparing?

5        Q     I don't know.

6              Did you see any job set up, sir?

7                   MR. FRIEDBERG:  Objection to the

8              form.

9    BY MR. GOLDBERG:

10       Q     Did you see any job set up?

11       A     I haven't seen any job set up.

12       Q     What about --

13       A     I wasn't around then when his group was

14   done.

15       Q     It's understood.

16       A     Okay.

17       Q     I'm talking about when you developed

18   opinion, if you saw these materials exactly.  That's

19   what I'm asking.

20       A     Yeah.

21       Q     Did you see anything relative to

22   insurance?

23       A     No.

24       Q     Did you see whether scaffolding or other

25   means of safe roof access were provided?

Page 250

```
 1        A     My understanding that was -- that was

 2   there for the installation of other work, and it was

 3   provided to the roofing contractor.

 4        Q     Okay.  We don't have to go through it

 5   all.  I -- my question actually, and I started on 3,

 6   so I was going to finish, but actually my question

 7   was with respect to interrogatory No. 4.  I

 8   apologize.

 9        A     Okay.

10        Q     That's what I'm interested in.  And the

11   question reads, and please read along with me,

12   "With regards to the construction work that's the

13   subject to this lawsuit, do you contend that work

14   performed by counter-defendant" -- and just for your

15   purposes, counter-defendant is Daybreak Huber &

16   Associates --

17        A     Uh-huh.

18        Q     -- "was defective in any manner.  If so,

19   describe the specific allegations that support the

20   basis for this contention."

21              Do you see that?

22        A     Yes.

23        Q     Okay.  Do you see the three areas that

24   are identified when asked about allegations relative

25   to defective construction work?
```

Draft Copy

Page 251

1       A       Okay.

2       Q       Do you see it?

3       A       Yes.

4       Q       Okay.  And it appears to me, and correct

5   me if I'm wrong, that in terms of roof leaking, we

6   are just talking about the gatehouse and garage.

7       A       That's what he says.

8       Q       Okay.  And the only other two issues that

9   are commented upon are the flashing in the main

10  house.

11              Right?

12      A       Uh-huh.

13      Q       And the caulking of the roof vents.

14              Yes?

15      A       That's what it says here.

16      Q       Okay.  Your report spoke about a lot more

17  than that, didn't it, sir?

18      A       Yes.

19      Q       Spoke about a lot more than those three

20  things?

21      A       Yes.

22      Q       And your report was drafted after

23  March 2014; was it not?

24      A       Yes.

25      Q       And do you have any idea --

Page 252

```
 1      A     And this is Mr. Friedberg's

 2   interrogatory.

 3      Q     Yes, sir.

 4      A     It's his response.

 5      Q     Yes, sir.

 6      A     From his opinion, his -- his --

 7      Q     Sir, I haven't -- I haven't asked a

 8   question.

 9            MR. FRIEDBERG:  But he's trying to

10            clarify.  He's asking you a question so

11            he can answer it.

12      A     Yeah.

13   BY MR. GOLDBERG:

14      Q     Well, I don't believe that I need to

15   answer those questions.  I've got to move on.

16      A     Okay.  That's fine.

17      Q     So my question is:  Do you have any idea

18   when Mr. Hendrin came on -- came on to the

19   property?

20      A     I don't -- I don't believe until -- I do

21   not know.

22      Q     Are you able to look in your notes and

23   see?

24      A     No.  I don't think I have --

25      Q     Did you review his report?
```

Page 253

1        A      Yes.

2        Q      Did it speak about the time that he went

3    on?

4        A      It refers to July.

5        Q      Okay.  And you went on when?

6        A      September 11.

7        Q      Do you have any documents in your records

8    that predate July -- what did you say, July 31?

9        A      Right.

10       Q      Do you have anything on your records that

11   predate July 31, 2014 --

12       A      No.

13       Q      -- other than -- excuse me, I've got to

14   finish -- other than what is indicated in response

15   to interrogatory No. 4 relative to complaints

16   concerning the work performed by Huber &

17   Associates?

18       A      No.

19              And I think I asked -- you asked that

20   before and I answered.

21       Q      Okay.

22              MR. GOLDBERG:  I'm all done, but I

23              would like to mark this even though it's

24              not part of the record.  I would like to

25              keep this as an exhibit to the

Page 254

1             deposition.

2                   MR. SIMPSON:  Okay.

3                   MR. GOLDBERG:  Actually, I guess I

4             don't need to.

5                   Right?

6                   MR. SIMPSON:  No.

7                   MR. GOLDBERG:  I'm not going to mark

8             it, but just for the record, it's

9             counterclaimant's responses to

10            interrogatories dated and signed by

11            Mr. Friedberg, March 8, 2014.

12                  One other thing, sorry.  I'll show

13            you also -- there was a supplemental -- I

14            want to make sure I'm clear for the

15            record.

16                  There was a supplemental response to

17            interrogatory provided by Mr. Friedberg?

18                  THE WITNESS:  Okay.

19  BY MR. GOLDBERG:

20       Q    We propounded -- or I beg your pardon,

21  Mr. Friedberg sent a supplemental response, and this

22  one is dated April 2014.

23       A    Okay.

24       Q    So it's after.

25                  And -- No. 18 and I'll hand it to you.

Page 255

1              Do you have it there?

2                   MR. SIMPSON:  Yeah.

3    BY MR. GOLDBERG:

4        Q      Interrogatory No. 11, I believe, that

5    these are a reference to kitchen cabinets --

6        A      Uh-huh.

7        Q      -- mold and water damage.

8               Right?

9        A      Uh-huh.

10       Q      Yes?

11       A      Yes.

12       Q      And then 18, the other supplemental

13   response just relative to kitchen cabinets.

14              Right?

15       A      Uh-huh.

16       Q      Yes?

17       A      Yes.

18       Q      Okay.  No additional items were noted as

19   the defects on the property that you've seen prior

20   to Mr. Hendrin's July 31st, 2014 site visit.

21              Right?

22       A      Correct.

23                   MR. GOLDBERG:  That's it.  Let's go

24              off the record for a second.

25                   (THEREUPON, THERE WAS A DISCUSSION

Page 256

1              OFF THE RECORD.)

2

3

4              REDIRECT EXAMINATION

5

6

7    BY MR. SIMPSON:

8       Q     If you could look at the executive

9    summary in your report?

10      A     Uh-huh.

11      Q     And in about the middle paragraph, the

12   one that starts with "all the roofs have pop

13   rivetted."

14      A     Yes.

15      Q     Near the bottom of that, it says,

16   "Workmanship at ridge intersections are so poor that

17   there are openings at some locations."

18            Can you tell me which locations the

19   openings were at?

20      A     There are openings at the beach bar, at

21   the master suite.

22                  (THEREUPON, MR. GOLDBERG LEAVES THE

23                  DEPOSITION.)

24      A     There are openings at the main pavilion

25   and the guest -- sorry, the -- and I believe -- no.

Page 257

1    I believe that's it.

2    BY MR. SIMPSON:

3        Q    Okay.  So -- and how many openings were

4    at the beach bar?

