**EXHIBIT 6**

Page 1

1         IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
                    DIVISION OF ST. THOMAS AND ST. JOHN

2

3     THOMAS F. FRIEDBERG &          :   CIVIL ACTION NO:
      SARAH L. BUNGE,                :   3:19-CV-0053

4

5              Plaintiffs,           :

6

7     vs                            :

8

9     DAYBREAK, INC., D/B/A HUBER    :   AUGUST 28, 2025
10    & ASSOCIATES                   :

11

12

13             Defendant.            :

14

15

16

17             DEPOSITION OF:  Arthur Sanders

18

19             DATE:        August 28, 2025

20

21             TIME:        10:11 A.M. - 2:02 P.M.

22

23             LOCATION:   Regus
24                         157 Church Street
25                         New Haven, Connecticut  06510

```
                                                    Page 2
 1   A P P E A R A N C E S:
 2
 3   REPRESENTING THE PLAINTIFF:
 4           Law Offices of Friedberg & Bunge
             1005 Rosecrans Street
 5           Suite 202   P.O. Box 6814
             San Diego, California  92166
 6           Email:  Tom@lawofficesFB.com
             By:   Thomas Friedberg, Esquire
 7
 8   REPRESENTING THE DEFENDANT:
 9           Williams, Leininger & Cosby
             301 SE Ocean Boulevard
10           Suite 205
             Stuart, Florida  34994
11           Email: jcosby@wlclaw.com
             By:    Jeffrey C. Cosby, Esquire
12
13   Present Via Zoom:
14           Andrew C. Simpson, Esquire
             VI Bar 451
15           2191 Church Street, Suite 5
             Christiansted, St. Croix
16           U.S. Virgin Islands  00820
17
18
19
20
21
22
23
24
25
```

Page 3

1                        I N D E X

2

3   WITNESS                                          PAGE

4   Arthur Sanders                                      6

5       Direct Examination by Mr. Cosby                 6

6

7   DEFENDANT'S EXHIBITS:

8   Exhibit 1 - Subpoena                               16

9   Exhibit 2 - Arthur Sanders 2014 Report             17

10  Exhibit 3 - Storm Damage Report                    17

11  Exhibit 4 - Dahill Projected Cost Report           18

12  Exhibit 5 - Dahill Project Review Report           18

13  Exhibit 6 - Cunningham & Lindsey Reports           18

14  Exhibit 7 - Dolan Summary of Economic Loss         18

15  Exhibit 8 - Arthur Sanders Deposition              18

16  Exhibit 9 - Friedberg/Huber Contracts              18

17  Exhibit 10 - Complaint                             19

18  Exhibit 11 - WJA Expert Report                     19

19  Exhibit 12 - Sketch                                19

20  Exhibit 13 - Drive                                 19

21

22  (Exhibits retained by Arthur Sanders.  Copy of exhibits

23   to be provided to counsel by Arthur Sanders.)

24

25

Page 4

1                    TRANSCRIPT LEGEND

2

3    [phonetic]        exact spelling not provided

4    [--]              break in speech continuity

5    and/or interrupted sentence

6    [...]             indicates omission of word(s) or trailing

7    off when reading or finishing a sentence

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              S T I P U L A T I O N S

2              IT IS STIPULATED by counsel for the parties

3    that all objections are reserved until the time of trial,

4    except those objections as are directed to the form of

5    the question.

6              IT IS STIPULATED by counsel for the parties

7    that all objections are reserved until the time of trial,

8    except those objections as are directed to the form of

9    the question.

10             IT IS FURTHER STIPULATED AND AGREED between

11   counsel for the parties that proof of the authority of

12   the Notary Public before whom this deposition is taken is

13   waived.

14             IT IS FURTHER STIPULATED AND AGREED between

15   counsel for the parties that any defects as to the notice

16   of the taking of the deposition are waived.

17             IT IS FURTHER STIPULATED AND AGREED between

18   counsel for the parties that the reading and signing of

19   the deposition transcript by the deponent is waived.

20

21

22

23

24

25

Page 6

1              THE COURT REPORTER:  Counsel, stipulations

2        for this deposition?

3              MR. FRIEDBERG:  By notice.

4              MR. COSBY:  By notice.

5              THE COURT REPORTER:  And would you like a

6        copy of this deposition, Counsel?

7              MR. FRIEDBERG:  Yes, I would.  Electronic

8        and the full suite with exhibits emailed to me.

9              MR. COSBY:  Same.

10              THE COURT REPORTER:  Okay.  Thank you.

11          A R T H U R            S A N D E R S,

12        having been first duly sworn by Christine N.

13        Meade, a notary public in and for the State of

14        Connecticut, was examined and testified on his

15        oath as follows:

16              THE COURT REPORTER:  Could you state your

17        name and address for the record, please?

18              THE WITNESS:  Arthur Lloyd Sanders,

19        2001 Chapel Street, New Haven,

20        Connecticut 06515.

21              THE COURT REPORTER:  Thank you.

22              Counsel, you're all set to begin.

23              MR. COSBY:  All right.

24                    DIRECT EXAMINATION

25    BY MR. COSBY:

Page 7

1     Q    All right.  Go ahead and state your name again,
2  please.
3     A    Arthur Lloyd Sanders.
4     Q    Okay.  I'm going to go over the ground rules
5  for the deposition as we start here.
6          Although, you and I are about 2-and-a-half feet
7  apart, keep your voice up.  You're soft or -- you know,
8  I'm not faulting you, but I want to make sure Mr. Simpson
9  can hear you and our court reporter can hear you and I
10  can hear you.
11          So I don't want to yell back and forth at each
12  other, but we may talk a little louder than we would if
13  you and I were in the room 2-and-a-half feet apart.
14     A    So noted.
15     Q    Okay.  You've been through depositions before.
16  Same process as I'm sure you've heard before.  I'll ask
17  you a series of questions.  Mr. Friedberg may have
18  questions for you.  Answer them to the best of your
19  ability.  Avoid the a uh-huh and huh-huh.
20     A    Yes, I will.
21     Q    If you say that, I'm going to say is that a
22  yes.  It's not the end of the world.  It's just -- you
23  know, when I say is that a yes, that's what I'm talking
24  about.  I'm cuing you to give me an answer that is
25  clearer than uh-huh or huh-huh.

Page 8

```
 1        A    Okay.

 2        Q    If you don't understand any question I ask,

 3   just let me know that and I will rephrase it.  I don't

 4   want you to answer something you don't understand.

 5             And we cannot talk over each other.  So if I

 6   start to ask a question and you cut me off with your

 7   answer or I cut off your answer with my next question,

 8   she can't take two of us down at once.  So it slows the

 9   process down, and I have to reask the question.

10             Again, it's not the end of the world, but let's

11   try not to talk over each other.  Okay?

12        A    Sure.

13        Q    To the extent you need to take a break at any

14   time, just let us know that.  I will take some breaks for

15   myself and for our reporter, but you have the right to

16   take a break as often as you need to.  I would just ask

17   you if there's a question pending, you answer it unless

18   it's an emergency-emergency, then we do whatever we need

19   to do.  Fair?

20        A    Yes.

21        Q    Okay.  All right.

22             So my understanding is, because you've been

23   listed as an expert in this case, that you've been

24   retained by Mr. Friedberg and Sarah Bunge in this case,

25   is that correct?
```

```
                                                  Page 9
  1        A    Yes.
  2        Q    Okay.  And what is your understanding of the
  3   scope of what your involvement is as an expert?
  4        A    My involvement is this is a case of not meeting
  5   contract requirements.
  6        Q    And you've testified previously in this case --
  7   in another case related to this property, correct?
  8        A    Yes.
  9        Q    One time?
 10        A    Yes.
 11        Q    Okay.
 12        A    One deposition.
 13        Q    Correct.
 14        A    Yes.
 15        Q    Did you offer any other testimony?
 16        A    In court.
 17        Q    Okay.  And was that -- what was the hearing or
 18   purpose of the testimony in court?
 19        A    It was related to the original construction.
 20        Q    Was it a hearing?  Was it a trial?
 21        A    I believe it was a trial.
 22        Q    Okay.
 23        A    I defer to Tom.
 24        Q    What -- to make sure we're talking about the
 25   same case, what case do you think you testified in trial
```

Page 10

1    related to this property?

2        A    Well, the trial against Daybreak.

3        Q    Okay.

4        A    I don't remember the exact docket or anything

5    else related to that.

6        Q    Okay.

7                MR. COSBY:  What am I missing here?

8                MR. FRIEDBERG:  We can go off the record.

9                MR. COSBY:  Yeah.

10               (Whereupon, a discussion was held off the

11          record.)

12               MR. COSBY:  We can go back on.

13   BY MR. COSBY:

14       Q    So we just had a discussion off the record.

15   You were listening.  You heard that that was a Daubert

16   hearing that you testified at, is that correct?

17       A    Yes.

18       Q    Okay.  And you've been unable to review that

19   testimony because it doesn't exist or can't be located,

20   is that fair?

21       A    That's true.

22       Q    Okay.  Any other testimony you've offered in

23   this case other than at that hearing and the prior

24   deposition in the superior court case?

25       A    No.

Page 11

1      Q    Okay.  All right.

2           Give me -- I know we sent a duces tecum

3    requesting various materials along with a notice of

4    deposition.

5           What have you brought with you today?

6      A    I've brought what I have.  I have --

7      Q    Let's go through what you have.

8      A    Okay.  I have my original -- a copy of my 2014

9    report.

10     Q    You can just set it up here as you go.  We're

11   going to mark this stuff, but I want to hear what you

12   have first.

13     A    I have actually two copies of my storm damage

14   report, one which is marked with exhibits and the other

15   one is just a copy.

16     Q    Is that your 2018 report?

17     A    Yes.

18     Q    Okay.

19     A    I have two documents from Dahill that -- one is

20   related to the cost of -- projected cost of work, and one

21   was related to a project review report for their -- the

22   work they did to repair damage from the hurricane.

23     Q    What are the dates of those two reports,

24   starting with the cost of work?

25     A    January 22nd.

Page 12

1      Q    Of?

2      A    It's labeled 137th year -- oh, 2020.  Sorry.

3           And the other report, the review report, is

4   March 8th, 2019.

5      Q    Okay.

6      A    I have the Cunningham & Lindsey reports,

7   interim reports, one through -- I'm not sure what the

8   last one is.  It's either three or four.  Yeah, well,

9   through -- through -- one through three and final report.

10          I have draft reports for the summary of

11  economic loss, which was prepared for Mr. Friedberg.

12  It's from Dolan.

13          And then I have depositions from Chris Bunge,

14  Sarah Bunge.  I actually have two copies of Sarah's I

15  think.  One was not condensed.

16     Q    Okay.

17     A    And depositions from Barry Huber.

18     Q    Dated?

19     A    April 28, 2025.  And also, April 28, 2025,

20  Micha Cady.

21          I have my request for a deposition, and the

22  subpoena.  The original -- well, it -- this is stapled

23  together, both the first and the -- and the revised

24  contract with Huber.

25          And the complaint, a copy of the complaint.

Page 13

1          Q     For this case?

2          A     Yes.   And I have a deposition from March 6,

3    2015, which was the original case.

4          Q     Whose depo?

5          A     Mine.

6          Q     Yours?

7          A     My depo, yes.

8          Q     Okay.

9          A     Arthur Sanders.   And I have the expert witness

10   report from WJA.

11               I have -- I do have one sketch that I did.

12   It's not dated.   I'm not sure when I did it.   It's just

13   a simple geometry exercise on the -- on the octagonal

14   roof.

15         Q     Okay.

16         A     And those are all -- all those documents are on

17   this flash drive, including what photographs I could

18   obtain from Hoffmann Architects, related to both projects

19   and whatever was in my possession.

20               There were no paper files from Hoffmann in 2018

21   or '19.   There was a pipe that burst on the fourth floor

22   of the building they were in and a lot of files got

23   damaged.

24         Q     What is your relationship with Hoffmann

25   Architects?

Page 14

1       A    I was a part of the ownership of the firm, and

2   when I turned 70 I was obligated to start selling shares,

3   which by contract I extended two years, and eventually

4   sold my last shares in 2021.

5            I officially retired -- well, I had retired and

6   had a retirement party in January of 2020, but due to

7   COVID, I was asked to do a little bit more work and

8   worked for about a year and a half after that until my

9   shares were sold.  So I am officially retired.

10      Q    Almost, since you're still here.

11      A    Well, I'm not here -- I'm here as an expert

12  witness to Tom.

13      Q    I understand.

14      A    My status is that I'm a retired architect.  I

15  hold the status of Emeritus with AIA.  I hold that same

16  status with my licensure in Connecticut where I am an

17  Emeritus.  My restriction, which I've held to, is that I

18  cannot take on any new work, and this is an existing

19  client that I'm --

20      Q    I understand.

21      A    -- providing expert testimony to.

22      Q    So you're working through any pending cases

23  that you were working on at the time of retirement, is

24  that fair?

25      A    It's somewhat fair because I did take one other

Page 15

```
 1   client in post retirement and did some -- just some field
 2   work with them, trying to solve the issues.
 3        Q    Okay.  Do you have any other cases that are
 4   still pending?
 5        A    No.
 6        Q    So whichever one you took on and this one are
 7   your last two as it exists right now?
 8        A    Yeah.  The other -- the other one would have
 9   perhaps been a case, but I declined to -- to be involved.
10        Q    Okay.  All right.
11             So the duces tecum asked for some other things.
12   Your curriculum vitae, is that on this drive or in the
13   materials we have?
14        A    It is in the material.  In the original
15   report -- my CV has not changed since the original
16   report.
17        Q    Okay.
18        A    And it was appended to the back of the report.
19   So it is here.
20        Q    Gotcha.  Okay.  All right.
21             So we're going to list some of these things.
22   If you could do one thing for me, take out the
23   depositions other than your own because I'm not going to
24   list those.
25        A    Okay.  You're not going to list Barry or Micha.
```

Page 16

1      Q    Barry, Micha, Sarah.  You can take those out.

2           The only deposition that I do want to list is

3    your old one --

4      A    My old one, yeah.

5      Q    -- or your original depo in the superior court

6    case.

7      A    Okay.

8      Q    And these exhibits we can mark for our court

9    reporter?

10     A    Sure.

11     Q    Okay.

12              MR. COSBY:  I'm happy to start marking

13           these if you want to hand me some stickers.

14              THE COURT REPORTER:  Sure.

15              MR. COSBY:  So let me take these.  I will

16           mark them in a certain order.

17              MR. COSBY:  All right.  So I will list as

18           Number 1 the subpoena for this deposition.

19              (Whereupon, Defendant's Exhibit 1,

20           Subpoena, marked for identification.)

21    BY MR. COSBY:

22     Q    I'll tell you what.  I'm going to give these

23    documents back to you and have you hand them to me

24    because you know them better than I do.

25              Your '14 report, if you can pull that.

Page 17

1        A    (Handing)

2   BY MR. COSBY:

3        Q    List that as Number 2.

4             (Whereupon, Defendant's Exhibit 2, Arthur

5        Sanders 2014 Report, marked for

6        identification.)

7   BY MR. COSBY:

8        Q    And the next one will be your -- a composite of

9   '18 Storm Damage Report.

10       A    Okay.  This is the other copy that had exhibits

11  attached to it.

12       Q    Of '14?

13            No, this is '18.

14       A    Oh, I'm sorry.  Okay.  Okay.

15       Q    So that's what I want next.  The '18 Storm

16  Damage Report.  You said there were two of them, one had

17  exhibits, one didn't.  We'll list both of those as a

18  composite.

19       A    Yes.

20       Q    Exhibit 3.

21            (Whereupon, Defendant's Exhibit 3, Storm

22       Damage 2018 Report, marked for identification.)

23       A    I'll actually just clip them together.

24  BY MR. COSBY:

25       Q    Sure.  Next will be the Dahill projected cost

1    of work.  We'll list that as Exhibit 4.

2                (Whereupon, Defendant's Exhibit 4, Dahill

3                Projected Cost Report, marked for

4                identification.)

5    BY MR. COSBY:

6        Q    And the Project Review Report from Dahill,

7    we'll list as Exhibit 5.

8                (Whereupon, Defendant's Exhibit 5, Dahill,

9                Project Review Report, marked for

10               identification.)

11   BY MR. COSBY:

12       Q    The Cunningham & Lindsey Reports 1 through 3

13   and the final we'll list as composite Exhibit 6.

14               (Whereupon, Defendant's Exhibit 6,

15               Cunningham & Lindsey Reports, marked for

16               identification.)

17               MR. COSBY:  The Dolan Summary of Economic

18               Loss, we'll list as Exhibit 7.

19               (Whereupon, Defendant's Exhibit 7, Dolan

20               Summary of Economic Loss, marked for

21               identification.)

22               MR. COSBY:  Exhibit 8 we will list your

23               deposition, your prior deposition transcript.

24               (Whereupon, Defendant's Exhibit 8, Arthur

25               Sanders' Deposition, marked for

Page 19

```
 1          identification.)
 2               MR. COSBY:  Exhibit 9 will be the
 3          contracts, the first and the revised between
 4          Friedberg and Huber.
 5               (Whereupon, Defendant's Exhibit 9,
 6          Friedberg and Huber Contracts, marked for
 7          identification.)
 8               MR. COSBY:  Exhibit 10 will be the
 9          Complaint in this case.
10               (Whereupon, Defendant's Exhibit 10,
11          Complaint, marked for identification.)
12               MR. COSBY:  Eleven will be the WJA Expert
13          Report.
14               (Whereupon, Defendant's Exhibit 11, WJA
15          Expert Report, marked for identification.)
16               MR. COSBY:  Exhibit 12 will be the sketch.
17               (Whereupon, Defendant's Exhibit 12,
18          Sketch, marked for identification.)
19               MR. COSBY:  We'll list the drive that you
20          handed me with photos and other things on it as
21          Exhibit 13.
22               (Whereupon, Defendant's Exhibit 13, Drive,
23          marked for identification.)
24     BY MR. COSBY:
25          Q    All right.  So let me cover a couple of other
```

Page 20

1    things.  We were talking about your curriculum vitae,

2    which you've provided as part of your report.  Let me

3    include the notice of taking the deposition as part of

4    Number 1.

5         A    Is this -- is this Number 1 here?

6         Q    That's Number 1, yes.

7         A    Okay.

8         Q    You can keep that in front of you.

9         A    Okay.

10         Q    So just going through these documents.  We

11    requested a copy of your current curriculum vitae.  We

12    covered that.

13              All diagrams, charts and reports, whether for

14    submission as a jury exhibit in evidence or for

15    demonstrative purposes.  So have we covered -- you gave a

16    sketch.

17              Are there any other diagrams that you prepared?

18         A    No, no.

19         Q    Or that you reviewed?

20         A    No.

21         Q    Okay.  Charts?

22         A    No.

23         Q    Reports, we've covered all your reports?

24         A    Yes.

25         Q    And you don't have any reports pending,

Page 21

1    correct?

2        A    No.

3        Q    Correct?

4        A    No.

5        Q    Correct, I'm correct?

6        A    I have no other reports pending.  Sorry.

7        Q    Thank you.

8             Any and all reports on your findings,

9    conclusions and opinions.

10            That's kind of a duplicate to what we've

11   already talked about, but we've covered that, correct?

12       A    Yes.

13       Q    Okay.  Any and all correspondence.  Is there

14   any correspondence between you and Mr. Friedberg at any

15   time, which would include emails, letters, anything like

16   that?

17       A    Nothing -- nothing that's except what's

18   privileged.

19       Q    Well, what's privileged?  I don't understand

20   that.  I'm not aware of any privilege.

21                MR. FRIEDBERG:  It's a privilege for draft

22           reports between the attorney and the expert,

23           attorney work product under the rules --

24           Rule 26 in the comments.

25                MR. COSBY:  I can understand that.

Page 22

```
 1   BY MR. COSBY:

 2        Q     Is there any other correspondence between you

 3   all --

 4        A     No.

 5        Q     -- other than draft reports?

 6        A     No.

 7        Q     Okay.  Were there draft reports?

 8                   MR. FRIEDBERG:  Let me assert the Rule 26.

 9             Objection.  Privileged.

10                   Go ahead and answer.

11        A     There were draft reports.

12   BY MR. COSBY:

13        Q     Okay.  As to 2014 or '18 or both?

14        A     As to this case.

15        Q     As to this report?

16        A     Yeah.

17        Q     Okay.  Were there drafts of the '14 and '18

18   reports?

19        A     Not to my recollection.

20        Q     When did you first prepare the report in this

21   case?

22        A     About a month ago.

23        Q     Okay.  All right.

24              And we'll get to that more later, but no other

25   correspondence, other than here's a draft, take a look at
```

Page 23

1    it and maybe he sent something back with changes.

2            And other than those communications, nothing

3    else?

4        A    No.

5        Q    A list of cases in which you've testified at

6    deposition or a trial.  I read your last deposition,

7    which said, I don't keep a list like that, is that fair?

8        A    I don't remember phrasing it that way, but --

9        Q    I'm summarizing.  I'm not quoting.  Do you

10   keep -- let me ask a different question.

11           Do you keep a list of your depositions or

12   trials within the last three years?

13       A    There are have been none.

14       Q    Okay.  You haven't had any --

15       A    No.

16       Q    -- depositions in the last three years?

17       A    No.

18       Q    Okay.  And no trials within the last

19   three years?

20       A    No.

21       Q    How many times do you think you've been deposed

22   as an expert?

23       A    Probably only two or three times.

24       Q    Okay.  Including one in the superior court

25   case?

Page 24

1      A    Yes.

2      Q    Have you ever appeared at trial in a case?

3      A    No.

4      Q    Have you ever testified in a Daubert hearing

5    other than in the superior court case?

6      A    No.

7      Q    Do you know if you've ever been challenged by a

8    Daubert hearing other than in the superior court case,

9    Daubert, Frye, any type of motion to strike your

10   testimony?

11     A    I have not been challenged.

12     Q    Do you know how many litigation cases you've

13   been involved in?

14     A    Only two or three, and I would have to go back

15   to Hoffmann records to try to understand what I was

16   involved in.

17     Q    How long have you worked with Hoffmann?

18     A    Thirty years.

19     Q    Thirty?

20     A    Yes.

21     Q    Okay.  And of the -- when did you first begin

22   doing any type of expert or litigation work?

23     A    Probably in the last five to eight years of my

24   practice.

25     Q    Was the superior court case the first case you

Page 25

1    handled as an expert?

2        A    It's the first case that went beyond
3    negotiation.

4        Q    Okay.  Was that the first time you were deposed
5    as an expert?

6        A    Yes.

7        Q    And you said about five years ago?  Is that
8    what you said when you started?

9        A    I would say five years from my retirement date,
10   probably -- maybe from '15.

11       Q    Okay.  2015?

12       A    Yes.

13       Q    And was that ever a high percentage of your
14   practice?

15       A    No.  It was never a high percentage.

16       Q    Did you -- were you ever deposed in a
17   non-expert context, in other words, for -- based on some
18   work you did or you were just a witness for some reason
19   professionally?

20       A    No.

21       Q    Okay.  And same context, ever testify in a
22   trial in a non-expert capacity?

23       A    No.

24       Q    A copy of any published article written by you
25   or to which you contributed, is that something that's on

Page 26

1   this drive?

2        A    There is one.  There is one Hoffmann Journal on

3   copper roofing that was previously submitted relative to

4   the first case.

5        Q    Okay.  And don't assume I have all that from

6   the first case.  I appreciate what you just --

7        A    Well, that's what I -- that's what I found from

8   the first case.

9        Q    Okay.  Were there any other articles, treaties,

10  journal -- journal entries or submissions, scholarly

11  writings, related to your work on the superior court case

12  or this case that you reviewed?

13       A    No.

14       Q    Who wrote the Hoffmann Journal writing that you

15  have on the drive?

16       A    It was written as part of the -- you know, to

17  go back a little bit in the history of Hoffmann

18  Architects.

19            John Hoffmann in the -- I think the late

20  1980-1990 period, started a technical journal distributed

21  to clients and others that -- and I think '94, he won a

22  national AIA award for the technical journal.  The

23  articles are still published today, sometimes quarterly,

24  sometimes a little bit more often.

25            They're offered by technical staff.  My paper

Page 27

1    on copper roofs was written by me, and there's a -- I

2    would say marketing staff that supports that effort, too,

3    that cleans things up and makes everything pretty.

4         Q    And when did you write that?

5         A    I don't know.  It would be on that -- it

6    would --

7         Q    We'll look at it.

8         A    Yeah.

9         Q    We'll pull it up.

10        A    It's on the drive.

11        Q    And the writing, Hoffmann Journal, still exists

12   under that title today?

13        A    Yes.

14        Q    Okay.  Hoffmann Architects is based where?

15        A    Their offices are down the street here in New

16   Haven.  When I was employed, we were in North Haven.  We

17   were in Hamden.  Hoffmann Architects also has a New York

18   City office and an office in Virginia, near

19   Washington D.C.

20        Q    Okay.

21        A    Approximately 50 employees.

22        Q    50 employees.  Okay.

23             How many architects, do you know?

24        A    I hazard to guess today, but they were

25   actually -- they became grandfathered into a corporation

Page 28

1    in New York City, and the name has changed to Hoffmann

2    Architects Plus Engineers.  One of the principals holds a

3    patent on a repair device for parking garages that's

4    become quite popular for fixing parking garages.  But I

5    don't know how many at this time.

6         Q    Over the thirty years that you worked for

7    Hoffmann, were there architects that worked on litigation

8    cases as experts?

9         A    In my day, myself and the newly retired

10   president, also his last name is Sanders.  Russ Sanders.

11   He and I were the primary people dealing with litigation.

12   Russ and I are not related.

13        Q    Okay.  That was my next question.

14             And how much of his work was involved in

15   litigation?

16        A    I couldn't hazard to guess.

17        Q    Can you guess whether it was less than

18   fifty percent of what he did?

19        A    Oh, yes.

20        Q    Much less?

21        A    Less than 50 percent.

22        Q    Okay.  All right.  And tell me in general what

23   was -- what did Hoffmann Architects do?

24        A    Hoffmann Architects specializes in building

25   envelope issues.

Page 29

1    Q    Okay.

2    A    And that is as simple as documents reroofing,

3  analysis of building envelope issues with reports and

4  documents for repairs.  That's pretty much it in a

5  nutshell.

6    Q    Were there, within the building industry, other

7  professionals at Hoffmann when you worked there, such as

8  general contractors, or was it all architects on the

9  professional side?

10   A    It was all architects and engineers.

11   Q    Architects and engineers --

12   A    Yeah.

13   Q    -- at the time you were there.  Okay.  All

14 right.

15   A    I haven't looked at that resume for quite a

16 while, and I didn't review it recently, but the largest

17 copper roof project I worked on was the renovation of the

18 roof at the Portrait Gallery in Washington D.C.  We were

19 a consultant to a Washington architect for the

20 installation of a new copper roof.  And I presume it's on

21 that resume.

22   Q    Was the previous roof copper --

23   A    No.

24   Q    -- or something different?

25   A    No.  In its history it was copper, but it had

Page 30

1    been roofed over with a modified bitumen.

2        Q    So do I understand correctly that the architect

3    needed someone that was experienced in copper roofing,

4    therefore, they retained your firm?

5        A    Yes.  And the three largest copper installation

6    companies in D.C. were involved in that work, and they

7    had previously -- they had actually come as

8    recommendations from a gentleman who was the project

9    manager and architect at the office of the architect of

10   the Capitol, who I was working with on the U.S. Capitol

11   Dome roof.

12       Q    Who are the three largest companies you've

13   worked with?

14       A    I'd have to go look.

15       Q    Okay.  All right.

16       A    Long time.

17       Q    Gotcha.  And you were involved in the design of

18   the renovation of that copper roof?

19       A    Yes.

20       Q    Renovation of the roof, which was converting to

21   copper, correct?

22       A    Yes.

23       Q    All right.  What was the timeframe of that?

24       A    I would say probably somewhere in the

25   neighborhood of 1994 to 1998, the same time I started

                                                    Page 31

1    work on the U.S. Capitol Dome.

2        Q    Do you know how many copper roof projects you

3    worked on?

4        A    I'd have to go back through my project list and

5    try to figure that out.

6        Q    Do you know what percentage of the work you did

7    over the years was -- involved roofs?

8        A    Roofs in general?

9        Q    Roofing, yes.

10       A    Probably 80 percent.

11       Q    Okay.  And you can't break it down any further

12   as to copper roofs, what percentage that would have been?

13       A    No.

14       Q    Is it fair that the work you did was not all

15   copper roofs?

16       A    No, it was not all copper roofs.

17       Q    And you're strictly involved in design, never

18   installed a copper roof, is that correct?

19       A    Not as a contractor, no.

20       Q    Did you do it in some other capacity?

21       A    No.  It was just as a design of a system.

22       Q    All right.  Are there any other articles that

23   you wrote?

24       A    Related to what?  I'm not sure what the

25   question is.

Page 32

1      Q    The bullet point for the -- for the deposition

2   was a copy of any published article written by you or to

3   which you contributed.  So if you were a co-author or you

4   wrote anything else --

5      A    I wrote probably over six journal articles over

6   the years.

7      Q    In the Hoffmann Journal?

8      A    Yeah.

9      Q    How hard is it to find those?  In other words,

10  can I Google it and pretty much find it if I use your

11  name and the Hoffmann Journal?

