**EXHIBIT 7**

Page 1

1        IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS

2                    DIVISION OF ST. THOMAS AND ST. JOHN

3

4        THOMAS F. FRIEDBERG &        :   CIVIL ACTION NO:

         SARAH L. BUNGE,             :   3:19-CV-0053

5

6                    Plaintiffs,     :

7        vs                          :

8        DAYBREAK, INC., D/B/A HUBER  :  SEPTEMBER 11, 2025

         & ASSOCIATES

9

10

11                        Volume II

12                CONTINUED DEPOSITION OF:  Arthur Sanders

13                DATE:     September 11, 2025

14                TIME:     1:02 P.M. -- 3:02 P.M.

15                LOCATION:  Regus

16                          157 Church Street

17                          New Haven, Connecticut  06510

18

19

20

21

22

23

24

25        Job No. CS7589338

Page 2

```
 1    A P P E A R A N C E S:
 2
 3    REPRESENTING THE PLAINTIFF:
 4            Law Offices of Friedberg & Bunge
              1005 Rosecrans Street
 5            Suite 202
              P.O. Box 6814
 6            San Diego, California  92166
              Email:  Tom@lawofficesFB.com
 7            By:  Thomas Friedberg, Esquire
 8
 9    REPRESENTING THE DEFENDANT:
10            Williams, Leininger & Cosby
              301 SE Ocean Boulevard
11            Suite 205
              Stuart, Florida  34994
12            Email: jcosby@wlclaw.com
              By:   Jeffrey C. Cosby, Esquire
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                      I N D E X

2

3    WITNESS                                      PAGE

4    Continued Depo Arthur Sanders                  5

5        Direct Examination by Mr. Cosby           5

6

7    (No Exhibits marked for this deposition date.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                        TRANSCRIPT LEGEND

2

3     [phonetic]         exact spelling not provided

4     [--]               break in speech continuity

5     and/or interrupted sentence

6     [...]                  indicates omission of word(s) or trailing

7     off when reading or finishing a sentence

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1          A R T H U R          S A N D E R S ,
2              previously sworn by Christine N. Meade, a
3              notary public in and for the State of
4              Connecticut, was examined and testified on his
5              oath as follows:
6                  CONTINUED DIRECT EXAMINATION
7      BY MR. COSBY:
8          Q    Please state your name.
9          A    Arthur Sanders.
10         Q    And do you understand you're under the same
11     oath to tell the truth that you were at the last
12     deposition?
13         A    I do understand that.
14         Q    Have you done any review or preparation for
15     this continued deposition?
16         A    Other than review the documents that I gave to
17     you before.
18         Q    Tell me what you did to prepare for today's
19     deposition.  I'm talking about in between the last time
20     and today.
21         A    I read Huber's deposition.  I got a copy of my
22     deposition to this point, but I haven't gotten a chance
23     to read that.  I went back to review my original report
24     and the short portion of it talking about the Copper &
25     Common Sense.  And that's basically it.

Page 6

1          Q    I mean, I'm referring to what you've done in

2    preparation.

3          A    Yeah.

4          Q    So have you read Mr. Huber's depo before?

5          A    Yes.

6          Q    And why did you read it again?

7          A    Well, I was wondering about what he said about

8    ridges.

9          Q    Did Mr. Friedberg instruct you to read his depo

10   again?

11         A    No.

12         Q    And what did you learn that he said about

13   ridges in his deposition?

14         A    He was kind of inconclusive.  But he did say

15   that anywhere -- that if there weren't any clips it would

16   be in violation of the contract.

17         Q    Right.  So if there were no clips that would

18   violate the contract?

19         A    Yes.

20         Q    You're not a lawyer, correct?

21         A    No.

22         Q    Am I correct?

23         A    Yes. I am not a lawyer.

24         Q    When you say you reviewed your original report,

25   what date -- what's the date of that report or which

                                            Page 7

1     report are you talking about?

2          A    It's in November of 2014.

3          Q    And why did you review that?

4          A    Well, because -- partly because I don't know if

5     I have reviewed the Dayhill information, but I was

6     confused as to when that -- because they referred to the

7     place with the 30 feet of failed ridge as north and I

8     kept thinking it was east.  They just -- it is really I

9     guess north.  It depends on where exactly north and south

10    are, but to clarify some things for me as to where my

11    photographs were, and so on.

12         Q    Are you talking about the open seam?

13         A    The open seam that they repaired.

14         Q    Dayhill?

15         A    Yes.

16         Q    Okay.  So that was one seam.  Regardless of

17    whether it was north or east, it was one seam, correct,

18    that they repaired?

19         A    Well, they did cap work all over.  They did cap

20    work on all the seams.  That was part of their charge.

21         Q    Well, how many open seams did Dayhill find?

22         A    Well, I understand from that along one ridge we

23    found it open for over 30 feet.

24         Q    All right.  And that was on one section of the

25    roof, via east or north or whatever the direction is, it

```
                                                    Page 8
 1     was one ridge, correct?
 2          A    To my understanding, yes.
 3          Q    Okay.  And by ridge, you mean the separation
 4     between the two pie pieces of the octagon?
 5          A    The intersection of the two pie pieces,
 6     correct.
 7          Q    Remember, we can't talk at the same time.  So
 8     if I'm talking, just wait until I finish.  I will
 9     eventually finish and I'll wait until you finish your
10     answer.  Understood?
11          A    Yes.
12          Q    I didn't hear your answer because I was still
13     talking.
14          A    Can you repeat the entire question?
15          Q    Sure.
16               MR. COSBY:  Can you read it back, please?
17               (Whereupon, the question was read back by
18          the Court Reporter.)
19          A    Yes.  The intersection of the two pie pieces.
20     BY MR. COSBY:
21          Q    All right.  And what did you review with regard
22     to Copper & Common Sense, you mean the report or an
23     article from Copper & Common Sense?
24          A    Just a refresher of recommendations for copper
25     roofs.
```

1      Q    As indicated in your report or as indicated in

2    some Cooper & Common Sense publication?

3      A    It's a Copper & Common Sense publication that

4    was part of my deposition submission.

5      Q    Okay.  I'm trying to understand what you

6    reviewed.  Did you review the Copper & Common Sense

7    article, or did you just review your report that

8    mentioned the article, or did you review your depo that

9    mentioned both?

10           I'm not clear on what you reviewed.

11     A    Exhibit 2 has an except from Copper & Common

12    Sense on the same roof construction.

13     Q    Okay.  So that's the article that you reviewed

14    before today?

15     A    Yes.

16     Q    Okay.  And any particular parts of the article

17    that you were reviewing?

18     A    Well, some things caught my eye that I hadn't

19    seen before.

20     Q    Tell me about those.

21     A    The requirement that pans have a 16th inch

22    space between adjacent pans to allow for expansion.

23     Q    How far?

24     A    16th of an inch.

25     Q    That has nothing to do with cleats, correct?

Page 10

1        A     No.

2        Q     Correct?

3        A     Yes, it does not.

4        Q     All right.  What else caught your eye?

5        A     When standard seams are used to finish hips or

6     ridges the seams on opposite sides of the hip and ridge

7     should be offset.

8        Q     Okay.  That doesn't specifically refer to

9     cleating, correct?

10        A     No.  But it does -- it does refer to the way

11     the cleats were -- the way the ridges were formed.

12        Q     Okay.  This case is a breach of contract

13     regarding an allegation of failure to provide cleating,

14     correct?

15        A     Yeah.  And those -- that's correct.  And those

16     things that I just mentioned probably have no relevance,

17     but you asked what I reviewed.

18        Q     I understand.  Did you review anything else

19     from the time we left the last deposition and when we

20     started two minutes ago?

21        A     Not that I recall.

22        Q     Have you conferenced with anyone or spoken to

23     anyone since the last deposition?

24        A     No.

25        Q     Including Mr. Friedberg.  I know you talked to

Page 11

1    him because I got here at 12:30 and you all were having a

2    conference.

3        A    We reviewed documents and nothing specific.

4        Q    All right.  Well, tell me what you were doing

5    for that twenty to thirty minutes.

6        A    We talked about what may have been the result

7    from previous deposition today of Dayhill.

8        Q    What do you mean?  Tell me specifically what he

9    said.

10       A    Well, I think Tom said that Dayhill testified

11   that there were no clips in the ridge.

12       Q    In the open ridge?

13       A    In the -- well, I think he said any ridges.  I

14   don't know.  I don't know what his testimony was.

15       Q    Okay.  What did Mr. Friedberg tell you?  Did he

16   tell you there were no clips in any ridges, that that's

17   what the testimony was today?

18       A    I'm sorry.  Even though it's not that long ago,

19   I don't remember.

20       Q    Okay.  What else was discussed?

21       A    My impending surgery scheduled.

22       Q    I'm not concerned with that.  No offense.  I'm

23   trying to understand with limited time what you discussed

24   with respect to this particular case.

25       A    That was it.

Page 12

1      Q    Was there any other discussion of the Barabas
2   testimony?
3      A    Nothing specific other than the cleats.
4      Q    Well, what took twenty minutes to discuss if
5   you talked about Barabas and --
6      A    We didn't talk about that.
7      Q    What?
8      A    I mean, we didn't talk that much about it
9   specifically, no.
10     Q    Okay.  Well, I walked in at 12:35.
11  Mr. Friedberg came out about two minutes to 1:00 and said
12  we're ready.  So I want to know what was discussed over
13  that timeframe.
14     A    I don't think anything other than communication
15  between he and I are privileged.
16     Q    What privilege?  There's no privilege.  You
17  understand I'm allowed to ask these questions.  You're
18  being evasive.
19              MR. FRIEDBERG:  Well, don't argue with
20         him.  Just ask the question.
21              MR. COSBY:  I have.
22  BY MR. COSBY:
23     Q    What did you talk about?
24     A    That's a big open thing.  You know, my memory
25  is not that good.

```
                                                  Page 13
 1        Q    Well, this was 45 minutes ago, sir.  With all
 2   due respect, are you telling me you can't remember what
 3   was discussed with counsel?
 4                 MR. FRIEDBERG:  Objection to form.
 5            Argumentative.
 6                 MR. COSBY:  Don't object --
 7                 MR. FRIEDBERG:  You know what, you're
 8            arguing with him, I'm going to put it on the
 9            record.  And go on.
10        A    Can we just talk about what your questions are
11   relative to this case?
12   BY MR. COSBY:
13        Q    No, no.  I want to talk about your conversation
14   with Mr. Friedberg, which I'm allowed to ask you about.
15   And you're saying you don't remember, but you're acting
16   like you don't want to answer that question.
17                 MR. FRIEDBERG:  Well, objection.
18            Form.  Argumentative.
19                 MR. COSBY:  Stop giving speaking
20            objections.
21                 MR. FRIEDBERG:  You know what, if you
22            argue with him I'm going to say argumentative
23            because it's clear you're arguing with the
24            witness.
25                 I'll object to form as well.
```

```
                                                       Page 14
 1               MR. COSBY:  You're only allowed to object
 2          to form.
 3               MR. FRIEDBERG:  Counsel, take it up with
 4          the magistrate.  You're arguing with the
 5          witness.
 6               MR. COSBY:  I'll move forward.
 7               MR. FRIEDBERG:  Fine.
 8     BY MR. COSBY:
 9          Q    Sir, I'm asking you a question.  I want you to
10     answer the question that I ask you.  This isn't voluntary
11     where you can answer it if you'd like to.
12               Answer the question.
13               MR. FRIEDBERG:  Objection to form.
14          A    I can answer.
15     BY MR. COSBY:
16          Q    You can answer the question.
17          A    We talked about Huber's deposition.  I talked
18     about what I showed you with the Copper & Common Sense.
19     We talked about the Dayhill review.  And we talked a
20     little bit about direction, when Rich Barabas says it's
21     north side.  I thought it was the east side.  Et cetera.
22     That's about it.
23          Q    Is that it?  Is there anything else?
24          A    Nothing that I recall.
25          Q    When you say you talked about the Dayhill
```

Page 15

1    review, what did you discuss?

2         A    What I stated before, about their being no

3    cleats.  And that there is over 30 feet of ridge that was

4    open.

5         Q    Other than the Copper & Common Sense article,

6    what did you review with Mr. Friedberg document wise,

7    photos?

8         A    No, no photos.

9         Q    No photos?

10        A    I think we looked at a photo in my old report.

11        Q    Which photo?

12        A    I think we looked at photo 39 and photo 40.

13        Q    And what did you discuss regarding photos 39

14   and 40?

15        A    Well, which one I referred to when -- when we

16   removed the cap and saw that there were no cleats.  And I

17   think that was actually on the -- on the east side.  And

18   the other photo where we opened up the next day was on

19   actually on the north side, which corresponds to --

20        Q    Can I see that?

21        A    Yes.

22        Q    Which corresponds to?

23        A    Where Dayhill had opened up.

24        Q    The photo 39 on page 20 of your report in 2014

25   does not indicate what area the roof that is

Page 16

1    directionally, correct?

2         A    Right.

3         Q    The area, or the photograph 40 on page 21 of

4    your report of 2014, also does not show directionally

5    what portion of the roof that is, correct?

6         A    Correct.  But that's the photograph -- I mean,

7    that's true.  But that is the photograph that you can see

8    the corner of the master suite in the upper right-hand

9    corner.  So I know now that that is north.

10        Q    As to photo 40?

11        A    Yes.

12        Q    Okay.  But there's nothing like that in photo

13   39 to determine where that is exactly, correct?

14        A    No.  I have no recollection.

15        Q    I was correct?

16        A    Yes.

17        Q    Any other photos that you looked at?

18        A    No.

19        Q    Was there any discussion of your prior

20   deposition testimony at any time from when it ended the

21   last time we were here and today?

22        A    No.  Other than my mentioning that I hadn't had

23   a chance to read it yet.

24        Q    Have you generated any additional reports or

25   any documents since the last deposition?

Page 17

1          A     No.

2          Q     Mr. Barabas mentioned having a video conference

3     call with you, or a video call, when he was on the roof.

4     Do you remember that?

5          A     No, I don't remember that.  And -- so that was

6     2019.  I don't even know what phone I would have had back

7     then.

8          Q     Regardless, you don't have any recollection --

9          A     No.

10          Q     -- of that phone call?

11          A     No, I don't.

12          Q     Or the purpose of it?

13          A     No.

14          Q     Do you remember getting any video calls from

15     the roof from anyone at any time?

16          A     No.

17          Q     In your June of 2025 report, which is your most

18     recent report, correct?

19          A     My expert report to Tom, yes.

20          Q     Was in June, correct?

21          A     Correct.

22          Q     The most recent report, correct?

23          A     Yes.

24          Q     You gave a cost price breakdown to replace --

25     well, pull out your report because I want to go over some

