# Exhibit 10

Transcript of the Testimony of:

**BARRY HUBER**

FRIEDBERG, et al.

vs.

DAYBREAK, INC.

October 7, 2025

Volume I



IN THE UNITED STATES DISTRICT COURT

OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN


| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, | ) ACTION NO.<br>) 3:19-cv-0053-RAM-EAH<br>) |
|         Plaintiffs, | )<br>) |
|     vs. | )<br>) |
| DAYBREAK, INC., dba HUBER & ASSOCIATES, | )<br>)<br>) |
|         Defendant. | )<br>) |


VIDEO-RECORDED

VIDEOCONFERENCE DEPOSITION OF

NON-RETAINED EXPERT BARRY HUBER

October 7, 2025


Reported by Beth A. Ballerini, CSR

Certificate No. 7358


Job No. 131974

Barry Huber                                               October 7, 2025

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   OF THE VIRGIN ISLANDS

 3              DIVISION OF ST. THOMAS AND ST. JOHN

 4

 5   THOMAS F. FRIEDBERG & SARAH L.   ) ACTION NO.
     BUNGE,                          ) 3:19-cv-0053-RAM-EAH
 6                                   )
                     Plaintiffs,     )
 7                                   )
         vs.                         )
 8                                   )
     DAYBREAK, INC., dba HUBER &     )
 9   ASSOCIATES,                     )
                                     )
10                   Defendant.      )
     _____)
11

12

13

14              The Video-Recorded Deposition of

15         Non-Retained Expert BARRY HUBER, located in

16         Lake City, Florida, was taken pursuant to

17         Notice of Deposition, via videoconference,

18         on Tuesday, October 7, 2025, commencing at

19         10:01 a.m. Pacific Standard Time/1:01 p.m.

20         Eastern Standard Time, before Beth A.

21         Ballerini, CSR No. 7358, a Certified Shorthand

22         Reporter in and for the State of California.

23

24

25
```

Barry Huber                                                    October 7, 2025

```
 1              A P P E A R A N C E S

 2

 3      (All appearances were via videoconference.)

 4

 5   For the Plaintiffs:

 6        LAW OFFICES OF FRIEDBERG & BUNGE
          BY:  THOMAS F. FRIEDBERG, ESQ.
 7                 and
              SARAH L. BUNGE, ESQ.
 8        1005 Rosecrans Street, Suite 202
          P.O. Box 6814
 9        San Diego, California 92166
          619.557.0101
10        tom@lawofficefb.com

11

12   For the Defendant:

13        WILLIAMS, LEININGER & COSBY, P.A.
          BY:  JEFFREY C. COSBY, ESQ.
14        301 Southeast Ocean Boulevard, Suite 205
          Stuart, Florida 34994
15        772.463.8402
          jcosby@wlclaw.com
16

17
     Also Present:
18
          John Dusenbery
19        Video Specialist

20

21

22

23

24

25
```

Barry Huber                                                  October 7, 2025

```
 1                    I N D E X

 2

 3    Examination by:                              PAGE

 4            Mr. Friedberg                            6

 5            Mr. Cosby                               59

 6

 7

 8

 9

10

11

12

13                    E X H I B I T S

14

15    EXHIBIT                                      PAGE

16    Exhibit 1     F&B v. Daybreak - Deposition     9
                    Exhibits
17                  (Bates Nos. P000001-000018)

18

19

20

21

22

23

24

25
```

Barry Huber                                      October 7, 2025

```
 1                TUESDAY, OCTOBER 7, 2025
 2                10:01 A.M. PST/1:01 P.M. EST
 3
 4          THE VIDEOGRAPHER:  Good morning.  We are now
 5   on the record.
 6          Today's date is October 7th, 2025.  The time
 7   is approximately 10:01 a.m. Pacific/1:01 Eastern
 8   Standard Time.
 9          This is the recorded deposition of Barry
10   Huber, testifying in the matter of Friedberg versus
11   Daybreak, Inc.  It is in U.S. District Court, Court
12   of the Virgin Islands, Division of St. Thomas and
13   St. John.  Case No. 3:19-cv-0053-RAM-EAH.
14          This deposition is taking place via Zoom
15   videoconferencing.  My name is John Dusenbery.  I'm with
16   Lexitas.  I'm the videographer.  The California
17   Certified Shorthand Reporter today is Beth Ballerini,
18   CSR No. 7358.
19          The deposition is recorded at all times unless
20   all counsel agree to go on or off the record.
21          Would all counsel present please state their
22   appearance, starting with the noticing attorney.
23          ATTORNEY FRIEDBERG:  Good day.  My name is Tom
24   Friedberg, and I represent the Plaintiffs.
25          ATTORNEY COSBY:  Jeff Cosby on behalf of
```

```
 1   Daybreak.
 2              THE COURT REPORTER:  Mr. Huber, please raise
 3   your right hand.
 4              Do you solemnly swear the testimony you are
 5   about to give in the matter now pending will be the
 6   truth, the whole truth, and nothing but the truth?
 7              THE WITNESS:  I do.
 8              THE COURT REPORTER:  Thank you.
 9
10                    E X A M I N A T I O N
11   BY ATTORNEY FRIEDBERG:
12       Q.   Hi.  Good morning, Barry.  I'm here to meet
13   with you again based on the fact that you've been listed
14   as a, quote, non-retained expert, close quote, to ask
15   you about some of your opinions and testimony.
16              Do I need to repeat the general admonitions or
17   instructions for a deposition?
18       A.   I hope not.  We should be good.
19       Q.   All right.  If for any reason I'm not clear
20   with my question and you'd like me to restate it, just
21   speak up and I'll be more than glad to do so.  Okay?
22       A.   Absolutely.
23       Q.   Have you had an opportunity of reviewing your
24   deposition transcript from April 28, 2025?
25       A.   Yeah, briefly.  My own briefly, yeah.
```

Barry Huber                                                October 7, 2025

```
1        Q.   Did you sign your deposition?

2        A.   No.

3        Q.   Were there any errors in your deposition that

4   you were aware of?

5        A.   Not that I'm aware of.

6        Q.   What documents have you reviewed since

7   April 28, 2025, pertaining to this case?

8        A.   Well -- let's see.  Looking through various

9   project photos; the contract; SMACNA; Revere.  I read

10  through the depositions by Brabas and Sanders, Part I

11  and Part II.  I can't say it was exciting reading and I

12  retained it all, but I did read through them.  Thinking

13  through just, you know, looking through some of the

14  documents about the case since the previous --

15       Q.   What documents -- I interrupted you.

16       A.   Like I say, you know, SMACNA; the contracts;

17  photographs of the job.

18       Q.   And those photographs, from what source?

19       A.   Our own file.

20       Q.   Those were photographs that were produced

21  previously by your office?

22       A.   Correct.

23       Q.   You've reviewed Mr. Brabas's deposition?

24       A.   I did.

25       Q.   Did you review the photographs Mr. Brabas
```

Barry Huber                                                    October 7, 2025

```
 1   took?
 2        A.    I was not aware of photographs.
 3        Q.    Were you aware of photographs showing where
 4   the hip/ridge intersection of the main roof failed?
 5        A.    As I say, I was not aware of photographs.
 6        Q.    When you reviewed the deposition transcript,
 7   did you see that they referred to photographs?
 8        A.    I honestly don't recall that.
 9        Q.    What about when you reviewed Mr. Sanders'
10   deposition, Volume I and II, were you aware of
11   photographs taken post-Irma?
12        A.    It would only be, not in reference to reading
13   through the deposition, but just knowing the history
14   with Sanders, that there were photographs from an
15   earlier report.
16        Q.    You haven't visited the site since April 2025?
17        A.    No.
18        Q.    In fact, you've never been on the site since
19   the work was completed in July of 2010.
20        A.    I'm trying to remember if I went back after
21   completion.  I think I did because you had some concern
22   with -- that you wanted some of those hip seams
23   straightened out, and I took pictures of them.  But
24   that's the best of my recollection.  Obviously, it's --
25   best of my recollection being so far back.
```

Barry Huber                                                                    October 7, 2025

1      Q.    Okay.  When you hired -- were you the one that

2   hired Micah?

3      A.    Yeah.  I'm pretty sure, yeah.

4      Q.    What was Micah's experience in the roofing

5   industry at the time you hired him?

6      A.    It was limited, as far as roofing goes.  He

7   was -- had a construction background because his dad was

8   a contractor, so --

9      Q.    The contract that we're referring to in this

10  case --

11          ATTORNEY FRIEDBERG:  And, John, if you could

12  bring it up.  It's on P8 of Exhibit 1.

13          (Exhibit 1 marked for identification.)

14  BY ATTORNEY FRIEDBERG:

15     Q.    Do you see that, Barry?

16     A.    Yeah.  It's a little blurry.  It's coming into

17  view here, I think.

18          Yup, there you go.

19     Q.    Did you draft this contract?

20     A.    I mean, if I didn't, Jack Burbach would have.

21  It was probably one of us, I would assume.

22     Q.    You agree, though, that this is a contract

23  from Huber & Associates, or Daybreak, for this

24  particular project.

25     A.    Correct.

1      Q.   Have you used this particular contract form
2  previously on other projects?
3      A.   Yeah, similar -- a similar template, yeah.
4      Q.   The Section II, work, do you know who drafted
5  that?
6      A.   I would again say that would be either myself
7  or Jack Burbach.
8      Q.   If, hypothetically, Jack Burbach drafted it,
9  would you have approved it prior to it being sent to the
10  owners?
11      A.   Yes.
12      Q.   And if I understand, you've been in the
13  roofing industry for, according to this document,
14  49 years?
15      A.   That is correct.
16      Q.   What specifically are your opinions as a
17  non-retained expert?
18      A.   Obviously that's a general question, and I --
19  you know, I know you're not talking about my opinions
20  about politics.  My opinions as an expert as it relates
21  to copper standing seam or roofing in general?
22      Q.   Let's go to page 5 of Exhibit 1.
23           Have you seen this document before?
24      A.   I can't say that I have.
25      Q.   Did Mr. Cosby contact you to discuss that he

1  wanted to list you as a non-retained expert?

2      A.   Yes.

3      Q.   And when was that conversation?

4      A.   Maybe a month ago.

5      Q.   And what were you asked to give opinions

6  regarding?

7      A.   Our expertise -- or my expertise as regards to

8  the roof in question.

9      Q.   Anything other than what you testified in

10 April of 2025?

11     A.   I guess I don't understand the question.  I

12 know it seems like a simple question, but I don't

13 understand it.

14     Q.   That's fine.

15          The opinions you were asked to give as a

16 non-retained expert, is that anything different than

17 what you testified to in your deposition in April of

18 2025?

19     A.   I wouldn't say anything different, but we

20 might be able to expound on what was said.

21     Q.   And what do you mean by that?

22     A.   More clarification of standards and what was

23 expected -- or should be accepted on this particular

24 project.

25     Q.   And what standards are you referring to?

Barry Huber                                              October 7, 2025

1        A.    The standards that were referenced in our
2   contract.
3        Q.    Which are?
4        A.    SMACNA and Revere Copper & Common Sense.
5        Q.    Whether you drafted or approved this contract,
6   the contract itself requires a list of both SMACNA and
7   Copper & Common Sense, using the word "and."
8              Do you agree?
9        A.    Yes.
10       Q.    As opposed to "or," meaning either/or.
11       A.    Correct.
12       Q.    So the intention is that the work was to be
13  completed in compliance with both Copper & Common Sense
14  and SMACNA, correct?
15       A.    I will say yes with a caveat.  If there is a
16  conflict or a discrepancy, you're referring to both
17  standards, and then you go with one.
18       Q.    All right.  Well, you say you go with the one.
19  How do you know which one to go with?
20       A.    Depending on job conditions.
21       Q.    Well, the determination of which standard to
22  go for when the contract calls for both standards, you
23  said it's dependent on job conditions?
24              Is that your testimony?
25       A.    Well -- to explain it, it's, like -- for

1  example, one standard might say you should use expansion

2  cleats after 20 feet, and another standard might say you

3  should use expansion cleats on a 30-foot panel.  And

4  given the, say, temperature changes for the locale, you

5  might go with the 30-foot.  But if you're, say, up in

6  the North where it could go from 120 temperature down

7  to 40 below, you might put your expansion cleats at

8  20 feet.  If --

9      Q.   Were any -- I'm sorry, go ahead.  I didn't

10  mean to interrupt you.

11      A.   Tom, it's with -- considering job conditions

12  to do the best for the job at hand.

13      Q.   Considering job conditions, understanding that

14  it's hotter in the Caribbean than in the Northeast

15  United States, were expansion cleats in fact put on any

16  of the copper runs?

17      A.   It's not -- that's not really the correct

18  question.

19      Q.   Well, it's the question I'm asking you.

20           Were expansion cleats used in this case on

21  this project?

22      A.   I don't believe so, but it's not a question of

23  the heat but of the variation of temperatures.

24      Q.   Given the variation of temperatures that may

25  exist on St. John, were expansion cleats used?

```
 1        A.  It's not --

 2             ATTORNEY COSBY:  Object to form.

 3             You can answer.

 4             THE WITNESS:  It's not as possible in the

 5   Caribbean as, like I say, where the temperature extremes

 6   are massively extreme.  I mean from, like, say, even

 7   40 below in the Midwest to in the summer being roof

 8   temperatures of 150 or 160.  The amount of movement with

 9   the metal, you need to really seriously think about

10   expansion cleats.

11   BY ATTORNEY FRIEDBERG:

12        Q.  Well, are you saying there's not a movement

13   of the metal because of the temperature in the Virgin

14   Islands?

15        A.  I'm saying the temperature extremes.

16        Q.  I understand.

17             Did you hear my question or do you want it

18   restated?

