**Exhibit 11**

Transcript of the Testimony of:

**BARRY HUBER**

FRIEDBERG, et al.

vs.

DAYBREAK, INC.

April 28, 2025

Volume I



IN THE UNITED STATES DISTRICT COURT

OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN


THOMAS F. FRIEDBERG & SARAH L.   ) ACTION NO.
BUNGE,                              ) 3:19-cv-0053-RAM-EAH
                                   )
              Plaintiffs,    )
                                   )
      vs.                        )
                                   )
DAYBREAK, INC., dba HUBER &       )
ASSOCIATES,                    )
                                 )
             Defendant.     )
_____)


VIDEO-RECORDED

VIDEOCONFERENCE DEPOSITION OF

BARRY HUBER

April 28, 2025


Reported by Beth A. Ballerini, CSR

Certificate No. 7358


Job No. 124759

Barry Huber                                                    April 28, 2025

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   OF THE VIRGIN ISLANDS

 3              DIVISION OF ST. THOMAS AND ST. JOHN

 4

 5   THOMAS F. FRIEDBERG & SARAH L.   ) ACTION NO.
     BUNGE,                          ) 3:19-cv-0053-RAM-EAH
 6                                   )
                     Plaintiffs,     )
 7                                   )
          vs.                        )
 8                                   )
     DAYBREAK, INC., dba HUBER &     )
 9   ASSOCIATES,                     )
                                     )
10                   Defendant.      )
     _____)
11

12

13

14          The Video-Recorded Deposition of BARRY HUBER,

15   located in Lake City, Florida, was taken pursuant to

16   Amended Notice of Deposition, via videoconference, on

17   Monday, April 28, 2025, commencing at 9:17 a.m. Pacific

18   Daylight Time/12:17 p.m. Eastern Standard Time, before

19   Beth A. Ballerini, CSR No. 7358, a Certified Shorthand

20   Reporter in and for the State of California.

21

22

23

24

25
```

Barry Huber                                                    April 28, 2025

```
 1              A P P E A R A N C E S

 2

 3        (All appearances were via videoconference.)

 4

 5    For the Plaintiffs:

 6         LAW OFFICES OF FRIEDBERG & BUNGE
           BY:  THOMAS F. FRIEDBERG, ESQ.
 7         1005 Rosecrans Street, Suite 202
           P.O. Box 6814
 8         San Diego, California 92166
           619.557.0101
 9         tom@lawofficefb.com

10

11    For the Defendant:

12         WILLIAMS, LEININGER & COSBY, P.A.
           BY:  JEFFREY C. COSBY, ESQ.
13         301 SE Ocean Boulevard, Suite 205
           Stuart, Florida 34994
14         772.463.8402
           jcosby@wlclaw.com

15

16

17    Also Present:

18         John Dusenbery
           Video Specialist

19

20

21

22

23

24

25
```

Barry Huber                                                    April 28, 2025

```
 1                        I N D E X

 2

 3   Examination by:                              PAGE

 4          Mr. Friedberg                         6, 54

 5          Mr. Cosby                             52

 6

 7

 8

 9

10

11

12

13                      E X H I B I T S

14

15      (Exhibits to the Deposition of Micha Cady,
        taken Monday, April 28, 2025, attached for
16      reference.)

17   EXHIBIT

18   Exhibit 1      Plaintiffs' Amended Notice of
                    Deposition and Request For
19                  Production

20   Exhibit 2      F&B v. Daybreak - Deposition
                    Exhibits
21                  (Bates Nos. P000001-000086)

22

23

24

25
```

```
 1                    MONDAY, APRIL 28, 2025
 2                 9:17 A.M. PDT/12:17 P.M. EST
 3
 4           THE VIDEOGRAPHER:  Good morning.  We now are
 5      on the record.
 6               Today's date is April 28th, 2025.  The time is
 7      approximately 9:17 Pacific Time/12:17 Eastern Standard
 8      Time.
 9               This begins the video-recorded deposition of
10      Barry Huber, testifying in the matter of Friedberg
11      versus Daybreak, Incorporated.  It is in U.S. District
12      Court of the Virgin Islands, Division of St. Thomas and
13      St. John.  Case No. 3:19-cv-0053-RAM-EAH.
14               This deposition is taking place via Zoom
15      videoconferencing.  My name is John Dusenbery.
16      I'm the videographer with Lexitas.  The California
17      Certified Shorthand Reporter today is Beth Ballerini,
18      CSR No. 7358.
19               This deposition is recorded at all times
20      unless all counsel agree to go on or off the record.
21               Would all the counsel that are present please
22      state your appearance, starting with the noticing
23      attorney.
24               MR. FRIEDBERG:  Yeah.  Hi.  Good morning.  My
25      name is Tom Friedberg on behalf of Plaintiffs.
```

1          MR. COSBY:  Jeff Cosby on behalf of Daybreak.

2          THE COURT REPORTER:  Mr. Huber, please raise

3    your right hand.

4          Do you solemnly swear the testimony you are

5    about to give in the matter now pending will be the

6    truth, the whole truth, and nothing but the truth?

7          THE WITNESS:  I do.

8          THE COURT REPORTER:  Thank you.

9

10                E X A M I N A T I O N

11   BY MR. FRIEDBERG:

12        Q.   Hi.  Good morning.  Would you like me to refer

13   to you as Barry or Mr. Huber?

14        A.   Barry is fine.

15        Q.   Okay.  Good morning, Barry.  You know me, we

16   met before, Tom Friedberg.  I'm here to take your

17   deposition regarding the project that your company did

18   in St. John in 2010.

19          You've had your deposition taken previously?

20        A.   Yes.

21        Q.   Approximately how many times?

22        A.   Three, four.

23        Q.   I deposed you one of those times.

24          Since the time I deposed you, have you had a

25   deposition taken any other times?

Barry Huber                                                    April 28, 2025

```
 1        A.    No, not that I recall.
 2        Q.    All right.  What is your project -- well, let
 3   me ask you this.  Can I dispense with the general
 4   instructions for a deposition or are you sufficiently --
 5   or would you like me to go over them?
 6        A.    There's no need.
 7        Q.    Okay.  If for any reason my question is not
 8   clear, just ask me to rephrase it.  I'll be more than
 9   glad to do so because if you answer I'm going to assume
10   you understood my question and testified based on your
11   personal knowledge.  Agreed?
12        A.    I will ask again.
13        Q.    All right.  Thank you.
14              How many projects have you done in the
15   U.S. Virgin Islands?
16        A.    One.  Our recent history is all I recall right
17   now.  But I'm unclear -- I've been in business a long
18   time.  I'm unclear about that.  I think just yours.
19        Q.    All right.  I mean you've done work in the
20   British Virgin Islands, correct?
21        A.    Correct.
22        Q.    So on your website you mentioned projects in
23   the United States Virgin Islands.
24              Are you aware of that?
25        A.    No.
```

Barry Huber                                                April 28, 2025

```
 1        Q.   Who prepares your website?  Do you have any
 2   involvement with that?
 3        A.   Not much.
 4        Q.   And does anyone at your company do that or do
 5   you use an outside vendor?
 6        A.   I believe it's actually inside and outside
 7   office.
 8        Q.   At any point in time did you have a license
 9   from the Virgin Islands government to conduct business
10   in the Virgin Islands?
11        A.   Not that I recall.
12        Q.   Any reason why you did not get a license?
13             MR. COSBY:  Object to the form.
14             You can answer.
15             THE WITNESS:  No.
16   BY MR. FRIEDBERG:
17        Q.   Are you aware there's a requirement that you
18   need to be licensed to perform work in the U.S. Virgin
19   Islands?
20        A.   No.
21        Q.   How did you first get involved in this
22   project?
23        A.   I can't recall.
24        Q.   How many times were you on St. John?
25        A.   Approximately four.  Possibly four.
```

```
 1        Q.   Tell me when that was.

 2        A.   I know originally with you and your wife

 3   before contracting.  I do not recall if I did a site

 4   visit during.  I do know I came out after the roof was

 5   installed to inspect and observe any punch items that

 6   may be necessary.  And then I know we came back out for

 7   the deposition.

 8        Q.   Did you take any --

 9             At any point in time did you do any

10   measurements or takeoffs on the roof?

11        A.   I don't recall.

12        Q.   You mentioned that you came out after the roof

13   was completed.  When was this in relation to completion?

14        A.   You were -- you were not on-site, if I

15   remember right, and I was checking the job out, to the

16   best of my recollection.

17        Q.   When you came to the project, who did you

18   check in with?

19        A.   I don't remember.

20        Q.   Was there anyone on the site at the time, or

21   did you just walk on?

22        A.   I don't recall.

23        Q.   How did you access the roofs?

24        A.   I don't recall.

25        Q.   Did you use a ladder?
```

Barry Huber                                                    April 28, 2025

1      A.    If I was up on the roof, I probably did then

2   unless there was some other access or scaffold or

3   something in place.

4      Q.    Do you know whether you were on the roofs when

5   you came after the project was completed?

6      A.    I do not recall.

7      Q.    What if anything do you recall when you went

8   there to look at the roofs after the project was

9   completed?

10     A.    My most clear recollection is based off of the

11  photos that I have.

12     Q.    Okay.  And what do the photos tell you?

13     A.    There was -- you were concerned about the

14  straightness of the hips, the ridges along the hips, and

15  so I took a picture of that.

16     Q.    Okay.  Anything else?

17     A.    I can't recall anything else.

18     Q.    We're here talking only about the lower

19  building, the main building, the main roof.

20           Do you have that in your mind?

21     A.    Yes.

22     Q.    So did you sit in through Micha's deposition,

23  listening?

24     A.    Parts of it.

25     Q.    Who in your organization was in charge of

Barry Huber                                          April 28, 2025

1   packing the containers before they were shipped down?

2        A.    It would have been people in my shop, I would

3   assume.

4        Q.    Do you have any names of anyone who was in

5   charge?

6        A.    No.

7        Q.    What role did Ron Barker play with respect to

8   this project, if you know?

9        A.    He was in the office.  So to the best of my

10  recollection, would have been doing, you know,

11  office-type things with invoicing, things like that.

12       Q.    Do you have any independent recollection of

13  any aspects of this project?

14       A.    That's a very broad question.  Could you reask

15  it?

16       Q.    Sure.

17             What do you remember about the project?

18       A.    A beautiful site; a collection of buildings

19  that's beautifully situated overlooking the water; and

20  some typical I guess you would call Caribbean

21  construction aspects to it.  Nothing difficult about the

22  project.  It looked like an ideal setting for a copper

23  standing seam roof.

24       Q.    You mentioned that you were present on the

25  project prior to commencement of the work.  What was the

```
 1   purpose of that visit?
 2        A.   To meet with you and your wife.
 3        Q.   And at that time did you inspect any of the
 4   roofs?
 5        A.   I'm sure I did.
 6             (Interruption in the proceedings.)
 7             THE WITNESS:  Could I take a moment and
 8   disconnect this phone over here?
 9             MR. FRIEDBERG:  Sure.
10             THE WITNESS:  Thank you.  Excuse me.
11             I thought I turned the volume down.  I
12   apologize.  I disconnected it.
13             MR. FRIEDBERG:  Are you ready?
14             THE WITNESS:  Yes, please.
15   BY MR. FRIEDBERG:
16        Q.   Okay.  I think I was asking you whether you
17   inspected the roof prior to construction.
18        A.   I would assume I would have, to some degree.
19   To what degree that was, I do not recall.
20        Q.   Is there anything about the roof that caused
21   you concern?
22        A.   I guess you would have to ask the question
23   maybe about level of concern.
24        Q.   Okay.  What was your level of concern?
25        A.   There was some level of concern because some
```

Barry Huber                                                April 28, 2025

1   of the roofs had been exposed to the weather it looked

2   like quite a long time.

3        Q.   And in terms of the soundness or structure of

4   the roofs, did you have any concern?

5        A.   I don't recall any concern regarding that.

6        Q.   And when you say exposed to the weather, what

7   do you mean?

8        A.   Some of the underlayment that had been used

9   was alligatoring -- what they call alligatoring, you

10  know, like an alligator skin because it had been exposed

11  for so long.

12       Q.   Was any other material placed above that

13  alligatoring material prior to the copper roof being

14  installed?

15       A.   I would assume so because I didn't -- I don't

16  remember seeing anything, you know, in any pictures of

17  the project.  So I guess based off of that I would

18  assume.

19       Q.   So you're assuming that there was some type of

20  underlayment that was placed shortly before the copper

21  roof being installed?

22            Is that your testimony?

23       A.   My testimony would be that the -- the on-site

24  contractor, Chris, was to prepare the roofs for the

25  copper roofing and to address any issues so that we

Barry Huber                                                    April 28, 2025

```
 1   could simply come and install the copper roofing on --
 2        Q.   Why do you say -- I'm sorry, I interrupted
 3   you.  Go ahead and finish.
 4        A.   -- on a sound roof.
 5        Q.   My first question:  Why did you state that
 6   Chris was the on-site contractor?  Did he ever represent
 7   he was?
 8        A.   Yeah.
 9        Q.   What did he say?
10        A.   Well, he was the point of contact for the
11   plans and information about the job.  So I guess by
12   default you would assume he was.  Maybe was that assumed
13   erroneously?  But an assumption would be since he was
14   there building and referring to the plans and the
15   construction.
16        Q.   Did you ever ask Chris if he was the on-site
17   contractor?
18        A.   I don't recall.
19        Q.   Was there anything about the roof prior to
20   installation of copper immediately -- well, strike that.
21   Let me withdraw.
22             Was there anything about the roof immediately
23   prior to installation of copper that would lead you to
24   believe that it was anything other than sound?
25        A.   Not to my knowledge.
```

Barry Huber                                                        April 28, 2025

1        Q.   So at the time -- this was in 2010.  I've seen

2   documents that you had insurance with Southern Owners

3   Insurance and Ameritrust Group.

4             Is that correct?

5        A.   I don't recall.

6        Q.   All right.  Are you aware of any reservation

7   of rights issued by any of the insurance companies with

8   respect to this particular lawsuit?

9        A.   I'm not aware.

10       Q.   By not aware, meaning there is none or you

11  don't know?

12       A.   I don't know.

13            MR. COSBY:  Object to the form.

14            You can answer.

15  BY MR. FRIEDBERG:

16       Q.   So at some point in time you prepared a

17  proposal, correct?

18       A.   Correct.

19            MR. FRIEDBERG:  All right.  We're going to use

20  the same exhibits, Beth, that we used for Micha's, so we

21  can just refer to them.

22  BY MR. FRIEDBERG:

23       Q.   You've reviewed the documents, Exhibit 2,

24  which is a series of documents with the F&B v.

25  Daybreak - Deposition Exhibits.

Barry Huber                                                    April 28, 2025

```
 1              Have you seen those, Barry?
 2       A.   Yes.
 3              MR. FRIEDBERG:  So, John, I'm going to ask
 4    that you --
 5    BY MR. FRIEDBERG:
 6       Q.   Well, first let me ask you, it had a request
 7    for production of 14 items.  I didn't receive an
 8    objection to the request for production.
 9              Do you have the items that are identified in
10    the request for production?
11       A.   I haven't -- I'm not sure.
12       Q.   Did you make an effort -- well, strike that.
13              Did you see the request for production?
14       A.   I saw the documents, and we provided
15    everything to our counsel that we have, every last --
16    everything that we have.
17       Q.   So when I deposed you a number of years ago
18    you mentioned that you had moved offices and were no
19    longer able to locate a number of the documents.
20              Is that still the case, you cannot locate the
21    documents?
22       A.   My answer would be a little more than a yes or
23    no because the amount of documents -- I would have to
24    know how many there were to begin with and what was
25    missing.
```

Barry Huber                                              April 28, 2025

1      Q.   Did you have a job file for this job?

2      A.   I'm sure we did.

3      Q.   And what's generally contained within your job

4  file?

5      A.   Estimates; invoices; if there's roof plans, a

6  roof plan would be in there; owner contact information.

7      Q.   Do you still have the job file?

8      A.   There was a paper file found at our office

9  that we provided to our attorney that had very limited

10 information, according to my secretary.

11     Q.   And which attorney was this?

12     A.   To our counsel, our current counsel,

13 Mr. Cosby.

14     Q.   Okay.  And do you know what was contained

15 within those files?

16     A.   No.

17          MR. FRIEDBERG:  Let's bring up P8, John.

18 BY MR. FRIEDBERG:

19     Q.   Do you recognize this document, Barry?

20     A.   Yes.

21     Q.   And what is this document?

22     A.   A proposal for roofing the residence at

23 St. John.

24     Q.   This is a February 2010 proposal?

25     A.   That's what it says.

1      Q.   And so down in Section II it talks about

2  17 on-center panel widths and cleats installed 12 inches

3  on center.

4           Do you see that?

5      A.   Yes.

6      Q.   Let's go to P11, if we can.

7           And do you see this document?

8      A.   Yes.

9      Q.   And this is a May 7, 2010, proposal?

10     A.   Correct.

11     Q.   Do you know if this was the final agreement

12 that was reached between -- for this particular project?

13     A.   I believe it was.

14     Q.   Do you have a signed version?

15     A.   I do not know.

16     Q.   Do you know whether you signed this contract?

17     A.   I do not recall.

18     Q.   Whether you signed it or didn't sign it, would

19 you agree that the May 7 proposal is in fact the

20 contract?

21     A.   It appears to be.

22     Q.   So Section II, I want to talk to you about

23 some differences.  It says panels 15 inches on center

24 and cleats 9 1/2 inches on center.

25           Do you see that?

Barry Huber                                            April 28, 2025

```
 1        A.    Yes.
 2        Q.    Can you explain to me why there's a difference
 3   between the February and May proposals?
 4        A.    It would be apparent that the information was
 5   given to us that the panels were wished to be smaller
 6   and the cleat spacing tighter.
 7        Q.    And are you aware of the reason for this?
 8        A.    Pardon?
 9        Q.    Are you aware of the reason for this, the
10   cleat spacing being tighter?
11        A.    I guess the question is confusing.
12        Q.    All right.  Let me withdraw and reask.
13              Why is there a difference between 12 inches on
14   center and 9 1/2 inches on center for the cleat spacing?
15        A.    So I -- if I may clarify.
16        Q.    Sure.
17        A.    So you're wondering what the foundation of the
18   change is, why -- what -- what precipitated the change?
19        Q.    Let's start with that.
20        A.    Okay.  I imagine somebody gave us some
21   information that the deck -- or roof deck or battens --
22   were going to be spaced differently than what we had
23   proposed.
24        Q.    And did that result in a change order or
25   increase in changes?
```

1     A.   It would have caused an increase because of

2  the amount of additional fasteners and additional panels

3  to install on the roof.

4     Q.   Let's go to page 12.

5          That 10,735, is that the additional charge for

6  the smaller panels and cleat spacing?

7     A.   Correct.

8     Q.   So under the terms of the agreement of May

9  2010, would you agree that the cleats were to be spaced

10 approximately 9 1/2 inches on center?

11         MR. COSBY:  Object to the form.

12         You can answer.

13         THE WITNESS:  I believe the page with the

14 scope referred to 9 1/2 inches on average.

15 BY MR. FRIEDBERG:

16    Q.   All right.  Okay.  Would you agree that the

17 agreement of May 2010 required cleats to be installed an

18 average of 9 1/2 inches on center with 2 ring shank

19 nails per cleat?

20    A.   Yes.

21    Q.   And if, hypothetically, cleats were not

22 installed an average of 9 1/2 inches on center and in

23 fact there were areas where there was several feet of

24 cleats not installed, would you agree that would be in

25 contravention of the May 2010 agreement?

1           MR. COSBY:  Object to the form.

2           You can answer.

3           THE WITNESS:  Hypothetically, well, yes.

4    BY MR. FRIEDBERG:

5       Q.   If in fact cleats were not installed on an

6    average of 9 1/2 inches on center, what is the effect of

7    that?

8           MR. COSBY:  Form.

9           You can answer.

10          THE WITNESS:  That is -- it's -- the question

11   is not a simple answer.

12   BY MR. FRIEDBERG:

13      Q.   Okay.  I'm listening.

14      A.   Okay.  So if it was in some part of the roof

15   to, say, 10 inches, or another part of the roof

16   12 inches, and it is localized, little to no effect.

17   But the only way to really determine, someone would have

18   to actually do an uplift test to a panel to see what

19   effect if any failure would come with uplift pressures.

20      Q.   And what is an uplift test?

21      A.   If you were able to construct a pull test --

22   if I could explain a pull test maybe with tile, clay

23   tile, because maybe it's easier.

24          You could put a device above the tile, hook

25   the edge of the tile and pull upwards and see how much

 1  resistance it has to try to replicate what wind pressure
 2  would do to a tile.
 3          It's more difficult with a copper standing
 4  seam because you have to have your apparatus out a good
 5  ways from the standing seams to do the pull test.
 6          So engineering would tell you that
 7  12 inches on center -- or at least engineering that I
 8  have seen before -- 12 inches on center would meet the
 9  Dade County wind codes.
10          So when you ask the question, Tom, to be a
11  little more clearer, it's kind of a broad thing just to
12  say well, if it wasn't at 9 1/2 inches on average, what
13  is the effect.  It's -- it's not just, like, a clear-cut
14  answer there.
15      Q.   This pull test you're referring to, what's the
16  ASTM standard for that?
17      A.   I do not know.
18      Q.   And in fact it's essentially by pulling up
19  you're exerting pounds, or equivalent to pounds, I take
20  it?
21          Well, first of all, are you familiar with how
22  to perform this test?
23      A.   Not on copper standing seam, no.
24      Q.   If, hypothetically -- well, strike that.
25          The actual cleats themselves are to be secured

Barry Huber                                                      April 28, 2025

```
 1   to the battens with 2-inch ring shank nails, correct?
 2         A.   I don't know.
 3         Q.   Well, I'm reading the contract.  It says an
 4   average --
 5              Well, what are the cleats attached to; do you
 6   know?
 7         A.   The cleats should have been attached to the
 8   battens.
 9         Q.   With 2 ring shank nails per cleat.
10         A.   Correct.
11         Q.   And were you present when Mike had testified
12   that he would know that in fact the ring shank nails
13   were in fact nailed into a wooden batten?
14         A.   I heard something in the previous deposition
15   about would you know whether you hit insulation or not,
16   or somebody said something about insulation.
17         Q.   And do you recall what Mike had testified to?
18         A.   That he would be aware.
19         Q.   If, hypothetically, there were several feet in
20   which there was no cleats -- in other words, there were
21   battens skipped -- do you know whether or not that would
22   be in contravention to the May 2010 agreement?
23         A.   Yes, it would be.
24         Q.   So you heard testimony -- or, strike that.
25   Let me ask you this.  Strike what I just said
```

1    previously.

2            As I understand, each panel where it meets the

3    hip, it's supposed to be folded over?

4        A.    Correct, a single lock.

5        Q.    And where the two panels meet, how much copper

6    is available to make that lock?

7        A.    One panel is bent up shorter than the other

8    panel, and then the longer panel is folded over the

9    shorter.

10       Q.    Sure.  What are the dimensions?

11       A.    Approximately anywhere from 1 inch on one side

12   to 1 1/2 and maybe greater on the other.

13       Q.    Are there --

14       A.    Approximately.

15       Q.    Sure.

16            Are there minimum tolerances for the amount of

17   copper to be used in folding over to make the seam?

18       A.    On a single lock there could be.

19       Q.    What are the ranges of tolerances?

20       A.    I'm not sure.

21       Q.    Well, if, hypothetically, one of the panels

22   did not have enough material to be folded over to make a

23   single lock, would that affect the integrity of the

24   actual seam itself?

25            MR. COSBY:  Object to the form.

Barry Huber                                                        April 28, 2025

```
 1              You can answer.
 2              THE WITNESS:  If that was the case, it doesn't
 3   necessarily -- well, I guess -- I guess let's be clear,
 4   if we could.  Do you mean the integrity of the seam as
 5   far as waterproofness?
 6   BY MR. FRIEDBERG:
 7        Q.   Wind.
 8        A.   Wind.  No.
 9        Q.   All right.  So you're saying that if one panel
10   in fact did not have any excess material and the other
11   panel did have some excess material that was used to
12   form the seam, would that be an appropriate or
13   acceptable seam in accordance with Revere Copper &
14   Common Sense and SMACNA?
15        A.   To be clear, you're asking a different
16   question than the previous question.  Is that correct?
17        Q.   My question stands.  Do you have an answer for
18   it or do you need it read back?
19              THE COURT REPORTER:  In accordance with -- we
20   couldn't hear you when you turned your head.
21              MR. FRIEDBERG:  Sure.  In accordance with
22   Revere Copper & Common Sense and SMACNA.
23              THE WITNESS:  So could you repeat the
24   question, please?
25              MR. FRIEDBERG:  Can you read it back, Beth.
```

Barry Huber                                              April 28, 2025

