**Exhibit 12**

Transcript of the Testimony of:

**MICHA CADY**

FRIEDBERG, et al.

vs.

DAYBREAK, INC.

April 28, 2025

Volume I



IN THE UNITED STATES DISTRICT COURT

OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN


| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, | ) ACTION NO.<br>) 3:19-cv-0053-RAM-EAH<br>) |
|             Plaintiffs, | )<br>) |
|     vs. | )<br>) |
| DAYBREAK, INC., dba HUBER & ASSOCIATES, | )<br>)<br>) |
|             Defendant. | )<br>) |
| _____ | ) |


VIDEO-RECORDED

VIDEOCONFERENCE DEPOSITION OF

MICHA CADY

April 28, 2025




Reported by Beth A. Ballerini, CSR

Certificate No. 7358



Job No. 124759

Micha Cady                                                      April 28, 2025

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   OF THE VIRGIN ISLANDS

 3              DIVISION OF ST. THOMAS AND ST. JOHN

 4

 5   THOMAS F. FRIEDBERG & SARAH L.    ) ACTION NO.
     BUNGE,                           ) 3:19-cv-0053-RAM-EAH
 6                                    )
                     Plaintiffs,      )
 7                                    )
          vs.                         )
 8                                    )
     DAYBREAK, INC., dba HUBER &       )
 9   ASSOCIATES,                      )
                                      )
10                   Defendant.       )
     _____)
11

12

13

14          The Video-Recorded Deposition of MICHA CADY,

15   located in Lake City, Florida, was taken pursuant to

16   Amended Notice of Deposition, via videoconference, on

17   Monday, April 28, 2025, commencing at 8:02 a.m. Pacific

18   Daylight Time/11:02 a.m. Eastern Standard Time, before

19   Beth A. Ballerini, CSR No. 7358, a Certified Shorthand

20   Reporter in and for the State of California.

21

22

23

24

25
```

Micha Cady                                                    April 28, 2025

```
 1              A P P E A R A N C E S

 2

 3      (All appearances were via videoconference.)

 4

 5   For the Plaintiffs:

 6        LAW OFFICES OF FRIEDBERG & BUNGE
          BY:  THOMAS F. FRIEDBERG, ESQ.
 7        1005 Rosecrans Street, Suite 202
          P.O. Box 6814
 8        San Diego, California 92166
          619.557.0101
 9        tom@lawofficefb.com

10

11   For the Defendant:

12        WILLIAMS, LEININGER & COSBY, P.A.
          BY:  JEFFREY C. COSBY, ESQ.
13        301 SE Ocean Boulevard, Suite 205
          Stuart, Florida 34994
14        772.463.8402
          jcosby@wlclaw.com
15

16

17   Also Present:

18        Barry Huber

19        John Dusenbery
          Video Specialist

20

21

22

23

24

25
```

Micha Cady                                                    April 28, 2025

```
 1                    I N D E X

 2

 3    Examination by:                           PAGE

 4            Mr. Friedberg                       6

 5            Mr. Cosby                          56

 6

 7

 8

 9

10

11

12

13                    E X H I B I T S

14

15    EXHIBIT                                   PAGE

16    Exhibit 1     Plaintiffs' Amended Notice of    20
                    Deposition and Request For
17                  Production

18    Exhibit 2     F&B v. Daybreak - Deposition     20
                    Exhibits
19                  (Bates Nos. P000001-000086)

20

21

22

23

24

25
```

Micha Cady                                                      April 28, 2025

```
 1                    MONDAY, APRIL 28, 2025
 2                 8:02 A.M. PDT/11:02 A.M. EST
 3
 4            THE VIDEOGRAPHER:  Good morning.  We are now
 5    on the record.
 6            Today's date is April 28th, 2025.  The time is
 7    approximately 8:02 a.m. Pacific Time/11:02 Eastern
 8    Standard Time.
 9            This begins the video-recorded deposition of
10    Micha Cady -- Cady, testifying in the matter of
11    Friedberg versus Daybreak, Incorporated.  It is in
12    U.S. District Court of the Virgin Islands, Division of
13    St. Thomas and St. John.  Case No. 3:19-cv-0053-RAM-EAH.
14            This deposition is taking place via Zoom
15    videoconferencing.  My name is John Dusenbery.  I'm the
16    videographer with Lexitas.  The California Certified
17    Shorthand Reporter today from Lexitas is Beth Ballerini,
18    CSR No. 7358.
19            The deposition is recorded at all times unless
20    all counsel agree to go on or off the record.
21            Would all the counsel that are present please
22    state your appearance, starting with the noticing
23    attorney.
24            MR. FRIEDBERG:  Yes.  Good morning.  This is
25    Tom Friedberg on behalf of Plaintiffs.
```

```
 1              MR. COSBY:  Good morning.  This is Jeff Cosby
 2   on behalf of Daybreak.
 3              THE COURT REPORTER:  Mr. Cady, please raise
 4   your right hand.
 5              Do you solemnly swear the testimony you are
 6   about to give in the matter now pending will be the
 7   truth, the whole truth, and nothing but the truth?
 8              THE WITNESS:  I do.
 9              THE COURT REPORTER:  Thank you.
10
11                  E X A M I N A T I O N
12   BY MR. FRIEDBERG:
13       Q.  Hi.  Good morning.  Would you prefer I call
14   you Micha or Mr. Cady?
15       A.  Micha is fine, yeah.
16       Q.  Yeah, good morning, Micha.  My name is Tom
17   Friedberg.  We met, you know, years ago when you were
18   down in St. John.  I'm here to take your deposition
19   regarding the work that you performed in St. John as
20   well as get some background information from you.
21              Have you ever had your deposition taken
22   before?
23       A.  I have before, yes.
24       Q.  How many times?
25       A.  Besides this one, twice.
```

Micha Cady                                                    April 28, 2025

```
 1          Q.    And what were the matters regarding?
 2          A.    The first one I was an expert witness in a
 3    project done in Boca Raton for a slate project.  And
 4    then the second one was a project we were involved in in
 5    Greenville, South Carolina.
 6          Q.    And the Greenville project, what was the role?
 7    Why were you being deposed, if you know?
 8          A.    Because they were countersuing us for delaying
 9    the project, which was -- was inaccurate.  So we just
10    settled that a month ago.
11          Q.    Okay.  Settlement in your favor or were you
12    paying money?
13          A.    Mutual; both.
14          Q.    Okay.  The matter in which you said you were
15    an expert witness, when was that?
16          A.    That was probably about four years ago --
17    three, four years ago.
18          Q.    And what type of roof was it?
19          A.    It was a slate roof.
20          Q.    And what was the scope of your involvement
21    specifically?
22          A.    So the roof had been installed by a different
23    installer down in Boca Raton, and they called us in
24    there to inspect the roof as it was installed
25    incorrectly.  So we had to do a report on that and then
```

1    be an expert witness of why it was installed

2    incorrectly.

3         Q.    Okay.  And what's the status of that matter?

4         A.    I did my deposition years ago, and the owner

5    was working it out with the contractor.

6         Q.    All right.  What's your date of birth, Cady --

7    I mean, Micha?

8         A.    5-11-78.

9         Q.    And what's your highest level of education?

10        A.    High school.

11        Q.    What year?

12        A.    When I graduated?

13        Q.    Yeah.

14        A.    It was in -- oh, goodness -- back in '96.

15        Q.    Other than a driver's license, do you have any

16   other licenses?

17        A.    No.

18        Q.    Have you ever applied for a contractor's

19   license?

20        A.    No.

21        Q.    Give me a thumbnail sketch of your employment

22   since leaving high school.

23        A.    So I worked -- started working for my dad back

24   in -- when I was 15.  Did that for about five years.

25        Q.    And what did your dad do?

1    A.    He is a carpenter.  He did home building.  So

2  I got into helping him, starting young.

3         Then I started my own company in 2000.  So

4  from about 2000 to 2008 I owned Cady Carpentry & Trim,

5  which was my own business.

6    Q.    Where was that located?

7    A.    In Lake City, Florida.  I was doing interior

8  trim work and design.

9         I did -- back when everything kind of fell

10  apart in 2006/2007, in 2008 I started working for Barry

11  Huber as an installer.  I did that from about 2008 to

12  2012, for about four years.

13         Then I transitioned into project management,

14  doing the -- you know, project manager.  I did that from

15  about 2012 to 2020.

16         And then in 2020 I became part owner and VP of

17  Huber & Associates, and that is my current.

18    Q.    And who is the other owner, or other owners?

19    A.    Jamin Huber and Barry Huber.

20    Q.    And day to day what are your roles?  What are

21  your duties and responsibilities?

22    A.    So basically I oversee -- I'm VP.  So I kind

23  of oversee the project management side of it, so I have

24  a couple of project managers that I oversee, and they

25  oversee the crew; the procurement of material; and then

1  just relationships with the contractors and homeowners

2  and running projects.

3        Q.   Prior to 2010 had you been involved in

4  installing copper roofs?

5        A.   Prior to 2010?

6        Q.   Yes.

7        A.   I did several.  When I worked for Barry I

8  did -- from about 2008 to 2012 I did slate; we did

9  copper; we did cedar.

10        Q.   Let's talk about copper itself.  How many

11  copper roofs were you involved in prior to 2010, if you

12  know?

13        A.   I would have to guess.  Probably four to six.

14        Q.   Let's go over a couple -- you've been deposed

15  before.  I didn't do the admonitions.  You've done well

16  giving me an audible response.  Please do so, yes or no,

17  or some other verbal response.

18             If you don't know or not sure, tell me that.

19  We don't want you to guess or speculate, but I am

20  entitled to your best estimate.

21             You'll have an opportunity after today to read

22  and review the deposition transcript and make changes if

23  you so desire.  If you make a material change, I can

24  comment, or another attorney can comment that you said

25  one thing and then changed your deposition testimony,

Micha Cady                                                    April 28, 2025

 1   and this may affect your believability or credibility.
 2           Do you understand that?
 3       A.   Yes.
 4       Q.   The projects that you worked on -- I'm sorry,
 5   you gave me an estimate, the number of roofs.  It was
 6   four to six; is that correct?
 7       A.   Yes, correct.
 8       Q.   And what did you do specifically?
 9       A.   As far as those roof areas?  Helped with
10   installation.
11       Q.   And what does that mean?
12       A.   From the start of the project installing
13   flashings; installing valleys; installing the panels.
14       Q.   Okay.  When were you first advised or first
15   informed that there was going to be a project down in
16   St. John?
17       A.   I don't recall the exact date, obviously
18   because it was 15 years ago.  So I believe Barry had
19   mentioned that we had a project that he was going to be
20   looking at for doing a copper installation in
21   St. John's.
22       Q.   And what were you told about that project?
23       A.   Just the fact of -- just that, you know, that
24   we had a project, a standing seam copper project in
25   St. John's, and at the time that's all I knew of it.

Micha Cady                                                    April 28, 2025

1        Q.   Were you involved in any of the estimating in

2   terms of the type of materials, the amount of materials,

3   the type of labor that would be necessary to perform the

4   work in St. John?

5        A.   No.

6        Q.   Who was in charge of that?

7        A.   At the time I think Jack Burbach worked for

8   us.  So I think it might have been Jack Burbach who was

9   helping with some of the estimating on that.  And then

10  obviously I think maybe Jamin and Barry input as well.

11       Q.   What was Jack Burbach's role?

12       A.   He was an estimator.

13       Q.   And how long did he work --

14            Is Mr. Burbach still with Huber & Associates?

15       A.   No, no, he's not.  He's probably been gone --

16  he moved up to North Carolina probably ten years ago.

17       Q.   Who is Ron Baker?

18       A.   Barker?

19       Q.   Barker.

20       A.   He was -- he worked for Barry years and years

21  ago.  I think he was one of the estimators, so one of

22  the site guys, or in the office, again, like, 10 years

23  ago, 15 years ago.

24       Q.   Okay.  Do you know what involvement Mr. Barker

25  had with respect to the project in St. John?

1       A.    Specifically, I do not.

2       Q.    At some point were you advised that you were

3    going to be going to St. John for a period of time?

4       A.    Yes.

5       Q.    All right.  And who selected the crew to go to

6    St. John?

7       A.    It was probably a combination of myself and

8    Barry.  We put it through together, had our crew that

9    does the copper, and we selected the four or five guys

10   that went and put it together.

11      Q.    Who was in charge of determining what

12   materials to be shipped to St. John?

13      A.    At the time it would have been somebody in the

14   office, and I didn't have anything to do with the office

15   portion at that point.  I was just the installer.  So

16   more than likely it could have been Ron Barker that was

17   helping with that.

18      Q.    Were you aware of the logistics to getting

19   materials down to St. John?

20      A.    Logistics as in briefly.  I mean I knew you

21   had to get a shipping container and, you know, ship

22   everything over there.  We've done island shipping

23   before.

24      Q.    Were you involved -- well, let me ask you, the

25   crew that was put together, who was in charge of the

1   crew?

2        A.   I was one of them.  I mean I guess you could

3   call it I was the project crew guy.

4        Q.   The project foreman?  Would that be an

5   accurate description?

6        A.   Yeah.

7        Q.   All right.  And you said you were one of them.

8   Was there another one?

9        A.   Well, I had -- obviously it was between myself

10  and the four guys there.  They kind of looked up to me

11  since I worked for Huber, you know, and they were the

12  employees.  So I consider myself the project manager on

13  that one.

14       Q.   The individuals that comprise the crew, do you

15  know what their experience was?

16       A.   Their experience was all in roofing.  Several

17  of them all copper, the ones I had on there.  They all

18  had experience in roofing, every one of them.

19       Q.   Did they have experience working for Huber

20  before or was this a new job for them?

21       A.   No, they did.

22       Q.   No, they did what?

23       A.   They had experience.

24       Q.   Ralph Laverdue -- did I pronounce that

25  correctly?  L-a-v-e-r-d-u-e?

Micha Cady                                                    April 28, 2025

1        A.    D-u-r-e, Laverdure.  Ralph Laverdure, yeah.

2        Q.    What was his experience?

3        A.    He had several years.  I mean I could try to

4   go back and figure all their stuff out, but he had

5   multiple years of roofing experience.  He's been a

6   roofer for most of his life.

7        Q.    And what did he do down in St. John?

8        A.    He was part of the install crew.

9        Q.    Peter Laughlin?

10       A.    Same.

11       Q.    How long had he worked for Huber; do you know?

12       A.    Several years.  He's been -- he's been working

13  for us, doing jobs for us.  He works -- he has his own

14  company now.  But he's been doing -- he's been doing

15  copper roofing, copper gutters, copper stuff his whole

16  life in the last 15, 20 years.

17       Q.    Tim Peterson?

18       A.    Yup, same thing.  He had a good background in

19  construction.  I think he was in construction, again,

20  since the early age of 16, 17 years old, and he's been

21  doing construction and did a lot of roofing with us.

22       Q.    Jim Schlimner, S-c-h-l-i-m-n-e-r?

23       A.    Yeah, yeah.  Same thing.  Multiple projects

24  with us at the same time doing roofing.

25       Q.    Brandon Novak?

1      A.    Yes, he was one of our helpers as well.

2      Q.    Are any of these individuals still with

3   Huber & Associates?

4      A.    No.

5      Q.    Do you know when approximately they left?

6      A.    Oh, goodness.  Probably a good 10 years ago.

7   Might have been longer.  Jim did several jobs for us

8   after that.  But yeah, it's probably been 10, 12 years.

9      Q.    Have you ever done any other projects in

10  St. John?

11     A.    Not that I recall.

12     Q.    Are you involved or have you ever looked at

13  their website, Huber & Associates?

14     A.    Yeah.

15     Q.    It touts or states that there are projects in

16  St. John, U.S. Virgin Islands.

17           Are you aware of that?

18     A.    I'm trying to remember which ones they were.

19  If I did, I don't know if I was involved in those.  I've

20  done several in British Virgin Islands.  I'm trying to

21  recall if there was anything I did in the U.S. Virgin

22  Islands other than yours.

23     Q.    That's what I'd like to know.  Were there any

24  others?

25     A.    I can go back years and check and see which

1    ones they were, if there was -- if I was involved with

2    them.

3         Q.   Do you recall ever being down there on any

4    other projects other than the one in Chocolate Hole?

5         A.   I don't recall.

6         Q.   Do you know whether or not Huber & Associates

7    obtained a license to work in the Virgin Islands?

8         A.   I -- I do not know that.

9         Q.   Who would generally be the individual who

10   would be in charge of obtaining licensure from various

11   governmental entities for work to be performed in a

12   foreign jurisdiction?

13        A.   It would have been part of the office staff

14   back then.  I'm trying to think of who -- I'd have to go

15   back and check to see who was working 15 years ago in

16   the office doing that one.

17        Q.   Was Ron Barker the office manager?

18        A.   He was one of them, yes.

19        Q.   All right.  Was Jack Burbach still with the

20   office at that time?

21        A.   Yeah.  He was the estimator.

22        Q.   Do you have a specific recollection of the

23   work that was performed in the Virgin Islands?

24        A.   Yes, as far as the copper standing seam

25   panels?

1    Q.   Yeah.  Tell me how the project proceeded; in

2    other words, you know, getting the containers there,

3    they're present on site -- well, let me strike that.

4         Let me ask you, did you have any involvement

5    with respect to the logistics of getting the containers

6    to the Virgin Islands?

7    A.   No.

8    Q.   When was the first time you put eyes on the

9    container with the materials?

10   A.   I believe it was when they were on site, when

11   I did the site visit, or when we came out there to

12   actually perform the work and --

13   Q.   Was there -- I'm sorry, I interrupted you.

14   What was your answer?

15   A.   No.  Yeah, when I got on site, that was the

16   first time I seen the containers.

17   Q.   Do you know who was in charge of inspecting

18   the containers for completeness prior to the containers

19   being shipped to the U.S. Virgin Islands?

20   A.   I do not know.

21   Q.   And how many containers were shipped?

22   A.   I do not recall.  I believe it was two, but I

23   cannot state for certain.

24   Q.   What type of items were inside the containers?

25   A.   They would have been flashings, and then also

Micha Cady                                                    April 28, 2025

1    coils of copper.  I believe the pan former.  The tools
2    and stuff were shipped out there as well for doing --
3    for performing the work.
4         Q.   And how much copper?  You said rolls of
5    copper.  Can you be more specific?
6         A.   I would have to go back and look to be
7    accurate.  I don't want to answer inaccurately as far as
8    how many rolls of copper were in there.
9         Q.   Have you reviewed any documents in preparation
10   for your deposition today?
11        A.   Yes.
12        Q.   What did you review?
13        A.   Just some documents that were sent to me from
14   counsel, some pictures, and then just some reports.
15        Q.   All right.  Well, I need to know what
16   specifically what you reviewed.  All right?
17        A.   Just the deposition report that was sent to us
18   with our contract and, like, a roof plan, and then the
19   pictures.
20        Q.   Is that the document that has a Bates stamp in
21   red on the bottom that says F&B v. Daybreak --
22        A.   Yeah.  Correct, that's the one.
23        Q.   Let me finish.
24             It says F&B v. Daybreak - Deposition Exhibits.
25   Is that the one?

Micha Cady                                                        April 28, 2025

1      A.    Correct.

2      Q.    Any other documents?

3      A.    No.

4            (Exhibit 1 and Exhibit 2 marked for

5            identification.)

6            MR. FRIEDBERG:  Let's mark as Exhibit 1 the

7   notice of deposition.  We'll mark as Exhibit 2 the

8   deposition exhibits which are Bates-stamped 1 through

9   86.

10  BY MR. FRIEDBERG:

11     Q.    Prior to your --

12           And when did you review these documents?

13     A.    Just this week.  They were just sent a few

14  days ago and I've been just looking at them again in the

15  last few days, last week.

16     Q.    Prior to reviewing the documents that were

17  sent to you within the last week, were there any -- was

18  there any other time that you reviewed documents

19  regarding this matter?

20     A.    It might have been a couple of months ago, I

21  was looking through some of the old pictures and files.

22  That's it.

23     Q.    Some time ago I deposed Barry in a different

24  lawsuit and he mentioned that the offices had moved and

25  documents were no longer available.

Micha Cady                                                April 28, 2025

1          Do you know whether or not the job files are
2    still available for this project?
3          A.   I do not believe so.  I think we looked for
4    them recently, and being it was 15 years ago I don't
5    think there was anything that was kept paper file.
6          Q.   Anything electronic?
7          A.   Anything electronic would have been submitted
8    to our counsel.
9          Q.   All right.  Did you do an inventory of the
10   items in the container when it arrived in St. John?
11         A.   Honestly, being that it was 15 years ago, I do
12   not recall.
13         Q.   What would be your custom and -- well, let me
14   lay some foundation.
15         You've done work in remote jurisdictions prior
16   to the St. John project, correct?
17         A.   Uh-huh.
18         Q.   Yes?
19         A.   Yes.
20         Q.   And do you have a custom and practice of what
21   you do in terms of confirming the inventory that's
22   shipped, that it's all present?
23         A.   Yes.  I mean obviously they should have
24   accurately had a list of items that were in the
25   container.  You have to have a list that are going in

Micha Cady                                                    April 28, 2025

1   the container for your BOL, for the shipping container.
2   So somebody would have had a list of that that was
3   shipped because you have to list every item.
4        Q.   And what is BOL?
5        A.   It's just the bill of lading.
6        Q.   Do you know whether there were custom
7   declarations prepared?
8        A.   I do not.  I was not involved in that.
9        Q.   Was it your custom and practice to look at the
10  bill of lading and compare what was actually received on
11  the island was in conformancy with the bill of lading?
12       A.   That would be typical, yes.
13       Q.   Was there anything that you were short -- that
14  was not in the container?
15       A.   At the time I don't recall.  But no, I think
16  we had everything we needed.  Obviously with the coils
17  of copper that were in there, you don't know exactly how
18  much, you know, the coil usage is going to be until you
19  use it.  But as far as sheet stocks and drip edge and
20  all the other stuff in there, the tools and stuff, yes.
21       Q.   What about caulking?  Was the caulking
22  included?
23       A.   The caulking?
24       Q.   Yeah.
25       A.   I -- I don't recall.

Micha Cady                                                 April 28, 2025

```
 1        Q.    Were there --
 2              Do you recall conversations that you had with
 3   Ron where items were actually missing from the
 4   container?
 5        A.    I don't.
 6        Q.    Do you recall contacting Ron and stating I
 7   need stuff shipped down immediately in order to perform
 8   this job because it wasn't in the container?
 9        A.    I don't recall.
10        Q.    Do you know whether or not items were
11   purchased on-island to supplement what was in the
12   container?
13        A.    I don't recall that either.  It's just --
14   those kind of details from 15 years ago, I'd have to
15   have receipts.
16        Q.    Do you know if there are receipts?
17        A.    I have not found any, no.
18        Q.    So -- let me go back.
19              You had a crew of, what, six guys?
20        A.    Yeah, I believe it was six.  I'm trying to
21   list them all out, but there's, like, six guys.  Are you
22   including myself?
23        Q.    Yes.
24              And who operated the pan former?
25        A.    I think it was both myself and it was Austin
```

1    Schlimner.  He was the main guy running the panels and

2    running the machine at that time.

3         Q.   And what did you do on the project?

4         A.   I helped install -- helped install the panels

5    and was part of the crew, like, the installer.

6         Q.   So your testimony is you were on the roofs?

7         A.   Yes.

8         Q.   And had you been involved -- prior to this

9    project had you actually formed copper panels using a

10   pan former?

11        A.   Yes.

12        Q.   How many times?  Or how many projects, I

13   should ask?

14        A.   At least -- well, you're talking in the time

15   prior to yours?

16        Q.   Yes.

17        A.   The four to six.  I mean every time we have a

18   pan former on site or we're doing a copper project we

19   pan form them.

20        Q.   Can you describe the roofs that were on the

21   project in St. John?

22        A.   They were conformed of copper standing seam

23   panels 15 inches wide, continuous copper panels standing

24   seam double-lock.

25        Q.   And describe the roofs themselves.

Micha Cady                                                    April 28, 2025

1    A.    There was multiple buildings.  They were

2  cone-shaped, octagon, lower-pitched towards the bottom

3  and then pitch change to a steeper pitch at the top of

4  the main building.  And the other buildings were all

5  octagon.  And I think there was one other building, like

6  a gazebo.

7    Q.    How many -- well, strike that.

8          Do you recall how many separate buildings

9  there were?

10   A.    Without actually looking at the roof plan, I

11 believe there was four.  One, two, three, four.

12   Q.    All right.  Explain the process to me.  You

13 mentioned there were rolls of copper.  How does it go

14 from roll of copper to a finish roof?

15   A.    So you basically take the copper spool, the

16 copper roll that goes onto a decoiler, and then it's fed

17 into the machine.  It's an 18-inch-wide panel.  Then it

18 forms it through this machine to a specific length.  As

19 it feeds it through the machine it forms a male and

20 female on each side; a male on one side, a female on the

21 other.  And it comes out the other side as a preformed

22 panel.  Ends up being 15 inches wide.

23   Q.    And then what happens to the 15-inch-wide

24 panel?

25   A.    So then once you run it through the machine,

Micha Cady                                                      April 28, 2025

1  you have specific lengths that you use.  So I mean you
2  measure out the roof, you cut your panels, it shears it,
3  then that panel is then taken over to the roof and
4  installed onto the roof.
5       Q.   How is it installed?
6       A.   It's hemmed onto the bottom of a drip edge.
7  There's a D-style drip edge that goes around the bottom
8  of the roof to start out with.  It is hemmed on and
9  locked onto the D-style drip edge.
10      Q.   How is that done?
11      A.   You take hand seamers and you basically fold a
12 1-inch seam at the bottom -- a hem at the bottom and you
13 lock it onto your drip edge.
14      Q.   How is it locked on?
15      A.   It's folded and crimped onto the drip edge.
16      Q.   Okay.  Continue.
17      A.   And then you basically -- then you take your
18 clips and you lock your clips onto the side, and then
19 nail it down to the roof deck.
20      Q.   What types of fasteners were used to secure
21 the panels?
22      A.   Ring shank stainless steel roofing nails.
23      Q.   Screws or nails?
24      A.   I believe that one was with the nails.
25      Q.   And how many ring shanks were there?

