IN THE UNITED STATES DISTRICT COURT

OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

THOMAS F. FRIEDBERG & SARAH L. BUNGE,  ) ACTION NO.
) 3:19-cv-0053-RAM-EAH
)
        Plaintiffs,  )
)
  vs.  )
)
DAYBREAK, INC., dba HUBER & ASSOCIATES,  )
)
)
        Defendant.  )
)

VIDEO-RECORDED

VIDEOCONFERENCE DEPOSITION OF

BARRY HUBER

April 28, 2025

Reported by Beth A. Ballerini, CSR

Certificate No. 7358

Job No. 124759

Barry Huber                                                                 April 28, 2025

```
 1      A.   If I was up on the roof, I probably did then
 2   unless there was some other access or scaffold or
 3   something in place.
 4      Q.   Do you know whether you were on the roofs when
 5   you came after the project was completed?
 6      A.   I do not recall.
 7      Q.   What if anything do you recall when you went
 8   there to look at the roofs after the project was
 9   completed?
10      A.   My most clear recollection is based off of the
11   photos that I have.
12      Q.   Okay.  And what do the photos tell you?
13      A.   There was -- you were concerned about the
14   straightness of the hips, the ridges along the hips, and
15   so I took a picture of that.
16      Q.   Okay.  Anything else?
17      A.   I can't recall anything else.
18      Q.   We're here talking only about the lower
19   building, the main building, the main roof.
20           Do you have that in your mind?
21      A.   Yes.
22      Q.   So did you sit in through Micha's deposition,
23   listening?
24      A.   Parts of it.
25      Q.   Who in your organization was in charge of
                                                      Page 10
```

```
 1   purpose of that visit?
 2      A.   To meet with you and your wife.
 3      Q.   And at that time did you inspect any of the
 4   roofs?
 5      A.   I'm sure I did.
 6           (Interruption in the proceedings.)
 7           THE WITNESS:  Could I take a moment and
 8   disconnect this phone over here?
 9           MR. FRIEDBERG:  Sure.
10           THE WITNESS:  Thank you.  Excuse me.
11           I thought I turned the volume down.  I
12   apologize.  I disconnected it.
13           MR. FRIEDBERG:  Are you ready?
14           THE WITNESS:  Yes, please.
15   BY MR. FRIEDBERG:
16      Q.   Okay.  I think I was asking you whether you
17   inspected the roof prior to construction.
18      A.   I would assume I would have, to some degree.
19   To what degree that was, I do not recall.
20      Q.   Is there anything about the roof that caused
21   you concern?
22      A.   I guess you would have to ask the question
23   maybe about level of concern.
24      Q.   Okay.  What was your level of concern?
25      A.   There was some level of concern because some
                                                      Page 12
```

```
 1   packing the containers before they were shipped down?
 2      A.   It would have been people in my shop, I would
 3   assume.
 4      Q.   Do you have any names of anyone who was in
 5   charge?
 6      A.   No.
 7      Q.   What role did Ron Barker play with respect to
 8   this project, if you know?
 9      A.   He was in the office.  So to the best of my
10   recollection, would have been doing, you know,
11   office-type things with invoicing, things like that.
12      Q.   Do you have any independent recollection of
13   any aspects of this project?
14      A.   That's a very broad question.  Could you reask
15   it?
16      Q.   Sure.
17           What do you remember about the project?
18      A.   A beautiful site; a collection of buildings
19   that's beautifully situated overlooking the water; and
20   some typical I guess you would call Caribbean
21   construction aspects to it.  Nothing difficult about the
22   project.  It looked like an ideal setting for a copper
23   standing seam roof.
24      Q.   You mentioned that you were present on the
25   project prior to commencement of the work.  What was the
                                                      Page 11
```

```
 1   of the roofs had been exposed to the weather it looked
 2   like quite a long time.
 3      Q.   And in terms of the soundness or structure of
 4   the roofs, did you have any concern?
 5      A.   I don't recall any concern regarding that.
 6      Q.   And when you say exposed to the weather, what
 7   do you mean?
 8      A.   Some of the underlayment that had been used
 9   was alligatoring -- what they call alligatoring, you
10   know, like an alligator skin because it had been exposed
11   for so long.
12      Q.   Was any other material placed above that
13   alligatoring material prior to the copper roof being
14   installed?
15      A.   I would assume so because I didn't -- I don't
16   remember seeing anything, you know, in any pictures of
17   the project.  So I guess based off of that I would
18   assume.
19      Q.   So you're assuming that there was some type of
20   underlayment that was placed shortly before the copper
21   roof being installed?
22           Is that your testimony?
23      A.   My testimony would be that the -- the on-site
24   contractor, Chris, was to prepare the roofs for the
25   copper roofing and to address any issues so that we
                                                      Page 13
```

