```
                                                          Page 1

 1      IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
 2                 DIVISION OF ST. THOMAS AND ST. JOHN
 3
 4
 5                                        )
        THOMAS F. FRIEDBERG & SARAH L.    )
 6      BUNGE,                            )
                                          )
 7                   Plaintiffs,          )  Civil Action No.
                                          )  3:19-cv-0053
 8      Vs.                               )
                                          )
 9      DAYBREAK, INC. dba HUBER &        )
        ASSOCIATES,                       )
10                                        )
                     Defendant.           )
11                                        )
12
13
14
15                   DEPOSITION OF SARAH L. BUNGE
16
17
                              May 2, 2025
18
19
20           One South Church Avenue, Suite 1200
                         Tucson, Arizona
21
22
23
24
                     Reported By:  Zella Mae Howard
25                    Certified Reporter No. 50734
```

Page 38

1  A. Well, they just, you know -- they weren't overly
2  friendly or overly conversant, or they were just, you
3  know, guys.
4  Q. Do you know how many guys were in the Daybreak
5  crew?
6  A. I don't know, four or five, five or six, maybe, I
7  don't know.
8  Q. And do you know any of them by name?
9  A. Huber's son-in-law, Micah. I don't recall any of
10 the other names.
11 Q. Did you ever have any conversations with Micah
12 about the project as far as questions you had during the
13 installation of the copper in the main house or anything
14 like that?
15 A. I'm sure we had conversation. I think in terms
16 of telling them what to do or asking about their work
17 methods, no, if that's what you're asking --
18 Q. I'm not asking if you --
19 A. -- I mean not, How does that -- How does that
20 forming machine work, that sort of thing.
21 Q. Okay. Did you ever discuss with Micah this
22 garage and stuff, using the garage, or where the forming
23 machine was?
24 A. Not -- No particular discussions. I mean --
25 Q. Was Micah present at the project for the whole

Page 39

1  time that the copper was being installed?
2  A. Yes, I think so.
3         They never -- The -- The rudeness wasn't so
4  much projected towards us. Quite frankly it was I believe
5  more of a racist situation.
6  Q. That sounds like you're speculating.
7  A. Well, it was directed towards those of another
8  race primarily.
9  Q. Did you ever observe any cleats in the garage?
10 A. Not specifically.
11 Q. Were you present during Hurricane Irma at
12 Chocolate Hole?
13 A. Yes.
14 Q. And were you in the main house at any time during
15 Hurricane Irma?
16 A. During the storm, itself?
17 Q. Yes.
18 A. No.
19 Q. What state of construction was the main house at
20 the time of Hurricane Irma?
21 A. Shell.
22 Q. Were there doors or windows installed?
23 A. Not permanent ones.
24 Q. Does that mean they were temporary?
25 A. Yes.

Page 40

1  Q. Tell me about -- Describe the temporary doors or
2  windows.
3  A. Plywood. If they're doors, they have hinges and
4  locks on them. The windows mostly I don't think were
5  hinged. I think they were, you know, solid more than
6  anything else, or screwed, rather.
7  Q. And who installed the plywood doors and windows?
8  A. I don't know. I think it was probably done when
9  Andy was there, if not maybe Darren.
10 Q. Do you know?
11 A. I think Andy. I think Andy did that.
12 Q. Okay. And do you know why the plywood doors and
13 windows were installed?
14 A. Well, because we wanted to button up once we got,
15 you know, the walls and the roof on, button it up, keep
16 the weather out, so you could store the materials and
17 stuff in there, and to keep the weather out and keep it
18 secure. And then you don't have to worry when there's a
19 storm coming; you don't have to run around trying to
20 button everything up, 'cause we just keep it buttoned up
21 and ready for storms.
22 Q. How long before Irma was that buttoned up, as you
23 call it, with the plywood?
24 A. I don't know specifically. A long time.
25 Q. Right. In other words, that wasn't for Irma

