# Exhibit 6

## IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| DAYBREAK, INC, et al., | CASE NO. ST-10-CV-716 |
| Plaintiff, | ANSWER TO ACTION FOR DEBT, BREACH OF CONTRACT AND TO ENFORCE CONSTRUCTION LIEN |
| v. | |
| THOMAS F. FRIEDBERG, et al., | |
| Defendants. | |
| THOMAS F. FRIEDBERG, et al., | COUNTERCLAIM FOR BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE AND FRAUD |
| Counterclaimants, | |
| v. | |
| DAYBREAK, INC., et al., | JURY TRIAL DEMANDED |
| Counterdefendants. | |
| THOMAS F. FRIEDBERG, et al., | THIRD PARTY CLAIM FOR FRAUD |
| Third Party Plaintiffs, | |
| v. | JURY TRIAL DEMANDED |
| BARRY R. HUBER, | |
| Third Party Defendant. | |

## MOTION TO CERTIFY QUESTIONS FOR INTERLOCUTORY APPEAL

NOW COME the Defendants, Counterclaimants, and Third Party Plaintiffs, THOMAS F. FRIEDBERG, SARAH BUNGE, and LAW OFFICES OF FRIEDBERG & BUNGE, by and through their attorney, W. MARK WILCZYNSKI, ESQ., of the LAW OFFICE OF W. MARK WILCZYNSKI, P.C., and hereby move this Court to certify a question for interlocutory appeal to the Supreme Court of the Virgin Islands, pursuant to 4 V.I.C. § 33(c).

*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 2

This Court has made the decision that the movants' claims in this case are limited to $210,000, when experts in the field have valued their damages at *more than three times that amount.* The movants contend that the Court's decision was procedurally and substantively flawed and they assert that they now face the prospect of proceeding to trial in this cause – and spending all of the time, money, and energy that entails – without hope of an award which can address their damages.

While the movants agree that this Court has the power to limit evidence and limit claims, they take the position that in this instance, insufficient evidence existed upon which such sanctions could be based and it was, as the result, error for the Court to rule otherwise. The movants, despite having adhered to all deadlines and discovery standards, have been penalized. They seek certification of this issue for interlocutory appeal to the Supreme Court of the Virgin Islands.

## PROPOSED QUESTIONS FOR CERTIFICATION

1. Where a motion *in limine* seeks to limit evidence for a party's failure to disclose evidence, does *V.I.R.Civ.P.* 37(c) govern imposition of such a sanction?

2. Can a trial court impose a Rule 37(c) sanction other than the nine delineated sanctions?

3. Is the trial court required to make an express finding concerning substantial justification or harmlessness under Rule 37(c)(1) where the sanctioned party explicitly relies upon such a defense?

Case: 3:19-cv-00053-RAM-EAH   Document #: 112-6   Filed: 01/20/26   Page 4 of 120
*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 3

## RELEVANT FACTUAL BACKGROUND

This case is, in its most basic terms, a dispute between homeowners and their roofing contractor about the sufficiency of work and payment for that work.

The case began by Plaintiff Daybreak, Inc. filing their complaint in which they sought $31,000 for breach of contract and debt, alleging that the Defendant Homeowners failed to pay the Plaintiff Roofing Contractor for the work that he performed. *Complaint,* December 21, 2010.[1] After initially responding to the Complaint by filing a motion to dismiss, on September 30, 2012, the Defendants asserted their Answer and Third Party Claim and, on the same day, sought to remove the action to the District Court.

While removed to the District Court in March 2013, the Defendants provided their Rule 26 Disclosures which provided the following Computation of Damages, "[Defendants] will be submitting costs of repair estimates through their experts." A copy of the Rule 26 Disclosures is attached as **Exhibit A**. Shortly thereafter, in May 2014, the District Court remanded the matter back to the Superior Court. *Order of May 1, 2013.* In November 2013, the Parties submitted their *Joint Discovery Plan* to the Court. That document, drafted by Plaintiff's counsel and later signed by all attorneys, provided for the following deadlines:

- Fact discovery to be completed by April 30, 2014;

---

[1] For the sake of brevity and clarity, I have referred to my clients as 'Defendants' and the opposing parties as 'Plaintiffs' unless the use of those terms would be confusing.

Case: 3:19-cv-00053-RAM-EAH    Document #: 112-6    Filed: 01/20/26    Page 5 of 120
*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 4

- "Plaintiff/CounterDefendant and Third Party Defendants'" expert report by August 29, 2014; and

- "Defendants/CounterClaimants and Third Party Plaintiffs'" expert report by October 31, 2014.

These discovery dates, proposed by the parties, were accepted by the Court and given force and effect to set discovery scheduling. *Order of December 16, 2013.*

In March 2014, responding to Interrogatories propounded by the Plaintiffs, the Defendants stated that costs of repair due to Plaintiff's alleged negligence were estimated at $210,000. Excerpts from the Interrogatory Responses are attached as **Exhibit B**. On July 31, 2014, the Plaintiffs were permitted entry upon the property belonging to the Defendants' to allow their expert to conduct a physical inspection of the premises. In subsequent deposition testimony, their expert admitted that he walked every known section of roof on the property:

Q. (By Mr. Friedberg) Did you walk on the metal roof over the first level of the gatehouse? It's a pitch hip roof?
A. Eh-hmm.
Q. Q. Yes, you did?
A. Yes.
Q. And you walked on the roof that would be facing west, is that correct, the gatehouse?
A. Yes.
Q. And you're saying there is some other type of roof that you felt you wanted to walk on to?
A. No. I'm saying that we did not go on the far side of that gatehouse.
Q. The far side being what side?
A. South.
Q. Okay. And you believe there is some type of roof there?
A. I don't know.
Q. All right. So, other than the fact that you didn't look at the south side of the gatehouse --
A. Right.

*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 5

Q. -- you had all access to all roofs?

A. Yes.

Q. And you were able to look at all roofs; is that correct?

A. That's correct.

Q. And I believe you actually climbed on all the roofs; is that correct?

A. I think we went on every one, yes.

...

Q. But my questions go to the hips, seams and/or reglets. You were able to freely look at, inspect and/or photograph any of them on the property, correct?

A. Yes.

Q. You feel you had enough time to do that?

A. Yes.

Q. Was there discussion regarding the amount of time you thought you would need to look at the roofs?

A. We were told we had like a two or three hour window to look at them.

Q. Was that sufficient in your opinion?

A. To visually inspect the roof, yes, but to take apart the roof or do any testing in that manner, no. Would have taken a lot more time.

Q. You didn't have any tools to take them apart, did you?

A. No, I did not.

> *Deposition of Stephen Hendron,* January 7, 2015, 75:22-76:25; 79:15-80:8, applicable excerpts of which are attached as **Exhibit C**.

Following the July site visit, Plaintiffs timely filed their expert disclosure, the report of Stephen Hendren, on August 29, 2014. *Daybreak, Inc. and Barry R. Huber's Expert Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(2),* August 29, 2014, a partial copy of which is attached as **Exhibit D**. As contemplated by the discovery schedule - executed by both parties and endorsed by the Court, the onus was then on the Defendants to file their expert disclosure. The Defendants filed their expert disclosure, the report of Arthur Sanders, on November 13, 2014. *Defendants', Counterclaimants' and Third Party Plaintiffs' Fed.R.Civ.P. Rule 26(a)(2)(B) Expert Witness Disclosures,* November 13, 2014, a partial copy of which is attached as **Exhibit**

Case: 3:19-cv-00053-RAM-EAH    Document #: 112-6    Filed: 01/20/26    Page 7 of 120
*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 6

**E.**  The Sanders report endorsed a complete removal and replacement of the roofs, and setting a probable cost of construction at $759,357.

Following that disclosure, in December 2014, the Defendants filed supplemental responses to the interrogatories and document requests previously propounded by the Plaintiffs.  The supplemental responses incorporated Defendant's expert report to amend the amount of damages sought to the cost of repair as set out in the Sanders report, as well as the cost to repair and replace some damaged cabinetry in the home.

On January 5, 2015, the Plaintiff/Counter-Defendant filed a motion seeking to have a second inspection of the premises.  The gravamen of their motion was that because their expert was allowed only two hours to conduct their inspection and that Plaintiff's expert had a longer period, that they should be allowed re-entry to the premises.  *Daybreak, Inc. d/b/a Huber and Associates and Barry Huber's Motion for Re-Entry Upon Land,* January 5, 2015, ¶¶ 6-9.  They also argued that they did not appreciate the extent of the CounterPlaintiffs' claim for damages until after their initial inspection and, therefore, they should be allowed the additional opportunity.  *Id.,* ¶ 10.  Once the issue was fully briefed, Judge Adam Christian held a hearing on the motion.  In ruling from the bench, he stated:

> I just don't see any reason to extend or have this re-entry done.  It seems to me that the issues were there in front of the parties and certainly could have been addressed over the last several years now.  So that motion is denied.  When I say that motion, I'm talking about the motion to re-enter the land.
>
> *Official Transcript of Telephonic Status Conference,* February 2, 2015, 32:1-9, a complete copy of which is attached as **Exhibit F**.

Case: 3:19-cv-00053-RAM-EAH    Document #: 112-6    Filed: 01/20/26    Page 8 of 120
Daybreak v. Friedberg, et al.
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 7

Plaintiffs argued that it was unfair because they were unaware of the full scope of the claims prior to Defendants' expert disclosure. *Id.,* **Exhibit F**, 25:9-25. As to whether the Defendants' damages evidence would be allowed, Judge Christian ruled in February 2015 that these arguments were "more in the nature of a motion in limine as to what should be accepted as evidence for trial." *Id.,* **Exhibit F**, 27:23-28:1.

Judge Christian subsequently wrote in the *Record of Proceedings* that "Plaintiff's motion to re-enter to the land in question was denied." A copy of the *Record of Proceedings* is attached as **Exhibit G**.

Almost two years after the *Motion to Re-Enter* was decided, the issue is raised again by the Plaintiffs in *Daybreak, Inc. d/b/a Huber and Associates and Barry Huber's Request for Additional Time to Hear all Outstanding Motions,* December 29, 2016. That document listed "outstanding pre-trial Motions pending before this Honorable Court," and that listing included, despite Judge Christian's clear ruling on the question, a statement that *Daybreak's and Huber's Motion for Re-Entry Upon Land.* No motion for reconsideration had ever been filed with regard to Judge Christian's February 2015 ruling. Attorney Friedberg subsequently lodged with the Court a copy of the *Record of Proceedings* reflecting that *Daybreak's and Huber's Motion for Re-Entry Upon Land* had previously been argued and ruled on. A hearing on the pending motions was scheduled before this Court on March 28, 2017. Shortly before that hearing, Attorney Kyle Walden, who was scheduled to appear on behalf of Attorney Friedberg - who was outside of the Territory, could not appear due to a conflict. This required Attorney Friedberg to appear for Defendants by telephone. See, e.g., *Defendants' Emergency*

*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 8

*Motion for Leave to Appear Telephonically at Hearing Set for March 28, 2017*, March

17, 2017.

During the course of that hearing, Attorney Friedberg, appearing for Defendants,

pointed out that the motion for re-entry had been decided and denied by Judge

Christian. Attorney Simpson, appearing for Plaintiffs, stated that "Judge Christian did

not rule" on the motion. *Transcript, Motions Hearing,* March 28, 2017, 7:25-8:1, a

complete copy of which is attached as **Exhibit H**. Attorney Simpson further stated,

> What Judge Christian said is Christian said is "I'm basically gonna limit
> you to what was disclosed in discovery and I'll deal with what came out of
> the discovery, the expert report from the defendant counter-plaintiff with a
> motion in limine." If they have expanded the case beyond what was
> disclosed in discovery, he was implying to us I'll deal with that through a
> motion in limine rather than opening discovery. So that part of it, the
> motion in limine, still needs to be resolved, because we never had an
> opportunity to do an inspection and produce an expert report on what
> came to us for the very first time in the defendant's expert report.

*Id.,* **Exhibit H**, 8:21-9:12.

No written motion *in limine* on the issue was ever filed on the issue. Attorney

Friedberg, who was appearing by telephone at the March 28th hearing, had every

expectation going into the conference that the issues of the motion to re-enter had been

resolved and would not require further argument. See Defendants' *Notice of Lodgment*

*of Court's Record of Proceedings Denying Motion to Re-Enter Land and to Re-Open*

*Discovery,* March 27, 2017.

This Court heard extensive verbal argument on the motion, ultimately siding with

the Plaintiffs and concluding that, "one of two things is going to happen, either it's going

*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 9

to stay limited to the $210,000, or reinspection can occur only with Mr. Hendron as the inspector, not a new expert." *Id.,* 32:4-9.

On April 20, 2017, this office made its first appearance on behalf of the Defendants/Counter-Plaintiffs.

On May 2, 2017, the Court's Order of April 26, 2017, was entered. That Order provided a number of rulings on pending motions, as argued before the Court on March 28th. In particular relevance here, the Order stated that, "Daybreak's motion to limit damages to Two Hundred Ten Thousand Dollars ($210,000) is hereby GRANTED."

On May 15, 2017, Defendants timely filed their *Motion for Extension of Time to Seek Reconsideration.* The motion, which sought an extension of time until the close of business on June 1, 2017, was not opposed. The Court never granted or denied the motion to extend time.

On June 1, 2017, Defendants filed their *Motion to Reconsider Order of May 2, 2017.* That motion argued that the Court erred in limiting the Defendants' damages to $210,000 because that sanction was not supported by *V.I.R.Civ.P.* 37(c)(1), the Court's basis for limiting the extent of the movant's claims. Defendants argued that that Rule 37 remedies are not available where the complained-upon conduct is either harmless or justified and that their actions were both. The Court denied the motion for reconsideration without comment in an Order certified on June 23, 2017.

Case: 3:19-cv-00053-RAM-EAH   Document #: 112-6   Filed: 01/20/26   Page 11 of 120
Daybreak v. Friedberg, et al.
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 10

## LEGAL STANDARDS

### Interlocutory Appeal

Ordinarily, the Supreme Court may only hear an appeal from a final judgment –

which is "one that ends the litigation on the merits and leaves nothing to do but execute

the judgment." *Yusuf v. Hamed,* 62 V.I. 565, 567 (V.I. 2015). One exception to the

'final judgment rule' is that where there is a significant dispute over the governing law

whose resolution may speed the resolution of the case, an interlocutory appeal may be

allowed. A prerequisite to that, however, is a certification by the trial judge that such

conditions exist.

> Whenever the Superior Court judge, in making a civil action or order not
> otherwise appealable under this section, is of the opinion that *the order
> involves a controlling question of law as to which there is substantial
> ground for difference of opinion and that an immediate appeal from the
> order may materially advance the ultimate termination of litigation*, the
> judge shall so state in the order. The Supreme Court of the Virgin Islands
> may thereupon, in its discretion, permit an appeal to be taken from the
> order, if application is made to it within ten days after the entry of the
> order; except that application for an appeal hereunder may not stay
> proceedings, in the Superior Court unless the Superior Court judge or the
> Supreme Court or a justice thereof orders a stay of the proceedings.

4 V.I.C. § 33(c) (emphasis added).

A 'controlling question of law' is one which would terminate the case or

"materially affect the outcome of the litigation." *Chitolie v. Bank of Nova Scotia,* 62 V.I.

85, 88 (V.I. Super. Ct. 2014), quoting *Charleswell v. Chase Manhattan Bank, NA.,* 277

F.R.D. 277, 284 (D.V.I. 2011).

Case: 3:19-cv-00053-RAM-EAH    Document #: 112-6    Filed: 01/20/26    Page 12 of 120
*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 11

The decision to certify or not is soundly within the discretion of the trial judge and no appeal can result unless the Superior Court endorses that process. *In re Le Blanc,* 49 V.I. 508, 523 (V.I. 2008).

### Discovery Sanctions

*V.I.R.Civ.P.* 37(c)(1) allows for a party to be sanctioned when they fail to provide information required in their self-executing disclosures. The imposition of these sanctions is a matter within the discretion of the trial court. *Davis v. Varlack Ventures, Inc.,* 59 V.I. 229, 236 (V.I. 2013). However, the statute does explicitly provide that sanctions may not follow where the failure to disclosure was substantially justified or harmless. *V.I.R.Civ.P.* 37(c)(1). The burden for showing that the failure to disclose was justified or harmless lies with the party facing sanction. *Malloy v. Reyes,* 61 V.I. 163, 184-85 (V.I. 2014).

