## IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, | |
| Plaintiffs, | |
| v. | |
| DAYBREAK, INC. dba HUBER & ASSOCIATES, | **CIVIL ACTION NO. 3:19-cv-0053** |
| Defendant. | |

### PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Daybreak Inc. dba Huber & Associates, respectfully submits its response to Plaintiffs' Statement of Undisputed Facts in Support of their Opposition to Defendant's Motion for Summary Judgment and states as follows:

Plaintiffs' Statement(s) (followed by Defendant's Responses):

1(a).[1] Plaintiffs filed this District Court Action alleging one claim for breach of contract against Daybreak relating to the copper roof Daybreak installed on only one the buildings on Plaintiffs' home located at 168 Chocolate Hole, St. John, United States Virgin Islands (the "Property")—the Main Pavillion, also known as the Main House ("Main House").

**Defendant's Response: Undisputed.**

1(b).   Plaintiffs learned that Daybreak had breached the contract requirement to install cleats at specified intervals to secure the Main House roof when one entire seam opened during Hurricane Irma in 2017.

---

[1] Defendant has separated Plaintiffs' paragraphs into separate sentences to better reply to their claims.

**Defendant's Response: Disputed.** *See* **Defendant's Statement of Uncontested Material Facts (SUMF) ¶¶ 10 and 11.**

1(c).    In depositions taken in the District Court Action in 2025, Daybreak admitted for the first time that it did not install any cleats at all as required by the parties' contract on all of the hip ridge seams on the Main House and the other buildings on the Property.

**Defendant's Response: Disputed. ¶¶ 2, 3, 4, 5, 29, 30, and 32.**

1(d).    On December 14, 2025 Plaintiffs filed their own Motion for Summary Judgment based on Daybreak's admission that it breached the contract requirements to install cleats on the Main House roof.

**Defendant's Response: Disputed.** *See* **Defendant's Statement of Additional Material Facts in Support of Its Opposition to Plaintiffs' Motion for Summary Judgment ("SAMF") ¶¶ 2, 3, 4, 5, 29, 30, and 32.**

1(e).    Plaintiffs seek to receive the benefit of their bargain—replacement of the Main House roof with a copper roof properly cleated and secured as required by the contract that provides the wind resistance for which Plaintiffs paid Daybreak. *See,* Declaration of Thomas F. Friedberg in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Friedberg Decl."), ¶ 2; Plaintiffs' Motion for Summary Judgment, Doc. Nos. 86-92.

**Defendant's Response: Disputed. SAMF ¶¶ 2, 3, 4, 5, 29, 30, and 32 and SUMF ¶ 31.**

2.    On May 7, 2010 Plaintiffs entered into a contract with Defendant to manufacture and install a standing seam copper roof on the buildings on the Property (the "Contract"). The buildings that comprise Plaintiffs' residence include a Gate House, a Garage, a Guest House, a Main House, a Master Suite, a Library, a Dining Gazebo and a Beach Bar.  The Contract specifies that Plaintiffs would provide all the copper for the roofing project. *See,* Friedberg Decl., ¶ 6;

Contract, attached as Exhibit A to Friedberg Decl.

**Defendant's Response: Undisputed.**

3.      Defendant performed its work under the Contact in 2010. Prior to commencing the work under the Contract, Defendant measured the roof and agreed to perform the work required by the Contract for the sum of $187,839.00. Plaintiffs paid Defendant $230,854.97, which was in excess of the Contract price. Despite Plaintiffs having fully paid Defendant in excess of the Contract price, Defendant walked off the job prior to the final walk through and left certain portions of the roofs uncompleted. As a result of Defendant's failure to complete the job, the roofs on the Gate House and Garage leaked and caused damage. *See*, Friedberg Decl., ¶ 7.

**Defendant's Response: Disputed. SUMF ¶ 6.**

4.      In December 2010 Defendant filed an Action for Debt, Breach of Contract and to Enforce Construction Lien against Plaintiffs in the Superior Court of the Virgin Islands, Division of St. Thomas and St. John, Case No. ST-2010-CV-00716 (the "Superior Court Action"). *See*, Friedberg Decl., ¶ 8; Superior Court Action attached as Exhibit B to Friedberg Decl.

**Defendant's Response: Undisputed.**

5.      On October 5, 2012 Plaintiffs filed an Answer and Counterclaim against Defendant Daybreak ("Counterclaim") and a Third Party Claim for fraud against Defendant's principal, Barry Huber. *See*, Friedberg Decl., ¶ 9; Counterclaim attached as Exhibit C to Friedberg Decl.

**Defendant's Response: Undisputed.**

6.      Plaintiffs' Counterclaim was based on incomplete and defective work done by Defendant on the two upper buildings on the Property which had experienced water intrusion damage—the Gate House and the Garage. Plaintiffs' Counterclaim included a claim alleging that

Daybreak breached the Contract by "failing to complete the work and by walking off the job prior to the final walk through and leaving certain portions of the roofs uncompleted." The Counterclaim alleged that as a result of Daybreak's breach of contract by failing to complete their job "the roofs leak and have resulted in damage to Counterclaimants home." The breach of contract claim identified the specific damage as replacing the roof on the Gate House. *See,* Friedberg Decl., ¶ 10; Counterclaim at ¶ 9, attached as Exhibit C to Friedberg Decl.

**Defendant's Response: Disputed. *See* SUMF ¶¶ 7, 25, and 27.**

7.    The Counterclaim included a breach of warranty claim against Daybreak also based on incomplete and defective work on the Gate House roof. The Breach of Warranty claim alleges that "[t]he roof panels, specifically on the gate house, leak and are not of merchantable quality nor fit for their intended purpose." *See,* Friedberg Decl., ¶ 11; Counterclaim at ¶ 17, attached as Exhibit C to Friedberg Decl.

**Defendant's Response: Undisputed.**

8.    The Counterclaim included a claim for negligence by Daybreak based on the roof leaks in the Gatehouse and Garage that required the roofs on those upper buildings to be replaced. The Counterclaim alleged that Daybreak negligently installed flashing over the plaster that resulted in "cracking and damaging the custom colored plaster that was in place prior to the installation by Counterdefendant." The Counterclaim alleged that as a result of Daybreak's negligence the roofs on the Gate House and Garage leaked. The Main House, which is the subject of the District Court Action, was not referred to in the Superior Court Counterclaim and no claims arising out of the work on the main house were asserted in the Counterclaim. The Counterclaim alleged damages that included the cost of replacing the leaking roofs on the Gate House and replastering the areas of custom-colored plaster that were damaged by the leaking roofs. *See,*

Friedberg Decl., ¶ 12; Counterclaim at ¶ 20, attached as Exhibit C to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SUMF ¶¶ 7, 25, and 27.**

9.      The Counterclaim includes fraud claims against Daybreak and Huber based on misrepresentations they made regarding the amount of copper that would be required based on Daybreak's measurements that fraudulently induced Plaintiffs to enter into the Contract. *See*, Friedberg Decl., ¶ 13; Counterclaim at ¶¶ 23-29, Third Party Complaint at ¶¶ 5-12, attached as Exhibit C to Friedberg Decl.

