# Exhibit 1

# IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS

## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| DAYBREAK, INC., dba HUBER AND ASSOCIATES,<br><br>          Plaintiff,<br><br>v.<br><br>THOMAS F. FRIEDBERG, SARAH BUNGE, LAW OFFICES OF FRIEDBERG & BUNGE, AND MERRILL LYNCH CREDIT CORPORATION,<br><br>          Defendants | **CASE NO. ST-10-cv-716**<br><br>**OMNIBUS DECLARATION OF THOMAS F. FRIEDBERG IN SUPPORT OF ATTACHMENT OF EXHIBITS FOR:**<br><br>**1. MOTION IN LIMINE TO PRECLUDE BARRY HUBER FROM TESTIFYING REGARDING MATTERS REQUIRING EXPERT OPINION** |
| THOMAS F. FRIEDBERG and SARAH L. BUNGE,<br><br>          Counterclaimants,<br><br>v.<br><br>DAYBREAK, INC., and HUBER AND ASSOCIATES,<br><br>          Counterdefendants. | **2. MOTION IN LIMINE TO PRECLUDE DAYBREAK'S UNSUPPORTED CLAIM FOR DAMAGES FOR BREACH OF CONTRACT** |
| THOMAS F. FRIEDBERG and SARAH L. BUNGE,<br><br>          Third Party Plaintiffs,<br><br>v.<br><br>BARRY R. HUBER,<br><br>          Third Party Defendant. | |

I, THOMAS F. FRIEDBERG, declare:

1.      I am an attorney at law duly licensed to practice before all of the Courts of the Virgin Islands and the Courts of the State of California, and a partner in The Law Offices of Friedberg & Bunge, who are the attorneys for Defendants, Counterclaimants and Third Party Plaintiffs.

2      I have personal knowledge of the facts stated herein, and if called as a witness, could competently testify thereto.

3.      Attached as Exhibit "A" are  true and correct excerpts from the Deposition of Barry Huber.

4.      Attached as Exhibit "B" are true and correct excerpts from the Deposition of Stephen Hendren.

5.      Attached as Exhibit "C" is a true and correct copy of Barry Huber's Response to Roof Study By Hoffman Architects & Comments on Case ("Response").

6.      Attached as Exhibit "D" is a true and correct copy of Huber and Associates All Transactions for Friedberg & Bunge ("Summary").

7.      Attached as Exhibit "E" are true and correct copies of the bills of lading, entitled Goods of US Origin.

8.      Attached as Exhibit "F" are true and correct excerpts from the Deposition of Arthur Sanders.

/ / /

/ / /

/ / /

/ / /

9.      Attached as Exhibit "G" are true and correct excerpts from the Deposition of Thomas Friedberg.

I declare under penalty of perjury, under the laws of the Virgin Islands, that the foregoing is true and correct, and that this declaration is executed this 9th day of May, 2015, at St. John, Virgin Islands.

_____

Thomas F. Friedberg, Declarant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of May 2015, a true and correct copy of the

**OMNIBUS DECLARATION OF THOMAS F. FRIEDBERG IN SUPPORT OF**

**ATTACHMENT OF EXHIBITS.** was served by e-mail and US Mail to the following parties:

Andrew C. Simpson. Esq.
Emily Shoup. Esq.
**ANDREW C. SIMPSON. P.C.**
2191 Church Street. Suite 5
Chirstiansted. St. Croix. VI 00820
TEL : (340) 719-3930
FAX: (340) 719-3903
"asimpson@coralbrief.com"

Stacy L. White. Esq.
**LAW OFFICES OF STACY L. WHITE**
1142 King Street.
Christiansted. St. Croix
Virgin Islands. 00820
"stacylwhite@att.net"

Joseph Goldberg. Esq.
**COLE. SCOTT & KISSANE, P.A.**
9150 South Dadeland Boulevard. Suite 1400
PO Box 569015
Miami. Florida 33256
TEL : (305) 350-5300
FAX : (305) 373-2294
"Joe.Goldberg@csklegal.com"

# EXHIBIT "A"

IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| DAYBREAK, INC., dba ) | |
| HUBER AND ASSOCIATES, ) | CIVIL CASE NO. ST-10-cv-716 |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | |
| ) | ACTION FOR DEBT, BREACH OF |
| THOMAS F. FRIEDBERG, ) | CONTRACT AND TO ENFORCE |
| SARAH BUNGE, LAW OFFICES ) | CONSTRUCTION LIEN |
| OF FRIEDBERG & BUNGE, AND ) | |
| MERRILL LYNCH CREDIT ) | |
| CORPORATION. ) | |
| ) | |
| Defendants. ) | |
| ) | |
| —————————————— ) | |
| AND ALL RELATED ) | |
| COUNTER-CLAIMS ) | |

THE ORAL DEPOSITION OF BARRY HUBER was taken on the 31st of July, 2014 at the Law Offices of Friedberg & Bunge 5000 Estate Enighed, Office Suites II, Suites C&D, St. John, USVI between the hours of 2:07 p.m. and 5:25 p.m., Pursuant to the Federal Rules of Civil Procedure.

\*          \*          \*

Reported by:
Casmus A. Caines
Certified Reporter
P.O. Box 503094
(340) 643-2879

*DEPOSITION OF BARRY HUBER*
*July 31, 2014*                    21

```
 1      A    As much as I possibly can.

 2      Q    All right.

 3      A    And I don't hardly get any opportunity to go do it, but

 4  I just got a little bit up in Barrington, Illinois recently.

 5      Q    All right.  Prior to Barrington, Illinois when

 6  was the last time you did it?

 7      A    Oh gosh, cause that's really R&R for me.

 8      Q    But did you have any R and R down in St. John?

 9      A    Just couple site visits, one or something.  I can't

10  remember how many times I came by.

11      Q    When was the first time you were by the site?

12      A    With you.

13      Q    Did you ever make any visits to the site prior

14  to --

15      A    I thought it was you -- I think it was with you the

16  first time.  Then I -- was Chris there at the time?  I can't

17  remember.

18      Q    It's your deposition, try to find out.  How many

19  times were you in St. John?

20      A    Oh gosh.

21      Q    Let's start there.

22      A    On two or three.  I can't remember right now.

23      Q    And the first time you came down what was the

24  purpose?

25      A    I thought it was to meet with you and Sarah and to look
```

CASMUS A. CAINES - CERTIFIED REPORTER

*DEPOSITION OF BARRY HUBER*
*July 31, 2014*                    29

```
 1      A    To say for sure that I have them or I don't have them
 2  how can I?  I have explained to you what we've been through for
 3  moving.
 4      Q    I take it is you don't have them present with
 5  you; is that correct?
 6                    ATTORNEY GOLDBERG:  Object to the form.
 7      A    You mean here with me?  No, I don't have them with me.
 8  Or we would have never billed you if we didn't have them.
 9      Q    You did take a look at the request for
10  production, the documents we produced here at your
11  deposition, did you not?
12      A    I looked at this, yes.  I was given this by Joe.
13      Q    And you see Request for Production number 11?
14      A    I believe some documents were provided in relation to
15  this.
16      Q    Documents were provided but did you see -- the
17  documents you provided is that the sum total the documents
18  that you have?
19      A    That were available at the time.
20      Q    Okay.  Are there actual any specific receipts,
21  itemizing any employee expenses, any other expenses that
22  you have responsive to item number 11?
23      A    I am sure I can get them from the supplier.
24      Q    You are making certain claims for employee costs,
25  expenses and reimbursements, correct?
```

DEPOSITION OF BARRY HUBER
July 31, 2014                                    30

1     A      I think it was mostly materials if I remember right.

2     Q      You are not making any claims for employee costs,

3     expenses and reimbursements?

4            ATTORNEY GOLDBERG:  Object to the form.

5     A      There may be some.

6     Q      Do you have receipts for those employee costs,

7     expenses, or reimbursements?

8     A      On my person, no.

9     Q      Have you produced those documents for your

10    employee costs, expenses or reimbursements?

11    A      I thought there is a summary of those things.

12    Q      Have you actually produced the actual background

13    or -- excuse me -- not background but the supporting

14    documents upon which the summary was based?

15           ATTORNEY GOLDBERG:  Object to the form.

16    A      Could you repeat the question.

17           ATTORNEY FRIEDBERG:  Could you read it

18           back.

