**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, | **ACTION NO. 3:19-cv-0053-RAM-EAH** |
| Plaintiffs, | **ACTION FOR DAMAGES** |
| v. | |
| DAYBREAK, INC. dba HUBER & ASSOCIATES, | |
| Defendant. | |

**JOINT FINAL PRETRIAL ORDER**

The following shall constitute the Joint Final Pretrial Order pursuant to Rule 16(e) of the

Federal Rules of Civil Procedure and L.R.Ci.16.1(b) and this Final Pretrial Order shall govern the

conduct of the trial in this case.

1. **APPEARANCES**

    **For the Plaintiffs:**

    Thomas F. Friedberg, Esq. (VI 1006)
    Law Offices of Friedberg & Bunge
    1005 Rosecrans Street, Suite 202
    PO Box 6814
    San Diego, California 92166

    Brian Glasser, Esq. (*Pro hac vice pending*)
    Bailey & Glasser , LLP
    1055 Thomas Jefferson Street NW, Suite 540
    Washington, D.C. 20027

    David L. Selby, II, Esq. (*Pro hac vice pending*)
    Bailey & Glasser , LLP
    3000 Riverchase Galleria, Suite 905
    Birmingham, AL 35244

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 2

_____

**For the Defendant:**

Jeffrey C. Cosby, Esq. (*Pro hac vice*)
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994

Andrew C. Simpson, Esq.
Andrew C. Simpson, PC
2191 Church St., Ste. 5
Christiansted, VI 00820

## II.    NATURE OF ACTION AND JURISDICTION OF THE COURT

This case is a single cause of action for damages based on Defendant's alleged breach of contract. The purpose of this contract between Plaintiffs and Defendant was to manufacture and install a standing seam copper roof on Plaintiffs' main pavilion structure located at 168 Chocolate Hole, St. John, United States Virgin Islands. This action is brought pursuant to the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs and Defendant are citizens of different states, and the amount in controversy exceeds $75,000.

## III.    FACTUAL CONTENTIONS OF THE PLAINTIFFS:

### A.    The Parties' Contract

On May 7, 2010, Plaintiffs and Defendant entered into a contract for the manufacture and installation of copper standing seam roofs on all the buildings in the project, including the Main Pavillion (the "Contract").   The Contract required Defendant to install a copper standing seam roof system and required Defendant to install cleats to secure the copper roofing at an agreed spacing averaging 9.5 inches on center.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 3

_____

### B.     The Contract Required Defendant to Comply with Industry Standards that Include Securing the Copper Roof with Cleats

The Contract incorporates two specific industry standards with which Defendant was required to comply: (a) Revere Copper & Common Sense ("Revere C&CS"), and (b) the Sheet Metal and Air Conditioning Contractors' National Association, Inc. ("SMACNA").

Standing seam roofing involves joining sheets or strips of copper with seams that are elevated above the roof's surface.   This method provides a weathertight copper membrane. Standing seam roofing may be formed from sheets, strips and/or rolls of copper.   Individual panels can be formed with hand tools, on sheet metal brakes (power or manually operated), or with portable pan-forming equipment.   Panels can be connected to form pans; and both panels and pans are secured to the substrate in the same manner.

The octagonal roof on the Main House was designed as a series of copper panels forming triangular-shaped pans connected where the ends of the panels making up the pans meet at the hip ridges of the roof.   The panels are joined together to form pans with one edge of each panel secured to the substrate with cleats; and the pans are joined by creating a seam where they meet at the roof's hip ridge lines.   Seams connecting the edges of the panels within the pans, and the seams formed where the pans meet and connect at the roof's hip ridges, can be finished (completed and closed) with a variety of hand and power tools.   In the case of the octagonal design of the Main House roof, the ends of the panels forming the triangular pans are cut at an angle and seamed to the cut ends of the corresponding panels making up the next pan where they meet at the hip ridge line.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 4
_____

As stated in Revere C&CS: "Regardless of the form of copper used, the method of forming panels and/or finishing seams, certain basic principles apply to all standing seam installations." Those standard principles include the method for securing the seams of the copper panels and pans making up the copper membrane to the roof surface with cleats worked into the seams.    Revere C&CS provides:

> Standing seam roofing and wall cladding *is secured to the structure by cleats worked into the seams*.    It is necessary that the cleats be attached to a material that has sufficient "holding power" to prevent fastener "pull-out" during high wind events.

The Revere C&CS standards provide that the cleats used to secure the panels and pans in a standing seam roof should be (a) the same copper weight as the roof panels and 2" wide; (b) preferably spaced 12" apart; and (c) secured to wood deck/sheathing with two copper, copper alloy or stainless steel screws.

The SMACNA standards also require securing a standing seam copper roof with cleats and provides specifications: "Cleats should be at 12 in. (300 mm) maximum intervals. Two fasteners per cleat are used with cleat tabs folded over the fastener heads."

Both the Revere C&CS and SMACNA standards require the installation of cleats in *all* seams to secure the copper panels/pans *including where they meet at hips or ridges*.    The Revere C&CS industry standards are the same for securing copper seams anywhere on the roof, including the roof's flat surfaces and its hips and ridges.    Revere C&CS states under the heading Hips and Ridges: "Ridges and hips shall be provided with standing seams constructed as specified for standing seams of main roof."    This includes the same requirement that cleats must be "*worked into the seams*" at specified intervals to secure the copper roof panels/pans to the substrate on both

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 5

_____

the main roof and the hips and ridges.    Revere C&CS "Specifications for roofs with standing seams" addresses the pan method of construction *and includes the installation of cleats in the seams of the copper roof pans*, with no exception for copper pans that intersect at the roof's hip or ridge lines. (emphasis added).

The SMACNA Manual also requires that with both the pan and roll method of construction, copper panels and pans must be installed with cleats inside the seams to attach the copper to the substrate, including at the roof's hips or ridges.    The SMACNA Manual includes diagrams depicting the placement of cleats inside the seams where the panels or pans form the "hip or ridge" of the roof.

When the roof is installed, the cleats attaching each copper panel and pan to the substrate are not visible because the cleats are covered with the next copper panel or pan and the edges are then seamed closed.    In Defendant's installation of the Main House roof, the seams at the hip ridges where the copper panels making up the triangular pans meet were covered with a copper cap that was riveted over the pan seams.    The seams Defendant formed at the hip ridges, and the cleats that should be installed within the seams, are not visible when the roof assembly is complete.

The applicable standards provide that cleats securing the copper membrane to the substrate should be spaced at 12 inches on center.    Plaintiffs negotiated to increase the number of cleats and reduce the spacing to 9.5 inches on center to provide increased wind protection. The increase in the number of cleats and the tighter spacing resulted in a price increase to the Contract.

Daybreak Project manager Micah Cady ("Cady") confirmed that the purpose of the cleats is "to hold the panel down to the substrate."    Cady testified that the pre-installed wooden battens were spaced sufficiently to allow Defendant to secure the copper with cleats at an

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 6

_____

average of 9.5 inches on center.   Defendant's principal, Barry Huber ("Huber"), testified that the purpose for securing the copper seams with cleats is to provide wind resistance and protect from wind failure and confirmed the wooden battens were properly installed.

