**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE,<br><br>          Plaintiffs,<br><br>v.<br><br>DAYBREAK, INC. dba HUBER & ASSOCIATES,<br><br>          Defendant. | **ACTION NO. 3:19-cv-0053-RAM-EAH**<br><br>**ACTION FOR DAMAGES** |

<u>**PLAINTIFFS' TRIAL BRIEF**</u>

Plaintiffs, THOMAS F. FRIEDBERG and SARAH L. BUNGE, respectfully file the following Trial Brief.

**1. APPEARANCES**

**For the Plaintiffs:**

Thomas F. Friedberg, Esq. (VI 1006)
Law Offices of Friedberg & Bunge
1005 Rosecrans Street, Suite 202
PO Box 6814
San Diego, California 92166

Brian Glasser, Esq. (*Pro hac vice pending*)
Bailey & Glasser , LLP
1055 Thomas Jefferson Street NW, Suite 540
Washington, D.C. 20027

David L. Selby, II, Esq. (*Pro hac vice pending*)
Bailey & Glasser , LLP
3000 Riverchase Galleria, Suite 905
Birmingham, AL 35244

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 2

_____

**For the Defendant:**

Jeffrey C. Cosby, Esq. (*Pro hac vice*)
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994

Andrew C. Simpson, Esq.
Andrew C. Simpson, PC
2191 Church St., Ste. 5
Christiansted, VI 00820

## II.    NATURE OF ACTION AND JURISDICTION OF THE COURT

This case is a single cause of action for damages based on Defendant's breach of contract. The purpose of this contract between Plaintiffs and Defendant was to manufacture and install a standing seam copper roof on Plaintiffs' home located at 168 Chocolate Hole, St. John, United States Virgin Islands. This action is brought pursuant to the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs and Defendant are citizens of different states, and the amount in controversy exceeds $75,000.

## III.    FACTUAL CONTENTIONS:

### A.    The Parties' Contract

On May 7, 2010, Plaintiffs and Defendant entered into a contract for the manufacture and installation of   copper standing seam roofs on all the buildings in the project, including the Main House (the "Contract").   The Contract required Defendant to install a copper standing seam roof system and required Defendant to install cleats to secure the copper roofing at an agreed spacing averaging 9.5 inches on center.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 3

---

**B.    The Contract Required Defendant to Comply with Industry Standards that Include Securing the Copper Roof with Cleats**

The Contract incorporates two specific industry standards with which Defendant was required to comply: (a) Revere Copper & Common Sense ("Revere C&CS"), and (b) the Sheet Metal and Air Conditioning Contractors' National Association, Inc. ("SMACNA").

Standing seam roofing involves joining sheets or strips of copper with seams that are elevated above the roof's surface.   This method provides a weathertight copper membrane. Standing seam roofing may be formed from sheets, strips and/or rolls of copper.   Individual panels can be formed with hand tools, on sheet metal brakes (power or manually operated), or with portable pan-forming equipment.   Panels can be connected to form pans; and both panels and pans are secured to the substrate in the same manner.

The octagonal roof on the Main House was designed as a series of copper panels forming triangular-shaped pans connected where the ends of the panels making up the pans meet at the hip ridges of the roof.   The panels are joined together to form pans with one edge of each panel secured to the substrate with cleats; and the pans are joined by creating a seam where they meet at the roof's hip ridge lines.   Seams connecting the edges of the panels within the pans, and the seams formed where the pans meet and connect at the roof's hip ridges, can be finished (completed and closed) with a variety of hand and power tools.   In the case of the octagonal design of the Main House roof, the ends of the panels forming the triangular pans are cut at an angle and seamed to the cut ends of the corresponding panels making up the next pan where they meet at the hip ridge line.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 4

_____

As stated in Revere C&CS: "Regardless of the form of copper used, the method of forming panels and/or finishing seams, certain basic principles apply to all standing seam installations." Those standard principles include the method for securing the seams of the copper panels and pans making up the copper membrane to the roof surface with cleats worked into the seams.    Revere C&CS provides:

> Standing seam roofing and wall cladding *is secured to the structure by cleats worked into the seams*.    It is necessary that the cleats be attached to a material that has sufficient "holding power" to prevent fastener "pull-out" during high wind events.

The Revere C&CS standards provide that the cleats used to secure the panels and pans in a standing seam roof should be (a) the same copper weight as the roof panels and 2" wide; (b) preferably spaced 12" apart; and (c) secured to wood deck/sheathing with two copper, copper alloy or stainless steel screws.

The SMACNA standards also require securing a standing seam copper roof with cleats and provides specifications: "Cleats should be at 12 in. (300 mm) maximum intervals. Two fasteners per cleat are used with cleat tabs folded over the fastener heads."

Both the Revere C&CS and SMACNA standards require the installation of cleats in *all* seams to secure the copper panels/pans *including where they meet at hips or ridges*.    The Revere C&CS industry standards are the same for securing copper seams anywhere on the roof, including the roof's flat surfaces and its hips and ridges.    Revere C&CS states under the heading Hips and Ridges: "Ridges and hips shall be provided with standing seams constructed as specified for standing seams of main roof."    This includes the same requirement that cleats must be "*worked into the seams*" at specified intervals to secure the copper roof panels/pans to the substrate on both

_____

the main roof and the hips and ridges.    Revere C&CS "Specifications for roofs with standing seams" addresses the pan method of construction *and includes the installation of cleats in the seams of the copper roof pans*, with no exception for copper pans that intersect at the roof's hip or ridge lines. (emphasis added).

