# IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| THOMAS F. FRIEDBERG & SARAH L. BUNGE, <br><br> Plaintiffs, <br><br> v. <br><br> DAYBREAK, INC. dba HUBER & ASSOCIATES, <br><br> Defendant. | ACTION NO. 3:19-cv-0053-RAM-EAH <br><br> ACTION FOR DAMAGES |

## DEFENDANT'S TRIAL BRIEF

Defendant, DAYBREAK, INC. dba HUBER & ASSOCIATES, respectfully files the following Trial Brief:

**I.    APPEARANCES**

**For the Plaintiffs:**

Thomas F. Friedberg, Esq. (VI 1006)
Law Offices of Friedberg & Bunge
1005 Rosecrans Street, Suite 202
PO Box 6814
San Diego, California 92166

Brian Glasser, Esq. (*Pro hac vice pending*)
Bailey & Glasser , LLP
1055 Thomas Jefferson Street NW, Suite 540
Washington, D.C. 20027

David L. Selby, II, Esq. (*Pro hac vice pending*)
Bailey & Glasser , LLP
3000 Riverchase Galleria, Suite 905
Birmingham, AL 35244

    **For the Defendant:**

Jeffrey C. Cosby, Esq. (*Pro hac vice*)
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL 34994

Andrew C. Simpson, Esq.
Andrew C. Simpson, PC
2191 Church St., Ste. 5
Christiansted, VI 00820

## II.   NATURE OF ACTION AND JURISDICTION OF THE COURT

This case is a single cause of action for damages based on Defendant's alleged breach of contract. The purpose of this contract between Plaintiffs and Defendant was to manufacture and install a standing seam copper roof on Plaintiffs' main pavilion structure located at 168 Chocolate Hole, St. John, United States Virgin Islands. This action is brought pursuant to the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs and Defendant are citizens of different states, and the amount in controversy exceeds $75,000.

## III.   FACTUAL CONTENTIONS:

Defendant denies Plaintiffs' claims and allegations. Defendant alleges the following:

In 2010, Daybreak Roofing Company ("Daybreak") was contracted to install copper standing seam roofs on eight separate structures, including the "Main Pavilion," at the Friedberg-Bunge residence in St. John, Virgin Islands. The contract specified that cleats should be installed at an average of 9.5 inches on center. The contract also specified that the roofing would be "installed in accordance with Revere Copper & Common Sense & SMACNA. Each ridge seam is located at the point where the sides of one triangle intersect with the sides of another triangle. The other seams on the roof are "standing seams" joining 15" wide copper "pans" together to form one of the eight triangles.

Daybreak sued Friedberg in a separate action in the Superior Court of the Virgin Islands alleging that Friedberg failed to make the final payment due under the contract. Friedberg counterclaimed, alleging widespread defects in the roofing work across all eight structures, including the Main Pavillion. To support his counterclaim, Friedberg retained Arthur L. Sanders, AIA, as an expert witness to evaluate the alleged defects. Exhibit 5, Expert Report of Sanders in Case No. ST-2010-CV-00716. In support of his report for the Superior Court litigation, Sanders conducted a comprehensive inspection of all eight roofs, including an invasive, destructive examination of the Main Pavilion roof.

As part of this inspection, Sanders physically opened a section of the copper roof on the Main Pavilion to examine the construction beneath the visible surface and observed the absence of cleats in the ridges. When asked why he brought a roofing mechanic with him to the inspection of the roof, he explained that it was for the specific purpose of determining if the roof was cleated in accordance with the contractual requirements. When asked about the prior inspection, Sanders confirmed that the only ridge seam that failed during Hurricane Irma was the ridge seam that he opened up in 2014. This seam was shown as an alleged defect in Sanders' 2014 expert report. Sanders further testified that the reason for the 9.5" on average spacing requirement for cleats (less than the industry standard of 12") was because "this is a high wind area." At the time of his deposition, Sanders could not recall seeing an engineering report. It was "absolutely" Sanders' opinion in 2015 during his deposition that "cleats should have been in the ridges." When deposed in the present case, Sanders speculated that the alleged damage from Hurricane Irma would not have occurred if there had been cleats on the ridges even though the remaining ridges had no damage.

