**DISTRICT COURT OF THE VIRGIN ISLANDS**

**DIVISION OF ST. THOMAS AND ST. JOHN**

**THOMAS F. FRIEDBERG,**
**and SARAH L. BUNGE,**

**Plaintiffs,**

**v.**

**3:19-cv-00053-ER-EAH**

**DAYBREAK, INC. d/b/a HUBER & ASSOCIATES,**

**Defendant.**

**COUNSEL:** **Thomas F. Friedberg, Esq.**
**Brian A. Glasser, Esq.**
**David L. Selby, Esq.**
*On behalf of Plaintiffs*
**Jeffrey C. Cosby, Esq.**
**Andrew C. Simpson, Esq.**
*On behalf of Defendant*

Rec'd.DCVI-SX 09 11'26 PM05:48

## REPORT AND RECOMMENDATION

**THIS MATTER** comes before the Court upon referral by the District Judge for a Report & Recommendation ("R&R"), Dkt. No. 143, on the motion for summary judgment filed by Plaintiffs Thomas F. Friedberg and Sarah L. Bunge ("Plaintiffs"). Dkt. No. 86. For the reasons that follow, the Court recommends that the motion for summary judgment be denied.

## BACKGROUND

### I. Procedural Background

Plaintiffs commenced this action on July 14, 2019, asserting a single claim for breach of contract against Defendant Daybreak, Inc., doing business as Huber & Associates ("Daybreak"), arising from the manufacture and installation of a copper standing seam roof at Plaintiffs' residence located in St. John, United States Virgin Islands. Dkt. No. 1 ¶¶ 1, 7.

Early in the litigation, Daybreak filed a "Motion to Dismiss for Failure to State a Claim or Motion to Stay," which it later amended. Dkt. Nos. 12, 16 (Amended Motion). Following the parties' September 25, 2024 joint status report, Dkt. No. 30, and the dismissal of a related Superior Court action, the Court rendered Daybreak's Motion to Stay moot. Dkt. No. 31. On October 14, 2024, Daybreak filed its Answer to the Complaint, in which it denied liability and asserted affirmative defenses. Dkt. No. 33. On November 14, 2024, the Court held an Initial Conference and issued a Scheduling Order setting deadlines for discovery, amended pleadings, dispositive motions, and status conferences. Dkt. No. 42. Thereafter, the parties conducted extensive discovery, including written discovery, fact and expert depositions, and submission of expert reports regarding the roof system, its installation, the incorporated standards, and the alleged damages.

On December 14, 2025, both parties filed motions for summary judgment. Dkt. Nos. 86, 93. Plaintiffs filed the instant Motion for Summary Judgment, together with a supporting memorandum, Statement of Undisputed Material Facts, and declarations with exhibits. Dkt. Nos. 86, 87, 88, 89, 90, 91, 92. Daybreak filed an opposition to Plaintiffs' Motion and a response to Plaintiffs' Statement of Undisputed Material Facts. Dkt. Nos. 103, 104, 105. Plaintiffs thereafter filed a reply. Dkt. Nos. 107, 109.

## II. Factual Background

This action concerns a standing seam copper roof system installed at Plaintiffs' property at 168 Chocolate Hole in St. John, United States Virgin Islands. Dkt. No. 104 ¶ 1. In May 2010, Plaintiffs entered into a written contract with Daybreak for the manufacture and installation of copper standing seam roofs on several structures at the property, including the Main House Pavilion ("Main House"), the only structure at issue here. *Id.* ¶¶ 1, 2(a); *see also* Dkt. No. 101-1.

The Main House roof has an octagonal structure formed by triangular copper panels that meet at multiple hip-ridge lines. Dkt. No. 104 ¶ 13. The contract required Daybreak to install a sixteen-ounce red copper standing seam roof system in accordance with Revere Copper & Common Sense ("Revere") and the Sheet Metal and Air Conditioning Contractors' National Association, Inc. ("SMACNA") industry standards. Dkt. No. 101-1 at 2; *see* also Dkt. No. 104 ¶¶ 9–10. The contract further specified fifteen-inch-on-center panel widths, one-inch double-locked standing seams, and cleats installed at an average spacing of 9.5 inches on center with two ring-shank nails per cleat. Dkt. No. 101-1 at 2. Plaintiffs contend that Daybreak's original proposal called for cleats spaced twelve inches on center and that Plaintiffs negotiated for the closer 9.5-inch spacing to provide greater wind protection. Dkt. No. 88 ¶ 22; 89 ¶ 23; Dkt. No. 107 at 8. Daybreak disputes Plaintiffs' characterization of those negotiations. Dkt. No. 104 ¶ 22. Daybreak used cleats to secure the edges of the individual panels forming the triangular pans but did not install cleats where the pans met at the hip-ridge intersections. Dkt. No. 104 ¶¶ 30–31, 35, 37(a). The parties dispute whether the contract and incorporated standards required cleats at those intersections.