5        A    There were two.

6        Q    Okay.  How many at the master suite?

7        A    At -- there was one there, one.

8        Q    Okay.  And how many in the main

9    pavilions?

10       A    I'm sorry.  The master suite, yeah,

11   there was one; and the main pavilion, there was one

12   so.

13       Q    Okay.  And that one is the one that was

14   photographed, I think, photograph 40.

15            Right?

16       A    Yes.

17       Q    Okay.  Did you photograph the others?

18       A    I probably have photographs of all the

19   caps itself.

20       Q    I'm not asking about caps.  I'm asking

21   about the -- or maybe the --

22       A    Yeah, and those show the openings.

23       Q    Okay.  Those are the openings, you are

24   talking about the openings at the caps?

25       A    Yes.

Draft Copy

Page 258

1     Q     Okay.  So that's just a matter of

2  repairing the cap and then --

3     A     Yes.

4     Q     -- that's taken care of.

5           Correct?

6     A     You do realize that in most of those cap

7  locations, there are also nails that were put

8  into -- through the copper that weren't protected,

9  so those exist.

10    Q     Okay.

11    A     We haven't talked about them.

12    Q     Okay.  And I think you have a photograph

13  of that in your report.

14          Right?

15    A     Yes.

16    Q     And you don't know who did those nails.

17          Correct?

18    A     No.

19    Q     You don't know when that was done?

20    A     No.

21    Q     In the next paragraph in the executive

22  summary, it says, "At the top of the ridges, the

23  method of capping the intersection of ribs is

24  inconsistently and poorly executed from building to

25  building."

Page 259

1          Do you see that?

2      A    Yes.

3      Q    Are they -- was the capping done

4   consistently per -- on each building and just

5   differed from building to building?

6      A    You'll see in the photographs that, in

7   some cases, they put a cap that was pop rivetted

8   down to the other cap and sometimes they left out a

9   rib and -- and -- so it's just -- it is inconsistent

10  all over.

11     Q    Okay.

12     A    So --

13     Q    So even within a single building, it was

14  inconsistent, you said?

15     A    Done.  Done a little different, yeah.

16     Q    Okay.  The holes that you noted in the

17  roof, that you photographed them, should they be

18  fixed?

19     A    Oh, yeah.

20     Q    Okay.  Should they be fixed now?  Is

21  there any point in waiting?

22     A    Well, there's not any point in waiting to

23  do any of this.  I think the owner is probably

24  anxious to do this, but it's a matter of resolving

25  these issues.

Page 260

1       Q       I mean, the holes could be --

2               (THEREUPON, THERE WAS AN

3               INTERRUPTION.)

4               (THEREUPON, MR. GOLDBERG JOINS THE

5               DEPOSITION BY TELEPHONE.)

6               MR. SIMPSON:  Can you hear us?

7               MR. GOLDBERG:  Yeah, I can hear you.

8       Thank you.

9  BY MR. SIMPSON:

10      Q       The holes could be soldered.

11              Correct?

12      A       They may be too large for solder, but,

13 you know, I -- I think that they should be part of

14 an entire repair for a different cap.

15      Q       Well, this --

16      A       If they were repaired right now.

17      Q       Is there any question that water is going

18 to get in the holes you saw?

19      A       I can't imagine that water wouldn't get

20 in.

21      Q       Okay.  Wouldn't it be best to do some

22 sort of at least temporary patch now so that the

23 underlayment isn't getting moisture and possibly

24 rolling out so that it can be reused if the roof

25 does have to be replaced?

Page 261

1       A       Yes.

2       Q       Okay.  We talked a little bit about

3    the -- you said that you saw cuts in the standing

4    seams at the transition points --

5       A       Yes.

6       Q       -- correct?

7               Do you have any photographs of those?

8       A       Yes.  And that's what you'll get.

9       Q       Okay.

10      A       You were given those photographs to do

11   enlargements on the CD.

12      Q       Okay.

13      A       Or on the flash drive.

14      Q       All right.  Well, I've got them pulled up

15   on my computer and we can identify them by the file

16   number as we go through.

17              If you can tell me which ones show -- I'm

18   talking about a deliberate cut -- right? -- you

19   understand that's what I mean?

20      A       I -- yeah.  I -- in other words, if

21   you -- if you zero in on this, every one of these

22   has a deliberate cut because in order to -- to

23   kink that panel up, you have to cut the vertical

24   section.

25      Q       Okay.

Page 262

1        A        So they are all -- they are all cut.

2        Q        So we are looking at photo P1090601,

3    which is on the flash drive that's been identified

4    as Exhibit 7.

5        A        Uh-huh.

6        Q        And so I have blown it up here.

7        A        It's in the shadow, so I would

8    probably -- if it were on my computer, I'd probably

9    lighten it, but --

10       Q        Okay.  I'm moving to a different photo.

11                Does that show it?

12       A        It's just to the left here where there's

13   a defect.

14       Q        Okay.  That looks like -- I guess

15   that would be -- that doesn't look like a deliberate

16   cut, does it?

17       A        Well, this is -- this one, I think, was

18   soldered over on the top.

19       Q        Okay.  For the record, I'm now looking at

20   the photo that's identified as P1090602, so can we

21   see the cut in this one?

22       A        No.  Because it's from the top.

23       Q        Okay.  Now, I'm showing you photo

24   P109632.

25                Can you see a deliberate cut in that one?

Page 263

1      A     You know, can I -- I'm wondering if -- if

2  I can just bring them up on this screen and see if

3  we can --

4                MR. FRIEDBERG:  Why don't we get off

5           the record for a second.

6           (THEREUPON, THERE WAS A DISCUSSION

7           OFF THE RECORD.)

8      A     Okay.

9  BY MR. SIMPSON:

10     Q     We are looking at the photo that ends in

11  602.

12     A     And the line of the cut is here, that

13  line.  Understand that that's a vertical and this

14  pan goes into this pan, the two fold into one

15  another, and this is cracked across the top due to

16  stress.

17     Q     Okay.

18     A     So that is --

19     Q     Is that due to expansion stress or the

20  stress of making the transition?

21     A     The expansion stress.

22     Q     Okay.

23     A     So we can go back and we can go to the

24  others.

25     Q     Okay.  The other four that were 32, 33,

Page 264

1    34, and 35?

2        A        Yeah.   This was taken because Tom was

3    standing on the area that is not supported below and

4    pressing down and back.   I don't think it was

5    intended as a shot that shows a defect.

6        Q        Okay.

7        A        So --

8        Q        And that was 632?

9        A        Yeah.   And this one, 633, and there's

10   shadow here, but there's a -- there's a crack on the

11   deck here.

12       Q        Okay.   Before you move off of that one,

13   just let me be sure we are -- yeah, that if you zoom

14   out, there's a spot on there, it almost looks like a

15   question mark.

16       A        Yeah.

17       Q        And you are referring to a spot that is

18   to the right and on the next standing seam to the

19   right of that question mark.

20              Right?

21       A        Yes.

22       Q        Okay.

23       A        Yeah.   So --

24       Q        Was that -- was that question mark -- is

25   that a question mark?