12     A    I don't know that that would get you there.  On

13  the Hoffmann website, there are journal articles.  I

14  don't know how far the archive goes back, but I authored

15  journal articles on sealant, on a lot of topics related

16  to the exterior.

17     Q    Is the website open to the public, or is it

18  protected, like you have to have a subscription or

19  anything like that.

20     A    I don't think you need a subscription.

21     Q    Or a password to get into the journal articles?

22     A    I don't -- I don't think so.  I'm not sure.  I

23  haven't looked at them for a long time.

24     Q    Okay.  Is it your understanding or belief that

25  they are on the website somewhere?

Page 33

1      A     The last time I looked for one, yes.

2      Q     Okay.  All right.

3            Did any of the other articles that you wrote

4  have anything to do with copper roofing?

5      A     I am -- I'm not sure.

6      Q     What was the gist of the article that you did

7  provide with regard to copper roofing?  Was it just

8  copper roofing in general or was it --

9      A     I would have to go back and look at it.

10     Q     Okay.  The one you put on the drive, you have

11  not read recently, is that fair?

12     A     That's true.

13     Q     Okay.  Have you looked through these documents

14  that you've provided?

15     A     Yes, I have.

16     Q     Okay.  Did you read your deposition from the

17  superior court case?

18     A     Yes, I did.

19     Q     Do you stand by your testimony in that superior

20  court case?

21            MR. FRIEDBERG:  Objection to form.

22     A     To the best of my knowledge.

23  BY MR. COSBY:

24     Q     All right.  In other words, did you read

25  through and say that wasn't right or I'd like to change

Page 34

1   this or I remember more now?

2                MR. COSBY:  Objection to form.

3       A    I think there's always clarity that might --

4   you know, might have to be brought out.

5   BY MR. COSBY:

6       Q    Well, is there anything you want to clarify

7   from that prior deposition?

8       A    I -- not right offhand.

9       Q    Okay.  Did you read it after it was taken, once

10  it was transcribed, back whenever that was?

11      A    I did.

12      Q    Did you make edits to it at that time?

13      A    I don't think I did.

14      Q    Okay.  The next bullet is, "Any and all notes

15  or other writings reflecting the results of a compilation

16  and summary of the facts deemed significant by you from

17  the source material provided in arriving at the opinions

18  or conclusions that you hold," which is a lot of

19  different words.

20               But upon reviewing any of these documents, any

21  of the photos, anything on this drive, your visit to the

22  property, do you have any notes or other writings that

23  aren't part of these reports?

24      A    No.

25      Q    Okay.  The next bullet is, "Any and all

Page 35

1    materials in your possession relative to the instant

2    lawsuit, including, but not limited to,

3    correspondence" -- we've covered that -- "reports,

4    summaries, calculations, notes, memoranda, raw data upon

5    which you base your opinions, models, plats, maps,

6    videotapes, audiotapes or other materials prepared in

7    anticipation of being used at the trial in this matter or

8    assisting in your analysis and/or the formulation of your

9    opinions and any and all documents, including texts,

10   government reports, statistics or other authoritative

11   materials in which you base your opinions."

12          Some of this falls into that.  Is there

13   anything that falls into that that you have not provided?

14   A    Not to my knowledge, no.

15   Q    And that -- the next sentence just talks about

16   whether it's in paper form, electronic, computer or any

17   other form.

18   A    No.

19   Q    Same answer?

20   A    Same answer, yes.

21   Q    Okay.  The next bullet is, "Your complete file

22   in connection with your investigation and evaluation of

23   the issues in the lawsuit, including, but not limited to,

24   all documents furnished to you by anyone."

25          So are there any documents that you were

Page 36

1  furnished that you returned to Mr. Friedberg, or anyone

2  else, other than what we have here so far and excluding

3  any draft reports --

4      A     No.

5      Q     -- that you stated are privileged?

6      A     Yeah, no.

7      Q     Okay.  "All documents you reviewed, prepared,

8  referred to or relied upon in arriving at any of your

9  opinions or conclusions concerning the issues involved in

10  the lawsuit, including, but not limited to, all texts,

11  periodicals, articles, books or similar information."

12          Anything there?

13      A     No.

14      Q     "Any notes, reports, letters, memoranda or

15  written documentation received by you related to this

16  matter," other than what we already have?

17      A     No.

18      Q     I think the next one we've already covered.

19          And the last one is "All models, illustrations,

20  photographs, exhibits or documents of any kind which you

21  intend" -- it should say "to use or contemplate using to

22  explain, illustrate or support testimony at trial."

23          Is there anything you're anticipating in terms

24  of a trial exhibit?

25      A     No.

Page 37

1        Q    And, I mean, in addition to what you already
2   have.  There's photographs and things like that.
3        A    Right.
4        Q    Whatever you provided is -- it's asking beyond
5   that.  Is there anything else that you anticipate?
6        A    No.
7        Q    Do you have any pending work you're doing on
8   this case other than preparing for this deposition?
9        A    No.
10       Q    Do you plan to visit the property again?
11       A    At this time I have no plan, but I don't know
12  what might come up to make me want to --
13       Q    If you're asked to, you would, but you don't
14  have a plan to, is that fair?
15       A    No, I don't have a plan.
16       Q    Okay.  Do we have each and every document you
17  relied upon in forming your opinions in this case?
18       A    Yes.
19       Q    And the last one is your complete file for this
20  case, representing any work performed since you were
21  retained through the date of the deposition.
22            We've covered that, right?
23       A    Yes.
24       Q    What about billing?  I didn't see any invoices
25  in the paper products.  What about invoices?

Page 38

1     A    You don't have a current invoice from me.  I
2  was going to prepare it after the deposition, but you --
3  it's -- well, it's in there I believe.
4     Q    What do you mean "in there"?
5          I don't know if you mean on the drive.  I
6  didn't see it in here, but I haven't looked through it
7  all yet.
8     A    I think that was part of the response.
9               MR. COSBY:  Let's go off for a moment.
10              (Whereupon, a discussion was held off the
11          record.)
12  BY MR. COSBY:
13     Q    You need this?
14     A    Yes.
15     Q    Here.
16     A    It's on here.  It is -- there's a main folder
17  that has "deposition" and then it says "admin."  And it
18  says ALS/AIA invoice.  There's a Word copy and a PDF.
19     Q    Okay.  So it --
20     A    But that was sent as an attachment to a
21  response, and I don't know if it was just --
22     Q    Well, what does the invoice say?  What -- what
23  is reflected on the invoice.  I'll look at it shortly,
24  but is there a total amount you billed to date?
25     A    Yes.

Page 39

```
1        Q    What is that?
2        A    So I billed for 31 hours at $350, a total bill
3   of $12,300.
4        Q    $12,300 is the total?
5        A    Yeah, yeah.
6        Q    Prior to today's deposition?
7        A    Yeah.
8        Q    Does that include prep for the deposition?
9        A    No, it does not.
10       Q    Okay.
11       A    This was billed on the end of June, June 29th,
12  2025.  So it doesn't include --
13       Q    All right.  Thirty-one hours times $350 is
14  $10,850, but you said $12,300.
15       A    Well --
16       Q    Is there a cost in there or something?
17       A    Maybe it is a typo.
18       Q    Just to save time.
19       A    No, I think -- I think the 31 is incorrect.
20  Two, 4, 8, 10, 12, 14, 16, 18 and 6 is 24 and 12 is 36.
21       Q    Thirty-six hours.
22       A    So the subtotal is incorrect.
23       Q    Okay.  How many hours have you -- how many
24  hours --
25       A    I have it in notes.  I don't have it right in
```

Page 40

1    my head.

2        Q    As far as prep for this depo?

3        A    Yeah.

4        Q    Okay.

5        A    Review of all the transcripts.

6        Q    You think it's more or less than ten hours?

7        A    I think it's probably more than ten hours.

8        Q    Okay.  And the 36 hours you reference, is that

9    solely with regard to this district court, federal court

10   case -- district court, federal court case that we're

11   here about?

12       A    Yeah.  Yeah.

13       Q    Okay.  That does not include your work on the

14   superior court case involving this same property,

15   correct?

16       A    No.

17       Q    I saw in your deposition that you had billed

18   $38,000 for that case.

19            Is that the total amount, or was there more

20   after your deposition?

21       A    I really don't have a record of that billing.

22       Q    Okay.

23       A    That was done through Hoffmann.

24       Q    Your appearance in court for that Daubert

25   hearing, was that after your deposition?

```
                                                    Page 41
 1       A    Yes.
 2       Q    Okay.  I assume you spent time to prepare for
 3  that Daubert hearing?
 4       A    Yes.
 5       Q    Extensive?
 6       A    And to travel to St. John.
 7       Q    Okay.  All right.
 8            Do you have that bill?  Where can we get that
 9  billing?
10       A    I can try to retrieve that from Hoffmann.
11       Q    Okay.  And what did you bill for your travel
12  time to St. John?  Is it the same rate, 350, or is it
13  different?
14       A    I do not recall.
15            THE WITNESS:  So at the time that I was
16            asked for a W-9, I submitted the invoice to
17            you.
18            MR. COSBY:  This is your deposition.  He's
19            asking what records you have.  And you're going
20            back I don't know how many years.
21       A    For those records, I -- I don't know.
22  BY MR. COSBY:
23       Q    Tom can't help you with the answer.
24       A    Oh, no, no.  I meant -- I meant as far as this
25  current invoice.
```

Page 42

1    Q    Okay.  Has it been paid, that June invoice?

2    A    Yes.  Yes, it has.

3    Q    All right.  So the amount outstanding is

4    whatever prep -- whatever prep time you had for this

5    deposition?

6    A    Yes.

7    Q    And the charge for this deposition today is

8    what per hour?

9    A    I should have gone back to my fee schedule.

10   Q    Is your fee schedule on here?

11   A    Yes, it is.

12   Q    Okay.  Is your hourly rate the same for this

13   expert work, whether you're drafting a report or in a

14   deposition or out at a site.

15   A    Yeah, I made the hourly rate a hundred dollars

16   more.  It's 450.

17   Q    It's 450?

18   A    And testimony is a different number.

19   Q    Okay.  When did you change it to 450?

20   A    When I was asked for a fee schedule.

21   Q    Okay.  I mean, was there some point in this

22   case that your rate changed from 350 to 450?

23   A    No, it's just the nature of what is involved.

24   Q    Okay.  I don't know that I understand what

25   you're saying.

Page 43

1          Are you saying you charge me 450 for this
2    deposition?
3          A    I don't understand -- well, I wasn't looking at
4    it as charging the opposing attorney.
5          Q    Okay.  Do you want to look at this again to see
6    what your -- I'd like you to testify from -- I'm not
7    trying to have a closed-book test here.
8          A    Okay.
9               MR. FRIEDBERG:  Counsel, you were provided
10              Mr. Hoffmann's deposition fee schedule under
11              the local rules, including his charge -- hourly
12              charge and his W-9 for this deposition.
13              MR. COSBY:  Okay.  It doesn't relieve him
14              from bringing it.
15         A    Well, it's on the flash drive.
16    BY MR. COSBY:
17         Q    I'm not accusing you of anything.  I'm just
18    trying to get -- sometimes exhibits don't make it here,
19    and we have to get them emailed or delivered later.
20         A    Okay.  I -- I broke down what -- my expert
21    witness report was 350 per hour.  Deposition testimony is
22    450 per hour, a minimum of four hours.  Trial testimony
23    is $500 per hour with a minimum of $2,000.
24         Q    That includes travel?
25         A    Travel and travel lodging, I deem to be actual

Page 44

1    expense.

2        Q    Okay.  So if you're on a plane, you're not

3    billing for the time on the plane?

4        A    No.

5        Q    You're billing Mr. Friedberg for the cost of

6    the plane ticket, correct?

7        A    Yes.

8        Q    Okay.  And you're not billing --

9        A    That was common on any Hoffmann work that I did

10   where travel was involved.

11       Q    Okay.  So when does the clock start?  If you --

12   for your hourly rate.  Let's say we're trying this case

13   next week, which we're not, obviously, and you leave for

14   St. John, when does the meter start on the 350 per

15   hour -- I'm sorry, 500 per hour?

16       A    The appearance at court.

17       Q    So anything up to that, you're not charging

18   your hourly rate other than prep time?

19       A    No.

20       Q    Prep time would be charged, correct?

21       A    Yeah.  And that's not to say that I wouldn't do

22   the prep time on the plane, but -- you know.

23       Q    I understand.  I understand.  Okay.

24            But if you were prepping for this, it's still

25   at 350 an hour, correct?

Page 45

1      A    Yes.

2      Q    Did your hourly rate for deposition increase

3   recently?

4      A    This is -- you know, I don't do this as a

5   matter of living.  So this is a fee schedule that I

6   created for this purpose.

7      Q    I understand.  I'm not asking if you do it for

8   a living or not.  I just asked you a question.  You said

9   something to me about, I raised it a hundred dollars --

10     A    Or I changed it.

11     Q    -- an hour?

12     A    I made the rate for deposition testimony to be

13  different than the rate for general consultation.

14     Q    Okay.  And when did you do that?

15     A    When I was asked for a fee schedule.

16     Q    For this deposition?

17     A    Yeah.  It's dated 7/24, July 24th.

18     Q    Okay.  All right.

19          Do you think it's fair that your billing in the

20  superior court case approached $50,000 if it was 38,000

21  at the time of your deposition?

22          MR. FRIEDBERG:  Objection to form.

23          Argumentative.

24          MR. COSBY:  Don't do speaking objections.

25          I read the past depo.  Just object to the form.

Page 46

```
 1              And if you could, turn your noise thing
 2         down.
 3              MR. FRIEDBERG:  Counsel, don't lecture me.
 4              MR. COSBY:  I'm telling you to not
 5         interfere with the deposition.
 6              MR. FRIEDBERG:  I'm not interfering with
 7         the deposition.
 8              MR. COSBY:  There's no reason to --
 9              MR. FRIEDBERG:  You're spending more time
10         trying to lecture me.  Go on.  Ask your next
11         question.
12              MR. COSBY:  I have a question pending.  I
13         don't have to ask --
14      A    In answer to your question, there may have been
15   a lot of other work involved there that led to a
16   different number.  I -- you know, I can't speak to that
17   without seeing the Hoffmann bills.
18   BY MR. COSBY:
19      Q    Okay.  So if it was 38 -- assume it was 38,000
20   at the time that you were -- your deposition was taken,
21   you would have charged for whatever time for that
22   deposition, correct, at a four-hour minimum at $350 an
23   hour, correct?
24      A    I believe that was my billing rate at
25   Hoffmann.
```

Page 47

1     Q    Okay.  And then for whatever --

2     A    Almost ten years ago.

3     Q    -- for whatever prep time you had for that

4  Daubert hearing, that would be included, which was

5  extensive, I'm sure, correct?

6     A    Yes.

7     Q    And then time to -- do you know how long you

8  testified or waited to testify at the courthouse in the

9  Daubert hearing?

10    A    No.  I have no memory of that.

11    Q    Okay.

12    A    I was an employee of Hoffmann Architects.  Any

13  trip that I had to St. John, you know, I had a full

14  eight hours billed every day related to being there for

15  the trial.

16    Q    Right.  So for that -- and it's a hearing, not

17  a trial, but for that hearing, how many days were you

18  there for that?

19    A    I -- I don't remember.

20    Q    Do you know if it was more than one?

21    A    I don't recall.

22    Q    Do you know if you testified on a single day or

23  you came back second day?

24    A    I believe I testified on a single day.

25    Q    All right.  I think what you're telling me is

Page 48

1  Hoffmann would have the billing for that?  You don't have

2  anything?

3       A    I don't have anything, no.

4       Q    Okay.  Are you able to get that from Hoffmann?

5       A    I can try, yeah.

6       Q    All right.  Well, we'll list whatever the

7  billing is you're able to get from Hoffmann as

8  Exhibit 14.

9            And you can provide that to Mr. Friedberg?

10      A    Yes.

11      Q    Is there any other billing, or are there any

12  other charges related to work involving the Chocolate

13  Hole address other than the superior court case and in

14  this case?

15      A    I don't recall.  I'd have to see what

16  information I can get from Hoffmann and understand my --

17  you know, hourly charges and so on.

18      Q    All right.  I just want to make sure you

19  understand my question.  I'm trying to understand if

20  there's any other work you or Hoffmann did regarding the

21  Chocolate Hole address other than in the superior court

22  case or in this case?

23      A    No.  Other than -- no.

24      Q    Okay.  All right.

25            MR. COSBY:  We've been going for about an

Page 49

```
 1            hour 20.  Let's take a break.  I need a
 2            restroom break.
 3                   We'll go off the record and take five or
 4            so.
 5                   (Whereupon, a recess was taken from 11:19
 6            A.M. - 11:27 A.M.)
 7   BY MR. COSBY:
 8       Q    All right.  So let's discuss some of the
 9   documents that you've brought.  Let's start with this
10   drive.
11            You mentioned an invoice.  I see one dated
12   May 29 of 2025?
13       A    May?
14       Q    Maybe there's more than one.  The one I'm
15   looking at says May 29, 2025, totaling $8,487.50.
16       A    Is that a PDF?
17       Q    Yeah, I'm just going what's in this admin file.
18   So the second one I get to is June 29th of 2025, which
19   you mentioned.  It's probably a continuing invoice.  I
20   don't know what your system is, but this one has the
21   $12,300 total.
22            Is that how you're -- what's your understanding
23   as to --
24       A    That's my understanding of the bill that I sent
25   out.
```

Page 50

1      Q    Okay.  Would the May bill be incorporated

2   within that second one?

3      A    Yeah.

4      Q    All right.  It looks like some of the same

5   entries on there.  So maybe you just did some more work

6   and added to it?

7      A    Yeah.

8      Q    There's a Zoom call for an hour, who was the

9   Zoom call with?

10      A    I presume it was with Tom.

11      Q    And what did you discuss?

12      A    What was the date?

13      Q    It's not dated on the description.  It's in

14   your invoice for June 29th, but it's probably in the

15   other one also.

16      A    Probably talking about the documents I

17   reviewed.

18      Q    How many calls have you had with Mr. Friedberg

19   regarding the case we're here about?

20      A    I think two or three.

21      Q    And was -- were they all Zoom calls?

22      A    I believe so.

23      Q    Okay.

24      A    Yeah, our communications have been either

25   computer or by Zoom, yeah.

Page 51

1      Q    What do you mean computer or by Zoom.

2      A    No straight phone calls --

3      Q    Okay.

4      A    -- from one to the other.

5      Q    What other method have you called him other

6   than Zoom?

7      A    Only email.

8      Q    Okay.  So I don't -- I don't understand that a

9   call, but have you had calls with him other than the Zoom

10  call?

11     A    I don't believe so.

12     Q    There's one noted as .5, meaning a half an

13  hour.  And there's one -- that's on the May 29th, 2025,

14  invoice.  There's one on the -- the June 29th invoice

15  that has a Zoom call for an hour.  So I assume those are

16  separate calls?

17     A    Yes.

18     Q    Do you know what the first call was, for a half

19  an hour, what was discussed?

20     A    I wouldn't remember.

21     Q    Do you keep notes from the call?

22     A    No.

23     Q    And the hour-long call, what was that, do you

24  know?

25     A    Probably talking the -- this -- the documents,

Page 52

1    about the previous --

2         Q    What's your --

3         A    -- depositions.

4         Q    What's your understanding regarding the claims

5    the plaintiff, Mr. Friedberg, is making in this lawsuit?

6         A    My understanding is that all has to do with

7    requirements of the original contract not being met.

8         Q    How so?

9         A    That clips were to be installed and, they

10   were -- we discovered that there were not clips

11   installed.

12        Q    When you say "clips," do you mean cleats?

13        A    Cleats, yes.

14        Q    Clips and cleats, is that the same thing?

15        A    They're pretty -- pretty much synonymous, yes.

16        Q    Okay.  Anchors, is that the same thing or is

17   that different?

18        A    It's -- anchors certainly is a term that

19   applies to what a clip or a cleat does, yes.

20        Q    And what portion of the property is involved

21   with this lawsuit?

22        A    The -- what's referred to as the main pavilion

23   or the main house, the octagonal building.

24        Q    How many buildings comprise the main pavilion?

25        A    I think that the main pavilion stands alone

Page 53

1   with this little library structure at one corner and then

2   the master suit off it, but those are not considered part

3   of the main pavilion.

4        Q    Okay.  Is the main pavilion one building?

5        A    I would say it is, yes.

6        Q    Do you know how many roofing systems are on the

7   main pavilion?

8        A    The only roofing system on the main pavilion is

9   the copper roof.

10       Q    Right.  Is it just one system?

11            MR. FRIEDBERG:  I object to form.

12       A    Yeah, I don't know what you mean by "system."

13   BY MR. COSBY:

14       Q    Okay.  All right.  Well, we'll get into some

15   pictures, I guess, and clarify.

16            So if I understand what you've said, the

17   lawsuit, to your understanding, involves contract terms

18   not being met with regard to clips, cleats, anchors,

19   whatever you want to call them, being installed but only

20   with regard to the main pavilion, correct?

21       A    Yes.

22       Q    Okay.  The pain pavilion was the subject of the

23   superior court case, correct?

24            MR. FRIEDBERG:  Object to the form.

25       A    I don't think that's -- I think it was also

Page 54

```
 1   including everything else on the site, but there was a

 2   judgment that -- that apparently that the judge decided

 3   that it had been filed for -- for some reason he decided

 4   that it only pertained to the -- to the garage and the

 5   guest house.

 6   BY MR. COSBY:

 7       Q    That wasn't my question.  The main roof, the

 8   main pavilion roof was part of the superior court

 9   lawsuit, was it not?

10       A    To my understanding, it started out that way,

11   yes.

12       Q    Okay.  And your report in 2014 references

13   issues and inspections of the main pavilion, correct?

14       A    Yes.

15       Q    And your opinion ultimately was to completely

16   replace the roof on the main pavilion in the superior

17   court case, correct?

18                  MR. FRIEDBERG:  Object to the form.

19       A    Yes.

20   BY MR. COSBY:

21       Q    Was that a "yes"?

22       A    Yes.

23       Q    Okay.  And your opinion in this case is that

24   the main roof should be completely replaced, correct?

25       A    Yes.
```

Page 55

1      Q    In the same way that you opined it should be

2    replaced previously in the superior court case correct?

3                   MR. FRIEDBERG:  Object to the form.

4      A    I don't know if the wording was exactly the

5    same, but my opinion was it should be completely

6    replaced, yes.

7    BY MR. COSBY:

8      Q    The conclusion to replace it is the same as it

9    was previously, correct?

10                   MR. FRIEDBERG:  Objection to form.

11     A    Yes.

12   BY MR. COSBY:

13     Q    In other words, the opinion in the superior

14   court case was to replace the entire main pavilion roof?

15                   MR. FRIEDBERG:  Objection to form.

16   BY MR. COSBY:

17     Q    Is that fair?

18     A    Yes.

19     Q    And that's the same opinion you have now,

20   correct?

21     A    Yes.

22                   MR. FRIEDBERG:  Objection to form.

23   BY MR. COSBY:

24     Q    All right.  Part of your administration folder

25   or file on this zip drive -- or this drive you gave me

Page 56

1   is -- there's two invoices.  There's two fee schedules.

2   There's a document called "Rule 26", which cites needs to

3   be disclosed.

4           Do you understand that?

5       A   Mm-hmm.

6       Q   Yes?

7       A   Yes.

8       Q   Okay.  And there's a W-9 form dated July of

9   2025, correct?

10      A   Yes.

11      Q   Okay.  The deposition folder has the same

12  depositions you've provided in paper, correct?

13      A   Yes.

14      Q   What did you do in preparation for today's

15  deposition?

16      A   I reviewed the documents another time.

17      Q   Did you say, "I reviewed the documents another

18  time"?

19      A   Yeah.  Because I read through them previously.

20      Q   Okay.  Meaning again?

21      A   Yes.

22      Q   Okay.  All of these documents that you've

23  provided?

24      A   Yes.

25      Q   Anything else?

Page 57

1      A    No.

2      Q    Did you review anything on the internet?

3      A    No.

4      Q    How long did you spend preparing?

5      A    I'd have to look at my notes at home.

6      Q    When did you start preparing for the

7   deposition?

8      A    Well, most of the documents came -- a lot of

9   the documents came in when I was away.  So really it

10  wasn't until we got back from Colorado on the -- I think

11  the 16th.

12     Q    August 16th?

13     A    August 16th.  Yes.

14     Q    Okay.  And where did the documents come from?

15     A    They were --

16     Q    Hoffmann or Mr. Friedberg or --

17     A    From Mr. Friedberg --

18     Q    Okay.

19     A    -- for the testimony.  So I've had lots of

20  doctors' appointments and dental appointments.  I have

21  really probably spent -- I would say probably a total of

22  twelve hours over the time period, since I got back until

23  now.

24     Q    At 350 per hour?

25     A    Yes.

Page 58

1      Q    All right.  There's something called WJA video.
2    Are you familiar with that?
3      A    Yes.
4      Q    Okay.  What is your -- do you have any opinions
5    or conclusions regarding that video?
6      A    It's very far away, and then -- no, I don't
7    have a real opinion other than it's a -- you know, he
8    walked around every roof and documented the pinholes at
9    the break to the witch's hat and --
10     Q    When you say "every roof," can we agree --
11     A    Every --
12     Q    -- it was on the main pavilion?
13     A    Yeah.  Every -- if we can call them pie shape
14   on the octagonal, walking around.  And, like, even the
15   video is not real up close.  To me, it doesn't show a
16   lot.
17     Q    All right.  The -- I'm looking at your journal
18   article from Hoffmann Architects, and this is a 1997
19   article, is that correct?
20     A    If that's what it reads, yes.
21     Q    Okay.  And it's "Copper Roofing: An Enduring
22   Link Between Past and Future"?
23     A    Yes.
24     Q    And you wrote this for the Hoffmann Journal to
25   be used by -- was it clients, customers?

Page 59

1        A    It's distributed to clients.  It's a --

2        Q    Was --

3        A    We call it a marketing piece.

4        Q    Right.  The marketing piece would be someone

5   would read this and hire Hoffmann or you as an employee

6   of Hoffmann to design a copper roof system?

7        A    Or to investigate a failed copper roof.

8        Q    How much of your time was spent designing

9   versus investigating failed systems?

10       A    It's such a small percentage of my overall time

11  that -- you know, I had, you know, hundreds of projects

12  at Hoffmann.  I don't know.  Could be 1 percent, could be

13  5 percent.

14       Q    What could be, the failures?

15       A    The percentage -- the percentage that was, you

16  know, design versus failed investigations.

17       Q    Okay.  I want to make sure I understand it.

18  Which would be 1 to 5 percent, the failure analysis or

19  the design work?

20       A    The failure analysis.

21       Q    Okay.  Is there any maintenance that's required

22  for a copper roof?

23              MR. FRIEDBERG:  Objection to form.

24       A    You know, you could have a copper roof that was

25  in the vicinity of a fire.  You could have material

Page 60

1    that's put onto the copper roof that might start to eat

2    at the copper.  We've had storms in St. John that brought

3    materials from Africa that stained Tom's roof for a

4    couple of years before they were cleaned off by rain.

5           Maintenance for a copper roof might be edge

6    flashings, might be physical damage as in the punctures

7    that were created by the hurricane.

8    BY MR. COSBY:

9      Q    I'm not talking specifically Mr. Friedberg's

10   roof.  A copper roof in general.  I'm not talking about

11   storms or fires.

12     A    The beauty of a copper roof is it shouldn't --

13   shouldn't need a lot of maintenance.

14     Q    Okay.  Shouldn't need a lot isn't the same as

15   doesn't need any.  So what maintenance would there be,

16   generally speaking?

17           MR. FRIEDBERG:  Objection to form.

18           Objection to form.

19   BY MR. COSBY:

20     Q    You can answer.

21     A    The maintenance for a copper roof might be just

22   going up and looking at the copper roof on an annual or

23   biannual basis --

24     Q    Okay.

25     A    -- to see if there's anything that's disturbed.

Page 61

1      Q    All right.  What do you mean when you said

2    there was some African substance that was on the roof

3    and -- tell me about that.

4      A    There was a -- there was a point where the

5    color on the roof in St. John changed.

6      Q    Which structure?

7      A    It was all the structures.

8      Q    Okay.  Including the main pavilion?

9      A    And it was reported to me by --

10     Q    By Mr. Friedberg?

11     A    Yes.

12     Q    Okay.  When was that?

13     A    I'm not sure.  It's my recollection, but I'm

14   not sure of the exact date.

15     Q    Okay.  But we're talking about the copper roof

16   post installation by Daybreak?

17     A    Yes.  There was no copper roof before that.

18     Q    Okay.  Do you know whether it was closer in

19   time to installation or closer in time to now, the

20   present?

21     A    I think it was before the -- before the storm.

22     Q    Before Irma?

23     A    Before Irma, yeah.

24     Q    And what was the issue?

25     A    That the color of the roof changed.  There

Page 62

1  was --

2      Q    To what?

3      A    It was -- it was darkened.  It wasn't a patina

4  action.  It was -- and it did go away.  So there was some

5  sort of a chemical deposit on the copper.

6      Q    I want to make sure I understand.

7      A    And to my recollection and having reviewed it

8  after that, there was no physical change to the copper

9  that could be noticed.

10     Q    Okay.

11     A    It didn't -- it didn't affect the copper.

12     Q    It didn't affect the physical nature of the

13  copper?