```
                                              Page 18
 1    things with you.
 2         A     Okay.
 3               THE WITNESS:  Tom, do you have a copy?
 4               MR. FRIEDBERG:  I don't.
 5               THE WITNESS:  Sorry.  Here it is.
 6               MR. FRIEDBERG:  Do you have it?
 7               THE WITNESS:  Yes.
 8    BY MR. COSBY:
 9         Q     And that was exhibit what?
10         A     No, I'm sorry.  I don't have it.  This is
11    Exhibit 14.
12         Q     Do you have your report of June of 2025 with
13    you?
14         A     I do not have a copy of it, no.  I do have the
15    flash drive.
16         Q     All right.  I'm going to show you what we
17    marked as an exhibit of your report.  I don't remember
18    the number from last time.  It's your most recent report
19    of June 29, 2025.  Do you see that?
20         A     Yes.
21         Q     And you indicated costs in here, as you can
22    see, correct, where I've highlighted?
23         A     Yes.  Isn't this the original contract?
24         Q     You're noting the original contract price, is
25    that what you're doing here?
```

Page 19

1         A     Yes.

2         Q     Okay.

3         A     That's part of the original contract that I

4    included in the report.

5         Q     Okay.  In that same report you talk about -- of

6    how the pans were installed, nail edge over the cleated

7    edge of the first pan, do you remember that?

8         A     Yes.

9         Q     Okay.  And you say the panels are secured with

10   a seamer, S-E-A-M-E-R?

11        A     Yeah.

12        Q     And you say, "use of a seamer is usually done

13   after numerous panels are installed or even after all are

14   in place."  Is that correct?

15        A     That's traditionally how it's done, yes.

16        Q     Okay.  Do you know how it was done on the main

17   pavilion roof?  In other words, were they done a certain

18   number of panels at a time and then seamed or at the end

19   after all the panels were installed?

20        A     I do not remember.

21        Q     And you say that the cleats are covered with

22   copper panels, and what is the panel called that covers

23   the cleats?

24        A     The pan.

25        Q     The pan itself, is that correct?

Page 20

1          A     Yes.

2          Q     Okay.  Along the ridge line where this opening

3     was that we talked about a moment ago in your Exhibit 40,

4     the open seam.  That's a ridge line.  A seam is the same

5     thing, correct?

6          A     Yes.  Ridge or a hip.

7          Q     Ridge or a hip?

8          A     Yes.

9          Q     And it's where the wedges connect, correct, or

10    the intersection of the pie shaped wedges?

11         A     Yes.

12         Q     There's a cap over that rim, is that correct?

13         A     Yes.  That was the method chosen to cover that.

14    Single lap joint.

15         Q     Do you know how long the cap was that was

16    removed or that existed on that opening?

17         A     They were very short lengths, perhaps four to

18    six feet.

19         Q     Okay.  Do you know how many of them there were

20    on that ridge line?

21         A     I didn't make a count.

22         Q     Were those caps present when you were there on

23    that take particular open seam?

24               MR. FRIEDBERG:  Objection to form.

25         A     They were there, yes.

Page 21

1    BY MR. COSBY:

2        Q    Okay.  So those were -- my question is really,

3    did they blow off during the storm, those caps of the

4    ridge seam?

5        A    Not completely, no.  They were loose.

6        Q    Loose.  But they didn't blow away, correct?

7        A    No.

8        Q    Am I correct?

9        A    Yes.

10       Q    And what does it take to physically remove

11   those caps from a ridge line?

12       A    What we did was to drill out the cap and get

13   the pop rivet and remove it.

14       Q    So is it secured -- are the caps secured simply

15   with a pop rivet?

16       A    Yes.  But I think you had asked me yesterday

17   about the pop rivets and I had mentioned that they're

18   steel mandrel copperhead pop rivets and that most of them

19   were rusted.  A lot of them only went through two pieces

20   of material instead of through to the other side of the

21   cap.  They didn't provide a very secure hold to the cap.

22       Q    Move to strike.  I didn't even ask that, but I

23   understand.

24            So then you say in the same report that

25   September 7, 2017, Hurricane Irma strikes this area,

```
                                                    Page 22
  1    correct?

  2         A    Yes.

  3         Q    "After the storm, investigation revealed that

  4    the defendant, which is Dayhill, did not install cleats

  5    at the intersection of the copper panels that form the

  6    ridge between copper pans at 9.5 inches on center as

  7    required by the terms and conditions of the contract."

  8              Correct?

  9         A    Did you say Dayhill?

 10         Q    I didn't say Dayhill.

 11         A    Daybreak?

 12         Q    I said Daybreak.  Defendant, Daybreak.  I'm

 13    sorry, Daybreak, I meant.

 14              Is it correct, what I read?  Do you want me to

 15    read it again?

 16         A    Yes.

 17         Q    "After the storm, investigation revealed that

 18    Defendant did not install cleats at the intersection of

 19    the copper panels that form the ridge between copper pans

 20    at 9.5 inches on center as required by the terms and

 21    conditions of the contract."

 22         A    I did say that.

 23         Q    Now, the only ridge where that was confirmed

 24    was the one that was opened, correct?

 25         A    Yes.
```

Page 23

```
 1        Q    So where it says, "did not install cleats at
 2   the intersection of the copper panels," that's only in
 3   the one area where the ridge was opened that's in photo
 4   40 that we went over a moment ago, correct?
 5                  MR. FRIEDBERG:  Objection to form.
 6        A    That is the only area that we had opened.
 7   BY MR. COSBY:
 8        Q    And the areas that you didn't open you can't
 9   confirm whether there are cleats or not there, correct?
10                  MR. FRIEDBERG:  Objection to form.
11        A    That's correct.
12   BY MR. COSBY:
13        Q    There was no determination or investigation to
14   reveal whether cleats existed where the pans were away
15   from the ridges, correct?
16        A    In the investigation after the hurricane, that
17   is correct.
18        Q    So you answered it a certain way.  What about
19   any investigation before the hurricane?  Is it the same
20   answer?
21        A    Well, I'm sorry, I thought you were talking
22   about after the hurricane.
23             In the 2014 report, we opened the section on
24   the west side that showed that in a section there were
25   three cleats that were on average 9.5 inches.
```

Page 24

1     Q    Was that along the ridge or in a pan area?

2     A    It's a pan area.

3     Q    Okay.  So there's -- let me reask the question.

4          One, there had been confirmation at least for a

5     portion of the main pavilion roof that clips or cleats

6     were used on the pans themselves in the area you just

7     mentioned on the west side, correct?

8     A    Yes.  Yes.

9     Q    Or whatever side it was that you investigated.

10    I know we've had some discussion over directions.

11    A    Yes.

12    Q    But there was no -- my question was, there was

13    nothing that confirmed that there were no cleats on the

14    pan areas, not the ridge lines, but the pan areas of the

15    side of the roof where there was an open seam, correct?

16    A    Correct.

17    Q    In your report you have a number of things that

18    you indicate you were asked to determine under

19    investigation, and one of them is what caused damage to

20    the copper roof under Number 4.  Certainly, we know, and

21    I think we discussed a little bit last time that there

22    were things that damaged the copper roof that have

23    nothing to do with cleats, correct?

24    A    Correct.

25    Q    Flying debris, that doesn't have anything to do

Page 25

1    with cleats, correct?

2         A    That's true.  Correct.

3         Q    There were no specific pans missing due to the

4    storm, correct, on the main pavilion?

5         A    That's true.

6         Q    As you looked at the investigation -- well, the

7    investigation, as I said, has a number of different

8    things you were asked to determine.  One was did Daybreak

9    install cleats on an average of 9.5 inches on center on

10   the main pavilion copper roof.

11            Your answer was cleats were not installed at

12   9.5 inches on center.  You don't know if there were

13   cleats -- you can't say that there were no cleats at all

14   on that -- strike that.

15            You're not saying that there were no cleats any

16   where on that main pavilion roof, correct?

17        A    That's correct.

18        Q    You say during the April 2018 site visit the

19   ridge lines between the pans on the east side of the main

20   pavilion failed by opening up during Hurricane Irma.  The

21   only -- you used the plural, ridge lines.  The only one

22   we know of is the one that was opened in Exhibit 40 --

23   not Exhibit 40, but photo 40, correct?

24        A    Yes.

25        Q    That we just went over.

```
                                                        Page 26
 1          A     Yes.
 2          Q     It really should read ridge line between those
 3    pans, correct?
 4          A     It couldn't be -- it should say the singular
 5    instead plural.
 6          Q     But you later say, "my inspection at that time
 7    confirmed that there are multiple sections along the
 8    sloped witches hat that opened up since there were no
 9    cleats as required by the contract."
10          So let me make sure I understand what you're
11    saying there.  When you say multiple sections, do you
12    mean multiple sections of a single ridge line or multiple
13    ridge lines?
14          A     Multiple sections of the singular ridge line.
15          Q     Okay.  And that's really the crux of what I'm
16    asking you.  There's a single ridge line that opened up
17    that was inspected and determined or suspected there were
18    no cleats, correct?
19          A     That's correct, yes.
20          Q     Had you took photographs with a drone on your
21    visit?
22          A     No.
23          Q     There were drone photographs listed in your
24    report.  Who operated the drone?
25          A     I believe the owner got someone to have those
```

Page 27

1     drone photographs taken.

2          Q    Mr. Friedberg did?

3          A    Yes.

4          Q    Okay.  Do you know when those drone photographs

5     were taken?

6          A    I don't have any specifics about when those

7     were taken.

8          Q    Okay.  Under the same explanation paragraph

9     regarding Number 1, cleats not installed at 9.5 inches on

10    center.  There is a drone photograph listed, Photo 1, and

11    then, underneath that you say, "During the April 2018

12    site visit, the ridge lines between the pans on the east

13    side of the main pavilion failed by opening up."

14          We're only talking about a single ridge line, I

15    think we established, correct?

16                    MR. FRIEDBERG:  Objection to form.

17          A    Yes.

18    BY MR. COSBY:

19          A    Can I see that photo?

20          Q    Drone photo of the overall view.  You didn't

21    take that photo, correct?

22          A    No.  That was drone.

23          Q    Is that your language, drone photograph with

24    overall?

25          A    Yes.

Page 28

1      Q    Do you have any better quality photo than this
2  one that I see, which to me is a little grainy?
3      A    I don't have any of the original drone
4  photography.
5      Q    Did you at some point have that because you put
6  it in your report?
7      A    I don't remember.  You know, I know that I used
8  images in the report to the show the storm damage, but I
9  don't know what form that came in.  I think it was a
10  video, but I'm not sure.
11      Q    All right.  So Photo 2 shows, photo of failed
12  ridge line.  Well, look at Photo 2 before we talk about
13  what the --
14      A    Yes.
15      Q    -- caption is.
16          This is not a drone photo, is it?
17      A    No.  That's my photo.
18      Q    You took that?
19      A    Yes.
20      Q    While on the roof, correct?
21      A    Yes.
22      Q    And that's the ridge line we've been talking
23  about, correct?
24      A    Yes.
25      Q    The same one that's in 40 of that other

Page 29

1    exhibit?

2         A    Same ridge line.

3         Q    Same ridge line.

4         A    Much further up.

5         Q    Not same photo, but same ridge line as in 40,

6    correct?

7         A    Yes.

8         Q    Was there any damage to the west side of the

9    main pavilion post Irma?

10             Or if my directions are correct, when you say

11   the west side of the roof of the main pavilion as well as

12   the roofs of the other six buildings did not fail in

13   Hurricane Irma?

14        A    Yes.  That's true.  The west side being the

15   leeward side of the storm.

16        Q    Meaning the force of the storms would be on the

17   east side, the higher forces, correct?

18        A    The north and east.

19        Q    Is that correct, north and east?

20        A    Yes.

21        Q    Do you have any photos of any open seams other

22   than the one we see in photograph 2 of your report that

23   we just looked at or 40 of that other report?

24        A    I have no other photographs.

25        Q    You mentioned the failure of cleats along that

1    ridge line caused failures of pans on the main pavilion

2    roof.  Do you have any photographs that show failure of

3    pans?

4         A    I'm saying it's the warping of the pans

5    adjacent to those areas.

6         Q    Do you have photos that show that?

7         A    I think there's photos that Tom took that were

8    submitted showing the bow in the pans.

9         Q    Did you take any photos that show any bowing of

10   pans?

11        A    I think there's just probably some in that

12   group of photos.  I'd have to look through them.

13        Q    Do you have your photos?

14        A    I don't have them printed.  They were

15   submitted.

16        Q    What do you have with you today behind you?

17        A    I just have the documents that I brought

18   previously.

19        Q    Do you have photos?

20        A    I don't have printed photos, no.  I think they

21   were submitted electronically.

22        Q    I think I've got them.  We'll look at those in

23   a minute.

24             You note that there are a total 160 panels on

25   the main pavilion, is that correct?

Page 31

1          A     I don't remember coming at that number, but --

2          Q     Well, it says -- this is your report.  Page 10.

3     The drawings indicate damage to more than 80 panels.

4     Hoffman Architect recommends that the entire main

5     pavilion roof be replaced: a total of 160 panels.

6          A     I must have made an error there.  There are --

7          Q     I think you answered it.  Is that correct,

8     there are --

9          A     Twenty-one times 8, I believe.  Maybe 168.

10     There's ten panels on each side of the center panel so

11     there are 20 panels each, each octagon.

12          Q     You indicate you estimate that 95 percent of

13     the cost of copper in the 2018 report is for the main

14     pavilion.  Walk me through the calculation to get to that

15     estimate.

16          A     I used Huber's estimate of 8,400 square feet,

17     and substracted a number that I thought was square

18     footage of the main pavilion itself.

19          Q     Did you say you used Huber's, something from

20     Huber?

21          A     Yeah.  The original contract said there was

22     approximately 8,400 square feet.

23          Q     Of main pavilion?

24          A     Yeah.

25          Q     Well, let's go back to your report on page 10.

Page 32

1    You say there's a total if 160 panels totaling 3,520

2    square feet.  Is that the total area of the roof, or not?

3         A    I think that's what I came up with, yes.

4         Q    Okay.  So it's not 8,000.  It's 3,520, correct?

5         A    For the main pavilion?

6         Q    Right.  That's what you say here.  I'm trying

7    to understand if that's what you meant.

8         A    Yes.  Well, if you ratio that to the overall

9    project, I guess I was wrong as far as percentage wise.

10        Q    Okay.  So what would that ratio be relative to

11   the whole project?

12        A    Well, let's just say 35 over 85, which is 7

13   over --

14        Q    Less than 50 percent?

15        A    A little less than 50 percent.

16        Q    Okay.  So the statement, I estimate that

17   95 percent of the cost of copper in the 2018 report is

18   for the main pavilion is incorrect?

19             MR. FRIEDBERG:  Objection to form.

20        A    I don't -- I don't recall.  I'd have to go back

21   and redo that calculation to understand why I came up

22   with that number.

23   BY MR. COSBY:

24        Q    Okay.  But do you think you put pencil to paper

25   as opposed to, you know, a less intensive estimate?  In

1    other words, eyeballing it or that kind of thing?

2        A    Yeah, I don't know.

3        Q    You don't know one way or the other?

4        A    I don't remember, no.

5        Q    Okay.  But there's no where in the report that

6    breaks that down as far as calculations, correct?

7        A    No.

8        Q    And you don't have any notes that show that,

9    correct?

10        A    No.

11        Q    Correct?

12        A    That's right.

13        Q    Now, then you jump to -- strike that.

14            All right.  So let move to something else.

15            You do have your 2014 report, correct?

16        A    Yes.

17        Q    Let's look at that.  May I take a look at

18    yours, your report?  This was Exhibit 2 to the prior

19    deposition.  The things that you were asked to do under

20    the investigation section of your '25 report, 2025

21    report, were -- that's what you were asked to do in

22    approximately March of 2025 when Mr. Friedberg indicated

23    you were going to be an expert, is that correct?

24        A    Yes.

25        Q    Did you actually come up with some cost

Page 34

1  estimate of the roof or was that somebody else that did

2  that?

3       A    That was -- in the 2025, the current report,

4  the costs that were in there were related to basically

5  updating the data cost report.

6       Q    Okay.  The 2014 does not have any cost estimate

7  to replace the roof, correct?

8       A    I'm not sure.  I'd have to check.

9       Q    Well, isn't this it, what's in front of us?

10      A    You said the 20 --

11      Q    I'm sorry, the 2014 report, Exhibit 2, does not

12 have any cost estimate to replace the roof, correct?

13      A    No.  It was -- well, in the exhibit summary it

14 has a cost amount.

15      Q    What page is that?

16      A    That's in the summary.

17      Q    The bottom says, opinion of the probably cause

18 to construction is 7,500 -- excuse me, 759,357?

19      A    Yes.

20      Q    But that's as to all roofs.  That's not as to

21 the main pavilion alone, correct?

22      A    My recollection is that the only work that is

23 noted to be done in that report was the main pavilion.

24      Q    Well, doesn't the bottom of page 1 of your 2014

25 report say, "Hoffman Architects recommends removal and

Page 35

1    replacement of all roofs."

2            That's what it says, correct?

3       A    Yes.  I guess that's what it says.  Not my

4    recollection.

5       Q    So there's no cost designation in the 2014

6    report that shows us what the main pavilion roof alone

7    would cost to replace, correct?

8            I'm talking about this report and not that one

9    (indicating).

10      A    Yeah, I know.

11      Q    The 2014.  Am I correct?

12      A    Yes, that's correct.

13      Q    Now, is there such a thing in the 2018 report

14   as to the main pavilion cost of replacement -- not any

15   other roof.

16      A    The 2018 report was the damage from the

17   hurricane and there was a cost estimate in it.

18      Q    My question was, is there any --

19      A    Is it separated out for the main --

20      Q    Correct.

21      A    -- pavilion?

22           Is it separated out?  No, it is not.

23      Q    You understand that the cost for any other

24   roofing system on other buildings don't pertain to any

25   issue in this lawsuit, correct?

                                                    Page 36

1          A     Right.  And -- yes.

2          Q     What was the cost?

3          A     To clarify what this estimate was for, was for

4     storm damage.  So it was not -- it was full replacement

5     of the pavilion but it was storm damage to the other

6     roofs, not total replacement.

7          Q     So did it include any itemization of solely the

8     main pavilion?

9                    MR. FRIEDBERG:  All right.  Let me just

10               object to form.

11                    And just for a point of clarification, the

12               2014 report, at least my electronic copy, has a

13               complete breakdown by building.

14                    MR. COSBY:  This is 2018.

15                    Stop with the speaking objections.

16                    MR. FRIEDBERG:  No, I'm just trying to

17               find out where you're going with this because

18               --

19                    MR. COSBY:  I'm not talking about 2014.

20                    MR. FRIEDBERG:  I appreciate that.

21                    MR. COSBY:  I'm talking about 2018.

22                    MR. FRIEDBERG:  I understand that.  But

23               you previously were asking about the 2014 and

24               said there was no break down.  Actually, there

25               is a break down.