19        A.  Yeah, please restate it.

20             ATTORNEY FRIEDBERG:  Can you read it back.

21             THE COURT REPORTER:  One moment.

22             (Record read:

23                  Q.  Given the variation of temperatures

24                  that may exist on St. John, were

25                  expansion cleats used?)
```

Barry Huber                                          October 7, 2025

```
 1              THE WITNESS:  It would be very, very, very few
 2      examples I think on St. John where they would be
 3      applicable.
 4      BY ATTORNEY FRIEDBERG:
 5          Q.   So does the length of the copper run and
 6      the -- whether there's a change in elevation or
 7      direction have anything to do whether expansion cleats
 8      should be used?
 9          A.   Yes.
10          Q.   And explain to me how that works.
11          A.   The longer the panel, the more possibility for
12      expansion and contraction.
13          Q.   And what is the recommended length by SMACNA
14      and/or Copper & Common Sense when there's a change of
15      direction or elevation in the copper run?
16          A.   For a continuous panel I believe it's 30 feet.
17      I don't -- just recall.  I mean, don't take my word for
18      it without looking it up.
19          Q.   In this particular case, the main house has a
20      change of elevation or a change of direction.  Agreed?
21          A.   You mean a change in roof slope.
22          Q.   All right, a change in roof slope.  Agreed?
23          A.   Yes.
24          Q.   And can you describe that change in roof slope
25      by any quantitative measure?
```

Barry Huber                                          October 7, 2025

1       A.   I think the main slope was steeper -- at,
2   like, a what, 8/12, 10/12 -- and it went down to a 4 or
3   5/12 down towards the bottom of the roof.
4       Q.   With those roof slopes, do any of the
5   standards require expansion cleats when the copper run
6   itself is 30 feet?
7       A.   With the break in the roof, that may change
8   the requirement.
9       Q.   Did it change the requirement in this case?
10      A.   It may have.
11      Q.   All right.  Were expansion cleats then used to
12  address the change of requirement due to the roof slope
13  change?
14      A.   In other words, the roof slope would dictate
15  that they're not as necessary, the change in slope.
16      Q.   Is that your testimony?
17      A.   Yeah.  It depends, though -- again, you want
18  to get into the technicality of it here.  The change in
19  slope can provide a stationary point.  And if that
20  change in slope provides a stationary point, now the
21  length of the panel that you're addressing for expansion
22  and contraction has become shorter.
23      Q.   Are you aware of any criticisms by any
24  individuals regarding the length of the copper runs
25  without use of expansion cleats?

Barry Huber                                                    October 7, 2025

```
1        A.   I can't say for certain.  Sanders may have
2   said something about that, but I can't say for certain.
3        Q.   Were you advised or provided any documents
4   from Cunningham and Lindsay who evaluated the roof
5   post-Hurricane Irma?
6        A.   No.
7        Q.   Were you aware that the insurance appraisers
8   for the homeowners -- for the homeowners insurance
9   company opined that expansion cleats should have been
10  used because the runs were greater than 20 feet with a
11  change of roof slope?
12            ATTORNEY COSBY:  Object to the form.
13            THE WITNESS:  No.
14  BY ATTORNEY FRIEDBERG:
15       Q.   Do you agree or disagree with that statement?
16            ATTORNEY COSBY:  Form.
17            You can answer.
18            THE WITNESS:  To answer a general agree or
19  disagree would be inappropriate.
20  BY ATTORNEY FRIEDBERG:
21       Q.   Do you have any opinions regarding -- I'm
22  going to ask you to assume that Cunningham and Lindsay
23  prepared a report post-Hurricane Irma criticizing the
24  length of the copper runs greater than 20 feet with a
25  change of roof slope without the use of expansion
```

```
 1   cleats.
 2           Do you agree or disagree -- or, strike that.
 3           Do you have any opinions in response to that
 4   statement?
 5           ATTORNEY COSBY:  Object to the form.
 6           You can answer.
 7           THE WITNESS:  My opinion would center around,
 8   again, the length of the panel prior to the pitch change
 9   and exactly how many panels were of that length given
10   that it's -- what, 8-sided hip, I believe, on the main
11   house, or -- so that the -- I can't even imagine that
12   any one panel would make that grade, but knowing the
13   configuration of the roof.
14   BY ATTORNEY FRIEDBERG:
15       Q.   Well, were there single panels used without
16   break from the top of the roof to the area where the
17   gutters are?
18       A.   There was a pitch change, so there was a
19   break.
20       Q.   How was that break addressed?
21       A.   My recollection is they used -- well, it's a
22   method that is used to run the double-lock seam through
23   the pitch change so there's a continuous water flow.
24   It's a method that you -- well, we have a slang for it
25   called the birdie twist.  But anyway, it's a method to
```

Barry Huber                                                    October 7, 2025

1    allow the panel to have a continuous double-lock seam
2    through the pitch change.
3         Q.   So --
4         A.   But it does lock the panel down at that
5    corner.
6         Q.   So if I understand your testimony, it's okay
7    to have a 30-foot panel with a pitch change as long as
8    it's double-lock seam?
9         A.   No.
10        Q.   All right.  Correct me.
11        A.   It's actually okay to have panels of 30 feet
12   or longer according to SMACNA.
13        Q.   Move to strike as nonresponsive.
14             ATTORNEY FRIEDBERG:  Can you read my last
15   question back, I think the second to last, Beth.
16             THE COURT REPORTER:  One moment.
17             (Record read:
18                  Q.  So if I understand your testimony,
19                  it's okay to have a 30-foot panel with a
20                  pitch change as long as it's double-lock
21                  seam?)
22             THE WITNESS:  A -- so the question -- I don't
23   know if that was really the question.  I'm not -- I
24   don't want to be difficult.  I just want to be accurate.
25   I don't --

Barry Huber                                                    October 7, 2025

```
 1   BY ATTORNEY FRIEDBERG:
 2        Q.   Well, that's okay.  We're going to read the
 3   question back to you one more time.
 4             If you can do so, Beth.
 5             Please listen.
 6             (Record read:
 7                  Q.   So if I understand your testimony,
 8                  it's okay to have a 30-foot panel with a
 9                  pitch change as long as it's double-lock
10                  seam?)
11             THE WITNESS:  Having a double-lock seam isn't
12   necessary.  There's a lot of different seam
13   configurations.  You could have a snap-lock seam; a
14   single-lock seam, which I wouldn't advise, but -- and
15   have a 30-foot panel.
16   BY ATTORNEY FRIEDBERG:
17        Q.   How is the 30-foot panel dealt with with a
18   roof change in this particular case?
19        A.   Like I say -- I tried to describe before.  The
20   panel is installed but able to be pushed into the pitch
21   change and still double-locked.  I mean, I don't know
22   without maybe a little video showing how it's done.  I
23   don't know if I can describe it, I'm sorry.
24        Q.   Well, my question to you still stands:  Is it
25   your testimony that using a 30-foot panel with a roof
```

```
 1   slope change with a double-lock seam complies with
 2   industry standards?
 3        A.   Yes, as I mentioned before -- but it was
 4   struck -- was that SMACNA allows for panels of 30 foot
 5   or more.
 6        Q.   What does Copper & Common Sense say about it?
 7        A.   I'm not sure.
 8        Q.   Now, in drafting the contract, you decided to
 9   use the word Copper & Common Sense and SMACNA, correct?
10        A.   Correct.
11        Q.   As opposed to Copper & Common Sense or SMACNA,
12   correct?
13        A.   I wouldn't say that was some deliberate
14   decision.  I think it could have gone either way.  We
15   would not usually be splitting hairs like that because
16   the standards are pretty similar, so -- but and/or, you
17   still want to get a standard written.  It's for the
18   benefit of the homeowner that you put a standard in
19   there.
20        Q.   For the benefit of the homeowner, the standard
21   you put in was that the contract -- the work was to
22   comply with both Copper & Common Sense and SMACNA.
23   Agreed?
24        A.   Right, that's correct.  It's just your
25   previous question was we decided to do "and" versus
```

Barry Huber                                                    October 7, 2025

```
 1   "or."
 2        Q.   Move to strike as nonresponsive.
 3             The contract that was presented to the
 4   homeowners for approval did not use the word Copper &
 5   Common Sense or SMACNA.  Agreed?
 6        A.   Agreed.
 7        Q.   And the purpose, as you just testified, of
 8   listing the standards is to provide information to the
 9   homeowner as to which standard would be complied with.
10   Agreed?
11        A.   Correct.
12        Q.   And in terms of the actual work to be
13   performed --
14             Well, let's bring up page 8 of Exhibit 1.
15             Okay.  Do you see the Section II, work?
16        A.   Correct.
17        Q.   All right.  And we've talked about installed
18   in accordance with Revere Copper & Common Sense and
19   SMACNA.  Agreed?
20        A.   Agreed.
21        Q.   Anything else?  Any other opinions or
22   testimony regarding this bullet point?
23        A.   The first bullet point?  No.
24        Q.   Yeah, the bullet point that says installed in
25   accordance with Revere Copper & Common Sense and SMACNA.
```

Barry Huber                                                October 7, 2025

```
 1        A.   No other comments right now.
 2        Q.   All right.  And then the third bullet says:
 3   Cleats installed at an average of 9 1/2 inches O.C. --
 4   which is on center -- with 2 ring shank nails per cleat.
 5             Do you see that?
 6        A.   Correct.
 7        Q.   Was there any language limiting where cleats
 8   were to be installed?
 9        A.   The language is indicative of the cleats in
10   the panels.  It is not indicative of the hip seams.
11        Q.   Is there any mention of the fact that cleats
12   were not to be installed at the hip/ridge seam in the
13   contract?
14        A.   The geometry would prevent an installer from
15   installing cleats at the 9 1/2 inches on center in the
16   hip seams.
17        Q.   Move to strike as nonresponsive.
18             ATTORNEY FRIEDBERG:  Can you please read my
19   question, Beth.
20             (Record read:
21                  Q.   Is there any mention of the fact
22                  that cleats were not to be installed at
23                  the hip/ridge seam in the contract?)
24             THE WITNESS:  No.
25   BY ATTORNEY FRIEDBERG:
```

Barry Huber                                              October 7, 2025

1      Q.    Does SMACNA address cleats at the hip/ridge

2   intersections?

3      A.    They have an image in the book of them.

4      Q.    And the image depicts that, cleats being used

5   at the hip/ridge intersection?

6      A.    Correct.

7      Q.    Any written documentation indicating that for

8   the work to be performed cleats were not going to be

9   installed at the hip/ridge intersections?

10      A.    Any documentation to that effect?

11      Q.    Yeah.

12      A.    No.  The real world would prevent it, but no

13   documentation.

14      Q.    Move to strike as nonresponsive.

15           The contract that you provided, you intended

16   to list the material terms of the contract?

17           ATTORNEY COSBY:  Object to the form.

18           You can answer.

19           THE WITNESS:  I'm sorry, again, not to be

20   difficult, could you repeat that question?

21   BY ATTORNEY FRIEDBERG:

22      Q.    Yeah.  The document you drafted or had drafted

23   and you approved regarding the proposal for the roofing

24   project in St. John intended to contain all material

25   terms for the work, correct?

```
 1              ATTORNEY COSBY:  Form.

 2              You can answer.

 3              THE WITNESS:  It should.  I mean it's

 4    obviously a very brief proposal, but it should identify

 5    most things.  But obviously it is -- I mean if you

 6    really wanted to identify every single detail, we

 7    probably could have had a couple more pages of the

 8    details.

 9    BY ATTORNEY FRIEDBERG:

10         Q.   Well, you were the one that drafted the

11    proposal, correct?

12         A.   Either drafted or reviewed.

13         Q.   Okay.  And I think you testified the purpose

14    was to provide information to the owner?

15         A.   Correct.

16         Q.   And also define the work to be performed by

17    Huber & Associates.

18         A.   Correct.  However, you've asked the question

19    about details.  This is very limited in details, this

20    particular proposal.

21         Q.   Right.  But what is specified, you would

22    agree, which is listed as a line item is that the

23    installation is to be in accordance with both Revere

24    Copper & Common Sense and SMACNA.  Agreed?

25         A.   Agreed.  The --
```

Barry Huber                                                    October 7, 2025

```
1        Q.   All right.  And then the --
2             ATTORNEY COSBY:  Hold on.  Hold on.  He wasn't
3   finished answering.
4             ATTORNEY FRIEDBERG:  Well, it calls for a yes
5   or no.
6             ATTORNEY COSBY:  He's allowed to explain his
7   answer.  Let him answer the question.
8             ATTORNEY FRIEDBERG:  Well, I'll move to strike
9   anything after the agreed.
10            ATTORNEY COSBY:  Go ahead, you can answer.
11            THE WITNESS:  Well --
12            ATTORNEY FRIEDBERG:  There's no question
13  pending.
14            ATTORNEY COSBY:  He was not finished with his
15  answer.
16            ATTORNEY FRIEDBERG:  Counsel --
17            ATTORNEY COSBY:  Let him answer the question.
18            ATTORNEY FRIEDBERG:  Counsel, he answered the
19  question.  If you don't like how I'm conducting the
20  deposition, you have your rights and remedies.
21            ATTORNEY COSBY:  You're cutting him off.
22            ATTORNEY FRIEDBERG:  Counsel --
23            ATTORNEY COSBY:  Stop cutting him off.
24            ATTORNEY FRIEDBERG:  If you'll allow me to ask
25  my next question, maybe you'll get an idea that I'm
```

Barry Huber                                                      October 7, 2025

```
 1   going to allow him to explain.  Okay?  Just pipe down
 2   for a moment.
 3   BY ATTORNEY FRIEDBERG:
 4       Q.   Is there anything in the contract that says
 5   that there are conditions with conforming to Revere
 6   Copper & Common Sense and SMACNA?
 7            ATTORNEY COSBY:  Object to the form.
 8            And answer the previous question if --
 9            ATTORNEY FRIEDBERG:  Don't give an instruction
10   to my question, Counsel.  All right?
11   BY ATTORNEY FRIEDBERG:
12       Q.   Go ahead and answer the question, Mr. Huber.
13            ATTORNEY COSBY:  Answer the last question,
14   Mr. Huber.
15            ATTORNEY FRIEDBERG:  No.  Counsel, this is my
16   deposition.  Stop directing the witness to answer the
17   question.
18            ATTORNEY COSBY:  Don't interrupt the witness's
19   answer.
20            ATTORNEY FRIEDBERG:  All right.  You know,
21   let's go off the record so Jeff can calm down for a few
22   minutes and we'll come back.
23            ATTORNEY COSBY:  You can calm down.  Go take
24   some medication.
25            THE VIDEOGRAPHER:  Going off the record at
```

Barry Huber                                                    October 7, 2025

```
 1   approximately 10:31 a.m.
 2              (Recess taken.)
 3              THE VIDEOGRAPHER:  We are back on the record
 4   at approximately 10:39 a.m.
 5   BY ATTORNEY FRIEDBERG:
 6       Q.   Barry, do you have anything else you want to
 7   say?
 8       A.   We'd have to go back to the question at this
 9   point.
10       Q.   Well, I'm not sure where we left off or didn't
11   left off, so I'm just going to proceed.  All right?
12              ATTORNEY COSBY:  No.  Counsel, it was two
13   questions ago.  I would like that question read back
14   because he didn't complete his answer.
15              THE COURT REPORTER:  One moment.
16              ATTORNEY COSBY:  And just so you're clear --
17   just so you're clear, Beth, it's not the previous
18   question, it's two questions ago.
19              THE COURT REPORTER:  I'll read them both back.
20              (Record read:
21                   Q.   But what is specified, you would
22                   agree, which is listed as a line item is
23                   that the installation is to be in
24                   accordance with both Revere Copper &
25                   Common Sense and SMACNA.  Agreed?
```

1              And the next question:

2                    Q.  Is there anything in the contract

3                    that says that there are conditions with

4                    conforming to Revere Copper & Common

5                    Sense and SMACNA?)

6          THE WITNESS:  So the first of those two, I

7    was going to qualify, again, because -- I mean, I

8    understand -- you know, I don't know how much platform I

9    get to talk here.

10             But I understand completely what's going on

11   here, Tom, is -- and in the real world, for standing

12   seam copper or other roof systems, oh, I could give you

13   a proposal with many pages and many details and many

14   drawings.

15             So when you ask about Revere and SMACNA, there

16   is more to it than just saying these two specifications.

17   And when I say the real world, you could not

18   mathematically conform to 9 1/2 inches on center for hip

19   cleat spacing.  It's mathematically impossible.

20   BY ATTORNEY FRIEDBERG:

21        Q.  Are you done?

22        A.  So in regards to Revere and SMACNA, SMACNA

23   does not specify clips in the hip or ridge seam.  There

24   is a picture of that as well as a picture of other parts

25   of standing seam roofing, not a specification.

Barry Huber                                            October 7, 2025

1        Q.   Are you done?

2        A.   Yes.

3        Q.   So it's your testimony it's impossible to put

4   cleats or clips at 9 1/2 inches on the hip/ridge

5   configuration for this roof?

6        A.   The way the roof was constructed, yes.

7        Q.   Could not be done.

8        A.   Could not be done because of simple geometry.

9        Q.   Now, in this proposal that you prepared, you

10  made sure to include things that would not be included,

11  correct?

12            ATTORNEY COSBY:  Object to the form.

13            But you can answer.

14            THE WITNESS:  Yeah, I'm not sure what you're

15  referring to.

16  BY ATTORNEY FRIEDBERG:

17       Q.   Well, in the general conditions you basically

18  said that we're not to include travel, rental cars,

19  food, lodging, or freight, right?

20       A.   That is correct.  And, again, I will add, the

21  proposal is quite brief.  I could show you multipage

22  proposals.  And the proposal is quite brief, so it

23  doesn't necessarily address every single addition or

24  deletion that would be applicable to this project.

25       Q.   The proposal -- are you done?

Barry Huber                                                    October 7, 2025