```
1              (Record read:
2                   Q.  So you're saying that if one panel
3                   in fact did not have any excess material
4                   and the other panel did have some excess
5                   material that was used to form the seam,
6                   would that be an appropriate or
7                   acceptable seam in accordance with Revere
8                   Copper & Common Sense and SMACNA?)
9              MR. COSBY:  Object to the form.
10             THE WITNESS:  The question and the guidelines
11    of the question are not clear enough to be able to
12    answer.
13    BY MR. FRIEDBERG:
14        Q.   What is the purpose of having excess materials
15    to make the seam?
16        A.   To fold one panel over the top of another.
17        Q.   And the reason you do that is for what?
18        A.   Waterproofing.
19        Q.   Is it also to -- for wind resistance?
20        A.   No.
21        Q.   What's securing the panel to the battens or
22    the roof for wind resistance?
23        A.   The cleats 9 1/2 inches on center on average.
24        Q.   And if in fact -- well, I think I've asked
25    this question.
```

Barry Huber                                                April 28, 2025

1              So let me get back over to the seaming of the

2      hips.  You're saying that has nothing to do with wind?

3          A.   Correct.

4          Q.   Now, both the hips themselves, is there some

5      type of ridge cap placed?

6          A.   On your project a batten seam was placed.

7          Q.   What does that mean?

8          A.   That means a small upside down U, U-shaped

9      piece of metal, was placed over the seam for appearance

10     and for extra water shedding.

11         Q.   All right.  And how is that attached?

12         A.   Riveted.

13         Q.   And do you know -- or, strike that.

14              Do you have any information as to whether or

15     not there was sufficient material on each panel in order

16     to form the seam with approximately 1 inch on one side

17     and an 1 1/2 on the other?

18         A.   I do not have the knowledge of that.

19         Q.   If in fact there were panels that were cut

20     short so it could not make those dimensions, would that

21     be in violation of the agreement, the contract?

22              MR. COSBY:  Object to the form.

23              You can answer.

24              THE WITNESS:  No.  It would be an easy repair

25     though if --

Barry Huber                                          April 28, 2025

```
 1   BY MR. FRIEDBERG:
 2        Q.   What -- I'm sorry, I cut you off.  Were you
 3   done?
 4        A.   I said it would be an easy repair though in
 5   such a case where metal could have been added to the
 6   panel to create sufficient metal.
 7        Q.   And how would metal be added to the panel?
 8        A.   It could have been soldered in place.
 9        Q.   Do you know if that was done?
10        A.   Oh, no, I have no recollection.
11        Q.   If in fact the U-shaped batten that you
12   mentioned is placed over the hip, does that prevent
13   visualization of the seam?
14        A.   It covers obviously most of the seam, but it's
15   still sometimes visible from underneath the batten cap.
16   You can see along the edge what's happening.  But for
17   the most part obviously if it's a batten cover or batten
18   seam, it's going to cover most of it.
19        Q.   Can the cleats be seen through the copper
20   by -- in other words, do they telegraph through the
21   copper?
22        A.   On standing seam it's not uncommon when
23   they're machine-seamed.  Some of the machines which are
24   used for double-locking copper have pressure up to
25   over -- well over 1,000 pounds, and as those rollers
```

Barry Huber                                                    April 28, 2025

```
 1   roll over the seam, if it's visible, it's only on the
 2   one side where the double-lock isn't.  You can see it on
 3   the flat side of the seam.  That's pretty common, to be
 4   able to see where the cleats are.
 5        Q.   Do you know whether the cleats were able to be
 6   seen after the roof was installed?
 7        A.   I mean, in my mind's eye having seen different
 8   copper standing seam roofs, I've seen cleats visible.
 9   Why yours would be any different than what's in my
10   mind's eye, I couldn't say.
11        Q.   You've seen a number of close-up photos of the
12   main roof, I take it?
13        A.   Not necessarily close up.
14        Q.   In any of the photographs that you've seen, do
15   they -- are you able to determine if the cleats had
16   telegraphed through the copper?
17        A.   I don't recall any photographs close enough
18   for that.
19        Q.   Did you review the Hoffman architect report?
20        A.   I remember that report, yes, I do.
21        Q.   Do you recall -- strike that.  I interrupted
22   you.  Were you done?
23        A.   I do remember it, yes.  I did receive it.  I
24   did review it.
25        Q.   And when was that?
```

Barry Huber                                                April 28, 2025

1    A.   As of late, just even this morning at some

2  point, a part of it.

3    Q.   Do you recall there being close-up

4  photographs?

5    A.   Yes, in that report -- there were close-ups in

6  that report, you're correct.

7    Q.   Were you able to visualize any telegraphing of

8  cleats?

9    A.   They were too grainy to be able to see

10  anything like that.

11    Q.   Were you aware that there were materials that

12  needed to be shipped down during the project?

13    A.   Yes.

14    Q.   And what materials were you aware that needed

15  to be shipped down?

16    A.   Well, obviously the copper coils.  Then I

17  imagine then of course the -- all the normal things

18  would have needed to be shipped down.  I don't think we

19  bought anything really locally.

20    Q.   During the pendency of the project did

21  additional materials need to be shipped down?

22    A.   You're asking during the duration, while the

23  project was underway?

24    Q.   Yes.

25    A.   I don't recall.

Barry Huber                                                    April 28, 2025

1        Q.    Do you have a recollection of additional

2    copper and additional cleats needed to be shipped down?

3        A.    I do believe that we needed more copper to

4    finish the job, if I remember correctly.

5        Q.    Look at page 28.

6              What is this document?

7        A.    Looks like a printout from a spreadsheet,

8    probably some backup for estimating, I would imagine.

9        Q.    Is this a document your company prepared?

10       A.    It appears that way, yes.

11       Q.    Do you know who prepared it?

12       A.    I may have.  I'm not sure.

13       Q.    Let's talk about the section with the cleats.

14   It says additional cleats for project, 2,559.

15       A.    Where is that line?  Oh, I see, yes, uh-huh,

16   that's what it says.

17       Q.    And how is that determined?

18       A.    The spacing going from 12 inches to 9 1/2, I

19   would assume.

20       Q.    Is there some formula?

21       A.    Mathematics.

22       Q.    I understand it's mathematics.  But can you

23   tell me how -- is there a specific formula that you can

24   refer me to?

25       A.    Well, I guess I could generalize in roofing,

Barry Huber                                                    April 28, 2025

```
 1   of any number of roofing products, you assess the
 2   coverage of pieces per square --
 3           Can I -- can I take a break right now, please?
 4       Q.   Yeah, that's fine.  We can go off the record.
 5       A.   Even though we're kind of in the middle of
 6   this question, and I'm happy to bring it up again.  But
 7   I would like to take a short break, if I could.
 8       Q.   Yeah.  As long as you don't talk to counsel or
 9   anything.
10       A.   No.
11           THE VIDEOGRAPHER:  Going off the record at
12   approximately 9:53 a.m.
13           (Recess taken.)
14           THE VIDEOGRAPHER:  We are back on the record
15   at approximately 9:59 a.m.
16   BY MR. FRIEDBERG:
17       Q.   We took a break in the middle of your answer.
18   Before we went back on just now, Beth reread.
19           Can you continue with your answer, please.
20       A.   Yeah.  Again, I apologize for that.
21           And then, Beth, it is products rather than
22   projects.
23           So in any number of roofing products, roofers
24   are used to calculating pieces per square.  So, like,
25   say for simplicity an asphalt shingle has -- you know, a
```

1  standard shingle has 81 pieces per square.  So then you

2  know you have so many nails per piece.

3          And so with this particular roof, they're

4  longer panels but they're still so many pieces per

5  square and so many cleats per square.  So it's pretty

6  simple math that what used to be 12 inches on center now

7  has moved down to 9 1/2 inches on center.

8          So when I say mathematics, I wasn't trying to

9  be demeaning, but it's just a simple division problem.

10          Over 10 feet at 12 inches on center you have

11  10.  Over 10 feet at 9 1/2 inches on center you have

12  X number more.  If your panels are spanning the roof

13  over -- you know, if they are 17 inches wide over

14  10 feet, you have fewer panels.

15          So that's why I answered the way I did, Tom,

16  mathematics.

17      Q.   So you mentioned before when I was asking you

18  questions about the hips, you said that the reason why

19  you have the excess material and overlap is primarily

20  for rain.

21          Did I understand you correctly?

22      A.   Waterproofing.

23      Q.   Waterproofing.

24          Does it have anything to do with wind?

25      A.   No.

Barry Huber                                                                April 28, 2025

1      Q.   If in fact the seams don't have sufficient

2   material to fully bend over, do you know whether or not

3   those particular panels are susceptible to wind uplift?

4           MR. COSBY:   Form.

5           You can answer.

6           THE WITNESS:   Again, it -- it is -- it is

7   about waterproofing the roof at the hip.   The wind

8   resistance is your panel fastening.

9   BY MR. FRIEDBERG:

10     Q.   And panel fastening is what?

11     A.   Is the cleats -- in your case of your roof,

12  Tom, is 9 1/2 inches on center with 15-inch-wide panels.

13     Q.   All right.   So is it your testimony that it's

14  the cleats solely that's providing the wind resistance?

15          MR. COSBY:   Form.

16          You can answer.

17          THE WITNESS:   The cleats and the panels, yes.

18  BY MR. FRIEDBERG:

19     Q.   Okay.   And how are the panels providing wind

20  resistance?

21     A.   With the attachment of the cleats which are

22  folded into the seam.

23     Q.   Okay.

24     A.   And those cleats nailed to hopefully sound

25  wood deck or batten.

Barry Huber                                              April 28, 2025

1       Q.   Is there any evidence that there was anything

2   unsound about the wood battens that the cleats were

3   nailed into?

4       A.   We did no testing of the integrity of the

5   battens.

6       Q.   All right.  Well, the battens were -- well,

7   let me ask you, what is your understanding of what the

8   battens were?

9       A.   Our understanding was that the battens were

10  going to be applied in the hurricane zone that you are

11  in.

12      Q.   All right.  That was a poor question.

13           What was the size of the battens?

14      A.   They were I believe -- well, from pictures

15  they appear to be 1-by-4s, which is -- 1-by-4 is not

16  really 1-by-4.  It's 3/4 by 3 1/2.

17      Q.   Is that --

18      A.   I'm sorry, go ahead.

19      Q.   Is that a standard size batten, if you know?

20      A.   I would say it's one of the more commonly used

21  products for battens.

22      Q.   At any point in time did you become aware or

23  is there any evidence that the battens were not properly

24  installed?

25      A.   No.  I mean no recollection of such.

Barry Huber                                                    April 28, 2025

1        Q.    You mentioned the word alligator.  You were

2   down a number of months before the actual work began,

3   correct?

4        A.    Correct.

5        Q.    What you saw as alligatoring, was that when

6   you first -- your first visit to the site?

7        A.    I believe so, my first look.

8        Q.    Do you know if that condition was remedied

9   prior to the copper panels being installed?

10       A.    I would assume so.

11       Q.    All right.  I mean were you aware from

12   anything your crew told you that there was alligatoring

13   existing at the time the copper roof was installed?

14       A.    I don't recall.

15       Q.    And you mentioned about rollers.  What type of

16   rollers were used on this project?

17       A.    If you're referring to the machine seaming of

18   the double-lock --

19       Q.    Yes.

20       A.    I believe it was an ESE machine.  It's called

21   ESE.  It's just a manufacturer of roll-forming and

22   pan-forming equipment.

23       Q.    And that's electrical; in other words, it has

24   to be plugged in?

25       A.    It's electrical.

Barry Huber                                               April 28, 2025

1        Q.    Right.  And then basically you run it up the

2    seams and it crimps them?

3        A.    Yeah, yes.

4        Q.    And were hand seamers used as well?

5        A.    Hand seamers are necessary to start the seam

6    off correctly sometimes.  You know, these seamers, these

7    mechanical seamers -- and probably especially at the

8    time we did your roof -- you usually had to start --

9    kind of start the machine out with a hand seam to make

10   sure it got off on a good start.

11       Q.    Let me have you go to page 70.

12             And do you see this document?

13       A.    Let me get my reading glasses, if I could.

14             THE COURT REPORTER:  John, can you make it

15   bigger, please.

16             THE WITNESS:  It's legible.

17   BY MR. FRIEDBERG:

18       Q.    What is this document?

19       A.    It appears to be an invoice, but it's not --

20   but yet it says "Job Information," so I'm unclear.

21       Q.    It says "Extra Materials, Work & Expenses" on

22   the top.

23             Do you see that?

24       A.    I do see that.

25       Q.    And then at the bottom there's a total of

1    $15,067.

2            Do you see that?

3        A.    Yes, I do.

4        Q.    Okay.  In the first section it talks about

5    2-inch cleats.

6            Are those the copper cleats used to secure the

7    panels?

8        A.    Yes, I believe so.

9        Q.    Okay.  And it says quantity, 9,000.

10           Do you see that?

11       A.    Yes.

12       Q.    Were there 9,000 additional cleats needed?

13       A.    I can't answer the question.  I don't have

14   enough information to know.

15       Q.    This document is a document prepared by your

16   company, correct?

17       A.    Correct.

18       Q.    How many cleats in total were shipped down?

19       A.    I do not recall.

20       Q.    So we looked at page 28, and it asked for

21   2,559 more cleats.

22           Do you recall that?

23       A.    Yeah, I believe that was the number.

24       Q.    And we looked at page 70 and it talks about

25   9,000 cleats under a column -- or a document that says

```
 1   Extra Materials, Work & Expenses.

 2           Do you see that?

 3       A.   Yes.

 4       Q.   So were there in excess of 11,559 additional

 5   cleats needed?

 6           MR. COSBY:  Object to the form.

 7           You can answer.

 8           THE WITNESS:  So I'm -- I guess I need to see

 9   this on one page to be able to answer.  I guess I'm

10   confused about the question.  I'm -- you're going to

11   have to go through this again, I guess, to see --

12   BY MR. FRIEDBERG:

13       Q.   Let's bring up page 28, and then we'll bring

14   up page 70 --

15       A.   Okay.

16       Q.   -- and we'll take a look at each of them.

17       A.   Thank you.

18           MR. COSBY:  And, Tom, have you marked any of

19   these?

20           MR. FRIEDBERG:  Yes.  They're marked and

21   attached to Micha's, and I said at the beginning I'm

22   just going to refer to them in Barry's.

23           MR. COSBY:  I missed that.  Thank you.

24   BY MR. FRIEDBERG:

25       Q.   All right.  Do you have 28 in mind?  Can we go
```

Barry Huber                                                    April 28, 2025

1   to page 28, Barry?

2       A.   One moment.  I want to verify the numbers on

3   this page as much as we can.  So we had 84 project

4   squares.  I believe that was the whole project.  So now

5   I see with my reading glasses on it's 144 percent more

6   cleats per -- so cleats per square is 144 percent more

7   than --

8              THE COURT REPORTER:  I have to understand you,

9   sir.

10             THE WITNESS:  I am so sorry.  I'm basically

11  thinking out loud.  Excuse me.  Reading the document and

12  wanting to make sure I understand and be able to

13  understand Tom's question.  And referring to his

14  previous question about how it's calculated, and I see

15  on the sheet it says there's 144 percent more cleats.

16             So additional cleats per project.  And I won't

17  read it out loud anymore.  I apologize, Beth.  Let me

18  just take a moment.

19             Okay.  You can go back to page 70, please.

20  BY MR. FRIEDBERG:

21      Q.   Let me know when you're done.

22      A.   Okay.

23      Q.   So how many cleats were used on this project?

24      A.   It appears to me that 9,000 were used.

25      Q.   9,000 is on a document that says Extra

```
 1   Materials, Work & Expenses.
 2            Do you see that?
 3       A.   Yes, I do see that.  The -- I also see the
 4   cost for those 9,000.  I don't know what this document
 5   is, and the veracity of it I question.
 6       Q.   Well, it's your document, is it not?
 7       A.   That doesn't mean it's accurate.
 8       Q.   Is it your testimony you have inaccurate
 9   documents in terms of the materials?
10       A.   That's a generalization that I would not agree
11   to.
12            MR. COSBY:  Object --
13   BY MR. FRIEDBERG:
14       Q.   Well, I'm somewhat confused, Barry.  I mean
15   you have this documentation here in terms of the number
16   of cleats, and now you're questioning whether or not
17   it's accurate?  Did I get that right?
18            MR. COSBY:  Object to the form.
19            You can answer.
20            THE WITNESS:  There is a line on a document
21   that for all intents and purposes may have been titled
22   incorrectly.  And if a document is titled incorrectly by
23   somebody in the office, that would not mean for me that
24   it's a basis of something inaccurate in terms of
25   mathematics or what was used.
```

Barry Huber                                                    April 28, 2025

```
 1  BY MR. FRIEDBERG:
 2       Q.   Look at the last line of page 70.  Do you see
 3  that?
 4       A.   Yes.
 5       Q.   Read it to me.
 6       A.   "Extra Materials, Work and Expenses as noted
 7  above."
 8       Q.   And what's the total in terms of charge?
 9       A.   $15,067.47.
10       Q.   So the document at the bottom within the body
11  says extra materials.  Agreed?
12       A.   Thank you for enlarging.
13            Yes, that's what it says.
14       Q.   And this was intended to be a change order?
15       A.   I have no idea.
16       Q.   This was intended to be items to be billed on
17  this project?
18            MR. COSBY:  Object to the form.
19            You can answer.
20            THE WITNESS:  I do not know.
21  BY MR. FRIEDBERG:
22       Q.   So at the end of the day you can't tell me how
23  many cleats were used on this project.
24            Is that your testimony?
25       A.   Not without doing the math.
```

Barry Huber                                                    April 28, 2025

1      Q.   Do you have any documents to confirm the

2  number of cleats done on this project?

3      A.   Not that I know of.

4      Q.   Are you aware that during the duration of this

5  project additional materials needed to be shipped down

6  in order to complete the project?

7      A.   That's what I recall, something about

8  additional materials.

9      Q.   And do you have an understanding as to why it

10  was necessary to ship additional materials?

11      A.   No.

12      Q.   Do you know if there was an error in the

13  calculations by your company?

14      A.   I do not know.

15      Q.   What type of additional materials were

16  shipped, if you know?

17      A.   I do not have a clear recollection.

18      Q.   Are you still doing copper roofing?

19      A.   Yes.

20      Q.   What's the price of copper these days?

21      A.   It's gone up quite a bit, Tom.

22      Q.   When you last looked, what was the price of

23  copper?

24      A.   $7.10 a pound.

25      Q.   And how has that changed since 2010?

Barry Huber                                                    April 28, 2025

1        A.    I don't know exactly.

2        Q.    Do you know where the copper is sourced from?

3        A.    Could you be more clear with your question,

4   please?

5        Q.    Sure.

6              Is it sourced in the United States or abroad?

7        A.    Today?  I believe both.

8        Q.    Based on the fact you're still doing copper

9   roofing and you procure copper, have you been -- have

10  any understanding of how these tariffs are affecting the

11  price of copper, if you know?

12             MR. COSBY:  Object to the form.

13             THE WITNESS:  So far I haven't seen any -- I'm

14  not aware of any direct effects to any large degree.

15  BY MR. FRIEDBERG:

16       Q.    Generally the copper comes in 1,000-pound

17  rolls?

18       A.    Yeah, generally, I think that's accurate.

19       Q.    And it's 7.10 per pound?

20       A.    Today's money?

21       Q.    Yeah.

22       A.    Yes.

23       Q.    So let's go to page 20.

24             Have you seen this document?

25       A.    Yes.

Barry Huber                                                 April 28, 2025

```
 1        Q.   Let's go to page 21.
 2             I'm going to have you read paragraph 7, and
 3   let me know when you've read it.
 4             MR. COSBY:  Object to the form.
 5             But go ahead.
 6             THE WITNESS:  I've read it.
 7   BY MR. FRIEDBERG:
 8        Q.   Do you agree with the allegations in
 9   paragraph 7?
10             MR. COSBY:  Object to the form.
11             THE WITNESS:  The -- there is one part I don't
12   agree with.
13   BY MR. FRIEDBERG:
14        Q.   Okay.  And identify the line.
15        A.   It is the --
16             MR. COSBY:  Hold on.  Object to the form.
17             Go ahead.
18             THE WITNESS:  It's the sentence that says the
19   reason for the spacing of 9 1/2 inches on center was to
20   ensure that the copper panels and copper -- well,
21   cooper -- but copper pans would be secured to be able to
22   withstand hurricane force winds.
23   BY MR. FRIEDBERG:
24        Q.   And what portion do you disagree with?
25             MR. COSBY:  Form.
```

Barry Huber                                                April 28, 2025

```
1              You can answer.
2              THE WITNESS:  We did that at the direction of
3    the owner.  The reason -- it wasn't necessarily a reason
4    for doing that.  That's where it's inaccurate.
5              It would be more accurate to say the spacing
6    of 9 1/2 inches on center was because it was requested
7    by the owner to do it that way, but --
8    BY MR. FRIEDBERG:
9         Q.   And that -- I interrupted you.  Were you done?
10        A.   No, I wasn't.
11        Q.   Please continue.
12        A.   But the rest of the statements I would agree
13   with.
14        Q.   Okay.  The cleats -- the purpose of the cleat
15   is to secure the copper to the roof.  Agreed?
16        A.   Correct.
17        Q.   Would you agree that if in fact that there
18   was -- cleats were not installed at every batten and in
19   excess of even 12 inches, that would be in violation of
20   the contract?
21             MR. COSBY:  Object to the form.
22             THE WITNESS:  As long as we had the batten to
23   fasten to.
24   BY MR. FRIEDBERG:
25        Q.   All right.  So if there's a batten, it's
```

Barry Huber                                                April 28, 2025

```
 1   supposed to have a cleat.
 2            Is that your testimony?
 3       A.   The battens were to be spaced so that our
 4   cleats could be spaced at average of 9 1/2 inches.
 5       Q.   So if there's a batten, there's supposed to be
 6   a cleat attached to it, correct?
 7            MR. COSBY:  Form.
 8            You can answer.
 9            THE WITNESS:  That statement goes too far.
10   BY MR. FRIEDBERG:
11       Q.   Okay.  Correct it for me.
12       A.   Because if battens were at 4 1/2 inches on
13   center, we would not be installing a cleat at every
14   batten.
15       Q.   Do you have any reason to believe the cleats
16   were anything other than spaced so they could accept a
17   cleat at 9 1/2 inches on center?
18       A.   No.
19            MR. COSBY:  Object to the form.
20            THE WITNESS:  No.
21   BY MR. FRIEDBERG:
22       Q.   So if in fact the battens were placed at
23   9 1/2 inches so they could accept a cleat -- let me
24   withdraw and reask.
25            If in fact the battens were placed so they
```

Barry Huber                                              April 28, 2025

```
 1   could accept a cleat at approximately an average of
 2   9 1/2 inches on center, if in fact cleats were not
 3   placed to -- secured to a batten, would that be in
 4   violation of the contract?
 5          MR. COSBY:  Form objection.
 6          You can answer.
 7          THE WITNESS:  It would be a violation to the
 8   specification we wrote and the proposal, yes, and not
 9   aligned with what was proposed.
10   BY MR. FRIEDBERG:
11      Q.   And the proposal in fact was a contract.
12   Agreed?
13      A.   We could agree on that, I believe.
14      Q.   And although there may be a dispute as to the
15   lack of amount of dollars paid, Huber received roughly
16   $230,000 on this contract?
17      A.   I don't recall.
18      Q.   As we sit here today, is there anything else
19   you can recall about the project that we haven't
20   discussed?
21          MR. COSBY:  Form objection.
22          You can answer.
23          THE WITNESS:  Yeah, there is.
24   BY MR. FRIEDBERG:
25      Q.   Okay.  What is it?
```

1      A.    The disappointment that we were never given

2    opportunity by you to do anything additional to the roof

3    if you weren't happy with something.

4      Q.    Okay.  Do you have a recollection of being

5    asked to send a crew down to complete the roof?

6           MR. COSBY:  Object to the form.

7           You can answer.

8           THE WITNESS:  That question?  No.

9    BY MR. FRIEDBERG:

10     Q.    Did you ever send a crew down after the last

11   day that the workers were on the island to complete the

12   roof?

13     A.    We sent --

14          MR. COSBY:  Object to the form.  Predicate.

15          THE WITNESS:  I'm sorry.

16          MR. COSBY:  Sorry.  Object to the form.

17   Predicate.

18          THE WITNESS:  I -- to the best of my

19   recollection, we sent two guys down to address some

20   issues that were not suitable.

21   BY MR. FRIEDBERG:

22     Q.    All right.  Did any of that involve the main

23   roof?

24     A.    I don't recall.

25     Q.    Anything else that you can recall about the

1   project that we haven't discussed?

2       A.   Nothing specific right now.

3       Q.   How many times has your company been involved

4   in lawsuits or sued for work performed?

5       A.   Counting this, and if I count your first suit

6   against us?

7       Q.   You mean your suit against us?

8       A.   Well, you're going to get into the language of

9   it.  You asked how many times --

10      Q.   Yes.

11      A.   -- suit against me, correct?  Or against our

12  company?

13      Q.   Well, let's make it broader.  How many times

14  have you been involved in litigation regarding work

15  performed by your company?

16      A.   If, again -- I will say again, if that counts

17  the first time with you, Tom, and then now this time,

18  three.

19      Q.   And what was the time not involving this

20  project?

21      A.   A hotel project we did in Greenville,

22  South Carolina.

23      Q.   And what was the issue?

24      A.   They refused to pay us and so we liened the

25  property along with 20-some other subcontractors who

1   were not paid.

2       Q.   And did that matter result in a counterclaim

3   being filed by your company?

4       A.   Correct.

5       Q.   And there was money paid by your company on

6   that?

7       A.   We received a check in settlement from them.

8   It wasn't the full payment, but it was a pretty decent

9   amount.

10      Q.   And was any money paid by your company at

11  all?

12      A.   No, it wasn't paid because we -- just like I

13  say, we were still owed money, but we didn't get all of

14  it.  We got the lion's share of it.

15          MR. FRIEDBERG:  All right.  Why don't we just

16  take a break.  I think I'm pretty much done.  I just

17  want to look at my notes.

18          THE VIDEOGRAPHER:  Going off the record at

19  approximately 10:27 a.m.

20          (Recess taken.)

21          THE VIDEOGRAPHER:  We are back on the record

22  at approximately 10:29 a.m.

23          MR. FRIEDBERG:  Barry, I want to thank you for

24  letting me take your deposition.  I have nothing

25  further.

Barry Huber                                                      April 28, 2025