```
 1        A.   How many nails?
 2        Q.   No.  The ring -- the ring shanks themselves,
 3   did they have -- how many -- well, strike that.
 4             THE COURT REPORTER:  I couldn't understand
 5   that word.  Wrench?
 6             THE WITNESS:  Ring.
 7             MR. FRIEDBERG:  I'm coming back.  I'm sorry.
 8   BY MR. FRIEDBERG:
 9        Q.   The actual --
10             What do you call the fastener?  What's your
11   term?
12        A.   What do you call it?  A ring shank nail?
13        Q.   No.  What you put the nail into to secure it.
14        A.   Oh, a cleat.
15        Q.   Okay.  And what are the cleats made of?
16        A.   The cleats are made of copper.
17        Q.   And how many holes for the ring shank nails
18   are there per cleat?
19        A.   There's two.  You put two nails per cleat.
20        Q.   And what type of spacing?
21        A.   On the cleats?
22        Q.   Yes.
23        A.   Yeah.  9 1/2.
24        Q.   All right.  So you've looked through the
25   materials.  There was a prior proposal that called for
```

Micha Cady                                                          April 28, 2025

1    12 inches on center.

2            Were you aware of that?

3        A.   Yes, correct.

4        Q.   And then it went to 9 1/2 on center.

5            Are you aware of that?

6        A.   Correct.

7        Q.   Are you aware of why?  Or, strike that.

8            Are you aware why there was a change?

9        A.   From what I recall, the change was -- it went

10   from a 17-inch-wide panel to a 15.  And then the spacing

11   was to match up to meet the batten system that was being

12   installed by Chris.

13       Q.   Okay.  That's the 9 1/2 on center?

14       A.   Correct.

15       Q.   And is it your testimony that cleats were

16   placed at 9 1/2 on center on each panel throughout the

17   roof?

18            MR. COSBY:  Object to the form.

19            You can answer.

20            THE WITNESS:  Cleats were placed on average

21   9 1/2 depending on the batten system that was installed

22   by others.

23   BY MR. FRIEDBERG:

24       Q.   All right.  And describe the batten system.

25       A.   So the batten system was a 1-by-4 batten

1   system that runs horizontal and it had battens that were

2   running on average every 9 1/2 inches center to center

3   on average.

4        Q.   Was it a 1-by-4 or 1-by -- is it actually a

5   3 1/2?

6        A.   Yeah, correct.  A 1-by-4 is actually 3 1/2

7   nominal, yeah.

8        Q.   And then in between the battens what was

9   present -- was there any other material present?

10        A.   Yeah.  So then Chris had installed the

11   insulation in between the battens.

12        Q.   All right.  And then was there anything put on

13   top of the batten system?

14        A.   The copper panels.

15        Q.   Was there any type of paper or snow and ice

16   shield or --

17        A.   No.  That's under the batten system.

18        Q.   I'm sorry?

19        A.   That's what's under the batten system, so --

20        Q.   Were there any -- I'm sorry, I interrupted

21   you.  Go ahead.

22        A.   Yeah, there was an ice and water -- there was

23   a system already in place done by others, and then the

24   batten system was placed on top of that.

25             MR. FRIEDBERG:  John, can you bring up

Micha Cady                                                  April 28, 2025

```
 1   page 16.
 2   BY MR. FRIEDBERG:
 3        Q.   Do you recognize what's shown in this photo?
 4        A.   Yes.
 5        Q.   Have you seen other photos prior to or during
 6   the installation of the copper roof?
 7        A.   Repeat the question.  Have I seen any --
 8        Q.   Have you seen other photos that were taken
 9   during the actual installation of the copper roof that
10   show a portion of the roof and a portion of the --
11   what's underneath the copper roof?
12        A.   Yeah.  There's a couple different I think
13   progress photos that we had.  I think there are four or
14   five different progress photos.  Some of them had the
15   ice and water shield on, and the others had the battens.
16   There was a few in progress that I had seen.
17        Q.   What would you call --
18             Do you see the octagon building in the
19   picture?
20        A.   The large one there, the main?
21        Q.   Yes.
22        A.   Yes.
23        Q.   What do you refer that -- how do you refer to
24   that building?
25        A.   The main house.
```

Micha Cady                                                    April 28, 2025

1      Q.   Do you know whether or not there was a snow

2   and ice shield over the batten system on the main house

3   prior to the installation of the copper?

4      A.   If I recall, it's under because the ice and

5   water shield, the snow and ice, is meant to be under the

6   battens, then the batten system on top.

7      Q.   There are photographs that are not in these

8   exhibits, but have you seen the photographs where there

9   is a black material over the batten system that's

10  between the batten system and the copper?

11     A.   I don't recall.  I don't think the batten

12  system was on in those photos yet, if I'm correct.

13     Q.   All right.  I'm going to ask you,

14  hypothetically, to assume that there are photographs

15  showing portions of the copper roof being installed on

16  the main house with the snow and ice shield over the

17  batten system.

18     A.   I have not seen those photos --

19          MR. COSBY:  Object to the form.

20          Hold on.  I'm not sure there's a question yet.

21          MR. FRIEDBERG:  Right.

22          MR. COSBY:  But I object to the form, if it is

23  a question.

24  BY MR. FRIEDBERG:

25     Q.   Do you recall whether or not there was some

 1   type of black material placed over the battens prior to

 2   the installation of the copper on the main roof?

 3        A.   No, I do not recall.

 4        Q.   Are you disputing whether or not there was

 5   some type of material placed over the batten system

 6   prior to the installation of the copper roof on the main

 7   house?

 8             MR. COSBY:  Object to the form.

 9             But you can answer.

10             THE WITNESS:  I believe the pictures I had

11   seen were of ice and water shield on the roof prior to

12   battens, and it was not on the main house.  It was on

13   the other project -- on the other buildings.

14   BY MR. FRIEDBERG:

15        Q.   All right.  Well, we're focusing on the main

16   house.

17             If, hypothetically, there are photos showing a

18   portion of the copper installed on the main roof with

19   the black material over the batten system, would that

20   indicate in fact that the batten system had some type of

21   weatherproofing placed on top of it and underneath the

22   panels?

23             MR. COSBY:  Object to the form.

24             You can answer.

25             THE WITNESS:  Yes.  But to be honest, I do not

Micha Cady                                                        April 28, 2025

1  remember seeing any in-progress photos of the main house
2  with the batten system on or off.  The only ones I saw
3  of this were of the complete --
4  BY MR. FRIEDBERG:
5      Q.   All right.  So you mentioned that the -- well,
6  what is the purpose of the cleats?
7      A.   The purpose of the cleats?  To hold the panel
8  down to the substrate.
9      Q.   And when you have -- talk to me about how you
10 actually secure the panels to the roof themselves.  You
11 mentioned there are cleats that are placed approximately
12 9 1/2 inches on center, and then you use the two ring
13 shank nails to go into the battens, correct?
14     A.   Correct.
15          MR. COSBY:  Object to the form.
16          You can answer.
17          THE WITNESS:  That is correct.
18 BY MR. FRIEDBERG:
19     Q.   All right.  And if you look at the actual -- I
20 want to make sure I'm using the right terminology.
21          What do you call the single sheet of copper?
22 Is that a panel?  Or what do you refer to it as?
23     A.   Yes, so that would be the panel.
24     Q.   And where are the cleats placed?  Are they
25 placed on both sides of the panel or one side?

Micha Cady                                                    April 28, 2025

```
 1        A.    They're placed on one side.
 2        Q.    And what is done on the other side to secure
 3   it?
 4        A.    So they're placed on one side, and then the
 5   other panel locks on.  So that's why they have a male
 6   and a female.  So then the other panel locks onto it and
 7   it's seamed with hand seamers and then a dog, which is
 8   basically a power seamer that seams those panels
 9   together, and then you just always put the clips on the
10   next panel on one side.  Then the next panel locks onto
11   it.  So the clips are all on one side, but the panels
12   themselves are seamed to each other.
13        Q.    And when they're seamed is that a single-lock
14   or a double-lock seam?
15        A.    That's a double-lock.
16        Q.    And how does that work?
17        A.    So you take hand seamers, you lock the panel
18   on, and then you take a machine and start it from the
19   top and it runs all the way down and power-seams the
20   seams together to form the double-lock.
21        Q.    Is there anything placed on top of the seams?
22        A.    On top of the seams?  No.
23        Q.    There are -- I'm sorry, go ahead.
24        A.    Go ahead.  I'm good.
25        Q.    There are pie-shaped portions, do you see on
```

Micha Cady                                                    April 28, 2025

```
 1   the roof?
 2        A.   Yup.
 3        Q.   How are those pie-shaped portions fastened to
 4   each other?
 5        A.   When you say pie-shape, are you talking about
 6   the upper part?  The top part there?
 7        Q.   No.  Let me try and be a little more specific.
 8             It's an octagon.  Do you see that?
 9        A.   Yeah.
10        Q.   And there are certain sides to the octagon?
11        A.   Yes, the triangles that meet the hips.
12        Q.   All right.  How are the triangles secured?
13        A.   They're all secured down to the roof, like,
14   they're all clipped, like, everything is all clipped and
15   secured down to the roof.
16        Q.   How are they clipped?
17        A.   The panels themselves?
18        Q.   Yes.  Let's start there.
19        A.   Yeah.  The same way I just described with the
20   cleats.  You have a cleat that attaches to each batten
21   with two ring shank nails, and then each panel is seamed
22   to itself.
23        Q.   Okay.  Are there -- when I use the term pan,
24   are you familiar with that term?
25        A.   Yeah.  It's a copper pan.  It could be a
```

```
 1   different -- a couple different meanings, but it's a
 2   pan.  So what are you referring to when you say pan?
 3        Q.   Well, the section, for example, we're looking
 4   at on page 16, there seems to be -- if we look straight
 5   on there seems to be somewhat of a triangle.
 6            Do you see that?
 7        A.   Uh-huh.
 8        Q.   Yes?
 9        A.   Yes, yes.
10        Q.   How do the two triangles -- how are they
11   attached?
12        A.   I believe you're describing the hips, like,
13   the hip corners when the hips -- when it comes to the
14   hips.  So each panel is cleated to the roof on the
15   sides, and then when it gets to the hip, one side is
16   turned up 1 inch, and then when the other side comes
17   into it, that side is folded up 2 inches, and then they
18   fold over the top of each other and lock.  And then --
19        Q.   And they are put on top of the hips?
20        A.   The hips, yes.  Then there's a batten cap on
21   top of the hips.
22        Q.   And what's the purpose of the batten cap?
23        A.   The batten cap is to cover the seam.
24        Q.   If the batten cap is installed, are you able
25   to see the seams?
```

Micha Cady                                              April 28, 2025

1          A.    Well, it covers -- the one folds up one side,

2     the other folds up the other side, and they lap over the

3     top of each other, and then you take the batten cap and

4     you cover that seam.

5          Q.    When the batten cap -- strike that.

6                When the batten cap covers the seam, are you

7     able to see the seam?

8          A.    Depends on how much length you left on the

9     other side.  So when it's folded down over, you take an

10    anvil and you hammer them together, and you may end up

11    seeing -- depends if it was trimmed correctly.  If it's

12    trimmed, you know, with -- how much they trimmed it off,

13    when the batten cap goes on there you may still see the

14    copper where it was folded down onto the side.

15         Q.    Are you aware of any instances in which there

16    was insufficient copper in order to form the seam at any

17    of the ridge points on the main house?

18         A.    No.

19         Q.    How do you know?

20         A.    Well, you said was I aware of any.

21         Q.    Right.  Did you actually inspect them all?

22         A.    Well, I'm saying no, to my knowledge, I did

23    not see any that were insufficient.

24         Q.    All right.  Who was in charge of inspecting

25    the ridge -- where the ridge -- or the hips -- where

Micha Cady                                                    April 28, 2025

 1  they met to make sure they were properly seamed
 2  together?
 3      A.   Collectively all of us.  I mean we all have a
 4  high standard and know the method and the means for
 5  installing.  So every one of us knew -- whoever was up
 6  there installing knows how to fold the seams up and over
 7  and put the batten cap on.
 8      Q.   Are you aware of any instances in which cleats
 9  were not placed approximately 9 1/2 inches on center on
10  the main house?
11          MR. COSBY:  Object to the form.
12          You can answer.
13          THE WITNESS:  No, I'm not aware of it.
14  Every -- there was cleats on every -- every batten.
15  BY MR. FRIEDBERG:
16      Q.   If, hypothetically, there were cleats not on
17  every batten and not at 9 1/2 inches on center, or
18  nominally 9 1/2 inches on center, would that be contrary
19  to what the intent was in terms of securing the roof?
20          MR. COSBY:  Object to the form.
21          You can answer.
22          THE WITNESS:  I mean -- I'm answering
23  hypotheticals.  I mean I know every one of them was
24  attached.  We did not skip any.
25  BY MR. FRIEDBERG:

Micha Cady                                                    April 28, 2025

1        Q.    How do you know that?

2        A.    Because all of our guys were trained extremely

3    well.

4        Q.    All right.  Was there some type of procedure

5    in place to inspect the panels to make sure that the

6    cleats were installed nominally at 9 1/2 inches on

7    center?

8             MR. COSBY:  Object to the form.

9             You can answer.

10             THE WITNESS:  Just -- just common practice of

11    just knowing what the protocol was, knowing what the

12    guideline was, and knowing what we were supposed to do.

13    BY MR. FRIEDBERG:

14        Q.    If, hypothetically, there were cleats on one

15    of the hips, or where the actual panels met the hip, and

16    those panels had -- were not attached or did not have

17    cleats 9 1/2 inches on center, would that be contrary to

18    what the scope and the intent was in terms of installing

19    the cleats on this project?

20        A.    No, because --

21             MR. COSBY:  Object to the form.  Object to the

22    form.

23             You can answer.

24             THE WITNESS:  No, because there are no cleats

25    on the -- the hip and ridge don't have any cleats.  You

Micha Cady                                            April 28, 2025

1   have cleats in the body of the panel that are averaged
2   9 1/2.  There are no cleats and not needed on actual hip
3   junctures.
4   BY MR. FRIEDBERG:
5        Q.   Let me rephrase my question.
6             If, hypothetically, there were not cleats on
7   the panels as it met the hip, the panels immediately --
8   or at least forming a portion of the hip, would that be
9   contrary to the intent of installing cleats every
10  9 1/2 inches on center?
11            MR. COSBY:  Object to the form.
12            You can answer.
13            THE WITNESS:  No.  The cleats are -- you have
14  a batten.  And as you run your battens around, your hips
15  are longer.  So when you put a panel on, there may be
16  spots where the cleat is not exactly at the ridge -- or
17  at the hip juncture because it's all dictated by the
18  spacing of the battens.
19            So as my battens go around, there's a cleat on
20  every single batten.  And depending on where that lands,
21  at the last cleat I can put in, when it gets to the hip.
22  BY MR. FRIEDBERG:
23       Q.   Is it your testimony there was a cleat placed
24  on each and every batten?
25       A.   Yes.

Micha Cady                                                    April 28, 2025

1          Q.    And how do you know that?

2          A.    Again, from common practice, and we don't take

3    shortcuts.

4                Also when you seam the panels, you should be

5    able to see the indentation of where the cleats are at

6    on the -- on the hem sticking up.

7          Q.    Explain what you mean.

8          A.    So when you run the machine down the panel,

9    you have a cleat that's attached to a portion of every

10   batten.  And as it puts pressure on that seam and runs

11   down the seam, you'll see the clip telegraphing through

12   to where you can look and see if there's one on every --

13   on every batten.

14         Q.    What do you mean, the clip telegraphing

15   through?

16         A.    Like there's an extra piece of metal.  In

17   other words, it's thicker at that location.

18         Q.    So is it your testimony you'd be able to look

19   at the time of seaming the ridge to determine whether or

20   not there's a cleat present every approximately

21   9 1/2 inches on center?

22         A.    Yes, you --

23                MR. COSBY:  Objection to the form.

24   BY MR. FRIEDBERG:

25         Q.    I couldn't hear your answer.

Micha Cady                                          April 28, 2025

1      A.   You should be able to, yes.

2      Q.   And how would you be able to do that?  By

3  visually looking?

4      A.   Yes.

5      Q.   And once the ridges are seamed and the ridge

6  cap put on the ridge, are you able to see the cleats?

7      A.   Yeah.  Like I said before, you can see the

8  cleats telegraphing through.  So when it pinches tight

9  on the seam and goes down that seam and locks the panel

10  together, if you look closely you'd be able to see where

11  the cleats are at.

12     Q.   And then how would you be able to see that?

13     A.   From the side view.  Like, if you look at

14  the -- where it bends it over on the seam, you'd be able

15  to look at the side and see where there's an extra piece

16  of metal or a little indentation because that's where

17  your cleat would be.

18     Q.   And approximately how far from the ridge would

19  this cleat be?

20          MR. COSBY:  Object to form.

21          THE WITNESS:  Well, the cleat would be

22  technically on every batten.  So whatever the batten

23  spacing is.

24  BY MR. FRIEDBERG:

25     Q.   So if you have a ridge -- and you've explained

Micha Cady                                                    April 28, 2025

1  that -- where you have a male and female where you seam

2  them together.  And then you mentioned you can see the

3  cleats.

4          How far are the cleats -- can you actually see

5  the cleat from the ridge?

6      A.    Repeat the question again.

7      Q.    Sure.

8          The ridge itself is secured by seaming the

9  male and female portions.  Agreed?

10     A.    Are you talking about the ridge or the -- you

11 call them ridges, but technically hip, referred to as

12 hip.

13     Q.    All right.  Let's use the term hip.

14         The hips are secured by seaming the male and

15 female portions, correct?

16     A.    Not the hips.  The main body of the field.

17 The seams and the field, all those seams that run down

18 in the main field are all mechanically seamed with a

19 machine.

20         At the hips, like I mentioned before, the one

21 stands up 1 inch, the other one stands up 2 inches, and

22 you fold them over each other, and those are done by

23 hand.

24     Q.    All right.  In the process prior to folding

25 over are you able to see the clips -- or the cleats?

Micha Cady                                          April 28, 2025

1      A.    Yes.

2      Q.    And where are the cleats?  In other words, how

3  far from the area in which you're putting the ridge cap?

4      A.    They would be on every batten.  So however

5  that batten lands in -- however it dives into the hip.

6      Q.    Underneath the hip itself there are no cleats,

7  right?

8      A.    No.

9      Q.    How far to the left or right of the hip are

10  the cleats?

11      A.    It all depends on the panel layout and how

12  that panel dives into the hip and where the batten

13  spacing is at.

14      Q.    Would it be your expectation then prior to

15  securing the hip or the ridge and putting the hip cap on

16  that the workers would be able to visualize whether or

17  not there were in fact cleats present?

18      A.    Yeah.  I mean you would be putting the cleats

19  on into the battens, and then after you trim your hip

20  you stand it up on edge, and then the other side comes

21  into it, and you stand that one up taller and then fold

22  them over on top of each other.

23      Q.    Are you aware of any evidence or documents

24  that there were cleats not present on certain panels of

25  the main house?

Micha Cady                                          April 28, 2025

1       A.    That there was cleats not present?

2       Q.    Yes.

3       A.    Not in -- no.

4       Q.    If, hypothetically, there were cleats that

5    were not present, would that be contrary to the contract

6    terms requiring cleats to be installed approximately

7    9 1/2 inches on center?

8            MR. COSBY:  Object to the form.

9            THE WITNESS:  Again, it's a hypothetical, and

10   if there was missing cleats, then yes.  But all the

11   cleats were installed per batten layout.

12   BY MR. FRIEDBERG:

13      Q.    And if cleats were in fact not installed and

14   were not present, would that be contrary to the terms of

15   the contract?

16           MR. COSBY:  Object to the form.

17           You can answer.

18           THE WITNESS:  Then correct, yes.

19   BY MR. FRIEDBERG:

20      Q.    Now, you mentioned that these panels come

21   together to form the hip.  Did I get that correct?

22      A.    Correct.

23      Q.    And then you mentioned trimming.  Can you

24   describe that.

25      A.    Yes.  So you basically take the one side, you

```
 1   run it long, then you cut the panels along the hip, and
 2   then you take a hammer and you fold the seams down, they
 3   get folded down, and then you take some tongs, you bend
 4   them up, you trim it so it's 1 inch and lay it flat, and
 5   then the other side comes into it.  So you basically
 6   have two pieces.  So you can't form the hip until you
 7   have both sides on.
 8       Q.   Is there a minimum amount of overlap?
 9       A.   It's the -- you're matching the batten seam.
10   So the batten seam obviously is 1-inch high.  So the one
11   sticks up the 1 inch and then the other one sticks up
12   the 2 inch.  So when you fold it over, it folds down
13   onto the other 1 inch.
14       Q.   If there's not enough material to have 1 inch
15   on one side and 2 inches on the other side, is that
16   acceptable?
17           MR. COSBY:  Form.
18           You can answer.
19           THE WITNESS:  Give or take a quarter inch, I
20   mean it's acceptable.  So you run them long and then you
21   hammer them flat, snap a line and cut them and then
22   stand them up.
23   BY MR. FRIEDBERG:
24       Q.   So if I understand what you're telling me, the
25   tolerance is it has to be 3/4 inch on one side and
```

Micha Cady                                                    April 28, 2025

```
1    1 3/4 inch on the other.

2              Did I get that correct?

3         A.   Yeah.  So when you fold them over, you want to

4    have some overlap, you know, of 3/4 of an inch.

5         Q.   If, hypothetically, the panels where it meets

6    the hip were folded over and there was less than

7    3/4 of an inch overlap, would that be contrary to

8    industry standards?

9              MR. COSBY:  Object to the form.

10             THE WITNESS:  No.  You'd like to have that.

11   That's common practice; you like to have that.  If you

12   have 1/2 inch, it still would be watertight because you

13   have a batten cap, a batten seam, that basically is the

14   1 inch that goes over the top of it.

15   BY MR. FRIEDBERG:

16        Q.   But if, hypothetically, you have less than a

17   1/2 inch overlap, is that in conformancy with industry

18   standards?

19             MR. COSBY:  Object to the form.

20             THE WITNESS:  That's not -- that's not

21   preferred.

22   BY MR. FRIEDBERG:

23        Q.   Why not?

24        A.   Well, because you want as much overlap

25   obviously as you can get.  You try to get the overlap.
```

Micha Cady                                                    April 28, 2025

1       Q.   Okay.  If in fact there was overlap of less

2   than a 1/2 an inch, would that be in violation of the

3   contract, if you know?

4            MR. COSBY:  Form objection.

5            THE WITNESS:  Violation of the contract?  It's

6   not specifically described in there.  So no.

7   BY MR. FRIEDBERG:

8       Q.   Well, are you aware of Revere Copper

9   [inaudible] --

10      A.   Yes.

11           THE COURT REPORTER:  I'm sorry, I couldn't

12  hear you.

13  BY MR. FRIEDBERG:

14      Q.   Revere Copper & Common Sense.  You're familiar

15  with that?

16      A.   Yes.

17      Q.   And SMACNA?

18      A.   SMACNA?  Yes.

19      Q.   And those are actually specified in the

20  contract, correct?

21      A.   Yes.

22      Q.   And what do those two sources say in terms of

23  the amount of overlap?

24      A.   It's common practice -- I'd have to go back

25  and look at the detail.  But the same thing, fold up and

1  over.  I don't think they give a minimum, but they talk

2  about folding up and over to create the seam, to create

3  the lock.

4      Q.  Do you know whether or not if in fact the

5  overlap is less than a 1/2 inch whether that would

6  affect the wind resistance of the roof itself?

7          MR. COSBY:  Object to the form.

8          THE WITNESS:  No.

9  BY MR. FRIEDBERG:

10     Q.  That's something that is beyond your scope of

11 expertise?

12     A.  Right, right.  The cleats --

13     Q.  If in fact there were cleats installed less

14 than 9 1/2 inches on center, in fact there was sections

15 where there were several feet where there were no

16 cleats, do you know whether or not that would affect the

17 wind resistance of a copper roof?

18         MR. COSBY:  Object to the form.

19         THE WITNESS:  Well, obviously if you have

20 cleats -- now these cleats are put on at 9 1/2 on

21 average.  Miami data is 12.  But, yeah, in a

22 hypothetical situation, if you had cleats missing for

23 feet, then it would affect.

24 BY MR. FRIEDBERG:

25     Q.  Are you aware -- or have you ever been

Micha Cady                                                      April 28, 2025

1   involved with a copper roof in which wind has gotten
2   underneath a hip?
3           MR. COSBY:  Object to the form.
4           THE WITNESS:  No.
5   BY MR. FRIEDBERG:
6       Q.   Have you ever been involved in any type of
7   metal roof that sustained wind damage?
8       A.   Not of ours.  In a certain instance it
9   actually took off the entire framing and our panels
10  actually all stayed intact.
11      Q.   Are you aware what the substrate of this roof
12  was?
13      A.   The substrate was the plywood underneath.
14      Q.   Yeah.  Are you aware of how much plywood?
15      A.   What do you mean how much?  How thick?
16      Q.   How many layers of plywood and the thickness.
17      A.   No.  No, I was not involved in the framing of
18  it.
19      Q.   You've framed roofs, I take it, in the past?
20      A.   I have with my dad before, yes.
21      Q.   Did you have any concerns regarding the
22  framing of this roof?
23          MR. COSBY:  Object to the form.
24          THE WITNESS:  Not concerns with the framing.
25  We didn't do the framing or the batten system.  So that

Micha Cady                                                    April 28, 2025

1  was out of our control.  But there wasn't any concerns
2  as far as attachment.
3  BY MR. FRIEDBERG:
4       Q.   Okay.  What's a solder cleat?  S-o-l-d-e-r.
5       A.   A solder cleat?
6       Q.   Solder cleat.  Okay.  What is it?
7       A.   Sometimes you'll have a solder cleat,
8  depending on the application, if you have a -- you know,
9  sometimes you'll have a valley or you'll have a cricket
10 where you have to solder a cleat on, and then that's
11 soldered onto the panel.
12      Q.   Do you know whether there are any solder
13 cleats in this roof system?
14      A.   I don't believe there was.  I'm trying to
15 remember all the junctures and the flashings going
16 around the turret.  Not that I recall.  We had step
17 valley, counter flashings.  But I don't remember if
18 there was any actually soldered cleats.
19      Q.   What's a flat cleat?
20      A.   A flat cleat is just -- it's basically like a
21 flat piece of copper, like a cleat.
22      Q.   Were any flat cleats used?
23      A.   Again, I'd have to go back and look at the
24 pictures.  Flat cleats would just be used in -- there's
25 no valleys on this one here either.  So if there's any

1    flat cleats used it would have been in the segmented

2    valley by the turret.

3          Q.    How long were you on the island for?

4          A.    I believe it was over a month.

5          Q.    You left a couple of times, didn't you?

6          A.    I think I left once in between, yup.

7          Q.    Were you present for the walk-through punch

8    list at the end of the project?

9          A.    No.  If I recall we left and then we sent two

10   guys back to do the punch.

11         Q.    Do you know why you left prior to the owners

12   having the ability to meet with you and walk through the

13   project?

14         A.    I do not recall.  I think the timing was an

15   issue, and I believe you guys were out of town that week

16   and weren't getting back I think until that week, the

17   end of that week.

18         Q.    Who were the guys that came down for this

19   punch list you mentioned?

20         A.    If I recall -- and I don't know specifically

21   -- I think it was Ralph Laverdure I believe and Peter

22   Laughlin.

23         Q.    Are you aware of any documentation that would

24   support your contention that Ralph and Peter came down

25   for a punch list?

Micha Cady                                                    April 28, 2025