Barry Huber                                                                  April 28, 2025

```
 1  could simply come and install the copper roofing on --
 2     Q.  Why do you say -- I'm sorry, I interrupted
 3  you.  Go ahead and finish.
 4     A.  -- on a sound roof.
 5     Q.  My first question:  Why did you state that
 6  Chris was the on-site contractor?  Did he ever represent
 7  he was?
 8     A.  Yeah.
 9     Q.  What did he say?
10     A.  Well, he was the point of contact for the
11  plans and information about the job.  So I guess by
12  default you would assume he was.  Maybe was that assumed
13  erroneously?  But an assumption would be since he was
14  there building and referring to the plans and the
15  construction.
16     Q.  Did you ever ask Chris if he was the on-site
17  contractor?
18     A.  I don't recall.
19     Q.  Was there anything about the roof prior to
20  installation of copper immediately -- well, strike that.
21  Let me withdraw.
22         ==Was there anything about the roof immediately
23  prior to installation of copper that would lead you to
24  believe that it was anything other than sound?==
25     A.  ==Not to my knowledge.==
                                                    Page 14
```

```
 1     Q.  So at the time -- this was in 2010.  I've seen
 2  documents that you had insurance with Southern Owners
 3  Insurance and Ameritrust Group.
 4         Is that correct?
 5     A.  I don't recall.
 6     Q.  All right.  Are you aware of any reservation
 7  of rights issued by any of the insurance companies with
 8  respect to this particular lawsuit?
 9     A.  I'm not aware.
10     Q.  By not aware, meaning there is none or you
11  don't know?
12     A.  I don't know.
13         MR. COSBY:  Object to the form.
14         You can answer.
15  BY MR. FRIEDBERG:
16     Q.  So at some point in time you prepared a
17  proposal, correct?
18     A.  Correct.
19         MR. FRIEDBERG:  All right.  We're going to use
20  the same exhibits, Beth, that we used for Micha's, so we
21  can just refer to them.
22  BY MR. FRIEDBERG:
23     Q.  You've reviewed the documents, Exhibit 2,
24  which is a series of documents with the F&B v.
25  Daybreak - Deposition Exhibits.
                                                    Page 15
```

```
 1         Have you seen those, Barry?
 2     A.  Yes.
 3         MR. FRIEDBERG:  So, John, I'm going to ask
 4  that you --
 5  BY MR. FRIEDBERG:
 6     Q.  Well, first let me ask you, it had a request
 7  for production of 14 items.  I didn't receive an
 8  objection to the request for production.
 9         Do you have the items that are identified in
10  the request for production?
11     A.  I haven't -- I'm not sure.
12     Q.  Did you make an effort -- well, strike that.
13         Did you see the request for production?
14     A.  I saw the documents, and we provided
15  everything to our counsel that we have, every last --
16  everything that we have.
17     Q.  So when I deposed you a number of years ago
18  you mentioned that you had moved offices and were no
19  longer able to locate a number of the documents.
20         Is that still the case, you cannot locate the
21  documents?
22     A.  My answer would be a little more than a yes or
23  no because the amount of documents -- I would have to
24  know how many there were to begin with and what was
25  missing.
                                                    Page 16
```

```
 1     Q.  Did you have a job file for this job?
 2     A.  I'm sure we did.
 3     Q.  And what's generally contained within your job
 4  file?
 5     A.  Estimates; invoices; if there's roof plans, a
 6  roof plan would be in there; owner contact information.
 7     Q.  Do you still have the job file?
 8     A.  There was a paper file found at our office
 9  that we provided to our attorney that had very limited
10  information, according to my secretary.
11     Q.  And which attorney was this?
12     A.  To our counsel, our current counsel,
13  Mr. Cosby.
14     Q.  Okay.  And do you know what was contained
15  within those files?
16     A.  No.
17         MR. FRIEDBERG:  Let's bring up P8, John.
18  BY MR. FRIEDBERG:
19     Q.  Do you recognize this document, Barry?
20     A.  Yes.
21     Q.  And what is this document?
22     A.  A proposal for roofing the residence at
23  St. John.
24     Q.  This is a February 2010 proposal?
25     A.  That's what it says.
                                                    Page 17
```

Barry Huber  April 28, 2025

**Page 34**

1  Q. If in fact the seams don't have sufficient
2  material to fully bend over, do you know whether or not
3  those particular panels are susceptible to wind uplift?
4     MR. COSBY: Form.
5     You can answer.
6     THE WITNESS: Again, it -- it is -- it is
7  about waterproofing the roof at the hip. The wind
8  resistance is your panel fastening.
9  BY MR. FRIEDBERG:
10  Q. And panel fastening is what?
11  A. Is the cleats -- in your case of your roof,
12  Tom, is 9 1/2 inches on center with 15-inch-wide panels.
13  Q. All right. So is it your testimony that it's
14  the cleats solely that's providing the wind resistance?
15     MR. COSBY: Form.
16     You can answer.
17     THE WITNESS: The cleats and the panels, yes.
18  BY MR. FRIEDBERG:
19  Q. Okay. And how are the panels providing wind
20  resistance?
21  A. With the attachment of the cleats which are
22  folded into the seam.
23  Q. Okay.
24  A. And those cleats nailed to hopefully sound
25  wood deck or batten.