Page 41

1  specifically, correct?
2  A. No.
3  Q. And what was stored in the main house?
4  A. Lots of things, materials.
5  Q. What do you mean by, Materials, building
6  materials?
7  A. Yes.
8  Q. Anything else?
9  A. I'm not sure.
10 Q. Is there furniture in the main house?
11 A. Maybe some.
12 Q. Like what?
13 A. Oh, like the guys like would sometimes have patio
14 furniture that possibly washed up on the beach and so
15 forth that they would sit in to take breaks.
16 Q. Any appliances or things like that in the main
17 house?
18 A. Oh, there were, you know, things that --
19 materials for the site, yes.
20 Q. What do you mean, Materials for the site?
21 A. Well, there's probably air conditioners, air
22 conditioning compressors, you know, whatever else is going
23 to be installed.
24 Q. In other buildings?
25 A. Yeah, if we, you know, not necess- -- yeah,

Page 46

1 corner?
2   A. Of the -- the main house?
3   Q. Main house.
4   A. I believe so.
5   Q. Any damage to the roof systems in any of the
6 other buildings?
7   A. I think there was also an area on the gate house
8 where something hit, and there was a area where the copper
9 was deformed a bit.
10  Q. From debris?
11  A. Yeah. Yes.
12  Q. Any other buildings with roof damage that you
13 determined?
14  A. Yeah, the flat roofs that don't have copper on
15 them, they just have a coating on them, and that coating
16 was abraded.
17  Q. From debris?
18  A. I don't know. Maybe from debris, maybe just
19 salt, salt, like a sand blasting, salt blasting, I don't
20 know.
21  Q. Any other roof damage on the property due to
22 Irma?
23  A. Not that I can think of off the -- offhand.
24  Q. Any damage to the main house separate and apart
25 from the roof due to Irma?

Page 47

1   A. There was some plaster a lot -- throughout the
2 property. I think probably mostly every building had some
3 area where apparently debris hit and then plaster cracked
4 away.
5   Q. Did the plywood hold up --
6   A. Yes.
7   Q. -- in the main house?
8   A. One hundred percent.
9   Q. Was there any water that intruded during Irma
10 through the plywood openings?
11  A. Irma wasn't -- didn't seem to be a really wet
12 storm. It was a -- There may have been -- I'm sure there
13 was probably some moisture, but it wasn't like any
14 flooding on the floor or a solid water or anything. Maybe
15 some moisture, you know, near the doors where the wind
16 just blows it through, but, I mean, with the plywood on
17 there is probably less than you get with normal doors or
18 windows, because it overlaps the opening, where normal
19 door and window goes right into where the opening is.
20  Q. So it wasn't like you walked in and had
21 ankle-deep --
22  A. Oh, no, no.
23  Q. -- calf-deep water, correct?
24  A. No. At most there might be some damp concrete.
25  Q. I don't expect you to necessarily know the

Page 48

1 answer, but do you know how many openings as far as a door
2 or a window there are in the main house?
3   A. Not off the top of my head.
4   Q. And I'm asking in terms of when you've ordered
5 windows or doors for that. Does that ring any bells?
6   A. I wouldn't know the number.
7   Q. Okay. The storm, when -- When did Irma hit in
8 terms of day or night, do you recall?
9   A. Daytime.
10  Q. What part of the day, do you remember?
11  A. Oh, I -- I don't know. I think probably outer
12 bands probably started in the morning, and the main part
13 was probably more in the afternoon.
14  Q. And do you know when the last bands came through?
15 Was that in the evening, or --
16  A. Yeah, it seems to me we were outside walking
17 around some by dusk.
18  Q. And that the storm had passed?
19  A. Well, there might have still been some winds, but
20 they would not have been --
21  Q. Right.
22  A. -- dangerous.
23  Q. As far as the East side, you said panels lifted.
24 Do you know how many panels lifted?
25  A. I -- I didn't go up there, so I don't know.

Page 49

1   Q. Did you ever see photos that showed how many
2 panels lifted?
3   A. I probably did, but I don't recall now.
4   Q. Were the panels that were lifted repaired to any
5 extent?
6   A. I'm not -- Again, I wasn't up there. I don't
7 know what they were doing. I think they -- they didn't
8 just leave it so it was in a condition where it's going to
9 cause problems. They did some kind of repair.
10  Q. Who's, They?
11  A. The -- The people that came, Dayhill and the --
12 Art Sanders and the copper installation specialists from
13 Dayhill.
14  Q. And how soon was Dayhill out there after Irma --
15  A. I don't know.
16  Q. -- or how long?
17  A. I don't recall.
18  Q. Was it days, or more like weeks or months?
19  A. Well, it couldn't have been days or weeks,
20 because there was no way to get to the island from -- and
21 they would have had to have come from the mainland, so it
22 could not possibly have been within days, or even like
23 within two months, so sometime after that. And as to
24 when, I just don't recall.
25  Q. Okay. Was anything done in terms of any repair