Where sanctions are merited, the Rule provides a number of possible sanctions with the general position being that undisclosed evidence may not be used at trial. *Id.* Other penalties provided by the Rule include: (i) the payment of the other parties related expenses; (ii) an instruction to the jury regarding the party's failure; (ii) directing that certain facts be taken as established; (iii) prohibiting the disobedient party from supporting or opposing certain claims or defenses; (iv) striking pleadings; (v) staying further proceedings; (vi) dismissing an action in whole or in part; and/or (vii) default judgment. *Id.* Importantly, these are only *possible* sanctions. "Exclusion of evidence is not required for violations of Rule 26, as Rule 37(c)(1) explicitly states that, '[i]n addition to or instead of this sanction, the court, on motion and after giving an opportunity to be

Case: 3:19-cv-00053-RAM-EAH    Document #: 112-6    Filed: 01/20/26    Page 13 of 120
*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 12

heard' may impose other, less extreme sanctions." *Abdallah v. Abdel-Rahman,* 2016

V.I. LEXIS 181, *3-4 (V.I. Super. Ct. Oct. 11, 2016), quoting *Fed. R. Civ. P.* 37(c)(1).

When determining the proper sanction under Rule 37, courts consider such conduct as

the "pattern and practice of stonewalling, bad faith, lack of candor and stalling tactics."

*Battiste v. V.I. Tel. Corp.,* 48 V.I. 3, 16 (V.I. Super. Ct. 2006).

## ARGUMENT

The procedural vehicle by which the Plaintiffs sought to reduce the Defendants'

damages claims was by their oral "motion *in limine.*" Their use of that phrase was

undoubtedly as the result of Judge Christian's statements in February 2015 that these

arguments were "more in the nature of a motion *in limine* as to what should be accepted

as evidence for trial." **Exhibit F**, 27:23-28:1.

> Black's Law Dictionary defines motion *in limine* as a pretrial request that
> certain inadmissible evidence not be referred to or offered at trial and
> explains that, typically, a party makes this motion when it believes that
> mere mention of the evidence during trial would be highly prejudicial and
> could not be remedied by an instruction to disregard.

> *Edward v. Genoa Inc.,* 2017 V.I. LEXIS 12, *3 fn.5 (V.I. Super. Ct. Jan. 23,
> 2017), quoting *Black's Law Dictionary*, 10th ed. 2014 (internal citations
> and quotations omitted)(utilizing Rule 37 standards to determine the
> proper sanction on a motion *in limine*).

As in *Edward,* the Defendants here believe that Rule 37 offers the only

articulable standard for whether the Defendant should be sanctioned and what sanction

is proper. The Plaintiffs' complaint, after all, is that Defendants' Rule 26(a) disclosures

were not properly updated and that insufficient evidence of the amount of damages

sought was provided.

Case: 3:19-cv-00053-RAM-EAH    Document #: 112-6    Filed: 01/20/26    Page 14 of 120
*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 13

Sanctions are available, obviously, for failing to properly update Rule 26(a) disclosures. As cited above, Rule 37(c) provides for eight discrete sanctions to be levied – up to and including dismissal of the case entirely. What the Rule also makes clear, however, is that Rule 37 *are not available* where the failure to disclose was harmless or justified. Defendants assert that here they are both.

The Defendants said that they would supplement their damages estimates in their expert disclosure. They did so. Their disclosure was timely according to discovery deadlines *which were originally drafted by the Plaintiffs.* The Defendants did not violate these discovery deadlines but today face the prospect of spending the next several months preparing a case for trial that can never make them whole.

This Court has eviscerated the Defendants' claim despite the fact that the defendant did nothing but follow the deadlines set out by this Court. Interlocutory appeals exist to clarify legal disputes which "materially affect the outcome of the litigation." *Chitolie,* 62 V.I. at 88. There can be no honest dispute that this Court's sanction of the Defendant materially affects the outcome here.

While Court's have specifically rejected attempts by litigants to use post-discovery expert findings to bolster damages claims, in those instances, there were other, complicating factors. For instance, in *Silicon Knights, Inc. vs. Epic Games, Inc.,* the Eastern District of North Carolina looked at whether it could exclude a damages computation based solely upon and disclosed only as the part of an expert's report. While it did exclude the report under Rule 37(c)(1), it did so because it otherwise excluded the expert from testifying about his report. *Silicon Knights, Inc. vs. Epic*

*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 14

*Games, Inc.,* 2012 U.S. Dist. LEXIS 63707, \*9-10 (E.D.N.C. 2012). Similarly, in *MicroStrategy Inc. vs. Bus. Objects, S.A.,* 429 F.3d 1344 (Fed. Cir. 2005), the Court disallowed a damages calculation prepared by an expert but only after ruling that the expert's methodologies were flawed. Similarly, in *CQ, Inc. v. TXU Mining Co., L.P.,* 565 F.3d 268, 279-80 (5th Cir. 2009), the Court approved the exclusion of plaintiff's damages evidence by the expert where the Plaintiff failed to offer any justification for late disclosure, although the Court there did allow the Plaintiff to offer other evidence of damages that was timely disclosed.

The Defendants assert that this Court erred in not addressing their defense to Rule 37 sanctions. This Court has made no finding of ill will, bad intent, or contemptuous conduct on the part of the Defendants. Such an extreme sanction should only follow such extreme conduct. The Defendants told opposing counsel that they would provide a damages estimate through their expert report – a common practice and a common-sense practice. What do attorneys know about fixing a roof? The Defendants actions were all in keeping with the disclosure requirements.

The standards for interlocutory appeal are met here and this important question should be certified for presentation to the Supreme Court of the Virgin Islands.

*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 15

WHEREFORE, the Defendants here respectfully pray that this Honorable Court enter an order certifying to the V.I. Supreme Court whether diminution of the Defendants' claims were a proper remedy under Rule 37 where the Defendants' actions were within the proper time period, as well as granting such other and further relief as this Court deems proper and just.

A proposed Order is attached as **Exhibit I**.

Respectfully Submitted,

DATED: July 17, 2017

**W. MARK WILCZYNSKI, ESQ.**
Law Office of W. Mark Wilczynski, P.C.
Attorney for Defendants,
***THOMAS F. FRIEDBERG, SARAH BUNGE,***
***and LAW OFFICES OF FRIEDBERG & BUNGE***
Palm Passage, Suite C20-22
P.O. Box 1150
St. Thomas, VI 00804-1150
Telephone:   340-774-4547
Fax:   340-774-4759
mwilczynski@usvilaw.com
VI Bar No. 515

## CERTIFICATE OF SERVICE

I hereby certify on this the 17th day of July, 2017, I caused a true and exact copy of the **Motion to Certify Questions for Interlocutory Appeal** to be served via electronic mail and by mailing same, postage prepaid, to:

Andrew C. Simpson, Esq.
ANDREW C. SIMPSON, P.C.
2191 Church Street, Suite 5
Chirstiansted, St. Croix, VI 00820
Tel:  (340) 719-3900
Fax: (340) 719-3903
asimpson@coralbrief.com

*Daybreak v. Friedberg, et al.*
ST-10-CV-716
*Motion to Certify Questions for Interlocutory Appeal*
Page 16

### Attorney for Plaintiff

Stacy L. White, Esq.
LAW OFFICES OF STACY L. WHITE
1142 King Street
Christiansted, St. Croix
Virgin Islands, 00820
stacylwhite@att.net
**Co-counsel for Counterdefendants**

Joseph Goldberg, Esq.
COLE, SCOTT & KISSANE, P.A.
9150 South Dadeland Boulevard, Suite 1400
PO Box 569015
Miami, FL 33256
Joe.Goldberg@csklegal.com
**Attorney for Counterdefendants**

Thomas F. Friedberg, Esq. (VI#1006)
**LAW OFFICES OF FRIEDBERG & BUNGE**
610 West Ash Street, Suite 1400
P.O. Box 6814
San Diego, CA 92101
tom@lawofficefb.com
**Co-counsel for Defendants, Counter Claimants
and Third Party Plaintiffs**

This document complies with the page or word limitation set forth in Rule 6-1(e).

_Kelly Botkin_

# EXHIBIT A

# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| DAYBREAK, INC., dba HUBER AND ASSOCIATES, | **CASE NO. 12 cv 0076 CVG-RM** |
| Plaintiff, | **DEFENDANTS', COUNTERCLAIMANTS' AND THIRD PARTY PLAINTIFFS' INITIAL DISCLOSURE PURSUANT TO FED.R.CIV.P. 26(a)** |
| v. | |
| THOMAS F. FRIEDBERG, SARAH BUNGE, LAW OFFICES OF FRIEDBERG & BUNGE, AND MERRILL LYNCH CREDIT CORPORATION, | |
| Defendants. | |
| THOMAS F. FRIEDBERG and SARAH L. BUNGE, | |
| Counterclaimants, | |
| v. | |
| DAYBREAK, INC., and HUBER AND ASSOCIATES, | |
| Counterdefendants. | |
| THOMAS F. FRIEDBERG and SARAH L. BUNGE, | |
| Third Party Plaintiffs, | |
| v. | |
| BARRY R. HUBER, | |
| Third Party Defendant. | |

Defendants, THOMAS F. FRIEDBERG, SARAH L. BUNGE and MERRILL LYNCH CREDIT CORPORATION, and Counterclaimants and Third Party Plaintiffs, THOMAS F. FRIEDBERG and SARAH L. BUNGE, hereby serve their Rule 26(a) Initial Disclosures:

**Witnesses:**

1.  SARAH L. BUNGE

2.  THOMAS F. FRIEDBERG

3.  Chris Bunge, St. John, USVI

4.  Andrea Lee, Springline Architects, Red Hook, St. Thomas, USVI

5.  Tracy Roberts, Springline Architects, Red Hook, St. Thomas, USVI

6.  Barry Huber

7.  Ron Baker

8.  Micah Cady

9.  Ralph Laverdure

10. Peter Laughlin

11. Timothy Petersen

12. Austin Schlimmer

13. Brandon Novak

Plaintiffs reserve the right to amend and/or supplement this list based on information obtained in discovery.

**Documents:**

1.  Contracts prepared by Daybreak

2.  Correspondence and e-mails from and to Daybreak, Barry Huber, Ron Baker

3.  Invoices for materials and shipping

4.  Roof plans

5.  Photographs depicting roofs and damage

6.  Photographs provided by Barry Huber regarding exemplar octagonal roofs

7.  All depositions to be taken in this matter.

8.  Any and all documents, records, notes, charts, diagrams, oral reports prepared for or relied upon by expert witnesses.

9.  Any and all documents produced in response to formal and informal discovery requests, including, but not limited to, interrogatory answers, responses to request for production of documents, responses to requests for admissions, disclosure statements and depositions.

10. Any and all exhibits listed by plaintiff.

11. Any and all exhibits exchanged during the course of discovery.

12. Enlargements of any of the above exhibits, or any demonstrative exhibits.

Defendants reserve the right to amend and/or supplement this list based on information obtained in discovery.

C.    **Computation of Damages:**

Counterclaimants and Third Party Plaintiffs will be submitting costs of repair estimates through their experts.

///

///

///

///

///

///

**D.    Insurance:**

None for defendants that would apply to these claims. Counterdefendant Daybreak has a policy for completed products operations issued by Century Surety Company specific to this project that would likely provide coverage to Daybreak.

Dated : March 17, 2013                    **LAW OFFICES OF FRIEDBERG & BUNGE**

By: *s/ THOMAS F. FRIEDBERG, ESQ.*
   THOMAS F. FRIEDBERG, ESQ. (VI # 1006)
   Attorneys for Defendants, Counterclaimants and
   Third Party Plaintiffs
   610 West Ash Street, Suite 1400
   P.O. Box 6814
   San Diego, California 92101
   TEL : (619)557-0101
   FAX:  (619)557-0560
   " tom@lawofficefb.com"

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of March 2013, a true and correct copy of the

DEFENDANTS', COUNTERCLAIMANTS' AND THIRD PARTY PLAINTIFFS' RULE 26

INITIAL DISCLOSURE, was served by electronically filing this document and serving by US Mail

on the following parties:

Andrew C. Simpson, Esq.
**ANDREW C. SIMPSON, P.C.**
2191 Church Street, Suite 5
Chirstiansted, St. Croix, VI 00820
TEL : (340) 719-3900
FAX: (340) 719-3903
"asimpson@coralbrief.com"

*s/ THOMAS F. FRIEDBERG*

# EXHIBIT B

1

2 **IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS**

3 **DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| 4  DAYBREAK, INC., dba HUBER AND ASSOCIATES, | **CIVIL CASE NO. ST-10-cv-716** |
| 5            Plaintiff, | **ACTION FOR DEBT, BREACH OF CONTRACT AND TO ENFORCE CONSTRUCTION LIEN** |
| 6            v. | |
| 7  THOMAS F. FRIEDBERG, SARAH BUNGE, LAW OFFICES OF FRIEDBERG & BUNGE, AND MERRILL LYNCH CREDIT CORPORATION. | |
| 10            Defendants. | |

12 AND ALL RELATED COUNTER-CLAIMS

15 <u>**COUNTER CLAIMANTS' RESPONSES TO INTERROGATORIES**</u>

16 PROPOUNDING PARTY       :       Counter Defendant, DAYBREAK, INC., dba HUBER AND

17                                                         ASSOCIATES

18 RESPONDING PARTY       :       Counter Claimant, THOMAS F. FRIEDBERG

19 SET NUMBER                    :       ONE

20 <u>**PRELIMINARY STATEMENT**</u>

21       These responses are made solely for the purposes of, and in relation to, this action. Each

22 answer is given subject to all appropriate objections (including, but not limited to, objections

23 concerning competency, relevancy, materiality, propriety and admissibility) which would require the

24 exclusion of any statement contained herein if the interrogatory were asked of, or any response were

25 made by, a witness present and testifying in court. All such objections and grounds therefor are

26 reserved and may be interposed at the time of trial. Counterclaiming has not yet fully completed

27 investigation of the facts relating to this case, has not fully completed discovery in this action, and

28 has not completed preparations for trial. These answers are based only upon such information and

---

1   documents which are presently available to and specifically known to responding party and they
2   disclose only those contentions which presently occur to responding party. It is anticipated that
3   further discovery, independent investigation, legal research and analysis will supply additional facts,
4   add meaning to the known facts as well as establish entirely new factual conclusions and legal
5   contentions, all of which may lead to substantial additions to, changes in and/or variations in these
6   responses.

7         The following interrogatory responses are given without prejudice to Counterclaiming's right
8   to produce evidence of any subsequently discovered facts which Counterclaiming may later recall.
9   Counterclaiming accordingly reserves the right to produce evidence of any subsequently discovered
10  facts and the right to change any and all responses as additional facts are ascertained, analyses and
11  contentions are made and legal research is completed. The answers contained herein are made in
12  a good faith effort to supply as much factual information and as much specification of legal
13  conclusions as is presently known, but should in no way be to the prejudice of responding party in
14  relation to further discovery, research or analysis.

15                                      **GENERAL OBJECTIONS**

16        The propounding party prefaces the interrogatories with certain instructions and definitions.
17  Objection is made to these instructions and definitions insofar as they purport to relate to persons
18  and entities not under the control of the responding party. Objection is further made to the entire set
19  of interrogatories on the grounds that boiler plate definitions and instructions make the
20  interrogatories overboard, burdensome, irrelevant and not reasonably calculated to lead to the
21  discovery of admissible evidence. In addition, the scope of definitions and instructions causes the
22  interrogatories to impermissibly seek information that is subject to the attorney-client and attorney
23  work product privileges. Objection is also made to the definitions and instructions insofar as they
24  purport to expand the requirements of the Federal Rules of Civil Procedure.

25        Objection is further made to the interrogatories for requiring information protected by the
26  attorney-client privilege and the work product doctrine.

27        Objection is further made to the scope of the interrogatories that are not reasonably limited
28  in terms of time and scope. Counterclaiming will respond to the portion of the project involving

-2-

1 | Plaintiff and Counter defendant. It would be burdensome, harrasive and overbroad to require a
2 | response for the entire construction project for the residence on St. John, since this project began in
3 | 1999. The subject litigation involves the manufacturing and installation of the copper roofing and
4 | the responses will be limited to this aspect of the project.

5 | ## RESPONSES AND SPECIFIC OBJECTIONS

6 | Subject to the above preliminary statement and notwithstanding the above general objections,
7 | and without waiving those objections, Counterclaiming responds as follows:

8 | **INTERROGATORY NO. 1:**

9 | Please state the name, address and title of each person assisting with the preparation of the
10 | answers to these Interrogatories.

11 | **RESPONSE TO INTERROGATORY NO. 1:**

12 | Thomas F. Friedberg.

13 | **INTERROGATORY NO. 2:**

14 | Identify all persons known by you to have knowledge of construction work performed by any
15 | of the architects, engineers, contractors, or subcontractors, at the property in question from the
16 | beginning of your ownership of the property to the present time.