**Defendant's Response: Undisputed.**

10.      At the time Plaintiffs filed their Counterclaim in the Superior Court Action, Plaintiffs had not observed leaking in any roofs installed by Daybreak except for the Gate House and Garage, which were the only buildings completed and occupied at the time. The Counterclaim does not assert claims for replacement of the roof on any buildings on the Property except for the Gate House. *See*, Friedberg Decl., ¶ 14; Counterclaim, attached as Exhibit C to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SUMF ¶¶ 8 and 9.**

11.      The Counterclaim does not allege any breach of the Contract or negligence by Daybreak relating to the Contract requirement that Daybreak install cleats to secure the copper roof at an average of 9.5 inches on center. Plaintiffs had negotiated with Daybreak to increase the number of cleats and decrease the spacing between the cleats securing the copper roofs because they had been informed that the cleats were the only source of wind protection. Because the Property is in the hurricane-prone Caribbean, Plaintiffs wanted the extra protection from wind damage. Daybreak charged an additional $10,735.00 for the extra cleats. That extra charge is reflected in the Contract. *See*, Friedberg Decl., ¶ 15; Contract, attached as Exhibit A to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SUMF ¶ 1.**

12(a).   When Plaintiffs filed the Counterclaim, they did not know that Daybreak had not complied with the Contract requirement to install cleats to secure the copper roof at any of the hip ridges on the octagonal roof of the Main House.

**Defendant's Response: Disputed.** *See* **SUMF ¶¶ 11, 12, 13, and 14.**

12(b).   In February 2019 Plaintiffs retained a contractor, Dahill Co., Inc. ("Dahill"), to perform temporary repairs of damage to the roof following Hurricane Irma.

**Defendant's Response: Undisputed.**

12(c).   At that time, Dahill removed a damaged and loosened hip ridge cap from the Main House roof to expose a section of the hip ridge seam approximately 30 feet long that had opened during Hurricane Irma.

**Defendant's Response: Disputed.** *See* **SAMF ¶ 39.**

12(d).   Dahill's inspection of the open seam revealed that Daybreak had completely failed to install any cleats in the 30-foot length of hip roof seam leaving that entire seam unsecured to the substrate below.

**Defendant's Response: Disputed.** *See* **SAMF ¶ 39.**

12(e).   Irma's hurricane-force winds caused the unsecured hip ridge seam to open and loosened the hip ridge caps that Daybreak had installed over all of the hip ridge seams on the Main House roof. *See*, Friedberg Decl., ¶ 16.

**Defendant's Response: Disputed.** *See* **SAMF ¶ 39.**

13.   Plaintiffs did not learn until Daybreak's Project Manager, Micah Cady ("Cady"), was deposed in the District Court Action on April 28, 2025, that Daybreak failed to install cleats to secure all the hip ridge seams on the Main House roof. Cady and Barry Huber, the principal  of

Daybreak, were re-deposed as "non-retained experts" on October 7, 2025. During these depositions, both Cady and Huber testified that they did not install any cleats to secure the hip ridge seams on any of the roofs on the property, and specifically, did not install any cleats to secure the hip ridge seams on the Main House that is the subject of the District Court Action. *See*, Friedberg Decl., ¶ 16.

**Defendant's Response: Disputed.** *See* **SAMF ¶¶ 32 and 33.**

14.    For the first time in Cady's deposition on April 28, 2025 Daybreak admitted that it (a) never installs cleats in hip ridge seams to secure the copper panels or pans to the substrate, (b) Daybreak did not install cleats to secure any of the hip ridge seams on any of the buildings on the Property as required by the Contract and the industry standards incorporated into the Contract, and (c) Daybreak takes the position that cleats are not required to be installed to secure the copper roofing at the hip ridges by the Contract, the industry standards incorporated into the Contract, or accepted copper roofing industry practice. *See*, Friedberg Decl., ¶ 17.

**Defendant's Response: Undisputed.**

15.    The Counterclaim does not allege a breach of the Contract's requirements for the installation of cleats to secure the copper on any of the buildings on the Property. When Plaintiffs filed the Counterclaim, they had no knowledge that there were any problems with the cleats Daybreak had installed to provide required wind protection for any of the roofs Daybreak installed on the Property. For that reason, the Counterclaim does not assert any claims for breach of contract or negligence arising from the Contract's requirement for securing the copper roofs with appropriately spaced cleats. *See*, Friedberg Decl., ¶ 18.

**Defendant's Response: Disputed.** *See* **SUMF ¶¶ 8, 9, and 10.**

16.    In 2014 Plaintiffs retained Paradigm Construction Services ("Paradigm") to prepare a Preliminary Cost of Repair of the damage claims asserted in the Superior Court Counterclaim ("Paradigm Damage Report"). *See*, Friedberg Decl., ¶ 19; Paradigm Damage Report, attached as Exhibit D to Friedberg Decl.

**Defendant's Response:  Undisputed.**

17.    Section 1.0 of the Paradigm Damage Report identified the specific roof repair costs that Plaintiffs were asserting as damages against Daybreak in the Superior Court Action. Plaintiffs asserted in the Paradigm Damage Report that only the roofs on the Gate House (Section 1.1) and the Garage (Section 1.2) required the removal of "poorly installed flashing" and the removal of "poorly installed standing seam roofing." The Paradigm Damage Report stated that only the Gatehouse and Garage required the installation of new copper flashing and new copper roofing. *See*, Exhibit D at Sections 1.1 and 1.2, p. 1 of 3.  The Paradigm Damage Report did not identify any problems with Daybreak's compliance with the Contract requirement or industry standards relating to the installation of cleats to secure the Gate House and Garage roofs to the substrate. Paradigm's cost estimate for replacing the roofs on only those two buildings was based on Paradigm's identification of sloppy and unprofessional construction of the copper roofs and flashing that resulted in leaks observed in the Gate House and Garage. Paradigm's estimated cost to replace the Gatehouse roof was $37,028.50 and the estimated cost to replace the Garage roof was $5,256.00. *See*, Friedberg Decl., ¶ 20; Paradigm Damage Report at Sections 1.1 and 1.2 at p. 1 of 3, attached as Exhibit D to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SUMF Exhibit 5.**

18.    The Paradigm Damage Report did not identify any claims or damages related to the Contract's requirement for the installation of the cleats that secured the copper roof on any of

8

the buildings on the Property. *See*, Friedberg Decl., ¶ 21; Paradigm Damage Report, attached as Exhibit D.

**Defendant's Response: Disputed.** *See* **SUMF Exhibit 5.**

19.    The Paradigm Damage Report identified only one claim for damage related to the Main House roof. Section 1.3.1 identifies the cost of $930.00 to "[r]emove and replace bad caulking" on the Main House roof. As established in the Paradigm Damage Report, the damages Plaintiffs asserted against Daybreak in their Counterclaim did not include any damage claim related to Daybreak's failure to install cleats to secure the copper on the Main House roof to the substrate below it. *See*, Friedberg Decl., ¶ 22; Paradigm Damage Report at Section 1.3.1 at p. 1 of 3, attached as Exhibit D to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SUMF Exhibit 5.**

20.    The Paradigm Damage Report included a Roof Repair requirement to move 15 vent locations on the roofs and remove and replace bad caulking at all vent pipes for a total cost of $562.50. *See*, Friedberg Decl., ¶ 23; Paradigm Damage Report at Sections 1.4.1 and 1.4.2 at p. 1 of 3, attached as Exhibit D to Friedberg Decl.