19           REPORTER CAINES:  Have you actually

20           produced the actual background or -- excuse me -- not

21           background but the supporting documents upon which the

22           -- let me scroll down.  Have you actually produced --

23           ATTORNEY FRIEDBERG:  I will repeat it.

24           That's fine.  Let me know when you're ready.

25           REPORTER CAINES:  Yes, go ahead.

CASMUS A. CAINES - CERTIFIED REPORTER

DEPOSITION OF BARRY HUBER
July 31, 2014                          31

1   Q    Have you produced the background or the -- strike

2   that.  Have you produced the supporting documents upon

3   which your summary was based?

4                     ATTORNEY GOLDBERG:   Object to the

5        form.

6   A    Not that I am aware of.

7   Q    Who produced the summary?  Who prepared the

8   summary?

9   A    I suppose Cheryl would have went back and did

10  everything she could find on Quickbooks is probably --

11  Q    And how long has Cheryl been working for you?

12  A    Beginning of the year.

13  Q    All right.  Well, who came up with these numbers

14  in 2010?

15  A    Ron Barker would have been in charge at the time.

16  Q    And what did Ron Barker based these numbers on?

17  Where is that raw data?

18  A    Good question.

19  Q    It is a good question.  Do you know where the

20  information from which Ron Barker came up with the

21  summary?

22  A    Well, of course, you understand there is a supplier

23  involved to supply material, right?

24  Q    It's my deposition, Sir.  I am trying to find out

25  where --

CASMUS A. CAINES - CERTIFIED REPORTER

DEPOSITION OF BARRY HUBER
July 31, 2014                           32

1      A     Okay.

2      Q     -- the background information is for the summary

3   that Ron Barker came up with?  Ron has certain line items,

4   and I want to know where all the documentation is?  I

5   understand about a supplier.  That's one item, all right.

6   There is lots of other line items other than a supplier.

7      A     Right.  So they would either come from a supplier.  If

8   we have them or not the supplier would still have them and the

9   employee records those should all be in Quickbooks.

10     Q     Were any employee records produced?

11                ATTORNEY GOLDBERG:  Object to the form.

12     A     I don't remember seeing any except for a summary.

13     Q     Okay.  The summary included items for which you

14   are asking for reimbursement.  My question is very simple.

15   Other than a material supplier what is the basis -- where

16   is the documents upon which that summary was based?

17     A     That's a good question.

18     Q     You don't know, do you?

19                ATTORNEY GOLDBERG:  Object to form.

20     A     Not right now.  No, I don't.

21     Q     And you are unable to tell me as we sit here

22   today, correct?

23     A     No, I cannot without further digging around.

24     Q     Okay.  As a roofer on a project you are generally

25   a subcontractor.  In other words, you are not generally

CASMUS A. CAINES - CERTIFIED REPORTER

DEPOSITION OF BARRY HUBER
July 31, 2014                                    39

1    there may be need for maintenance and that maintenance could be

2    required within a year.

3        Q    And what type of maintenance are you suggesting?

4        A    Resealing certain flashings.

5        Q    What else?

6        A    Just checking, you know abutments and walls and you

7    know checking to make sure that things are still as they are

8    suppose to be.

9        Q    Were you aware warranty claims being made on the

10   roof in St. John within roughly thirty plus days after the

11   crew left?

12       A    No.

13       Q    Were you aware that Ron Barker was advised the

14   roof was leaking within approximately thirty plus days

15   after the crew left?

16       A    No.

17       Q    Did you ever -- anyone offer to come down to take

18   a look to see what some of the issues were with the roof?

19               ATTORNEY GOLDBERG:    Object to the form,

20       predicate.

21       A    I sent people back.

22       Q    When?

23       A    After there was a couple of things that were not

24   satisfactory.

25       Q    When?

CASMUS A. CAINES - CERTIFIED REPORTER

DEPOSITION OF BARRY HUBER
July 31, 2014                    40

```
1       A    Shortly after we finish.

2       Q    Okay.  Well, let's talk about the date, the

3  finish.  What date did your crew leave?

4       A    I couldn't tell you.

5       Q    Do you recall the crew leaving prior to final

6  inspection?

7       A    Yes.

8       Q    Is that generally what your crew does?

9       A    We usually have no problems with a finish roof that we

10 installed at all.

11      Q    You agree that there are some problems with the

12 roof in St. John?

13      A    No.

14      Q    Do you agree there are some leaks that are

15 occurring?

16      A    No.

17      Q    You don't think there is any leaking from that

18 roof?

19      A    No.

20      Q    Okay.

21      A    Not from the copper work.

22      Q    What do you think is causing the leaks?

23                  ATTORNEY GOLDBERG: Object to the

24           form.

25      A    First of all, you are making an assumption that there
```

1   is leaks.  I don't see any leaks.

2       Q      Okay.

3       A      If there are any leaks in the kitchen I don't think the

4   copper roof is leaking.

5       Q      What do you think the leaks are from?

6       A      It looks like a balcony issue.

7       Q      And what do you believe the balcony issue is?

8       A      That's not my scope there.

9       Q      All right.  You are a roofer.  You don't know

10  about balconies. Is that what you're telling me?

11      A      I am just saying wasn't my scope.

12      Q      And what's your scope?

13      A      Copper roofing.

14      Q      That's it?

15      A      On your roof.

16      Q      Okay.  You aware that -- let's strike that.  You

17  aware certain areas are flashings? There is actually holes

18  in the flashings, or flashings don't meet up?

19      A      How can I say this.  Flashings by nature overlap.  So

20  what is a hole in flashing mean?

21      Q      You shouldn't be able to see daylight through it,

22  should you?

23      A      Yeah, you could.

24      Q      All right.

25      A      You should.

DEPOSITION OF BARRY HUBER
July 31, 2014                    42

1    Q    Taken all the rivets are in order?

2    A    There could be some rivets loose, yeah.

3    Q    A couple or more than couple?

4    A    More than couple.

5    Q    Yeah. What --

6    A    Maintenance.

7    Q    Rivets are suppose -- how long should rivets
8  last?

9    A    That just depends.

10   Q    What type of rivets did you used?

11   A    Copper rivets.

12   Q    Do you have the documentation as to whether or
13 not they were appropriate rivets for this environmental
14 condition?

15            ATTORNEY GOLDBERG:  Object to the form.

16   A    I am sure I can find you know.  But there is no need
17 because there are still rivets up there so there is no need to
18 even go find.  They are there in place.

19   Q    It's your testimony the rivets are all in place?

20   A    No.

21   Q    How many rivets are missing?

22   A    Who knows.

23   Q    Did you make an effort to determine that?

24            ATTORNEY GOLDBERG:  Object to form.

25   A    You mean today?

CASMUS A. CAINES - CERTIFIED REPORTER

DEPOSITION OF BARRY HUBER
July 31, 2014                                    43

1      Q       I don't know.  Have you been back there other

2  times?

3      A       No.

4      Q       Okay.

5      A       I mean after the roof was complete then we send the

6  guys back to punch it out according to your request.  We never

7  came back.  We never had a call to come back.

8      Q       I am trying to find out when the guys came back

9  because I'm a little bit lost as to that.

10     A       I can --

11     Q       What guys came back?

12     A       I am pretty sure it was Ralph and Peter.

13     Q       Yeah?

14     A       Yeah.

15     Q       And when were they back?

16     A       They are back to make sure Sarah was happy with

17 everything.

18     Q       When did they come back?

19     A       I don't know the dates.  Are you kidding.

20     Q       Do you have any documentation that would suggest

21 that they even actually came back?

22     A       I am sure I can find it.  I mean there is some

23 documentation I am not sure regarding that, the trip back.

24     Q       And what work was done when they came back?

25     A       I think there is an e-mail from Peter actually

CASMUS A. CAINES - CERTIFIED REPORTER

1  describing some of that but --

2      Q    I will love to see it.  Do you have it?

3      A    But they did.  I think there were some crooked hip

4  seams if I remember right was one of the things that wasn't

5  acceptable.  There was daylight through a ridge or something

6  that you could see, or something else.  And there was a flashing

7  that you didn't like the way it was lapped, or Sarah didn't like

8  the way it was lapped.

9      Q    Do you have that e-mail?

10                    ATTORNEY GOLDBERG:  For the record, we did

11             bring some e-mails with us that Mr. Huber has found.

12             If you will just bear with me, okay.

13                    ATTORNEY FRIEDBERG:  All right.

14                    ATTORNEY GOLDBERG:  If you want them now

15             you can keep going, and I can find them.