### C.    Defendant's Methodology for Constructing the Main House Roof

Defendant's methodology of installation of the roof began by running rolled copper coils through a machine to form the panels making up the triangular pans.   The machine created a male connection on one side and a female connection on the other side of the copper strip, resulting in a 15" panel.   The copper panels were then cut to a designated length based on the octagonal roof section measurements.   The cut panels were taken to the roof where each copper octagonal roof pan was assembled in place. The pan construction started with a 15" panel or strip in the center of the octagonal section.   Installation proceeded counter-clockwise from the first center panel with cleats placed over the right-hand side of the panel on every wooden batten at an average of 9.5 inches on center from the base of the roof to the peak.   The next panel was installed by locking its female edge onto the male edge of the cleated panel.   The interlocked edges of the panels were then seamed closed with hand seamers.   The process was repeated with enough copper panels to form the pans that covered each octagonal section of the roof.

The pan installation process continued until the pan length overlapped the ridge line and the pan was marked, trimmed and turned up to form the hip ridge seam.   This seam is 1" high and runs along the angled ridge.   Because Defendant made the diagonal cuts to the ends by hand after the panels were attached to the roof, the edges of the triangular pans did not have the same male/female connectors that would have been formed by the rolling machine.   To create the seams

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 7

_____

joining the triangular pans at the hip ridges without male/female connectors, Defendant just folded the trimmed ends of the panels together and crimped the seams by hand.

Revere C&CS and the SMACNA Manual require the installation of cleats to secure the seams created from the edges of the copper panels that form the pans where they meet at the hip ridge line.   Neither of the standards exempt hip or ridge line seams from the requirement that cleats must be used to secure *all* copper seams to the substrate.   On the contrary, *both standards* require that cleats be worked into every copper seam to secure the copper panels and pans to the roof's substrate.   Properly spaced and secured cleats attaching the pans at the hip ridge lines are a key component of the concealed fastening system to ensure straight lines for aesthetics and securement for weathertightness.   Conversely, if the cleats are missing or not properly spaced at the hip ridge lines, the copper membrane is not secured at the roof's hip ridges and can fail in high wind events.   The pan seams at the hip ridge lines are located at the highest elevations of the roof which increases the likelihood of failure during wind events and makes securing the hip ridge seams with cleats even more critical.

**D.**     **Defendant Admits that it Failed to Install Cleats to Secure the Copper Roof at the Hip Ridges as Required by the Contact**

Defendant admits that it did not secure the seams of the copper pans to the substrate with cleats where the pans met at *any of the hip ridge lines* on the Main House roof. Defendant acknowledges that it formed the hip ridge line seams *without installing cleats inside the seams* and then covered the hip ridge seams by riveting copper hip caps over the seams.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 8

_____

Defendant's Project Manager, Cady, testified that Defendant connected the triangular, pie-shaped copper pans where they met at the roof ridges by simply folding the edges together to form a seam and then riveting a copper hip cap over the seam. Cady confirmed that Defendant did not install any cleats in the seams it formed to secure the copper pans/panels where they met at the hip ridges of the roof. Cady incorrectly testified that installing cleats to secure the copper seams at the hip ridges is not required by Revere C&CS and is only "optional" under the SMACNA standards.

Defendant's principal, Barry Huber ("Huber"), acknowledged that the purpose of installing cleats within the copper seams is to provide the *only* source of wind protection for the roof. Huber confirmed that Defendant did not install cleats to secure the copper seams where the pans meet at the hip ridges. He acknowledged that Defendant only secured the copper panel seams within the pans to the substrate and did not install cleats inside the seams where the pans intersect at the hip ridge lines. Huber claimed that Defendant did not install cleats within the hip ridge seams because it "is not a requirement" under Revere C&CS and SMACNA.

Defendant is wrong about the applicable standards. *Both* Revere C&CS and SMACNA require that cleats be worked into *all* seams to secure the copper membrane to the substrate. *Both* standards required Defendant to install cleats inside the seams at the hip ridges to secure the copper membrane at those critical, elevated locations. There is nothing "optional" about the important *mandatory* requirement that hip ridge seams must be secured with cleats in the same manner as every other copper seam on the roof.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 9

_____

Huber conceded in his deposition testimony that the Contract required Defendant to secure the copper roof membrane with cleats installed on average of 9.5 inches on center. Huber acknowledged that the purpose of the cleats is to secure the copper to the roof, and Defendant's failure to install cleats at the specified intervals would be a breach of the Contract.

Huber testified that Defendant drafted the Contract to provide information to Plaintiffs and define the scope of Defendant's work. Huber agreed that Defendant included as a Contract line item that it *must* install the roof in accordance with Revere C&CS and SMACNA. Huber and Cady both acknowledged that the wooden battens were installed properly and allowed the copper membrane to be secure to the battens every 9.5 inches as required by the Contract. However, Huber claimed that it would have been "mathematically impossible" to install cleats at 9.5 inches because of the "way it was constructed," and it "[c]ould not be done because of simple geometry." Huber admitted that Defendant had the ability to include any qualification or exclusion it wanted in the Contract; and Defendant did not address its alleged inability to comply with the standards requiring cleats at hip ridges due to the roof's geometry. Huber agreed that there was no exclusion or indication that certain standards would not be followed even though they were incorporated into the Contract.

Plaintiffs' architectural expert, Arthur Sanders, AIA *Emeritus*, confirms and documents that the wooden battens at the hip ridge intersections allowed the installation of cleats at 9.5 inches on center at the hip ridge seam. Sanders documents Defendant's failure to secure the triangular pans with cleats embedded in the hip ridge seams as required by the Contract, Revere C&CS and SMACNA. Without cleats at the hip ridge seams securing the copper to the substrate, the only things holding the triangular pans together are the seams Defendant hand-formed without

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 10

_____

male/female connectors, and the copper hip caps Defendant installed on top of the hip ridges. That is contrary to the Contract provision requiring cleats securing the copper at 9.5 inches on center, and both industry standards incorporated into the Contract. Sanders shows the proper installation of cleats at the hip ridge intersections and provides alternative means for Defendant to comply with the Contract requirement.

     **E.**     **During Hurricane Irma the Unsecured Hip Ridge Seams were Damaged and One of the Hip Ridge Seams Opened**

On or about September 7, 2017, Hurricane Irma struck the Territory. Plaintiffs retained Sanders to inspect and document damage to the copper roofs on their property and prepare proposals and estimates for repairing the roofs. In February 2018, Sanders visited the property to identify and document the damage to the roofs throughout the property, propose specific repairs, and prepare a construction cost estimate. Sanders observed and documented that all the copper caps covering the hip ridge lines on the octagonal Main House roof were loose and disturbed by the high winds during Hurricane Irma. In his Storm Damage Report, Sanders reported that the storm damage included "uplift/displacement at ridges."