The SMACNA Manual also requires that with both the pan and roll method of construction, copper panels and pans must be installed with cleats inside the seams to attach the copper to the substrate, including at the roof's hips or ridges.    The SMACNA Manual includes diagrams depicting the placement of cleats inside the seams where the panels or pans form the "hip or ridge" of the roof.

When the roof is installed, the cleats attaching each copper panel and pan to the substrate are not visible because the cleats are covered with the next copper panel or pan and the edges are then seamed closed.    In Defendant's installation of the Main House roof, the seams at the hip ridges where the copper panels making up the triangular pans meet were covered with a copper cap that was riveted over the pan seams.    The seams Defendant formed at the hip ridges, and the cleats that should be installed within the seams, are not visible when the roof assembly is complete.

The applicable standards provide that cleats securing the copper membrane to the substrate should be spaced at 12 inches on center.    Plaintiffs negotiated to increase the number of cleats and reduce the spacing to 9.5 inches on center to provide increased wind protection. The increase in the number of cleats and the tighter spacing resulted in a price increase to the Contract.

Daybreak Project manager Micah Cady ("Cady") confirmed that the purpose of the cleats is "to hold the panel down to the substrate."    Cady testified that the pre-installed wooden battens were spaced sufficiently to allow Defendant to secure the copper with cleats at an

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 6

_____

average of 9.5 inches on center.   Defendant's principal, Barry Huber ("Huber"), testified that the purpose for securing the copper seams with cleats is to provide wind resistance and protect from wind failure and confirmed the wooden battens were properly installed.

### C.    Defendant's Methodology for Constructing the Main House Roof

Defendant's methodology of installation of the roof began by running rolled copper coils through a machine to form the panels making up the triangular pans.   The machine created a male connection on one side and a female connection on the other side of the copper strip, resulting in a 15" panel.   The copper panels were then cut to a designated length based on the octagonal roof section measurements.   The cut panels were taken to the roof where each copper octagonal roof pan was assembled in place. The pan construction started with a 15" panel or strip in the center of the octagonal section.   Installation proceeded counter-clockwise from the first center panel with cleats placed over the right-hand side of the panel on every wooden batten at an average of 9.5 inches on center from the base of the roof to the peak.   The next panel was installed by locking its female edge onto the male edge of the cleated panel.   The interlocked edges of the panels were then seamed closed with hand seamers.   The process was repeated with enough copper panels to form the pans that covered each octagonal section of the roof.

The pan installation process continued until the pan length overlapped the ridge line and the pan was marked, trimmed and turned up to form the hip ridge seam.   This seam is 1" high and runs along the angled ridge.   Because Defendant made the diagonal cuts to the ends by hand after the panels were attached to the roof, the edges of the triangular pans did not have the same male/female connectors that would have been formed by the rolling machine.   To create the seams

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 7

_____

joining the triangular pans at the hip ridges without male/female connectors, Defendant just folded the trimmed ends of the panels together and crimped the seams by hand.

Revere C&CS and the SMACNA Manual require the installation of cleats to secure the seams created from the edges of the copper panels that form the pans where they meet at the hip ridge line. Neither of the standards exempt hip or ridge line seams from the requirement that cleats must be used to secure *all* copper seams to the substrate. On the contrary, *both standards* require that cleats be worked into every copper seam to secure the copper panels and pans to the roof's substrate. Properly spaced and secured cleats attaching the pans at the hip ridge lines are a key component of the concealed fastening system to ensure straight lines for aesthetics and securement for weathertightness. Conversely, if the cleats are missing or not properly spaced at the hip ridge lines, the copper membrane is not secured at the roof's hip ridges and can fail in high wind events. The pan seams at the hip ridge lines are located at the highest elevations of the roof which increases the likelihood of failure during wind events and makes securing the hip ridge seams with cleats even more critical.

**D.    Defendant Admits that it Failed to Install Cleats to Secure the Copper Roof at the Hip Ridges as Required by the Contact**

Defendant admits that it did not secure the seams of the copper pans to the substrate with cleats where the pans met at *any of the hip ridge lines* on the Main House roof. Defendant acknowledges that it formed the hip ridge line seams *without installing cleats inside the seams* and then covered the hip ridge seams by riveting copper hip caps over the seams.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 8

_____

Defendant's Project Manager, Cady, testified that Defendant connected the triangular, pie-shaped copper pans where they met at the roof ridges by simply folding the edges together to form a seam and then riveting a copper hip cap over the seam. Cady confirmed that Defendant did not install any cleats in the seams it formed to secure the copper pans/panels where they met at the hip ridges of the roof. Cady incorrectly testified that installing cleats to secure the copper seams at the hip ridges is not required by Revere C&CS and is only "optional" under the SMACNA standards.

Defendant's principal, Barry Huber ("Huber"), acknowledged that the purpose of installing cleats within the copper seams is to provide the *only* source of wind protection for the roof. Huber confirmed that Defendant did not install cleats to secure the copper seams where the pans meet at the hip ridges. He acknowledged that Defendant only secured the copper panel seams within the pans to the substrate and did not install cleats inside the seams where the pans intersect at the hip ridge lines. Huber claimed that Defendant did not install cleats within the hip ridge seams because it "is not a requirement" under Revere C&CS and SMACNA.