In supplemental interrogatory responses in the Superior Court case, Friedberg specifically

3

adopted Sanders' November 12, 2014 expert report as outlining all of his claims regarding defective workmanship. Sanders specifically called for replacement of the entire Main Pavilion roof in the Superior Court case. By adopting Sanders' report, Friedberg therefore asserted claims based on all defects identified in that report, including (a) the alleged lack of cleats securing the ridge seam to the substrate below it and (b) the need for complete replacement of the Main Pavilion roof. Despite Sanders' 2014 recommendation for complete replacement, despite his testimony about wind vulnerability, and his explicit concern about inadequate attachment "in a high wind area," Friedberg chose not to repair or replace the roof. Instead, the allegedly defective roof that Sanders testified was vulnerable to damage from severe winds in St. John's hurricane-prone environment remained in place through multiple hurricane seasons through the present.

On September 6-7, 2017, approximately three years after Sanders' inspection and while the Superior Court litigation was still pending, Hurricane Irma struck St. John as a category 5 hurricane. The storm brought sustained winds of approximately 185 mph, with higher gusts, making it one of the most powerful hurricanes to impact the Virgin Islands in recorded history. According to Sanders, St. John sustained winds in excess of "200 MPH for several hours." Despite the strength of Irma, the Main Pavilion roof showed exemplary performance in the storm. The Defendant's conforming to proper attachment of the roof caused all roof sections to remain securely intact.   Seeing that only one hip seam's batten cap blew off and that being the same seam destructively examined by the Owner's expert some years prior, speaks to the integrity of the overall installation. Specifically, there were only impact damages (from flying debris) and the only mechanical damage occurred at the exact location where Sanders, in 2014, unfolded the ridge seam and discovered that there were no cleats in that section of the ridge.   Thus, the Defendants allege that any damage to that seam is due to Sanders' failure to properly return it to its pre-inspection

condition.

Sanders conducted an inspection of the Main Pavilion roof in 2018 after Hurricane Irma. Sanders opined that his inspection revealed that Daybreak "did not install cleats at the intersection of the copper panels that form the ridge between the copper pans at 9.5 inches on center as required by the terms and conditions of the contract." When deposed about this statement, Sanders admitted that the area where he found the absence of cleats was the same ridge seam that he opened up in 2014. He reiterated that the damage found after Hurricane Irma was on the exact same ridge seam that he opened prior to Hurricane Irma. Sanders linked the 2017 hurricane damage directly to the alleged defect he identified in 2014.

In 2018, while the Superior Court case was still pending, Friedberg filed a separate lawsuit in this Court. Rather than asserting the hurricane damage as additional damage for the alleged defects Friedberg was already asserting in the Superior Court, Friedberg initiated the present litigation. In his District Court Complaint, Friedberg advanced a theory that directly contradicted the facts established by Sanders' 2014 inspection and testimony. Sanders' 2014 opinion and his deposition testimony in both cases establishes beyond dispute that the alleged defective condition of missing cleats securing the ridge seams was known to Sanders (and therefore to Friedberg) by September 11, 2014, the first day of his roof inspection conducted as part of the Superior Court case.

In 2023, the Superior Court case was resolved by the same parties through a monetary settlement. The settlement was purely financial; no repairs were performed as part of the resolution. It resulted in a general release with a specific and limited "carve out" of only claims that were asserted in the District Court case that were not encompassed in the Superior Court case. Friedberg claims that this lawsuit "deal[s] exclusively with the main house on the lower portion of

Plaintiffs' property." Friedberg also stated that "[t]he claims in the Superior Court action are limited to the two upper buildings—the gate house and the garage/studio. This claim is belied by the Sanders deposition and expert report of Sanders in the Superior Court case.

Plaintiffs allege that Copper & Common Sense & SMACNA require cleats in the ridges. However, Defendant's expert Joe Bragg testified that those two sources contradict each other as to whether cleats should be in the ridges. Mr. Bragg also testified that the Plaintiffs' interpretation of the contract is not industry standard. What is described in the contract as to the cleats indicated the horizontal portion of the battens and where they intersect with the vertical lock of the individual standing seam panels.