In 2014, Hoffmann Architects, Inc. ("Hoffmann") inspected portions of the Main House roof in connection with related litigation in Superior Court between the parties. Dkt. No. 89 ¶¶ 50–52; Dkt. No. 116-1 at 15:1–25. Arthur Sanders, Hoffmann's architectural director and Plaintiffs' architectural expert, testified that during the inspection the inspectors drilled out the rivets on a ridge cap, unlocked the overlapped portion of the ridge, and observed no cleats securing the intersection of the pans to the substrate. Dkt. No. 116-1 at 15:1–17. Sanders further testified that, the following day, the inspectors unfolded a portion of a standing seam on the west side of the roof and observed three cleats spaced approximately eight to ten inches apart.

*Id.* at 15:19–25. However, in a later declaration Sanders stated that the 2014 inspection involved opening a field seam and separately removing and replacing a short section of loose hip-ridge cap without opening the underlying hip seam. Dkt. No. 89 ¶¶ 50–52. Daybreak disputes that characterization and relies on its expert's opinion that the hip-ridge seam later identified as damaged was the same hip-ridge seam opened during the 2014 inspection. Dkt. No. 103 at 4–5; Dkt. No. 105-9 at 10–11.

In September 2017, Hurricane Irma struck the Virgin Islands. Dkt. No. 104 ¶ 3(a). In February 2018, Plaintiffs retained Hoffmann to inspect and document the condition of the roofs at the property. Dkt. No. 89 ¶ 6. Sanders reported that the caps covering the Main House hip-ridge lines were loose and disturbed and that the roof exhibited "uplift/displacement at ridges." Dkt. No. 89 ¶ 8; Dkt. No. 89-2 at 5. On February 24, 2019, Richard Barabas, Dahill's project manager, traveled to the property to perform temporary roof repairs, investigate an open seam, investigate an ongoing leak, and obtain measurements for a permanent repair. Dkt. No. 91-5 at 10:14–11:5. Barabas testified that an approximately thirty-foot section of a hip seam on the Main House was open and that he and another worker removed the hip cap, documented the exposed seam, closed the seam, replaced the cap, and riveted through the layers of copper. *Id.* at 13:5–18. Barabas further testified that photographs of the opened seam showed missing cleats and rivet holes that penetrated the upper layer of copper but not the lower layer. *Id.* at 24:11–25:24; *see also* Dkt. No. 91-6 at 2–4.

The parties also offer competing evidence concerning the meaning of the incorporated technical materials. Revere states that standing-seam roofing is secured to the structure by cleats worked into the seams and directs that ridges and hips be constructed as specified for the standing seams of the main roof. Dkt. No. 89-4 at §§ 3.A.2, 3.A.8–3.A.9. SMACNA provides

spacing and fastening specifications for cleats used in standing-seam roofing and includes a construction detail depicting a cleat at a hip or ridge. Dkt. No. 89-5 at 6.1–6.2, 6.14–6.16. Sanders interprets those materials as requiring cleats within the hip-ridge seams and opines that the roof's batten configuration permitted cleats to be installed there. Dkt. No. 89 ¶¶ 15–21, 38, 43–45. Daybreak's project manager, Micah Cady, testified that Daybreak did not install cleats at the hips because, in his view, cleats were neither customary nor required at those locations, and he interpreted SMACNA as presenting an optional construction method. Dkt. No. 91-4 at 25:20–26:12. Daybreak's roofing expert, Joseph Bragg, acknowledged that the SMACNA detail depicts a cleat along a hip ridge but interpreted Revere and the 9.5-inch spacing provision differently. Dkt. No. 91-8 at 77:21–78:2, 112:19–113:10; Dkt. No. 105-9 at 26–30. Barry Huber likewise acknowledged that the contract required cleats at an average spacing of 9.5 inches on center and agreed, in response to a hypothetical question, that leaving areas several feet long without cleats would contravene the contract. Dkt. No. 91-1 at 20:4–21:13. The hypothetical, however, did not identify the hip-ridge seams or ask whether the spacing provision applied there. *Id.*