Page 265

1              Is that something --

2     A     No.

3     Q     Okay.  It's just --

4     A     No.  It's just some sort of a -- it's

5     probably bird guano.

6     Q     All right.  Okay.

7     A     So it's actually -- you know, it's

8     interesting here that there is -- there is

9     weathering here, patina from -- from the salt.

10            So I'm just wondering if you take some of

11    the shadow out.  I'm trying to take some of the

12    shadow out by brightening it, but here was a crack

13    across the panel also.

14    Q     Okay.  And we are looking at 634.

15    A     Yes.

16    Q     And that's actually in the standing seam

17    that's to the left of that question mark.

18    A     Yeah.  I'm sorry, I'll clarify here.

19    This one was -- was soldered.  They dabbed solder

20    into the crack.

21    Q     Okay.  But it's your testimony that, at

22    that transition point, in every one of these

23    standing seams --

24    A     In many of them, there are cracks.

25    Q     Okay.  Cracks or deliberate cuts?

Page 266

1      A      Well, in order for -- to take the

2   vertical element of the standing seam, in order for

3   this panel to go up here, it has to be cut and it

4   has to be cut down to the flat pan in order --

5   and -- and they rotated the one section over the

6   other section so that it would cover it.

7      Q      Are you familiar with a process called

8   "The Bertie Twist," B-e-r-t-i-e?

9      A      No.

10     Q      Okay.  Attorney Goldberg asked you some

11  questions about the sealants and the industry

12  standards.

13            For the -- specifically for the reglet,

14  is there areas on a house like this, is there a

15  particular period of time that the sealant on the

16  reglets should be inspected?

17     A      I think that in -- in my opinion, that,

18  you know, five to seven years is a lifespan of a

19  polyurethane sealant that -- or urethane sealant

20  that you should probably inspect.

21     Q      Okay.  And is it your understanding that

22  urethane sealant was used?

23     A      Yes.

24     Q      Okay.

25     A      Yeah.

Draft Copy

Page 267

1          Now, I give that caveat for the average

2    installation, but I think that the installation

3    here, as far as shape of the joint and performance,

4    you know, it just wasn't correct and -- and no --

5    no, you know, it was just wrong.

6          Q      But even if -- if it was done properly,

7    you would still be inspecting it to require

8    resealing every five to seven years?

9          A      No, not resealing, but -- but inspecting

10   it.  Because I think probably the polyurethane is

11   probably good for 15 years, but there are cases

12   where it wasn't prepared properly or something in

13   substrate preparation that you should probably look

14   at it on that kind of schedule, so that you take

15   care of the anomalies that fail sooner.

16         Q      Okay.  In looking at Exhibit 5, which are

17   a bunch of your photos, your photos from

18   September 11, and specifically, I believe, this is

19   the 17th page, but it's the upper -- in the upper

20   left, there's a photo with a man holding a hose.

21         A      Uh-huh.  That's --

22         Q      Is that Fran?

23         A      That is Fran.

24         Q      Okay.  And is that him doing the water

25   test?

Page 268

1      A      That is the water test we performed on

2   this side of the roof.

3      Q      Okay.  We don't need to blow that up.  I

4   just can't.

5      A      Okay.  And you can see how far away he is

6   on the cone of the spray.

7      Q      Right.  And that's the hose that you used

8   for the whole water test?

9      A      Yes.

10     Q      Okay.  In your report, you mentioned

11  telegraphing in a couple places, telegraphing of

12  nails or screws --

13     A      Yes.

14     Q      -- into the copper and also telegraphing,

15  I think it's the --

16     A      The blocking.

17     Q      The blocking?

18     A      The blocking that was the support on the

19  roof.

20     Q      Is that a criticism you have of the --

21     A      No.

22     Q      Okay.

23     A      No.  It's just strictly an observation

24  that, you know, why, for example, the sub-girts that

25  everything is attached to, why those telegraph

Page 269

1    through the copper, you know, it -- it was kind of a

2    lot of places, so is it wind flutter that's doing

3    that?

4              Certainly, I don't think that there's

5    been that much foot traffic on this roof that that

6    would create it, but it's just an observation.

7        Q    Okay.

8        A    The screws at the perimeter, just

9    wouldn't necessarily expect, there's nothing in

10   the -- in the documentation about screwing things

11   down, but there seemed to be some crews at the

12   perimeter and the heads show through, who knows?

13             In our environment here in the northeast,

14   I see those heads because winter snow drifting would

15   kind of bring them out, but there's no particular

16   downside to those screws.

17       Q    Okay.  And you said that the gauge of the

18   valleys, being 16-ounces of the valleys, is not an

19   issue.

20             Right?

21       A    No, I don't feel it's an issue.

22       Q    Okay.

23       A    If it were in this environment, I'd want

24   20-ounce, but I'd want 20-ounce on the roof, too.

25       Q    Okay.  And then on page 15 of your

Page 270

```
 1    report, right above the photo, there's a statement,

 2    "We observed cracks in the copper pan in the

 3    standing seam in eight locations around the roof

 4    circumference."

 5         A    Yes.

 6         Q    Is that -- is that the number of cracks

 7    you observed in all of these roofs?

 8         A    That's the number observed in this main

 9    pavilion around at this level.

10         Q    At the transition point?

11         A    Yes.

12         Q    Okay.  You didn't observe any cracks

13    anywhere else in any of the other roofs.

14              Right?

15         A    No.

16         Q    No, you didn't?

17         A    No, I did not.

18         Q    Okay.  And when I was asking questions

19    earlier, you pulled out your portion of SMACNA.  I'm

20    wondering if we can make those pages -- you said

21    there are only a few pages that are relevant.  I'd

22    like to go ahead and make them an exhibit, so

23    that --

24         A    You are going to interfere with happy

25    hour here.  Off the record.
```

Page 271

1          So I'm going to do these four pages.

2     Q    Yeah.  Whatever page --

3     A    Stopping -- stopping at that the same

4  page.

5     Q    Whichever pages you -- you think are

6  relevant.

7     A    Yeah.  Well, those are the four sections.

8          (THEREUPON, THE WITNESS LEAVES THE

9          ROOM.)

10  BY MR. SIMPSON:

11     Q    Would it have been possible to precut the

12  panels if you were doing single lock joints at the

13  ridges?

14     A    What do you mean "precut"?

15     Q    Precut.  I think, you meant -- I think

16  you testified that -- or maybe it's in your opinion,

17  you felt that the panels should have been precut and

18  then installed.

19          Am I right about that?

20     A    Let's be very specific --

21     Q    Okay.

22     A    -- about what I -- what I -- what

23  question I was asked and what I think I responded

24  to.

25     Q    Okay.

Page 272

1        A        In my experience with roofing tin

2   knockers in -- in a job like this where one panel

3   mates into another panel, I would expect that the

4   metal worker would have taken the piece up, placed

5   it in place, marked it and, usually, that's a little

6   knocking with a set punch in -- where it's going to

7   -- to be bent.