14     A    Yeah.

15     Q    It was an aesthetic issue with color?

16     A    Yeah.

17     Q    And was it due to some application of an

18  African substance, or it just happened?

19     A    It happened after this event.

20     Q    What event?

21     A    That some storm came from the African coast.

22  It was reported to me.

23     Q    Okay.  Are we talking about Hurricane Irma or

24  something else?

25     A    No, no.  We're not talking about the hurricane.

Page 63

1      Q    A dust storm, or do you know?

2      A    No, I don't know.

3      Q    Okay.

4      A    No.  But generally speaking, a copper roof is

5   very enduring and needs relatively little maintenance.

6      Q    Okay.  I'm onto a different question.  I'm

7   talking about what you're talking about with this

8   discoloration that occurred.  So your understanding is it

9   was some sort of a weather-related event that caused the

10  color to darken?

11     A    Yeah.

12     Q    And how long did that exist?

13     A    I was never told how long.

14     Q    Okay.  Did you ever witness it firsthand, in

15  person?

16     A    No.

17     Q    Did you see drone or photos or footage of it?

18     A    No.

19     Q    You never saw photos of it?

20     A    I don't believe so.

21     Q    Okay.  What were you consulted to do with

22  regard to that?

23     A    There -- there was no consultation.

24     Q    Okay.  Was it just mentioned to you that that

25  happened?

Page 64

1      A    It was just mentioned, yeah.

2      Q    Okay.  And what was the fix?

3      A    There was no fix.  The following rains, you

4  know, eventually cleared it off.

5      Q    Do you know how long it existed?

6      A    No.

7      Q    Do you know if whatever it was had any effect

8  on the roofing system, the rivets --

9      A    There was no --

10     Q    -- anything involved with it?

11     A    There was no effect.

12     Q    And was it consistent on all of the roofs of

13  all the structures?

14     A    I can't confirm that.

15     Q    Do you know whether it was on the main

16  pavilion?

17     A    I think it was.

18     Q    Have you seen photos of that at any time?

19     A    No, I said no.

20     Q    Do you know if they exist?

21     A    I don't know.

22     Q    Was anyone, to your knowledge, consulted about

23  that?  In other words, did anyone go up on the roof and

24  try to clean it off or --

25     A    I don't have any knowledge.

1       Q    Were you called specifically to discuss that

2    issue, or was it discussed in passing while talking about

3    other --

4       A    It was just in --

5       Q    Hold on.  Let me finish my question.

6       A    Okay.

7       Q    Were you called specifically for that or was it

8    part of another call that you had?

9       A    I believe it was a discussion when I was

10   on-site sometime.

11      Q    Was --

12      A    Early on in my being hired.

13      Q    In the superior court case?

14      A    Before even the first report.

15      Q    Okay.  So prior to 2014?

16      A    Prior to when I was involved with the 2014

17   report, yes.

18      Q    Okay.  When was your first visit to the

19   property?

20      A    I don't know the exact date.

21      Q    Do you know the year?

22      A    Well, the report was 2014.

23      Q    I know that.  My question is, when was your

24   first visit to the property?

25      A    I believe in August of that year or September.

Page 66

1      Q     What was the purpose of that visit?

2      A     To look at the roof.

3      Q     For what?

4      A     To do a survey report on the condition of the

5   copper installation.

6      Q     Including the main pavilion?

7      A     All the buildings on the site.

8      Q     Including the main pavilion?

9      A     Yes.

10      Q     And that was at the request of Mr. Friedberg,

11   correct?

12      A     Yes.

13      Q     How did you -- did you know Mr. Friedberg prior

14   to that first visit?

15      A     No.

16      Q     Do you know how he found you or located you?

17      A     You'd have to ask him.

18      Q     I'm asking you.  Do you know how --

19      A     I don't know.

20      Q     Do you know if he found Hoffmann, who

21   recommended you, or he was looking for you specifically?

22      A     I think he found Hoffmann.  Maybe he found my

23   copper roof journal.  I don't know.

24      Q     Had you been do you know to St. John prior to

25   that visit?

Page 67

1      A    No.

2      Q    Okay.  Have you ever viewed or inspected any

3  other copper roofing system in the Virgin Islands other

4  than the Friedberg residence?

5      A    No.

6      Q    Meaning at any time before or after that first

7  visit?

8      A    No.

9      Q    Okay.  Did you ever meet Chris Bunge?

10     A    Yes.

11     Q    When did you meet him?

12     A    On that first visit.  He was at the site.

13     Q    Is that the one and only time you met him?

14     A    He may have been there at the time of the storm

15  damage report.  I don't recall.

16     Q    What was his role with regard to the property?

17              MR. FRIEDBERG:  Objection to form.

18     A    He, I believe, was doing -- assisting the

19  owner's contractor in construction of the buildings on

20  the site.

21  BY MR. COSBY:

22     Q    Who was the owner's contractor you're referring

23  to?

24     A    I don't know the name.

25     Q    Do you know what specifically he was doing as

Page 68

1    far as assisting the owner's contractor?

2        A    I think he did a lot of things related to

3    building the structures, you know, making sure there was

4    scaffolding for their work.  You know, I don't know his

5    full scope.

6        Q    How about related to the roof of the main

7    pavilion, did he do any work on that?

8        A    Well, I do know that he was the person that

9    installed the wood nailers and the membrane on the roofs.

10       Q    What do you mean by "wood nailers"?

11       A    There are wood nailers that are spaced

12   9-and-a-half inches on center from the base of the -- of

13   the building up to the peak.  And I think -- I've seen

14   photographs of the -- of the garage that show those

15   nailers prior to the copper roof.

16       Q    I'm talking about the main pavilion, though,

17   did you ever see anything with regard to the main

18   pavilion?

19       A    I saw existing photographs that showed the

20   membrane and some indication of the nailers that are

21   there.

22       Q    And what is the membrane attached to?

23       A    I can't speak to that.

24       Q    Did you ever see --

25       A    I know what the composite of the roof was

Page 69

1  described to me as.

2      Q    What was that?

3      A    Well, there's a structure with beams, and

4  there's decking consisting of tongue-and-groove

5  decorative ceiling.  Above that, I understand that

6  there's two layers of marine plywood and then the nailers

7  that Chris installed, and in between those nailers a

8  rigid insulation.

9      Q    A what?

10     A    A rigid insulation.

11     Q    What is -- insulation?

12     A    Yes.

13     Q    Okay.  Do you know what type?

14     A    No.

15     Q    Do you know who installed the two layers of

16  marine plywood?

17     A    I don't think I know.  I kind of presume it was

18  Chris, but I don't know.

19     Q    And the wood nailers, describe that for me.

20     A    I think they're just a 2 by 4.

21     Q    Okay.  I got you.

22          So they sit on top of the marine plywood?

23     A    Yes.

24     Q    And the idea is the -- whatever the roofing

25  material is would be attached to those?

Page 70

1    A    Yeah.  Which in this case, it's the copper

2    roofing.

3    Q    All right.  That 9-and-a-half inches was meant

4    to match the contract average 9-and-a-half inches?

5    A    Yes.

6    Q    Do you know what Chris -- Chris' experience was

7    with roofing?

8    A    It was my understanding that in Minnesota he

9    worked as a roofing contractor.

10    Q    What does that mean, he had his own roofing

11    company?

12    A    I don't know.

13    Q    Do you know if he was a licensed contractor?

14    A    I do not know.

15    Q    Do you know if he was a licensed roofing

16    contractor?

17    A    I do not know.

18    Q    Do you know anything about any professional

19    licenses that he does or doesn't have?

20    A    No.

21    Q    Do you know if he ever had any experience with

22    copper roofing prior to this residence?

23    A    I don't know.

24    Q    Do you know if he ever installed wood nailers

25    prior to this?

Page 71

1         A    I don't know.

2         Q    Or the underlayment plywood, marine plywood, do

3    you know if he ever did that before this?

4         A    No.

5         Q    Do you know if Chris was working from a set of

6    plans, architectural plans?

7         A    Well, the only thing I know is that there was a

8    set of building plans from Springline, and those were

9    plans that often architects use to create the drawings

10   that we used in explaining a report.

11        Q    Who is Springline?

12        A    They are an architectural firm.

13        Q    Where are they out of?

14        A    I don't know if they're in the Virgin Islands

15   or if in St. John's, but I -- my recollection is they're

16   in St. Thomas.

17        Q    Okay.  And is it your understanding that

18   Mr. Friedberg hired them to prepare the architectural

19   plans for this residence.

20        A    Yes, for this -- the seven buildings.  It's my

21   understanding that they were hired by Mr. Friedberg for

22   design for the seven buildings on the site.

23        Q    Do you know if Chris worked from those same

24   plans?

25        A    I presume so.  Everything pretty much looks

Page 72

1   like what the architect had planned.

2        Q    Did Chris have a crew working under him?

3        A    I don't know.

4        Q    And what was the extent of any conversations

5   you had with Chris regarding his work or any problems

6   with the project?

7        A    I had very few with Chris.

8        Q    Did you have any discussions with Chris about

9   issues --

10       A    Not -- not really.

11       Q    Let me finish.  -- issues with the main

12  pavilion roof?

13       A    I don't recall any specific discussions with

14  Chris.

15       Q    Do you know if Chris performed any repairs to

16  the main pavilion roof post hurricane Irma?

17       A    I don't know at all because I'm not even sure

18  he was there post Irma.  But I don't know.  I don't have

19  any knowledge of that.

20       Q    Do you know if Chris performed any work on the

21  roof system after Huber became involved in the project?

22       A    I don't know.

23       Q    Do you know of anyone who performed work on the

24  roof other than Chris and Daybreak or Huber's firm?

25       A    I'm not aware of any -- well, other than my

Page 73

1    investigation.

2         Q    Okay.  And we'll talk about that some more.

3    Was there anyone from Hoffmann that did any repair work

4    on the roof?

5         A    From Hoffmann, no.

6         Q    Okay.  Are you aware of anyone that did any

7    repair work on the roof from any entity?

8         A    After the storm damage, Dahill did repair work.

9         Q    And I'm talking about the --

10        A    Temporary roof repair.

11        Q    -- main pavilion, just so we're clear.

12        A    Yeah.

13        Q    What did Dahill do?

14        A    They patched areas where there were defects

15   from the storm and  it's -- it's in their report.

16        Q    Who at Dahill performed this work?

17        A    A person named Rich Barabas.

18        Q    Spell the last name.

19        A    I will try.  B-A-R-A-B-A-S, I believe.  I

20   probably haven't had a business card from him for

21   ten years.

22        Q    Barabas --

23        A    Yeah.

24        Q    -- is the pronunciation?

25        A    Yeah.  He's -- he's in your deposition list.

Page 74

1    Q    I understand.

2         Is that your understanding of the work he did,

3    was simply to patch defective areas?

4    A    There were -- in my storm report, there was a

5    plan for damage repair, which included some full

6    replacement of panels in the various -- you have the main

7    pavilion, and they have all the other buildings.  And

8    there was a lot of work all over.  So they did work on

9    almost every roof.

10        But in the main pavilion, they were repairing

11   caps on ridges.  They were patching dents from the flying

12   debris damage from the storm.  And I'd have to go to my

13   document again to verify all the work they did on the

14   main pavilion.

15   Q    You're welcome to look at that.  Go ahead.

16   A    Okay.  So here's one thing, main pavilion and

17   master suite, open hip seam found at the north side of

18   the building.  They -- I think they have a -- an issue

19   with the direction.  But removed the hip cap to expose

20   the seam, found rivets not secured in the lower paneling

21   in this area.  No clips were found throughout the open

22   seam.  No -- total seam length is approximately 36 to

23   38 linear feet.  Thirty linear feet was open during the

24   investigation.

25              MR. COSBY:  All right.  Let me move to

Page 75

1           strike the portion that's non-responsive and
2           make sure I understand something and you
3           understand the question.
4    BY MR. COSBY:
5        Q    First of all, you said the north.  You think
6    they're mistaken, you think it's another direction?
7        A    I think so.  I'm not sure they knew north from
8    south but --
9        Q    Did you -- what did you think it was?
10       A    I'm not sure.
11       Q    Okay.  Why do you think they're wrong?
12       A    This one photograph in the middle of page -- I
13   don't know if it's 8 -- it says 8 to 12 on the top.  You
14   can see off in the distance, there's the geodesic dome
15   that's on -- this would put this on the east side and not
16   on the north side.
17       Q    Right.  So my question was, what -- not what
18   did they determine was damaged but what did they do in
19   terms of fixes on the main pavilion?
20       A    Well, they -- they refastened caps and rivets
21   so that it engaged both the  the seam as well as just
22   going through the cap.
23       Q    Okay.
24       A    On -- yeah.  On other buildings, they did other
25   things.

Page 76

1      Q    Yeah, I'm not concerned with the other

2   buildings, at least for right now.

3      A    Okay.

4      Q    So the caps on the ridges, what was the damage

5   to the caps on the ridges?

6      A    You say "damage," but let me try to clarify.

7   The ridge consists of a panel edge that comes in, and

8   it's supposed to turn up an inch.  And from the other

9   direction, a panel comes in and install a cleat here

10  that's missing.  But the panel comes in, and it's an inch

11  and a half.  And that's folded over and seamed.  And then

12  a cap is put on that and riveted through all that

13  material.

14     Q    Okay.  So you have a male and a female, and

15  then the cap is over them with rivets to secure it, is

16  that correct?

17     A    Right.  And these were -- these were open at

18  this point.

19     Q    What do you mean "these were open"?

20     A    Where they -- where they came across these, it

21  was open.  You could see that there was no engagement

22  with the rivet.

23     Q    Yeah.  And what I'm asking you -- what I'm

24  asking you to do is be descriptive.  A transcript is not

25  going to show what you just drew, Number 1.  And when say

Page 77

1  "these were open" and things like that, I'm trying to get

2  you to clarify what you're talking about in words so when

3  we read the transcript later, we'll know what you're

4  talking about.

5      A    So --

6      Q    We have the male and the female.  We have the

7  cap and the rivets.  What are you talking about was

8  opened, when you say "these"?

9      A    So this -- this juncture was open.  It had been

10  lifted up by the wind perhaps.

11      Q    What photo are you referring to?

12      A    There's no number.  I mean, maybe --

13      Q    I know, but it's the top photo of page what?

14      A    Yeah.  Top photo with -- the page is labeled 8

15  of 12.

16      Q    Okay.

17      A    Okay.

18      Q    And you're looking at exhibit -- what's the

19  numbered exhibit you've got?

20      A    This is Exhibit 5.

21      Q    Okay.

22      A    And the tape measure on this measures about an

23  inch and a quarter.  So this is supposed to be a 1-inch

24  seam with a cap, and you can see here that the edge of

25  the panel that's coming in is not -- is too low.  And the

Page 78

1    rivet, which is right near the 1-inch mark on the tape,

2    the rivet is at the top of the cap.  So it's really not

3    penetrating anything, let alone the other side that it

4    should be hooked into.

5         Q    Can you show me where that is on a picture of

6    the main pavilion?

7         A    Yeah.  I can show you, actually, two

8    photographs.  If I go -- this is the storm damage report

9    and --

10        Q    Which is exhibit what?

11        A    It's Exhibit 3.

12        Q    Okay.

13        A    And Photo 27 shows an area that I could mark on

14   here, which is up in here (indicating).

15        Q    Okay.  So when you say up in here, I mean,

16   what --

17        A    I'd say it's probably about 8 feet above -- 8

18   to 10 feet above the bend that begins the witch's hat.

19        Q    Okay.  On what direction of the -- what area of

20   the roof?

21        A    It's, again, looking towards this geodesic

22   dome --

23        Q    Okay.

24        A    -- over here, this house (indicating).

25        Q    Okay.  And you're referring to Bates Page 35 of

Page 79

```
1     that exhibit for the photo of the close-up, correct?
2          A     Yes.
3          Q     And then what's the other page where you've
4     marked?  It's Page 52.
5          A     Page 52.
6          Q     And you've marked with a black pen, which I'm
7     not sure --
8          A     I think it's blue.
9          Q     Is it blue?  Okay.
10         A     Yeah.  It's a big splotch.
11         Q     All right.  Let me -- may I take a look at
12    that?
13         A     Yeah.
14         Q     So if we're looking at a clock, the portion you
15    showed, if straight down is 6:00 o'clock, that's about
16    5:00 or 5:30, is that correct, where you've drawn?
17         A     Yeah.
18         Q     Above the bend, correct?
19         A     Yeah.
20         Q     Okay.
21         A     And in the original roof, a photograph was
22    taken this direction (indicating).  We're just seeing a
23    little bit of the masonry of this building in the
24    background.
25         Q     What is "this direction"?  Because, again, I'm
```

Page 80

1    going to read that, and I'm not going to know what you
2    meant by "this direction."
3         A    I think this east.
4         Q    Okay.  So in any event, you're pointing to
5    the -- if I'm looking at this diagram on Page 52, right
6    side up, you're pointing to the right, is that correct?
7         A    Yes.
8         Q    Okay.  So what are you saying, in the
9    original --
10        A    In the original, the area that was deformed
11   was -- and I'll circle it here.  Was below that area.
12        Q    Okay.
13        A    And that's what Dahill repaired during my
14   investigation of -- in 2014.
15        Q    In 2014?
16        A    Yeah.
17        Q    Okay.  Let me make sure I understand that.
18        A    So --
19        Q    Yeah, go ahead.  Clarify.
20        A    Okay.  So we did two destructive tests in 2014.
21   One was on a pan section of -- on the -- what was called
22   the -- I don't know -- the north side.
23        Q    You've circled an area near 12:00 o'clock if
24   we're using that same clock, correct?
25        A    Yeah.

1    Q    Okay.  So the top of that circle --

2    A    And there we confirmed that there were cleats

3  in the -- in the pan jointing, the upturned and -- and

4  folded double-lock seams, that conformed to the contract.

5  Here (indicating) --

6    Q    We're now looking at the opposite side, more

7  towards 5:00 o'clock, correct?

8    A    Right.  In the original '14 report --

9    Q    Exhibit is what?

10    A    Exhibit 2.  There's a photograph that shows an

11  area that's very close to the transition to the witch's

12  hat, which is right -- right here (indicating), and

13  this --

14    Q    What page are you on in that Exhibit 2?

15    A    In Exhibit 2, Page 21.

16    Q    Which photo on Page 21?

17    A    Photo 40.  And in the previous page, Photo 39,

18  shows the condition before we took off the cap and it

19  shows clearly the upturned edge of the near panel with an

20  opening above it that would allow wind-driven rain to get

21  in.  So --

22    Q    Is 39 and 40 a picture of the same area or --

23    A    Yes.  Yeah.

24    Q    Okay.  All right.

25    A    And you can see that this area is at the bend

Page 82

1    to the witch's hat.

2        Q    Okay.  Thirty-nine and 40 comply with the area

3    that you circled in the 5:00 o'clock positioning --

4        A    Right.

5        Q    -- on Page 52 of Exhibit 3, correct?

6        A    Yes.

7        Q    Which is your damage report, correct?

8        A    Right.

9        Q    Okay.  So hold that thought a minute.

10           The Exhibit 2 portion was pre-Irma, correct?

11       A    Yes.

12       Q    Okay.  And just for clarification, my

13   understanding is the area you opened and determined clips

14   existed was the west side of the roof, is that fair?

15       A    Yes.

16       Q    Meaning this other side at the 5:00 o'clock or

17   5:30 orientation would be the east side of the roof,

18   correct?

19       A    Yes.

20       Q    Okay.  So what was the issue in 2014 with that

21   area of the roof upon your inspection.

22       A    That there was insufficient material to create

23   a proper joint in this condition, and the pop rivets had

24   corroded and failed and were not engaged with the -- what

25   should have been an overlapping seam.

Page 83

1      Q    Okay.  So what was the material of the pop
2    rivets?  What were they made of, if you know?
3      A    It's in this report.  I believe that they were
4    a copper top with a steel mandrel.
5      Q    Did the contract describe what rivets were
6    going to be used?
7      A    I don't believe they did.
8      Q    Okay.  And was it just that area where the pop
9    rivets had corroded?
10     A    No, they were all over.
11     Q    Were all the pop rivets in the entire roofing
12   systems corroded in 2014?
13     A    I -- no.  I -- when I say they were all over,
14   they were not uniformly all over.  They were in -- in
15   many places they were corroded.
16     Q    Okay.  And what's your -- what's your
17   experience with corroded pop rivets in other roofing
18   systems, not the Friedberg residence?
19              MR. FRIEDBERG:  Objection to form.
20   BY MR. COSBY:
21     Q    Have you seen it before?
22     A    I've seen corroded pop rivets in flashings and
23   other installations that when they corrode, they fail.
24     Q    I mean, is there something about how the pop
25   rivets were used that exposed them to corrosion?

Page 84

1       A     Well, they're in the --

2       Q     In other words, advanced or heightened or

3    quickened corrosion?

4       A     Well, steel and copper are -- fall on different

5    levels of the corrosion scale.  So there is -- there is

6    corrosion that happens because you have steel and copper

7    combined.

8       Q     In a salty environment, correct?

9       A     Well, salt adds to it, yes.

10      Q     So when you --

11      A     In my recommendation for the replacement, I

12   suggested that they be solid copper rivets.

13      Q     Okay.  You think that would avoid or slow down

14   the corrosion process?

15      A     You shouldn't have any corrosion.

16      Q     So will a copper roof corrode or not corrode --

17            MR. FRIEDBERG:  Objection to form.

18   BY MR. COSBY:

19      Q     -- the panels itself?

20            MR. FRIEDBERG:  Objection to form.

21      A     Copper roofs don't necessarily corrode.  They

22   weather, and the patina is -- you know, it's a form of

23   corrosion, but copper weathers that well.

24   BY MR. COSBY:

25      Q     Okay.  So in 2014, when you noted this issue in

Page 85

 1   that same area that later opened up, did you determine

 2   whether there were cleats or clips in that area in 2014?

 3                    MR. FRIEDBERG:  Objection to form.

 4        A    It never became a question that came up or that

 5   I -- that I thought about.  Somebody mentioned expansion

 6   cleats and, you know, I know that we talked about there

 7   not being any expansion cleats, but I don't -- I don't

 8   have a recollection that -- of noting that there weren't

 9   cleats in the ridge.

10   BY MR. COSBY:

11        Q    Are expansion cleats different from the cleats

12   that we're talking about that are to be at

13   9-and-a-half inches on average?

14        A    You know, they would be different, yes.

15        Q    Okay.  What's the difference?

16        A    Well, they would -- they would allow for more

17   movement.  And in a ridge like this, you know, with the

18   diagonal -- or the angled connection of the two pans, you

19   know, there's just a lot more freedom for it to move

20   in -- you know, in the field of the roof.

21        Q    Okay.  Were expansion cleats used?

22        A    No.

23        Q    Okay.  Were expansion cleats called for in the

24   architectural plans?

25        A    No. They -- they -- there were never and --

Page 86

1    sorry.  There were never any architectural plans.

2         Q    Regarding the copper roof?

3         A    Regarding the copper roof.

4         Q    Okay.  Do you know why?

5         A    Well, my understanding of the contract with

6    Daybreak is that the owner was relying on the expertise

7    of the -- of the roofing contractor for the copper

8    installation, and he asked that it be installed using

9    certain spacing of cleats but also, you know, asked that

10   it be installed in accordance with Copper and Common

11   Sense and SMACNA.  So there's no design from the owner

12   that had specific drawings, details.

13        Q    Right.  Do you think there should have been a

14   design --

15             MR. FRIEDBERG:  Objection to form.

16   BY MR. COSBY:

17        Q    -- from a design professional?

18        A    It really varies throughout the industry.

19        Q    I'm talking about on this specific property,

20   not throughout the industry.

21             In your opinion, should there have been a

22   design professional involved --

23             MR. FRIEDBERG:  Objection to form.

24   BY MR. COSBY:

25        Q    -- to create plans for Daybreak to follow?

Page 87

1      A    In my opinion --
2              MR. FRIEDBERG:  Let me object to -- let me
3          object to form.
4              Go ahead.
5      A    Okay.  In my opinion, throughout the industry
6  there are installations that are done with contractors
7  doing shop drawings without having, you know, a design
8  professional with -- and the codes for what's required
9  for a permit to do any sort of work throughout the
10  country vary on -- on who can do that.
11      Q    What --
12      A    The codes are leaning towards requiring that,
13  even for roof replacement, for a single-ply roof or a
14  modified bitumen roof.
15      Q    At the time this work was done on the copper
16  roof by Daybreak, the installation, was it required to
17  have a design professional?
18      A    No.
19      Q    But what's your opinion?  Should they have had
20  one or not?
21      A    Well, you know, in -- it's kind of like these
22  series of buildings.  There are -- there are no details
23  related to the design, I don't think, to specify how it's
24  done.
25      Q    I understand that's what reality was.  My

Page 88

1    question is, in your opinion, is that how you think it
2    should have been done?
3                    MR. FRIEDBERG:  Objection to form.
4        A    There were a lot of complications to this
5    design, and it would have been aided by having someone
6    prepare details.
7    BY MR. COSBY:
8        Q    All right.  And that -- Mr. Friedberg could
9    have retained an architect or someone to prepare plans,
10   correct?
11       A    I don't know that that's -- I don't know that
12   that's an option that he had.
13       Q    What do you mean it's not an option?
14       A    You know, who's down there to do it?
15       Q    So we know there was an architect that was down
16   there, Springline, correct?
17       A    Right.
18       Q    So that's one we know of.  Did you ever
19   research to see what architects were available for the --
20   for that?
21       A    No, I -- that's not part of my duty.
22       Q    All the structures throughout the islands, are
23   you telling me there's no architects involved?
24                    MR. FRIEDBERG:  Objection to form.
25       A    I don't know that.

Page 89

1    BY MR. COSBY:

2        Q    Okay.  There's no physical reason he couldn't

3    have retained an architect to look into this, correct?

4                    MR. FRIEDBERG:  Objection to form.

5        A    I don't know that.

6    BY MR. COSBY:

7        Q    Were there shop drawings --

8        A    Not to my knowledge.

9        Q    -- related to the roof?

10       A    Not to my knowledge.

11       Q    Was Chris Bunge the project manager for the

12   construction?

13                   MR. FRIEDBERG:  Objection to form.

14       A    I don't know that.

15   BY MR. COSBY:

16       Q    Was there a project manager --

17                   MR. FRIEDBERG:  Objection to form.

18       A    I don't know.

19   BY MR. COSBY:

20       Q    -- that oversaw all the construction?

21                   MR. FRIEDBERG:  Objection to form.

22       A    I'm not aware.

23                   MR. COSBY:  All right.  So I need another

24              restroom break.  So let's take five.

25                   (Whereupon, a recess was taken 12:32 P.M.

```
                                            Page 90

 1             - 12:38 P.M.)

 2   BY MR. COSBY:

 3       Q    Have you conferenced with Mr. Friedberg at any

 4   of the breaks?

 5       A    Have I conferenced?

 6       Q    Have you talked to him?

 7       A    We walked outside and we talked.

 8       Q    About what?

 9       A    About whether we're going to get done here

10   today.

11       Q    Well, that takes two seconds.  What else did

12   you discuss?

13       A    Well, it was just -- nothing else.

14       Q    You're telling me you've discussed nothing else

15   other than whether we're going to get done today during

16   our two breaks?

17       A    Yes.

18       Q    No discussion of what you're testifying to or

19   about?

20       A    Well, a little discussion on his demeanor but

21   other than that, no.

22       Q    Anything about the substance of your testimony?

23       A    No.

24       Q    Looking back at your 2014, can you go back to

25   those photos we were looking at, the 2014 report?
```

Page 91

1       A    Yeah.  What page were we on?

2       Q    I don't know.  You pulled it up.  You were

3   telling me --

4       A    I know.  I know.

5       Q    It was -- was it 39 and 40?

6       A    Yeah.

7       Q    Okay.

8       A    Thirty-nine and 40.

9       Q    Photos?

10      A    Yes.

11      Q    So we're back to Exhibit 2?

12      A    Yes.

13      Q    On Pages 20 and 21, is that right?

14      A    Yes.

15      Q    Okay.  So could you have determined at that

16  time whether there were clips present or cleats

17  present --

18              MR. FRIEDBERG:  Objection to form.

19  BY MR. COSBY:

20      Q    -- in that area?

21              MR. FRIEDBERG:  Objection to form.

22      A    I perhaps could, but I have no recollection of

23  dealing with the clips at that time.  I was so concerned

24  about looking at overlap and lack of it being tied

25  together with the rivets, and I -- we didn't open it up

```
                                                 Page 92
 1   enough to see if there's a -- if there are cleats there
 2   that are -- you know, that aren't secured or secured.
 3   BY MR. COSBY:
 4       Q    What would it have taken at that point in that
 5   area to determine whether or not cleats were present?
 6                 MR. FRIEDBERG:  Objection to form.
 7       A    I don't know.
 8   BY MR. COSBY:
 9       Q    You don't know how you would have determined
10   the presence or absence of cleats?
11                 MR. FRIEDBERG:  Objection to form.
12       A    Destructively tear the joint apart.
13   BY MR. COSBY:
14       Q    Was there destructive testing performed at that
15   time?
16                 MR. FRIEDBERG:  Objection to form.
17       A    What's "destructive"?  I mean, it was unseamed
18   and the metal worker reworked the joint to pull it back
19   together.
20   BY MR. COSBY:
21       Q    Okay.  I don't know what destructive testing
22   is.  Do you?
23                 MR. FRIEDBERG:  Objection to form.
24       A    I think there's a lot of definitions of
25   "destructive testing".
```

```
                                                    Page 93
 1    BY MR. COSBY:
 2        Q    Okay.  And you're in the industry.  Do you know
 3    what destructive testing is or not?
 4               MR. FRIEDBERG:  Objection to form.
 5        A    Destructive testing is taking something apart,
 6    whether that destructive name means that it's destroyed
 7    or not or whether it's just unfolded, if you will, and
 8    put back together.
 9    BY MR. COSBY:
10        Q    I mean, would you consider what was done in
11    2014 in that area destructive testing?
12               MR. FRIEDBERG:  Objection to form.
13        A    I think it was taking something apart and
14    putting it back together.  Now, why I didn't recognize
15    the absence of cleats, I don't know.
16    BY MR. COSBY:
17        Q    My question was, would you consider that
18    destructive?
19               MR. FRIEDBERG:  Objection to form.
20    BY MR. COSBY:
21        Q    Yes or no --
22               MR. FRIEDBERG:  Objection.
23    BY MR. COSBY:
24        Q    -- or I don't know?
25               MR. FRIEDBERG:  Objection to form.
```

Page 94

1      A    I don't know.

2   BY MR. COSBY:

3      Q    Were you present when that was opened up?

4      A    I was -- I was here when I took the photo.  I

5   was probably not there the entire time that it was taken

6   apart.