```
                                                          Page 37

 1                    MR. COSBY:  Well, you're doing a speaking
 2              -- you're coaching the witness.
 3                    MR. FRIEDBERG:  I'm not coaching.  I'm
 4              just clarifying -- you had asked the question.
 5              He doesn't have the full documentation.
 6                    MR. COSBY:  Yes.
 7                    MR. FRIEDBERG:  You can object and say
 8              what you want, but the documents are the
 9              documents.
10                    MR. COSBY:  If the documents are the
11              documents, then there's no need for you to say
12              anything, so --
13         A    Well, I just have --
14    BY MR. COSBY:
15         Q    Let's stick with the question we are on now.
16    Put the 2014 report aside.
17              Is there anything in the 2018 report that
18    designates the cost to replace the main pavilion roof?
19                    MR. FRIEDBERG:  Objection to form.
20    BY MR. COSBY:
21         Q    Solely that.  Not other things.
22                    MR. FRIEDBERG:  Objection to form.
23         A    The answer is no.
24    BY MR. COSBY:
25         Q    Okay.  Going back to the 2014 report, is there
```

Page 38

1   -- put that one aside.  I want you to focus on my

2   questions.

3          The 2014 report, is there anything that

4   designates the cost to replace the main pavilion roof

5   only in that 2014 report?

6                  MR. FRIEDBERG:  Objection to form.

7       A    The answer is no.

8   BY MR. COSBY:

9       Q    The cost estimate in the 2014 report, that

10  total number that we went over, 700,000 and whatever it

11  was, who calculated that figure?

12      A    Hoffman Architects.

13      Q    Who at Hoffman Architects?

14      A    Well, me.  And it also included numbers from

15  people at Springline and construction management firm.

16      Q    Well, let me make sure I understand who you're

17  talking about.

18          Springline is another architect?

19      A    Yes.

20      Q    Were they the architect on the job?

21      A    There was no architect -- they were the

22  architects of the original buildings.

23      Q    Okay.

24      A    The reason for other people getting involved is

25  logistics, construction management and oversight of the

Page 39

1    project.

2        Q    Okay.  And who was the construction management

3    company?

4        A    I've forgotten who Springline recommended.

5        Q    Okay.  So those two entities were consulted by

6    you in terms of preparing that estimate?

7        A    Yes.

8        Q    Okay.  So is there an estimate located in your

9    Exhibit 2?

10        A    Well, I'm not sure what is here in the printed

11    copy, but --

12        Q    Well, this is what you provided at the last

13    deposition, correct?

14        A    Yeah.  Well, I may have had an incomplete file.

15    I don't remember what was in my own hands.

16        Q    Let's look at the 2018 construction cost

17    estimate.  Is this in a similar form as the cost estimate

18    for the 2014 report?

19        A    Yes.  And Dayhill backup.

20        Q    And what?

21        A    And the Dayhill backup to that.

22        Q    What do you mean by the Dayhill backup to that?

23        A    The contractor's portion of the -- of the

24    estimate.

25        Q    Okay.  Did you use the Dayhill estimate for any

```
                                              Page 40
 1    purpose?
 2         A    For any purpose, what do you mean by that?
 3         Q    I don't see it referenced in your report per
 4    say.  I know it's attached, but I don't see any reference
 5    to the Dayhill report.  Did you utilize it in terms of
 6    your estimate?
 7              MR. FRIEDBERG:  Objection to form.
 8         A    Yeah, I believe so.  Yes.
 9    BY MR. COSBY:
10         Q    Okay.  Well, let's look at the construction
11    cost estimate that you prepared in -- it's dated July 27,
12    2018.  Do you have that?
13         A    Yes.
14         Q    Okay.  The first thing is storm damage
15    investigation report, that $30,000 is not part of
16    replacing the roof, correct?
17         A    That's correct.
18         Q    And, in fact, I don't know if you know if Ms.
19    Doland has taken that out of her figures, are you aware
20    of that?
21         A    Yes.
22         Q    Architect of record, is that Springline?
23         A    It was to be determined.
24         Q    Where did the $3,000 figure come from?  Where
25    did the $3,000 figure come from?
```

1          A    Just an estimate from our office of what

2     oversight might be.

3          Q    Okay.  I thought you said earlier that

4     Springline was consulted.  Just so I'm clear, that was

5     just from Hoffman, not anything to do with Springline?

6          A    No.  I'm sorry.  I stand corrected.  It was

7     intended to be Springline or another local architect.

8          Q    Did you get that number from Springline?

9          A    Yes.

10         Q    Is that noted somewhere?  Do you have notes

11    from what you called Springline or who you talked to at

12    Springline?

13         A    No.

14         Q    Copper roof plans and details and estimates,

15    $25,000.  Where does that number come from?

16         A    It came from an estimate of what it would take

17    to do detailed drawings for a copper roof.

18         Q    From Springline?

19         A    No.  From Hoffman, in-house.

20         Q    You're talking about architectural plans?

21         A    I'm talking about detailed copper roof plans.

22         Q    That could be prepared by Hoffman?

23         A    Yes.

24         Q    Or Springline?

25         A    Probably not Springline.  They wouldn't have

Page 42

1    the expertise to do that.

2        Q    I'm trying to understand.  Why do we need

3    Springline if Hoffman Architects is --

4        A    It's a local source for oversight.

5        Q    Okay.  And where is Springline located?

6        A    In the Virgin Islands in St. Thomas.

7        Q    Okay.

8        A    And as of what I know now they don't exist

9    anymore.

10       Q    Okay.  But at the time that this was made they

11   did exist and this was the number, correct?

12       A    Yes.

13       Q    Copper roof plans and detailing estimate,

14   25,000.  That's a Hoffman estimate.  How did you

15   calculate it?

16       A    It was just based on what the average cost for

17   doing a similar roof.

18       Q    Is that a single architect or more than one

19   person?

20       A    It's got to be a drafting personnel and

21   architect.

22       Q    Shop drawings, that would be by Hoffman?

23       A    No.  Those would be by the fabricator who would

24   fabricate the material to be shipped out.

25       Q    And where did you get that number?

```
                                              Page 43
 1        A    I've got it from Dayhill.  They were
 2   contemplating a company in Long Island to fabricate.
 3        Q    Who was that?
 4        A    I don't know the particular name.
 5        Q    Was that listed in their estimate anywhere?
 6        A    I'm not sure.
 7        Q    Do you see any $9,500 estimate in their number,
 8   their estimate, the breakdown?
 9        A    If they are purchasing the copper from a
10   fabrication shop it might be just in the copper number.
11        Q    Next is under general conditions, materials,
12   transient and coordination, so that calculation is based
13   on the transport of materials from St. Thomas as to St.
14   John, and then from St. John to the particular property?
15        A    Yes.
16        Q    As opposed to getting them to St. Thomas,
17   that's not included in that, correct?
18        A    Right.
19        Q    General materials is the same number.  How is
20   that calculated?
21        A    It was just a place holder.
22        Q    Okay.  Mobilization and scaffold, was that an
23   estimate where you consulted some source?
24        A    I think that came about from some questioning
25   of Springline in talking about local pricing.
```

Page 44

1          Q    Other than from Dayhill, do you have any backup
2     invoices, estimates or paperwork that is supporting any
3     of these numbers?
4          A    They would have been in Hoffman files, but the
5     paper files are gone.
6          Q    The answer is no, you do not have that?
7          A    I do not.
8          Q    You have copper crew, lodging and meals.  What
9     do you mean by copper crew, the installers?
10         A    The installers, yeah.
11         Q    Okay.
12         A    Those are numbers that Tom helped to come to.
13         Q    Tom Friedberg?
14         A    Yes.
15         Q    Does that assume three people?
16         A    No, I think it would assume to be six.
17         Q    Why is the quantity three?
18         A    I believe it's three weeks.
19         Q    I got you.  Sorry, I got confused.
20              That's just the lodging and meals for the six
21     people?
22         A    Yeah.
23         Q    And did they double up?
24         A    Yeah.
25         Q    For lodging, I mean?

Page 45

1          A     Yeah.

2          Q     And then, under copper roofing we have the

3    materials to get the copper to St. Thomas, $89,000,

4    correct?

5          A     Yep.

6          Q     At some point I saw --

7          A     Actually, that's months in the copper crew

8    lodging.

9          Q     Three months?

10         A     Yeah.

11         Q     Okay.  Back to copper materials, transport to

12   St. Thomas, 89,000.  I saw a note somewhere in your

13   report that said Mr. Friedberg was going to provide the

14   copper?

15         A     That goes back to the original contract.

16         Q     Okay.

17         A     So there -- if I'm not mistaken, in the

18   original contract there was a problem with theft of

19   copper that was designated for the project and I believe

20   that the original shipment of copper was paid for by the

21   owner independent of the contractor's price.

22         Q     Got you.  Okay.

23               So copper materials for the replacement was

24   $89,000, correct?

25         A     Yes.

Page 46

1          Q     And then, the labor for two months for six
2     people is $360,000, is that correct?
3          A     Yes.
4          Q     What is that per hour?
5          A     I'd have to go back.  I would have to go back
6     to my paper notes, which don't exist.
7          Q     The Dayhill estimate was in 2020, correct?
8          A     Yeah.
9          Q     And estimate that we're going over was 2018?
10         A     Yeah.
11         Q     So I don't see the labor numbers was way off
12    compared to what I see in Dayhill.  I see for you it's
13    360,000.  For the Dayhill estimate I see a little over
14    $100,000, plus 60,000 in premium time or overtime labor,
15    plus a supervisor rate, which totals with quick math
16    under $200,000 for labor.
17                   MR. FRIEDBERG:  There's no question.
18    BY MR. COSBY:
19         Q     Do you know what the reason for the difference
20    is the between what the Dayhill estimate and your
21    estimate is?
22                   MR. FRIEDBERG:  Objection to form.
23         A     No. I never made a compound -- a comparison.
24    BY MR. COSBY:
25         Q     Where did you get your number?

Page 47

1          A      Probably asking about labor rates, and probably

2      back then using a premium number on what I need to be

3      labor rates from the Dayhill people.  So I'm not sure why

4      there's such a big difference.

5          Q      Did Mr. Friedberg provide you any information

6      for the labor number?

7          A      No.

8          Q      And under that, do you know what the hourly

9      rate was for those laborers?

10         A      Probably 90 to 100.

11         Q      And then you have a category that says island

12     labor.  Is that an either or, or both, were needed?

13         A      Both are needed.  I mean, you need island labor

14     just to put up scaffolding, and clean up the site, et

15     cetera.

16         Q      Is that what that's for or is it --

17         A      Yes.

18         Q      -- or is it for installation?

19         A      No.  It's not related to the copper

20     installation.  It's related to moving things around the

21     site, et cetera.

22         Q      Okay.  So your labor numbers alone exceed the

23     estimate provided by Dayhill in 2020, correct?

24                     MR. FRIEDBERG:  Objection to form.

25     BY MR. COSBY:

Page 48

```
 1          Q     Is that correct?
 2          A     Well, if you're telling me it is, yes.
 3          Q     All right.  $471,800 exceeds 449,000, correct?
 4          A     Yes.
 5          Q     And then, you have administration of the
 6    construction, Hoffman Architects, two whole weeks with
 7    travel and expenses.  Is that one person or two, or how
 8    did Hoffman Architects --
 9          A     It would be just one person.
10          Q     Contractor oversight is 15 percent of what?
11          A     The overall.
12          Q     And the site supervision, what's the
13    difference?
14          A     Local site supervision.
15          Q     And CM travel, who is CM?
16          A     Probably CM coming out of St. Thomas and having
17    to take the ferry over for the day.
18          Q     All right.  In Dayhill's estimate you
19    understand does not separate out the main pavilion
20    either, correct?
21          A     Dayhill's estimate for the -- related to the
22    storm report is not separated out from the main pavilion.
23          Q     That $449,000 does not separate out replacement
24    of the main pavilion alone, correct?
25          A     Correct.
```

                                                        Page 49

1          Q    So I have some folders that were on that drive.

2     I have all of them that were on that drive you provided

3     last time.  Where would -- I wanted to get back to, you

4     said there were photos that showed damage to panels, and

5     I don't mean puncture damage.  I mean other damage.

6               So I've got a folder that says photos, a folder

7     that says Dayhill photos, photos from Hoffman box files

8     and other photos filed --

9          A    Let me Hoffman.

10         Q    This one (indicating)?

11              Let me see if I can get these bigger.  Let me

12    do this.

13              Can you find any pictures of damage, not

14    puncture damage or storm flying debris damage, but you

15    mentioned panels being damaged due to no cleats.  I'd

16    like to see that.  And I mean pans away from the ridge.

17         A    I wanted to show one that has bowed in the pan,

18    but it's hard at that scale.  These are all very similar

19    in the file there.

20         Q    Let me see if I can find it.

21              Back to the Dayhill estimate for a moment.

22    Were you doing an independent estimate or did you rely on

23    Dayhill's estimate in forming yours?

24         A    I was relying on input from Dayhill doing my

25    estimate.