```
 1        A.    Yes, I'm done.
 2        Q.    The proposal of May 7, 2010, is what you
 3   deemed to be appropriate for a contract to go forward
 4   with this particular project.  Agreed?
 5        A.    Agreed.
 6        Q.    It was totally within your -- strike that.
 7              You had the discretion and ability to insert
 8   or delete terms as you desired.  Agreed?
 9        A.    Correct.
10        Q.    You had the ability to use the terminology
11   that you so desired.  Agreed?
12        A.    Correct.
13        Q.    And I think you previously testified that the
14   purpose of the contract, among other things, was to
15   advise the homeowner what the work was to be done and
16   what standards would be used.  Agreed?
17        A.    Agreed.
18        Q.    And within the proposal, as you prepared it,
19   there was no indication that certain standards would not
20   be followed even though they were mentioned in the
21   contract.  Agreed?
22        A.    Agreed.
23        Q.    Let's go back to page 5.
24              Do you have that document -- okay, here it
25   goes.
```

Barry Huber                                                    October 7, 2025

```
 1              Do you see that?
 2       A.    Yeah, there it is.
 3       Q.    What's wind uplift?
 4       A.    Wind uplift.  So it's basically what happens
 5  on top of an airplane wing.  There's a pressure created
 6  by the wind that pulls on an airplane wing or a roof
 7  system.
 8       Q.    Does the wind uplift --
 9              Well, what did you intend wind uplift to be
10  used as referred to in this paragraph 2 on page 5?
11       A.    There's been discussion or -- that there's
12  been some wind uplift damage on the main pavilion, and
13  it was to address that.
14       Q.    And what are you referring to?
15       A.    Only what has been reported to me as a hip
16  seam coming loose, or the hip cap.  I'm not sure exactly
17  what this damage is to this day.  But very minimal
18  damage, as I understand it.
19       Q.    And who told you it was minimal damage?
20       A.    I saw some picture or something of -- that
21  there was a hip seam just that had come loose, or the
22  cap had come loose.
23       Q.    And the cap is secured by rivets?
24       A.    Yes.
25       Q.    And what rivets -- what size rivets were used?
```

Barry Huber                                          October 7, 2025

```
1         A.    I couldn't tell you.
2         Q.    Are the rivets supposed to go through both
3    sides of the copper panel that form the hip seam?
4         A.    That would be the intention.
5         Q.    All right.  And the reason why it would go
6    through both portions of the copper, why is that?
7         A.    To be more secure.
8         Q.    And if the ridge caps only went through one
9    side of the copper, would that be deficient?
10             ATTORNEY COSBY:  Object to the form.
11             You can answer.
12             THE WITNESS:  I don't -- I don't know if
13   that's possible -- what you mean by one side.  I mean,
14   if you're drilling through the -- what we call a batten
15   cap -- if you're drilling through the batten cap, you're
16   coming out the other side.  So you would be going
17   through both, like, automatically.
18   BY ATTORNEY FRIEDBERG:
19        Q.    All right.  Well, the hole is drilled and the
20   rivets are manually installed, right?
21        A.    Correct.  Again, it's drilled through the
22   entire seam from side to side.  If the drill bit doesn't
23   come out the other side, you can't put the rivet in.
24        Q.    Understood.  So if it's drilled through the
25   sides -- if it's drilled through on both sides, the
```

1   requirement would be to put a rivet that would go

2   through both sides.

3        A.   Correct.

4        Q.   And failure to put a rivet that goes through

5   both sides, would that be deficient?

6        A.   Again, it's kind of not even possible to do

7   that.  It's a question -- I understand the question.

8   But when you look at the section of a hip seam, the way

9   they're done, and the cap over the top to -- again,

10  you're drilling through, you automatically hit both

11  sides.

12            You can't, like -- you'd have to be going,

13  like, up some crazy angle out the top or something.  So

14  generally when you're putting on a batten cap and

15  riveting, you're going through both sides.  I mean,

16  just -- it just would be hard not to.

17       Q.   Understanding that the drill bit went through

18  both sides but the installer putting in the rivet didn't

19  install the rivet through both sides, would that be

20  deficient?

21       A.   In such a case the other side of the

22  rivet wouldn't actually give any resistance, and it

23  wouldn't -- I mean it wouldn't -- I don't know how to

24  say this.  But it would be, like -- I mean, it's -- when

25  you're putting a rivet on, you -- you do the rivet gun

Barry Huber                                                    October 7, 2025

```
 1    until the rivet pops, which means it's attached to the
 2    other side.
 3         Q.   If rivets were not attached to the other side
 4    while installing the batten cap, as you're referring to
 5    it, would that be deficient?
 6         A.   Yeah.  As it relates to the batten cap, yes.
 7         Q.   And the problem being that it wouldn't provide
 8    sufficient securement or attachment of the batten cap if
 9    the rivets fell all the way through.  Agreed?
10         A.   Yeah.  The batten cap itself, correct.
11         Q.   And that's something that an installer should
12    be aware of to make sure the rivets go all the way
13    through.  Agreed?
14         A.   Correct.
15         Q.   And assuming that the rivets on certain of the
16    batten caps -- or a number of the rivets didn't go all
17    the way through, you would be critical of that.  Agreed?
18         A.   Yeah.
19         Q.   And if the rivets didn't go all the way
20    through to secure the batten cap, it's likely that
21    batten cap may not stay secure.  Agreed?
22         A.   It would have to be a number of rivets.
23         Q.   If there were a number of rivets missing -- so
24    a 30-foot section of batten cap became dislodged -- you
25    would agree that that would be -- you would be critical
```

```
 1    of that.
 2         A.    It depends on how --
 3               ATTORNEY COSBY:  Object to the form.
 4               THE WITNESS:  It depends on how it became
 5    dislodged, I guess.
 6    BY ATTORNEY FRIEDBERG:
 7         Q.    All right.  If there were no -- if there were
 8    rivets that didn't go through on an approximate 30-foot
 9    section of batten cap and that batten cap became
10    dislodged in high winds, would you be critical of that,
11    the installation practices for that batten cap?
12               ATTORNEY COSBY:  Object to the form.
13               You can answer.
14               THE WITNESS:  It depends on the -- there are
15    circumstances that would affect the answer to that
16    question, Tom, because was it struck; how strong was the
17    wind.
18               So yeah, if the rivets in that 30-foot section
19    never had any what you call purchase, you know, going
20    through the metal, then it wouldn't obviously take as
21    much wind.
22               But if those rivets did go through, it could
23    still have been dislodged by something hitting it or the
24    amount of right wind in the right spot.
25    BY ATTORNEY FRIEDBERG:
```

Barry Huber                                                    October 7, 2025

1      Q.   You don't know anything about the winds and

2  how it affected or struck the roof on Chocolate Hole for

3  this project, do you?

4      A.   I don't know if anybody does, do they?

5      Q.   That's not my question.  Do you want the

6  question read back?

7      A.   Sure.

8           (Record read:

9                Q.  You don't know anything about the

10               winds and how it affected or struck the

11               roof on Chocolate Hole for this project,

12               do you?)

13          THE WITNESS:  Well, to answer that question,

14  whenever there's a wind event or storm event, no one

15  would know -- even with tornadoes it takes sometimes

16  weeks to figure out what the tornado classification was.

17          So the question is a little unclear on what

18  you're trying to determine.  I don't -- that's why I

19  answered how I did, Tom, that would anybody know?

20  BY ATTORNEY FRIEDBERG:

21      Q.   Move to strike as nonresponsive.

22          My question is very simple:  Do you know what

23  type of wind the roof encountered on Chocolate Hole

24  during Hurricane Irma?

25      A.   I could assume because it was the strongest

1   Atlantic storm recorded for that many days and passed

2   just north of St. John when it was a Cat 5.  So I could

3   assume that the winds were pretty intense.  But to know

4   them exactly, of course not.

5        Q.   I'm going to move to strike everything other

6   than no, of course not, as nonresponsive.

7        A.   Oh, my.

8        Q.   Well, I just want to be clear, because I don't

9   want this case to go to trial and you come up with a

10  number.

11            You don't know what the wind velocity was at

12  the time the wind struck this roof on St. John, do you?

13            ATTORNEY COSBY:  Object to the form.

14            You can answer.

15            THE WITNESS:  And I'm going to answer with a

16  question:  Does anybody?

17  BY ATTORNEY FRIEDBERG:

18       Q.   I don't care about anybody.  My question is do

19  you know?  Yes or no.

20       A.   No, I don't know.

21       Q.   Thank you.

22            If, hypothetically, that there are no clips at

23  the hip/ridge seam and the batten caps don't have rivets

24  through both sides, or the rivets didn't have purchase

25  on both sides, what is holding the panels together?

Barry Huber                                              October 7, 2025

```
1        A.    The cleats that were installed in the panels

2   themselves.  Like, for example, if you took two pieces

3   of paper, laid them on your desk, and you hemmed those

4   two pieces together -- meaning you took one piece of

5   paper and folded it over the top of the other with a

6   little simple seam, which is done on the hips -- if

7   those two pieces of paper didn't come up, the hip seam

8   or the seam of the paper would not come up.

9              So if your panels are secured, the hip seam

10  will not come up.

11       Q.    Okay.  So if I understand what you just told

12  me is that if the hips -- if the clips are not secure,

13  then the hip seam or hip/ridge seams can come apart.

14             Is that what you just told me?

15       A.    I told you that in the actual roof panels, if

16  the roof panels remain attached, the seam cannot come up

17  itself because the seam is made by the two panels.  It's

18  like I say with this -- you know, imagine two pieces of

19  paper laid.  You take one, fold it up, the other one

20  folded up, fold it over each other.  And then if the

21  paper doesn't come up, that fold will not come up.

22             The only way for the hip seam to come up is

23  for the panels to come up.  And that's why the

24  9 1/2 inches for the roof panels was what was specified

25  and followed.
```

1      Q.   So it's your testimony that if the roof panels

2   are cleated, then the hip/ridge seam won't come apart?

3      A.   The -- it won't, like, actually come up.  I

4   mean, yeah, the battens -- the batten cap could be blown

5   off.  And it's possible that one side of the seam could

6   be lifted.  I don't know if that happened or not.  But

7   as far as actual hip seam -- like damage or missing or

8   whatever -- the panels -- if the panels are secured, the

9   hip seam is there.

10      Q.   If the hip seam comes apart approximately half

11   an inch to an inch, would you agree that there is -- the

12   hip/ridge configuration didn't hold?

13          ATTORNEY COSBY:  Object to the form.

14          You can answer.

15          THE WITNESS:  I would -- I guess I'd have to

16   know exactly what -- what -- so you're asking, like,

17   say, if one side of the hip seam lifted up?  I mean I

18   know you mentioned potentially the batten cap.  But one

19   side of the actual hip seam lifted up?  Is that what

20   you're asking?

21   BY ATTORNEY FRIEDBERG:

22      Q.   Yes.

23      A.   Is that what you're asking?

24      Q.   Yes.

25      A.   Oh, okay.  Then -- then that -- then that

1    would have been wind uplift in that case.  Yeah, where

2    one side lifted up.  Yeah, the batten cap comes off and

3    one side, which is from one panel, comes and goes over

4    the top of the other.  The one side lifts up, that would

5    be wind damage then -- it could be wind damage, I should

6    say, not could -- I mean is -- it could be wind damage,

7    of course.

8        Q.   And is it your testimony if the cleats are

9    placed at 9 1/2 inches on center, that that cannot

10   occur?

11       A.   I didn't say that, no.  I said that -- you

12   asked about the hip seam itself.  So if one side of --

13   so it's two panels joining, and one goes and folds over

14   the top of the other.  If that one that is folded over

15   the top of the other was to be lifted -- just that fold

16   gets lifted up, that could potentially be wind uplift at

17   that point.

18           But to further clarify this, if there would

19   have been cleats in the hips, it would not have

20   prevented such because the cleat in the hip would only

21   be on the one panel.  So even in the case that you put

22   forth here, the hypothetical, it is -- it wouldn't have

23   made a difference.

24       Q.   A couple of things.  Number one is you

25   actually haven't done any evaluation, have you,

Barry Huber                                                October 7, 2025

1   regarding what happened to this roof and the separation
2   of the panels at the hip/ridge seam, have you?
3        A.   No.
4        Q.   And you don't have any opinions, as to a
5   reasonable degree of probability, as to why the
6   hip/ridge seam failed in this case, do you?
7        A.   I have no firsthand knowledge of such.
8        Q.   Do you have any opinions, to a reasonable
9   degree of probability, as to why the hip/ridge seam
10  failed in this case?
11       A.   It would be required, in order to answer that
12  question, to tell me what failure means.
13       Q.   Based on the materials that have been provided
14  to you by counsel, do you have any opinions, to a
15  reasonable degree of probability, as to why the
16  hip/ridge seam separated?
17       A.   Again -- you know, the reasons are probably
18  just a few, right?  Wind uplift; debris, flying debris;
19  or somebody prying it up to investigate.
20       Q.   Again, I don't want you to speculate,
21  Mr. Huber.
22            Can you read my question back, Beth.
23            And just let me know yes or no whether or not
24  you have an opinion, to a reasonable degree of
25  probability.