```
 1              Beth, I'll take roughs of both depositions.
 2              MR. COSBY:  I've got a couple of questions
 3   before we order the depo.
 4              Can you pull up, John, page 70.
 5
 6                    E X A M I N A T I O N
 7   BY MR. COSBY:
 8        Q.   Barry, can you see that document again?
 9        A.   Yes.
10              MR. COSBY:  Actually, I don't want -- can you
11   blow up the top left corner.
12              There you go.
13   BY MR. COSBY:
14        Q.   Who is email rb@huberandassociates.com?
15        A.   Oh, that's our office, the guy at the time,
16   Ron Barker.
17        Q.   Okay.  Does that indicate that Ron may have
18   been the one who prepared this document?
19              MR. FRIEDBERG:  Objection.  Form.
20              THE WITNESS:  A very, very good chance that he
21   is the guy, yes.  I don't know exactly.
22              MR. COSBY:  You can take that down.  Thank
23   you, John.
24   BY MR. COSBY:
25        Q.   If I ask you on any project how many cleats
```

1  were used, would you be able to tell me with any

2  accuracy?

3              MR. FRIEDBERG:  Objection.  Form.

4              THE WITNESS:  Not without digging into the

5  project.

6  BY MR. COSBY:

7      Q.   Any time you referred to a measurement of

8  9 1/2 inches on center, your understanding was the

9  agreement was that was the measurement on average,

10  correct?

11     A.   Correct.

12     Q.   Did you ever warranty this roof to withstand

13  any and all hurricane force winds?

14             MR. COSBY:  Objection.  Form.

15             THE WITNESS:  No.

16  BY MR. COSBY:

17     Q.   And does the fact that the main house had no

18  windows or doors at the time have any effect on a roof

19  during high winds?

20             MR. FRIEDBERG:  Objection.  Form; foundation.

21  BY MR. COSBY:

22     Q.   If you know.

23     A.   No.  I mean it can because pressures don't

24  equalize as well if there's openings.

25     Q.   You mentioned a single-lock at one point and

Barry Huber                                          April 28, 2025

1   then you said a double-lock.  Do you know if the seams

2   were single- or double-lock, or was there a combination?

3        A.   It was a combination.  The ridges or hips were

4   single-locked, and the panels were double-locked per our

5   proposal.

6             MR. COSBY:  Okay.  That's all I have.

7   Thank you.

8             MR. FRIEDBERG:  I just have a follow-up.

9

10            F U R T H E R   E X A M I N A T I O N

11  BY MR. FRIEDBERG:

12       Q.   Counsel asked you a question about the roof.

13  You have no knowledge about the actual roof itself, the

14  substrate, do you?

15            MR. COSBY:  Form objection.

16            THE WITNESS:  You mean the -- the elements of

17  the construction?

18  BY MR. FRIEDBERG:

19       Q.   Yes.

20       A.   Only from some photos inside it appears there

21  were beams, and above that unclear.

22       Q.   You don't know how many layers of plywood were

23  placed above the tongue and groove?

24       A.   I have no knowledge of that.

25       Q.   Or the thickness of the roof.

Barry Huber                                              April 28, 2025

```
 1              MR. COSBY:  Form objection.
 2              THE WITNESS:  I have no knowledge of that.
 3  BY MR. FRIEDBERG:
 4      Q.   And any of the wooden elements, were they ever
 5  affected by the hurricane, if you know?
 6              MR. COSBY:  Form objection.
 7              THE WITNESS:  The wooden elements that the
 8  roof was constructed of?
 9  BY MR. FRIEDBERG:
10      Q.   Yes.
11      A.   It's possible, but I have no knowledge of
12  it.
13      Q.   Have you ever seen any allegations in any of
14  this litigation that the wooden elements of the roof
15  were affected by anything?
16              MR. COSBY:  Object to the form.
17              THE WITNESS:  No.
18              MR. FRIEDBERG:  Thank you.  I have nothing
19  further.
20              MR. COSBY:  Beth, we'll take a copy.
21              THE COURT REPORTER:  Would you like a rough as
22  well?
23              MR. COSBY:  Sure.
24              THE COURT REPORTER:  Thank you.
25              THE VIDEOGRAPHER:  This concludes today's
```

Barry Huber                                                        April 28, 2025

1    deposition.  We are going off the record at

2    approximately 10:35 a.m.

3            (Proceedings concluded at 10:35 a.m.)

4                        --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Barry Huber                                                    April 28, 2025

1            DECLARATION UNDER PENALTY OF PERJURY

2

3         I, BARRY HUBER, hereby declare under penalty of

4    perjury that I have read the foregoing deposition and

5    that the testimony contained therein is a true and

6    correct transcription of my testimony given at said time

7    and place.

8         Dated this _____ day of _____,

9    20_____, at _____, _____.

10                   (City)                (State)

11

12

13              _____

14                        BARRY HUBER

15

16

17

18

19

20

21

22

23

24

25

Barry Huber                                                        April 28, 2025

```
1          ERRATA SHEET / CORRECTION CERTIFICATE

2     Page   Line   Correction/Reason

3     _____  _____  _____

4     _____  _____  _____

5     _____  _____  _____

6     _____  _____  _____

7     _____  _____  _____

8     _____  _____  _____

9     _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23

24    _____    _____

25       Date                       BARRY HUBER
```

Barry Huber                                                      April 28, 2025

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I, Beth A. Ballerini, Certified Shorthand

 4   Reporter in and for the State of California, do hereby

 5   certify:

 6           That the witness was by me duly sworn, and

 7   the foregoing testimony was reported by me and was

 8   thereafter transcribed with computer-aided

 9   transcription; and the preceding pages contain a full,

10   complete, and true record of said proceeding.

11           I further certify that I am a disinterested

12   person and am in no way interested in the outcome of

13   said action or connected with or related to any of the

14   parties in said action or to their respective counsel.

15           The dismantling, unsealing, or unbinding of the

16   original transcript will render the Reporter's

17   Certificate null and void.

18           IN WITNESS WHEREOF, I have hereunto set my hand

19   this 12th day of May 2025.

20

21                                _____

22                                Beth A. Ballerini, CSR
                                  Certificate No. 7358
23

24

25
```

**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE,<br><br>        Plaintiffs,<br><br>v.<br><br>DAYBREAK, INC. dba HUBER & ASSOCIATES,<br><br>        Defendant. | ACTION NO. 3:19-cv-0053-RAM-EAH<br><br>JURY TRIAL DEMANDED |

**EXHIBIT 1**

Micha Cady - 4/28/25

<u>**PLAINTIFFS' AMENDED NOTICE OF DEPOSITION AND REQUEST FOR PRORUCTION**</u>

PLEASE TAKE NOTICE that Plaintiffs will take the following deposition:

| Deponent | Date | Time | Location |
|---|---|---|---|
| Micha Cady | April 28, 2025 | 11:00 am EST/8:00 am PST | Zoom – Court Reporter will provide link |
| Barry Huber | April 28, 2025 | 12:00 pm EST 9:00 am PST | Zoom – Court reporter to provide link |

This deposition will be taken before a Certified Shorthand Reporter and will continue from day to day, excluding Sundays and holidays, until completed. This deposition may be videotaped for use at trial.

PLEASE TAKE FURTHER NOTICE that at the date and time of the deposition, Defendant is requested to produce the following:

<u>**DEFINITIONS**</u>

The terms "project" and "contract" shall refer to the copper roofing project referred to in Plaintiffs' complaint.

1.1

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Amended Notice of Deposition and Request for Production*
*April 22, 2025*
*Page 2*

---

**REQUEST FOR PRODUCTION NO. 1:**

Any and all documents describing or relating to Defendant's work on the Construction project that is the subject of this lawsuit.

.**REQUEST FOR PRODUCTION NO. 2:**

Any and all documents including, without limitation, e-mails, evidencing or relating to any and all claims or demands seeking payment for labor, services and/or materials furnished for the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 3:**

Any and all contracts, including drafts thereof, relating to the construction of the construction project that is the subject of this lawsuit, in whole or in part.

**REQUEST FOR PRODUCTION NO. 4:**

Any and all documents evidencing any communications, including, without limitation, e-mails, facsimile and telephone logs, relating to the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 5:**

Any and all correspondence, including, without limitation, written, electronic or e-mail, facsimile and written records of oral communications, relating to the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 6:**

2

1.2

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Amended Notice of Deposition and Request for Production*
*April 22, 2025*
*Page 3*

_____

Any and all documents, agreements, subcontracts, purchase orders, bonds, and similar documents involving labor or materials for the construction project that is the subject of this lawsuit, including any oral or written agreements, modifications or revisions thereof.

**REQUEST FOR PRODUCTION NO. 7**:

Any and all documents dealing with contract modifications and changes, including addenda, supplements, amendments, alterations or modifications for any contract between you and any other party in connection with the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 8**:

Any and all documents relating to changes, alterations or modifications in the scheduling for any work on the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 9**:

Any and all documents in your custody, possession or control pertaining to any work performed on the project, including all plans and specifications, whether in paper or electronic format; all field sketches; any documents regarding dimensions or measurements or the roof or roofs at the project; all photographs taken at the project at any time; all communications pertaining to the project between you and any other person including all e-mails and all documents evidencing any and all calculations used by you in determining the square footage or the costs to be charged for this project.

**REQUEST FOR PRODUCTION NO. 10**:

All documents listed in Defendant's Rule 26 Initial Disclosures, including the following:

1.3

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Amended Notice of Deposition and Request for Production*
*April 22, 2025*
*Page 4*

_____

1.      Contract between the parties dated May 7, 2010.

2.      Plaintiffs' Expert Report

3.      Photograph of the property during the installation of the roof.

4.      Standing Seam Construction Information Pamphlet

5.      Photographs from Hoffman and Associates Deposition

6.      Pictures of Roof taken During Installation of Roof (5 pictures).

7.      Google Earth Satellite Photographs of the subject property for

        August 10, 2017, September 27, 2017, and November 25, 2017.

8.      Roof Plan for Main House.

9.      Preliminary Costs of Repairs produced by Plaintiff's Response to Production dated

        Virgin Islands Superior Court Case No. ST-10-cv-716 on March 8, 2014.

10.     Photographs produced by Plaintiff's Response to Production dated Virgin Islands

        Superior Court Case No. ST-10-cv-716 on March 8, 2014.

11.     Email from Defendant to Plaintiff on February 9, 2010.

12.     Email from Chris Bunge to Jack Burbach dated April 16, 2010.

13.     Email from Defendant to Plaintiffs on May 15, 2010.

14.     Email from Defendant to Plaintiffs on May 19, 2010.

15.     Email from Defendant to Plaintiffs on May 22, 2010.

16.     Email from Plaintiffs to Defendant on May 23, 2010.

17.     mail from Jack Burbach to Barry Huber dated June 25, 2010.

1.4

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Amended Notice of Deposition and Request for Production*
*April 22, 2025*
*Page 5*

_____

18.    Correspondence from Plaintiffs to Defendant dated July 13, 2010.

19.    Email from Defendant to Plaintiff dated August 23, 92010.

20.    Plaintiffs Response to Supplemental Interrogatories in Virgin Islands Superior Court Case No. ST-10-cv-716 on April 13, 2014.

21.    Photographs depicting mold in the subject property that were produce in Response to Plaintiffs' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on April 13, 2014.

22.    Invoices for work performed on the subject property that were produce in Response to Defendants' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on December 12, 2014.

23.    Ledger of all transactions between Plaintiffs and Defendant produced in Defendant's Response to Plaintiffs' Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on June 13, 2014.

24.    Additional invoice for work performed on the subject property that were produce in Response to Defendants' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on June 13, 2014.

25.    Diagrams regarding the roofing project on the subject property that were produce in Response to Defendants' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv- 716 on June 13, 2014.

1.5

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Amended Notice of Deposition and Request for Production*
*April 22, 2025*
*Page 6*

_____

26.    Deposition of Arthur Sanders, AIA taken in Superior Court of the Virgin Islands Case No. ST-10-CV-716 taken on March 6, 2015.

27.    Deposition of Barry Huber taken in Superior Court of the Virgin Islands Case No. ST-10-CV-716 taken on July 31, 2014.

28.    Release signed in Superior Court of the Virgin Islands Case No. ST-10-CV-716.

**REQUEST FOR PRODUCTION NO. 11**:

A copy of the insurance contract and declarations page identified in Defendant's Rule 26 disclosures from Southern-Owners Insurance, Policy Number 184622-78009727-18.

**REQUEST FOR PRODUCTION NO. 12**:

A copy of the insurance contract and declarations page identified in Defendant's Rule 26 disclosures from Ameritrust Group.

**REQUEST FOR PRODUCTION NO. 13**:

A copy of any reservations of rights issued by Southern-Owners Insurance, Policy Number 184622-78009727-18, that refers to or discusses the coverage available to Daybreak, Inc., as a result of the allegations in the subject complaint.

**REQUEST FOR PRODUCTION NO. 14**:

A copy of any reservations of rights issued by Ameritrust Group, Inc., that refers to or discusses the coverage available to Daybreak, Inc., as a result of the allegations in the subject complaint.

1.6

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Amended Notice of Deposition and Request for Production*
*April 22, 2025*
*Page 7*

Dated : April 22, 2025                    **LAW OFFICES OF FRIEDBERG & BUNGE**

By: */s/ THOMAS F. FRIEDBERG, ESQ.*
                    THOMAS F. FRIEDBERG, ESQ.(VI#1006)
                    Attorneys for Plaintiffs THOMAS F.
                    FRIEDBERG & SARAH L. BUNGE
                    **THE LAW OFFICES OF FRIEDBERG &
                    BUNGE**
                    1005 ROSECRANS STREET, SUITE 202
                    PO BOX 6814
                    SAN DIEGO, CALIFORNIA 92166
                    TEL : (619)557-0101
                    FAX : (619)557-0560
                    E-mail : "tom@lawofficefb.com"

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of April 2025, a true and correct copy of **PLAINTIFFS'
AMENDED NOTICE OF DEPOSITION AND REQUEST FOR PRODUCTION** was e-
mailed to the following:

Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994
Telephone: 772-463-8402
Facsimile: 772-463-4820

Andrew C. Simpson
**ANDREW C. SIMPSON, PC**
2191 Church St., Ste. 5
Christiansted, VI 00820
TEL : 340.719.3900
E-MAIL :asimpson@coralbrief.com

                    */s/ THOMAS F. FRIEDBERG*
                    **THOMAS F. FRIEDBERG**

1.7

**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, | ACTION NO. 3:19-cv-0053-RAM-EAH |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| DAYBREAK, INC. dba HUBER & ASSOCIATES, | |
| Defendant. | |

**EXHIBIT**
**2**
Micha Cady - 4/28/25

### PLAINTIFFS' NOTICE OF DEPOSITION AND REQUEST FOR PRORUCTION

PLEASE TAKE NOTICE that Plaintiffs will take the following deposition:

| Deponent | Date | Time | Location |
|---|---|---|---|
| Barry Huber | April 8, 2025 | 11:00 am | Lexitas, 305 Northeast First Street, Gainsville, Florida 32601 (352) 373 7778 |

This deposition will be taken before a Certified Shorthand Reporter and will continue from day to day, excluding Sundays and holidays, until completed. This deposition may be videotaped for use at trial.

PLEASE TAKE FURTHER NOTICE that at the date and time of the deposition, Defendant is requested to produce the following:

### DEFINITIONS

The terms "project" and "contract" shall refer to the copper roofing project referred to in Plaintiffs' complaint.

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*March 6, 2025*
*Page 2*

---

**REQUEST FOR PRODUCTION NO. 1:**

Any and all documents describing or relating to Defendant's work on the Construction project that is the subject of this lawsuit.

.**REQUEST FOR PRODUCTION NO. 2**:

Any and all documents including, without limitation, e-mails, evidencing or relating to any and all claims or demands seeking payment for labor, services and/or materials furnished for the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 3**:

Any and all contracts, including drafts thereof, relating to the construction of the construction project that is the subject of this lawsuit, in whole or in part.

**REQUEST FOR PRODUCTION NO. 4**:

Any and all documents evidencing any communications, including, without limitation, e-mails, facsimile and telephone logs, relating to the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 5**:

Any and all correspondence, including, without limitation, written, electronic or e-mail, facsimile and written records of oral communications, relating to the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 6**:

**F&B v. DAYBREAK - DEPOSITION EXHIBITS         P000002**

2.2

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*March 6, 2025*
*Page 3*

---

Any and all documents, agreements, subcontracts, purchase orders, bonds, and similar documents involving labor or materials for the construction project that is the subject of this lawsuit, including any oral or written agreements, modifications or revisions thereof.

**REQUEST FOR PRODUCTION NO. 7**:

Any and all documents dealing with contract modifications and changes, including addenda, supplements, amendments, alterations or modifications for any contract between you and any other party in connection with the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 8**:

Any and all documents relating to changes, alterations or modifications in the scheduling for any work on the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 9**:

Any and all documents in your custody, possession or control pertaining to any work performed on the project, including all plans and specifications, whether in paper or electronic format; all field sketches; any documents regarding dimensions or measurements or the roof or roofs at the project; all photographs taken at the project at any time; all communications pertaining to the project between you and any other person including all e-mails and all documents evidencing any and all calculations used by you in determining the square footage or the costs to be charged for this project.

**REQUEST FOR PRODUCTION NO. 10**:

All documents listed in Defendant's Rule 26 Initial Disclosures, including the following:

**F&B v. DAYBREAK - DEPOSITION EXHIBITS**        **P000003**

2.3

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*March 6, 2025*
*Page 4*

---

1.      Contract between the parties dated May 7, 2010.

2.      Plaintiffs' Expert Report

3.      Photograph of the property during the installation of the roof.

4.      Standing Seam Construction Information Pamphlet

5.      Photographs from Hoffman and Associates Deposition

6.      Pictures of Roof taken During Installation of Roof (5 pictures).

7.      Google Earth Satellite Photographs of the subject property for

        August 10, 2017, September 27, 2017, and November 25, 2017.

8.      Roof Plan for Main House.

9.      Preliminary Costs of Repairs produced by Plaintiff's Response to Production dated

        Virgin Islands Superior Court Case No. ST-10-cv-716 on March 8, 2014.

10.     Photographs produced by Plaintiff's Response to Production dated Virgin Islands

        Superior Court Case No. ST-10-cv-716 on March 8, 2014.

11.     Email from Defendant to Plaintiff on February 9, 2010.

12.     Email from Chris Bunge to Jack Burbach dated April 16, 2010.

13.     Email from Defendant to Plaintiffs on May 15, 2010.

14.     Email from Defendant to Plaintiffs on May 19, 2010.

15.     Email from Defendant to Plaintiffs on May 22, 2010.

16.     Email from Plaintiffs to Defendant on May 23, 2010.

17.     mail from Jack Burbach to Barry Huber dated June 25, 2010.

4

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000004**

2.4

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*March 6, 2025*
*Page 5*

_____

18.    Correspondence from Plaintiffs to Defendant dated July 13, 2010.

19.    Email from Defendant to Plaintiff dated August 23, 92010.

20.    Plaintiffs Response to Supplemental Interrogatories in Virgin Islands Superior Court Case No. ST-10-cv-716 on April 13, 2014.

21.    Photographs depicting mold in the subject property that were produce in Response to Plaintiffs' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on April 13, 2014.

22.    Invoices for work performed on the subject property that were produce in Response to Defendants' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on December 12, 2014.

23.    Ledger of all transactions between Plaintiffs and Defendant produced in Defendant's Response to Plaintiffs' Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on June 13, 2014.

24.    Additional invoice for work performed on the subject property that were produce in Response to Defendants' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on June 13, 2014.

25.    Diagrams regarding the roofing project on the subject property that were produce in Response to Defendants' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv- 716 on June 13, 2014.

5

2.5

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*March 6, 2025*
*Page 6*

_____

26.    Deposition of Arthur Sanders, AIA taken in Superior Court of the Virgin Islands Case No. ST-10-CV-716 taken on March 6, 2015.

27.    Deposition of Barry Huber taken in Superior Court of the Virgin Islands Case No. ST-10-CV-716 taken on July 31, 2014.

28.    Release signed in Superior Court of the Virgin Islands Case No. ST-10-CV-716.

**REQUEST FOR PRODUCTION NO. 11**:

A copy of the insurance contract and declarations page identified in Defendant's Rule 26 disclosures from Southern-Owners Insurance, Policy Number 184622-78009727-18.

**REQUEST FOR PRODUCTION NO. 12**:

A copy of the insurance contract and declarations page identified in Defendant's Rule 26 disclosures from Ameritrust Group.

**REQUEST FOR PRODUCTION NO. 13**:

A copy of any reservations of rights issued by Southern-Owners Insurance, Policy Number 184622-78009727-18, that refers to or discusses the coverage available to Daybreak, Inc., as a result of the allegations in the subject complaint.

**REQUEST FOR PRODUCTION NO. 14**:

A copy of any reservations of rights issued by Ameritrust Group, Inc., that refers to or discusses the coverage available to Daybreak, Inc., as a result of the allegations in the subject complaint.

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000006**

2.6

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*March 6, 2025*
*Page  7*

_____

Dated :   March 6, 2025                         **LAW OFFICES OF FRIEDBERG & BUNGE**

By: */s/ THOMAS F. FRIEDBERG, ESQ.*_____
    THOMAS F. FRIEDBERG, ESQ.(VI#1006)
      Attorneys for Plaintiffs THOMAS F.
    FRIEDBERG & SARAH L. BUNGE
    **THE LAW OFFICES OF FRIEDBERG &**
    **BUNGE**
    1005 ROSECRANS STREET, SUITE 202
    PO BOX 6814
    SAN DIEGO, CALIFORNIA 92166
    TEL : (619)557-0101
    FAX : (619)557-0560
    E-mail : "tom@lawofficefb.com"

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of March 2025, a true and correct copy of **PLAINTIFFS'
REQUEST FOR PRODUCTION** was e-mailed to the following:
Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994
Telephone: 772-463-8402
Facsimile: 772-463-4820


Andrew C. Simpson
**ANDREW C. SIMPSON, PC**
2191 Church St., Ste. 5
Christiansted, VI 00820
TEL : 340.719.3900
E-MAIL :asimpson@coralbrief.com


_____
     */s/ THOMAS F. FRIEDBERG*_____
     **THOMAS F. FRIEDBERG**

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000007**

2.7



February 8, 2010

## PROPOSAL FOR THE ROOFING AT THE
## FRIEDBERG/BUNGE RESIDENCE
## St. John, USVI

**We propose the following:**
**SECTION I. GENERAL CONDITIONS.**

1) Provide job set up. Go over job schedule and plan with owner prior to start up.
2) Provide General Liability and Workman's Compensation Insurance.
3) Provide scaffolding or other means of safe roof access.
4) Provide for material handling necessary for roof loading.
5) Provide project close out. Remove all surplus tools, equipment, materials and debris.
6) This bid includes travel to and from St. John, USVI only.  NO rental cars, food, lodging or freight.
7) This pricing may be withdrawn, if not accepted within 21 days of the above date.
*(NOTE: Copper prices have been increasing.   This proposal is based off of a cost of $2.90 per pound as posted this date on COMEX.)*

**SECTION II. WORK:**

&#x2767; COPPER STANDING SEAM ROOF (APPRX 8,400 SF)
    1) Provide and install Rosin slip sheet over modified underlayment.
    2) Provide and install 16oz. Red Copper batten seam roof system:
        ▪ Installed in accordance with *Revere Copper & Common Sense & SMACNA.*
        ▪ Panels to be roll formed in 17" O.C. panel widths with 1" double locked standing seam.
        ▪ Cleats installed 12" O.C. with 2 ring shank nails per cleat.
            ○ NOTE:  See Alternate A. for screws in lieu of nails.
        ▪ Includes traditional style single rib ridge finish.
&#x2767; COPPER FLASHING
    1) Provide and install necessary 16 oz. Red copper flashings in the following locations:

| | | |
|---|---|---|
| ▪ Eave & gable drip edge | ▪ Stucco stop flashing | ▪ Crickets |
| ▪ Sidewall & headwall | ▪ Counter flashings | ▪ Chimney flashings |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS**        **P000008**

2.8



---

## SECTION III. COST AND TERMS.

ℭ PRICE BREAKDOWN
1) **Copper Roofing**
   ▪ **$182,740.00**
2) **Flashing**
   ▪ **$32,060.00**

1) Cost for work as described above $214,800.00 (One Hundred Ninety Thousand Seven Hundred Fifty Seven Dollars) to be paid in progress payments per schedule of values with balance due upon completion. 33% Deposit required upon acceptance.
2) Any additional work needed would be billed per the following:
   a. A per man hour rate of $ 63.35 (average rate for Supervisor, Mechanic, Roofer & Laborers)
   b. 15% above the cost of materials or equipment

## SECTION IV. ACCEPTANCE:

*Owner or Owner's Agent*                           *Huber & Associates*

By: _____          By: _____

Print Name: _____          Print Name: _____

Title: _____          Title: _____

Date: _____ /_____ /  2010          Date: _____ /_____ /  2010

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000009**

2.9



## SECTION VI. ROOF PLANS:





*Main House*

*Guest House & Gazebo*





*Gatehouse*

*Garage*



*Beach Bar*

**HUBER & ASSOCIATES**
*496 SW Ring Court, Lake City, FL 32025*
*Ph: (386) 487-1040 – Fax: (386) 755-3233*
*3 of 3*

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000010**

2.10



May 7, 2010

## PROPOSAL FOR THE ROOFING AT THE FRIEDBERG/BUNGE RESIDENCE
## St. John, USVI

**We propose the following:**

**SECTION I. GENERAL CONDITIONS.**

1) Provide job set up. Go over job schedule and plan with owner prior to start up.
2) Provide General Liability and Workman's Compensation Insurance.
3) Provide scaffolding or other means of safe roof access.
4) Provide for material handling necessary for roof loading.
5) Provide project close out. Remove all surplus tools, equipment, materials and debris.
6) This bid includes travel to and from St. John, USVI only.  NO rental cars, food, lodging or freight.
7) This pricing may be withdrawn, if not accepted within 21 days of the above date.