```
 1        A.   I would have to double-check and see who it
 2   was specifically.  I don't recall.
 3        Q.   What specifically do you recall about this
 4   project that we haven't covered?
 5             MR. COSBY:  Object to the form.
 6             You can answer.
 7             THE WITNESS:  Specifically about the project?
 8   BY MR. FRIEDBERG:
 9        Q.   Yeah.
10             MR. COSBY:  Same objection.
11             THE WITNESS:  I think we've covered
12   everything.  I mean I know we weren't involved in the
13   batten system and we were waiting for Chris.  I do know
14   there were several areas on the main house here that we
15   had to hold off on and he had to do something with the
16   removal of a batten to the lightning rod protection
17   system.  But other than that, I think we've covered it.
18   BY MR. FRIEDBERG:
19        Q.   Did you have any issues with the batten
20   systems?
21             MR. COSBY:  Object to the form.
22             THE WITNESS:  No, other than dictating the
23   spacing.  The batten system was installed by Chris and
24   we used his batten system, so --
25   BY MR. FRIEDBERG:
```

Micha Cady                                                      April 28, 2025

1        Q.    When the cleats were installed, were they
2    installed into wood?
3        A.    The copper cleats for our panels?
4        Q.    Yes.
5        A.    Yeah, correct, into the wood batten.
6        Q.    You would know, would you not, that when you
7    put the nail, the 2-inch ring shank nail, through the
8    hole of the cleat whether or not you're putting it into
9    wood.  Agreed?
10       A.    Oh, absolutely.  Versus insulation?
11       Q.    Yes.
12       A.    Yes.
13       Q.    And in fact if there was no wood there to
14   accept the nail, that's something you would know,
15   correct?
16       A.    Correct.
17             MR. FRIEDBERG:  All right.  Let's take a
18   break.  Let me just go look at my notes and I'll be
19   right back.  Okay?  Let's take five minutes.
20             THE WITNESS:  All right.
21             THE VIDEOGRAPHER:  Going off the record at
22   approximately 9:01 a.m.
23             (Recess taken.)
24             THE VIDEOGRAPHER:  We are back on the record
25   at approximately 9:03 a.m.

Micha Cady                                                      April 28, 2025

```
 1   BY MR. FRIEDBERG:
 2        Q.   You know, Micha, I just have a follow-up
 3   question or two.
 4             I had asked you questions as to whether or not
 5   you were aware as to if in fact the cleats were actually
 6   installed approximately 9 1/2 inches on center, and I
 7   think your answer was something that, well, my guys are
 8   well trained.
 9             My question is:  Do you have personal
10   knowledge as to whether or not cleats in fact were
11   installed approximately every 9 1/2 inches on center for
12   each panel of copper?
13             MR. COSBY:  Object to the form.
14             You can answer.
15             THE WITNESS:  Did I specifically examine every
16   single cleat on every single batten?  No.
17   BY MR. FRIEDBERG:
18        Q.   So it's correct you do not have personal
19   knowledge as to whether or not there were cleats
20   installed to secure each panel, correct?
21        A.   Correct.
22             MR. COSBY:  Object to the form.
23   BY MR. FRIEDBERG:
24        Q.   I'm sorry, I didn't hear your answer.  Is that
25   correct?
```

Micha Cady                                                April 28, 2025

```
 1        A.    Correct.
 2              MR. FRIEDBERG:  All right.  Thank you.  I have
 3    nothing further.
 4              MR. COSBY:  Just a couple of follow-ups.
 5
 6                    E X A M I N A T I O N
 7    BY MR. COSBY:
 8        Q.    When you refer to Chris, who are you talking
 9    about?
10        A.    So Chris Bunge is the -- I believe he was the
11    contractor and the framer I believe which is -- is that
12    Sarah's brother-in-law?
13        Q.    Okay.  And was Chris involved in any
14    measurements with regard to the roof?
15        A.    I think at the time he had given Jack Burbach
16    some of the plans and measurements on site.
17        Q.    And do you know anything about Chris's level
18    of experience on roofing work?
19        A.    I do not.  All I know is that he was the
20    framer on site that we were to contact and get ahold of;
21    and he was the one installing the batten system, doing
22    all the work there on site.
23        Q.    And who hired Chris?
24        A.    The owners.
25              MR. FRIEDBERG:  Objection.  Form.
```

Micha Cady                                                    April 28, 2025

1    BY MR. COSBY:

2         Q.   You were asked a number of questions about the

3    calculation or representation of 9 1/2 inches on center.

4              Is it your understanding that the contract

5    provided for 9 1/2 inches on average?

6         A.   That is correct.

7              MR. FRIEDBERG:   Objection.   Form.

8    BY MR. COSBY:

9         Q.   And are you aware of any circumstances where

10   looking at the cleating system as a whole they were not

11   installed on 9 1/2 inches on average?

12             MR. FRIEDBERG:   Objection.   Form; foundation.

13   BY MR. COSBY:

14        Q.   You can answer.

15        A.   Based on the roofing -- I believe it's the

16   inspector who inspected it years ago -- I believe he

17   said one of them was 8 inches, one of them was 9 inches,

18   and one of them was 10 inches, which would be an average

19   of 9.   So unless the batten spacing -- I mean the batten

20   spacing was all within general range.   That's why it's

21   an average of 9 1/2.

22        Q.   And that reference you just made of 8 -- I'm

23   sorry, tell me again, what were the three measurements?

24        A.   The 8, 9, and 10.

25        Q.   Okay.   And that sounds like it complies with

Micha Cady                                                    April 28, 2025

1    9 1/2 on average.

2              Would you agree?

3        A.   Correct.

4              MR. FRIEDBERG:  Objection as to form.

5              THE WITNESS:  Less than.

6    BY MR. COSBY:

7        Q.   Would you agree it complies with it?

8        A.   Yes.

9              MR. FRIEDBERG:  Objection.  Form.

10             THE COURT REPORTER:  Mr. Cady, if you could

11   just pause after the question to allow an objection, if

12   there is one.

13             THE WITNESS:  Okay.

14   BY MR. COSBY:

15       Q.   Are you aware of any circumstances on the

16   Chocolate Hole main house roof where the cleating was

17   not installed properly or utilized properly?

18             MR. FRIEDBERG:  Objection.  Form; foundation.

19             THE WITNESS:  No, I am not aware of any areas

20   that were not installed correctly.

21             MR. COSBY:  Thank you.  That's all I have.

22             We'll read if it's ordered.

23             THE COURT REPORTER:  Mr. Cosby, are you

24   ordering a certified copy?

25             MR. COSBY:  I'm not ordering anything.  If

Micha Cady                                                    April 28, 2025

```
 1   counsel is ordering, I'll take a copy.  I didn't hear
 2   what he said.
 3              MR. FRIEDBERG:  I don't have to order.  When I
 4   set the deposition, it's ordered.  It's up to you
 5   whether you want a copy.
 6              MR. COSBY:  I would like a copy.
 7              THE COURT REPORTER:  Thank you.
 8              Thanks, John.
 9              THE VIDEOGRAPHER:  This concludes today's
10   deposition.  We are going off the record at
11   approximately 9:08 a.m.
12              (Proceedings concluded at 9:08 a.m.)
13                           --oOo--
14
15
16
17
18
19
20
21
22
23
24
25
```

Micha Cady                                                April 28, 2025

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3          I, MICHA CADY, hereby declare under penalty of

 4   perjury that I have read the foregoing deposition and

 5   that the testimony contained therein is a true and

 6   correct transcription of my testimony given at said time

 7   and place.

 8          Dated this _____ day of _____,

 9   20_____, at _____, _____.

10              (City)              (State)

11

12

13                    _____

14                          MICHA CADY

15

16

17

18

19

20

21

22

23

24

25
```

Micha Cady                                                        April 28, 2025

```
1              ERRATA SHEET / CORRECTION CERTIFICATE

2     Page   Line   Correction/Reason

3     _____  _____  _____

4     _____  _____  _____

5     _____  _____  _____

6     _____  _____  _____

7     _____  _____  _____

8     _____  _____  _____

9     _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23

24    _____     _____

25       Date                       MICHA CADY
```

Micha Cady                                                    April 28, 2025

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Beth A. Ballerini, Certified Shorthand

 4   Reporter in and for the State of California, do hereby

 5   certify:

 6          That the witness was by me duly sworn, and

 7   the foregoing testimony was reported by me and was

 8   thereafter transcribed with computer-aided

 9   transcription; and the preceding pages contain a full,

10   complete, and true record of said proceeding.

11          I further certify that I am a disinterested

12   person and am in no way interested in the outcome of

13   said action or connected with or related to any of the

14   parties in said action or to their respective counsel.

15          The dismantling, unsealing, or unbinding of the

16   original transcript will render the Reporter's

17   Certificate null and void.

18          IN WITNESS WHEREOF, I have hereunto set my hand

19   this 12th day of May 2025.

20

21

22          _____
            Beth A. Ballerini, CSR
23          Certificate No. 7358