**Page 35**

1  Q. Is there any evidence that there was anything
2  unsound about the wood battens that the cleats were
3  nailed into?
4  A. We did no testing of the integrity of the
5  battens.
6  Q. All right. Well, the battens were -- well,
7  let me ask you, what is your understanding of what the
8  battens were?
9  A. Our understanding was that the battens were
10  going to be applied in the hurricane zone that you are
11  in.
12  Q. All right. That was a poor question.
13     What was the size of the battens?
14  A. They were I believe -- well, from pictures
15  they appear to be 1-by-4s, which is -- 1-by-4 is not
16  really 1-by-4. It's 3/4 by 3 1/2.
17  Q. Is that --
18  A. I'm sorry, go ahead.
19  Q. Is that a standard size batten, if you know?
20  A. I would say it's one of the more commonly used
21  products for battens.
22  Q. At any point in time did you become aware or
23  is there any evidence that the battens were not properly
24  installed?
25  A. No. I mean no recollection of such.

**Page 36**

1  Q. You mentioned the word alligator. You were
2  down a number of months before the actual work began,
3  correct?
4  A. Correct.
5  Q. What you saw as alligatoring, was that when
6  you first -- your first visit to the site?
7  A. I believe so, my first look.
8  Q. Do you know if that condition was remedied
9  prior to the copper panels being installed?
10  A. I would assume so.
11  Q. All right. I mean were you aware from
12  anything your crew told you that there was alligatoring
13  existing at the time the copper roof was installed?
14  A. I don't recall.
15  Q. And you mentioned about rollers. What type of
16  rollers were used on this project?
17  A. If you're referring to the machine seaming of
18  the double-lock --
19  Q. Yes.
20  A. I believe it was an ESE machine. It's called
21  ESE. It's just a manufacturer of roll-forming and
22  pan-forming equipment.
23  Q. And that's electrical; in other words, it has
24  to be plugged in?
25  A. It's electrical.

**Page 37**

1  Q. Right. And then basically you run it up the
2  seams and it crimps them?
3  A. Yeah, yes.
4  Q. And were hand seamers used as well?
5  A. Hand seamers are necessary to start the seam
6  off correctly sometimes. You know, these seamers, these
7  mechanical seamers -- and probably especially at the
8  time we did your roof -- you usually had to start --
9  kind of start the machine out with a hand seam to make
10  sure it got off on a good start.
11  Q. Let me have you go to page 70.
12     And do you see this document?
13  A. Let me get my reading glasses, if I could.
14     THE COURT REPORTER: John, can you make it
15  bigger, please.
16     THE WITNESS: It's legible.
17  BY MR. FRIEDBERG:
18  Q. What is this document?
19  A. It appears to be an invoice, but it's not --
20  but yet it says "Job Information," so I'm unclear.
21  Q. It says "Extra Materials, Work & Expenses" on
22  the top.
23     Do you see that?
24  A. I do see that.
25  Q. And then at the bottom there's a total of

```
 1              ERRATA SHEET / CORRECTION CERTIFICATE
 2     Page  Line   Correction/Reason
 3     ____  ____   _____
 4     ____  ____   _____
 5     ____  ____   _____
 6     ____  ____   _____
 7     ____  ____   _____
 8     ____  ____   _____
 9     ____  ____   _____
10     ____  ____   _____
11     ____  ____   _____
12     ____  ____   _____
13     ____  ____   _____
14     ____  ____   _____
15     ____  ____   _____
16     ____  ____   _____
17     ____  ____   _____
18     ____  ____   _____
19     ____  ____   _____
20     ____  ____   _____
21     ____  ____   _____
22     ____  ____   _____
23
24     _____          _____
25         Date                     BARRY HUBER
```

Page 58

```
 1                    REPORTER'S CERTIFICATE
 2
 3           I, Beth A. Ballerini, Certified Shorthand
 4     Reporter in and for the State of California, do hereby
 5     certify:
 6           That the witness was by me duly sworn, and
 7     the foregoing testimony was reported by me and was
 8     thereafter transcribed with computer-aided
 9     transcription; and the preceding pages contain a full,
10     complete, and true record of said proceeding.
11           I further certify that I am a disinterested
12     person and am in no way interested in the outcome of
13     said action or connected with or related to any of the
14     parties in said action or to their respective counsel.
15           The dismantling, unsealing, or unbinding of the
16     original transcript will render the Reporter's
17     Certificate null and void.
18           IN WITNESS WHEREOF, I have hereunto set my hand
19     this 12th day of May 2025.
20
21                    _____
22                    Beth A. Ballerini, CSR
                      Certificate No. 7358
23
24
25
```

Page 59