13 (Pages 46 - 49)

Page 74

1  A. Well, I mean --
2  Q. -- hold on, let me finish the question, please --
3  was any other portion of the roof opened up, or was it
4  determined in any other portion of the roof that there
5  were not clips or cleats?
6  A. We -- We do not know if there are other clips or
7  cleats under any of the portions except for the portions
8  on the West side that were previously looked at. We have
9  really no way of knowing what is under the rest of the
10 roof, whether it has clips or not.
11 Q. I'm not talking about the West side. If I didn't
12 state it, I meant to limit this to the East side.
13 A. All right.
14 Q. My understanding -- Let's talk about the West
15 side for a minute. My understanding on the West side was
16 is there were clips, you're just saying they weren't
17 spaced pursuant to the contract terms, correct?
18 A. We did not -- I do not believe that we removed
19 the entire West side. I -- The -- The portions that were
20 removed, which were on the West side, not the whole West
21 side, portions of the West side, the part that was
22 removed, there were clips. The portion on the East side
23 that was -- was opened, there were no clips. We do not
24 know as to areas that have not been opened.
25 Q. I understand that. But on the West side you

Page 75

1  never opened portions of the West side and found that
2  there were no clips at all; is that correct?
3  A. We did not open the whole West side. We opened
4  one portion of the West side. We do not know about the
5  rest of the West side, either. We only know about two
6  areas that were opened. One area had clips, one area did
7  not. That's all we know.
8  Q. I didn't -- I didn't say anything about opening
9  the whole roof. My question is, Did you ever open any
10 portion of the West side and find that there were no
11 clips?
12       MR. FRIEDBERG: Objection. Form.
13       THE WITNESS: We opened one portion of the
14 West side and there were clips. We did not open any other
15 portion of the West side. We -- So we do not know whether
16 or not there are clips.
17 BY MR. COSBY:
18 Q. Okay. And on the East side was any portion ever
19 opened other than the portion that nature opened?
20 A. Well, that's -- that's probably a misstatement I
21 -- I -- Nature did not open it. It opened probably
22 because there were no clips. Obviously, if there were
23 clips, it probably would not have opened. So I don't --
24 the cause is not really nature, I don't think. So that
25 might be a misstatement of the facts. But we -- there was

Page 76

1  one area that was opened on the East side, and that area
2  has no clips. As to the rest of the area, no one opened
3  it and looked to see if there were any clips. We did not
4  do that destructive testing, and so we -- we don't really
5  know what the situation is under the rest of the roof.
6        MR. COSBY: Okay. All right. That's all I
7  have.
8        MR. FRIEDBERG: All right. We'll read and
9  review.
10       THE REPORTER: And what would you like for
11 your copy?
12       MR. FRIEDBERG: Well, I'm going to take a
13 copy, a full suite, and then I also want a rough.
14       (The deposition was concluded at 11:45
15 o'clock a.m.)

Page 77

CERTIFICATE OF REPORTER
STATE OF ARIZONA)
COUNTY OF PIMA )
       I, Zella Mae Howard, a Certified Reporter
in the State of Arizona, do hereby certify that the
5 foregoing deposition was taken before me in the County of
Pima, State of Arizona; that an oath or affirmation was
6 duly administered by me to the witness, SARAH L. BUNGE,
pursuant to A.R.S. 41-324(B); that the questions
7 propounded to the witness and the answers of the witness
thereto were taken down by me in shorthand and thereafter
8 reduced to typewriting; that the transcript is a full,
true, and accurate record of the proceeding, all done to
9 the best of my skill and ability; that the preparation,
production and distribution of the transcript and copies
10 of the transcript comply with the Arizona Revised Statutes
and in ACJA 7-206(F)(3); ACJA 7-206J(1)(g)(1) and (2); and
11 ACJA 7-206J(3)(b).
       The witness herein, SARAH L. BUNGE,
12 requested reading and signing.
       IN WITNESS WHEREOF, I have set my hand in my
13 office in the County of Pima, State of Arizona, this 8th
day of May, 2025.

17     <%23364,Signature%>
       ZELLA MAE HOWARD, RMR, CR NO. 50734