17 | **RESPONSE TO INTERROGATORY NO. 2:**

18 | Objection: The interrogatory as phrased is overbroad, burdensome and harrasive since the
19 | property was first acquired in 1999 and copper roofing project took place in or about 2010. However,
20 | without waiver, Counter claimants respond as follows:

21 | 1. SARAH L. BUNGE

22 | 2. THOMAS F. FRIEDBERG

23 | 3. Chris Bunge, St. John, USVI

24 | 4. Andrea Lee, Springline Architects, Red Hook, St. Thomas, USVI

25 | 5. Tracy Roberts, Springline Architects, Red Hook, St. Thomas, USVI

26 | 6. Barry Huber

27 | 7. Ron Baker

28 | 8. Micah Cady

- 3 -

1    9.    Ralph Laverdure

2    10.   Peter Laughlin

3    11.   Timothy Petersen

4    12.   Austin Schlimmer

5    13.   Brandon Novak

6    **INTERROGATORY NO. 3:**

7    Describe in detail all work and services performed by the Counter defendant and all materials

8    provided pursuant to the construction work that is the subject of this lawsuit, by identifying or

9    providing among other things, as follows:

10   1.    an itemized list of all work or services performed and materials provided;

11   2.    the dates in which the itemized work, services, or materials were performed or

12         furnished; and

13   3.    each person known by you to have any knowledge of the facts as set forth in this

14         Interrogatory answer.

15   **RESPONSE TO INTERROGATORY NO. 3:**

16   The scope of work is set forth in the Proposal for Roofing which has been provided in the

17   Rule 26 disclosures. The project was to provide a custom standing seam copper roof for 6 buildings,

18   with approximate roof square footage of 8,400 square footage, to be confirmed by Counter defendant

19   Huber based on his personal measurements and Counter defendant's review and analysis of the

20   CAD drawings supplied by the architect, Tracy Roberts of Springline Architects. The buildings were

21   the main house, guest house, beach bar with outside bathroom, dining gazebo, gate house and

22   garage/studio. Counter defendant was to provide the following:

23   1.    Job set up

24   2.    Provide General Liability and Workers' Compensation Insurance

25   3.    Provide scaffolding or other means for safe roof access

26   4.    Provide for material handling necessary for roof loading

27   5.    Provide project closeout, including removing all surplus tools, equipment and debris

28   6.    Travel to and from St. John

- 4 -

1      7.    Provide and install Rosin slip sheet over modified underlayment

2      8.    Install 16 oz. Red Copper standing seam roof system with 15" O.C. panel widths with

3              1" double locked standing seam. Cleats installed at an average of 9.5" O.C. with ring

4              shank nails per cleat. Traditional style single rib ridge finish

5      9.    Provide and install necessary 16 oz. Red Copper flashing in all areas where needed.

6      10.   Determine that Red Copper coils which were pre-paid and picked up by Counter

7              defendant were adequate for the job and to provide any excess Red Copper necessary

8              to complete the job.

9      The work was performed between May and July 2010.

10    The persons referred to in response to Interrogatory Number 2 have knowledge of these facts.

11   **INTERROGATORY NO. 4:**

12      With regard to the construction work that is the subject of this lawsuit, do you contend that

13   work performed by the Counter defendant was defective in any manner? If so, describe the specific

14   allegations that support the basis for this contention.

15   **RESPONSE TO INTERROGATORY NO. 4:**

16      Yes. A detailed cost of repair identifying the areas which need to be repaired is attached.

17      1.    Roof leaking - the gate house and garage roofs leak. There are defects in the manner

18              of attachment of the copper roof and there are gaps in the panels and flashing. The

19              workers cracked the plaster while installing the flashing, causing rain to migrate

20              through the cracked plaster and leak into the house. Repair entails removal and

21              replacement of the defective portions of roof, flashing and replastering.

22      2.    Flashing main house - the flashing and caulking needs to be redone as it leaks and an

23              inappropriate caulk was used which has deteriorated.

24      3.    Caulking roof vents - an improper product was used and the caulk has deteriorated.

25      In addition to the above defects, during the course of the work, due to significant waste

26   occurring in the cutting and installation of the room panels, the workers ran out of copper product

27   on two occasions. Incomplete runs of copper were used. Prior to the final approval of the work, the

28   workers packed up, left island and returned to Florida. The last two buildings were the gate house

-5-

1  and garage studio. These roofs were were completed in a substandard manner with damage done to

2  the plaster while attaching the flashing.

3  **INTERROGATORY NO. 5:**

4  With regard to the construction work that is the subject of this lawsuit, do you contend that

5  work performed by any other contractor or subcontractor, other than the Counter defendant, was

6  defective in any manner? If so, identify the other contractor/subcontractor and describe the specific

7  allegations that support the basis for this contention.

8  **RESPONSE TO INTERROGATORY NO. 5:**

9  No.

10  **INTERROGATORY NO. 6:**

11  If your answer to Interrogatory 4 and/or 5 is "yes", please state the following as to each

12  alleged defective item:

13  1.    whether the item was repaired or replaced, or is expected to be repaired or replaced;

14  the costs incurred or expected to repair or replace the item;

15  2.    the date when the item was or will be repaired or replaced;

16  3.    by whom the item was or will be repaired or replaced;

17  4.    whether the allegedly defective item caused any damage or injury to persons or

18  property;

19  5.    identify all documents relating to the repair or replacement of the item;

20  6.    list separately and identify with specificity each location in the project at which each

21  such defect existed.

22  **RESPONSE TO INTERROGATORY NO. 6:**

23  With respect to response to interrogatory number 5, see attached cost of repair. The defects

24  have not been repaired.

25  **INTERROGATORY NO. 7:**

26  With respect to each construction item, which you allege to be defective, please identify the

27  person(s) responsible for ensuring compliance with the project plans and specifications.

28  / / /

1 **RESPONSE TO INTERROGATORY NO. 7:**

2      Counter defendant.

3 **INTERROGATORY NO. 8:**

4      With respect to the construction work that is the subject of this lawsuit, please list all
5 demands for work or for repairs made by you to the Counter defendant, and indicate the response
6 to each such demand, and if the alleged problem persisted after such response, whether any
7 additional demand was made. If no additional demand for work was made, please explain why no
8 additional demand was made.

9 **RESPONSE TO INTERROGATORY NO. 8:**

10      In late July 2010 and again in August 2010, demands were made to Ron Baker at Counter
11 defendant's company for warranty repairs due to water leaking into the gate house and garage when
12 it rains and to replace the cracked plaster. The requests for warranty repairs were denied. This matter
13 is now in litigation.

14 **INTERROGATORY NO. 9:**

15      Describe in detail all remedial work done during the course of the construction work that is
16 the subject of this lawsuit by identifying or providing, among other things, as follows:

17      1.      an itemized list of all work or services performed and the scope of work;

18      2.      the dates in which the itemized work or services was performed; and

19      3.      each person known by you to have any knowledge of the facts as set forth in this
20              Interrogatory answer.

21      4.      the identity, address and telephone numbers of the person or persons who did such
22              remedial work

23 **RESPONSE TO INTERROGATORY NO. 9:**

24      None to date.

25 **INTERROGATORY NO. 10:**

26      For each alleged defect of the construction work that is the subject of this lawsuit, list the
27 party(ies) whom you believe is/are responsible for such defect, the percentage of fault which you
28 attribute to each party and the reason(s) for such apportionment of fault.

- 7 -

1 **RESPONSE TO INTERROGATORY NO. 10:**

2 Counter defendant, Daybreak, dba Huber and Associates and Third Party Defendant Barry
3 R. Huber, 100%.

4 **INTERROGATORY NO. 11:**

5 With respect to each alleged defect within the scope of Counter defendant's work, please
6 state how such defect(s) contribute(s) to alleged deficient and faulty construction of the Project.

7 **RESPONSE TO INTERROGATORY NO. 11:**

8 The there is leakage into the gate house and garage when it rains. There is water intrusion
9 where the caulking is defective. Water intrudes through the cracks in the plaster caused when the
10 flashing was attached.

11 **INTERROGATORY NO. 12:**

12 With respect to each alleged defect within the scope of Counter defendant's work, please
13 indicate whether the defect occurred on a project-wide or isolated basis, and if it occurs at isolated
14 locations or areas, please state the number of locations or the percentage of the total area where the
15 condition occurs.

16 **RESPONSE TO INTERROGATORY NO. 12:**

17 The defects are identified above and involve the gate house and garage roof and plaster. The
18 caulking defects occur project wide. The specific measurements are contained in the cost of repair
19 estimate attached to these responses.

20 **INTERROGATORY NO. 13:**

21 Were you charged with any violation of law or Building Code (including any regulations or
22 ordinances) arising out of the construction work that is the subject of this lawsuit? If so, what was
23 the nature of the charge; what plea or answer, if any, did you enter to the charge; what court or
24 agency heard the charge; was any written report prepared by anyone regarding this charge, and if so,
25 what is the name and address of the person or entity that prepared the report; do you have a copy of
26 the report; and was the testimony at any trial, hearing or other proceeding on the charge recorded in
27 any manner, and if so, what was the name and address of the person who recorded the testimony?
28 / / /

- 8 -

**RESPONSE TO INTERROGATORY NO. 13:**

No.

**INTERROGATORY NO. 14:**

Please provide the names, addresses and current telephone numbers of all persons who are believed or known by you, your agents or your attorneys to have any knowledge concerning any of the issues in this lawsuit; and specify the subject matter about which the witness has knowledge.

**RESPONSE TO INTERROGATORY NO. 14:**

1.    SARAH L. BUNGE

2.    THOMAS F. FRIEDBERG

3.    Chris Bunge, St. John, USVI

4.    Andrea Lee, Springline Architects, Red Hook, St. Thomas, USVI

5.    Tracy Roberts, Springline Architects, Red Hook, St. Thomas, USVI

6.    Barry Huber

7.    Ron Baker

8.    Micah Cady

9.    Ralph Laverdure

10.    Peter Laughlin

11.    Timothy Petersen

12.    Austin Schlimmer

13.    Brandon Novak

**INTERROGATORY NO. 15:**

Have you heard or do you know about any information, report, statement or remark made by or on behalf of any party to this lawsuit, other than yourself, concerning any issue in this lawsuit? If so, state the name and address of each person who made the statement or statements, the name and address of each person who heard it, and the date, time, place and substance of each statement.

**RESPONSE TO INTERROGATORY NO. 15:**

Yes. Sarah Bunge spoke to Ron Baker about the warranty repairs in July and August 2010 and inquired when the leaks in the gate house and garage could be repaired. Mr. Baker and Counter

- 9 -

1 | defendant refused to take any action.

2 | **INTERROGATORY NO. 16:**

3 |     To your knowledge, has any report been made or has a statement been taken from any of the

4 | persons listed in your answers to interrogatories #15? If so, please answer the following:

5 | **RESPONSE TO INTERROGATORY NO. 16:**

6 |     No.

7 | **INTERROGATORY NO. 17:**

8 |     State the name and address of every person known to you, your agents, or your attorneys, who

9 | has knowledge about, or possession, custody or control of, any plans, specifications, blueprints, shop

10 | drawings, drawings, revisions of each MSDS sheets, model, plat, map, drawing, motion pictures,

11 | video tapes, or photographs pertaining to any fact or issue involved in this controversy; and describe

12 | as to each, what each item such person has, the name and address of the person who took or prepared

13 | it, and the date it was taken or prepared.

14 | **RESPONSE TO INTERROGATORY NO. 17:**

15 |     The original CAD plans and specifications for the house are in the possession of Tracy

16 | Roberts of Springline Architects. Copies of the roofing plans have been provided as part of the Rule

17 | 26 disclosures. Photographs depicting the damage to the plaster and certain areas of the roof have

18 | also been provided as part of the Rule 26 disclosures. Additional copies are attached to the response

19 | to request for production.

20 | ///

21 | ///

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///

1  **INTERROGATORY NO. 18:**

2       List all damages you claim in your counterclaim, specifically enumerating each amount

3  incurred and to whom paid. Specifically describe any damages you are claiming other than out of

4  pocket expenses and the specific basis for each          .

5  **RESPONSE TO INTERROGATORY NO. 18:**

6       Costs of repair are estimated at $210,676.12. See attached cost of repair estimate.

7  DATED: March 8, 2014                    **LAW OFFICES OF FRIEDBERG & BUNGE**

8

9                                         By: _____
                                          THOMAS F. FRIEDBERG, ESQ.(VI#1006)
10                                        Attorneys for Defendants and Counter
                                          claimants
11                                        610 West Ash Street, Suite 1400
                                          P.O. Box 6814
12                                        San Diego, CA 92101
                                          Tel:  (619) 557-0101
13                                        Fax: (619) 557-0560
                                          "Tom@lawofficefb.com"

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 11 -

1

## CERTIFICATE OF SERVICE

2    The undersigned hereby certifies that a true and exact copy of the foregoing **COUNTER**

3    **CLAIMANTS' RESPONSES TO INTERROGATORIES** was served on the 8th day of March,

4    2014, by causing this document to be served by U.S. Mail, First Class, delivered to the following:

5    Andrew C. Simpson, Esq.
     **ANDREW C. SIMPSON, P.C.**
6    2191 Church Street, Suite 5
     Chirstiansted, St. Croix, VI 00820
7    TEL : (340) 719-3900
     FAX: (340) 719-3903
8    "asimpson@coralbrief.com"

9    Stacy L. White, Esq.
     **LAW OFFICES OF STACY L. WHITE**
10   1142 King Street
     Christiansted, St. Croix
11   Virgin Islands, 00820
     "stacylwhite@att.net"

12

     Brad Sturgis, Esq.
13   **COLE, SCOTT & KISSANE, P.A.**
     9150 South Dadeland Boulevard, Suite 1400
14   PO Box 569015
     Miami, Florida 33256
15   TEL : (305) 350-5300
     FAX : (305) 373-2294
16   "Brad.Sturges@csklegal.com"

17

18

19                                         THOMAS F. FRIEDBERG, ESQ.

20

21

22

23

24

25

26

27

28

- 12 -

1

## VERIFICATION

2

### DAYBREAK vs. FRIEDBERG et al.

3

### Superior Court of the Virgin Islands

4       I, **THOMAS F. FRIEDBERG**, declare that I am a Defendant and Counter claimant in the

5   above-entitled cause, and I have read the foregoing RESPONSES TO INTERROGATORIES AND

6   REQUEST FOR PRODUCTION OF DOCUMENTS, know the contents thereof, and I certify that

7   the same is true of my own knowledge, except as to those matters which are therein stated upon

8   information and belief, and as to those matters, I believe them to be true.

9       I declare under the penalty of perjury under the laws of the United States Virgin Islands that

10  the foregoing is true and correct.

11      This declaration is executed this _8th_ day of _March_ _____, 2014, at

12  _San Diego, CA_ .