**Defendant's Response: Undisputed**

21.    Section 2.1 of the Paradigm Damage Report identified stucco repair costs for only the Gate House and the Garage where the roofs would be replaced.    Specifically,    for those two buildings Plaintiffs asserted damage claims to "[r]eplace stucco at walls where removed" on the Gatehouse (Section 2.1.3) and the Garage (Section 2.1.4). The estimated cost to repair the stucco on only those two buildings following the replacement of the roofs was $33,416.00. The Paradigm Damage Report did not assert any claims for stucco repair on the Main House because there was no claim by Plaintiffs that the Main House roof must be replaced or

repaired in a manner that would require the removal and replacement of stucco. *See*, Friedberg Decl., ¶ 24; Paradigm Damage Report, Section 2.1 at p. 2 of 3, attached as Exhibit D to the Friedberg Decl.

**Defendant's Response: Undisputed.**

22.     Section 3.1 of the Paradigm Damage Report itemized General Requirements to perform the Roof Repair and Stucco Repair work on the Gate House and Garage that Plaintiffs asserted as damages in Sections 1.0 and 2.0. The total General Requirement costs estimated by Paradigm were $14,590.00. Section 3.2 itemized the machines required to do the work at an estimated cost of $43,000.00. Section 3.3 of the Paradigm Damage Report itemized travel and lodging required to perform the roof and stucco repairs at an estimated cost of $24,896.00. The total estimate for the General Requirements for the Roof Repair and Stucco Repair was $57,590.00. *See*, Friedberg Decl., ¶ 25; Paradigm Damage Report, Section 3.0 at p. 3 of 3, attached to as Exhibit D to the Friedberg Decl.

**Defendant's Response: Undisputed.**

23.     The Paradigm Damage Report presented a total amount of $210,676.12 as the damages claimed by Plaintiffs in the Counterclaim for Daybreak's breach of contract, breach of warranty, negligence and fraud. The damage claims identified in the Paradigm Report included only the cost to replace the roofs on the Gate House and Garage. Plaintiffs' damage claims did not include replacement of the roofs on the Main House or any other buildings on the Property. *See*, Friedberg Decl., ¶ 26; Paradigm Damage Report, Section 3.0 at p. 3 of 3, attached to as Exhibit D to the Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SUMF ¶ 8 and Memorandum Opinion dated August 21, 2018 in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs'**

**Opposition to its Motion for Summary Judgment.**

24.     The Parties' Joint Discovery Plan that became an Order of the Superior Court required all fact discovery to be completed by April 30, 2014. The pre-trial Order required Daybreak and Huber to provide their expert's report and subsequently required Plaintiffs to provide their expert's report. *See*, Friedberg Decl., ¶ 27.

**Defendant's Response: Undisputed.**

25.     On March 8, 2014 Plaintiffs served a response to an interrogatory propounded by Daybreak requesting that Plaintiffs list "all damages you claim in your counterclaim." Plaintiffs responded that they were asserting costs of repair identified in the Paradigm Damage Report, a copy of which was produced in discovery, in the amount of $210,676.12. Plaintiff's interrogatory response identified the damages it was asserting against Daybreak as the $210,676.12 cost of replacing the Gate House and Garage roofs, associated stucco repairs on those buildings, a small cost to remove and replace bad caulking on the Main house roof, the relocation of 15 vents on the roofs of all buildings, and the General Requirements to perform that work. The damages asserted in the Superior Court action did not include replacement of the Main House roof. The damages asserted in Plaintiffs' discovery responses did not include any damage related to Daybreak's breach of the Contract requirements to install cleats to secure any of the copper roofs it installed on the Property. *See,* Friedberg Decl., ¶ 28; Counter Claimants Response to Interrogatory No. 18, attached as Exhibit E to Friedberg Decl.; Paradigm Damage Report, attached as Exhibit D to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **Exhibit 8 to the SUMF, Counterclaimants' Supplemental Responses to Interrogatories dated December 12, 2014 in ST-10-CV-716 .**

26.    On July 31, 2014, Daybreak and Huber were given access to the Property to have their expert conduct a physical inspection of the roofs of all the buildings. Following the inspection, Daybreak and Huber produced the report of their expert, Stephen Hendren, on August 29, 2014. *See*, Friedberg Decl., ¶ 29.

**Defendant's Response: Objection, relevancy. Disputed. *See* Memorandum Opinion dated August 21, 2018 in ST-10-CV-716 attached as attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for Summary Judgment..**

27.    On November 13, 2014 Plaintiffs served their expert disclosure identifying their roofing expert as Arthur Sanders ("Sanders") of Hoffmann Architects, Inc. ("Hoffmann"). Plaintiffs provided a copy of the Hoffmann Copper Roof Investigation report dated November 12, 2014 ("Hoffmann Expert Report"). *See*, Friedberg Decl., ¶ 30; Hoffmann Expert Report, attached as Exhibit F to Friedberg Decl.

**Defendant's Response: Memorandum Opinion dated August 21, 2018 in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for Summary Judgment.**

28.    In the Hoffmann Expert Report Sanders confirmed Paradigm's recommendation that the Gate House and Garage roofs should be replaced. With respect to the Gate House, Sanders reported that two of the four hipped roofs on the building had roof lines that intersect with stucco walls and have counterflashing installed into the applied finish, resulting in all the rooms below having leaks. Sanders reported that his water testing showed the water leakage was directly linked to infiltration at the counterflashing. *See*, Friedberg Decl., ¶ 31; Hoffmann Expert Report at p. 42, attached as Exhibit F to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **Exhibit 5 to SUMF, Arthur Sander's November 2014 Report.**

29.     With respect to the Garage roof, Sanders reported that the Garage had leaks "associated with the through wall reglets that were installed into the stucco facades at the low roof along the north wall of the building." *See*, Friedberg Decl., ¶ 32; Hoffmann Expert Report at p. 43, attached as Exhibit F to Friedberg Decl.

**Defendant's Response: Objection, relevancy.**

30.     The Hoffmann Expert Report went beyond the $ 210,676.12 damages asserted in the Paradigm Damage Report which required only replacement of the Gate House and Garage roofs. Sanders inspected the other buildings and found poor workmanship and defects and recommended the removal and replacement of all roofs on the Property. Because the replacement would involve removal of the existing roofs, installation of new weather protection, remobilizing and all the costs associated with working on St. John, Sanders provided his opinion that the probable cost of construction for the replacement of all roofs would be $759,357. *See*, Friedberg Decl., ¶ 33; Hoffmann Expert Report at p. 1, attached as Exhibit F to Friedberg Decl.