16                    ATTORNEY FRIEDBERG: All right, that's fine.

17                    ATTORNEY GOLDBERG:  It's up to you.

18                    ATTORNEY FRIEDBERG:  I will keep going.

19     Q    Did you ever measure the roof?

20     A    I don't remember.

21     Q    Do you customarily measure roofs before you bid

22  on them?

23     A    No, not always.

24     Q    Well, what do you base your bid on?

25     A    Plans.

DEPOSITION OF BARRY HUBER
July 31, 2014                              102

1     Q     And you see that's the exact amount of additional

2     copper that you were putting down fifteen thousand two

3     hundred and twenty-two dollars and eighty-nine cents?

4     A     Uh-huh.

5     Q     Yes?

6     A     Yes.  It looks like we -- yep.

7     Q     It looks like that was paid for, correct?

8     A     Yes, uh-hum.

9     Q     You would agree that those charges should not

10    appear on the Huber and Associates or Daybreak ledger as

11    owing?

12                    ATTORNEY GOLDBERG:  Object to the

13             form.

14    A     It's a summary of all the costs and what was not paid.

15    So, it looks like, yes, there is a payment made but there is

16    also other payments made.  There is a ten thousand dollar

17    payment made, thirty-nine thousand dollar payment made.  There

18    is a lot of payments made, but there isn't enough payments made

19    to cover the costs that we incurred.

20    Q     Okay.  Some of your costs included, for example,

21    the desire of some of your employees to change the lodging

22    that was provided, correct?

23    A     There is a lodging bill I see in here as a change

24    order.

25    Q     Lodging was provided to the employees, and they

DEPOSITION OF BARRY HUBER
July 31, 2014                        103

1   decided that they wanted to get a more how should I say it

2   upscale.  You recall any of that?

3       A    It's --

4                   ATTORNEY GOLDBERG: Is that a question?

5                   ATTORNEY FRIEDBERG:  Yeah.

6       A    Yeah.

7       Q    You recall that?

8       A    Yeah.

9       Q    You recall apparently they wanted to bring their

10  wives and girlfriends down and stay in a nice condo?

11      A    Now that I don't remember.

12      Q    And so they went and got Delbert's (phon) place

13  right over here on Enighed Pond and had really nice big

14  flat screen and granite countertops?  You remember all

15  that?

16      A    No, I don't remember that.

17      Q    And that --

18                  ATTORNEY GOLDBERG: Objection as to

19          relevance.

20                  THE WITNESS:  Exactly.

21                  ATTORNEY FRIEDBERG: It's part of the

22          bills that are in this claim, Counsel.  That's

23          what relevant.

24                  ATTORNEY GOLDBERG: Objection.

25                  ATTORNEY FRIEDBERG:  You can object

CASMUS A. CAINES - CERTIFIED REPORTER

DEPOSITION OF BARRY HUBER
July 31, 2014                           104

```
 1          all you want.

 2      Q    The bottom line is this, Mr. Huber, did you

 3  attempt to bill for the desire to improve the lodging

 4  arrangements that previously have been made so that your

 5  crew can stay in more luxurious quarters?

 6                      ATTORNEY GOLDBERG:  Object to the

 7          form.

 8      A    It looks like nine hundred dollars according to our

 9  final summary, which I would be happy to forego that in payment

10  of copper that's due.

11                      ATTORNEY GOLDBERG: Just answer the

12          questions.

13      Q    What do you think copper is due, how much?

14                      ATTORNEY GOLDBERG: Just answer his

15          questions.

16      A    The copper according to the summary here according to

17  this one it says there is a balance the book show of thirty

18  thousand.

19      Q    For copper?

20      A    No, for on the account.  And then a balance on the

21  account of 7/12/10 shows a balance owing of fifty-three

22  thousand.

23      Q    All right.  How much do you contend additional

24  copper is due?

25      A    I would have to go through this completely to give that
```

CASMUS A. CAINES - CERTIFIED REPORTER

DEPOSITION OF BARRY HUBER
July 31, 2014                            105

1    amount.

2        Q    So, it's your contention now it's fifty-three

3    thousand dollars that's due?

4                    ATTORNEY GOLDBERG:  Object to the

5           form.

6        A    There is two different summaries of transactions for

7    the Friedberg Bunge's project.  One of those shows a balance on

8    the account of fifty-three thousand.  One shows a balance on the

9    account because it shows some credits were issued of thirty

10   thousand seven hundred and thirty-one.

11                   ATTORNEY GOLDBERG:  That's okay.  You

12          should refer to this copy.

13       Q    Do you have your invoices that support what you

14   contend to be the balances, the actual invoices?  Not the

15   account summary, but the actual statements of the

16   breakdowns?

17       A    I am sure we could get some from our material supplier.

18       Q    All right.  Mr. Huber --

19                   ATTORNEY GOLDBERG:  Counsel, we could

20          do without the theatrics.

21       Q    Mr. Huber, what type of documentation would you

22   have to support your claim in this lawsuit?  You've

23   mentioned documents from material suppliers.  What else?

24                   ATTORNEY GOLDBERG:  Objection to the

25          form.

CASMUS A. CAINES - CERTIFIED REPORTER

DEPOSITION OF BARRY HUBER
July 31, 2014                    106

1    A    I will say it again, I sold my office building, a huge

2    office building.  I put files in a container, finally got the

3    files out of the container, moving them to a warehouse, finally

4    built a file room in the new office so.

5    Q    All right.  You don't have them here today; is

6    that correct?

7    A    Correct.

8    Q    You don't have any documentation confirming the

9    charges for this additional copper, correct?

10                    ATTORNEY GOLDBERG:  Form.

11                    ATTORNEY SHOUP:  Objection, form.

12   A    I can't say for sure whether I do or not in the office.

13   Q    Let's be clear, here at your properly notice

14   deposition with a document requests in which technically

15   we're at the last day of discovery except for a deposition

16   -- one deposition tomorrow you don't have with you the

17   documents to support the additional charges for copper; is

18   that correct?

19                    ATTORNEY GOLDBERG:  Object to the

20           form of the question.

21                    ATTORNEY SHOUP:  Object to form.

22                    ATTORNEY GOLDBERG: I provide it to

23           you, Counsel.  You have all your documents.

24   Q    It calls for a yes or no.

25                    ATTORNEY GOLDBERG: You can answer if

CASMUS A. CAINES - CERTIFIED REPORTER

DEPOSITION OF BARRY HUBER
July 31, 2014                    133

1  are referring to, yep.

2      Q    And it's your contention that what amount is due?

3      A    According to this form the quotes currently show thirty

4  thousand seven hundred and thirty-one dollars and eighty-seven

5  cents.

6      Q    And there is a credit not issue what's that?

7      A    I think those were credits that we were willing to give

8  at one time but because of I don't know some reason we were

9  still wondering if we should even allow them to be given.

10     Q    What were they credits for?

11     A    I am not sure.

12     Q    Well, what were the issues?

13     A    There they are listed.  It looks like there is a double

14 asterisk which refers to credits not previously issued up above.

15     Q    Right.  But I am trying to find out what those

16 pertaining to?

17     A    Credit for rosin paper, labor and material.

18     Q    Well, you agree that you didn't put the rosin

19 paper on, correct?  It was already there?

20     A    Okay.

21     Q    I am asking.  Isn't that true?

22     A    If it was over battens?

23     Q    Well, let me back up foundation and ask.  You

24 aware the roof was prep before you got there?