In February 2019, Plaintiffs hired Dahill Co. ("Dahill"), a Structural Restoration Contractor, to make temporary repairs to the roof to stabilize it and prevent further damage. Dahill identified an approximately 30-foot section of a hip ridge cap on the northeast side of the Main House roof that had been deformed and displaced during the hurricane and the seam had opened. Dahill removed the hip cap to expose the open hip ridge seam to inspect it. Dahill confirmed that there were no cleats securing the opened seam to the substrate. This is consistent

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 11
_____

with Defendant's testimony that it did not install cleats inside any of the hip ridge seams.   Dahill closed the seam by putting a new cap on and riveting it closed.

Dahill also identified problems with Defendant's riveting of the hip cap that covered the open hip seam.   Dahill documented that rivets Defendant used to secure the copper panels together in the hip ridge seam did not penetrate the lower portion of the hip seam.   Dahill reported that this condition was typical throughout the entire length of the seam.   Defendant's failure to properly secure the hip caps with rivets is significant because Defendant admits it did not install cleats to secure the hip ridge seams.   As a result, only the improperly riveted hip caps hold the hip ridge seams together.    The unsecured condition in which Defendant left all the hip ridge seams explains why Sanders observed that all the Main House hip caps were loosened and displaced by wind uplift during Hurricane Irma, with one hip ridge seam opening completely.

**F.      To Repair the Damage Cause by Defendant's Breach of the Contract the Entire Main House Roof Must be Replaced**

Defendant acknowledges that cleats provide the only source of wind protection for the copper roof.   Defendant's failure to install cleats as required to secure the hip ridge seams eliminated that wind damage protection, which caused one of the Main House hip ridge seams to open during Hurricane Irma and all the other hip ridge caps to become loose and disturbed. Defendant's admission that it omitted cleats at *every hip ridge seam* on the Main House means that none of the triangular pans are properly secured to the substrate.   The only way to secure the hip ridge seams connecting the triangular panels that make up the hexagonal roof on the Main House is to remove all the pans to allow one side to be accessible for cleating.   The repair process would

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 12

_____

likely damage the copper pans and the panels that make up each pan. Replacement of all the copper pans that make up the Main House roof is the only viable option.

Plaintiff's economic expert, Laura Dolan, has calculated the current cost of the copper roof replacement on the Main House, including increases due to tariffs imposed in 2025, at $666,964 in 2025 and $719,792 at the time of trial in 2026.

## IV.    FACTUAL CONTENTIONS OF THE DEFENDANT:

Defendants deny Plaintiffs' claims and allegations. Defendant alleges the following:

In 2010, Daybreak Roofing Company ("Daybreak") was contracted to install copper standing seam roofs on eight separate structures, including the "Main Pavilion," at the Friedberg-Bunge residence in St. John, Virgin Islands. The contract specified that cleats should be installed at an average of 9.5 inches on center. The contract also specified that the roofing would be "installed in accordance with Revere Copper & Common Sense & SMACNA. Each ridge seam is located at the point where the sides of one triangle intersect with the sides of another triangle. The other seams on the roof are "standing seams" joining 15" wide copper "pans" together to form one of the eight triangles.

Daybreak sued Friedberg in a separate action in the Superior Court of the Virgin Islands alleging that Friedberg failed to make the final payment due under the contract. Friedberg counterclaimed, alleging widespread defects in the roofing work across all eight structures, including the Main Pavillion. To support his counterclaim, Friedberg retained Arthur L. Sanders, AIA, as an expert witness to evaluate the alleged defects. Exhibit 5, Expert Report of Sanders in Case No. ST-2010-CV-00716. In support of his report for the Superior Court litigation, Sanders conducted a comprehensive inspection of all eight roofs, including an invasive, destructive

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 13

_____

examination of the Main Pavilion roof.

As part of this inspection, Sanders physically opened a section of the copper roof on the Main Pavilion to examine the construction beneath the visible surface and observed the absence of cleats in the ridges. When asked why he brought a roofing mechanic with him to the inspection of the roof, he explained that it was for the specific purpose of determining if the roof was cleated in accordance with the contractual requirements. When asked about the prior inspection, Sanders confirmed that the only ridge seam that failed during Hurricane Irma was the ridge seam that he opened up in 2014. This seam was shown as an alleged defect in Sanders' 2014 expert report. Sanders further testified that the reason for the 9.5" on average spacing requirement for cleats (less than the industry standard of 12") was because "this is a high wind area."   At the time of his deposition, Sanders could not recall seeing an engineering report. It was "absolutely" Sanders' opinion in 2015 during his deposition that "cleats should have been in the ridges." When deposed in the present case, Sanders speculated that the alleged damage from Hurricane Irma would not have occurred if there had been cleats on the ridges even though the remaining ridges had no damage.

In supplemental interrogatory responses in the Superior Court case, Friedberg specifically adopted Sanders' November 12, 2014 expert report as outlining all of his claims regarding defective workmanship. Sanders specifically called for replacement of the entire Main Pavilion roof in the Superior Court case. By adopting Sanders' report, Friedberg therefore asserted claims based on all defects identified in that report, including (a) the alleged lack of cleats securing the ridge seam to the substrate below it and (b) the need for complete replacement of the Main Pavilion roof. Despite Sanders' 2014 recommendation for complete replacement, despite his testimony

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 14

_____

about wind vulnerability, and his explicit concern about inadequate attachment "in a high wind area," Friedberg chose not to repair or replace the roof. Instead, the allegedly defective roof that Sanders testified was vulnerable to damage from severe winds in St. John's hurricane-prone environment remained in place through multiple hurricane seasons through the present.

On September 6-7, 2017, approximately three years after Sanders' inspection and while the Superior Court litigation was still pending, Hurricane Irma struck St. John as a category 5 hurricane. The storm brought sustained winds of approximately 185 mph, with higher gusts, making it one of the most powerful hurricanes to impact the Virgin Islands in recorded history. According to Sanders, St. John sustained winds in excess of "200 MPH for several hours." Despite the strength of Irma, the Main Pavilion roof showed exemplary performance in the storm. The Defendant's conforming to proper attachment of the roof caused all roof sections to remain securely intact.   Seeing that only one hip seam's batten cap blew off and that being the same seam destructively examined by the Owner's expert some years prior, speaks to the integrity of the overall installation. Specifically, there were only impact damages (from flying debris) and the only mechanical damage occurred at the exact location where Sanders, in 2014, unfolded the ridge seam and discovered that there were no cleats in that section of the ridge.   Thus, the Defendants allege that any damage to that seam is due to Sanders' failure to properly return it to its pre-inspection condition.

Sanders conducted an inspection of the Main Pavilion roof in 2018 after Hurricane Irma. Sanders opined that his inspection revealed that Daybreak "did not install cleats at the intersection of the copper panels that form the ridge between the copper pans at 9.5 inches on center as required by the terms and conditions of the contract." When deposed about this statement, Sanders admitted

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 15

_____

that the area where he found the absence of cleats was the same ridge seam that he opened up in 2014. He reiterated that the damage found after Hurricane Irma was on the exact same ridge seam that he opened prior to Hurricane Irma. Sanders linked the 2017 hurricane damage directly to the alleged defect he identified in 2014.