Defendant is wrong about the applicable standards. Both Revere C&CS and SMACNA require that cleats be worked into *all* seams to secure the copper membrane to the substrate. Both standards required Defendant to install cleats inside the seams at the hip ridges to secure the copper membrane at those critical, elevated locations. There is nothing "optional" about the important *mandatory* requirement that hip ridge seams must be secured with cleats in the same manner as every other copper seam on the roof.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 9

_____

Huber conceded in his deposition testimony that the Contract required Defendant to secure the copper roof membrane with cleats installed on average of 9.5 inches on center. Huber acknowledged that the purpose of the cleats is to secure the copper to the roof, and Defendant's failure to install cleats at the specified intervals would be a breach of the Contract.

Huber testified that Defendant drafted the Contract to provide information to Plaintiffs and define the scope of Defendant's work. Huber agreed that Defendant included as a Contract line item that it must install the roof in accordance with Revere C&CS and SMACNA. Huber and Cady both acknowledged that the wooden battens were installed properly and allowed the copper membrane to be secure to the battens every 9.5 inches as required by the Contract. However, Huber claimed that it would have been "mathematically impossible" to install cleats at 9.5 inches because of the "way it was constructed," and it "[c]ould not be done because of simple geometry." Huber admitted that Defendant had the ability to include any qualification or exclusion it wanted in the Contract; and Defendant did not address its alleged inability to comply with the standards requiring cleats at hip ridges due to the roof's geometry. Huber agreed that there was no exclusion or indication that certain standards would not be followed even though they were incorporated into the Contract.

Plaintiffs' architectural expert, Arthur Sanders, AIA *Emeritus*, confirms and documents that the wooden battens at the hip ridge intersections allowed the installation of cleats at 9.5 inches on center at the hip ridge seam. Sanders documents Defendant's failure to secure the triangular pans with cleats embedded in the hip ridge seams as required by the Contract, Revere C&CS and SMACNA. Without cleats at the hip ridge seams securing the copper to the substrate, the only things holding the triangular pans together are the seams Defendant hand-formed without

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 10

_____

male/female connectors, and the copper hip caps Defendant installed on top of the hip ridges. That is contrary to the Contract provision requiring cleats securing the copper at 9.5 inches on center, and both industry standards incorporated into the Contract.   Sanders shows the proper installation of cleats at the hip ridge intersections and provides alternative means for Defendant to comply with the Contract requirement.

### E.    During Hurricane Irma the Unsecured Hip Ridge Seams were Damaged and One of the Hip Ridge Seams Opened

On or about September 7, 2017, Hurricane Irma struck the Territory.    Plaintiffs retained Sanders to inspect and document damage to the copper roofs on their property and prepare proposals and estimates for repairing the roofs.    In February 2018, Sanders visited the property to identify and document the damage to the roofs throughout the property, propose specific repairs, and prepare a construction cost estimate.    Sanders observed and documented that all the copper caps covering the hip ridge lines on the octagonal Main House roof were loose and disturbed by the high winds during Hurricane Irma.    In his Storm Damage Report, Sanders reported that the storm damage included "uplift/displacement at ridges."

In February 2019, Plaintiffs hired Dahill Co. ("Dahill"), a Structural Restoration Contractor, to make temporary repairs to the roof to stabilize it and prevent further damage. Dahill identified an approximately 30-foot section of a hip ridge cap on the northeast side of the Main House roof that had been deformed and displaced during the hurricane and the seam had opened.   Dahill removed the hip cap to expose the open hip ridge seam to inspect it.   Dahill confirmed that there were no cleats securing the opened seam to the substrate.    This is consistent

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 11

_____

with Defendant's testimony that it did not install cleats inside any of the hip ridge seams.   Dahill closed the seam by putting a new cap on and riveting it closed.

Dahill also identified problems with Defendant's riveting of the hip cap that covered the open hip seam.   Dahill documented that rivets Defendant used to secure the copper panels together in the hip ridge seam did not penetrate the lower portion of the hip seam.   Dahill reported that this condition was typical throughout the entire length of the seam.   Defendant's failure to properly secure the hip caps with rivets is significant because Defendant admits it did not install cleats to secure the hip ridge seams.   As a result, only the improperly riveted hip caps hold the hip ridge seams together.    The unsecured condition in which Defendant left all the hip ridge seams explains why Sanders observed that all the Main House hip caps were loosened and displaced by wind uplift during Hurricane Irma, with one hip ridge seam opening completely.

**F.      To Repair the Damage Cause by Defendant's Breach of the Contract the Entire Main House Roof Must be Replaced**

Defendant acknowledges that cleats provide the only source of wind protection for the copper roof.   Defendant's failure to install cleats as required to secure the hip ridge seams eliminated that wind damage protection, which caused one of the Main House hip ridge seams to open during Hurricane Irma and all the other hip ridge caps to become loose and disturbed. Defendant's admission that it omitted cleats at *every hip ridge seam* on the Main House means that none of the triangular pans are properly secured to the substrate.   The only way to secure the hip ridge seams connecting the triangular panels that make up the hexagonal roof on the Main House is to remove all the pans to allow one side to be accessible for cleating.   The repair process would

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 12

_____

likely damage the copper pans and the panels that make up each pan. Replacement of all the copper pans that make up the Main House roof is the only viable option.