Sanders admitted that he did not have the expertise to opine as to the windspeeds that cleats could withstand if they encountered winds in excess of 200 miles per hour and explained "you need someone who diagnoses these things from the industry to respond to that. Perhaps somebody from Copper and Common Sense or perhaps someone from Miami Dade." When asked to acknowledge that "wind damage, wind speeds, what damage would be caused by what speed" was not in his expertise, Sanders agreed, stating, "I'm not in that business, no." Sanders expressed his personal belief that a "[i]f there were cleats there, there would be no uplift damage to a reasonable wind speed, including maybe the second largest storm in St. John's history" and that a "reasonable wind speed limit was "[m]aybe 175 miles per hour." Sanders thought the highest wind speed on St. John was 176 mph. Id. at 104:6-12. In his report supporting Friedberg's separate homeowners' insurance claim, Sanders claimed that more than 80 panels (pans) were damaged to justify replacing the entire roof. However, there was no mention of missing cleats contributing to the loss. Sanders' opinions are based on assumptions.. In Sanders' report for his insurance case, he does not allege any roof failure due to the absence of cleats.

Friedberg knew about the lack of cleats on the ridges as of September 11, 2014, at the latest, when Sanders unfolded the ridge seam. Moreover, Friedberg was alleging defects with the main pavilion roof as early as 2012. In Sanders' report in 2014, he opined that the replacement cost of the Main Pavilion roof was $358,771. Friedberg asserts that the same replacement cost is between $682,301 and $712,540 in 2026 prices.

IV.    **STATEMENT OF DAMAGES**:

Defendant denies Plaintiffs' claims, has raised defenses and alleges attorneys' fees and costs are due to Defendant for the defense of this action.

V.    **STATEMENT OF ANY LEGAL ISSUES PRESENTED**:

**A. Friedberg's claim is barred by Release and/or *Res Judicata***

The exact issue raised in this case was known to Plaintiffs (collectively "Friedberg") and settled in 2024 in the related Superior Court action Friedberg brought (Case No. ST-2010-CV-00716) ("the Superior Court Case") and is therefore barred by both the express terms of the release and *res judicata*. Friedberg released all claims encompassed in the Superior Court case. Friedberg claims that the instant case is wholly separate from the case previously filed in the Superior Court regarding the same roof. Specifically, Friedberg claims that this lawsuit "deal[s] exclusively with the main house on the lower portion of Plaintiffs' property," *see* SUMF 41 whereas (again according to Friedberg) "[t]he claims in the Superior Court Action are limited to the two upper buildings—the gate house and the garage/studio. SUMF 42. But Friedberg has not been candid with the Court. Friedberg supplemented his interrogatory responses in the Superior Court case to clarify that his claims encompassed everything in the Sanders' expert report. SUMF ¶25.

**B. Friedberg's failure to fix the claimed defects is an intervening cause.**

Friedberg's failure to secure the roof after his expert opined in 2014 that the roof was not constructed to the engineering standards adopted by Friedberg for the express purpose of protecting the roof from loss during a hurricane is an intervening cause that breaks the chain of causation related to Daybreak's alleged failure to construct the roof in accordance with the terms of the contract. Friedberg knew by September 11, 2014 when Sanders opened the ridge seam that there were no cleats in that location. Moreover, at that time Sanders was opining that the entire Main Pavilion roof needed to be replaced because of alleged defects, including the alleged lack of cleats. An intervening cause destroys the causal connection between the defendant's acts and the victim's injury, thereby becoming the cause of the injury. *Cyprian v. Virgin Islands Water & Power Auth.*, 2022 VI SUPER 99, ¶29, 2022 WL 22949652 (Dec. 22, 2022). If the intervening act was reasonably foreseeable, it is not considered to have destroyed the causal connection. Id. ¶30. Gross negligence is unforeseeable whereas ordinary negligence is considered foreseeable. *Id.*

**C. Friedberg cannot meet his burden of proving causation**

Friedberg cannot prove that Daybreak's alleged breach of contract was a cause of the Hurricane Irma damage. Even without the intervening cause, there are at least three possible explanations for the alleged roof failure in this case: (1) alteration of the roof by Friedberg's own agent, Sanders; (2) the roof was not designed to escape completely unscathed when encountering the windspeeds and gusts of a storm such as Irma; and/or (3) defective workmanship. Because Friedberg is unable to rule out the first two potential causes, he cannot prove his claim based upon the third potential cause.