Sanders opines that the absence of cleats left the hip-ridge seams unsecured, that the condition became apparent when Hurricane Irma subjected the roof to high winds, and that installing cleats now would require removing the existing copper pans, which likely could not be reinstalled without damage. Dkt. No. 89 ¶¶ 2–8, 49–54. Bragg, by contrast, concludes that the roof does not exhibit lifting, buckling, displaced panels, clip failure, or other conditions he associates with wind-uplift failure. Dkt. No. 105-9 at 3–6. He further testified that, although repairs would be invasive, the seams could potentially be opened and cleats or another attachment system installed without replacing the entire roof. Dkt. No. 91-8 at 80:15–82:8.

Bragg did not prepare and had no estimate of the cost to repair or replace the Main House roof. *Id.* at 86:4–7.

The Hoffmann storm-damage report documented damage to more than eighty Main House panels and recommended replacement of the Main House roof. Dkt. No. 89-2 at 2, 6–7. The report's broader estimate also included work on other structures at the property. Dkt. No. 89-3 at 22–24. Sanders estimates that ninety-five percent of the copper and labor costs were attributable to the Main House, while Daybreak disputes that allocation as speculative. Dkt. No. 89 ¶ 55; Dkt. No. 104 ¶ 59. Plaintiffs' economic expert, Laura Fuchs Dolan, updated the copper-material and labor components of the estimate and calculated a present-value economic loss of $666,964 in 2025 and $719,792 in 2026, excluding a previously included $30,000 report cost. Dkt. No. 92 ¶¶ 5–7; Dkt. No. 92-3.

**A. Plaintiffs' Position**

Plaintiffs seek summary judgment on their sole claim for breach of contract. They contend that the contract and incorporated Revere and SMACNA standards required Daybreak to install cleats at all standing seams, including the Main House hip-ridge seams, at an average spacing of 9.5 inches on center. Dkt. No. 87 at 6–15, 19–22; Dkt. No. 107 at 1–3, 8–9. Because Daybreak did not install cleats at the hip-ridge seams, Plaintiffs contend that Daybreak failed to provide the roof required by the contract. Dkt. No. 87 at 19–22; Dkt. No. 107 at 2–3.

Plaintiffs ask for $719,792, which they allege is the cost of replacing the Main House roof. Dkt. No. 87 at 22–24; Dkt. No. 107 at 12–13. They clarify that they do not seek compensation for damage caused by Hurricane Irma. Rather, Plaintiffs contend that the hurricane revealed the alleged deficiency when a hip-ridge seam opened and that replacement is necessary because

the existing roof cannot be retrofitted with the allegedly required cleats without removing the copper pans. Dkt. No. 107 at 3–4, 8–10, 12–13.

**B. Defendant's Position**

Daybreak disputes Plaintiffs' interpretation of the contract and incorporated industry standards. It contends that the 9.5-inch cleat-spacing requirement applies to the standing seams forming the field panels and does not require cleats at the hip-ridge intersections. Dkt. No. 103 at 1–3; Dkt. No. 104 ¶¶ 2(c), 24, 29, 31. Daybreak further maintains that Revere and SMACNA permit other construction methods at those locations. Dkt. No. 103 at 3; Dkt. No. 104 ¶¶ 24, 29, 31; Dkt. No. 105-9 at 26–30.

Daybreak also disputes that the alleged absence of cleats caused Plaintiffs' claimed loss. Dkt. No. 103 at 1–2, 10–12. It relies on expert evidence that the roof does not exhibit conditions associated with wind-uplift failure and contends that the roof's condition may instead be attributable to Hurricane Irma, debris impacts, the roof's design and geometry, or the prior opening and reassembly of a portion of the roof during the 2014 inspection. Dkt. No. 103 at 2, 10–12; Dkt. No. 105-9 at 3–6.

Daybreak separately moved for summary judgment on Plaintiffs' breach of contract claim. Dkt. No. 93. In a separate Report and Recommendation, this Court recommended that Daybreak's Motion be granted on the ground that Plaintiffs' claim is barred by claim preclusion. *See* Dkt. No. 149. Specifically, this Court concluded that the Superior Court's dismissal with prejudice constituted a valid, final judgment on the merits, that the parties were the same in both actions, and that Plaintiffs' present breach of contract claim arose from the same transaction or occurrence as their Superior Court Counterclaim. *Id.* at 149. If the District Judge adopts that Report and Recommendation, he need not reach the merits of Plaintiffs' Motion for

Summary Judgment. However, if the District Judge does not adopt this Court's Report and Recommendation granting Daybreak's Motion for Summary Judgment based on claim preclusion, out of an abundance of caution, this Court will now address Plaintiffs' Motion for Summary Judgment on the merits.