8              And then he would, either on a break,

9   either on a small break, that he might do on the

10  roof or he'd take it down from the roof to a full

11  10-foot break and bend that edge up.  And -- and it

12  would -- with a preformed panel that has an upturned

13  edge and upturned edge, when he's mating into an

14  adjacent panel, he would mark both of those points.

15  He would cut the vertical that has -- where he

16  terminates on both sides and then he would -- he

17  would bend that up and mark off what length he

18  needed for the upturned edge and do that all in a

19  break as opposed to just maybe bending it by hand.

20             I mean, you can see where we took this

21  apart that there's no clean line to -- to that.

22  They just appear to have bent it in the field.

23       Q        Okay.

24       A        And it -- and not even with some sort of

25  straight edge to -- to create a crisp corner.  So

Page 273

1    that's what I would have expected that would have

2    been done and that doesn't seem to have been done

3    here.

4         Q     Could that have been done -- could

5    that -- can that be done when you are doing single

6    locks at the ridge, along the ridge, or is that only

7    done with double lock?

8         A     No.  That could be done with either one.

9    It's just a matter of how much material you are

10   leaving on the vertical.

11        Q     And is that a practical thing to do when

12   you are doing octagon roofs?

13        A     It's not any different than any hip roof

14   that anybody would do -- you know, that has an

15   intersection like this.

16             Now, some people would choose to put a

17   batten along that line and it provides you with a

18   natural upturned space, and then you tie your leg

19   into the batten cap, but that wasn't the choice of

20   the contractor here.

21        Q     And you are not suggesting that they

22   should -- they were required to do that or anything

23   like that?

24        A     Not required to.

25        Q     Okay.

Page 274

1      A      It might have made it easier to have a

2    clean detail.

3      Q      Turn to photo 68.  That's the photo of

4    the vent stack.

5             Right?

6      A      Uh-huh.

7      Q      And you make the comment there, "The

8    vertical seam is only soldered at the base, not at

9    the top."

10            Now, this is not a -- so it's a vent

11   stack.  It's not carrying -- it doesn't need to be

12   water tight or anything.

13            Correct?

14     A      What do you mean by that?

15            This vertical seam, if water got into

16   that vertical seam, it could get under the roof.

17     Q      So --

18     A      The vent stack itself, the opening in the

19   top, it, you know, keeps water out essentially by

20   gravity or goes in and drains out through the

21   system.

22     Q      Okay.  And so are you -- is it your

23   belief that it should have been soldered the entire

24   length?

25     A      Yes.

Draft Copy

1        Q     Okay.

2        A     Or seamed together.

3        Q     Okay.

4        A     A folded seam.

5        Q     Okay.  And there was no folded seam

6    there?

7        A     No.

8        Q     Okay.  So I'm going to mark as Exhibit

9    23, the section from SMACNA that you had photocopied

10    for me.

11               (THEREUPON, SANDERS EXHIBIT NO. 23,

12               SECTION FROM SMACNA, WAS MARKED FOR

13               IDENTIFICATION.)

14    BY MR. SIMPSON:

15        Q     Now, with respect to allowing for -- your

16    other criticism relating to the vent stack is

17    allowing for expansion -- of vent stack allowing

18    with the panel.

19               Correct?

20        A     Yes.

21        Q     What -- what is the concern there?

22    Explain to me what the problem issue is.

23        A     So there is a little raised section of

24    copper here around the vent, but essentially, this

25    vertical section of copper is soldered to a doughnut

Page 276

1    below it and that's beneath the pan.  And then the

2    two are soldered together.

3              Okay?

4       Q    Okay.

5       A    The vent is fixed in place and the -- and

6    that pan wants to move with expansion and

7    contraction.  So it -- it puts stress on -- on that

8    solder and -- and could crack.

9       Q    Okay.

10      A    So, usually, what would happen is that

11   the panel that this is in would only be 10 feet and

12   it would be allowed to move within the roof and not

13   put a lot of stress on that soldered joint.

14      Q    So if it was a panel of 10 feet or less,

15   you wouldn't need a transition?

16      A    I wouldn't be concerned about it and --

17   and, you know, if -- yeah.  If this panel is -- is

18   only, you know, 7 feet or less than 10 feet, I also

19   wouldn't be concerned about it.

20      Q    Okay.

21      A    So --

22      Q    How many vent stacks were there in panels

23   that were longer than 10 feet?

24      A    I'd have to look.  It's probably three or

25   four.

Page 277

```
1        Q      Okay.  And how many of those that were
2   in panels longer than 10 feet didn't have a
3   transition?
4        A      Oh, none of them had -- the only -- the
5   only one that had a transition was on the small
6   library roof and that was a very small panel to
7   start with.
8        Q      Okay.  So that wasn't even longer than
9   10 feet?
10       A      Yeah.  It -- it kind of surprised me that
11  there was one there and it was one of the early
12  roofs done and then it would seem that they just
13  chose to ignore it after that.
14       Q      Okay.  Have we covered everything?
15              Oh, no.
16       A      Valley of the jolly.
17       Q      Pardon me?
18       A      I said, the valley of the jolly.
19              Is that a valley detail?
20       Q      Yes.  Let me show you what I've marked as
21  Exhibit 24 --
22       A      Uh-huh.
23       Q      -- which is a valley detail.
24
25
```

Draft Copy

Page 278

```
 1                    (THEREUPON, SANDERS EXHIBIT NO. 24,

 2                    VALLEY DETAIL, WAS MARKED FOR

 3                    IDENTIFICATION.)

 4    BY MR. SIMPSON:

 5         Q    And would you agree with me that that

 6    would be a suitable way of creating an expansion of

 7    transition of the transition place of the main

 8    pavilion?

 9                    MR. FRIEDBERG:  Objection.  Form.

10         A    It's not the way I would do it.

11    BY MR. SIMPSON:

12         Q    Okay.  Would you agree with me, it's a

13    way it could be done?

14                    MR. FRIEDBERG:  Objection.  Form.

15         A    I don't like this lower edge.  It seems

16    to be prone to water infiltration.

17    BY MR. SIMPSON:

18         Q    Okay.  And why is that?

19         A    Because any wind driven water could

20    bypass this joint.  The -- what's not shown here is

21    cleating and it -- it would probably -- you know, it

22    would probably be better to extend the lower panel

23    up here and then hook a new upper panel to it from

24    above, either to a soldered cleat or -- or -- or

25    bending over the pan.
```

Draft Copy

Page 279

1        Q     Okay.

2        A     But you still have to work with -- no.

3   Anyway you do this, you -- it -- it's -- you really

4   have to replace the panels to do it.

5        Q     And why is that?

6        A     Well, because you are not going to just

7   cut this and -- and -- and loop it over and hem this

8   down.  It's something that has to be placed in place

9   and installed.  You'd have to uninstall all of the

10  ribs here to do this upper work.

11       Q     You'd have to uninstall the upper ribs

12  back --

13       A     You'd have to unfold --

14       Q     -- a couple feet.

15             Right?

16       A     -- unfold the standing seams -- no.  I

17  don't think you could do that.  You'd have to lift

18  this panel to get this in.