7      Q    Okay.  Who took it apart?

8      A    The metal worker from Dahill.

9      Q    What was the name?

10     A    Fran Nelson, referred to as Franny.

11     Q    Franny?

12     A    Yeah.

13     Q    Were you up there on the roof with Franny at

14  any time?

15     A    Yes.

16     Q    Do you know if Fran or Franny determined there

17  were clips or not at any time?

18     A    I don't remember us discussing that at all.

19     Q    At any time?

20     A    At any time, no.

21     Q    When's the last time you've spoken with Franny

22  about this roofing system?

23     A    The last time I spoke to Franny, he was

24  repairing some slate on my house but --

25     Q    That wasn't my question.  My question was --

Page 95

1        A     But I haven't spoken to him.

2        Q     Well, that --

3        A     About this job.

4        Q     That make no sense.  You were on the roof with

5    him and you never spoke with him about it?

6                    MR. FRIEDBERG:  Objection to form.

7        A     Afterwards, no.

8    BY MR. COSBY:

9        Q     I said when was the last --

10       A     We had very few questions about it.

11       Q     Listen to my question closely.

12             When was the last time you spoke with Franny

13   about this roofing system?

14       A     Probably on the roof when we were there.

15       Q     Okay.  And what did you discuss with him?

16       A     Discussed how he was going to repair this and

17   discussed all the other things that we came across.

18       Q     What did Franny do for you?  Did he perform

19   work on your home?

20       A     He's -- he has over the years.  His other

21   expertise is in slate, and I have a hundred-year-old

22   slate roof on my house.  And over the years, as a -- I

23   think he's independent from Dahill now, but he works on

24   Dahill projects.  I had a chimney rebuilt, and the

25   flashing at the back of the chimney replaced.  Franny did

Page 96

1    some slate work and some copper roof on the back apron of

2    that chimney.  And over the years, he's probably done two

3    or three projects at my house.

4         Q    What was your scope of work at the time you

5    were at the property in 2014?

6         A    What was my scope of work?  It was to review

7    all the roofs on site and opine on the installation and

8    the condition --

9         Q    Including whether -- including whether the

10   installation complied with the contract documents?

11        A    Yes.

12        Q    Okay.  What -- are there any other ways to

13   determine the presence or absence of cleats other than

14   opening the system up?

15        A    If the cleats were happen to -- so the -- let

16   me just talk about the standing seams, for example.  The

17   standing seams, it's very difficult to find any other way

18   than taking a seam apart.  They talked about -- in a

19   report, talked about being able to see the cleat when --

20   after it's been compressed by the roll.  That's virtually

21   not possible.

22        Q    Is that telegraphing, that concept?

23        A    Yeah.  It's the concept of having a piece of

24   copper under -- you know, a folded piece of copper.  And

25   then, the roller having it shown a difference in that

Page 97

1   cleat thickness.  It just doesn't show up that way.  It

2   doesn't show up in this project that way.

3       Q    Did cleats -- let's talk generally, not just

4   this project.

5            On copper roofing systems, have you seen cleats

6   via that telegraphing, in other words, not opening

7   something up but seeing an indentation that suggested

8   there was a cleat there?

9       A    I've never seen that before on a roof where the

10  roller is used to format a cleat.

11      Q    Have you seen it on a roof where a roller was

12  not used?

13      A    I really haven't seen -- at least not to my

14  recollection, no.

15      Q    Okay.  So if I'm clear with your answer, you've

16  never seen a telegraphing cleat, is that correct?

17      A    Yeah.

18      Q    Okay.  Have you ever read about such a thing?

19  I mean, is there a consensus or opposing opinions in the

20  industry as to whether telegraphing is a farce or it

21  exists?

22            MR. FRIEDBERG:  Objection to form.

23      A    I've never seen anything like that, no.

24  BY MR. COSBY:

25      Q    Meaning, any article or any publications about

Page 98

1    that?

2        A    No.  Yeah, I've never seen that.

3        Q    Was it mentioned in some of other report about

4    telegraphing?

5                MR. FRIEDBERG:  Objection to form.

6        A    I'm not aware of that.

7    BY MR. COSBY:

8        Q    I thought you made a reference a moment ago

9    that you read somewhere where there was something about

10   telegraphing.  What were you referring to?

11       A    I'm not sure.  I thought maybe it was one of

12   the -- maybe it might have been Micha's deposition.

13       Q    Okay.  Where he mentioned telegraphing?

14       A    I think he said where he could have just seen

15   it.

16       Q    In terms of metals, if you know, how soft is

17   copper?

18                MR. FRIEDBERG:  Objection to form.

19   BY MR. COSBY:

20       Q    Relative to other metals?

21                MR. FRIEDBERG:  Objection to form.

22       A    Compared to steel, it's very malleable able.

23   BY MR. COSBY:

24       Q    You talked previously about damage to caps on

25   ridges, when we were talking about what Dahill did post

Page 99

1    storm to make some fixes or repairs.  The patching of

2    dents, are you talking about dents that were actually

3    holes or just dents?

4         A    A variety.

5         Q    Okay.

6         A    Some were dents.  Some were penetrated through

7    the copper.

8         Q    Does a dent -- excuse me.  Strike that.

9              Were the dents patched or just the holes?

10        A    I'm not sure what procedure they used, but I've

11   seen photographs that it looked like it may have been a

12   membrane to patch it up.  I'm not sure what they did.

13        Q    But those dents and holes from flying debris

14   had nothing to do with cleats or non-cleats or whether

15   the contract was complied with, correct?

16        A    No.  That's true.

17        Q    In your report -- your current report and maybe

18   even your past one.  I'll have to look at it again.  But

19   you suggest that had there been cleats damage would not

20   have occurred, is that a correct statement?

21                  MR. FRIEDBERG:  I'm going to object to the

22             form.

23        A    Damage would not -- the damage at the ridge

24   line would not have occurred.

25

```
                                                    Page 100
 1   BY MR. COSBY:
 2        Q    Right.  I don't mean to suggest dents and holes
 3   would not have occurred.  There's no stopping that,
 4   right?
 5        A    No.
 6        Q    But your suggestion is on the ridge line there
 7   wouldn't have been damage had there been cleats, is that
 8   a fair statement?
 9        A    Yes, that's a correct statement.
10        Q    Okay.  Do you know anything about the wind
11   resistence of those cleats, in other words, the forces
12   involved that would make the cleat fail?
13              MR. FRIEDBERG:  Objection to form.
14   BY MR. COSBY:
15        Q    Do you understand my question?
16        A    No.
17        Q    Okay.  Well, let me know if you don't
18   understand my question.  That was one of the rules at the
19   beginning.
20              My understanding of one of your opinions is
21   that had there been cleats there wouldn't have been
22   damage at least at the ridge line, is that correct?
23        A    I can say that --
24        Q    Is that correct or not?
25        A    -- throughout the pan system of the roof where
```

Page 101

1    the roof established that there were cleats, there was no

2    damage in that storm.  And I can say with 51 percent

3    certainty that if the cleats were in the ridges I'm sure

4    they would not have been damaged.

5         Q    To a hundred percent certainty?

6              MR. FRIEDBERG:  Objection to form.

7         A    Over 50 percent.

8    BY MR. COSBY:

9         Q    Okay.  Are the cleats designed to hold the roof

10   together under any forces of wind?

11             MR. FRIEDBERG:  Objection to form.

12        A    A thousand miles per hour?  I can't say that.

13   BY MR. COSBY:

14        Q    Okay.  What is the threshold?

15             MR. FRIEDBERG:  Objection to form.

16        A    Well, the recommendations in Copper and Common

17   Sense a panel width and spacing of cleats is a national

18   standard that is used.  And, you know --

19   BY MR. COSBY:

20        Q    That's not my question.

21             Is there a certain wind threshold that even the

22   cleats would fail?

23             MR. FRIEDBERG:  Objection to form.

24        A    Not to my knowledge.

25

```
                                                    Page 102
 1   BY MR. COSBY:
 2        Q    So would they withstand a thousand mile an
 3   hour?
 4                  MR. FRIEDBERG:  Objection to form.
 5        A    I think that's a question that -- you know, not
 6   even a relative one.
 7   BY MR. COSBY:
 8        Q    You're not here to determine what's relevant or
 9   not.  You're here to answer the questions.
10             So answer the question.
11                  MR. FRIEDBERG:  Objection to form.
12        A    I don't -- I don't think that you can ever get
13   a wind speed of a thousand miles per hour.  But if you
14   had that, maybe a copper roof would fail.
15   BY MR. COSBY:
16        Q    If there are cleats present, does that mean
17   there would be no uplift damage regardless of a wind
18   speed?
19                  MR. FRIEDBERG:  Objection to form.
20        A    I can't answer that.
21   BY MR. COSBY:
22        Q    I thought you said had there been cleats there
23   wouldn't have been damage?
24                  MR. FRIEDBERG:  Objection to form.
25        A    You're changing the question.
```

```
                                                    Page 103
 1   BY MR. COSBY:
 2       Q   I'm not changing the question.  I'm asking you
 3   the question.
 4               MR. FRIEDBERG:  No question pending.
 5           You're just making a statement.
 6               MR. COSBY:  Well, there is a question.  He
 7           didn't answer it.  He just said you're changing
 8           the question.
 9               MR. FRIEDBERG:  I'm going to object to
10           form.  You're badgering the witness.
11               MR. COSBY:  I'm not badgering the witness.
12               MR. FRIEDBERG:  Well, yeah, you are.
13           Why don't you ask the question again.
14               MR. COSBY:  I did ask the question.
15   BY MR. COSBY:
16       Q   You need me to repeat it?
17       A   Yes.
18       Q   Okay.
19               MR. COSBY:  Can you please read back a
20           couple questions ago where he said you changed
21           the question?
22               (Whereupon, several questions were read
23           back by the Court Reporter.)
24       A   If there were cleats there, there would be no
25   uplift damage to a reasonable wind speed, including maybe
```

Page 104

1 the second largest storm in St. John's history.

2 BY MR. COSBY:

3      Q    What's a reasonable wind speed?  What do you

4 mean by that?

5      A    Maybe a 175 miles per hour.

6      Q    What was the top wind speed in Irma?

7      A    At the site, I don't know.

8      Q    Do you know what was recorded on the Island of

9 St. John as the highest wind speed?

10      A    No.  It was in the other report.

11      Q    What was it?

12      A    I think it was 176.

13      Q    Would cleats withstand or would cleats be able

14 to withstand uplift damage in eceses of 200-mile an hour

15 winds?

16               MR. FRIEDBERG:  Objection to form.

17      A    I think you need someone who diagnoses these

18 things for the industry to respond to that.  Perhaps

19 somebody from Copper and Common Sense or perhaps someone

20 from Miami Dade.

21 BY MR. COSBY:

22      Q    So you don't know about the wind damage,

23 correct?

24               MR. FRIEDBERG:  Objection to form.

25

Page 105

1    BY MR. COSBY:

2        Q    That's not your wheel house or expertise, wind

3    damage, wind speeds, what damage would be caused by what

4    speed, is that fair?

5                    MR. FRIEDBERG:  Object to form.

6        A    I'm not in that business, no.

7    BY MR. COSBY:

8        Q    Okay.  Did you do any analysis to determine if

9    any uplift occurred with regard to this roof during

10   Hurricane Irma because of the failure of the main

11   pavilion to have windows or doors?

12                   MR. FRIEDBERG:  Objection to form.

13       A    I did not.  And the reason for that is the

14   building was totally enclosed from below, which was

15   equivalent to having windows and doors.  And the

16   structure of the roof, solid Tongue & Groove roofing,

17   multiple layers of plywood and member would really

18   inhibit any pressure change differential that might

19   affect the roof from below.

20   BY MR. COSBY:

21       Q    Okay.  What was securing the below area?

22       A    What was securing the below area?

23                   MR. FRIEDBERG:  Objection to form.

24   BY MR. COSBY:

25       Q    You said there were no windows and doors, but

page

```
                                                    Page 106
 1   what was there in the openings?
 2        A    It was covered and secured with plywood at all
 3   openings.
 4        Q    And do you know when that was installed?
 5        A    I believe it was installed -- it was
 6   substantially there when I was there in 2014.
 7        Q    Okay.
 8        A    And never changed.
 9        Q    Do you know who installed it?
10        A    No.
11        Q    Is it your understanding that those -- that
12   plywood would make it air tight?
13        A    Windows don't make a building air tight.
14        Q    That wasn't my question.  My question was --
15        A    I can't to a reasonable --
16        Q    Let me finish my question.
17             Would plywood have made it air tight?
18                  MR. FRIEDBERG:  Objection to form.  Go
19             ahead.
20        A    I believe so.
21   BY MR. COSBY:
22        Q    Would windows have made it air tight?
23                  MR. FRIEDBERG:  Objection to form.
24        A    Not any more than the plywood.
25
```

```
                                                Page 107
```

1   BY MR. COSBY:

2       Q    I thought you said the plywood would make it

3   air tight?

4                 MR. FRIEDBERG:  Objection to form.

5       A    Relative to the need for air tightness.

6   BY MR. COSBY:

7       Q    I didn't qualify my question.  It was, would

8   the plywood have made it air tight?  It's a yes or a no.

9       A    I believe it would, yes.

10      Q    Did you do any testing on any of the openings

11  to determine if they were air tight?

12      A    No.

13      Q    Do you know if those -- that plywood remained

14  in the same condition it was when you left in 2014 and at

15  the time of the storm in 2017, Hurricane Irma?

16      A    No.

17      Q    To your knowledge, are there doors and windows

18  on those openings today?

19      A    I have no knowledge of what it looks like

20  today.  But, no, I have no knowledge.

21      Q    What if there were no -- what if there was no

22  plywood on those openings, would that affect uplift

23  forces on the roof?

24                 MR. FRIEDBERG:  Objection to form.

25      A    Not for me to know.  I think that the structure

Page 108

1    of the large beams in the main pavilion, which are on the

2    ridge line, and the decking on the inside, as well as the

3    plywood on the outside, make that roof into a very

4    robust, resistant structure.

5    BY MR. COSBY:

6        Q    What was the -- you said there was an overlay

7    or underlay on the roof prior to the installation of the

8    copper?

9        A    Hm-hmm.

10       Q    Yes?

11       A    Yes.

12       Q    And I think you said you didn't know what it

13   was?

14       A    I don't know specifically what the membrane

15   was, but it was a self-adhesive membrane material.

16       Q    Who installed that?

17       A    My understanding is that Chris installed that.

18       Q    You are not an expert on the forces that would

19   cause a clip to fail, wind forces, correct?

20       A    No.

21       Q    Am I correct?

22       A    Other than my knowledge of industry practice

23   and standards, I'm not an expert, no.

24       Q    You have concluded that because -- as I

25   understood it, and correct me if I'm wrong, your

1  testimony with regard to the clips and the storm damage

2  is on the west side, that portion of the roof held up

3  fine because we noted clips there.  On the east side it

4  did not, thus there must not be clips, is that fair?

5          MR. FRIEDBERG:  Objection to form.

6      A    I'm not sure what portion of the roof you're

7  talking about.

8  BY MR. COSBY:

9      Q    Okay.  Well, remember earlier when we were

10  talking about the 12:00 o'clock area and the 5:00 o'clock

11  area?  And you can feel to look at the diagram again.  I

12  think we determined, or you agreed, that the west side is

13  where you found clips in 2014, correct?

14      A    And it was assumed that in the pan on the

15  inside, that the pans would have that same clip spacing

16  and be in conformance.

17      Q    Is it your opinion that there were cleats but

18  they were not spaced properly or that there were no

19  cleats on the east side?

20      A    Are you talking about in the pan system?

21      Q    Yes.

22      A    No.  I'm not saying that there there's no

23  cleats on the east side in the pan system.

24      Q    The contract provision that says nine and a

25  half inches on average, is that with respect to the pan

Page 110

1    system or something else?

2        A    I think it's a contract requirement that

3    applies to the whole job.

4        Q    So every portion of a roof had to have a cleat

5    nine and a half inches on average?

6        A    Yeah.  And when you get to the ridge you need

7    cleats in the ridge.

8        Q    So back to what I understand your conclusion to

9    be.  You're stating that the -- well, strike that.

10       Was there any uplift damage on the west side of

11   the roof in the main building?

12       A    No.

13       Q    Was there any --

14       A    From the leeward side of the wind.

15       Q    What do you mean by the leeward side of the

16   wind?

17       A    So the storm came from across the bay counter

18   clockwise and the brunt of that force -- and it's uphill.

19   There's dramatic incline from the water level up.  The

20   dramatic force on this roof was on the east side.

21       Q    Okay.

22       A    There's not -- the winds subside on the west.

23   I wouldn't expect there to be damage over there.

24       Q    Okay.  That can also explain why there was

25   damage on the east side, the forces were greater on that

Page 111

1    side, correct?

2        A    Yes.

3        Q    We were just talking about the five or 5:30

4    orientation of that portion of the roof that you looked

5    at in 2014, which coincided with an area that it was

6    determined there were no clips or cleats in 2018 post

7    storm.  Do you follow me so far?

8        A    Yes.

9        Q    And who determined that were no cleats in 2018?

10       A    Well, I don't know that there was a

11   determination of no cleats in that area.  We were looking

12   at that area for its lack of overlap and seaming and the

13   deficient caps due to the copper there.

14       Q    Okay.  So are you saying that you're unable to

15   confirm whether there were cleats or not in that area in

16   2018?

17       A    At that time I don't think I was able to

18   confirm that.

19              MR. FRIEDBERG:  You're talking about 2014

20              or 2018?

21       A    2018.

22   BY MR. COSBY:

23       Q    My question was 2018.

24       A    Yeah.

25       Q    What area -- strike that.

```
 1          Was there any area other than the 5:00 o'clock
 2   to 5:30, what we've referenced in photos 39 and 40 that
 3   we discussed already, were there any areas other than
 4   that that showed any kind of post storm damage related to
 5   uplift in your opinion?
 6      A    Not to my recollection.
 7      Q    Okay.  So you don't know to what extent cleats
 8   exist on the east side of the roof, correct?
 9               MR. FRIEDBERG:  Objection to form.
10      A    At this point, no.  It's my presumption that
11   they were missing in that area near the change in
12   elevation to the witch's hat, that probably were missing
13   in all the ridges.
14   BY MR. COSBY:
15      Q    That's an assumption, correct?
16      A    Yeah.
17      Q    What portion of the roof is that at the
18   5:00 o'clock area, the witch's hat?
19      A    What portion of the ridge -- total ridge lent?
20      Q    No.  Let me finish my question.
21          What portion of the entire main pavilion roof
22   is that percentage wise?
23      A    As far as linear footage, I would say -- I'm
24   calculating at 3 percent, as a percentage of the overall
25   ridge length.
```

Page 113

1    Q    Okay.  So let me make sure I understand what
2    you mean by 3 percent.
3           Three percent is the -- that area that we've
4    been talking in the five to 5:30 area is the 3 percent of
5    the entire main pavilion roof?
6    A    Three percent of the ridge line length.
7           Now, when you think -- it still comes down to
8    what does that translate to when you have to create
9    cleats and you can't install any cleats there unless you
10   destructively remove one side of the connection, which
11   means taking the panel off all the way down.
12   Q    But I don't know that I heard your answer to my
13   question.
14          Was it 3 percent of the entire main roof
15   pavilion, was that your calculation?
16   A    My calculation is 3 percent of the linear
17   footage of the rib.
18   Q    Of the rip?
19   A    The rib.
20   Q    The rib?
21   A    Yeah.
22   Q    So my question is, what percentage of the
23   entire main pavilion roof is that, is that less than
24   3 percent?
25                    MR. FRIEDBERG:  Objection to form.

Page 114

1      A    It's hard to tell.  Using an area calculation,

2   you're using, you know -- you know, what do I say that

3   that rib is as a percentage, do we say it's six inches

4   wide, you know.  And then, take that comparison to the

5   whole area of the roof.  I don't think you can put it in

6   those terms.

7   BY MR. COSBY:

8      Q    Okay.  But if it's 3 percent of the rib with

9   your calculation, the rib is not the entirety of the

10  roof, correct?

11     A    Right.

12     Q    So we can agree that the percentage of that

13  area in relation to the entire roof would be less than

14  3 percent, correct?

15     A    Yeah.

16     Q    Okay.  If the plywood prevented wind from

17  entering the main pavilion, is that what your

18  understanding is, in your opinion?

19     A    Yes.

20     Q    How is there uplift damage?  Where is it coming

21  from?

22     A    It's the surface.

23     Q    What do you mean surface?

24     A    The wind -- from the wind on the exterior

25  surface.

Page 115

1          Q    Explain it to me.

2          A    Well, as I stated before, the storm came from

3     the bay in counter clockwise rotation and up the hill

4     accelerated.  It's blowing against this rib structure,

5     the inner section of the pan on these octagonal sections.

6     It's blowing against that, which is a very poorly

7     installed cap over a female and male connection of a one

8     inch joint that was short on one side and it just tore

9     the joint apart.

10         Q    Okay.  And so, help me out.  Where is the wind

11    entering to cause the uplift?

12         A    It's not entering.  It's traveling along the

13    roof in upward fashion to tear.

14         Q    Okay.  And it may be my misconception, so just

15    bear with me.  But when I think of uplift I think of wind

16    getting underneath a roof to lift it?

17         A    That's not the only way that wind affects a

18    roof.

19         Q    Okay.  So explain to me what you think happened

20    here as far as wind.

21         A    As I just said, you know, it's surface wind

22    hitting this slopped roof and tearing at the material.

23    It doesn't have to be internal pressure in a building to

24    --

25         Q    I understand your position on that.  I'm trying

```
                                              Page 116
```

1    to understand how it would happen then if there wasn't --

2    when I hear uplift.  I understand wind can cause damage

3    to a structure.  But when I consider uplift my conception

4    --

5         A    Once --

6         Q    Hold on.  Hold on.

7              My understanding of it with uplift is some

8    force from below, but you're telling me that's not the

9    case?

10        A    No.

11        Q    Okay.  How did this -- you agree that the --

12   most of the roof structure remained after the hurricane,

13   correct?  In other words, panels didn't fly off?

14        A    When you say structure, I think of the building

15   but --

16        Q    Well, the roof.

17        A    The roof installation, yes, I do agree.

18        Q    Not a single panel flew off, correct?

19        A    Correct.

20        Q    Did a single cap fly off?

21        A    I think there were areas where caps flew off.

22   The top of the witch's hat, you know, was disengaged.

23        Q    Did it fly off or was it disengaged?

24        A    It was just disengaged.

25        Q    But remained?

Page 117

1    A    Right.

2    Q    What are the caps secured with?

3    A    With a pop rivet.

4    Q    I'm sorry?

5    A    With a pop rivet.

6    Q    Do you have any photos showing missing caps due

7    to the storm?

8    A    No.  No.

9    Q    Other than the 5:00 o'clock to 5:30 orientation

10   we talked about in photographs 39 and 40, are there any

11   other areas of that eastern side of the roof that were

12   opened?

13   A    No.

14   Q    And we've talked about west and we've talked

15   about east.  Assuming those were correct from the 12:00

16   o'clock orientation down to the 5:00 and 6:00 o'clock

17   orientation, because it's round, it's a little difficult

18   to describe in the same way with those directions, but

19   was there any damage to the north or south sides of the

20   main pavilion?

21   A    Not that I saw.

22   Q    How much time did you spend up on the roof in

23   2018, main pavilion?

24   A    Probably about six hours.

25   Q    And how about in 2014?

```
                                        Page 118
1       A    I don't know.  I'd probably say about the same.
2   I'm not sure.
3       Q    Were you taking photographs?
4       A    Yes.
5       Q    Are there any photographs that exist other than
6   the ones that are in your report or that you provided?
7       A    No, I've given you everything from the Hoffman
8   file.
9       Q    Was there anyone from Hoffman that traveled
10  with you on either visit to assist you?
11      A    No.
12      Q    And was it just two trips that you've been down
13  there, 2014 and 2018?
14      A    Yes.
15      Q    As far as roofing systems, what's more
16  susceptible to uplift damage, a flat roof or a pitched
17  roof like this?
18             MR. FRIEDBERG:  Objection to form.
19  BY MR. COSBY:
20      Q    If you know.  Do you know?
21             MR. FRIEDBERG:  Objection to form.
22      A    I don't have statistics on which is more
23  vulnerable.  So many of the roofing failures are created
24  by, you know, an edge condition that just arose, some
25  failure at the edge to get wind underneath the roof
```

1  system and cause a failure, or cheap metal buildings in

2  Florida that the door blows out and everything blows away

3  from underneath.  I don't know that anybody has those

4  statistics.

5  BY MR. COSBY:

6      Q    But you don't, correct?

7      A    I don't, no.

8      Q    And as far as -- you mentioned different

9  states.  As far as your projects, I know you mentioned DC

10 as an area you've designed copper roofing systems or

11 system, what other states have you designed copper

12 roofing for?

13     A    I'd have to go back to my Hoffman list of

14 projects to come up with that.

15     Q    Have you designed any copper roofing system in

16 states that are susceptible to hurricanes?  Understanding

17 that every state could have one at least up the east

18 coast, but some get them more than others.

19          So, like Florida, have you ever designed a

20 cooper roof system in Florida?

21     A    No.

22     Q    How about North Carolina, the coastal area?

23     A    No.

24     Q    Are the roofing systems you've designed, are

25 they all commercial?

1    A    Yes.

2    Q    No residential?

3    A    No.

4    Q    Correct?

5    A    Correct.

6    Q    Has any of the roofing systems you've designed

7 experienced any failures?

8    A    No.

9    Q    Has Hoffman been part of any litigation

10 claiming there was any defects or failures in any Hoffman

11 systems, roofing related?

12    A    Not to my knowledge, no.

13    Q    When you say building envelop, do you include

14 everything, walls?

15    A    Walls, windows.

16    Q    As far as your design experience, can you give

17 me a percentage as to the roof designs versus walls or

18 other envelop components?

19    A    Probably fifty-fifty.

20    Q    Other than your -- let me make sure I

21 understand.

22         You've had two Zoom calls with Mr. Friedberg.

23 Are those the only calls you've had with him on this

24 case?

25    A    I believe so, yes.

Page 121

1       Q    I imagine you had calls with him leading up to
2   the deposition in the superior court case, correct?
3       A    Yeah.
4       Q    Do you know how many calls you had?
5       A    I have no recollection of that.
6       Q    Have you -- other than for your deposition, or
7   for the Daubert hearing or for this deposition, have you
8   ever met with him in person?
9            I guess the inspection of the property as well
10  both times.  Other than those visits, have you ever met
11  with him in person?
12      A    Only the visits to the site.
13      Q    Okay.  The visits to the site, the depositions
14  and the Daubert hearing would be the only times?
15      A    Yeah.  And I'm not sure if -- and certainly in
16  2014, I'm sure we both were available to be there, and in
17  '18 after the storm damage, I don't recall.
18      Q    Okay.  When you were there in 2014, did you go
19  into the main pavilion?  Not the roof, but underneath.
20      A    Yes.
21      Q    Did you notice any water damage at that time?
22      A    There was water damage on the east side at the
23  down -- there should be a photograph in there.  It's an
24  interior shot.
25      Q    Do you know what location it was in the

Page 122

1    interior of the main pavilion?

2        A    Kind of down from that 5:00 o'clock, 6:00

3    o'clock location.

4        Q    And I'm talking about rooms.  Like, was it a

5    particular room?

6        A    Well, the main pavilion is a big open room on

7    that level.

8        Q    Well, take a look and I'll let you find it for

9    me.

10       A    Well, actually it might not have been included

11   in the report.  But the back side on the west side where

12   the library attaches to the main pavilion, there was some

13   issues with the way the flashing was installed into the

14   stone wall and inside the main pavilion was -- this is

15   (indicating) the library wall build out and there was

16   leaking in there.

17       Q    What photo and page is that?

18       A    That is photo 18 on page 11.

19       Q    Of Exhibit 2?

20       A    Yeah.

21       Q    The library --

22       A    There may be --

23       Q    Go ahead.

24       A    There may be a photograph of the other leak on

25   the east side that wasn't included in this report.  It

Page 123

1   was relatively minor.  That might be in the general

2   photographs.