```
                                                Page 50
 1        Q    What does that mean?  Did you speak with
 2    someone or did you use their estimate or both?
 3        A    I spoke with them and they gave us an estimate
 4    as well.
 5        Q    Who did you speak with at Dayhill?
 6        A    Probably both the previous owner, Jamie McAdam,
 7    as well as Richie Maiocci.
 8        Q    Did you ever speak to Mr. Barabas about the
 9    estimate?
10        A    No.  I don't think I did.
11        Q    Are you aware that he prepared the estimate on
12    behalf of Dayhill?
13        A    No, I wasn't aware of who actually prepared it.
14        Q    Are there any photos in your 2018 report which
15    show damage to pans, separating out puncture, flying
16    debris type damage?
17        A    Photo 28 shows the pan uplifted.
18        Q    Let me see that.
19             Where in that photo?  Is that your shoe?
20        A    No. I believe that's Tom's shoe.  And it's
21    bulged in that part.
22        Q    Where?  Tell me specifically where.
23        A    You know what, I do recognize that shoe.
24    That's mine.  Under the shoe that's my hand.
25        Q    Well, we can't see under the shoe.  So where
```

Page 51

1      does it show a bulge?

2          A    It's like I was pressing on it.  I recognize

3      the bulge by pressing on it.

4          Q    So I understand -- or just so I understand, we

5      can't see the bulge in the photo.  You're describing what

6      you had experienced on the roof?

7          A    Yes.

8          Q    Is that correct?

9          A    Yes.

10         Q    Okay.  What area of the roof is that

11     directionally?

12         A    I think it probably the southeast.

13         Q    Is it main pavilion?

14         A    Yes, the main pavilion.

15         Q    The photo doesn't indicate which direction,

16     correct?

17         A    That's correct.

18         Q    Keep looking.

19         A    This is further over to the west.

20         Q    What number?

21         A    29.

22         Q    And then, the same thing, can we see the bulge

23     in the photo?

24         A    No.

25         Q    It's just a picture of your foot?

```
                                                   Page 52

 1          A    Yes.

 2          Q    And we don't know directionally where that is

 3     according to the caption, correct?

 4          A    Yes.

 5          Q    Do you know otherwise where that is?

 6          A    Just by the sun setting in the afternoon.

 7          Q    And what does that mean?  Can you tell us what

 8     area of the roof that is?

 9          A    It's the southwest corner.

10          Q    Okay.  I thought you said there was no damage

11     to the west side?

12                    MR. FRIEDBERG:  Objection to form.

13     BY MR. COSBY:

14          Q    Other than maybe debris damage.

15          A    And other than the uplifting.

16          Q    Well, hold on a second.  Let's stop there for a

17     minute.

18               I thought you said there was uplift on the east

19     side and there was no uplift damage to any other

20     structure or to the west side, you noted the west side

21     was cleating back in 2014, thus you concluded the east

22     was not cleated?

23          A    I was probably thinking that in the terms of

24     debris denting, et cetera, on the west side as opposed to

25     bulging and uplift in the panels.
```

Case: 3:19-cv-00053-RAM-EAH    Document #: 105-7    Filed: 01/07/26    Page 54 of 88

```
                                                    Page 53
 1          Q    Let me make sure I'm clear.
 2               Are you saying now that there is uplift damage
 3     on the west side of the roof?
 4                    MR. FRIEDBERG:  Objection to form.
 5          A    On the southwest side of the roof.
 6               I think --
 7     BY MR. COSBY:
 8          Q    Hold on a second.  There's no question pending.
 9               So let's get back to page -- we went over this
10     previously today, but let make sure I understand it
11     because I think you said something that makes me think I
12     don't understand it.
13               Under Number 2 of your investigation on page 7
14     of your 2025 report you say, "Failure to install cleats
15     subjected the copper panels to loosen and failure."
16               Does that sound familiar?
17          A    I don't have that.
18          Q    Okay.  Does that sound familiar?
19          A    I'm sorry, read it again, please.
20          Q    Under Number 2 you state, "Failure to install
21     cleats subjected the copper panels to loosen and
22     failure."
23               We've established that right, correct?
24          A    Yes.
25          Q    Okay.  You state in the second paragraph of
```

800-567-8658                                            973-410-4098

Page 54

```
 1    that, that "It should be noted that in 2014 on the west
 2    side of the main pavilion a section of the panels
 3    standing seam rib was opened up to confirm the existence
 4    of cleats in the spacing.  It was noted that the cleats
 5    were present and spaced at 8 inches, 9 inches and 10
 6    inches, which is consistent with an average spacing of
 7    9.5 inches on center.  The west side of the roof of the
 8    main pavilion, as well as the roofs of the six other
 9    buildings, did not fail on Hurricane Irma.  This supports
10    my opinion that this roof with properly spaced and
11    secured cleats as required by the contract was capable of
12    surviving Hurricane Irma without failure."
13             So that doesn't sound to me like there's uplift
14    on the west side.
15                     MR. FRIEDBERG:  Objection to form.
16    BY MR. COSBY:
17        Q    Do you agree?
18        A    It didn't include -- it didn't include the
19    uplift on the west side.  When I say west, I'm talking
20    about southwest.
21        Q    All right.  But that is still -- there's no
22    mention of any south side uplift damage in your report,
23    is there?
24                     MR. FRIEDBERG:  Objection to form.
25        A    I may not have included it on photographic
```

Page 55

1    reference, no.

2    BY MR. COSBY:

3        Q    Or in writing, correct?

4            MR. FRIEDBERG:  Objection to be from.

5    BY MR. COSBY:

6        Q    Correct?

7        A    Yes.  Correct.

8        Q    Under Number 4 of your -- strike that.  Never

9    mind.

10            You mention in the superior court case

11   deposition that there were issues with the length of the

12   panels, in other words, the expansion and contraction

13   issues.  Do you remember that?

14       A    Yeah.  Anything over 30 feet is not

15   recommended.

16       Q    Okay.  Would that contribute to damage in a

17   storm?

18            MR. FRIEDBERG:  Objection to form.

19       A    I don't think it's ready.

20   BY MR. COSBY:

21       Q    Well, what's the impact of the inability of

22   panels to expand and contract?

23       A    Potential cracking.

24       Q    And were there areas where the panels were two

25   short along the edge of the roof?

Page 56

1      A    Along the ridge of the roof.

2      Q    I don't know, what do you define the ridge as?

3      A    The ridge is the intersection of the two --

4      Q    I said the edge of the roof.

5      A    Two short at the edge of the roof.  I don't

6 believe there were any cases like that.

7      Q    Okay.

8      A    Meaning that, the edge of the roof, the copper

9 is tucked over unedged piece.

10     Q    No issues with that?

11     A    Not that was -- no.

12     Q    You mention options in terms of the re-roofing

13 with regard to the pans and the length?

14     A    Yes.

15     Q    So you indicated there's a problem -- I guess a

16 practical problem at least, with panels that are over

17 33 feet in length?

18     A    Yes.

19     Q    And you say three different options.  No, you

20 say two options.  Although, there were three numbers.

21 It's either two or three.  But you say to reinstall any

22 kind there are two options.  One, pre-fabricate and ship

23 in a 40-foot container, which is not an option, because

24 the container could not be transported to the site.  So

25 that's a logistics issue, correct?

```
                                              Page 57
 1        A    Yech.
 2        Q    Number 2, roll the pieces on-site.  Is that
 3   what was done originally?
 4        A    That's what was done originally.
 5        Q    You say there's no rolling machine on the
 6   island.  How do we know that?
 7        A    Because that was the way previously.  That
 8   condition hasn't changed.  They shipped the rolling
 9   machine to the site.
10        Q    How do we know there's not one currently there?
11        A    I checked with the local sources and there's no
12   rolling machine.
13        Q    When did you get?
14        A    Back in 2019.
15        Q    We're now in 2025, correct?
16        A    Yes.
17        Q    I'm not saying there is one, but the
18   possibility exist there is one, correct?
19                  MR. FRIEDBERG:  Objection to form.
20        A    I think that's a possibility, yes.
21   BY MR. COSBY:
22        Q    In any event, if there isn't one there would
23   need one transported there, correct?
24        A    Yes.
25        Q    You say that option was considered but was
```

Page 58

1    found to be quite costly because of the transportation

2    cost and the higher cost of on-site fabrications.  Let's

3    break that down.

4           How did you calculate the transportation cost

5    of a rolling machine?

6       A    I got that from Dayhill, who got it from

7    somebody.

8       Q    Is that in the Dayhill estimate?

9       A    No.  Because they weren't going to do it that

10   way.

11      Q    So we don't know the source for that, is that

12   correct?

13      A    Yes, that's correct.

14      Q    And then, you say the higher cost of on-site

15   fabrication.  What's higher about the cost of doing an

16   on-site fabrication versus off-site?

17      A    You have to roll it.  You have to store it

18   there.  I mean, it's just easier for somebody who is in

19   the fabrication business, like this firm in Long Island,

20   that rolls, cuts.  Traditionally, copper roofs are done

21   in 10-foot increments.  You can probably in conjunction

22   with the fabricator figure out whether maybe two pieces

23   of copper form the length up to the witches hat, and then

24   so on.

25          But it's just better to do it that way than

Page 59

1   hand rolling it and hand cutting or breaking the pieces
2   on-site.
3       Q    Are there benefits to having a roller on-site?
4       A    Well, perhaps, if you screw up something you
5   need --
6       Q    In other words, you don't have to ship a whole
7   new pan or pans.  You can cut it on-site, correct?
8       A    Yes.
9       Q    Then, the second one is the -- if the roof is
10  re-installed with panels of less than 20 feet the copper
11  can be fabricated off-site and shipped in a 20-foot
12  container.  This solution is the least expensive.
13           Is there any issue with getting a 20-foot
14  container up the property since a 40-foot container did
15  not work?
16      A    I've forgotten.  I know we had discussions
17  about the original project and what happened with the
18  container, but I don't remember.  I don't think there was
19  a problem with the 20-foot container.
20      Q    Was any container utilized before?
21      A    I believe so.
22      Q    How big?
23      A    I don't know.
24      Q    Let me just look over my notes.  I think I'm
25  about finished.

```
                                                         Page 60
 1                MR. COSBY:  All right.  That's all I have.
 2           That's all the questions I have for you.
 3                THE WITNESS:  Okay.
 4                MR. COSBY:  Other than one thing -- I'm
 5           sorry, I do have another question.
 6                Hang on.
 7      BY MR. COSBY:
 8           Q    Mr. Sanders, did you bring the documents that
 9      -- I assumed you obtained those documents from Hoffman?
10           A    Yes.
11           Q    Do you have those today?
12           A    I think I sent them to you.
13           Q    My question is, do you have those with you --
14           A    No, I don't.
15           Q    -- with you today?
16           A    No.  I thought the electronic was sufficient.
17           Q    Did you look at the amount you billed in that
18      other matter?
19           A    I briefly reviewed those, yes.
20           Q    What was the amount?
21           A    Overall?
22           Q    Yeah.  Of this first case.  The superior court
23      case.
24           A    That was billing all the way through --
25           Q    So what was it?
```

```
                                                      Page 61
 1         A      It was a big number.  It included, you know, --
 2     it included I believe the storm damage report.
 3                      MR. FRIEDBERG:  He just wants to know if
 4             you know the number.  That's all.
 5         A      Yeah, I don't know offhand.  There were six
 6     invoices, right?  Over a period of five years.
 7     BY MR. COSBY:
 8         Q      My question was simply, do you know what the
 9     number was?
10         A      No.
11         Q      Is it over $50,000?
12         A      I think it was close to it.
13         Q      All right.
14                      MR. COSBY:  Let's take a break for a
15             moment.
16                      (Whereupon, a recess was taken.)
17     BY MR. COSBY:
18         Q      So listed as -- at your last deposition as
19     Exhibit 14 was items that involved the invoices from
20     Hoffman Architects, which you obtained and sent to us,
21     correct?
22         A      Yes.
23         Q      The first invoice is Invoice Number 256803,
24     dated March 6th of 2018, with an invoice total of $2,406,
25     is that correct?
```

```
                                              Page 62
 1          A    Yes.
 2          Q    The next invoice is 255796, dated July 17,
 3     2017, with a total of $22,193.96, correct?
 4          A    Yes.
 5          Q    And then, the next invoice is 256387, dated
 6     November 22, 2017, and it's $1,140?
 7          A    Hm-hmm.
 8          Q    Yes?
 9          A    Yes.
10          Q    And then, we have -- I'm sorry.  It's actually
11     going into the next page.  It was not 1,000.  It was
12     $22,193.96, correct?  I read you that number by accident.
13          A    Okay.  Keep scrolling up.  Go up.
14                    MR. FRIEDBERG:  Objection to form.
15     BY MR. COSBY:
16          Q    Is this $1,140 one a separate invoice?  It
17     looks like it is.  Let me reask the question.
18                    It's a different invoice number.
19          A    It was outstanding there.
20          Q    Okay.
21          A    That's a running total.
22          Q    So the invoice was for $1,140, then we show the
23     amount outstanding?
24          A    Which probably included other invoices.
25          Q    22,193.96, right?
```

Page 63

1          A     Yes.

2          Q     Next one shows -- it's 252498, dated May 22,

3     2015, that's an invoice totaling $1,750?

4          A     Yes.

5          Q     And then, we have one in April of 2015,

6     April 22nd, Invoice 242435, that's $3,087.50, correct?

7          A     Yes.

8          Q     And then, we have February 10th, 2015, Invoice

9     242246, $2,800?

10         A     Yes.

11         Q     In that invoice summary it says the total bill

12    is 38,000.  The prior bill was 35,000, correct?

13         A     Yes.  It's adding the 2,800.

14         Q     I understand.

15               Going back to 2014, November 25th, 2014,

16    current bill there's $20,057.75, prior billed was

17    $15,614.81, arriving at a total on that date of

18    $35,672.56, correct?

19         A     Yes.

20         Q     Was that your visit for the Daubert hearing?

21    Or it's just to write your report?

22         A      It's just to write the report, I believe.

23         Q     He one prior to that is 10-20-2014, Invoice

24    241632, total is 15,000 -- this is a travel -- site visit

25    travel, $15,614.81, correct?