```
 1                  (Record read:
 2                      Q.  Based on the materials that have
 3                      been provided to you by counsel, do you
 4                      have any opinions, to a reasonable degree
 5                      of probability, as to why the hip/ridge
 6                      seam separated?)
 7              THE WITNESS:  I guess I would generally call
 8    it storm damage.
 9    BY ATTORNEY FRIEDBERG:
10        Q.   Well, I don't want you to guess, sir.  I mean,
11    you've been -- you've testified as an expert in the
12    past, haven't you?
13        A.   Yes.
14        Q.   And you understand that your testimony has to
15    be based upon a reasonable degree of probability?
16        A.   Yeah.  And in light of that very thing, I
17    would say storm damage.  But, again, I've already
18    testified that I have no firsthand knowledge.
19              So to ask an expert what the damage is or how
20    it happened without firsthand knowledge but only
21    photographs, why wouldn't such an expert say, well,
22    probably storm damage.  How could he say anything else
23    without being firsthand?
24        Q.   Well, that's what I'm trying to find out,
25    Barry -- and I'm not threading the needle here -- it's
```

1  just that I need to find out specifically, you know, the

2  basis of what your opinions are and the basis therefrom.

3          And, number one, you've confirmed you have no

4  personal knowledge of really -- well, let me ask you:

5  What is lacking of your personal knowledge to be able to

6  answer a question as to why there was separation in the

7  hip/ridge seam?

8      A.   Well, you know, was there any debris strikes

9  near the hip/ridge seam?

10     Q.   Assuming there was not.  What other

11  information?

12     A.   Was the seam ever -- was it -- did it happen

13  to be the seam that was investigated before and weakened

14  the seam?

15     Q.   Would your expectation be a 30-foot section

16  would open up if in fact only 1 to 2 feet was

17  investigated?

18          ATTORNEY COSBY:  Object to the form.

19          You can answer.

20          THE WITNESS:  It could aid in such a thing.

21  It's the old, you know, sardines can effect.  You start

22  peeling.  Once you start peeling, it could aid in the

23  effect, yeah.

24  BY ATTORNEY FRIEDBERG.

25     Q.   Your assumption is that there was an

Barry Huber                                                    October 7, 2025

1  inspection; that the person who did the inspection
2  didn't properly reseam it and rerivet it and put the
3  batten cap back?
4           ATTORNEY COSBY:  Form.
5           You can answer.
6           THE WITNESS:  Well, you had asked me what --
7  you know, what basis I would like -- or what possible
8  things would cause this.  So I gave you those possible
9  things.  That's all I was doing.
10 BY ATTORNEY FRIEDBERG:
11      Q.   You don't know, to any reasonable degree of
12 probability, what exactly happened, do you?
13      A.   Again, no firsthand knowledge, right.
14      Q.   What other opinions have you been asked to
15 give as a, quote, non-retained expert, close quote?
16      A.   What other -- I'm sorry, what other opinions
17 am I asked to give?
18      Q.   Yeah.
19      A.   Anything regarding the roof in question and
20 how it was assembled.  You know, generally that.
21      Q.   All right.  Do you know how the roof was
22 assembled since you weren't there?
23      A.   We have some photos of how it was put together
24 while the guys were there.  You know, I -- I don't think
25 I was there while it was being installed, Tom.  I don't

Barry Huber                                              October 7, 2025

1    think I --

2         Q.   Do the photographs show any of the cleats

3    in situ; in other words, in place?

4         A.   Not that I --

5              ATTORNEY COSBY:  Object to the form.

6              But you can answer.

7              THE WITNESS:  Sorry, Jeff.

8              No, not that I can recall.

9    BY ATTORNEY FRIEDBERG:

10        Q.   Was there any discussion with anyone in the

11   crew during the installation regarding cleats?

12        A.   Not that I recall.

13        Q.   What specific opinions have you discussed with

14   counsel as to what you would give as a non-retained

15   expert?

16        A.   I don't remember discussing opinions with

17   counsel that I would give, just that I would be a --

18   whatever that is, non-whatever expert, whatever that was

19   called.

20        Q.   All right.  Do you have any additional

21   opinions regarding this project based on anything you

22   reviewed to date that weren't disclosed in your April

23   2025 deposition?

24        A.   Well, you know, again, at the time -- I mean

25   even from that deposition, you know, being kind of

1    hindered in being able to explain that -- the way the

2    battens were configured, the hypotenuse that's formed

3    by a hip seam, you couldn't have done cleats at

4    9 1/2 inches on center.  And, therefore, it's not any

5    great extrapolation to simply know that 9 1/2 inches

6    only referred to the roof panels and did not refer to

7    the hip seams.

8        Q.   Is that specified anywhere in your contract?

9        A.   Again, there's a -- there's a number of things

10   that aren't necessarily listed in any given job anywhere

11   on the planet that you go out and do -- to the best of

12   your abilities, to do the right job.  And listed or not,

13   they are done in doing the best job you can.

14       Q.   Move to strike as nonresponsive.

15       A.   Oh, my.  Can you ask the question again?

16       Q.   Sure.

17            Foundationally, the purpose of your contract

18   was to advise the owner of the scope of work and what

19   was to be included or not included.  Agreed?

20            ATTORNEY COSBY:  Form.

21            You can answer.

22            THE WITNESS:  In the one page is it possible

23   to possibly list all what is included and not included?

24   So I'm answering with a question.

25   BY ATTORNEY FRIEDBERG:

Barry Huber                                                    October 7, 2025

```
 1        Q.   All right.  I'm going to move to strike as
 2   nonresponsive.
 3             I take it that you agree that your contract
 4   did not list anything referable to your claimed
 5   impossibility to install cleats at 9 1/2 inches on
 6   center on the hip/ridge.  Agreed?
 7             ATTORNEY COSBY:  Form.
 8             You can answer.
 9             THE WITNESS:  To clarify impossible --
10   BY ATTORNEY FRIEDBERG:
11        Q.   I'm using your terminology from earlier.
12        A.   And that's why I'm clarifying.
13        Q.   You know, again, you used the word impossible.
14        A.   Yeah.  And so geometrically -- and this is
15   easy to understand.  On a triangle, a right triangle,
16   you have a 9 1/2 inch vertical line, then you have a
17   horizontal line, and then a hypotenuse is created.  That
18   hypotenuse is over 10 inches.  And so geometrically to
19   think that the 9 1/2 inches applied to clips on a hip
20   seam when they would be ineffective anyway --
21        Q.   Move to strike as nonresponsive.
22             I'd appreciate it if you'd listen to my
23   question, Barry.
24             You, again, testified that it would be
25   impossible to install clips at 9 1/2 inches on average
```

Barry Huber                                          October 7, 2025

1   on the hip/ridge seam.  Agreed?  That's what your

2   testimony is?

3        A.   I will not agree without being able to clarify

4   what impossible means.

5        Q.   Well, what does impossible mean then to you?

6   It's your term.

7        A.   Thank you.  Geometrically, if the battens are

8   9 1/2 inches on center on that roof, on that particular

9   roof, it would be over 10 inches, would not meet the

10  standard that was listed.

11            On those other roofs on the property would be

12  even greater spacing, probably over 14 inches.  And,

13  again, that's why the 9 1/2 inches did not apply to the

14  hip seams.

15            And to be clear -- and, you know, you'll

16  probably strike it because -- I don't know why -- but to

17  be clear, the 9 1/2 inches, as you can see, would apply

18  to the panels but could not apply to the hip.

19            So when I use the word impossible, it's just

20  as far as the geometry of it.

21        Q.   You're right, I'm going to move to strike as

22  nonresponsive.

23            The battens were not 9 1/2 inches on center,

24  were they?

25        A.   Well, they had to be.

Barry Huber                                          October 7, 2025

```
1        Q.   The cleats were to be 9 1/2 inches on center,
2   not the battens.
3        A.   Well, for the cleats to be, the battens needed
4   to be.
5        Q.   The battens are -- well, how wide are the
6   battens?
7        A.   They're 1-by-4s, I believe.
8        Q.   All right.  So nominal is 3 1/4 or
9   3 1/2 inches nominally?
10       A.   3 1/2.  Yeah, 3 1/2.
11       Q.   And it's your testimony it would be impossible
12  for the battens to be placed in such a manner that they
13  could not receive a cleat on average of 9 1/2 inches on
14  center?
15       A.   That was not my testimony, no.
16       Q.   All right.  Well, can the battens be placed in
17  such a manner so that the cleats can be placed on an
18  average of 9 1/2 inches on center for the hip/ridge
19  seam?
20       A.   I don't know what the geometry would be
21  without doing some calculations, but they would have
22  been -- in some of those roofs on your property would
23  have needed to be, like, almost solid decking, I think.
24       Q.   I'm going to move to strike as nonresponsive.
25            As you sit here today, you can't tell me, can
```

1  you, if in fact battens in the dimensions we've talked

2  about were installed whether it would accept the cleat

3  on an average of 9 1/2 inches on center at the hip/ridge

4  seam, can you?

5       A.   Well, mathematically, in many cases it would

6  not be sufficient.

7       Q.   Whether it was or was not sufficient, you

8  would agree that there was no mention of the fact that

9  cleats were not to be installed [inaudible] within the

10 terms of the contract?

11           ATTORNEY COSBY:  Object to the form.

12           You can answer.

13           THE WITNESS:  I'm sorry, you're going to have

14 to repeat that.

15           THE COURT REPORTER:  You froze in your

16 question, Tom.

17           Whether it was or was not sufficient, you

18 would agree that there was no mention of the fact that

19 cleats were not to be installed -- within the terms of

20 the contract?  We missed a section.

21 BY ATTORNEY FRIEDBERG:

22      Q.   Sure.  That the cleats were not to be

23 installed at the intersection of the hip/ridge seams.

24           ATTORNEY COSBY:  Object to the form.

25           THE WITNESS:  Because there is no

Barry Huber                                                        October 7, 2025

```
 1   specification for it.  If you refer to SMACNA and
 2   Revere, you would know that is not a requirement.
 3   BY ATTORNEY FRIEDBERG:
 4        Q.   Move to strike as nonresponsive.
 5             I just want to -- looking at the four corners
 6   of the contract, you would agree there's no mention of
 7   the fact that cleats are not to be installed at the
 8   hip/ridge seams on the contract itself?
 9        A.   It is inferred by the standards.
10        Q.   Move to strike as nonresponsive.
11             Would you agree that it's specifically not
12   listed on the contract that cleats are not to be
13   installed at the hip/ridge seams?
14             ATTORNEY COSBY:  Object to the form.
15             You can answer.
16             THE WITNESS:  How about just do nonresponsive?
17   BY ATTORNEY FRIEDBERG:
18        Q.   No.  I'm asking for the question, and I'll
19   move to compel it.
20             Do you need the question read back?
21        A.   Sure.
22             (Record read:
23                  Q.  Would you agree that it's
24                  specifically not listed on the contract
25                  that cleats are not to be installed at
```

Barry Huber                                                    October 7, 2025

```
 1                    the hip/ridge seams?)
 2            THE WITNESS:  One could easily gather that
 3   that was the case.
 4   BY ATTORNEY FRIEDBERG:
 5       Q.   Move to strike as nonresponsive.
 6            On the contract itself, you're able to read
 7   the words that you drafted?
 8       A.   Correct.
 9       Q.   And the words that you drafted, is it
10   mentioned anywhere in the contract that the cleats are
11   not to be installed at the hip/ridge seams?
12            ATTORNEY COSBY:  Object to the form.
13            You can answer.
14            THE WITNESS:  I guess it would be appropriate
15   to say that they are not listed as needing to be
16   installed.
17   BY ATTORNEY FRIEDBERG:
18       Q.   Move to strike as nonresponsive.
19            Really simple.  And, again, I know you can
20   read the contract; you drafted it.
21            Looking at your contract that you drafted,
22   does it specifically mention the cleats are not going to
23   be installed at the hip/ridge intersections?
24            ATTORNEY COSBY:  Form.
25            THE WITNESS:  It doesn't say that they would
```

Barry Huber                                                    October 7, 2025

```
 1   be.
 2              ATTORNEY FRIEDBERG:  Move to strike as
 3   nonresponsive.
 4              Can I have the question read back, please.
 5              (Record read:
 6                   Q.  Really simple.  And, again, I know
 7                   you can read the contract; you drafted
 8                   it.
 9                        Looking at your contract that you
10                   drafted, does it specifically mention
11                   the cleats are not going to be installed
12                   at the hip/ridge intersections?)
13              THE WITNESS:  It doesn't say that they would
14   be.  That's my final answer.  Or we can go on all day,
15   but that's all I'm going to say.
16   BY ATTORNEY FRIEDBERG:
17         Q.   Move to strike as nonresponsive.
18              Show me in your contract where it says that
19   they would not be.
20         A.   Show me where it says they would be.
21         Q.   I'm asking the questions, Barry.
22              In the contract does it state in there that
23   the cleats would be?  Calls for a yes or no.
24         A.   It doesn't say --
25              ATTORNEY COSBY:  Object to form.
```

Barry Huber                                          October 7, 2025

```
 1              You can answer.
 2              THE WITNESS:  It doesn't say they would be.
 3  BY ATTORNEY FRIEDBERG:
 4      Q.   Show in the contract -- or, strike that.
 5              Does it say in the contract that the cleats
 6  would not be installed at the hip/ridge intersection?
 7      A.   It doesn't say that they would be.  Tom, I'm
 8  going to say this all day long because it's not a fair
 9  question.  It doesn't say that they would be and it
10  doesn't say that they wouldn't be.
11              So that's just, like -- it's not even worth
12  answering because it doesn't say they would be and it
13  doesn't say that they wouldn't be.  So how can you
14  answer that?
15      Q.   Move to strike as nonresponsive.
16              Do you have any other opinions regarding any
17  other aspect of this case that you've been asked to
18  give?
19      A.   No.
20      Q.   Do you have any opinions regarding any aspects
21  of this case that you haven't been asked to give?
22      A.   Not that I can think of right now.
23      Q.   Did you speak to Mr. Bragg at all?
24      A.   I don't know who that is.
25      Q.   Were you told -- Mr. Bragg purportedly is an
```

Barry Huber                                        October 7, 2025

```
 1   expert hired by your counsel.
 2           Did you ever hear what Mr. Bragg's opinions
 3   are?
 4       A.   I guess to clarify -- we might have talked --
 5   I might have talked to him.  I -- I'm not -- I don't
 6   know how to answer that because I'm not sure.  Mr. Bragg
 7   sounds unfamiliar to me in this situation, so --
 8       Q.   Do you recall speaking to an individual
 9   claimed to be an expert for you in this case?
10       A.   Yeah, I do remember speaking to -- yes.
11       Q.   Do you recall the substance of that
12   conversation?
13       A.   Not real clear.
14       Q.   Do you recall any aspect of that conversation?
15       A.   That he had visited the site, whoever it was.
16       Q.   Anything else?
17       A.   And he was going to be getting a report to
18   Jeff.
19       Q.   Have you looked at that report?
20       A.   I don't recall seeing the report.
21           ATTORNEY FRIEDBERG:  All right.  Why don't we
22   go off the record for a few minutes and I may be done.
23           THE VIDEOGRAPHER:  Going off the record at
24   approximately 11:18 a.m.
25           (Recess taken.)
```

Barry Huber                                          October 7, 2025

```
 1            THE VIDEOGRAPHER:  We are back on the record
 2   at approximately 11:20 a.m.
 3   BY ATTORNEY FRIEDBERG:
 4        Q.   Are you ready, Barry?
 5        A.   Yes.
 6        Q.   And I'm almost done.  I just want to ask you
 7   this.
 8            The decision as to what to put into and what
 9   not to put into the contract was exclusively yours.
10   Agreed?
11            ATTORNEY COSBY:  Object to the form.
12   BY ATTORNEY FRIEDBERG:
13        Q.   The owner didn't have anything to do with
14   drafting your proposal, did they?
15        A.   Oh.  Well -- I mean --
16            ATTORNEY COSBY:  Object to form.
17            THE WITNESS:  -- yes and no, I guess, because
18   obviously the input came from either you, Tom, or from
19   Chris about changing the spacing of the battens from
20   what we originally proposed.
21            But beyond that, I can't think of anything too
22   much.  I mean, there's some details about copper supply
23   and things, but -- I mean, I get the spirit of the
24   question.  But owner input would have been limited to
25   changing it to a 9 1/2 and how we configured the copper
```

```
1   supply, I think, pretty much.
2   BY ATTORNEY FRIEDBERG:
3       Q.   All right.  And changing it to 9 1/2 basically
4   resulted in an upcharge.  You charged --
5       A.   Yeah, I recall, I think it went from 12 to
6   9 1/2, to the best I can remember.
7       Q.   And in terms of the length of the contract,
8   that was completely within your control?
9           ATTORNEY COSBY:  Object to the form.
10          You can answer.
11          THE WITNESS:  The length, meaning --
12  BY ATTORNEY FRIEDBERG:
13      Q.   Yeah.  How many pages it had.
14      A.   Oh.  Yeah, it was a pretty well standard,
15  simple proposal form.
16      Q.   Right.  But if you wanted to make it longer,
17  you could have made it longer and put more terms in.
18      A.   Yeah.
19          ATTORNEY FRIEDBERG:  Thank you.  I have
20  nothing further.
21          THE WITNESS:  Okay.
22          ATTORNEY COSBY:  I've got a few questions,
23  Barry.
24          Can you pull up the contract, John.  I don't
25  remember what exhibit -- or I think it's Exhibit 1, a
```

Barry Huber                                          October 7, 2025