**SECTION II. WORK:**

- ℂ COPPER STANDING SEAM ROOF (APPRX 8,400 SF)
    1) Provide and install Rosin slip sheet over modified underlayment.
    2) Install 16oz. Red Copper standing seam roof system:
        - Installed in accordance with *Revere Copper & Common Sense & SMACNA.*
        - Panels to be roll formed in <u>15" O.C. panel widths</u> with 1" double locked standing seam.
        - Cleats installed at an average of <u>9.5" O.C.</u> with 2 ring shank nails per cleat.
            - o NOTE:  See Alternate A. for screws in lieu of nails.
        - Includes traditional style single rib ridge finish.
- ℂ COPPER FLASHING
    1) Provide and install necessary 16 oz. Red copper flashings per industry standards, as listed above, in all areas where needed.

*HUBER & ASSOCIATES*
*496 SW Ring Court, Lake City, FL 32025*
*Ph: (386) 487-1040 – Fax: (386) 755-3233*
*1 of 3*

**F&B v. DAYBREAK - DEPOSITION EXHIBITS      P000011**



---

## SECTION III. COST AND TERMS.

ᙘ  PRICE BREAKDOWN  NOTE: Price reduce due to Owner providing majority of
copper for roofing and flashings.

| | | |
|---|---|---|
| 1) | **Copper Roofing & Flashing previous quote:** | **$214,800.00** |
| | **Less all copper in bid** | **-$37,696.00** |
| | **Add for smaller panels and cleat spacing** | **+$10,735.00** |
| | **Updated Cost** | **$187,839.00** |

*Additional copper, as, or if needed, to be provided by Owner or Contractor (see
additional work note below).  Shipping costs from Owner's supply to our shop to be
billed separately at cost (invoice provided).*

Cost for work as described above $187,839.00 (One Hundred Eighty Seven
Thousand Eight Hundred Thirty Nine Dollars) to be paid in progress payments
per schedule of values with balance due upon completion.  $25,000.00 Deposit
required upon acceptance and materials required paid upon purchase.
[*Any additional work or material needed would be billed per the following:
A per man hour rate of $ 63.35 (average rate for Supervisor, Mechanic, Roofer &
Laborers) and 15% above the cost of materials or equipment.*]

## SECTION IV. ACCEPTANCE:

*Owner or Owner's Agent*                    *Huber & Associates*

By: _____    By: _____

Print Name: _____    Print Name: _____

Title: _____    Title: _____

Date: _____ /_____ /  2010      Date: _____ /_____ /  2010

***HUBER & ASSOCIATES***
*496 SW Ring Court, Lake City, FL 32025*
*Ph: (386) 487-1040 – Fax: (386) 755-3233*
*2  of  3*

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000012**



---

**SECTION VI. ROOF PLANS:**





*Main House*                                          *Guest House & Gazebo*

                                  

*Gatehouse*                                           *Garage*



*Beach Bar*

***HUBER & ASSOCIATES***
*496 SW Ring Court, Lake City, FL 32025*
*Ph: (386) 487-1040 – Fax: (386) 755-3233*
*3  of  3*

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000013**

2.13

# Friedberg/Bunge Residence
### *Plot #168, Estate Chocolate Hole*



5/7/2010

| Description | | Selling |
|---|---|---|
| Labor / Material or Equip. | | Amount |

**1 *General Conditions***

| | | | |
|---|---|---|---|
| Set-up/Mobilize Labor | | $ | 2,391 |
| Permits | | $ | - |
| Mock Ups | | $ | - |
| Mock Up Materials | | $ | - |
| Supervision Costs | | $ | 3,552 |
| Plane Fares | | $ | 5,121 |
| Travel Time (Incl. Mock Ups) | | $ | 4,878 |
| Material Handling Equipment | by owner | $ | - |
| Scaffolding Labor | | $ | - |
| Scaffolding Equip. | by owner | $ | - |
| Site Logistics | | $ | 3,722 |
| Motel & Meal Expense | by owner | $ | - |
| Daily Clean Up | | $ | 1,819 |
| Other Material | | $ | - |
| Job Close Out/Pack | | $ | 1,517 |
| Job Close Out Materials | | $ | - |
| ***126  Labor Hours*** | | **$** | **22,999** |

**2 *Roof Prep & Flashings***

| | | | |
|---|---|---|---|
| Roof Tear-off | | $ | - |
| Dumpster - Facilities | | $ | - |
| Rosin Sheet Dry-in | | $ | 2,636 |
| Rosin Sheet | | $ | 1,009 |
| Peel & Stick RP 40 Labor | | $ | - |
| Peel & Stick Materials | | $ | - |
| Eave / Gable Flashing Labor | | $ | - |
| 16oz Copper | | $ | - |
| Valley Flashings Labor | | $ | 3,812 |

| | | |
|---|---|---|
| 16oz Copper | $ | - |
| Sidewall Flashing Labor | $ | 3,312 |
| 16oz Copper | $ | - |
| Headwall Flashing Labor | $ | 815 |
| 16 oz. Copper | $ | - |
| Stucco Stop Flashing Labor | $ | - |
| 16 oz. Copper | $ | - |
| Chimneys or Crickets Labor | $ | 5,575 |
| 16 oz. Copper | $ | - |
| **243  Labor Hours** | **$** | **17,159** |

### 3  Roof Install

| | | |
|---|---|---|
| Copper Standing Seam | $ | 86,606 |
| Copper Materials | $ | - |
| Material Handling | $ | 3,931 |
| Freight                          by owner | $ | - |
| Pan Forming | $ | 4,333 |
| Copper Materials | $ | - |
| Valley Install (cutting) | $ | 4,812 |
| Valley Install Materials | $ | - |
| Hip Cutting & Forming | $ | 15,406 |
| Hip Cap Materials | $ | 1,574 |
| Ridges Labor | $ | 6,091 |
| Ridge Batten Caps | $ | 1,643 |
| ISO Board Labor | $ | - |
| ISO Board Materials | $ | - |
| Flat Roof Membrane Labor | $ | - |
| Flat Roof Membrane Materials | $ | - |
| Rollers | $ | 4,812 |
| Fasteners & Cleats | $ | 7,738 |
| **1492  Labor Hours** | **$** | **136,946** |

| | | |
|---|---|---|
| **Total of Sections** | **$** | **177,104** |
| **Add for smaller seams and cleat spacing** | **$** | **10,735** |
| **New Total** | **$** | **187,839** |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000015**

2.15



F&B v. DAYBREAK - DEPOSITION EXHIBITS    P000016

2.16

214106 Storm Damage
Friedberg-Bunge Residence St. John V. I.



Photo 25. Pop Rivets have failed, and cap is loose.

**Main Pavilion**



Photo 26. Overall view of failed hip ridge cap.

Copyright Hoffmann Architects, Inc. 2018                    Page - 13

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000017**

2.17



214106 Storm Damage
Friedberg-Bunge Residence St. John V. I.



Photo 27. Failure along hip ridge line due to wind uplift.



Photo 28. Pans have lifted at other ridges.

F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000018

2.18

214106 Storm Damage
Friedberg-Bunge Residence St. John V. I.



Photo 29. Pans have lifted at other ridges.



Photo 30. Dents and one puncture.

Copyright Hoffmann Architects, Inc. 2018

F&B v. DAYBREAK - DEPOSITION EXHIBITS    P000019

2.19

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**

**DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, | **CIVIL CASE NO. 3:19-cv-0053** |
| Plaintiffs, | **ACTION FOR DAMAGES - BREACH OF CONTRACT AND DEMAND FOR JURY TRIAL** |
| v. | |
| DAYBREAK, INC., dba HUBER & ASSOCIATES, | **Action Filed : July 14, 2019**<br>**Trial Date    : Not set** |
| Defendant. | |

Plaintiffs, THOMAS F. FRIEDBERG and SARAH L. BUNGE, allege as follows:

**JURISDICTION/VENUE**

1.     Plaintiffs, THOMAS F. FRIEDBERG and SARAH L. BUNGE, (hereinafter "Plaintiffs") are, and at all times herein, citizens and residents of the County of San Diego, State of California.

2.     Plaintiffs are informed and believes, and based thereupon alleges, that Defendant, DAYBREAK, INC., dba HUBER & ASSOCIATES (hereinafter "DAYBREAK"), is a Florida Corporation with its principal place of business within the State of Florida.

3.     At all times herein mentioned, Defendant DAYBREAK was operating as a cooper roofing manufacturer, contractor, fabricator and installer of a cooper roof for a residence located at 168 Chocolate Hole, St. John, Virgin Islands, and was performing construction work to make and install a cooper roof within the Territory of the United States Virgin Islands.

4.     Subject matter jurisdiction is proper since the citizenship of Plaintiffs and Defendant is diverse and the amount in controversy, exclusive of interests and costs, exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00). Therefore, this Court has jurisdiction over the matter pursuant to 28. U.S.C.§ 1332.

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000020

2.20

5.     Personal jurisdiction over Defendant, DAYBREAK, is proper under 5 V.I.C. § 4903 since Defendant transacted business and contracted to supply goods and services within the Territory of the Virgin Islands.

6.     On or about May 7, 2010, Plaintiffs entered into a written contract with Defendant to manufacture and install a standing seam copper roof, including all underlayments, flashings, crickets, including supplying all necessary equipment, materials and supplies, at Plaintiff's home located at 168 Chocolate Home, St. John, United States Virgin Islands. A copy of the contract has been attached to Plaintiff's Complaint as Exhibit "A."

7.     A material term and specific contract condition required that the work include cleats be installed at an average of 9.5 inches on center with 2 ring shanks per cleat. The cleats are used to secure the copper panels and to hold the cooper panels that form the cooper pans in place. The cooper panels and the cooper pans were to be secured with cleats installed at an average of 9.5 inches on center. The reason for the spacing of 9.5 inches on center was to insure that the cooper panels and cooper pans would be secured and able to withstand hurricane force winds. Defendant charged an additional amount for the specific spacing requirement under the terms and conditions of the contract.

8.     The cleats, once installed, are not visible to the naked eye. The cleats are covered with the cooper panels as each panel is installed to make up a cooper pan. The cooper pans are then secured with cleats and a ridge cap is riveted at the intersection of each cooper pan. The cleats that are installed at the intersection of the cooper pans is similarly not visible to the naked eye since the cleats are underneath the cooper panels and cooper pans.

9.     Pursuant to the terms and conditions of the contract, work began on or about June 2010 and was substantially completed by on or about mid July 2010.

10.     On or about September 7, 2017, the Hurricane Irma struck the Territory. The cooper pans at the ridge of the main house separated. After the storm, investigation revealed that Defendant did not install cleats at the intersection of the cooper panels that form the cooper pan at 9.5 inches on center as required by the terms and conditions of the contract. The areas of the failure of the cooper roof at the main house coincided to the areas where Defendant did not place cleats at 9.5

F&B/Huber                      Complaint for Damages                      3:19-cv-0053

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000021

2.21

1   inches on center.

2       11.     The failure to install cleats at 9.5 inches on center was a breach of a material term of

3   the contract. The failure to install the cleats at 9.5 inches on center was a latent defect that was not

4   discoverable prior to September 7, 2017, since the cleats were to have been placed underneath the

5   cooper panels and cooper pans and their existence or non-existence would not have been visible to

6   the naked eye or upon reasonable inspection since the cleats are concealed. The failure to install the

7   cleats became discoverable after the intersection of the cooper pans separated where there were no

8   cleats. The failure to install the cleats in accordance with the plans and specifications of the contract

9   is a breach of the construction contract and constitutes a latent defect under 5 V.I.C. § 32b since the

10  failure to install the cleats was not apparent by reasonable inspection prior to September 7, 2017.

11      12.     As a direct and proximate result of Defendant's breach of contract, Plaintiffs have

12  been damaged in a sum in excess of $75,000.00 for the damage to the main roof due to the failure

13  to install the cleats at 9.5 inches on center.

14      13.     As a direct and proximate result of Defendant's breach of contract, Plaintiffs have

15  incurred damages, including incidental and consequential damages, in an amount in excess of

16  $75,000.00.

17      14.     As a direct and proximate result of the breach of contract by Plaintiffs have and will

18  incur reasonable attorneys' fees and costs.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

- 3 -

F&B/Huber                 Co mplaint for Damages              3 :19-cv-0053

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000022

1    WHEREFORE, Plaintiffs pray as follows:

2    1.    For breach of contract damages in an amount in excess of $75,000.00;

3    2.    For incidental and consequential damages in an amount to be proven at time of trial;

4    3.    For interest at the maximum legal rate in an amount to be proven at time of trial;

5    4.    For attorney's fees in an amount to be proven;

6    5.    For a trial by jury pursuant to Rule 38, Federal Rules of Practice;

7    6.    For costs of suit incurred herein; and

8    7.    For such other and further relief, including equitable relief, as this Court deems just

9  and proper.

10  Dated : July 14, 2019          **LAW OFFICES OF FRIEDBERG & BUNGE**

11

12            By: _s/ THOMAS F. FRIEDBERG, ESQ._
             THOMAS F. FRIEDBERG, ESQ. (VI # 1006)

13            Attorneys for Plaintiffs, THOMAS F. FRIEDBERG
             and SARAH L. BUNGE

14            610 West Ash Street, Suite 1400
             P.O. Box 6814

15            San Diego, California 92101
             TEL : (619)557-0101

16            FAX:  (619)557-0560
             " tom@lawofficefb.com"

17

18                   **DEMAND FOR JURY**

19    Plaintiffs hereby demands a jury trial pursuant to Rule 38, of the Federal Rules of Practice.

20  Dated : July 14, 2019          **LAW OFFICES OF FRIEDBERG & BUNGE**

21            By: _s/ THOMAS F. FRIEDBERG, ESQ._
             THOMAS  F.  FRIEDBERG,  ESQ.  (VI  #  1006)

22            Attorneys for Plaintiffs, THOMAS F. FRIEDBERG
             and SARAH L. BUNGE

23            610 West Ash Street, Suite 1400
             P.O. Box 6814

24            San Diego, California 92101
             TEL : (619)557-0101

25            FAX:  (619)557-0560
             "tom@lawofficefb.com"

26

27

28

- 4 -

F&B/Huber            Complaint for Damages            3:19-cv-0053

2.23

2:21 PM
07/12/10

# Huber and Associates
# All Transactions for Friedberg & Bunge

| Date | Transaction | All Transactions<br>Amount | Now Revised |
|---|---|---|---|
| 05/13/2010 | **Contract Amount** | **187,839.00** | **187,839.00** |
| 05/24/2010 | **Add'n Copper Change Order** | **15,222.89** | **17,506.32** |
| 06/21/2010 | **Add'n Copper Change Order** | **11,525.10** | **13,253.87** |
| 06/30/2010 | **Change Order Consisting Of:** | **11,873.42** | **12,469.36** |
| | *Add'n Flashing Mat'ls* | *4,633.00* | 5,228.94 |
| | *Flat Roof to Pitched Roof - Labor* | *2,565.68* | 2,565.68 |
| | *Help Chris on Eaves* | *253.40* | 253.40 |
| | *Vent Boots to Copper - Labor* | *1,520.40* | 1,520.40 |
| | *Meals & Fuel* | *2,900.94* | 2,900.94 |
| 07/08/2010 | **Change Order Consisting Of:** | **4,264.15** | **4,411.75** |
| | *Last Shipment of Copper* | *984.00* | 1,131.60 |
| | *Labor Copper at Each Boot* | *760.20* | 760.20 |
| | *Lodging* | *900.00* | 900.00 |
| | *Meals & Fuel* | *1,619.95* | 1,619.95 |
| | **Sub-Total** | **230,724.56** | **235,480.29** |
| | | | |
| | **\*\*CREDITS NOT PREVIOUSLY ISSUED** | **-5,464.00** | **-4,171.09** |
| | *Resin Paper L & M* | *3,645.00* | 3,645.00 |
| | *Excise Tax* | | 526.09 |
| | *Credit for Add'n Flashing Mat'ls* | | 0.00 |
| | *Daily Clean-up (which I don't agree* | | |
| | *with the assessment by Chris)* | *1,819.00* | 0.00 |
| | **TOTAL ADJUSTED COST** | **225,260.56** | **231,309.20** |
| | | | |
| 05/12/2010 | Payment | 25,000.00 | 25,000.00 |
| 05/25/2010 | Payment | 15,222.89 | 15,222.89 |
| 06/15/2010 | Payment | 37,600.00 | 37,600.00 |
| 06/22/2010 | Payment | 50,096.66 | 50,096.66 |
| 06/29/2010 | Payment | 39,700.95 | 39,700.95 |
| 07/09/2010 | Payment | 10,000.00 | 10,000.00 |
| 07/16/2010 | Payment | 22,372.19 | 22,372.19 |
| | | 199,992.69 | 199,992.69 |
| | | | |
| | Balance on Account | 25,267.87 | 31,316.51 |
| | **Split Actual Copper Overage** | | |
| | **per Calculations in e-mail** | | 0.00 |
| | **if Amount Due is paid upon reciept of this invoice** | | |
| | FINAL AMOUNT DUE | 25,267.87 | **$   31,316.51** |
| | Plus \*\*Credits not issued | 5,464.00 | |
| | Books Currently Show | $   30,731.87 | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000024**

2.24

**Huber and Associates**
## All Transactions for Friedberg & Bunge
**All Transactions**

with 15% Mark-up
with 15% Mark-up

with 15% Mark-up

with 15% Mark-up

Credit ok'd
Credit ok'd
 No longer offering credit for 5,228.94
     *(add'n flashing above)
No longer offering this credit
<mark>CONTRACT AMOUNT</mark> WITH CHANGE ORDERS
<mark>AND OK'D CREDITS</mark>

No longer offering this credit

This would be the new balance with
additional charges, per contract, less
credits we would be willing to offer

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000025

2.25

|  |  |  |  |  |
|---|---|---|---|---|
| Bid Description: | *Copper Standing Seam Roofing* | | **OVERHEAD STUDY** | |
| Project Name: | Friedberg/Bunge Residence | | Crew of | |
| Location: | Plot #168, Estate Chocolate Hole | | Hrs towards OH | |
| Bid Due By: | January 15, 2010 | | Monthly Overhead of | |
| Date Bid: | December 15, 2009 | | Overhead per Hour | |

|  |  |  |  |
|---|---|---|---|
| **CREW SIZE** | 6 | **LABOR RATES ON BIDS** | |
| | | Labor Rate Base | |
| **MARGINS ON BID** | | Labor w/O.T. | |
| Sales Tax | 7.0% | $214,800 | |
| Profit | 10.0% | (CONTRACT TOTAL FROM BID PAGE) | **LODGING & MEALS / DAY** |
| Overhead | 10.0% | | Men per room per night> |
| | | | per night |
| **WORK DAYS** | | | meals/day |
| Days/Week | 5.5 | | TOTAL per Day |
| Hours/day | 9.0 | | Total / hr |
| Hrs / Week | 49.5 | | |
| Weeks per month AV | 4.33 | | **MAN DAY COST** |
| Available Days per M | 23.83 | | Cost @ |
| Consider | 75% | of full days per month | Cost for Motel & Meals |
| Means | 17.88 | days per month for O. H. | Total for Labor Cost |
| **SUPERVISOR RATES** | | | Selling @ |
| Labor Rate Base | $38.00 | $79,040.00 | Selling for Meals & Lodging |
| With O.T. | $41.65 | | SELLING with Motel & Meal |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000026**

2.26



|  |  |  |
|---|---|---|
| 2650 | | |
| $ 70,000 | | |
| $26.42 | | |
| | | **PROFIT MARGIN** |
| | | STANDARDS |
| $30.00 | | |
| $32.88 | | 0% |
| 4.00 | Equals per day of: | Distance |
| $121 | $ 30.25 | 200 |
| $12 | $12 | |
| | $ 42.25 | |
| $ 4.69 | | |
| $ 533.64 | | |
| $ 42.25 | | |
| $ 575.89 | | |
| $ 645.71 | < USE THIS, IF BID | Hourly |
| $ 51.12 | ADDS MOTEL & MEAL | Rates |
| $ 696.83 | | $ 77.43 |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000027**

2.27

| Project Squares Bid | 84 | | |
|---|---|---|---|

| | Coil Width | Approx. Drop | Finished Panel |
|---|---|---|---|
| **ORIGINAL BID** | | | |
| Panel Size | *20* | *3* | 17 |
| | | | |
| **Cleats Spacing (inches) BID** | | | **12** |
| Amount of **panels** per square | | 7.06 | |
| Amount of **cleats** per square | | 70.6 | |
| | | | |
| **IF 18" COIL** | | | |
| Panel Size | *18* | *3* | **15** |
| **Cleats Spacing (inches)** | | | **9.5** |
| Amount of **panels** per square | | 8.00 | 114% more |
| Amount of **cleats** per square | | 101.1 | 144% more |

**Additional hours**
**CLEATS**

| Additional Cleats for Project | 2,559 | more cleats for project then bid | |
|---|---|---|---|
| Time per cleat | 1.1 | minutes | |
| Additional hours | 47 | @ $63.35 | $2,972.08 |

**PANELS**

| Additional Panels for Project | 79 | more panels for project then bid | |
|---|---|---|---|
| Average time per panel | 1.55 | hours | |
| Additional hours | 123 | @ $63.35 | **$7,762.98** |

**IF RETURNING COPPER**

| Copper in stock | 7803 | sq ft |
|---|---|---|
| Potential credit (asuming in good shape) | | |

| | | $3.11 | current comex (cost at mills) |
|---|---|---|---|
| | Vendor add | $0.70 | |
| | Price from Supplier | $3.81 | |

*NOTE: Comex is without any processing or dealer adds.*
*Retail vendors typically add approx. 70 cents higher per pound*

CREDIT on COPPER

| If at slightly less the Comex | $2.75 | which is equal to an approx. | |
|---|---|---|---|
| | | 28% re-stocking fee | |
| Total Credit | | | $21,458.25 |
| Purchase new | 7803 | $3.81 | $29,729.43 |
| **Additional Cost** | | | **$8,271.18** |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS**     **P000028**

2.28

## Friedberg/Bunge Residence
### Plot #168, Estate Chocolate Hole



| Description | QTY. | Waste % Add |
|---|---|---|
| **1 _General Conditions_** | | |
| Job Set-up/Mobilize Labor | 3 M/D's | |
| Permits | 1 permit | |
| Mock Ups | 0 M/D's | |
| Mock Up Materials | 0 allowance | |
| Supervision Costs | 1 M/D's | |
| Plane Fares | 7 Each | |
| Travel Time (Incl. Mock Ups) | 7 M/D's | |
| Material Handling Equipment | 0 Weeks | **BY OWNER** |
| Scaffolding Labor | 0 M/D's | |
| Scaffolding Equip. | 0 Mnths Rent | **BY OWNER** |
| Logistics | 6 M/D's | |
| Motel & Meal Expense | 0 Rooms | **BY OWNER** |
| Daily Clean Up | 3 M/D's | |
| Other Material | 0 Each | |
| Job Close Out | 2 M/D's | |
| Job Close Out Materials | 1 | |
| **126 Labor Hours** | | |
| | | |
| **2 _Roof Prep & Flashings_** | | |
| Roof Tear-off | 0 sqs | |
| Dumpster - Facilities | 0 Ea | |
| Rosin Sheet Dry-in | 87 sqs | |
| Rosin Sheet | 87 sqs | 12% |
| Peel & Stick RP 40 Labor | 0 sqs | |
| Peel & Stick Materials | 0 sqs | 30% |
| Eave / Gable Flashing Labor | 1059 lft | |
| 16oz Copper | 1059 lft | 13% |
| Valley Flashings Labor | 116 lft | |
| 16oz Copper | 116 lft | 13% |
| Sidewall Flashing Labor | 141 lft | |
| 16oz Copper | 141 lft | 13% |
| Headwall Flashing Labor | 13 lft | |
| 16 oz. Copper | 13 lft | 13% |
| Stucco Stop Flashing Labor | 153 ea | |
| 16 oz. Copper | 153 ea | 13% |
| Chimneys or Crickets Labor | 4 ea | |
| Vents Materials | 4 allowance | 13% |
| | | |
| **243 Labor Hours** | | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000029**

2.29

**3 _Roof Install_**

| | | | |
|---|---|---|---|
| Copper Standing Seam | 87 | sqs | |
| Copper Materials | 87 | sqs | 17% |
| Material Handling | 7 | M/D's | |
| Freight | 0 | Loads | by owner |
| Cross Seams | 0 | lft | |
| Copper Materials | 0 | lft | 7% |
| Valley Install (cutting) | 116 | lft | |
| Valley Install Materials | 116 | lft | 0% |
| Hip Cutting & Forming | 1115 | lft | |
| Hip Cap Materials | 1115 | lft | 9% |
| Ridges Labor | 97 | lft | |
| Ridge Batten Caps | 97 | lft | 9% |
| ISO Board Labor | 0 | sqs | |
| ISO Board Materials | 0 | sqs | 10% |
| Flat Roof Membrane Labor | 0 | sqs | |
| Flat Roof Membrane Materials | 0 | sqs | 10% |
| Rollers | 1 | set | |
| Fasteners | 87 | sqs | |