24

25
```

**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, | **ACTION NO. 3:19-cv-0053-RAM-EAH** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| DAYBREAK, INC. dba HUBER & ASSOCIATES, | |
| Defendant. | |

**EXHIBIT**
**1**
Micha Cady - 4/28/25

### PLAINTIFFS' AMENDED NOTICE OF DEPOSITION AND REQUEST FOR PRORUCTION

PLEASE TAKE NOTICE that Plaintiffs will take the following deposition:

| Deponent | Date | Time | Location |
|---|---|---|---|
| Micha Cady | April 28, 2025 | 11:00 am EST/8:00 am PST | Zoom – Court Reporter will provide link |
| Barry Huber | April 28, 2025 | 12:00 pm EST 9:00 am PST | Zoom – Court reporter to provide link |

This deposition will be taken before a Certified Shorthand Reporter and will continue from day to day, excluding Sundays and holidays, until completed. This deposition may be videotaped for use at trial.

PLEASE TAKE FURTHER NOTICE that at the date and time of the deposition, Defendant is requested to produce the following:

### DEFINITIONS

The terms "project" and "contract" shall refer to the copper roofing project referred to in Plaintiffs' complaint.

1.1

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Amended Notice of Deposition and Request for Production*
*April 22, 2025*
*Page 2*

---

**REQUEST FOR PRODUCTION NO. 1:**

Any and all documents describing or relating to Defendant's work on the Construction project that is the subject of this lawsuit.

.**REQUEST FOR PRODUCTION NO. 2**:

Any and all documents including, without limitation, e-mails, evidencing or relating to any and all claims or demands seeking payment for labor, services and/or materials furnished for the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 3**:

Any and all contracts, including drafts thereof, relating to the construction of the construction project that is the subject of this lawsuit, in whole or in part.

**REQUEST FOR PRODUCTION NO. 4**:

Any and all documents evidencing any communications, including, without limitation, e-mails, facsimile and telephone logs, relating to the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 5**:

Any and all correspondence, including, without limitation, written, electronic or e-mail, facsimile and written records of oral communications, relating to the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 6**:

1.2

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Amended Notice of Deposition and Request for Production*
*April 22, 2025*
*Page 3*

_____

Any and all documents, agreements, subcontracts, purchase orders, bonds, and similar documents involving labor or materials for the construction project that is the subject of this lawsuit, including any oral or written agreements, modifications or revisions thereof.

**REQUEST FOR PRODUCTION NO. 7**:

Any and all documents dealing with contract modifications and changes, including addenda, supplements, amendments, alterations or modifications for any contract between you and any other party in connection with the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 8**:

Any and all documents relating to changes, alterations or modifications in the scheduling for any work on the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 9**:

Any and all documents in your custody, possession or control pertaining to any work performed on the project, including all plans and specifications, whether in paper or electronic format; all field sketches; any documents regarding dimensions or measurements or the roof or roofs at the project; all photographs taken at the project at any time; all communications pertaining to the project between you and any other person including all e-mails and all documents evidencing any and all calculations used by you in determining the square footage or the costs to be charged for this project.

**REQUEST FOR PRODUCTION NO. 10**:

All documents listed in Defendant's Rule 26 Initial Disclosures, including the following:

1.3

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Amended Notice of Deposition and Request for Production*
*April 22, 2025*
*Page 4*

_____

1.      Contract between the parties dated May 7, 2010.

2.      Plaintiffs' Expert Report

3.      Photograph of the property during the installation of the roof.

4.      Standing Seam Construction Information Pamphlet

5.      Photographs from Hoffman and Associates Deposition

6.      Pictures of Roof taken During Installation of Roof (5 pictures).

7.      Google Earth Satellite Photographs of the subject property for

        August 10, 2017, September 27, 2017, and November 25, 2017.

8.      Roof Plan for Main House.

9.      Preliminary Costs of Repairs produced by Plaintiff's Response to Production dated

        Virgin Islands Superior Court Case No. ST-10-cv-716 on March 8, 2014.

10.     Photographs produced by Plaintiff's Response to Production dated Virgin Islands

        Superior Court Case No. ST-10-cv-716 on March 8, 2014.

11.     Email from Defendant to Plaintiff on February 9, 2010.

12.     Email from Chris Bunge to Jack Burbach dated April 16, 2010.

13.     Email from Defendant to Plaintiffs on May 15, 2010.

14.     Email from Defendant to Plaintiffs on May 19, 2010.

15.     Email from Defendant to Plaintiffs on May 22, 2010.

16.     Email from Plaintiffs to Defendant on May 23, 2010.

17.     mail from Jack Burbach to Barry Huber dated June 25, 2010.

1.4

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Amended Notice of Deposition and Request for Production*
*April 22, 2025*
*Page 5*

_____

18.    Correspondence from Plaintiffs to Defendant dated July 13, 2010.

19.    Email from Defendant to Plaintiff dated August 23, 92010.

20.    Plaintiffs Response to Supplemental Interrogatories in Virgin Islands Superior Court Case No. ST-10-cv-716 on April 13, 2014.

21.    Photographs depicting mold in the subject property that were produce in Response to Plaintiffs' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on April 13, 2014.

22.    Invoices for work performed on the subject property that were produce in Response to Defendants' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on December 12, 2014.

23.    Ledger of all transactions between Plaintiffs and Defendant produced in Defendant's Response to Plaintiffs' Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on June 13, 2014.

24.    Additional invoice for work performed on the subject property that were produce in Response to Defendants' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on June 13, 2014.

25.    Diagrams regarding the roofing project on the subject property that were produce in Response to Defendants' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv- 716 on June 13, 2014.

1.5

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Amended Notice of Deposition and Request for Production*
*April 22, 2025*
*Page 6*

_____

26.     Deposition of Arthur Sanders, AIA taken in Superior Court of the Virgin Islands Case No. ST-10-CV-716 taken on March 6, 2015.

27.     Deposition of Barry Huber taken in Superior Court of the Virgin Islands Case No. ST-10-CV-716 taken on July 31, 2014.

28.     Release signed in Superior Court of the Virgin Islands Case No. ST-10-CV-716.

**REQUEST FOR PRODUCTION NO. 11**:

A copy of the insurance contract and declarations page identified in Defendant's Rule 26 disclosures from Southern-Owners Insurance, Policy Number 184622-78009727-18.

**REQUEST FOR PRODUCTION NO. 12**:

A copy of the insurance contract and declarations page identified in Defendant's Rule 26 disclosures from Ameritrust Group.

**REQUEST FOR PRODUCTION NO. 13**:

A copy of any reservations of rights issued by Southern-Owners Insurance, Policy Number 184622-78009727-18, that refers to or discusses the coverage available to Daybreak, Inc., as a result of the allegations in the subject complaint.

**REQUEST FOR PRODUCTION NO. 14**:

A copy of any reservations of rights issued by Ameritrust Group, Inc., that refers to or discusses the coverage available to Daybreak, Inc., as a result of the allegations in the subject complaint.

1.6

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Amended Notice of Deposition and Request for Production*
*April 22, 2025*
*Page 7*

_____

Dated :   April 22, 2025              **LAW OFFICES OF FRIEDBERG & BUNGE**

By: */s/ THOMAS F. FRIEDBERG, ESQ.*
                    THOMAS F. FRIEDBERG, ESQ.(VI#1006)
                      Attorneys for Plaintiffs THOMAS F.
                    FRIEDBERG & SARAH L. BUNGE
                    **THE LAW OFFICES OF FRIEDBERG &
                    BUNGE**
                    1005 ROSECRANS STREET, SUITE 202
                    PO BOX 6814
                    SAN DIEGO, CALIFORNIA 92166
                    TEL : (619)557-0101
                    FAX : (619)557-0560
                    E-mail : "tom@lawofficefb.com"

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of April 2025, a true and correct copy of **PLAINTIFFS' AMENDED NOTICE OF DEPOSITION AND REQUEST FOR PRODUCTION** was e-mailed to the following:

Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994
Telephone: 772-463-8402
Facsimile: 772-463-4820


Andrew C. Simpson
**ANDREW C. SIMPSON, PC**
2191 Church St., Ste. 5
Christiansted, VI 00820
TEL : 340.719.3900
E-MAIL :asimpson@coralbrief.com


                    */s/ THOMAS F. FRIEDBERG*
                    **THOMAS F. FRIEDBERG**

                       7

                                                              1.7

**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN**

THOMAS F. FRIEDBERG & SARAH L. BUNGE,

        Plaintiffs,

v.

DAYBREAK, INC. dba HUBER & ASSOCIATES,

        Defendant.

ACTION NO. 3:19-cv-0053-RAM-EAH

JURY TRIAL DEMANDED

**EXHIBIT**
**2**
Micha Cady - 4/28/25

## <u>PLAINTIFFS' NOTICE OF DEPOSITION AND REQUEST FOR PRORUCTION</u>

PLEASE TAKE NOTICE that Plaintiffs will take the following deposition:

| Deponent | Date | Time | Location |
|---|---|---|---|
| Barry Huber | April 8, 2025 | 11:00 am | Lexitas, 305 Northeast First Street, Gainsville, Florida 32601 (352) 373 7778 |

This deposition will be taken before a Certified Shorthand Reporter and will continue from day to day, excluding Sundays and holidays, until completed. This deposition may be videotaped for use at trial.

PLEASE TAKE FURTHER NOTICE that at the date and time of the deposition, Defendant is requested to produce the following:

### <u>DEFINITIONS</u>

The terms "project" and "contract" shall refer to the copper roofing project referred to in Plaintiffs' complaint.

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*March 6, 2025*
*Page 2*

---

**REQUEST FOR PRODUCTION NO. 1:**

Any and all documents describing or relating to Defendant's work on the Construction project that is the subject of this lawsuit.

.**REQUEST FOR PRODUCTION NO. 2**:

Any and all documents including, without limitation, e-mails, evidencing or relating to any and all claims or demands seeking payment for labor, services and/or materials furnished for the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 3**:

Any and all contracts, including drafts thereof, relating to the construction of the construction project that is the subject of this lawsuit, in whole or in part.

**REQUEST FOR PRODUCTION NO. 4**:

Any and all documents evidencing any communications, including, without limitation, e-mails, facsimile and telephone logs, relating to the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 5**:

Any and all correspondence, including, without limitation, written, electronic or e-mail, facsimile and written records of oral communications, relating to the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 6**:

2

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000002**

2.2

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*March 6, 2025*
*Page 3*

---

Any and all documents, agreements, subcontracts, purchase orders, bonds, and similar documents involving labor or materials for the construction project that is the subject of this lawsuit, including any oral or written agreements, modifications or revisions thereof.

**REQUEST FOR PRODUCTION NO. 7**:

Any and all documents dealing with contract modifications and changes, including addenda, supplements, amendments, alterations or modifications for any contract between you and any other party in connection with the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 8**:

Any and all documents relating to changes, alterations or modifications in the scheduling for any work on the construction project that is the subject of this lawsuit.

**REQUEST FOR PRODUCTION NO. 9**:

Any and all documents in your custody, possession or control pertaining to any work performed on the project, including all plans and specifications, whether in paper or electronic format; all field sketches; any documents regarding dimensions or measurements or the roof or roofs at the project; all photographs taken at the project at any time; all communications pertaining to the project between you and any other person including all e-mails and all documents evidencing any and all calculations used by you in determining the square footage or the costs to be charged for this project.

**REQUEST FOR PRODUCTION NO. 10**:

All documents listed in Defendant's Rule 26 Initial Disclosures, including the following:

3

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*March 6, 2025*
*Page 4*

_____

1.    Contract between the parties dated May 7, 2010.

2.    Plaintiffs' Expert Report

3.    Photograph of the property during the installation of the roof.

4.    Standing Seam Construction Information Pamphlet

5.    Photographs from Hoffman and Associates Deposition

6.    Pictures of Roof taken During Installation of Roof (5 pictures).

7.    Google Earth Satellite Photographs of the subject property for

      August 10, 2017, September 27, 2017, and November 25, 2017.

8.    Roof Plan for Main House.

9.    Preliminary Costs of Repairs produced by Plaintiff's Response to Production dated

      Virgin Islands Superior Court Case No. ST-10-cv-716 on March 8, 2014.

10.   Photographs produced by Plaintiff's Response to Production dated Virgin Islands

      Superior Court Case No. ST-10-cv-716 on March 8, 2014.

11.   Email from Defendant to Plaintiff on February 9, 2010.

12.   Email from Chris Bunge to Jack Burbach dated April 16, 2010.

13.   Email from Defendant to Plaintiffs on May 15, 2010.

14.   Email from Defendant to Plaintiffs on May 19, 2010.

15.   Email from Defendant to Plaintiffs on May 22, 2010.

16.   Email from Plaintiffs to Defendant on May 23, 2010.

17.   mail from Jack Burbach to Barry Huber dated June 25, 2010.

4

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000004**

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*March 6, 2025*
*Page 5*

_____

18.    Correspondence from Plaintiffs to Defendant dated July 13, 2010.

19.    Email from Defendant to Plaintiff dated August 23, 92010.

20.    Plaintiffs Response to Supplemental Interrogatories in Virgin Islands Superior Court Case No. ST-10-cv-716 on April 13, 2014.

21.    Photographs depicting mold in the subject property that were produce in Response to Plaintiffs' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on April 13, 2014.

22.    Invoices for work performed on the subject property that were produce in Response to Defendants' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on December 12, 2014.

23.    Ledger of all transactions between Plaintiffs and Defendant produced in Defendant's Response to Plaintiffs' Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on June 13, 2014.

24.    Additional invoice for work performed on the subject property that were produce in Response to Defendants' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv-716 on June 13, 2014.

25.    Diagrams regarding the roofing project on the subject property that were produce in Response to Defendants' Supplement Response to Request for Production in Virgin Islands Superior Court Case No. ST-10-cv- 716 on June 13, 2014.

2.5

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*March 6, 2025*
*Page 6*

---

26.    Deposition of Arthur Sanders, AIA taken in Superior Court of the Virgin Islands Case No. ST-10-CV-716 taken on March 6, 2015.

27.    Deposition of Barry Huber taken in Superior Court of the Virgin Islands Case No. ST-10-CV-716 taken on July 31, 2014.

28.    Release signed in Superior Court of the Virgin Islands Case No. ST-10-CV-716.

**REQUEST FOR PRODUCTION NO. 11**:

A copy of the insurance contract and declarations page identified in Defendant's Rule 26 disclosures from Southern-Owners Insurance, Policy Number 184622-78009727-18.

**REQUEST FOR PRODUCTION NO. 12**:

A copy of the insurance contract and declarations page identified in Defendant's Rule 26 disclosures from Ameritrust Group.

**REQUEST FOR PRODUCTION NO. 13**:

A copy of any reservations of rights issued by Southern-Owners Insurance, Policy Number 184622-78009727-18, that refers to or discusses the coverage available to Daybreak, Inc., as a result of the allegations in the subject complaint.

**REQUEST FOR PRODUCTION NO. 14**:

A copy of any reservations of rights issued by Ameritrust Group, Inc., that refers to or discusses the coverage available to Daybreak, Inc., as a result of the allegations in the subject complaint.

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000006

2.6

*F&B v. Daybreak*
*USCD Case No. 3:19-cv-0053-RAM-EAH*
*Notice of Deposition and Request for Production*
*March 6, 2025*
*Page 7*

_____

Dated :   March 6, 2025                    **LAW OFFICES OF FRIEDBERG & BUNGE**

By: */s/ THOMAS F. FRIEDBERG, ESQ.*
        THOMAS F. FRIEDBERG, ESQ.(VI#1006)
        Attorneys for Plaintiffs THOMAS F.
        FRIEDBERG & SARAH L. BUNGE
        **THE LAW OFFICES OF FRIEDBERG &**
        **BUNGE**
        1005 ROSECRANS STREET, SUITE 202
        PO BOX 6814
        SAN DIEGO, CALIFORNIA 92166
        TEL : (619)557-0101
        FAX : (619)557-0560
        E-mail : "tom@lawofficefb.com"

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of March 2025, a true and correct copy of **PLAINTIFFS' REQUEST FOR PRODUCTION** was e-mailed to the following:
Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994
Telephone: 772-463-8402
Facsimile: 772-463-4820


Andrew C. Simpson
**ANDREW C. SIMPSON, PC**
2191 Church St., Ste. 5
Christiansted, VI 00820
TEL : 340.719.3900
E-MAIL :asimpson@coralbrief.com


        */s/ THOMAS F. FRIEDBERG*
        **THOMAS F. FRIEDBERG**

7



February 8, 2010

## PROPOSAL FOR THE ROOFING AT THE
## FRIEDBERG/BUNGE RESIDENCE
## S t .   J o h n ,   U S V I

**We propose the following:**
**SECTION I. GENERAL CONDITIONS.**

1) Provide job set up. Go over job schedule and plan with owner prior to start up.
2) Provide General Liability and Workman's Compensation Insurance.
3) Provide scaffolding or other means of safe roof access.
4) Provide for material handling necessary for roof loading.
5) Provide project close out. Remove all surplus tools, equipment, materials and debris.
6) This bid includes travel to and from St. John, USVI only.  NO rental cars, food, lodging or freight.
7) This pricing may be withdrawn, if not accepted within 21 days of the above date. *(NOTE: Copper prices have been increasing.   This proposal is based off of a cost of $2.90 per pound as posted this date on COMEX.)*

**SECTION II. WORK:**

  ❧ COPPER STANDING SEAM ROOF (APPRX 8,400 SF)
    1) Provide and install Rosin slip sheet over modified underlayment.
    2) Provide and install 16oz. Red Copper batten seam roof system:
      ▪ Installed in accordance with *Revere Copper & Common Sense & SMACNA.*
      ▪ Panels to be roll formed in 17" O.C. panel widths with 1" double locked standing seam.
      ▪ Cleats installed 12" O.C. with 2 ring shank nails per cleat.
        ○ NOTE:  See Alternate A. for screws in lieu of nails.
      ▪ Includes traditional style single rib ridge finish.
  ❧ COPPER FLASHING
    1) Provide and install necessary 16 oz. Red copper flashings in the following locations:

| | | |
|---|---|---|
| ▪ Eave & gable drip edge | ▪ Stucco stop flashing | ▪ Crickets |
| ▪ Sidewall & headwall | ▪ Counter flashings | ▪ Chimney flashings |

***HUBER & ASSOCIATES***
*496 SW Ring Court, Lake City, FL 32025*
*Ph: (386) 487-1040 – Fax: (386) 755-3233*
*1  of  3*

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000008**



---

**SECTION III. COST AND TERMS.**

     &#x2767; PRICE BREAKDOWN
       1) **Copper Roofing**
         ▪ **$182,740.00**
       2) **Flashing**
         ▪ **$32,060.00**

1) Cost for work as described above $214,800.00 (One Hundred Ninety Thousand Seven Hundred Fifty Seven Dollars) to be paid in progress payments per schedule of values with balance due upon completion. 33% Deposit required upon acceptance.
2) Any additional work needed would be billed per the following:
      a.  A per man hour rate of $ 63.35 (average rate for Supervisor, Mechanic, Roofer & Laborers)
      b.  15% above the cost of materials or equipment

**SECTION IV. ACCEPTANCE:**
*Owner or Owner's Agent*                      *Huber & Associates*

By: _____     By: _____

Print Name: _____     Print Name: _____

Title: _____     Title: _____

Date: _____ /_____ /  2010     Date: _____ /_____ /  2010

F&B v. DAYBREAK - DEPOSITION EXHIBITS    P000009

2.9



## SECTION VI. ROOF PLANS:





*Main House*                                    *Guest House & Gazebo*





*Gatehouse*                                    *Garage*



*Beach Bar*

**HUBER & ASSOCIATES**
*496 SW Ring Court, Lake City, FL 32025*
*Ph: (386) 487-1040 – Fax: (386) 755-3233*
*3  of  3*

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000010**



May 7, 2010

## PROPOSAL FOR THE ROOFING AT THE FRIEDBERG/BUNGE RESIDENCE
## S t .   J o h n ,     U S V I

**We propose the following:**

**SECTION I. GENERAL CONDITIONS.**

1) Provide job set up. Go over job schedule and plan with owner prior to start up.
2) Provide General Liability and Workman's Compensation Insurance.
3) Provide scaffolding or other means of safe roof access.
4) Provide for material handling necessary for roof loading.
5) Provide project close out. Remove all surplus tools, equipment, materials and debris.
6) This bid includes travel to and from St. John, USVI only.  NO rental cars, food, lodging or freight.
7) This pricing may be withdrawn, if not accepted within 21 days of the above date.

**SECTION II. WORK:**

&#x2767; COPPER STANDING SEAM ROOF (APPRX 8,400 SF)
   1) Provide and install Rosin slip sheet over modified underlayment.
   2) Install 16oz. Red Copper standing seam roof system:
      ▪ Installed in accordance with *Revere Copper & Common Sense & SMACNA.*
      ▪ Panels to be roll formed in <u>15" O.C. panel widths</u> with 1" double locked standing seam.
      ▪ Cleats installed at an average of <u>9.5" O.C.</u> with 2 ring shank nails per cleat.
         o NOTE:  See Alternate A. for screws in lieu of nails.
      ▪ Includes traditional style single rib ridge finish.
&#x2767; COPPER FLASHING
   1) Provide and install necessary 16 oz. Red copper flashings per industry standards, as listed above, in all areas where needed.

*HUBER & ASSOCIATES*
*496 SW Ring Court, Lake City, FL 32025*
*Ph: (386) 487-1040 – Fax: (386) 755-3233*
*1  of  3*
F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000011

2.11



---

**SECTION III. COST AND TERMS.**

    ☙ PRICE BREAKDOWN  NOTE: Price reduce due to Owner providing majority of
copper for roofing and flashings.

      1) **Copper Roofing & Flashing previous quote:**    **$214,800.00**
        **Less all copper in bid**          **-$37,696.00**
        **Add for smaller panels and cleat spacing**   **+$10,735.00**
        **Updated Cost**         **$187,839.00**

*Additional copper, as, or if needed, to be provided by Owner or Contractor (see additional work note below).  Shipping costs from Owner's supply to our shop to be billed separately at cost (invoice provided).*

Cost for work as described above $187,839.00 (One Hundred Eighty Seven Thousand Eight Hundred Thirty Nine Dollars) to be paid in progress payments per schedule of values with balance due upon completion.  $25,000.00 Deposit required upon acceptance and materials required paid upon purchase.
[*Any additional work or material needed would be billed per the following:
A per man hour rate of $ 63.35 (average rate for Supervisor, Mechanic, Roofer & Laborers) and 15% above the cost of materials or equipment.*]

**SECTION IV. ACCEPTANCE:**
*Owner or Owner's Agent*         *Huber & Associates*

By: _____    By: _____

Print Name: _____    Print Name: _____

Title: _____    Title: _____

Date: _____ /_____ /  2010    Date: _____ /_____ /  2010

***HUBER & ASSOCIATES***
*496 SW Ring Court, Lake City, FL 32025*
*Ph: (386) 487-1040 – Fax: (386) 755-3233*
*2  of  3*
**F&B v. DAYBREAK - DEPOSITION EXHIBITS    P000012**

2.12



---

**SECTION VI. ROOF PLANS:**





*Main House*                                    *Guest House & Gazebo*





*Gatehouse*                                    *Garage*



*Beach Bar*

***HUBER & ASSOCIATES***
*496 SW Ring Court, Lake City, FL 32025*