13

14                                          _____

15                                              THOMAS F. FRIEDBERG

16

17

18

19

20

21

22

23

24

25

26

27

28

Prepared for:
**Thomas Friedberg**

# Preliminary Cost of Repair

03/07/14
Project# 617

Friedberg & Bunge Residence · 168 Chocolate Hole, St. John, Virgin Islands

| | | REPAIR SCOPE - DESCRIPTION | # | UNIT | COST | | TOTAL | NOTES |
|---|---|---|---|---|---|---|---|---|

## 1.0  ROOF REPAIR

| | | | # | UNIT | COST | | TOTAL | NOTES |
|---|---|---|---|---|---|---|---|---|
| **1.1** | **GATE HOUSE** | | | | | | | |
| | 1.1.1 | Mask and protect surrounding areas | 1 | EA | $ | 500.00 | $ 500.00 | |
| | 1.1.2 | Remove stucco at walls with flashing | 873.00 | SF | $ | 4.00 | $ 3,492.00 | or 4 guys at 2 days (16hrs) * $25/hr = $1600 |
| | 1.1.3 | Remove poorly installed flashings | 63.00 | LF | $ | 6.00 | $ 378.00 | |
| | 1.1.4 | Remove poorly installed standing seam roofing | 573.00 | SF | $ | 6.00 | $ 3,438.00 | |
| | 1.1.5 | Install new copper flashing (Labor) | 63.00 | LF | $ | 18.00 | $ 1,134.00 | |
| | 1.1.6 | Install new copper roofing (Labor) | 573.00 | EA | $ | 29.50 | $ 16,903.50 | Bid for $16,900 |
| | 1.1.7 | 16 oz. Copper Flashing material | 63.00 | LF | $ | 18.00 | $ 1,134.00 | |
| | 1.1.8 | 16 oz. Copper Roll Roofing Material (+35% waste) | 773.00 | SF | $ | 13.00 | $ 10,049.00 | Bid for $9,600 |
| **1.1** | | **GATE HOUSE** | | | | | $ 37,028.50 | |
| **1.2** | **GARAGE** | | | | | | | |
| | 1.2.1 | Mask and protect surrounding areas | 1 | EA | $ | 500.00 | $ 500.00 | |
| | 1.2.2 | Remove stucco at walls with flashing | 236.00 | SF | $ | 4.00 | $ 944.00 | or 4 guys at 1 days (8hrs) * $25/hr = $800 |
| | 1.2.3 | Remove poorly installed flashings | 16.00 | LF | $ | 6.00 | $ 96.00 | |
| | 1.2.4 | Remove poorly installed standing seam roofing | 61.00 | SF | $ | 6.00 | $ 366.00 | |
| | 1.2.5 | Install new copper flashing (Labor) | 16.00 | LF | $ | 18.00 | $ 288.00 | |
| | 1.2.6 | Install new copper roofing (Labor) | 61.00 | EA | $ | 28.00 | $ 1,708.00 | |
| | 1.2.7 | 16 oz. Copper Flashing material | 16.00 | LF | $ | 18.00 | $ 288.00 | |
| | 1.2.8 | 16 oz. Copper Roll Roofing Material (+35% waste) | 82.00 | SF | $ | 13.00 | $ 1,066.00 | |
| **1.2** | | **GARAGE** | | | | | $ 5,256.00 | |
| **1.3** | **MAIN HOUSE CAULKING** | | | | | | | |
| | 1.3.1 | Remove and replace bad caulking | 62.00 | LF | $ | 15.00 | $ 930.00 | |
| **1.3** | | **MAIN HOUSE CAULKING** | | | | | $ 930.00 | |
| **1.4** | **ALL BUILDINGS VENT PIPES** | | | | | | | |
| | 1.4.1 | Movement to each of the 15 vent locations | 15 | EA | $ | 25.00 | $ 375.00 | |
| | 1.4.2 | Remove and replace bad caulking at all vent pipes | 12.5 | LF | $ | 15.00 | $ 187.50 | |
| **1.4** | | **ALL BUILDINGS VENT PIPES** | | | | | $ 562.50 | |
| **1.0** | | **ROOF REPAIR** | | | | | $ 43,777.00 | |

Prepared by:
Paradigm Construction Services
771 Jamacha Road # 526
El Cajon, CA 92019

*Privileged – For Mediation Purposes Only*
*Protected by Civil Code Section 1152 1119-1128*

Page 1 of 3

Prepared for:
**Thomas Friedberg**

# Preliminary Cost of Repair

03/07/14
Project# 617

## 2.0  STUCCO REPAIR

| | 2.1 | STUCCO | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2.1.1 | Build scaffolding for stucco (2 buildings) | | | | | $ | 3,850.00 |
| | | Scaffolding lumber (2 @ 3 x 16 x 24) | | | $ | 2,250.00 | | |
| | | Scaffolding labor (4 guys at 2 days) | | | $ | 1,600.00 | | |
| | 2.1.2 | Mask and protect surrounding areas | 1 | EA | $ | 500.00 | $ | 500.00 |
| | 2.1.3 | GATE HOUSE Replace stucco at walls where removed. Includes special color requirements to match existing | 873 | SF | $ | 24.00 | $ | 20,952.00 |
| | 2.1.4 | GARAGE Replace stucco at walls where removed. Includes special color requirements to match existing | 236 | SF | $ | 24.00 | $ | 5,664.00 |
| | 2.1.5 | Plaster material special order color | 1 | EA | $ | 600.00 | $ | 600.00 |
| | 2.1.6 | Plaster material bulk sand | 1 | EA | $ | 1,200.00 | $ | 1,200.00 |
| | 2.1.7 | Plaster mixer rental 2 weeks | 2 | EA | $ | 750.00 | $ | 1,500.00 |
| 2.1 | | STUCCO | | | | | $ | 34,266.00 |
| **2.0** | | **STUCCO REPAIR** | | | | | **$** | **34,266.00** |

Prepared by:
Paradigm Construction Services
771 Jamacha Road # 525
El Cajon, CA 92019

*Privileged - For Mediation Purposes Only*
*Protected by Civil Code Section 1152 1119-1128*

Prepared for:
**Thomas Friedberg**

# Preliminary Cost of Repair

03/07/14
Project# 617

## 3.0  GENERAL REQUIREMENTS

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 3.1 | GENERAL REQUIREMENTS | | | | | | | |
| | | 3.1.1 | Purchase shipping container | 1 | EA | $ | 2,500.00 | $ | 2,500.00 |
| | | 3.1.2 | Ocean ship container from Miami to STT. | 1 | EA | $ | 6,460.00 | $ | 6,460.00 |
| | | 3.1.3 | Customs clearance for container (10% mat) | 10% | EA | $ | 12,500.00 | $ | 1,250.00 |
| | | 3.1.3 | Foreign tax on any materials outside US | 10% | EA | $ | 1,800.00 | $ | 180.00 |
| | | 3.1.3 | Ferry container from STT to SJJ | 1 | EA | $ | 700.00 | $ | 700.00 |
| | | 3.1.3 | Offload container with Penns forklift | 2 | EA | $ | 100.00 | $ | 200.00 |
| | | 3.1.3 | Penn forklift to move material & equip on site | 15 | HR | $ | 100.00 | $ | 1,500.00 |
| | | 3.1.3 | Trash container for 2 weeks | 1 | EA | $ | 700.00 | $ | 700.00 |
| | | 3.1.4 | Transport trash from SJJ to STT | 1 | EA | $ | 500.00 | $ | 500.00 |
| | | 3.1.4 | Portable restroom 2 weeks | 1 | EA | $ | 600.00 | $ | 600.00 |
| | 3.1 | | **GENERAL REQUIREMENTS** | | | | | $ | 14,590.00 |
| | 3.2 | MACHINES | | | | | | | |
| | | 3.2.1 | Englert® MetalMan Multi-Panel Roof Forming Machine on trailer | 1 | EA | $ | 35,000.00 | $ | 35,000.00 |
| | | 3.2.2 | Load framing machine in container | 1 | EA | $ | 2,500.00 | $ | 2,500.00 |
| | | 3.2.3 | Brake machine for flashing | 1 | EA | $ | 4,000.00 | $ | 4,000.00 |
| | | 3.2.4 | Load brake machine in container | 1 | EA | $ | 1,500.00 | $ | 1,500.00 |
| | 3.2 | | **MACHINES** | | | | | $ | 43,000.00 |
| | 3.3 | TRAVEL LODGING | | | | | | | |
| | | 3.3.1 | Travel for 4 member roofing crew (airfare) | 4 | EA | $ | 1,474.00 | $ | 5,896.00 |
| | | 3.3.2 | Travel for 1 supervisor (airfare) | 1 | EA | $ | 2,750.00 | $ | 2,750.00 |
| | | 3.3.3 | Lodging for 5 people @ 10 nights each | 50 | EA | $ | 275.00 | $ | 13,750.00 |
| | | 3.3.4 | Per Diem for 5 people @ 10 days each | 50 | EA | $ | 50.00 | $ | 2,500.00 |
| | 3.3 | | **TRAVEL LODGING** | | | | | $ | 24,896.00 |
| **3.0** | | | **GENERAL REQUIREMENTS** | | | | | $ | 57,590.00 |

| | **ALL TOTALS** | | | | |
|---|---|---|---|---|---|
| 1.0 | ROOF REPAIR | | | $ | 43,777.00 |
| 2.0 | STUCCO REPAIR | | | $ | 34,266.00 |
| 3.0 | GENERAL REQUIREMENTS | | | $ | 57,590.00 |
| 6.0 | SUPERVISION | | | $ | 14,800.00 |
| 7.0 | **PERMITS AND FEES (10% of Construction)** | 10% | $ 92,893.00 | $ | 9,289.30 |
| 8.0 | **OVERHEAD AND PROFIT** | 20% | $ 150,433.00 | $ | 30,086.60 |
| 9.0 | **CONTINGENCY** | 20% | $ 150,433.00 | $ | 30,086.60 |
| **TOTAL** | | | | **$** | **219,869.50** |

Prepared by:
Paradigm Construction Services
771 Jamacha Road # 526
El Cajon, CA 92019

*Privileged – For Mediation Purposes Only*
*Protected by Civil Code Section 1152 1119-1128*

Page 3 of 3

# EXHIBIT F

IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

DAYBREAK, INC., d/b/a HUBER AND )
ASSOCIATES, )
                         )
              Plaintiff, )
                         )
vs.                     )
                         )
THOMAS F. FRIEDBERG, SARAH BUNGE, )
LAW OFFICES OF FRIEDBERG & BUNGE, )
and MERRILL LYNCH CREDIT )
CORPORATION, )
                         )
             Defendants. )

THOMAS F. FRIEDBERG and SARAH L. )
BUNGE, )
                         )
           Counterclaimants, )
                         )
vs.                     ) ST-10-CV-716
                         )
DAYBREAK, INC., d/b/a HUBER AND )
ASSOCIATES, )
                         )
           Counterdefendant. )

THOMAS F. FRIEDBERG and SARAH L. )
BUNGE, )
                         )
           Third Party Plaintiffs, )
                         )
vs.                     )
                         )
BARRY R. HUBER, )
                         )
           Third Party Defendant. )

COPY

OFFICIAL TRANSCRIPT OF:

TELEPHONIC STATUS CONFERENCE

February 2, 2015

*Persha Stoutt-Warner*

2

1

2        BEFORE:            HONORABLE ADAM G. CHRISTIAN,
                           Judge Presiding

3

4        APPEARANCES:      **LAW OFFICES OF ANDREW C. SIMPSON**
                           **BY:  EMILY SHOUP, ESQ.**
5                          2191 Church Street, Suite 5
                           Christiansted, St. Croix, VI
6                               00820

7                          (Attorney for Plaintiff Daybreak)

8                          **COLE, SCOTT & KISSANE, P.A.**
                           **BY: JOSEPH GOLDBERG, ESQ.**
9                          9150 South Dadeland Boulevard
                           Suite 1400
10                         P.O. Box 569015
                           Miami, FL 33256
11
                           (Attorney for Plaintiff Daybreak)
12

13                         **LAW OFFICES OF FRIEDBERG & BUNGE**
                           **BY:  THOMAS F. FRIEDBERG, ESQ.**
14                         610 West Ash Street, Suite 1400
                           P.O. Box 6814
15                         San Diego, CA 92166

16                         (Pro Per Se, Attorney for Defendant
                           Bunge, Merrill Lynch, and Offices
17                         of Friedberg & Bunge)

18

19

20

21                         **********

22

23

24

25

*Persha Stoutt-Warner, RMR*

*Official Court Reporter II*

(Colloquy)                                    3

**P-R-O-C-E-E-D-I-N-G-S:**


*  *  *

1
2
3
4        [WHEREUPON, court is now in
5    session.]
6              THE CLERK:  Good afternoon.
7    Civil non-jury calendar for Monday,
8    February 2, 2015.  Daybreak, Inc., d/b/a
9    Huber and Associates vs. Thomas F.
10   Friedberg, Sarah Bunge, Law Offices of
11   Friedberg and Bunge, and Merrill Lynch
12   Credit Corporation, Case Number
13   ST-10-CV-716, for status conference.
14             ATTORNEY SHOUP:  Good
15   afternoon, Your Honor.  Emily Shoup on
16   behalf of Daybreak, Inc.
17             ATTORNEY GOLDBERG:  Good
18   afternoon, Your Honor.  Joseph Goldberg
19   on behalf of Daybreak, Inc.
20             ATTORNEY FRIEDBERG:  Good
21   afternoon, Your Honor.  Thomas Friedberg
22   on behalf of Thomas Friedberg in pro per
23   se, Bunge, and Merrill Lynch, as well as
24   the Law Offices of `Friedberg and Bunge.
25             THE COURT:  Good afternoon,

*Persha Stoutt-Warner, RMR*
*Official Court Reporter II*

(Colloquy)                                                          4

1    this is Judge Christian.  First, I want

2    to thank you for your patience this

3    morning.  I had some familiar matters

4    that were unforeseen that I had to deal

5    with.  So, thank you for your patience,

6    and thank you for your patience in

7    getting everyone online this afternoon.

8            We have a couple of motions here

9    that I want to address very quickly, and

10   we do have a court reporter here in the

11   event that anyone wants to order a

12   transcript.  First, we have the

13   plaintiff's, Daybreak, request to

14   re-enter on to the land in question for

15   purposes of additional discovery.

16   That's been briefed on both sides.  And

17   now, I even have requests for sur

18   replies on that same issue.  It seems to

19   me that the main complaint from Daybreak

20   is that they did not have sufficient

21   time to inspect the property.

22            Am I correct on that?

23            ATTORNEY GOLDBERG:  This is

24   Attorney Goldberg, Judge.  Yes, that's

25   one of the main areas, the amount of

**(Colloquy)**                                        **5**

1    time.  Yes.  Yes, sir.  There are other

2    issues also associated with why we want

3    to re-enter the land, but that is

4    certainly one of them, Judge.

5              THE COURT:  Okay.  How much

6    time did your expert have to inspect the

7    property?

8              ATTORNEY GOLDBERG:  I would

9    say, Your Honor, less than two hours.

10             THE COURT:  Okay.  Attorney

11   Friedberg, was the Plaintiffs' expert in

12   any way rushed off in less than two

13   hours or, say, less than three hours?

14             ATTORNEY FRIEDBERG:  No.

15   We had attempted to arrange this for the

16   day before.  The expert was allowed to

17   go on each and every single roof

18   uncumbered.  He was not restricted.  And

19   after the expert had looked at every

20   single roof, then climbed on every

21   single roof, I asked if there was

22   anything additional they wanted to do.

23   At that time they said no.

24             THE COURT:  Back to

25   Plaintiffs.  What has changed so

1    drastically that your expert needs to go

2    back and look at the same dwellings

3    again?

4              ATTORNEY GOLDBERG:   Sure.

5    Couple things have happened.   First and

6    foremost, I think in the Scheduling

7    Order that was initially entered in this

8    case, and maybe it was an oversight on

9    my part or my predecessor's part; and I

10   take responsibility for that.   But what

11   happened was obviously with the

12   Plaintiffs.   The initial claim on this

13   issue, and Attorney Shoup can speak to

14   it, as she is the attorney of record on

15   the main issue where Daybreak is the

16   Plaintiffs, okay?   On those particular

17   issues that was with respect to a breach

18   of contract, a $30,000 alleged

19   nonpayment for some copper, okay?

20   Within the two years -- two years passed

21   and a counterclaim was filed by Attorney

22   Friedberg.   The counterclaim issue is

23   what the entire expert discovery issue

24   is about.

25             So, what happened was I told

(Colloquy)                                           7

1    Attorney Friedberg that my expert needs

2    to go on the premises but it's basically

3    going to be just a general site

4    inspection without any testing, and I

5    reserve my right to go back on the

6    property if the court so allows.  We

7    only had a limited amount of time.  We

8    were provided one single day.  I

9    provided the correspondence to the Court

10   for Your Honor's review.  One single day

11   for us to go on there.  And it just so

12   happened that that was the same day we

13   had another deposition set.  So, I said,

14   sure, I'm going to work with you.  We'll

15   go on and if we need to do additional

16   testing later on then that's something

17   that we need to address, okay?  That

18   happened.

19        Now, fast forward to November,

20   okay, Attorney Friedberg sent his expert

21   report to us.  His expert spent two days

22   on the roof and then the entirety of the

23   claims changed.  Before we were talking

24   about the replacement, the repair of

25   certain areas of the roof.  His expert

**(Colloquy)**                                              *8*

1   report said they need a complete and

2   total replacement of the entire roof

3   (all 8,400 square feet of the roof) to a

4   tune of three, four times the original

5   cost, seven hundred and sixty something

6   thousand dollars.

7        So, I'm kind of with my hands

8   tied because I had no authority to

9   provide a rebuttal, even though I'm

10  technically the Defendant, and I have to

11  be able to be the defendant and be able

12  to rebut the claim being asserted by his

13  expert. So, I think the timing on

14  things was a little bit of an issue.

15  And I beg your pardon for not addressing

16  that with the Court earlier, in terms of

17  the Scheduling Order, but I think now

18  the claims have drastically changed.

19        THE COURT: Okay. Attorney

20  Shoup, what's your view on this? I

21  haven't heard from you yet.