**Defendant's Response: Disputed. Memorandum Opinion dated August 21, 2018 in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for Summary Judgment.**

31.     In the Hoffmann Expert Report Sanders was critical of the quality and workmanship of Daybreak's installation of all the copper roofs on the Property. Sanders' primary criticism of the Main House roof was that Daybreak had installed copper sheets in excess of 34 feet which exceeded the industry standard of 30 feet. Sanders opined that spans of the length installed by Daybreak should have been designed with either expansion relief or as traditional

shorter lengths with transverse seams. In addition, he reported that the "nature of the architectural design with two slopes inhibits expansion along the span of the sheets," which he identified as a "flaw in design proposed by the contractor."  Sanders reported that the change in slope "creates  a hard point where expansion forces are concentrated." Sanders reported that "[t]he openings where the copper is tearing are from the concentration of stresses." *See*, Friedberg Decl., ¶ 34; Hoffmann Expert Report at pp. 1, 38-39 attached as Exhibit F to Friedberg Decl.

**Defendant's Response: Disputed. *See*, SAMF ¶¶ 17, 18, 19, 20, and 21. Memorandum Opinion dated August 21, 2018  in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for Summary Judgment.**

32.    Sanders took steps to determine if Daybreak had installed cleats to secure the copper membrane to the substrate spaced on average of 9.5 inches as required by the Contract.  In the Hoffmann Expert Report Sanders described opening "one standing seam in the field of the roof on the low sloped west side of the Main Pavilion" and finding "four cleats in this area that were spaced at 8", 10", and 9"." Sanders' finding confirmed that while Daybreak may not have exactly complied with the 9.5-inch cleat spacing requirement in the Contract, the cleats found in the standing seam were close enough to meet the "on average" requirement. As a result of this finding by Sanders in the small section of standing seam he opened on one of the Main House roof pans, Plaintiffs believed Daybreak had complied with the Contract requirement to install cleats at 9.5 inches on average on the Main House roof and all other roofs on the Property. *See*, Friedberg Decl., ¶ 35; Hoffmann Expert Report at p. 6, attached to this declaration as Exhibit F.

**Defendant's Response: Disputed. *See* SUMF ¶¶ 10, 11, and 12 and Exhibit 5 to SUMF, Sanders' November 12, 2014 report, Page 48, ¶3.**

33.     The Hoffmann Expert Report included general criticism of the condition of

Daybreak's workmanship on the ridges on the roofs that were covered with riveted ridge caps:

> Rivets used to install caps at ridges are copper with a steel mandrel. Typically they were sized too short to capture and bind together all the layers of metal in the joint. There are many cases where one side that was predrilled was open. The rivets used have steel mandrels that corrode. Although the mandrell does not function structurally after installation; the corrosion will eventually be evident.

> Ridges created at pan intersections on both the octagonal and hip roofs are capped with "u" shaped copper stalled in 10 foot lengths with an approximate 1" overlap.

> Workmanship at the ridge conditions varies. This is especially true on the Main Pavillion where the panel transitions from a low slope to the steeper slope. The turned up edge of the pans is inconsistent and at times panel edges are short leaving gaps.

*See*, Friedberg Decl., ¶ 36; Hoffmann Expert Report at pp. 17-20, attached as Exhibit F to

Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SAMF ¶ 28.**

34.     The Hoffmann Expert Report also included photographs of a section of a ridge

cap on the east side of the Main House roof showing the pan edge cut near a folded seam and an

exposed edge of the pan which created an opening for water to enter. Sanders described removing

only one section of the cap that covered that hip ridge. The total length of the hip ridge was

approximately 33 feet and Sanders opened only an approximately 2-foot section of the seam, or

approximately 6% of the total length of the hip ridge. Sanders described what they found when

they exposed the short, approximately 2-foot section of the ridge seam: "Here we found that the

pans were joined with one side lapped over the other. A section of the vertical, non-lapped side

was too short to be covered by either the lap or the cap."  The Hoffmann Expert Report included a

photograph showing the short section of open seam and states: "At this location the pans appear to

be field cut with irregular edges. There are locations where these ridge lines are not straight. This may be one case where the ridge location irregularity, created by the installers poor planning, caused one side to be short." *See*, Friedberg Decl., ¶ 37; Hoffmann Expert Report at pp. 20, 21, Photos 38, 39 and 40, attached as Exhibit F to Friedberg Decl.

**Defendant's Response: Objection, lack of foundation. Disputed. *See* Exhibit 9 to SAMF, Page J.**

35.     Sanders reported that he did not observe the presence of cleats or expansion clips in the 2-foot section of hip ridge seam he opened on the Main House roof. The spacing of the cleats in the pan seams that were previously exposed in the seam on the west side of the Main House roof were not spaced at precisely 9.5 inches but rather varied between 8 and 10 inches. Given the inconsistent spacing of the cleats on the west side, there was no reason to assume that even if there were no cleats on the approximately 2-foot section which represented about 6% of the total length of the hip ridge, that there was an absence of cleats on the remaining 31 feet, or 94%, of the remaining hip ridge. *See*, Friedberg Decl., ¶ 38.

**Defendant's Response: Objection, speculation. Disputed. *See* Exhibit 5 to SUMF, Page 45, ¶3, Sanders' November 12, 2014 report.**

36.     The Hoffmann Expert Report contained a building-by-building evaluation. The report identified the primary problem with the Main House roof was its design and construction with copper sheets that are approximately 34 feet long without the installation of expansion cleats that are recommended by the Revere Copper & Common Sense standard for spans over 30 feet. Sanders reported that Copper & Common Sense recommends that spans over 30 feet be constructed with cleats that allow for expansion with a combination of expansion and fixed cleats. Sanders reported that to his knowledge, Daybreak did not install expansion clips along with the

16

fixed cleats he had confirmed were properly spaced at an average of 9.5 inches in the standing seam Hoffmann had opened on the west side of the Main House roof. *See*, Friedberg Decl., ¶ 39; Hoffmann Expert Report at pp. 38-39, attached as Exhibit F to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SAMF ¶¶ 1, 2, 3, 4, 5, 29, 30.**

37.     Sanders also criticized Daybreak's workmanship in forming the octagonal roof intersections and opined that the single fold flap and riveted caps were neither appropriate nor traditional. Sanders identified Photos 38, 39 and 40 that show the ridge pan edges were not high enough to create a closure leading to evidence of water leaks in the Main House that Plaintiffs had not previously observed. *See*, Friedberg Decl., ¶ 40; Hoffmann Expert Report at p. 39, attached as Exhibit F to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SAMF ¶ 19.**