25     A    I think so.

CASMUS A. CAINES - CERTIFIED REPORTER

DEPOSITION OF BARRY HUBER
July 31, 2014                                    134

```
 1     Q     With rosin paper, correct?

 2     A     I don't think he put -- would have put rosin paper on.

 3     Q     Well, there would -- the roof had battens and

 4  insulation?

 5     A     Rosin paper is a different thing.

 6     Q     I understand.

 7     A     Okay.

 8     Q     Would had battens and insulation?

 9     A     I believe so.

10     Q     And then there was underlayment below that,

11  correct?

12     A     I believe so.

13     Q     And then there was rosin paper put over the

14  battens and insulation?

15     A     I don't know.

16     Q     Do you have any document showing you ship rosin

17  paper down?

18     A     No, not that I'm aware of.

19     Q     Isn't it true, in fact, that the roofs were fully

20  prep with rosin paper when your crew arrive?

21     A     No.

22     Q     It's your contention that your crew put rosin

23  paper on?

24     A     Rosin paper would disintegrate if it gets wet.  It

25  turns mushy and disintegrates.
```

CASMUS A. CAINES - CERTIFIED REPORTER

# EXHIBIT "B"

```
 1              IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS

 2                 DIVISION OF ST. THOMAS AND ST. JOHN

 3

 4    DAYBREAK, INC., d/b/a HUBER      )
      and ASSOCIATES,                  )
 5                                     )
                     Plaintiff,        )
 6                                     )
              vs.                      )  Case No. ST-10-cv-716
 7                                     )
      THOMAS F. FRIEDBERG, SARAH       )
 8    BUNGE, LAW OFFICES OF FRIEDBERG  )
      AND BUNGE, AND MERRILL LYNCH     )
 9    CREDIT CORPORATION,              )
                                       )
10                   Defendants.       )

11                           VOLUME I

12          THE ORAL DEPOSITION OF STEPHEN HENDREN was

13    taken on the 7th day of January, 2015, at the Law

14    Offices of Law Offices of Friedberg and Bunge,

15    5000 ESTATE ENIGHED, OFFICE SUITES II, Suites C&D, Cruz

16    Bay, St. Jon, U.S. Virgin Islands, between the hours of

17    10:41 a.m. and 1:06 p.m. pursuant to Notice and Federal

18    Rules of Civil Procedure.

19                   _____

20

21                       Reported by:

22                     DESIREE D. HILL
                Registered Professional Reporter
23                 Hill's Reporting Services
                      P.O. Box 307501
24               St. Thomas, Virgin Islands
                     (340) 777-6466
25
```

STEPHEN HENDREN   - DIRECT

1   sorry.

2       Q.    That's all right.  You understand what the

3   word "methodology" is?

4       A.    Yes.

5       Q.    All right.  Did you apply any methodology

6   to reach any your opinions or conclusions in this

7   case?

8       A.    We did a site inspection, and from that, I

9   took notes, and from that, I wrote my report.

10      Q.    Do you have your notes here?

11      A.    No, I do not.

12      Q.    Where are your notes?

13      A.    I would hope they would be in my office.

14      Q.    All right.  Well, tell me, how were the

15  notes written?  Were they handwritten?

16      A.    Handwritten.

17      Q.    When were they handwritten?

18      A.    During the inspection.

19      Q.    And how many pages of notes are we talking

20  about?

21      A.    Maybe two or three.

22      Q.    And what will be contained on the notes?

23      A.    The observations that I saw that day in

24  the field.

25      Q.    We're going to come back and talk at length

60

STEPHEN HENDREN  - DIRECT

```
1    Mr. Goldberg?

2         A.    That --

3               MR. GOLDBERG:  Object to form.

4         A.    They wanted an inspection.

5         Q.    Has your bill been paid?

6         A.    Yes.

7         Q.    Who paid the bill?

8         A.    Their company, Cole, Scott and --

9         Q.    You received a check from the law firm?

10        A.    Yes.

11        Q.    Have you had any other communications about

12   this case, meaning other than Mr. Goldberg?

13        A.    Mr. Huber Barry.

14        Q.    Anyone other than Mr. Huber and

15   Mr. Goldberg?

16        A.    Yourself.

17        Q.    Anyone else?  And Ms. Shoup, I understand.

18   She's a lawyer.  Anyone other than those individuals?

19        A.    No.

20        Q.    All right.  Did you ever speak to Mr. Huber

21   prior to meeting him on-site?

22        A.    No.

23        Q.    How long did you spend on site?

24        A.    Approximately an hour and a half, two

25   hours.
```

61

STEPHEN HENDREN  - DIRECT

| | | |
|---|---|---|
| 1 | Q. | Were you able to do what you wanted to do? |
| 2 | A. | Not really, no. |
| 3 | Q. | What did you want to do? |
| 4 | A. | I talked with him about water testing and |
| 5 | | doing some preliminary removal of seams, et cetera, |
| 6 | | to ascertain as to what was really there. |
| 7 | Q. | All right.  When was this discussion? |
| 8 | A. | After we left. |
| 9 | Q. | When after? |
| 10 | A. | Right after.  Like we met up here. |
| 11 | Q. | You met up here where? |
| 12 | A. | Outside by Jack's Deli. |
| 13 | Q. | What day was this conversation? |
| 14 | A. | Same day. |
| 15 | Q. | All right.  And any reason why you didn't |
| 16 | | perform any water testing? |
| 17 | A. | We weren't there long enough. |
| 18 | Q. | Well.  What type of water testing did you |
| 19 | | want to perform? |
| 20 | A. | I would like to have seen water applied to |
| 21 | | the roof beginning at a low area, wait and see if it |
| 22 | | started to leak, and then from there, move up the |
| 23 | | roof in increments so we could tell if the roof was |
| 24 | | leaking, where it was leaking. |
| 25 | Q. | What roofs did you want to water test? |

62

STEPHEN HENDREN  - DIRECT

1    A.    The roof in question where the reglets

2    were.  I believe that's the main pavilion and the

3    house where you live.  Is it called the Carriage

4    House, I think?

5    Q.    Okay.  Did you have any tools with you that

6    day?

7    A.    No.  I brought -- I just brought a ladder.

8    Q.    And we've already talked -- you don't have

9    the, at least in July of 2014, you didn't have the

10   necessary hand tools, correct, to open up seams and

11   reseam, correct?

12   A.    Eh-hmm.

13   Q.    Yes?

14   A.    Yes.

15   Q.    And in fact you actually -- have you

16   ever -- I believe we've covered this but I just want

17   to be sure.  Have you ever actually opened up the

18   seam, the standing seam copper roof or disassembled

19   one?

20   A.    No.

21   Q.    In your field notes, did you put anything

22   about that you wanted to do anything else?

23   A.    No.

24   Q.    You mentioned that to Mr. Goldberg?

25   A.    That I did not put them in the --

77

STEPHEN HENDREN  - DIRECT

```
1        Q.    All right.  And when you climbed on the
2   roofs, were you given any -- do you have -- was there
3   any restrictions to your access to the roofs?
4        A.    No.  Normal, natural impediments that we
5   had to walk around, rocks, walls.
6        Q.    You brought a ladder, correct?
7        A.    I brought a ladder.
8        Q.    And with your ladder you were able to climb
9   onto the various roofs?
10       A.    That's correct.
11       Q.    And when you were on the roofs actually
12  walking around the roofs, were you able to freely walk
13  around without impediments?
14       A.    Yes.
15       Q.    Was there any restrictions placed on your
16  ability to walk around the roofs?
17       A.    No.
18       Q.    Did you have a camera with you?
19       A.    I had a camera phone with me, yes,
20  I-phone.
21       Q.    Did you take some pictures?
22       A.    Yes.
23       Q.    Were there impediments or restrictions on
24  your taking any pictures?
25       A.    No.
```

79

STEPHEN HENDREN  - DIRECT

1    In other words --

2         A.    No.

3         Q.    -- you were able to freely photograph what

4    you wanted to photograph, correct?

5         A.    Yes.

6         Q.    With respect to the seams, were you able to

7    freely photograph what you wanted to photograph?

8         A.    Yes.

9         Q.    Inspect the reglets, were you able to

10   freely photograph what you wanted to photograph?

11        A.    Yes.

12        Q.    And that was done for each and every roof?

13        A.    Yes.  There are no reglets on each and

14   every roof but where they were, yes.

15        Q.    But my questions go to the hips, seams

16   and/or reglets.  You were able to freely look at,

17   inspect and/or photograph any of them on the property,

18   correct?

19        A.    Yes.

20        Q.    You feel you had enough time to do that?

21        A.    Yes.

22        Q.    Was there discussion regarding the amount

23   of time you thought you would need to look at the

24   roofs?

25        A.    We were told we had like a two or three

80

STEPHEN HENDREN  - DIRECT

1    hour window to look at them.

2        Q.    Was that sufficient in your opinion?

3        A.    To visually inspect the roof, yes, but to

4    take apart the roof or do any testing in that manner,

5    no.  Would have taken a lot more time.

6        Q.    You didn't have any tools to take them

7    apart, did you?

8        A.    No, I did not.

9        Q.    Are you familiar with the ASTM standards

10   for water testing?

11       A.    No.

12       Q.    Have I ever heard of -- do you know what

13   ASTM is?

14       A.    Yes, American Society for Testing

15   Materials.

16       Q..    Are you a member of any of their

17   subcommittees or committees?

18       A.    No, sir.

19       Q.    Are you familiar if there are standards

20   regarding water testing?