In 2018, while the Superior Court case was still pending, Friedberg filed a separate lawsuit in this Court. Rather than asserting the hurricane damage as additional damage for the alleged defects Friedberg was already asserting in the Superior Court, Friedberg initiated the present litigation. In his District Court Complaint, Friedberg advanced a theory that directly contradicted the facts established by Sanders' 2014 inspection and testimony. Sanders' 2014 opinion and his deposition testimony in both cases establishes beyond dispute that the alleged defective condition of missing cleats securing the ridge seams was known to Sanders (and therefore to Friedberg) by September 11, 2014, the first day of his roof inspection conducted as part of the Superior Court case.

In 2023, the Superior Court case was resolved by the same parties through a monetary settlement. The settlement was purely financial; no repairs were performed as part of the resolution. It resulted in a general release with a specific and limited "carve out" of only claims that were asserted in the District Court case that were not encompassed in the Superior Court case. Friedberg claims that this lawsuit "deal[s] exclusively with the main house on the lower portion of Plaintiffs' property." Friedberg also stated that "[t]he claims in the Superior Court action are limited to the two upper buildings—the gate house and the garage/studio. This claim is belied by the Sanders deposition and expert report of Sanders in the Superior Court case.

Plaintiffs allege that Copper & Common Sense & SMACNA require cleats in the ridges.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 16

_____

However, Defendant's expert Joe Bragg testified that those two sources contradict each other as to whether cleats should be in the ridges. Mr. Bragg also testified that the Plaintiffs' interpretation of the contract is not industry standard. What is described in the contract as to the cleats indicated the horizontal portion of the battens and where they intersect with the vertical lock of the individual standing seam panels.

Sanders admitted that he did not have the expertise to opine as to the windspeeds that cleats could withstand if they encountered winds in excess of 200 miles per hour and explained "you need someone who diagnoses these things from the industry to respond to that. Perhaps somebody from Copper and Common Sense or perhaps someone from Miami Dade." When asked to acknowledge that "wind damage, wind speeds, what damage would be caused by what speed" was not in his expertise, Sanders agreed, stating, "I'm not in that business, no." Sanders expressed his personal belief that a "[i]f there were cleats there, there would be no uplift damage to a reasonable wind speed, including maybe the second largest storm in St. John's history" and that a "reasonable wind speed limit was "[m]aybe 175 miles per hour." Sanders thought the highest wind speed on St. John was 176 mph. Id. at 104:6-12. In his report supporting Friedberg's separate homeowners' insurance claim, Sanders claimed that more than 80 panels (pans) were damaged to justify replacing the entire roof. However, there was no mention of missing cleats contributing to the loss. Sanders' opinions are based on assumptions.. In Sanders' report for his insurance case, he does not allege any roof failure due to the absence of cleats.

Friedberg knew about the lack of cleats on the ridges as of September 11, 2014, at the latest, when Sanders unfolded the ridge seam. Moreover, Friedberg was alleging defects with the main pavilion roof as early as 2012. In Sanders' report in 2014, he opined that the replacement

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 17

_____

cost of the Main Pavilion roof was $358,771. Friedberg asserts that the same replacement cost is

between $682,301 and $712,540 in 2026 prices.

### V.    ADMISSIONS AND STIPULATIONS:

The parties have stipulated to the admissibility of the following documents:

1. Contract between the parties dated May 7, 2010

2. Proposal from Defendant for project dated February 8, 2010

3. Photographs of cooper being placed on main roof

4. Photographs of failed hip/ridge seams

### VI.    STATEMENT OF DAMAGES:

**Plaintiffs:**

Plaintiffs seek breach of contract damages of $719,792, plus pre-judgment and post

judgment interest and attorneys' fees, which represents the costs of repair/replacement of the main

house roof.

**Defendant:**

Defendant denies Plaintiffs' claims, has raised defenses and allege attorneys' fees and costs

are due to Defendant for the defense of this action.

### VII.    AMENDMENTS TO THE PLEADINGS:

There shall be no amendments to the pleadings.

### VIII.    STATEMENT OF ANY LEGAL ISSUES PRESENTED:

**Plaintiffs:**

**A.  Defendant Breached the Contract by Failing to Install the Cleats Required
   to Secure the Copper Membrane at the Hip Ridges**

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 18

_____

Breach of contract claims require "an enforceable contractual duty to perform, a full performance by the nonbreaching party, a failure to perform without legal excuse by the beaching party, and damage that flows from that breach." *Manbodh Asbestos Litigation Series, et al. v. Hess Oil, Virgin Islands Corp.*, 47 V.I. 267, 290 (V.I. Super. Ct. 2005) (citing Restatement (Second) of Contracts 235 (1981)) (citations omitted).

 A contractor's liability is fixed by the terms of his contract, and he is obligated to perform according to those terms. 13 Am. Jur. 2d *Building and Construction Contracts* 27 and 17A C.J.S. *Contracts* 494(2); *See also Whitfield Constr. Co., Inc. v. Community Dev. Corp.*, 392 F. Supp. 982, 11 V.I. 655 (D.V.I. 1975).   Where a party to a building or construction contract fails to comply with the duty imposed by the terms of the contract, a breach results for which an action may be maintained to recover the damages sustained thereby. 13 Am. Jur. 2d *Building and Construction Contracts* 72; *See also* Restatement (Second) of Contracts 235(2) (When performance of a duty under a contract is due any non-performance is a breach).

The Contract at issue in this case was prepared by Defendant and its terms are clear and straightforward.   Defendant was required to install a standing seam copper roof "in accordance with Revere Copper & Common Sense and SMACNA."   Plaintiff negotiated a more stringent requirement for the spacing of the cleats that secure the copper membrane than the specified standards recommend.   To increase wind protection for the copper roof, Defendant agreed to increase the number of cleats securing the copper roof to the substrate and reduce the spacing to an average of 9.5 inches on center instead of 12 inches as recommended by Revere C&CS and SMACNA.   Defendant charged Plaintiff more money to increase the number of cleats securing the copper roof.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 19

_____

There is no disagreement or ambiguity in the Revere C&CS and SMACNA standards regarding how and where Defendant was required to install the cleats securing the copper membrane.   Both standards require that cleats be worked into *every copper seam* on the roof to provide the *only* source of wind resistance in a standing seam copper roof installation.   There is no exception for the copper seams formed where panels or pans meet at the hip ridge lines, the highest points on the roof that are the most susceptible to wind damage.   To the contrary, both standards required Defendant to construct the copper seams at the hip ridges in the same manner as the seams that connected the panels that made up the triangular pans.

As with all seams, Defendant was required to install cleats inside the hip ridge seams to secure the copper membrane to the substrate.   SMACNA includes a diagram showing Defendant how to comply with that requirement.   Defendant admits it ignored that contractual requirement and omitted the cleats from the hip ridge seams.   Plaintiff's architectural expert has demonstrated that the pre-installed wooden battens were positioned to accept the hip ridge cleats and identified different ways in which Defendant could have installed cleats in the hip ridge seams. The result of Defendant's breach is that *none* of the hip ridge seams are secured to the substrate.   Defendant's breach caused all the hip seams to become loose and disturbed by Hurricane Irma, with one of the hip ridge seams opening to reveal the absence of cleats.   Defendant acknowledges that its failure to install cleats in the hip ridge seams eliminated the only source of protection from wind uplift and damage.