Plaintiff's economic expert, Laura Dolan, has calculated the current cost of the copper roof replacement on the Main House, including increases due to tariffs imposed in 2025, at $666,964 in 2025 and $719,792 at the time of trial in 2026.

## IV.    STATEMENT OF DAMAGES:

Plaintiffs seek breach of contract damages of $719,792, plus pre-judgment and post judgment interest and attorneys' fees, which represents the costs of repair/replacement of the main house roof.

## V.    STATEMENT OF LEGAL ISSUES PRESENTED:

### A.  Defendant Breached the Contract by Failing to Install the Cleats Required to Secure the Copper Membrane at the Hip Ridges

Breach of contract claims require "an enforceable contractual duty to perform, a full performance by the nonbreaching party, a failure to perform without legal excuse by the beaching party, and damage that flows from that breach." *Manbodh Asbestos Litigation Series, et al. v. Hess Oil, Virgin Islands Corp.*, 47 V.I. 267, 290 (V.I. Super. Ct. 2005) (citing Restatement (Second) of Contracts 235 (1981)) (citations omitted).

A contractor's liability is fixed by the terms of his contract, and he is obligated to perform according to those terms. 13 Am. Jur. 2d *Building and Construction Contracts* 27 and 17A C.J.S. *Contracts* 494(2); *See also Whitfield Constr. Co., Inc. v. Community Dev. Corp.*, 392 F. Supp. 982, 11 V.I. 655 (D.V.I. 1975). Where a party to a building or construction contract fails to comply

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 13

_____

with the duty imposed by the terms of the contract, a breach results for which an action may be maintained to recover the damages sustained thereby. 13 Am. Jur. 2d *Building and Construction Contracts* 72; *See also* Restatement (Second) of Contracts 235(2) (When performance of a duty under a contract is due any non-performance is a breach).

The Contract at issue in this case was prepared by Defendant and its terms are clear and straightforward. Defendant was required to install a standing seam copper roof "in accordance with Revere Copper & Common Sense and SMACNA." Plaintiff negotiated a more stringent requirement for the spacing of the cleats that secure the copper membrane than the specified standards recommend. To increase wind protection for the copper roof, Defendant agreed to increase the number of cleats securing the copper roof to the substrate and reduce the spacing to an average of 9.5 inches on center instead of 12 inches as recommended by Revere C&CS and SMACNA. Defendant charged Plaintiff more money to increase the number of cleats securing the copper roof.

There is no disagreement or ambiguity in the Revere C&CS and SMACNA standards regarding how and where Defendant was required to install the cleats securing the copper membrane. Both standards require that cleats be worked into *every copper seam* on the roof to provide the *only* source of wind resistance in a standing seam copper roof installation. There is no exception for the copper seams formed where panels or pans meet at the hip ridge lines, the highest points on the roof that are the most susceptible to wind damage. To the contrary, both standards required Defendant to construct the copper seams at the hip ridges in the same manner as the seams that connected the panels that made up the triangular pans.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 14

_____

As with all seams, Defendant was required to install cleats inside the hip ridge seams to secure the copper membrane to the substrate.   SMACNA includes a diagram showing Defendant how to comply with that requirement.   Defendant admits it ignored that contractual requirement and omitted the cleats from the hip ridge seams.   Plaintiff's architectural expert has demonstrated that the pre-installed wooden battens were positioned to accept the hip ridge cleats and identified different ways in which Defendant could have installed cleats in the hip ridge seams. The result of Defendant's breach is that *none* of the hip ridge seams are secured to the substrate.   Defendant's breach caused all the hip seams to become loose and disturbed by Hurricane Irma, with one of the hip ridge seams opening to reveal the absence of cleats.   Defendant acknowledges that its failure to install cleats in the hip ridge seams eliminated the only source of protection from wind uplift and damage.

Defendant has no valid excuse for its failure to secure the hip ridge seams with cleats. Defendant inaccurately claims that the Revere C&CS standard does not address installing cleats to secure hip ridge seams.   In fact, Revere C&CS expressly provides that hip and ridge seams must be constructed with cleats in the same manner as all other copper seams on the roof. Defendant claims that the SMACNA direction to install cleats inside hip ridge seams—with its diagram showing how to do so—is only "optional."   Defendant's argument is contradicted by the mandatory language in the SMACNA manual.   Even if there were an inconsistency between the two standards incorporated into the Contract (which there is not), any ambiguity must be resolved against Defendant because it drafted the Contract. Restatement (Second) of Contracts 206.

There is no evidence to support Defendant's claim, made for the first time recently, that it was "mathematically" or "geometrically" impossible for Defendant to install cleats in the hip ridge

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 15

---

seams.   Plaintiff's expert has shown that the wooden battens met at the hip ridges and it was possible to install cleats along the ridge lines.   Defendant's Project Manager testified the battens were placed appropriately and there were no problems attaching the copper membrane to the battens anywhere on the Main House roof.   Furthermore, Defendant had the roof plan when it prepared the Contract and would have known at the time of contracting if it was mathematically or geometrically impossible to comply with the standards Defendant incorporated into the Contract.   Defendant admits it did not exclude hip ridge cleats from the Contract and did not provide an exception—due to alleged impossibility or any other reason—to Defendant's agreement to comply with both Revere C&CS and SMACNA.