**D. Friedberg failed to mitigate the alleged damages by repairing the roof in 2015.**

Friedberg knew in 2014 that his expert, Sanders, considered the Main Pavilion roof to be defectively constructed and required replacement. Friedberg also is charged with the knowledge of Sanders that the ridges did not have cleats securing them to the substrate and it was Friedberg who retained an engineer to specify cleat placement for purposes of securing the roof for hurricanes. Under those facts, the failure to repair the roof, even if it was to only temporarily repair it so that the ridges were secured in the manner Sanders claims was required by the contract, can only be deemed to be wanton, reckless behavior demonstrating a conscious indifference to the safety of property. That's the definition of gross negligence. The decision not to secure the roof in a hurricane zone is more than mere thoughtlessness or inadvertence, or simple inattention (ordinary negligence). As such, Friedberg's failure to protect his own property from a known danger rises to the level of an intervening cause, breaking the chain of causation and preventing a finding of causation against Daybreak.

**E. Plaintiffs' Damages, if any, are Limited to the Cost of Materials and Labor that Existed When the Defect was Found in 2014.**

The 10-year (and counting) delay in repairs has resulted in vastly increased prices due to changing economic factors. Friedberg knew about the lack of cleats on the ridges as of September 11, 2014 when Sanders unfolded the ridge seam. Moreover, Friedberg was alleging general defects with the Main Pavilion roof as early as 2012. Based on this knowledge, Friedberg had an obligation to replace or repair the roof in 2014 as soon as he learned of the alleged defect. Instead, Friedberg kept the same roof in place that was installed. Meanwhile, the price of labor and materials has skyrocketed. In Sanders' report in 2014, he opined that the replacement cost of the Main Pavilion roof was $358,771. Currently, Friedberg asserts that the same replacement cost is between

$682,301 and $712,540. By failing to mitigate their damages, Plaintiffs are limited in the damages that they are able to recover. *See Ramier v. Stout,* 1979 WL 444370 (Terr. V.I. 1978). In that case, Plaintiffs knew of the defect with the construction. *Id.* However, they failed to mitigate their losses and have the issues repaired in a timely manner. *Id.* In that case, the Court found that Plaintiff had a duty to mitigate his damages and that he was limited to the costs to repair when the defect was discovered. *Id.*

### VI.   DEFENDANT'S WITNESSES

1. Thomas F. Friedberg, Plaintiff/Claimant
2. Sarah L. Bunge, Plaintiff/Claimant
3. Chris Bunge, Brother of Sarah L. Bunge and contractor who worked on property
4. John Bragg Defendant's Expert
5. Barry Huber, Owner and Corporate Representative of Daybreak, also unretained expert
6. Micah Cady, Foreman for Defendant Daybreak, also unretained expert
7. Richard Barabbas, Copper Roofer who performed an inspection and provided an estimate of roof
8. Richard Maiocco, Owner of Dahill, Inc
9. Arthur Sanders, Plaintiffs' Expert Architect.
10. Laura Dolan, Plaintiffs' Expert

### VII.   DEFENDANT'S EXHIBIT LIST

1. Contract Dated May 7, 2010
2. Deposition Transcript of Arthur Sanders taken on September 11, 2025
3. Deposition Transcript of Arthur Sanders taken on August 28, 2025
4. Deposition Transcript of Arthur Sanders taken on March 6, 2014