**DISCUSSION**

## I. Summary Judgment Standard

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual dispute is genuine when the evidence would permit a reasonable factfinder to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether a fact is material depends on the substantive law governing the claim; only disputes concerning facts that could affect the outcome of the action preclude summary judgment. *Id.*

In considering a motion for summary judgment, the Court does not determine which party's evidence is more persuasive. Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts remain functions of the factfinder. *Id.* at 255. The Court therefore must believe the nonmoving party's evidence and draw all justifiable inferences in that party's favor. *Id.*

The moving party bears the initial burden of identifying the basis for summary judgment and demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. A failure of proof concerning an essential element on which a party bears the burden at trial renders the remaining facts immaterial. *Id.* at 322–23. Where, as here, Plaintiffs seek summary judgment on a claim for which they bear the burden of proof, the evidence must be sufficiently

one-sided that a reasonable factfinder could not find for Daybreak on an essential element of that claim. *See Anderson*, 477 U.S. at 251–52 (explaining that summary judgment turns on whether the evidence presents sufficient disagreement to require submission to the factfinder or is so one-sided that one party must prevail as a matter of law).

The substantive law governing Plaintiffs' claim therefore determines the facts that Plaintiffs must establish without a genuine dispute. If the record would permit a reasonable factfinder to find for Daybreak on an essential element of Plaintiffs' breach-of-contract claim, Plaintiffs are not entitled to summary judgment.

## II. Preliminary Matters

In opposing Plaintiffs' Motion for Summary Judgment, Daybreak relied on an uncertified copy of Arthur Sanders's March 6, 2015 deposition transcript. Dkt. No. 105-3. Plaintiffs objected that the transcript was unauthenticated and constituted inadmissible hearsay. Dkt. No. 111. Daybreak thereafter filed a certified copy of the same transcript at Dkt. No. 116-1. Plaintiffs objected to that filing as untimely and prejudicial because Daybreak filed it after the close of summary-judgment briefing. Dkt. No. 119. Daybreak responded that the certified transcript contains the same testimony as the previously filed copy and differs only by the addition of the court reporter's certification. Dkt. No. 120 ¶¶ 3–5.

Federal Rule of Civil Procedure 56(c)(2) permits a party to lodge an objection that material cited at summary judgment "cannot be presented in a form that would be admissible in evidence." At summary judgment, however, the Court may consider evidence that the proponent can present in admissible form at trial. *See Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016). Rule 56(e)(1) also permits the Court, when a party fails to properly support an assertion of fact, to "give an opportunity to properly support or

address the fact." Fed. R. Civ. P. 56(e)(1); *see also Pittsburgh Metro Area Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 938 F. Supp. 2d 555, 570 (W.D. Pa. 2013) (considering evidence challenged as inadmissible where the proponent could present the evidence in admissible form at trial).

Here, Daybreak corrected the authentication deficiency by filing the certified transcript at Dkt. No. 116-1. Daybreak represents that the certified transcript contains the same testimony as the previously filed copy, and Plaintiffs identify no substantive difference between the two versions. *See* Dkt. No. 119; Dkt. No. 120 ¶¶ 3–5. The certification therefore does not alter Sanders's testimony or introduce new substantive evidence. Because Daybreak can present Sanders's testimony in admissible form at trial, the Court will consider the certified transcript at Dkt. No. 116-1 in resolving Plaintiffs' Motion for Summary Judgment. Accordingly, the Court overrules Plaintiffs' objection to Daybreak's supplemental filing, Dkt. No. 119, and denies as moot Plaintiffs' authentication objection to the superseded uncertified transcript, Dkt. No. 111.