19             You are -- I've seen people try -- try to

20  do this with -- with standing seam copper before

21  and you really can't do this by just unzipping a

22  portion of it.  You wind up damaging the upper

23  portion when you try -- try to bend it enough to do

24  this.

25       Q     Okay.

Page 280

1      A     So --

2      Q     But, certainly, then you could just

3    remove the top portion and leave the bottom portion

4    of the roof intact.

5            Correct?

6                  MR. FRIEDBERG:  Objection to the

7                  form.

8      A     Well, the bottom portion bend at this

9    corner and is still a problem with the stress that

10   came to this corner.  I -- it is still my opinion

11   that there's not a good way to fix this without

12   taking off the panel and putting it back on.  It's

13   so labor intensive to do some of these things

14   that -- and you wind up with a -- something that's

15   potentially not water tight afterwards.

16   BY MR. SIMPSON:

17     Q     Well, your solution was going to be to

18   put some sort of transition flashing in at that

19   point.

20           Right?

21     A     Yes.

22           Perhaps -- perhaps go ahead and -- and

23   bring the standing seam down and -- and do this in

24   flat seam across a valley, if you will.  And then

25   tie in new panels up to the roof.

Page 281

1      Q      Right.  So there would be -- there

2  would be an opportunity for water penetration there,

3  too.

4             Correct?

5      A      Not if it was, you know, fully soldered

6  flat seam in this area all the way around at the

7  transition.

8      Q      The recommendations in Copper and Common

9  Sense are made for copper roofs in what kind of

10  environment?

11      A      They are -- they apply to all

12  environments.  That's one of the questions that I

13  actually asked the -- the Copper Development guy

14  about, what do you think about exposure in a salt

15  spray environment of the Caribbean and he said it

16  was -- you know, in his experience, it's fine, you

17  know.

18      Q      Okay.  But -- in other words, those

19  standards are made for roofs that are up here in

20  Connecticut where they are exposed to freezing

21  temperatures and hot summer temperatures?

22      A      Well, if you are referring to the

23  expansion capability, you -- you are supposed to --

24  in designing a copper roof, always go to the

25  specific lengths and do the expansion calculation to

1   find out how much movement.  And it -- it should be

2   in the engineering judgment of -- of either the

3   professional or the roofer to say, you know, what

4   can -- what can it tolerate?

5              And I think that -- that nearly quarter

6   inch of movement on that -- that transition is much

7   too severe and that's why the stress cracks are

8   there.

9       Q     Would you agree that the temperature

10  variance for a copper roof in the northeast is going

11  to be about 215 degrees?

12      A     I would say you'd probably have to figure

13  it from zero to maybe 140, 160, so I think you are

14  in that range, yeah.

15      Q     Okay.  You have to go below zero --

16  right? -- because the temperature gets below zero?

17      A     Yeah, but, you know, exterior roofs don't

18  actually get down to that because -- because of

19  thermal loss in buildings.  So I -- I don't think --

20  you know, I think you are fine at 200 to 250.

21      Q     Okay.

22      A     And I think using a hundred in Saint John

23  is a -- is a good number.

24      Q     Okay.  How much will a 30-foot panel

25  expand with a 185-degree temperature difference?

Page 283

1       A       According to my calculation, about

2    five-eighths of an inch.

3       Q       Okay.  And that's acceptable under SMACNA

4    and Copper and Common Sense.

5               Right?

6       A       It's not a matter of acceptance.

7                    MR. FRIEDBERG:  Objection.

8       A       It's a matter of what does that result

9    in.  And if your -- if your panel wants to move

10   five-eighths of an inch, you've got to either allow

11   it or -- or do something else.

12   BY MR. SIMPSON:

13      Q       Okay.

14      A       That -- that -- you know, sometimes --

15   sometimes the standing seam is -- is attached

16   really at the top and the bottom where it connects

17   into the eve is the part that allows for expansion.

18   That -- you know, that's intolerable without

19   allowance for expansion.  And it's allowance for

20   the cleats to move relative to where they are

21   attached as well as what happens at one end or the

22   other to allow for that five-eighths of an inch

23   movement.

24      Q       But under Revere's Copper and Common

25   Sense, I could do a 30-foot -- up to a 30-foot

Page 284

1    panel --

2        A    Right.

3        Q    -- in the northeast without using

4    expansion cleats.

5             Correct?

6        A    Right.

7                 MR. FRIEDBERG:  Objection.  Form.

8    BY MR. SIMPSON:

9        Q    And that would have moved up to

10   five-eighths of an inch.

11            Correct?

12       A    Right.

13       Q    And that would still be within the

14   standard.

15            Correct?

16                MR. FRIEDBERG:  Objection.  Form.

17       A    That's within the standard, but how you

18   allow for that has to be taken into account.

19   BY MR. SIMPSON:

20       Q    Okay.  And you were just describing some

21   of the ways you could account for it.

22            Right?

23       A    Right.

24       Q    Like not having it fixed at one end?

25       A    Right.

Page 285

1      Q    That would be sufficient to --

2      A    And, essentially, what I think we have is

3    a 17-foot panel and a 17-foot panel both wanting to

4    expand and contract right at that -- that point of

5    the intersection where it wants to just keep putting

6    stress on that intersection and crack it at the

7    upturned leg.

8                 (THEREUPON, THE COURT REPORTER

9                 REQUESTS CLARIFICATION.)

10     A    Upturned leg of the standing seam.

11              MR. SIMPSON:  I have no further

12          questions.

13              THE WITNESS:  Okay.

14              MR. FRIEDBERG:  I have a few.  Just

15          hang on.

16

17

18              CROSS-EXAMINATION

19

20

21   BY MR. FRIEDBERG:

22     Q    I just have a few on Mr. Sanders and I

23   just want to clarify a couple of things on the

24   record.

25              Can you explain why you are recommending

1    replacement as opposed to repair?

2        A      I'm recommending full replacement as

3    opposed to repair because the conditions at the rib

4    intersection -- the pan intersections needs to be

5    repaired on all the roofs.  And it's my feeling that

6    to do that properly, you have to replace the panels

7    that intersect and that's every panel on the -- on

8    the project.  And if you -- if you were to do a

9    repair, it would probably be more costly than the

10   full replacement.

11       Q      Can you explain that?

12       A      The labor to rework all of those upturned

13   legs at the ridge intersection, I think, vastly

14   outweighs the full replacement of this roof.  And to

15   make sure that it's done properly in a repair, I

16   think, is --

17       Q      And just so I can understand or for the

18   record, be clear, the labor you are talking about,

19   what has to be done assuming, for the sake of

20   discussion, that you were going to look at repair

21   and you were going to attempt to address those pan

22   intersections, would the actual pans have to be

23   removed and reformed?

24       A      You would have to remove the cap all the

25   way up the rib.  You'd have to unfold the -- the

Page 287

1    seam.  You would have to -- if there were pieces

2    that were short, you'd have to perhaps attach on new

3    pieces that were either cleated or soldered on and

4    do repairs in all those areas and then re-seam it

5    back together.