3        Q    The library to your knowledge, is that a

4   separate building from the main pavilion?

5        A    It's kind of tucked in.  So this octagonal roof

6   (indicating).

7        Q    We're looking at page 11 of Exhibit 5?

8        A    Yeah.  The library is this octagonal roof.

9        Q    Yeah.

10       A    So it encroaches into the main room.

11       Q    I got you.

12            So as we're looking at this diagram on page 11

13   of that exhibit, and that's Exhibit 5.

14       A    Five.

15       Q    There's a larger octagonal diagram which shows

16   the main pavilion, correct?

17       A    Yeah.

18       Q    And up around between 2:00 and 3:00 o'clock

19   there's a smaller octagonal structure noted, and that's

20   the library, correct?

21       A    That's the library.  And the leaking was into

22   the main pavilion around this area (indicating), the

23   flashing.

24       Q    Is that leaking -- was there any issues with

25   the roof of the library that could have caused leaking

Page 124

1  into the main pavilion?

2      A    It's not the roof of the library.  It's the

3  flashing connection between this main pavilion roof and

4  the concrete and stone wall of the library.

5      Q    Did the roof of the library fail?

6      A    No.

7      Q    Or did it open in any way that would have

8  caused water intrusion into the main pavilion, to your

9  knowledge?

10     A    No.

11     Q    Did you prepare any report for any homeowners

12  insurance claims brought due to Hurricane Irma?

13     A    Well, my report in 2018 was a report of storm

14  damage.  It was my presumption that the owner would use

15  it for his insurance.

16     Q    The same report we've been talking about, no

17  separate report, correct?

18     A    Correct.  Right.  No separate report.  I was

19  not looking at -- to my knowledge the previous case was

20  gone and the purpose of this storm damage report was to

21  report any damage to insurance.

22     Q    What do you mean by the previous case was gone?

23     A    The Daubert case.

24     Q    Well, you understand the superior court case

25  continued on until beyond Hurricane Irma?

Page 125

1      A     Well, I didn't know that.  My presumption was

2  that it was gone.  My report was not -- was looking at

3  storm damage.

4      Q     I understand if you thought the Daubert hearing

5  was a trial and that was over, then that's one thing.

6      A     Yeah.

7      Q     Are you aware of any other worker, contractor,

8  inspector or anyone else getting on that roof at any

9  time, other than yourself, Dahill, Mr. Friedberg.  We

10  know my expert went up there.  Are you aware of any other

11  person or any person representing any other entity being

12  on that roof at any time for any purpose?

13      A     I'm not aware of anyone being on that roof.

14      Q     Was there anyone from Hoffman involved in this

15  case involved in the Chocolate Hole property other than

16  you?

17      A     No.  Other than internal review.

18      Q     Okay.  What do you mean by internal review?

19      A     Well, we produce -- we produced a lot of survey

20  reports and they're all reviewed by -- I, myself, with

21  the director of the Hamden office for I think seven or

22  eight years and I reviewed every report that went out of

23  the office.

24      Q     Okay.

25      A     In my case, anything that I wrote was reviewed

Page 126

1  by Russ Sanders.

2      Q    Okay.  Kind of like a peer review?

3      A    Yes.

4      Q    Okay.  Did you review stuff he did?

5      A    Actually, Russ probably for the last eight or

6  ten years was more administrative as our president and

7  vice president.

8      Q    But that's the type of review you're talking

9  about?

10     A    Yeah.

11     Q    Anyone else --

12     A    Performance or format, et cetera.

13     Q    Anyone involved in any review other than Russ?

14     A    No.  Well, John Hoffman perhaps.

15     Q    Okay.  And you had now associates working under

16 you crunching numbers or doing any analysis, or did you?

17     A    No.  I mean, some of the graphic stuff I let

18 out to people to just create the architect drawings that

19 we used as the basis for the reports.

20     Q    Were you ever contacted by video from the

21 property, in other words, somebody showing you something

22 going on at the property?

23     A    Well, to my recollection no.  But it got

24 brought up today with Dahill because they have a

25 recollection that they contacted me by Hangout or

Page 127

1  something to show me some things and I have no

2  recollection of that.

3       Q    When you say that got brought up today by

4  Dahill, did you speak with someone at Dahill today?

5       A    We just talked to them this morning because I

6  didn't talk to anybody there for a long time.

7       Q    And who is we?

8       A    Tom and I.

9       Q    Tom and you called someone at Dahill today?

10      A    Yes.

11      Q    Who did you call?

12      A    We called Rich Maiocco and Rich Barabas.

13      Q    So how long did you --

14      A    So Tom hadn't talked to them and he mentioned

15  to Rich there's going to be a deposition.  Don't know

16  when.

17      Q    Okay.  How long did you speak with those Dahill

18  folks today?

19      A    Ten minutes.

20      Q    When did you meet Mr. Friedberg, what time?

21      A    Around 8:30, I guess.

22      Q    Prior to our 10:30 deposition?

23      A    It was 10:00 o'clock.

24      Q    I'm sorry, 10:00 o'clock deposition.

25      A    Yeah.

1     Q    And were you together until the deposition?

2     A    Yeah.

3     Q    Did you meet here?

4     A    Yes.

5     Q    And what input did Rich Maiocco or the other

6  Rich Barabas have today?

7     A    Well, you know, Tom had mentioned to me about

8  him saying that I had video conference with them and I

9  asked did that really happen.  I can't remember it, you

10  know, but --

11     Q    Did they convince you that it did?

12     A    I'm still not convinced.

13     Q    Okay.  What did they suggest they were showing

14  you by the video?

15     A    I don't know.  You know, maybe some of the

16  defects.  I don't know.

17     Q    Okay.  They didn't say today or remember, we

18  showed you X, Y or Z?

19     A    No.

20     Q    Did they say how long that video call was?

21     A    No.

22     Q    No?

23     A    No.

24     Q    Post storm it would have been, correct?

25     A    Yes.  Post the repair, yeah.

Page 129

1    Q    Okay.  Was there any discussion with them today

2    on their repairs, what they were?

3    A    No.

4    Q    Was there any conference with anyone else today

5    other than Mr. Friedberg and those two gentlemen?

6    A    No.

7    Q    Did you have any conference with Mr. Friedberg

8    in the last week or so prior to today's question

9    conference?

10    A    No.  He's been traveling.  I've been at the

11    doctors.

12    Q    When you were down in St. John in 2018, did you

13    notice any damage to any other structures when you

14    visited the island?

15    A    Any other --

16    Q    Not pre.

17    A    -- houses?

18    Q    Houses, buildings of any type.  Was there

19    damage that you noticed?

20    A    I don't really recall.  You would think --

21    well, it was the year after.

22    Q    The storm was in September of 2017, is that

23    correct?

24    A    Yeah.

25    Q    Okay.  And you got there what month of 2018?

Page 130

1      A    May.  It was an August report, so it was

2    probably May.

3      Q    Okay.  So May.  You flew into St. Thomas, I

4    assume?

5      A    Yes.

6      Q    And did you notice damage in St. Thomas?

7      A    Not of significance, no.

8      Q    So nothing jumps out to you as looking like a

9    war zone or anything like that or was --

10     A    No.

11     Q    Hold on.  Let me finish.

12          -- when you visited St. Thomas and St. John in

13   2018?

14     A    No.

15     Q    Assume there were no overhanging portions of

16   the roof and it was completely sealed, the main pavilion,

17   can hurricane winds still cause upward damage in those

18   areas -- in that area?

19          MR. FRIEDBERG:  Objection to form.

20     A    Elaborate a little bit.

21   BY MR. COSBY:

22     Q    I think you said the below part of the main

23   pavilion, the windows and door openings were sealed with

24   plywood, correct?

25     A    Yes.

1     Q    And that the wind came from up above?

2     A    Yeah.

3     Q    Is that correct?

4     A    Yes.

5     Q    Okay.  Assume -- and let me make sure I

6  understand.  Why -- what was the method by which wind

7  caused uplift damage?

8     A    You describe it as uplift, but I would say it's

9  the forceful, you know, direction of the wind at the roof

10  hitting the ridge line and causing the separation of the

11  copper.  And then, once those joints are open, air flow

12  underneath the copper and deforming the copper.

13    Q    Okay.  So do you call it uplift damage or is it

14  not considered uplift damage?

15    A    It's still uplift, whether it's above the roof

16  or below the roof.

17    Q    Okay.  I thought you were just correcting me

18  saying it wasn't uplift?

19    A    No.  No.  It's not uplift in the classic, you

20  know -- even a tornado where you have a storm with a

21  pressure difference and the interior pressure wants to

22  blow things out in a house.

23    Q    But I think what you just described as wind

24  entering where panels were separated and getting up

25  underneath the panels, is that correct?

Page 132

1       A    Yeah.  Yeah.

2       Q    Are you telling me that there couldn't be

3    uplift damage if those panels were not separated?

4       A    If they were held down by cleats.

5       Q    That couldn't occur.  In other words, there

6    can't be uplift damage if cleats are present, is that

7    your conclusion?

8       A    Yeah.

9       Q    Any reports, or treatises, or scholarly

10   writings or any writing that support that?

11      A    Not that I have in my possession.

12      Q    Have you ever inspected any other copper roof

13   or any roof jobs of Daybreak or Huber?

14      A    No.

15      Q    Have you ever spoken to any owners or

16   developers that have worked with Daybreak?

17      A    No, I have not.

18      Q    Other than Chris Bunge, Mr. Friedberg, perhaps

19   Mr. Friedberg's wife, the Dahill people, have you ever

20   spoken to anyone else about this case?  And I don't mean

21   if you told your wife or family member --

22      A    No.

23      Q    -- I'm traveling down for a deposition or that

24   kind of thing?

25      A    I did have some -- in 2014, I did have some

1  discussions with the national technical person at Copper

2  and Common Sense.

3          Q    Who did you speak with?

4          A    I don't know the name now.  It was so long ago.

5          Q    And what was the purpose of the call?

6          A    To understand the requirements for a copper

7  roof.  And I had a lot of technical discussions with him

8  over the years, starting with my consultation with the

9  portrait gallery in D.C. and other copper jobs.

10         Q    Okay.  And what were speaking with him --

11         A    Nothing specific.

12         Q    It was a he?

13         A    Yeah.

14         Q    Okay.  Did you ever speak with anyone at Copper

15  and Common Sense about this particular job?

16         A    No.

17         Q    The Friedberg job?

18         A    I don't think so.

19         Q    Or any issues with the Friedberg job?

20         A    No.

21         Q    Okay.  So what --

22         A    Just in general I had technical discussions

23  with them.

24         Q    Okay.  So did the discussions you had with them

25  pertain to anything that is in play at the Friedberg job?

Page 134

1     A    No, not that I recall.

2     Q    All right.  Did you ever speak with Miss Dolan?

3     A    No.

4     Q    All right.  Were you ever present at the --

5  strike that.

6          While you were present at the Friedberg

7  residence, did it ever rain?

8     A    Sprinkled a couple of days.  No significant

9  rain.

10    Q    Any water intrusion that was actively going on

11 while you were there at any time?

12    A    Not in the main pavilion.

13    Q    Is there anything about your 2014 report you

14 would change?

15         MR. FRIEDBERG:  Objection to form.

16    A    Not that I'm aware of.

17 BY MR. COSBY:

18    Q    How about the -- go ahead.  Continue your

19 answer.

20    A    I said not that I'm aware of at this time.

21    Q    How about the 2018 report?

22         MR. FRIEDBERG:  Objection to form.

23    A    Same answer.

24 BY MR. COSBY:

25    Q    And the 2025 report is fairly new, so I

Page 135

1    wouldn't expect it, but is there anything you intend to
2    change about it?
3         A    Again, not that I'm aware of.
4         Q    The standing seam construction, is this from
5    Copper and Common Sense?
6         A    Yes, it is.
7         Q    Your work as a design professional architect,
8    have you ever -- have any of your jobs been to renovate
9    or redo any roofing systems post catastrophic storm
10   damage?
11        A    Yes.
12        Q    Tell me about that.
13        A    I worked for a Swiss Bank for UBS on a data
14   center in Shelton, Connecticut, that had a dramatic
15   failure that occurred in a hurricane event.
16        Q    What hurricane or what year was that?
17        A    I believe it was -- I'm not sure of the date.
18   I can probably find that out in the records.  The data
19   center -- large data center, concrete roof.
20        Q    Concrete roof?
21        A    Concrete roof.  Multiple layers of insulation.
22   One, opening the roof, a roof hatch.  The corner flashing
23   on a parapet wall gave way and a third of the roof
24   flooded with the insulation building up, and out of the
25   abundance of caution they replaced the entire roof.

1    Q    With the same time roof system?

2    A    With a modification.

3    Q    Not a copper roof, though, correct?

4    A    No.

5    Q    Correct?

6    A    Correct.

7    Q    Any other storm related design renovations?

8    A    Not that I can think of offhand.

9    Q    All right.

10        MR. FRIEDBERG:  Counsel, we're getting

11        close to my hard stop.

12        MR. COSBY:  Let me wrap up here in the

13        next couple of minutes.

14        MR. FRIEDBERG:  I literally have like two

15        minutes and I got to go.

16        MR. COSBY:  Okay.  I thought 2:00 was our

17        hard stop.

18        MR. FRIEDBERG:  Yeah.  Well, okay.  I

19        mean, we're two minutes from 2:00.

20        MR. COSBY:  If you need to stop right now,

21        we'll stop right now.  But I just don't want to

22        -- let me state some comments before we wrap

23        up.

24        I'm not finished with the deposition.

25        MR. FRIEDBERG:  I understand that.

```
 1              MR. COSBY:  All right.  Well, I want to
 2         make sure it's clear on the record, you agree
 3         that I'll be able to come back and ask more
 4         questions of Mr. Sanders.  You have a hard
 5         stop.
 6              MR. FRIEDBERG:  Up until your FRCP
 7         requirements, yeah, you have the right to take
 8         his deposition.
 9              MR. COSBY:  All right.  So you're going to
10         make him available again should we need it?
11              MR. FRIEDBERG:  Yep.  Subject to
12         Mr. Sander's schedule.
13              THE WITNESS:  Yeah.
14    BY MR. COSBY:
15         Q    Well, do you plan on going anywhere?
16         A    No.  But I have a few surgeries coming.
17         Q    I'm sorry to hear that.
18              MR. COSBY:  All right.  Well, I'm
19         suspending the deposition.  I'm not finishing
20         it but we'll stop for the day.
21              THE WITNESS:  Well, I'd certainly be
22         available if it was an electronic, too.
23              MR. COSBY:  I can't promise that I'm going
24         to be interested in an electronic deposition.
25              THE WITNESS:  Okay.
```

```
                                              Page 138
 1              MR. COSBY:  Let me make sure these
 2         exhibits -- I don't know if these got twisted
 3         around.
 4              THE WITNESS:  Well, this --
 5              MR. COSBY:  This isn't mine, so take a
 6         look at this and tell me what that is.
 7              THE WITNESS:  This is the subpoena for
 8         documents and notice of taking the deposition.
 9              MR. COSBY:  I thought we had a sticker on
10         it.  That's why I'm asking you.
11              THE WITNESS:  Didn't you just give that
12         one back to me?
13              MR. COSBY:  Yeah.  Maybe that's it.  That
14         should all be connected, if we have a paper
15         clip or something.
16              THE WITNESS:  Okay.  Now, what are you --
17         are you leaving these with her?
18              MR. COSBY:  Well, let's talk about that.
19         Let me first eject this.  She can have the
20         drive.  There's no issue with that, correct?
21              THE WITNESS:  Sure.
22              MR. COSBY:  Off the record.
23              (Whereupon, the deposition adjourned at
24         2:02 P.M.)
25
```

Page 139

```
 1              CERTIFICATE OF REPORTER
 2         I, Christine N. Meade, a commissioner in and
 3    for the State of Connecticut, do hereby certify that the
 4    deposition of Arthur Sanders was taken before me on
 5    August 28, 2025.
 6         I further certify that the witness was duly
 7    sworn by me to testify to the truth, the whole truth, and
 8    nothing but the truth, that she was examined under oath,
 9    and the foregoing is a true and accurate transcription of
10    the testimony as taken stenographically by me and
11    subsequently transcribed as hereinbefore appears.
12         I further certify that I am neither attorney
13    nor counsel for, nor related to, nor employed by any of
14    the parties to the action in which this deposition is
15    taken, and further that I am not a relative or employee
16    of any attorney or counsel employed by the parties
17    hereto, nor financially interested in the outcome of the
18    action.
19         IN WITNESS THEREOF I have hereunto set my hand
20    this 3rd day of September, 2025.
21
22
23
24
      Christine N. Meade, Notary Public
25    My Commission expires: December 31, 2027.
```

[& - 31]                                                    Page 140

| & | 13 3:20 19:21,22 | 2,000 43:23 | 49:12,15,18 |
|---|---|---|---|

**&** 1:3,10 2:4,9
3:13 12:6 18:12
18:15 105:16

**0**

**0053** 1:3
**00820** 2:16
**06510** 1:25
**06515** 6:20

**1**

**1** 3:8 16:18,19
18:12 20:4,5,6
59:12,18 76:25
77:23 78:1
**10** 3:17 19:8,10
39:20 78:18
**10,850** 39:14
**1005** 2:4
**10:00** 127:23,24
**10:11** 1:21
**10:30** 127:22
**11** 3:18 19:14
122:18 123:7,12
**11:27** 49:6
**12** 3:19 19:16,17
39:20,20 75:13
77:15
**12,300** 39:3,4,14
49:21
**12:32** 89:25
**12:38** 90:1

**13** 3:20 19:21,22
**137th** 12:2
**14** 16:25 17:12
22:17 39:20
48:8 81:8
**15** 25:10
**157** 1:24
**16** 3:8 39:20
**16th** 57:11,12
57:13
**17** 3:9,10
**17009** 139:24
**175** 104:5
**176** 104:12
**18** 3:11,12,13,14
3:15,16 17:9,13
17:15 22:13,17
39:20 121:17
122:18
**19** 3:17,18,19,20
13:21
**1980-1990**
26:20
**1994** 30:25
**1997** 58:18
**1998** 30:25

**2**

**2** 3:9 7:6,13 17:3
17:4 69:20
81:10,14,15
82:10 91:11
122:19

**2,000** 43:23
**20** 49:1 91:13
**200** 104:14
**2001** 6:19
**2014** 3:9 11:8
17:5 22:13
54:12 65:15,16
65:22 80:14,15
80:20 82:20
83:12 84:25
85:2 90:24,25
93:11 96:5
106:6 107:14
109:13 111:5,19
117:25 118:13
121:16,18
132:25 134:13
**2015** 13:3 25:11
**2017** 107:15
129:22
**2018** 11:16
13:20 17:22
111:6,9,16,20
111:21,23
117:23 118:13
124:13 129:12
129:25 130:13
134:21
**2019** 12:4
**202** 2:5
**2020** 12:2 14:6
**2021** 14:4
**2025** 1:9,19
12:19,19 39:12

**49:12,15,18**
51:13 56:9
134:25 139:5,20
**2027** 139:25
**205** 2:10
**21** 81:15,16
91:13
**2191** 2:15
**22nd** 11:25
**24** 39:20
**24th** 45:17
**26** 21:24 22:8
56:2
**27** 78:13
**28** 1:9,19 12:19
12:19 139:5
**29** 49:12,15
**29th** 39:11
49:18 50:14
51:13,14
**2:00** 123:18
136:16,19
**2:02** 1:21
138:24

**3**

**3** 3:10 17:20,21
18:12 78:11
82:5 112:24
113:2,4,14,16
113:24 114:8,14
**301** 2:9
**31** 39:2,19
139:25

**34994** 2:10
**35** 78:25
**350** 39:2,13
  41:12 42:22
  43:21 44:14,25
  46:22 57:24
**36** 39:20 40:8
  74:22
**38** 46:19 74:23
**38,000** 40:18
  45:20 46:19
**39** 81:17,22 91:5
  112:2 117:10
**3:00** 123:18
**3:19** 1:3
**3rd** 139:20

**4**

**4** 3:11 18:1,2
  39:20 69:20
**40** 81:17,22 82:2
  91:5,8 112:2
  117:10
**450** 42:16,17,19
  42:22 43:1,22
**451** 2:14

**5**

**5** 2:15 3:12 18:7
  18:8 51:12
  59:13,18 77:20
  123:7,13
**50** 27:21,22
  28:21 101:7

**50,000** 45:20
**500** 43:23 44:15
**51** 101:2
**52** 79:4,5 80:5
  82:5
**5:00** 79:16 81:7
  82:3,16 109:10
  112:1,18 117:9
  117:16 122:2

**6**

**6** 3:4,5,13 13:2
  18:13,14 39:20
**6814** 2:5

**7**

**7** 3:14 18:18,19
**7/24** 45:17
**70** 14:2

**8**

**8** 3:15 18:22,24
  39:20 75:13,13
  77:14 78:17,17
**8,487.50.** 49:15
**80** 31:10
**8:30** 127:21
**8th** 12:4

**9**

**9** 3:16 19:2,5
  41:16 43:12
  56:8 68:12 70:3
  70:4 85:13
**92166** 2:5

**94** 26:21

**a**

**a.m.** 1:21 49:6,6
**ability** 7:19
**able** 48:4,7
  96:19 98:22
  104:13 111:17
  137:3
**above** 69:5
  78:17,18 79:18
  81:20 131:1,15
**absence** 92:10
  93:15 96:13
**abundance**
  135:25
**accelerated**
  115:4
**accordance**
  86:10
**accurate** 139:9
**accusing** 43:17
**action** 1:3 62:4
  139:14,18
**actively** 134:10
**actual** 43:25
**actually** 11:13
  12:14 17:23
  27:25 30:7 78:7
  99:2 122:10
  126:5
**added** 50:6
**addition** 37:1

**address** 6:17
  48:13,21
**adds** 84:9
**adhesive** 108:15
**adjourned**
  138:23
**admin** 38:17
  49:17
**administration**
  55:24
**administrative**
  126:6
**advanced** 84:2
**aesthetic** 62:15
**affect** 62:11,12
  105:19 107:22
**affects** 115:17
**africa** 60:3
**african** 61:2
  62:18,21
**ago** 22:22 25:7
  47:2 98:8
  103:20 133:4
**agree** 58:10
  114:12 116:11
  116:17 137:2
**agreed** 5:10,14
  5:17 109:12
**ahead** 7:1 22:10
  74:15 80:19
  87:4 106:19
  122:23 134:18
**aia** 14:15 26:22
  38:18

**[aided - attachment]**                                    Page 142

**aided**  88:5
**air**  106:12,13,17
   106:22 107:3,5
   107:8,11 131:11
**allow**  81:20
   85:16
**als**  38:18
**amount**  38:24
   40:19 42:3
**analysis**  29:3
   35:8 59:18,20
   105:8 126:16
**anchors**  52:16
   52:18 53:18
**andrew**  2:14
**angled**  85:18
**annual**  60:22
**answer**  7:18,24
   8:4,7,7,17 22:10
   35:19,20 41:23
   46:14 60:20
   97:15 102:9,10
   102:20 103:7
   113:12 134:19
   134:23
**anticipate**  37:5
**anticipating**
   36:23
**anticipation**
   35:7
**anybody**  119:3
   127:6
**apart**  7:7,13
   92:12 93:5,13

94:6,7 96:18
   115:9
**apparently**  54:2
**appearance**
   40:24 44:16
**appeared**  24:2
**appears**  139:11
**appended**  15:18
**application**
   62:17
**applies**  52:19
   110:3
**appointments**
   57:20,20
**appreciate**  26:6
**approached**
   45:20
**approximately**
   27:21 74:22
**april**  12:19,19
**apron**  96:1
**architect**  14:14
   29:19 30:2,9,9
   72:1 88:9,15
   89:3 126:18
   135:7
**architects**  13:18
   13:25 26:18
   27:14,17,23
   28:2,7,23,24
   29:8,10,11
   47:12 58:18
   71:9 88:19,23

**architectural**
   71:6,12,18
   85:24 86:1
**archive**  32:14
**area**  74:21
   78:13,19 80:10
   80:11,23 81:11
   81:22,25 82:2
   82:13,21 83:8
   85:1,2 91:20
   92:5 93:11
   105:21,22
   109:10,11 111:5
   111:11,12,15,25
   112:1,11,18
   113:3,4 114:1,5
   114:13 119:10
   119:22 123:22
   130:18
**areas**  73:14 74:3
   112:3 116:21
   117:11 130:18
**argumentative**
   45:23
**arose**  118:24
**arriving**  34:17
   36:8
**arthur**  1:17 3:4
   3:9,15,22,23
   6:18 7:3 13:9
   17:4 18:24
   139:4
**article**  25:24
   32:2 33:6 58:18

58:19 97:25
**articles**  26:9,23
   31:22 32:5,13
   32:15,21 33:3
   36:11
**asked**  14:7
   15:11 37:13
   41:16 42:20
   45:8,15 86:8,9
   128:9
**asking**  37:4
   41:19 45:7
   66:18 76:23,24
   103:2 138:10
**assert**  22:8
**assist**  118:10
**assisting**  35:8
   67:18 68:1
**associates**  1:10
   126:15
**assume**  26:5
   41:2 46:19
   51:15 130:4,15
   131:5
**assumed**  109:14
**assuming**
   117:15
**assumption**
   112:15
**attached**  17:11
   68:22 69:25
**attaches**  122:12
**attachment**
   38:20

**[attorney - building]**

**attorney** 21:22
  21:23 43:4
  139:12,16
**audiotapes** 35:6
**august** 1:9,19
  57:12,13 65:25
  130:1 139:5
**author** 32:3
**authored** 32:14
**authoritative**
  35:10
**authority** 5:11
**available** 88:19
  121:16 137:10
  137:22
**average** 70:4
  85:13 109:25
  110:5
**avoid** 7:19
  84:13
**award** 26:22
**aware** 21:20
  72:25 73:6
  89:22 98:6
  125:7,10,13
  134:16,20 135:3

**b**

**b** 1:9 73:19,19
**back** 7:11 10:12
  15:18 16:23
  23:1 24:14
  26:17 31:4
  32:14 33:9

34:10 41:20
  42:9 47:23
  57:10,22 90:24
  90:24 91:11
  92:18 93:8,14
  95:25 96:1
  103:19,23 110:8
  119:13 122:11
  137:3 138:12
**background**
  79:24
**badgering**
  103:10,11
**bank** 135:13
**bar** 2:14
**barabas** 73:17
  73:22 127:12
  128:6
**barry** 12:17
  15:25 16:1
**base** 35:5,11
  68:12
**based** 25:17
  27:14
**basis** 60:23
  126:19
**bates** 78:25
**bay** 110:17
  115:3
**beams** 69:3
  108:1
**bear** 115:15
**beauty** 60:12

**beginning**
  100:19
**begins** 78:18
**belief** 32:24
**believe** 9:21
  38:3 46:24
  47:24 50:22
  51:11 63:20
  65:9,25 67:18
  73:19 83:3,7
  106:5,20 107:9
  120:25 135:17
**bend** 78:18
  79:18 81:25
**best** 7:18 33:22
**better** 16:24
**beyond** 25:2
  37:4 124:25
**biannual** 60:23
**big** 79:10 122:6
**bill** 39:2 41:8,11
  49:24 50:1
**billed** 38:24
  39:2,11 40:17
  47:14
**billing** 37:24
  40:21 41:9 44:3
  44:5,8 45:19
  46:24 48:1,7,11
**bills** 46:17
**bit** 14:7 26:17
  26:24 79:23
  130:20

**bitumen** 30:1
  87:14
**black** 79:6
**blow** 131:22
**blowing** 115:4,6
**blows** 119:2,2
**blue** 79:8,9
**book** 43:7
**books** 36:11
**boulevard** 2:9
**box** 2:5
**break** 4:4 8:13
  8:16 31:11 49:1
  49:2 58:9 89:24
**breaks** 8:14
  90:4,16
**bringing** 43:14
**broke** 43:20
**brought** 11:5,6
  34:4 49:9 60:2
  124:12 126:24
  127:3
**brunt** 110:18
**build** 122:15
**building** 13:22
  28:24 29:3,6
  52:23 53:4 68:3
  68:13 71:8
  74:18 79:23
  105:14 106:13
  110:11 115:23
  116:14 120:13
  123:4 135:24

**buildings** 52:24
66:7 67:19
71:20,22 74:7
75:24 76:2
87:22 119:1
129:18
**bullet** 32:1
34:14,25 35:21
**bunge** 1:3 2:4
8:24 12:13,14
67:9 89:11
132:18
**burst** 13:21
**business** 73:20
105:6

**c**

**c** 2:1,11,14
**cady** 12:20
**calculating**
112:24
**calculation**
113:15,16 114:1
114:9
**calculations**
35:4
**california** 2:5
**call** 50:8,9 51:9
51:10,15,18,21
51:23 53:19
58:13 59:3 65:8
127:11 128:20
131:13 133:5

**called** 51:5 56:2
58:1 65:1,7
80:21 85:23
127:9,12
**calls** 50:18,21
51:2,9,16
120:22,23 121:1
121:4
**cap** 74:19 75:22
76:12,15 77:7
77:24 78:2
81:18 115:7
116:20
**capacity** 25:22
31:20
**capitol** 30:10,10
31:1
**caps** 74:11
75:20 76:4,5
98:24 111:13
116:21 117:2,6
**card** 73:20
**carolina** 119:22
**case** 8:23,24 9:4
9:6,7,25,25
10:23,24 13:1,3
15:9 16:6 19:9
22:14,21 23:25
24:2,5,8,25,25
25:2 26:4,6,8,11
26:12 33:17,20
37:8,17,20
40:10,10,14,18
42:22 44:12