```
                                              Page 64
 1          A    Yes.

 2          Q    So those were the invoices, all the invoices

 3     Convoys you pulled from the prior work from Hoffman,

 4     correct?

 5          A    That's correct.

 6          Q    That form the basis of Exhibit 14 to your

 7     deposition, correct?

 8          A    Yes.

 9          Q    All right.

10               MR. COSBY:  Now, I have no further

11          questions.

12                    THE WITNESS:  Okay.

13                    MR. FRIEDBERG:  We'll read and review.

14               No questions.

15               (Whereupon, the deposition adjourned at

16          3:02 P.M.)

17

18

19

20

21

22

23

24

25
```

Page 65

1                          ERRATA SHEET

2     REPORTER:          Christine N. Meade

3     NAME OF CASE: Thomas F. Friedberg, Et al vs.

4                      Daybreak, Inc. d/b/a Huber & Associates

5     DEPONENT:   Continued deposition of Arthur Sanders

6     DEPOSITION DATE:  September 11, 2025

7     PAGE LINE      NOW READS      SHOULD READ      REASON

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25         Job No. CS7589338

Page 66

1                          J U R A T

2

3         I, _____, hereby certify

4    that the foregoing testimony given by me on

5    _____, 2025, is true and accurate, including

6    any corrections noted on the Errata Sheet, to the best of

7    my knowledge and belief.

8

9                    _____

10                    Deponent's Signature

11

12         In the city of _____ in said

13    county of _____, this ____ day of

14    _____, 2025, personally appeared, and

15    he made oath to the truth of the foregoing corrections.

16

17    Subscribed before me, _____

18                         Notary Public

19

20    My commission expires: _____

21

22

23

24

     Job No. CS7589338

25

CERTIFICATE OF REPORTER

1

2          I, Christine N. Meade, a commissioner in and
for the State of Connecticut, do hereby certify that the
3
continued deposition of Arthur Sanders was taken before
4
me on September 11, 2025.
5

6          I further certify that the witness was duly
sworn by me to testify to the truth, the whole truth, and
7
nothing but the truth, that she was examined under oath,
8
and the foregoing is a true and accurate transcription of
9
the testimony as taken stenographically by me and
10
subsequently transcribed as hereinbefore appears.
11

12         I further certify that I am neither attorney
nor counsel for, nor related to, nor employed by any of
13
the parties to the action in which this deposition is
14
taken, and further that I am not a relative or employee
15
of any attorney or counsel employed by the parties
16
hereto, nor financially interested in the outcome of the
17
action.
18

19         IN WITNESS THEREOF I have hereunto set my hand
this 24th day of September, 2025.
20

21         _____
22         Christine N. Meade, Notary Public
23         My Commission expires: December 31, 2027.

24

25

```
                                              Page 68

 1    Thomas Friedberg, Esquire

 2    Tom@lawofficesFB.com

 3                    September 30, 2025

 4    RE: Friedberg, Thomas F. And Bunge, Sarah L. v. Daybreak Inc.

 5        9/11/2025, Arthur Sanders , Vol II (#7589338)

 6        The above-referenced transcript is available for

 7    review.

 8        Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    erratas-cs@veritext.com.

16     Return completed errata within 30 days from

17    receipt of testimony.