```
 1    composite.
 2              That's fine.  Thank you.
 3
 4                   E X A M I N A T I O N
 5    BY ATTORNEY COSBY:
 6        Q.   Barry, I've got some questions for you.  So I
 7    know we just went back and forth for a long time.  But
 8    the language regarding cleating, would you agree within
 9    this contract there's no specific language that says
10    cleats should be in the hip seams or should not be in
11    the hip seams, correct?
12              ATTORNEY FRIEDBERG:  Objection.  Form.
13              THE WITNESS:  Correct.
14    BY ATTORNEY COSBY:
15        Q.   Okay.  As I understand it, as you, a person in
16    the copper roofing industry, can interpret this
17    provision as meaning with regard to the panels where
18    that bullet point says cleats installed on an average of
19    9.5 inches on center with 2 ring shank nails per cleat;
20    is that correct?
21              ATTORNEY FRIEDBERG:  Objection.  Form.
22              THE WITNESS:  That was -- yes, referred to the
23    panels.
24    BY ATTORNEY COSBY:
25        Q.   A moment ago you were asked about the contract
```

Barry Huber                                    October 7, 2025

 1   and whether it was solely your document without any

 2   input from the owner.

 3              Isn't it true that, as you've indicated,

 4   initially the contract said 12 inches, or some -- maybe

 5   it was 12 1/2 or 12 inches, whatever it was, on average

 6   and they requested it be changed to 9.5 inches on

 7   center?  They being the owner or an owner

 8   representative.

 9              ATTORNEY FRIEDBERG:  Objection.  Form.

10              THE WITNESS:  Yes.

11   BY ATTORNEY COSBY:

12       Q.   Your answer may have cut off.  Did you say

13   correct?

14       A.   Yes, correct.

15              ATTORNEY COSBY:  All right.  John, you can

16   take that down, please.  Thank you.

17   BY ATTORNEY COSBY:

18       Q.   Is there anything in SMACNA in words that says

19   cleats are required to be used in the hip seams?

20              ATTORNEY FRIEDBERG:  Objection.  Form.

21              THE WITNESS:  No.

22   BY ATTORNEY COSBY:

23       Q.   Is there anything in Copper & Common Sense

24   that says that?

25       A.   No.

Barry Huber                                           October 7, 2025

1                ATTORNEY FRIEDBERG:  Objection.  Form.

2    BY ATTORNEY COSBY:

3        Q.   Is it your understanding that one of the seams

4    was opened up at some period of time before Hurricane

5    Irma?

6                ATTORNEY FRIEDBERG:  Objection.  Form.

7                THE WITNESS:  My understanding, it was because

8    of the Sanders investigation.  I remember seeing on his

9    report, which is still in the file, that they had opened

10   up a hip seam.  Exactly where, I couldn't tell you.

11   BY ATTORNEY COSBY:

12       Q.   My question is, was it before or after Irma

13   that that was done?

14               ATTORNEY FRIEDBERG:  Objection.  Form.

15               THE WITNESS:  Before Irma.

16   BY ATTORNEY COSBY:

17       Q.   Do you know how one would sufficiently close

18   back -- close a seam back up after opening it up?  I

19   mean is that possible in the industry?

20               ATTORNEY FRIEDBERG:  Objection.  Form.

21               THE WITNESS:  Yes.  Copper is very malleable.

22   You could actually, you know, put it back together.

23   Yeah.

24   BY ATTORNEY COSBY:

25       Q.   Do you know if the pre-Irma investigation of

1  the roof by Arthur Sanders revealed that there were in

2  fact cleats on the west side of the main pavilion?

3          ATTORNEY FRIEDBERG:  Objection.  Form.

4          THE WITNESS:  I do remember in his report him

5  saying that cleats were installed at 9 1/2 inches on

6  average.

7  BY ATTORNEY COSBY:

8      Q.   They pulled it up and measured three different

9  cleats, and the average of those measurements was

10  9 1/2 inches, correct?

11     A.   Correct.

12          ATTORNEY FRIEDBERG:  Objection.  Form.

13          THE WITNESS:  Correct.

14  BY ATTORNEY COSBY:

15     Q.   Do you have any reason to believe if your

16  workers installed cleats on the west side portion of

17  this main pavilion, they would not have done the same

18  cleating on the east side?

19          ATTORNEY FRIEDBERG:  Objection.  Form.

20          THE WITNESS:  I'm pretty familiar with the

21  crew at the time, and none of the crew that I know of

22  that was there would do anything but to do a quality job

23  and stay consistent, and that the panel cleating is the

24  most important part of the cleating system.

25  BY ATTORNEY COSBY:

1      Q.   But do you know of any reason why --

2           ATTORNEY FRIEDBERG:  Well, wait.  Objection.

3  Form.  Nonresponsive.

4  BY ATTORNEY COSBY:

5      Q.   Do you know of any reason why cleating would

6  have been done on the west portion of the main roof and

7  not other portions of the main roof?

8           ATTORNEY FRIEDBERG:  Objection.  Form.

9           THE WITNESS:  No.

10  BY ATTORNEY COSBY:

11     Q.   And just because directions -- we've talked to

12  a lot of witnesses and there's different versions of

13  what the directions are.

14          Do you have any reason to believe if cleating

15  was performed on the section that Arthur Sanders

16  inspected or his crew inspected prior to Hurricane Irma

17  that revealed cleating, there wouldn't be cleating on

18  any other section of the main roof panel sections?

19          ATTORNEY FRIEDBERG:  Objection.  Form.

20          THE WITNESS:  There would be no reason to

21  assume that any other panel sections of the roof would

22  be anything but 9 1/2 inches on average.

23          ATTORNEY FRIEDBERG:  Form.  Nonresponsive.

24  BY ATTORNEY COSBY:

25     Q.   I don't know if it was you or Micah that was

Barry Huber                                           October 7, 2025

```
1    asked.  I think it was Micah was asked while you were
2    present today whether any cleats were left over after
3    the job.
4           Are you aware of not having enough cleats on
5    this job at any time?
6           ATTORNEY FRIEDBERG:  Objection.  Form.
7           THE WITNESS:  No, I can't say that I remember
8    anything about the quantities being plus or minus.
9    However, when you're working in the Caribbean, then you
10   always want to have more than you need.
11   BY ATTORNEY COSBY:
12      Q.   Is that what you dictated in this project?
13      A.   Like I say, we have done -- had done -- we
14   don't do much anymore.  But when we worked in the
15   Caribbean, you would -- your crew would be down if you
16   ran out of materials.  So you always try to make sure
17   you had more than enough.
18          But to specifics on this job, obviously it was
19   a long time ago.
20      Q.   And do you stand by whatever opinions you've
21   given today and in your previous deposition?
22          ATTORNEY FRIEDBERG:  Objection.  Form.
23          THE WITNESS:  Yes.
24   BY ATTORNEY COSBY:
25      Q.   Including any deposition that was taken of you
```

1    in the superior court case.

2                ATTORNEY FRIEDBERG:  Objection.  Form.

3                THE WITNESS:  Are you referring to, like, way

4    back?

5    BY ATTORNEY COSBY:

6        Q.    The superior court case is the other

7    proceeding in a different court that was being handled

8    where you were deposed in that case.  So I just want to

9    confirm that you stand by any opinions you gave in that

10   deposition as well.

11               ATTORNEY FRIEDBERG:  Objection.  Form.

12               THE WITNESS:  I would -- I would say yes.  I

13   mean, I haven't changed my thoughts on any of this.

14   BY ATTORNEY COSBY:

15       Q.    It sounds like you haven't reviewed that old

16   deposition recently; is that correct?

17       A.    No, I have not.

18               ATTORNEY COSBY.  Okay.  All right.  That's all

19   I have.

20               ATTORNEY FRIEDBERG:  I don't have anything

21   further.

22               THE VIDEOGRAPHER:  Beth?

23               THE COURT REPORTER:  Read and sign?

24               ATTORNEY COSBY:  Yes.

25               THE COURT REPORTER:  And copy order,

Barry Huber                                                    October 7, 2025

```
 1   Mr. Cosby?

 2           ATTORNEY COSBY:  Yes.

 3           THE COURT REPORTER:  Thank you so much.

 4           THE VIDEOGRAPHER:  This concludes today's

 5   deposition.  We are going off the record at

 6   approximately 11:31 a.m.

 7           (Proceedings concluded at

 8           11:31 a.m. PST/2:31 p.m. EST.)

 9                       --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Barry Huber                                                    October 7, 2025

1               DECLARATION UNDER PENALTY OF PERJURY

2

3          I, BARRY HUBER, hereby declare under penalty of

4    perjury that I have read the foregoing deposition and

5    that the testimony contained therein is a true and

6    correct transcription of my testimony given at said time

7    and place.

8          Dated this _____ day of _____,

9    20_____, at _____, _____.

10                   (CITY)                    (STATE)

11

12

13                      _____

14                           BARRY HUBER

15

16

17

18

19

20

21

22

23

24

25

Barry Huber                                          October 7, 2025

```
 1           ERRATA SHEET / CORRECTION CERTIFICATE

 2    Page   Line   Correction/Reason

 3    _____  _____  _____

 4    _____  _____  _____

 5    _____  _____  _____

 6    _____  _____  _____

 7    _____  _____  _____

 8    _____  _____  _____

 9    _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23

24    _____   _____

25        Date                     BARRY HUBER
```

Barry Huber                                                    October 7, 2025

```
 1                REPORTER'S CERTIFICATE

 2

 3           I, Beth A. Ballerini, Certified Shorthand

 4    Reporter in and for the State of California, do hereby

 5    certify:

 6           That the witness was by me duly sworn, and

 7    the foregoing testimony was reported by me and was

 8    thereafter transcribed with computer-aided

 9    transcription; and the preceding pages contain a full,

10    complete, and true record of said proceeding.

11           I further certify that I am a disinterested

12    person and am in no way interested in the outcome of

13    said action or connected with or related to any of the

14    parties in said action or to their respective counsel.

15           The dismantling, unsealing, or unbinding of the

16    original transcript will render the Reporter's

17    Certificate null and void.

18           IN WITNESS WHEREOF, I have hereunto set my hand

19    this 21st day of October 2025.

20           __X__  Reading and Signing was requested.

21           _____  Reading and Signing was waived.

22           _____  Reading and Signing was not requested.

23

24    _____

25           Beth A. Ballerini, CSR
             Certificate No. 7358
```

Barry Huber                                                    October 7, 2025

**Exhibits**

**Ex 0001 Barry H**
**uber 100725**
  4:16 9:12,13
  10:22 22:14 58:25

---

**-**

**--ooo--** 66:9

---

**1**

**1** 9:12,13 10:22
  22:14 44:16 58:25

**1-by-4s** 50:7

**1/2** 23:3,15 29:18
  30:4 39:24 41:9
  47:4,5 48:5,16,19,
  25 49:8,13,17,23
  50:1,9,10,13,18
  51:3 57:25 58:3,6
  60:5 62:5,10
  63:22

**1/4** 50:8

**10** 48:18 49:9

**10/12** 16:2

**10:01** 5:2,7

**10:31** 28:1

**10:39** 28:4

**11:18** 56:24

**11:20** 57:2

**11:31** 66:6,8

**12** 58:5 60:4,5

**120** 13:6

**14** 49:12

**150** 14:8

**160** 14:8

---

**2**

**2** 23:4 32:10 44:16
  59:19

**20** 13:2,8 17:10,24

**2010** 8:19 31:2

**2025** 5:1,6 6:24
  7:7 8:16 11:10,18
  46:23

**28** 6:24 7:7

---

**3**

**3** 50:8,9,10

**30** 15:16 16:6
  19:11 21:4

**30-foot** 13:3,5
  19:7,19 20:8,15,
  17,25 35:24 36:8,
  18 44:15

**3:19-cv-0053-**
**ram-eah** 5:13

---

**4**

**4** 16:2

**40** 13:7 14:7

**49** 10:14

---

**5**

**5** 10:22 31:23
  32:10 38:2

**5/12** 16:3

---

**7**

**7** 5:1 31:2

**7358** 5:18

**7th** 5:6

---

**8**

**8** 22:14

**8-sided** 18:10

**8/12** 16:2

---

**9**

**9** 23:3,15 29:18
  30:4 39:24 41:9
  47:4,5 48:5,16,19,
  25 49:8,13,17,23
  50:1,13,18 51:3
  57:25 58:3,6 62:5,
  10 63:22

**9.5** 59:19 60:6

---

**A**

**a.m.** 5:2,7 28:1,4
  56:24 57:2 66:6,8

**abilities** 47:12

**ability** 31:7,10

**Absolutely** 6:22

**accept** 51:2

**accepted** 11:23

**accordance**
  22:18,25 25:23
  28:24

**accurate** 19:24

**actual** 22:12
  39:15 40:7,19

**add** 30:20

**addition** 30:23

**additional** 46:20

**address** 16:12
  24:1 30:23 32:13

**addressed** 18:20

**addressing**
  16:21

**admonitions**
  6:16

**advise** 20:14
  31:15 47:18

**advised** 17:3

**affect** 36:15

**affected** 37:2,10

**agree** 5:20 9:22

  12:8 17:15,18
  18:2 25:22 28:22
  35:25 40:11 48:3
  49:3 51:8,18 52:6,
  11,23 59:8

**agreed** 15:20,22
  21:23 22:5,6,10,
  19,20 25:24,25
  26:9 28:25 31:4,5,
  8,11,16,17,21,22
  35:9,13,17,21
  47:19 48:6 49:1
  57:10

**ahead** 13:9 26:10
  27:12

**aid** 44:20,22

**airplane** 32:5,6

**allowed** 26:6

**amount** 14:8
  36:24

**and/or** 15:14
  21:16

**angle** 34:13

**answering** 26:3
  47:24 55:12

**anymore** 64:14

**appearance** 5:22

**applicable** 15:3
  30:24

**applied** 48:19

**apply** 49:13,17,18

**appraisers** 17:7

**approval** 22:4

**approved** 10:9
  12:5 24:23

**approximate**
  36:8

**approximately**
  5:7 28:1,4 40:10
  56:24 57:2 66:6

**April** 6:24 7:7
  8:16 11:10,17
  46:22

**area** 18:16

**Arthur** 62:1 63:15

**aspect** 55:17
  56:14

**aspects** 55:20

**assembled**
  45:20,22

**Associates** 9:23
  25:17

**assume** 9:21
  17:22 37:25 38:3
  63:21

**assuming** 35:15
  44:10

**assumption**
  44:25

**Atlantic** 38:1

**attached** 35:1,3
  39:16

**attachment** 35:8

**attorney** 5:22,23,
  25 6:11 9:11,14
  14:2,11,20 15:4
  17:12,14,16,20
  18:5,14 19:14
  20:1,16 23:18,25
  24:17,21 25:1,9
  26:2,4,6,8,10,12,
  14,16,17,18,21,
  22,23,24 27:3,7,9,
  11,13,15,18,20,23
  28:5,12,16 29:20
  30:12,16 33:10,18
  36:3,6,12,25
  37:20 38:13,17
  40:13,21 43:9
  44:18,24 45:4,10
  46:5,9 47:20,25
  48:7,10 51:11,21,
  24 52:3,14,17
  53:4,12,17,24
  54:2,16,25 55:3
  56:21 57:3,11,12,
  16 58:2,9,12,19,
  22 59:5,12,14,21,
  24 60:9,11,15,17,
  20,22 61:1,2,6,11,
  14,16,20,24 62:3,
  7,12,14,19,25
  63:2,4,8,10,19,23,
  24 64:6,11,22,24