**_1492  Labor Hours_**

**Sum**

Materials with Sales Tax
Travel Time
Supervision
Project Duration                          _6_
Gen Labor
Motel & Meal
Overhead
Sub-Total

Profit                          _16%_
**87.0** sqs
**$2,469** PER SQ



**Date of Bid:** 1/15/2010
**Today's Date:** 3/31/2025

| Install Rate OR M/D BID | | Order Qty Labor | Mat'ls | Labor Unit $ | Mat'l Unit $ | Cost Amount |
|---|---|---|---|---|---|---|
| 1 | | 3.0 M/D's | | 575.89 | | 1,728 |
| | | | 1.0 permit | | 0.00 | 0 |
| 0 | | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 allowance | | 550.00 | 0 |
| 1 | | 1.0 M/D's | | 654.80 | | 655 |
| | | | 7.0 Each | | 565.00 | 4,232 |
| 1 | | 7.0 M/D's | | 575.89 | | 4,031 |
| | | | 0.0 Weeks | | 875.00 | 0 |
| 0 | | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 Mnths Rent | | 750.00 | 0 |
| 1 | | 6.0 M/D's | | 575.89 | | 3,455 |
| | | | 0.0 Rooms | | 90.00 | 0 |
| 1 | | 3.0 M/D's | | 575.89 | | 1,728 |
| | | | 0.0 Each | | 215.00 | 0 |
| 1 | | 2.0 M/D's | | 575.89 | | 1,152 |
| | | | 1.0 allowance | | 350.00 | 375 |
| | | | | | $ | 17,355 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 Ea | | 400.00 | 0 |
| 23 | per day | 3.8 M/D's | | 575.89 | | 2,178 |
| | | | 97.4 sqs | | 8.00 | 834 |
| | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 sqs | | 45.00 | 0 |
| 200 | per day | 5.3 M/D's | | 575.89 | | 3,049 |
| | | | 1196.7 lft | | 4.50 | 5,762 |
| 100 | per day | 1.2 M/D's | | 575.89 | | 668 |
| | | | 131.1 lft | | 10.00 | 1,403 |
| 33 | per day | 4.3 M/D's | | 575.89 | | 2,461 |
| | | | 159.3 lft | | 5.75 | 980 |
| 75 | per day | 0.2 M/D's | | 575.89 | | 100 |
| | | | 14.7 lft | | 5.75 | 90 |
| 35 | per day | 4.4 M/D's | | 575.89 | | 2,517 |
| | | | 172.9 ea | | 6.75 | 1,249 |
| 0.5 | per day | 8.0 M/D's | | 575.89 | | 4,607 |
| | | | 4.5 allowance | | 450.00 | 2,176 |
| | | | | | $ | 28,075 |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS**        **P000031**

2.31

| | | | | | | |
|---|---|---|---|---|---|---|
| 0.7 | per day | 124.3 M/D's | | 575.89 | | 71,576 |
| <= for seams | | 101.8 sqs | | | 362.00 | 39,427 |
| 1 | | 7.0 M/D's | | 575.89 | | 4,031 |
| | | 0.0 Loads | | | | 0 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | 0.0 lft | | | 0.00 | 0 |
| 45 | per day | 2.6 M/D's | | 575.89 | | 1,485 |
| | | 116.0 lft | | | 0.00 | 0 |
| 45 | per day | 24.8 M/D's | | 575.89 | | 14,269 |
| | | 1215.4 lft | | | 1.00 | 1,300 |
| 45 | per day | 2.2 M/D's | | 575.89 | | 1,241 |
| | | 105.7 lft | | | 12.00 | 1,358 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | 0.0 lft | | | 110.00 | 0 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | 0.0 lft | | | 125.00 | 0 |
| 0.2 | per day | 5.0 M/D's | | 575.89 | | 2,879 |
| | | 87.0 sqs | | | 31.98 | 2,977 |
| | | | | | $ | **140,544** |
| | | | | | $ | 185,974 |

## mary of Hard Costs

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | $ | 62,163 | | |
| 63 | Man Hours | @ $ 32.88 | $ | 2,071 | | |
| 9 | Man Hours | @ $ 41.65 | $ | 375 | | |
| men | 34 Days | | | | | |
| 1862 | Man Hours | @ $ 32.88 | $ | 61,209 | $ 40,000 | |
| 1934 | Total Hours | @ $ 4.69 | $ | 9,077 | | |
| 1934 | Total Hours | @ $ 26.42 | $ | 51,078 | | |
| | Labor @ | $ 63.99 | $ | 185,974 | | |
| | | 9.92 | $ | 28,826 | | **101,113.35** |
| | Labor @ | $ 73.91 | $ | **214,800** | | |
| | | other | | | | |
| | | Total | $ | 214,800 | | |

| Selling Amount | With General Conditions | | | COST (Labor w/OH) | |
| --- | --- | --- | --- | --- | --- |
| | LABOR (With Labor carrying all of GC's) | | Mat'ls Selling | LABOR | MATERIALS |
| $ 2,090 | | | | $ 888 | |
| $ - | | | | | $ - |
| $ - | | | | $ - | |
| $ - | | | | | $ - |
| $ 792 | | | | $ 296 | |
| $ 5,121 | | | | | $ 4,232 |
| $ 4,878 | | | | $ 2,071 | |
| $ - | | | | $ - | |
| $ - | | | | | $ - |
| $ 4,181 | | | | $ 1,775 | |
| $ - | | | | | $ - |
| $ 2,090 | | | | $ 888 | |
| $ - | | | | | $ - |
| $ 1,394 | | | | $ 592 | |
| $ 453 | | | | | $ 375 |
| $ 20,999 | | | | | |
| | | | | | |
| $ - | $ - | 0% | $ - | $ - | |
| $ - | $ - | | | | $ - |
| $ 2,636 | $ 3,048 | 2% | $ 2,636 | $ 1,119 | |
| $ 1,009 | $ 1,009 | | | | $ 834 |
| $ - | $ - | 0% | $ - | $ - | |
| $ - | $ - | | | | $ - |
| $ 3,690 | $ 4,266 | 3% | $ 3,690 | $ 1,567 | |
| $ 6,972 | $ 6,972 | | | | $ 5,762 |
| $ 808 | $ 935 | 1% | $ 808 | $ 343 | |
| $ 1,697 | $ 1,697 | | | | $ 1,403 |
| $ 2,977 | $ 3,443 | 2% | $ 2,977 | $ 1,264 | |
| $ 1,186 | $ 1,186 | | | | $ 980 |
| $ 121 | $ 140 | 0% | $ 121 | $ 51 | |
| $ 109 | $ 109 | | | | $ 90 |
| $ 3,046 | $ 3,522 | 2% | $ 3,046 | $ 1,294 | |
| $ 1,511 | $ 1,511 | | | | $ 1,249 |
| $ 5,575 | $ 6,446 | 4% | $ 5,575 | $ 2,367 | |
| $ 2,633 | $ 2,633 | | | | $ 2,176 |
| $ 33,971 | | | | | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000033**

2.33

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $ | 86,606 | $ | 100,140 | 64% | $ | 86,606 | $ | 36,777 | | |
| $ | 47,707 | $ | 47,707 | | | | | | $ | 39,427 |
| $ | 4,878 | $ | 5,640 | 4% | $ | 4,878 | $ | 2,071 | | |
| $ | - | $ | - | | | | | | $ | - |
| $ | - | $ | - | 0% | $ | - | $ | - | | |
| $ | - | $ | - | | | | | | $ | - |
| $ | 1,796 | $ | 2,077 | 1% | $ | 1,796 | $ | 763 | | |
| $ | - | $ | - | | | | | | $ | - |
| $ | 17,266 | $ | 19,964 | 13% | $ | 17,266 | $ | 7,332 | | |
| $ | 1,574 | $ | 1,574 | | | | | | $ | 1,300 |
| $ | 1,502 | $ | 1,737 | 1% | $ | 1,502 | $ | 638 | | |
| $ | 1,643 | $ | 1,643 | | | | | | $ | 1,358 |
| $ | - | $ | - | 0% | $ | - | $ | - | | |
| $ | - | $ | - | | | | | | $ | - |
| $ | - | $ | - | 0% | $ | - | $ | - | | |
| $ | - | $ | - | | | | | | $ | - |
| $ | 3,484 | $ | 4,029 | 3% | $ | 3,484 | $ | 1,480 | | |
| $ | 3,602 | $ | 3,602 | | | | | | $ | 2,977 |
| **$** | **170,058** | **$** | **225,029** | | **$** | **134,386** | **$** | **61,209** | **$** | **62,163** |
| $ | 225,029 | $ | 186,709 | | | | | | | |
| $ | 28,091 | $ | (38,320) | | | | | | | |
| $ | 10,229 | $ | - | | | | | | | |
| $ | 214,800 | | | | | | | | | |

214800

F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000034

2.34

2:21 PM
07/12/10

**Huber and Associates**
## All Transactions for Friedberg & Bunge

| Date | Transaction | All Transactions Amount | Now Revised |
|------|-------------|------------------------|-------------|
| 05/13/2010 | **Contract Amount** | 187,839.00 | 187,839.00 |
| 05/24/2010 | Add'n Copper Change Order | 15,222.89 | 17,506.32 |
| 06/21/2010 | Add'n Copper Change Order | 11,525.10 | 13,253.87 |
| 06/30/2010 | Change Order Consisting Of: | 11,873.42 | 12,469.36 |
| | *Add'n Flashing Mat'ls | 4,633.00 | 5,228.94 |
| | Flat Roof to Pitched Roof - Labor | 2,565.68 | 2,565.68 |
| | Help Chris on Eaves | 253.40 | 253.40 |
| | Vent Boots to Copper - Labor | 1,520.40 | 1,520.40 |
| | Meals & Fuel | 2,900.94 | 2,900.94 |
| 07/08/2010 | Change Order Consisting Of: | 4,264.15 | 4,411.75 |
| | Last Shipment of Copper | 984.00 | 1,131.60 |
| | Labor Copper at Each Boot | 760.20 | 760.20 |
| | Lodging | 900.00 | 900.00 |
| | Meals & Fuel | 1,619.95 | 1,619.95 |
| | Sub-Total | 230,724.56 | 235,480.29 |
| | | | |
| | **CREDITS NOT PREVIOUSLY ISSUED | -5,464.00 | -4,171.09 |
| | Resin Paper L & M | 3,645.00 | 3,645.00 |
| | Excise Tax | | 526.09 |
| | Credit for Add'n Flashing Mat'ls | | 0.00 |
| | Daily Clean-up (which I don't agree | | |
| | with the assessment by Chris) | 1,819.00 | 0.00 |
| | TOTAL ADJUSTED COST | 225,260.56 | 231,309.20 |
| | | | |
| 05/12/2010 | Payment | 25,000.00 | 25,000.00 |
| 05/25/2010 | Payment | 15,222.89 | 15,222.89 |
| 06/15/2010 | Payment | 37,600.00 | 37,600.00 |
| 06/22/2010 | Payment | 50,096.66 | 50,096.66 |
| 06/29/2010 | Payment | 39,700.95 | 39,700.95 |
| 07/09/2010 | Payment | 10,000.00 | 10,000.00 |
| 07/16/2010 | Payment | 22,372.19 | 22,372.19 |
| | | 199,992.69 | 199,992.69 |
| | Balance on Account | 25,267.87 | 31,316.51 |
| | **Split Actual Copper Overage** | | |
| | **per Calculations in e-mail** | | 0.00 |
| | if Amount Due is paid upon reciept of this invoice | | |
| | FINAL AMOUNT DUE | 25,267.87 | $ 31,316.51 |
| | Plus **Credits not issued | 5,464.00 | |
| | Books Currently Show | $ 30,731.87 | |

2.35

2:21 PM
07/12/10

**Huber and Associates**
**All Transactions for Friedberg & Bunge**
All Transactions

with 15% Mark-up
with 15% Mark-up

with 15% Mark-up

with 15% Mark-up

Credit ok'd
Credit ok'd
No longer offering credit for 5,228.94
    *(add'n flashing above)
No longer offering this credit
CONTRACT AMOUNT WITH CHANGE ORDERS
AND OK'D CREDITS

No longer offering this credit

This would be the new balance with
additional charges, per contract, less
credits we would be willing to offer

**F&B v. DAYBREAK - DEPOSITION EXHIBITS**      **P000036**

2.36

# Friedberg/Bunge Residence

*Plot #168, Estate Chocolate Hole*

| Description | Waste % Add | Install Rate OR M/D BID | | Labor |
|---|---|---|---|---|
| **1 *General Conditions*** | | | | |
| Job Set-up/Mobilize Labor | | 1 | | 3.0 |
| Permits | | | | |
| Mock Ups | | 0 | | 0.0 |
| Mock Up Materials | | | | |
| Supervisor | | 1 | | 1.0 |
| Plane Fares | | | | |
| Travel Time (Incl. Mock Ups) | | 1 | | 7.0 |
| Material Handling Equipment | BY OWNER | | | |
| Scaffolding Labor | | 0 | | 0.0 |
| Scaffolding Equip. | BY OWNER | | | |
| Logistics | | 1 | | 6.0 |
| Motel & Meal Expense | BY OWNER | | | |
| Daily Clean Up | | 1 | | 3.0 |
| Other Material | | | | |
| Job Close Out | | 1 | | 2.0 |
| Job Close Out Materials | | | | |
| | **126  Labor Hours** | | | |
| | | | | |
| **2 *Roof Prep & Flashings*** | | | | |
| Roof Tear-off | | 0 | per day | 0.0 |
| Dumpster - Facilities | | | | |
| Rosin Sheet Dry-in | | 23 | per day | 3.8 |
| Rosin Sheet | 12% | | | |
| Peel & Stick RP 40 Labor | | | per day | 0.0 |
| Peel & Stick Materials | 30% | | | |
| Eave / Gable Flashing Labor | | 200 | per day | 5.3 |
| 16oz Copper | 13% | | | |
| Valley Flashings Labor | | 100 | per day | 1.2 |
| 16oz Copper | 13% | | | |
| Sidewall Flashing Labor | | 33 | per day | 4.3 |
| 16oz Copper | 13% | | | |
| Headwall Flashing Labor | | 75 | per day | 0.2 |
| 16 oz. Copper | 13% | | | |
| Stucco Stop Flashing Labor | | 35 | per day | 4.4 |
| 16 oz. Copper | 13% | | | |
| Chimneys or Crickets Labor | | 0.5 | per day | 8.0 |
| Related Materials | 13% | | | |

**243  Labor Hours**

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000037**

2.37

**3** _Roof Install_

| | | 0.7 | | |
|---|---|---|---|---|
| Copper Standing Seam | | 0.65 | per day | 133.8 |
| Copper Materials | 17% | <= for seams | | |
| Material Handling | | 1 | | 7.0 |
| Freight | by owner | | | |
| Cross Seams | | 0 | per day | 0.0 |
| Copper Materials | 7% | | | |
| Valley Install (cutting) | | 45 | per day | 2.6 |
| Valley Install Materials | 0% | | | |
| Hip Cap | | 45 | per day | 24.8 |
| Hip Cap Materials | 9% | | | |
| Ridges Labor | | 45 | per day | 2.2 |
| Ridge Batten Caps | 9% | | | |
| ISO Board Labor | | 0 | per day | 0.0 |
| ISO Board Materials | 10% | | | |
| Flat Roof Membrane Labor | | 0 | per day | 0.0 |
| Flat Roof Membrane Materials | 10% | | | |
| Rollers | | 0.2 | per day | 5.0 |
| Fasteners | | | | |

_**1578  Labor Hours**_

## Summary of Hard Co

| | | | |
|---|---|---|---|
| | 63 | Man Hours | |
| | 9 | Man Hours | |
| 6 | men | 36 | Days |
| | 1948 | Man Hours | |
| | 2020 | Total Hours | |
| | 2020 | Total Hours | |
| | | Labor @ | |

_21%_

sqs

PER SQ                    Labor @

**F&B v. DAYBREAK - DEPOSITION EXHIBITS     P000038**

2.38

Date of Bid: 1/15/2010
Today's Date: 3/31/2025



**HUBER & ASSOCIATES**

| Order Qty Mat'ls | Labor Unit $ | Selling Amount | LABOR With Labor carrying all of GC's | |
|---|---|---|---|---|
| M/D's | 575.89 | $ 2,090 | | |
| 1.0 permit | | $ - | | |
| M/D's | 575.89 | $ - | | |
| 0.0 allowance | | $ - | | |
| M/D's | 654.80 | $ 792 | | |
| 7.0 Each | | $ 5,121 | | |
| M/D's | 575.89 | $ 4,878 | | |
| 0.0 Weeks | | $ - | | |
| M/D's | 575.89 | $ - | | |
| 0.0 Mnths Rent | | $ - | | |
| M/D's | 575.89 | $ 4,181 | | |
| 0.0 Rooms | | $ - | | |
| M/D's | 575.89 | $ 2,090 | | |
| 0.0 Each | | $ - | | |
| M/D's | 575.89 | $ 1,394 | | |
| 1.0 allowance | | $ 453 | | |
| | | $ 20,999 | | |
| | | | | |
| M/D's | 575.89 | $ - | $ - | |
| 0.0 Ea | | $ - | $ - | |
| M/D's | 575.89 | $ 2,636 | $ 3,028 | |
| 97.4 sqs | | $ 1,009 | $ 1,009 | |
| M/D's | 575.89 | $ - | $ - | |
| 0.0 sqs | | $ - | $ - | |
| M/D's | 575.89 | $ 3,690 | $ 4,239 | |
| 1196.7 lft | | $ 4,634 | $ 4,634 | |
| M/D's | 575.89 | $ 808 | $ 929 | |
| 131.1 lft | | $ 1,523 | $ 1,523 | |
| M/D's | 575.89 | $ 2,977 | $ 3,421 | |
| 159.3 lft | | $ 925 | $ 925 | |
| M/D's | 575.89 | $ 121 | $ 139 | |
| 14.7 lft | | $ 71 | $ 71 | |
| M/D's | 575.89 | $ 3,046 | $ 3,500 | |
| 172.9 ea | | $ 837 | $ 837 | |
| M/D's | 575.89 | $ 5,575 | $ 6,405 | |
| 4.5 Ea | | $ 525 | $ 525 | |
| | | $ 28,377 | | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000039**

2.39

| | | | | | |
|---|---|---|---|---|---|
| M/D's | 575.89 | $ | 93,268 | $ | 107,154 |
| 101.8 sqs | | $ | 58,645 | $ | 58,645 |
| M/D's | 575.89 | $ | 4,878 | $ | 5,604 |
| 0.0 Loads | | $ | - | $ | - |
| M/D's | 575.89 | $ | - | $ | - |
| 0.0 lft | | $ | - | $ | - |
| M/D's | 575.89 | $ | 1,796 | $ | 2,064 |
| 116.0 lft | | $ | - | $ | - |
| M/D's | 575.89 | $ | 17,266 | $ | 19,837 |
| 1215.4 lft | | $ | 1,574 | $ | 1,574 |
| M/D's | 575.89 | $ | 1,502 | $ | 1,726 |
| 105.7 lft | | $ | 1,643 | $ | 1,643 |
| M/D's | 575.89 | $ | - | $ | - |
| 0.0 lft | | $ | - | $ | - |
| M/D's | 575.89 | $ | - | $ | - |
| 0.0 lft | | $ | - | $ | - |
| M/D's | 575.89 | $ | 3,484 | $ | 4,003 |
| 87.0 sqs | | $ | 3,942 | $ | 3,942 |
| | | $ | **187,999** | $ | **237,375** |
| | | $ | 237,375 | | |

## osts

| | | | | | |
|---|---|---|---|---|---|
| | | | | $ | - | $ | - |
| | | $ | 66,861 | | |
| @ $ 32.88 | $ | 2,071 | | |
| @ $ 41.65 | $ | 375 | | |
| | | | | |
| @ $ 32.88 | $ | 64,038 | $ | 64,413 |
| @ $ 4.69 | $ | 9,481 | $ | 17,745 |
| @ $ 26.42 | $ | 53,351 | $ | 82,158 |
| $ 63.99 | $ | 196,177 | | |
| | | | | |
| 13.44 | $ | 41,197 | | |
| | | | | |
| $ 77.43 | $ | **237,375** | | |
| | $ | **214,800** | | |
| Difference | $ | 22,575 | | |
| Copper Value | $ | (52,822) | | |
| | | 184,553 | | |

2:21 PM
07/12/10

**Huber and Associates**

# All Transactions for Friedberg & Bunge

All Transactions

| Type | Num | Date | Account | Amount |
|------|-----|------|---------|--------|
| Estimate | 34 | 05/13/2010 | Contract Amount | 187,839.00 |
| Invoice | 1622 | 05/24/2010 | Accounts Receivable | 15,222.89 |
| Invoice | 1630 | 06/21/2010 | Accounts Receivable | 11,525.10 |
| Invoice | 1637 | 06/30/2010 | Accounts Receivable | 11,873.42 |
| Invoice | 1640 | 07/08/2010 | Accounts Receivable | 4,264.15 |
| | | | | 230,724.56 |
| | | | | |
| Payment | 25169 | 05/12/2010 | Undeposited Funds | 25,000.00 |
| Payment | 25190 | 05/25/2010 | Undeposited Funds | 15,222.89 |
| Payment | | 06/15/2010 | Undeposited Funds | 37,600.00 |
| Payment | 25262 | 06/22/2010 | Undeposited Funds | 50,096.66 |
| Payment | 25266 | 06/29/2010 | Undeposited Funds | 39,700.95 |
| Payment | 25287 | 07/09/2010 | Undeposited Funds | 10,000.00 |
| **Total** | | | | 177,620.50 |

Balance on Account          53,104.06

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000041

2.41

2:21 PM
07/12/10

**Huber and Associates**

## All Transactions for Friedberg & Bunge

**All Transactions**

Contract Amount

Change Order

Change Order

Change Order

Change Order

**Total**

**F&B v. DAYBREAK - DEPOSITION EXHIBITS**    **P000042**

2.42

# Friedberg/Bunge Residence
*Plot #168, Estate Chocolate Hole*

| Description | QTY. | | Waste % Add |
|---|---|---|---|
| **1** **General Conditions** | | | |
| Job Set-up/Mobilize Labor | 3 | M/D's | |
| Permits | 1 | permit | |
| Mock Ups | 0 | M/D's | |
| Mock Up Materials | 0 | allowance | |
| Supervisor | 1 | M/D's | |
| Plane Fares | 7 | Each | |
| Travel Time (Incl. Mock Ups) | 7 | M/D's | |
| Material Handling Equipment | 0 | Weeks | **BY OWNER** |
| Scaffolding Labor | 0 | M/D's | |
| Scaffolding Equip. | 0 | Mnths Rent | **BY OWNER** |
| Logistics | 6 | M/D's | |
| Motel & Meal Expense | 0 | Rooms | **BY OWNER** |
| Daily Clean Up | 3 | M/D's | |
| Other Material | 0 | Each | |
| Job Close Out | 2 | M/D's | |
| Job Close Out Materials | 1 | | |
| | **126** | **Labor Hours** | |
| | | | |
| **2** **Roof Prep & Flashings** | | | |
| Roof Tear-off | 0 | sqs | |
| Dumpster - Facilities | 0 | Ea | |
| Rosin Sheet Dry-in | 87 | sqs | |
| Rosin Sheet | 87 | sqs | 12% |
| Peel & Stick RP 40 Labor | 0 | sqs | |
| Peel & Stick Materials | 0 | sqs | 30% |
| Eave / Gable Flashing Labor | 0 | lft | |
| 16oz Copper | 0 | lft | 13% |
| Valley Flashings Labor | 116 | lft | |
| 16oz Copper | 116 | lft | 13% |
| Sidewall Flashing Labor | 141 | lft | |
| 16oz Copper | 141 | lft | 13% |
| Headwall Flashing Labor | 13 | lft | |
| 16 oz. Copper | 13 | lft | 13% |
| Stucco Stop Flashing Labor | 153 | ea | |
| 16 oz. Copper | 153 | ea | 13% |
| Chimneys or Crickets Labor | 4 | ea | |
| Vents Materials | 4 | allowance | 13% |
| | **196** | **Labor Hours** | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000043**

**3  _Roof Install_**

| | | |
|---|---|---|
| Copper Standing Seam | 87 sqs | |
| Copper Materials | 17 sqs | 17% |
| Material Handling | 7 M/D's | |
| Freight | 0 Loads | by owner |
| Cross Seams | 0 lft | |
| Copper Materials | 0 lft | 7% |
| Valley Install (cutting) | 116 lft | |
| Valley Install Materials | 116 lft | 0% |
| Hip Cap | 1115 lft | |
| Hip Cap Materials | 1115 lft | 9% |
| Ridges Labor | 97 lft | |
| Ridge Batten Caps | 97 lft | 9% |
| ISO Board Labor | 0 sqs | |
| ISO Board Materials | 0 sqs | 10% |
| Flat Roof Membrane Labor | 0 sqs | |
| Flat Roof Membrane Materials | 0 sqs | 10% |
| Rollers | 1 set | |
| Fasteners | 87 sqs | |

**_1805  Labor Hours_**

**Su**

| | |
|---|---|
| **Materials with Sales Tax** | |
| **Travel Time** | |
| **Supervision** | |
| **Project Duration** | _6_ |
| **Gen Labor** | |
| **Motel & Meal** | |
| **Overhead** | |
| **Sub-Total** | |
| **Profit**  _21%_ | |