*Ph: (386) 487-1040 – Fax: (386) 755-3233*
*3  of  3*

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000013**

2.13

# Friedberg/Bunge Residence



*Plot #168, Estate Chocolate Hole*

5/7/2010

| Description | | Selling |
|---|---|---|
| Labor / Material or Equip. | | Amount |

**1** **_General Conditions_**

| | | | |
|---|---|---|---|
| Set-up/Mobilize Labor | | $ | 2,391 |
| Permits | | $ | - |
| Mock Ups | | $ | - |
| Mock Up Materials | | $ | - |
| Supervision Costs | | $ | 3,552 |
| Plane Fares | | $ | 5,121 |
| Travel Time (Incl. Mock Ups) | | $ | 4,878 |
| Material Handling Equipment | by owner | $ | - |
| Scaffolding Labor | | $ | - |
| Scaffolding Equip. | by owner | $ | - |
| Site Logistics | | $ | 3,722 |
| Motel & Meal Expense | by owner | $ | - |
| Daily Clean Up | | $ | 1,819 |
| Other Material | | $ | - |
| Job Close Out/Pack | | $ | 1,517 |
| Job Close Out Materials | | $ | - |
| **126  Labor Hours** | | **$** | **22,999** |

**2** **_Roof Prep & Flashings_**

| | | | |
|---|---|---|---|
| Roof Tear-off | | $ | - |
| Dumpster - Facilities | | $ | - |
| Rosin Sheet Dry-in | | $ | 2,636 |
| Rosin Sheet | | $ | 1,009 |
| Peel & Stick RP 40 Labor | | $ | - |
| Peel & Stick Materials | | $ | - |
| Eave / Gable Flashing Labor | | $ | - |
| 16oz Copper | | $ | - |
| Valley Flashings Labor | | $ | 3,812 |

| | | |
|---|---|---|
| 16oz Copper | $ | - |
| Sidewall Flashing Labor | $ | 3,312 |
| 16oz Copper | $ | - |
| Headwall Flashing Labor | $ | 815 |
| 16 oz. Copper | $ | - |
| Stucco Stop Flashing Labor | $ | - |
| 16 oz. Copper | $ | - |
| Chimneys or Crickets Labor | $ | 5,575 |
| 16 oz. Copper | $ | - |
| **243  Labor Hours** | $ | **17,159** |

**3  _Roof Install_**

| | | |
|---|---|---|
| Copper Standing Seam | $ | 86,606 |
| Copper Materials | $ | - |
| Material Handling | $ | 3,931 |
| Freight                              by owner | $ | - |
| Pan Forming | $ | 4,333 |
| Copper Materials | $ | - |
| Valley Install (cutting) | $ | 4,812 |
| Valley Install Materials | $ | - |
| Hip Cutting & Forming | $ | 15,406 |
| Hip Cap Materials | $ | 1,574 |
| Ridges Labor | $ | 6,091 |
| Ridge Batten Caps | $ | 1,643 |
| ISO Board Labor | $ | - |
| ISO Board Materials | $ | - |
| Flat Roof Membrane Labor | $ | - |
| Flat Roof Membrane Materials | $ | - |
| Rollers | $ | 4,812 |
| Fasteners & Cleats | $ | 7,738 |
| **1492  Labor Hours** | $ | **136,946** |
| | | |
| **_Total of Sections_** | $ | **177,104** |
| **_Add for smaller seams and cleat spacing_** | $ | **10,735** |
| **_New Total_** | $ | **187,839** |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000015**

2.15



F&B v. DAYBREAK - DEPOSITION EXHIBITS    P000016

2.16

214106 Storm Damage
Friedberg-Bunge Residence St. John V. I.



*Photo 25. Pop Rivets have failed, and cap is loose.*

**Main Pavilion**



**Photo 26. Overall view of failed hip ridge cap.**

Copyright Hoffmann Architects, Inc. 2018

Page - 13

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000017**

2.17

214106 Storm Damage
Friedberg-Bunge Residence St. John V. I.



Photo 27. Failure along hip ridge line due to wind uplift.



Photo 28. Pans have lifted at other ridges.

Copyright Hoffmann Architects, Inc. 2018

Page - 14

F&B v. DAYBREAK - DEPOSITION EXHIBITS    P000018

2.18

214106 Storm Damage
Friedberg-Bunge Residence St. John V. I.



Photo 29. Pans have lifted at other ridges.



Photo 30. Dents and one puncture.

Copyright Hoffmann Architects, Inc. 2018

Page - 15

F&B v. DAYBREAK - DEPOSITION EXHIBITS    P000019

2.19

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**

**DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, | **CIVIL CASE NO. 3:19-cv-0053** |
| Plaintiffs, | **ACTION FOR DAMAGES - BREACH OF CONTRACT AND DEMAND FOR JURY TRIAL** |
| v. | |
| DAYBREAK, INC., dba HUBER & ASSOCIATES, | **Action Filed : July 14, 2019** <br> **Trial Date     : Not set** |
| Defendant. | |

Plaintiffs, THOMAS F. FRIEDBERG and SARAH L. BUNGE, allege as follows:

**JURISDICTION/VENUE**

1.      Plaintiffs, THOMAS F. FRIEDBERG and SARAH L. BUNGE, (hereinafter "Plaintiffs") are, and at all times herein, citizens and residents of the County of San Diego, State of California.

2.      Plaintiffs are informed and believes, and based thereupon alleges, that Defendant, DAYBREAK, INC., dba HUBER & ASSOCIATES (hereinafter "DAYBREAK"), is a Florida Corporation with its principal place of business within the State of Florida.

3.      At all times herein mentioned, Defendant DAYBREAK was operating as a cooper roofing manufacturer, contractor, fabricator and installer of a cooper roof for a residence located at 168 Chocolate Hole, St. John, Virgin Islands, and was performing construction work to make and install a cooper roof within the Territory of the United States Virgin Islands.

4.      Subject matter jurisdiction is proper since the citizenship of Plaintiffs and Defendant is diverse and the amount in controversy, exclusive of interests and costs, exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00). Therefore, this Court has jurisdiction over the matter pursuant to 28. U.S.C.§ 1332.

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000020

2.20

5. Personal jurisdiction over Defendant, DAYBREAK, is proper under 5 V.I.C. § 4903 since Defendant transacted business and contracted to supply goods and services within the Territory of the Virgin Islands.

6. On or about May 7, 2010, Plaintiffs entered into a written contract with Defendant to manufacture and install a standing seam copper roof, including all underlayments, flashings, crickets, including supplying all necessary equipment, materials and supplies, at Plaintiff's home located at 168 Chocolate Home, St. John, United States Virgin Islands. A copy of the contract has been attached to Plaintiff's Complaint as Exhibit "A."

7. A material term and specific contract condition required that the work include cleats be installed at an average of 9.5 inches on center with 2 ring shanks per cleat. The cleats are used to secure the copper panels and to hold the cooper panels that form the cooper pans in place. The cooper panels and the cooper pans were to be secured with cleats installed at an average of 9.5 inches on center. The reason for the spacing of 9.5 inches on center was to insure that the cooper panels and cooper pans would be secured and able to withstand hurricane force winds. Defendant charged an additional amount for the specific spacing requirement under the terms and conditions of the contract.

8. The cleats, once installed, are not visible to the naked eye. The cleats are covered with the cooper panels as each panel is installed to make up a cooper pan. The cooper pans are then secured with cleats and a ridge cap is riveted at the intersection of each cooper pan. The cleats that are installed at the intersection of the cooper pans is similarly not visible to the naked eye since the cleats are underneath the cooper panels and cooper pans.

9. Pursuant to the terms and conditions of the contract, work began on or about June 2010 and was substantially completed by on or about mid July 2010.

10. On or about September 7, 2017, the Hurricane Irma struck the Territory. The cooper pans at the ridge of the main house separated. After the storm, investigation revealed that Defendant did not install cleats at the intersection of the cooper panels that form the cooper pan at 9.5 inches on center as required by the terms and conditions of the contract. The areas of the failure of the cooper roof at the main house coincided to the areas where Defendant did not place cleats at 9.5

- 2 -

F&B v. DAYBREAK - DEPOSITION EXHIBITS      P000021

2.21

1  inches on center.

2     11.    The failure to install cleats at 9.5 inches on center was a breach of a material term of

3  the contract. The failure to install the cleats at 9.5 inches on center was a latent defect that was not

4  discoverable prior to September 7, 2017, since the cleats were to have been placed underneath the

5  cooper panels and cooper pans and their existence or non-existence would not have been visible to

6  the naked eye or upon reasonable inspection since the cleats are concealed. The failure to install the

7  cleats became discoverable after the intersection of the cooper pans separated where there were no

8  cleats. The failure to install the cleats in accordance with the plans and specifications of the contract

9  is a breach of the construction contract and constitutes a latent defect under 5 V.I.C. § 32b since the

10  failure to install the cleats was not apparent by reasonable inspection prior to September 7, 2017.

11     12.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs have

12  been damaged in a sum in excess of $75,000.00 for the damage to the main roof due to the failure

13  to install the cleats at 9.5 inches on center.

14     13.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs have

15  incurred damages, including incidental and consequential damages, in an amount in excess of

16  $75,000.00.

17     14.    As a direct and proximate result of the breach of contract by Plaintiffs have and will

18  incur reasonable attorneys' fees and costs.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

- 3 -

F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000022

2.22

1    WHEREFORE, Plaintiffs pray as follows:

2    1.    For breach of contract damages in an amount in excess of $75,000.00;

3    2.    For incidental and consequential damages in an amount to be proven at time of trial;

4    3.    For interest at the maximum legal rate in an amount to be proven at time of trial;

5    4.    For attorney's fees in an amount to be proven;

6    5.    For a trial by jury pursuant to Rule 38, Federal Rules of Practice;

7    6.    For costs of suit incurred herein; and

8    7.    For such other and further relief, including equitable relief, as this Court deems just

9    and proper.

10   Dated : July 14, 2019                    **LAW OFFICES OF FRIEDBERG & BUNGE**

11

12                              By: *s/ THOMAS F. FRIEDBERG, ESQ.*
                                THOMAS F. FRIEDBERG, ESQ. (VI # 1006)
13                              Attorneys for Plaintiffs, THOMAS F. FRIEDBERG
                                and SARAH L. BUNGE
14                              610 West Ash Street, Suite 1400
                                P.O. Box 6814
15                              San Diego, California 92101
                                TEL : (619)557-0101
16                              FAX:  (619)557-0560
                                " tom@lawofficefb.com"

17

18                              **DEMAND FOR JURY**

19   Plaintiffs hereby demands a jury trial pursuant to Rule 38, of the Federal Rules of Practice.

20   Dated : July 14, 2019                    **LAW OFFICES OF FRIEDBERG & BUNGE**

21                              By: *s/ THOMAS F. FRIEDBERG, ESQ.*
                                THOMAS  F.  FRIEDBERG,  ESQ.  (VI  #  1006)
22                              Attorneys for Plaintiffs, THOMAS F. FRIEDBERG
                                and SARAH L. BUNGE
23                              610 West Ash Street, Suite 1400
                                P.O. Box 6814
24                              San Diego, California 92101
                                TEL : (619)557-0101
25                              FAX:  (619)557-0560
                                "tom@lawofficefb.com"

26

27

28

- 4 -

F&B/Huber                    Complaint for Damages                    3:19-cv-0053

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000023**

2.23

2:21 PM
07/12/10

# Huber and Associates
# All Transactions for Friedberg & Bunge

| Date | Transaction | All Transactions Amount | Now Revised |
|------|-------------|-------------------------|-------------|
| 05/13/2010 | **Contract Amount** | **187,839.00** | **187,839.00** |
| 05/24/2010 | **Add'n Copper Change Order** | **15,222.89** | **17,506.32** |
| 06/21/2010 | **Add'n Copper Change Order** | **11,525.10** | **13,253.87** |
| 06/30/2010 | **Change Order Consisting Of:** | **11,873.42** | **12,469.36** |
| | *Add'n Flashing Mat'ls* | *4,633.00* | *5,228.94* |
| | *Flat Roof to Pitched Roof - Labor* | *2,565.68* | *2,565.68* |
| | *Help Chris on Eaves* | *253.40* | *253.40* |
| | *Vent Boots to Copper - Labor* | *1,520.40* | *1,520.40* |
| | *Meals & Fuel* | *2,900.94* | *2,900.94* |
| 07/08/2010 | **Change Order Consisting Of:** | **4,264.15** | **4,411.75** |
| | *Last Shipment of Copper* | *984.00* | *1,131.60* |
| | *Labor Copper at Each Boot* | *760.20* | *760.20* |
| | *Lodging* | *900.00* | *900.00* |
| | *Meals & Fuel* | *1,619.95* | *1,619.95* |
| | **Sub-Total** | **230,724.56** | **235,480.29** |
| | **\*\*CREDITS NOT PREVIOUSLY ISSUED** | **-5,464.00** | **-4,171.09** |
| | *Resin Paper L & M* | *3,645.00* | *3,645.00* |
| | *Excise Tax* | | *526.09* |
| | *Credit for Add'n Flashing Mat'ls* | | *0.00* |
| | *Daily Clean-up (which I don't agree* | | |
| | *with the assessment by Chris)* | *1,819.00* | *0.00* |
| | **TOTAL ADJUSTED COST** | **225,260.56** | **231,309.20** |
| 05/12/2010 | Payment | 25,000.00 | 25,000.00 |
| 05/25/2010 | Payment | 15,222.89 | 15,222.89 |
| 06/15/2010 | Payment | 37,600.00 | 37,600.00 |
| 06/22/2010 | Payment | 50,096.66 | 50,096.66 |
| 06/29/2010 | Payment | 39,700.95 | 39,700.95 |
| 07/09/2010 | Payment | 10,000.00 | 10,000.00 |
| 07/16/2010 | Payment | 22,372.19 | 22,372.19 |
| | | 199,992.69 | 199,992.69 |
| | Balance on Account | 25,267.87 | 31,316.51 |
| | **Split Actual Copper Overage** | | |
| | **per Calculations in e-mail** | | 0.00 |
| | **if Amount Due is paid upon reciept of this invoice** | | |
| | FINAL AMOUNT DUE | 25,267.87 | $    31,316.51 |
| | Plus \*\*Credits not issued | 5,464.00 | |
| | Books Currently Show | $     30,731.87 | |

2:21 PM
07/12/10

**Huber and Associates**
## All Transactions for Friedberg & Bunge
**All Transactions**

with 15% Mark-up
with 15% Mark-up

with 15% Mark-up

with 15% Mark-up

Credit ok'd
Credit ok'd
 No longer offering credit for 5,228.94
     *(add'n flashing above)
No longer offering this credit
CONTRACT AMOUNT WITH CHANGE ORDERS
AND OK'D CREDITS

No longer offering this credit

This would be the new balance with
additional charges, per contract, less
credits we would be willing to offer

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000025

2.25

| | | | |
|---|---|---|---|
| Bid Description: | *Copper Standing Seam Roofing* | | **OVERHEAD STUDY** |
| Project Name: | Friedberg/Bunge Residence | | Crew of |
| Location: | Plot #168, Estate Chocolate Hole | | Hrs towards OH |
| Bid Due By: | January 15, 2010 | | Monthly Overhead of |
| Date Bid: | December 15, 2009 | | Overhead per Hour |

**CREW SIZE**    6                                                      **LABOR RATES ON BIDS**

| | | | |
|---|---|---|---|
| | | | Labor Rate Base |
| **MARGINS ON BID** | | | Labor w/O.T. |
| Sales Tax | 7.0% | $214,800 | |
| Profit | 10.0% | (CONTRACT TOTAL FROM BID PAGE) | **LODGING & MEALS / DAY** |
| Overhead | 10.0% | | Men per room per night> |
| | | | per night |
| **WORK DAYS** | | | meals/day |
| Days/Week | 5.5 | | TOTAL per Day |
| Hours/day | 9.0 | | Total / hr |
| Hrs / Week | 49.5 | | |
| Weeks per month AV | 4.33 | | **MAN DAY COST** |
| Available Days per M | 23.83 | | Cost @ |
| Consider | 75% | of full days per month | Cost for Motel & Meals |
| Means | 17.88 | days per month for O. H. | Total for Labor Cost |
| **SUPERVISOR RATES** | | | Selling @ |
| Labor Rate Base | $38.00 | $79,040.00 | Selling for Meals & Lodging |
| With O.T. | $41.65 | | SELLING with Motel & Meal |



|  |  | | |
|---|---|---|---|
| | 2650 | | |
| $ | 70,000 | | PROFIT |
| | $26.42 | | MARGIN |
| | | | STANDARDS |
| | $30.00 | | |
| | $32.88 | | 0% |

| 4.00 | Equals per day of: | Distance |
|---|---|---|
| $121 | $ | 30.25 | 200 |
| $12 | | $12 | |
| | $ | 42.25 | |
| $ | 4.69 | | |

|  |  | | |
|---|---|---|---|
| $ | 533.64 | | |
| $ | 42.25 | | |
| $ | 575.89 | | |
| $ | 645.71 | < USE THIS, IF BID | Hourly |
| $ | 51.12 | ADDS MOTEL & MEAL | Rates |
| $ | 696.83 | | $ 77.43 |

| Project Squares Bid | 84 | | |
|---|---|---|---|

| | Coil Width | Approx. Drop | Finished Panel |
|---|---|---|---|
| **ORIGINAL BID** | | | |
| Panel Size | *20* | *3* | 17 |
| | | | |
| **Cleats Spacing (inches) BID** | | | **12** |
| Amount of **panels** per square | | 7.06 | |
| Amount of **cleats** per square | | 70.6 | |
| | | | |
| **IF 18" COIL** | | | |
| Panel Size | *18* | *3* | **15** |
| **Cleats Spacing (inches)** | | | **9.5** |
| Amount of **panels** per square | | 8.00 | 114% more |
| Amount of **cleats** per square | | 101.1 | 144% more |

**Additional hours**
**CLEATS**

| Additional Cleats for Project | 2,559 | more cleats for project then bid | |
|---|---|---|---|
| Time per cleat | 1.1 | minutes | |
| Additional hours | 47 | @ $63.35 | $2,972.08 |

**PANELS**

| Additional Panels for Project | 79 | more panels for project then bid | |
|---|---|---|---|
| Average time per panel | 1.55 | hours | |
| Additional hours | 123 | @ $63.35 | **$7,762.98** |

**IF RETURNING COPPER**

| Copper in stock | 7803 | sq ft |
|---|---|---|
| Potential credit (asuming in good shape) | | |

| | $3.11 | current comex (cost at mills) |
|---|---|---|
| Vendor add | $0.70 | |
| Price from Supplier | $3.81 | |

*NOTE: Comex is without any processing or dealer adds.*
*Retail vendors typically add approx. 70 cents higher per pound*

CREDIT on COPPER

| If at slightly less the Comex | $2.75 | which is equal to an approx. |
|---|---|---|
| | | 28% re-stocking fee |
| Total Credit | | $21,458.25 |
| Purchase new | 7803 | $3.81 | $29,729.43 |
| **Additional Cost** | | | **$8,271.18** |

# Friedberg/Bunge Residence
*Plot #168, Estate Chocolate Hole*



| Description | QTY. | | Waste % Add |
|---|---|---|---|
| **1** ***General Conditions*** | | | |
| Job Set-up/Mobilize Labor | 3 M/D's | | |
| Permits | 1 permit | | |
| Mock Ups | 0 M/D's | | |
| Mock Up Materials | 0 allowance | | |
| Supervision Costs | 1 M/D's | | |
| Plane Fares | 7 Each | | |
| Travel Time (Incl. Mock Ups) | 7 M/D's | | |
| Material Handling Equipment | 0 Weeks | **BY OWNER** | |
| Scaffolding Labor | 0 M/D's | | |
| Scaffolding Equip. | 0 Mnths Rent | **BY OWNER** | |
| Logistics | 6 M/D's | | |
| Motel & Meal Expense | 0 Rooms | **BY OWNER** | |
| Daily Clean Up | 3 M/D's | | |
| Other Material | 0 Each | | |
| Job Close Out | 2 M/D's | | |
| Job Close Out Materials | 1 | | |
| | ***126  Labor Hours*** | | |
| **2** ***Roof Prep & Flashings*** | | | |
| Roof Tear-off | 0 sqs | | |
| Dumpster - Facilities | 0 Ea | | |
| Rosin Sheet Dry-in | 87 sqs | | |
| Rosin Sheet | 87 sqs | | 12% |
| Peel & Stick RP 40 Labor | 0 sqs | | |
| Peel & Stick Materials | 0 sqs | | 30% |
| Eave / Gable Flashing Labor | 1059 lft | | |
| 16oz Copper | 1059 lft | | 13% |
| Valley Flashings Labor | 116 lft | | |
| 16oz Copper | 116 lft | | 13% |
| Sidewall Flashing Labor | 141 lft | | |
| 16oz Copper | 141 lft | | 13% |
| Headwall Flashing Labor | 13 lft | | |
| 16 oz. Copper | 13 lft | | 13% |
| Stucco Stop Flashing Labor | 153 ea | | |
| 16 oz. Copper | 153 ea | | 13% |
| Chimneys or Crickets Labor | 4 ea | | |
| Vents Materials | 4 allowance | | 13% |
| | ***243  Labor Hours*** | | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000029**

2.29

**3 _Roof Install_**

| | | | |
|---|---|---|---|
| Copper Standing Seam | 87 | sqs | |
| Copper Materials | 87 | sqs | 17% |
| Material Handling | 7 | M/D's | |
| Freight | 0 | Loads | by owner |
| Cross Seams | 0 | lft | |
| Copper Materials | 0 | lft | 7% |
| Valley Install (cutting) | 116 | lft | |
| Valley Install Materials | 116 | lft | 0% |
| Hip Cutting & Forming | 1115 | lft | |
| Hip Cap Materials | 1115 | lft | 9% |
| Ridges Labor | 97 | lft | |
| Ridge Batten Caps | 97 | lft | 9% |
| ISO Board Labor | 0 | sqs | |
| ISO Board Materials | 0 | sqs | 10% |
| Flat Roof Membrane Labor | 0 | sqs | |
| Flat Roof Membrane Materials | 0 | sqs | 10% |
| Rollers | 1 | set | |
| Fasteners | 87 | sqs | |

**1492  Labor Hours**

**Sum**

| | |
|---|---|
| **Materials with Sales Tax** | |
| **Travel Time** | |
| **Supervision** | |
| **Project Duration** | _6_ |
| **Gen Labor** | |
| **Motel & Meal** | |
| **Overhead** | |
| **Sub-Total** | |
| **Profit** | _16%_ |
| **87.0** sqs | |
| **$2,469** PER SQ | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000030**



Date of Bid:  1/15/2010

Today's Date:  3/31/2025

| nstall Rate OR M/D BID | Order Qty Labor | Mat'ls | Labor Unit $ | Mat'l Unit $ | Cost Amount |
|---|---|---|---|---|---|
| 1 | 3.0 M/D's | | 575.89 | | 1,728 |
| | | 1.0 permit | | 0.00 | 0 |
| 0 | 0.0 M/D's | | 575.89 | | 0 |
| | | 0.0 allowance | | 550.00 | 0 |
| 1 | 1.0 M/D's | | 654.80 | | 655 |
| | | 7.0 Each | | 565.00 | 4,232 |
| 1 | 7.0 M/D's | | 575.89 | | 4,031 |
| | | 0.0 Weeks | | 875.00 | 0 |
| 0 | 0.0 M/D's | | 575.89 | | 0 |
| | | 0.0 Mnths Rent | | 750.00 | 0 |
| 1 | 6.0 M/D's | | 575.89 | | 3,455 |
| | | 0.0 Rooms | | 90.00 | 0 |
| 1 | 3.0 M/D's | | 575.89 | | 1,728 |
| | | 0.0 Each | | 215.00 | 0 |
| 1 | 2.0 M/D's | | 575.89 | | 1,152 |
| | | 1.0 allowance | | 350.00 | 375 |
| | | | | $ | 17,355 |
| | | | | | |
| 0 | per day | 0.0 M/D's | 575.89 | | 0 |
| | | 0.0 Ea | | 400.00 | 0 |
| 23 | per day | 3.8 M/D's | 575.89 | | 2,178 |
| | | 97.4 sqs | | 8.00 | 834 |
| | per day | 0.0 M/D's | 575.89 | | 0 |
| | | 0.0 sqs | | 45.00 | 0 |
| 200 | per day | 5.3 M/D's | 575.89 | | 3,049 |
| | | 1196.7 lft | | 4.50 | 5,762 |
| 100 | per day | 1.2 M/D's | 575.89 | | 668 |
| | | 131.1 lft | | 10.00 | 1,403 |
| 33 | per day | 4.3 M/D's | 575.89 | | 2,461 |
| | | 159.3 lft | | 5.75 | 980 |
| 75 | per day | 0.2 M/D's | 575.89 | | 100 |
| | | 14.7 lft | | 5.75 | 90 |
| 35 | per day | 4.4 M/D's | 575.89 | | 2,517 |
| | | 172.9 ea | | 6.75 | 1,249 |
| 0.5 | per day | 8.0 M/D's | 575.89 | | 4,607 |
| | | 4.5 allowance | | 450.00 | 2,176 |
| | | | | | |
| | | | | $ | 28,075 |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS**    **P000031**

2.31

| | | | | | | |
|---|---|---|---|---|---|---|
| 0.7 | per day | 124.3 M/D's | | 575.89 | | 71,576 |
| <= for seams | | 101.8 sqs | | | 362.00 | 39,427 |
| 1 | | 7.0 M/D's | | 575.89 | | 4,031 |
| | | 0.0 Loads | | | | 0 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | 0.0 lft | | | 0.00 | 0 |
| 45 | per day | 2.6 M/D's | | 575.89 | | 1,485 |
| | | 116.0 lft | | | 0.00 | 0 |
| 45 | per day | 24.8 M/D's | | 575.89 | | 14,269 |
| | | 1215.4 lft | | | 1.00 | 1,300 |
| 45 | per day | 2.2 M/D's | | 575.89 | | 1,241 |
| | | 105.7 lft | | | 12.00 | 1,358 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | 0.0 lft | | | 110.00 | 0 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | 0.0 lft | | | 125.00 | 0 |
| 0.2 | per day | 5.0 M/D's | | 575.89 | | 2,879 |
| | | 87.0 sqs | | | 31.98 | 2,977 |
| | | | | | $ | **140,544** |
| | | | | | $ | 185,974 |

## mary of Hard Costs

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | $ | 62,163 | | |
| 63 | Man Hours | @ $ 32.88 | | $ | 2,071 | | |
| 9 | Man Hours | @ $ 41.65 | | $ | 375 | | |
| men | 34 Days | | | | | | |
| 1862 | Man Hours | @ $ 32.88 | | $ | 61,209 | $ 40,000 | |
| 1934 | **Total Hours** | @ $ 4.69 | | $ | 9,077 | | |
| 1934 | **Total Hours** | @ $ 26.42 | | $ | 51,078 | | |
| | Labor @ | $ 63.99 | | $ | 185,974 | | |
| | | 9.92 | | $ | 28,826 | 101,113.35 | |
| | Labor @ | $ 73.91 | | $ | **214,800** | | |
| | | other | | | | | |
| | | Total | | $ | 214,800 | | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000032**

2.32

| Selling Amount | With General Conditions | | COST (Labor w/OH) | |
|---|---|---|---|---|
| | LABOR (With Labor carrying all of GC's) | Mat'ls Selling | LABOR | MATERIALS |
| $ 2,090 | | | $ 888 | |
| $ - | | | | $ - |
| $ - | | | $ - | |
| $ - | | | | $ - |
| $ 792 | | | $ 296 | |
| $ 5,121 | | | | $ 4,232 |
| $ 4,878 | | | $ 2,071 | |
| $ - | | | | $ - |
| $ - | | | $ - | |
| $ - | | | | $ - |
| $ 4,181 | | | $ 1,775 | |
| $ - | | | | $ - |
| $ 2,090 | | | $ 888 | |
| $ - | | | | $ - |
| $ 1,394 | | | $ 592 | |
| $ 453 | | | | $ 375 |
| **$ 20,999** | | | | |

| Selling Amount | LABOR | % | Mat'ls Selling | LABOR | MATERIALS |
|---|---|---|---|---|---|
| $ - | $ - | 0% | $ - | $ - | |
| $ - | $ - | | | | $ - |
| $ 2,636 | $ 3,048 | 2% | $ 2,636 | $ 1,119 | |
| $ 1,009 | $ 1,009 | | | | $ 834 |
| $ - | $ - | 0% | $ - | $ - | |
| $ - | $ - | | | | $ - |
| $ 3,690 | $ 4,266 | 3% | $ 3,690 | $ 1,567 | |
| $ 6,972 | $ 6,972 | | | | $ 5,762 |
| $ 808 | $ 935 | 1% | $ 808 | $ 343 | |
| $ 1,697 | $ 1,697 | | | | $ 1,403 |
| $ 2,977 | $ 3,443 | 2% | $ 2,977 | $ 1,264 | |
| $ 1,186 | $ 1,186 | | | | $ 980 |
| $ 121 | $ 140 | 0% | $ 121 | $ 51 | |
| $ 109 | $ 109 | | | | $ 90 |
| $ 3,046 | $ 3,522 | 2% | $ 3,046 | $ 1,294 | |
| $ 1,511 | $ 1,511 | | | | $ 1,249 |
| $ 5,575 | $ 6,446 | 4% | $ 5,575 | $ 2,367 | |
| $ 2,633 | $ 2,633 | | | | $ 2,176 |
| **$ 33,971** | | | | | |

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000033

2.33

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| $ | 86,606 | $ | 100,140 | 64% | $ 86,606 | $ 36,777 | |
| $ | 47,707 | $ | 47,707 | | | | $ 39,427 |