22        ATTORNEY SHOUP: Yes, Your

23  Honor. I am aligned with Attorney

24  Friedberg on this, on this request, and

25  if I may speak.

1          THE COURT:  Friedberg or

2   Goldberg?

3          ATTORNEY Shoup:  Sorry.  I

4   am aligned with Attorney Goldberg on the

5   issue, and if I may speak to the timing

6   that our expert had, had any detailed

7   log of the time from that day.  We did

8   have a deposition of -- I believe Mr.

9   Huber was deposed that afternoon.  We

10  were on the property from 10:45 to

11  12:30, and part of that inspection, of

12  course --

13          THE COURT:  What day was

14  this?

15          ATTORNEY SHOUP:  That was

16  on July 31st.

17          THE COURT:  Of 2014?

18          ATTORNEY SHOUP:  Yes, sir.

19          THE COURT:  Okay.

20          ATTORNEY SHOUP:  And, of

21  course, since that inspection involved

22  looking at roofs it involved getting

23  ladders out, transferring ladders around

24  from roof to roof.  There are a number

25  of properties or a number of buildings

1    on the property.  And so, even though we

2    were physically on the property for less

3    than two hours a lot of that time was

4    just moving ladders around.  So, the

5    actual inspection of the roof was even

6    shorter.  We did not go on every

7    building because we were told by

8    Attorney Friedberg that several of the

9    buildings did not have any issues, and

10   so, we didn't need to go on to those

11   buildings, then we received his expert's

12   report that requires complete

13   replacement of all of the roofs.

14          So, I just wanted to address the

15   issues regarding the timing of the

16   inspection on that day.

17          THE COURT:  Okay.  Attorney

18   Friedberg?

19          ATTORNEY FRIEDBERG:  Yes.

20          THE COURT:  Now, this did

21   start out in a somewhat limited capacity

22   in terms of a breach of contract.  In

23   fact, it was even removed to the

24   District Court, which remanded because

25   there wasn't sufficient amount in

(Colloquy)                                11

1    controversy.   At the time -- and this is

2    for anyone who wishes to answer.   At the

3    time the Plaintiffs' expert went to look

4    at the roof was there any knowledge or

5    notice given that there were issues with

6    each and every, I believe it's nine

7    buildings, that there were issues with

8    each and every one of the buildings on

9    that property?

10                ATTORNEY SHOUP:   No.

11                ATTORNEY FRIEDBERG:   This

12   is Attorney Friedberg.   Let me answer

13   that.   Your Honor, initially, an initial

14   posture repair estimate was prepared for

15   the two upper buildings which required

16   roof replacements.   At the time of the

17   inspection Mr. Hendren, who was the

18   actual expert hired by the Plaintiff and

19   Counterdefendant, physically went on the

20   lower buildings as well.   He and Mr.

21   Huber actually climbed and walked around

22   each and every roof.

23        And I do have to take issue with

24   respect to these comments that Mr.

25   Hendren was unable to go on the roofs.

(Colloquy)                                    12

1   I did depose Mr. Hendren, and I asked

2   him specifically at the deposition if he

3   was limited or restricted, and he said

4   no.   Mr. Hendren has a belief that there

5   was maybe one roof on the gatehouse

6   which is a vulkem roof.   It's not a

7   copper roof.   And that roof was --

8   nothing was done by Mr. Huber, Daybreak,

9   with respect to that, but that roof was

10   accessible.   And quite candidly, he made

11   a point, he made a comment during the

12   inspection that he wants to touch and

13   walk on each and every single roof.

14        At the time that Mr. Hendren was

15   present, he asked, and I agreed, and the

16   other attorneys came by, if there were

17   issues with respect to the other

18   buildings, and that was answered in the

19   affirmative.   Mr. Hendren was inside the

20   other buildings, shown watermarks from

21   where the areas of the roofs were

22   leaked, or were leaking, and indicated

23   that these are the, this is the evidence

24   that there is leaking from the roofs.

25   Mr. Hendren and Mr. Huber then proceeded

(Colloquy)                                          13

1    to climb on the roofs and attempted to

2    corollate whether or not they felt the

3    water leaking that was present on the

4    wall was, in fact, through of the roofs.

5           Mr. Hendren's Expert Rule 26

6    report basically indicates that -- he

7    noted that there was evidence of water

8    staining, but he is not able to tell

9    whether that water staining was new, or

10   old, or predated the roofs, and he

11   really does not have an opinion.  Mr.

12   Hendren also indicated that based upon

13   his inspection of the roof -- he said

14   from his position that the roofs were

15   done appropriately and is not

16   recommending any cost to repair.  These

17   are Mr. Hendren's opinions as set forth

18   in his report.

19           So, to answer the Court's

20   question, Mr. Hendren was advised at the

21   time of inspection there were issues

22   with respect to each and every roof.  He

23   was shown evidence inside the buildings,

24   evidence of watermarking from the

25   leaking, then Mr. Hendren then proceeded

(Colloquy)                                    **14**

1    to look on the roofs of each and every

2    building in his attempt to, in his mind,

3    prove or disprove whether he was going

4    to render an opinion that there was an

5    issue with regards to the roofs.  He

6    elected to say that there was no issue

7    with the roof.  That is his decision,

8    and he certified his report.

9              THE COURT:  Okay.  And this

10   was in July of last year?

11             ATTORNEY FRIEDBERG:  That

12   is correct.  The first I heard that

13   there was any issue to reopen and

14   everything -- in understanding that, you

15   know, we are aware of the Court's

16   deadlines, painfully aware, because we

17   had it coming up and we had the issue

18   with respect to expert discovery.  In

19   accordance with the Court's scheduling

20   order, which, in fact, has been in place

21   for close to a year now, fact discovery

22   was a certain day.  July 31 this

23   inspection took place.  The first we

24   heard about this, quote unquote,

25   re-enter -- they haven't come out and

1    said it, but they suggested it, they

2    want to bring a new expert in, they want

3    to reopen everything.

4           The challenge we have with this,

5    Judge, and we've been pointing out, is

6    that the schedule has been set by the

7    Court and nothing has been raised until

8    the dates have passed.  And this is not

9    a good practice of law.  We have to

10   abide by the Court's deadlines.  We have

11   to schedule this appropriately.  And to

12   somehow suggests that there is some type

13   of surprise here, there is no evidence

14   to support that contention.

15           But the fact of the matter

16   is, counsel for -- Attorney Shoup and

17   Attorney Goldberg haven't done anything

18   affirmatively.  If, in fact, there was a

19   contention, they should have brought it

20   forward to the Court in August or so, or

21   September, or October, or even November

22   when we were -- in late October when we

23   had the status conference.

24           We've gone forward, Judge, to

25   meet the Court's deadlines.  In fact, we

(Colloquy)                                    **16**

1    attempted to reset Mr. Hendren's

2    deposition.  There was some issue that

3    we had to bring before the Court so we

4    can take it.  All counsels were down; we

5    had taken Mr. Hendren's deposition.  We

6    made Mr. Sanders available within the

7    period of time for the discovery cutoff.

8    And the day before the discovery time

9    cutoff the motions started flying.  The

10   schedule should have been set to

11   understand that dates are coming up, and

12   we need to abide by those dates.

13           Getting back to the inspection.

14   Mr. Hendren has had a full and adequate

15   opportunity to look at the roofs.  And

16   really, I think what this is, Judge, and

17   I'll soon request that we file a

18   sur-reply, this is just an attempt, six

19   months later, for the other side to

20   attempt to bring in new experts.  And

21   that's really what it is.

22           THE COURT:  Okay.  Attorney

23   Shoup or Attorney Goldberg, are you

24   looking to get new experts in there?

25           ATTORNEY GOLBERG:  Your

(Colloquy)                                        17

1    Honor, a couple of things if I could.

2                        THE COURT:  First, answer

3    my question.

4                        ATTORNEY GOLBERG:

5    Possibly.  Yes, Your Honor.

6                        THE COURT:  Okay.  Proceed.

7                        ATTORNEY GOLDBERG:  But the

8    reason -- we were never looking to do

9    that, Your Honor -- is because in

10   November when we got Mr. Friedberg's

11   expert disclosure the entirety of the

12   claims changed.  He wanted a complete

13   replacement in the entirety of the roof.

14   If you look at his cost to repair

15   furnished in early discovery, he was

16   talking about the cost to repair is

17   about $200,000, I believe.  Then, he

18   filed his Rule 26 Expert Disclosure in

19   November, after I had already filed my

20   expert disclosure.  That's when he now

21   says he wants $760,000 replacement and

22   had his experts spend two days.  That's

23   what the issue on this case is, the fact

24   that -- my client is not going to have

25   the ability to rebut Attorney

**(Colloquy)**                                    **18**

1   Friedberg's report, and we are the

2   Defendants on that particular claim.

3   And, again, I think that was a potential

4   mistake early on in the Scheduling Order

5   not to account for that. There is

6   really no expert on the issue around the

7   Plaintiff. The experts on the issue are

8   on the Counterdefendant, and as the

9   counterdefendant I need to have an

10  ability to rebut those claims.

11          And in terms of the timing, Your

12  Honor, in November is when Attorney

13  Friedberg furnished his expert report.

14  I asked for deposition dates from

15  Attorney Friedberg's expert within ten

16  days of the report, which is a 70-page

17  report. He provided one single date

18  availability for deposition. Attorney

19  Shoup was in trial on that date, so she

20  was unable to make it. So, we asked for

21  additional dates, and we never got any

22  response. So, this has been very

23  difficult to schedule.

24          The reason that I want to

25  re-enter the land, the reason that I

(Colloquy)                                    19

1    think I should be entitled to re-enter

2    the land, with whatever expert I

3    determine should look at it, is based on

4    his report where I'm the defendant,

5    where I've got a burden to prove --

6    well, he's got the burden of proof, and

7    I've got to be able to defend myself.

8    Right now I have no ability to defend

9    myself because the entirety, the claims

10   in this matter has completely and

11   totally changed from what it was

12   initially.

13        And Attorney Friedberg's

14   assertion that we had uncumbered access

15   to the entirety of the roofs is just

16   absolutely false.  It's just not the

17   case.  We were there for less than two

18   hours.  I don't think anybody can walk

19   the entirety of Mr. Friedberg's

20   residence in two hours.  It's just

21   impossible.

22             ATTORNEY FRIEDBERG:  Your

23   Honor, I think, really, the important

24   issue is this, is that I did take Mr.

25   Hendren's deposition.  We provided

(Colloquy)                                      20

1    portions of it with the Court.  We're

2    still waiting for Desiree Hill, the

3    court reporter.  She hasn't sent the

4    final up yet.  But the defense has his

5    expert.  He was prepared to rebut, and

6    he did rebut Mr. Sanders' report.  And

7    he basically reviewed and went point by

8    point.  I covered it in his deposition.

9    And, basically, in his deposition he

10   says that he disputes what Mr. Sanders

11   said, and he did rebut it.  And so,

12   really, they are just attempting -- I

13   think they want another expert when they

14   already have an expert who has given a

15   Rule 26 report, given a deposition, and

16   expressed his opinions.

17           And we can lodge the deposition

18   with the Court if the Court so desires.

19           THE COURT:  When was the

20   counterclaim filed and approved?

21           ATTORNEY FRIEDBERG:  The

22   counterclaim was filed with District

23   Court.  I'm actually out of town, Your

24   Honor, so I don't have access to my

25   file, but it was -- the counterclaim

(Colloquy)                                            21

1   would have been filed -- I think, it was

2   late 2012, either September or --

3              THE COURT:  All right, I

4   think I found it here.

5              ATTORNEY FRIEDBERG:  With

6   the counterclaim, we sought to remove

7   the action, and then the District Court

8   remanded it based upon the primary, the

9   plaintiff's claims is less than 75.

10             THE COURT:  But that was in

11  2012, right?

12             ATTORNEY FRIEDBERG:  And

13  the 2012 counterclaim sets forth --

14             THE COURT:  So, the parties

15  both knew -- let me make my point.  The

16  pleadings were closed in 2012.  Does

17  anyone dispute that?

18             ATTORNEY FRIEDBERG:  No.

19             ATTORNEY GOLDBERG:  I don't

20  believe so.  I don't have the entire

21  court file in front of me.  I think that

22  that's correct, Your Honor.

23             ATTORNEY SHOUP:  I don't

24  have any reason to dispute that either.

25             THE COURT:  So, then why is

**(Colloquy)**                                    **22**

1   this issue coming up in late 2014?

2   Everybody knew what the issues were.

3   You can't say that Mr. Hendren didn't --

4   well, I don't know what he knew exactly.

5   I don't know what he was advised of.

6   But certainly he had the opportunity to

7   let him know what the counterclaims were

8   about, as existed, when he went to see

9   the property in July of last year.  So,

10  why -- I don't see why that needs to be

11  reopened.

12          ATTORNEY GOLDBERG:  Sure.

13  Your Honor, because for the first time

14  in the entire litigation, okay, after

15  discovery, that's when Attorney

16  Friedberg provided his expert report.

17  That was the first time in litigation.

18          THE COURT:  Attorney

19  Goldberg, that's not after discovery.

20  That's part of the discovery.  What

21  you're saying is your expert has a

22  report that says the value of repair is

23  X.  They have, they being the

24  Defendants, have an expert report saying

25  the value of the repairs is Y.  That's

Note this is part of Feb 2015 transcript. Next page is part of March 28, 2017 transcript!

**Colloquy**

1    Honor wishes to review it as to what they

2    claim the issues were before we inspected.

3    We can only inspect what we believe or we

4    would only have reason to inspect what we

5    believe the issues to be, but we weren't

6    told what the issues were or we wouldn't

7    have a reason to inspect them.

8           THE COURT:  Okay.  Okay,

9    thank you.

10          ATTORNEY FRIEDBERG:  Your

11    Honor, it's Attorney Friedberg, may I be

12    heard?

13          THE COURT:  Yes, you may.

14          ATTORNEY FRIEDBERG:  Thank

15    you.  These are the same, in fact,

16    arguments that were made before Judge

17    Christian in February 2015, and we spent

18    quite a bit of time going over it and

19    Judge Christianson(sic) denied them

20    outright.  You know, this is an attempt to

21    rehash what previously was before the

22    Court.  I think that Attorney Goldberg has

23    failed to mention to the Court when he

24    mentioned that, you know, his expert Mr.

25    Hendren had full access to all the roofs,

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

1    and after which he basically said

2    "Everything is fine. It doesn't need any

3    repair." And that's what Judge

4    Christianson focused on, because he --

5    Daybreak made its decision, and basically

6    after inspecting the roof say "We don't

7    believe it's necessary to do anything."

8              Judge Christian did not want and

9    we opposed an attempt by Daybreak to

10   really bring in a new expert, because it's

11   reentry of land for subterfuge and they

12   don't like the expert they have; they want

13   to bring in a new expert. You know, this

14   is the opportunity they had. Judge

15   Christianson had all the issues brief.

16   Everything Attorney Goldberg is mentioning

17   was argued before Judge Christian. The

18   rule was made, a record of proceeding was

19   made, because it was 2015, no motion for

20   reconsideration was ever brought, and we

21   believe the matter is closed. These

22   additional issues Attorney Goldberg is

23   mentioning is not contained in the record

24   of proceedings which is pretty complete.

25              THE COURT: What do you mean

Colloquy

1      -- what additional issues he's referring

2      to?

3                 ATTORNEY FRIEDBERG:   Any

4      additional issues that Attorney Goldberg

5      is attempting to claim that, you know, he

6      wants to bring in sur-reply, he wants to

7      bring in additional information.  This was

8      all dealt with by Judge Christian in

9      extensive telephone hearing, and it was

10     documented in the Record of Proceedings.

11                 Judge Christian was pretty

12     clear, no reentry of land, you don't get a

13     new expert, discovery is closed, it is

14     what it is, and he made it -- that was the

15     order of the Court.

16                 THE COURT:  Are you asking

17     for an expert other than Mr. Hendren your

18     same expert?

19                 ATTORNEY GOLDBERG:  Your

20     Honor, at one point we had asked for a

21     different expert, because, again, the case

22     had changed from one thing to another with

23     additional issues.  They weren't just

24     saying "You just need to repair the roof

25     and here is what it is."  Now they're

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

**Colloquy**

1    saying "we need a full replacement on the

2    roof.  So there was a request made for

3    additional expert.  I don't that Judge

4    Christian -- it was never a formal motion.

5    I don't know that Judge Christian ever

6    ruled upon that.  But that's not really

7    why I'm bringing up what I'm bringing up.

8    What I'm asking for here is the Court to

9    limit the damages based on what Mr.

10   Hendren went out and viewed at the time,

11   or to allow us to go back to look at the

12   property based on the new information that

13   was provided 'cause we never had a chance

14   to have the full scope of what occurred.