38.     After disclosing the Hoffmann Expert Report in November 2014, Plaintiffs supplemented their interrogatory responses in December 2014. Plaintiffs incorporated the Hoffmann Expert Report into the interrogatories asking for a description of Daybreak's "defective" construction of the "Project" and the amount of Plaintiffs' damages. Plaintiffs' supplemental interrogatory responses did not include any claims for breach of contract based on the Contract's requirement that Daybreak install cleats at an average of 9.5 inches to secure the copper roof. The Hoffmann Expert Report confirmed that when Sanders and his crew opened a seam securing the copper pan on the west side of the Main House cleats were observed to be properly spaced as required by the Contract. The Hoffmann Expert Report did not contain any finding that Daybreak had breached the 9.5-inch cleating requirement in the Contract and Plaintiffs  did not assert such a claim in their supplemental discovery responses. *See*, Friedberg Decl., ¶ 41; Hoffman Expert Report, attached as Exhibit F to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SUMF ¶¶ 25 and 26.**

39.     Following Plaintiffs' disclosure of the Hoffmann Expert Report, Daybreak filed a motion with the Superior Court seeking to have a second inspection of the Property. Daybreak claimed that the Hoffmann Expert Report expanded the damages Plaintiffs were asserting in the Counterclaim to more than the replacement of only the Gate House and Garage roofs identified in the Paradigm Damage Report. Daybreak argued it was entitled to conduct another inspection because the Hoffmann Expert Report identified for the first time defects on the Main House roof and other roofs on the Property, recommended replacement of all roofs on the Property in addition to the Gate House and Garage that were identified in the Paradigm Damage Report, and increased the damage calculation to $759,357 from the $210,676.12 in damages identified in the Paradigm Damage Report. *See,* Friedberg Decl., ¶ 42.

**Defendant's Response: Disputed. Memorandum Opinion dated August 21, 2018 in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for Summary Judgment.**

40.     The motion was heard by Superior Court Judge Adam Christian on February 2, 2015. Judge Christian rejected Daybreak's request to reopen discovery and allow it to perform another inspection. However, Judge Christian ruled that the Court would later decide on a motion in limine whether the claims asserted in the Counterclaim were limited to those asserted in the Paradigm Damage Report produced in March 2014, with its damage claim of $210,676.12 for the cost of replacing only the Gate House and Garage roofs. *See,* Friedberg Decl., ¶ 43.

**Defendant's Response: Disputed. Memorandum Opinion dated August 21, 2018 in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for Summary Judgment.**

18

41.     Judge Christian subsequently retired and the Superior Court Action was reassigned to the Hon. Renée Gumbs Carty. Daybreak and Huber filed a motion requesting an order limiting the damage claims asserted by Plaintiff in the Superior Court action to the claims listed in the Paradigm Damage Report that totaled approximately $210,000 and included only replacement of the roofs on the Gate House and Garage. On March 28, 2017 Judge Carty heard the motion along with a number of other outstanding pretrial motions. *See*, Friedberg Decl., ¶ 44.

**Defendant's Response: Disputed. Memorandum Opinion dated August 21, 2018  in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for Summary Judgment.**

42.     On April 26, 2017 Judge Carty issued an Order granting Daybreak's motion and limiting Plaintiffs' Counterclaim to the claims asserted in the Paradigm Damage Report in the amount of $210,000. *See,* Friedberg Decl., ¶ 45; Superior Court April 26, 2017 Order, attached as Exhibit G to Friedberg Decl.

**Defendant's Response: Disputed. Memorandum Opinion dated August 21, 2018  in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for Summary Judgment.**

43.     The Superior Court's April 26, 2017 Order established that Plaintiffs' claims asserted in their Counterclaim were limited to only those identified in the Paradigm Damage Report. Those claims for defective construction included replacement of the Gate House and Garage roofs, relocation of 15 vents and $930.00 to remove and repair bad caulking on the Main House roof. The Court's April 26, 2017 Order excluded from the claims asserted in the Counterclaim any defects and damages described in the Hoffmann Expert Report that went

beyond the defects and damages identified in the Paradigm Damage Report. The $210,000 damage limitation ordered by the Superior Court included only (a) the claims for defective construction of the Gate House and Garage roofs requiring the replacement of only those two roofs, (b) repairing the stucco on the Gate House and Garage following replacement of those roofs, (c) removing and replacing bad caulking on the Main House roof, (d) moving 15 vent pipes and removing and replacing associated caulking, and (e) the General Conditions for that specific work identified in the Paradigm Damage Report. *See*, Friedberg Decl., ¶ 46; Superior Court April 26, 2017 Order, attached as Exhibit G to Friedberg Decl.

**Defendant's Response: Disputed. Memorandum Opinion dated August 21, 2018 in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for Summary Judgment.**

44.     The parties prepared for trial based on the Court's April 26, 2017 Order that the claims Plaintiffs asserted in the Counterclaim were limited to only the claims identified in the Paradigm Damage Report and excluded any claims in the Hoffmann Expert Report other than those identified in the Paradigm Damage Report totaling approximately $210,000 in damages. *See*, Friedberg Decl., ¶ 47; Superior Court April 26, 2017 Order, attached as Exhibit G to Friedberg Decl.

**Defendant's Response: Disputed. Memorandum Opinion dated August 21, 2018 in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for Summary Judgment.**

45.     The Superior Court Action was still pending when Hurricane Irma struck the U.S. Virgin Islands on September 7, 2017. Following Hurricane Irma, Plaintiffs retained Hoffmann Architects and Sanders to inspect and document damage to the copper roofs on the

Property and prepare proposals and estimates for repairing the roofs. In February 2018 Sanders visited the property after services had been restored to St. John. The purpose of his visit was to identify and document the damage to the roofs throughout the property, propose specific repairs, and work with a roofing contractor to prepare a construction cost estimate. *See,* Friedberg Decl., ¶ 48.

**Defendant's Response: Undisputed.**

46.     Plaintiff Friedberg was present with Sanders when he inspected the storm damage in February 2018. Their inspection revealed that an entire hip ridge seam, more than 30 feet long, on the Main House had opened. The open hip seam was photographed by Sanders. The photograph of the open hip ridge seam taken in February 2018 is the first evidence Plaintiffs had that Daybreak had not installed cleats on an average of 9.5 inches to secure at least one entire seam of the copper membrane on the Main House roof. *See,* Friedberg Decl., ¶ 49; Open Ridge Photograph taken February 2018, attached as Exhibit H to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SUMF ¶¶ 9, 10, 11, 12, 13, 14, 15, 16, 17, and 18.**

47.     In July 2018 Plaintiffs received a copy of Hoffmann Architects' Summary of Storm Damage ("Storm Damage Report"). In his cover letter Sanders made "special note of the damage to the Main Pavilion where the copper pans were pulled upward along the hip ridge lines and now are not safely secured." Sanders estimated that over 50% of the Main House roof panels would have to be replaced and that likely many of the remaining pans would be damaged during the work. Hoffmann Architects recommended removal and replacement of the entire Main House roof. Included in the Hoffmann Report is Roof Damage Plan A102 which documents that when Sanders inspected the Main House roof in February 2018, he found that all the hip ridge caps were loosened and damaged and needed to be replaced. In the Storm Damage Summary section Sanders

21

reported that the storm damage included "uplift/displacement at ridges." *See*, Friedberg Decl., ¶ 50; Storm Damage Report and cover letter, attached as Exhibit I to Friedberg Decl.