21       A.    No, sir.  I would have to look them up.

22             (Deposition Exhibit No. 6 was

23              marked for identification.)

24       Q.    Handing you Exhibit 6.  It is a three-page

25   document.  When was that provided to you?

STEPHEN HENDREN  -  DIRECT

1    going inside, you want to see what the moisture is, is

2    there a methodology to do that?

3        A.    Again, test the roof.

4        Q.    Assuming you don't test the roof, is there

5    any way to test the inside to see if there is any

6    moisture in the wall?

7        A.    Other than what will be visible?  Restate

8    it.

9        Q.    Sure.  How do you determine the amount of

10   moisture in the wall?

11       A.    With a moisture meter.

12       Q.    That's something you have?

13       A.    Do I have one?

14       Q.    Yes.

15       A.    No.

16       Q.    And what does a moisture meter allow you to

17   determine?

18       A.    Moisture content of the surface that

19   you're placing it against.

20       Q.    That's something you have done previously?

21       A.    Yes.

22       Q.    And I take it that's something you have

23   done.  You have done some maintenance work on some of

24   these homes in St. John?

25       A.    Normally you use it for plaster, fresh

108

STEPHEN HENDREN  - DIRECT

1    plaster, to determine the moisture content as to

2    whether it's cured and ready for paint and ready for

3    primer.

4         Q.    Okay.  Have you ever used it -- in using a

5    moisture meter, you realize certain areas of the wall

6    may have more moisture than other areas of the wall?

7         A.    Sure.

8         Q.    And certain surfaces may have more moisture

9    than other surfaces?

10        A.    Yes.

11        Q.    And they're readily available, right,

12   moisture meters?

13        A.    Yes.

14        Q.    You could come down to St. John Hardware

15   and pick one up, right?

16        A.    I'm not sure if you could get one at St.

17   John Hardware but you could certainly order them

18   online.  I can't tell you whether they have one or

19   not.

20        Q.    All right.  You looked in the gatehouse at

21   some of the interior walls, correct?

22        A.    Yes.

23        Q.    Did you use a moisture meter?

24        A.    No, I did not.

25        Q.    Any reason why you couldn't have used a

STEPHEN HENDREN   - DIRECT

1    moisture meter?

2         A.    No.

3         Q.    Is there a standard regarding the depth

4    cuts for the reglets?

5         A.    I'm not aware of it, Tom.  I would have to

6    look and see.  I don't know.

7              (Deposition Exhibit No. 11 was

8               marked for identification.)

9         Q.    I'm going to mark this 11.1, 11.2.

10   Apparently it's page two and three, and the question

11   is what is page one?

12        A.    This was part of Mr. Huber's report.

13   Isn't that in there?

14        Q.    I don't know, sir.  It was loose in the

15   photographs.

16        A.    Then I may have pulled it out.

17        Q.    Okay.  I am going to hand you that, Exhibit

18   9.  You let me know.  It seems to have page two and

19   three contained therein.

20        A.    No.  No, it doesn't.

21        Q.    So, 11 is part of the documents you got

22   from Mr. Huber?

23        A.    Yes.

24        Q.    And you received those when?

25        A.    I think this one yesterday.

112

STEPHEN HENDREN  -  DIRECT

1    pictures?

2         A.    I don't know.

3         Q.    Did you examine the wall above the sink in

4    the gatehouse?

5         A.    The kitchen?

6         Q.    Yeah, the kitchen.

7         A.    Had two sinks, yes.

8         Q.    What did you note?

9         A.    It appears there was some water damage

10   there.  Water had filtrated somehow.

11        Q.    Did you put your hand against it?

12        A.    No, I don't think so.

13        Q.    Why not?

14        A.    Didn't occur to me.

15        Q.    Were you advised during the site inspection

16   that that's been an ongoing area that has been causing

17   further damage?

18        A.    Yes.

19        Q.    All right.  And you looked at it, correct?

20        A.    Yes.

21        Q.    Didn't touch it?

22        A.    No, not that I know of.

23        Q.    Okay.  Had the ability to touch it if you

24   so desired?

25        A.    Yes.

114

STEPHEN HENDREN  - DIRECT

1          (Deposition Exhibit No. 13 was

2              marked for identification.)

3      Q.     Fair enough.  Exhibit 13, what is that?

4      A.     It's a picture of the wall inside.  I

5  believe the same area of the gatehouse, Carriage

6  House.

7      Q.     Did you take that picture?

8      A.     No.

9      Q.     Do you know who took that picture?

10      A.     No.

11      Q.     Do you know why you have that picture?

12      A.     It shows a lot of different cracking in

13  the concrete, and I was wondering as to whether or

14  not the cracking of the concrete actually was causing

15  some of the water problems.

16      Q.     The cracking of the concrete where, the

17  inside?

18      A.     Yeah.  Well, that would transmit all the

19  way through the wall.

20      Q.     Did you touch that area of the wall?

21      A.     Actually in that area I did and it was

22  moist.

23      Q.     Your report indicates there are no areas of

24  moisture you observed.

25      A.     That I observed.

STEPHEN HENDREN  - DIRECT

```
1      Q.      Right.

2      A.      That I saw.

3      Q.      Okay.  But you touched the areas that were

4    moist?

5      A.      I touched, yes, that area.  That's the

6    only area I can specifically remember where there was

7    really any moisture at all was on that wall.

8      Q.      So just so I understand, and I'm not

9    getting into a game of semantics with you, you tag

10   filed the document that in your mind that there was

11   moisture on the wall by touching it, correct?

12     A.      Yes.

13             (Deposition Exhibit No. 14 was

14              marked for identification.)

15     Q.      Exhibit 14, did you take that picture?

16     A.      No.

17     Q.      Do you know who took that picture?

18     A.      No.

19     Q.      You know why that picture was taken?

20     A.      Same reason.  But this one not only shows

21   cracking, it shows leakage around an electrical box.

22   And my question, in my mind, became where that

23   leaking came from.  Was it a roof penetration of a

24   pipe that wasn't sealed and let the water into the

25   box?  I don't know.  Just one of the questions I had.
```

124

STEPHEN HENDREN  - DIRECT

1    workmanlike manner?

2              MR. GOLDBERG:   Form.

3         A.     I have no idea.

4         Q.     Next paragraph, it talks about several

5    areas were observed.  How many areas were observed?

6         A.     I don't know the exact name of the

7    building, I'm sorry.  The large round pavilion in the

8    middle, I assume, is the main pavilion, and the one

9    next to that, the places where the unfinished plywood

10   was on the inside, that's what I'm talking about.

11        Q.     Did you in your field note -- strike that.

12   You made field notes, correct?

13        A.     Yes.

14        Q.     Did you attempt to document where you noted

15   any leaks?

16        A.     No, I did photograph those.  Those were my

17   photographs.

18        Q.     Okay.  Did you make any notes of any of

19   your observations?

20        A.     No.

21        Q.     And did you do any tac tile observations of

22   those areas that you noted in the main pavilion?

23        A.     I don't understand the question.

24        Q.     Did you touch the walls?

25        A.     Thank you.  No.

STEPHEN HENDREN  - DIRECT

1    Q.    You just looked, correct?

2    A.    Just looked.

3    Q.    Do you recall being pointed to an area of

4  the main pavilion in the great room, the area facing

5  out to the water where there was some water marking on

6  the plaster part of the ceiling?

7    A.    No, I don't recall that.

8    Q.    There was nothing preventing you from

9  touching the walls or the areas pointed out to you?

10   A.    The low walls that I can reach, yes.

11   Q.    And a wall that's higher, you had a ladder,

12  correct?

13   A.    If the ladder would fit in there, yes, I'd

14  be able to get up there, that's correct.

15   Q.    Okay.  You next talked about in the third

16  paragraph the roof leaking, the balcony above has

17  concrete walls in the floor that could be passing

18  water.  You saw where Mr. Sanders did a water test to

19  that area?

20   A.    I saw photographs of water testing --

21  well, appeared to be water testing, yes.

22   Q.    Did you see there was some discussion of

23  that particular area?