Defendant has no valid excuse for its failure to secure the hip ridge seams with cleats. Defendant inaccurately claims that the Revere C&CS standard does not address installing cleats to secure hip ridge seams.   In fact, Revere C&CS expressly provides that hip and ridge seams

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 20

_____

must be constructed with cleats in the same manner as all other copper seams on the roof. Defendant claims that the SMACNA direction to install cleats inside hip ridge seams—with its diagram showing how to do so—is only "optional."   Defendant's argument is contradicted by the mandatory language in the SMACNA manual.   Even if there were an inconsistency between the two standards incorporated into the Contract (which there is not), any ambiguity must be resolved against Defendant because it drafted the Contract. Restatement (Second) of Contracts 206.

There is no evidence to support Defendant's claim, made for the first time recently, that it was "mathematically" or "geometrically" impossible for Defendant to install cleats in the hip ridge seams.  Plaintiff's expert has shown that the wooden battens met at the hip ridges and it was possible to install cleats along the ridge lines.   Defendant's Project Manager testified the battens were placed appropriately and there were no problems attaching the copper membrane to the battens anywhere on the Main House roof.   Furthermore, Defendant had the roof plan when it prepared the Contract and would have known at the time of contracting if it was mathematically or geometrically impossible to comply with the standards Defendant incorporated into the Contract.   Defendant admits it did not exclude hip ridge cleats from the Contract and did not provide an exception—due to alleged impossibility or any other reason—to Defendant's agreement to comply with both Revere C&CS and SMACNA.

Defendant acknowledges that the Contract required it to install cleats to secure the copper membrane at 9.5 inches on center and that failure to do so would be a breach.   Defendant observed the pre-installed wooden battens before it began installing the copper roof.   Defendant did not object to the batten layout or inform Plaintiffs that it would be "impossible" to secure the hip ridge seams with cleats as required by the Contract and the incorporated standards.   Defendant may not

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 21

_____

claim after Plaintiffs learned of the breach that it was "impossible" to perform a critical contract

requirement.   There are no disputed facts and Plaintiffs have established that Defendant breached

the Contract requirement to install cleats securing the copper membrane at the hip ridge

intersections.   Defendant is liable for breach of contract as a matter of law and responsible for all

damage caused by its breach.

**B.      Plaintiffs' Damages Caused by Defendant's Breach of the Contract is the Cost**

**of Replacing the Main House Roof**

The measure of damages for breach of contract in the Virgin Islands was stated by the

Court in *Hewitt v. Morton*, 1999 VI Lexis (April 14, 1999), as follows:

> Contract damages are ordinarily based on the injured party's expectation interest and
> are intended to give him the benefit of his bargain by awarding him a sum of money
> that will, to the extent possible, put him in as good a position as he would have been
> in had the contract been performed. Restatement (Second) of Contracts 347, cmt. a;
> *See also Christmas v. Virgin Islands Water & Power Auth.*, 527 F. Supp. 843, 18
> V.I. 624 (D.V.I 1981). For breach due to defective performance or due to
> abandonment of the contract, an injured party can get a judgment for
> damages measured by the reasonable cost of reconstruction and completion in
> accordance with the contract, so long as this is possible and does not involve
> unreasonable economic waste. *See* 13 Am Jur 2d *Building & Construction
> Contracts*  80 and 5 *Corbin on Contracts* 1089 (1964)(emphasis supplied); *See
> also Sheldon v. Northeast Developers. Inc.*, 127 Vt. 15, 238 A.2d 775 (Vt. 1968) and
> *Cooper Concrete Co. v. Hendricks*, 386 S.W.2d 221 (Tex. Civ. App. 1965).24 The
> amount actually paid by the owner to another contractor for correction and
> completion in accordance with the contract is a measure of damages for the
> Defendant's breach. 5 *Corbin on Contracts* 1089; *See also Dierickx v. Vulcan
> Industries*, 10 Mich. App. 67, 158 N.W.2d 778 (Mich. Ct. App. 1968).

Restatement Second Contracts sets forth the measure of damages as follows:

§ 347 Measure of Damages in General

Subject to the limitations stated in §§ 350-53, the injured party has a right to
damages based on his expectation interest as measured by:

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 22

_____

(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

(b) any other loss, including incidental or consequential loss, caused by the breach, less

(c) any cost or other loss that he has avoided by not having to perform.

In this case, Plaintiffs expectation was that Defendant would comply with the contract requirements and the Revere C&CS and SMACNA standards by providing a copper roof secured with cleats at an average of 9.5 inches on center.   Instead, Defendant delivered a roof with *no cleats at all* to secure the copper membrane at the hip ridge lines.   Defendant's breach of contract, which it admits occurred, left the entire Main House roof vulnerable to wind damage. Defendant's breach caused Plaintiffs damage in September 2017 when Hurricane Irma damaged and loosened all the unsecured hip ridge seams, causing one of them to open up.   When Plaintiffs learned of Defendant's breach, they pursued their legal remedies through this action.

The measure of damages for Defendant's breach is the cost that Plaintiffs must incur to replace the Main House roof.   Replacing the roof is the only way to give Plaintiffs their contractual expectation.   Plaintiff's experts have identified the cost to replace the Main House roof as $666,964 in 2025 dollars, and $719,792 at the time of trial in 2026.    Defendant has not produced any evidence to dispute that damage amount.

### A. Plaintiffs' Claim for Replacement of the Main House Roof is Not Barred by the Superior Court Settlement Agreement or *Res Judicata*

Daybreak argues that Plaintiffs' claim for breach of contract for failing to install cleats on the Main House roof is "barred by Release and/or *Res Judicata*."   Daybreak relies on an agreement to settle a Superior Court (ST-10-cv-716) lawsuit that *expressly excludes* the only claim

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 23

_____

asserted in this District Court action.    Daybreak argues that the parties' agreement to exclude the District Court action from that settlement does not mean what it says.

Daybreak argues it never intended to exclude from the release the only claim in the District Court action—despite expressly saying so in the settlement agreement.    Daybreak argues that Plaintiffs' claim for replacement of the Main House roof is exempt because the replacement of the Main House roof was included in the damages asserted in the Superior Court lawsuit.    In other words, Daybreak contends its agreement to exclude the *only* claim in the District Court action was meaningless when Daybreak made it to induce Plaintiffs to settle the Superior Court lawsuit.

Daybreak fails to disclose that it filed a motion in the Superior Court case to *limit the claims asserted by Plaintiffs in their Counterclaim to exclude any claim for replacement of the Main House roof*.    The Superior Court granted Daybreak's motion and gave it the preclusion order it requested.    The Court issued an Order excluding from Plaintiffs' Counterclaim any damages for replacement of the Main House roof.    The Superior Court limited the claims that Plaintiffs asserted in their Counterclaim in the Superior Court lawsuit *to damages for the replacement of two different roofs – the Gate House and the Garage*.    The Superior Court's Order excluding any claims for replacement of the Main House roof is *res judicata* and establishes as a matter of law that Daybreak is erroneous in their assertion that the Superior Court settlement released the only claim in this District Court action.