Defendant acknowledges that the Contract required it to install cleats to secure the copper membrane at 9.5 inches on center and that failure to do so would be a breach.   Defendant observed the pre-installed wooden battens before it began installing the copper roof.   Defendant did not object to the batten layout or inform Plaintiffs that it would be "impossible" to secure the hip ridge seams with cleats as required by the Contract and the incorporated standards.   Defendant may not claim after Plaintiffs learned of the breach that it was "impossible" to perform a critical contract requirement.   There are no disputed facts and Plaintiffs have established that Defendant breached the Contract requirement to install cleats securing the copper membrane at the hip ridge intersections.   Defendant is liable for breach of contract as a matter of law and responsible for all damage caused by its breach.

**B.      Plaintiffs' Damages Caused by Defendant's Breach of the Contract is the Cost of Replacing the Main House Roof**

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 16

_____

The measure of damages for breach of contract in the Virgin Islands was stated by the

Court in *Hewitt v. Morton*, 1999 VI Lexis (April 14, 1999), as follows:

> Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed. Restatement (Second) of Contracts 347, cmt. a; *See also Christmas v. Virgin Islands Water & Power Auth.*, 527 F. Supp. 843, 18 V.I. 624 (D.V.I 1981). For breach due to defective performance or due to abandonment of the contract, an injured party can get a judgment for damages measured by the reasonable cost of reconstruction and completion in accordance with the contract, so long as this is possible and does not involve unreasonable economic waste. *See* 13 Am Jur 2d *Building & Construction Contracts* 80 and 5 *Corbin on Contracts* 1089 (1964)(emphasis supplied); *See also Sheldon v. Northeast Developers. Inc.*, 127 Vt. 15, 238 A.2d 775 (Vt. 1968) and *Cooper Concrete Co. v. Hendricks*, 386 S.W.2d 221 (Tex. Civ. App. 1965).24 The amount actually paid by the owner to another contractor for correction and completion in accordance with the contract is a measure of damages for the Defendant's breach. 5 *Corbin on Contracts* 1089; *See also Dierickx v. Vulcan Industries*, 10 Mich. App. 67, 158 N.W.2d 778 (Mich. Ct. App. 1968).

Restatement Second Contracts sets forth the measure of damages as follows:

> § 347 Measure of Damages in General
>
> Subject to the limitations stated in §§ 350-53, the injured party has a right to damages based on his expectation interest as measured by:
>
> (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
>
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
>
> (c) any cost or other loss that he has avoided by not having to perform.

In this case, Plaintiffs expectation was that Defendant would comply with the contract

requirements and the Revere C&CS and SMACNA standards by providing a copper roof secured

with cleats at an average of 9.5 inches on center.  Instead, Defendant delivered a roof with *no*

*cleats at all* to secure the copper membrane at the hip ridge lines.   Defendant's breach of contract,

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 17

_____

which it admits occurred, left the entire Main House roof vulnerable to wind damage. Defendant's breach caused Plaintiffs damage in September 2017 when Hurricane Irma damaged and loosened all the unsecured hip ridge seams, causing one of them to open up. When Plaintiffs learned of Defendant's breach, they pursued their legal remedies through this action.

The measure of damages for Defendant's breach is the cost that Plaintiffs must incur to replace the Main House roof. Replacing the roof is the only way to give Plaintiffs their contractual expectation. Plaintiff's experts have identified the cost to replace the Main House roof as $666,964 in 2025 dollars, and $719,792 at the time of trial in 2026. Defendant has not produced any evidence to dispute that damage amount.

### A. Plaintiffs' Claim for Replacement of the Main House Roof is Not Barred by the Superior Court Settlement Agreement or *Res Judicata*

Daybreak argues that Plaintiffs' claim for breach of contract for failing to install cleats on the Main House roof is "barred by Release and/or *Res Judicata*." Daybreak relies on an agreement to settle a Superior Court (ST-10-cv-716) lawsuit that *expressly excludes* the only claim asserted in this District Court action. Daybreak argues that the parties' agreement to exclude the District Court action from that settlement does not mean what it says.

Daybreak argues it never intended to exclude from the release the only claim in the District Court action—despite expressly saying so in the settlement agreement. Daybreak argues that Plaintiffs' claim for replacement of the Main House roof is exempt because the replacement of the Main House roof was included in the damages asserted in the Superior Court lawsuit. In other words, Daybreak contends its agreement to exclude the *only* claim in the District Court action was meaningless when Daybreak made it to induce Plaintiffs to settle the Superior Court lawsuit.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 18

_____

Daybreak fails to disclose that it filed a motion in the Superior Court case to *limit the claims asserted by Plaintiffs in their Counterclaim to exclude any claim for replacement of the Main House roof*.   The Superior Court granted Daybreak's motion and gave it the preclusion order it requested.   The Court issued an Order excluding from Plaintiffs' Counterclaim any damages for replacement of the Main House roof.   The Superior Court limited the claims that Plaintiffs asserted in their Counterclaim in the Superior Court lawsuit *to damages for the replacement of two different roofs – the Gate House and the Garage*.   The Superior Court's Order excluding any claims for replacement of the Main House roof is *res judicata* and establishes as a matter of law that Daybreak is erroneous in their assertion that the Superior Court settlement released the only claim in this District Court action.