5. Deposition Transcript of Thomas Friedberg taken on March 17, 2025

6. Deposition Transcript of Richard Barabas taken on September 11, 2025

7. Deposition Transcript of Sarah Bunge taken on May 2, 2025

8. Deposition Transcript of Chris Bunge taken on April 24, 2025

9. Deposition Transcript of Laura Dolan taken on September 8, 2025

10. Deposition Transcript of Richard Maiocco taken on September 5, 2025

11. Deposition Transcript of Joe Bragg

12. Deposition Transcript of Barry Huber taken on April 29, 2025

13. Deposition of Transcript of Barry Huber taken on October 7, 2025

14. Deposition Transcript of Micah Cady taken on April 28, 2025

15. Deposition Transcript of Micah Cady taken on October 7, 2025

16. Complaint in U.S.V.I. Superior Court Case No. ST-10-CV-716

17. Answer and Counterclaim in U.S.V.I. Superior Court Case No. ST-10-CV-716

18. Settlement Agreement in U.S.V.I. Superior Court Case No. ST-10-CV-716

19. Defendants' Answers to Interrogatories in U.S.V.I. Superior Court Case No. ST-10-CV-716

20. Defendants' Expert Disclosure in U.S.V.I. Superior Court Case No. ST-10-CV-716

21. Plaintiff's Motion to Re-enter Land in U.S.V.I. Superior Court Case No. ST-10-CV-716

22. Order U.S.V.I. in Superior Court Case No. ST-10-CV-716 Limiting Damages

23. Opinion on Defendants' Motion for Reconsideration U.S.V.I. Superior Court Case No. ST-10-CV-716

24. Defendants' Motion for Interlocutory Appeal in U.S.V.I. Superior Court Case No. ST-10-CV-716

25. Order Denying Defendants' Motion for Interlocutory Appeal U.S.V.I. Superior Court Case No. ST-10-CV-716

26. Defendants' Supplement Response to Interrogatories in U.S.V.I. Superior Court Case No. ST-10-CV-716

27. Order of Dismissal in   U.S.V.I. Superior Court Case No. ST-10-CV-716

28. Hoffman Expert Report Dated August 20, 2018

29. Hoffman Expert Report Dated June 29, 2025

30. Hoffman Expert Report November 2014

31. Laura Dolan's Expert Report (Dolan Economic Analysis dated June 25 and September 3, 2025

32. Joe Bragg's Expert Report

33. Joe Bragg's Photographs taken at inspection

34. Joe Brag's CV

35. Photographs of the Property Taken during the Installation of the Roof(s) in Summer of 2010 (5 photos)

36. Main Roof Plans

37. National Hurricane Center's Report on Hurricane Irma

38. Daybreak's Proposal dated February 8, 2010

39. Paradim Construction Estimate for Gate House/Garage

40. Revere Cooper and Common Sense Excerpts

41. SMACNA Excerpts

42. Dahill Report with Photographs of Roof 2018

43. Photographs from the Deposition of Arthur Sanders taken on March 6, 2014 (93 Photographs)

44. HIP treatment Diagram

45. Google Earth Satellite Photographs of the subject property for August 10, 2017, September 27, 2017, and November 25, 2017

46. Excerpt from SCMNA regarding Panel Lengths

## VIII. DEFENDANT'S EXPERT WITNESSES

1. Joseph Bragg – Roofing expert
2. Barry Huber – non-retained expert
3. Micah Cady – non-retained expert

## IX. SPECIAL PROBLEMS:

**Defendant:**

Defendant states that an evidentiary hearing on whether the U.S.V.I. Superior Court Case release is a bar to this action is not required and this issue is before the Court by way of the Defendants' Motion for Summary Judgment.

## X. ESTIMATED LENGTH OF TRIAL:

Defendant estimates a 2-day trial and a jury trial has been demanded.

Attorneys for Defendant

*/s/* Jeffrey C. Cosby

Jeffrey C. Cosby, Esq. (*Pro hac vice*)
Williams, Leininger & Cosby, P.A.
301 SE Ocean Blvd., Suite 205
Stuart, FL   34994

Andrew C. Simpson, Esq.
Andrew C. Simpson, PC
2191 Church St., Ste. 5
Christiansted, VI 00820