## III. Breach of Contract

Under Virgin Islands law, a plaintiff asserting a breach-of-contract claim must establish "(1) an agreement; (2) a duty created by that agreement; (3) a breach of that duty; and (4) damages." *Phillip v. Marsh-Monsanto*, 66 V.I. 612, 620–21 (2017). The duties imposed on a contracting party arise from the agreement itself. *See Sunshine Shopping Ctr., Inc. v. LG Elecs. Panama*, No. 15-cv-00041, 2022 U.S. Dist. LEXIS 245672, at *12–16 (D.V.I. Nov. 1, 2022). The scope of a contracting party's duties is determined by the express terms of the parties' agreement. *Id.* at *13–16 (D.V.I. Nov. 1, 2022).

In interpreting a contract, the Court seeks to ascertain the parties' objectively manifested intent. *Sunshine Shopping Ctr., Inc. v. Kmart Corp.*, 85 F. Supp. 2d 537, 540 (D.V.I.

2000) (hereinafter *Kmart Corp.*). A contractual provision is ambiguous when it is susceptible to two reasonable alternative interpretations. *Id.* If the written terms can reasonably be read only one way, the Court may interpret them as a matter of law. *Id.* If the contractual language is ambiguous, its meaning may require resolution by the factfinder in light of relevant extrinsic evidence. *Id.* The Court considers the agreement as a whole, as well as the alternative interpretation advanced and the nature of the objective evidence supporting that interpretation. *Id.*

**A. Scope of Daybreak's Contractual Duty**

The parties agree that the May 7, 2010 contract governed Daybreak's installation of the Main House roof. They also agree that the contract required Daybreak to install a red-copper standing-seam roof system in accordance with Revere and SMACNA and required cleats at an average spacing of 9.5 inches on center. Their dispute concerns the scope of that requirement—specifically, whether the contract required Daybreak to install cleats at the Main House hip-ridge seams.

The contractual language and incorporated standards provide support for Plaintiffs' interpretation. Revere states that standing-seam roofing is secured to the structure by cleats worked into the seams and directs that ridges and hips using standing seams be constructed as specified for the standing seams of the main roof. Dkt. No. 89-4 §§ 3.A.2, 3.A.9. SMACNA likewise specifies cleat spacing for standing-seam roofing and includes a construction detail depicting a cleat where panels or pans form a hip or ridge. Dkt. No. 89-5 §§ 6.1–6.2, 6.14–6.16. Plaintiffs' expert, Arthur Sanders, reads those provisions together as requiring cleats at the hip-ridge seams and opines that the Main House battens permitted Daybreak to install those cleats at 9.5 inches on center. Dkt. No. 89 ¶¶ 18–21, 38.

Daybreak offers evidence supporting a different interpretation. Its project manager, Micah Cady, testified that Daybreak installed the 9.5-inch-spaced cleats along the body of the panels but did not install cleats at the hip-ridge junctures because, in his view, Revere did not require them and SMACNA presented such cleating as an optional construction method. Dkt. No. 91-4 at 25:20–29:1, 39:24–40:3, 44:6–8. Daybreak's roofing expert, Joseph Bragg, likewise distinguishes the field-panel attachment from hip-ridge construction. Although Bragg testified that SMACNA indicates cleats along the hip ridge, he testified that Revere does not require them there and opined that the contract's 9.5-inch spacing requirement applies to the vertical field-panel attachment rather than the hip-ridge configuration. Dkt. No. 91-8 at 113:2–10; Dkt. No. 105-9 at 11. In his expert report, Bragg further opines that the contract's 9.5-inch spacing requirement applies to the vertical field-panel attachment and that industry practice treats hip-ridge attachment as a separate configuration. Dkt. No. 105-9 at 11.

Because Plaintiffs bear the burden of proving the scope of Daybreak's contractual duty, summary judgment is appropriate only if no reasonable factfinder could conclude that the contract imposed a different duty than the one Plaintiffs assert. *See Anderson*, 477 U.S. at 251–52; *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003). The contract itself does not expressly state whether the 9.5-inch cleat-spacing requirement applies at the hip-ridge seams. Plaintiffs derive that obligation from the interaction between the contract and the incorporated Revere and SMACNA standards. Although those standards provide support for Plaintiffs' interpretation, Daybreak has presented evidence supporting a different construction of the same requirements. *See supra.* Considering the contractual language, the incorporated standards, and the evidence concerning their application, a reasonable factfinder could accept either interpretation. *See Kmart Corp.*, 85 F. Supp. 2d at 540; *Sunshine Shopping*, 2022 U.S. Dist. LEXIS

245672, at *13 n.10. The agreement is therefore ambiguous as to whether Daybreak was required to install cleats at the hip-ridge seams. *See Kmart Corp.*, 85 F. Supp. 2d at 540 (explaining that a contractual provision is ambiguous when it is susceptible to two reasonable alternative interpretations).