6        Q    Okay.  I mean, are there some pans that

7    are just, based upon your inspection, cannot be

8    repaired due to defects such as from this

9    cracking?

10                  MR. SIMPSON:  Objection.  Form.

11   BY MR. FRIEDBERG:

12       Q    Go ahead and answer.

13       A    The main pavilion is -- needs to allow

14   for expansion and -- and absolutely has to be

15   replaced.

16       Q    Okay.  I'm going to go over -- I want to

17   talk about each building, but I have a few follow-up

18   questions.

19                  In terms of the issues regarding the pan

20   intersections, is this a condition that was as a

21   result of the roofing contractor?

22                  MR. SIMPSON:  Objection.  Form.

23                  MR. GOLDBERG:  Join.

24       A    I think that when it came to mating these

25   two panels together, that there was not enough

Page 288

1   expertise to do it properly.  And that's my

2   impression of what I saw in the field of the

3   conditions that were left.

4   BY MR. FRIEDBERG:

5       Q    And the basis of your opinion is what?

6       A    Well, one of the things, for example, is

7   that when you fold over a standing seam to bring it

8   into that condition, anybody worth their salt would

9   have taken metal out of that -- out of that piece,

10  so it wasn't this bulky tongue that had to fold over

11  the seam and that wasn't done.

12           As a matter of fact, you see all over the

13  place in the photographs the standing seam coming

14  under the cap and -- and actually showing up on the

15  far side of the joint.  And that made the cap

16  extremely wide, made the cap difficult to pop rivet

17  through.  It -- it probably would have been much

18  better to have a folded seam along these ridges

19  instead of having a seam that was just simply capped

20  because it allowed the workers to just slap it

21  together and throw the cap on.

22      Q    In terms of the top portions of the roof,

23  the -- I want to make sure I get the terminology

24  correct -- what are you referring to that as?

25      A    The cap or the peak, the cap peaks.

Page 289

1      Q      The cap peaks, yeah.

2             In your analysis --

3                    (THEREUPON, THERE WAS AN

4                    INTERRUPTION.)

5                    SECRETARY:  He got disconnected.

6             Here he is.

7    BY MR. FRIEDBERG:

8      Q      Okay.  In your analysis, did you review

9    whether or not the peak caps, at least, the copper

10   underneath was done so in a proper fashion?

11     A      My -- what I found when i removed -- when

12   we removed the peak caps is that the copper was cut

13   and short -- the pans were cut short of one another,

14   so there was a gap of something in excess of a half

15   an inch and any water infiltration that -- that

16   might get past the cap because the sealant

17   deteriorated would go right into the -- the

18   substrate.

19     Q      Do you have an opinion concerning the

20   method in which the pans terminated at the peak

21   cap?

22     A      I have an opinion as to, you know, the

23   pans could have, at least, been lapped together in

24   the flat at the peak cap and the -- the standing

25   seams, as they came to the peak, did not have to be

Page 290

1   terminated and then capped over with a short piece

2   of cap as they did.  It could have -- the detail

3   could have been much different and much better.  And

4   a soldered cap covering over everything could have

5   been secured to the -- to the pans and made into a

6   much better detail.

7        Q    The question comes up then:  Why can't

8   you just replace the peak cap?  What are the

9   problems with that?

10       A    Well --

11             MR. GOLDBERG:  Object -- object to

12             the form.

13             MR. FRIEDBERG:  Well, I'm asking

14             your question, Joe.

15   BY MR. FRIEDBERG:

16       Q    Go ahead and answer.

17             MR. SIMPSON:  You don't get to ask

18             questions the way we get to ask

19             questions.

20   BY MR. FRIEDBERG:

21       Q    Assuming I'm Joe Goldberg and I'm asking

22   you that the -- why can't you just replace the peak

23   cap as opposed to replacing the roof?  What would be

24   your answer?

25       A    Well, I would still go back on the fact

1  that the intersections of the pans are problematic

2  throughout the roofs, but just replacing the peak

3  cap would probably involve soldering something as

4  cleats to the existing pans.  And I'd be very

5  worried about burning down your roofs, but, you

6  know, you could always create a detail here to only

7  address the cap, but in my opinion, it doesn't

8  address the overall problems of these roofs.

9       Q     And let me ask you in terms of the

10  overall problems, Mr. Sanders.  You've been giving

11  opinions here.

12            Is there a -- you know, based upon your

13  years of experience in dealing with this particular

14  area, specifically copper roofs, water infiltration,

15  the various standard or lack thereof, is there a

16  standard of care that you can address as to the

17  minimum acceptable standard that a roofing

18  contractor should use in installing a copper roof

19  such as that in Saint John?

20            MR. GOLDBERG:  Object.  Object to

21            the form.

22            MR. SIMPSON:  Objection.

23       A     I don't -- I don't feel the contractor

24  met the standard of care here because of the way the

25  ridges were -- were addressed throughout the roof.

Page 292

1   It -- it was the expedient way to finish off pans

2   intersecting and -- and not a really good way.

3   To -- to just install caps along a single fold

4   leaves an awful lot of problems.  And I saw where

5   sheets were short.  I saw where things were

6   overlapped from the standing seam fold from the

7   other side.  Just really, I don't -- I don't think

8   is a -- is a high standard of care at all.

9   BY MR. FRIEDBERG:

10      Q     Do you have an opinion regarding level of

11  craftmanship or workmanship by the copper roof

12  employees on this project?

13              MR. GOLDBERG:  Object to the form.

14      A     Yeah.  I -- I -- you know, I -- I think I

15  fall short of saying it was amateurish, but there --

16  it's just when -- it just didn't show a level of

17  mechanic work that I have seen on copper roof work.

18  BY MR. FRIEDBERG:

19      Q     And just so we are clear, your

20  experience dealing with copper roof work, how

21  long -- how many years have you been dealing with

22  copper roofs?

23      A     My -- my work on the Patent Office

24  building, the Portrait Gallery for the Smithsonian

25  started in the mid-'90s and that was my first

Page 293

1    intense exposure to copper work, so about 20

2    years.

3        Q    And in dealing with the roofs you've

4    mentioned, the Patent building and the Portrait

5    Gallery of the Smithsonian Institute, those are

6    issues dealing with water infiltration as well?

7                    MR. GOLDBERG:  Objection to the

8            form.

9    BY MR. FRIEDBERG:

10       Q    Or are those issues that you are dealing

11   with water infiltration?

12       A    They were dealing with replacing an

13   existing copper roof with a new copper roof and it

14   did deal with roofs that were leaking.

15       Q    You mentioned a little bit about

16   expansion.

17            Did you see any effort of the roofing

18   contractor, Huber or Daybreak, to take into account

19   any expansion of the roof in Saint John?

20                    MR. GOLDBERG:  Object to the form.

21                    MR. SIMPSON:  Objection.

22       A    I don't see any -- any allowance for

23   expansion.

24   BY MR. FRIEDBERG:

25       Q    Is a failure to take into account any

Page 294

1    expansion, can you explain how that factors into

2    your analysis of your ultimate opinion regarding

3    replacement versus repair?