45:20 48:13,14
48:22,22 50:19
53:23 54:17,23
55:2,14 65:13
70:1 116:9
120:24 121:2
124:19,22,23,24
125:15,25
132:20
**cases** 14:22 15:3
23:5 24:12 28:8
**catastrophic**
135:9
**cause** 108:19
115:11 116:2
119:1 130:17
**caused** 63:9
105:3 123:25
124:8 131:7
**causing** 131:10
**caution** 135:25
**ceiling** 69:5
**center** 68:12
135:14,19,19
**certain** 16:16
86:9 101:21
**certainly** 52:18
121:15 137:21
**certainty** 101:3
101:5
**certificate** 139:1
**certify** 139:3,6
139:12

**cetera** 126:12
**challenged** 24:7
24:11
**change** 33:25
42:19 62:8
105:18 112:11
134:14 135:2
**changed** 15:15
28:1 42:22
45:10 61:5,25
103:20 106:8
**changes** 23:1
**changing**
102:25 103:2,7
**chapel** 6:19
**charge** 42:7
43:1,11,12
**charged** 44:20
46:21
**charges** 48:12
48:17
**charging** 43:4
44:17
**charts** 20:13,21
**cheap** 119:1
**chemical** 62:5
**chimney** 95:24
95:25 96:2
**chocolate** 48:12
48:21 125:15
**chris** 12:13 67:9
69:7,18 70:6,6
71:5,23 72:2,5,7
72:8,14,15,20

[chris - compressed]

72:24 89:11 108:17 132:18

**christiansted** 2:15

**christine** 6:12 139:2,24

**church** 1:24 2:15

**circle** 80:11 81:1

**circled** 80:23 82:3

**cites** 56:2

**city** 27:18 28:1

**civil** 1:3

**claiming** 120:10

**claims** 52:4 124:12

**clarification** 82:12

**clarify** 34:6 53:15 76:6 77:2 80:19

**clarity** 34:3

**classic** 131:19

**clean** 64:24

**cleaned** 60:4

**cleans** 27:3

**clear** 73:11 97:15 137:2

**cleared** 64:4

**clearer** 7:25

**clearly** 81:19

**cleat** 52:19 76:9 96:19 97:1,8,10 97:16 100:12 110:4

**cleats** 52:12,13 52:14 53:18 81:2 85:2,6,7,9 85:11,11,21,23 86:9 91:16 92:1 92:5,10 93:15 96:13,15 97:3,5 99:14,14,19 100:7,11,21 101:1,3,9,17,22 102:16,22 103:24 104:13 104:13 109:17 109:19,23 110:7 111:6,9,11,15 112:7 113:9,9 132:4,6

**client** 14:19 15:1

**clients** 26:21 58:25 59:1

**clip** 17:23 52:19 108:19 109:15 138:15

**clips** 52:9,10,12 52:14 53:18 74:21 82:13 85:2 91:16,23 94:17 109:1,3,4 109:13 111:6

**clock** 44:11 79:14 80:24

**clockwise** 110:18 115:3

**close** 58:15 79:1 81:11 136:11

**closed** 43:7

**closely** 95:11

**closer** 61:18,19

**coast** 62:21 119:18

**coastal** 119:22

**codes** 87:8,12

**coincided** 111:5

**color** 61:5,25 62:15 63:10

**colorado** 57:10

**combined** 84:7

**come** 30:7 37:12 57:14 119:14 137:3

**comes** 76:7,9,10 113:7

**coming** 77:25 114:20 137:16

**comments** 21:24 136:22

**commercial** 119:25

**commission** 139:25

**commissioner** 139:2

**common** 44:9 86:10 101:16 104:19 133:2,15 135:5

**communicatio...** 23:2 50:24

**companies** 30:6 30:12

**company** 70:11

**compared** 98:22

**comparison** 114:4

**compilation** 34:15

**complaint** 3:17 12:25,25 19:9 19:11

**complete** 35:21 37:19

**completely** 54:15,24 55:5 130:16

**complications** 88:4

**complied** 96:10 99:15

**comply** 82:2

**components** 120:18

**composite** 17:8 17:18 18:13 68:25

**compressed** 96:20

**comprise** 52:24
**computer** 35:16
  50:25 51:1
**concept** 96:22
  96:23
**conception**
  116:3
**concerned** 76:1
  91:23
**concerning** 36:9
**concluded**
  108:24
**conclusion** 55:8
  110:8 132:7
**conclusions**
  21:9 34:18 36:9
  58:5
**concrete** 124:4
  135:19,20,21
**condensed**
  12:15
**condition** 66:4
  81:18 82:23
  96:8 107:14
  118:24
**conference**
  128:8 129:4,7,9
**conferenced**
  90:3,5
**confirm** 64:14
  111:15,18
**confirmed** 81:2
**conformance**
  109:16

**conformed** 81:4
**connected**
  138:14
**connecticut**
  1:25 6:14,20
  14:16 135:14
  139:3
**connection**
  35:22 85:18
  113:10 115:7
  124:3
**consensus** 97:19
**consider** 93:10
  93:17 116:3
**considered** 53:2
  131:14
**consistent** 64:12
**consisting** 69:4
**consists** 76:7
**construction**
  9:19 67:19
  89:12,20 135:4
**consultant**
  29:19
**consultation**
  45:13 63:23
  133:8
**consulted** 63:21
  64:22
**contacted**
  126:20,25
**contemplate**
  36:21

**context** 25:17
  25:21
**continue** 134:18
**continued**
  124:25
**continuing**
  49:19
**continuity** 4:4
**contract** 9:5
  12:24 14:3 52:7
  53:17 70:4 81:4
  83:5 86:5 96:10
  99:15 109:24
  110:2
**contractor**
  31:19 67:19,22
  68:1 70:9,13,16
  86:7 125:7
**contractors**
  29:8 87:6
**contracts** 3:16
  19:3,6
**contributed**
  25:25 32:3
**conversations**
  72:4
**converting**
  30:20
**convince** 128:11
**convinced**
  128:12
**cooper** 119:20
**copies** 11:13
  12:14

**copper** 26:3
  27:1 29:17,20
  29:22,25 30:3,5
  30:18,21 31:2
  31:12,15,16,18
  33:4,7,8 53:9
  58:21 59:6,7,22
  59:24 60:1,2,5
  60:10,12,21,22
  61:15,17 62:5,8
  62:11,13 63:4
  66:5,23 67:3
  68:15 70:1,22
  83:4 84:4,6,12
  84:16,21,23
  86:2,3,7,10
  87:15 96:1,24
  96:24 97:5
  98:17 99:7
  101:16 102:14
  104:19 108:8
  111:13 119:10
  119:11,15
  131:11,12,12
  132:12 133:1,6
  133:9,14 135:5
  136:3
**copy** 3:22 6:6
  11:8,15 12:25
  17:10 20:11
  25:24 32:2
  38:18
**corner** 53:1
  135:22

| | | | |
|---|---|---|---|
| **corporation** 27:25 | **correcting** 131:17 | 88:7 89:1,6,15 89:19,23 90:2 | **country** 87:10 **couple** 19:25 |
| **correct** 8:25 9:7 | **correctly** 30:2 | 91:19 92:3,8,13 | 60:4 103:20 |
| 9:13 10:16 21:1 | **correspondence** | 92:20 93:1,9,16 | 134:8 136:13 |
| 21:3,5,5,11 | 21:13,14 22:2 | 93:20,23 94:2 | **court** 1:1 6:1,5 |
| 30:21 31:18 | 22:25 35:3 | 95:8 97:24 98:7 | 6:10,16,21 7:9 |
| 40:15 44:6,20 | **corrode** 83:23 | 98:19,23 100:1 | 9:16,18 10:24 |
| 44:25 46:22,23 | 84:16,16,21 | 100:14 101:8,13 | 16:5,8,14 23:24 |
| 47:5 53:20,23 | **corroded** 82:24 | 101:19 102:1,7 | 24:5,8,25 26:11 |
| 54:13,17,24 | 83:9,12,15,17 | 102:15,21 103:1 | 33:17,20 40:9,9 |
| 55:2,9,20 56:9 | 83:22 | 103:6,11,14,15 | 40:10,10,14,24 |
| 56:12 58:19 | **corrosion** 83:25 | 103:19 104:2,21 | 44:16 45:20 |
| 66:11 76:16 | 84:3,5,6,14,15 | 105:1,7,20,24 | 48:13,21 53:23 |
| 79:1,16,18 80:6 | 84:23 | 106:21 107:1,6 | 54:8,17 55:2,14 |
| 80:24 81:7 82:5 | **cosby** 2:9,11 3:5 | 108:5 109:8 | 65:13 103:23 |
| 82:7,10,18 84:8 | 6:4,9,23,25 10:7 | 111:22 112:14 | 121:2 124:24 |
| 88:10,16 89:3 | 10:9,12,13 | 114:7 118:19 | **courthouse** 47:8 |
| 97:16 99:15,20 | 16:12,15,17,21 | 119:5 130:21 | **cover** 19:25 |
| 100:9,22,24 | 17:2,7,24 18:5 | 134:17,24 | **covered** 20:12 |
| 104:23 108:19 | 18:11,17,22 | 136:12,16,20 | 20:15,23 21:11 |
| 108:21,25 | 19:2,8,12,16,19 | 137:1,9,14,18 | 35:3 36:18 |
| 109:13 111:1 | 19:24 21:25 | 137:23 138:1,5 | 37:22 106:2 |
| 112:8,15 114:10 | 22:1,12 33:23 | 138:9,13,18,22 | **covid** 14:7 |
| 114:14 116:13 | 34:2,5 38:9,12 | **cost** 3:11 11:20 | **create** 71:9 |
| 116:18,19 | 41:18,22 43:13 | 11:20,24 17:25 | 82:22 86:25 |
| 117:15 119:6 | 43:16 45:24 | 18:3 39:16 44:5 | 113:8 126:18 |
| 120:4,5 121:2 | 46:4,8,12,18 | **counsel** 3:23 5:2 | **created** 45:6 |
| 123:16,20 | 48:25 49:7 | 5:6,11,15,18 6:1 | 60:7 118:23 |
| 124:17,18 | 53:13 54:6,20 | 6:6,22 43:9 46:3 | **crew** 72:2 |
| 128:24 129:23 | 55:7,12,16,23 | 136:10 139:13 | **croix** 2:15 |
| 130:24 131:3,25 | 60:8,19 67:21 | 139:16 | **crunching** |
| 136:3,5,6 | 74:25 75:4 | **counter** 110:17 | 126:16 |
| 138:20 | 83:20 84:18,24 | 115:3 | **cuing** 7:24 |
| | 85:10 86:16,24 | | |

**cunningham**
3:13 12:6 18:12
18:15
**current** 20:11
38:1 41:25
99:17
**curriculum**
15:12 20:1,11
**customers** 58:25
**cut** 8:6,7
**cv** 1:3 15:15

**d**

**d** 1:9 3:1 6:11
**d.c.** 27:19 29:18
30:6 133:9
**dade** 104:20
**dahill** 3:11,12
11:19 17:25
18:2,6,8 73:8,13
73:16 80:13
94:8 95:23,24
98:25 125:9
126:24 127:4,4
127:9,17 132:19
**damage** 3:10
11:13,22 17:9
17:16,22 60:6
67:15 73:8 74:5
74:12 76:4,6
78:8 82:7 98:24
99:19,23,23
100:7,22 101:2
102:17,23

103:25 104:14
104:22 105:3,3
109:1 110:10,23
110:25 112:4
114:20 116:2
117:19 118:16
121:17,21,22
124:14,20,21
125:3 129:13,19
130:6,17 131:7
131:13,14 132:3
132:6 135:10
**damaged** 13:23
75:18 101:4
**darken** 63:10
**darkened** 62:3
**data** 35:4
135:13,18,19
**date** 1:19 25:9
37:21 38:24
50:12 61:14
65:20 135:17
**dated** 12:18
13:12 45:17
49:11 50:13
56:8
**dates** 11:23
**daubert** 10:15
24:4,8,9 40:24
41:3 47:4,9
121:7,14 124:23
125:4
**day** 28:9 47:14
47:22,23,24

137:20 139:20
**daybreak** 1:9
10:2 61:16
72:24 86:6,25
87:16 132:13,16
**days** 47:17
134:8
**dc** 119:9
**dealing** 28:11
91:23
**debris** 74:12
99:13
**december**
139:25
**decided** 54:2,3
**decking** 69:4
108:2
**declined** 15:9
**decorative** 69:5
**deem** 43:25
**deemed** 34:16
**defective** 74:3
**defects** 5:15
73:14 120:10
128:16
**defendant** 1:13
2:8
**defendant's** 3:7
16:19 17:4,21
18:2,8,14,19,24
19:5,10,14,17
19:22
**defer** 9:23

**deficient** 111:13
**definitions**
92:24
**deformed** 80:10
**deforming**
131:12
**delivered** 43:19
**demeanor** 90:20
**demonstrative**
20:15
**dent** 99:8
**dental** 57:20
**dents** 74:11 99:2
99:2,3,6,9,13
100:2
**depo** 13:4,7
16:5 40:2 45:25
**deponent** 5:19
**deposed** 23:21
25:4,16
**deposit** 62:5
**deposition** 1:17
3:15 5:12,16,19
6:2,6 7:5 9:12
10:24 11:4
12:21 13:2 16:2
16:18 18:23,23
18:25 20:3 23:6
23:6 32:1 33:16
34:7 37:8,21
38:2,17 39:6,8
40:17,20,25
41:18 42:5,7,14
43:2,10,12,21

45:2,12,16,21
46:5,7,20,22
56:11,15 57:7
73:25 98:12
121:2,6,7
127:15,22,24
128:1 132:23
136:24 137:8,19
137:24 138:8,23
139:4,14
**depositions** 7:15
12:13,17 15:23
23:11,16 52:3
56:12 121:13
**describe** 69:19
83:5 117:18
131:8
**described** 69:1
131:23
**description**
50:13
**descriptive**
76:24
**design** 30:17
31:17,21 59:6
59:16,19 71:22
86:11,14,17,22
87:7,17,23 88:5
120:16 135:7
136:7
**designed** 101:9
119:10,11,15,19
119:24 120:6

**designing** 59:8
**designs** 120:17
**destroyed** 93:6
**destructive**
80:20 92:14,17
92:21,25 93:3,5
93:6,11,18
**destructively**
92:12 113:10
**details** 86:12
87:22 88:6
**determination**
111:11
**determine** 75:18
85:1 92:5 96:13
102:8 105:8
107:11
**determined**
82:13 91:15
92:9 94:16
109:12 111:6,9
**developers**
132:16
**device** 28:3
**diagnoses**
104:17
**diagonal** 85:18
**diagram** 80:5
109:11 123:12
123:15
**diagrams** 20:13
20:17
**diego** 2:5

**difference** 85:15
96:25 131:21
**different** 23:10
29:24 34:19
41:13 42:18
45:13 46:16
52:17 63:6 84:4
85:11,14 119:8
**differential**
105:18
**difficult** 96:17
117:17
**direct** 3:5 6:24
**directed** 5:4,8
**direction** 74:19
75:6 76:9 78:19
79:22,25 80:2
131:9
**directions**
117:18
**director** 125:21
**disclosed** 56:3
**discoloration**
63:8
**discovered**
52:10
**discuss** 49:8
50:11 65:1
90:12 95:15
**discussed** 51:19
65:2 90:14
95:16,17 112:3
**discussing**
94:18

**discussion**
10:10,14 38:10
65:9 90:18,20
129:1
**discussions** 72:8
72:13 133:1,7
133:22,24
**disengaged**
116:22,23,24
**distance** 75:14
**distributed**
26:20 59:1
**district** 1:1 40:9
40:10
**disturbed** 60:25
**division** 1:1
**docket** 10:4
**doctors** 57:20
129:11
**document** 37:16
56:2 74:13
**documentation**
36:15
**documented**
58:8
**documents**
11:19 13:16
16:23 20:10
29:2,4 33:13
34:20 35:9,24
35:25 36:7,20
49:9 50:16
51:25 56:16,17
56:22 57:8,9,14

**[documents - established]**

96:10 138:8
**doing**  24:22
  37:7 67:18,25
  87:7 126:16
**dolan**  3:14
  12:12 18:17,19
  134:2
**dollars**  42:15
  45:9
**dome**  30:11
  31:1 75:14
  78:22
**door**  119:2
  130:23
**doors**  105:11,15
  105:25 107:17
**double**  81:4
**draft**  12:10
  21:21 22:5,7,11
  22:25 36:3
**drafting**  42:13
**drafts**  22:17
**dramatic**
  110:19,20
  135:14
**drawings**  71:9
  86:12 87:7 89:7
  126:18
**drawn**  79:16
**drew**  76:25
**drive**  3:20 13:17
  15:12 19:19,22
  26:1,15 27:10
  33:10 34:21

38:5 43:15
  49:10 55:25,25
  138:20
**driven**  81:20
**drone**  63:17
**duces**  11:2
  15:11
**due**  14:6 62:17
  111:13 117:6
  124:12
**duly**  6:12 139:6
**duplicate**  21:10
**dust**  63:1
**duty**  88:21

**e**

**e**  2:1,1 3:1 6:11
**earlier**  109:9
**early**  65:12
**east**  75:15 80:3
  82:17 109:3,19
  109:23 110:20
  110:25 112:8
  117:15 119:17
  121:22 122:25
**eastern**  117:11
**eat**  60:1
**eceses**  104:14
**economic**  3:14
  12:11 18:17,20
**edge**  60:5 76:7
  77:24 81:19
  118:24,25

**edits**  34:12
**effect**  64:7,11
**effort**  27:2
**eight**  24:23
  47:14 125:22
  126:5
**either**  12:8
  50:24 118:10
**eject**  138:19
**elaborate**
  130:20
**electronic**  6:7
  35:16 137:22,24
**elevation**
  112:12
**eleven**  19:12
**email**  2:6,11
  51:7
**emailed**  6:8
  43:19
**emails**  21:15
**emergency**  8:18
  8:18
**emeritus**  14:15
  14:17
**employed**  27:16
  139:13,16
**employee**  47:12
  59:5 139:15
**employees**
  27:21,22
**enclosed**  105:14
**encroaches**
  123:10

**enduring**  58:21
  63:5
**engaged**  75:21
  82:24
**engagement**
  76:21
**engineers**  28:2
  29:10,11
**entering**  114:17
  115:11,12
  131:24
**entire**  55:14
  83:11 94:5
  112:21 113:5,14
  113:23 114:13
  135:25
**entirety**  114:9
**entity**  73:7
  125:11
**entries**  26:10
  50:5
**envelop**  120:13
  120:18
**envelope**  28:25
  29:3
**environment**
  84:8
**equivalent**
  105:15
**esquire**  2:6,11
  2:14
**established**
  101:1

et 126:12
evaluation
  35:22
event 62:19,20
  63:9 80:4
  135:15
eventually 14:3
  64:4
evidence 20:14
exact 4:3 10:4
  61:14 65:20
exactly 55:4
examination 3:5
  6:24
examined 6:14
  139:8
example 96:16
except 5:4,8
  21:17
excluding 36:2
excuse 99:8
exercise 13:13
exhibit 3:8,9,10
  3:11,12,13,14
  3:15,16,17,18
  3:19,20 16:19
  17:4,20,21 18:1
  18:2,7,8,13,14
  18:18,19,22,24
  19:2,5,8,10,14
  19:16,17,21,22
  20:14 36:24
  48:8 77:18,19
  77:20 78:10,11

79:1 81:9,10,14
81:15 82:5,10
91:11 122:19
123:7,13,13
exhibits 3:7,22
  3:22 6:8 11:14
  16:8 17:10,17
  36:20 43:18
  138:2
exist 10:19
  63:12 64:20
  112:8 118:5
existed 64:5
  82:14
existing 14:18
  68:19
exists 15:7
  27:11 97:21
expansion 85:5
  85:7,11,21,23
expect 110:23
  135:1
expense 44:1
experience 70:6
  70:21 83:17
  120:16
experienced
  30:3 120:7
expert 3:18 8:23
  9:3 13:9 14:11
  14:21 19:12,15
  21:22 23:22
  24:22 25:1,5,17
  25:22 42:13

43:20 108:18,23
125:10
expertise 86:6
  95:21 105:2
experts 28:8
expires 139:25
explain 36:22
  110:24 115:1,19
explaining
  71:10
expose 74:19
exposed 83:25
extended 14:3
extensive 41:5
  47:5
extent 8:13 72:4
  112:7
exterior 32:16
  114:24

**f**

f 1:3
facts 34:16
fail 83:23
  100:12 101:22
  102:14 108:19
  124:5
failed 59:7,9,16
  82:24
failure 59:18,20
  105:10 118:25
  119:1 135:15
failures 59:14
  118:23 120:7,10

fair 8:19 10:20
  14:24,25 23:7
  31:14 33:11
  37:14 45:19
  55:17 82:14
  100:8 105:4
  109:4
fairly 134:25
fall 84:4
falls 35:12,13
familiar 58:2
family 132:21
far 32:14 36:2
  40:2 41:24 58:6
  68:1 111:7
  112:23 115:20
  118:15 119:8,9
  120:16
farce 97:20
fashion 115:13
faulting 7:8
federal 40:9,10
fee 42:9,10,20
  43:10 45:5,15
  56:1
feel 109:11
feet 7:6,13
  74:23,23 78:17
  78:18
female 76:14
  77:6 115:7
field 15:1 85:20
fifty 28:18
  120:19,19

**[figure - friedberg]**

**figure**  31:5
**file**  35:21 37:19
  49:17 55:25
  118:8
**filed**  54:3
**files**  13:20,22
**final**  12:9 18:13
**financially**
  139:17
**find**  32:9,10
  96:17 122:8
  135:18
**findings**  21:8
**fine**  109:3
**finish**  65:5
  72:11 106:16
  112:20 130:11
**finished**  136:24
**finishing**  4:7
  137:19
**fire**  59:25
**fires**  60:11
**firm**  14:1 30:4
  71:12 72:24
**first**  6:12 11:12
  12:23 19:3
  22:20 24:21,25
  25:2,4 26:4,6,8
  51:18 65:14,18
  65:24 66:14
  67:6,12 75:5
  138:19
**firsthand**  63:14

**five**  24:23 25:7
  25:9 49:3 89:24
  111:3 113:4
  123:14
**fix**  64:2,3
**fixes**  75:19 99:1
**fixing**  28:4
**flash**  13:17
  43:15
**flashing**  95:25
  122:13 123:23
  124:3 135:22
**flashings**  60:6
  83:22
**flat**  118:16
**flew**  116:18,21
  130:3
**flooded**  135:24
**floor**  13:21
**florida**  2:10
  119:2,19,20
**flow**  131:11
**fly**  116:13,20,23
**flying**  74:11
  99:13
**folded**  76:11
  81:4 96:24
**folder**  38:16
  55:24 56:11
**folks**  127:18
**follow**  86:25
  111:7
**following**  64:3

**follows**  6:15
**footage**  63:17
  112:23 113:17
**force**  110:18,20
  116:8
**forceful**  131:9
**forces**  100:11
  101:10 107:23
  108:18,19
  110:25
**foregoing**  139:9
**form**  5:4,8
  33:21 34:2
  35:16,17 45:22
  45:25 53:11,24
  54:18 55:3,10
  55:15,22 56:8
  59:23 60:17,18
  67:17 83:19
  84:17,20,22
  85:3 86:15,23
  87:3 88:3,24
  89:4,13,17,21
  91:18,21 92:6
  92:11,16,23
  93:4,12,19,25
  95:6 97:22 98:5
  98:18,21 99:22
  100:13 101:6,11
  101:15,23 102:4
  102:11,19,24
  103:10 104:16
  104:24 105:5,12
  105:23 106:18

  106:23 107:4,24
  109:5 112:9
  113:25 118:18
  118:21 130:19
  134:15,22
**format**  97:10
  126:12
**forming**  37:17
**formulation**
  35:8
**forth**  7:11
**found**  26:7
  66:16,20,22,22
  74:17,20,21
  109:13
**four**  12:8 43:22
  46:22
**fourth**  13:21
**fran**  94:10,16
**franny**  94:10,11
  94:13,16,21,23
  95:12,18,25
**frcp**  137:6
**freedom**  85:19
**friedberg**  1:3
  2:4,6 3:16 6:3,7
  7:17 8:24 10:8
  12:11 19:4,6
  21:14,21 22:8
  33:21 36:1 43:9
  44:5 45:22 46:3
  46:6,9 48:9
  50:18 52:5
  53:11,24 54:18

**[friedberg - happened]**                                    Page 153

55:3,10,15,22
57:16,17 59:23
60:17 61:10
66:10,13 67:4
67:17 71:18,21
83:18,19 84:17
84:20 85:3
86:15,23 87:2
88:3,8,24 89:4
89:13,17,21
90:3 91:18,21
92:6,11,16,23
93:4,12,19,22
93:25 95:6
97:22 98:5,18
98:21 99:21
100:13 101:6,11
101:15,23 102:4
102:11,19,24
103:4,9,12
104:16,24 105:5
105:12,23
106:18,23 107:4
107:24 109:5
111:19 112:9
113:25 118:18
118:21 120:22
125:9 127:20
129:5,7 130:19
132:18 133:17
133:19,25 134:6
134:15,22
136:10,14,18,25
137:6,11

**friedberg's** 60:9
132:19
**front** 20:8
**frye** 24:9
**full** 6:8 47:13
68:5 74:5
**furnished** 35:24
36:1
**further** 5:10,14
5:17 31:11
139:6,12,15
**future** 58:22

**g**

**gallery** 29:18
133:9
**garage** 54:4
68:14
**garages** 28:3,4
**general** 28:22
29:8 31:8 33:8
45:13 60:10
123:1 133:22
**generally** 60:16
63:4 97:3
**gentleman** 30:8
**gentlemen**
129:5
**geodesic** 75:14
78:21
**geometry** 13:13
**getting** 115:16
125:8 131:24
136:10

**gist** 33:6
**give** 7:24 11:2
16:22 120:16
138:11
**given** 118:7
**go** 7:1,4 10:8,12
11:7,10 22:10
24:14 26:17
30:14 31:4 33:9
38:9 46:10 49:3
62:4 64:23
74:12,15 78:8
80:19 87:4
90:24 106:18
119:13 121:18
122:23 134:18
136:15
**goes** 32:14
**going** 7:4,21
11:11 15:21,23
15:25 16:22
20:10 38:2
41:19 48:25
49:17 60:22
75:22 76:25
80:1,1 83:6 90:9
90:15 95:16
99:21 103:9
126:22 127:15
134:10 137:9,15
137:23
**google** 32:10
**gotcha** 15:20
30:17

**government**
35:10
**grandfathered**
27:25
**graphic** 126:17
**greater** 110:25
**groove** 69:4
105:16
**ground** 7:4
**guess** 27:24
28:16,17 53:15
121:9 127:21
**guest** 54:5

**h**

**h** 6:11
**half** 7:6,13 14:8
51:12,18 68:12
70:3,4 76:11
85:13 109:25
110:5
**hamden** 27:17
125:21
**hand** 16:13,23
139:19
**handed** 19:20
**handing** 17:1
**handled** 25:1
**hangout** 126:25
**happen** 96:15
116:1 128:9
**happened** 62:18
62:19 63:25
115:19

**[happens - illustrate]**    Page 154

**happens** 84:6
**happy** 16:12
**hard** 32:9 114:1
  136:11,17 137:4
**hat** 58:9 78:18
  81:12 82:1
  112:12,18
  116:22
**hatch** 135:22
**haven** 1:25 6:19
  27:16,16
**hazard** 27:24
  28:16
**head** 40:1
**hear** 7:9,9,10
  11:11 116:2
  137:17
**heard** 7:16
  10:15 113:12
**hearing** 9:17,20
  10:16,23 24:4,8
  40:25 41:3 47:4
  47:9,16,17
  121:7,14 125:4
**heightened** 84:2
**held** 10:10
  14:17 38:10
  109:2 132:4
**help** 41:23
  115:10
**hereinbefore**
  139:11
**hereto** 139:17

**hereunto**
  139:19
**high** 25:13,15
**highest** 104:9
**hill** 115:3
**hip** 74:17,19
**hire** 59:5
**hired** 65:12
  71:18,21
**history** 26:17
  29:25 104:1
**hitting** 115:22
  131:10
**hm** 108:9
**hmm** 56:5 108:9
**hoffman** 118:7
  118:9 119:13
  120:9,10 125:14
  126:14
**hoffmann** 13:18
  13:20,24 24:15
  24:17 26:2,14
  26:17,19 27:11
  27:14,17 28:1,7
  28:23,24 29:7
  32:7,11,13
  40:23 41:10
  44:9 46:17,25
  47:12 48:1,4,7
  48:16,20 57:16
  58:18,24 59:5,6
  59:12 66:20,22
  73:3,5