18      If the witness fails to do so within the time

19    allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24

25
```

**[& - 40]**                                                      Page 1

| & | | | |
|---|---|---|---|
| **&**   1:4,8 2:4,10 5:24 8:22,23 9:2,3,6,11 14:18 15:5 65:4 | **15,614.81**   63:17 63:25<br>**157**   1:16<br>**160**   30:24 31:5 32:1<br>**168**   31:9<br>**16th**   9:21,24<br>**17**   62:2<br>**1:00**   12:11<br>**1:02**   1:14 | **2017**   21:25 62:3,6<br>**2018**   25:18 27:11 31:13 32:17 35:13,16 36:14,21 37:17 39:16 40:12 46:9 50:14 61:24<br>**2019**   17:6 57:14<br>**202**   2:5<br>**2020**   46:7 47:23<br>**2025**   1:8,13 17:17 18:12,19 33:20,22 34:3 53:14 57:15 65:6 66:5,14 67:5,20 68:3<br>**2027**   67:23<br>**205**   2:11<br>**21**   16:3<br>**22**   62:6 63:2<br>**22,193.96**   62:3 62:12,25<br>**22nd**   63:6<br>**241632**   63:24<br>**242246**   63:9<br>**242435**   63:6<br>**24th**   67:20<br>**25**   33:20<br>**25,000**   41:15 42:14 | **252498**   63:2<br>**255796**   62:2<br>**256387**   62:5<br>**256803**   61:23<br>**25th**   63:15<br>**27**   40:11<br>**28**   50:17<br>**29**   18:19 51:21 |

| 0 |
|---|
| **0053**   1:4<br>**06510**   1:17 |

| 1 |
|---|
| **1**   27:9,10 34:24<br>**1,000**   62:11<br>**1,140**   62:6,16 62:22<br>**1,750**   63:3<br>**10**   31:2,25 54:5 58:21<br>**10-20-2014**   63:23<br>**100**   47:10<br>**100,000**   46:14<br>**1005**   2:4<br>**10th**   63:8<br>**11**   1:8,13 65:6 67:5<br>**12:30**   11:1<br>**12:35**   12:10<br>**14**   18:11 61:19 64:6<br>**15**   48:10<br>**15,000**   63:24 |

| 2 |
|---|
| **2**   9:11 28:11,12 29:22 33:18 34:11 39:9 53:13,20 57:2<br>**2,406**   61:24<br>**2,800**   63:9,13<br>**20**   15:24 31:11 34:10 59:10,11 59:13,19<br>**20,057.75**   63:16<br>**200,000**   46:16<br>**2014**   7:2 15:24 16:4 23:23 33:15 34:6,11 34:24 35:5,11 36:12,19,23 37:16,25 38:3 38:5,9 39:18 52:21 54:1 63:15,15<br>**2015**   63:3,5,8 |

| 3 |
|---|
| **3,000**   40:24,25<br>**3,087.50**   63:6<br>**3,520**   32:1,4<br>**30**   7:7,23 15:3 55:14 68:3,16<br>**30,000**   40:15<br>**301**   2:10<br>**31**   67:23<br>**33**   56:17<br>**34994**   2:11<br>**35**   32:12<br>**35,000**   63:12<br>**35,672.56**   63:18<br>**360,000**   46:2,13<br>**38,000**   63:12<br>**39**   15:12,13,24 16:13<br>**3:02**   1:14 64:16<br>**3:19**   1:4 |

| 4 |
|---|
| **4**   24:20 55:8<br>**40**   15:12,14 16:3,10 20:3 23:4 25:22,23 |

| | | | |
|---|---|---|---|
| 25:23 28:25<br>29:5,23 56:23<br>59:14<br>**449,000** 48:3,23<br>**45** 13:1<br>**471,800** 48:3 | **9**<br>**9** 54:5<br>**9,500** 43:7<br>**9.5** 22:6,20<br>23:25 25:9,12<br>27:9 54:7<br>**9/11/2025** 68:5<br>**90** 47:10<br>**92166** 2:6<br>**95** 31:12 32:17 | **administration**<br>48:5<br>**afternoon** 52:6<br>**ago** 10:20<br>11:18 13:1<br>20:3 23:4<br>**agree** 54:17<br>**al** 65:3<br>**allegation**<br>10:13<br>**allotted** 68:19<br>**allow** 9:22<br>**allowed** 12:17<br>13:14 14:1<br>**amount** 34:14<br>60:17,20 62:23<br>**answer** 8:10,12<br>13:16 14:10,11<br>14:12,14,16<br>23:20 25:11<br>37:23 38:7<br>44:6<br>**answered**<br>23:18 31:7<br>**anymore** 42:9<br>**appeared** 66:14<br>**appears** 67:11<br>**applicable** 68:8<br>**appreciate**<br>36:20<br>**approximately**<br>31:22 33:22<br>**april** 25:18<br>27:11 63:5,6 | **architect** 31:4<br>38:18,20,21<br>40:22 41:7<br>42:18,21<br>**architects**<br>34:25 38:12,13<br>38:22 42:3<br>48:6,8 61:20<br>**architectural**<br>41:20<br>**area** 15:25 16:3<br>21:25 23:3,6<br>24:1,2,6 32:2<br>51:10 52:8<br>**areas** 23:8<br>24:14,14 30:5<br>55:24<br>**argue** 12:19<br>13:22<br>**arguing** 13:8<br>13:23 14:4<br>**argumentative**<br>13:5,18,22<br>**arriving** 63:17<br>**arthur** 1:12 3:4<br>5:9 65:5 67:4<br>68:5<br>**article** 8:23 9:7<br>9:8,13,16 15:5<br>**aside** 37:16<br>38:1<br>**asked** 10:17<br>21:16 24:18<br>25:8 33:19,21 |
| **5** | | | |
| **5** 3:4,5<br>**50** 32:14,15<br>**50,000** 61:11 | | | |
| **6** | | | |
| **60,000** 46:14<br>**6814** 2:5<br>**6th** 61:24 | | | |
| **7** | | | |
| **7** 21:25 32:12<br>53:13<br>**7,500** 34:18<br>**700,000** 38:10<br>**7589338** 68:5<br>**759,357** 34:18 | | | |
| **8** | | | |
| **8** 31:9 54:5<br>**8,000** 32:4<br>**8,400** 31:16,22<br>**80** 31:3<br>**85** 32:12<br>**89,000** 45:3,12<br>45:24 | **a**<br>**above** 68:6<br>**accident** 62:12<br>**accuracy** 68:9<br>**accurate** 66:5<br>67:9<br>**acknowledg...**<br>68:12<br>**acting** 13:15<br>**action** 1:4<br>67:14,18<br>**actually** 15:17<br>15:19 33:25<br>36:24 45:7<br>50:13 62:10<br>**adding** 63:13<br>**additional**<br>16:24<br>**adjacent** 9:22<br>30:5<br>**adjourned**<br>64:15 | | |

**[asked - certificate]**

37:4
**asking** 14:9
  26:16 36:23
  47:1
**associates** 1:8
  65:4
**assume** 44:15
  44:16
**assumed** 60:9
**attached** 40:4
  68:11
**attorney** 67:12
  67:16 68:13
**available** 68:6
**average** 23:25
  25:9 42:16
  54:6
**aware** 40:19
  50:11,13

**b**

**b** 1:8 65:4
**back** 5:23 8:16
  8:17 17:6
  31:25 32:20
  37:25 45:11,15
  46:5,5 47:2
  49:3,21 52:21
  53:9 57:14
  63:15
**backup** 39:19
  39:21,22 44:1
**barabas** 12:1,5
  14:20 17:2

50:8
**based** 42:16
  43:12
**basically** 5:25
  34:4
**basis** 64:6
**behalf** 50:12
**belief** 66:7
**believe** 26:25
  31:9 40:8
  44:18 45:19
  50:20 56:6
  59:21 61:2
  63:22
**benefits** 59:3
**best** 66:6
**better** 28:1
  58:25
**big** 12:24 47:4
  59:22 61:1
**bigger** 49:11
**bill** 63:11,12,16
**billed** 60:17
  63:16
**billing** 60:24
**bit** 14:20 24:21
**blow** 21:3,6
**bottom** 34:17
  34:24
**boulevard** 2:10
**bow** 30:8
**bowed** 49:17
**bowing** 30:9

**box** 2:5 49:7
**breach** 10:12
**break** 4:4 36:24
  36:25 58:3
  61:14
**breakdown**
  17:24 36:13
  43:8
**breaking** 59:1
**breaks** 33:6
**briefly** 60:19
**bring** 60:8
**brought** 30:17
**building** 36:13
**buildings** 29:12
  35:24 38:22
  54:9
**bulge** 51:1,3,5
  51:22
**bulged** 50:21
**bulging** 52:25
**bunge** 1:4 2:4
  68:4
**business** 58:19

**c**

**c** 2:1,12
**calculate** 42:15
  58:4
**calculated**
  38:11 43:20
**calculation**
  31:14 32:21
  43:12

**calculations**
  33:6
**california** 2:6
**call** 17:3,3,10
**called** 19:22
  41:11
**calls** 17:14
**cap** 7:19,19
  15:16 20:12,15
  21:12,21,21
**capable** 54:11
**caps** 20:22 21:3
  21:11,14
**caption** 28:15
  52:3
**case** 10:12
  11:24 13:11
  55:10 60:22,23
  65:3
**cases** 56:6
**category** 47:11
**caught** 9:18
  10:4
**cause** 34:17
**caused** 24:19
  30:1
**center** 22:6,20
  25:9,12 27:10
  31:10 54:7
**certain** 19:17
  23:18
**certainly** 24:20
**certificate** 67:1

| | | | |
|---|---|---|---|
| **certify** 66:3 67:3,6,12 | 23:1,9,14,25 24:5,13,23 | **complete** 36:13 **completed** 68:16 | **consistent** 54:6 **construction** 9:12 34:18 |
| **cetera** 14:21 47:15,21 52:24 | 25:1,9,11,13,13 25:15 26:9,18 | **completely** 21:5 | 38:15,25 39:2 39:16 40:10 |
| **chance** 5:22 16:23 | 27:9 29:25 49:15 53:14,21 | **compound** 46:23 | 48:6 **consulted** 39:5 |
| **changed** 57:8 | 54:4,4,11 | **concerned** 11:22 | 41:4 43:23 |
| **changes** 68:10 | **clips** 6:15,17 11:11,16 24:5 | **concluded** 52:21 | **container** 56:23,24 59:12 |
| **charge** 7:20 | **close** 61:12 | **condition** 57:8 | 59:14,14,18,19 |
| **check** 34:8 **checked** 57:11 | **cm** 48:15,15,16 **coaching** 37:2,3 | **conditions** 22:7 22:21 43:11 | 59:20 **contemplating** 43:2 |
| **chosen** 20:13 **christine** 5:2 | **come** 33:25 40:24,25 41:15 | **conference** 11:2 17:2 | **continued** 1:12 3:4 5:6,15 65:5 |
| 65:2 67:2,22 **church** 1:16 | 44:12 **coming** 31:1 | **conferenced** 10:22 | 67:4 **continuity** 4:4 |
| **city** 66:12 **civil** 1:4 | 48:16 **commission** | **confirm** 23:9 54:3 | **contract** 6:16 6:18 10:12 |
| **clarification** 36:11 | 66:20 67:23 **commissioner** | **confirmation** 24:4 | 18:23,24 19:3 22:7,21 26:9 |
| **clarify** 7:10 36:3 | 67:2 **common** 5:25 | **confirmed** 22:23 24:13 | 31:21 45:15,18 54:11 55:22 |
| **clarifying** 37:4 **clean** 47:14 | 8:22,23 9:2,3,6 9:11 14:18 | 26:7 **confused** 7:6 | **contraction** 55:12 |
| **clear** 9:10 13:23 41:4 | 15:5 **communication** | 44:19 **conjunction** | **contractor** 48:10 |
| 53:1 **cleated** 19:6 | 12:14 **company** 39:3 | 58:21 **connect** 20:9 | **contractor's** 39:23 45:21 |
| 52:22 **cleating** 10:9 | 43:2 **compared** | **connecticut** 1:17 5:4 67:3 | **contribute** 55:16 |
| 10:13 52:21 **cleats** 9:25 | 46:12 **comparison** | **considered** 57:25 | **conversation** 13:13 |
| 10:11 12:3 15:3,16 19:21 19:23 22:4,18 | 46:23 | | |

[convoys - damage]                                                    Page 5

**convoys** 64:3
**cooper** 9:2
**coordination**
  43:12
**copies** 68:14
**copper** 5:24
  8:22,23,24 9:3
  9:6,11 14:18
  15:5 19:22
  22:5,6,19,19
  23:2 24:20,22
  25:10 31:13
  32:17 41:14,17
  41:21 42:13
  43:9,10 44:8,9
  45:2,3,7,11,14
  45:19,20,23
  47:19 53:15,21
  56:8 58:20,23
  59:10
**copperhead**
  21:18
**copy** 5:21 18:3
  18:14 36:12
  39:11
**corner** 16:8,9
  52:9
**correct** 6:20,22
  7:17 8:1,6 9:25
  10:2,9,14,15
  16:1,5,6,13,15
  17:18,20,21,22
  18:22 19:14,25
  20:5,9,12 21:6

21:8 22:1,8,14
22:24 23:4,9
23:11,15,17
24:7,15,16,23
24:24 25:1,2,4
25:16,17,23
26:3,18,19
27:15,21 28:20
28:23 29:6,10
29:17,19 30:25
31:7 32:4 33:6
33:9,11,15,23
34:7,12,21
35:2,7,11,12,20
35:25 39:13
40:16,17 42:11
43:17 45:4,24
46:2,7 47:23
48:1,3,20,24,25
51:8,16,17
52:3 53:23
55:3,6,7 56:25
57:15,18,23
58:12,13 59:7
61:21,25 62:3
62:12 63:6,12
63:18,25 64:4
64:5,7
**corrected** 41:6
**corrections**
  66:6,15
**corresponds**
  15:19,22

**cosby** 2:10,12
  3:5 5:7 8:16,20
  12:21,22 13:6
  13:12,19 14:1
  14:6,8,15 18:8
  21:1 23:7,12
  27:18 32:23
  36:14,19,21
  37:1,6,10,14,20
  37:24 38:8
  40:9 46:18,24
  47:25 52:13
  53:7 54:16
  55:2,5,20
  57:21 60:1,4,7
  61:7,14,17
  62:15 64:10
**cost** 17:24
  31:13 32:17
  33:25 34:5,6
  34:12,14 35:5
  35:7,14,17,23
  36:2 37:18
  38:4,9 39:16
  39:17 40:11
  42:16 58:2,2,4
  58:14,15
**costly** 58:1
**costs** 18:21
  34:4
**counsel** 13:3
  14:3 67:13,16
  68:14

**count** 20:21
**county** 66:13
**court** 1:1 8:18
  55:10 60:22
**cover** 20:13
**covered** 19:21
**covers** 19:22
**cracking** 55:23
**crew** 44:8,9
  45:7
**crux** 26:15
**cs** 68:15
**cs7589338** 1:25
  65:25 66:24
**current** 34:3
  63:16
**currently** 57:10
**cut** 59:7
**cuts** 58:20
**cutting** 59:1
**cv** 1:4

| d |
| --- |

**d** 1:8 3:1 5:1
  65:4
**damage** 24:19
  28:8 29:8 31:3
  35:16 36:4,5
  40:14 49:4,5,5
  49:13,14,14
  50:15,16 52:10
  52:14,19 53:2
  54:22 55:16
  61:2

**[damaged - east]**                                                            Page 6

**damaged**  24:22
  49:15
**data**  34:5
**date**  1:13 3:7
  6:25,25 63:17
  65:6
**dated**  40:11
  61:24 62:2,5
  63:2
**daubert**  63:20
**day**  15:18
  48:17 66:13
  67:20
**daybreak**  1:8
  22:11,12,12,13
  25:8 65:4 68:4
**dayhill**  7:5,14
  7:21 11:7,10
  14:19,25 15:23
  22:4,9,10
  39:19,21,22,25
  40:5 43:1 44:1
  46:7,12,13,20
  47:3,23 49:7
  49:21,24 50:5
  50:12 58:6,8
**dayhill's**  48:18
  48:21 49:23
**days**  68:16
**debris**  24:25
  49:14 50:16
  52:14,24
**december**
  67:23

**defendant**  2:9
  22:4,12,18
**define**  56:2
**denting**  52:24
**depends**  7:9
**depo**  3:4 6:4,9
  9:8
**deponent**  65:5
  68:13
**deponent's**
  66:10
**deposing**  68:13
**deposition**  1:12
  3:7 5:12,15,19
  5:21,22 6:13
  9:4 10:19,23
  11:7 14:17
  16:20,25 33:19
  39:13 55:11
  61:18 64:7,15
  65:5,6 67:4,14
**describing**  51:5
**designated**
  45:19
**designates**
  37:18 38:4
**designation**
  35:5
**detailed**  41:17
  41:21
**detailing**  42:13
**details**  41:14
**determination**
  23:13

**determine**
  16:13 24:18
  25:8
**determined**
  26:17 40:23
**diego**  2:6
**difference**
  46:19 47:4
  48:13
**different**  25:7
  56:19 62:18
**direct**  3:5 5:6
**direction**  7:25
  14:20 51:15
**directionally**
  16:1,4 51:11
  52:2
**directions**
  24:10 29:10
**discuss**  12:4
  15:1,13
**discussed**  11:20
  11:23 12:12
  13:3 24:21
**discussion**  12:1
  16:19 24:10
**discussions**
  59:16
**district**  1:1
**division**  1:2
**document**  15:6
**documentation**
  37:5

**documents**
  5:16 11:3
  16:25 30:17
  37:8,9,10,11
  60:8,9
**doing**  11:4
  18:25 37:1
  42:17 49:22,24
  58:15
**doland**  40:19
**double**  44:23
**drafting**  42:20
**drawings**  31:3
  41:17 42:22
**drill**  21:12
**drive**  18:15
  49:1,2
**drone**  26:20,23
  26:24 27:1,4
  27:10,20,22,23
  28:3,16
**due**  13:2 25:3
  49:15
**duly**  67:6

**e**

**e**  2:1,1 3:1 5:1
  19:10,10
**earlier**  41:3
**easier**  58:18
**east**  7:8,17,25
  14:21 15:17
  25:19 27:12
  29:17,18,19

**[east - finish]**                                                    Page 7

52:18,21
**edge**  19:6,7
   55:25 56:4,5,8