Barry Huber

October 7, 2025

65:2,5,11,14,18,
20,24 66:2

**automatically**
33:17 34:10

**average** 23:3
48:25 50:13,18
51:3 59:18 60:5
62:6,9 63:22

**aware** 7:4,5 8:2,3,
5,10 16:23 17:7
35:12 64:4

—————

**B**

**back** 8:20,25
14:20 19:15 20:3
27:22 28:3,8,13,
19 31:23 37:6
42:22 45:3 52:20
54:4 57:1 59:7
61:18,22 65:4

**background** 9:7

**Ballerini** 5:17

**Barry** 5:9 6:12
9:15 28:6 43:25
48:23 54:21 57:4
58:23 59:6

**based** 6:13 42:13
43:2,15 46:21

**basically** 30:17
32:4 58:3

**basis** 44:2 45:7

**batten** 33:14,15
34:14 35:4,6,8,10,
16,20,21,24 36:9,
11 38:23 40:4,18
41:2 45:3

**battens** 40:4 47:2
49:7,23 50:2,3,5,
6,12,16 51:1
57:19

**behalf** 5:25

**benefit** 21:18,20

**Beth** 5:17 19:15
20:4 23:19 28:17
42:22 65:22

**birdie** 18:25

**bit** 33:22 34:17

**blown** 40:4

**blurry** 9:16

**book** 24:3

**bottom** 16:3

**Brabas** 7:10,25

**Brabas's** 7:23

**Bragg** 55:23,25
56:6

**Bragg's** 56:2

**break** 16:7 18:16,
19,20

**briefly** 6:25

**bring** 9:12 22:14

**bullet** 22:22,23,
24 23:2 59:18

**Burbach** 9:20
10:7,8

—————

**C**

**calculations**
50:21

**California** 5:16

**call** 33:14 36:19
43:7

**called** 18:25
46:19

**calls** 12:22 26:4
54:23

**calm** 27:21,23

**cap** 32:16,22,23
33:15 34:9,14
35:4,6,8,10,20,21,
24 36:9,11 40:4,
18 41:2 45:3

**caps** 33:8 35:16
38:23

**care** 38:18

**Caribbean** 13:14
14:5 64:9,15

**cars** 30:18

**case** 5:13 7:7,14
9:10 13:20 15:19
16:9 20:18 34:21
38:9 41:1,21 42:6,
10 53:3 55:17,21
56:9 65:1,6,8

**cases** 51:5

**Cat** 38:2

**caveat** 12:15

**center** 18:7 23:4,
15 29:18 41:9
47:4 48:6 49:8,23
50:1,14,18 51:3
59:19 60:7

**Certified** 5:17

**change** 15:6,14,
20,21,22,24 16:7,
9,12,13,15,18,20
17:11,25 18:8,18,
23 19:2,7,20 20:9,
18,21 21:1

**changed** 60:6
65:13

**changing** 57:19,
25 58:3

**charged** 58:4

**Chocolate** 37:2,
11,23

**Chris** 57:19

**circumstances**
36:15

**claimed** 48:4
56:9

**clarification**
11:22

**clarify** 41:18 48:9
49:3 56:4

**clarifying** 48:12

**classification**
37:16

**clear** 6:19 28:16,
17 38:8 49:15,17
56:13

**cleat** 23:4 29:19
41:20 50:13 51:2
59:19

**cleated** 40:2

**cleating** 59:8
62:18,23,24 63:5,
14,17

**cleats** 13:2,3,7,
15,20,25 14:10,25
15:7 16:5,11,25
17:9 18:1 23:3,7,
9,11,15,22 24:1,4,
8 30:4 39:1 41:8,
19 46:2,11 47:3
48:5 50:1,3,17
51:9,19,22 52:7,
12,25 53:10,22
54:11,23 55:5
59:10,18 60:19
62:2,5,9,16 64:2,4

**clips** 29:23 30:4
38:22 39:12
48:19,25

**close** 6:14 45:15
61:17,18

**comments** 23:1

**Common** 12:4,7,
13 15:14 21:6,9,
11,22 22:5,18,25
25:24 27:6 28:25
29:4 60:23

**company** 17:9

**compel** 52:19

**complete** 28:14

**completed** 8:19
12:13

**completely**
29:10 58:8

**completion** 8:21

**compliance**
12:13

**complied** 22:9

**complies** 21:1

**comply** 21:22

**composite** 59:1

**concern** 8:21

**concluded** 66:7

**concludes** 66:4

**conditions**
12:20,23 13:11,13
27:5 29:3 30:17

**conducting**
26:19

**configuration**
18:13 30:5 40:12

**configurations**
20:13

**configured** 47:2
57:25

**confirm** 65:9

**confirmed** 44:3

**conflict** 12:16

**conform** 29:18

**conforming** 27:5
29:4

**consistent** 62:23

**constructed**
30:6

**construction** 9:7

**contact** 10:25

**continuous**
15:16 18:23 19:1

**contract** 7:9 9:9,
19,22 10:1 12:2,5,
6,22 21:8,21 22:3
23:13,23 24:15,16
27:4 29:2 31:3,14,
21 47:8,17 48:3
51:10,20 52:6,8,
12,24 53:6,10,20,
21 54:7,9,18,22
55:4,5 57:9 58:7,
24 59:9,25 60:4

**contraction**
15:12 16:22

**contractor** 9:8

**contracts** 7:16

**control** 58:8

Barry Huber                                                                    October 7, 2025

conversation
11:3 56:12,14

copper 10:21
12:4,7,13 13:16
15:5,14,15 16:5,
24 17:24 21:6,9,
11,22 22:4,18,25
25:24 27:6 28:24
29:4,12 33:3,6,9
57:22,25 59:16
60:23 61:21

copy 65:25

corner 19:5

corners 52:5

correct 7:22 9:25
10:15 12:11,14
13:17 19:10 21:9,
10,12,24 22:11,16
23:6 24:6,25
25:11,15,18
30:11,20 31:9,12
33:21 34:3 35:10,
14 53:8 59:11,13,
20 60:13,14
62:10,11,13 65:16

Cosby 5:25 10:25
14:2 17:12,16
18:5 24:17 25:1
26:2,6,10,14,17,
21,23 27:7,13,18,
23 28:12,16 30:12
33:10 36:3,12
38:13 40:13 44:18
45:4 46:5 47:20
48:7 51:11,24
52:14 53:12,24
54:25 57:11,16
58:9,22 59:5,14,
24 60:11,15,17,22
61:2,11,16,24
62:7,14,25 63:4,
10,24 64:11,24
65:5,14,18,24
66:1,2

counsel 5:20,21
26:16,18,22
27:10,15 28:12
42:14 43:3 46:14,
17 56:1

couple 25:7
41:24

court 5:11 6:2,8
14:21 19:16
28:15,19 51:15
65:1,6,7,23,25
66:3

crazy 34:13

created 32:5
48:17

crew 46:11 62:21
63:16 64:15

critical 35:17,25
36:10

criticisms 16:23

criticizing 17:23

CSR 5:18

Cunningham
17:4,22

cut 60:12

cutting 26:21,23

D

dad 9:7

damage 32:12,
17,18,19 40:7
41:5,6 43:8,17,19,
22

date 5:6 46:22

day 5:23 32:17
54:14 55:8

Daybreak 5:11
6:1 9:23

days 38:1

dealt 20:17

debris 42:18 44:8

decided 21:8,25

decision 21:14
57:8

decking 50:23

deemed 31:3

deficient 33:9
34:5,20 35:5

define 25:16

degree 42:5,9,15,
24 43:4,15 45:11

delete 31:8

deletion 30:24

deliberate 21:13

dependent 12:23

Depending
12:20

depends 16:17
36:2,4,14

depicts 24:4

deposed 65:8

deposition 5:9,
14,19 6:17,24 7:1,
3,23 8:6,10,13
11:17 26:20 27:16
46:23,25 64:21,25
65:10,16 66:5

depositions 7:10

describe 15:24
20:19,23

desired 31:8,11

desk 39:3

detail 25:6

details 25:8,19
29:13 57:22

determination
12:21

determine 37:18

dictate 16:14

dictated 64:12

difference 41:23

difficult 19:24
24:20

dimensions 51:1

directing 27:16

direction 15:7,
15,20

directions 63:11,
13

disagree 17:15,
19 18:2

disclosed 46:22

discrepancy
12:16

discretion 31:7

discuss 10:25

discussed 46:13

discussing
46:16

discussion
32:11 46:10

dislodged 35:24
36:5,10,23

District 5:11

Division 5:12

document 10:13,
23 24:22 31:24
60:1

documentation
24:7,10,13

documents 7:6,
14,15 17:3

double-lock
18:22 19:1,8,20
20:9,11 21:1

double-locked
20:21

draft 9:19

drafted 10:4,8
12:5 24:22 25:10,
12 53:7,9,20,21
54:7,10

drafting 21:8
57:14

drawings 29:14

drill 33:22 34:17

drilled 33:19,21,
24,25

drilling 33:14,15
34:10

due 16:12

Dusenbery 5:15

E

earlier 8:15 48:11

easily 53:2

east 62:18

Eastern 5:7

easy 48:15

effect 24:10
44:21,23

either/or 12:10

elevation 15:6,
15,20

encountered
37:23

entire 33:22

errors 7:3

EST 5:2 66:8

evaluated 17:4

evaluation 41:25

event 37:14

examples 15:2

exciting 7:11

exclusively 57:9

exhibit 9:12,13
10:22 22:14 58:25

exist 13:25 14:24

expansion 13:1,
3,7,15,20,25
14:10,25 15:7,12
16:5,11,21,25
17:9,25

expectation
44:15

expected 11:23

experience 9:4

expert 6:14
10:17,20 11:1,16
43:11,19,21 45:15
46:15,18 56:1,9

Barry Huber

October 7, 2025

expertise 11:7

explain 12:25
15:10 26:6 27:1
47:1

expound 11:20

extrapolation
47:5

extreme 14:6

extremes 14:5,
15

**F**

fact 6:13 8:18
13:15 23:11,21
44:16 51:1,8,18
52:7 62:2

failed 8:4 42:6,10

failure 34:4 42:12

fair 55:8

familiar 62:20

feet 13:2,8 15:16
16:6 17:10,24
19:11 44:16

fell 35:9

figure 37:16

file 7:19 61:9

final 54:14

find 43:24 44:1

fine 11:14 59:2

finished 26:3,14

firsthand 42:7
43:18,20,23 45:13

flow 18:23

flying 42:18

fold 39:19,20,21
41:15

folded 39:5,20
41:14

folds 41:13

food 30:19

foot 21:4

form 10:1 14:2
17:12,16 18:5
24:17 25:1 27:7
30:12 33:3,10
36:3,12 38:13
40:13 44:18 45:4
46:5 47:20 48:7
51:11,24 52:14
53:12,24 54:25
57:11,16 58:9,15
59:12,21 60:9,20
61:1,6,14,20 62:3,
12,19 63:3,8,19,
23 64:6,22 65:2,
11

formed 47:2

forward 31:3

Foundationally
47:17

freight 30:19

Friedberg 5:10,
23,24 6:11 9:11,
14 14:11,20 15:4
17:14,20 18:14
19:14 20:1,16
23:18,25 24:21
25:9 26:4,8,12,16,
18,22,24 27:3,9,
11,15,20 28:5
29:20 30:16 33:18
36:6,25 37:20
38:17 40:21 43:9
44:24 45:10 46:9
47:25 48:10 51:21
52:3,17 53:4,17
54:2,16 55:3
56:21 57:3,12
58:2,12,19 59:12,
21 60:9,20 61:1,6,
14,20 62:3,12,19
63:2,8,19,23 64:6,
22 65:2,11,20

froze 51:15

**G**

gather 53:2

gave 45:8 65:9

general 6:16
10:18,21 17:18
30:17

generally 34:14
43:7 45:20

geometrically
48:14,18 49:7

geometry 23:14
30:8 49:20 50:20

give 6:5 11:5,15
27:9 29:12 34:22
45:15,17 46:14,17
55:18,21

glad 6:21

good 5:4,23 6:12,
18

grade 18:12

great 47:5

greater 17:10,24
49:12

guess 11:11 36:5
40:15 43:7,10
53:14 56:4 57:17

gun 34:25

gutters 18:17

guys 45:24

**H**

hairs 21:15

half 40:10

hand 6:3 13:12

handled 65:7

happen 44:12

happened 40:6
42:1 43:20 45:12

hard 34:16

hear 14:17 56:2

heat 13:23

hemmed 39:3

high 36:10

hindered 47:1

hip 8:22 18:10
23:10,16 29:18,23
32:15,16,21 33:3
34:8 39:7,9,13,22
40:7,9,10,17,19
41:12,20 47:3,7
48:19 49:14,18
59:10,11 60:19
61:10

hip/ridge 8:4
23:12,23 24:1,5,9
30:4 38:23 39:13
40:2,12 42:2,6,9,
16 43:5 44:7,9
48:6 49:1 50:18
51:3,23 52:8,13
53:1,11,23 54:12
55:6

hips 39:6,12
41:19

hired 9:1,2,5 56:1

history 8:13

hit 34:10

hitting 36:23

hold 26:2 40:12

holding 38:25

hole 33:19 37:2,
11,23

homeowner
21:18,20 22:9
31:15

homeowners
17:8 22:4

honestly 8:8

hope 6:18

horizontal 48:17

hotter 13:14

house 15:19
18:11

Huber 5:10 6:2
9:23 25:17 27:12,
14 42:21

Hurricane 37:24
61:4 63:16

hypotenuse 47:2

48:17,18

hypothetical
41:22

hypothetically
10:8 38:22

**I**

idea 26:25

identification
9:13

identify 25:4,6

II 7:11 8:10 10:4
22:15

image 24:3,4

imagine 18:11
39:18

important 62:24

impossibility
48:5

impossible
29:19 30:3 48:9,
13,25 49:4,5,19
50:11

inappropriate
17:19

inaudible 51:9

inch 40:11 48:16

inches 23:3,15
29:18 30:4 39:24
41:9 47:4,5 48:5,
18,19,25 49:8,9,
12,13,17,23 50:1,
9,13,18 51:3
59:19 60:4,5,6
62:5,10 63:22

include 30:10,18

included 30:10
47:19,23

Including 64:25

indicating 24:7

indication 31:19

indicative 23:9,
10

Barry Huber

October 7, 2025

**individual** 56:8

**individuals** 16:24

**industry** 9:5 10:13 21:2 59:16 61:19

**ineffective** 48:20

**inferred** 52:9

**information** 22:8 25:14 44:11

**initially** 60:4

**input** 57:18,24 60:2

**insert** 31:7

**inspected** 63:16

**inspection** 45:1

**install** 34:19 48:5,25

**installation** 25:23 28:23 36:11 46:11

**installed** 20:20 22:17,24 23:3,8, 12,22 24:9 33:20 39:1 45:25 51:2,9, 19,23 52:7,13,25 53:11,16,23 54:11 55:6 59:18 62:5, 16