**87.0** sqs

**$2,302** PER SQ

Date of Bid:  1/15/2010
Today's Date:  3/31/2025



| Install Rate OR M/D BID | | Order Qty Labor | Mat'ls | Labor Unit $ | Mat'l Unit $ | Cost Amount |
|---|---|---|---|---|---|---|
| 1 | | 3.0 M/D's | | 575.89 | | 1,728 |
| | | | 1.0 permit | | 0.00 | 0 |
| 0 | | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 allowance | | 550.00 | 0 |
| 1 | | 1.0 M/D's | | 654.80 | | 655 |
| | | | 7.0 Each | | 565.00 | 4,232 |
| 1 | | 7.0 M/D's | | 575.89 | | 4,031 |
| | | | 0.0 Weeks | | 875.00 | 0 |
| 0 | | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 Mnths Rent | | 750.00 | 0 |
| 1 | | 6.0 M/D's | | 575.89 | | 3,455 |
| | | | 0.0 Rooms | | 90.00 | 0 |
| 1 | | 3.0 M/D's | | 575.89 | | 1,728 |
| | | | 0.0 Each | | 215.00 | 0 |
| 1 | | 2.0 M/D's | | 575.89 | | 1,152 |
| | | | 1.0 allowance | | 350.00 | 375 |
| | | | | | $ | 17,355 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 Ea | | 400.00 | 0 |
| 23 | per day | 3.8 M/D's | | 575.89 | | 2,178 |
| | | | 97.4 sqs | | 8.00 | 834 |
| | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 sqs | | 45.00 | 0 |
| | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 lft | | 4.50 | 0 |
| 100 | per day | 1.2 M/D's | | 575.89 | | 668 |
| | | | 131.1 lft | | 10.00 | 1,403 |
| 33 | per day | 4.3 M/D's | | 575.89 | | 2,461 |
| | | | 159.3 lft | | 5.75 | 980 |
| 75 | per day | 0.2 M/D's | | 575.89 | | 100 |
| | | | 14.7 lft | | 5.75 | 90 |
| 35 | per day | 4.4 M/D's | | 575.89 | | 2,517 |
| | | | 172.9 ea | | 6.75 | 1,249 |
| 0.5 | per day | 8.0 M/D's | | 575.89 | | 4,607 |
| | | | 4.5 allowance | | 450.00 | 2,176 |
| | | | | | $ | 19,264 |

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000045

2.45

| | | | | | | |
|---|---|---|---|---|---|---|
| 0.55 | per day | 159.1 M/D's | | 575.89 | | 91,617 |
| <= for seams | | 19.9 sqs | | | 362.00 | 7,704 |
| 1 | | 7.0 M/D's | | 575.89 | | 4,031 |
| | | 0.0 Loads | | | | 0 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | 0.0 lft | | | 0.00 | 0 |
| 45 | per day | 2.6 M/D's | | 575.89 | | 1,485 |
| | | 116.0 lft | | | 0.00 | 0 |
| 45 | per day | 24.8 M/D's | | 575.89 | | 14,269 |
| | | 1215.4 lft | | | 1.00 | 1,300 |
| 45 | per day | 2.2 M/D's | | 575.89 | | 1,241 |
| | | 105.7 lft | | | 12.00 | 1,358 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | 0.0 lft | | | 110.00 | 0 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | 0.0 lft | | | 125.00 | 0 |
| 0.2 | per day | 5.0 M/D's | | 575.89 | | 2,879 |
| | | 87.0 sqs | | | 31.98 | 2,977 |

$ **128,862**
$ 165,481

## ummary of Hard Costs

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | $ | 24,678 | |
| 63 | Man Hours | @ $ 32.88 | $ | 2,071 | | |
| 9 | Man Hours | @ $ 41.65 | $ | 375 | | |
| men | 39 Days | | | | | |
| 2127 | Man Hours | @ $ 32.88 | $ | 69,940 | $ 40,000 | |
| 2199 | **Total Hours** | @ $ 4.69 | $ | 10,324 | | |
| 2199 | **Total Hours** | @ $ 26.42 | $ | 58,092 | | |
| | Labor @ | $ 63.99 | $ | 165,481 | | |

| | | | | |
|---|---|---|---|---|
| | 13.44 | $ | 34,751 | **122,783.52** |

| | | | | |
|---|---|---|---|---|
| | Labor @ | $ 77.43 | $ | **200,232** |
| | | | $ | **(14,568)** |
| | | other | | |
| | | Total | $ | 200,232 |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000046**

2.46



| Selling Amount | | LABOR<br>*With Labor carrying all of GC's* | |
|---|---|---|---|
| $ | 2,090 | | |
| $ | - | | |
| $ | - | | |
| $ | - | | |
| $ | 792 | | |
| $ | 5,121 | | |
| $ | 4,878 | | |
| $ | - | | |
| $ | - | | |
| $ | 4,181 | | |
| $ | - | | |
| $ | 2,090 | | |
| $ | - | | |
| $ | 1,394 | | |
| $ | 453 | | |
| **$** | **20,999** | | |
| | | | |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | 2,636 | $ | 2,993 |
| $ | 1,009 | $ | 1,009 |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | 808 | $ | 918 |
| $ | 1,697 | $ | 1,697 |
| $ | 2,977 | $ | 3,381 |
| $ | 1,186 | $ | 1,186 |
| $ | 121 | $ | 137 |
| $ | 109 | $ | 109 |
| $ | 3,046 | $ | 3,459 |
| $ | 1,511 | $ | 1,511 |
| $ | 5,575 | $ | 6,330 |
| $ | 2,633 | $ | 2,633 |
| | | | |
| **$** | **23,309** | | |

| | | | |
|---|---:|---|---:|
| $ | 110,856 | $ | 125,880 |
| $ | 9,322 | $ | 9,322 |
| $ | 4,878 | $ | 5,539 |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | 1,796 | $ | 2,040 |
| $ | - | $ | - |
| $ | 17,266 | $ | 19,606 |
| $ | 1,574 | $ | 1,574 |
| $ | 1,502 | $ | 1,706 |
| $ | 1,643 | $ | 1,643 |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | 3,484 | $ | 3,956 |
| $ | 3,602 | $ | 3,602 |
| **$** | **155,923** | **$** | **200,232** |
| $ | 200,232 | | |
| | | | |
| $ | - | $ | - |

# Friedberg/Bunge Residence
*Plot #168, Estate Chocolate Hole*

| Description | Waste % Add | Install Rate OR M/D BID | | Labor |
|---|---|---|---|---|
| **1  *General Conditions*** | | | | |
| Job Set-up/Mobilize Labor | | 1 | | *3.0* |
| Permits | | | | |
| Mock Ups | | 0 | | *0.0* |
| Mock Up Materials | | | | |
| Supervisor | | 1 | | *1.0* |
| Plane Fares | | | | |
| Travel Time (Incl. Mock Ups) | | 1 | | *7.0* |
| Material Handling Equipment | **BY OWNER** | | | |
| Scaffolding Labor | | 0 | | *0.0* |
| Scaffolding Equip. | **BY OWNER** | | | |
| Logistics | | 1 | | *6.0* |
| Motel & Meal Expense | **BY OWNER** | | | |
| Daily Clean Up | | 1 | | *3.0* |
| Other Material | | | | |
| Job Close Out | | 1 | | *2.0* |
| Job Close Out Materials | | | | |

***126  Labor Hours***

| Description | Waste % Add | Install Rate OR M/D BID | | Labor |
|---|---|---|---|---|
| **2  *Roof Prep & Flashings*** | | | | |
| Roof Tear-off | | 0 | per day | *0.0* |
| Dumpster - Facilities | | | | |
| Rosin Sheet Dry-in | | 23 | per day | *3.8* |
| Rosin Sheet | 12% | | | |
| Peel & Stick RP 40 Labor | | | per day | *0.0* |
| Peel & Stick Materials | 30% | | | |
| Eave / Gable Flashing Labor | | 200 | per day | *5.3* |
| 16oz Copper | 13% | | | |
| Valley Flashings Labor | | 100 | per day | *1.2* |
| 16oz Copper | 13% | | | |
| Sidewall Flashing Labor | | 33 | per day | *4.3* |
| 16oz Copper | 13% | | | |
| Headwall Flashing Labor | | 75 | per day | *0.2* |
| 16 oz. Copper | 13% | | | |
| Stucco Stop Flashing Labor | | 35 | per day | *4.4* |
| 16 oz. Copper | 13% | | | |
| Chimneys or Crickets Labor | | 0.5 | per day | *8.0* |
| Related Materials | 13% | | | |

***243  Labor Hours***

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000049**

| | | | | | |
|---|---|---|---|---|---|
| **3 _Roof Install_** | | | 0.7 | | |
| Copper Standing Seam | | | 0.65 | per day | _133.8_ |
| Copper Materials | 17% | | <= for seams | | |
| Material Handling | | | 1 | | _7.0_ |
| Freight | by owner | | | | |
| Cross Seams | | | 0 | per day | _0.0_ |
| Copper Materials | 7% | | | | |
| Valley Install (cutting) | | | 45 | per day | _2.6_ |
| Valley Install Materials | 0% | | | | |
| Hip Cap | | | 45 | per day | _24.8_ |
| Hip Cap Materials | 9% | | | | |
| Ridges Labor | | | 45 | per day | _2.2_ |
| Ridge Batten Caps | 9% | | | | |
| ISO Board Labor | | | 0 | per day | _0.0_ |
| ISO Board Materials | 10% | | | | |
| Flat Roof Membrane Labor | | | 0 | per day | _0.0_ |
| Flat Roof Membrane Materials | 10% | | | | |
| Rollers | | | 0.2 | per day | _5.0_ |
| Fasteners | | | | | |

**1578  Labor Hours**

**Summary of Hard C**

| | | | |
|---|---|---|---|
| | _63_ | _Man Hours_ | |
| | _9_ | _Man Hours_ | |
| _6_ | _men_ | _36_ | _Days_ |
| | _1948_ | _Man Hours_ | |
| | _2020_ | **Total Hours** | |
| | _2020_ | **Total Hours** | |
| | | _Labor @_ | |

_21%_

sqs

PER SQ          _Labor @_

Date of Bid:  1/15/2010
Today's Date:  3/31/2025



| Order Qty | | Labor | | Selling | | LABOR | |
| Mat'ls | | Unit $ | | Amount | | With Labor carrying all of GC's | |

| | | | | | |
|---|---|---|---|---|---|
| M/D's | | 575.89 | $ | 2,090 | |
| | 1.0 permit | | $ | - | |
| M/D's | | 575.89 | $ | - | |
| | 0.0 allowance | | $ | - | |
| M/D's | | 654.80 | $ | 792 | |
| | 7.0 Each | | $ | 5,121 | |
| M/D's | | 575.89 | $ | 4,878 | |
| | 0.0 Weeks | | $ | - | |
| M/D's | | 575.89 | $ | - | |
| | 0.0 Mnths Rent | | $ | - | |
| M/D's | | 575.89 | $ | 4,181 | |
| | 0.0 Rooms | | $ | - | |
| M/D's | | 575.89 | $ | 2,090 | |
| | 0.0 Each | | $ | - | |
| M/D's | | 575.89 | $ | 1,394 | |
| | 1.0 allowance | | $ | 453 | |
| | | | $ | 20,999 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| M/D's | | 575.89 | $ | - | $ | - |
| | 0.0 Ea | | $ | - | $ | - |
| M/D's | | 575.89 | $ | 2,636 | $ | 3,028 |
| | 97.4 sqs | | $ | 1,009 | $ | 1,009 |
| M/D's | | 575.89 | $ | - | $ | - |
| | 0.0 sqs | | $ | - | $ | - |
| M/D's | | 575.89 | $ | 3,690 | $ | 4,239 |
| | 1196.7 lft | | $ | 4,634 | $ | 4,634 |
| M/D's | | 575.89 | $ | 808 | $ | 929 |
| | 131.1 lft | | $ | 1,523 | $ | 1,523 |
| M/D's | | 575.89 | $ | 2,977 | $ | 3,421 |
| | 159.3 lft | | $ | 925 | $ | 925 |
| M/D's | | 575.89 | $ | 121 | $ | 139 |
| | 14.7 lft | | $ | 71 | $ | 71 |
| M/D's | | 575.89 | $ | 3,046 | $ | 3,500 |
| | 172.9 ea | | $ | 837 | $ | 837 |
| M/D's | | 575.89 | $ | 5,575 | $ | 6,405 |
| | 4.5 Ea | | $ | 525 | $ | 525 |
| | | | $ | 28,377 | |

| | | | | | |
|---|---|---|---|---|---|
| *M/D's* | *575.89* | $ | 93,268 | $ | 107,154 |
| 101.8 sqs | | $ | 58,645 | $ | 58,645 |
| *M/D's* | *575.89* | $ | 4,878 | $ | 5,604 |
| 0.0 Loads | | $ | - | $ | - |
| *M/D's* | *575.89* | $ | - | $ | - |
| 0.0 lft | | $ | - | $ | - |
| *M/D's* | *575.89* | $ | 1,796 | $ | 2,064 |
| 116.0 lft | | $ | - | $ | - |
| *M/D's* | *575.89* | $ | 17,266 | $ | 19,837 |
| 1215.4 lft | | $ | 1,574 | $ | 1,574 |
| *M/D's* | *575.89* | $ | 1,502 | $ | 1,726 |
| 105.7 lft | | $ | 1,643 | $ | 1,643 |
| *M/D's* | *575.89* | $ | - | $ | - |
| 0.0 lft | | $ | - | $ | - |
| *M/D's* | *575.89* | $ | - | $ | - |
| 0.0 lft | | $ | - | $ | - |
| *M/D's* | *575.89* | $ | 3,484 | $ | 4,003 |
| 87.0 sqs | | $ | 3,942 | $ | 3,942 |
| | | $ | **187,999** | $ | **237,375** |
| | | $ | 237,375 | | |

osts

| | | | |
|---|---|---|---|
| $ - | | $ - | |

| | | | | | |
|---|---|---|---|---|---|
| | $ | 66,861 | | | |
| @ $ 32.88 | $ | 2,071 | | | |
| @ $ 41.65 | $ | 375 | | | |
| @ $ 32.88 | $ | 64,038 | $ | 64,413 |
| @ $ 4.69 | $ | 9,481 | $ | 17,745 |
| @ $ 26.42 | $ | 53,351 | $ | 82,158 |
| $ 63.99 | $ | 196,177 | | |

| | | | |
|---|---|---|---|
| 13.44 | $ | 41,197 | |

| | | | |
|---|---|---|---|
| $ 77.43 | $ | **237,375** | |
| | $ | **214,800** | |
| Difference | $ | 22,575 | |
| Copper Value | $ | (52,822) | |
| | | 184,553 | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000052**

2.52

# Johnson Residence
## Copper  Standing Seam

| Roof Area Calcs: | measurements | | Slope | Factor | Squares | |
|---|---|---|---|---|---|---|
| *Main House* | *10* | *78* | 9 | 1.45 | 11.3 | |
| *Main House* | *10* | *47.5* | 12 | 1.65 | 7.8 | |
| *Main House* | *10* | *183* | 2 | 1.2 | 22.0 | |
| *Master Bedroom* | *10* | *20* | 9 | 1.45 | 2.9 | |
| *Master Bedroom* | *10* | *90* | 2 | 1.2 | 10.8 | |
| *Guest House* | *10* | *28* | 9 | 1.45 | 4.1 | QUOTED: |
| *Guest House* | *10* | *58* | 2 | 1.2 | 7.0 | |
| *Bedroom* | | | | 13.7 | 13.7 | |
| ***TOTAL*** | | | | | **85.0** | |
| Low Slope Areas | (2/12 pitch and pan areas) | | | | 50.5 | |
| *Add for pan areas* | *10* | *20* | 2 | 1.12 | 2.2 | |
| ***Copper Squares*** | | | | | **87.2** | |
| | | | | Total Sqs. | **87.2** | |
| | | Squares per day | 0.50 | | | |

## LABOR

| | SCOPE | QTY. (item) | Description | Sqs./Day or M/D's | M/D's Bid | Cost | |
|---|---|---|---|---|---|---|---|
| **A. I** | **General Conditions** | | | | | | |
| 1 | Set-up - Mobilization | | | 4 | 4.0 | $ | 2,138.94 |
| 2 | Supervision | 172.9 | crew days is  14.4 | >>> | 12.0 | $ | 6,416.83 |
| 3 | Travel time | | | 12 | 12.0 | $ | 6,416.83 |
| 4 | Freight | | material handling | 8 | 8.0 | $ | 4,277.89 |
| 5 | Scaffolding | | by owner | 3 | 3.0 | $ | 1,604.21 |
| 6 | Food & lodging | | Lodging by owner | | 0.0 | $ | - |
| | Section Totals | | | | 39.0 | $ | 20,854.70 |
| | With Mark-ups | | | | | $ | 25,234.18 |
| **B. II** | **Roof Prep** | | | | | | |
| 1 | Check 30lb | 88.0 | | 69 | 1.3 | $ | 681.98 |
| 2 | Peel and Stick | 0.0 | sqs | 0 | 0.0 | $ | - |
| 3 | Flashings | | allowance | 18 | 18.0 | $ | 9,625.25 |
| | Section Totals | | | | 19.3 | $ | 10,307.23 |
| | With Mark-ups | | | | | $ | 12,471.74 |
| **C. III** | **Installation** | | | | | | |
| 1 | Standing Seam | 88.0 | sqs | 1 | 88.0 | $ | 47,056.75 |
| 2 | Shop fab | 102.96 | sqs of panels | 2 | 51.5 | $ | 27,528.20 |
| 3 | Solder & accessories | 88.0 | sqs | 16 | 5.5 | $ | 2,941.05 |
| 4 | Hip and Ridge | 335.0 | lft | 30 | 11.2 | $ | 5,971.22 |
| 5 | Cricket add | 3.0 | sqs | 0.5 | 6.0 | $ | 3,208.42 |
| 6 | Close out | | | 4 | 4.0 | $ | 2,138.94 |
| | Section Totals | | | | 166.1 | $ | 88,844.58 |
| | With Mark-ups | | | | | $ | 107,501.94 |
| **D. IV** | **Totals** | | | | | | |
| 1 | Costs | | Crew Size 12 | Man Days | 172.9 | $ | 120,006.50 |
| 2 | Selling Prices | | | | | $ | 145,207.87 |
| | Contract Value | | | | | $ | - |
| 3 | Project Cost | | all hard costs but no overhead | | | $ | 177,411.59 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 4 | **Project Selling** | **with standard 10 & 10** | | | | | **$** | **214,668.02** |
| 5 | Overhead | 172.9 | man days | times | $ 237.74 | per day | $ | 41,114.52 |
| 6 | Profit | | | | | | $ | (177,411.59) |
| 7 | **Total Overhead & Profit** | | | | | | **$** | **(136,297.07)** |

| | | |
|---|---|---|
| **TOTAL EXPECTED CONTRACT VALUE** | **$** | **7,587.50** |
| TOTAL PROFIT EXPECTED | $ | (176,094.75) |
| **TOTAL PROFIT & OVERHEAD EXPECTED** | **$** | **(134,980.23)** |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000054**

2.54

**3/31/2025**

| Spreadsheet Stats: | | | | |
|---|---|---|---|---|
| *LABOR RATES* | *per m/d* | $ | | 297.00 |
| *OVERHEAD* | *per m/d* | $ | | 237.74 |
| *COST* | *per m/d* | | | 534.74 |
| *SELLING PRICE* | *per m/d* | $ | | 647.03 |

| | | | |
|---|---|---|---|
| *Per Square Price* | $ 2,460.66 | *(matl's used)* | |

| Sales Tax | 6.5% | **BID** | $ | **214,668.02** |
|---|---|---|---|---|
| | | From Contract | $ | - |
| *MTL. & LABOR M.U.'s* | | Overhead | $ | 41,114.52 |
| OH | **10%** | **Profit** | $ | **(392,079.61)** |
| P | **10%** | **OH & Profit** | $ | **(136,297.07)** |

### MATERIALS/EQUIPMENT

| Adjust | Description | Unit Cost | | Cost | |
|---|---|---|---|---|---|
| | permit | $ | 625.00 | $ | - |
| 1 | lodging | $ | 4,000.00 | $ | 4,260.00 |
| 7 | extra plane | $ | 550.00 | $ | 4,100.25 |
| 1 | freight by owner | | | $ | - |
| | rental | | | $ | - |
| 172.9 | split w/owner | $ | 35.00 | $ | 3,223.21 |
| | | | | $ | 11,583.46 |
| | | | | $ | 14,015.98 |
| | rls | | | $ | - |
| 0 | rolls | $ | 42.00 | $ | - |
| 24 | sheets | $ | 130.00 | $ | 3,322.80 |
| | | | | $ | 3,322.80 |
| | | | | $ | 4,020.59 |
| | sqs | $ | 400.00 | $ | 37,488.00 |
| | | | | $ | - |
| | sqs | $ | 21.00 | $ | 1,968.12 |
| | per lft> | $ | 5.00 | $ | 1,783.88 |
| 8 | sqs | $ | 54.00 | $ | 460.08 |
| 1 | misc. | $ | 750.00 | $ | 798.75 |
| | | | | $ | 42,498.83 |
| | | | | $ | 51,423.58 |
| | | | | $ | 57,405.08 |
| | | | | $ | 69,460.15 |

| **+ Extra Work** | unit price |
|---|---|
| Gutter & Hook Ups | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS    P000055**

2.55



| LFT | 250 | $ | 30.35 | $ | 7,587.50 |
|-----|-----|---|-------|---|----------|
|     |     |   |       | $ | -        |

*ACTUAL QUOTE>*

**Total of Additional Work** | | | | **$** | **7,587.50**

**F&B v. DAYBREAK - DEPOSITION EXHIBITS       P000056**

2.56

| Total SQS | 87 |
|---|---|
| $ per SQ | $    459.77 |
| Sqs Installed | 87 |
| Sqs Remaining | 0.0 |
| % Complete | 100% |

| Fill in Blue Cells Only | Weekly | 52 | hrs | If Project Not Complete: | |
|---|---|---|---|---|---|
| | | | | Adjust TO: | 100% |

**Basics**

| Class | | Name | BASE | OT | 40 Hrs | addn hrs 12 | Weekly TOTAL |
|---|---|---|---|---|---|---|---|
| Sub | 1 | Micah Cady | $   40.0 | $    - | $ 1,600.00 | $   480.00 | $   2,080.00 |
| Sub | 1 | Peter Laughlin | $   25.0 | $    - | $ 1,000.00 | $   300.00 | $   1,300.00 |
| Sub | 1 | Tim Peterson | $   28.0 | $    - | $ 1,120.00 | $   336.00 | $   1,456.00 |
| Sub | 1 | David | $   23.0 | $    - | $   920.00 | $   276.00 | $   1,196.00 |
| Sub | 0 | | | $    - | $    - | $    - | $    - |
| Sub | 1 | Steve K. | $   25.0 | $    - | $ 1,000.00 | $   300.00 | $   1,300.00 |
| Sub | 0 | | | $    - | $    - | $    - | $    - |
| Employee | 1 | Austin | $   15.0 | $ 22.50 | $   600.00 | $   270.00 | $   870.00 |
| Sub | 1 | Brandon | $   22.0 | $    - | $   880.00 | $   264.00 | $   1,144.00 |
| Employee | 0 | | | $    - | $    - | $    - | $    - |

| | 7 men | | | | 1 week | $   9,346.00 |
|---|---|---|---|---|---|---|

| | | |
|---|---|---|
| Average: | $ | 25.68 |
| TOTAL HOURS | | 1558 |
| Per Man Total | | 223 |
| Duration <> Weeks | | 4.3 |
| Total Dollars | $ | 40,000 |

**Install Requirements:**

| sqs/week | 20.33 |
|---|---|
| sq/wk/man | 2.90 |
| sq/day/man | 0.53 |

**Travel Study**

| Plane Fares | $4,550 | $650 |
|---|---|---|
| Rooms & | 2 rooms <> some at house | |
| Meals | $8,688.21 | $145 |
| | | per day |
| Other | | |
| TOTAL | **$13,238.21** | |

| | Travel $ | | |
|---|---|---|---|
| | Base | $ | 40,000 |
| | Travel $ | $ | - |
| | LABOR ONLY | $ | 40,000 |
| | Yet to Complete | $ | - |
| | For Labor Only | $ | 40,000 |
| | BASE | $ | 40,000 |

| hare of Labor $'s | | Actual | | | | | Actual Pay | |
|---|---|---|---|---|---|---|---|---|
| | | Full | Actual | | | | | |
| Share | Share in $ | Hoully | Hours | | | | | NET PAY |
| 22% | $8,902 | 40.00 | 223.00 | 14% | $1,274 | 22% | $7,628 | $8,902.20 |
| 14% | $5,564 | 25.00 | 223.00 | 14% | $796 | 14% | $4,767 | $5,563.88 |
| 16% | $6,232 | 28.00 | 223.00 | 14% | $892 | 16% | $5,340 | $6,231.54 |
| 13% | $5,119 | 23.00 | 223.00 | 14% | $733 | 13% | $4,386 | $5,118.77 |
| 0% | $0 | 0.00 | | 0% | $0 | 0% | $0 | $0.00 |
| 14% | $5,564 | 25.00 | 223.00 | 14% | $796 | 14% | $4,767 | $5,563.88 |
| 0% | $0 | 0.00 | | 0% | $0 | 0% | $0 | $0.00 |
| 9% | $3,724 | 16.73 | 223.00 | 14% | $533 | 9% | $3,191 | $3,723.52 |
| 12% | $4,896 | 22.00 | 223.00 | 14% | $701 | 12% | $4,195 | $4,896.21 |
| 0% | $0 | 0.00 | | 0% | $0 | 0% | $0 | $0.00 |
| 100% | $40,000 | 179.73 | 1558 | | $5,726 | | $34,274 | $40,000.00 |
| | | | | | $34,274 | | | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS**        **P000058**