| $ | 4,878 | $ | 5,640 | 4% | $ 4,878 | $ 2,071 | |
| $ | - | $ | - | | | | $ - |
| $ | - | $ | - | 0% | $ - | $ - | |
| $ | - | $ | - | | | | $ - |
| $ | 1,796 | $ | 2,077 | 1% | $ 1,796 | $ 763 | |
| $ | - | $ | - | | | | $ - |
| $ | 17,266 | $ | 19,964 | 13% | $ 17,266 | $ 7,332 | |
| $ | 1,574 | $ | 1,574 | | | | $ 1,300 |
| $ | 1,502 | $ | 1,737 | 1% | $ 1,502 | $ 638 | |
| $ | 1,643 | $ | 1,643 | | | | $ 1,358 |
| $ | - | $ | - | 0% | $ - | $ - | |
| $ | - | $ | - | | | | $ - |
| $ | - | $ | - | 0% | $ - | $ - | |
| $ | - | $ | - | | | | $ - |
| $ | 3,484 | $ | 4,029 | 3% | $ 3,484 | $ 1,480 | |
| $ | 3,602 | $ | 3,602 | | | | $ 2,977 |
| $ | **170,058** | $ | **225,029** | | $ **134,386** | $ **61,209** | $ **62,163** |
| $ | 225,029 | $ | 186,709 | | | | |
| $ | 28,091 | $ | (38,320) | | | | |
| $ | 10,229 | $ | - | | | | |
| $ | 214,800 | | | | | | |

214800

2:21 PM
07/12/10

**Huber and Associates**

## All Transactions for Friedberg & Bunge

| Date | Transaction | All Transactions Amount | Now Revised |
|------|-------------|-------------------------|-------------|
| 05/13/2010 | **Contract Amount** | 187,839.00 | 187,839.00 |
| 05/24/2010 | Add'n Copper Change Order | 15,222.89 | 17,506.32 |
| 06/21/2010 | Add'n Copper Change Order | 11,525.10 | 13,253.87 |
| 06/30/2010 | Change Order Consisting Of: | 11,873.42 | 12,469.36 |
| | *Add'n Flashing Mat'ls | 4,633.00 | 5,228.94 |
| | Flat Roof to Pitched Roof - Labor | 2,565.68 | 2,565.68 |
| | Help Chris on Eaves | 253.40 | 253.40 |
| | Vent Boots to Copper - Labor | 1,520.40 | 1,520.40 |
| | Meals & Fuel | 2,900.94 | 2,900.94 |
| 07/08/2010 | Change Order Consisting Of: | 4,264.15 | 4,411.75 |
| | Last Shipment of Copper | 984.00 | 1,131.60 |
| | Labor Copper at Each Boot | 760.20 | 760.20 |
| | Lodging | 900.00 | 900.00 |
| | Meals & Fuel | 1,619.95 | 1,619.95 |
| | Sub-Total | 230,724.56 | 235,480.29 |
| | **CREDITS NOT PREVIOUSLY ISSUED | -5,464.00 | -4,171.09 |
| | Resin Paper L & M | 3,645.00 | 3,645.00 |
| | Excise Tax | | 526.09 |
| | Credit for Add'n Flashing Mat'ls | | 0.00 |
| | Daily Clean-up (which I don't agree | | |
| | with the assessment by Chris) | 1,819.00 | 0.00 |
| | TOTAL ADJUSTED COST | 225,260.56 | 231,309.20 |
| 05/12/2010 | Payment | 25,000.00 | 25,000.00 |
| 05/25/2010 | Payment | 15,222.89 | 15,222.89 |
| 06/15/2010 | Payment | 37,600.00 | 37,600.00 |
| 06/22/2010 | Payment | 50,096.66 | 50,096.66 |
| 06/29/2010 | Payment | 39,700.95 | 39,700.95 |
| 07/09/2010 | Payment | 10,000.00 | 10,000.00 |
| 07/16/2010 | Payment | 22,372.19 | 22,372.19 |
| | | 199,992.69 | 199,992.69 |
| | Balance on Account | 25,267.87 | 31,316.51 |
| | **Split Actual Copper Overage** | | |
| | **per Calculations in e-mail** | | 0.00 |
| | **if Amount Due is paid upon reciept of this invoice** | | |
| | FINAL AMOUNT DUE | 25,267.87 | $   31,316.51 |
| | Plus **Credits not issued | 5,464.00 | |
| | Books Currently Show | $   30,731.87 | |

2.35

2:21 PM
07/12/10

**Huber and Associates**
## All Transactions for Friedberg & Bunge
**All Transactions**

with 15% Mark-up
with 15% Mark-up

with 15% Mark-up

with 15% Mark-up

Credit ok'd
Credit ok'd
 No longer offering credit for 5,228.94
     *(add'n flashing above)
No longer offering this credit
CONTRACT AMOUNT WITH CHANGE ORDERS
AND OK'D CREDITS

No longer offering this credit

This would be the new balance with
additional charges, per contract, less
credits we would be willing to offer

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000036**

2.36

# Friedberg/Bunge Residence
*Plot #168, Estate Chocolate Hole*

| Description | Waste % Add | Install Rate OR M/D BID | | Labor |
|---|---|---|---|---|
| **1  General Conditions** | | | | |
| Job Set-up/Mobilize Labor | | 1 | | 3.0 |
| Permits | | | | |
| Mock Ups | | 0 | | 0.0 |
| Mock Up Materials | | | | |
| Supervisor | | 1 | | 1.0 |
| Plane Fares | | | | |
| Travel Time (Incl. Mock Ups) | | 1 | | 7.0 |
| Material Handling Equipment | BY OWNER | | | |
| Scaffolding Labor | | 0 | | 0.0 |
| Scaffolding Equip. | BY OWNER | | | |
| Logistics | | 1 | | 6.0 |
| Motel & Meal Expense | BY OWNER | | | |
| Daily Clean Up | | 1 | | 3.0 |
| Other Material | | | | |
| Job Close Out | | 1 | | 2.0 |
| Job Close Out Materials | | | | |
| | **126  Labor Hours** | | | |
| | | | | |
| **2  Roof Prep & Flashings** | | | | |
| Roof Tear-off | | 0 | per day | 0.0 |
| Dumpster - Facilities | | | | |
| Rosin Sheet Dry-in | | 23 | per day | 3.8 |
| Rosin Sheet | 12% | | | |
| Peel & Stick RP 40 Labor | | | per day | 0.0 |
| Peel & Stick Materials | 30% | | | |
| Eave / Gable Flashing Labor | | 200 | per day | 5.3 |
| 16oz Copper | 13% | | | |
| Valley Flashings Labor | | 100 | per day | 1.2 |
| 16oz Copper | 13% | | | |
| Sidewall Flashing Labor | | 33 | per day | 4.3 |
| 16oz Copper | 13% | | | |
| Headwall Flashing Labor | | 75 | per day | 0.2 |
| 16 oz. Copper | 13% | | | |
| Stucco Stop Flashing Labor | | 35 | per day | 4.4 |
| 16 oz. Copper | 13% | | | |
| Chimneys or Crickets Labor | | 0.5 | per day | 8.0 |
| Related Materials | 13% | | | |

**243  Labor Hours**

F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000037

2.37

**3 Roof Install**

| | | 0.7 | | |
|---|---|---|---|---|
| Copper Standing Seam | | 0.65 | per day | 133.8 |
| Copper Materials | 17% | <= for seams | | |
| Material Handling | | 1 | | 7.0 |
| Freight | by owner | | | |
| Cross Seams | | 0 | per day | 0.0 |
| Copper Materials | 7% | | | |
| Valley Install (cutting) | | 45 | per day | 2.6 |
| Valley Install Materials | 0% | | | |
| Hip Cap | | 45 | per day | 24.8 |
| Hip Cap Materials | 9% | | | |
| Ridges Labor | | 45 | per day | 2.2 |
| Ridge Batten Caps | 9% | | | |
| ISO Board Labor | | 0 | per day | 0.0 |
| ISO Board Materials | 10% | | | |
| Flat Roof Membrane Labor | | 0 | per day | 0.0 |
| Flat Roof Membrane Materials | 10% | | | |
| Rollers | | 0.2 | per day | 5.0 |
| Fasteners | | | | |

**1578  Labor Hours**

## Summary of Hard C⸱

| | | | |
|---|---|---|---|
| | 63 | Man Hours | |
| | 9 | Man Hours | |
| 6 | men | 36 | Days |
| | 1948 | Man Hours | |
| | 2020 | Total Hours | |
| | 2020 | Total Hours | |
| | | Labor @ | |

21%

sqs

PER SQ

Labor @

Date of Bid: 1/15/2010
Today's Date: 3/31/2025



| Order Qty Mat'ls | Labor Unit $ | Selling Amount | | LABOR With Labor carrying all of GC's | |
|---|---|---|---|---|---|
| M/D's | 575.89 | $ | 2,090 | | |
| 1.0 permit | | $ | - | | |
| M/D's | 575.89 | $ | - | | |
| 0.0 allowance | | $ | - | | |
| M/D's | 654.80 | $ | 792 | | |
| 7.0 Each | | $ | 5,121 | | |
| M/D's | 575.89 | $ | 4,878 | | |
| 0.0 Weeks | | $ | - | | |
| M/D's | 575.89 | $ | - | | |
| 0.0 Mnths Rent | | $ | - | | |
| M/D's | 575.89 | $ | 4,181 | | |
| 0.0 Rooms | | $ | - | | |
| M/D's | 575.89 | $ | 2,090 | | |
| 0.0 Each | | $ | - | | |
| M/D's | 575.89 | $ | 1,394 | | |
| 1.0 allowance | | $ | 453 | | |
| | | $ | 20,999 | | |
| M/D's | 575.89 | $ | - | $ | - |
| 0.0 Ea | | $ | - | $ | - |
| M/D's | 575.89 | $ | 2,636 | $ | 3,028 |
| 97.4 sqs | | $ | 1,009 | $ | 1,009 |
| M/D's | 575.89 | $ | - | $ | - |
| 0.0 sqs | | $ | - | $ | - |
| M/D's | 575.89 | $ | 3,690 | $ | 4,239 |
| 1196.7 lft | | $ | 4,634 | $ | 4,634 |
| M/D's | 575.89 | $ | 808 | $ | 929 |
| 131.1 lft | | $ | 1,523 | $ | 1,523 |
| M/D's | 575.89 | $ | 2,977 | $ | 3,421 |
| 159.3 lft | | $ | 925 | $ | 925 |
| M/D's | 575.89 | $ | 121 | $ | 139 |
| 14.7 lft | | $ | 71 | $ | 71 |
| M/D's | 575.89 | $ | 3,046 | $ | 3,500 |
| 172.9 ea | | $ | 837 | $ | 837 |
| M/D's | 575.89 | $ | 5,575 | $ | 6,405 |
| 4.5 Ea | | $ | 525 | $ | 525 |
| | | $ | 28,377 | | |

F&B v. DAYBREAK - DEPOSITION EXHIBITS   P000039

2.39

| | | | | | |
|---|---|---|---|---|---|
| M/D's | 575.89 | $ | 93,268 | $ | 107,154 |
| 101.8 sqs | | $ | 58,645 | $ | 58,645 |
| M/D's | 575.89 | $ | 4,878 | $ | 5,604 |
| 0.0 Loads | | $ | - | $ | - |
| M/D's | 575.89 | $ | - | $ | - |
| 0.0 lft | | $ | - | $ | - |
| M/D's | 575.89 | $ | 1,796 | $ | 2,064 |
| 116.0 lft | | $ | - | $ | - |
| M/D's | 575.89 | $ | 17,266 | $ | 19,837 |
| 1215.4 lft | | $ | 1,574 | $ | 1,574 |
| M/D's | 575.89 | $ | 1,502 | $ | 1,726 |
| 105.7 lft | | $ | 1,643 | $ | 1,643 |
| M/D's | 575.89 | $ | - | $ | - |
| 0.0 lft | | $ | - | $ | - |
| M/D's | 575.89 | $ | - | $ | - |
| 0.0 lft | | $ | - | $ | - |
| M/D's | 575.89 | $ | 3,484 | $ | 4,003 |
| 87.0 sqs | | $ | 3,942 | $ | 3,942 |
| | | **$** | **187,999** | **$** | **237,375** |
| | | $ | 237,375 | | |

## osts

| | | | | | | |
|---|---|---|---|---|---|---|
| | | $ | 66,861 | $ | - | $ | - |
| @ $ 32.88 | $ | 2,071 | | |
| @ $ 41.65 | $ | 375 | | |
| | | | | |
| @ $ 32.88 | $ | 64,038 | $ | 64,413 |
| @ $ 4.69 | $ | 9,481 | $ | 17,745 |
| @ $ 26.42 | $ | 53,351 | $ | 82,158 |
| $ 63.99 | $ | 196,177 | | |
| | | | |
| 13.44 | $ | 41,197 | | |
| | | | |
| $ 77.43 | $ | **237,375** | | |
| | $ | **214,800** | | |
| Difference | $ | 22,575 | | |
| Copper Value | $ | (52,822) | | |
| | | 184,553 | | |

2:21 PM
07/12/10

**Huber and Associates**

# All Transactions for Friedberg & Bunge

All Transactions

| Type | Num | Date | Account | Amount |
|------|-----|------|---------|--------|
| Estimate | 34 | 05/13/2010 | Contract Amount | 187,839.00 |
| Invoice | 1622 | 05/24/2010 | Accounts Receivable | 15,222.89 |
| Invoice | 1630 | 06/21/2010 | Accounts Receivable | 11,525.10 |
| Invoice | 1637 | 06/30/2010 | Accounts Receivable | 11,873.42 |
| Invoice | 1640 | 07/08/2010 | Accounts Receivable | 4,264.15 |
| | | | | 230,724.56 |
| | | | | |
| Payment | 25169 | 05/12/2010 | Undeposited Funds | 25,000.00 |
| Payment | 25190 | 05/25/2010 | Undeposited Funds | 15,222.89 |
| Payment | | 06/15/2010 | Undeposited Funds | 37,600.00 |
| Payment | 25262 | 06/22/2010 | Undeposited Funds | 50,096.66 |
| Payment | 25266 | 06/29/2010 | Undeposited Funds | 39,700.95 |
| Payment | 25287 | 07/09/2010 | Undeposited Funds | 10,000.00 |
| **Total** | | | | 177,620.50 |

Balance on Account                                       53,104.06

**F&B v. DAYBREAK - DEPOSITION EXHIBITS      P000041**

2.41

2:21 PM
07/12/10

**Huber and Associates**
**All Transactions for Friedberg & Bunge**
All Transactions

Contract Amount

Change Order

Change Order

Change Order

Change Order

**Total**

F&B v. DAYBREAK - DEPOSITION EXHIBITS    P000042

2.42

# Friedberg/Bunge Residence
*Plot #168, Estate Chocolate Hole*

| Description | QTY. | | Waste % Add |
|---|---|---|---|
| **1 _General Conditions_** | | | |
| Job Set-up/Mobilize Labor | 3 | M/D's | |
| Permits | 1 | permit | |
| Mock Ups | 0 | M/D's | |
| Mock Up Materials | 0 | allowance | |
| Supervisor | 1 | M/D's | |
| Plane Fares | 7 | Each | |
| Travel Time (Incl. Mock Ups) | 7 | M/D's | |
| Material Handling Equipment | 0 | Weeks | **BY OWNER** |
| Scaffolding Labor | 0 | M/D's | |
| Scaffolding Equip. | 0 | Mnths Rent | **BY OWNER** |
| Logistics | 6 | M/D's | |
| Motel & Meal Expense | 0 | Rooms | **BY OWNER** |
| Daily Clean Up | 3 | M/D's | |
| Other Material | 0 | Each | |
| Job Close Out | 2 | M/D's | |
| Job Close Out Materials | 1 | | |
| | **126** | **Labor Hours** | |
| | | | |
| **2 _Roof Prep & Flashings_** | | | |
| Roof Tear-off | 0 | sqs | |
| Dumpster - Facilities | 0 | Ea | |
| Rosin Sheet Dry-in | 87 | sqs | |
| Rosin Sheet | 87 | sqs | 12% |
| Peel & Stick RP 40 Labor | 0 | sqs | |
| Peel & Stick Materials | 0 | sqs | 30% |
| Eave / Gable Flashing Labor | 0 | lft | |
| 16oz Copper | 0 | lft | 13% |
| Valley Flashings Labor | 116 | lft | |
| 16oz Copper | 116 | lft | 13% |
| Sidewall Flashing Labor | 141 | lft | |
| 16oz Copper | 141 | lft | 13% |
| Headwall Flashing Labor | 13 | lft | |
| 16 oz. Copper | 13 | lft | 13% |
| Stucco Stop Flashing Labor | 153 | ea | |
| 16 oz. Copper | 153 | ea | 13% |
| Chimneys or Crickets Labor | 4 | ea | |
| Vents Materials | 4 | allowance | 13% |
| | | | |
| | **196** | **Labor Hours** | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000043**

**3  _Roof Install_**

| | | | |
|---|---|---|---|
| Copper Standing Seam | 87 | sqs | |
| Copper Materials | 17 | sqs | 17% |
| Material Handling | 7 | M/D's | |
| Freight | 0 | Loads | by owner |
| Cross Seams | 0 | lft | |
| Copper Materials | 0 | lft | 7% |
| Valley Install (cutting) | 116 | lft | |
| Valley Install Materials | 116 | lft | 0% |
| Hip Cap | 1115 | lft | |
| Hip Cap Materials | 1115 | lft | 9% |
| Ridges Labor | 97 | lft | |
| Ridge Batten Caps | 97 | lft | 9% |
| ISO Board Labor | 0 | sqs | |
| ISO Board Materials | 0 | sqs | 10% |
| Flat Roof Membrane Labor | 0 | sqs | |
| Flat Roof Membrane Materials | 0 | sqs | 10% |
| Rollers | 1 | set | |
| Fasteners | 87 | sqs | |

**_1805  Labor Hours_**

**Su**

**Materials with Sales Tax**
**Travel Time**
**Supervision**
**Project Duration**                                    _6_
**Gen Labor**
**Motel & Meal**
**Overhead**

**Sub-Total**

**Profit**         _21%_

**87.0** sqs

**$2,302** PER SQ



Date of Bid: 1/15/2010
Today's Date: 3/31/2025

| Install Rate OR M/D BID | | Order Qty Labor | Mat'ls | Labor Unit $ | Mat'l Unit $ | Cost Amount |
|---|---|---|---|---|---|---|
| 1 | | 3.0 M/D's | | 575.89 | | 1,728 |
| | | | 1.0 permit | | 0.00 | 0 |
| 0 | | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 allowance | | 550.00 | 0 |
| 1 | | 1.0 M/D's | | 654.80 | | 655 |
| | | | 7.0 Each | | 565.00 | 4,232 |
| 1 | | 7.0 M/D's | | 575.89 | | 4,031 |
| | | | 0.0 Weeks | | 875.00 | 0 |
| 0 | | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 Mnths Rent | | 750.00 | 0 |
| 1 | | 6.0 M/D's | | 575.89 | | 3,455 |
| | | | 0.0 Rooms | | 90.00 | 0 |
| 1 | | 3.0 M/D's | | 575.89 | | 1,728 |
| | | | 0.0 Each | | 215.00 | 0 |
| 1 | | 2.0 M/D's | | 575.89 | | 1,152 |
| | | | 1.0 allowance | | 350.00 | 375 |
| | | | | | $ | 17,355 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 Ea | | 400.00 | 0 |
| 23 | per day | 3.8 M/D's | | 575.89 | | 2,178 |
| | | | 97.4 sqs | | 8.00 | 834 |
| | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 sqs | | 45.00 | 0 |
| | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 lft | | 4.50 | 0 |
| 100 | per day | 1.2 M/D's | | 575.89 | | 668 |
| | | | 131.1 lft | | 10.00 | 1,403 |
| 33 | per day | 4.3 M/D's | | 575.89 | | 2,461 |
| | | | 159.3 lft | | 5.75 | 980 |
| 75 | per day | 0.2 M/D's | | 575.89 | | 100 |
| | | | 14.7 lft | | 5.75 | 90 |
| 35 | per day | 4.4 M/D's | | 575.89 | | 2,517 |
| | | | 172.9 ea | | 6.75 | 1,249 |
| 0.5 | per day | 8.0 M/D's | | 575.89 | | 4,607 |
| | | | 4.5 allowance | | 450.00 | 2,176 |
| | | | | | $ | 19,264 |

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000045

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0.55 | per day | 159.1 | M/D's | | 575.89 | | 91,617 |
| <= for seams | | 19.9 | sqs | | | 362.00 | 7,704 |
| 1 | | 7.0 | M/D's | | 575.89 | | 4,031 |
| | | 0.0 | Loads | | | | 0 |
| 0 | per day | 0.0 | M/D's | | 575.89 | | 0 |
| | | 0.0 | lft | | | 0.00 | 0 |
| 45 | per day | 2.6 | M/D's | | 575.89 | | 1,485 |
| | | 116.0 | lft | | | 0.00 | 0 |
| 45 | per day | 24.8 | M/D's | | 575.89 | | 14,269 |
| | | 1215.4 | lft | | | 1.00 | 1,300 |
| 45 | per day | 2.2 | M/D's | | 575.89 | | 1,241 |
| | | 105.7 | lft | | | 12.00 | 1,358 |
| 0 | per day | 0.0 | M/D's | | 575.89 | | 0 |
| | | 0.0 | lft | | | 110.00 | 0 |
| 0 | per day | 0.0 | M/D's | | 575.89 | | 0 |
| | | 0.0 | lft | | | 125.00 | 0 |
| 0.2 | per day | 5.0 | M/D's | | 575.89 | | 2,879 |
| | | 87.0 | sqs | | | 31.98 | 2,977 |

|  |  |
|---|---|
| $ | **128,862** |
| $ | 165,481 |

## Summary of Hard Costs

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | $ | 24,678 | | |
| 63 | Man Hours | @ | $ 32.88 | $ | 2,071 | | |
| 9 | Man Hours | @ | $ 41.65 | $ | 375 | | |
| men | 39 | Days | | | | | |
| 2127 | Man Hours | @ $ 32.88 | $ | 69,940 | $ | 40,000 |
| 2199 | Total Hours | @ $ 4.69 | $ | 10,324 | | |
| 2199 | Total Hours | @ $ 26.42 | $ | 58,092 | | |
| | Labor @ | $ 63.99 | $ | 165,481 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 13.44 | $ | 34,751 | | **122,783.52** |

| | | | | |
|---|---|---|---|---|
| | Labor @ | $ 77.43 | $ | **200,232** |
| | | | $ | **(14,568)** |
| | | other | | |
| | Total | $ | 200,232 | |



| Selling Amount | LABOR *With Labor carrying all of GC's* |
|---|---|
| $ 2,090 | |
| $ - | |
| $ - | |
| $ - | |
| $ 792 | |
| $ 5,121 | |
| $ 4,878 | |
| $ - | |
| $ - | |
| $ 4,181 | |
| $ - | |
| $ 2,090 | |
| $ - | |
| $ 1,394 | |
| $ 453 | |
| **$ 20,999** | |
| | |
| $ - | $ - |
| $ - | $ - |
| $ 2,636 | $ 2,993 |
| $ 1,009 | $ 1,009 |
| $ - | $ - |
| $ - | $ - |
| $ - | $ - |
| $ - | $ - |
| $ 808 | $ 918 |
| $ 1,697 | $ 1,697 |
| $ 2,977 | $ 3,381 |
| $ 1,186 | $ 1,186 |
| $ 121 | $ 137 |
| $ 109 | $ 109 |
| $ 3,046 | $ 3,459 |
| $ 1,511 | $ 1,511 |
| $ 5,575 | $ 6,330 |
| $ 2,633 | $ 2,633 |
| | |
| **$ 23,309** | |

| | | |
|---|---|---|
| $ | 110,856 | $ | 125,880 |
| $ | 9,322 | $ | 9,322 |
| $ | 4,878 | $ | 5,539 |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | 1,796 | $ | 2,040 |
| $ | - | $ | - |
| $ | 17,266 | $ | 19,606 |
| $ | 1,574 | $ | 1,574 |
| $ | 1,502 | $ | 1,706 |
| $ | 1,643 | $ | 1,643 |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | - | $ | - |
| $ | 3,484 | $ | 3,956 |
| $ | 3,602 | $ | 3,602 |
| **$** | **155,923** | **$** | **200,232** |
| $ | 200,232 | | |
| | | | |
| $ | - | $ | - |

F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000048

2.48

# Friedberg/Bunge Residence
*Plot #168, Estate Chocolate Hole*

| Description | Waste % Add | Install Rate OR M/D BID | | Labor |
|---|---|---|---|---|
| **1** ***General Conditions*** | | | | |
| Job Set-up/Mobilize Labor | | 1 | | *3.0* |
| Permits | | | | |
| Mock Ups | | 0 | | *0.0* |
| Mock Up Materials | | | | |
| Supervisor | | 1 | | *1.0* |
| Plane Fares | | | | |
| Travel Time (Incl. Mock Ups) | | 1 | | *7.0* |
| Material Handling Equipment | **BY OWNER** | | | |
| Scaffolding Labor | | 0 | | *0.0* |
| Scaffolding Equip. | **BY OWNER** | | | |
| Logistics | | 1 | | *6.0* |
| Motel & Meal Expense | **BY OWNER** | | | |
| Daily Clean Up | | 1 | | *3.0* |
| Other Material | | | | |
| Job Close Out | | 1 | | *2.0* |
| Job Close Out Materials | | | | |

*126  Labor Hours*

| Description | Waste % Add | Install Rate OR M/D BID | | Labor |
|---|---|---|---|---|
| **2** ***Roof Prep & Flashings*** | | | | |
| Roof Tear-off | | 0 | per day | *0.0* |
| Dumpster - Facilities | | | | |
| Rosin Sheet Dry-in | | 23 | per day | *3.8* |
| Rosin Sheet | 12% | | | |
| Peel & Stick RP 40 Labor | | | per day | *0.0* |
| Peel & Stick Materials | 30% | | | |
| Eave / Gable Flashing Labor | | 200 | per day | *5.3* |
| 16oz Copper | 13% | | | |
| Valley Flashings Labor | | 100 | per day | *1.2* |
| 16oz Copper | 13% | | | |
| Sidewall Flashing Labor | | 33 | per day | *4.3* |
| 16oz Copper | 13% | | | |
| Headwall Flashing Labor | | 75 | per day | *0.2* |
| 16 oz. Copper | 13% | | | |
| Stucco Stop Flashing Labor | | 35 | per day | *4.4* |
| 16 oz. Copper | 13% | | | |
| Chimneys or Crickets Labor | | 0.5 | per day | *8.0* |
| Related Materials | 13% | | | |

*243  Labor Hours*

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000049**

2.49

| **3** | ***Roof Install*** | | 0.7 | | |
|---|---|---|---|---|---|
| | Copper Standing Seam | | 0.65 | per day | *133.8* |
| | Copper Materials | 17% | <= for seams | | |
| | Material Handling | | 1 | | *7.0* |
| | Freight | by owner | | | |
| | Cross Seams | | 0 | per day | *0.0* |
| | Copper Materials | 7% | | | |
| | Valley Install (cutting) | | 45 | per day | *2.6* |
| | Valley Install Materials | 0% | | | |
| | Hip Cap | | 45 | per day | *24.8* |
| | Hip Cap Materials | 9% | | | |
| | Ridges Labor | | 45 | per day | *2.2* |
| | Ridge Batten Caps | 9% | | | |
| | ISO Board Labor | | 0 | per day | *0.0* |
| | ISO Board Materials | 10% | | | |
| | Flat Roof Membrane Labor | | 0 | per day | *0.0* |
| | Flat Roof Membrane Materials | 10% | | | |
| | Rollers | | 0.2 | per day | *5.0* |
| | Fasteners | | | | |

**1578  Labor Hours**

## Summary of Hard Co

| | | | |
|---|---|---|---|
| | | *63* | *Man Hours* |
| | | *9* | *Man Hours* |
| *6* | *men* | *36* | *Days* |
| | | *1948* | *Man Hours* |
| | | *2020* | ***Total Hours*** |
| | | *2020* | ***Total Hours*** |
| | | | *Labor @* |
| | *21%* | | |

sqs

| PER SQ | | | *Labor @* |

Date of Bid:  1/15/2010
Today's Date:  3/31/2025



| Order Qty | Mat'ls | Labor Unit $ | Selling Amount | | LABOR With Labor carrying all of GC's | |
|---|---|---|---|---|---|---|
| M/D's | | 575.89 | $ | 2,090 | | |
| | 1.0 permit | | $ | - | | |
| M/D's | | 575.89 | $ | - | | |
| | 0.0 allowance | | $ | - | | |
| M/D's | | 654.80 | $ | 792 | | |
| | 7.0 Each | | $ | 5,121 | | |
| M/D's | | 575.89 | $ | 4,878 | | |
| | 0.0 Weeks | | $ | - | | |
| M/D's | | 575.89 | $ | - | | |
| | 0.0 Mnths Rent | | $ | - | | |
| M/D's | | 575.89 | $ | 4,181 | | |
| | 0.0 Rooms | | $ | - | | |
| M/D's | | 575.89 | $ | 2,090 | | |
| | 0.0 Each | | $ | - | | |
| M/D's | | 575.89 | $ | 1,394 | | |
| | 1.0 allowance | | $ | 453 | | |
| | | | $ | **20,999** | | |
| | | | | | | |
| M/D's | | 575.89 | $ | - | $ | - |
| | 0.0 Ea | | $ | - | $ | - |
| M/D's | | 575.89 | $ | 2,636 | $ | 3,028 |
| | 97.4 sqs | | $ | 1,009 | $ | 1,009 |
| M/D's | | 575.89 | $ | - | $ | - |
| | 0.0 sqs | | $ | - | $ | - |
| M/D's | | 575.89 | $ | 3,690 | $ | 4,239 |
| | 1196.7 lft | | $ | 4,634 | $ | 4,634 |
| M/D's | | 575.89 | $ | 808 | $ | 929 |
| | 131.1 lft | | $ | 1,523 | $ | 1,523 |
| M/D's | | 575.89 | $ | 2,977 | $ | 3,421 |
| | 159.3 lft | | $ | 925 | $ | 925 |
| M/D's | | 575.89 | $ | 121 | $ | 139 |
| | 14.7 lft | | $ | 71 | $ | 71 |
| M/D's | | 575.89 | $ | 3,046 | $ | 3,500 |
| | 172.9 ea | | $ | 837 | $ | 837 |
| M/D's | | 575.89 | $ | 5,575 | $ | 6,405 |
| | 4.5 Ea | | $ | 525 | $ | 525 |
| | | | | | | |
| | | | $ | **28,377** | | |

| | | | | | |
|---|---|---|---|---|---|
| *M/D's* | *575.89* | $ | 93,268 | $ | 107,154 |
| 101.8 sqs | | $ | 58,645 | $ | 58,645 |
| *M/D's* | *575.89* | $ | 4,878 | $ | 5,604 |
| 0.0 Loads | | $ | - | $ | - |
| *M/D's* | *575.89* | $ | - | $ | - |
| 0.0 lft | | $ | - | $ | - |
| *M/D's* | *575.89* | $ | 1,796 | $ | 2,064 |
| 116.0 lft | | $ | - | $ | - |
| *M/D's* | *575.89* | $ | 17,266 | $ | 19,837 |
| 1215.4 lft | | $ | 1,574 | $ | 1,574 |
| *M/D's* | *575.89* | $ | 1,502 | $ | 1,726 |
| 105.7 lft | | $ | 1,643 | $ | 1,643 |
| *M/D's* | *575.89* | $ | - | $ | - |
| 0.0 lft | | $ | - | $ | - |
| *M/D's* | *575.89* | $ | - | $ | - |
| 0.0 lft | | $ | - | $ | - |
| *M/D's* | *575.89* | $ | 3,484 | $ | 4,003 |
| 87.0 sqs | | $ | 3,942 | $ | 3,942 |
| | | $ | **187,999** | $ | **237,375** |
| | | $ | 237,375 | | |

osts

| | | | | | |
|---|---|---|---|---|---|
| | | $ | - | $ | - |
| | $ | 66,861 | | | |
| @ $ 32.88 | $ | 2,071 | | | |
| @ $ 41.65 | $ | 375 | | | |
| | | | | | |
| @ $ 32.88 | $ | 64,038 | $ | 64,413 | |
| @ $ 4.69 | $ | 9,481 | $ | 17,745 | |
| @ $ 26.42 | $ | 53,351 | $ | 82,158 | |
| $ 63.99 | $ | 196,177 | | | |

| | | | |
|---|---|---|---|
| 13.44 | $ | 41,197 | |

| | | | |
|---|---|---|---|
| $ 77.43 | $ | **237,375** | |
| | $ | **214,800** | |
| Difference | $ | 22,575 | |
| Copper Value | $ | (52,822) | |
| | | 184,553 | |

# Johnson Residence
## Copper  Standing Seam

| Roof Area Calcs: | measurements | | Slope | Factor | Squares | |
|---|---|---|---|---|---|---|
| *Main House* | 10 | 78 | 9 | 1.45 | 11.3 | |
| *Main House* | 10 | 47.5 | 12 | 1.65 | 7.8 | |
| *Main House* | 10 | 183 | 2 | 1.2 | 22.0 | |
| *Master Bedroom* | 10 | 20 | 9 | 1.45 | 2.9 | |
| *Master Bedroom* | 10 | 90 | 2 | 1.2 | 10.8 | |
| *Guest House* | 10 | 28 | 9 | 1.45 | 4.1 | QUOTED: |
| *Guest House* | 10 | 58 | 2 | 1.2 | 7.0 | |
| *Bedroom* | | | | 13.7 | 13.7 | |
| *TOTAL* | | | | | 85.0 | |
| Low Slope Areas | (2/12 pitch and pan areas) | | | | 50.5 | |
| *Add for pan areas* | 10 | 20 | 2 | 1.12 | 2.2 | |
| *Copper Squares* | | | | | 87.2 | |
| | | | | Total Sqs. | 87.2 | |
| | | Squares per day | 0.50 | | | |

## LABOR

| | SCOPE | QTY. (item) | Description | Sqs./Day or  M/D's | M/D's Bid | Cost | |
|---|---|---|---|---|---|---|---|
| A. I | **General Conditions** | | | | | | |
| 1 | Set-up - Mobilization | | | 4 | 4.0 | $ | 2,138.94 |
| 2 | Supervision | 172.9 | crew days is    14.4 | >>> | 12.0 | $ | 6,416.83 |
| 3 | Travel time | | | 12 | 12.0 | $ | 6,416.83 |
| 4 | Freight | | material handling | 8 | 8.0 | $ | 4,277.89 |
| 5 | Scaffolding | | by owner | 3 | 3.0 | $ | 1,604.21 |
| 6 | Food & lodging | | Lodging by owner | | 0.0 | $ | - |
| | Section Totals | | | | 39.0 | $ | 20,854.70 |
| | With Mark-ups | | | | | $ | 25,234.18 |
| B. II | **Roof Prep** | | | | | | |
| 1 | Check 30lb | 88.0 | | 69 | 1.3 | $ | 681.98 |
| 2 | Peel and Stick | 0.0 | sqs | 0 | 0.0 | $ | - |
| 3 | Flashings | | allowance | 18 | 18.0 | $ | 9,625.25 |
| | Section Totals | | | | 19.3 | $ | 10,307.23 |
| | With Mark-ups | | | | | $ | 12,471.74 |
| C. III | **Installation** | | | | | | |
| 1 | Standing Seam | 88.0 | sqs | 1 | 88.0 | $ | 47,056.75 |
| 2 | Shop fab | 102.96 | sqs of panels | 2 | 51.5 | $ | 27,528.20 |
| 3 | Solder & accessories | 88.0 | sqs | 16 | 5.5 | $ | 2,941.05 |
| 4 | Hip and Ridge | 335.0 | lft | 30 | 11.2 | $ | 5,971.22 |
| 5 | Cricket add | 3.0 | sqs | 0.5 | 6.0 | $ | 3,208.42 |
| 6 | Close out | | | 4 | 4.0 | $ | 2,138.94 |