15                   Mr. -- Attorney Friedberg is

16   correct, Judge Christian did deny the

17   Motion for Re-Entry Upon Land, but what

18   Attorney Friedberg fails to mention is

19   Judge Christian also noted that we would

20   have an opportunity to bring a motion in

21   limine, which we've done, to limit the

22   damages to $210,000 based on what our

23   expert went out and reviewed at the time.

24                   ATTORNEY FRIEDBERG:  Your

25   Honor, this is Attorney Friedberg.  I

**Colloquy**

1   would respectfully disagree.  The Record
2   of Proceedings is rather extensive; it
3   documents what occurred.  And, you know,
4   these are the same arguments that were
5   raised in February 2015.  If the Court
6   looks at the timeline, the events that are
7   being addressed occurred in the Summer and
8   Fall of 2014.  And this is -- this was the
9   reason why we had the hearing before Judge
10  Christianson.  Those issues as far as
11  we're concerned are closed.
12                  And the sum of the foundational
13  issue is this, Mr. Hendren right or wrong
14  has already stated in his opinion there is
15  no need for a repair.  You know, it begs
16  the question, you know.  Really what
17  defendants are trying to do is get a
18  second bite of the apple.  They had their
19  opportunity, the judge has already ruled
20  on these matters, and we request that this
21  Court respect and uphold Judge
22  Christianson's ruling on these matters.
23  We believe they have been fully vetted,
24  decided, and it's inappropriate to raise
25  them again.

1           THE COURT: But it seems like

2    as if that they still didn't have the

3    opportunity since they got the report in

4    November 2014, that they still didn't have

5    the opportunity to address the increase in

6    the -- I understand the request to limit

7    the damages, but they still didn't have

8    the opportunity to flush out the November

9    2014 report from when the expert came back

10   and said it's about $700,000.

11          ATTORNEY FRIEDBERG:  If I

12   may, Your Honor?  Number one is, that was

13   the same issue that was argued before

14   Judge Christian.  Number two, is they had

15   had a full opportunity to vet because they

16   spent almost seven hours deposing Mr.

17   Sanders with all his photographs, the

18   basis for his cost to repair.  They had

19   had a full opportunity to see what's the

20   basis of Mr. Sanders' opinions are.  These

21   are issues, again, Your Honor, that have

22   already previously been decided.  The

23   arguments by Attorney Goldberg are the

24   same arguments that were put before judge

25   Christian, and Judge Christian said "No.

**Colloquy**

1    You are not gonna go back. This is it."

2                    THE COURT: But, no -- but

3    what I'm --

4                    ATTORNEY FRIEDBERG: There is

5    no motion in the Record of Proceedings

6    regarding --

7                    THE COURT: They may have had

8    the opportunity to question Mr. Sanders

9    for seven hours, but they didn't have the

10   opportunity to reinspect, that's what I'm

11   hearing.

12                   ATTORNEY FRIEDBERG: That is,

13   in fact, because that request was made and

14   denied by Judge Christian after reviewing

15   Mr. Sanders' report.

16                   ATTORNEY SIMPSON: If I

17   might, Your Honor?

18                   THE COURT: Attorney Simpson.

19                   ATTORNEY SIMPSON: Two

20   things, the Record of Proceedings as we

21   keep explaining, the judge did not address

22   the Motion in Limine. And what he says in

23   the Record of Proceedings is -- or what

24   the Record of Proceeding says "The Court

25   stated that the issues pending in this

**Colloquy**

1   matter is the scope of the discovery and
2   the scope of the supplemental discovery."
3   In other words, he left open, okay, if I'm
4   not gonna let you go on up and reinspect,
5   then I may limit Mr. Friedberg's right to
6   recover damages, because it's not fair
7   when the complaints talks about
8   "re-roofing the gate house," that's what
9   the counterclaim says.  And, discovery is
10  closed, your expert goes out, and "your"
11  being the plaintiffs, goes out and does
12  his work.  And the first time you realize
13  that it's not re-roof the gate house but
14  reroof eight houses, is when you get that
15  November report.  So what Judge Christian
16  was saying was, "This case has been
17  pending too long; I'm not gonna reopen
18  discovery; I'll address this problem in
19  the Motion in Limine."  In other words,
20  the Motion in Limine we brought says
21  "limited to the damages in the complaint
22  not the damages that we were ambushed with
23  in their rebuttal expert report."
24              ATTORNEY FRIEDBERG:   Your
25  Honor, this is Attorney Friedberg, may I

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

**Colloquy**

1    be heard?  I would respectfully disagree.

2    In the discovery these issues were laid

3    out.  In deposition testimony before Mr.

4    Sanders' report was prepared, these issues

5    were laid out as to whether portions of

6    the property that have leaks.  And with

7    all due respect, Mr. Hendren did climb on

8    the various roofs of all the buildings and

9    looked at the various roofs.  And -- so he

10   had the opportunity and was on the main

11   house roof, was on the gate house roof,

12   was on the guest house roof, was on the

13   garage roof, and walked around looking at

14   all these various roofs, as well as the

15   beach bar roof.  And took photographs of

16   the roofs, inspected the roofs.  And --

17   so, you know, they have had an

18   opportunity.  Really what this ended up

19   being was a subterfuge in an attempt to

20   bring a new expert in which Judge

21   Christian did not allow, and he said

22   Daybreak has had a full opportunity, and

23   they were advised where the claims of

24   damages were.

25               And -- again, these issues have

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

**Colloquy**

1   all been rehashed or hashed out

2   previously, and we believe that they have

3   been decided.

4           THE COURT: Well, one of two

5   things is going to happen, either it's

6   going to stay limited to the $210,000, or

7   reinspection can occur only with Mr.

8   Hendren as the inspector, not a new

9   expert.

10           So I'll take that -- I'll, you

11   know, move on from that particular motion

12   at this point. I'll -- those would be the

13   options that the Court will explore, and

14   I'll reduce it to an order.

15           ATTORNEY GOLDBERG: Thank

16   you, Your Honor.

17           THE COURT: Okay. What is

18   the next motion?

19           ATTORNEY SIMPSON: Your

20   Honor, there would be the Motion to

21   Exclude Art Sanders from Testifying as to

22   the Breach of Contract Damages Associated

23   -- and Damages Associated with the Breach

24   of Contract.

25           THE COURT: Okay. Attorney

**Colloquy**

1    Friedberg.

2              ATTORNEY FRIEDBERG:  Thank

3    you, Your Honor.

4              THE COURT:  Well, I'm sorry.

5              ATTORNEY FRIEDBERG:  Mr.

6    Sanders was asked in his deposition, "Did

7    Daybreak perform the contract?"  He said,

8    "Yes, to the extent they put a copper roof

9    on and...." --

10             THE MARSHAL:  Excuse me,

11   Attorney Friedberg.  Attorney Friedberg,

12   hold on a minute.

13             THE COURT:  Hold on a second.

14   Attorney Simpson, I'll hear the arguments

15   on that.

16             ATTORNEY SIMPSON:  Yes, Your

17   Honor.  The contract in this proceeding

18   required my client to build a roof to the

19   standards of Revere -- to two standards,

20   one is called the abbreviation is

21   S-M-A-C-N-A pronounced Smac-Na(phonetic).

22   It's -- the actual full name is in the

23   briefs.  And the other one is publication

24   by a company name Revere called Copper and

25   Common Sense.  And the contract specifies

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

1    various things, that cleats are used to
2    affix the panels to the roof, an average
3    distance apart of nine and a half inches.
4    Not each one has to be exactly nine and a
5    half inches.  And using copper panels that
6    are 15 inches wide with one-inch double
7    locked standing seam.  And again,
8    installed in accordance with Revere's
9    Copper and Common Sense and SMACNA.  "Mr.
10   Sanders is deposed, he admits we built to
11   that standard.  And it's in his
12   deposition.  "I think that the work
13   completed complied with what Huber's
14   proposal was."  He has his own standard
15   that he wants to impose, and that goes to
16   the Daubert issue 'cause it's simply his
17   standard that comes out of nowhere.  But
18   he admits we built to the standard of the
19   contract.  And, so he should not be
20   allowed to testify that we breached the
21   contract or that we didn't breach -- or
22   that we didn't build to the standard of
23   the contract, which is what he said in his
24   expert report which is why brought -- if
25   you hadn't said in the expert report, and

**Colloquy**

1      then contradicted himself in the

2      deposition, we wouldn't be hearing the

3      motion.

4              But in the expert report he says

5      we didn't build to the standard.  And,

6      specifically, what he accuses the company

7      of doing is failing to use double lock

8      standing seam joints along the standing

9      seams.  He admits in his deposition that

10      he was wrong about that, and they are

11      double lock standing seams.

12              So, we take his depo- -- we have

13      a report from him that says "you didn't

14      build to the standard of the contract."

15      We take his deposition he says we did.

16      And we just want -- we want it clear that

17      he can't go back on his deposition and

18      he's stuck with that.

19              THE COURT:  Well, can't you

20      deal with that in cross-examination

21      though?

22              ATTORNEY SIMPSON:  Is it

23      possible to?  Is it possible to, yes.  But

24      should we have to?  Should we have to have

25      the jury hear argument in our opening

**Colloquy**

1    statement that we didn't breach the

2    contract, that we breach the contract, and

3    then have to deal with that when he's

4    admitted in his deposition that we didn't.

5    The purpose of the action -- I shouldn't

6    say jury it's non-jury, so -- but the

7    purpose of the motion is to limit the

8    proceedings, to streamline them so that

9    everyone knows what's at issue and we can

10    move forward based upon that rather than

11    something that isn't at issue in the case.

12                THE COURT:  So, you're saying

13    that as an expert he cannot render an

14    expert opinion on the -- something that is

15    so crucial to the contract which where he

16    may say it was in fact a breach because

17    the -- you mentioned the double locks --

18    you mention double locks, you mention the

19    nine and a half inch cleat copper panels,

20    that type of stuff.  So, you're saying

21    that he cannot draw an expert opinion that

22    then becomes an issue of a breach of the

23    contract?

24                ATTORNEY SIMPSON:  I'm

25    saying, he has admitted, that his expert

---

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

1   opinion is that we did not breach the

2   contract, and therefore that's not an

3   issue in the case anymore. And he should

4   not be allowed to come into trial and

5   testify contrary to that. We've taken his

6   deposition and we've locked him in on

7   that, there is no breach of contract. So,

8   that should not be an issue in this case

9   and we should -- there are other issues,

10  we will deal with them at trial. This is

11  one issue we should not have to deal with

12  at trial.

13              THE COURT: Okay. Attorney

14  Friedberg?

15              ATTORNEY FRIEDBERG: Thank

16  you, Your Honor. You know -- yeah, Mr.

17  Sanders testified to the extent that the

18  contract called for copper roofs to be

19  installed. Yeah, a copper roof was

20  installed but that's kind of where it --

21  Mr. Sanders' opinions diverged. So the

22  roof that was installed was not done in a

23  workmanlike manner under the *Raimer vs.*

24  *Stout 14 VI 568* implying every contract is

25  the requirement that would implied

1    warranty if they do the work in a
2    workmanlike manner.  And, specifically,
3    the problems are, and Mr. Sanders at
4    length testified to and showed pictures,
5    is that we can look at the main roof or
6    the main pavilion, and the standards
7    require that when you have a length of a
8    panel--and these are pans--and if the
9    Court probably looked at all the
10   photographs, you're starting out with a
11   16-inch wide piece of copper is put
12   through a roll former and cut to a certain
13   length.  If it's cut in a dimension
14   greater than 30 feet, and if there is a
15   change of angle, the standards require
16   because of the expansion contractions of
17   properties of copper, that an expansion
18   joint be put in.  And in this case what
19   was required under these standards was
20   that, two separate panels be placed in and
21   there'll actually be a seam at the area
22   where there is a change.  An expansion
23   joint be placed in.
24          What happened is, is that the
25   standards were not followed, 32 foot

1  panels were put in, and they were cleated

2  in without expansion joints.  This is

3  resulted in the pans cracking and

4  photographs of the cracked pans are

5  evidenced in Mr. Sanders' report, and this

6  violates the standards upon which the roof

7  was to be built under the contract.

8              Second, regarding this issue is

9  single lock versus double lock.  You know,

10  there is evidence in these photograph that

11  there is a number of pans that weren't

12  even single locked.  In other words, the

13  pans were cut too short where they

14  couldn't join them, and there was no

15  ability to lock them properly, or even

16  lock them at all because there wasn't

17  enough material.  In other words, in

18  installing the actual copper pans the

19  width was reduced from the amount which

20  was necessary to such a way where the pans

21  could not be locked together.  These are

22  just several examples where the roof did

23  not meet the standards that were required

24  to be met under the contract.

25              There are numerous instances,

1   what Mr. Sanders did is he photographed
2   and documented where these violations
3   occurred and then testified.  I will agree
4   Mr. Sanders said that, "Yeah, a copper
5   roof were installed."  So that's where the
6   opinions end.  And Mr. Sanders said that
7   -- "merely placing a copper roof on
8   doesn't necessarily mean that you complied
9   with the contract.  You have to put it on
10  in a workmanlike manner, and those
11  standards were -- those are just two of
12  the examples I'm providing to the Court.
13              There are a number of other
14  issues.  For example, where the pans meet
15  the peak of the roof, what happens is is
16  the pans were cut short, there are
17  actually holes in the roof.  So when you
18  climb to the top of the roof and you look
19  at the top, you can actually see areas
20  where there is no copper and there's no
21  protection whatsoever.  That's not how the
22  contract was intended to be performed,
23  because whether it's a CCS standard or
24  SMACNA standard, you got to join the
25  panels together, and this was not done.

1           The unfortunate problem is is

2    that you can't really remedy this

3    situation because the panels are already

4    cut and they are attached on or cleated on

5    about every nine or nine and a half inches

6    on either side.  And so, there is really

7    no way to remedy the situation other than

8    removing the entire pan itself and that's

9    disassembly and replacement of the roof.

10           So I would respectfully disagree

11   with counsel's -- what he is represented

12   what the testimony is and I just given the

13   Court several examples.

14           The Court has Mr. Sanders's

15   report.  There's color photographs

16   attached showing all these deficits.

17   Thank you.

18           THE COURT:  All right.  Thank

19   you.

20           ATTORNEY SIMPSON:  If I may,

21   Your Honor.

22           THE COURT:  Yes.

23           ATTORNEY SIMPSON:  Attorney

24   Friedberg is testifying.  What he is

25   saying is not in the record.  It is not

1    accurate.  It is absolutely not accurate.

2    He does this in his motions and his

3    written briefs, he says things, he doesn't

4    cite evidence for it, and it is simply not

5    true.  He keeps saying, "Oh, Mr. Sanders

6    agrees that a copper roof was installed."

7    That's not what Mr. Sanders say.  He said

8    "I think that the work completed complied

9    with what Huber's proposal was."  And his

10   proposal was to build to SMACNA and Copper

11   -- Copper -- Revere's Copper and Common

12   Sense Standards.

13              He keeps talking about the

14   workmanlike standard.  He says, "The

15   standards require an expansion joint

16   because the roof bends."  Absolutely

17   false.  Mr. Friedberg cannot point to a

18   single standard that requires that.  The

19   only person that says that is the -- is

20   Mr. Sanders through *ipse dixit*.  It's not

21   true.  It is not a standard.  That's

22   simply Mr. Sanders's opinion that is not

23   supported by the standards.  And that's

24   the problem we have in this case.  We have

25   a contract, it requires to be built to

1    certain standards.

2                  Let me give you an example, I

3    just bought a Honda. I had a choice

4    between an XL, an XLT an RL, each one gets

5    better and better. What they are trying

6    to do here is say "You bought the low end

7    Honda, but you should of -- we should have

8    been -- I bought the low end Honda but I'm

9    gonna sue because I didn't get the high

10   end Honda." But I didn't pay for that.

11   And I knew -- I knew what I was getting, I

12   was getting built to this standard, which

13   was a very good standard, just like the

14   low end Hondas are very good standards.

15   But if I wanted bells and whistles I spell

16   that out in the contract and I pay for

17   that. So we built to the standards and

18   Mr. Sanders admits it.

19                  THE COURT: Okay. All right.

20   Thank you. So I'll reserve my ruling on

21   that one also. But a lot of this would be

22   flushed out in the Daubert hearing?

23                  ATTORNEY SIMPSON: Yes. I

24   agree with that, Your Honor.