**Defendant's Response: Disputed. *See* SUMF ¶ 48.**

48.    In February 2019 Plaintiffs hired Dahill to make temporary repairs to the roofs on the Property to stabilize them and prevent further damage from water intrusion. Dahill prepared a Project Review Report dated March 8, 2019 ("Dahill Report"). *See*, Friedberg Decl., ¶ 51; Dahill, attached as Exhibit J to Friedberg Decl.

**Defendant's Response: Disputed. *See* SAMF ¶¶ 36 and 37.**

49.    As documented in the Dahill Report and described by its Project Manager Richard Barabas ("Barabas") in his deposition, an approximately 30-foot section of a hip ridge cap on the northeast side of the Main House roof had been deformed and displaced during the hurricane and the seam had opened. Dahill removed the hip cap to expose the approximately 30-foot open hip ridge seam to inspect it. Barabas testified: "There was one seam we found that was a hip seam that we opened up and took the hip cap off to expose what was underneath. There was about thirty – a thirty foot of seam was open, and documented it and closed it back up." Dahill closed the seam by putting a new cap on and riveting it closed while making sure they riveted through all the layers of copper. Dahill documented the open hip seam in photographs taken by Barabas. *See*, Friedberg Decl., ¶ 52; Deposition of Richard Barabas ("Barabas Depo.") at 12:25-13:12; 33:21-25, attached to as Exhibit K to Friedberg Decl.; Dahill Photographs, attached as Exhibit L to Friedberg Decl.

**Defendant's Response: Defendant's Response: Disputed. *See* SAMF ¶¶ 36 and 37.**

50.    The 30-foot section of ridge seam that was opened during Hurricane Irma was not the same Main House ridge seam that Sanders inspected in 2014. The approximately 2-foot

long section of the seam that Sanders opened in 2014 is on the opposite side of the pan from the long,

approximately 30-foot section of open seam that was inspected and repaired by Dahill in 2019. Contrary to the claim made by Defendant, the hip ridge seam that failed during Hurricane Irma was not the same seam that Hoffmann Architects inspected in 2014. *See*, Friedberg Decl., ¶ 53; Main House roof plan diagram, attached as Exhibit M to Friedberg Decl.

**Defendant's Response: Disputed. *See* SAMF ¶ 15.**

51.    Dahill and Barabas reported in 2019 that their inspection and repair of the 30-foot section of the opened Main House seam revealed that that there were no cleats securing the entire seam hip ridge seam to the roof's substrate. This was the first notice Plaintiffs had that Daybreak had failed to secure at least one entire hip ridge seam on the Main House roof with cleats spaced on an average of 9.5 inches apart as required by the Contract. *See*, Friedberg Decl., ¶ 54.

**Defendant's Response: Disputed. See Exhibit 5, Page 45, ¶3 to SUMF, Sanders' November 12, 2014 report.**

52.    Because the Superior Court's April 26, 2017 Order limited the claims Plaintiffs were asserting in their Counterclaim to the replacement of the roofs on the Gate House and Garage, Plaintiffs could not assert in the Superior Court Action their claim for breach of the Contract for installation of the Main House roof. To assert their claim for breach of contract damages consisting of the cost of replacing the Main House roof, Plaintiffs filed this District Court Action on July 14, 2019. *See*, Friedberg Decl., ¶ 55; Plaintiffs' Action for Damages - Breach of Contract and Demand for Jury Trial (Document #1), attached as Exhibit N to Friedberg Decl.

**Defendant's Response: Disputed. Memorandum Opinion dated August 21, 2018  in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for**

Summary Judgment.

53(a).  The District Court Action relates only to Daybreak's breach of the Contract to install the copper roof on the Main House which was not part of the claims asserted in the Superior Court Action that was pending at the time.

**Defendant's Response: Disputed. Memorandum Opinion dated August 21, 2018  in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for Summary Judgment.**

53(b).  The gravamen of the District Court Action is not defective construction of the Main House roof.

**Defendant's Response: Disputed. *See* Exhibit 5 to SUMF.**

53(c).  The District Court Action alleges only a single cause of action for Breach of Contract alleging that Daybreak breached the Contract by failing to comply with the Contract requirement and industry standards and specifications incorporated into the Contract for the installation of cleats on the Main House roof spaced at 9.5 inches on average. Specifically, Plaintiffs allege in the District Court Action that because Daybreak did not install cleats spaced at an average of 9.5 inches as required by the Contract to secure the copper pans that make up the octagonal Main House roof, the copper pans are not secured to the substrate and are susceptible to wind damage, and the Main House roof must be replaced.

**Defendant's Response: Disputed. *See* Exhibit 5 to SUMF and Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment, Pages 15 to 16.**

54(d).  The District Court Action does not include claims for breach of contract damages related to any roofs other than the Main House roof. *See,* Friedberg Decl., ¶ 56; Action for Damages – Breach of Contract, attached as Exhibit N to Friedberg Decl.

**Defendant's Response: Undisputed.**

54.     Daybreak never acknowledged in the Superior Court Action that it did not install cleats to secure any of the hip ridges on any of the roofs on the Property. Daybreak never claimed in the Superior Court Action that it was not required to install cleats to secure the copper membrane at the hip ridges by the Contract and the industry standards incorporated into it. Daybreak made those claims for the first time in this District Court Action. *See*, Friedberg Decl., ¶ 57.

**Defendant's Response: Objection, relevancy. Disputed.** *See* **SAMF ¶¶ 4, 5, 29, 30, 31, and 35.**

55.     The first time Plaintiffs learned that Daybreak did not install cleats in any of the hip ridge seams was when its Project Manager Cady and principal Huber testified at their depositions on April 28, 2025 and October 7, 2025. Cady admitted in his deposition taken on April 28, 2025 that Daybreak did not install cleats in any of the hip ridge intersections on any of the roofs on the Property. Cady described in his April 28, 2025 deposition for the first time how Defendant connected the triangular, pie-shaped pans where they met at the roof hip ridges:

> Q. How do the two triangles - - how are they attached?
> A. I believe you're describing the hips, like, the hip corners where the hips - - when it comes to the hips. So each panel is cleated to the roof on the sides, and then when it gets to the hip, one side is turned up 1 inch, and then when the other side comes into it, that side is folded up 2 inches, and then they fold over the top of each other and lock. And then - -
> Q.     And they are put on top of the hips?
> A.     The hips, yes.  Then there's a batten cap on top of the hips.
> Q.     And what's the purpose of the batten cap?
> A.     The batten cap is to cover the seam.

*See, See,* Friedberg Decl., ¶ 58; April 28, 2025 Deposition of Micah Cady ("4/28/25 Cady Depo.") at 36:10-37:4, attached as Exhibit O to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **Exhibit 5 to the SUMF.**

56.     Cady testified for the first time in his April 28, 2025 deposition that Defendant

did not install any cleats to secure the copper panels/pans where they met at the hip ridges of the roof:

> THE WITNESS: No, because there are no cleats on the – the hip and ridge don't have any cleats. You have cleats in the body of the panel that are averaged 9 ½. There are no cleats and not needed on actual hip junctures.