24   A.    Yes.

25   Q.    And do you recall what the conclusions

# EXHIBIT "C"

### Response to Roof Study by Hoffman Architects & Comments on Case

**First Quick Overview. No Issues or Concerns Until Years Later Pursuing Final Payment.**
First, there were NO issues, questions or concerns with the roof until the unanswered requests for final payment prompted Huber and Associates to hire an attorney to pursue the final payment. Consequently, years after the roof's completion, the request for final payment was only answered by countersuit. When in reality, all that was required by the owner was some sort of reply, comments, questions, a memo, or even, for that matter, hire an independent inspection if there was the slightest concern of the roof's integrity. Huber and Associates' communication and actions clearly showed a level of customer service to make sure they were completely happy with the project. This included sending two men after completion back to the project to do whatever they requested and certify the roof was to their satisfaction. Now these many years later, there are no issues with the roof's actual performance except an assertion of two small leaks on the roof (a roof that consists of approximately 100 different intersecting roof planes in approximately 8,000 square feet of area).

### HOFFMAN'S REPORT
**Apparent Predetermined Conclusion.**
Secondly, and more importantly, Friedburg's second hired expert, Hoffman Architects, have been hired to produce one conclusion: condemn the roof. This is not even logical when there is no challenge to over 90% of the roof's surface and its application. To do this they must consider that any part of the roof that might need attention is cause for total failure, just as if after 4 years of service a chip in a windshield and a scratch on the bumper does not dictate a new car. To uphold their conclusion they cannot consider any possibility of building maintenance, or minor alteration, or even a repair. Any party skilled in copper metal roofing is aware of any variety of alternate industry acceptable methods for installation, all of which would only dictate minor revisions.

**Use of Only One Specification.**
To help support their reasoning they only reference Revere Copper's *Copper and Common Sense*, and not SMACNA, whereas the roofing proposal clearly references both. Huber and Associates references these to maintain a standard of application. But, there are some differences between Revere Copper's *Copper and Common Sense* and SMACNA. For example, SMACNA does not require a 20oz copper drip edge as Revere does. Again, SMACNA says panel lengths of '30 feet or more' on mechanically seamed roofs whereas Revere says 30 feet. Thus, items they allege are not per spec are indeed per spec. Besides the fact that there are only 8 out of approximately 500 panels that exceed 30 feet and if that whole area was so named to be replaced it would only account for 10% of the entire roofing project. There are many other differences as well, which, along with the roof's history of performance, clearly negate any and all claims of needing a new roof.

*Note Regarding Industry Specifications. There are three major metal roofing industry guidelines referred to for proper application:*
1. *SMACNA's Standard Practice in Sheet Metal, first published in 1929.*
2. *Revere Copper's Copper and Common Sense, first published in 1945.*
3. *CDA (Copper Development Association) which was founded in the US in the early 1960's and has had contributed many publicized standards and details in the last couple of decades.*





1

**Response to Roof Study by Hoffman Architects & Comments on Case**

Point-by-point by industry standards and specifications why the roof assessment by Hoffman Architects is flawed:

1. **Panel Lengths.**
   a. **Over 30' Acceptable.** SMACNA states for standing seam roofs on page 6.11 (shown below): "Although short pans are shown in Figure 6-4, roll formed pans of lengths 30 ft. (9.14 m) or more might be used."

**STANDING SEAM ROOFS**                                                    **FIGURE 6-4 TO 6-6**

The standing seam roofing on Figures 6-4, 6-5 and 6-6 is recommended for roofs having a slope of 1 in. per foot or greater. Slopes of 3 in. per foot(88 mm/m) or less are deemed low pitch. Medium pitch slopes are those over 3:12 up through 6:12. Higher pitches are constructed the same as medium pitch but are much more difficult to work on and walk on. As pitch decreases from 3:12 making adjustments in construction detail (such as adding sealant in seams or increasing seam height) or verifying that water will

locked to the one below as shown in A, or B of Detail 3, Figure 6-5. The adjacent row of pans is next installed and the standing seams completed as in C and D of Detail 1.

Although short pans are shown in Figure 6-4, roll formed pans of lengths of 30 ft. (9.14 m) or more might be used. Seams on such pans would be machine closed.

   b. **Not the Whole Project.** Even if a 30ft panel length applied to this project there are only 4 panels, which exceed 30ft out of approximately 500 panels (less than 1% of the roof).

   c. **Expansion & Contraction.** Panel lengths are mentioned due to expansion and contraction of panels. HOWEVER, this area of the world does not have the severe contraction and expansion as other parts where winter temperatures could reach -30 degrees F and summer roof temperatures of around 185 degrees F (a 215 degree variance). Whereas roof temperatures in the USVI would be roughly between 65 degrees up to 175 degrees (a 110 degree variance). This means overall panel movement for the four panels in question is only between 1/4" to 3/8".



| | Max | Min | | | | |
|---|---|---|---|---|---|---|
| Contraction | 175 | 65 | 110 | | | |
| Expansion | 175 | 70 | 105 | | | |
| length | Movement | Temp variance | | | | 11.8 |
| 34 | 0.0000098 | 110 | 0.036652 | 0.36875 | | 32 |
| | | | | | | 11 |
| 34 | 0.0000098 | 105 | 0.034986 | 0.34375 | | 32 |

**Response to Roof Study by Hoffman Architects & Comments on Case**

2. **Hip Treatment.**
   a. **Misreported.** To begin with, Hoffman's claim that the hips are not single locked is simply not true. The image below, taken from their report, is marked to show the single lock. Additionally, the image from a mid-project site inspection clearly shows single lock from other side.



   b. **Single Rib Standing Seam.** SMACNA shows a single locking standing seam as shown here. In addition to this single rib standing seam, a riveted simple cap to improve appearance.
   c. **Alternate Acceptable Practice Not Whole Roof Replacement.** If the riveted cap were to be eliminated, and apply a different treatment, would not, by any means, or by any reason, require a total replacement. One simply option, which aligns with industry standards, and the intent of the proposal to have a 'single rib appearance', would be desired such as is shown in Revere's Supplementary Roofing Details and similar to CDA's Alternative Hip and Ridge Cap (4.2.2 or 4.2.1). CDA's 4.2.1 is shown below.





STANDING SEAM
LAID OVER 8"
FROM RIDGE

**ALTERNATIVE 1**

BNR 1/4/15

**Response to Roof Study by Hoffman Architects & Comments on Case**

A step-by-step application for the roof to implement the alternate method is shown below. Even if the hip were not single locked the method below would again negate the claim that all new panels would have to be installed.



One further point:
There was a roof installed years ago in Palm Beach County (FL) permitted for use with the following detail for capping:



4

BRII  1/4/15

**Response to Roof Study by Hoffman Architects & Comments on Case**

3. **Top or Peak Caps.** Some of those pictured look very bad. According to the crew who installed the roof it appears someone removed and replaced them. Chris Bunge (Sarah Bunge's brother) had told the crew he needed to install lightening protection and this could have been the start of such, but like other things on the project never completed. Regardless, a simple repair not requiring total replacement by any means.

EXAMPLE OF NEW CAP INSTALL



4. **20oz Copper Edges and Valleys.** SMACNA does not require this.

5. **Flashing and Leak Concerns.**
   a. **Flawed water testing.** Almost always, and for obvious reasons, leaks always narrow down to one point of entry. In the Hoffman report they specifically state water is sprayed on walls and counter flashing, yet conclude it is a certain flashing. That same area in the photo from the Hoffman report to the right, which is above the kitchen, highlights exactly where the leak area could be and all other areas do not leak.



**Response to Roof Study by Hoffman Architects & Comments on Case**

Another supposed leak around the corner shows clearly the poor water testing practice. Water testing is a very slow and careful procedure. Water on the window means flawed testing. The photo from the report below again shows other potential areas for leaks (besides their conclusions of roof related only). However, when water testing is done by spraying the entire area you lose the possibility of truly defining the leak.



b. **Even if Leaks Exist this Dictates Minor Repairs.** Even if there are leaks this does not condemn the whole roof. Even if reglets needed to be cut deeper and resealed this does not even come close to considering reroofing. Approximately 200 ft of flashing reglets out of about 6,300 lft of roof panels is a small portion of the entire roof.

c. **Pre-roof Conditions and Reglet Cutting.**

1. Before the roof work began areas where leaks are supposedly reported were not even flashed or protected and it appears those areas were in that state for at a minimum several months if not years (judging by the degradation of the exisitng membrane on the roof likely years).