The Superior Court has already determined that Plaintiffs' claim in the District Court Action alleging breach of contract requiring replacement of the Main House roof *was not asserted in the Superior Court action*.    Having obtained a court order *preventing* Plaintiffs from asserting the only claim in the District Court action, Daybreak is collaterally estopped from now taking the

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 24

_____

opposite position.    Plaintiffs' claim in the District Court action for replacement of the Main

House roof based on Daybreak's breach of contract was neither asserted nor resolved in the

Superior Court lawsuit. Thus, it is expressly excluded from the settlement agreement and is not

barred by the release or *res judicata*.

Defendant has raised the issue that this action is barred based on a settlement in the Superior

Court case that dealt with different buildings on the property. The Superior Court action ruled that

any claim by Plaintiffs for replacement of the Main Hause roof was excluded from their

Counterclaim in the Superior Court Action.   There was no claim for replacement of the Main

house roof in the Counterclaim filed in 2012. Conversely, in discovery, Plaintiffs asserted damages

limited to the replacement of the Gate House and Garage roofs as provided in the Paradigm

Damage Report.   After more than two years of litigation and after discovery had closed, Plaintiffs'

expert then recommended adding the replacement of the Main House roof to the claims asserted

in the Counterclaim.

Daybreak vehemently objected to adding the new claim and moved for an order limiting

the Counterclaim to the claims asserted in the Paradigm Damage Report.   Daybreak was

successful, its motion was granted, and the Superior Court's Order precluded Plaintiffs from

asserting a claim for replacement of the Main House roof in the Superior Court action.

Having successfully obtained a court order *excluding* any claim for replacement of the

Main House roof from the Superior Court action, Daybreak is collaterally estopped from now

claiming the opposite as it does in this motion—that Plaintiffs' claim in the District Court action

for replacement of the Main House roof was "asserted" and "resolved" in the Superior Court case.

The Third Circuit has identified four standard requirements for the application of collateral

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 25

_____

estoppel: (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action.   *Henglein v. Colt Indus. Operating Corp.*, 260 F. 3d 201, 209 (3d Cir. 2001).   The requirements for collateral estoppel are satisfied here.

The issue on which Daybreak relies for in its Motion for Summary Judgment is identical to the issue raised by Daybreak and ruled on in the Superior Court's April 26, 2017 Order—whether the claims asserted in Plaintiffs' Counterclaim included a claim for replacement of the Main House roof.   The *identical issue* was *actually litigated* when the Superior Court considered the evidence and arguments and granted Daybreak's motion to *exclude* any claim for replacement of the Main House roof (and any other claims beyond those identified in the Paradigm Damage Report).   Whether Plaintiffs could add a claim for replacement of the Main House roof was *necessary* to the Superior Court's Order limiting Plaintiffs' damages to the costs to replace only the Gate House and Garage roofs itemized in the Paradigm Damage Report.   Daybreak was *fully represented* in the Superior Court action and successfully brought the motion that resulted in the preclusion Order Daybreak now wishes to ignore.

The Superior Court Order which granted Daybreak's motion precluded any claim for replacement of the Main House roof and limited the claims asserted in the Counterclaim to those in the Paradigm Damage Report.   Plaintiffs were adversely impacted because the damages recommended by their expert were reduced by more than two thirds when the Main House roof replacement was precluded by the Superior Court Order—from $759,357 to $210,000.   The Superior Court Action proceeded toward trial with the claims asserted by Plaintiff limited to those

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 26

---

identified in the Paradigm Damage Report—replacement of the Gate House and Garage roofs with no claim for replacement of the Main House roof.

The parties eventually negotiated a settlement of the claims that the Superior Court had ruled were asserted in the Counterclaim.   A final and valid judgment was entered in the Superior Court action based on a settlement of the Counterclaim as limited by the Superior Court Order. "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."   Restatement (Second) of Judgments § 27 (1982).   The Third Circuit has consistently applied this general rule.   *Nat'l R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n,* 288 F. 3d 519, 525 (3d. Cir. 2002).

The Superior Court Settlement Agreement expressly provides that it "does not extinguish" the sole claim in the District Court action "to the extent that District Court case does not encompass claims that were asserted in the Superior Court case."   Because Plaintiffs were precluded by the Superior Court's April 26, 2017 Order from asserting a claim for replacement of the Main House roof in their Counterclaim, it *could not be asserted in the Superior Court case* and was not extinguished by the settlement agreement.   Daybreak sought and obtained the Superior Court Order excluding the Main House roof replacement from the Counterclaim.   Daybreak is collaterally estopped from taking the opposite position in this motion.   The only claim in the District Court action *could not be asserted in the Superior Court action* and was therefore excluded from the Superior Court Settlement Agreement.

The Superior Court's order dismissing that case expressly states the dismissal was based on the parties' settlement.   The parties finalized the settlement terms after the dismissal, including

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 27
_____

the carve out of the District Court action, and Daybreak's insurer tendered to Plaintiffs the settlement funds.   The order dismissing the Superior Court action confirms it is based on a settlement that excludes the District Court action from any release.

### C.   Defendant's Causation, Intervening Cause, Alteration and Mitigation Arguments Are Meritless and Are Not Defenses to this Breach of Contract Action

Plaintiffs allege only a breach of contract claim for which they seek to recover the benefit of their bargain: a copper roof on their Main House secured to the substrate with cleats spaced as required by the Contract and the industry standards incorporated into it.   Plaintiffs do not make claims of negligence, product liability, or any other tort.   Plaintiffs do not seek to recover damages to their property caused by Daybreak's faulty work or a failure of the roof during the high winds that hit St. John during Hurricane Irma.   Plaintiffs just want the benefit of their bargain, which requires replacement of the Main House roof.   The causation requirement for breach of contract is that the damages must be a foreseeable result of the breach when the contract was made. Restatement (Second) of Contracts § 351.   It was foreseeable when Daybreak agreed to install cleats that Daybreak's failure to do so would require replacement of the entire Main House roof to properly secure it with cleats.

Plaintiffs were not obligated to pay twice for the roof they bargained for once they learned that at least one roof seam was not secured as required by the Contract after Hurricane Irma.   The injured party in a breach of contract action is required to make reasonable efforts to minimize their losses, and they cannot recover for damages they could have avoided.   Restatement (Second) of

_____

Contracts § 350.    Plaintiffs complied with the mitigation requirement.    After one complete hip

ridge seam was opened by the hurricane, Plaintiffs mitigated any water leakage or other damage

that might result from Daybreak's breach of the Contract by hiring contractors to secure the roof

and repair any leaks or potential leaks.

      Plaintiffs are not seeking property damages caused by the failure to secure the Main House

roof.    Plaintiffs seek to recover the benefit of their bargain in the form of the roof they paid

Daybreak to install.    Defendant's suggestion that Plaintiffs should have replaced the entire Main

House roof at their own cost to "mitigate" their damages is preposterous. Plaintiffs did not know

that Daybreak breached the Contract's requirements until Daybreak admitted this during

depositions in 2025.