The Superior Court has already determined that Plaintiffs' claim in the District Court Action alleging breach of contract requiring replacement of the Main House roof *was not asserted in the Superior Court action*.   Having obtained a court order *preventing* Plaintiffs from asserting the only claim in the District Court action, Daybreak is collaterally estopped from now taking the opposite position.   Plaintiffs' claim in the District Court action for replacement of the Main House roof based on Daybreak's breach of contract was neither asserted nor resolved in the Superior Court lawsuit. Thus, it is expressly excluded from the settlement agreement and is not barred by the release or *res judicata*.

Defendant has raised the issue that this action is barred based on a settlement in the Superior Court case that dealt with different buildings on the property. The Superior Court action ruled that any claim by Plaintiffs for replacement of the Main Hause roof was excluded from their Counterclaim in the Superior Court Action.   There was no claim for replacement of the Main

_____

house roof in the Counterclaim filed in 2012. Conversely, in discovery, Plaintiffs asserted damages limited to the replacement of the Gate House and Garage roofs as provided in the Paradigm Damage Report.   After more than two years of litigation and after discovery had closed, Plaintiffs' expert then recommended adding the replacement of the Main House roof to the claims asserted in the Counterclaim.

Daybreak vehemently objected to adding the new claim and moved for an order limiting the Counterclaim to the claims asserted in the Paradigm Damage Report.   Daybreak was successful, its motion was granted, and the Superior Court's Order precluded Plaintiffs from asserting a claim for replacement of the Main House roof in the Superior Court action.

Having successfully obtained a court order *excluding* any claim for replacement of the Main House roof from the Superior Court action, Daybreak is collaterally estopped from now claiming the opposite as it does in this motion—that Plaintiffs' claim in the District Court action for replacement of the Main House roof was "asserted" and "resolved" in the Superior Court case. The Third Circuit has identified four standard requirements for the application of collateral estoppel: (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action.   *Henglein v. Colt Indus. Operating Corp.*, 260 F. 3d 201, 209 (3d Cir. 2001).   The requirements for collateral estoppel are satisfied here.

The issue on which Daybreak relies for in its Motion for Summary Judgment is identical to the issue raised by Daybreak and ruled on in the Superior Court's April 26, 2017 Order— whether the claims asserted in Plaintiffs' Counterclaim included a claim for replacement of the

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 20

_____

Main House roof.   The *identical issue* was *actually litigated* when the Superior Court considered the evidence and arguments and granted Daybreak's motion to *exclude* any claim for replacement of the Main House roof (and any other claims beyond those identified in the Paradigm Damage Report).   Whether Plaintiffs could add a claim for replacement of the Main House roof was *necessary* to the Superior Court's Order limiting Plaintiffs' damages to the costs to replace only the Gate House and Garage roofs itemized in the Paradigm Damage Report.   Daybreak was *fully represented* in the Superior Court action and successfully brought the motion that resulted in the preclusion Order Daybreak now wishes to ignore.

The Superior Court Order which granted Daybreak's motion precluded any claim for replacement of the Main House roof and limited the claims asserted in the Counterclaim to those in the Paradigm Damage Report.   Plaintiffs were adversely impacted because the damages recommended by their expert were reduced by more than two thirds when the Main House roof replacement was precluded by the Superior Court Order—from $759,357 to $210,000.   The Superior Court Action proceeded toward trial with the claims asserted by Plaintiff limited to those identified in the Paradigm Damage Report—replacement of the Gate House and Garage roofs with no claim for replacement of the Main House roof.

The parties eventually negotiated a settlement of the claims that the Superior Court had ruled were asserted in the Counterclaim.   A final and valid judgment was entered in the Superior Court action based on a settlement of the Counterclaim as limited by the Superior Court Order. "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."   Restatement (Second) of

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 21

_____

Judgments § 27 (1982).   The Third Circuit has consistently applied this general rule.   *Nat'l R.R.*

*Passenger Corp. v. Pennsylvania Pub. Util. Comm'n,* 288 F. 3d 519, 525 (3d. Cir. 2002).

The Superior Court Settlement Agreement expressly provides that it "does not extinguish"

the sole claim in the District Court action "to the extent that District Court case does not encompass

claims that were asserted in the Superior Court case."   Because Plaintiffs were precluded by the

Superior Court's April 26, 2017 Order from asserting a claim for replacement of the Main House

roof in their Counterclaim, it *could not be asserted in the Superior Court case* and was not

extinguished by the settlement agreement.   Daybreak sought and obtained the Superior Court

Order excluding the Main House roof replacement from the Counterclaim.   Daybreak is

collaterally estopped from taking the opposite position in this motion.   The only claim in the

District Court action *could not be asserted in the Superior Court action* and was therefore excluded

from the Superior Court Settlement Agreement.

The Superior Court's order dismissing that case expressly states the dismissal was based

on the parties' settlement.   The parties finalized the settlement terms after the dismissal, including

the carve out of the District Court action, and Daybreak's insurer tendered to Plaintiffs the

settlement funds.   The order dismissing the Superior Court action confirms it is based on a

settlement that excludes the District Court action from any release.

## C.    Defendant's Causation, Intervening Cause, Alteration and Mitigation Arguments Are Meritless and Are Not Defenses to this Breach of Contract Action

Plaintiffs allege only a breach of contract claim for which they seek to recover the benefit

of their bargain: a copper roof on their Main House secured to the substrate with cleats spaced as

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 22

_____

required by the Contract and the industry standards incorporated into it.    Plaintiffs do not make

claims of negligence, product liability, or any other tort.    Plaintiffs do not seek to recover

damages to their property caused by Daybreak's faulty work or a failure of the roof during the high

winds that hit St. John during Hurricane Irma.    Plaintiffs just want the benefit of their bargain,

which requires replacement of the Main House roof.    The causation requirement for breach of

contract is that the damages must be a foreseeable result of the breach when the contract was made.