When contractual language is ambiguous, its meaning may require resolution by the factfinder in light of relevant extrinsic evidence. *See Kmart Corp.*, 85 F. Supp. 2d at 540. Here, the parties offer conflicting evidence concerning industry practice and the application of the incorporated technical standards to the hip-ridge seams. The competing evidence concerning the scope of the cleat requirement would permit a reasonable factfinder to determine that the contract did not require Daybreak to install cleats at the hip-ridge seams as Plaintiffs contend was required.

Because the parties' competing evidence leaves the scope of Daybreak's contractual duty unresolved, that issue ordinarily would be left to the factfinder. *See Kmart Corp.*, 85 F. Supp. 2d at 540; *Lieberman v. Corporacion Experienca Unica, S.A.*, 226 F. Supp. 3d 451, 464 (E.D. Pa. 2016). However, Plaintiffs contend that § 206 resolves the ambiguity in their favor as a matter of law because Daybreak supplied the contractual language. If Plaintiffs are correct, the Court may proceed to determine whether Daybreak breached that duty and whether Plaintiffs have established the remaining elements of their breach of contract claim. The Court therefore addresses Plaintiffs' § 206 argument before determining whether the unresolved scope of Daybreak's contractual duty precludes summary judgment.

**B. Plaintiffs' Section 206 Argument**

Plaintiffs rely on § 206 of the Restatement (Second) of Contracts, which provides that, "[i]n choosing among the reasonable meanings" of contractual language, the meaning that

operates against the party supplying the words is "generally preferred." Restatement (Second) of Contracts § 206. Plaintiffs contend that § 206 supplies a basis for resolving the disputed scope of Daybreak's contractual duty in their favor without submitting that issue to the factfinder. *See* Dkt. No. 107. Specifically, they argue that any ambiguity must be construed against Daybreak because Daybreak drafted the contract. *Id.* at 8. But the Supreme Court of the Virgin Islands has not expressly adopted the doctrine of *contra proferentem*, under which ambiguous contractual language is construed against the party that supplied it. *See Moody v. Hartford Fin. Grp., Inc.*, 513 F. Supp. 3d 496, 513 n.5 (E.D. Pa. 2021); *see also Caraballo v. People*, 75 V.I. 297, 311 (2021).

However, the District Court in *RLF Nazareth, LLC v. York RSG (International), Ltd.* conducted a *Banks* analysis of § 206 and concluded that *contra proferentem* is the soundest rule for the Virgin Islands. 2023 WL 6377637, at *5 n.10 (D.V.I. Sept. 30, 2023). In applying the doctrine, the court in *RLF Nazareth* specifically noted the absence of additional extrinsic evidence bearing on the ambiguous contractual term and concluded that, if the provision remained ambiguous, it would be construed against the drafter. *Id.*

The doctrine of *contra proferentem* does not require the Court to disregard the parties' contract as a whole or the evidence bearing on whether Daybreak was contractually obligated to install cleats at the hip-ridge seams. In the instant matter, the terms of the parties' contract were negotiated by the parties. To that end, the Court necessarily must consider that negotiation in determining whether the contract term at issue should be construed against Daybreak. *Barco Urban Renewal Corp. v. Housing Authority of City of Atlantic City* is instructive as to the role § 206 plays when the disputed contractual term was negotiated rather than imposed by one party. 674 F.2d 1001 (3d Cir. 1982). There, the parties negotiated the agreement with the assistance of counsel, and the party against whom the court ultimately

construed the disputed provision had participated in drafting the agreement. *Id.* at 1004, 1010. However, the Third Circuit did not resolve the dispute against that party based on drafting alone. *Id.* at 1008–10. Rather, it first examined the disputed provision together with the remainder of the contract and the relevant circumstantial evidence to determine the parties' intended bargain. *Id.* Only after considering that evidence did the court invoke § 206 as additional support for construing the provision against the party that had drafted the disputed provision. *Id.* at 1010.

Consistent with *Barco*, the Court considers the agreement as a whole and the relevant circumstances in assessing whether the parties' objectively manifested intent can be determined as a matter of law; interpretive tools, including § 206, are subordinate to that inquiry. *See Barco*, 674 F.2d at 1008–10. However, where extrinsic evidence is introduced to aid in interpreting an agreement, the parties' intent presents a question of fact unless the evidence and resulting inferences are uncontroverted. *Id.* at 1008; *see also Kmart Corp.*, 85 F. Supp. 2d at 540.