4                    MR. GOLDBERG:  Object to the form.

5        A     It certainly influences my -- my

6    recommendation for replacement of the main pavilion

7    where the spans are so long and we have this

8    transition from one slope to a higher slope.

9    BY MR. FRIEDBERG:

10       Q     Okay.  In terms of the ridge details that

11   you saw, is that -- are your criticisms throughout

12   the project?

13       A     Yes.

14                    MR. GOLDBERG:  Object to the form.

15   BY MR. FRIEDBERG:

16       Q     In terms of the -- coming up with your

17   recommended cost of replacement, I believe you

18   indicated you contacted Dahill to discuss --

19       A     Yeah.

20       Q     -- costs?

21       A     Yeah.

22       Q     Have requests been made to you to, at

23   least, get going and see about getting these roofs

24   replaced?

25       A     No.  But you did talk to me about wanting

Page 295

1    to alleviate the leak problems at -- at the

2    gatehouse.

3        Q    Was a request made to, at least, make an

4    inquiry to, at least, start with the gatehouse and

5    get that roof replaced?

6        A    At the minimum -- you made a request to,

7    at a minimum, see if we can repair the flashing

8    conditions that are currently causing leaks.

9        Q    And your recommendation is regarding the

10   gatehouse to repair or replace that?

11       A    Well, my recommendation is initially to

12   repair these flashings so that you can be

13   watertight, but they have the same conditions as

14   elsewhere, and I -- I still recommend that they be

15   replaced.

16       Q    Okay.

17            MR. FRIEDBERG:  All right.  I don't

18            think I have anything further at this

19            time.

20            MR. SIMPSON:  Okay.  I've --

21            MR. GOLDBERG:  I've got a couple

22            quick ones.  Excuse the mapping.  I don't

23            know if you can hear -- do you do that

24            when --

25            Can you hear me?

Page 296

1          THE WITNESS:  Yes.  Turn left.

2

3

4              RECROSS-EXAMINATION

5

6

7   BY MR. GOLDBERG:

8       Q     Mr. Sanders, did you do any independent

9   research relative to Mr. Huber's company?

10      A     No, I did not.

11      Q     Did you do any Google searches or look at

12  his website?

13      A     No.

14      Q     Do you have any idea what type of

15  projects he's done?

16      A     No.

17      Q     Do you know any of the projects

18  besides -- hold on.

19            Do you know of any of the projects that

20  Mr. Huber and Huber & Associates/Daybreak has done

21  at all besides Mr. Friedberg's?

22      A     No, I do not.

23      Q     And with respect to the one project that

24  you did on the copper -- the copper restoration that

25  you just recently testified to, can you tell me how

Page 297

1  old was that work?

2      A      The Patent Office dates from the 1860s.

3  I don't remember if it had its original copper roof

4  or if there was another copper roof installed.  The

5  replacement was in the mid-'90s and was fine until

6  Mr. Foster put a skylight over the courtyard.

7      Q      And with respect to your recent testimony

8  concerning the gatehouse, the repairs that

9  Mr. Friedberg asked to be done, if I understand

10  correctly, he asked you to do repairs on that

11  particular portion of his home?

12      A      We -- we talked about what could possibly

13  be done to arrest the water infiltration in the

14  living room and the kitchen.

15      Q      Did he ask -- did he ask you to go ahead

16  and make repairs?

17      A      No.

18      Q      Did he ask Fran to make repairs?

19      A      I -- I had a conversation with Fran and

20  the owner of the company that he works for talking

21  about whether it would be possible to send him down

22  to do repairs and that --

23      Q      And -- sorry.

24      A      -- and that's all been done so far.

25      Q      And what did he say relative to that

Page 298

1    conversation?

2         A      Well, that it would be possible.

3         Q      And has that -- has that been undertaken?

4         A      No.

5         Q      Has any quotes been submitted?

6         A      No.

7         Q      Has any discussions further been had

8    with Mr. Friedberg that you are aware relative to

9    that?

10        A      No.

11               And to tell you the truth, it's in my

12   court because I haven't -- I've been too busy to

13   basically do some details to -- for the corrective

14   work --

15        Q      Okay.

16        A      -- that would --

17        Q      And that --

18        A      -- that would produce a proposal.

19        Q      Okay.  So there are plans in place for

20   repair at that particular -- hold on a second --

21   that that would address the issues pertaining to --

22   sorry, sorry -- pertaining to the leaks associated

23   with the gatehouse?

24        A      The -- the request had been made of me

25   and I haven't gotten to it, let's put it that way.

Page 299

1      Q    Yeah, but that's not my question.

2           My question is:  Is it possible to -- to

3    do repairs on that particular portion of the roof?

4                MR. FRIEDBERG:  Objection.  Form.

5                Go ahead.

6      A    I think it's possible to put a new

7    counter flashing in that addresses those leaks.

8    BY MR. GOLDBERG:

9      Q    And would that be a repair or a

10   replacement, sir?

11     A    That -- that would only be a localized

12   repair to address those localized conditions and not

13   the overall conditions.

14     Q    So repair is possible?

15     A    At those localized areas.

16     Q    And relative to the gatehouse itself; is

17   that right?

18     A    Yes.

19     Q    Okay.

20                MR. GOLDBERG:  I have nothing

21                further.

22

23

24

25

Page 300

1                    FURTHER REDIRECT EXAMINATION

2

3

4    BY MR. SIMPSON:

5         Q    When you -- you are familiar with bread

6    boxing -- are you familiar with the term "bread

7    boxing"?

8         A    No.

9         Q    Okay.  Are you familiar with wide -- wide

10   ridge -- not sure how to -- you are not familiar

11   with the term "bread boxing" --

12        A    No.

13        Q    -- as used in the copper roofing

14   industry?

15        A    No.

16        Q    You made the comment that anyone worth

17   their salt would take out metal when folding the

18   standing seams.

19             Correct?

20        A    Because there's just way too much metal

21   going into the joint.

22        Q    Is there anywhere in Revere or SMACNA

23   that suggests doing that?

24        A    No.  I think it's common knowledge

25   amongst roofing mechanics.

Page 301

1      Q     Okay.  And you -- I think you had told me

2  earlier that for the peak caps, neither Revere nor

3  SMACNA have a detail for that.

4            Correct?

5      A     Correct.

6      Q     Okay.  When did you have the discussion

7  with Mr. Friedberg about fixing the -- was it the

8  gatehouse?

9      A     Yeah.

10     Q     Okay.

11     A     About -- about a month ago --

12     Q     Okay.

13     A     -- when you were supposed to be here.

14     Q     Okay.

15            MR. SIMPSON:  I have no other

16            questions.

17            MR. FRIEDBERG:  I don't --

18

19

20       FURTHER RECROSS-EXAMINATION

21

22

23  BY MR. GOLDBERG:

24     Q     One more.

25            Have you had a discussion with

Page 302

1    Mr. Friedberg regarding making repairs to any other

2    portion of his home?

3         A     No.

4         Q     All right.  How much do you believe that

5    repair is going to cost?