**hoffmann's**
  43:10
**hold** 14:15,15
  34:18 65:5 82:9
  101:9 116:6,6
  130:11
**holds** 28:2
**hole** 48:13,21
  125:15
**holes** 99:3,9,13
  100:2
**home** 57:5
  95:19
**homeowners**
  124:11
**hooked** 78:4
**hour** 42:8 43:21
  43:22,23 44:15
  44:15,25 45:11
  46:22,23 49:1
  50:8 51:13,15
  51:19,23 57:24
  101:12 102:3,13
  104:5,14
**hourly** 42:12,15
  43:11 44:12,18
  45:2 48:17
**hours** 39:2,13
  39:21,23,24
  40:6,7,8 43:22
  47:14 57:22
  117:24
**house** 52:23
  54:5 78:24

94:24 95:22
  96:3 105:2
  131:22
**houses** 129:17
  129:18
**huber** 1:9 3:16
  12:17,24 19:4,6
  72:21 132:13
**huber's** 72:24
**huh** 7:19,19,19
  7:25,25,25
**hundred** 42:15
  45:9 95:21
  101:5
**hundreds** 59:11
**hurricane** 11:22
  60:7 62:23,25
  72:16 105:10
  107:15 116:12
  124:12,25
  130:17 135:15
  135:16
**hurricanes**
  119:16

**i**

**idea** 69:24
**identification**
  16:20 17:6,22
  18:4,10,16,21
  19:1,7,11,15,18
  19:23
**illustrate** 36:22

[illustrations - islands]                                    Page 155

**illustrations**
  36:19
**imagine**  121:1
**inch**  76:8,10
  77:23,23 78:1
  115:8
**inches**  68:12
  70:3,4 85:13
  109:25 110:5
  114:3
**incline**  110:19
**include**  20:3
  21:15 39:8,12
  40:13 120:13
**included**  47:4
  74:5 122:10,25
**includes**  43:24
**including**  13:17
  23:24 35:2,9,23
  36:10 43:11
  54:1 61:8 66:6,8
  96:9,9 103:25
**incorporated**
  50:1
**incorrect**  39:19
  39:22
**increase**  45:2
**indentation**
  97:7
**independent**
  95:23
**indicates**  4:6
**indicating**  78:14
  78:24 79:22

81:5,12 122:15
  123:6,22
**indication**  68:20
**industry**  29:6
  86:18,20 87:5
  93:2 97:20
  104:18 108:22
**information**
  36:11 48:16
**inhibit**  105:18
**inner**  115:5
**input**  128:5
**inside**  108:2
  109:15 122:14
**inspected**  67:2
  132:12
**inspection**
  82:21 121:9
**inspections**
  54:13
**inspector**  125:8
**install**  76:9
  113:9
**installation**
  29:20 30:5
  61:16,19 66:5
  86:8 87:16 96:7
  96:10 108:7
  116:17
**installations**
  83:23 87:6
**installed**  31:18
  52:9,11 53:19
  68:9 69:7,15

70:24 86:8,10
  106:4,5,9
  108:16,17 115:7
  122:13
**instant**  35:1
**insufficient**
  82:22
**insulation**  69:8
  69:10,11 135:21
  135:24
**insurance**
  124:12,15,21
**intend**  36:21
  135:1
**interested**
  137:24 139:17
**interfere**  46:5
**interfering**  46:6
**interim**  12:7
**interior**  121:24
  122:1 131:21
**internal**  115:23
  125:17,18
**internet**  57:2
**interrupted**  4:5
**intrusion**  124:8
  134:10
**investigate**  59:7
**investigating**
  59:9
**investigation**
  35:22 73:1
  74:24 80:14

**investigations**
  59:16
**invoice**  38:1,18
  38:22,23 41:16
  41:25 42:1
  49:11,19 50:14
  51:14,14
**invoices**  37:24
  37:25 56:1
**involved**  15:9
  24:13,16 28:14
  30:6,17 31:7,17
  36:9 42:23
  44:10 46:15
  52:20 64:10
  65:16 72:21
  86:22 88:23
  100:12 125:14
  125:15 126:13
**involvement**  9:3
  9:4
**involves**  53:17
**involving**  40:14
  48:12
**irma**  61:22,23
  62:23 72:16,18
  82:10 104:6
  105:10 107:15
  124:12,25
**island**  104:8
  129:14
**islands**  1:1 2:16
  67:3 71:14
  88:22

**issue** 61:24
62:15 65:2
74:18 82:20
84:25 138:20
**issues** 15:2
28:25 29:3
35:23 36:9
54:13 72:9,11
122:13 123:24
133:19

**j**

**january** 11:25
14:6
**jcosby** 2:11
**jeffrey** 2:11
**job** 95:3 110:3
133:15,17,19,25
**jobs** 132:13
133:9 135:8
**john** 1:1 26:19
41:6,12 44:14
47:13 60:2 61:5
66:24 104:9
126:14 129:12
130:12
**john's** 71:15
104:1
**joint** 82:23
92:12,18 115:8
115:9
**jointing** 81:3
**joints** 131:11

**journal** 26:2,10
26:10,14,20,22
27:11 32:5,7,11
32:13,15,21
58:17,24 66:23
**judge** 54:2
**judgment** 54:2
**july** 45:17 56:8
**jumps** 130:8
**juncture** 77:9
**june** 39:11,11
42:1 49:18
50:14 51:14
**jury** 20:14

**k**

**keep** 7:7 20:8
23:7,10,11
51:21
**kind** 21:10
36:20 69:17
87:21 112:4
122:2 123:5
126:2 132:24
**knew** 75:7
**know** 7:7,23 8:3
8:14 11:2 16:24
24:7,12 26:16
27:5,23 28:5
31:2,6 32:12,14
34:4 37:11 38:5
38:21 41:20,21
42:24 44:22
45:4 46:16 47:7

47:13,20,22
48:17 49:20
51:18,24 53:6
53:12 55:4 58:7
59:11,11,12,16
59:24 61:18
63:1,2 64:4,5,7
64:15,20,21
65:20,21,23
66:13,16,18,19
66:20,23,24
67:24,25 68:3,4
68:4,8,25 69:13
69:15,17,18
70:6,12,13,14
70:15,17,18,21
70:23,24 71:1,3
71:5,7,14,23
72:3,15,17,18
72:20,22,23
75:13 77:3,13
80:1,22 83:2
84:22 85:6,6,14
85:17,19,20
86:4,9 87:7,21
88:11,11,14,15
88:18,25 89:5
89:14,18 91:2,4
91:4 92:2,7,9,21
93:2,15,24 94:1
94:16 96:24
98:16 100:10,17
101:18 102:5
104:7,8,22

106:4,9 107:13
107:25 108:12
108:14 111:10
112:7 113:12
114:2,2,4
115:21 116:22
118:1,20,20,24
119:3,9 121:4
121:25 125:1,10
127:15 128:7,10
128:15,15,16
131:9,20 133:4
138:2
**knowledge**
33:22 35:14
64:22,25 72:19
89:8,10 101:24
107:17,19,20
108:22 120:12
123:3 124:9,19

**l**

**l** 1:3 5:1
**labeled** 12:2
77:14
**lack** 91:24
111:12
**large** 108:1
135:19
**larger** 123:15
**largest** 29:16
30:5,12 104:1
**late** 26:19

law  2:4
lawofficesfb.c...
  2:6
lawsuit  35:2,23
  36:10 52:5,21
  53:17 54:9
layers  69:6,15
  105:17 135:21
leading  121:1
leak  122:24
leaking  122:16
  123:21,24,25
leaning  87:12
leave  44:13
leaving  138:17
lecture  46:3,10
led  46:15
leeward  110:14
  110:15
left  107:14
legend  4:1
leininger  2:9
length  74:22
  112:25 113:6
lent  112:19
letters  21:15
  36:14
level  110:19
  122:7
levels  84:5
library  53:1
  122:12,15,21
  123:3,8,20,21
  123:25 124:2,4

124:5
licensed  70:13
  70:15
licenses  70:19
licensure  14:16
lift  115:16
lifted  77:10
limited  35:2,23
  36:10
lindsey  3:13
  12:6 18:12,15
line  99:24 100:6
  100:22 108:2
  113:6 131:10
linear  74:23,23
  112:23 113:16
link  58:22
list  15:21,24,25
  16:2,17 17:3,17
  18:1,7,13,18,22
  19:19 23:5,7,11
  31:4 48:6 73:25
  119:13
listed  8:23
listen  95:11
listening  10:15
literally  136:14
litigation  24:12
  24:22 28:7,11
  28:15 120:9
little  7:12 14:7
  26:17,24 53:1
  63:5 79:23
  90:20 117:17

130:20
living  45:5,8
lloyd  6:18 7:3
local  43:11
located  10:19
  66:16
location  1:23
  121:25 122:3
lock  81:4
lodging  43:25
long  24:17
  30:16 32:23
  47:7 51:23 57:4
  63:12,13 64:5
  127:6,13,17
  128:20 133:4
look  22:25 27:7
  30:14 33:9
  38:23 43:5 57:5
  66:2 74:15
  79:11 89:3
  99:18 109:11
  122:8 138:6
looked  29:15
  32:23 33:1,13
  38:6 99:11
  111:4
looking  43:3
  49:15 58:17
  60:22 66:21
  77:18 78:21
  79:14 80:5 81:6
  90:24,25 91:24
  111:11 123:7,12

124:19 125:2
  130:8
looks  50:4 71:25
  107:19
loss  3:14 12:11
  18:18,20
lot  13:22 32:15
  34:18 46:15
  57:8 58:16
  60:13,14 68:2
  74:8 85:19 88:4
  92:24 125:19
  133:7
lots  57:19
louder  7:12
low  77:25
lower  74:20

m

made  42:15
  45:12 83:2 98:8
  106:17,22 107:8
main  38:16
  52:22,23,24,25
  53:3,4,7,8,20
  54:7,8,13,16,24
  55:14 58:12
  61:8 64:15 66:6
  66:8 68:6,16,17
  72:11,16 73:11
  74:6,10,14,16
  75:19 78:6
  105:10 108:1
  110:11 112:21

113:5,14,23
114:17 117:20
117:23 121:19
122:1,6,12,14
123:4,10,16,22
124:1,3,8
130:16,22
134:12
**maintenance**
59:21 60:5,13
60:15,21 63:5
**maiocco** 127:12
128:5
**make** 7:8 9:24
34:12 37:12
43:18 48:18
59:17 62:6 75:2
80:17 95:4 99:1
100:12 106:12
106:13 107:2
108:3 113:1
120:20 131:5
137:2,10 138:1
**makes** 27:3
**making** 52:5
68:3 103:5
**male** 76:14 77:6
115:7
**malleable** 98:22
**manager** 30:9
89:11,16
**mandrel** 83:4
**maps** 35:5

**march** 12:4 13:2
**marine** 69:6,16
69:22 71:2
**mark** 11:11
16:8,16 78:1,13
**marked** 11:14
16:20 17:5,22
18:3,9,15,20,25
19:6,11,15,18
19:23 79:4,6
**marketing** 27:2
59:3,4
**marking** 16:12
**masonry** 79:23
**master** 53:2
74:17
**match** 70:4
**material** 15:14
34:17 59:25
69:25 76:13
82:22 83:1
108:15 115:22
**materials** 11:3
15:13 35:1,6,11
60:3
**matter** 35:7
36:16 45:5
**meade** 6:13
139:2,24
**mean** 37:1 38:4
38:5 42:21 51:1
52:12 53:12
61:1 68:10
70:10 76:19

77:12 78:15
83:24 88:13
92:17 93:10
97:19 100:2
102:16 104:4
110:15 113:2
114:23 124:22
125:18 126:17
132:20 136:19
**meaning** 51:12
56:20 67:6
82:16 97:25
**means** 93:6
113:11
**meant** 41:24,24
70:3 80:2
**measure** 77:22
**measures** 77:22
**meet** 67:9,11
127:20 128:3
**meeting** 9:4
**member** 105:17
132:21
**membrane** 68:9
68:20,22 99:12
108:14,15
**memoranda**
35:4 36:14
**memory** 47:10
**mentioned**
49:11,19 63:24
64:1 85:5 98:3
98:13 119:8,9
127:14 128:7

**met** 52:7 53:18
67:13 121:8,10
**metal** 92:18
94:8 119:1
**metals** 98:16,20
**meter** 44:14
**method** 51:5
131:6
**miami** 104:20
**micha** 12:20
15:25 16:1
**micha's** 98:12
**middle** 75:12
**mile** 102:2
104:14
**miles** 101:12
102:13 104:5
**mine** 13:5 138:5
**minimum** 43:22
43:23 46:22
**minnesota** 70:8
**minor** 123:1
**minute** 82:9
**minutes** 127:19
136:13,15,19
**misconception**
115:14
**missing** 10:7
76:10 112:11,12
117:6
**mistaken** 75:6
**mm** 56:5
**models** 35:5
36:19

**modification**
136:2
**modified** 30:1
87:14
**moment** 38:9
98:8
**month** 22:22
129:25
**morning** 127:5
**motion** 24:9
**move** 74:25
85:19
**movement**
85:17
**multiple** 105:17
135:21

**n**

**n** 2:1 3:1 5:1
6:11,12 139:2
139:24
**nailers** 68:9,10
68:11,15,20
69:6,7,19 70:24
**name** 6:17 7:1
28:1,10 32:11
67:24 73:18
93:6 94:9 133:4
**named** 73:17
**national** 26:22
101:17 133:1
**nature** 42:23
62:12

**near** 27:18 78:1
80:23 81:19
112:11
**necessarily**
84:21
**need** 8:13,16,18
32:20 38:13
49:1 60:13,14
60:15 89:23
103:16 104:17
107:5 110:6
136:20 137:10
**needed** 30:3
**needs** 56:2 63:5
**negotiation** 25:3
**neighborhood**
30:25
**neither** 139:12
**nelson** 94:10
**never** 25:15
31:17 63:13,19
85:4,25 86:1
95:5 97:9,16,23
98:2 106:8
**new** 1:25 6:19
14:18 27:15,17
28:1 29:20
134:25
**newly** 28:9
**nine** 82:2 91:8
109:24 110:5
**noise** 46:1
**non** 25:17,22
75:1 99:14

**north** 27:16
74:17 75:5,7,16
80:22 117:19
119:22
**notary** 5:12
6:13 139:24
**noted** 7:14
51:12 84:25
109:3 123:19
**notes** 34:14,22
35:4 36:14
39:25 51:21
57:5
**notice** 5:15 6:3
6:4 11:3 20:3
121:21 129:13
130:6 138:8
**noticed** 62:9
129:19
**noting** 85:8
**number** 16:18
17:3 20:4,5,6
42:18 46:16
76:25 77:12
**numbered**
77:19
**numbers** 126:16
**nutshell** 29:5

**o**

**o** 5:1
**o'clock** 79:15
80:23 81:7 82:3
82:16 109:10,10

112:1,18 117:9
117:16,16 122:2
122:3 123:18
127:23,24
**oath** 6:15 139:8
**object** 45:25
53:11,24 54:18
55:3 87:2,3
99:21 103:9
105:5
**objection** 22:9
33:21 34:2
45:22 55:10,15
55:22 59:23
60:17,18 67:17
83:19 84:17,20
85:3 86:15,23
88:3,24 89:4,13
89:17,21 91:18
91:21 92:6,11
92:16,23 93:4
93:12,19,22,25
95:6 97:22 98:5
98:18,21 100:13
101:6,11,15,23
102:4,11,19,24
104:16,24
105:12,23
106:18,23 107:4
107:24 109:5
112:9 113:25
118:18,21
130:19 134:15
134:22

**[objections - opposing]**

| | | | |
|---|---|---|---|
| **objections** 5:3,4 5:7,8 45:24 | 20:7,9,21 21:13 22:7,13,17,23 | 74:16 75:11,23 76:3,14 77:16 | **omission** 4:6 **once** 8:8 34:9 |
| **obligated** 14:2 | 23:14,18,24 | 77:17,21 78:12 | 116:5 131:11 |
| **obtain** 13:18 | 24:21 25:4,11 | 78:15,19,23,25 | **ones** 118:6 |
| **obviously** 44:13 | 25:21 26:5,9 | 79:9,20 80:4,8 | **open** 32:17 |
| **occur** 132:5 | 27:14,20,22 | 80:12,17,20 | 74:17,21,23 |
| **occurred** 63:8 | 28:13,22 29:1 | 81:1,24 82:2,9 | 76:17,19,21 |
| 99:20,24 100:3 | 29:13 30:15 | 82:12,20 83:1,8 | 77:1,9 91:25 |
| 105:9 135:15 | 31:11 32:24 | 83:16 84:13,25 | 122:6 124:7 |
| **ocean** 2:9 | 33:2,10,13,16 | 85:15,21,23 | 131:11 |
| **octagonal** 13:13 | 34:9,14,25 | 86:4 87:5 89:2 | **opened** 77:8 |
| 52:23 58:14 | 35:21 36:7 | 91:7,15 92:21 | 82:13 85:1 94:3 |
| 115:5 123:5,8 | 37:16 38:19 | 93:2 94:7 95:15 | 117:12 |
| 123:15,19 | 39:10,23 40:4,8 | 96:12 97:15,18 | **opening** 81:20 |
| **offer** 9:15 | 40:13,22 41:2,7 | 98:13 99:5 | 96:14 97:6 |
| **offered** 10:22 | 41:11 42:1,12 | 100:10,17 101:9 | 135:22 |
| 26:25 | 42:19,21,24 | 101:14 103:18 | **openings** 106:1 |
| **offhand** 34:8 | 43:5,8,13,20 | 105:8,21 106:7 | 106:3 107:10,18 |
| 136:8 | 44:2,8,11,23 | 109:9 110:21,24 | 107:22 130:23 |
| **office** 27:18,18 | 45:14,18 46:19 | 111:14 112:7 | **opine** 96:7 |
| 30:9 125:21,23 | 47:1,11 48:4,24 | 113:1 114:8,16 | **opined** 55:1 |
| **offices** 2:4 27:15 | 50:1,23 51:3,8 | 115:10,14,19 | **opinion** 54:15 |
| **officially** 14:5,9 | 52:16 53:4,14 | 116:11 121:13 | 54:23 55:5,13 |
| **oh** 12:2 17:14 | 53:22 54:12,23 | 121:18 125:18 | 55:19 58:7 |
| 28:19 41:24 | 56:8,11,20,22 | 125:24 126:2,4 | 86:21 87:1,5,19 |
| **okay** 6:10 7:4 | 57:14,18 58:4 | 126:15 127:17 | 88:1 109:17 |
| 7:15 8:1,11,21 | 58:21 59:17,21 | 128:13,17 129:1 | 112:5 114:18 |
| 9:2,11,17,22 | 60:14,24 61:8 | 129:25 130:3 | **opinions** 21:9 |
| 10:3,6,18,22 | 61:12,15,18 | 131:5,13,17 | 34:17 35:5,9,11 |
| 11:1,8,18 12:5 | 62:10,23 63:3,6 | 133:10,14,21,24 | 36:9 37:17 58:4 |
| 12:16 13:8,15 | 63:14,21,24 | 136:16,18 | 97:19 100:20 |
| 15:3,10,17,20 | 64:2 65:6,15,18 | 137:25 138:16 | **opposing** 43:4 |
| 15:25 16:7,11 | 67:2,9 69:13,21 | **old** 16:3,4 95:21 | 97:19 |
| 17:10,14,14 | 71:17 73:2,6 | | |

**opposite**  81:6
**option**  88:12,13
**order**  16:16
**orientation**
  82:17 111:4
  117:9,16,17
**original**  9:19
  11:8 12:22 13:3
  15:14,15 16:5
  52:7 79:21 80:9
  80:10 81:8
**outcome**  139:17
**outside**  90:7
  108:3
**outstanding**
  42:3
**overall**  59:10
  112:24
**overhanging**
  130:15
**overlap**  91:24
  111:12
**overlapping**
  82:25
**overlay**  108:6
**oversaw**  89:20
**own**  15:23
  70:10
**owner**  86:6,11
  124:14
**owner's**  67:19
  67:22 68:1
**owners**  132:15

**ownership**  14:1

**p**

**p**  2:1,1 5:1
**p.m.**  1:21 89:25
  90:1 138:24
**p.o.**  2:5
**page**  3:3 75:12
  77:13,14 78:25
  79:3,4,5 80:5
  81:14,15,16,17
  82:5 91:1
  122:17,18 123:7
  123:12
**pages**  91:13
**paid**  42:1
**pain**  53:22
**pan**  80:21 81:3
  100:25 109:14
  109:20,23,25
  115:5
**panel**  76:7,9,10
  77:25 81:19
  101:17 113:11
  116:18
**paneling**  74:20
**panels**  74:6
  84:19 116:13
  131:24,25 132:3
**pans**  85:18
  109:15
**paper**  13:20
  26:25 35:16
  37:25 56:12

138:14
**parapet**  135:23
**parking**  28:3,4
**part**  14:1 20:2,3
  26:16 34:23
  38:8 53:2 54:8
  55:24 65:8
  88:21 120:9
  130:22
**particular**
  122:5 133:15
**parties**  5:2,6,11
  5:15,18 139:14
  139:16
**party**  14:6
**passing**  65:2
**password**  32:21
**past**  45:25 58:22
  99:18
**patch**  74:3
  99:12
**patched**  73:14
  99:9
**patching**  74:11
  99:1
**patent**  28:3
**patina**  62:3
  84:22
**pavilion**  52:22
  52:24,25 53:3,4
  53:7,8,20,22
  54:8,13,16
  55:14 58:12
  61:8 64:16 66:6

66:8 68:7,16,18
  72:12,16 73:11
  74:7,10,14,16
  75:19 78:6
  105:11 108:1
  112:21 113:5,15
  113:23 114:17
  117:20,23
  121:19 122:1,6
  122:12,14 123:4
  123:16,22 124:1
  124:3,8 130:16
  130:23 134:12
**pdf**  38:18 49:16
**peak**  68:13
**peer**  126:2
**pen**  79:6
**pending**  8:17
  14:22 15:4
  20:25 21:6 37:7
  46:12 103:4
**penetrated**  99:6
**penetrating**
  78:3
**people**  28:11
  126:18 132:19
**percent**  28:18
  28:21 31:10
  59:12,13,18
  101:2,5,7
  112:24 113:2,3
  113:4,6,14,16
  113:24 114:8,14

**[percentage - present]**

**percentage**
25:13,15 31:6
31:12 59:10,15
59:15 112:22,24
113:22 114:3,12
120:17
**perform** 95:18
**performance**
126:12
**performed**
37:20 72:15,20
72:23 73:16
92:14
**period** 26:20
57:22
**periodicals**
36:11
**permit** 87:9
**person** 63:15
68:8 73:17
121:8,11 125:11
125:11 133:1
**pertain** 133:25
**pertained** 54:4
**phone** 51:2
**phonetic** 4:3
**photo** 77:11,13
77:14 78:13
79:1 81:16,17
81:17 94:4
122:17,18
**photograph**
75:12 79:21
81:10 121:23

122:24
**photographs**
13:17 36:20
37:2 68:14,19
78:8 99:11
117:10 118:3,5
123:2
**photos** 19:20
34:21 63:17,19
64:18 90:25
91:9 112:2
117:6
**phrasing** 23:8
**physical** 60:6
62:8,12 89:2
**picture** 78:5
81:22
**pictures** 53:15
**pie** 58:13
**piece** 59:3,4
96:23,24
**pinholes** 58:8
**pipe** 13:21
**pitched** 118:16
**places** 83:15
**plaintiff** 2:3
52:5
**plaintiffs** 1:5
**plan** 37:10,11
37:14,15 74:5
137:15
**plane** 44:2,3,6
44:22

**planned** 72:1
**plans** 71:6,6,8,9
71:19,24 85:24
86:1,25 88:9
**plats** 35:5
**play** 133:25
**please** 6:17 7:2
103:19
**plus** 28:2
**ply** 87:13
**plywood** 69:6
69:16,22 71:2,2
105:17 106:2,12
106:17,24 107:2
107:8,13,22
108:3 114:16
130:24
**point** 32:1 42:21
61:4 76:18 92:4
112:10
**pointing** 80:4,6
**poorly** 115:6
**pop** 82:23 83:1
83:8,11,17,22
83:24 117:3,5
**popular** 28:4
**portion** 52:20
75:1 79:14
82:10 109:2,6
110:4 111:4
112:17,19,21
**portions** 130:15
**portrait** 29:18
133:9

**position** 115:25
**positioning** 82:3
**possession**
13:19 35:1
132:11
**possible** 96:21
**post** 15:1 61:16
72:16,18 98:25
111:6 112:4
128:24,25 135:9
**practice** 24:24
25:14 108:22
**pre** 82:10
129:16
**prep** 39:8 40:2
42:4,4 44:18,20
44:22 47:3
**preparation**
56:14
**prepare** 22:20
38:2 41:2 71:18
88:6,9 124:11
**prepared** 12:11
20:17 35:6 36:7
**preparing** 37:8
57:4,6
**prepping** 44:24
**presence** 92:10
96:13
**present** 2:13
61:20 91:16,17
92:5 94:3
102:16 132:6
134:4,6

**president** 28:10 126:6,7

**pressure** 105:18 115:23 131:21 131:21

**presume** 29:20 50:10 69:17 71:25

**presumption** 112:10 124:14 125:1

**pretty** 27:3 29:4 32:10 52:15,15 71:25

**prevented** 114:16

**previous** 29:22 52:1 81:17 124:19,22

**previously** 9:6 26:3 30:7 55:2,9 56:19 98:24

**primary** 28:11

**principals** 28:2

**prior** 10:23 18:23 34:7 39:6 65:15,16 66:13 66:24 68:15 70:22,25 108:7 127:22 129:8

**privilege** 21:20 21:21

**privileged** 21:18 21:19 22:9 36:5

**probably** 23:23 24:23 25:10 30:24 31:10 32:5 40:7 49:19 50:14,16 51:25 57:21,21 73:20 78:17 94:5 95:14 96:2 112:12 117:24 118:1 120:19 126:5 130:2 135:18

**problems** 72:5

**procedure** 99:10

**process** 7:16 8:9 84:14

**produce** 125:19

**produced** 125:19

**product** 21:23

**products** 37:25

**professional** 29:9 70:18 86:17,22 87:8 87:17 135:7

**professionally** 25:19

**professionals** 29:7

**project** 3:12 11:21 18:6,9 29:17 30:8 31:4 72:6,21 89:11

89:16 97:2,4

**projected** 3:11 11:20 17:25 18:3

**projects** 13:18 31:2 59:11 95:24 96:3 119:9,14

**promise** 137:23

**pronunciation** 73:24

**proof** 5:11

**proper** 82:23

**properly** 109:18

**property** 9:7 10:1 34:22 37:10 40:14 52:20 65:19,24 67:16 86:19 96:5 121:9 125:15 126:21 126:22

**protected** 32:18

**provide** 33:7 48:9

**provided** 3:23 4:3 20:2 33:14 34:17 35:13 37:4 43:9 56:12 56:23 118:6

**providing** 14:21

**provision** 109:24

**public** 5:12 6:13 32:17 139:24

**publications** 97:25

**published** 25:24 26:23 32:2

**pull** 16:25 27:9 92:18

**pulled** 91:2

**punctures** 60:6

**purpose** 9:18 45:6 66:1 124:20 125:12 133:5

**purposes** 20:15

**put** 33:10 60:1 75:15 76:12 93:8 114:5

**putting** 93:14

**q**

**qualify** 107:7

**quarter** 77:23

**quarterly** 26:23

**question** 5:5,9 8:2,6,7,9,17 23:10 28:13 31:25 45:8 46:11,12,14 48:19 54:7 63:6 65:5,23 75:3,17 85:4 88:1 93:17 94:25,25 95:11 100:15,18

**[question - remained]**                                                      Page 164

101:20 102:5,10
102:25 103:2,3
103:4,6,8,13,14
103:21 106:14
106:14,16 107:7
111:23 112:20
113:13,22 129:8
**questions**  7:17
  7:18 95:10
  102:9 103:20,22
  137:4
**quickened**  84:3
**quite**  28:4 29:15
**quoting**  23:9

**r**

**r**  2:1 6:11,11,11
  73:19
**rain**  60:4 81:20
  134:7,9
**rains**  64:3
**raised**  45:9
**rate**  41:12 42:12
  42:15,22 44:12
  44:18 45:2,12
  45:13 46:24
**raw**  35:4
**read**  23:6 33:11
  33:16,24 34:9
  45:25 56:19
  59:5 77:3 80:1
  97:18 98:9
  103:19,22

**reading**  4:7 5:18
**reads**  58:20
**real**  58:7,15
**reality**  87:25
**really**  40:21
  57:9,21 72:10
  78:2 86:18
  97:13 105:17
  128:9 129:20
**reask**  8:9
**reason**  25:18
  46:8 54:3 89:2
  105:13
**reasonable**
  103:25 104:3
  106:15
**rebuilt**  95:24
**recall**  41:14
  47:21 48:15
  67:15 72:13
  121:17 129:20
  134:1
**received**  36:15
**recently**  29:16
  33:11 45:3
**recess**  49:5
  89:25
**recognize**  93:14
**recollection**
  22:19 61:13
  62:7 71:15 85:8
  91:22 97:14
  112:6 121:5
  126:23,25 127:2

**recommendati...**
  84:11
**recommendati...**
  30:8 101:16
**recommended**
  66:21
**record**  6:17
  10:8,11,14
  38:11 40:21
  49:3 137:2
  138:22
**recorded**  104:8
**records**  24:15
  41:19,21 135:18
**redo**  135:9
**refastened**
  75:20
**reference**  40:8
  98:8
**referenced**
  112:2
**references**
  54:12
**referred**  36:8
  52:22 94:10
**referring**  67:22
  77:11 78:25
  98:10
**reflected**  38:23
**reflecting**  34:15
**regard**  33:7
  40:9 53:18,20
  63:22 67:16
  68:17 105:9