**either**  47:12
   48:20 56:21
**electronic**
   36:12 60:16
**electronically**
   30:21
**email**  2:6,12
**employed**
   67:13,16
**employee**  67:15
**ended**  16:20
**entire**  8:14 31:4
**entities**  39:5
**errata**  65:1
   66:6 68:11,13
   68:16
**erratas**  68:15
**error**  31:6
**esquire**  2:7,12
   68:1
**established**
   27:15 53:23
**estimate**  31:12
   31:15,16 32:16
   32:25 34:1,6
   34:12 35:17
   36:3 38:9 39:6
   39:8,17,17,24
   39:25 40:6,11
   41:1,16 42:13
   42:14 43:5,7,8

43:23 46:7,9
46:13,20,21
47:23 48:18,21
49:21,22,23,25
50:2,3,9,11
58:8
**estimates**  41:14
   44:2
**et**  14:21 47:14
   47:21 52:24
   65:3
**evasive**  12:18
**event**  57:22
**eventually**  8:9
**exact**  4:3
**exactly**  7:9
   16:13
**examination**
   3:5 5:6
**examined**  5:4
   67:8
**exceed**  47:22
**exceeds**  48:3
**except**  9:11
**excuse**  34:18
**exhibit**  9:11
   18:9,11,17
   20:3 25:22,23
   29:1 33:18
   34:11,13 39:9
   61:19 64:6
**exhibits**  3:7
**exist**  42:8,11
   46:6 57:18

**existed**  20:16
   23:14
**existence**  54:3
**expand**  55:22
**expansion**  9:22
   55:12
**expenses**  48:7
**expensive**
   59:12
**experienced**
   51:6
**expert**  17:19
   33:23
**expertise**  42:1
**expires**  66:20
   67:23
**explanation**
   27:8
**eye**  9:18 10:4
**eyeballing**  33:1

**f**

**f**  1:4 65:3 68:4
**fabricate**  42:24
   43:2 56:22
**fabricated**
   59:11
**fabrication**
   43:10 58:15,16
   58:19
**fabrications**
   58:2
**fabricator**
   42:23 58:22

**fact**  40:18
**fail**  29:12 54:9
**failed**  7:7 25:20
   27:13 28:11
**fails**  68:18
**failure**  10:13
   29:25 30:2
   53:14,15,20,22
   54:12
**failures**  30:1
**familiar**  53:16
   53:18
**far**  9:23 32:9
   33:6
**february**  63:8
**feet**  7:7,23 15:3
   20:18 31:16,22
   32:2 55:14
   56:17 59:10
**ferry**  48:17
**figure**  38:11
   40:24,25 58:22
**figures**  40:19
**file**  39:14 49:19
**filed**  49:8
**files**  44:4,5 49:7
**financially**
   67:17
**find**  7:21 36:17
   49:13,20
**fine**  14:7
**finish**  8:8,9,9
   10:5

[finished - hour]                                    Page 8

| | | | |
|---|---|---|---|
| **finished** 59:25 | 53:4 54:15,24 | 67:6,12,15 | **hands** 39:15 |
| **finishing** 4:7 | 55:18 57:19 | **g** | **hang** 60:6 |
| **firm** 38:15 | 58:23 62:14 | **general** 43:11 | **happened** |
| 58:19 | 64:6 | 43:19 | 59:17 |
| **first** 19:7 40:14 | **formed** 10:11 | **generated** | **hard** 49:18 |
| 60:22 61:23 | **forming** 49:23 | 16:24 | **hat** 26:8 58:23 |
| **five** 61:6 | **forward** 14:6 | **getting** 17:14 | **haven** 1:17 |
| **flash** 18:15 | **found** 7:23 | 38:24 43:16 | **hear** 8:12 |
| **florida** 2:11 | 58:1 | 59:13 | **hearing** 63:20 |
| **flying** 24:25 | **four** 20:17 | **given** 66:4 | **helped** 44:12 |
| 49:14 50:15 | **friedberg** 1:4 | **giving** 13:19 | **hereinbefore** |
| **focus** 38:1 | 2:4,7 6:9 10:25 | **go** 13:9 17:25 | 67:11 |
| **folder** 49:6,6 | 11:15 12:11,19 | 31:25 32:20 | **hereto** 67:17 |
| **folders** 49:1 | 13:4,7,14,17,21 | 46:5,5 62:13 | **hereunto** 67:19 |
| **follows** 5:5 | 14:3,7,13 15:6 | **goes** 45:15 | **higher** 29:17 |
| **foot** 51:25 | 18:4,6 20:24 | **going** 13:8,22 | 58:2,14,15 |
| 56:23 58:21 | 23:5,10 27:2 | 18:16 33:23 | **highlighted** |
| 59:11,13,14,19 | 27:16 32:19 | 36:17 37:25 | 18:22 |
| **footage** 31:18 | 33:22 36:9,16 | 45:13 46:9 | **hip** 10:6 20:6,7 |
| **force** 29:16 | 36:20,22 37:3 | 58:9 62:11 | **hips** 10:5 |
| **forces** 29:17 | 37:7,19,22 | 63:15 | **hm** 62:7 |
| **foregoing** 66:4 | 38:6 40:7 | **good** 12:25 | **hmm** 62:7 |
| 66:15 67:9 | 44:13 45:13 | **gotten** 5:22 | **hoffman** 31:4 |
| **forgotten** 39:4 | 46:17,22 47:5 | **grainy** 28:2 | 34:25 38:12,13 |
| 59:16 | 47:24 52:12 | **group** 30:12 | 41:5,19,22 |
| **form** 13:4,18 | 53:4 54:15,24 | **guess** 7:9 32:9 | 42:3,14,22 |
| 13:25 14:2,13 | 55:4,18 57:19 | 35:3 56:15 | 44:4 48:6,8 |
| 20:24 22:5,19 | 61:3 62:14 | **h** | 49:7,9 60:9 |
| 23:5,10 27:16 | 64:13 65:3 | **h** 5:1 | 61:20 64:3 |
| 28:9 32:19 | 68:1,4 | **hand** 16:8 | **hold** 21:21 |
| 36:10 37:19,22 | **front** 34:9 | 50:24 59:1,1 | 52:16 53:8 |
| 38:6 39:17 | **full** 36:4 37:5 | 67:19 | **holder** 43:21 |
| 40:7 46:22 | **further** 29:4 | | **hour** 46:4 |
| 47:24 52:12 | 51:19 64:10 | | |

**hourly** 47:8
**house** 41:19
**huber** 1:8
    31:20 65:4
**huber's** 5:21
    6:4 14:17
    31:16,19
**hurricane**
    21:25 23:16,19
    23:22 25:20
    29:13 35:17
    54:9,12

### i

**ii** 1:11 68:5
**images** 28:8
**impact** 55:21
**impending**
    11:21
**inability** 55:21
**inch** 9:21,24
**inches** 22:6,20
    23:25 25:9,12
    27:9 54:5,5,6,7
**include** 36:7
    54:18,18
**included** 19:4
    38:14 43:17
    54:25 61:1,2
    62:24
**including** 10:25
    66:5
**incomplete**
    39:14

**inconclusive**
    6:14
**incorrect** 32:18
**increments**
    58:21
**independent**
    45:21 49:22
**indicate** 15:25
    24:18 31:3,12
    51:15
**indicated** 9:1,1
    18:21 33:22
    56:15
**indicates** 4:6
**indicating** 35:9
    49:10
**information**
    7:5 47:5
**input** 49:24
**inspected** 26:17
**inspection** 26:6
**install** 22:4,18
    23:1 25:9
    53:14,20
**installation**
    47:18,20
**installed** 19:6
    19:13,19 25:11
    27:9 59:10
**installers** 44:9
    44:10
**instruct** 6:9
**intended** 41:7

**intensive** 32:25
**interested**
    67:17
**interrupted** 4:5
**intersection** 8:5
    8:19 20:10
    22:5,18 23:2
    56:3
**investigated**
    24:9
**investigation**
    22:3,17 23:13
    23:16,19 24:19
    25:6,7 33:20
    40:15 53:13
**invoice** 61:23
    61:23,24 62:2
    62:5,16,18,22
    63:3,6,8,11,23
**invoices** 44:2
    61:6,19 62:24
    64:2,2
**involved** 38:24
    61:19
**irma** 21:25
    25:20 29:9,13
    54:9,12
**island** 43:2
    47:11,13 57:6
    58:19
**islands** 1:1 42:6
**issue** 35:25
    56:25 59:13

**issues** 55:11,13
    56:10
**itemization**
    36:7
**items** 61:19

### j

**j** 66:1
**jamie** 50:6
**jcosby** 2:12
**jeffrey** 2:12
**job** 1:25 38:20
    65:25 66:24
**john** 1:2 43:14
    43:14
**joint** 20:14
**july** 40:11 62:2
**jump** 33:13
**june** 17:17,20
    18:12,19

### k

**keep** 51:18
    62:13
**kept** 7:8
**kind** 6:14 33:1
    56:22
**know** 7:4 10:25
    11:14,14 12:12
    12:24 13:7,21
    16:9 17:6
    19:16 20:15,19
    24:10,20 25:12
    25:22 27:4
    28:7,7,9 32:25

**[know - mention]**                                                Page 10

33:2,3 35:10
40:4,18,18
42:8 43:4
46:19 47:8
50:23 52:2,5
56:2 57:6,10
58:11 59:16,23
61:1,3,4,5,8
**knowledge**
66:7

**l**

**l**  1:4 68:4
**labor**  46:1,11
46:14,16 47:1
47:3,6,12,13,22
**laborers**  47:9
**language**  27:23
**lap**  20:14
**law**  2:4
**lawofficesfb....**
2:6 68:2
**lawsuit**  35:25
**lawyer**  6:20,23
**learn**  6:12
**leeward**  29:15
**left**  10:19
**legal**  68:23
**legend**  4:1
**leininger**  2:10
**length**  55:11
56:13,17 58:23
**lengths**  20:17

**limited**  11:23
**line**  20:2,4,20
21:11 26:2,12
26:14,16 27:14
28:12,22 29:2
29:3,5 30:1
65:7
**lines**  24:14
25:19,21 26:13
27:12
**listed**  26:23
27:10 43:5
61:18
**little**  14:20
24:21 28:2
32:15 46:13
**local**  41:7 42:4
43:25 48:14
57:11
**located**  39:8
42:5
**location**  1:15
**lodging**  44:8,20
44:25 45:8
**logistics**  38:25
56:25
**long**  11:18
20:15 43:2
58:19
**look**  28:12
30:12,22 33:17
33:17 39:16
40:10 59:24
60:17

**looked**  15:10
15:12 16:17
25:6 29:23
**looking**  51:18
**looks**  62:17
**loose**  21:5,6
**loosen**  53:15,21
**lot**  21:19

**m**

**m**  19:10
**machine**  57:5,9
57:12 58:5
**made**  31:6
42:10 46:23
66:15
**magistrate**
14:4
**main**  19:16
24:5 25:4,10
25:16,19 27:13
29:9,11 30:1
30:25 31:4,13
31:18,23 32:5
32:18 34:21,23
35:6,14,19
36:8 37:18
38:4 48:19,22
48:24 51:13,14
54:2,8
**maiocci**  50:7
**make**  20:21
26:10 38:16
53:1,10

**makes**  53:11
**management**
38:15,25 39:2
**mandrel**  21:18
**march**  33:22
61:24
**marked**  3:7
18:17
**master**  16:8
**material**  21:20
42:24
**materials**  43:11
43:13,19 45:3
45:11,23
**math**  46:15
**matter**  60:18
**mcadam**  50:6
**meade**  5:2 65:2
67:2,22
**meals**  44:8,20
**mean**  6:1 8:3
8:22 11:8 12:8
16:6 26:12
39:22 40:2
44:9,25 47:13
49:5,5,16 50:1
52:7 58:18
**meaning**  29:16
56:8
**meant**  22:13
32:7
**memory**  12:24
**mention**  54:22
55:10 56:12

**mentioned** 9:8
9:9 10:16 17:2
21:17 24:7
29:25 49:15
**mentioning**
16:22
**method** 20:13
**mind** 55:9
**mine** 50:24
**minute** 30:23
52:17
**minutes** 10:20
11:5 12:4,11
13:1
**missing** 25:3
**mistaken** 45:17
**mobilization**
43:22
**moment** 20:3
23:4 49:21
61:15
**months** 45:7,9
46:1
**move** 14:6
21:22 33:14
**moving** 47:20
**multiple** 26:7
26:11,12,12,14

**n**

**n** 2:1 3:1 5:1,2
65:2 67:2,22
**nail** 19:6

**name** 5:8 43:4
65:3
**need** 37:11 42:2
47:2,13 57:23
59:5
**needed** 47:12
47:13
**neither** 67:12
**never** 46:23
55:8
**new** 1:17 59:7
**north** 7:7,9,9
7:17,25 14:21
15:19 16:9
29:18,19
**notary** 5:3
66:18 67:22
**note** 30:24
45:12 68:10
**noted** 34:23
41:10 52:20
54:1,4 66:6
**notes** 33:8
41:10 46:6
59:24
**noting** 18:24
**november** 7:2
62:6 63:15
**number** 18:18
19:18 24:17,20
25:7 27:9 31:1
31:17 32:22
38:10 41:8,15
42:11,25 43:7

43:10,19 46:25
47:2,6 51:20
53:13,20 55:8
57:2 61:1,4,9
61:23 62:12,18
**numbers** 38:14
44:3,12 46:11
47:22 56:20
**numerous**
19:13

**o**

**oath** 5:5,11
66:15 67:8
**object** 13:6,25
14:1 36:10
37:7
**objection** 13:4
13:17 14:13
20:24 23:5,10
27:16 32:19
37:19,22 38:6
40:7 46:22
47:24 52:12
53:4 54:15,24
55:4,18 57:19
62:14
**objections**
13:20 36:15
**obtained** 60:9
61:20
**ocean** 2:10
**octagon** 8:4
31:11

**offense** 11:22
**offhand** 61:5
**office** 41:1
**offices** 2:4
**offset** 10:7
**okay** 7:16 8:3
9:5,13,16 10:8
10:12 11:15,20
12:10 16:12
18:2 19:2,5,9
19:16 20:2,19
21:2 24:3
26:15 27:4,8
32:4,10,16,24
33:5 34:6
37:25 38:23
39:2,5,8,25
40:10,14 41:3
42:5,7,10
43:22 44:11
45:11,16,22
47:22 51:10
52:10 53:18,25
55:16 56:7
60:3 62:13,20
64:12
**old** 15:10
**omission** 4:6
**open** 7:12,13
7:21,23 11:12
12:24 15:4
20:4,23 23:8
24:15 29:21

[opened - photographic]                                    Page 12

**opened**   15:18
 15:23 22:24
 23:3,6,23
 25:22 26:8,16
 54:3
**opening**   20:2
 20:16 25:20
 27:13
**operated**   26:24
**opinion**   34:17
 54:10
**opposed**   32:25
 43:16 52:24
**opposite**   10:6
**option**   56:23
 57:25
**options**   56:12
 56:19,20,22
**original**   5:23
 6:24 18:23,24
 19:3 28:3
 31:21 38:22
 45:15,18,20
 59:17
**originally**   57:3
 57:4
**outcome**   67:17
**outstanding**
 62:19,23
**overall**   27:20
 27:24 32:8
 48:11 60:21
**oversight**   38:25
 41:2 42:4

48:10
**overtime**   46:14
**own**   39:15
**owner**   26:25
 45:21 50:6

**p**

**p**   2:1,1
**p.m.**   1:14,14
 64:16
**p.o.**   2:5
**page**   3:3 15:24
 16:3 31:2,25
 34:15,24 53:9
 53:13 62:11
 65:7
**paid**   45:20
**pan**   19:7,24,25
 24:1,2,14,14
 49:17 50:17
 59:7
**panel**   19:22
 31:10
**panels**   19:9,13
 19:18,19,22
 22:5,19 23:2
 30:24 31:3,5
 31:10,11 32:1
 49:4,15 52:25
 53:15,21 54:2
 55:12,22,24
 56:16 59:10
**pans**   9:21,22
 19:6 22:6,19

23:14 24:6
 25:3,19 26:3
 27:12 30:1,3,4
 30:8,10 49:16
 50:15 56:13
 59:7
**paper**   32:24
 44:5 46:6
**paperwork**
 44:2
**paragraph**
 27:8 53:25
**part**   7:20 9:4
 19:3 40:15
 50:21
**particular**   9:16
 11:24 20:23
 43:4,14
**parties**   67:14
 67:16
**partly**   7:4
**parts**   9:16
**pavilion**   19:17
 24:5 25:4,10
 25:16,20 27:13
 29:9,11 30:1
 30:25 31:5,14
 31:18,23 32:5
 32:18 34:21,23
 35:6,14,21
 36:5,8 37:18
 38:4 48:19,22
 48:24 51:13,14
 54:2,8

**pencil**   32:24
**pending**   53:8
**people**   38:15,24
 44:15,21 46:2
 47:3
**percent**   31:12
 32:14,15,17
 48:10
**percentage**
 32:9
**period**   61:6
**person**   42:19
 48:7,9
**personally**
 66:14
**personnel**
 42:20
**pertain**   35:24
**phone**   17:6,10
**phonetic**   4:3
**photo**   15:10,11
 15:12,12,18,24
 16:10,12 23:3
 25:23 27:10,19
 27:20,21 28:1
 28:11,11,12,16
 28:17 29:5
 50:17,19 51:5
 51:15,23
**photograph**
 16:3,6,7 27:10
 27:23 29:22
**photographic**
 54:25

**[photographs - rate]**                                         Page 13

**photographs**
7:11 26:20,23
27:1,4 29:24
30:2
**photography**
28:4
**photos**   15:7,8,9
15:13 16:17
29:21 30:6,7,9
30:12,13,19,20
49:4,6,7,7,8
50:14
**physically**
21:10
**picture**   51:25
**pictures**   49:13
**pie**   8:4,5,19
20:10
**piece**   56:9
**pieces**   8:4,5,19
21:19 57:2
58:22 59:1
**place**   7:7 19:14
43:21
**plaintiff**   2:3
**plaintiffs**   1:6
**plans**   41:14,20
41:21 42:13
**please**   5:8 8:16
53:19
**plural**   25:21
26:5
**plus**   46:14,15

**point**   5:22 28:5
36:11 45:6
**pop**   21:13,15
21:17,18
**portion**   5:24
16:5 24:5
39:23
**possibility**
57:18,20