**installer** 23:14 34:18 35:11

**installing** 23:15 35:4

**instruction** 27:9

**instructions** 6:17

**insurance** 17:7,8

**intend** 32:9

**intended** 24:15, 24

**intense** 38:3

**intention** 12:12 33:4

**interpret** 59:16

**interrupt** 13:10 27:18

**interrupted** 7:15

**intersection** 8:4 24:5 51:23 55:6

**intersections** 24:2,9 53:23 54:12

**investigate** 42:19

**investigated** 44:13,17

**investigation** 61:8,25

**Irma** 17:5,23 37:24 61:5,12,15 63:16

**Islands** 5:12 14:14

**item** 25:22 28:22

---

**J**

**Jack** 9:20 10:7,8

**Jeff** 5:25 27:21 46:7 56:18

**job** 7:17 12:20,23 13:11,12,13 47:10,12,13 62:22 64:3,5,18

**John** 5:13,15 9:11 13:25 14:24 15:2 24:24 38:2, 12 58:24 60:15

**joining** 41:13

**July** 8:19

---

**K**

**kind** 34:6 46:25

**knowing** 8:13 18:12

**knowledge** 42:7 43:18,20 44:4,5

45:13

---

**L**

**lacking** 44:5

**laid** 39:3,19

**language** 23:7,9 59:8,9

**left** 28:10,11 64:2

**length** 15:5,13 16:21,24 17:24 18:8,9 58:7,11

**Lexitas** 5:16

**lifted** 40:6,17,19 41:2,15,16

**lifts** 41:4

**light** 43:16

**limited** 9:6 25:19 57:24

**limiting** 23:7

**Lindsay** 17:4,22

**list** 11:1 12:6 24:16 47:23 48:4

**listed** 6:13 25:22 28:22 47:10,12 49:10 52:12,24 53:15

**listen** 20:5 48:22

**listing** 22:8

**locale** 13:4

**lock** 19:4

**lodging** 30:19

**long** 19:7,20 20:9 55:8 59:7 64:19

**longer** 15:11 19:12 58:16,17

**looked** 56:19

**loose** 32:16,21,22

**lot** 20:12 63:12

---

**M**

**made** 30:10 39:17 41:23 58:17

**main** 8:4 15:19 16:1 18:10 32:12 62:2,17 63:6,7,18

**make** 18:12 35:12 58:16 64:16

**malleable** 61:21

**manner** 50:12,17

**manually** 33:20

**marked** 9:13

**massively** 14:6

**material** 24:16,24

**materials** 42:13 43:2 64:16

**mathematically** 29:18,19 51:5

**matter** 5:10 6:5

**meaning** 12:10 39:4 58:11 59:17

**means** 35:1 42:12 49:4

**measure** 15:25

**measured** 62:8

**measurements** 62:9

**medication** 27:24

**meet** 6:12 49:9

**mention** 23:11, 21 51:8,18 52:6 53:22 54:10

**mentioned** 21:3 31:20 40:18 53:10

**metal** 14:9,13 36:20

**method** 18:22,24, 25

**Micah** 9:2 63:25 64:1

**Micah's** 9:4

**Midwest** 14:7

**minimal** 32:17,19

**minus** 64:8

**minutes** 27:22 56:22

**missed** 51:20

**missing** 35:23 40:7

**moment** 14:21 19:16 27:2 28:15 59:25

**month** 11:4

**morning** 5:4 6:12

**move** 19:13 22:2 23:17 24:14 26:8 37:21 38:5 47:14 48:1,21 49:21 50:24 52:4,10,19 53:5,18 54:2,17 55:15

**movement** 14:8, 12

**multipage** 30:21

---

**N**

**nails** 23:4 59:19

**necessarily** 30:23 47:10

**needed** 50:3,23

**needing** 53:15

**needle** 43:25

**nominal** 50:8

**nominally** 50:9

**non-retained** 6:14 10:17 11:1, 16 45:15 46:14

**non-whatever** 46:18

**nonresponsive** 19:13 22:2 23:17 24:14 37:21 38:6 47:14 48:2,21

---

Barry Huber                                                                October 7, 2025

49:22 50:24 52:4,
10,16 53:5,18
54:3,17 55:15
63:3,23

**north** 13:6 38:2

**Northeast** 13:14

**noticing** 5:22

**number** 35:16,
22,23 38:10 41:24
44:3 47:9

___

**O**

**O.C.** 23:3

**Object** 14:2 17:12
18:5 24:17 27:7
30:12 33:10 36:3,
12 38:13 40:13
44:18 46:5 51:11,
24 52:14 53:12
54:25 57:11,16
58:9

**Objection** 59:12,
21 60:9,20 61:1,6,
14,20 62:3,12,19
63:2,8,19 64:6,22
65:2,11

**occur** 41:10

**October** 5:1,6

**office** 7:21

**open** 44:16

**opened** 61:4,9

**opening** 61:18

**opined** 17:9

**opinion** 18:7
42:24

**opinions** 6:15
10:16,19,20 11:5,
15 17:21 18:3
22:21 42:4,8,14
43:4 44:2 45:14,
16 46:13,16,21
55:16,20 56:2
64:20 65:9

**opportunity** 6:23

**opposed** 12:10
21:11

**order** 42:11 65:25

**originally** 57:20

**owner** 25:14
47:18 57:13,24
60:2,7

**owners** 10:10

___

**P**

**p.m.** 5:2 66:8

**P8** 9:12

**Pacific/1:01** 5:7

**pages** 25:7 29:13
58:13

**panel** 13:3 15:11,
16 16:21 18:8,12
19:1,4,7,19 20:8,
15,17,20,25 33:3
41:3,21 62:23
63:18,21

**panels** 18:9,15
19:11 21:4 23:10
38:25 39:1,9,15,
16,17,23,24 40:1,
8 41:13 42:2 47:6
49:18 59:17,23

**paper** 39:3,5,7,8,
19,21

**paragraph** 32:10

**part** 7:10,11
62:24

**parts** 29:24

**passed** 38:1

**past** 43:12

**pavilion** 32:12
62:2,17

**peeling** 44:22

**pending** 6:5
26:13

**performed** 22:13
24:8 25:16 63:15

**period** 61:4

**person** 45:1
59:15

**personal** 44:4,5

**pertaining** 7:7

**photographs**
7:17,18,20,25 8:2,
3,5,7,11,14 43:21
46:2

**photos** 7:9 45:23

**picture** 29:24
32:20

**pictures** 8:23

**piece** 39:4

**pieces** 39:2,4,7,
18

**pipe** 27:1

**pitch** 18:8,18,23
19:2,7,20 20:9,20

**place** 5:14 46:3

**Plaintiffs** 5:24

**planet** 47:11

**platform** 29:8

**point** 16:19,20
22:22,23,24 28:9
41:17 59:18

**politics** 10:20

**pops** 35:1

**portion** 62:16
63:6

**portions** 33:6
63:7

**possibility** 15:11

**possibly** 47:23

**post-hurricane**
17:5,23

**post-irma** 8:11

**potentially** 40:18
41:16

**practices** 36:11

**pre-irma** 61:25

**prepared** 17:23

30:9 31:18

**present** 5:21 64:2

**presented** 22:3

**pressure** 32:5

**pretty** 9:3 21:16
38:3 58:1,14
62:20

**prevent** 23:14
24:12

**prevented** 41:20

**previous** 7:14
21:25 27:8 28:17
64:21

**previously** 7:21
10:2 31:13

**prior** 10:9 18:8
63:16

**probability** 42:5,
9,15,25 43:5,15
45:12

**problem** 35:7

**proceed** 28:11

**proceeding** 65:7

**proceedings**
66:7

**produced** 7:20

**project** 7:9 9:24
11:24 13:21 24:24
30:24 31:4 37:3,
11 46:21 64:12

**projects** 10:2

**properly** 45:2

**property** 49:11
50:22

**proposal** 24:23
25:4,11,20 29:13
30:9,21,22,25
31:2,18 57:14
58:15

**proposals** 30:22

**proposed** 57:20

**provide** 16:19
22:8 25:14 35:7

**provided** 17:3
24:15 42:13 43:3

**provision** 59:17

**prying** 42:19

**PST/1:01** 5:2

**PST/2:31** 66:8

**pull** 58:24

**pulled** 62:8

**pulls** 32:6

**purchase** 36:19
38:24

**purportedly**
55:25

**purpose** 22:7
25:13 31:14 47:17

**pushed** 20:20

**put** 13:7,15 21:18,
21 30:3 33:23
34:1,4 41:21 45:2,
23 57:8,9 58:17
61:22

**putting** 34:14,18,
25

___

**Q**

**qualify** 29:7

**quality** 62:22

**quantitative**
15:25

**quantities** 64:8

**question** 6:20
10:18 11:8,11,12
13:18,19,22 14:17
19:15,22,23 20:3,
24 21:25 23:19
24:20 25:18 26:7,
12,17,19,25 27:8,
10,12,13,17 28:8,
13,18 29:1 34:7
36:16 37:5,6,13,
17,22 38:16,18
42:12,22 44:6
45:19 47:15,24
48:23 51:16
52:18,20 54:4

Barry Huber

October 7, 2025

55:9 57:24 61:12

**questions** 28:13, 18 54:21 58:22 59:6

**quote** 6:14 45:15

---
**R**
---

**raise** 6:2

**ran** 64:16

**read** 7:9,12 14:20, 22 19:14,17 20:2, 6 23:18,20 28:13, 19,20 37:6,8 42:22 43:1 52:20, 22 53:6,20 54:4,5, 7 65:23

**reading** 7:11 8:12

**ready** 57:4

**real** 24:12 29:11, 17 56:13

**reason** 6:19 33:5 62:15 63:1,5,14, 20

**reasonable** 42:5, 8,15,24 43:4,15 45:11

**reasons** 42:17

**recall** 8:8 15:17 46:8,12 56:8,11, 14,20 58:5

**receive** 50:13

**recently** 65:16

**recess** 28:2 56:25

**recollection** 8:24,25 18:21

**recommended** 15:13

**record** 5:5,20 14:22 19:17 20:6 23:20 27:21,25 28:3,20 37:8 43:1 52:22 54:5 56:22, 23 57:1 66:5

**recorded** 5:9,19 38:1

**refer** 47:6 52:1

**referable** 48:4

**reference** 8:12

**referenced** 12:1

**referred** 8:7 32:10 47:6 59:22

**referring** 9:9 11:25 12:16 30:15 32:14 35:4 65:3

**regard** 59:17

**relates** 10:20 35:6

**remain** 39:16

**remedies** 26:20

**remember** 8:20 46:16 56:10 58:6, 25 61:8 62:4 64:7

**rental** 30:18

**repeat** 6:16 24:20 51:14

**report** 8:15 17:23 56:17,19,20 61:9 62:4

**reported** 32:15

**Reporter** 5:17 6:2,8 14:21 19:16 28:15,19 51:15 65:23,25 66:3

**represent** 5:24

**representative** 60:8

**requested** 60:6

**require** 16:5

**required** 42:11 60:19

**requirement** 16:8,9,12 34:1 52:2

**requires** 12:6

**rerivet** 45:2

**reseam** 45:2

**resistance** 34:22

**response** 18:3

**restate** 6:20 14:19

**restated** 14:18

**resulted** 58:4

**retained** 7:12

**revealed** 62:1 63:17

**Revere** 7:9 12:4 22:18,25 25:23 27:5 28:24 29:4, 15,22 52:2

**review** 7:25

**reviewed** 7:6,23 8:6,9 25:12 46:22 65:15

**reviewing** 6:23

**ridge** 29:23 33:8

**rights** 26:20

**ring** 23:4 59:19

**rivet** 33:23 34:1,4, 18,19,22,25 35:1

**riveting** 34:15

**rivets** 32:23,25 33:2,20 35:3,9,12, 15,16,19,22,23 36:8,18,22 38:23, 24

**roof** 8:4 11:8 14:7 15:21,22,24 16:3, 4,7,12,14 17:4,11, 25 18:13,16 20:18,25 29:12 30:5,6 32:6 37:2, 11,23 38:12 39:15,16,24 40:1 42:1 45:19,21 47:6 49:8,9 62:1 63:6,7,18,21

**roofing** 9:4,6 10:13,21 24:23 29:25 59:16

**roofs** 49:11 50:22

**run** 15:5,15 16:5 18:22

**runs** 13:16 16:24 17:10,24

---
**S**
---

**Sanders** 7:10 8:14 17:1 61:8 62:1 63:15

**Sanders'** 8:9

**sardines** 44:21

**scope** 47:18

**seam** 10:21 18:22 19:1,8,21 20:10, 11,12,13,14 21:1 23:12,23 29:12, 23,25 32:16,21 33:3,22 34:8 38:23 39:6,7,8,9, 13,16,17,22 40:2, 5,7,9,10,17,19 41:12 42:2,6,9,16 43:6 44:7,9,12,13, 14 47:3 48:20 49:1 50:19 51:4 61:10,18

**seams** 8:22 23:10,16 39:13 47:7 49:14 51:23 52:8,13 53:1,11 59:10,11 60:19 61:3

**section** 10:4 22:15 34:8 35:24 36:9,18 44:15 51:20 63:15,18

**sections** 63:18, 21

**secure** 33:7 35:20,21 39:12

**secured** 32:23 39:9 40:8

**securement** 35:8

**Sense** 12:4,7,13 15:14 21:6,9,11, 22 22:5,18,25

**25:24 27:6 28:25 29:5 60:23**

**separated** 42:16 43:6

**separation** 42:1 44:6

**shank** 23:4 59:19

**shorter** 16:22

**Shorthand** 5:17

**show** 30:21 46:2 54:18,20 55:4

**showing** 8:3 20:22

**side** 33:9,13,16, 22,23 34:21 35:2, 3 40:5,17,19 41:2, 3,4,12 62:2,16,18

**sides** 33:3,25 34:2,5,11,15,18, 19 38:24,25

**sign** 7:1 65:23

**similar** 10:3 21:16

**simple** 11:12 30:8 37:22 39:6 53:19 54:6 58:15

**simply** 47:5

**single** 18:15 25:6 30:23

**single-lock** 20:14

**sir** 43:10

**sit** 50:25

**site** 8:16,18 56:15

**situ** 46:3

**situation** 56:7

**size** 32:25

**slang** 18:24

**slope** 15:21,22,24 16:1,12,14,15,19, 20 17:11,25 21:1

**slopes** 16:4

**SMACNA** 7:9,16 12:4,6,14 15:13 19:12 21:4,9,11, 22 22:5,19,25 24:1 25:24 27:6 28:25 29:5,15,22 52:1 60:18

**snap-lock** 20:13

**solely** 60:1

**solemnly** 6:4

**solid** 50:23

**sounds** 56:7 65:15

**source** 7:18

**spacing** 29:19 49:12 57:19

**speak** 6:21 55:23

**speaking** 56:8,10

**specific** 46:13 59:9

**specifically** 10:16 44:1 52:11, 24 53:22 54:10

**specification** 29:25 52:1

**specifications** 29:16

**specifics** 64:18

**speculate** 42:20

**spirit** 57:23

**splitting** 21:15

**spot** 36:24

**St** 5:12,13 13:25 14:24 15:2 24:24 38:2,12

**stand** 64:20 65:9

**standard** 5:8 12:21 13:1,2 21:17,18,20 22:9 49:10 58:14

**standards** 11:22, 25 12:1,17,22 16:5 21:2,16 22:8 31:16,19 52:9

**standing** 10:21 29:11,25

**stands** 20:24

**start** 44:21,22

**starting** 5:22

**state** 5:21 54:22

**statement** 17:15 18:4

**States** 13:15

**stationary** 16:19, 20

**stay** 35:21 62:23

**steeper** 16:1

**Stop** 26:23 27:16

**storm** 37:14 38:1 43:8,17,22

**straightened** 8:23

**strike** 18:2 19:13 22:2 23:17 24:14 26:8 31:6 37:21 38:5 47:14 48:1, 21 49:16,21 50:24 52:4,10 53:5,18 54:2,17 55:4,15