2.58

| Hourly | Change from Base | Other Adjustments Adjust for Partial Complete % | Earned | comp | $ | Final Due |
|---|---|---|---|---|---|---|
| $39.92 | 100% | 100% | $ 8,902.20 | $ (0.08) | $ - | $ 8,902.20 |
| $24.95 | 100% | 100% | $ 5,563.88 | $ (0.05) | $ - | $ 5,563.88 |
| $27.94 | 100% | 100% | $ 6,231.54 | $ (0.06) | $ - | $ 6,231.54 |
| $22.95 | 100% | 100% | $ 5,118.77 | $ (0.05) | $ - | $ 5,118.77 |
| #DIV/0! | #DIV/0! | 100% | $ - | #DIV/0! | $ - | $ - |
| $24.95 | 100% | 100% | $ 5,563.88 | $ (0.05) | $ - | $ 5,563.88 |
| #DIV/0! | #DIV/0! | 100% | $ - | #DIV/0! | $ - | $ - |
| $16.70 | 100% | 100% | $ 3,723.52 | $ (0.03) | $ - | $ 3,723.52 |
| $21.96 | 100% | 100% | $ 4,896.21 | $ (0.04) | $ - | $ 4,896.21 |
| #DIV/0! | #DIV/0! | 100% | $ - | #DIV/0! | $ - | $ - |
| | | | $ 40,000.00 | | $ - | $ 40,000.00 |
| | | | | | To Date>>> | $ 40,000.00 |

(Other Adjustments — PREVIOUS PAYMENTS)

$ 8,033.00
$        65.0
           61.5%
           38.5%

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000060

2.60

# Friedberg/Bunge Residence
*Plot #168, Estate Chocolate Hole*



3/31/2025

| Description<br>Labor / Material or Equip. | | Selling<br>Amount |
|---|---|---|
| **1 _General Conditions_** | | |
| Set-up/Mobilize Labor | $ | 2,391 |
| Permits | $ | - |
| Mock Ups | $ | - |
| Mock Up Materials | $ | - |
| Supervision Costs | $ | 3,552 |
| Plane Fares | $ | 5,121 |
| Travel Time (Incl. Mock Ups) | $ | 4,878 |
| Material Handling Equipment    by owner | $ | - |
| Scaffolding Labor | $ | - |
| Scaffolding Equip.    by owner | $ | - |
| Site Logistics | $ | 3,722 |
| Motel & Meal Expense    by owner | $ | - |
| Daily Clean Up | $ | 1,819 |
| Other Material | $ | - |
| Job Close Out/Pack | $ | 1,517 |
| Job Close Out Materials | $ | - |
| **_126  Labor Hours_** | **$** | **22,999** |
| **2 _Roof Prep & Flashings_** | | |
| Roof Tear-off | $ | - |
| Dumpster - Facilities | $ | - |
| Rosin Sheet Dry-in | $ | 2,636 |
| Rosin Sheet | $ | 1,009 |
| Peel & Stick RP 40 Labor | $ | - |
| Peel & Stick Materials | $ | - |
| Eave / Gable Flashing Labor | $ | - |
| 16oz Copper | $ | - |
| Valley Flashings Labor | $ | 3,812 |
| 16oz Copper | $ | - |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000061**

2.61

| | | |
|---|---|---|
| Sidewall Flashing Labor | $ | 3,312 |
| 16oz Copper | $ | - |
| Headwall Flashing Labor | $ | 815 |
| 16 oz. Copper | $ | - |
| Stucco Stop Flashing Labor | $ | - |
| 16 oz. Copper | $ | - |
| Chimneys or Crickets Labor | $ | 5,575 |
| 16 oz. Copper | $ | - |
| **243  Labor Hours** | **$** | **17,159** |

### 3 _Roof Install_

| | | |
|---|---|---|
| Copper Standing Seam | $ | 86,606 |
| Copper Materials | $ | - |
| Material Handling | $ | 3,931 |
| Freight                          by owner | $ | - |
| Pan Forming | $ | 4,333 |
| Copper Materials | $ | - |
| Valley Install (cutting) | $ | 4,812 |
| Valley Install Materials | $ | - |
| Hip Cutting & Forming | $ | 15,406 |
| Hip Cap Materials | $ | 1,574 |
| Ridges Labor | $ | 6,091 |
| Ridge Batten Caps | $ | 1,643 |
| ISO Board Labor | $ | - |
| ISO Board Materials | $ | - |
| Flat Roof Membrane Labor | $ | - |
| Flat Roof Membrane Materials | $ | - |
| Rollers | $ | 4,812 |
| Fasteners & Cleats | $ | 7,738 |
| **1492  Labor Hours** | **$** | **136,946** |
| | | |
| **Total of Sections** | **$** | **177,104** |
| **Add for smaller seams and cleat spacing** | **$** | **10,735** |
| **New Total** | **$** | **187,839** |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000062**

2.62

# Friedberg/Bunge Residence
*Plot #168, Estate Chocolate Hole*

| Description | QTY. | | Waste % Add |
|---|---|---|---|
| **1** *General Conditions* | | | |
| Job Set-up/Mobilize Labor | 3 M/D's | | |
| Permits | 1 permit | | |
| Mock Ups | 0 M/D's | | |
| Mock Up Materials | 0 allowance | | |
| Supervision Costs | 1 M/D's | | |
| Plane Fares | 7 Each | | |
| Travel Time (Incl. Mock Ups) | 7 M/D's | | |
| Material Handling Equipment | 0 Weeks | **BY OWNER** | |
| Scaffolding Labor | 0 M/D's | | |
| Scaffolding Equip. | 0 Mnths Rent | **BY OWNER** | |
| Logistics | 6 M/D's | | |
| Motel & Meal Expense | 0 Rooms | **BY OWNER** | |
| Daily Clean Up | 3 M/D's | | |
| Other Material | 0 Each | | |
| Job Close Out | 2 M/D's | | |
| Job Close Out Materials | 1 | | |
| **126 Labor Hours** | | | |
| | | | |
| **2** *Roof Prep & Flashings* | | | |
| Roof Tear-off | 0 sqs | | |
| Dumpster - Facilities | 0 Ea | | |
| Rosin Sheet Dry-in | 87 sqs | | |
| Rosin Sheet | 87 sqs | | 12% |
| Peel & Stick RP 40 Labor | 0 sqs | | |
| Peel & Stick Materials | 0 sqs | | 30% |
| Eave / Gable Flashing Labor | 0 lft | | |
| 16oz Copper | 0 lft | | 13% |
| Valley Flashings Labor | 116 lft | | |
| 16oz Copper | 116 lft | | 13% |
| Sidewall Flashing Labor | 141 lft | | |
| 16oz Copper | 141 lft | | 13% |
| Headwall Flashing Labor | 13 lft | | |
| 16 oz. Copper | 13 lft | | 13% |
| Stucco Stop Flashing Labor | 153 ea | | |
| 16 oz. Copper | 153 ea | | 13% |
| Chimneys or Crickets Labor | 4 ea | | |
| Vents Materials | 4 allowance | | 13% |
| **196 Labor Hours** | | | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000063**

2.63

**3  _Roof Install_**

| | | | |
|---|---|---|---|
| Copper Standing Seam | 87 | sqs | |
| Copper Materials | 87 | sqs | 17% |
| Material Handling | 7 | M/D's | |
| Freight | 0 | Loads | by owner |
| Fabricate Panels | 87 | lft | |
| Copper Materials | 87 | lft | 7% |
| Valley Install (cutting) | 116 | lft | |
| Valley Install Materials | 116 | lft | 0% |
| Hip Cutting & Forming | 1115 | lft | |
| Hip Cap Materials | 1115 | lft | 9% |
| Ridges Labor | 97 | lft | |
| Ridge Batten Caps | 97 | lft | 9% |
| ISO Board Labor | 0 | sqs | |
| ISO Board Materials | 0 | sqs | 10% |
| Flat Roof Membrane Labor | 0 | sqs | |
| Flat Roof Membrane Materials | 0 | sqs | 10% |
| Rollers | 1 | set | |
| Fasteners | 87 | sqs | |

**1562  _Labor Hours_**

## Sum

**Materials with Sales Tax**
**Travel Time**
**Supervision**
**Project Duration**          _6_
**Gen Labor**
**Motel & Meal**
**Overhead**

**Sub-Total**

**Profit**          _21%_

**87.0** sqs

**#REF!** PER SQ

Date of Bid:  1/15/2010
Today's Date:  3/31/2025

| Install Rate OR M/D BID | | Order Qty Labor | Mat'ls | Labor Unit $ | Mat'l Unit $ | Cost Amount |
|---|---|---|---|---|---|---|
| 1 | | 3.0 M/D's | | 575.89 | | 1,728 |
| | | | 1.0 permit | | 0.00 | 0 |
| 0 | | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 allowance | | 550.00 | 0 |
| 1 | | 1.0 M/D's | | 654.80 | | 655 |
| | | | 7.0 Each | | 565.00 | 4,232 |
| 1 | | 7.0 M/D's | | 575.89 | | 4,031 |
| | | | 0.0 Weeks | | 875.00 | 0 |
| 0 | | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 Mnths Rent | | 750.00 | 0 |
| 1 | | 6.0 M/D's | | 575.89 | | 3,455 |
| | | | 0.0 Rooms | | 90.00 | 0 |
| 1 | | 3.0 M/D's | | 575.89 | | 1,728 |
| | | | 0.0 Each | | 215.00 | 0 |
| 1 | | 2.0 M/D's | | 575.89 | | 1,152 |
| | | | 1.0 allowance | | 350.00 | 375 |
| | | | | | $ | 17,355 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 Ea | | 400.00 | 0 |
| 23 | per day | 3.8 M/D's | | 575.89 | | 2,178 |
| | | | 97.4 sqs | | 8.00 | 834 |
| | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 sqs | | 45.00 | 0 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 lft | | 0.00 | 0 |
| 100 | per day | 1.2 M/D's | | 575.89 | | 668 |
| | | | 131.1 lft | | 0.00 | 0 |
| 33 | per day | 4.3 M/D's | | 575.89 | | 2,461 |
| | | | 159.3 lft | | 0.00 | 0 |
| 75 | per day | 0.2 M/D's | | 575.89 | | 100 |
| | | | 14.7 lft | | 0.00 | 0 |
| 35 | per day | 4.4 M/D's | | 575.89 | | 2,517 |
| | | | 172.9 ea | | 0.00 | 0 |
| 0.5 | per day | 8.0 M/D's | | 575.89 | | 4,607 |
| | | | 4.5 allowance | | 0.00 | 0 |
| | | | | | $ | 13,366 |

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000065

2.65

| | | | | | |
|---|---|---|---|---|---|
| 0.7 | per day | 124.3 M/D's | 575.89 | | 71,576 |
| <= for seams | | 101.8 sqs | | 0.00 | 0 |
| 1 | | 7.0 M/D's | 575.89 | | 4,031 |
| | | 0.0 Loads | | | 0 |
| 11.2 | per day | 7.8 M/D's | 575.89 | | 4,473 |
| | | 93.1 lft | | 0.00 | 0 |
| 45 | per day | 2.6 M/D's | 575.89 | | 1,485 |
| | | 116.0 lft | | 0.00 | 0 |
| 45 | per day | 24.8 M/D's | 575.89 | | 14,269 |
| | | 1215.4 lft | | 1.00 | 1,300 |
| 45 | per day | 2.2 M/D's | 575.89 | | 1,241 |
| | | 105.7 lft | | 12.00 | 1,358 |
| 0 | per day | 0.0 M/D's | 575.89 | | 0 |
| | | 0.0 lft | | 110.00 | 0 |
| 0 | per day | 0.0 M/D's | 575.89 | | 0 |
| | | 0.0 lft | | 125.00 | 0 |
| 0.2 | per day | 5.0 M/D's | 575.89 | | 2,879 |
| | | 87.0 sqs | | 31.98 | 2,977 |

|  | $ | **105,590** |
|---|---|---|
|  | $ | 136,311 |

## mary of Hard Costs

| | | | | $ | 11,076 | |
|---|---|---|---|---|---|---|
| 63 | Man Hours | @ $ 32.88 | | $ | 2,071 | |
| 9 | Man Hours | @ $ 41.65 | | $ | 375 | |
| men | 35 | Days | | | | |
| 1884 | Man Hours | @ $ 32.88 | | $ | 61,941 | $ 40,000 |
| 1956 | **Total Hours** | @ $ 4.69 | | $ | 9,182 | |
| 1956 | **Total Hours** | @ $ 26.42 | | $ | 51,666 | |
| | | Labor @ | $ 63.99 | $ | 136,311 | |
| | | | 13.44 | $ | 28,625 | **102,232.24** |
| | | Labor @ | $ 77.43 | $ | **164,936** | |
| | | | | | **#REF!** | |
| | | | TOTAL | | **#REF!** | |
| | | | al Quote | | **#REF!** | |

| Selling Amount | With General Conditions | | COST (Labor w/OH) | |
| --- | --- | --- | --- | --- |
| | LABOR (With Labor carrying all of GC's) | Mat'ls Selling | LABOR | MATERIALS |
| $ 2,090 | | | $ 888 | |
| $ - | | | | $ - |
| $ - | | | $ - | |
| $ - | | | | $ - |
| $ 792 | | | $ 296 | |
| $ 5,121 | | | | $ 4,232 |
| $ 4,878 | | | $ 2,071 | |
| $ - | | | $ - | |
| $ - | | | | $ - |
| $ 4,181 | | | $ 1,775 | |
| $ - | | | | $ - |
| $ 2,090 | | | $ 888 | |
| $ - | | | | $ - |
| $ 1,394 | | | $ 592 | |
| $ 453 | | | | $ 375 |
| **$ 20,999** | | | | |

| Selling Amount | LABOR | % | Mat'ls Selling | LABOR | MATERIALS |
| --- | --- | --- | --- | --- | --- |
| $ - | $ - | 0% | $ - | $ - | |
| $ - | $ - | | | | $ - |
| $ 2,636 | $ 3,043 | 2% | $ 2,636 | $ 1,119 | |
| $ 1,009 | $ 1,009 | | | | $ 834 |
| $ - | $ - | 0% | $ - | $ - | |
| $ - | $ - | | | | $ - |
| $ - | $ - | 0% | $ - | $ - | |
| $ - | $ - | | | | $ - |
| $ 808 | $ 933 | 1% | $ 808 | $ 343 | |
| $ - | $ - | | | | $ - |
| $ 2,977 | $ 3,437 | 2% | $ 2,977 | $ 1,264 | |
| $ - | $ - | | | | $ - |
| $ 121 | $ 139 | 0% | $ 121 | $ 51 | |
| $ - | $ - | | | | $ - |
| $ 3,046 | $ 3,516 | 2% | $ 3,046 | $ 1,294 | |
| $ - | $ - | | | | $ - |
| $ 5,575 | $ 6,435 | 4% | $ 5,575 | $ 2,367 | |
| $ - | $ - | | | | $ - |
| **$ 16,172** | | | | | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000067**

2.67

| | | | | | | | |
|---|---|---:|---|---:|---|---:|---:|
| $ | 86,606 | | $ | 99,968 | 64% | $ | 86,606 | $ | 36,777 | | |
| $ | - | | $ | - | | | | | | $ | - |
| $ | 4,878 | | $ | 5,630 | 4% | $ | 4,878 | $ | 2,071 | $ | - |
| $ | - | | $ | - | | | | | | $ | - |
| $ | 5,413 | | $ | 6,248 | 4% | $ | 5,413 | $ | 2,299 | $ | 0 |
| $ | 1,796 | | $ | 2,073 | 1% | $ | 1,796 | $ | 763 | | |
| $ | - | | $ | - | | | | | | $ | - |
| $ | 17,266 | | $ | 19,930 | 13% | $ | 17,266 | $ | 7,332 | | |
| $ | 1,574 | | $ | 1,574 | | | | | | $ | 1,300 |
| $ | 1,502 | | $ | 1,734 | 1% | $ | 1,502 | $ | 638 | | |
| $ | 1,643 | | $ | 1,643 | | | | | | $ | 1,358 |
| $ | - | | $ | - | 0% | $ | - | $ | - | | |
| $ | - | | $ | - | | | | | | $ | - |
| $ | - | | $ | - | 0% | $ | - | $ | - | | |
| $ | - | | $ | - | | | | | | $ | - |
| $ | 3,484 | | $ | 4,022 | 3% | $ | 3,484 | $ | 1,480 | | |
| $ | 3,602 | | $ | 3,602 | | | | | | $ | 2,977 |
| **$** | **127,764** | | **$** | **164,936** | | **$** | **136,109** | **$** | **61,941** | **$** | **11,076** |
| $ | 164,936 | | $ | 186,709 | | | | | | | |
| $ | 28,091 | | $ | 21,773 | | | | | | | |
| $ | - | | $ | - | | | | | | | |
| $ | 214,800 | | | | | | | | | | |

214800

| Coils | | pallet weight | NET | should be |
|---|---|---|---|---|
| 1 | 854 lbs | 25 | 829 | 1139 |
| 2 | 1092 lbs | 25 | 1067 | |
| 3 | 1084 lbs | 25 | 1059 | |
| 4 | 1044 lbs | 25 | 1019 | |
| 5 | 1090 lbs | 25 | 1065 | |
| 6 | 616 lbs | 25 | 591 | |
| 7 | 1080 lbs | 25 | 1055 | |
| 8 | 698 lbs | 25 | 673 | |
| | 7558 lbs | 200 | 7358 | |
| | | | 7,803 | |
| | | | 445 | |
| | | $4.15 | $1,847 | |

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000069

2.69

**HUBER AND ASSOCIATES**
496 SW Ring Court
Lake City, FL 32025
Phone:      386-487-1040
Fax:         386-755-3233
Email:rb@huberandsociates.com



## EXTRA MATERIALS, WORK & EXPENSES

### Job Information:

Friedberg/Bunge

| Qty | Type | Material | Description | Pounds of Copper | |
|---|---|---|---|---|---|
| 140 | LFT | 20 oz Copper | Valley - 24" | 350 | |
| 1340 | LFT | 16 oz Copper | Batten Cap - 1 1/4 x 1/4 x 1 1/4 | 308 | |
| 170 | LFT | 16 oz Copper | Counter Flashing - 10' - 5"x 5" | 354 | |
| 130 | LFT | 16 oz Copper | Solder Cleat | 33 | |
| 350 | Pc | 16 oz Copper | 2" x 4" Flat Clips | 19 | |
| 9000 | Pcs | 16 oz Copper | 2" Cleats | 500 | |
| 14 | Pcs | 16 oz Copper | 3 x 10 Sheets | 420 | |
| | | | Less 3' coils stock provided by other roofer | (1,115) | |
| | | | Total pounds of Extra Flashing | 869 | |
| | | | @ $4.10/# (average cost) | $      4,546.90 | Billed Inv #1637 |
| 8 | Pcs | 16 oz copper | 3x10 sheets - Sent Wednesday 7/7 @ 4.10/# | $       984.00 | This Billing |
| **Hours** | **Type** | **Material** | **Description** | **@ $63.35/hour** | |
| 40.5 | Panel Install | 16 oz. copper | Change flat roof to pitched copper roof | 2,566 | Billed Inv #1637 |
| 4 | Eave Labor | 16 oz. copper | Help Chris Bunge install eave drip edge | 253 | Billed Inv #1637 |
| 24 | Copper Boots | 16 oz. copper | Change vent boots to copper | 1,520 | Billed Inv #1637 |
| 12 | Copper Add | 16 oz. copper | Add copper flashing below each boot | **760** | This Billing |
| | | | | $      5,099.68 | |
| | **Expense Type** | **Dates** | **Description** | **Extension** | |
| | Food & Meals | 6/9/10-6/25/10 | Reciept total to this date | $      2,795.94 | Billed Inv #1637 |
| | Fuel for Big Blue | 6/9/10-6/25/10 | Intraisland transportation | $        105.00 | Billed Inv #1637 |
| | Lodging | 6/9/10-6/25/10 | None - Paid by Mr. Friedberg | | |
| | Lodging | 6/30/10-7/10/10 | 9 Nights at $100.00 | $        900.00 | This Billing |
| | Food & Meals | 6/30/10-7/10/10 | Approximate Reciept total to this date | $      1,564.95 | This Billing |
| | Fuel for Big Blue | 6/30/10-7/10/10 | Intraisland transportation | $         55.00 | This Billing |
| | | | | $      5,420.89 | |
| | | | | **Totals** | |
| | | | Extra Materials, Work and Expenses as noted above | $     15,067.47 | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000070**

2.70

Seller/Shipper:

# HUBER AND ASSOCIATES

496 SW RING COURT
LAKE CITY, FL 32025

## HUBER & ASSOCIATES

| | |
|---|---|
| Phone: | 386-487-1027 |
| Fax: | 386-755-3233 |
| E-mail: | rb@huberandassociates.com |
| | bh@huberandassociates.com |

## COMMERCIAL INVOICE

| | | | |
|---|---|---|---|
| Statement #: | 105 | Bill To / Consignee: | Cruz Bay, St. John Island |
| Date: | March 31, 2025 | | Law Offices of Friedberg & Bunge |
| Customer ID: | not applicable | c/o | Micah Cady of Huber and Assoiates |
| Document #: | | | 5000 Estate Enighed, PMB 158 |
| BOOKING #: | 9614309 | | St. John, USVI  00830 |

**Goods of US Origin**

| Qty | Type | Description | | per item | Amount |
|-----|------|-------------|---|----------|--------|
| | | | | | $          - |
| | | | | | $          - |
| 2 | | 18" Rolls of Copper - 16 oz. - Made in USA | | $ 4,100.00 | $   8,200.00 |
| 1 | | 20" Rolls of Copper - 16 oz. - Made in USA | | $ 4,326.00 | $   4,326.00 |
| | | | | | $          - |
| | | OCEAN FREIGHT PRE-PAID | | | $          - |
| | | | | | $          - |
| | | INSURE CARGO | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | | $          - |
| | | | | **Total** | $   12,526.00 |

**Reminder:** Please include the statement number on your check.

**Terms:** Balance due in 30 days.

F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000071

2.71

| ☐ | Pre-made Flashings | | | | |
|---|---|---|---|---|---|
| | | | Valley Metal | See Work Order | |
| | | | Batten Caps | See Work Order | |
| | | | Counter flashing | See Work Order | |
| | | | Solder Cleat | See Work Order | |
| | | | Flat Cleats | See Work Order | |
| | | | 2" COPPER Cleats | See Work Order | |
| ☐ | Sheet Stock - cut from 36" Coil | | | See Work Order | |
| ☐ | Drills | | | | |
| | | 1 | Hammer Drill | | Stock |
| | | 4 | Impacts | | ??? |
| | | 2 or 3 | Reg. Drills | | Stock |
| ☐ | Scaffolding | | | | |
| | | 8 | end frames | | Stock |
| | | 6 | cross braces | | Stock |
| ☐ | Sheet Metal Tools | | | | |
| | | | Break | 10' Heavy One | Stock |
| | | | Deck Tongs | | Stock |
| | | | Misc tongs | | Stock |
| ☐ | Rivet tool | | 2 | | 1 Stock/1 Home Depot |
| ☐ | First and second stage hand seamers | | | | 1st Stage Stock/2nd stage check with Jamin |
| ☐ | Power Seamer- | | | | New in stock - check with Jamin if renting |
| ☐ | Caulk | 48 tubes Sikaflex - Med Bronze | **UPS Today** | | Costal |
| ☐ | Screws - SS | 20,000 | 15000 stock/5000 UPS Today | | ESE Machines |
| ☐ | Diamond blades for grinder | | 2 pieces | | **Home Depot** |
| ☐ | 1/4" Masonary Drill Bits | | 5 | | **Home Depot** |
| ☐ | 3/16" Masonary Drill Bits | | 5 | | **Home Depot** |
| ☐ | Duck bill vice grips | | | | **Home Depot** |
| ☐ | Needle nose vice grips | | | | **Home Depot** |
| ☐ | Mapp gas | 2 Tanks - Peter has torch | | | **Home Depot** |
| ☐ | Metric and American Allen Wrench Sets | | | | **Home Depot** |
| ☐ | Downspout crimper | | | | **Home Depot?** |
| ☐ | Rivets | | 1,500 | | Hub Industrial |
| ☐ | 1/8 bit | | 24 | | Hub Industrial |
| ☐ | #2 SQ Drives | | 10 | | Hub Industrial |
| ☐ | #2 Phil Drives | | 10 | | Hub Industrial |
| ☐ | Lead Anchors | | 1/4 x 1 1/2 | | Hub Industrial |
| ☐ | First Aid Kit | | | | Hub Industrial |
| ☐ | Grinder - small - 4.5" | | | | Stock |
| ☐ | Lead Anchors | | 1/4 x 1 | | Stock |
| ☐ | Extension Cords | | | | Stock |
| ☐ | Solder | | 50 Lbs | | Stock |
| ☐ | Snips | | | | Stock |
| ☐ | Acetelyene Set-up | | | | Stock |
| ☐ | Power sheers | | | | Stock |
| ☐ | Clips - Copper | 9,000 | pcs | | Stock |
| ☐ | Vice Grip C-clamps | | | | Stock |
| ☐ | Saw Horse | | | | Stock |
| ☐ | Anvil | | | | Stock |
| ☐ | Broom | | | | Stock |
| ☐ | Flux | | | | Stock |
| ☐ | Flux Brushes | | | | Stock |
| ☐ | Pan Formers - with new rollers | | | | Stock |
| ☐ | Copper Nails | | 10 lbs | | Stock |
| ☐ | 15" plywood ladders | | | | Stock/Make |

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000072

2.72

59511 (7-15)

12-0170-00
W L HUNTER INSURANCE AGENCY LLC
PO BOX 1827
LAKE CITY  FL  32056-1827



LIFE · HOME · CAR · BUSINESS

P.O. BOX 30660 · LANSING, MICHIGAN 48909-8160

Southern-Owners Insurance Company

06-12-2018

DAYBREAK INC HUBER & ASSOCIATES
DBA CUSTOM CEDAR SOLUTIONS H&A
ROOFING
186 SW RING CT
LAKE CITY  FL  32025-9726

**Remember**, you can view your policy, pay your bill or change your paperless options any time online, at **www.auto-owners.com**.  If you have not already enrolled your policy, you may do so using policy number **184622-78009727-18** and Personal ID Code (PID) **3C5 N5C 28N**.