| | Section Totals | | | | 166.1 | $ | 88,844.58 |
| | With Mark-ups | | | | | $ | 107,501.94 |
| D. IV | **Totals** | | | | | | |
| 1 | Costs | | Crew Size 12 | Man Days | 172.9 | $ | 120,006.50 |
| 2 | Selling Prices | | | | | $ | 145,207.87 |
| | Contract Value | | | | | $ | - |
| 3 | Project Cost | | all hard costs but no overhead | | | $ | 177,411.59 |

| 4 | **Project Selling** | | **with standard 10 & 10** | | | | | **$** | **214,668.02** |
|---|---|---|---|---|---|---|---|---|---|
| 5 | Overhead | 172.9 | man days | times | $ | 237.74 | per day | $ | 41,114.52 |
| 6 | Profit | | | | | | | $ | (177,411.59) |
| 7 | **Total Overhead & Profit** | | | | | | | **$** | **(136,297.07)** |

|  |  |  |
|---|---|---|
| **TOTAL EXPECTED CONTRACT VALUE** | **$** | **7,587.50** |
| TOTAL PROFIT EXPECTED | $ | (176,094.75) |
| **TOTAL PROFIT & OVERHEAD EXPECTED** | **$** | **(134,980.23)** |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000054**

2.54



**3/31/2025**

| Spreadsheet Stats: | | | | |
|---|---|---|---|---|
| *LABOR RATES* | *per m/d* | $ | 297.00 | |
| *OVERHEAD* | *per m/d* | $ | 237.74 | |
| *COST* | *per m/d* | $ | 534.74 | |
| *SELLING PRICE* | *per m/d* | $ | 647.03 | |
| | | | | |
| *Per Square Price* | $ | 2,460.66 | *(matl's used)* | |

| Sales Tax | 6.5% | **BID** | $ | **214,668.02** |
|---|---|---|---|---|
| | | From Contract | $ | - |
| *MTL. & LABOR M.U.'s* | | Overhead | $ | 41,114.52 |
| OH | **10%** | **Profit** | $ | **(392,079.61)** |
| P | **10%** | **OH & Profit** | $ | **(136,297.07)** |

### MATERIALS/EQUIPMENT

| Adjust | Description | Unit Cost | | Cost | |
|---|---|---|---|---|---|
| | permit | $ | 625.00 | $ | - |
| 1 | lodging | $ | 4,000.00 | $ | 4,260.00 |
| 7 | extra plane | $ | 550.00 | $ | 4,100.25 |
| 1 | freight by owner | | | $ | - |
| | rental | | | $ | - |
| 172.9 | split w/owner | $ | 35.00 | $ | 3,223.21 |
| | | | | $ | 11,583.46 |
| | | | | $ | 14,015.98 |
| | rls | | | $ | - |
| 0 | rolls | $ | 42.00 | $ | - |
| 24 | sheets | $ | 130.00 | $ | 3,322.80 |
| | | | | $ | 3,322.80 |
| | | | | $ | 4,020.59 |
| | sqs | $ | 400.00 | $ | 37,488.00 |
| | | | | $ | - |
| | sqs | $ | 21.00 | $ | 1,968.12 |
| | per lft> | $ | 5.00 | $ | 1,783.88 |
| 8 | sqs | $ | 54.00 | $ | 460.08 |
| 1 | misc. | $ | 750.00 | $ | 798.75 |
| | | | | $ | 42,498.83 |
| | | | | $ | 51,423.58 |
| | | | | $ | 57,405.08 |
| | | | | $ | 69,460.15 |

| **+ Extra Work** | unit price |
|---|---|
| Gutter & Hook Ups | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS      P000055**



| | | | | |
|---|---|---|---|---|
| LFT | 250 | $ 30.35 | $ | 7,587.50 |
| | | | $ | - |
| | *ACTUAL QUOTE>* | | | |
| **Total of Additional Work** | | | **$** | **7,587.50** |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000056**

2.56

| Total SQS | 87 |
|---|---|
| $ per SQ | $ 459.77 |
| Sqs Installed | 87 |
| Sqs Remaining | 0.0 |
| % Complete | 100% |

| Fill in Blue Cells Only | Weekly | 52 | hrs | If Project Not Complete: |
|---|---|---|---|---|
| | | | | Adjust TO: 100% |

| | | | Basics | | OT | 40 Hrs | addn hrs 12 | Weekly TOTAL |
|---|---|---|---|---|---|---|---|---|
| Class | | Name | | BASE | | | | |
| Sub | 1 | Micah Cady | $ | 40.0 | $ - | $ 1,600.00 | $ 480.00 | $ 2,080.00 |
| Sub | 1 | Peter Laughlin | $ | 25.0 | $ - | $ 1,000.00 | $ 300.00 | $ 1,300.00 |
| Sub | 1 | Tim Peterson | $ | 28.0 | $ - | $ 1,120.00 | $ 336.00 | $ 1,456.00 |
| Sub | 1 | David | $ | 23.0 | $ - | $ 920.00 | $ 276.00 | $ 1,196.00 |
| Sub | 0 | | | | $ - | $ - | $ - | $ - |
| Sub | 1 | Steve K. | $ | 25.0 | $ - | $ 1,000.00 | $ 300.00 | $ 1,300.00 |
| Sub | 0 | | | | $ - | $ - | $ - | $ - |
| Employee | 1 | Austin | $ | 15.0 | $ 22.50 | $ 600.00 | $ 270.00 | $ 870.00 |
| Sub | 1 | Brandon | $ | 22.0 | $ - | $ 880.00 | $ 264.00 | $ 1,144.00 |
| Employee | 0 | | | | $ - | $ - | $ - | $ - |

| | 7 men | | | | | | 1 week | $ 9,346.00 |
|---|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Average: | $ 25.68 |
| TOTAL HOURS | 1558 |
| Per Man Total | 223 |
| Duration <> Weeks | 4.3 |
| Total Dollars | $ 40,000 |

Install Requirements:
| sqs/week | 20.33 |
|---|---|
| sq/wk/man | 2.90 |
| sq/day/man | 0.53 |

**Travel Study**

| Plane Fares | $4,550 | $650 |
|---|---|---|
| Rooms & | 2 rooms <> some at house | |
| Meals | $8,688.21 | $145 |
| | | per day |
| Other | | |
| TOTAL | **$13,238.21** | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS**          **P000057**

2.57

| | | |
|---|---|---|
| Travel $ | | |
| Base $ | 40,000 | |
| Travel $ $ | - | |
| LABOR ONLY $ | 40,000 | |
| Yet to Complete $ | - | |
| For Labor Only $ | 40,000 | |
| BASE $ | 40,000 | |

| Share of Labor $'s | | Actual Full Hoully | Actual Hours | | | | | Actual Pay NET PAY |
|---|---|---|---|---|---|---|---|---|
| Share | Share in $ | | | | | | | |
| 22% | $8,902 | 40.00 | 223.00 | 14% | $1,274 | 22% | $7,628 | $8,902.20 |
| 14% | $5,564 | 25.00 | 223.00 | 14% | $796 | 14% | $4,767 | $5,563.88 |
| 16% | $6,232 | 28.00 | 223.00 | 14% | $892 | 16% | $5,340 | $6,231.54 |
| 13% | $5,119 | 23.00 | 223.00 | 14% | $733 | 13% | $4,386 | $5,118.77 |
| 0% | $0 | 0.00 | | 0% | $0 | 0% | $0 | $0.00 |
| 14% | $5,564 | 25.00 | 223.00 | 14% | $796 | 14% | $4,767 | $5,563.88 |
| 0% | $0 | 0.00 | | 0% | $0 | 0% | $0 | $0.00 |
| 9% | $3,724 | 16.73 | 223.00 | 14% | $533 | 9% | $3,191 | $3,723.52 |
| 12% | $4,896 | 22.00 | 223.00 | 14% | $701 | 12% | $4,195 | $4,896.21 |
| 0% | $0 | 0.00 | | 0% | $0 | 0% | $0 | $0.00 |
| 100% | $40,000 | 179.73 | 1558 | | $5,726 | | $34,274 | $40,000.00 |
| | | | | | $34,274 | | | |

|  | Change | Other Adjustments<br>Adjust for Partial Complete | | comp | Other Adjustments<br>PREVIOUS PAYMENTS | |
| Hourly | from Base | % | Earned | | $ | Final Due |
|---|---|---|---|---|---|---|
| $39.92 | 100% | 100% | $ 8,902.20 | $ (0.08) | $ - | $ 8,902.20 |
| $24.95 | 100% | 100% | $ 5,563.88 | $ (0.05) | $ - | $ 5,563.88 |
| $27.94 | 100% | 100% | $ 6,231.54 | $ (0.06) | $ - | $ 6,231.54 |
| $22.95 | 100% | 100% | $ 5,118.77 | $ (0.05) | $ - | $ 5,118.77 |
| #DIV/0! | #DIV/0! | 100% | $ - | #DIV/0! | $ - | $ - |
| $24.95 | 100% | 100% | $ 5,563.88 | $ (0.05) | $ - | $ 5,563.88 |
| #DIV/0! | #DIV/0! | 100% | $ - | #DIV/0! | $ - | $ - |
| $16.70 | 100% | 100% | $ 3,723.52 | $ (0.03) | $ - | $ 3,723.52 |
| $21.96 | 100% | 100% | $ 4,896.21 | $ (0.04) | $ - | $ 4,896.21 |
| #DIV/0! | #DIV/0! | 100% | $ - | #DIV/0! | $ - | $ - |
| | | | $ 40,000.00 | | $ - | $ 40,000.00 |
| | | | | | To Date>>> | $ 40,000.00 |

$ 8,033.00
$      65.0
      61.5%
      38.5%

F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000060

2.60

# Friedberg/Bunge Residence
### *Plot #168, Estate Chocolate Hole*



HUBER
& ASSOCIATES

3/31/2025

| Description<br>Labor / Material or Equip. | | Selling<br>Amount |
|---|---|---|
| **1 *General Conditions*** | | |
| Set-up/Mobilize Labor | $ | 2,391 |
| Permits | $ | - |
| Mock Ups | $ | - |
| Mock Up Materials | $ | - |
| Supervision Costs | $ | 3,552 |
| Plane Fares | $ | 5,121 |
| Travel Time (Incl. Mock Ups) | $ | 4,878 |
| Material Handling Equipment    by owner | $ | - |
| Scaffolding Labor | $ | - |
| Scaffolding Equip.    by owner | $ | - |
| Site Logistics | $ | 3,722 |
| Motel & Meal Expense    by owner | $ | - |
| Daily Clean Up | $ | 1,819 |
| Other Material | $ | - |
| Job Close Out/Pack | $ | 1,517 |
| Job Close Out Materials | $ | - |
| ***126 Labor Hours*** | **$** | **22,999** |
| | | |
| **2 *Roof Prep & Flashings*** | | |
| Roof Tear-off | $ | - |
| Dumpster - Facilities | $ | - |
| Rosin Sheet Dry-in | $ | 2,636 |
| Rosin Sheet | $ | 1,009 |
| Peel & Stick RP 40 Labor | $ | - |
| Peel & Stick Materials | $ | - |
| Eave / Gable Flashing Labor | $ | - |
| 16oz Copper | $ | - |
| Valley Flashings Labor | $ | 3,812 |
| 16oz Copper | $ | - |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000061**

| | | |
|---|---|---|
| Sidewall Flashing Labor | $ | 3,312 |
| 16oz Copper | $ | - |
| Headwall Flashing Labor | $ | 815 |
| 16 oz. Copper | $ | - |
| Stucco Stop Flashing Labor | $ | - |
| 16 oz. Copper | $ | - |
| Chimneys or Crickets Labor | $ | 5,575 |
| 16 oz. Copper | $ | - |
| **243 Labor Hours** | $ | **17,159** |

**3** **Roof Install**

| | | |
|---|---|---|
| Copper Standing Seam | $ | 86,606 |
| Copper Materials | $ | - |
| Material Handling | $ | 3,931 |
| Freight                            by owner | $ | - |
| Pan Forming | $ | 4,333 |
| Copper Materials | $ | - |
| Valley Install (cutting) | $ | 4,812 |
| Valley Install Materials | $ | - |
| Hip Cutting & Forming | $ | 15,406 |
| Hip Cap Materials | $ | 1,574 |
| Ridges Labor | $ | 6,091 |
| Ridge Batten Caps | $ | 1,643 |
| ISO Board Labor | $ | - |
| ISO Board Materials | $ | - |
| Flat Roof Membrane Labor | $ | - |
| Flat Roof Membrane Materials | $ | - |
| Rollers | $ | 4,812 |
| Fasteners & Cleats | $ | 7,738 |
| **1492 Labor Hours** | $ | **136,946** |

| | | |
|---|---|---|
| **Total of Sections** | $ | **177,104** |
| **Add for smaller seams and cleat spacing** | $ | **10,735** |
| **New Total** | $ | **187,839** |

# Friedberg/Bunge Residence
*Plot #168, Estate Chocolate Hole*

| Description | QTY. | | Waste % Add |
|---|---|---|---|

**1** *General Conditions*

| | | | |
|---|---|---|---|
| Job Set-up/Mobilize Labor | 3 M/D's | | |
| Permits | 1 permit | | |
| Mock Ups | 0 M/D's | | |
| Mock Up Materials | 0 allowance | | |
| Supervision Costs | 1 M/D's | | |
| Plane Fares | 7 Each | | |
| Travel Time (Incl. Mock Ups) | 7 M/D's | | |
| Material Handling Equipment | 0 Weeks | **BY OWNER** | |
| Scaffolding Labor | 0 M/D's | | |
| Scaffolding Equip. | 0 Mnths Rent | **BY OWNER** | |
| Logistics | 6 M/D's | | |
| Motel & Meal Expense | 0 Rooms | **BY OWNER** | |
| Daily Clean Up | 3 M/D's | | |
| Other Material | 0 Each | | |
| Job Close Out | 2 M/D's | | |
| Job Close Out Materials | 1 | | |

**126  Labor Hours**

**2** *Roof Prep & Flashings*

| | | |
|---|---|---|
| Roof Tear-off | 0 sqs | |
| Dumpster - Facilities | 0 Ea | |
| Rosin Sheet Dry-in | 87 sqs | |
| Rosin Sheet | 87 sqs | 12% |
| Peel & Stick RP 40 Labor | 0 sqs | |
| Peel & Stick Materials | 0 sqs | 30% |
| Eave / Gable Flashing Labor | 0 lft | |
| 16oz Copper | 0 lft | 13% |
| Valley Flashings Labor | 116 lft | |
| 16oz Copper | 116 lft | 13% |
| Sidewall Flashing Labor | 141 lft | |
| 16oz Copper | 141 lft | 13% |
| Headwall Flashing Labor | 13 lft | |
| 16 oz. Copper | 13 lft | 13% |
| Stucco Stop Flashing Labor | 153 ea | |
| 16 oz. Copper | 153 ea | 13% |
| Chimneys or Crickets Labor | 4 ea | |
| Vents Materials | 4 allowance | 13% |

**196  Labor Hours**

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000063**

2.63

**3  _Roof Install_**

| | | | |
|---|---|---|---|
| Copper Standing Seam | 87 | sqs | |
| Copper Materials | 87 | sqs | 17% |
| Material Handling | 7 | M/D's | |
| Freight | 0 | Loads | by owner |
| Fabricate Panels | 87 | lft | |
| Copper Materials | 87 | lft | 7% |
| Valley Install (cutting) | 116 | lft | |
| Valley Install Materials | 116 | lft | 0% |
| Hip Cutting & Forming | 1115 | lft | |
| Hip Cap Materials | 1115 | lft | 9% |
| Ridges Labor | 97 | lft | |
| Ridge Batten Caps | 97 | lft | 9% |
| ISO Board Labor | 0 | sqs | |
| ISO Board Materials | 0 | sqs | 10% |
| Flat Roof Membrane Labor | 0 | sqs | |
| Flat Roof Membrane Materials | 0 | sqs | 10% |
| Rollers | 1 | set | |
| Fasteners | 87 | sqs | |

**1562  Labor Hours**

**Sum**

**Materials with Sales Tax**
**Travel Time**
**Supervision**
**Project Duration**                                        _6_
**Gen Labor**
**Motel & Meal**
**Overhead**

**Sub-Total**

**Profit**            _21%_

**87.0** sqs

**#REF!** PER SQ

Date of Bid:  1/15/2010
Today's Date:  3/31/2025

| Install Rate OR M/D BID | | Order Qty Labor | Order Qty Mat'ls | Labor Unit $ | Mat'l Unit $ | Cost Amount |
|---|---|---|---|---|---|---|
| 1 | | 3.0 M/D's | | 575.89 | | 1,728 |
| | | | 1.0 permit | | 0.00 | 0 |
| 0 | | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 allowance | | 550.00 | 0 |
| 1 | | 1.0 M/D's | | 654.80 | | 655 |
| | | | 7.0 Each | | 565.00 | 4,232 |
| 1 | | 7.0 M/D's | | 575.89 | | 4,031 |
| | | | 0.0 Weeks | | 875.00 | 0 |
| 0 | | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 Mnths Rent | | 750.00 | 0 |
| 1 | | 6.0 M/D's | | 575.89 | | 3,455 |
| | | | 0.0 Rooms | | 90.00 | 0 |
| 1 | | 3.0 M/D's | | 575.89 | | 1,728 |
| | | | 0.0 Each | | 215.00 | 0 |
| 1 | | 2.0 M/D's | | 575.89 | | 1,152 |
| | | | 1.0 allowance | | 350.00 | 375 |
| | | | | | $ | 17,355 |
| | | | | | | |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 Ea | | 400.00 | 0 |
| 23 | per day | 3.8 M/D's | | 575.89 | | 2,178 |
| | | | 97.4 sqs | | 8.00 | 834 |
| | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 sqs | | 45.00 | 0 |
| 0 | per day | 0.0 M/D's | | 575.89 | | 0 |
| | | | 0.0 lft | | 0.00 | 0 |
| 100 | per day | 1.2 M/D's | | 575.89 | | 668 |
| | | | 131.1 lft | | 0.00 | 0 |
| 33 | per day | 4.3 M/D's | | 575.89 | | 2,461 |
| | | | 159.3 lft | | 0.00 | 0 |
| 75 | per day | 0.2 M/D's | | 575.89 | | 100 |
| | | | 14.7 lft | | 0.00 | 0 |
| 35 | per day | 4.4 M/D's | | 575.89 | | 2,517 |
| | | | 172.9 ea | | 0.00 | 0 |
| 0.5 | per day | 8.0 M/D's | | 575.89 | | 4,607 |
| | | | 4.5 allowance | | 0.00 | 0 |
| | | | | | $ | 13,366 |

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000065

2.65

| | | | | | |
|---|---|---|---|---|---|
| 0.7 | per day | 124.3 *M/D's* | | 575.89 | 71,576 |
| <= for seams | | 101.8 sqs | | 0.00 | 0 |
| 1 | | 7.0 *M/D's* | | 575.89 | 4,031 |
| | | 0.0 Loads | | | 0 |
| 11.2 | per day | 7.8 *M/D's* | | 575.89 | 4,473 |
| | | 93.1 lft | | 0.00 | 0 |
| 45 | per day | 2.6 *M/D's* | | 575.89 | 1,485 |
| | | 116.0 lft | | 0.00 | 0 |
| 45 | per day | 24.8 *M/D's* | | 575.89 | 14,269 |
| | | 1215.4 lft | | 1.00 | 1,300 |
| 45 | per day | 2.2 *M/D's* | | 575.89 | 1,241 |
| | | 105.7 lft | | 12.00 | 1,358 |
| 0 | per day | 0.0 *M/D's* | | 575.89 | 0 |
| | | 0.0 lft | | 110.00 | 0 |
| 0 | per day | 0.0 *M/D's* | | 575.89 | 0 |
| | | 0.0 lft | | 125.00 | 0 |
| 0.2 | per day | 5.0 *M/D's* | | 575.89 | 2,879 |
| | | 87.0 sqs | | 31.98 | 2,977 |

|  | $ | **105,590** |
|---|---|---|
|  | $ | 136,311 |

## mary of Hard Costs

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | $ | 11,076 | |
| *63* | *Man Hours* | *@ $ 32.88* | $ | 2,071 | | |
| *9* | *Man Hours* | *@ $ 41.65* | $ | 375 | | |
| *men* | *35* | *Days* | | | | |
| *1884* | *Man Hours* | *@ $ 32.88* | $ | 61,941 | $ | 40,000 |
| *1956* | *Total Hours* | *@ $ 4.69* | $ | 9,182 | | |
| *1956* | *Total Hours* | *@ $ 26.42* | $ | 51,666 | | |
| | *Labor @* | *$ 63.99* | $ | 136,311 | | |
| | | *13.44* | $ | 28,625 | **102,232.24** | |
| | *Labor @* | *$ 77.43* | $ | **164,936** | | |
| | | | | **#REF!** | | |
| | | TOTAL | | **#REF!** | | |
| | | ual Quote | | **#REF!** | | |

| Selling Amount | With General Conditions LABOR (With Labor carrying all of GC's) | | Mat'ls Selling | COST (Labor w/OH) LABOR | MATERIALS |
|---|---|---|---|---|---|
| $ 2,090 | | | | $ 888 | |
| $ - | | | | | $ - |
| $ - | | | | $ - | |
| $ - | | | | | $ - |
| $ 792 | | | | $ 296 | |
| $ 5,121 | | | | | $ 4,232 |
| $ 4,878 | | | | $ 2,071 | |
| $ - | | | | $ - | |
| $ - | | | | | $ - |
| $ - | | | | | $ - |
| $ 4,181 | | | | $ 1,775 | |
| $ - | | | | | $ - |
| $ 2,090 | | | | $ 888 | |
| $ - | | | | | $ - |
| $ 1,394 | | | | $ 592 | |
| $ 453 | | | | | $ 375 |
| **$ 20,999** | | | | | |
| | | | | | |
| $ - | $ - | 0% | $ - | $ - | |
| $ - | $ - | | | | $ - |
| $ 2,636 | $ 3,043 | 2% | $ 2,636 | $ 1,119 | |
| $ 1,009 | $ 1,009 | | | | $ 834 |
| $ - | $ - | 0% | $ - | $ - | |
| $ - | $ - | | | | $ - |
| $ - | $ - | 0% | $ - | $ - | |
| $ - | $ - | | | | $ - |
| $ 808 | $ 933 | 1% | $ 808 | $ 343 | |
| $ - | $ - | | | | $ - |
| $ 2,977 | $ 3,437 | 2% | $ 2,977 | $ 1,264 | |
| $ - | $ - | | | | $ - |
| $ 121 | $ 139 | 0% | $ 121 | $ 51 | |
| $ - | $ - | | | | $ - |
| $ 3,046 | $ 3,516 | 2% | $ 3,046 | $ 1,294 | |
| $ - | $ - | | | | $ - |
| $ 5,575 | $ 6,435 | 4% | $ 5,575 | $ 2,367 | |
| $ - | $ - | | | | $ - |
| | | | | | |
| **$ 16,172** | | | | | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000067**

2.67

| | | | | | |
|---|---|---|---|---|---|
| $ 86,606 | $ 99,968 | 64% | $ 86,606 | $ 36,777 | |
| $ - | $ - | | | | $ - |
| $ 4,878 | $ 5,630 | 4% | $ 4,878 | $ 2,071 | |
| $ - | $ - | | | | $ - |
| $ 5,413 | $ 6,248 | 4% | $ 5,413 | $ 2,299 | |
| $ 0 | $ 0 | | | | $ 0 |
| $ 1,796 | $ 2,073 | 1% | $ 1,796 | $ 763 | |
| $ - | $ - | | | | $ - |
| $ 17,266 | $ 19,930 | 13% | $ 17,266 | $ 7,332 | |
| $ 1,574 | $ 1,574 | | | | $ 1,300 |
| $ 1,502 | $ 1,734 | 1% | $ 1,502 | $ 638 | |
| $ 1,643 | $ 1,643 | | | | $ 1,358 |
| $ - | $ - | 0% | $ - | $ - | |
| $ - | $ - | | | | $ - |
| $ - | $ - | 0% | $ - | $ - | |
| $ - | $ - | | | | $ - |
| $ 3,484 | $ 4,022 | 3% | $ 3,484 | $ 1,480 | |
| $ 3,602 | $ 3,602 | | | | $ 2,977 |
| **$ 127,764** | **$ 164,936** | | **$ 136,109** | **$ 61,941** | **$ 11,076** |
| $ 164,936 | $ 186,709 | | | | |
| $ 28,091 | $ 21,773 | | | | |
| $ - | $ - | | | | |
| $ 214,800 | | | | | |

214800

| | Coils | | pallet weight | NET | should be |
|---|---|---|---|---|---|
| 1 | 854 | lbs | 25 | 829 | 1139 |
| 2 | 1092 | lbs | 25 | 1067 | |
| 3 | 1084 | lbs | 25 | 1059 | |
| 4 | 1044 | lbs | 25 | 1019 | |
| 5 | 1090 | lbs | 25 | 1065 | |
| 6 | 616 | lbs | 25 | 591 | |
| 7 | 1080 | lbs | 25 | 1055 | |
| 8 | 698 | lbs | 25 | 673 | |
| | 7558 | lbs | 200 | 7358 | |
| | | | | 7,803 | |
| | | | | 445 | |
| | | | $4.15 | $1,847 | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS         P000069**

2.69



**HUBER AND ASSOCIATES**
496 SW Ring Court
Lake City, FL 32025
Phone:        386-487-1040
Fax:            386-755-3233
Email:rb@huberandassociates.com

## EXTRA MATERIALS, WORK & EXPENSES

### Job Information:

Friedberg/Bunge

| Qty | Type | Material | Description | Pounds of Copper | |
|---|---|---|---|---|---|
| 140 | LFT | 20 oz Copper | Valley  - 24" | 350 | |
| 1340 | LFT | 16 oz Copper | Batten Cap - 1  1/4 x 1/4 x 1 1/4 | 308 | |
| 170 | LFT | 16 oz Copper | Counter Flashing - 10' -  5"x 5" | 354 | |
| 130 | LFT | 16 oz Copper | Solder Cleat | 33 | |
| 350 | Pc | 16 oz Copper | 2" x 4" Flat Clips | 19 | |
| 9000 | Pcs | 16 oz Copper | 2" Cleats | 500 | |
| 14 | Pcs | 16 oz Copper | 3 x 10 Sheets | 420 | |
| | | | Less 3' coils stock provided by other roofer | (1,115) | |
| | | | Total pounds of Extra Flashing | 869 | |
| | | | @ $4.10/# (average cost) | $    4,546.90 | Billed Inv #1637 |
| 8 | Pcs | 16 oz copper | 3x10 sheets - Sent Wednesday 7/7 @ 4.10/# | $      984.00 | This Billing |
| Hours | Type | Material | Description | @ $63.35/hour | |
| 40.5 | Panel Install | 16 oz. copper | Change flat roof to pitched copper roof | 2,566 | Billed Inv #1637 |
| 4 | Eave Labor | 16 oz. copper | Help Chris Bunge install eave drip edge | 253 | Billed Inv #1637 |
| 24 | Copper Boots | 16 oz. copper | Change vent boots to copper | 1,520 | Billed Inv #1637 |
| 12 | Copper Add | 16 oz. copper | Add copper flashing below each boot | 760 | This Billing |
| | | | | $    5,099.68 | |
| | Expense Type | Dates | Description | Extension | |
| | Food & Meals | 6/9/10-6/25/10 | Reciept total to this date | $    2,795.94 | Billed Inv #1637 |
| | Fuel for Big Blue | 6/9/10-6/25/10 | Intraisland transportation | $      105.00 | Billed Inv #1637 |
| | Lodging | 6/9/10-6/25/10 | None - Paid by Mr. Friedberg | | |
| | Lodging | 6/30/10-7/10/10 | 9 Nights at $100.00 | $      900.00 | This Billing |
| | Food & Meals | 6/30/10-7/10/10 | Approximate Reciept total to this date | $    1,564.95 | This Billing |
| | Fuel for Big Blue | 6/30/10-7/10/10 | Intraisland transportation | $       55.00 | This Billing |
| | | | | $    5,420.89 | |
| | | | | Totals | |
| | | | Extra Materials, Work and Expenses as noted above | $   15,067.47 | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000070**

2.70

Seller/Shipper:
## HUBER AND ASSOCIATES
496 SW RING COURT
LAKE CITY, FL 32025



| Phone: | 386-487-1027 |
| Fax: | 386-755-3233 |
| E-mail: | rb@huberandassociates.com |
| | bh@huberandassociates.com |

## COMMERCIAL INVOICE

| Statement #: | 105 |
| Date: | March 31, 2025 |
| Customer ID: | not applicable |
| Document #: | |
| BOOKING #: | 9614309 |

Bill To / Consignee: Cruz Bay, St. John Island
Law Offices of Friedberg & Bunge
c/o Micah Cady of Huber and Assoiates
5000 Estate Enighed, PMB 158
St. John, USVI  00830

**Goods of US Origin**

| Qty | Type | Description | | per item | Amount |
|-----|------|-------------|---|----------|--------|
| | | | | | $ - |
| | | | | | $ - |
| 2 | | 18" Rolls of Copper - 16 oz. - Made in USA | | $ 4,100.00 | $ 8,200.00 |
| 1 | | 20" Rolls of Copper - 16 oz. - Made in USA | | $ 4,326.00 | $ 4,326.00 |
| | | | | | $ - |
| | | OCEAN FREIGHT PRE-PAID | | | $ - |
| | | | | | $ - |
| | | INSURE CARGO | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | **Total** | $ 12,526.00 |

**Reminder:** Please include the statement number on your check.

**Terms:** Balance due in 30 days.

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000071**

2.71

| | Item | | | |
|---|---|---|---|---|
| ☐ | Pre-made Flashings | | | See Work Order |
| | | Valley Metal | | See Work Order |
| | | Batten Caps | | See Work Order |
| | | Counter flashing | | See Work Order |
| | | Solder Cleat | | See Work Order |
| | | Flat Cleats | | See Work Order |
| | | 2" COPPER Cleats | | See Work Order |
| ☐ | Sheet Stock - cut from 36" Coil | | | See Work Order |
| ☐ | Drills | | | |
| | | 1 Hammer Drill | | Stock |
| | | 4 Impacts | | ??? |
| | | 2 or 3 Reg. Drills | | Stock |
| ☐ | Scaffolding | | | |
| | | 8 end frames | | Stock |
| | | 6 cross braces | | Stock |
| ☐ | Sheet Metal Tools | | | |
| | | Break | 10' Heavy One | Stock |
| | | Deck Tongs | | Stock |
| | | Misc tongs | | Stock |
| ☐ | Rivet tool | | 2 | **1 Stock/1 Home Depot** |
| ☐ | First and second stage hand seamers | | | **1st Stage Stock/2nd stage check with Jamin** |
| ☐ | Power Seamer- | | | **New in stock - check with Jamin if renting** |
| ☐ | Caulk | 48  tubes Sikaflex - Med Bronze | **UPS Today** | Costal |
| ☐ | Screws - SS | 20,000 | 15000 stock/5000 UPS Today | ESE Machines |
| ☐ | Diamond blades for grinder | | 2 pieces | **Home Depot** |
| ☐ | 1/4" Masonary Drill Bits | | 5 | **Home Depot** |
| ☐ | 3/16" Masonary Drill Bits | | 5 | **Home Depot** |
| ☐ | Duck bill vice grips | | | **Home Depot** |
| ☐ | Needle nose vice grips | | | **Home Depot** |
| ☐ | Mapp gas | 2 Tanks - Peter has torch | | **Home Depot** |
| ☐ | Metric and American Allen Wrench Sets | | | **Home Depot** |
| ☐ | Downspout crimper | | | **Home Depot?** |
| ☐ | Rivets | | 1,500 | Hub Industiral |
| ☐ | 1/8 bit | | 24 | Hub Industiral |
| ☐ | #2 SQ Drives | | 10 | Hub Industiral |
| ☐ | #2 Phil Drives | | 10 | Hub Industiral |
| ☐ | Lead Anchors | | 1/4 x 1 1/2 | Hub Industiral |
| ☐ | First Aid Kit | | | Hub Industiral |
| ☐ | Grinder - small - 4.5" | | | Stock |
| ☐ | Lead Anchors | | 1/4 x 1 | Stock |
| ☐ | Extension Cords | | | Stock |
| ☐ | Solder | | 50 Lbs | Stock |
| ☐ | Snips | | | Stock |
| ☐ | Acetelyene Set-up | | | Stock |
| ☐ | Power sheers | | | Stock |
| ☐ | Clips - Copper | 9,000 | pcs | Stock |
| ☐ | Vice Grip C-clamps | | | Stock |
| ☐ | Saw Horse | | | Stock |
| ☐ | Anvil | | | Stock |
| ☐ | Broom | | | Stock |
| ☐ | Flux | | | Stock |
| ☐ | Flux Brushes | | | Stock |
| ☐ | Pan Formers - with new rollers | | | Stock |
| ☐ | Copper Nails | | 10 lbs | Stock |
| ☐ | 15" plywood ladders | | | Stock/Make |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000072**

2.72

59511 (7-15)

12-0170-00
W L HUNTER INSURANCE AGENCY LLC
PO BOX 1827
LAKE CITY  FL  32056-1827



LIFE · HOME · CAR · BUSINESS

P.O. BOX 30660·LANSING, MICHIGAN 48909-8160

Southern-Owners Insurance Company

06-12-2018

DAYBREAK INC HUBER & ASSOCIATES
DBA CUSTOM CEDAR SOLUTIONS H&A
ROOFING
186 SW RING CT
LAKE CITY  FL  32025-9726

**Remember**, you can view your policy, pay your bill or change your paperless options any time online, at **www.auto-owners.com**.  If you have not already enrolled your policy, you may do so using policy number **184622-78009727-18** and Personal ID Code (PID) **3C5 N5C 28N**.

Your agency's phone number is 386-752-6990.

RE:  Policy 184622-78009727-18

Thank you for selecting Auto-Owners Insurance Group to serve your insurance needs!  Feel free to contact your independent Auto-Owners agent with questions you may have.

Auto-Owners and its affiliate companies offer a variety of programs, each of which has its own eligibility requirements, coverages and rates.  In addition, Auto-Owners also offers many billing options.  Please take this opportunity to review your insurance needs with your Auto-Owners agent, and discuss which company, program, and billing option may be most appropriate for you.

Auto-Owners Insurance Company was formed in 1916.  The Auto-Owners Insurance Group is comprised of five property and casualty companies and a life insurance company.  Our A++ (Superior) rating by A.M. Best Company signifies that we have the financial strength to provide the insurance protection you need.

*~  Serving Our Policyholders and Agents Since 1916  ~*

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000073**