25                  THE COURT: Okay. Very well.

44

**Colloquy**

1    What's your next motion, Attorney Simpson?

2                    ATTORNEY SIMPSON:  Your

3    Honor, there's one that -- I think it's

4    unopposed regarding of proper references

5    at trial.  It's fairly benign stuff, and

6    actually, I think, when we filed it we had

7    forgotten that this was a bench trial.  A

8    lot of it is -- were -- excluding things

9    that would bother -- that we would be

10   concern would prejudice the jury.  But

11   it's unopposed.  And -- I believe that is

12   all of our motions.

13                   THE COURT:  You have a motion

14   to extend all remaining deadlines?

15                   ATTORNEY SIMPSON:  Your

16   Honor, I think that was all -- that was

17   one of the rule was that Judge Christian

18   ruled on, and that's also rolled up in the

19   whole idea of whether damages are limited

20   or whether we get additional time to have

21   an expert go out there.

22                   THE COURT:  I see.  Okay.  So

23   that's relative to the Re-Entry Upon Land?

24                   ATTORNEY SIMPSON:  Correct,

25   Your Honor.  Obviously, if we have our

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

1        expert go out there again there will have

2        to be deadlines for the report and

3        depositions and all of that.

4                    THE COURT:   Okay.   Attorney

5        Friedberg?

6                    ATTORNEY FRIEDBERG:   Yes,

7        Your Honor.   The first motion we have is

8        dealing with the Plaintiff's complaint and

9        Daybreak unsupported damage claim.   And,

10       specifically, the claim is of damages of

11       $31,000 or so.   To date, Daybreak through

12       Mr. Huber has failed to produce any source

13       documents.   In other words, any receipts

14       or invoices.   They are relying on

15       summaries.   And under Federal Rule of

16       Evidence 1006 and the *Pritchard vs.*

17       *Liggett* case 295 F.2d 292.   The summary is

18       only admissible if the underlying evidence

19       is admissible.   And that's been the

20       problem with plaintiff claim from the

21       beginning, is that there are no invoices.

22       A statement was sent saying you owe "X"

23       number of dollars and request has been

24       made for backup information.

25                    And, specifically, when Mr.

**Colloquy**

1   Huber was asked under oath on page 29

2   through 31 of his deposition, the question

3   was, "Do the summary include items for

4   which you are asking for reimbursement?

5   The question is very simple. Where are

6   the documents upon which the summary is

7   based." And Mr. Huber said "That's a good

8   question." Next question is "You don't

9   know, do you?" The answer is "Not right

10  now. No, I don't."

11              THE COURT: I read it. I

12  read it.

13              ATTORNEY FRIEDBERG: Yes. To

14  date Mr. Huber hasn't provided anything to

15  support his damage claim. If Mr. Huber

16  was confronted with the fact that 12 rolls

17  of copper were pre-purchased, they only

18  shipped -- reels were pre-purchased and

19  stored in his warehouse, they only shipped

20  ten rolls. There's a document by the

21  Custom's Bill of Lading. Rosin paper or

22  underlayment paper was billed for but

23  wasn't ship because that was not part of

24  the contract with $4,000 right there.

25              I mean, what this -- what is

**Colloquy**

1    plaintiff's claim is just "Pay me this 'X'
2    number of, you know, money on this
3    contract." But he's never to date
4    provided any documentation for it. Our
5    motion is to preclude Mr. -- Daybreak from
6    asserting a damage claim because now,
7    what, seven years have gone by since this
8    roof has been put on. To date we don't
9    have any documentation, source
10   documentation, and Daybreak cannot produce
11   any and has refused to produce; they don't
12   simply have any. And this is the time and
13   place where plaintiff claim have to fail
14   because you can't pursue and prosecute a
15   claim for damages without evidence of
16   damages.
17                    THE COURT: Well, Attorney
18   Friedberg, wasn't this a contract though
19   in terms -- with a scope of work
20   associated with it, a contract for about a
21   hundred and eighty-seven thousand dollars,
22   $88,000, I believe, but with a scope of
23   work attached to it?
24                    ATTORNEY FRIEDBERG: There
25   was a scope of work and then there were

1    supplemental claims for -- approximately

2    $225,000 was paid to Daybreak.  And, I

3    think, where the parties fell apart is

4    that Daybreak was asking for additional

5    moneys based upon claims that they had to

6    buy additional copper.  And when we went

7    back and looked, found the Customs' bills

8    of lading that that additional copper

9    which was pre-purchased wasn't shipped.

10   So, Huber -- excuse me, Daybreak was paid

11   in excess of their contracted amount, but

12   the fact of the matter is they are seeking

13   more and haven't been able to document

14   what this is based on.

15                  THE COURT:  Attorney Simpson?

16                  ATTORNEY SIMPSON:  Yes, Your

17   Honor.

18                  ATTORNEY FRIEDBERG:  To date

19   we haven't seen any receipts or invoices

20   or any documentation supporting this

21   damage claim.

22                  THE COURT:  Okay.

23                  ATTORNEY SIMPSON:  This is a

24   factual question that is a question of the

25   adequacy of the evidence we have, not

1    limitation of.  This is not a Federal Rule

2    of Evidence 1006 Summary of Evidence.

3    This is the invoices that were submitted

4    to Mr. Friedberg for payment.  They are

5    not prepared buy a lawyer, they weren't

6    prepared for purpose of litigation.  What

7    we did is if I submitted my bill for

8    services to my client and the client said

9    "I want to see your individual time

10    spent."  And I might say "I don't have

11    them" or "they are on my computer 'cause I

12    do everything by computer."  That goes to

13    weight of the evidence and the fact finder

14    is saying "Well, I don't like the fact

15    that you don't have backup and so I'm not

16    gonna support."  Or can say "Well, you

17    know, this is how you normally bill and it

18    seems reasonable."  It's a fact finding

19    issue.

20                    THE COURT:  But, Attorney

21    Simpson, the scope of work basically says,

22    "X" amount of work needs to be completed

23    for "X" amount of dollars and -- and

24    the -- you know, there are times when you

25    have to make these changes -- the change

1    order so to speak, so there is

2    modification as time goes on, but there is

3    justification for that modification. And

4    the change orders need to represent

5    something that Daybreak was not able to

6    anticipate during the repair period,

7    during the construction period; right? So

8    my question then is, I understand what

9    you're saying in terms of the invoice

10    that's being billed to the defendant, to

11    the client, but at the same time it has to

12    reflect percentages of work being done.

13    So, what he's saying though is that today,

14    you know, seven years later, he's paid out

15    "X" amount of thousands of dollars,

16    there's been a substantial increase, maybe

17    what, $40,000 increase in the work, and --

18    and then just summaries basically --

19    summaries that your client cannot find

20    because the office has moved and

21    everything, but summaries that have not

22    been properly documented thus far. What

23    do you have to say?

24                ATTORNEY SIMPSON: Well,

25    first of all, the summaries they do exist.

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

1            THE COURT:   Okay.

2                        ATTORNEY SIMPSON:   And there

3    is documentation.   Just for example, as in

4    the Bill of Lading, now Mr. Friedberg just

5    sat here and told you the Bill of Lading

6    shows that only ten -- things of copper

7    were shipped.   That's not true.   The Bill

8    of Lading shows that 12 were shipped.   It

9    is Mr. Friedberg who is the plaintiff in

10   the case who testifies that only ten came

11   out of the container.   I don't know why he

12   thinks that, but the Bill of Lading shows

13   12, we paid Customs on 12, we, Mr. Huber,

14   says "We got 12 and they were used in the

15   project."   The only testimony

16   contradicting that is Mr. Huber who isn't

17   there the whole time so maybe he just

18   wasn't there when two of the copper rolls

19   came out.   So, there is supporting

20   documentation for some stuff and some

21   there isn't.   And what we're saying is,

22   Mr.  Huber's testimony and his summaries

23   and his explanations how he arrived at the

24   summaries and how they were prepared in

25   the ordinary course of his business at the

1    time, and if you find him credible you can

2    award him on that.  If you find Mr.

3    Friedberg credible even though he is

4    contradicted by the actual Bill of Lading,

5    then you find for him.  But that's a fact

6    question for trial not for a motion in

7    limine.  What he is really trying to do is

8    a summary judgment motion after the

9    deadline for summary judgment.  But even

10   if it was summary judgment there would be

11   factual questions that come down to

12   hearing the witnesses and resolving those

13   credibility issues.

14                ATTORNEY FRIEDBERG:  Your

15   Honor, may I be heard?

16                THE COURT:  Yes, you may.

17                ATTORNEY FRIEDBERG:  Thank

18   you.  Rule 26 is pretty clear.  The

19   plaintiff's got to supply the damage

20   documentation.  This hasn't been done.

21   Merely writing on a piece of paper "This

22   is what my damages are.  These are what my

23   claims are," that are produced in the

24   source documentation doesn't satisfy that.

25                Mr. Huber simply doesn't have

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

**Colloquy**

1    the information.  Whether he ever had it
2    or not he's never produced it.  And it's
3    unfortunate, but he should not be able to
4    assert a damage claim unless he can
5    document what his damages are.  And, you
6    know, this is not, you know -- if there
7    are invoices of his receipts -- Mr. Huber
8    or Daybreak was the one that instituted
9    this lawsuit shortly after the project was
10   completed.  And it was his obligation as
11   the plaintiff to have the documentation to
12   support his damage claim.  He doesn't have
13   his damage claim, documentation, and we
14   shouldn't have to go further if he hasn't
15   complied with Rule 26 and that's the
16   purpose of the motion.  We're asking the
17   Court to make a ruling that Mr. Huber --
18   excuse me, Daybreak since he cannot
19   support his damage claim shouldn't be able
20   to assert his damage claim.  It's just
21   that simple.  That's what Rule 26
22   requires.
23            ATTORNEY SIMPSON:  May I
24   address that point, Your Honor?
25            THE COURT:  Yes, you may.

Colloquy

1         ATTORNEY SIMPSON:   Rule 26
2    does not do what Attorney Friedberg says.
3    What it does is it precludes you from
4    introducing evidence that you have not
5    disclosed.  So, we can't surprise Attorney
6    Friedberg at trial with a document that
7    hasn't been disclosed in discovery.  We
8    gave an itemization as required by Rule 26
9    by the disclosure rules, we provided our
10   damage supports, if that's not sufficient
11   that's decided by the trier of fact.
12         THE COURT:  But he's saying
13   that there is no basis.  There is no
14   factual support, anything to substantiate
15   your -- the summary.
16         ATTORNEY SIMPSON:  And I'm
17   saying there is.  There is my client's
18   testimony, there's bills of ladings,
19   there's other documents.  He doesn't like
20   those documents.  And he wants to rely
21   upon his testimony only.  We don't think
22   that's gonna be found credible at the time
23   we get to trial, and we think Mr. Huber
24   will be found credible.  But, all Rule 26
25   says is, you come forward with this

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

**Colloquy**

1   evidence and if you don't come forward

2   with that evidence you don't get to use

3   that evidence at trial. It doesn't mean

4   that you can't put on evidence that you

5   have disclosed and make your claim. It's

6   just that you may decide at trial that

7   evidence that we did disclose was not

8   sufficient, but Rule 26 is not summary

9   judgment, that's Rule 56.

10            ATTORNEY FRIEDBERG:  Your

11   Honor, may I be heard?

12            THE COURT:  Yes.

13            ATTORNEY FRIEDBERG:  We

14   lodged with the Court what Mr. Huber or

15   Daybreak has produced. The Pritchard

16   versus Liggett case is pretty clear.

17   These scribbles a lot of them is

18   illegible, there is some printouts you

19   can't even read. This is not the type of

20   evidence that's gonna be admissible,

21   that's gonna support any type of summary.

22   And it's -- the question is a dope(sic) of

23   evidence and it's plaintiff's obligation

24   to produce. This is the time and place.

25   Plaintiff has not produced the damage

1    documentation.   It's not a factual

2    determination.   What was produced is

3    before the Court.   It's been lodged as

4    consideration of this motion.

5              The Court can take a look at

6    what Mr. -- what Daybreak has produced.

7    And we submit that, you know, the time to

8    document the damage claim has long since

9    passed.   And if you can't document your

10   damages you shouldn't be able to bring

11   your claim for breach of contract.   It's

12   just that simple.

13             THE COURT:   Okay.  Very well.

14   Okay.   I'll reserve on that.  What's your

15   next motion, Attorney Friedberg.

16             ATTORNEY FRIEDBERG:   It's to

17   exclude the testimony of Mr. Hendren.   Mr.

18   Hendren is a general contractor by his own

19   admission --

20             ATTORNEY GOLDBERG:   That's

21   a --

22             THE COURT:   Attorney

23   Friedberg.   Attorney Friedberg.

24             ATTORNEY FRIEDBERG:   -- he

25   has no expertise --

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

**Colloquy**

1              THE MARSHAL:  Attorney

2    Friedberg.  Hello.

3              ATTORNEY FRIEDBERG:  Yes.

4              THE COURT:  Attorney

5    Friedberg, I've already decided we're

6    going to have a separate Daubert hearing

7    for both Mr. Hendren and Mr. Sanders.

8              ATTORNEY FRIEDBERG:  Very

9    well, Your Honor.  They are Daubert

10   issues.  The next motion deals with Mr.

11   Huber and the fact that Mr. Huber has

12   worked into or merged into expert

13   testimony.  Mr. Huber was not designated

14   as an expert.  He has not prepared a

15   report.  Under Rule 702 it would be

16   inappropriate for Mr. Huber to offer

17   expert opinions in this matter.

18             THE COURT:  Well, Attorney

19   Friedberg, I'm going to grant that motion.

20   So -- I'm granting the motion to preclude

21   Mr. Huber from testifying as an expert in

22   this matter.  He is the interested party,

23   he is the plaintiff.

24             ATTORNEY FRIEDBERG:  Thank

25   you.

1            ATTORNEY GOLDBERG:   May I

2    respond, Your Honor?

3            THE COURT:   Yes, you may.

4            ATTORNEY GOLDBERG:   There is

5    no issue with precluding Mr. Huber from

6    testifying as to an expert.   But I do

7    believe he should be permitted to testify

8    under Rule 70- -- under Federal Rule of

9    Evidence 701 as a lay person.

10            THE COURT:   Yes.

11            ATTORNEY GOLDBERG:   And

12    provide his testimony, and I don't know

13    what specific issues that Mr. -- Attorney

14    Friedberg is concerned with, but I think

15    his reply goes beyond the scope of

16    allowing Mr. Huber to testify as an

17    expert.   I agree with that and I think in

18    our response we addressed we're not

19    bringing him as an expert of 702, it's

20    701, and there are multiple cases that

21    have addressed issues where there's going

22    to be -- there's going to be information

23    that's going to be brought out by Mr.

24    Huber based on his involvement in the

25    project and his position with Daybreak

1    that is going to require specialized

2    knowledge, but that goes to 701. So --

3                 THE COURT: Well, the

4    specialized knowledge that he has is it

5    any different from Mr. Sanders' or Mr.

6    Hendren?

7                 ATTORNEY GOLDBERG: Well,

8    certainly because he was involved -- I

9    mean, absolutely, 'cause he was involved

10   with contract negotiations, he was

11   involved on the project as it pertains to

12   overseeing his workers, he was involved in

13   the completion aspect, he was involved in

14   warranty issues, he was involved in --

15                 THE COURT: Okay. But that's

16   still lay testimony though?

17                 ATTORNEY GOLDBERG: Yes, Your

18   Honor.

19                 THE COURT: Right. So he can

20   testify as the lay witness but not draw

21   any opinions whatsoever.

22                 ATTORNEY GOLDBERG: Well --

23   I'm not --

24                 THE COURT: As an expert.

25                 ATTORNEY GOLDBERG: I

**Colloquy**

1    understand Your Honor's ruling, but I

2    think that -- I want to make sure we have

3    a clear understanding of Mr. Huber's

4    ability to testify. I agree he is not

5    gonna be qualified as an expert in this

6    case, but I think the case law would

7    allow, and Mr. Friedberg's own case law

8    and his reply, I think, will allow, and if

9    I may, Your Honor, just address a couple

10   cases. But -- because this comes up a lot

11   where the lines are a little bit blurred

12   as to whether you're an expert or whether

13   you're a lay person witness. And Mr.

14   Friedberg has motion citing the case of

15   Charles vs. People of the Virgin Islands.

16   And the facts in that case are a little

17   bit --

18              THE COURT: What's the cite

19   on that case?