*See*, Friedberg Decl., ¶ 59; 4/28/25 Cady Depo. at 39:24-40:3; 44:6-8, attached as Exhibit O to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **Exhibit 5 to the SUMF.**

57.    Daybreak designated Cady as a non-retained expert and he was deposed again on October 7, 2025. He testified that he was asked to evaluate Defendant's failure to install cleats where the copper panels met at the roof hip ridges. When asked what the SMACNA and Revere Copper & Common Sense standards provide regarding installing cleats at hip joints Cady testified: "I believe SMACNA is an option, and it is not mentioned in Copper & Common Sense. It's not in there." Cady testified that the "optional" installation of cleats at a hip ridge intersection might apply if "the panels are extra wide, you may need more cleating. But on common practice, they're installed on the edges of the panels only." *See*, Friedberg Decl., ¶ 60; Deposition of Micah Cady dated October 7, 2025 ("10/7/25 Cady Depo.") at 25:20-26:12; 26:22-27:1, attached as Exhibit P to Friedberg Decl.

**Defendant's Response: Undisputed.**

58.    In his October 7, 2025 deposition Cady conceded that there is nothing in the Contract indicating that cleats are not to be installed at the hip ridge intersections. He testified Daybreak has never installed cleats at a hip ridge intersection:

> Q.    Within the four corners of the contract is there any statement or language indicating cleats are not to be installed at the hip/ridge intersections?
> ATTORNEY COSBY: Form.
> You can answer.

> THE WITNESS.        No.
> BY ATTORNEY FRIEDBERG.      Is it your testimony that you've never
> installed clips or cleats at hip/ridge intersections?
> A.        That is correct.

In his second deposition Cady confirmed that in this roof installation Defendant did not install cleats at any of the hip ridge intersections. *See*, Friedberg Decl., ¶ 61; 10/7/25 Cady Depo. at 31:4-13; 39:1-10; 39:18-21, attached as Exhibit P to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SAMF ¶¶  4, 5, 29, 30, 31, and 35.**

59.        Both Cady and Huber testified for the first time in the District Court Action that Daybreak does not believe that the Contract and the industry standards required it to install cleats to secure any of the hip ridge seams on the Main House, or any of the other roofs on the Property. Until Daybreak made these admissions in their April 2025 and October 2025 depositions, Plaintiffs did not know that none of the hip ridge seams on the Main House (or any other buildings on the Property) were secured by cleats, and that Daybreak does not think they should be secured with cleats. *See,* Friedberg Decl., ¶ 62.

**Defendant's Response: Disputed.** *See* **Exhibit 5 to the SUMF.**

60.        Huber testified at his deposition taken on October 7, 2025 that Defendant did not install cleats at the intersection of the hip ridge seams "[b]ecause there is no specification for it." He testified: "If you refer to SMACNA and Revere, you would know it is not a requirement." *See,* Friedberg Decl., ¶ 63; October 7, 2025 Deposition of Barry Huber ("10/7/25 Huber Depo.") at 51:7-52:2, attached as Exhibit Q to Friedberg Decl.

**Defendant's Response: Undisputed.**

61.        The Superior Court Action was delayed as the Territory recovered from Hurricane Irma and then delayed further by the COVID-19 pandemic. *See,* Friedberg Decl., ¶ 64.

**Defendant's Response: Undisputed.**

62.    In late-2023 the parties began negotiating a settlement of the Superior Court Action. Different insurers were providing a defense to Daybreak in the Superior Court Action and the District Court Action; and different attorneys were hired by the insurers to defend the Superior Court Counterclaim and the District Court Action. Attorney Joseph Goldberg was retained by the insurer defending the Counterclaim in the Superior Court Action to represent Daybreak in the defense of the Counterclaim. Huber had his own personal counsel representing him to defend the fraud Counterclaim and to assert Daybreak's breach of contract claim for the payment of the additional money Daybreak alleged it was owed under the Contract. *See*, Friedberg Decl., ¶ 65.

**Defendant's Response: Objection, relevancy and disclosure of confidential information related to settlement.**

63.    Mr. Friedberg negotiated the settlement of the Superior Court Action with only Mr. Goldberg and the insurer that was providing a defense of the Counterclaim in the Superior Court Action. The insurer defending Daybreak in the District Court Action and the attorney it retained to defend that case were not involved in the negotiation of a settlement of the Superior Court Counterclaim. Huber and his personal counsel did not participate in negotiating the Superior Court settlement beyond agreeing to drop Daybreak's claim for unpaid contract funds if we were able to agree with Mr. Goldberg and the insurer on a monetary settlement of the Counterclaim. *See*, Friedberg Decl., ¶ 66.

**Defendant's Response: Objection, relevancy and disclosure of confidential information related to settlement.**

64.    The starting point for the negotiations to settle the Superior Court Counterclaim was the $210,000 in damages consisting primarily of the cost to replace the Gate House and Garage roofs as limited by the Superior Court's April 26, 2017 Order. Mr. Goldberg and the

insurer defending the Superior Court Counterclaim were not involved in the District Court Action and could not negotiate a settlement of the Main House roof replacement claim asserted in that case. The attorney and insurer defending the District Court Action did not participate in the negotiation of the settlement of the Superior Court Counterclaim and the negotiations did not include any consideration for the Main House roof replacement costs claimed in the District Court Action. *See*, Friedberg Decl., ¶ 67.

**Defendant's Response: Objection, relevancy and disclosure of confidential information related to settlement.**

65.     In order to settle the Superior Court Action Plaintiffs agreed to compromise their $210,000 damage claim and accept a reduced amount for the repair costs asserted in the Paradigm Damage Report. Plaintiffs insisted that as a condition of settlement of the Superior Court Action, the written settlement agreement must provide that the settlement and releases are limited to the damage claims asserted in the Paradigm Damage Report, as ordered by the Superior Court in its April 26, 2017 Order, and would not include the pending claim in the District Court Action for replacement of the Main House roof based on Daybreak's breach of the Contract requirement to install cleats. Counsel for Daybreak, Joseph Goldberg, and Counsel for Plaintiffs, Thomas Friedberg, agreed to include a provision in the Superior Court settlement agreement to exclude the District Court Action from any release. *See*, Friedberg Decl., ¶ 68.

**Defendant's Response: Objection, relevancy and disclosure of confidential information related to settlement.**

66.     Mr. Goldberg and Mr. Friedberg began working on drafting a confidential settlement agreement with a provision excluding the District Court Action from the release. On November 16, 2023, Daybreak filed a Notice of Settlement informing the Superior Court that the

parties had reached settlement. On November 17, 2023, the Superior Court issued an Order directing the Parties to file a Joint Dismissal with Prejudice within thirty days. *See*, Friedberg Decl., ¶ 69.