2. Additionally, regarding reglet sizes consider field conditions to cut any deeper into the stucco, considering that particular stucco application, would have only served to damage the stucco. The stone walls were a mix of very irregular stone as well



as bottle fragments and pieces. Once again, if repairs are needed it is repairable. An additional option is shown below if such is needed. There are many varieties similar to one shown here (Fry Reglet)





BRH 1/4/15

**Response to Roof Study by Hoffman Architects & Comments on Case**

6. **Sewer Vent Flashings, Small Cracks at Pitch Change and Rosin Paper.**
   a. **Sewer Vent Flashings.** If necessary sewer vent flashings could be redone and a flashing panel added.
   b. **Small Cracks.** These could be repaired by adding a transition flashing at the pitch change. Extreme worst case would be to redo upper section (approximately 1/3 of main roof only or only about 10% of total project).
   c. **Red Rosin or Building Paper.** Asphalt saturated felt heats up under copper roofing and the asphalt leaches out and sticks to the metal and thus the requirement of a 'slip sheet'. Because the roof was covered with a non-asphalt saturated felt (Berger UDL) there was no need for this paper. SMACNA says rosin paper required over **asphalt saturated** felt. Revere states (after listing **saturated** roofing felt): *To prevent bonding between copper and roofing felt a layer of smooth building paper should be laid over the felt.* To further reinforce the lack of need for the resin paper on the Friedburg project CDA spec writing instructions say after mentioning non-30lb felt usage:

   DELETE ABOVE AND RETAIN BELOW IF ALTERNATIVE UNDERLAYMENT IS USED.

   F. Roofing Felt Underlayment: Asphalt saturated felt weighing not less than 30 lbs per 100 square feet.

   USE BELOW UNDER COPPER INSTALLED ON roofing felt underlayment.

   G. Paper Slip Sheet: Minimum 4-lb. red rosin-sized building paper.

   RETAIN BELOW IF BATTENS ARE INTENDED AS PART OF ROOFING WORK.

   H. Batten Bars and Strips: If size is not indicated, provide battens of nominal 2-inch (50-mm)

Cost for the paper is as shown below and should have been credited to the Owner.





**70 lb. Red Rosin Paper - 36" x 520'**



Heavy-duty coverage for floors and counters.

- Protect surfaces from moisture and debris during construction.
- Quick-and-easy cleanup.
- Durable non-adhesive paperboard made from 100% recycled fibers.

NOTE:
EACH ROLL HAS 1560 SQ. FT.

THE PROJECT WOULD HAVE REQUIRED 6 ROLLS FOR A COST OF $210

INSTALLATION IS SIMPLY TO ROLL UNDER BEFORE INSTALLING PANELS

| MODEL NO. | WIDTH | LENGTH/ ROLL | BASIS WEIGHT | LBS./ ROLL | PRICE PER ROLL | | | ADD TO CART |
|---|---|---|---|---|---|---|---|---|
| | | | | | 1 | 2 | 6+ | |
| S-20036 | 36" | 520' | 70 lb. | 36 | $39 | $37 | $35 | |

Additional Info   Email Page   Request a Catalog

# EXHIBIT "D"

2:21 PM
07/12/10

# Huber and Associates
## All Transactions for Friedberg & Bunge

| Date | Transaction All Transactions | | Now Revised |
|------|------------------------------|---|-------------|
| 05/13/2010 | Contract Amount | 187,839.00 | 187,839.00 |
| 05/24/2010 | Add'n Copper Change Order | 15,222.89 | 17,506.32 |
| 06/24/2010 | Add'n Copper Change Order | 11,525.10 | 13,253.87 |
| 06/30/2010 | Change Order Consisting Of: | 11,873.42 | 12,469.36 |
| | *Add'n Flashing Marts | 4,633.00 | 5,228.94 |
| | Flat Roof to Pitched Roof - Labor | 2,565.68 | 2,565.68 |
| | Help Chris on Eaves | 253.40 | 253.40 |
| | Vent Boots to Copper - Labor | 1,520.40 | 1,520.40 |
| | Meals & Fuel | 2,900.94 | 2,900.94 |
| 07/08/2010 | Change Order Consisting Of | 4,264.15 | 4,411.75 |
| | Last Shipment of Copper | 984.00 | 1,131.60 |
| | Labor Copper at Each Boot | 760.20 | 760.20 |
| | Lodging | 900.00 | 900.00 |
| | Meals & Fuel | 1,619.95 | 1,619.95 |
| | Sub-Total | 230,724.56 | 235,480.29 |
| | | | |
| | **CREDITS NOT PREVIOUSLY ISSUED | -5,464.00 | -4,171.09 |
| | Resin Paper L & M | 3,645.00 | 3,645.00 |
| | Excise Tax | | 526.09 |
| | Credit for Add'n Flashing Mat?s | | 0.00 |
| | Daily Clean-up (which I don't agree | | |
| | with the assessment by Chris) | 1,819.00 | 0.00 |
| | TOTAL ADJUSTED COST | 225,260.56 | 231,309.20 |
| | | | |
| 05/12/2010 | Payment | 25,000.00 | 25,000.00 |
| 05/25/2010 | Payment | 15,222.89 | 15,222.89 |
| 06/15/2010 | Payment | 37,600.00 | 37,600.00 |
| 06/22/2010 | Payment | 50,096.86 | 50,096.86 |
| 06/29/2010 | Payment | 39,700.95 | 39,700.95 |
| 07/09/2010 | Payment | 10,000.00 | 10,000.00 |
| 07/16/2010 | Payment | 22,372.19 | 22,372.19 |
| | | 199,992.69 | 199,992.69 |
| | | | |
| | Balance on Account | 25,267.87 | 31,316.51 |
| | Split Actual Copper Overage | | |
| | per Calculations in e-mail | | 0.00 |

|   |   | If Amount |   |
|---|---|-----------|---|
| FINAL AMOUNT DUE | 25,267.87 | | 31,316.51 |
| Plus **Credits not Issued | 5,464.00 | | |
| Books Currently Show | $ 30,731.87 | | |

# EXHIBIT "E"

**HUBER AND ASSOCIATES**
496 SW RING COURT
LAKE CITY, FL 32025



386-487-1027
386-755-3233
rh@huberandassociates.com
bh@huberandassociates.com

St. John Island
Friedberg/Bunge Residence
Plot #168
Estate Chocolate Hole
U.S. Virgin Islands

104
June 8, 2010
not applicable
623984
7239540

### Goods of US Origin

| Qty | Type | Description | | per item | | Amount |
|---|---|---|---|---|---|---|
| 309 | ea | Copper Flashings and Sheets – Made in USA | | $ 7.97 | $ | 2,462.73 |
| 9350 | ea | Copper Cleats – Made in USA | | $ 0.10 | $ | 935.00 |
| 10 | | 18" Rolls of Copper – 16 oz. – Made in USA | | $ 4,000.00 | $ | 40,000.00 |
| 280 | | Lead Anchors | | $ 0.35 | $ | 98.00 |
| 48 | | Sikaflex Caulk – Med Bronze | | $ 3.74 | $ | 179.52 |
| 50 | | lbs. of solder | | $ 6.75 | $ | 337.50 |
| 1500 | | #44 Rivets | | $ 0.20 | $ | 300.00 |
| 4 | BXS | SS Screws | | $ 350.00 | $ | 1,400.00 |
| 10 | pounds | Copper Nails | | $ 6.00 | $ | 60.00 |
| | | | | | $ | - |
| | | **TOOLS / MISC TOOLS (Note all tools are to be returned to U.S. (shipper):** | | | | |
| 1 | | 4.5" Grinder with Blades | | | $ | - |
| 7 | | Hammer Drill, 2 Regular Drills, 4 Impact Drills | | | $ | - |
| 7 | | Extension Cords | | | $ | - |
| 2 | | 15" Plywood Ladders | | | $ | - |
| 8 | | Scaffolding | | | $ | - |
| 1 | Box | Sheetmetal tools: Deck Tongs, Misc. Tongs, Rivet Tool, Snips, | | | $ | - |
| | | Needle nose Vice grips, Soldering Irons, Seamers, Crimpers | | | $ | - |
| | | Duck bill vise grips, C-clamp vise grimps, acetelyne, anvil | | | $ | - |
| 1 | | Sheetmetal Break – 10' | | | $ | - |
| 1 | Box | Drill Bits: 1/4 Masonary; 3/16 Masonary;1/8 Bits, #2 Phil & Sq Bits, | | | $ | - |
| 2 | Ea | Saw horses | | | $ | - |
| | | SS Screws & Copper Clips | | | | |
| | | Brooom & Dust Pan | | | | |
| 2 | EA | Mapp Set Ups | | | | |
| 1 | EA | Acetelyne Set ups | | | | |
| | | First Aid Kit | | | | |
| 2 | EA | Allen Wrench Sets | | | $ | - |

| | | | Total | $ | 45,772.75 |
|---|---|---|---|---|---|

06/22/2010 TUE 10:04  FAX 888 755 3233 Huber & Associates                          ☑001/002