      Defendant's suggestion that Sanders "materially altered" the Main House roof in 2014 is

wrong and would not be a defense to Plaintiffs' claim for breach of the Contract even if he had

done so.    The ridge seam Sanders inspected in 2014 was not the same ridge seam that opened

during Hurricane Irma in 2017. Sanders' inspection of a 2-foot section, or approximately 6% of a

different seam has no relation to this breach of contract case.    Again, this is not a tort case;

"causation" of the damage resulting from Daybreak's breach of contract is not an issue.    Plaintiffs

are entitled to a roof on their Main House with the wind protection for which they bargained and

paid.

      Similarly, Defendant's claims that Plaintiffs were aware of Defendant's failure to install

cleats as early as 2014 is without merit. While Sanders did inspect a 2-foot section, or

approximately 6% of a different seam is not relevant to the failure of the hip/ridge connection due

to a lack of cleats along the entire 33' length of the hip/ridge that was discovered in 2018 after

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 29

_____

Hurricane Irma. Defendant's suggestion that Plaintiffs had actual knowledge that there were no cleats in any of the hip/ridge seams as early as 2014 is not correct. It was not until Cady and Huber admitted in their depositions in 2025 that Plaintiffs were first put on notice that all of the hip/ridge seams did not have cleats. Since the hip/ridge seams were concealed with ridge caps, a visual inspection would not have reveleted this omission. Defendant's suggestion that even a small section on a different hip/ridge that did not have cleats means a complete absence of cleats or every hip/ridge throughout the main roof is not supported by the evidence.

Likewise, whether the roof Daybreak agreed to provide was designed to withstand any particular windspeed is irrelevant to the breach of contract claim. Similarly, Sanders' expertise in windspeed resistance and the wind resistance provided by the cleats is irrelevant. This is not a negligent design or construction case. Plaintiffs seek the benefit of their bargain which requires Daybreak to replace the Main House roof. Plaintiffs are entitled to the cost of a new roof at the time a judgment is entered in their favor.

**Defendant:**

**A. Friedberg's claim is barred by Release and/or *Res Judicata***

The exact issue raised in this case was known to Plaintiffs (collectively "Friedberg") and settled in 2024 in the related Superior Court action Friedberg brought (Case No. ST-2010-CV-00716) ("the Superior Court Case") and is therefore barred by both the express terms of the release and *res judicata*. Friedberg released all claims encompassed in the Superior Court case. Friedberg claims that the instant case is wholly separate from the case previously filed in the Superior Court regarding the same roof. Specifically, Friedberg claims that this lawsuit "deal[s] exclusively with the main house on the lower portion of Plaintiffs' property," *see* SUMF 41

whereas (again according to Friedberg) "[t]he claims in the Superior Court Action are limited to the two upper buildings—the gate house and the garage/studio. SUMF 42. But Friedberg has not been candid with the Court. Friedberg supplemented his interrogatory responses in the Superior Court case to clarify that his claims encompassed everything in the Sanders' expert report. SUMF ¶25.

**B. Friedberg's failure to fix the claimed defects is an intervening cause.**

Friedberg's failure to secure the roof after his expert opined in 2014 that the roof was not constructed to the engineering standards adopted by Friedberg for the express purpose of protecting the roof from loss during a hurricane is an intervening cause that breaks the chain of causation related to Daybreak's alleged failure to construct the roof in accordance with the terms of the contract. Friedberg knew by September 11, 2014 when Sanders opened the ridge seam that there were no cleats in that location. Moreover, at that time Sanders was opining that the entire Main Pavilion roof needed to be replaced because of alleged defects, including the alleged lack of cleats. An intervening cause destroys the causal connection between the defendant's acts and the victim's injury, thereby becoming the cause of the injury. *Cyprian v. Virgin Islands Water & Power Auth.*, 2022 VI SUPER 99, ¶29, 2022 WL 22949652 (Dec. 22, 2022). If the intervening act was reasonably foreseeable, it is not considered to have destroyed the causal connection. Id. ¶30. Gross negligence is unforeseeable whereas ordinary negligence is considered foreseeable. *Id.*

**C. Friedberg cannot meet his burden of proving causation**

Friedberg cannot prove that Daybreak's alleged breach of contract was a cause of the Hurricane Irma damage. Even without the intervening cause, there are at least three possible explanations for the alleged roof failure in this case: (1) alteration of the roof by Friedberg's own

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 31

_____

agent, Sanders; (2) the roof was not designed to escape completely unscathed when encountering the windspeeds and gusts of a storm such as Irma; and/or (3) defective workmanship. Because Friedberg is unable to rule out the first two potential causes, he cannot prove his claim based upon the third potential cause.

**D. Friedberg failed to mitigate the alleged damages by repairing the roof in 2015.**

Friedberg knew in 2014 that his expert, Sanders, considered the Main Pavilion roof to be defectively constructed and required replacement. Friedberg also is charged with the knowledge of Sanders that the ridges did not have cleats securing them to the substrate and it was Friedberg who retained an engineer to specify cleat placement for purposes of securing the roof for hurricanes. Under those facts, the failure to repair the roof, even if it was to only temporarily repair it so that the ridges were secured in the manner Sanders claims was required by the contract, can only be deemed to be wanton, reckless behavior demonstrating a conscious indifference to the safety of property. That's the definition of gross negligence. The decision not to secure the roof in a hurricane zone is more than mere thoughtlessness or inadvertence, or simple inattention (ordinary negligence).   As such, Friedberg's failure to protect his own property from a known danger rises to the level of an intervening cause, breaking the chain of causation and preventing a finding of causation against Daybreak.

**E. Plaintiffs' Damages, if any, are Limited to the Cost of Materials and Labor that Existed When the Defect was Found in 2014.**

The 10-year (and counting) delay in repairs has resulted in vastly increased prices due to changing economic factors. Friedberg knew about the lack of cleats on the ridges as of September 11, 2014 when Sanders unfolded the ridge seam. Moreover, Friedberg was alleging general defects

_____

with the Main Pavilion roof as early as 2012. Based on this knowledge, Friedberg had an obligation

to replace or repair the roof in 2014 as soon as he learned of the alleged defect. Instead, Friedberg

kept the same roof in place that was installed. Meanwhile, the price of labor and materials has

skyrocketed. In Sanders' report in 2014, he opined that the replacement cost of the Main Pavilion

roof was $358,771. Currently, Friedberg asserts that the same replacement cost is between

$682,301 and $712,540. By failing to mitigate their damages, Plaintiffs are limited in the damages

that they are able to recover. *See Ramier v. Stout,* 1979 WL 444370 (Terr. V.I. 1978). In that case,

Plaintiffs knew of the defect with the construction. *Id.* However, they failed to mitigate their losses

and have the issues repaired in a timely manner. *Id.* In that case, the Court found that Plaintiff had

a duty to mitigate his damages and that he was limited to the costs to repair when the defect was

discovered. *Id.*


X.  **ISSUES OF LAW:**

**Plaintiffs:**

1.  Did the contract entered into by the parties require installation of cleats on

    the hip ridge intersections?