Restatement (Second) of Contracts § 351.    It was foreseeable when Daybreak agreed to install

cleats that Daybreak's failure to do so would require replacement of the entire Main House roof to

properly secure it with cleats.

      Plaintiffs were not obligated to pay twice for the roof they bargained for once they learned

that at least one roof seam was not secured as required by the Contract after Hurricane Irma.    The

injured party in a breach of contract action is required to make reasonable efforts to minimize their

losses, and they cannot recover for damages they could have avoided.    Restatement (Second) of

Contracts § 350.    Plaintiffs complied with the mitigation requirement.    After one complete hip

ridge seam was opened by the hurricane, Plaintiffs mitigated any water leakage or other damage

that might result from Daybreak's breach of the Contract by hiring contractors to secure the roof

and repair any leaks or potential leaks.

      Plaintiffs are not seeking property damages caused by the failure to secure the Main House

roof.    Plaintiffs seek to recover the benefit of their bargain in the form of the roof they paid

Daybreak to install.    Defendant's suggestion that Plaintiffs should have replaced the entire Main

House roof at their own cost to "mitigate" their damages is preposterous. Plaintiffs did not know

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 23

_____

that Daybreak breached the Contract's requirements until Daybreak admitted this during depositions in 2025.

Defendant's suggestion that Sanders "materially altered" the Main House roof in 2014 is wrong and would not be a defense to Plaintiffs' claim for breach of the Contract even if he had done so. The ridge seam Sanders inspected in 2014 was not the same ridge seam that opened during Hurricane Irma in 2017. Sanders' inspection of a 2-foot section, or approximately 6% of a different seam has no relation to this breach of contract case. Again, this is not a tort case; "causation" of the damage resulting from Daybreak's breach of contract is not an issue. Plaintiffs are entixtled to a roof on their Main House with the wind protection for which they bargained and paid.

Likewise, whether the roof Daybreak agreed to provide was designed to withstand any particular windspeed is irrelevant to the breach of contract claim. Similarly, Sanders' expertise in windspeed resistance and the wind resistance provided by the cleats is irrelevant. This is not a negligent design or construction case. Plaintiffs seek the benefit of their bargain which requires Daybreak to replace the Main House roof. Plaintiffs are entitled to the cost of a new roof at the time a judgment is entered in their favor.

### VI.    **PLAINTIFFS' WITNESSES:**

1.  Thomas F. Friedberg – party and percipient

2.  Sarah L. Bunge – party and percipient

3.  Richard Maiocco – owner of Dahill, Inc.

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 24

4. Richard Barabbas – cooper roofer who documented damage in 2018 and prepared estimate and scope of work

5. Micah Cady- Adverse – Defendant's Foreperson

6. Barry Huber – Adverse – Defendant and owner of Daybreak

7. Arthur Sandrs, AIA Emeritus – Architectural expert

8. Larua Dolan – Economic expert

## VI.    <u>EXHIBITS:</u>

| PRESIDING JUDGE<br>Robert Molloy | | | | | PLAINTIFF'S ATTORNEY<br>Thomas F. Friedberg/Brian Glasser | DEFENDANT'S ATTORNEY<br>Jeffrey Cosby |
|---|---|---|---|---|---|---|
| TRIAL DATE (S)<br>April 14, 2026 - April 28, 2026 | | | | | COURT REPORTER | COURTROOM DEPUTY |
| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES | |
| 1 | | | | | Contract dated May 7, 2010 | |
| 2 | | | | | Proposal from Daybreak dated February 8, 2010 | |
| 3 | | | | | Main roof plans | |
| 4 | | | | | Photographs of cooper being installed on main roof | |
| 5 | | | | | Revere Cooper and Common Sense excerpts | |
| 6 | | | | | SMACNA excerpts | |
| 7 | | | | | Illustration - complaint cleat layout | |
| 8 | | | | | Illustration - non-complaint cleat layout | |
| 9 | | | | | Illustration - Alternative method cleat attachment -1 | |
| 10 | | | | | Illustration - Alternative method cleat attachment - 2 | |
| 11 | | | | | Dahill report (Barabas) with photographs of roof in 2018 | |
| 12 | | | | | Photograph - 2014 inspection vs. 2017 inspection | |
| 13 | | | | | Curriculum vitae - Arthur Sanders | |