Here, the record contains evidence that the cleat-spacing provision was the subject of negotiation rather than a term merely imposed upon Plaintiffs by Daybreak. Plaintiffs themselves assert that Daybreak's original proposal specified cleats spaced twelve inches on center, that Plaintiffs negotiated for additional cleats spaced at 9.5 inches on center to provide greater wind protection, and that the additional cleats and tighter spacing increased the contract price. Dkt. No. 88 ¶ 22; Dkt. No. 89 ¶ 23; Dkt. No. 107 at 8. Daybreak disputes Plaintiffs' characterization of those negotiations, Dkt. No. 104 ¶ 22, but does not dispute that the final contract required cleats at an agreed average spacing of 9.5 inches on center. *Id.* ¶ 23. Thus, unlike *RLF Nazareth*, where no additional extrinsic evidence bore on the disputed provision,

the record here contains extrinsic evidence bearing on the parties' intended contractual obligation and supports competing inferences concerning the scope of that obligation.

Plaintiffs rely on the contract, the incorporated Revere and SMACNA standards, and Sanders's testimony to contend that cleats were required at the hip-ridge seams. Dkt. No. 89 ¶¶ 18–21, 38. Daybreak relies on Cady's and Bragg's testimony to contend that the cleats were only required for the field-panel seams and that the hip-ridge intersections constituted a separate construction configuration that did not require cleats. Dkt. No. 91-4 at 25:20–29:1, 39:24–40:3, 44:6–8; Dkt. No. 91-8 at 113:2–10; Dkt. No. 105-9 at 11.

Therefore, the parties disagree about whether cleats were required at the hip-ridge seams, and § 206 simply does not permit the Court to bypass that disputed evidence and select Plaintiffs' interpretation as a matter of law merely because Plaintiffs identify Daybreak as the party that supplied the disputed wording. As *Barco* demonstrates, § 206 operates within the broader inquiry into the parties' objectively manifested intent; it does not replace that inquiry. *See Barco*, 674 F.2d at 1008–10. Because the extrinsic evidence concerning the intended scope of the cleat-spacing requirement is controverted and supports competing reasonable inferences, determining whether the parties intended the 9.5-inch requirement to extend to the hip-ridge seams requires the fact finder to resolve those competing inferences. *See id.* at 1008; *Kmart Corp.*, 85 F. Supp. 2d at 540. The Court may not undertake that weighing of competing evidence on Plaintiffs' Motion for Summary Judgment. *See Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004).

Accordingly, § 206 does not establish Plaintiffs' interpretation of the contract as a matter of law. The scope of Daybreak's contractual duty—specifically, whether the parties intended the 9.5-inch cleat-spacing requirement to apply at the Main House hip-ridge seams—remains

genuinely disputed. Because the scope of Daybreak's contractual duty concerns an essential element of Plaintiffs' breach-of-contract claim, *see Phillip*, 66 V.I. at 620–21, Plaintiffs have not established that element as a matter of law and therefore are not entitled to summary judgment.

**CONCLUSION**

For the foregoing reasons, the undersigned Magistrate Judge hereby **RECOMMENDS** that Plaintiffs Thomas F. Friedberg and Sarah L. Bunge's Motion for Summary Judgment, Dkt. No. 86, be **DENIED AS MOOT** for the reasons stated in this Court's separate Report and Recommendation addressing Daybreak's Motion for Summary Judgment, Dkt. No. 149. Alternatively, if the District Judge does not adopt and approve the Report and Recommendation in Dkt. No. 149, the Court **RECOMMENDS** that Plaintiffs' Motion for Summary Judgment be **DENIED** because a genuine dispute of material fact remains concerning the scope of Daybreak's contractual duty.

Any objections to this Report and Recommendation must be filed in writing within fourteen (14) days of receipt of this notice, 28 U.S.C. § 636(b)(1), and must "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis of such objection." LRCi 72.3. Failure to file objections within the specified time shall bar the aggrieved party from attacking such Report and Recommendation before the assigned District Court Judge. *See, e.g., Thomas v. Arn*, 474 U.S. 140 (1985).

ENTER:

Dated: September 11, 2026

/s/ Emile A. Henderson III
EMILE A. HENDERSON III
U.S. MAGISTRATE JUDGE