6         A     I have no clue at this point.

7         Q     Okay.  Can you give me a round about?

8         A     No.  Because I haven't done the details.

9    I haven't run it by the contractor.  And there's a

10   lot of logistics involved in -- in what the total

11   cost is going to be to send someone down to do it.

12        Q     And I assume that you are going to be

13   paid for the architectural work that you do relative

14   to the repair?

15        A     I would give Mr. Friedberg a proposal for

16   my services, yes.

17        Q     You would expect to be paid for that,

18   wouldn't you?

19        A     Yes.

20        Q     And the roofing contractor, that was the

21   same gentleman that came down with you on your

22   inspection.

23              Right?

24        A     Yes.  That's -- that's the tin knocker,

25   the mechanic, yes.

Draft Copy

Page 303

1       Q       And that would be the person that you're

2    recommending for the project?

3       A       Yes.

4       Q       Same person that came down with you to

5    assess the situation relative to the work that was

6    done down there?

7       A       Yes.

8       Q       And --

9       A       And probably another assistant.

10       Q       Okay.  And that would be the same -- the

11    same company and the same person that was hired by

12    Mr. Friedberg to assess the quality of the work done

13    by Huber & Associates.

14               Is that right?

15       A       That's the same person that came down to

16    take things apart.  He's not part of the assessment

17    per se.

18       Q       Okay.  I think I have everything I need,

19    guys.  Thank you.

20               THE WITNESS:  All right.

21               MR. SIMPSON:  Okay.  And just for

22               the record, we've substituted a new USB

23               for Exhibit 7, which has all the photos

24               on it.

25               THE WITNESS:  Oh, yeah, that's

Page 304

1                right.

2                     MR. FRIEDBERG:  Mr. Sanders will

3                review and sign.  I'll take the PTX,

4                e-Trans with a PDF of the exhibits.

5                     MR. GOLDBERG:  I'm sorry, is he

6                reading or waiving?

7                     MR. FRIEDBERG:  No.  He's reading

8                and signing.  He's not waiving.

9                     MR. GOLDBERG:  Okay.  I just didn't

10               hear, Tom.  Sorry.

11                    Are we off the record?

12                    MR. FRIEDBERG:  Yeah.

13                    (THEREUPON, THE DEPOSITION WAS

14                    CONCLUDED AT 4:28 P.M.)

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2                                              PAGE

3    DIRECT EXAMINATION BY MR. SIMPSON            4

4    CROSS-EXAMINATION BY MR. GOLDBERG            85

5    REDIRECT EXAMINATION BY MR. SIMPSON          256

6    CROSS-EXAMINATION BY MR. FRIEDBERG           285

7    RECROSS-EXAMINATION BY MR. GOLDBERG          296

8    FURTHER REDIRECT EXAMINATION BY MR. SIMPSON  300

9    FURTHER RECROSS-EXAMINATION BY MR. GOLDBERG  301

10

11

12                    INDEX OF EXHIBITS

13   SANDERS EXHIBIT                            PAGE

14   NO. 1, HOFFMAN JOURNAL ARTICLE CALLED

15        COPPER, AN ENDURING LINK BETWEEN

16        PAST AND FUTURE                         8

17   NO. 2, SEVEN JOURNAL ARTICLES               8

18   NO. 3, PLAN DRAWING WITH MARKINGS BY THE

19        WITNESS INDICATING LOCATIONS           58

20   NO. 4, PHOTOGRAPHS                          74

21   NO. 5, PHOTOGRAPHS TAKEN ON SEPTEMBER 11    74

22   NO. 6, PHOTOGRAPHS TAKEN ON SEPTEMBER 12    75

23   NO. 7, THUMB DRIVE                          155

24   NO. 8, CONTRACTS                            135

25   NO. 9, PHOTOGRAPHS                          135

Draft Copy

Page 306

1    NO. 10, PHOTOGRAPH OF ROOF                          136

2    NO. 11, PHOTOGRAPH                                  141

3    NO. 12, PHOTOGRAPH OF MAIN PAVILION                 141

4    NO. 13, DOCUMENT                                    143

5    NO. 14, DOCUMENT                                    144

6    NO. 15, TIMELINE                                    155

7    NO. 16, INVOICES                                    167

8    *NO. 17, (TO BE FURNISHED BY THE WITNESS)

9    NO. 18, OPINION OF PROBABLE CONSTRUCTION COSTS  219

10   NO. 19, PROPOSAL TO MR. FRIEDBERG                   228

11   NO. 20, RESEARCH DOCUMENTS                          230

12   NO. 21, COST OF REPAIR                              240

13   NO. 22, ARCHITECT'S PLAN                            241

14   NO. 23, SECTION FROM SMACNA                         275

15   NO. 24, VALLEY DETAIL                               278

16   *NOT PROVIDED AT TIME OF DEPOSITION.  TO BE PROVIDED

17   BY WITNESS

18

19   (Reporter's Note:  Original exhibits to be sealed

20   with original transcript.)

21

22

23

24

25

Page 307

1                    C E R T I F I C A T E

2            I hereby certify that I am a Notary Public,

3    in and for the State of Connecticut, duly

4    commissioned and qualified to administer oaths.

5            I further certify that the deponent named in

6    the foregoing deposition was by me duly sworn, and

7    thereupon testified as appears in the foregoing

8    deposition; that said deposition was taken by me

9    stenographically in the presence of counsel and

10   reduced to typewriting under my direction, and the

11   foregoing is a true and accurate transcript of the

12   testimony.

13           I further certify that I am neither of

14   counsel nor attorney to either of the parties to

15   said suit, nor am I an employee of either party to

16   said suit, nor of either counsel in said suit, nor

17   am I interested in the outcome of said cause.

18           Witness my hand and seal as Notary Public

19   this _____ day of _____ , 2015.

20

21                   _____

22                        Clifford Edwards

23                        Notary Public

24   My commission expires:  9/30/2016

25

Page 308

```
 1                    J U R A T

 2

 3       I have read the foregoing 307 pages and hereby

 4    acknowledge the same to be a true and correct record

 5    of the testimony.

 6

 7

 8

 9              _____

10                        ARTHUR L. SANDERS, AIA

11

12    Subscribed and sworn to

13    _____.

14    Before me this _____ day of   _____,

15    2015.

16

17

18

19

20    _____

21    Notary Public

22    My Commission Expires:

23

24

25
```

Draft Copy

```
 1                    DEPOSITION ERRATA SHEET

 2     Page No._____Line No._____ Change to:_____

 3     _____

 4     Reason for change:_____

 5     Page No._____Line No._____Change to:_____

 6     _____

 7     Reason for change:_____

 8     Page No._____Line No._____ Change to:_____

 9     _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____ Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____ Change to:_____

21     _____

22     Reason for change:_____

23

24     SIGNATURE:_____DATE:_____

25     NAME:  ARTHUR L. SANDERS, AIA
```

```
 1                 DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____ Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____ Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____ Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20
21
22
23    SIGNATURE:_____DATE:_____
24    NAME:  ARTHUR L. SANDERS, AIA
25
```

Draft Copy