109:1
**regarding**  48:20
  50:19 52:4 58:5
  72:5 86:2,3
**regardless**
  102:17
**regus**  1:23
**related**  9:7,19
  10:1,5 11:20,21
  13:18 26:11
  28:12 31:24
  32:15 36:15
  47:14 48:12
  63:9 68:2,6
  87:23 89:9
  112:4 120:11
  136:7 139:13
**relation**  114:13
**relationship**
  13:24
**relative**  26:3
  35:1 98:20
  102:6 107:5
  139:15
**relatively**  63:5
  123:1
**relevant**  102:8
**relied**  36:8
  37:17
**relieve**  43:13
**relying**  86:6
**remained**
  107:13 116:12
  116:25

**remember** 10:4
23:8 34:1 47:19
51:20 94:18
109:9 128:9,17
**remove** 113:10
**removed** 74:19
**renovate** 135:8
**renovation**
29:17 30:18,20
**renovations**
136:7
**repair** 11:22
28:3 73:3,7,8,10
74:5 95:16
128:25
**repaired** 80:13
**repairing** 74:10
94:24
**repairs** 29:4
72:15 99:1
129:2
**repeat** 103:16
**rephrase** 8:3
**replace** 54:16
55:8,14
**replaced** 54:24
55:2,6 95:25
135:25
**replacement**
74:6 84:11
87:13
**report** 3:9,10,11
3:12,18 11:9,14
11:16,21 12:3,3

12:9 13:10
15:15,16,18
16:25 17:5,9,16
17:22 18:3,6,9
19:13,15 20:2
22:15,20 42:13
43:21 54:12
65:14,17,22
66:4 67:15
71:10 73:15
74:4 78:8 81:8
82:7 83:3 90:25
96:19 98:3
99:17,17 104:10
118:6 122:11,25
124:11,13,13,16
124:17,18,20,21
125:2,22 130:1
134:13,21,25
**reported** 61:9
62:22
**reporter** 6:1,5
6:10,16,21 7:9
8:15 16:9,14
103:23 139:1
**reports** 3:13
11:23 12:6,7,10
18:12,15 20:13
20:23,23,25
21:6,8,22 22:5,7
22:11,18 29:3
34:23 35:3,10
36:3,14 125:20
126:19 132:9

**representing**
2:3,8 37:20
125:11
**request** 12:21
66:10
**requested** 20:11
**requesting** 11:3
**required** 59:21
87:8,16
**requirement**
110:2
**requirements**
9:5 52:7 133:6
137:7
**requiring** 87:12
**reroofing** 29:2
**research** 88:19
**reserved** 5:3,7
**residence** 67:4
70:22 71:19
83:18 134:7
**residential**
120:2
**resistant** 108:4
**resistence**
100:11
**respect** 109:25
**respond** 104:18
**response** 38:8
38:21
**responsive** 75:1
**restriction**
14:17

**restroom** 49:2
89:24
**results** 34:15
**resume** 29:15
29:21
**retained** 3:22
8:24 30:4 37:21
88:9 89:3
**retired** 14:5,5,9
14:14 28:9
**retirement** 14:6
14:23 15:1 25:9
**retrieve** 41:10
**returned** 36:1
**review** 3:12
10:18 11:21
12:3 18:6,9
29:16 40:5 57:2
96:6 125:17,18
126:2,4,8,13
**reviewed** 20:19
26:12 36:7
50:17 56:16,17
62:7 125:20,22
125:25
**reviewing** 34:20
**revised** 12:23
19:3
**reworked** 92:18
**rib** 113:17,19,20
114:3,8,9 115:4
**rich** 73:17
127:12,12,15
128:5,6

**ridge** 76:7 85:9
85:17 99:23
100:6,22 108:2
110:6,7 112:19
112:19,25 113:6
131:10
**ridges** 74:11
76:4,5 98:25
101:3 112:13
**right** 6:23 7:1
8:15,21 11:1
15:7,10,20
16:17 19:25
22:23 28:22
29:14 30:15,23
31:22 33:2,24
33:25 34:8 37:3
37:22 39:13,25
41:7 42:3 45:18
47:16,25 48:6
48:18,24 49:8
50:4 53:10,14
55:24 58:1,17
59:4 61:1 70:3
74:25 75:17
76:2,17 78:1
79:11 80:5,6
81:8,12,12,24
82:4,8 86:13
88:8,17 89:23
91:13 100:2,4
114:11 117:1
124:18 134:2,4
136:9,20,21

137:1,7,9,18
**rigid** 69:8,10
**rip** 113:18
**rivet** 76:22 78:1
78:2 117:3,5
**riveted** 76:12
**rivets** 64:8
74:20 75:20
76:15 77:7
82:23 83:2,5,9
83:11,17,22,25
84:12 91:25
**robust** 108:4
**role** 67:16
**roll** 96:20
**roller** 96:25
97:10,11
**roof** 13:14 29:17
29:18,20,22
30:11,18,20
31:2,18 53:9
54:7,8,16,24
55:14 58:8,10
59:6,7,22,24
60:1,3,5,10,10
60:12,21,22
61:2,5,15,17,25
63:4 64:23 66:2
66:23 68:6,15
68:25 72:12,16
72:21,24 73:4,7
73:10 74:9
78:20 79:21
82:14,17,21

84:16 85:20
86:2,3 87:13,13
87:14,16 89:9
94:13 95:4,14
95:22 96:1 97:9
97:11 100:25
101:1,9 102:14
105:9,16,19
107:23 108:3,7
109:2,6 110:4
110:11,20 111:4
112:8,17,21
113:5,14,23
114:5,10,13
115:13,16,18,22
116:12,16,17
117:11,22
118:16,17,25
119:20 120:17
121:19 123:5,8
123:25 124:2,3
124:5 125:8,12
125:13 130:16
131:9,15,16
132:12,13 133:7
135:19,20,21,22
135:22,23,25
136:1,3
**roofed** 30:1
**roofing** 26:3
30:3 31:9 33:4,7
33:8 53:6,8
58:21 64:8 67:3
69:24 70:2,7,9

70:10,15,22
83:11,17 86:7
94:22 95:13
97:5 105:16
118:15,23
119:10,12,15,24
120:6,11 135:9
**roofs** 27:1 31:7
31:8,12,15,16
64:12 68:9
84:21 96:7
**room** 7:13 122:5
122:6 123:10
**rooms** 122:4
**rosecrans** 2:4
**rotation** 115:3
**round** 117:17
**rule** 21:24 22:8
56:2
**rules** 7:4 21:23
43:11 100:18
**russ** 28:10,12
126:1,5,13

**s**

**s** 2:1 4:6 5:1,1
6:11,11 73:19
**salt** 84:9
**salty** 84:8
**san** 2:5
**sander's** 137:12
**sanders** 1:17 3:4
3:9,15,22,23
6:18 7:3 13:9

17:5 18:25
28:10,10 126:1
137:4 139:4
**sarah** 1:3 8:24
12:14 16:1
**sarah's** 12:14
**save** 39:18
**saw** 40:17 63:19
68:19 117:21
**saying** 42:25
43:1 80:8
109:22 111:14
128:8 131:18
**says** 38:17,18
49:15 75:13
109:24
**scaffolding** 68:4
**scale** 84:5
**schedule** 42:9
42:10,20 43:10
45:5,15 137:12
**schedules** 56:1
**scholarly** 26:10
132:9
**scope** 9:3 68:5
96:4,6
**se** 2:9
**sealant** 32:15
**sealed** 130:16
130:23
**seam** 74:17,20
74:22,22 75:21
77:24 82:25
96:18 135:4

**seamed** 76:11
**seaming** 111:12
**seams** 81:4
96:16,17
**second** 47:23
49:18 50:2
104:1
**seconds** 90:11
**section** 80:21
115:5
**sections** 115:5
**secure** 76:15
**secured** 74:20
92:2,2 106:2
117:2
**securing** 105:21
105:22
**see** 37:24 38:6
43:5 48:15
49:11 60:25
63:17 68:17,24
75:14 76:21
77:24 81:25
88:19 92:1
96:19
**seeing** 46:17
79:22 97:7
**seen** 64:18
68:13 83:21,22
97:5,9,11,13,16
97:23 98:2,14
99:11
**self** 108:15

**selling** 14:2
**sense** 86:11 95:4
101:17 104:19
133:2,15 135:5
**sent** 11:2 23:1
38:20 49:24
**sentence** 4:5,7
35:15
**separate** 51:16
123:4 124:17,18
**separated**
131:24 132:3
**separation**
131:10
**september**
65:25 129:22
139:20
**series** 7:17
87:22
**set** 6:22 11:10
71:5,8 139:19
**seven** 71:20,22
125:21
**several** 103:22
**shape** 58:13
**shares** 14:2,4,9
**shelton** 135:14
**shop** 87:7 89:7
**short** 115:8
**shortly** 38:23
**shot** 121:24
**show** 58:15
68:14 76:25
78:5,7 97:1,2

127:1
**showed** 68:19
79:15 112:4
128:18
**showing** 117:6
126:21 128:13
**shown** 96:25
**shows** 78:13
81:10,18,19
123:15
**side** 29:9 74:17
75:15,16 78:3
80:6,22 81:6
82:14,16,17
109:2,3,12,19
109:23 110:10
110:14,15,20,25
111:1 112:8
113:10 115:8
117:11 121:22
122:11,11,25
**sides** 117:19
**signature**
139:24
**significance**
130:7
**significant**
34:16 134:8
**signing** 5:18
**similar** 36:11
**simple** 13:13
29:2
**simply** 74:3

**[simpson - storm]**

**simpson**  2:14
7:8
**single**  47:22,24
87:13 116:18,20
**sit**  69:22
**site**  42:14 54:1
65:10 66:7
67:12,20 71:22
96:7 104:7
121:12,13
**six**  32:5 39:21
114:3 117:24
**sketch**  3:19
13:11 19:16,18
20:16
**slate**  94:24
95:21,22 96:1
**slopped**  115:22
**slow**  84:13
**slows**  8:8
**smacna**  86:11
**small**  59:10
**smaller**  123:19
**soft**  7:7 98:16
**sold**  14:4,9
**solely**  40:9
**solid**  84:12
105:16
**solve**  15:2
**somebody**  85:5
104:19 126:21
**somewhat**  14:25
**sorry**  12:2 17:14
21:6 44:15 86:1

117:4 127:24
137:17
**sort**  62:5 63:9
87:9
**source**  34:17
**south**  75:8
117:19
**spaced**  68:11
109:18
**spacing**  86:9
101:17 109:15
**speak**  46:16
68:23 127:4,17
133:3,14 134:2
**speaking**  45:24
60:16 63:4
133:10
**specializes**
28:24
**specific**  72:13
86:12,19 133:11
**specifically**  60:9
65:1,7 66:21
67:25 108:14
**specify**  87:23
**speech**  4:4
**speed**  102:13,18
103:25 104:3,6
104:9 105:4
**speeds**  105:3
**spell**  73:18
**spelling**  4:3
**spend**  57:4
117:22

**spending**  46:9
**spent**  41:2 57:21
59:8
**splotch**  79:10
**spoke**  94:23
95:5,12
**spoken**  94:21
95:1 132:15,20
**springline**  71:8
71:11 88:16
**sprinkled**  134:8
**st**  1:1,1 2:15
41:6,12 44:14
47:13 60:2 61:5
66:24 71:15,16
104:1,9 129:12
130:3,6,12,12
**staff**  26:25 27:2
**stained**  60:3
**stand**  33:19
**standard**
101:18
**standards**
108:23
**standing**  96:16
96:17 135:4
**stands**  52:25
**stapled**  12:22
**start**  7:5 8:6
14:2 16:12
44:11,14 49:9
57:6 60:1
**started**  25:8
26:20 30:25

54:10
**starting**  11:24
133:8
**state**  6:13,16 7:1
119:17 136:22
139:3
**stated**  36:5
115:2
**statement**  99:20
100:8,9 103:5
**states**  1:1 119:9
119:11,16
**stating**  110:9
**statistics**  35:10
118:22 119:4
**status**  14:14,15
14:16
**steel**  83:4 84:4,6
98:22
**stenographica...**
139:10
**sticker**  138:9
**stickers**  16:13
**stipulated**  5:2,6
5:10,14,17
**stipulations**  6:1
**stone**  122:14
124:4
**stop**  136:11,17
136:20,21 137:5
137:20
**stopping**  100:3
**storm**  3:10
11:13 17:9,15

**[storm - t]**    Page 169

17:21 61:21
62:21 63:1
67:14 73:8,15
74:4,12 78:8
99:1 101:2
104:1 107:15
109:1 110:17
111:7 112:4
115:2 117:7
121:17 124:13
124:20 125:3
128:24 129:22
131:20 135:9
136:7
**storms** 60:2,11
**straight** 51:2
79:15
**street** 1:24 2:4
2:15 6:19 27:15
**strictly** 31:17
**strike** 24:9 75:1
99:8 110:9
111:25 134:5
**structure** 53:1
61:6 69:3
105:16 107:25
108:4 115:4
116:3,12,14
123:19
**structures** 61:7
64:13 68:3
88:22 129:13
**stuart** 2:10

**stuff** 11:11
126:4,17
**subject** 53:22
137:11
**submission**
20:14
**submissions**
26:10
**submitted** 26:3
41:16
**subpoena** 3:8
12:22 16:18,20
138:7
**subscription**
32:18,20
**subsequently**
139:11
**subside** 110:22
**substance** 61:2
62:18 90:22
**substantially**
106:6
**subtotal** 39:22
**suggest** 99:19
100:2 128:13
**suggested** 84:12
97:7
**suggestion**
100:6
**suit** 53:2
**suite** 2:5,10,15
6:8 74:17
**summaries** 35:4

**summarizing**
23:9
**summary** 3:14
12:10 18:17,20
34:16
**superior** 10:24
16:5 23:24 24:5
24:8,25 26:11
33:17,19 40:14
45:20 48:13,21
53:23 54:8,16
55:2,13 65:13
121:2 124:24
**support** 36:22
132:10
**supports** 27:2
**supposed** 76:8
77:23
**sure** 7:8,16 8:12
9:24 12:7 13:12
16:10,14 17:25
31:24 32:22
33:5 47:5 48:18
59:17 61:13,14
62:6 68:3 72:17
75:2,7,10 79:7
80:17 98:11
99:10,12 101:3
109:6 113:1
118:2 120:20
121:15,16 131:5
135:17 137:2
138:1,21

**surface** 114:22
114:23,25
115:21
**surgeries**
137:16
**survey** 66:4
125:19
**susceptible**
118:16 119:16
**suspending**
137:19
**swiss** 135:13
**sworn** 6:12
139:7
**synonymous**
52:15
**system** 31:21
49:20 53:8,10
53:12 59:6 64:8
67:3 72:21
94:22 95:13
96:14 100:25
109:20,23 110:1
119:1,11,15,20
136:1
**systems** 53:6
59:9 83:12,18
97:5 118:15
119:10,24 120:6
120:11 135:9

| t |
| --- |
| **t** 5:1,1 6:11 |

**[take - thought]**

**take** 8:8,13,14
8:16 14:18,25
15:22 16:1,15
22:25 49:1,3
79:11 89:24
114:4 122:8
137:7 138:5
**taken** 5:12 34:9
46:20 49:5
79:22 89:25
92:4 94:5 139:4
139:10,15
**takes** 90:11
**talk** 7:12 8:5,11
73:2 96:16 97:3
127:6 138:18
**talked** 21:11
85:6 90:6,7
96:18,19 98:24
117:10,14,14
127:5,14
**talking** 7:23
9:24 20:1 50:16
51:25 60:9,10
61:15 62:23,25
63:7,7 65:2
68:16 73:9 77:2
77:4,7 85:12
86:19 98:25
99:2 109:7,10
109:20 111:3,19
113:4 122:4
124:16 126:8

**talks** 35:15
**tape** 77:22 78:1
**tear** 92:12
115:13
**tearing** 115:22
**technical** 26:20
26:22,25 133:1
133:7,22
**tecum** 11:2
15:11
**telegraphing**
96:22 97:6,16
97:20 98:4,10
98:13
**tell** 16:22 28:22
61:3 114:1
135:12 138:6
**telling** 46:4
47:25 88:23
90:14 91:3
116:8 132:2
**temporary**
73:10
**ten** 40:6,7 47:2
73:21 126:6
127:19
**term** 52:18
**terms** 36:23
53:17 75:19
98:16 114:6
**test** 43:7
**testified** 6:14
9:6,25 10:16
23:5 24:4 47:8

47:22,24
**testify** 25:21
43:6 47:8 139:7
**testifying** 90:18
**testimony** 9:15
9:18 10:19,22
14:21 24:10
33:19 36:22
42:18 43:21,22
45:12 57:19
90:22 109:1
139:10
**testing** 92:14,21
92:25 93:3,5,11
107:10
**tests** 80:20
**texts** 35:9 36:10
**thank** 6:10,21
21:7
**thereof** 139:19
**thickness** 97:1
**thing** 15:22 46:1
52:14,16 71:7
74:16 97:18
125:5 132:24
**things** 15:11,21
19:20 20:1 27:3
37:2 68:2 75:25
77:1 95:17
104:18 127:1
131:22
**think** 9:25 12:15
23:21 26:19,21
32:20,22 34:3

34:13 36:18
38:8 39:19,19
40:6,7 45:19
47:25 50:20
52:25 53:25,25
57:10 61:21
64:17 66:22
68:2,13 69:17
69:20 74:18
75:5,6,7,9,11
79:8 80:3 84:13
86:13 87:23
88:1 92:24
93:13 95:23
98:14 102:5,12
104:12,17
107:25 108:12
109:12 110:2
111:17 113:7
114:5 115:15,15
115:19 116:14
116:21 125:21
129:20 130:22
131:23 133:18
136:8
**third** 135:23
**thirty** 24:18,19
28:6 39:13,21
74:23 82:2 91:8
**thomas** 1:1,3
2:6 71:16 130:3
130:6,12
**thought** 82:9
85:5 98:8,11

[thought - two]                                                    Page 171

102:22 107:2
125:4 131:17
136:16 138:9
**thousand**
101:12 102:2,13
**three** 12:8,9
23:12,16,19,23
24:14 30:5,12
50:20 96:3
113:3,6
**threshold**
101:14,21
**ticket** 44:6
**tied** 91:24
**tight** 106:12,13
106:17,22 107:3
107:8,11
**tightness** 107:5
**time** 1:21 5:3,7
8:14 9:9 14:23
21:15 25:4 28:5
29:13 30:16,25
32:23 33:1
34:12 37:11
39:18 41:2,12
41:15 42:4 44:3
44:18,20,22
45:21 46:9,20
46:21 47:3,7
56:16,18 57:22
59:8,10 61:19
61:19 64:18
67:6,13,14
87:15 91:16,23

92:15 94:5,14
94:17,19,20,21
94:23 95:12
96:4 107:15
111:17 117:22
121:21 125:9,12
127:6,20 134:11
134:20 136:1
**timeframe**
30:23
**times** 23:21,23
39:13 121:10,14
**title** 27:12
**today** 11:5
26:23 27:12,24
42:7 90:10,15
107:18,20
126:24 127:3,4
127:9,18 128:6
128:17 129:1,4
**today's** 39:6
56:14 129:8
**together** 12:23
17:23 91:25
92:19 93:8,14
101:10 128:1
**told** 63:13
132:21
**tom** 2:6 9:23
14:12 41:23
50:10 127:8,9
127:14 128:7
**tom's** 60:3

**tongue** 69:4
105:16
**took** 15:6 81:18
94:4,7
**top** 69:22 75:13
77:13,14 78:2
81:1 83:4 104:6
116:22
**topics** 32:15
**tore** 115:8
**tornado** 131:20
**total** 38:24 39:2
39:4 40:19
49:21 57:21
74:22 112:19
**totaling** 49:15
**totally** 105:14
**towards** 78:21
81:7 87:12
**trailing** 4:6
**transcribed**
34:10 139:11
**transcript** 4:1
5:19 18:23
76:24 77:3
**transcription**
139:9
**transcripts** 40:5
**transition** 81:11
**translate** 113:8
**travel** 41:6,11
43:24,25,25
44:10

**traveled** 118:9
**traveling**
115:12 129:10
132:23
**treaties** 26:9
**treatises** 132:9
**trial** 5:3,7 9:20
9:21,25 10:2
23:6 24:2 25:22
35:7 36:22,24
43:22 47:15,17
125:5
**trials** 23:12,18
**trip** 47:13
**trips** 118:12
**true** 10:21 33:12
99:16 139:9
**truth** 139:7,7,8
**try** 8:11 24:15
31:5 41:10 48:5
64:24 73:19
76:6
**trying** 15:2 43:7
43:18 44:12
46:10 48:19
77:1 115:25
**tucked** 123:5
**turn** 46:1 76:8
**turned** 14:2
**twelve** 57:22
**twisted** 138:2
**two** 8:8 11:13
11:19,23 12:14
14:3 15:7 17:16

23:23 24:14
39:20 50:20
56:1,1 69:6,15
78:7 80:20
85:18 90:11,16
96:2 118:12
120:22 129:5
136:14,19
**type** 24:9,22
69:13 126:8
129:18
**typo** 39:17

**u**

**u** 5:1 6:11
**u.s.** 2:16 30:10
31:1
**ubs** 135:13
**uh** 7:19,25
**ultimately** 54:15
**unable** 10:18
111:14
**under** 21:23
27:12 43:10
72:2 96:24
101:10 126:15
139:8
**underlay** 108:7
**underlayment**
71:2
**underneath**
115:16 118:25
119:3 121:19
131:12,25

**understand** 8:2
8:4 14:13,20
21:19,25 24:15
30:2 42:24 43:3
44:23,23 45:7
48:16,19,19
51:8 53:16 56:4
59:17 62:6 69:5
74:1 75:2,3
80:17 87:25
100:15,18 110:8
113:1 115:25
116:1,2 120:21
124:24 125:4
131:6 133:6
136:25
**understanding**
8:22 9:2 32:24
49:22,24 52:4,6
53:17 54:10
63:8 70:8 71:17
71:21 74:2
82:13 86:5
100:20 106:11
108:17 114:18
116:7 119:16
**understood**
108:25
**unfolded** 93:7
**uniformly** 83:14
**united** 1:1
**unseamed** 92:17
**uphill** 110:18

**uplift** 102:17
103:25 104:14
105:9 107:22
110:10 112:5
114:20 115:11
115:15 116:2,3
116:7 118:16
131:7,8,13,14
131:15,18,19
132:3,6
**upturned** 81:3
81:19
**upward** 115:13
130:17
**use** 32:10 36:21
71:9 124:14
**used** 35:7 58:25
71:10 83:6,25
85:21 97:10,12
99:10 101:18
126:19
**using** 36:21
80:24 86:8
114:1,2

**v**

**varies** 86:18
**variety** 99:4
**various** 11:3
74:6
**vary** 87:10
**verify** 74:13
**versus** 59:9,16
120:17

**vi** 2:14
**vice** 126:7
**vicinity** 59:25
**video** 58:1,5,15
126:20 128:8,14
128:20
**videotapes** 35:6
**viewed** 67:2
**virgin** 1:1 2:16
67:3 71:14
**virginia** 27:18
**virtually** 96:20
**visit** 34:21 37:10
65:18,24 66:1
66:14,25 67:7
67:12 118:10
**visited** 129:14
130:12
**visits** 121:10,12
121:13
**vitae** 15:12 20:1
20:11
**voice** 7:7
**vs** 1:7
**vulnerable**
118:23

**w**

**w** 41:16 43:12
56:8
**waited** 47:8
**waived** 5:13,16
5:19

| | | | |
|---|---|---|---|
| **walked** 58:8 | 124:16 | 131:9,23 | 34:19 55:13 |
| 90:7 | **weather** 63:9 | **windows** 105:11 | 64:23 77:2 84:2 |
| **walking** 58:14 | 84:22 | 105:15,25 | 97:6 100:11 |
| **wall** 122:14,15 | **weathers** 84:23 | 106:13,22 | 116:13 126:21 |
| 124:4 135:23 | **website** 32:13 | 107:17 120:15 | 132:5 |
| **walls** 120:14,15 | 32:17,25 | 130:23 | **work** 11:20,22 |
| 120:17 | **week** 44:13 | **winds** 104:15 | 11:24 14:7,18 |
| **want** 7:8,11 8:4 | 129:8 | 110:22 130:17 | 15:2 18:1 21:23 |
| 11:11 16:2,13 | **welcome** 74:15 | **wise** 112:22 | 24:22 25:18 |
| 17:15 34:6 | **went** 25:2 | **witch's** 58:9 | 26:11 28:14 |
| 37:12 43:5 | 125:10,22 | 78:18 81:11 | 30:6 31:1,6,14 |
| 48:18 53:19 | **west** 82:14 | 82:1 112:12,18 | 37:7,20 40:13 |
| 59:17 62:6 | 109:2,12 110:10 | 116:22 | 42:13 44:9 |
| 136:21 137:1 | 110:22 117:14 | **withstand** 102:2 | 46:15 48:12,20 |
| **wants** 131:21 | 122:11 | 104:13,14 | 50:5 59:19 68:4 |
| **war** 130:9 | **wheel** 105:2 | **witness** 3:3 6:18 | 68:7 72:5,20,23 |
| **washington** | **when's** 94:21 | 13:9 14:12 | 73:3,7,8,16 74:2 |
| 27:19 29:18,19 | **whichever** 15:6 | 25:18 41:15 | 74:8,8,13 87:9 |
| **water** 110:19 | **wide** 114:4 | 43:21 63:14 | 87:15 95:19 |
| 121:21,22 124:8 | **width** 101:17 | 103:10,11 | 96:1,4,6 135:7 |
| 134:10 | **wife** 132:19,21 | 137:13,21,25 | **worked** 14:8 |
| **way** 23:8 54:10 | **williams** 2:9 | 138:4,7,11,16 | 24:17 28:6,7 |
| 55:1 96:17 97:1 | **wind** 77:10 | 138:21 139:6,19 | 29:7,17 30:13 |
| 97:2 113:11 | 81:20 100:10 | **wja** 3:18 13:10 | 31:3 70:9 71:23 |
| 115:17 117:18 | 101:10,21 | 19:12,14 58:1 | 132:16 135:13 |
| 122:13 124:7 | 102:13,17 | **wlclaw.com** | **worker** 92:18 |
| 135:23 | 103:25 104:3,6 | 2:11 | 94:8 125:7 |
| **ways** 96:12 | 104:9,22 105:2 | **won** 26:21 | **working** 14:22 |
| **we've** 20:23 | 105:3 108:19 | **wood** 68:9,10,11 | 14:23 30:10 |
| 21:10,11 35:3 | 110:14,16 | 69:19 70:24 | 71:5 72:2 |
| 36:18 37:22 | 114:16,24,24 | **word** 4:6 38:18 | 126:15 |
| 48:25 60:2 | 115:10,15,17,20 | **wording** 55:4 | **works** 95:23 |
| 112:2 113:3 | 115:21 116:2 | **words** 25:17 | **world** 7:22 8:10 |
| 117:14,14 | 118:25 131:1,6 | 32:9 33:24 | |

[wrap - zoom]                                   Page 174

| | | z |
|---|---|---|
| **wrap**  136:12,22 | 77:14 78:7 | |
| **write**  27:4 | 79:10,13,17,19 | **z**  128:18 |
| **writing**  26:14 | 80:16,19,25 | **zip**  55:25 |
| 27:11 132:10 | 81:23 91:1,6 | **zone**  130:9 |
| **writings**  26:11 | 94:12 96:23 | **zoom**  2:13 50:8 |
| 34:15,22 132:10 | 97:17 98:2 | 50:9,21,25 51:1 |
| **written**  25:24 | 103:12 110:6 | 51:6,9,15 |
| 26:16 27:1 32:2 | 111:24 112:16 | 120:22 |
| 36:15 | 113:21 114:15 | |
| **wrong**  75:11 | 121:3,15 122:20 | |
| 108:25 | 123:8,9,17 | |
| **wrote**  26:14 | 125:6 126:10 | |
| 31:23 32:4,5 | 127:25 128:2,25 | |
| 33:3 58:24 | 129:24 131:2 | |
| 125:25 | 132:1,1,8 | |

| x | 133:13 136:18 |
|---|---|
| **x**  3:1 128:18 | 137:7,13 138:13 |

| y | **year**  12:2 14:8 |
|---|---|
| **y**  128:18 | 65:21,25 95:21 |
| **yeah**  10:9 12:8 | 129:21 135:16 |
| 15:8 16:4 22:16 | **years**  14:3 23:12 |
| 27:8 29:12 32:8 | 23:16,19 24:18 |
| 36:6 39:5,5,7 | 24:23 25:7,9 |
| 40:3,12,12 | 28:6 31:7 32:6 |
| 42:15 44:21 | 41:20 47:2 60:4 |
| 45:17 48:5 | 73:21 95:20,22 |
| 49:17 50:3,7,24 | 96:2 125:22 |
| 50:25 53:12 | 126:6 133:8 |
| 56:19 58:13 | **yell**  7:11 |
| 61:23 62:14,16 | **yep**  137:11 |
| 63:11 64:1 70:1 | **york**  27:17 28:1 |
| 73:12,23,25 | |
| 75:24 76:1,23 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.