**post**   29:9
**potential**   55:23
**practical**   56:16
**pre**   56:22
**premium**   46:14
47:2
**preparation**
5:14 6:2
**prepare**   5:18
**prepared**   40:11
41:22 50:11,13
**preparing**   39:6
**present**   20:22
54:5
**pressing**   51:2,3
**previous**   11:7
50:6
**previously**   5:2
30:18 36:23
53:10 57:7
**price**   17:24
18:24 45:21
**pricing**   43:25
**printed**   30:14
30:20 39:10

**prior**   16:19
33:18 63:12,16
63:23 64:3
**privilege**   12:16
12:16
**privileged**
12:15
**probably**   10:16
30:11 34:17
41:25 47:1,1
47:10 48:16
50:6 51:12
52:23 58:21
62:24
**problem**   45:18
56:15,16 59:19
**project**   32:9,11
39:1 45:19
59:17
**properly**   54:10
**property**   43:14
59:14
**provide**   10:13
21:21 45:13
47:5
**provided**   4:3
39:12 47:23
49:2
**public**   5:3
66:18 67:22
**publication**   9:2
9:3
**pull**   17:25

**pulled**   64:3
**puncture**   49:5
49:14 50:15
**purchasing**
43:9
**purpose**   17:12
40:1,2
**put**   13:8 28:5
32:24 37:16
38:1 47:14

**q**

**quality**   28:1
**quantity**   44:17
**question**   8:14
8:17 12:20
13:16 14:9,10
14:12,16 21:2
24:3,12 35:18
37:4,15 46:17
53:8 60:5,13
61:8 62:17
**questioning**
43:24
**questions**   12:17
13:10 38:2
60:2 64:11,14
**quick**   46:15
**quite**   58:1

**r**

**r**   2:1 5:1,1,1
19:10 66:1
**rate**   46:15 47:9

**[rates - reviewed]**                                                          Page 14

**rates** 47:1,3
**ratio** 32:8,10
**read** 5:21,23
  6:4,6,9 8:16,17
  16:23 22:14,15
  26:2 53:19
  62:12 64:13
  65:7 68:9
**reading** 4:7
**reads** 65:7
**ready** 12:12
  55:19
**really** 7:8 21:2
  26:2,15
**reask** 24:3
  62:17
**reason** 38:24
  46:19 65:7
  68:11
**recall** 10:21
  14:24 32:20
**receipt** 68:17
**recent** 17:18,22
  18:18
**recess** 61:16
**recognize**
  50:23 51:2
**recollection**
  16:14 17:8
  34:22 35:4
**recommendat...**
  8:24
**recommended**
  39:4 55:15

**recommends**
  31:4 34:25
**record** 13:9
  40:22
**redo** 32:21
**refer** 10:8,10
**reference** 40:4
  55:1
**referenced** 40:3
  68:6
**referred** 7:6
  15:15
**referring** 6:1
**refresher** 8:24
**regard** 8:21
  56:13
**regarding**
  10:13 15:13
  27:9
**regardless** 7:16
  17:8
**regus** 1:15
**reinstall** 56:21
**related** 34:4
  47:19,20 48:21
  67:13
**relative** 13:11
  32:10 67:15
**relevance**
  10:16
**rely** 49:22
**relying** 49:24
**remember** 8:7
  11:19 13:2,15

  17:4,5,14
  18:17 19:7,20
  28:7 31:1 33:4
  39:15 55:13
  59:18
**removal** 34:25
**remove** 21:10
  21:13
**removed** 15:16
  20:16
**repaired** 7:13
  7:18
**repeat** 8:14
**replace** 17:24
  34:7,12 35:7
  37:18 38:4
**replaced** 31:5
**replacement**
  35:1,14 36:4,6
  45:23 48:23
**replacing** 40:16
**report** 5:23
  6:24,25 7:1
  8:22 9:1,7
  15:10,24 16:4
  17:17,18,19,22
  17:25 18:12,17
  18:18 19:4,5
  21:24 23:23
  24:17 26:24
  28:6,8 29:22
  29:23 31:2,13
  31:25 32:17
  33:5,15,18,20

  33:21 34:3,5
  34:11,23,25
  35:6,8,13,16
  36:12 37:16,17
  37:25 38:3,5,9
  39:18 40:3,5
  40:15 45:13
  48:22 50:14
  53:14 54:22
  61:2 63:21,22
**reporter** 8:18
  65:2 67:1
**reports** 16:24
**representing**
  2:3,9
**required** 22:7
  22:20 26:9
  54:11
**requirement**
  9:21
**respect** 11:24
  13:2
**result** 11:6
**return** 68:13,16
**reveal** 23:14
**revealed** 22:3
  22:17
**review** 5:14,16
  5:23 7:3 8:21
  9:6,7,8 10:18
  14:19 15:1,6
  64:13 68:7
**reviewed** 6:24
  7:5 9:6,10,13

**[reviewed - separated]**                                              Page 15

| | | s | seamer 19:10 |
|---|---|---|---|

10:17 11:3
60:19
**reviewing** 9:17
**rib** 54:3
**rich** 14:20
**richie** 50:7
**ridge** 7:7,22 8:1
8:3 10:6 11:11
11:12 15:3
20:2,4,6,7,20
21:4,11 22:6
22:19,23 23:3
24:1,14 25:19
25:21 26:2,12
26:13,14,16
27:12,14 28:12
28:22 29:2,3,5
30:1 49:16
56:1,2,3
**ridges** 6:8,13
10:6,11 11:13
11:16 23:15
**right** 6:17 7:24
8:21 10:4 11:4
16:2,8 18:16
28:11 32:6
33:12,14 36:1
36:9 43:18
48:3,18 53:23
54:21 60:1
61:6,13 62:25
64:9
**rim** 20:12

**rivet** 21:13,15
**rivets** 21:17,18
**roll** 57:2 58:17
**roller** 59:3
**rolling** 57:5,8
57:12 58:5
59:1
**rolls** 58:20
**roof** 7:25 9:12
15:25 16:5
17:3,15 19:17
24:5,15,20,22
25:10,16 28:20
29:11 30:2
31:5 32:2 34:1
34:7,12 35:6
35:15 37:18
38:4 40:16
41:14,17,21
42:13,17 51:6
51:10 52:8
53:3,5 54:7,10
55:25 56:1,4,5
56:8 59:9
**roofing** 35:24
45:2 56:12
**roofs** 8:25
29:12 34:20
35:1 36:6 54:8
58:20
**rosecrans** 2:4
**running** 62:21
**rusted** 21:19

**s**

**s** 2:1 4:6 5:1,1
19:10
**san** 2:6
**sanders** 1:12
3:4 5:9 60:8
65:5 67:4 68:5
**sarah** 1:4 68:4
**saw** 15:16 45:6
45:12
**saying** 13:15
25:15 26:11
30:4 53:2
57:17
**says** 14:20 23:1
31:2 34:17
35:2,3 47:11
49:6,7 63:11
**scaffold** 43:22
**scaffolding**
47:14
**scale** 49:18
**scheduled**
11:21
**screw** 59:4
**scrolling** 62:13
**se** 2:10
**seam** 7:12,13
7:16,17 20:4,4
20:23 21:4
24:15 54:3
**seamed** 19:18

**seamer** 19:10
19:12
**seams** 7:20,21
10:5,6 29:21
**second** 52:16
53:8,25 59:9
**section** 7:24
23:23,24 33:20
54:2
**sections** 26:7
26:11,12,14
**secure** 21:21
**secured** 19:9
21:14,14 54:11
**see** 15:20 16:7
18:19,22 27:19
28:2 29:22
40:3,4 43:7
46:11,12,12,13
49:11,16,20
50:18,25 51:5
51:22
**seen** 9:19
**sense** 5:25 8:22
8:23 9:2,3,6,12
14:18 15:5
**sent** 60:12
61:20 68:14
**sentence** 4:5,7
**separate** 48:19
48:23 62:16
**separated**
35:19,22 48:22

[separating - store]                                                    Page 16

separating
  50:15
separation   8:3
september   1:8
  1:13 21:25
  65:6 67:5,20
  68:3
set   67:19
setting   52:6
shaped   20:10
sheet   65:1 66:6
  68:11
ship   56:22 59:6
shipment   45:20
shipped   42:24
  57:8 59:11
shoe   50:19,20
  50:23,24,25
shop   42:22
  43:10
short   5:24
  20:17 55:25
  56:5
show   16:4
  18:16 28:8
  30:2,6,9 33:8
  49:17 50:15
  51:1 62:22
showed   14:18
  23:24 49:4
showing   30:8
shows   28:11
  35:6 50:17
  63:2

side   14:21,21
  15:17,19 21:20
  23:24 24:7,9
  24:15 25:19
  27:13 29:8,11
  29:14,15,17
  31:10 52:11,19
  52:20,20,24
  53:3,5 54:2,7
  54:14,19,22
sides   10:6
sign   68:12
signature   66:10
signed   68:19
similar   39:17
  42:17 49:18
simply   21:14
  61:8
single   20:14
  26:12,16 27:14
  42:18
singular   26:4
  26:14
sir   13:1 14:9
site   25:18 27:12
  47:14,21 48:12
  48:14 56:24
  57:2,9 58:2,14
  58:16,16 59:2
  59:3,7,11
  63:24
six   20:18 29:12
  44:16,20 46:1
  54:8 61:5

sloped   26:8
solely   36:7
  37:21
solution   59:12
solutions   68:23
somebody   34:1
  58:7,18
sorry   11:18
  18:5,10 22:13
  23:21 34:11
  41:6 44:19
  53:19 60:5
  62:10
sound   53:16,18
  54:13
source   42:4
  43:23 58:11
sources   57:11
south   7:9 54:22
southeast   51:12
southwest   52:9
  53:5 54:20
space   9:22
spaced   54:5,10
spacing   54:4,6
speak   50:1,5,8
speaking   13:19
  36:15 37:1
specific   11:3
  12:3 25:3
specifically
  10:8 11:8 12:9
  50:22

specifics   27:6
speech   4:4
spelling   4:3
spoke   50:3
spoken   10:22
springline
  38:15,18 39:4
  40:22 41:4,5,7
  41:8,11,12,18
  41:24,25 42:3
  42:5 43:25
square   31:16
  31:17,22 32:2
st   1:2,2 42:6
  43:13,13,14,16
  45:3,12 48:16
stand   41:6
standard   10:5
standing   54:3
started   10:20
state   5:3,8
  53:20,25 67:3
stated   15:2
statement
  32:16
states   1:1
steel   21:18
stenographic...
  67:10
stick   37:15
stop   13:19
  36:15 52:16
store   58:17

**[storm - three]**                                                    Page 17

| | | | |
|---|---|---|---|
| **storm** 21:3 22:3 | **supervision** | 14:17,17,19,19 | **things** 7:10 |
| 22:17 25:4 | 48:12,14 | 14:25 20:3 | 9:18 10:16 |
| 28:8 29:15 | **supervisor** | 41:11 | 18:1 24:17,22 |
| 36:4,5 40:14 | 46:15 | **talking** 5:19,24 | 25:8 33:19 |
| 48:22 49:14 | **supporting** | 7:1,12 8:8,13 | 37:21 47:20 |
| 55:17 61:2 | 44:2 | 23:21 27:14 | **think** 11:10,13 |
| **storms** 29:16 | **supports** 54:9 | 28:22 35:8 | 12:14 15:10,12 |
| **street** 1:16 2:4 | **sure** 8:15 26:10 | 36:19,21 38:17 | 15:17 21:16 |
| **strike** 21:22 | 28:10 34:8 | 41:20,21 43:25 | 24:21 27:15 |
| 25:14 33:13 | 38:16 39:10 | 54:19 | 28:9 30:7,11 |
| 55:8 | 43:6 47:3 53:1 | **tell** 5:11,18 | 30:20,22 31:7 |
| **strikes** 21:25 | 53:10 | 9:20 11:4,8,15 | 32:3,24 43:24 |
| **structure** 52:20 | **surgery** 11:21 | 11:16 50:22 | 44:16 50:10 |
| **stuart** 2:11 | **surviving** 54:12 | 52:7 | 51:12 53:6,11 |
| **subjected** | **suspected** | **telling** 13:2 | 53:11 55:19 |
| 53:15,21 | 26:17 | 48:2 | 57:20 59:18,24 |
| **submission** 9:4 | **sworn** 5:2 67:7 | **ten** 31:10 | 60:12 61:12 |
| **submitted** 30:8 | **system** 35:24 | **terms** 22:7,20 | **thinking** 7:8 |
| 30:15,21 | **t** | 39:6 40:5 | 52:23 |
| **subscribed** | | 52:23 56:12 | **thirty** 11:5 |
| 66:17 | **t** 5:1 66:1 | **testified** 5:4 | **thomas** 1:2,4 |
| **subsequently** | **take** 14:3 20:23 | 11:10 | 2:7 42:6 43:13 |
| 67:11 | 21:10 27:21 | **testify** 67:7 | 43:16 45:3,12 |
| **substracted** | 30:9 33:17 | **testimony** | 48:16 65:3 |
| 31:17 | 41:16 48:17 | 11:14,17 12:2 | 68:1,4 |
| **sufficient** 60:16 | 61:14 | 16:20 66:4 | **thought** 14:21 |
| **suite** 2:5,11 | **taken** 27:1,5,7 | 67:10 68:9,17 | 23:21 31:17 |
| 16:8 | 40:19 61:16 | **theft** 45:18 | 41:3 52:10,18 |
| **summary** 34:13 | 67:4,10,15 | **thereof** 67:19 | 60:16 |
| 34:16 63:11 | **talk** 8:7 12:6,8 | **thing** 12:24 | **three** 23:25 |
| **sun** 52:6 | 12:23 13:10,13 | 20:5 33:1 | 44:15,17,18 |
| **superior** 55:10 | 19:5 28:12 | 35:13 40:14 | 45:9 56:19,20 |
| 60:22 | **talked** 10:25 | 51:22 60:4 | 56:21 |
| | 11:6 12:5 | | |

[time - voluntary]                                                    Page 18

**time** 1:14 5:19
  8:7 10:19
  11:23 16:20,21
  17:15 18:18
  19:18 24:21
  26:6 42:10
  46:14 49:3
  68:18
**timeframe**
  12:13 68:8
**times** 31:9
**today** 5:20 9:14
  11:7,17 16:21
  30:16 53:10
  60:11,15
**today's** 5:18
**tom** 2:6 11:10
  17:19 18:3
  30:7 44:12,13
  68:2
**tom's** 50:20
**took** 12:4 26:20
  28:18 30:7
**total** 30:24 31:5
  32:1,2 36:6
  38:10 61:24
  62:3,21 63:11
  63:17,24
**totaling** 32:1
  63:3
**totals** 46:15
**traditionally**
  19:15 58:20

**trailing** 4:6
**transcribed**
  67:11
**transcript** 4:1
  68:6,19
**transcription**
  67:9
**transient** 43:12
**transport**
  43:13 45:11
**transportation**
  58:1,4
**transported**
  56:24 57:23
**travel** 48:7,15
  63:24,25
**true** 16:7 25:2
  25:5 29:14
  66:5 67:9
**truth** 5:11
  66:15 67:7,7,8
**trying** 9:5
  11:23 32:6
  36:16 42:2
**tucked** 56:9
**twenty** 11:5
  12:4 31:9
**two** 8:4,5,19
  10:20 12:11
  21:19 39:5
  46:1 48:6,7
  55:24 56:3,5
  56:20,21,22
  58:22

**type** 50:16

**u**

**u** 5:1 66:1
**under** 5:10
  24:18,20 27:8
  33:19 43:11
  45:2 46:16
  47:8 50:24,25
  53:13,20 55:8
  67:8
**underneath**
  27:11
**understand**
  5:10,13 7:22
  9:5 10:18
  11:23 12:17
  21:23 26:10
  32:7,21 35:23
  36:22 38:16
  42:2 48:19
  51:4,4 53:10
  53:12 63:14
**understanding**
  8:2
**understood**
  8:10
**unedged** 56:9
**united** 1:1
**updating** 34:5
**uplift** 52:18,19
  52:25 53:2
  54:13,19,22

**uplifted** 50:17
**uplifting** 52:15
**upper** 16:8
**use** 19:12 39:25
  50:2
**used** 10:5 24:6
  25:21 28:7
  31:16,19 68:19
**using** 47:2
**usually** 19:12
**utilize** 40:5
**utilized** 59:20

**v**

**v** 68:4
**verify** 68:9
**veritext** 68:14
  68:23
**veritext.com.**
  68:15
**versus** 58:16
**video** 17:2,3,14
  28:10
**view** 27:20
**violate** 6:18
**violation** 6:16
**virgin** 1:1 42:6
**visit** 25:18
  26:21 27:12
  63:20,24
**vol** 68:5
**volume** 1:11
**voluntary**
  14:10

[vs - yesterday]                                                    Page 19

| | | |
|---|---|---|
| **vs**   1:7 65:3 | **witches**   26:8 | **years**   61:6 |
| **w** | 58:23 | **yech**   57:1 |
| **wait**   8:8,9 | **witness**   3:3 | **yep**   45:5 |
| **walk**   31:14 | 13:24 14:5 | **yesterday** |
| **walked**   12:10 | 18:3,5,7 37:2 | 21:16 |
| **want**   12:12 | 60:3 64:12 | |
| 13:13,16 14:9 | 67:6,19 68:8 | |
| 17:25 22:14 | 68:10,12,18 | |
| 37:8 38:1 | **wlclaw.com** | |
| **wanted**   49:3,17 | 2:12 | |
| **wants**   61:3 | **wondering**   6:7 | |
| **warping**   30:4 | **word**   4:6 | |
| **way**   10:10,11 | **words**   19:17 | |
| 23:18 33:3 | 33:1 55:12 | |
| 46:11 57:7 | 59:6 | |
| 58:10,25 60:24 | **work**   7:19,20 | |
| **we've**   24:10 | 34:22 59:15 | |
| 28:22 53:23 | 64:3 | |
| **wedges**   20:9,10 | **write**   63:21,22 | |
| **weeks**   44:18 | **writing**   55:3 | |
| 48:6 | **wrong**   32:9 | |
| **went**   5:23 | **x** | |
| 21:19 23:4 | **x**   3:1 | |
| 25:25 38:10 | **y** | |
| 53:9 | **yeah**   6:3 10:15 | |
| **west**   23:24 24:7 | 19:11 31:21,24 | |
| 29:8,11,14 | 33:2 35:10 | |
| 51:19 52:11,20 | 39:14 40:8 | |
| 52:20,24 53:3 | 44:10,22,24 | |
| 54:1,7,14,19,19 | 45:1,10 46:8 | |
| **williams**   2:10 | 46:10 55:14 | |
| **wise**   15:6 32:9 | 60:22 61:5 | |