**strikes** 44:8

**strong** 36:16

**strongest** 37:25

**struck** 21:4 36:16 37:2,10 38:12

**substance** 56:11

**sufficient** 35:8 51:6,7,17

**sufficiently** 61:17

**summer** 14:7

**superior** 65:1,6

**supply** 57:22 58:1

**supposed** 33:2

**swear** 6:4

**system** 32:7 62:24

**systems** 29:12

___

**T**

**takes** 37:15

**taking** 5:14

**talk** 29:9

**talked** 22:17 51:1 56:4,5 63:11

**talking** 10:19

**technicality** 16:18

**temperature** 13:4,6 14:5,13,15

**temperatures** 13:23,24 14:8,23

**template** 10:3

**term** 49:6

**terminology** 31:10 48:11

**terms** 22:12 24:16,25 31:8 51:10,19 58:7,17

**testified** 11:9,17 22:7 25:13 31:13 43:11,18 48:24

**testifying** 5:10

**testimony** 6:4,15 12:24 16:16 19:6, 18 20:7,25 22:22 30:3 40:1 41:8 43:14 49:2 50:11, 15

**therefrom** 44:2

**thing** 43:16 44:20

**things** 25:5 30:10 31:14 41:24 45:8, 9 47:9 57:23

**Thinking** 7:12

**Thomas** 5:12

**thoughts** 65:13

**threading** 43:25

**time** 5:6,8 9:5 20:3 38:12 46:24 59:7 61:4 62:21 64:5,19

**times** 5:19

**today** 5:17 50:25 64:2,21

**today's** 5:6 66:4

**told** 32:19 39:11, 14,15 55:25

**Tom** 5:23 13:11 29:11 36:16 37:19 45:25 51:16 55:7 57:18

**top** 18:16 32:5 34:9,13 39:5 41:4, 14,15

**tornado** 37:16

**tornadoes** 37:15

**totally** 31:6

**transcript** 6:24 8:6

**travel** 30:18

**trial** 38:9

**triangle** 48:15

**true** 60:3

**truth** 6:6

**TUESDAY** 5:1

**twist** 18:25

**type** 37:23

___

**U**

**U.S.** 5:11

**unclear** 37:17

**understand** 10:12 11:11,13 14:16 19:6,18 20:7 29:8,10 32:18 34:7 39:11 43:14 48:15 59:15

**understanding**

13:13 34:17 61:3, 7

**Understood** 33:24

**unfamiliar** 56:7

**United** 13:15

**upcharge** 58:4

**uplift** 32:3,4,8,9, 12 41:1,16 42:18

___

**V**

**variation** 13:23, 24 14:23

**velocity** 38:11

**versions** 63:12

**versus** 5:10 21:25

**vertical** 48:16

**video** 20:22

**videoconferenci ng** 5:15

**view** 9:17

**Virgin** 5:12 14:13

**visited** 8:16 56:15

**Volume** 8:10

___

**W**

**wait** 63:2

**wanted** 8:22 11:1 25:6 58:16

**water** 18:23

**weakened** 44:13

**weeks** 37:16

**west** 62:2,16 63:6

**wide** 50:5

**wind** 32:3,4,6,8,9, 12 36:17,21,24 37:14,23 38:11,12 41:1,5,6,16 42:18

Barry Huber                                                    October 7, 2025

**winds** 36:10 37:1,
10 38:3

**wing** 32:5,6

**witness's** 27:18

**witnesses** 63:12

**word** 12:7 15:17
21:9 22:4 48:13
49:19

**words** 16:14 46:3
53:7,9 60:18

**work** 8:19 10:4
12:12 21:21
22:12,15 24:8,25
25:16 31:15 47:18

**worked** 64:14

**workers** 62:16

**working** 64:9

**works** 15:10

**world** 24:12
29:11,17

**worth** 55:11

**written** 21:17
24:7

---

**Y**

---

**years** 10:14

**Yup** 9:18

---

**Z**

---

**Zoom** 5:14

**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE,<br><br>       Plaintiffs,<br><br>v.<br><br>DAYBREAK, INC. dba HUBER & ASSOCIATES,<br><br>       Defendant. | ACTION NO. 3:19-cv-0053-RAM-EAH<br><br>JURY TRIAL DEMANDED |

**EXHIBIT
1
Barry Huber - 10/7/25**

<u>**PLAINTIFFS' NOTICE OF DEPOSITION AND REQUEST FOR PRODUCTION**</u>

PLEASE TAKE NOTICE that Plaintiffs will take the following deposition:

| Deponent | Date | Time | Location |
|---|---|---|---|
| Micha Cady | October 7, 2025 | 9:00 am PST/12:00 pm EST | Zoom – Court Reporter will provide link |
| Barry Huber | October 7, 2025 | 10:30 am PST/ 1:30 pm EST | Zoom – Court reporter to provide link |

This deposition will be taken before a Certified Shorthand Reporter and will continue from day to day, excluding Sundays and holidays, until completed. This deposition may be videotaped for use at trial.

PLEASE TAKE FURTHER NOTICE that three working days prior to the deposition, Defendants are requested to produce the following:

<u>**DEFINITIONS**</u>

The terms "project" and "contract" shall refer to the copper roofing project referred to in Plaintiffs' complaint.

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*October 1, 2025*
*Page 2*

---

**REQUEST FOR PRODUCTION NO. 1:**

Any and all documents upon which either reviewed or relied upon in evaluating the claims that the copper standing seam roof at 168 Chocolate Hole Road in St. John sustained wind uplift damage during Hurricane Irma due to installation deficiencies.

**REQUEST FOR PRODUCTION NO. 2:**

Any and all documents upon which you either reviewed or relied upon with regard to your opinions on roofing installation practices, industry standards of care, causes of roofing failures or deficiencies, adequacy of materials and workmanship, and related matters based on his experience and review of case materials in this case.

**REQUEST FOR PRODUCTION NO. 3:**

Any and all documents upon which you either reviewed or relied upon with regard to your opinions as stated in the Amended Expert Designation stating that your opinions will be based on his personal expertise, industry standards and accepted roofing practices.

Dated : October 1, 2025

**LAW OFFICES OF FRIEDBERG & BUNGE**
By: */s/ THOMAS F. FRIEDBERG, ESQ.*
    THOMAS F. FRIEDBERG, ESQ.(VI#1006)
    Attorneys for Plaintiffs THOMAS F.
FRIEDBERG & SARAH L. BUNGE
**THE LAW OFFICES OF FRIEDBERG &
BUNGE**
1005 ROSECRANS STREET, SUITE 202
PO BOX 6814
SAN DIEGO, CALIFORNIA 92166
TEL : (619)557-0101
FAX : (619)557-0560
E-mail : "tom@lawofficefb.com"

2

1.2

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*October 1, 2025*
*Page 3*

_____

### CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of October 2025, a true and correct copy of **PLAINTIFFS' NOTICE OF DEPOSITION AND REQUEST FOR PRODUCTION** was e-mailed to the following:

Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994
Telephone: 772-463-8402
Facsimile: 772-463-4820

Andrew C. Simpson
**ANDREW C. SIMPSON, PC**
2191 Church St., Ste. 5
Christiansted, VI 00820
TEL : 340.719.3900
E-MAIL :asimpson@coralbrief.com

_____*/s/ THOMAS F. FRIEDBERG*_____
**THOMAS F. FRIEDBERG**

**F&B v. DAYBREAK**                    **P000003**

1.3

## IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, | CIVIL ACTION NO. 3:19-cv-0053 |
| Plaintiffs, | |
| v. | |
| DAYBREAK, INC. dba HUBER & ASSOCIATES, | |
| Defendant. | |

TO: THOMAS F. FRIEDBERG & SARAH L. BUNGE

Defendant, Daybreak, Inc d/b/a Huber & Associates hereby files the following Amended Expert Disclosure Statement Pursuant to Fed. R. Civ. P. Rule 26(a):

Retained Expert:

1. Joseph V. Bragg, 400 N New York Avenue, Suite 110, Winter Park, FL 32789. Mr. Bragg Mr. Bragg is a Roofing Contractor (CCC1333311) and General Contractor (CGC1534425), as well as a HAAG Certified Inspector (#992103012). He has over 20 years of experience in the roofing industry, encompassing a broad range of roofing systems and products, including tile,

shingle, modified bitumen, TPO, FiberTite, standing seam, 5-V, R-panel, coping, gutters, and coating products.

Mr. Bragg has evaluated claims that the copper standing seam roof at 168 Chocolate Hole Road in St. John sustained wind uplift damage during Hurricane Irma due to installation deficiencies. Further, he is expected to offer opinions on roofing installation practices, industry standards of care, causes of roofing failures or deficiencies, adequacy of materials and workmanship, and related matters based on his inspection, experience, and review of case materials. His opinions will be based on his personal expertise, inspection findings, industry standards and accepted roofing practices.

Additional subjects, analyses, and opinions are set forth in detail in his expert report, which is incorporated herein by reference.

Non-Retained Experts:

2. Barry Huber, c/o Jeffrey C. Cosby, Esq. Mr. Huber is a licensed roofer who has 49 years of experience in the roofing industry, encompassing a broad range of roofing systems and products, including wood, slate, clay tile, copper, ornamental, thatch, and historical roofing. Mr. Huber has evaluated claims that the copper standing seam roof at 168 Chocolate Hole Road in St. John sustained wind uplift damage during Hurricane Irma due to installation

deficiencies. Further, he is expected to offer opinions on roofing installation practices, industry standards of care, causes of roofing failures or deficiencies, adequacy of materials and workmanship, and related matters based on his experience and review of case materials. His opinions will be based on his personal expertise, industry standards and accepted roofing practices.

3. Micha Cady, c/o Jeffrey C. Cosby, Esq. Mr. Cady is roofer who has 17 years of experience in the roofing industry, encompassing a broad range of roofing systems and products, including wood, slate, clay tile, copper, ornamental, thatch, and historical roofing. Mr. Cady has evaluated claims that the copper standing seam roof at 168 Chocolate Hole Road in St. John sustained wind uplift damage during Hurricane Irma due to installation deficiencies. Further, he is expected to offer opinions on roofing installation practices, industry standards of care, causes of roofing failures or deficiencies, adequacy of materials and workmanship, and related matters based on his experience and review of case materials. His opinions will be based on his personal expertise, industry standards and accepted roofing practices.

## :**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that on August 19, 2025, we electronically served the foregoing document via CM/ECF system to the parties listed below:

s/ Jeffrey C. Cosby, Esq.
Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL  34994
Telephone: 772-463-8402
Facsimile: 772-463-4820


s/ Andrew C. Simpson, Esq.
Andrew C. Simpson, Esq.
VI Bar 451
Attorney for Defendant Daybreak Inc
2191 Church Street, Ste. 5
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone No. (340)719-3900


**SERVICE LIST:**

Thomas Friedberg, Esq.
LAW OFFICES OF FRIEDBERG & BUNGE
1005 Rosecrans Street, Suite 202
P.O. Box 6814
San Diego, California 92166-0814
Telephone : (619)557-0101
Attorney for the Plaintiffs



May 7, 2010

## PROPOSAL FOR THE ROOFING AT THE FRIEDBERG/BUNGE RESIDENCE
## St. John, USVI

**We propose the following:**

**SECTION I. GENERAL CONDITIONS.**

1) Provide job set up. Go over job schedule and plan with owner prior to start up.
2) Provide General Liability and Workman's Compensation Insurance.
3) Provide scaffolding or other means of safe roof access.
4) Provide for material handling necessary for roof loading.
5) Provide project close out. Remove all surplus tools, equipment, materials and debris.
6) This bid includes travel to and from St. John, USVI only.  NO rental cars, food, lodging or freight.
7) This pricing may be withdrawn, if not accepted within 21 days of the above date.

**SECTION II. WORK:**

    ℭ COPPER STANDING SEAM ROOF (APPRX 8,400 SF)
    1) Provide and install Rosin slip sheet over modified underlayment.
    2) Install 16oz. Red Copper standing seam roof system:
- Installed in accordance with *Revere Copper & Common Sense & SMACNA*.
- Panels to be roll formed in <u>15" O.C. panel widths</u> with 1" double locked standing seam.
- Cleats installed at an average of <u>9.5" O.C.</u> with 2 ring shank nails per cleat.
    - NOTE:  See Alternate A. for screws in lieu of nails.
- Includes traditional style single rib ridge finish.

    ℭ COPPER FLASHING
    1) Provide and install necessary 16 oz. Red copper flashings per industry standards, as listed above, in all areas where needed.

**SECTION III. COST AND TERMS.**

*HUBER & ASSOCIATES*
*496 SW Ring Court, Lake City, FL 32025*
*Ph: (386) 487-1040 – Fax: (386) 755-3233*
*1  of  3*

**F&B v. DAYBREAK**                    **P000008**

1.8



ℰ PRICE BREAKDOWN  NOTE: Price reduce due to Owner providing majority of copper for roofing and flashings.

1) Copper Roofing & Flashing previous quote:    $214,800.00
Less copper believed to be in stock from Owner    -$28,091.00
Add for smaller panels and cleat spacing    +$10,735.00
Updated Cost    $197,444.00

*Additional copper, as, or if needed, to be provided by Owner or Contractor (see additional work note below). Shipping costs from Owner's supply to our shop to be billed separately at cost (invoice provided).*

Cost for work as described above $197,444.00 (One Hundred Ninety Seven Thousand Four Hundred Forty Four Dollars) to be paid in progress payments per schedule of values with balance due upon completion. 33% Deposit required upon acceptance.

[Any additional work or material needed would be billed per the following:

   a.   A per man hour rate of $ 63.35 (average rate for Supervisor, Mechanic, Roofer & Laborers)
   b.   15% above the cost of materials or equipment]

**SECTION IV. ACCEPTANCE:**

*Owner or Owner's Agent*                         *Huber & Associates*

By: _____              By: _____

Print Name: _____           Print Name: _____

Title: _____            Title: _____

Date: _____ /_____ /  2010        Date: _____ /_____ /  2010

*HUBER & ASSOCIATES*
*496 SW Ring Court, Lake City, FL 32025*
*Ph: (386) 487-1040 – Fax: (386) 755-3233*
*2  of  3*
**F&B v. DAYBREAK**                                    **P000009**

1.9



## SECTION VI. ROOF PLANS:



Main House                                    Guest House & Gazebo



Gatehouse



Garage



Beach Bar

**HUBER & ASSOCIATES**
*496 SW Ring Court, Lake City, FL 32025*
*Ph: (386) 487-1040 – Fax: (386) 755-3233*
*3 of 3*



F&B v. DAYBREAK

P000011

1.11



F&B v. DAYBREAK

P000012

1.12



F&B v. DAYBREAK

P000013

1.13



F&B v. DAYBREAK

P000014

1.14



F&B v. DAYBREAK

P000015

1.15



FAB v. DAYBREAK

P000016

1.16



F&B v. DAYBREAK

P000017

1.17



F&B v. DAYBREAK

P000018