Your agency's phone number is 386-752-6990.

RE:  Policy 184622-78009727-18

Thank you for selecting Auto-Owners Insurance Group to serve your insurance needs!  Feel free to contact your independent Auto-Owners agent with questions you may have.

Auto-Owners and its affiliate companies offer a variety of programs, each of which has its own eligibility requirements, coverages and rates.  In addition, Auto-Owners also offers many billing options.  Please take this opportunity to review your insurance needs with your Auto-Owners agent, and discuss which company, program, and billing option may be most appropriate for you.

Auto-Owners Insurance Company was formed in 1916.  The Auto-Owners Insurance Group is comprised of five property and casualty companies and a life insurance company.  Our A++ (Superior) rating by A.M. Best Company signifies that we have the financial strength to provide the insurance protection you need.

*~ Serving Our Policyholders and Agents Since 1916  ~*

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000073**

2.73

Agency Code : 12-0170-00                                    Policy Number : 184622-78009727

14019 (10-16)

# YOUR INSURANCE AUDIT - HOW TO SAVE TIME AND MONEY

### WHAT IS AN INSURANCE AUDIT?

Insurance audits are typically performed on commercial insurance policies providing auto, general liability, garage liability, umbrella and workers compensation coverages. When these polices are issued, you are asked to pay an estimated premium. Estimated premiums are based on the nature of your business and your estimate of exposures (i.e., payroll, sales, etc.) for the policy period.

Once your policy expires, we conduct an audit to collect information on actual exposures and operations. From this information, we determine the final earned premium. Premium adjustments are then determined by comparing audited exposures and operations with the original policy estimates.

### WHAT RECORDS ARE NEEDED FOR THE AUDIT?

Good record keeping is important to the audit process. Accurate records provide and confirm information, save time and minimize your insurance costs. The premium auditor will let you know which of the following records will be needed for your audit when the audit appointment is made.

- PAYROLL RECORDS include payroll journal and summary, federal tax reports (941's), state unemployment reports and individual earnings records. Totals should be kept for overtime when applicable.
- EMPLOYEE RECORDS include the number of employees and hours, days or weeks worked annually.
- SALES JOURNAL includes all goods or products sold, rented and/or distributed as well as service, repair and installation. Sales or excise taxes collected separately and submitted to the government need to be identified in order to be excluded.
- CHECK REGISTER and CASH DISBURSEMENTS show payments to subcontractors, material costs and payments for casual labor.
- CERTIFICATES OF INSURANCE show the subcontractors used during the policy period for construction, erection and/or repair for general liability and workers compensation insurance coverages. They are also used for commercial automobile hired auto coverage.
- INCOME STATEMENTS include subcontracted labor costs and payroll amounts.

### WHEN AND HOW WILL THE AUDIT BE DONE?

We will collect audit information from you shortly after your policy expires. Smaller, less complex policies may only require that you assemble and send the necessary information to us, or have the information available when a telephone auditor calls.

Larger and more complicated policies are handled by a field auditor, who will schedule an appointment with you shortly after the policy expires.

If you must change or cancel a scheduled appointment, please contact the auditor as far in advance as you can. It is best to schedule and complete this audit within 30 days from your policy expiration date. It is important for the auditor to ask questions about your operations. If you cannot be present to answer questions, someone familiar with the specifics of your entire business operations should be available. If you direct us to your accountant, we will obtain as much information as possible from your accountant and contact you with additional questions.

Most of our audits take a half hour or less, but audits of larger policies may take longer. Though the auditor will have a number of questions, you will not have to be directly involved during the entire audit if adequate records are available.

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000074

2.74

## HOW CAN YOU SAVE MONEY?

There are several ways you can save on premium dollars depending on the type of business and coverages you have. Not all of the following may apply to your particular business.

- PAYROLL DIVISION - A single employee's payroll can be divided, except when the employee works in a clerical, sales, drafting or driving position.  Proper records must be kept in dollar amounts that reflect work actually performed before a breakdown can be applied.  Without adequate records, the entire payroll for the employee must be placed in the highest rated classification.
- EMPLOYEE TIPS - Tips declared by employees may be excluded from their gross payroll only if separately identified.  Amounts added to customer's bills, such as service charges, which are collected by you and disbursed to your employees are not excludable.
- CERTIFICATES OF INSURANCE - Have certificates available for the audit at your premises (or your accountant's) to ensure that charges are not made unnecessarily.  It is best to obtain a certificate of insurance prior to a subcontractor performing work for you.  Certificates must cover the period when the subcontractor worked for you.  This may require certificates covering two different policy terms for the subcontractor.
- DRIVERS - (For general liability coverage), employees with the sole responsibility of driving may often be excluded from chargeable payroll, if their wages are shown separately.  However, employees who perform other duties besides driving must be placed in the highest rated class describing their duties.
- COST OF HIRE is commonly used on commercial automobile policies as a premium basis for hired auto coverage.  This includes automobiles and trailers used under contract on behalf of or loaned to the named insured, which may include rental units as well as subcontracted hauling for the insured.

Your business is unique.  If you have questions about how your specific circumstances will affect savings, please contact your insurance agent.

## BASIC DEFINITIONS

- REMUNERATION is commonly called payroll, but can include items not normally part of payroll, or exclude items which are part of payroll.  It includes wages, the value of meals and lodging, and other substitutes for money. (Substitutes for money include draws, dividends, traveling expenses and travel time payments, gift certificates or merchandise credits, annuities, and contributions to individual retirement accounts.  This list is not all inclusive but represents common substitutes for money.)  Your premium auditor will discuss this with you at the time of your audit.

- OVERTIME is the hours worked for which there is an increase in the rate of pay. It includes:

1. Work in excess of 8 hours per day, or 40 hours per week.
2. Work on Saturdays, Sundays or holidays.
3. Work in any day or week, in excess of a guaranteed wage agreement.
4. Ordinarily, overtime pay is equal to 1 1/2 times the regular hourly rate.  For example, a regular pay rate of $10 per hour at time and a half generates a $15 per hour overtime rate.  If the extra $5 of pay is shown separately, it is excluded in total.  If total overtime wage is shown in in a combined amount of $15 (regular pay plus increase) and included in gross payroll,  one third ($5) will be deducted from gross pay.  If the overtime wage is calculated at double time, one half will be deducted from gross pay.
5. Extra pay for shift differential is not considered overtime.

- GROSS SALES is the gross amount charged by you or others trading under your name for all goods or products sold or distributed, operations performed and rentals.  Some deductions from gross sales include sales or excise tax, returns and allowances and finance charges for items sold on installment.

  SUBCONTRACTOR is often used interchangeably with "independent contractor".  We ordinarily apply the definition to subcontractors performing construction, erection or structural alteration for a general contractor. Most workers compensation laws hold you responsible for employees of an uninsured subcontractor.  In some states, they may extend to an uninsured subcontractor without employees, if an employee-employer relationship

F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000075

2.75

can be established. A liability policy will also include a charge for subcontractors as though they were your employees if there is no certificate showing evidence of insurance. Subcontractors can easily obtain a certificate of insurance through their insurance agent.

- TOTAL COST is the cost of all work let or sublet in connection with each specific project including:
  1. The cost of all labor, materials and equipment furnished, used, or delivered for use in the execution of the work.
  2. All fees, bonuses or commissions made, paid or due.
  3. The rates apply per $1,000 of total cost.

### COMMONLY ASKED QUESTIONS

Q: Why is an audit necessary?
A: To calculate the exact amount of premium you will be charged. Actual exposures and operations are determined by an audit. After they are compared with initial estimates and later endorsements, a final audit premium is determined.
Q: If overtime is not summarized, will I still get credit?
A: Overtime records must show overtime pay separately by employee or classification or it will not be deducted.
Q: If I do not have certificates of insurance from subcontractors for the audit, will I be able to get them?
A: It is in your best interest to request a certificate from a subcontractor prior to the work being performed, rather than at the time of audit. You will be charged for employees of those subcontractors not providing certificates as though they were your employees.
Q: Several of my employees do more than one type of work. How should I assign their payrolls?
A: Payrolls may be divided into appropriate classifications, provided the division is reflected on the original records in dollar amounts.
Q: Some of my work could be considered clerical and sales. Should I separate it?
A: The clerical and sales classifications cannot be used with any any other class for division of a single employee's payroll
Q: Is it necessary to provide audit information if my renewal policy has been canceled?
A: Yes, policies are issued using estimated payroll or sales. Actual payroll or sales needs to be known to determine if additional premium is due the company, or a return premium is due the policyholder.

In some states, a surcharge may be applied to the workers compensation policy for failure to comply with the audit process.

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000076

2.76

55081 (8-88)

# AVAILABILITY OF RISK MANAGEMENT PLAN - FLORIDA

The Florida Tort Reform and Insurance Act of 1986 requires insurance companies to make available to commercial casualty and commercial property policyholders guidelines for risk management plans.

Risk management guidelines include the following:

A. Safety measures, including, as applicable, the following areas:

    1. Accidental occurrences;
    2. Fire hazards and fire prevention and detection;
    3. Liability for acts from the course of business;
    4. Slip and fall hazards; and
    5. Product injury.

B. Training to insureds in safety management techniques.

C. Safety management counseling services.

Risk Management Plan guidelines are available at your request. If you desire this service, please contact your agent for assistance in completing the request.

55081 (8-88)             Page 1 of 1

---

55531 (6-11)

# NOTICE OF CHANGE IN POLICY TERMS
### YOUR SUBCONTRACTED WORK

Dear Policyholder,

Your policy has a subcontracted work classification. The subcontracted work classification requires that your sub-contractors are "adequately insured contractors". We define an "adequately insured subcontractor" to be a subcontractor who carries commercial general liability insurance.

If your subcontractors are not "adequately insured subcontractors", they will be classified and rated as your employees and charged a premium which best describes their work. This classification procedure will result in a substantial additional premium charge to you at final audit.

We suggest that you take immediate steps to qualify your subcontractors as "adequately insured subcontractors" to avoid any additional premium charges at final audit.

If you have any questions, please contact your Auto-Owners Insurance agency.

55531 (6-11)             Page 1 of 1

F&B v. DAYBREAK - DEPOSITION EXHIBITS     P000077

Agency Code : 12-0170-00                                          Policy Number : 184622-78009727

59242 (6-00)

**Florida**
## POLICYHOLDER INFORMATION AND ASSISTANCE

We are here to serve you and as our policyholder your satisfaction is very important to us.  Should you have any questions or a complaint regarding your policy that cannot be resolved by your agent, you may contact our Tallahassee Regional Office for information and assistance by calling 850-216-3180.

Auto-Owners Insurance Company
Owners Insurance Company
Southern-Owners Insurance Company

59242 (6-00)                                                          Page 1 of 1

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000078

2.78

# *Tailored Protection Insurance Policy*

**Southern-Owners Insurance Company**

In witness whereof, we, the Southern-Owners Insurance Company, have caused this policy to be issued and to be duly signed by our President and Secretary.

Secretary                              President

55156 (7-12)

F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000080

# Southern-Owners

Page  1

Issued    06-12-2018

INSURANCE COMPANY
6101 ANACAPRI BLVD., LANSING, MI 48917-3999

**TAILORED PROTECTION POLICY DECLARATIONS**

AGENCY    W L HUNTER INSURANCE AGENCY LLC
12-0170-00          MKT TERR 055          386-752-6990

New Business Effective    06-01-2018
**POLICY NUMBER    184622-78009727-18**
Company Use          78-46-FL-1806

INSURED    DAYBREAK INC HUBER & ASSOCIATES
DBA CUSTOM CEDAR SOLUTIONS H&A
ROOFING
ADDRESS    186 SW RING CT

LAKE CITY  FL  32025-9726

Company
Bill

| **Policy Term** | |
|---|---|
| 12:01 a.m. | 12:01 a.m. |
| 06-01-2018 | 06-01-2019 |

to

55039 (11-87)

<table><tr><td colspan="2" align="center">COMMON POLICY INFORMATION</td></tr></table>

**Business Description:**    Roofing Contractor

**Entity:**    Corporation

**Program:**    Contractors  Office

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PART(S): | PREMIUM |
|---|---|
| COMMERCIAL GENERAL LIABILITY COVERAGE | $45,609.00 |
| COMMERCIAL INLAND MARINE COVERAGE | $2,109.00 |
| SURTAX | $45.60 |
| FLORIDA EMERGENCY TRUST FUND SURCHARGE | $4.00 |
| **TOTAL** | **$47,767.60** |
| **PAID IN FULL DISCOUNT** | **$4,593.44** |
| **TOTAL POLICY PREMIUM IF PAID IN FULL** | **$43,174.16** |

**THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**
The Paid in Full Discount does not apply to fixed fees, statutory charges or minimum premiums.

Premium shown above for commercial general liability coverage is an advanced premium deposit and may be subject to audit.

Forms that apply to all coverage part(s) shown above (except garage liability, dealer's blanket, commercial automobile, if applicable):
IL0017 (11-85)    55156 (07-12)

A 12% Cumulative Multi-Policy Discount applies.  Supporting policies are marked with an (X):
Comm Umb(X)  Comm Auto(X)  WC( )  Life(X)  Personal( )  Farm( ).

A merit rating plan factor of 0.90 applies.

Countersigned By:  W L HUNTER INSURANCE AGENCY LLC

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000081**

2.81

Southern-Owners Ins. Co.                                                          Issued          06-12-2018

AGENCY   W L HUNTER INSURANCE AGENCY LLC                    Company    POLICY NUMBER   184622-78009727-18
         12-0170-00          MKT TERR 055                   Bill                                 78-46-FL-1806

INSURED   DAYBREAK INC HUBER & ASSOCIATES                               Term   06-01-2018  to  06-01-2019

55040 (11-87)

| COMMERCIAL GENERAL LIABILITY COVERAGE |
|---|

| COVERAGE | LIMITS OF INSURANCE |
|---|---|
| General Aggregate | $2,000,000 |
| (Other Than Products-Completed Operations) | |
| Products-Completed Operations Aggregate | $2,000,000 |
| Personal Injury and Advertising Injury | $1,000,000 |
| Each Occurrence | $1,000,000 |
| **COMMERCIAL GENERAL LIABILITY PLUS ENDORSEMENT** | |
| Damage to Premises Rented to You | $300,000  Any One Premises |
| (Fire, Lightning, Explosion, Smoke or Water Damage) | |
| Medical Payments | $10,000  Any One Person |
| Hired Auto & Non-Owned Auto | $1,000,000  Each Occurrence |
| Expanded Coverage Details See Form: | |
|   Extended Watercraft | |
|   Personal Injury Extension | |
|   Broadened Supplementary Payments | |
|   Broadened Knowledge Of Occurrence | |
|   Additional Products-Completed Operations Aggregate | |
|   Blanket Additional Insured - Lessor of Leased Equipment | |
|   Blanket Additional Insured - Managers or Lessors of Premises | |
|   Newly Formed or Acquired Organizations Extension | |
|   Blanket Waiver of Subrogation | |

Twice the "General Aggregate Limit", shown above, is provided at no additional charge for each 12 month period in accordance with form 55300.

**AUDIT TYPE:**  Annual Audit

Forms that apply to this coverage:
```
59350   (01-15)     55146   (06-04)     55189   (09-04)     55238   (06-04)     55592   (02-14)
55091   (10-08)     55371   (01-07)     55531   (06-11)     IL0021  (07-02)     55296   (09-09)
55637   (09-14)     55300   (07-05)     CG0220  (03-12)     IL0017  (11-85)     55513   (11-11)
55719   (11-15)     55718   (11-15)     55373   (01-07)     55200   (06-96)
```

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000082**

2.82

Southern-Owners Ins. Co.                                                        Issued      06-12-2018

AGENCY   W L HUNTER INSURANCE AGENCY LLC                Company     **POLICY NUMBER**   **184622-78009727-18**
         12-0170-00          MKT TERR 055               Bill                            78-46-FL-1806

INSURED   DAYBREAK INC HUBER & ASSOCIATES                          Term   06-01-2018  to  06-01-2019

---

### LOCATION 0001  -  BUILDING 0001

**Location:**  186 Sw Ring Ct, Lake City, FL 32025-9726
**Territory:**  006                          **County:**  Columbia

| CLASSIFICATION | CODE | SUBLINE | PREMIUM BASIS | RATE | PREMIUM |
|---|---|---|---|---|---|
| Commercial General Liability Plus Endorsement Included At 7.5% Of The Premises Operation Premium | 00501 | Prem/Op | Prem/Op Prem Included | Included | Included |
| Amendment Of Location & Project Aggregate Limits Of Insurance Endorsement Included At 2% Of The Premises Operations Premium | 00502 | | Prem/Op Prem | | |
| Contractors - Subcontracted Work - In Connection With Construction, Reconstruction, Repair Or Erection Of Buildings | 91585 | Prem/Op Prod/Comp Op | Total Costs 200,000 200,000 | Each 1000 .623 1.413 | $125.00 $283.00 |
| Roofing - Residential Three Stories And Under | 98678 | Prem/Op Prod/Comp Op | Payroll $600,000 $600,000 | Each 1000 41.837 31.643 | $25,102.00 $18,986.00 |
| Additional Interests | 49950 | | | | |
| Blanket Add'L Insured - O/L/C | | Prod/Comp Op | Flat Charge | | $550.00 |

| COMMERCIAL GENERAL LIABILITY COVERAGE - LOCATION 0001 SUMMARY | PREMIUM |
|---|---|
| TERRORISM - CERTIFIED ACTS    SEE FORM: 59350 | $450.00 |
| **LOCATION 0001** | **$45,496.00** |

---

### LOCATION 0002  -  BUILDING 0001

**Location:**  184 Sw Ring Ct, Lake City, FL 32025-9726
**Territory:**  006                          **County:**  Columbia

| CLASSIFICATION | CODE | SUBLINE | PREMIUM BASIS | RATE | PREMIUM |
|---|---|---|---|---|---|
| Buildings Or Premises - Bank Or Office - Mercantile Or Manufacturing- Maintained By The Insured (Lessor's Risk Only) (For-Profit) | 61217 | Prem/Op Prod/Comp Op | Area 5,000 5,000 | Each 1000 22.221 .213 | $111.00 $1.00 |

| COMMERCIAL GENERAL LIABILITY COVERAGE - LOCATION 0002 SUMMARY | PREMIUM |
|---|---|
| TERRORISM - CERTIFIED ACTS    SEE FORM: 59350 | $1.00 |
| **LOCATION 0002** | **$113.00** |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000083**

Page   4

Southern-Owners Ins. Co.

| | Issued | 06-12-2018 |
|---|---|---|

AGENCY    W L HUNTER INSURANCE AGENCY LLC
12-0170-00              MKT TERR 055

Company    **POLICY NUMBER    184622-78009727-18**
Bill                                              78-46-FL-1806

INSURED    DAYBREAK INC HUBER & ASSOCIATES

Term   06-01-2018   to   06-01-2019

16198 (07-87)

| **COMMERCIAL INLAND MARINE COVERAGE** |
|---|

16436 (12-06)

| **PREMIER CONTRACTORS INLAND MARINE PLUS COVERAGE PACKAGE** |
|---|

The coverages indicated below apply anywhere in the coverage territory.  The limit for each coverage is the maximum amount available regardless of the number of locations.

| COVERAGE | LIMIT | DEDUCTIBLE |
|---|---|---|
| BUILDING MATERIALS AND INSTALLATION PROPERTY | $50,000 | $500 |
| ELECTRONIC DATA PROCESSING EQUIPMENT | $30,000 WITH A $2,500 MAXIMUM LIMIT PER LAPTOP COMPUTER | $500 |
| CONTRACTORS EQUIPMENT AND TOOLS | $50,000 WITH A $2,500 MAXIMUM LIMIT PER TOOL | $500 |
| RENTAL REIMBURSEMENT AND EXTRA EXPENSE FOR CONTRACTORS EQUIPMENT | $1,000 PER DAY/$4,000 MAXIMUM | $500 |

Forms that apply to this coverage package:
16431  (12-06)    16432  (07-11)    16434  (12-06)    16435  (07-11)

**COINSURANCE CONTRACT** - The rate charged in this policy is based upon the use of the coinsurance clause attached to this policy, with the consent of the insured.

**COVERAGES PROVIDED**

Insurance applies to covered property for which a limit of insurance is shown.

Forms that apply to Inland Marine:
59350  (01-15)    16080  (08-86)    55081  (08-88)    16566  (12-14)    16431  (12-06)
16432  (07-11)    16434  (12-06)    16435  (07-11)

| **LOCATION 0001  -  BUILDING 0001** |
|---|

**Location:**  186 Sw Ring Ct, Lake City, FL 32025-9726

**Rating Information for CONTRACTORS EQUIPMENT**
Territory: 012                                County: Columbia
Program: Contractors                    Rate Class: 3

| COVERAGE | COINSURANCE | DEDUCTIBLE | LIMIT | RATE | PREMIUM |
|---|---|---|---|---|---|
| CONTRACTORS EQUIPMENT CONTRACTOR EQUIPMENT - SPECIAL FORM | | | | | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000084**

2.84

Southern-Owners Ins. Co.

Issued    06-12-2018

AGENCY   W L HUNTER INSURANCE AGENCY LLC
12-0170-00          MKT TERR 055

Company Bill     POLICY NUMBER   **184622-78009727-18**
78-46-FL-1806

INSURED   DAYBREAK INC HUBER & ASSOCIATES

Term   06-01-2018   to   06-01-2019

| COVERAGE | COINSURANCE | DEDUCTIBLE | LIMIT | RATE | PREMIUM |
|---|---|---|---|---|---|
| 1. TELESCOPIC HANDLER - FORK<br>Th63/Catepillar<br>Serial #: 5WN03056<br>Valuation: Actual Cash Value | | $500 | $20,000 | Variable | $121.00 |
| 2. FORKLIFT<br>42-6Fgu15/Toyota<br>Serial #: 61291<br>Valuation: Actual Cash Value | | $500 | $7,000 | Variable | $42.00 |
| 3. RASS BREAK SYSTEM<br>3000/Ras<br>Serial #: RASS BREAK SYSTEM<br>Valuation: Actual Cash Value | | $500 | $85,000 | Variable | $514.00 |
| 4. RASS SHEAR MACHINE<br>52.31/Ras<br>Valuation: Actual Cash Value | | $500 | $25,000 | Variable | $151.00 |
| 5. HYDRAULIC PRESS<br>Hydraulic Press<br>Serial #: M403<br>Valuation: Actual Cash Value | | $500 | $7,500 | Variable | $45.00 |
| 6. STAMP DROP HAMMER<br>Ceco<br>Valuation: Actual Cash Value | | $500 | $45,000 | Variable | $272.00 |
| Rented Equipment<br>Valuation: Actual Cash Value | | $500 | $50,000 | Variable | $303.00 |
| TOTAL FOR THIS COVERAGE: | | | | | $1,448.00 |

**Rating Information for Premier Contractors Inland Marine Plus Coverage Package**
Territory: 012                                County: Columbia
Program: Contractors

| COVERAGE | COINSURANCE | DEDUCTIBLE | LIMIT | RATE | PREMIUM |
|---|---|---|---|---|---|
| Premier Contractors Inland Marine Plus Coverage Package | | | | | $602.00 |
| TOTAL FOR THIS COVERAGE: | | | | | $602.00 |

Forms that apply to this location:
16241   (05-94)      16071   (07-09)      16242   (05-95)      16431   (12-06)      16432   (07-11)
16434   (12-06)      16435   (07-11)

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000085**

2.85

Page   6

Southern-Owners Ins. Co.                                                Issued       06-12-2018

AGENCY   W L HUNTER INSURANCE AGENCY LLC          Company   **POLICY NUMBER   184622-78009727-18**
         12-0170-00          MKT TERR 055          Bill                                78-46-FL-1806

INSURED   DAYBREAK INC HUBER & ASSOCIATES                        Term   06-01-2018   to   06-01-2019

| COMMERCIAL INLAND MARINE COVERAGE - LOCATION 0001 SUMMARY | PREMIUM |
|---|---|
| TERRORISM - CERTIFIED ACTS   SEE FORM: 59350 | $21.00 |
| **LOCATION 0001** | **$2,071.00** |

A single deductible applies per claim.  If more than one item is involved in a claim, the single highest applicable deductible amount is used.

| | PREMIUM |
|---|---|
| **PREMIER CONTRACTORS INLAND MARINE PLUS SUBTOTAL** | **$602.00** |
| **PREMIER CONTRACTORS INLAND MARINE PLUS BALANCE TO MINIMUM** | **$38.00** |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000086**

2.86