2.73

Agency Code : 12-0170-00                                    Policy Number : 184622-78009727

14019 (10-16)

# YOUR INSURANCE AUDIT - HOW TO SAVE TIME AND MONEY

### WHAT IS AN INSURANCE AUDIT?

Insurance audits are typically performed on commercial insurance policies providing auto, general liability, garage liability, umbrella and workers compensation coverages. When these polices are issued, you are asked to pay an estimated premium. Estimated premiums are based on the nature of your business and your estimate of exposures (i.e., payroll, sales, etc.) for the policy period.

Once your policy expires, we conduct an audit to collect information on actual exposures and operations. From this information, we determine the final earned premium. Premium adjustments are then determined by comparing audited exposures and operations with the original policy estimates.

### WHAT RECORDS ARE NEEDED FOR THE AUDIT?

Good record keeping is important to the audit process. Accurate records provide and confirm information, save time and minimize your insurance costs. The premium auditor will let you know which of the following records will be needed for your audit when the audit appointment is made.

- PAYROLL RECORDS include payroll journal and summary, federal tax reports (941's), state unemployment reports and individual earnings records. Totals should be kept for overtime when applicable.
- EMPLOYEE RECORDS include the number of employees and hours, days or weeks worked annually.
- SALES JOURNAL includes all goods or products sold, rented and/or distributed as well as service, repair and installation. Sales or excise taxes collected separately and submitted to the government need to be identified in order to be excluded.
- CHECK REGISTER and CASH DISBURSEMENTS show payments to subcontractors, material costs and payments for casual labor.
- CERTIFICATES OF INSURANCE show the subcontractors used during the policy period for construction, erection and/or repair for general liability and workers compensation insurance coverages. They are also used for commercial automobile hired auto coverage.
- INCOME STATEMENTS include subcontracted labor costs and payroll amounts.

### WHEN AND HOW WILL THE AUDIT BE DONE?

We will collect audit information from you shortly after your policy expires. Smaller, less complex policies may only require that you assemble and send the necessary information to us, or have the information available when a telephone auditor calls.
Larger and more complicated policies are handled by a field auditor, who will schedule an appointment with you shortly after the policy expires.
If you must change or cancel a scheduled appointment, please contact the auditor as far in advance as you can. It is best to schedule and complete this audit within 30 days from your policy expiration date. It is important for the auditor to ask questions about your operations. If you cannot be present to answer questions, someone familiar with the specifics of your entire business operations should be available. If you direct us to your accountant, we will obtain as much information as possible from your accountant and contact you with additional questions.
Most of our audits take a half hour or less, but audits of larger policies may take longer. Though the auditor will have a number of questions, you will not have to be directly involved during the entire audit if adequate records are available.

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000074

2.74

## HOW CAN YOU SAVE MONEY?

There are several ways you can save on premium dollars depending on the type of business and coverages you have. Not all of the following may apply to your particular business.

- PAYROLL DIVISION - A single employee's payroll can be divided, except when the employee works in a clerical, sales, drafting or driving position.  Proper records must be kept in dollar amounts that reflect work actually performed before a breakdown can be applied.  Without adequate records, the entire payroll for the employee must be placed in the highest rated classification.
- EMPLOYEE TIPS - Tips declared by employees may be excluded from their gross payroll only if separately identified.  Amounts added to customer's bills, such as service charges, which are collected by you and disbursed to your employees are not excludable.
- CERTIFICATES OF INSURANCE - Have certificates available for the audit at your premises (or your accountant's) to ensure that charges are not made unnecessarily.  It is best to obtain a certificate of insurance prior to a subcontractor performing work for you.  Certificates must cover the period when the subcontractor worked for you.  This may require certificates covering two different policy terms for the subcontractor.
- DRIVERS - (For general liability coverage), employees with the sole responsibility of driving may often be excluded from chargeable payroll, if their wages are shown separately.  However, employees who perform other duties besides driving must be placed in the highest rated class describing their duties.
- COST OF HIRE is commonly used on commercial automobile policies as a premium basis for hired auto coverage.  This includes automobiles and trailers used under contract on behalf of or loaned to the named insured, which may include rental units as well as subcontracted hauling for the insured.

Your business is unique.  If you have questions about how your specific circumstances will affect savings, please contact your insurance agent.

## BASIC DEFINITIONS

- REMUNERATION is commonly called payroll, but can include items not normally part of payroll, or exclude items which are part of payroll.  It includes wages, the value of meals and lodging, and other substitutes for money. (Substitutes for money include draws, dividends, traveling expenses and travel time payments, gift certificates or merchandise credits, annuities, and contributions to individual retirement accounts.  This list is not all inclusive but represents common substitutes for money.)  Your premium auditor will discuss this with you at the time of your audit.

- OVERTIME is the hours worked for which there is an increase in the rate of pay. It includes:

1. Work in excess of 8 hours per day, or 40 hours per week.
2. Work on Saturdays, Sundays or holidays.
3. Work in any day or week, in excess of a guaranteed wage agreement.
4. Ordinarily, overtime pay is equal to 1 1/2 times the regular hourly rate.  For example, a regular pay rate of $10 per hour at time and a half generates a $15 per hour overtime rate.  If the extra $5 of pay is shown separately, it is excluded in total.  If total overtime wage is shown in in a combined amount of $15 (regular pay plus increase) and included in gross payroll,  one third ($5) will be deducted from gross pay.  If the overtime wage is calculated at double time, one half will be deducted from gross pay.
5. Extra pay for shift differential is not considered overtime.

- GROSS SALES is the gross amount charged by you or others trading under your name for all goods or products sold or distributed, operations performed and rentals.  Some deductions from gross sales include sales or excise tax, returns and allowances and finance charges for items sold on installment.

  SUBCONTRACTOR is often used interchangeably with "independent contractor".  We ordinarily apply the definition to subcontractors performing construction, erection or structural alteration for a general contractor. Most workers compensation laws hold you responsible for employees of an uninsured subcontractor.  In some states, they may extend to an uninsured subcontractor without employees, if an employee-employer relationship

F&B v. DAYBREAK - DEPOSITION EXHIBITS        P000075

2.75

can be established.  A liability policy will also include a charge for subcontractors as though they were your employees if there is no certificate showing evidence of insurance.  Subcontractors can easily obtain a certificate of insurance through their insurance agent.

- TOTAL COST is the cost of all work let or sublet in connection with each specific project including:
  1. The cost of all labor, materials and equipment furnished, used, or delivered for use in the execution of the work.
  2. All fees, bonuses or commissions made, paid or due.
  3. The rates apply per $1,000 of total cost.

## COMMONLY ASKED QUESTIONS

Q:  Why is an audit necessary?
A:  To calculate the exact amount of premium you will be charged.  Actual exposures and operations are determined by an audit.  After they are compared with initial estimates and later endorsements, a final audit premium is determined.
Q:  If overtime is not summarized, will I still get credit?
A:  Overtime records must show overtime pay separately by employee or classification or it will not be deducted.
Q:  If I do not have certificates of insurance from subcontractors for the audit, will I be able to get them?
A:  It is in your best interest to request a certificate from a subcontractor prior to the work being performed, rather than at the time of audit.  You will be charged for employees of those subcontractors not providing certificates as though they were your employees.
Q:  Several of my employees do more than one type of work.  How should I assign their payrolls?
A:  Payrolls may be divided into appropriate classifications, provided the division is reflected on the original records in dollar amounts.
Q:  Some of my work could be considered clerical and sales.  Should I separate it?
A:  The clerical and sales classifications cannot be used with any any other class for division of a single employee's payroll
Q:  Is it necessary to provide audit information if my renewal policy has been canceled?
A:  Yes, policies are issued using estimated payroll or sales.  Actual payroll or sales needs to be known to determine if additional premium is due the company, or a return premium is due the policyholder.

In some states, a surcharge may be applied to the workers compensation policy for failure to comply with the audit process.

14019 (10-16)

F&B v. DAYBREAK - DEPOSITION EXHIBITS    P000076

2.76

Agency Code : 12-0178-00                                        Policy Number : 184622-78009727

55081 (8-88)

# AVAILABILITY OF RISK MANAGEMENT PLAN - FLORIDA

The Florida Tort Reform and Insurance Act of 1986 requires insurance companies to make available to commercial casualty and commercial property policyholders guidelines for risk management plans.

Risk management guidelines include the following:

A.  Safety measures, including, as applicable, the following areas:

    1.  Accidental occurrences;
    2.  Fire hazards and fire prevention and detection;
    3.  Liability for acts from the course of business;
    4.  Slip and fall hazards; and
    5.  Product injury.

B.  Training to insureds in safety management techniques.

C.  Safety management counseling services.

Risk Management Plan guidelines are available at your request.  If you desire this service, please contact your agent for assistance in completing the request.

55081 (8-88)                                                                                    Page 1 of 1

---

55531 (6-11)

# NOTICE OF CHANGE IN POLICY TERMS
## YOUR SUBCONTRACTED WORK

Dear Policyholder,

Your policy has a subcontracted work classification.  The subcontracted work classification requires that your sub-contractors are "adequately insured contractors".  We define an "adequately insured subcontractor" to be a subcontractor who carries commercial general liability insurance.

If your subcontractors are not "adequately insured subcontractors", they will be classified and rated as your employees and charged a premium which best describes their work.  This classification procedure will result in a substantial additional premium charge to you at final audit.

We suggest that you take immediate steps to qualify your subcontractors as "adequately insured subcontractors" to avoid any additional premium charges at final audit.

If you have any questions, please contact your Auto-Owners Insurance agency.

55531 (6-11)                                                                                    Page 1 of 1

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000077

59242 (6-00)

**Florida**
## POLICYHOLDER INFORMATION AND ASSISTANCE

We are here to serve you and as our policyholder your satisfaction is very important to us.  Should you have any questions or a complaint regarding your policy that cannot be resolved by your agent, you may contact our Tallahassee Regional Office for information and assistance by calling 850-216-3180.

Auto-Owners Insurance Company
Owners Insurance Company
Southern-Owners Insurance Company

59242 (6-00)                                                                                          Page 1 of 1

F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000078

2.78

# *Tailored Protection Insurance Policy*

*Southern-Owners Insurance Company*

F&B v. DAYBREAK - DEPOSITION EXHIBITS      P000079

In witness whereof, we, the Southern-Owners Insurance Company, have caused this policy to be issued and to be duly signed by our President and Secretary.

Secretary                                             President

55156 (7-12)

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000080**

# *Southern-Owners*

Page   1

Issued    06-12-2018

INSURANCE COMPANY
6101 ANACAPRI BLVD., LANSING, MI 48917-3999

**TAILORED PROTECTION POLICY DECLARATIONS**

AGENCY    W L HUNTER INSURANCE AGENCY LLC
12-0170-00          MKT TERR 055        386-752-6990

New Business Effective    06-01-2018
**POLICY NUMBER        184622-78009727-18**
Company Use                78-46-FL-1806

INSURED    DAYBREAK INC HUBER & ASSOCIATES
DBA CUSTOM CEDAR SOLUTIONS H&A
ROOFING
ADDRESS    186 SW RING CT

LAKE CITY  FL  32025-9726

Company
Bill

| Policy Term | |
|---|---|
| 12:01 a.m. to | 12:01 a.m. |
| 06-01-2018 | 06-01-2019 |

55039 (11-87)

| COMMON POLICY INFORMATION |
|---|

**Business Description:**    Roofing Contractor

**Entity:**    Corporation

**Program:**    Contractors  Office

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PART(S): | PREMIUM |
|---|---|
| COMMERCIAL GENERAL LIABILITY COVERAGE | $45,609.00 |
| COMMERCIAL INLAND MARINE COVERAGE | $2,109.00 |
| SURTAX | $45.60 |
| FLORIDA EMERGENCY TRUST FUND SURCHARGE | $4.00 |
| **TOTAL** | **$47,767.60** |
| **PAID IN FULL DISCOUNT** | **$4,593.44** |
| **TOTAL POLICY PREMIUM IF PAID IN FULL** | **$43,174.16** |

**THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**
The Paid in Full Discount does not apply to fixed fees, statutory charges or minimum premiums.

Premium shown above for commercial general liability coverage is an advanced premium deposit and may be subject to audit.

Forms that apply to all coverage part(s) shown above (except garage liability, dealer's blanket, commercial automobile, if applicable):
IL0017 (11-85)     55156  (07-12)

A 12% Cumulative Multi-Policy Discount applies.  Supporting policies are marked with an (X):
Comm Umb(X)  Comm Auto(X)  WC( )  Life(X)  Personal( )  Farm( ).

A merit rating plan factor of 0.90 applies.

Countersigned By:  W L HUNTER INSURANCE AGENCY LLC

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000081**

2.81

Page  2

Southern-Owners Ins. Co.                                                                                      Issued        06-12-2018

AGENCY   W L HUNTER INSURANCE AGENCY LLC                         Company      **POLICY NUMBER   184622-78009727-18**
         12-0170-00            MKT TERR 055                       Bill                                          78-46-FL-1806

INSURED   DAYBREAK INC HUBER & ASSOCIATES                                      Term   06-01-2018   to   06-01-2019

55040 (11-87)

| COMMERCIAL GENERAL LIABILITY COVERAGE |
|---|

| COVERAGE | LIMITS OF INSURANCE |
|---|---|
| General Aggregate | $2,000,000 |
| (Other Than Products-Completed Operations) | |
| Products-Completed Operations Aggregate | $2,000,000 |
| Personal Injury and Advertising Injury | $1,000,000 |
| Each Occurrence | $1,000,000 |
| **COMMERCIAL GENERAL LIABILITY PLUS ENDORSEMENT** | |
| Damage to Premises Rented to You | $300,000  Any One Premises |
| (Fire, Lightning, Explosion, Smoke or Water Damage) | |
| Medical Payments | $10,000  Any One Person |
| Hired Auto & Non-Owned Auto | $1,000,000  Each Occurrence |
| Expanded Coverage Details See Form: | |
| Extended Watercraft | |
| Personal Injury Extension | |
| Broadened Supplementary Payments | |
| Broadened Knowledge Of Occurrence | |
| Additional Products-Completed Operations Aggregate | |
| Blanket Additional Insured - Lessor of Leased Equipment | |
| Blanket Additional Insured - Managers or Lessors of Premises | |
| Newly Formed or Acquired Organizations Extension | |
| Blanket Waiver of Subrogation | |

Twice the "General Aggregate Limit", shown above, is provided at no additional charge for each 12 month period in
accordance with form 55300.

**AUDIT TYPE:**  Annual Audit

Forms that apply to this coverage:
```
59350   (01-15)      55146   (06-04)      55189   (09-04)      55238   (06-04)      55592   (02-14)
55091   (10-08)      55371   (01-07)      55531   (06-11)      IL0021  (07-02)      55296   (09-09)
55637   (09-14)      55300   (07-05)      CG0220  (03-12)      IL0017  (11-85)      55513   (11-11)
55719   (11-15)      55718   (11-15)      55373   (01-07)      55200   (06-96)
```

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000082**

2.82

Southern-Owners Ins. Co.                                                      Issued      06-12-2018

AGENCY   W L HUNTER INSURANCE AGENCY LLC               Company   **POLICY NUMBER   184622-78009727-18**
12-0170-00            MKT TERR 055                     Bill                                78-46-FL-1806

INSURED   DAYBREAK INC HUBER & ASSOCIATES                         Term   06-01-2018  to  06-01-2019

---

### LOCATION 0001  -  BUILDING 0001

**Location:** 186 Sw Ring Ct, Lake City, FL 32025-9726
**Territory:** 006                              **County:** Columbia

| CLASSIFICATION | CODE | SUBLINE | PREMIUM BASIS | RATE | PREMIUM |
|---|---|---|---|---|---|
| Commercial General Liability Plus Endorsement Included At 7.5% Of The Premises Operation Premium | 00501 | Prem/Op | Prem/Op Prem Included | Included | Included |
| Amendment Of Location & Project Aggregate Limits Of Insurance Endorsement Included At 2% Of The Premises Operations Premium | 00502 | | Prem/Op Prem | | |
| Contractors - Subcontracted Work - In Connection With Construction, Reconstruction, Repair Or Erection Of Buildings | 91585 | Prem/Op Prod/Comp Op | Total Costs 200,000 200,000 | Each 1000 .623 1.413 | $125.00 $283.00 |
| Roofing - Residential Three Stories And Under | 98678 | Prem/Op Prod/Comp Op | Payroll $600,000 $600,000 | Each 1000 41.837 31.643 | $25,102.00 $18,986.00 |
| Additional Interests | 49950 | | | | |
| Blanket Add'L Insured - O/L/C | | Prod/Comp Op | Flat Charge | | $550.00 |

| COMMERCIAL GENERAL LIABILITY COVERAGE - LOCATION 0001 SUMMARY | PREMIUM |
|---|---|
| TERRORISM - CERTIFIED ACTS    SEE FORM: 59350 | $450.00 |
| **LOCATION 0001** | **$45,496.00** |

### LOCATION 0002  -  BUILDING 0001

**Location:** 184 Sw Ring Ct, Lake City, FL 32025-9726
**Territory:** 006                              **County:** Columbia

| CLASSIFICATION | CODE | SUBLINE | PREMIUM BASIS | RATE | PREMIUM |
|---|---|---|---|---|---|
| Buildings Or Premises - Bank Or Office - Mercantile Or Manufacturing- Maintained By The Insured (Lessor's Risk Only) (For-Profit) | 61217 | Prem/Op Prod/Comp Op | Area 5,000 5,000 | Each 1000 22.221 .213 | $111.00 $1.00 |

| COMMERCIAL GENERAL LIABILITY COVERAGE - LOCATION 0002 SUMMARY | PREMIUM |
|---|---|
| TERRORISM - CERTIFIED ACTS    SEE FORM: 59350 | $1.00 |
| **LOCATION 0002** | **$113.00** |

Southern-Owners Ins. Co.

| | | Issued | 06-12-2018 |
|---|---|---|---|

AGENCY   W L HUNTER INSURANCE AGENCY LLC
12-0170-00          MKT TERR 055

Company Bill   **POLICY NUMBER   184622-78009727-18**
78-46-FL-1806

INSURED   DAYBREAK INC HUBER & ASSOCIATES

Term   06-01-2018   to   06-01-2019

16198 (07-87)

| **COMMERCIAL INLAND MARINE COVERAGE** |
|---|

16436 (12-06)

| **PREMIER CONTRACTORS INLAND MARINE PLUS COVERAGE PACKAGE** |
|---|

The coverages indicated below apply anywhere in the coverage territory.  The limit for each coverage is the maximum amount available regardless of the number of locations.

| COVERAGE | LIMIT | DEDUCTIBLE |
|---|---|---|
| BUILDING MATERIALS AND INSTALLATION PROPERTY | $50,000 | $500 |
| ELECTRONIC DATA PROCESSING EQUIPMENT | $30,000 WITH A $2,500 MAXIMUM LIMIT PER LAPTOP COMPUTER | $500 |
| CONTRACTORS EQUIPMENT AND TOOLS | $50,000 WITH A $2,500 MAXIMUM LIMIT PER TOOL | $500 |
| RENTAL REIMBURSEMENT AND EXTRA EXPENSE FOR CONTRACTORS EQUIPMENT | $1,000 PER DAY/$4,000 MAXIMUM | $500 |

Forms that apply to this coverage package:
16431  (12-06)    16432  (07-11)    16434  (12-06)    16435  (07-11)

**COINSURANCE CONTRACT** - The rate charged in this policy is based upon the use of the coinsurance clause attached to this policy, with the consent of the insured.

**COVERAGES PROVIDED**

Insurance applies to covered property for which a limit of insurance is shown.

Forms that apply to Inland Marine:
59350  (01-15)    16080  (08-86)    55081  (08-88)    16566  (12-14)    16431  (12-06)
16432  (07-11)    16434  (12-06)    16435  (07-11)

| **LOCATION 0001  -  BUILDING 0001** |
|---|

**Location:** 186 Sw Ring Ct, Lake City, FL 32025-9726

**Rating Information for CONTRACTORS EQUIPMENT**
Territory: 012                                      County: Columbia
Program: Contractors                                Rate Class: 3

| COVERAGE | COINSURANCE | DEDUCTIBLE | LIMIT | RATE | PREMIUM |
|---|---|---|---|---|---|
| CONTRACTORS EQUIPMENT CONTRACTOR EQUIPMENT - SPECIAL FORM | | | | | |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000084**

2.84

Southern-Owners Ins. Co.                                                                          Issued       06-12-2018

AGENCY    W L HUNTER INSURANCE AGENCY LLC                          Company     **POLICY NUMBER    184622-78009727-18**
          12-0170-00          MKT TERR 055                         Bill                           78-46-FL-1806

INSURED   DAYBREAK INC HUBER & ASSOCIATES                                      Term   06-01-2018   to   06-01-2019

| COVERAGE | COINSURANCE | DEDUCTIBLE | LIMIT | RATE | PREMIUM |
|---|---|---|---|---|---|
| 1. TELESCOPIC HANDLER - FORK | | $500 | $20,000 | Variable | $121.00 |
|    Th63/Catepillar | | | | | |
|    Serial #: 5WN03056 | | | | | |
|    Valuation: Actual Cash Value | | | | | |
| 2. FORKLIFT | | $500 | $7,000 | Variable | $42.00 |
|    42-6Fgu15/Toyota | | | | | |
|    Serial #: 61291 | | | | | |
|    Valuation: Actual Cash Value | | | | | |
| 3. RASS BREAK SYSTEM | | $500 | $85,000 | Variable | $514.00 |
|    3000/Ras | | | | | |
|    Serial #: RASS BREAK SYSTEM | | | | | |
|    Valuation: Actual Cash Value | | | | | |
| 4. RASS SHEAR MACHINE | | $500 | $25,000 | Variable | $151.00 |
|    52.31/Ras | | | | | |
|    Valuation: Actual Cash Value | | | | | |
| 5. HYDRAULIC PRESS | | $500 | $7,500 | Variable | $45.00 |
|    Hydraulic Press | | | | | |
|    Serial #: M403 | | | | | |
|    Valuation: Actual Cash Value | | | | | |
| 6. STAMP DROP HAMMER | | $500 | $45,000 | Variable | $272.00 |
|    Ceco | | | | | |
|    Valuation: Actual Cash Value | | | | | |
|    Rented Equipment | | $500 | $50,000 | Variable | $303.00 |
|    Valuation: Actual Cash Value | | | | | |
| TOTAL FOR THIS COVERAGE: | | | | | $1,448.00 |

**Rating Information for Premier Contractors Inland Marine Plus Coverage Package**
Territory: 012                                                County: Columbia
Program: Contractors

| COVERAGE | COINSURANCE | DEDUCTIBLE | LIMIT | RATE | PREMIUM |
|---|---|---|---|---|---|
| Premier Contractors Inland Marine Plus Coverage Package | | | | | $602.00 |
| TOTAL FOR THIS COVERAGE: | | | | | $602.00 |

Forms that apply to this location:
16241   (05-94)     16071   (07-09)     16242   (05-95)     16431   (12-06)     16432   (07-11)
16434   (12-06)     16435   (07-11)

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000085**

2.85

Page   6

Southern-Owners Ins. Co.

Issued      06-12-2018

AGENCY    W L HUNTER INSURANCE AGENCY LLC
          12-0170-00              MKT TERR 055

Company
Bill

**POLICY NUMBER**   **184622-78009727-18**
                                    78-46-FL-1806

INSURED    DAYBREAK INC HUBER & ASSOCIATES

Term   06-01-2018   to   06-01-2019

| COMMERCIAL INLAND MARINE COVERAGE - LOCATION 0001 SUMMARY | PREMIUM |
|---|---|
| TERRORISM - CERTIFIED ACTS    SEE FORM: 59350 | $21.00 |
| **LOCATION 0001** | **$2,071.00** |

A single deductible applies per claim.  If more than one item is involved in a claim, the single highest applicable deductible amount is used.

|  | PREMIUM |
|---|---|
| **PREMIER CONTRACTORS INLAND MARINE PLUS SUBTOTAL** | **$602.00** |
| **PREMIER CONTRACTORS INLAND MARINE PLUS BALANCE TO MINIMUM** | **$38.00** |

**F&B v. DAYBREAK - DEPOSITION EXHIBITS          P000086**

2.86