20              ATTORNEY GOLDBERG: Yes, Your

21   Honor. And I have an extra copy if you

22   need it. 60 VI 823. And this is

23   involving doctor testimony. And it was

24   involving sexual assault and the facts are

25   a little bit, I guess, you know, personal

**Colloquy**

1    if you will or -- basically what happen
2    was, the doctor that saw this young woman
3    who came in alleging a sexual assault had
4    occurred, they had testified that their
5    examination of this young lady indicated
6    that whatever had penetrated her vagina
7    tearing her hymen did not just penetrate
8    her once but several times.  Each
9    physician testified and based on their
10   findings from their examination, and
11   taking into account their history of
12   performing these types of examinations,
13   their conclusion was that both children
14   were sexually abused.  The Court allowed
15   it saying that was based on their
16   perception of the child when they saw her
17   in the hospital, and then they were able
18   to come up with the conclusion that both
19   children were sexually abused.  And what
20   the Court said was, "Although the
21   physicians' specialized training they have
22   contributed to their ability to evaluate
23   each child's injuries.  The Superior Court
24   correctly permitted the testimony without
25   qualifying those experts given that they

1    limited their testimony to their personal

2    observations of the child, and they

3    limited their opinion testimony only to

4    that which was, and this is the critical

5    part, rationally based on their

6    perception."

7                   So, Mr. Huber, we believe he

8    should be able to testify based on his

9    perceptions, based on his dealings with

10   Mr. Friedberg and Miss Bunge, and then

11   come to a conclusion based on his -- the

12   rationally based -- come to the conclusion

13   based on his rationally based perceptions.

14   So I do think the lines are a little bit

15   blurred.  There are other cases for the

16   record I don't need to go into unless Your

17   Honor wants me to, but *International*

18   *Renting and Leasing Corp. vs. McClean*

19   which is a Third Circuit case 303 F. Supp

20   -- I'm sorry.  It's a -- yeah, 303 F. Supp

21   2d. 573.  And I think that case is

22   actually one of the better ones in our

23   favor in that regard.  Where the general

24   manager of Budget Rent-a-Car was allowed

25   to testify regarding damages to a car that

was returned to the site even though he wasn't qualified as an expert. And the Court in that case, and just very briefly said, that "Budget's Rental general manager had sufficient knowledge and expertise to provide opinion testimony under Rule 701 regarding repair cost. He was the general manager. He testified he saw the car when it was towed to the Budget's lot. That the car looked destroyed and un-fixable. He had also oversaw the repair of vehicles in the course of his duties as general manager. He had special training and certified repair auto mobiles, and his company operates it's own repair shop."

So he was allowed to provide that. That's very similar to Mr. Huber. He's got 40 years of experience in this industry, he's a licensed roofing contractor in four different states, he's operated this company for many years, and to limit his ability to testify under 701 and provide his perceptions based on his -- his conclusions based on his

**Colloquy**

1  perceptions I believe would be

2  inappropriate.

3              THE COURT:  Okay.

4              ATTORNEY FRIEDBERG:  May I be

5  heard, Your Honor?

6              THE COURT:  Yes, you may,

7  Attorney Friedberg.  Yes.

8              ATTORNEY FRIEDBERG:  Thank

9  you, Your Honor.

10             THE COURT:  You're welcome.

11             ATTORNEY FRIEDBERG:  There's

12  a big difference between a treating

13  physician and Mr. Huber.  Mr. Huber has

14  attempted in this litigation to go and

15  testify more than in his role as the

16  individual as a contractor.  He is

17  attempting to step into the roles of

18  forensic expert.  And, basically, opine

19  whether there are failures in this roof

20  and dealing with cost to repair versus

21  replacement issues.  These are issues

22  under 702 for which expert testimony is

23  required.

24             Defendants chose Mr. Hendren as

25  their expert.  You know, Mr. Huber is not

**Colloquy**

1    their expert, he is not listed as an

2    expert, or was listed as anyone who would

3    be offering any expert opinions.  It would

4    be inappropriate for Mr. Huber to render

5    opinions concerning his thought processes

6    or whatever they are, concerning after the

7    fact, after his work was done as to

8    whether the roof does or doesn't meet

9    standards, whether the roof has failures,

10   and what to do about those failures.  You

11   know Mr. Huber was the individual that

12   negotiated the contract.  He can testify

13   about that.  Mr. Huber was present before

14   the roof began.  He can testify about

15   that.  Mr. Huber was there on the first

16   day of the project; he can testify about

17   that.  Mr. Huber made one visit two or

18   three weeks into the project.  He can

19   testify about that.  Mr. Huber did not

20   visit the project at any point thereafter

21   until the lawsuit was filed and

22   accompanying Mr. Hendren.

23              So the reason the motion was

24   filed is because Mr. Huber is essentially

25   providing or feeding Mr. Hendren the

1    opinion that Mr. Hendren is going to

2    proffer.  And we want to make sure that

3    Mr. Hendren is the designated expert, they

4    are his opinions, and that Mr. Huber is

5    not essentially testifying or providing

6    Mr. -- under the guise of being an expert,

7    expert opinions.  There is a big

8    difference between 701 and 702 here.

9                        Mr. Huber should not be able to

10   come in and render after the fact

11   opinions.  This is similar to a treating

12   physician that may actually see a patient

13   and testify to what his percipient

14   observations are.  This is a whole lot

15   different situation.  For example, if the

16   treating physician was being given a

17   subsequent medical report and asked to

18   opine whether that medical report is

19   consistent or inconsistent with diagnosis

20   or prognosis.  That would be a matter of

21   expert opinion.  That's what precisely

22   what plaintiff is attempting to do here.

23   Thank you.

24                        THE COURT:  All right.  Thank

25   you.  So Mr. Huber will be able to testify

**Colloquy**

1   to the limited visits or the limited

2   inspection that he did, whether it was

3   once or twice, but he cannot testify to --

4   he is limited to his perception, but he

5   cannot testify or draw any opinions

6   primarily because he was not there as far

7   as I'm understanding.

8                ATTORNEY GOLDBERG:  May I be

9   heard, Your Honor?

10                THE COURT:  Yes.

11                ATTORNEY GOLDBERG:  I don't

12   -- I can't come before the Court and tell

13   you how many times exactly right this

14   minute that he was there.  I believe it

15   was three or four times.  But I do know

16   that after the project was completed there

17   were some punch list items.  I'm not sure

18   if Mr. Huber was there or not.  But I do

19   know that he had multiple conversations

20   with Mr. Friedberg and Miss Bunge

21   regarding whatever punch list items needed

22   to be addressed and the completion of the

23   project.  That actually corresponded that

24   I have in one of my comment -- I'm happy

25   to find it, Your Honor -- which addressed

Colloquy

1    Mr. Friedberg's content with the project.

2              You have to understand, Mr.

3    Huber was the point of contact here for

4    Friedberg and Miss Bunge. They weren't

5    going to the workers on site and asking

6    how were things progressing, how were

7    things going? Yes he wasn't there

8    actually laying the roof on, but he was

9    very much involved in the entirety of the

10   project. He is the president and owner of

11   the company. So he had his hands on the

12   dealings every day. He was talking to his

13   supervisors -- excuse me, to his workmen

14   daily as to what the progress was; how it

15   was going; were they making good time;

16   were there any problematic weather issues?

17   So, I'm not sure in a vacuum right this

18   minute -- I understand Your Honor's desire

19   and I understand that Your Honor's ruling,

20   quite frankly, but I don't know that we

21   know the extent right now of Mr. Huber's

22   ability to testify on those issues as to

23   his perceptions, because he did have daily

24   contact with his workers.

25              THE COURT: Yeah, but having

**Colloquy**

1    daily contact with your worker and him

2    being in -- him not being at the site in

3    and of itself to observe the quality of

4    work, those are two different issues.  If

5    he goes in and he does, you know, two

6    inspections or three inspections and they

7    are done probably not, you know, towards

8    the very end or after the work is

9    completed and a thorough inspection is

10   done, not just a -- just, you know, a

11   little site, you know, glimpse inspection

12   but a thorough inspection to be done, then

13   he should not be able to testify and draw

14   any opinions, especially because they will

15   be done in his favor any which way as the

16   plaintiff.  It's not, you know -- you have

17   an expert Mr. Hendren.

18              ATTORNEY GOLDBERG:  Well,

19   we're actually the defendant on that

20   particular issue.  We are the plaintiff in

21   the case but we're actually the counter-

22   -- it would be the counter defendant in

23   that particular circumstance, so the

24   burden would be on Mr. Friedberg in that

25   regard.  But, I don't know that it needs

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

Colloquy

1    to be exactly based on I've went and
2    actually looked at it.  I mean, he's
3    provided photographs.  I mean, with
4    technology these days you don't have to be
5    exactly on site to make a perception on
6    things.  His work -- he had photographs
7    that were furnished to him.  He was in
8    contact on a daily basis with his crew and
9    the people that were in charge at the
10   site.  So just 'cause he wasn't
11   necessarily right there on property, I
12   don't know that that's a limit to his
13   ability to testify.
14            THE COURT:  See I don't know
15   if pictures can do any justice though in
16   terms of, you know, a thorough inspection
17   rather than just, you know, just being on
18   the roof, you know, and doing the physical
19   inspection yourself.  So --
20            ATTORNEY GOLDBERG:  Maybe
21   Your Honor would be incline to do a
22   proffer of Mr. Huber at the time of trial
23   so that we don't get into issues that are
24   outside the scope.  I'm not sure if that
25   would be the best way to handle it.  But I

**Colloquy**

1    think we need -- we may need further

2    clarity, because the problem you have here

3    is that, you know, Mr. Huber has been

4    doing this for 40 years, so -- and the

5    whole scope of the project was -- was

6    addressed between Mr.  Friedberg and Mr.

7    Huber.  So, he's got intimate knowledge

8    regarding the entirety of the project and

9    it's gonna be very difficult for him just

10   like the doctor in Charles.  And by the

11   way, the Charles case, is Mr. Friedberg's

12   case.  That's not my case.  He cited that

13   in his reply.  So when he says doctors are

14   much different, this was his case that he

15   provided, I just found what I believe to

16   be a distinguishing factor in his case

17   that he provided, which is that those

18   doctors in that case they could testify

19   based on their perception.  They didn't

20   come to the ultimate conclusion that those

21   young women were sexually abused.  So I do

22   believe that Mr. Huber should be able to

23   testify regarding his perceptions and

24   ultimately testify that the roofs were put

25   on in a workmanlike manner.  I think.

**Colloquy**

1    that's the same thing as the Charles case.

2    THE COURT:  Okay.  Very well.

3    So -- okay.  So I'll have the proffer done

4    prior to trial as you recommended.

5    ATTORNEY GOLDBERG:  Thank

6    you, Your Honor.

7    THE COURT:  You're welcome.

8    ATTORNEY FRIEDBERG:  Your

9    Honor, may I be heard in response to Mr.

10   Goldberg?

11   THE COURT:  Yes.

12   ATTORNEY FRIEDBERG:  Thank

13   you.  The concern we have here with Mr.

14   Huber is coming in after the fact

15   rendering the ultimate opinion that it was

16   done in a workmanlike manner, that is a

17   702 issue.  And that's a lot different

18   than his perceptions at the beginning of

19   the project and of the one or two times

20   that he may have come by.  And the

21   evidence will be, there was no final

22   walkthrough by Mr. Huber or any of his

23   employees, they just simply left the

24   island.  And that will be the evidence.

25   You know, the issue whether it's

**Colloquy**

1   workmanlike or not workmanlike, that's an
2   ultimate conclusion, that's appropriate
3   matter for an expert. And, again, Mr.
4   Huber was not designated. And just like a
5   treating physician, if you want a treating
6   physician to render an opinion you
7   definitely need him as a non-retained
8   expert. That was not done in case. Mr.
9   Huber should not be able to go into
10  matters of workmanlike or non-workmanlike
11  or the roof was properly put on or the
12  failures to the roof. That's what he has
13  -- that's what Mr. Hendren has been
14  designated to do. And Mr. Huber was not
15  designated. And even assuming for sake of
16  discussion he would be, it would be
17  cumulative. The defendants already chose
18  their expert and they should be limited to
19  that expert.
20              THE COURT: Okay. Very well.
21  Thank you.
22              ATTORNEY FRIEDBERG: Thank
23  you.
24              ATTORNEY SIMPSON: I think
25  that's all the motions, Your Honor.

**Colloquy**

1              THE COURT:  Okay.  Attorney

2    Friedberg, is that it?

3              ATTORNEY FRIEDBERG:  I

4    believe so, Your Honor.  We just have the

5    Daubert ones.  And what I'd ask the Court

6    for leave to do if I can contact, reach

7    out to Mr. Sanders to find out what his

8    schedule is, and I will file with the

9    Court, you know, to let the Court know Mr.

10   Sanders' availability as well as I'll

11   lodge my trial calendar with the Court.

12             ATTORNEY GOLDBERG:  Your

13   Honor, can I comment on that?

14             THE COURT:  Yes.

15             ATTORNEY GOLDBERG:  I would

16   appreciate it if Attorney Friedberg, just

17   because scheduling has been a little bit

18   of an issue in this case, if Attorney

19   Friedberg would actually provide Mr.

20   Sanders' availability to us first so that

21   we can then cross reference so the Court

22   is not going back and forth with

23   scheduling.  And then we can come up with

24   some acceptable dates and provide a few

25   proposed dates to the Court as oppose to

**Colloquy**

1    just Mr. Sanders' 'cause obviously there's

2    several parties involved here.

3                    THE COURT:  Yes.  Okay.

4                    ATTORNEY FRIEDBERG:  That's

5    fine.  I may not be able accomplish that

6    by close of business today, if I can have

7    at least until the end of the week, Your

8    Honor, and I'll meet and confer with

9    counsel and we'll see what we can do to

10   advise the Court?

11                   THE COURT:  Okay.  So by

12   March 31st, this Friday, the availability

13   of Mr. Sanders and Mr. Hendren?

14                   ATTORNEY GOLDBERG:  Yes, Your

15   Honor.

16                   THE COURT:  Okay.  And you

17   will file a notice with the Court advising

18   the Court and then the Court will schedule

19   the date for the hearing.  And, Attorney

20   Friedberg, you have to be present.

21                   ATTORNEY FRIEDBERG:  I

22   understand, Your Honor.

23                   THE COURT:  Okay.

24                   ATTORNEY SIMPSON:  Your

25   Honor, if I might, I'd just like to point

KAI M. MULLEY, RPR, OFFICIAL COURT REPORTER II

**Colloquy**

1    out logistically, if you're incline to

2    allow additional expert examination of the

3    roof and supplemental report, that's gonna

4    affect the --

5            THE COURT:  I'll get through

6    these -- I'll get through these -- I'll

7    deal with these motions that we dealt with

8    today and then I will -- and then I will

9    deal with the availability of both parties

10   at a later time.  But you can provide it,

11   you know, you can provide the information,

12   you know, for the month of June and look

13   towards the month of June and we'll take

14   it from there.

15           ATTORNEY SIMPSON:  Thank you,

16   Your Honor.

17           ATTORNEY GOLDBERG:  Very

18   well, Your Honor.  Thank you.

19           THE COURT:  You're welcome.

20           ATTORNEY FRIEDBERG:  Just so

21   I'm sure are we done, Your Honor?

22           THE COURT:  Yes.

23           ATTORNEY FRIEDBERG:  All

24   right.  Thank you.  Have a wonderful day.

25           THE COURT:  Yes.  Thank you

**Colloquy**

1    so much.   Have wonderful day.

2                    ATTORNEY FRIEDBERG:   All

3    right.   Thank you for your accommodations.

4    Bye bye.

5                    THE COURT:   You're welcome.

6    You're excused if there is nothing else.

7    You're excused.

8                    ATTORNEY SIMPSON:   Thank you

9    again, Your Honor.

10                    THE MARSHAL:   All rise.

11                    **(Court case concluded.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF REPORTER**

2          I, KAI M. MULLEY, RPR, an Official Court

3    Reporter II of the Superior Court of the Virgin

4    Islands, do hereby certify that I did report

5    stenographically, in my professional capacity, the

6    **MOTIONS HEARING** held in the matter of **DAYBREAK INC.**

7    **DBA HUBER AND ASSOCIATES vs. THOMAS F. FRIEDBERG,**

8    **SARAH L. BUNGE, MERILL LYNCH, AND THE LAW OFFICES OF**

9    **FRIEDBERG AND BUNGE ST-10-CV-716** taken on **MARCH 28,**

10   **2017;** that I was requested to and did reduce to

11   transcript form, the following proceedings, and that

12   the **78** pages, inclusive, comprise a full, true and

13   accurate transcription of the testimony given,

14   objections of counsel, rulings of the Court, and all

15   matters to which same relate.

16          IN WITNESS WHEREOF, I have hereunto affix my

17   signature this 18TH day of MAY, 2017.

18

19

20

21

22

23   _____
                **Kai M. Mulley, RPR**
              **Official Court Reporter II**

24

25