**Defendant's Response: Objection, relevancy and disclosure of confidential information related to settlement.**

67.    The Parties were not able to finalize the Settlement Agreement within the thirty days ordered by the Court but were continuing to negotiate terms. On February 23, 2024, the Superior Court issued the following Order:

> On November 16, 2023, Plaintiff filed a Notice of Settlement informing the Court that the Parties have settled their differences. This Court issued an Order on November 17, 2023, directing the Parties to file a Joint Stipulation of Dismissal within thirty (30) days. To date, the Parties have not filed a Joint Stipulation of Dismissal in this matter or filed any motion seeking further relief. The premises considered, it is hereby
> **ORDERED** that this case is Dismissed with Prejudice; and it is further
> **ORDERED** that copies of this Order shall be distributed to counsel of record.

*See*, Friedberg Decl., ¶ 70; Superior Court's February 23, 2024 Order, attached as Exhibit R to Friedberg Decl.

**Defendant's Response: Undisputed.**

68.    Understanding that the Superior Court's dismissal order was based on the parties' agreement to settle the case, counsel continued to negotiate the terms to settle only the Superior Court Action, but not the District Court Action. On June 12, 2024 the Parties finalized and executed their settlement agreement resolving the Superior Court Action. *See*, Friedberg Decl.,

¶ 71; Settlement Agreement and Release of Claimant Claims ("Superior Court Settlement Agreement"), attached as Exhibit S to Friedberg Decl.

**Defendant's Response: Disputed.** *See* **SUMF ¶¶ 14, 27, and 43.**

69.     Consistent with the agreement to exclude the District Court Action from the settlement, the Superior Court Settlement Agreement contains the following provision excluding the claims in the District Court Action from the release:

> The settlement of the above-entitled Superior Court Lawsuit does not extinguish the claims in the District Court case number 3:19-cv-0053 to the extent that District Court case does not encompass claims that were asserted in the above-entitled Superior Court case.

*See,* Friedberg Decl., ¶ 72; Superior Court Settlement Agreement at pp. 1, 3, 4, 5, attached as Exhibit S to Friedberg Decl.

**Defendant's Response: Disputed. *See* SUMF ¶¶ 14, 27, and 43.**

70.     Plaintiffs signed the Superior Court Settlement Agreement knowing that the Superior Court's April 26, 2017 Order limited the claims asserted by Plaintiffs in their Superior Court Counterclaim to the damages asserted in the Paradigm Damage Report totaling $210,000. Based on the Court's Order, the claims asserted in Plaintiffs' Superior Court Counterclaim were only damages consisting of the cost to replace the Gate House and Garage roofs, remove and replace bad caulking on the Main House roof, move all vent pipes, repair stucco on the Gate House and Garage, and the General Requirements for that work as set forth in the Paradigm Damage Report. Those claims are not encompassed in the District Court Action. The District Court Action includes only a single claim for breach of contract damages for the cost of replacing the Main House roof, which Plaintiffs were precluded by the Superior Court's April 26, 2017 Order from asserting in the Superior Court Action. *See,* Friedberg Decl., ¶ 73; Paradigm Damage Report, attached as Exhibit D to Friedberg Decl.; Superior Court April 26, 2017 Order, attached as Exhibit G to Friedberg Decl.

**Defendant's Response: Disputed. *See* SUMF ¶¶ 14, 27, and 43.**

71.     Following the execution of the Superior Court Settlement Agreement, the insurer

31

defending Daybreak in the Superior Court Action paid Plaintiffs the monetary amount they had agreed to pay to resolve only the Superior Court Action. Litigation of the District Court Action continued, with a different insurer and attorney providing Daybreak's defense. *See*, Friedberg Decl., ¶ 74.

**Defendant's Response: Disputed. *See* SUMF ¶¶ 14, 27, and 43.**

72. Plaintiffs and Daybreak continued to conduct discovery in the District Court Action, including additional inspections of the Main House roof by experts, producing expert reports and deposing the parties, experts and third-party witnesses. As discussed above, Daybreak admitted for the first time in depositions taken in April and October 2025 that it did not comply with the Contract requirement to secure the copper roof membrane with cleats on an average of 9.5 inches in any of the hip ridge seams on the Main House roof. *See*, Friedberg Decl., ¶ 75.

**Defendant's Response: Disputed. *See* Exhibit 5 to the SUMF.**

73. Plaintiffs mitigated their damages that were identified in the Paradigm Damage Report by hiring contractors in 2014 to repair the flashing and other defects that were causing leaks to the Gate House and Garage and remove and replace the bad caulking on the Main House to prevent leaks. Likewise, in 2019 Plaintiffs hired Dahill to repair the entire hip ridge seam that had been opened on the Main House roof by Hurricane Irma in 2017 and make any other repairs needed to make the Main House roof secure and weathertight. Plaintiffs have taken all reasonable steps required to prevent wind and water intrusion into the Main House and all other buildings on the Property. *See*, Friedberg Decl., ¶ 76.

**Defendant's Response: Disputed. *See* SAMF ¶ 28 and Exhibit 9 to the SUMF at 142:1-12, Deposition of Thomas Friedberg taken on March 15, 2025**

74. In this District Court Action Plaintiffs assert a claim for replacement of the Main

House roof that was excluded by the Superior Court's April 26, 2017 Order limiting the Counterclaim to the claims making up the $210,000 damage claims asserted in the Paradigm Damage Report. The April 26, 2017 Superior Court Order is *res judicata* that Plaintiffs did not assert their claim for replacement of the Main House roof in the Superior Court Action, and that claim is expressly excluded from the Superior Court settlement agreement. *See*, Friedberg Decl., ¶ 77; Superior Court April 26, 2017 Order, attached as Exhibit G to Friedberg Decl.; Plaintiffs' Action for Damages - Breach of Contract and Demand for Jury Trial (Document #1), attached as Exhibit N to Friedberg Decl.

**Defendant's Response: Disputed. *See* Memorandum Opinion dated August 21, 2018  in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for Summary Judgment.**

75.    The District Court Action is limited to only the cost to replace the Main House roof to give Plaintiffs the benefit of their bargain under the Contract. Plaintiffs' claim in the District Court Action that Daybreak breached the Contract by failing to install cleats in the Main House roof as required by the Contract was expressly excluded from the Superior Court Settlement Agreement. The District Court Action does not encompass any of the $210,000 in damages identified in the Paradigm Damage Report that the Superior Court ruled were the only claims Plaintiffs asserted in the Superior Court Action. All of the evidence regarding the Superior Court Actions and the claims asserted by Plaintiffs reveals that there is no merit to Daybreak's claim that the District Court Action is barred by the Superior Court Settlement Agreement or the doctrine of *res judicata.*

**Defendant's Response: Disputed. Memorandum Opinion dated August 21, 2018  in ST-10-CV-716 attached as Exhibit 7 to Defendant's Reply to Plaintiffs' Opposition to its Motion for**

**Summary Judgment.**

Date: January 20, 2026

<u>s/ Jeffrey C. Cosby, Esq.</u>
Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL  34994
Telephone: 772-463-8402
Facsimile: 772-463-4820

<u>s/ Andrew C. Simpson, Esq.</u>
Andrew C. Simpson, Esq.
VI Bar 451
Attorney for Defendant Daybreak Inc
2191 Church Street, Ste. 5
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone No. (340)719-3900