*TONYA*          *770-270-5325*

**Seller/Shipper:**
**HUBER AND ASSOCIATES**
496 SW RING COURT
LAKE CITY, FL 32025

**HUBER**
**& ASSOCIATES**
Phone:  386-487-1027
Fax:    386-755-3233
E-mail: rh@huberandassociates.com
        info@huberandassociates.com

## COMMERCIAL INVOICE

Statement #:   305
Date:          June 22, 2010
Customer ID:   not applicable
Document #:
BOOKING #:     9814309

Bill To / Consignee: Cruz Bay, St. John Island
                     Law Offices of Friedberg & Bunge
c/o                  Micah Cady of Huber and Associates
                     5000 Estate Enighed, PMB 158
                     St. John, USVI 00830

### Goods of US Origin

| Qty | Type | Description | per item | Amount |
|-----|------|-------------|----------|--------|
| | | | | $ - |
| - | - | | - | $ - |
| 2 | | 18" Rolls of Copper - 16 oz. - Made in USA | $ 4,100.00 | $ 8,200.00 |
| 1 | | 20" Rolls of Copper - 16 oz. - Made in USA | $ 4,326.00 | $ 4,326.00 |
| | | | | $ - |
| | | OCEAN FREIGHT PRE-PAID | | $ - |
| | | | | $ - |
| | | INSURE CARGO | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | | $ - |
| | | | Total | $ 12,526.00 |

Reminder: Please include the statement number on your check.
Terms: Balance due in 30 days.

!

# EXHIBIT "F"

ARTHUR L. SANDERS, AIA                                    March 06, 2015
DAYBREAK vs. FRIEDBERG                                              1

```
        IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
           DIVISION OF ST. THOMAS AND ST. JOHN

CIVIL CASE NO.: ST-10-CV-716
- - - - - - - - - - - - - - - - - - - -X
DAYBREAK, INC., d/b/a               :
HUBER AND ASSOCIATES,               :
                 Plaintiff          :
                                    :
VS                                  :
                                    :
THOMAS F. FRIEDBERG, SARAH BUNGE,   :
LAW OFFICES OF FRIEDBERG & BUNGE,   :
AND MERRILL LYNCH CREDIT            :
CORPORATION,                        :
                 Defendants         :
- - - - - - - - - - - - - - - - - - -X
THOMAS F. FRIEDBERG and             :
SARAH L. BUNGE,                     :
                 Counterclaimants   :
                                    :
VS                                  :
                                    :
DAYBREAK, INC., D/B/A               :
HUBER AND ASSOCIATES,               :
                 Counterdefendants  :
- - - - - - - - - - - - - - - - - - -X
THOMAS F. FRIEDBERG and             :
SARAH L. BUNGE,                     :
                                    :
          Third Party Plaintiffs,   :
                                    :
VS                                  :
                                    :
BARRY R. HUBER,                     :
          Third Party Defendant     :
- - - - - - - - - - - - - - - - - - -X


        DEPOSITION OF ARTHUR L. SANDERS, AIA
```



```
 1            I'm sorry.  We'll get to that but we'll
 2    mark on here that this is where the standing seam
 3    was taken apart.
 4            Okay.  I'm sorry.  It's photo nine.
 5       Q    Okay.  And you've made a heavy pencil
 6    mark on that to show where -- and you have written
 7    "photo 9" on the plan drawing.
 8            Correct?
 9       A    Yes.
10       Q    Okay.  Why don't we mark that, before I
11    forget, as Exhibit 3.
12                 (THEREUPON, SANDERS EXHIBIT NO. 3,
13                 PLAN DRAWING WITH MARKINGS BY THE
14                 WITNESS INDICATING LOCATIONS, WAS
15                 MARKED FOR IDENTIFICATION.)
16    BY MR. SIMPSON:
17       Q    One of your criticisms is that rosin
18    paper was not used under this copper.
19            Correct?
20       A    I think it was just an observation that
21    it was in the contractor's proposal and it was not
22    installed.
23       Q    You understand that -- or is it your
24    understanding that because of the type of
25    underlayment on the roof, rosin paper wouldn't
```



# EXHIBIT "G"

IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

DAYBREAK, INC., dba HUBER AND          )
ASSOCIATES,                            )
                                       )
                Plaintiff,             )     Case No.
                                       )     ST-10-CV-716
        vs.                            )
                                       )     Pages 1-200
THOMAS F. FRIEDBERG, SARAH BUNGE,      )
LAW OFFICES OF FRIEDBERG & BUNGE,      )
AND MERRILL LYNCH CREDIT CORP.         )
                                       )
                Defendants.            )
------------------------------------/

* FULL CAPTION CONTINUED ON PAGE 2*


DEPOSITION OF THOMAS FRIEDBERG


Date:      Friday, August 1, 2014

Location:  Law Offices of Friedberg & Bunge
           5000 Estate Enighed
           Office Suites II, Suites C&D
           St. John, U.S. Virgin Islands


Reported by:

N. Antoinette Cérge
Certified and Licensed Court Reporter
CSR-California/Realtime Writer
P.O. Box 303426 • St. Thomas, Virgin Islands   00803
340.771.6008
caribbeanreporting@yahoo.com


Certified Original

1  what was coming out of the container?

2      A    Well, Chris is aware -- the document

3  speaks for itself, of the number of rolls of copper

4  and the machine -- which is a big machine -- and

5  there's a spool.  And I may have been present the

6  day --

7          The container had been here, but I may have

8  been present when they started to unpack some because I

9  recall that the forklift that we had on the site, the

10  side loader wasn't sufficient to pick up a coil, and we

11  had to hire Penn to bring the forklift up because of

12  the weight of the coil.  And I recall seeing our

13  forklift start to tip because of the weight.

14     Q    Do you know, though, if anybody went into

15  the container and counted off there were "X" numbers

16  of coils of copper in the container when it first

17  arrived?

18     A    According to the shipping manifest,

19  there's supposed to be ten.

20     Q    I understand that, and that would have

21  been completed prior to being shipped.  But that's

22  what I'm getting at.

23          When it arrived on your property, did anyone

24  go into the container and confirm that there's ten

25  coils?

159

1    A    All I know is there was supposed to be a
2    total of thirteen that were shipped -- ten would fit
3    in -- and three which were there were going to be
4    shipped down; they were already available.  Because
5    a total of thirteen rolls were needed.
6        Q    When you said three that were there were
7    going to be shipped in, you mean three that were in
8    Florida were going to be shipped down to St. John?
9        A    Before the project started, Huber said
10   total of thirteen rolls.  "Seven are from the prior
11   person.  You need five more."  So --
12       Q    That's only twelve.
13       A    All right.  I'm off.  All right.
14       Q    Okay.
15       A    Bottom line is not all the rolls that
16   needed to come down came down.
17       Q    Because they couldn't fit in the
18   container?
19       A    That's what I was led to believe.
20       Q    Okay.  So the only thing I'm trying to get
21   at, on the Shipping Manifest there's supposed to be
22   ten rolls in the container.  Did anyone -- when that
23   container arrived on your property did anyone go
24   into the container to confirm that there were ten
25   rolls?

160

1      A      There were supposed to be all the rolls

2  that were necessary.  There were supposed to be more

3  than ten, is the point I'm trying to make.  And

4  presumably only ten arrived because that's what

5  Huber put on the manifest.  But that wasn't the

6  amount that he said was necessary or that had been

7  arranged and purchased.

8      Q      Okay.  But ten were on the manifest, and

9  ten arrived?

10     A      Well, but there are supposed to be five

11  additional rolls supplied that were bought and paid

12  for.  They didn't all -- all of the rolls of copper

13  did not arrive.

14     Q      Okay.  But that's kind of a different

15  issue.

16            My question is, ten rolls of copper were on

17  the manifest, and ten arrived at the dock?

18     A      I don't know.  All I know is that we were

19  told before the container shipped that arrangements

20  had been made financially for all the copper that

21  was necessary.  Five rolls needed to be supplied by

22  Huber; seven were obtained from the prior person.

23  They were all supposed to come down at the same

24  time; apparently they didn't.  Apparently it was

25  short.