2.  Does SMNCA require the hip ridge intersections to be secured to the

    substrate with cleats?

3.  Does Copper and Common Sense require the hip ridge intersections to be

    secure to the substrate with cleats?

4.  Did Defendant breach the contract by not installing cleats on the hip ridge

    intersections?

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 33

_____

5.      Is Defendant liable to Plaintiffs for the costs to replace the entire current roof of the main house that has no cleats at the hip ridge intersections with a copper standing seam roof that has the hip ridge intersections cleated to the substrate in accordance with the provisions of the contract; i.e., cleats to be installed at an average of 9.5" on center?

6.      Did the Superior Court Order granting Defendant's motion to limit Plaintiffs' damages to $210,000 for the cost of the roof repair of the gate house and garage exclude any claim for damages to the main roof?

7.      Are Defendant's collaterally estopped from claiming the breach of contract for not installing cleats at the hip/ridge intersections and the damages claimed for the failure to install cleats on the main roof was covered by the settlement/release in the Superior Court action?

8.      Did the release in the Superior Court action exclude the claim in this District Court action for breach of contract by not installing cleats at the hip ridge intersection?.

9.      Did the release in the Superior Court action exclude Plaintiffs' claims in this District Court case for damage to replace the main house roof?

**Defendant**

1.      Was Plaintiffs' claims barred by Release and/or *Res Judicata?*

2.      Was the Plaintiffs failure to fix the claimed defects and intervening cause?

3.      Was the roof's alleged failure caused by Defendant not installing cleats in the hip ridges?

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 34
_____

4.     If damages are awarded, what are the measure of those damages based on

when Plaintiffs knew of the alleged defect?

## XI.    LEGAL ISSUES, DEFENSES OR CLAIMS TO BE ABANDONED:

**Plaintiffs:**

None.

**Defendant:**

**None.**

## XII.    ADDITIONAL DISCOVERY:

The time for fact and expert discovery has closed.

## XIII.    PLAINTIFFS' EXPERT WITNESSES:

1.  Arthur Sanders, AIA, Emeritus – architectural expert

2.  Laura Dolan - economist

## XIV.    DEFENDANT'S EXPERT WITNESSES

1.  Joseph Bragg – Roofing expert

2.  Barry Huber – non-retained expert

3.  Micah Cady – non-retained expert

## XV. PLAINTIFFS' NON-EXPERT WITNESSES:

1.  Thomas F. Friedberg – party and percipient

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 35

_____

    2.   Sarah L. Bunge – party and percipient

    3.   Richard Maiocco – owner of Dahill, Inc.

    4.   Richard Barabbas – cooper roofer who documented damage in 2018 and prepared estimate and scope of work

    5.   Micah Cady – adverse – foreman for Defendant

    6.   Barry Huber – adverse – owner of Daybreak

## XVI.   DEFENDANT'S NON-EXPERT WITNESSES:

    1.   Barry Huber-owner of Daybreak

    2.   Micah Cady-foreman for Defendant

    3.   Sarah L. Bunge, Plaintiff

    4.   Thomas F. Friedberg, Plaintiff

    5.   Chris Bunge-brother of Sarah L. Bunge and contractor who worked on the property.

    6.   Richard Maiocco – owner of Dahill, Inc. without waiving objection

    7.   Richard Barabbas – cooper roofer who documented damage in 2018 and prepared estimate and scope of work without waiving objection.

## XVII.  SPECIAL PROBLEMS:

**Plaintiffs:**

Plaintiffs are requesting a special set of April 21, 2026, which is within the current trial period.

The parties have filed cross-motions for summary judgment (Plaintiffs' motion  - Docs. 86-92; Defendant's motion – Docs. 93-95). Plaintiffs are requesting a ruling on their motion prior

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 36
_____

to the commencement of trial. Defendants are also requesting a ruling on their motion(s) prior to

trial.

Plaintiffs are also requesting an evidentiary hearing for the Court to determine as a matter

of law that the release in the Superior Court Action is not a bar to the present District Court case.

**Defendant:**

Defendants state that the evidentiary hearing is not required and this issue is before the

Court by way of the Defendants' Motion for Summary Judgment.

## XVIII. <u>ESTIMATED LENGTH OF TRIAL</u>:

**Plaintiffs:**

2 to 3 days.

**Defendant:**

2 days.

## XVIX. <u>TRIAL BRIEFS</u>:

Shall include (a) proposed list of witnesses; (b) proposed list of exhibits; and (c)

estimated length of case-in-chief and case-in-defense and shall be filed on or before March 10,

2026 in accordance with the Court's November 14, 2024, Scheduling Order (Doc. 42).

Defendants' state that Rule 16.1 of the Local Rules of Civil Procedure requires trial briefs no later

than 7 days prior to the trial setting, i.e. no later than April 7, 2026.

## <u>CONCLUDING CERTIFICATION</u>

WE HEREBY CERTIFY by the affixing or our signatures to this Joint Pretrial Order that

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 37

_____

it reflects the efforts of all counsel and that we have carefully and completely reviewed all parts of

this order prior to submission to the Court. Further, it is acknowledged that amendments to this

Final Pretrial Order will not be permitted except where the Court determines that manifest injustice

would require the amendment is not allowed.


Attorneys for Plaintiffs

*/s/ Thomas F. Friedberg, Esq.*

Thomas F. Friedberg, Esq. (VI 1006)
Law Offices of Friedberg & Bunge
1005 Rosecrans Street, Suite 202
San Diego, California 92166

Brian Glasser, Esq. (*Pro hac vice*)
Bailey & Glasser, LLP
1055 Thomas Jefferson Street NW, Suite 540
Washington, D.C. 20027

David L. Selby, II, Esq. (*Pro hac vice*)
Bailey & Glasser, LLP
3000 Riverchase Galleria, Suite 905
Birmingham, AL 35244


Attorneys for Defendant

*/s/ Jeffrey C. Crosby*

Jeffrey C. Cosby, Esq. (*Pro hac vice*)
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994

Andrew C. Simpson, Esq.
Andrew C. Simpson, PC
2191 Church St., Ste. 5
Christiansted, VI 00820

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page  38

_____

Entry of the foregoing Final Pretrial Order is hereby **APPROVED**; it is further

**ORDERED** that the deadline to file dispositive motions has expired; it is further

**ORDERED** that no amendments shall be made to the Joint Final Pretrial Order except upon

approval of this Court.

**DONE AND SO ORDERED**

**DATED:**                    _____
                             ROBERT A. MOLLOY
                             District Judge

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Joint Pretrial Order
Page 39

_____

### CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of March 2026, a true and correct copy of JOINT

FINAL PRETRIAL ORDER was filed with the CM/ECF system which will provide notice to the

following:

Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994
Telephone: 772-463-8402
Facsimile: 772-463-4820

Andrew C. Simpson
**ANDREW C. SIMPSON, PC**
2191 Church St., Ste. 5
Christiansted, VI 00820
TEL : 340.719.3900
E-MAIL :asimpson@coralbrief.com

                    */s/ THOMAS F. FRIEDBERG*
                    **THOMAS F. FRIEDBERG**