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 25

| 14 | | | | | Hoffmann Storm Damage Report by Arthur Sanders |
|----|--|--|--|--|---|
| 15 | | | | | Curriculum vitae - Laura Dolan |
| 16 | | | | | Dolan economic analysis - 6/25/25 |
| 17 | | | | | Dolan economic analysis - 9/3/25 |
| 18 | | | | | Paradim Construction Estimate for Gate House/Garage |
| 19 | | | | | Sample cleat |
| 20 | | | | | Deposition transcript - Barry Huber 4/28/25 |
| 21 | | | | | Deposition transcript - Barry Huber 10/7/25 |
| 22 | | | | | Deposition transcript - Micah Cady - 4/28/25 |
| 23 | | | | | Deposition transcript - Micah Cady - 10/7/25 |
| 24 | | | | | Deposition transcript - Richard Miaocco |
| 25 | | | | | Deposition transcript - Richard Barabas |
| 26 | | | | | Deposition transcript - Joe Bragg |
| 27 | | | | | Superior Court Action - counterclaim |
| 28 | | | | | Redacted Settlement Agreement/Release of Superior Court Action |
| 29 | | | | | Order of Dismissal of Superior Court Action |
| 30 | | | | | Deposition transcript Art Sanders - Volume I |
| 31 | | | | | Deposition transcript of Art Sanders - Volume II |
| 32 | | | | | Deposition transcript of Laura Dolan |
| 33 | | | | | Deposition transcript of Thomas F. Friedberg |
| 34 | | | | | Deposition transcript of Sarah L. Bunge |
| 35 | | | | | Superior Court Order limiting damages to $210,000 |
| | | | | | |
| | | | | | |
| | | | | | |

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 26

_____

VII.    **SPECIAL PROBLEMS**:

   **Plaintiffs:**

Plaintiffs are requesting a special set of April 21, 2026, which is within the current trial period.

The parties have filed cross-motions for summary judgment (Plaintiffs' motion  - Docs. 86-92; Defendant's motion – Docs. 93-95. Plaintiffs are requesting a ruling on their motion prior to the commencement of trial.

Plaintiffs' are also requesting an evidentiary hearing for the Court to determine as a matter of law that the release in the Superior Court Action is not a bar to the present District Court case.

Plaintiffs are also requesting an Order *in limine* to prevent Defendant from referring to an insurance claim Plaintiffs' filed for other portions of the property following Hurricane Irma. Any insurance claim or payments would be a collateral source. This is a breach of contract action and not a tort claim. While under a tort theory the collateral source rule is at issue, there are no collateral source set offs under a breach of contract claim. The gist of the lawsuit against Defendant sounds in breach of contract and not tort. While there is a statutory limitation regarding the collateral source rule for tort cases (5 V.I.C. 427), this rule only applies where there are damages based on bodily injury. *See Pedro v. Higgins,* 53.V.I.98, 2010 V.I. LEXIS 18(V.I. Super.Ct. 2010).

When interpreting the use of collateral source payments to limit damages, the courts have specifically rejected evidence of collateral source payments and refused to allow offset in breach of contact cases. While no Virgin Islands case could be found, in *Caroline-A-Contracting, LLC v. J. Scott Campell Construction Company*, the Court of Appeals in North Carolina (COA20-60 2021), explained the rationale for the distinction between contract and tort cases. In a construction

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 27
_____

case, the Court held that the defendant is not entitled to a collateral source set off.   As the Court

stated, it would be unfair to allow the breaching defendant contractor to avoid the full cost of

damages caused by the breach merely because the plaintiff recovered insurance proceeds from an

unrelated (or collateral) source.   In accordance with nationwide precedent, the Court in *Caroline*

reasoned that plaintiff paid for the insurance protection and is entitled to the benefit of that

bargain.   The plaintiff is also entitled to the benefit of the bargain he made with the

defendant.   The defendant contractor did not contribute to the insurance premium and is not

entitled to a windfall benefit from plaintiff's insurance contract.   The plaintiff should not be

punished for his prudence in contracting with an insurer and is entitled to the benefit to the bargain

he purchased from each independent contractor.   Plaintiff is entitled to the insurance protection

he purchased and that recovery does not excuse the defendant's breach nor reduce his liability for

damages.   As the *Caroline* Court noted in its conclusion, to the extent such payments overlap and

allow a double recovery, "in this situation, the injured party…not the tortfeasor…should reap any

such windfall."


**VIII.   ESTIMATED LENGTH OF TRIAL:**

Plaintiffs estimate that this is a 2 to 3 day trial. A jury has been demanded.


Attorneys for Plaintiffs

*/s/ Thomas F. Friedberg, Esq.*

Thomas F. Friedberg, Esq. (VI 1006)
Law Offices of Friedberg & Bunge
1005 Rosecrans Street, Suite 202

*Friedberg & Bunge v. Daybreak, Inc.*
Case No. : 19-cv-0053
Plaintiffs' Trial Brief
Page 28
_____

San Diego, California 92166

Brian Glasser, Esq. (*Pro hac vice*)
Bailey & Glasser, LLP
1055 Thomas Jefferson Street NW, Suite 540
Washington, D.C. 20027

David L. Selby, II, Esq. (*Pro hac vice*)
Bailey & Glasser, LLP
3000 Riverchase Galleria, Suite 905
Birmingham, AL 35244


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of March 2026, a true and correct copy of

PLAINTIFF'S TRIAL BRIEF was filed with the CM/ECF system which will provide notice to the

following:

Jeffrey C. Cosby, Esq.
Florida Bar No. 967981
Service to: eservice@wlclaw.com
Attorney for Defendant Daybreak Inc
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994
Telephone: 772-463-8402
Facsimile: 772-463-4820

Andrew C. Simpson
**ANDREW C. SIMPSON, PC**
2191 Church St., Ste. 5
Christiansted, VI 00820
TEL : 340.719.3900
E-MAIL :asimpson@coralbrief.com


_____*/s/ THOMAS F. FRIEDBERG*_____
**THOMAS F. FRIEDBERG**